**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD, DANIEL LOPER, WILLIS MCGAHEE, MICHAEL MCKENZIE, JAMIZE OLAWALE, ALEX PARSONS, ERIC SMITH, CHARLES SIMS, JOEY THOMAS, and LANCE ZENO, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | |
| vs. | |
| THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN; THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; THE BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN; THE DISABILITY BOARD OF THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; DENNIS CURRAN; JACOB FRANK; BELINDA LERNER; SAM MCCULLUM; ROBERT SMITH; JEFF VAN NOTE; and ROGER GOODELL, | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiffs Jason Alford, Willis McGahee, Daniel Loper, Michael McKenzie, Jamize Olawale, Alex Parsons, Eric Smith, Charles Sims, Joey Thomas, and Lance Zeno (collectively, "Plaintiffs"), on behalf of themselves and on behalf of the members of the proposed Class and Subclasses defined below, present this complaint against Defendants The NFL Player Disability & Survivor Benefit Plan and NFL Player Disability & Neurocognitive Benefit Plan (formerly, the Bert Bell/Pete Rozelle NFL Player Retirement Plan) (the "Plan"); the Plan's Administrator and

fiduciary, the Disability Board ("Board") and its members, Defendants Dennis Curran, Belinda Lerner, Jacob Frank, Sam McCullum, Robert Smith, and Jeff Van Note; and the Board's Chairman, National Football League ("NFL") Commissioner Roger Goodell (all collectively, "Defendants"), seeking redress for the wrongful denial of benefits, the denial of statutorily mandated full and fair review of benefits denials, violations of plan terms or governing regulations, and breaches of fiduciary duty.  Solely on behalf of the Plan itself, Plaintiffs present this complaint to seek removal of the Board's members by reason of their egregious and repeated breaches of fiduciary duties.

## I.  INTRODUCTION AND NATURE OF THE ACTION

1.      Plaintiffs are former National Football League ("NFL") football players who bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA"), against the Plan and its fiduciaries, including, but not limited to, the Plan's Administrator to recover benefits due under the terms of the Plan, to enforce their rights under the terms of the Plan, to clarify their rights under the terms of the Plan, to enjoin acts and practices that violate the terms of the Plan or ERISA, and, separately "to obtain other appropriate equitable relief" including, but not limited to, removal of the fiduciary, restitution, equitable surcharge, and other relief in connection with Defendants' repeated, willful, and systematic pattern of breaching their fiduciary duty of loyalty through affirmative misrepresentations, hostile and adversarial positions, bad faith, active concealment, and by otherwise failing to discharge their duties solely and exclusively in the interest of disabled retired NFL Players and their beneficiaries.

2.      Repeated lies; material misrepresentations; active concealment; flagrant violations of the ERISA statute, regulations, and case law; ever-shifting inconsistent and illogical interpretations of the terms of the Plan; and reliance on conflicted advisors have resulted in a pattern of systematic bias against disabled NFL Players— motivated by financial considerations

2

to limit the payment of benefits to the very Players whom the Plan was designed to help, as one court put it, as "compensation for investing themselves in the sport."

3.      In short, the Board's repeated hostility, continual objectively unreasonable conduct, particularly when considered in the aggregate, including as one court put it, "act[ing] as an adversary, not a fiduciary," an overly aggressive and disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics, as well as Defendants' systematic and repeated pattern and practice of breaches of fiduciary duties justify extraordinary relief.

4.      Plaintiffs seek to pull back the curtain on behalf of all similarly situated former NFL Players, bringing many relevant factual and legal issues concerning the Plan to light.  As the district court that recently reversed the Board's denial of benefits described, "[t]he curtain has been pulled back as to the inner workings of [the Board].  And what lies behind it is far from pretty with respect to how it handles disability benefit claims sought by former players[.]"  *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 3:20-CV-1277-S, 2022 WL 2237451, at *1, *130-32 (N.D. Tex. June 21, 2022) ("Behind the curtain is the troubling but apparent reality that these abuses by the Board are part of a larger strategy engineered to ensure that former NFL players suffering from the devastating effects of severe head trauma are not awarded Active Football benefits."), *appeal pending*, No. 22-10710 (5th Cir. appellee's br. filed Feb. 2, 2023).

5.      As described herein, "like many other former players suffering from the effects of head trauma" and other injuries and impairment(s), Plaintiffs and members of the proposed Class defined below were "forced to navigate a byzantine process in order to attempt to obtain those benefits, only to be met with denial."  *Id.* ("And in reaching its decision, the Board relied almost exclusively on compromised advisors, failed to consider important—let alone *all*—information in

Plaintiff's file, and shirked its fiduciary obligations under both ERISA and the Plan itself.").  As in *Cloud*, what will "become clear over the course of this litigation is that [Plaintiffs' and Class members'] claim[s] for disability benefits [were] wrongfully and arbitrarily denied in a process that lacked the procedural safeguards both promised by the benefits plan and required by law." *Id.* (explaining that "the Court's conclusion that the Board abused its discretion and did not provide a full and fair review on numerous bases—indeed, at nearly each step of the review process—is hardly unprecedented, and Plaintiff's allegations against Defendant and the Board are hardly unique. Dozens of former NFL players have lodged similar challenges, and the Court's findings echo the concerns already expressed by courts across the country.").

## II.    JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to Sections 502(a)(1)(B), (a)(2)-(3), (e)(1), and (f) of ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (a)(2)-(3), (e)(1), and (f), and 28 U.S.C. § 1331.

7.    Declaratory, equitable, and injunctive relief are authorized by 28 U.S.C. § 2201 and 2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

8.    This Court has personal jurisdiction over Defendants because they are located or transact business in, and have significant contacts with, this District, and because ERISA provides for nationwide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

9.    Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and 28 U.S.C. § 1391(b) and (c) because many, if not most, of the breaches and violations giving rise to Plaintiffs' claims occurred in this District.

### III.     PARTIES

10.     Plaintiffs, who are specifically identified and whose applications are discussed in paragraphs 73-252 below, are former NFL players and meet the Plan's definition of "Player."

11.     Plaintiffs are Plan "Participants," as defined by 29 U.S.C. § 1002(7).

12.     The Bert Bell/Pete Rozelle NFL Player Retirement Plan was a defined benefit pension plan and is also an employee welfare benefit plan, as defined by 29 U.S.C. § 1002(1)-(2). The Fair Market Value of Assets in the Plan as of March 31, 2015 was $1,809,624,966.

13.     The NFL Player Disability & Survivor Benefit Plan and NFL Player Disability & Neurocognitive Benefits Plan are employee welfare benefit plans, as defined by 29 U.S.C. § 1002(1).  For the Plan year ending March 31, 2019, the total additions to the Plan (i.e., Employer contributions plus interest income) equaled $182,681,069.  After deductions for benefits paid to participants as well as $17,783,557 in "Administrative expenses," the Plan had a net increase of $7,856,570, with $48,590,049 in net assets available at the end of year.  For the Plan year ending March 31, 2020, the total additions to the Plan equaled $212,906,940.  After deductions for benefits paid to participants as well as $20,436,655 in "Administrative expenses," the Plan had a net increase of $7,434,746, with $56,024,795 in net assets available at the end of year.

14.     In *Cloud*, a Board member testified that the Plan has "assets in excess of $9 billion."

15.     The Plan has its principal place of business located at 200 St. Paul Street, Suite 2420, Baltimore, MD 21202-2040.

16.     Defendant Board is the Administrator and fiduciary of the Plan, within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16), and is sued in its capacity as such.  The Board is composed of seven individuals—three selected by the National Football League Players Association ("NFLPA"), and three by the NFL Management Council (i.e., the team owners).

Defendant Roger Goodell, the NFL's Commissioner, is the seventh member of the Board and is its non-voting Chairman.

17.     Defendants Dennis Curran, Belinda Lerner, Jacob Frank, Sam McCullum, Robert Smith, and Jeff Van Note are the members of the Board, and are named in their capacities as such.

## IV.    FACTUAL ALLEGATIONS

### A.  Defendants' History of Parsimonious and Hostile Claims Processing, Adversarial and Biased Administration, Bad Faith, and Repeated Substantial Plan and ERISA Violations

18.     Federal courts across the country have been pulling back the curtain on Defendants' violations of ERISA, including a flagrant disregard of the full-and-fair review requirement, biased claims administration, a disturbing pattern of illogical and inconsistent interpretations to the detriment of participants, and other unscrupulous result-oriented decisions. Examples include:

a.  *Jani v. Bell*, 209 F. App'x 305, 317-20 (4th Cir. 2006) (finding Board's denial of Active Football T & P benefits to Hall of Fame Center "Iron Mike" Webster was an abuse of discretion and "indicates culpable conduct, if not bad faith");

b.  *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 19-cv-05360-JSC, 2022 WL 1786576, at *3 (N.D. Cal. June 1, 2022) (reasoning Board's hired Medical Advisory Physician's "opinion is not persuasive and is instead 'illogical' and 'implausible'"); *id.* (explaining "Board's decision is owed little deference" because Board's "course of dealing suggests an intent to deny [Player] benefits application regardless of the evidence. ... [Board did not] delv[e] into the record before it.  Instead, … Board 'simply adopted the opinions of its retained physicians by default.'  In so doing, the… Board showed an unreasonable bias in favor of Plan-selected physicians") (internal citations omitted); *Dimry v. Bert Bell/Pete*

6

*Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807, 818 (N.D. Cal. 2020) (discussing how Board "acted as an adversary, not a fiduciary"), *aff'd and remanded*, 855 F. App'x 332 (9th Cir. 2021);

c. *Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 593-95 (11th Cir. 2020) (finding arbitrary and capricious denial of benefits because "Board wholly failed to consider record evidence that contradicted the opinions of the Plan Neutral Physicians. The Board said it 'reviewed [the] entire file,' but that statement is belied by the record."); *id*. ("Because the Board failed to consider the combined effect of Mr. Mickell's many physical and mental impairments, it ignored an important consideration in the question of whether he was disabled.");

d. *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 266 (4th Cir. 2017) (court "reject[ed] the Plan's post-hoc argument that Solomon had to submit contemporaneous medical evidence. … Nowhere does the [Plan's] text require the player to submit 'contemporaneous medical evidence'[.] … In fact, we explicitly rejected this contemporaneous-evidence argument when the Plan raised it before this court more than a decade ago. … Stripped of the arbitrary restrictions on evidence it would consider, the Board provided no justification for denying …benefits, let alone substantial evidence for doing so.") (citing *Jani*, 209 F. App'x at 316-17);

e. *Brumm v. Bert Bell NFL Ret. Plan*, 995 F.2d 1433, 1434-39 (8th Cir. 1993) (Board abused its discretion by interpreting Plan to exclude cumulative injuries and furnishing notice inadequate under ERISA, and Plan's summary plan description violated ERISA);

f.   *Moore v. Bert Bell/Pete Rozelle NFL Ret. Plan*, 282 F. App'x 599, 601 (9th Cir. 2008) (Board's decision an unreasonable interpretation of Plan terms in absence of any vocational testimony that there was, in fact, specific job that plaintiff could perform given his substantial impairment);

g.   *Carter v. Bert Bell/ Pete Rozelle NFL Ret. Plan*, No. 11-BE-3821-KOB, 2012 WL 6043050, at *3 (N.D. Ala. Dec. 3, 2012) (Board unjustly denied benefits and failed to consider medical report submitted by Player);

h.   *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. ELH-12-634, 2013 WL 6909200, at *16-17, *26 (D. Md. Dec. 31, 2013) (Board abused discretion by acting inconsistent with Plan's terms; "Plan's latest rationale for denying… amounts to a 'Hail Mary' pass"; Board's interpretation unreasonable where it interpreted term in Plan to have different meanings); *id.* (Board unreasonably required self-reported symptoms to be supported by objective evidence although Plan's terms contain no such requirement);

i.   *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. WDQ-09-2612, 2012 WL 2374661, at *14-15 (D. Md. June 19, 2012) ("A 'reasoning mind' would not accept the undetailed reports" of the Board-hired physicians relied upon by the Plan "as 'sufficient to support a particular conclusion.'... [T]he Court concludes that the Defendants abused their discretion in denying … [higher] T & P benefits.");

j.   *In re Marshall*, 261 F. App'x 522, 526 (4th Cir. Jan. 2008) (per curiam) (Board abused its discretion and failed to fulfill its duty through unreasonable effort to determine onset date because it ignored findings favorable to Player in selecting

8

date of physician's examination as disability onset date);

k.    *Ashmore v. NFL Player Disability & Neurocognitive Benefit Plan,* No. 16-81710-CIV, 2018 WL 3424453, at *9 (S.D. Fla. June 15, 2018) ("no reasonable basis" for Board's denial which "defie[d] all reason and common sense");

l.    *Cloud*, 2022 WL 2237451, at *2 (Board "both failed to provide Plaintiff a full and fair review and abused its discretion when it denied Plaintiff's reclassification appeal").

### B.   <u>Background</u>

19.    The NFL is a highly profitable professional football league in the United States, with increasing global appeal playing in foreign countries, that garners the attention of millions of fans and viewers each week during the NFL season.

20.    Even after NFL rule changes for safety, the NFL is unable to prevent violent injuries from occurring during football activities. *See*, *e.g.*, "Bills issued this update on Damar Hamlin" (Jan. 3, 2023), https://www.buffalobills.com/news/bills-issued-this-update-on-damar-hamlin (last visited Feb. 8, 2023); Madeline Coleman, "Tua Tagovailoa Shares Frightening Details from Night of Concussion" (Oct. 19, 2022) https://www.si.com/nfl/2022/10/19/tua-tagovailoa-shares-frightening-details-from-night-of-concussion (last visited Feb. 8, 2023).

21.    Many former NFL players have turned to the Plan to determine whether they qualify for disability benefits. Defendants, however, have erected oftentimes insuperable obstacles to Players' efforts to obtain the benefits to which they are rightly entitled.

22.    Significant orthopedic disabilities are common for retired players. For example, 36.3% of Players report suffering from degenerative joint disease ("DJD") (i.e., osteoarthritis). Moreover, hamstring injuries are a considerable cause of disability in football. "Between 1989 and 1998, injury data were prospectively collected by athletic trainers for every NFL team and recorded

… Over the 10-year study period 1716 hamstring strains were reported." Furthermore, "[d]isc herniations represent a common and debilitating injury to the professional athlete." "A retrospective analysis was performed on all disc herniations to the cervical, thoracic, and lumbar spine during a 12-season period (2000-2012) using the NFL's surveillance database." "During the 12 seasons, 275 disc herniations occurred in the spine." The study concluded that "[d]isc herniations represent a significant cause of morbidity in the NFL." Moreover, "[s]houlder instability is a common injury in the NFL." "From 2012 through 2017, 403 missed-time shoulder instability injuries were documented in 355 unique players in the NFL over the full study period."

23.    In 2002, Dr. Bennet Omalu discovered Chronic Traumatic Encephalopathy ("CTE") during the study of former Pittsburgh Steeler Mike Webster's brain.  CTE has been determined to occur as a result of repeated head trauma and has been commonly linked to football play   A 2019 study led by Boston University studied the brains of 266 deceased NFL players and found that 223 of them had CTE.  Signs and symptoms of CTE include, but are not limited to, memory loss, attention and processing speed impairment, confusion, impaired judgment, visual spatial impairment, depression, language impairment, parkinsonism, suicidality, and progressive dementia. These symptoms often manifest years or even decades after a player's last brain trauma.

24.    During the first hearing before the House Judiciary Committee on the impact of head injuries sustained by NFL players, Representative Maxine Waters stated "I believe you are an $8 billion organization that has failed in your responsibility to the players.  We all know it's a dangerous sport. Players are always going to get injured.  The only question is, are you going to pay for it?"  In January 2010, the House Judiciary Committee held further hearings where Representative Linda Sanchez said: "I find it really ridiculous that he's saying that concussions don't cause long-term cognitive problems … I think most people you ask on the street would figure

that repeated blows to the head aren't good for you."

25.     According to the U.S. Centers for Disease Control and Prevention:

A concussion is a type of traumatic brain injury—or TBI—caused by a bump, blow, or jolt to the head or by a hit to the body that causes the head and brain to move rapidly back and forth.  This sudden movement can cause the brain to bounce around or twist in the skull, creating chemical changes in the brain and sometimes stretching and damaging brain cells.

… [T]he effects of a concussion can be serious.

26.     In 2011 and 2012, scores of former NFL players filed numerous lawsuits against the NFL, seeking damages for CTE symptoms stemming from concussive and sub-concussive NFL injuries.  The claims in those suits were all under state law, and the litigation was ultimately centralized as the multidistrict *In re National Football League Players' Concussion Injury Litigation*, No. 2:12-md-2323-AB (E.D. Pa.) ("*NFL Concussion*"), ultimately involving the claims of thousands of former NFL players.  In 2015, the court presiding over that litigation gave final approval to a groundbreaking class action settlement, providing for monetary awards and other relief.  The *NFL Concussion* settlement, however, specifically did not release settlement class members' claims relating to ERISA-governed Plan benefits under the Plan.

27.     Despite the frequency of degenerating football-linked impairments, Players do not receive lifetime medical insurance to care for the lifelong ailments from playing this violent sport.

**C.  The Plan and How It *Should* Operate**

28.     The Plan provides disability and related benefits to eligible NFL Players, including Plaintiffs and Class members. The Plan is jointly administered by employee and employer representatives and is a multi-employer plan as defined in 29 U.S.C. § 1002(37).

29.     An eligible Player (as defined in the Plan) who satisfies the terms of the Plan will receive Total and Permanent ("T & P") Disability benefits (Plan Art. 3 § 3.1 and Plan Art. 4 § 4.1 (formerly at Plan Art. 5 § 5.1)); Line of Duty ("LOD") Disability benefits (Plan Art. 5 § 5.1

11

(formerly at Plan Art. 6 § 6.1)); or Neurocognitive Disability ("NC") benefits (Plan Art. 6 § 6.1).

Between 2014 and 2016, an average of over 1,000 Retired Players applied for benefits each year.

### i.      The NFL Player Benefits Office

30.     The benefits application process involves the NFL Player Benefits Office, which is

in charge of the day-to-day administration of Plan benefits. All employees at the Benefits Office

are employed by Defendants.  When a Player applies for disability benefits, his "case" is assigned

to a benefits coordinator in the Benefits Office's disability group.

### ii.      The Disability Initial Claims Committee

31.     The Plan's Disability Initial Claims Committee ("the Committee") makes an initial

decision on Players' claims for disability benefits.  The Committee consists of three members, one

appointed by the NFL Management Council, one appointed by the NFLPA, and one who is the

Plan's Medical Director, jointly designated by the NFLPA and the NFL Management. If the

Management and NFLPA members are deadlocked with respect to a benefit entitlement decision,

the claim will be a "deemed denial" and represent the Committee's final decision. On cases that

are preliminarily "deemed denials" because of a medical disagreement between the other two

members, the Committee member who is a medical professional casts the deciding vote.  If the

Plan's Medical Director determines that the medical evidence is either inconclusive or insufficient,

he or she abstains from voting.

32.     The terms of the Plan state that the Committee members will review *all* facts and

circumstances in the administrative record before rendering a decision.

### iii.      The Disability Board

33.     Players may appeal Committee decisions to the Plan's Disability Board ("the

Board").  The Board may not accord any deference to the determination of the Committee or its

advisors.

34.     The Board is the Plan's named fiduciary within the meaning of ERISA Section 402(a)(2), 29 U.S.C. § 1102(a)(2), and is responsible for implementing and administering the Plan.

35.     As required by federal law and the Plan, the Board's review of an adverse determination must take into account *all* available information, irrespective of whether that information was presented or available to the Committee. Also, the Plan states that Board members must review all facts and circumstances in the administrative record before rendering a decision.

36.     Commenting on proposed federal regulations on behalf of the Plan, in a December 2016 letter to the U.S. Department of Labor, the Board's own lawyers at Groom Law Group, Chartered ("Groom") represented that the Board *knew* that:  (i) "[t]he decision-making fiduciaries of the Plan must not only carefully apply all of these rules, they must do so while reviewing voluminous records. It is typical for a claimant to submit hundreds or thousands of pages of documents, including their entire college and NFL medical records"; and (ii) "[t]he bottom line is that these decisions require careful analysis."

37.     The Board must adhere to its fiduciary duties and its decisions must be reasoned, principled, logical, consistent with the plain language of the Plan, supported by substantial evidence to support its conclusion, consistent with prior interpretations, and consistent with the intent of the Plan.  Moreover, although the Plan grants the Board broad discretion to interpret, control, implement, and manage the Plan, including discretionary authority to decide claims for benefits, the Board does not have discretion to act in violation of the law and does not have unfettered discretion to deny benefits.

38.     As noted above, the six voting members of the Board are three members appointed by the NFL Management Council and three members appointed by the NFLPA.  In addition, the

Board's non-voting member (and its honorary Chairman) is the NFL Commissioner.  Pursuant to Section 9.1 of the Plan, "either the Commissioner or, in his absence, his designee, will preside at all meetings of the Board."  The Commissioner's duties are limited to those specified  in the Plan.

### iv.     Board-Hired and Board-Paid Allegedly "Neutral Physicians"

39.     "Neutral Physician" is defined in the Plan as "the health care professional(s) designated under Section 12.3." Section 12.3 states that "[t[he Disability Board will maintain a network of Neutral Physicians to examine Players who apply for benefits under this Plan."[1]

40.     The duties of a Plan-described "Neutral Physician" include the duty to provide complete reports on the Player's disability (or disabilities) as necessary for the Committee or Board "to make an adequate determination" on the Player's benefits claim. Moreover, Section 12.3 provides that "[t]he NFLPA and [NFL] Management Council will jointly designate[] such Neutral Physicians. Any Neutral Physician so designated by the NFLPA and Management Council will serve until the earliest of (1) the death, disability or retirement of the Neutral Physician, (2) the NFLPA and Management Council jointly remove and replace the Neutral Physician, or (3) thirty days after either the NFLPA or Management Council gives written notice of the Neutral Physician's removal to the other party, the Neutral Physician, and the Disability Board."

41.     The Plan, however, does not contain other procedures to ensure that Plan represented "Neutral Physicians" are indeed impartial and unbiased.  The Plan also does not contain other procedures to ensure affirmative steps that can be taken to reduce bias and promote accurate claims determinations, such as maintaining records of the findings of its allegedly "Neutral Physicians" on claims to show their neutrality in practice; maintaining management

---

[1] For the sake of brevity and simplicity, references throughout to "physicians" or "Neutral Physicians" in general also encompass Plan-hired neuropsychologists, even though the latter are not, strictly speaking, physicians.

checks on the statistics of rate of claims denied or granted by individual "Neutral Physicians";  or conducting substantive audits of claims, the claims process and all support experts, such as physicians,  who potentially impact the outcome of claims.  In fact, the Board has specifically declared that it does not maintain statistics of the rate of findings of disability by its designated physicians.  Furthermore, the Plan provides no other penalties for inaccurate or inadequate decision-making by Plan-declared "Neutral Physicians."

42.     These "Neutral Physicians" are selected and paid by the Board, which consistently, repetitively, and affirmatively touts and refers to these physicians as "Neutral Physicians."  For example, the Board repeatedly assures Players in decision letters that it has "no doubt" that Board-hired physicians are "Neutral" and without bias against Players.

43.     Players frequently rely on the information conveyed to them in decision letters, such as when deciding whether to (i) file an appeal of an adverse decision, (ii) bring an ERISA lawsuit to challenge a final benefits decision, or (iii) pursue medical care for their conditions.

44.     The Plan states that if three or more voting members of the Board conclude that a medical issue exists as to whether a Player qualifies for a benefit under the Plan (such as where physician reports are in conflict or ambiguous), the Board's members may submit the issue to a "Medical Advisory Physician" ("MAP") for a final and binding determination.  Also, the Player may be required to attend additional examinations by Neutral Physicians, including MAPs.  In the case of Neurocognitive Disability benefits (described below), the determination will be based on the written evidence in the Player's file and does not involve a new examination by an MAP.

45.     If a Player's claim is sent to an MAP, the MAP will have discretion to decide the medical issue. In all other respects, including the interpretation of this Plan and whether the claimant is entitled to benefits, the Plan states that the Board will retain its full discretion.  If there

is a question as to whether the MAP properly applied the terms of the Plan, such as with respect to the standards for Line of Duty benefits (defined and described below), the Board has the right and duty to bring such questions to the attention of the MAP. Under the Plan, after all such questions have been addressed, the MAP's ultimate decision is final and binding on the Board.

### D.  **Benefits under the Plan**

46.     The Plan provides for several categories of disability benefits, as described below.

### i.  **Total & Permanent Disability Benefits**

47.     An Article 3 (or Article 4, depending on which version of the Plan applies to the Player) Eligible Player (as defined in the Plan) is entitled to Total and Permanent ("T & P") disability benefits if the Board finds that (1) "he has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment" and (2) such condition is permanent (the "General Standard").

48.     The T & P General Standard contains exceptions. "The educational level and prior training of a Player will not be considered in determining whether such Player is" T & P disabled. "A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit … merely because: such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated with a charitable organization, is employed out of benevolence, or receives up to $30,000 per year in earned income." "A disability will be deemed to be 'permanent' if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period."

49.     There are different categories of T & P benefits:  (i) Active Football; (ii) Active Nonfootball; (iii) Inactive A; and (iv) Inactive B.  These categories are defined in the Plan and pay different amounts to Players who are eligible for them to compensate Players for having invested

their bodies and brains in the sport. Active Football pays $265,000 per year, Active Nonfootball pays $165,000 per year, Inactive A pays $135,000 per year, and Inactive B pays $65,000 per year.

50.     For Active Football benefits, the Plan states:  "Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) his disability(ies) arises out of League football activities while he is an Active Player, and causes him to be totally and permanently disabled, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within 18 months after he ceases to be an Active Player." In prior versions of the Plan, the definition of Active Football required that the disability or disabilities have rendered the Player totally and permanently disabled (within the meaning of the Plan) shortly after the disability or disabilities first arose.

51.     According to the district court in *Cloud*, out of the thousands of former Players who filed applications for benefits, a mere *30* Players currently receive Active Football T & P benefits.

52.     The difference between Active Football as opposed to Active Nonfootball T & P disability is that the former must "arise out of League football activities."

53.     "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season or post-season game, or *any combination thereof* or out-of-League football activity supervised by an Employer, including all required or directed activities. "Arise out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

54.     For Inactive A benefits, the Plan states:  "Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) the Player does not qualify for

benefits in categories (a) [Active Football] or (b) [Active Nonfootball] above, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within fifteen (15) years after the end of his last Credited Season.  This category does not require that the disability arise out of League football activities." Section 3.5 of the Plan states with respect to "Psychological/Psychiatric Disorders" that "[a] payment for [T & P] as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 3.4(b) [Active Nonfootball], Section 3.4(c) [Inactive A], or Section 3.4(d) [Inactive B], except that a [T & P] disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 3.4(a) [Active Football] if the requirements for [T & P] are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for Plan T&P benefits under Section 3.4(a) [Active Football]."

55.     With one exception, Players who receive Social Security disability ("SSD") will also be deemed T & P disabled under the current Plan.[2]

56.     For a Player to receive T & P benefits under the General Standard, at least one Plan selected Physician must find that the Player is T & P disabled.

---

[2] Beginning in 2024, however, SSD determinations will no longer be accepted in lieu of the General Standard and Players who received Inactive A T & P disability benefits by reason of a SSD determination will be subject to a continuation examination by a Board-hired physician between 2024 and 2026 to maintain their benefits.

### ii.  Line-of-Duty Disability Benefits

57.     A Retired Player is entitled to Line-of-Duty ("LOD") benefits if the Player incurred a "substantial disablement" "arising out of League football activities."  A "substantial disablement" either (1) rates at least 10 points, or for applications received on and after April 1, 2020, is rated at least 9 points, on the Point System appended to the Plan; (2) "[i]s the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system"; or (3) meets other requirements listed in the Plan.  "Arising out of League football activities" is defined the same for T & P and LOD benefits eligibility.  The Point System replaced a system of impairment percentages used in the past to determine Players' LOD benefits eligibility.

58.     Points for impairments are specifically enumerated in the Plan (e.g., "Symptomatic Shoulder Instability" is worth three Points).  Recently, the standard for LOD eligibility changed.  Article 60, Section 8(e) of the Collective Bargaining Agreement ("CBA") dated March 15, 2020 states:  "With respect to applications received on or after April 1, 2020, a 'substantial disablement' is a 'permanent disability' other than a neurocognitive, brain-related neurological (excluding nerve damage) or 'psychiatric impairment.'"  Previously, Players could apply for and receive LOD benefits for a major functional impairment of the brain (e.g., post-concussion syndrome).

59.     For a Player to receive LOD benefits, at least one Plan Neutral Physician must find that the Player meets these requirements, except that, for applications received on or after April 1, 2020, a Player who submits sufficient medical records to establish that he has a "substantial disablement" as determined by the Board will not be subject to an evaluation by a Plan Physician.

### iii.  Neurocognitive Disability Benefits

60.     Neurocognitive Disability ("NC") benefits were created in 2011.  A Player will be entitled to NC benefits if he has a "mild neurocognitive impairment," which is a "mild objective

impairment in one or more domains of neurocognitive functioning which reflect acquired brain dysfunction, but not severe enough to interfere with his ability to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit."

61.     A Player may also be entitled to NC benefits if he has a "moderate neurocognitive impairment," which is a "mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations in order to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit."

62.     A Player may qualify for NC benefits even if his impairment does not arise out of League football activities. If an impairment, however, results primarily from psychological/psychiatric conditions, such as depression, a Player is not entitled to NC benefits.

63.     For a Player to receive NC benefits, at least one Plan Neutral Physician must find that the Player has a mild or moderate neurocognitive impairment.

64.     According to a 2018 NFLPA Former Player Benefits Overview document, only 124 Retired Players were receiving NC benefits.

**E.  Defendants' Fiduciary Duties Under ERISA**

65.     Based on Section 404(a)(1)(B) of ERISA, 29 U.S.C. § 1101(a)(1)(B); caselaw precedent; and the plain language of the Plan itself (specifically, Section 9.8), the Committee and the Board have fiduciary duties, including, among other duties, the duty of loyalty, which is the "highest known to the law," and the duty of care, to make its decisions "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

20

66.     Additionally, Section 404(a)(1) of ERISA, 29 U.S.C. § 1104(a)(1), imposes higher-than-marketplace standards of conduct on Defendants in their management and administration of the Plan. Rooted in trust law, ERISA and the Plan set forth a special fiduciary duty of loyalty standard upon the fiduciaries; namely, that Defendants must discharge their duties with respect to the Plan and discretionary claims processing solely and exclusively in the interests of the Players and their beneficiaries. As part of its fiduciary duty of loyalty, the Board has a duty to deal fairly and honestly with Players, and to convey complete and accurate information to Players and beneficiaries.

## F.  Additional Requirements for Claim Consideration

67.     For T & P disability benefits, caselaw precedent dictates that the Board must consider the cumulative impact and combined effects of all of a claimant's impairment(s), rather than each impairment or type of impairment "in silo."

68.     Also, the Plan does not require objective medical evidence to support a disability claim.  In 2022, a court held that it is unreasonable for the Board to reject a Player's undisputed and reliable self-reported evidence when Plan terms do not limit proof to objective evidence.

69.     Moreover, ERISA-implementing regulations require the Board to provide a "full and fair review" of an appeal of an adverse benefits determination, which includes taking "into account all comments, documents, records, and other information submitted by the claimant and relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination."  29 C.F.R. § 2569.503-1(h)(1)(iv).  Furthermore, the Board must engage in "a meaningful dialogue" with Players and their beneficiaries.

70.     Under federal regulations, the Plan "must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision.  Accordingly, decisions regarding

hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the individual will support the denial of benefits."  29 C.F.R. § 2560.503-1(b)(7).

### G.  **Summary Plan Description**

71.     The Summary Plan Description ("SPD") of the Plan is governed by ERISA implementing regulations, which provide, in pertinent part:

> All [statements of ERISA rights and additional explanatory and descriptive] information shall be written in a manner calculated to be understood by the average plan participant[.] … Inaccurate, incomprehensible or misleading explanatory material will fail to meet the requirements of this section.

29 C.F.R. § 2520.102-3(t)(1).

72.     The 2019 SPD represented that:  (i) "In making its decision on review, the … Board will take into account all available information, regardless of whether it was available or presented to the … Committee, and will afford no deference to the determination made by the … Committee."; (ii) "This decision will be made by reviewing your application, any supporting documents that you provide, neutral physician report(s), and any records in your file."; (iii) "The Committee and/or the … Board … carefully reviews each application, and makes a decision on an individual basis"; and (vi) "The Committee will consider all of the elements of your application." The word "neutral" is used 38 times in the SPD when referencing Board-hired physicians.

### H.  **Plaintiffs' Applications for Benefits**

**Plaintiff Lance Zeno**

73.     Plaintiff Lance Zeno is a resident of Huntington Beach, California.

74.     Plaintiff Zeno played the particularly vulnerable position of center in the NFL.  Not surprisingly, he suffered multiple concussions and head trauma from football activities.

22

75.     Plaintiff Zeno applied for NC benefits on September 17, 2020.

76.     Plaintiff Zeno was evaluated by Board-selected and Board-paid neuropsychologist Dr. Dean Delis. The Board has paid Dr. Delis at least $1,105,120 in compensation, including at least $617,000 from April 1, 2017 through March 31, 2021.

77.     In a sample of 66 total benefit conclusions that he rendered, Dr. Delis concluded that 92.42% of the Players were not entitled to the applied-for benefit.  This sample of 66 Player evaluations by Dr. Delis includes a 100% T & P denial rate, involving 22 T & P evaluations rendered by Dr. Delis, and a 100% LOD denial rate, involving 14 evaluations that he rendered.

78.     Dr. Delis was the Board's third highest paid neuropsychologist from April 1, 2018 through March 31, 2019.  Combining the total T & P statistics in the sample for the Board's three highest-paid neuropsychologists from 2018-19, Drs. Delis, Sutapa McNasby, and Stephen Macciocchi, overall there was not a *single* Player out of 36 total Players evaluated by these three neuropsychologists whom they found to qualify for T & P benefits.

79.     The Board knows that, having collected more than $1.1 million from the Plan, Dr. Delis benefits financially from doing repeat business with the Board.  It follows that the Board knows that Dr. Delis has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, that he will render reports upon which the Board may rely in justifying its decision to deny benefits to a Plan participant.

80.     The Board has not removed Dr. Delis from its network of Neutral Physicians.

81.     Dr. Delis has authored and co-authored publications that downplay the effects of traumatic brain injuries or attempt to shift those effects to other non-cognitive causes.  For example, a 2011 publication co-authored by Dr. Delis concluded that the authors' "findings suggest that, among individuals in early recovery from mild to moderate TBI, self-reported

depressive symptoms, rather than patients' cognitive complaints, are associated with objective executive function." Not surprisingly, in 2011, the Board hired Dr. Delis to evaluate cognitive impairments.

82.     As was the case with many Players whom he evaluated, Dr. Delis concluded that Mr. Zeno is not entitled to the NC benefit.  Dr. Delis' report concerning Plaintiff Zeno contained numerous inconsistencies.  For example, Dr. Delis' conclusion was that Mr. Zeno showed "no" evidence of even mild acquired neurocognitive impairment. Several of Mr. Zeno's test scores however, were described by other Board physicians for other Players (as well as Board physicians on Plaintiff Zeno's appeal) as showing mild impairments.  Moreover, although he downplayed the significance of even his own tests results demonstrating mild impairments on specific tests, Dr. Delis inconsistently explained in another report that those specific tests are "sensitive to acquired brain damage."

83.     According to Dr. Delis, Mr. Zeno's "only risk factor for having permanent, acquired neurocognitive impairment appears to be the multiple concussions that he sustained while playing football."  Both Dr. Delis and the Board-hired neurologist who evaluated Plaintiff Zeno (Dr. Laura Desadier), however, jointly concluded that Plaintiff Zeno showed "no" evidence of even mild acquired neurocognitive impairment—despite the fact that both Dr. Delis's testing and Plaintiff Zeno's submitted medical reports demonstrated the presence of cognitive impairments.

84.     The Committee denied Plaintiff Zeno's application on November 23, 2021.  In its December 1, 2021 denial letter, the Committee claimed that it had reviewed Plaintiff Zeno's application *and the other materials* in his file, including the Board-hired physicians' reports.  The Committee asserted that it "reached its decision despite the potentially conflicting evidence" in records that Plaintiff Zeno had submitted in support of the application.

24

85.     In his appeal to the Board on April 28, 2022, Mr. Zeno provided evidence that he had received a Qualifying Diagnosis of Level 1 Neurocognitive Impairment (i.e., moderate impairment in two or more cognitive domains among other criteria) through the *NFL Concussion* settlement and that the Board-hired physicians who had examined him in connection with his NC benefits application had rendered conclusions inconsistent with the impairments they found.

86.     The Board-hired neuropsychologist Dr. Lauren Drag and Board-hired neurologist Dr. Selena Ellis who evaluated Plaintiff Zeno in connection with his appeal had only recently been hired by the Board, sometime between 2020 and March 2021, and therefore had not been paid substantial sums from the Board at that time.  For example, from April 1, 2020 through March 31, 2021, Dr. Drag received the reasonable total of $30,000 in direct or indirect compensation from the Board.

87.     Those two Board-hired physicians jointly concluded after evaluating Plaintiff Zeno that he did, in fact, show objective evidence of acquired mild neurocognitive impairment as defined by the Plan. Both Board-hired physicians on appeal unambiguously concluded that Plaintiff Zeno's neurocognitive impairments were *not* "likely secondary to a primary psychiatric problem or substance use/abuse problem."

88.     The Board issued a letter in connection with Plaintiff Zeno's appeal on August 31, 2022.  In its decision letter, the Board stated that it planned to send Plaintiff Zeno's case to two Board-hired MAP physicians for a record review and final and binding determination.

89.     Board-hired neuropsychologist Dr. William Garmoe performed a record review of Plaintiff Zeno's benefits claim, along with another MAP Physician.  The Board labeled Dr. Garmoe a neutral MAP.  Dr. Garmoe, however, was not neutral in any reasonable sense of the word.  The Plan paid him at least $1,221,000 in direct or indirect compensation, including at least

$700,500 from April 1, 2017 through March 31, 2021.  In a sample of three Players whom he evaluated for  T & P or LOD benefits purposes, Dr. Garmoe found none qualified.[3]

90.     Dr. Garmoe is predisposed to rejecting disability claims stemming from traumatic football injuries. In a televised interview on WTTG (the Washington, D.C. FOX affiliate) on December 1, 2014, Dr. Garmoe stated:  (i) "One of the things that's important to know about concussion is that people are living in fear of them right now as though there is something that's hidden that's going to explode in their brain and one day they are just going to wake up suicidal or things like that and that is rarely the case."; (ii) "The overwhelming majority of concussions actually heal quite well and don't leave lasting effects."; and (iii) "If you've had a single concussion you've recovered well you don't have to live in fear of something going off in your brain one day and you becoming suicidal or homicidal."  The reporter asked the following question:  "Injuries still happen and whether it's on the soccer field or the football field I'm sure there are a lot of parents that are saying you know look my kid had a concussion should I be worried now that maybe something will come back in the future that maybe they are not showing signs of now?"  Dr. Garmoe replied: "That's a great question the answer to that in almost all cases is no."; and "So for example many of the symptoms of concussion overlap with other types of health conditions such as depression and anxiety."[4]

91.     The Board knows that Dr. Garmoe benefits financially from doing repeat business

---

[3] Although the Plan's provisions governing the NC benefit state that a Player will be denied NC benefits if he fails two or more validity indices, Dr. Garmoe has previously admitted to the Board as part of a T & P MAP evaluation that "many individuals with dementia will fail validity indices."  Thus, many Players applying for the NC benefit because of dementia will be deemed ineligible for the NC benefit *because* of their dementia.

[4] MedStar National Rehabilitation Network, *WTTG-FOX: Dr. William Garmoe - Neuropsychology and Concussions*, YouTube (Dec. 1, 2014), https://www.youtube.com/watch?v=my3pyLWZ2Io (last visited Feb. 8, 2023).

with it, having collected more than $1.2 million from the Board.  It follows that the Board knows that Dr. Garmoe has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, reports upon which the Board may rely in justifying its decision to deny benefits to a Plan participant.

92.     Indeed, Dr. Garmoe was the NFL's highest paid neuropsychologist from April 1, 2020 through March 31, 2021.  Combining the total T & P statistics in the sample for the Board's highest-paid and second-highest paid neuropsychologist in 2020-2021, Dr. Stephen Macciocchi, and highest-paid psychiatrist that year, Dr. Martin Strassnig, overall there was *no* Player out of 28 total Players evaluated by these three physicians whom they found to qualify for T & P.

93.     Similarly, combining the total T & P statistics in the sample for the Board's four highest-paid neuropsychologists from April 1, 2019 through March 31, 2020—Drs. Delis, Garmoe, Stephen Macciocchi, and Janyna Mercado—there was *no* Player out of 46 Players evaluated by these four neuropsychologists whom they found to qualify for T & P.

94.     Similarly, combining the total T & P statistics in the sample for the Board's five highest-paid neuropsychologists from April 1, 2017 through March 31 2018—Drs. Garmoe, Macciocchi, Mercado, McNasby, and Johnny Wen—there was *no* Player out of 44 Players evaluated by these five neuropsychologists whom they found to qualify for T & P.

95.     In response to the MAP report, Plaintiff Zeno's counsel presented the Board with a Notice of Monetary Award of Neurocognitive Impairment Level 1.5 (i.e., early dementia) from the *NFL Concussion* settlement.

96.     Dr. Garmoe dismissed unanimous findings and, instead, contended in the MAP report that Plaintiff Zeno's objective impairment "might relate to other factors, and does not appear indicative of neurocognitive impairment."  He did not explain in his MAP report what those "other

factors" might be. Notably, none of the other Board physicians concluded in their reports that "other factors" could be a factor in Plaintiff Zeno's test results, and therefore, this was not a medical issue in dispute, in conflict, or ambiguous for the MAP to decide. *See* Plan Section 9.3(a).

97.     In his MAP report, Dr. Garmoe asserted that "[w]ith regard to the conclusion that there is mild language impairment, our analysis does not find … a declining pattern." Dr. Garmoe inconsistently stated in the next line of his report, however, that Plaintiff's Zeno's performance on a cognitive test "declined" and, one line later, that Plaintiff Zeno "showed a mild reduction across two assessments." Furthermore, with respect to his scores on the Montreal Cognitive Assessment ("MoCA") test, Dr. Garmoe dismissed Plaintiff Zeno's objective evidence of a language impairment as a "trivial error" without providing any explanation as to why it was "trivial."

98.     In its final denial letter, issued on November 22, 2022, the Board stated that the MAP neuropsychologist, Dr. Garmoe, and the MAP neurologist, Dr. Silvana Riggio, had reviewed Mr. Zeno's records and concluded that he did not show evidence of an acquired neurocognitive impairment because his impairment might relate to other non-cognitive factors.

99.     The Board affirmatively represented that, at its November 9, 2022 meeting, it had "reviewed the record and tentatively found that [Plaintiff Zeno is] ineligible for NC benefits."

100.     The Board used nearly identical boilerplate language in its final denial letter that was rejected by the Court in *Dimry* as attempting, but failing, to demonstrate neutrality in practice by the Board and its hired physicians.

**Plaintiff Willis McGahee**

101.     Plaintiff Willis McGahee is a resident of Davie, Florida.

102.     Plaintiff McGahee played in the NFL for eleven years as a running back.

103.     Plaintiff McGahee applied for T & P benefits in 2016.

104.     In connection with his application, Plaintiff McGahee was evaluated by Board-

selected and Board-paid neurologist, Dr. Barry McCasland.  The Board has paid Dr. McCasland at least $1,469,500.  Not surprisingly, Dr. McCasland asserted that Plaintiff McGahee was not T & P disabled.

105.     In a sample of 33 T & P and LOD disability evaluations that he conducted, Dr. McCasland found *no* Player to be entitled to either benefit.  The Board knows that, having collected more than $1.4 million from the Board, Dr. McCasland benefits financially from doing repeat business with it.  It follows that the Board knows that Dr. McCasland has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, reports upon which the Board may rely in justifying its decision to deny benefits to a Plan participant.  For example, in *Mickell*, 832 F. App'x at 589, the Court, in reversing the Board's denial of T & P benefits based on the Board's failure to consider both the cumulative effect of all the Player's impairments and the medical evidence that contradicted the Board's Physicians' opinions, noted that, by his own admission, Dr. McCasland had reviewed only "certain" medical records before rendering his opinion.

106.     In his report on Mr. McGahee, Dr. McCasland failed to discuss whether McGahee was T & P disabled from the cumulative impact of all of his impairments.  Dr. McCasland incorrectly stated that McGahee was unimpaired on two cognitive tests, despite examination results showing cognitive impairment (e.g., drawing a clockface showing eleven past ten o'clock when instructed to draw ten past eleven o'clock).  Moreover, Dr. McCasland asserted in his Physician Report Form ("PRF")[5]:  "What is the nature of the impairment? None."  Dr. McCasland

---

[5] The Board requests that hired Physicians fill out a PRF, which contains Board-standardized questions for each particular benefit evaluation performed by a Board physician.  Generally, Physicians also submit their own narrative report as well behind the completed PRF.

rendered this opinion in the face of statements in his own report that Mr. McGahee had several impairments.

107.    In connection with his T & P benefits application, Plaintiff McGahee was also evaluated by Board-selected neuropsychologist, Dr. Rodney Vanderploeg, who claimed that Mr. McGahee was not T & P disabled.  The Board has paid Dr. Vanderploeg at least $950,500.  In a sample of eight Players whom he evaluated for T & P benefits purposes,  Dr. Vanderploeg found only one Player to be T & P disabled (i.e., an 87.5% denial rate). There is no evidence that Dr. Vanderploeg considered whether Plaintiff McGahee was T & P disabled from the cumulative impact of all of his impairments. Moreover, he improperly considered Plaintiff McGahee's "demographic background," including his race, when estimating his premorbid IQ.[6]

108.    The Committee denied Plaintiff McGahee's application on August 8, 2016.  In its denial letter, the Committee did not identify the materials it had considered.

109.    In 2020, Mr. McGahee reapplied for T & P benefits. In connection with this application, Mr. McGahee was evaluated by Board-paid neurologist Dr. George Diaz, who opined that Mr. McGahee was not T & P disabled.  A sample of 12 benefit evaluations by Dr. Diaz showed that he found that *no* Player qualified for the applied-for benefit (i.e., a 100% denial rate). Although prohibited by the terms of the Plan from considering training, Dr. Diaz alleged that Plaintiff McGahee could perform "[a]ny employment he is trained to do."  Moreover, Dr. Diaz did

---

[6] In the *NFL Concussion* settlement, the parties negotiated modifications to the settlement agreement that proscribe the use of race norms and demographic estimates based on race from the settlement program.  *See In re Nat'l Football League Players' Concussion Injury Litig.*, No. 2:12-md-02323-AB (E.D. Pa. Mar. 4, 2022) (ECF No. 11648) (order approving modifications).  Just a few months earlier, in a December 2021 position paper, the American Academy of Clinical Neuropsychology had called for the "elimination of race as a variable in demographically-based normative test interpretation."  https://theaacn.org/wp-content/uploads/2021/11/AACN-Position-Statement-on-Race-Norms.pdf (last visited Feb. 8, 2023).

not state in his report that he had reviewed any of the reports of the other three physicians who had examined Mr. McGahee in connection with his application.

110.     There were several inconsistencies (if not absurdities) in Dr. Diaz's report.  For example, rather than checking off that the cause of Plaintiff McGahee's concussions was an "injury," Dr. Diaz instead checked off that the cause was "illness," "other," and "unknown."

111.     Plaintiff McGahee was also evaluated in connection with his T & P claim by the Board's highest-paid psychologist for the year running from April 1, 2020 through March 31, 2021, Dr. Martin Strassnig.  A sample of 13 Players evaluated by Dr. Strassnig for T & P benefits purposes shows that he found *none* of the Players T & P disabled (i.e., a 100% T & P denial rate). Not surprisingly, Dr. Strassnig opined that Mr. McGahee was not T & P disabled.  Dr. Strassnig unreasonably dismissed self-reported complaints, including "very severe depression."

112.     Mr. McGahee was also evaluated by Board-paid neuropsychologist Dr. Thomas Crum, who opined that McGahee was not T & P disabled, despite having expressed "thoughts that he would be better off dead," and suffering substantial dysfunction with daily tasks.  Dr. Crum failed to address the combined impact of Mr. McGahee's impairments, and in estimating his premorbid IQ, Dr. Crum improperly considered Plaintiff McGahee's "demographic."  A sample of six benefit evaluations that he rendered, including three T & P benefits evaluations, showed that Dr. Crum found no Player to be qualified for benefits (i.e., a  100% denial rate).

113.     In its denial letter dated March 3, 2021, the Committee represented that it had reviewed Mr. McGahee's application and all other materials in his file and that it did not disagree with the statements in the medical records submitted in support of the application. The Committee's denial letter failed to address Mr. McGahee's claim that the cumulative effect of his ailments was a ground for finding him T & P disabled.

114.    Mr. McGahee timely appealed. On appeal, he was evaluated by Board-paid psychiatrist Dr. Matthew Norman.  During the five-year period April 2016 through March 31, 2021, Dr. Norman was paid at least $695,500 by the Board.  A sample of 30 Players whom he evaluated for Plan benefits purposes showed that Dr. Norman found 28 of 30 players not to be disabled (i.e., a 93.33% denial rate).  Dr. Norman failed to address whether Mr. McGahee was T & P disabled from the cumulative impact of his impairments.

115.    Mr. McGahee was also evaluated by Board-selected orthopedist Dr. Herndon Murray, who opined that Mr. McGahee was not T & P disabled. The Board has paid Dr. Murray at least $918,704.  Not surprisingly, a sample of 10 Players whom he evaluated for T & P benefits purposes showed that Dr. Murray found none to quality (i.e., a 100% denial rate).  By his own admission, Dr. Murray did not consider the combined impact of Mr. McGahee's impairments and discounted his self-reported symptoms.

116.    Plaintiff McGahee was also evaluated on appeal by Board-paid neurologist Dr. Matthew Gwynn, who opined that Mr. McGahee was not T & P disabled.  In a sample of three Players whom he evaluated for benefits purposes, Dr. Gwynn found none of them disabled. Although Dr. Gwynn asserted that Mr. McGahee could perform "[a]nything that he is qualified for by an orthopedist," there is no evidence that Dr. Gwynn reviewed *orthopedist* Dr. Murray's report. He also dismissed Mr. McGahee's self-reported symptoms and even his own objective evidence and admission that Mr. McGahee's MoCA score indicated cognitive impairment.

117.    Mr. McGahee was evaluated in connection with his T & P benefits appeal by Board-paid neuropsychologist Dr. Jason King. Although noting that Plaintiff McGahee suffered from "clinically significant depression" and required frequent shifts of position due to pain, Dr. King opined that Mr. McGahee was not T & P disabled. Dr. King failed to consider whether Mr.

McGahee was T & P disabled from the combined impact of all his impairments.  Also, Dr. King gave little to no weight to Plaintiff McGahee's self-reported symptoms, including severe chronic pain, depression, and suicidal ideation.

118.    The Board issued a final appeal denial letter on November 22, 2022.  In its letter, the Board represented that it had reviewed the entire record but failed to address the cumulative effect of Mr. McGahee's conditions, which had been listed as a T & P disabling condition on his application.  There is no evidence that the Board actually reviewed the physicians' reports or any evidence submitted.

**Plaintiff Michael McKenzie**

119.    Plaintiff Michael McKenzie is a resident of Prairieville, Louisiana.

120.    Plaintiff McKenzie played in the NFL for 11 years.

121.    Mr. McKenzie applied for T & P benefits in December 2018.

122.    Plaintiff McKenzie was evaluated by Board-paid orthopedist Dr. Paul Saenz.  Dr. Saenz received at least $1,122,864 from the Board in compensation.  Not surprisingly, in a sample of 17 Players whom he evaluated for T & P benefits purposes, Dr. Saenz found *no* Player to be T & P disabled (i.e., a 100% T & P denial rate).  Dr. Saenz dismissed Mr. McKenzie's self-reported symptoms of pain without stating reasonable grounds for doing so.  Dr. Saenz's report also contained inconsistencies.  For example, although Mr. McKenzie stated that his chronic back pain was "aggravated with changes in position," Dr. Saenz concluded that Mr. McKenzie was capable of performing a job with "changes in position." Also, although he reported that Mr. McKenzie's "chronic cervical strain" "[r]esult[ed] [f]rom" an "[u]nknown" cause, Dr. Saenz at the same time found the disabilities "causally related to injuries sustained during this player's course of employment within the [NFL]."

123.    Plaintiff McKenzie was also evaluated by Board-paid neurologist, Dr. Eric Brahin,

who concluded that Plaintiff McKenzie was not T & P disabled.  Dr. Brahin acknowledged, however, he had to terminate his evaluation of Mr. McKenzie early due to "serious psychiatric issues" that, in his view, warranted "emergent psychiatric evaluation."  Dr. Brahin was paid at least $1,387,000 from the Board from 2013 to 2020.  Not surprisingly, a sample of 71 benefit evaluations by Dr. Brahin shows that he found 66 Players did not qualify for the respective benefit for which they had applied (i.e., a 92.95% denial rate).  The sample included 32 T & P benefits evaluations in which he found 93.75% of the Players did not qualify for T & P disability.  In *Colvin v. 88 Board, Joint Board of Trustees for 88 Plan*, No. SA-17-CV-974-XR, 2018 WL 1756738, at *2 (W.D. Tex. Apr. 11, 2018), the court noted the plaintiff's treating physician's observation that Dr. Brahin had "conducted only a short meeting" with the plaintiff there and that Dr. Brahin's report contained "many factual errors."

124.    Plaintiff McKenzie was also evaluated by Board-paid neuropsychologist Dr. Janyna Mercado, who concluded that he was not T & P disabled, despite also finding that "based on his fragile psychological state, it is not likely that he would be able to maintain employment." From April 1, 2017 through March 31, 2020, Dr. Mercado was paid at least $633,000 from the Board in direct or indirect compensation, including $213,000 for the year running from April 1, 2019 through March 31, 2020.   Not surprisingly, a sample of 13 benefit evaluations for T & P or LOD benefits purposes shows that Dr. Mercado found that *none* of the Players qualified for either T & P or LOD benefits (i.e., a 100% denial rate).

125.    Dr. Mercado's report contained several inconsistencies.  For example, she alleged that Mr. McKenzie had "invalid test results on the TOMM [Test of Memory Malingering]" and labeled his score of 45 on TOMM trial 2 as "suspect."  According to the test manual, though, a score of 45 on the TOMM does *not* indicate the possibility of malingering.

126. Also, while Dr. Mercado conceded that "it is not likely that [Mr. McKenzie] would be able to maintain employment," the Committee nonetheless stated in letter denying Mr. McKenzie's application that "the Plan's neutral physicians … independently concluded that [Mr. McKenzie is] capable of employment." Neither the Committee's in its initial decision letter, nor Groom in its summary sheet, mentioned that Plaintiff McKenzie claimed T & P disability based on the cumulative impact of his impairments. The Committee also stated in its initial decision letter that it had reviewed Mr. McKenzie's materials in his file and did *not* disagree with the medical records he submitted.

127. Mr. McKenzie appealed the Committee's denial to the Board on August 7, 2019 and was evaluated by Board-paid psychiatrist Dr. Norman, whose lush compensation from the Board and history of rendering opinions adverse to Players seeking benefits are recounted above. Dr. Norman opined that Mr. McKenzie was not T & P disabled, but failed to discuss whether he was T & P disabled from the combined impact of his impairments. Also, his report contained numerous contradictions and inconsistencies. For example, Dr. Norman unreasonably discounted "severe depressive symptoms" and "[d]epressed mood most of the day, nearly every day," asserting that "[d]espite his reported symptoms and concerns, Mr. McKenzie did not exhibit sufficient objective symptoms."

128. Plaintiff McKenzie was also evaluated in connection with his T & P benefits appeal by Board-paid neurologist Dr. McCasland, whose lush seven-figure compensation from the Board and history of rendering opinions adverse to Players seeking T & P or LOD disability benefits are recounted above. Dr. McCasland opined that Mr. McKenzie was not T & P disabled.

129. In evaluating Mr. McKenzie, Dr. McCasland expressed his preordained view, remarking: "The likelihood of any headache disorder constituting a total disability … is practically

zero." That opinion was inconsistent with prior interpretations of even the Board's own MAP, who has previously determined other Players to be T & P disabled due to headache disorders. Dr. McCasland failed to discuss whether Mr. McKenzie was T & P disabled from the cumulative impact of his impairments; and discounted and dismissed both self-reported symptoms and objective evidence, including MoCA testing demonstrating objective cognitive impairment.

130.    Mr. McKenzie was also evaluated by Board-paid neuropsychologist Dr. Stephen Macciocchi, who concluded that he was not T & P disabled. Dr. Macciocchi was paid $1,496,800 from the Board in compensation. Not surprisingly, from a sample of 12 Players whom he evaluated for T & P disability purposes, Dr. Macciocchi found *no* Player to be T & P disabled (i.e., a 100% T & P denial rate).

131.    Although the terms of the Plan state that "educational level … will not be considered in determining" entitlement to T & P benefits, Dr. Macciocchi acted inconsistently with the terms of the Plan by alleging that Mr. McKenzie could perform an "occupation consistent with educational and experiential background and interest." Also, Dr. Macciocchi failed to consider whether Plaintiff McKenzie was T & P disabled from the combined impact of his impairments, stating that his evaluation was "solely from a neurocognitive perspective."

132.    Mr. McKenzie was also evaluated by Board-paid orthopedist Dr. Virgil Medlock, who concluded that Mr. McKenzie was not T & P disabled. From April 1, 2016 through March 31, 2021, Dr. Medlock was paid at least $495,500 from the Board. Not surprisingly, a sample of eight Players whom he evaluated for T & P benefits purposes shows that Dr. Medlock found *none* of them T & P disabled (i.e., a 100% T & P denial rate). Dr. Medlock unreasonably dismissed Plaintiff McKenzie's complaints of pain.

133.    In its final appeal denial letter dated November 22, 2019, the Board contended

that it had reviewed the administrative record in deciding Mr. McKenzie's appeal, but it failed to address the cumulative effect of his ailments, which had been listed on his application as a T & P disabling condition.

134.    Plaintiff McKenzie applied again for T & P disability benefits in April 2021.  In connection with his second application, Plaintiff McKenzie was evaluated by Board-paid neurologist Dr. Clark, who concluded that Mr. McKenzie was not T & P disabled.  Dr. Clark reported that he could not conclude that Mr. McKenzie was T & P disabled on the basis of his neurological problems alone, stating that Mr. McKenzie's migraines were partially disabling.  He acknowledged, though, that Mr. McKenzie's psychiatric status appeared to be "totally" disabling. Dr. Clark added that "[t]he evidence overall suggest[ed that] his cognitive problems [we]re directly related to his psychiatric condition."

135.    Plaintiff McKenzie was also evaluated by Board-paid neuropsychologist Dr. Neal Deutch.  A sample of 22 Players evaluated by Dr. Deutch for benefits shows that he found 86.4% of those Players not disabled.

136.    The Committee issued a decision denying Mr. McKenzie's application.  In its denial letter, the Committee failed to mention that Plaintiff McKenzie claimed benefits based on the cumulative impact of his impairments.  Crucially, the Committee made no mention of Dr. Clark's cumulative finding that Plaintiff McKenzie appeared *totally* disabled to the extent that psychiatric factors were considered.

137.    Mr. McKenzie appealed the Committee's denial to the Board on December 28, 2021.  In connection with his appeal, Mr. McKenzie was evaluated by Board-paid psychiatrist Dr. Strassnig, whose history of rendering opinions adverse to Players seeking T & P disability benefits is recounted above.  At odds with other evidence concerning Mr. McKenzie's mental state, Dr.

Strassnig provided a conclusory statement that Mr. McKenzie had "[n]o psychiatric restrictions or limitations to gainful employment."   Dr. Strassnig did not, however, consider the cumulative impact of Mr. McKenzie's ailments.   He detailed his reliance on the Board-hired physicians who had examined Mr. McKenzie in connection with his initial T & P application.

138.     Mr. McKenzie was also evaluated by Board-paid orthopedist Dr. Hussein Elkousy.   Dr. Elkousy has been paid at least $1,128,123 by the Board in compensation.   Not surprisingly, a sample of eight Players evaluated by Dr. Elkousy for T & P shows that he found 7 of those Players not T & P disabled (i.e., an 87.5% denial rate).   Dr. Elkousy opined that Mr. McKenzie was not T & P disabled and failed to consider the cumulative impact of his ailments. Dr. Elkousy's report contained errors, and he unreasonably ignored self-reported chronic pain. Moreover, he presented conclusions that could not be reconciled with those in other medical reports.   For example, Dr. Elkousy reported that his lumbar examination of Plaintiff McKezie was allegedly normal and that his x-rays demonstrated only "mild degenerative changes but preserved disc space."   Those findings are at odds with even Dr. Saenz's 2019 x-ray finding of "moderate degenerative disc disease" with "retrolisthesis … and appreciable foraminal narrowing," Dr. Saenz's diagnoses of permanent lumbar herniated nucleus pulpous and a marked decrease of the lumbar range of motion in all planes.   Also, Dr. Elkousy's knee x-ray finding of only "mild" DJD was inconsistent with Dr. Saenz's 2019 x-ray finding of "marked" DJD.

139.     In connection with his appeal to the Board, Mr. McKenzie was also evaluated by Board-paid neuropsychologist, Dr. Laura Lacritz, who likewise opined that Mr. McKenzie was not T & P disabled.   Dr. Lacritz failed to consider the combined impact of his impairments. A sample of six Players evaluated by Dr. Lacritz for Plan benefits purposes shows that she found no Player qualified for benefits (i.e., a 100% denial rate).

140.     The Board issued a decision denying Mr. McKenzie's appeal on June 6, 2022.  In its denial letter, the Board erroneously stated that Mr. McKenzie was ineligible for NC benefits, even though he had applied only for T & P benefits.  Although the Plan precludes the Board's reliance on the same advisors upon which the Committee has relied, the Board stated in its letter that it had based its denial on the opinions of all eight Neutral Physicians.  The Board maintained that it had reviewed all of the records, including Dr. Clark's report.  Like the Committee, however, the Board ignored Dr. Clark's cumulative finding that Mr. McKenzie is totally disabled to the extent that psychiatric factors were considered.

**Plaintiff Charles Sims**

141.     Plaintiff Charles Sims is a resident of Rosenberg, Texas.

142.     Plaintiff Sims played in the NFL for four years as a running back. Mr. Sims applied for T & P benefits in 2020.  Although Mr. Sims was deemed T & P disabled, the Committee in its initial decision letter dated June 11, 2021 advised him that because the Committee had been deadlocked as to the appropriate classification, he would receive benefits in the Inactive A category.

143.     Specifically, the Committee informed him that one member believed that Mr. Sims' condition had not begun during his NFL career so as to entitle him to the higher-paying Active Football classification.  The Committee omitted that Mr. Sims had also applied for T & P on the basis of the combined impact of his impairments, including "post-concussive syndrome" and multiple orthopedic "NFL related impairments," including injuries "sustained while playing football in the NFL." In its decision letter, the Committee failed to acknowledge that the physician who deemed Plaintiff Sims T & P disabled reported that the conditions had started while he was an Active Player.

144.     On December 7, 2021, Plaintiff Sims appealed the Committee's refusal to award

him Active T & P benefits to the Board, submitting additional medical records, including team records contemporaneously discussing that his impairments related to conditions he suffered while an Active Player, and pointing out that the physician who deemed him T & P disabled reported that the conditions that so rendered him had started in 2016 and 2018, while Mr. Sims was an Active Player.

145.    Although the Plan rules for Active T & P benefits do not contain an objective evidence standard, and despite the uncontradicted objective evidence, including team records while Mr. Sims was an Active Player, the MAP who reviewed Mr. Sims' claim file, Dr. Riggio, faulted Mr. Sims because his conditions were "primarily via self-report with some corroboration from his wife, and while important, lack[ed] objective data to sustain the claim."

146.    The Board issued a final decision on Mr. Sims' claim on June 3, 2022 in which it contended that Mr. Sims' "file contain[ed] no evidence that [his] disability arose while an Active Player."  The Special Rules of Section 3.5 were not cited or referenced in the Board's decision.

147.    Contrary to the terms of the Plan, Board Members testified in the *Cloud* action that it was their understanding that, Active Football T & P benefits are intended only for situations where a Player suffers a catastrophic injury, such as a paralyzing collision during a game.

**Plaintiff Jamize Olawale**

148.    Plaintiff Jamize Olawale is a resident of Southlake, Texas.

149.    Mr. Olawale played in the NFL for eight credited seasons.  He applied for T & P, LOD, and NC benefits in March 2021.  In connection with his applications, Mr. Olawale was evaluated by Board-paid orthopedist Dr. Saenz, whose lush, seven-figure compensation from the Board and history of rendering opinions adverse to claimants are recounted above.  In his remarks, Dr. Saenz incorrectly stated that Mr. Olawale "was not likely seeking Disability on the basis of

orthopedic impairments but more likely for the sequelae of multiple concussive episodes."

150.    Dr. Saenz awarded six out of the nine points needed to qualify for LOD (three points each for left knee and right ankle moderate degenerative joint disease).  Although Board-hired physicians are required to award points for each occurrence of each Plan-listed orthopedic impairment, and although Mr. Olawale suffered from "Lumbar Stress Fracture with Spondylolysis," which is worth three points, Dr. Saenz failed to credit those three points to Mr. Olawale. In his remarks, Dr. Saenz opined that there was radiographic evidence of L5 pars defect/stress fractures with spondylolysis,[7] but he claimed that there was no documentation that it arose during Mr. Olawale's NFL career.  On the very next page of his report, however, Dr. Saenz explicitly indicated that Mr. Olawale's lumbar spondylolysis was caused by an "injury." Moreover, Dr. Saenz reported "an array of team-maintained injury reports" to his lumbar spine. Also, although Mr. Olawale's left hip X-ray revealed DJD, Dr. Saenz failed to award three points for that condition.  A sample of 14 Players whom he evaluated for LOD benefits shows that Dr. Saenz awarded none of them points for this common impairment among former NFL Players.

151.    In all, Mr. Olawale would have received the nine points needed to qualify for LOD disability benefits but for Dr. Saenz's opinions that were inconsistent with the Plan's plain terms.

152.    In connection with his 2021 T & P and NC benefits applications, Mr. Olawale was evaluated by Board-paid neurologist Dr. Brahin, whose lucrative compensation from the Board and history concerning Players' benefit claims are recounted above.

153.    When examined by Dr. Brahin, Mr. Olawale scored a 24/30 on the MoCA Test, a grade that is 2 points below normal.  Dr. Brahin incorrectly marked that Mr. Olawale was

---

[7] Notably, the Board's current MAP awarded a different Player three points for "Lumbar Stress Fracture with Spondylolysis" for "L5-S1 pars defect."

unimpaired on a Visuospatial/Executive Functioning test, despite results that showed cognitive impairment. Dr. Brahin concluded that Mr. Olawale was not T & P disabled and did not have at least a mild objective cognitive impairment in any cognitive domain to qualify for NC benefits. Although Plaintiff Olawale recounted to Dr. Brahin that he had thoughts of suicide as recently as two weeks before the examination, Dr. Brahin reported that Mr. Olawale had no suicidal ideations.

154.    Mr. Olawale was also examined by Board-chosen neuropsychologist Dr. Justin O'Rourke. A sample of nine Players evaluated by Dr. O'Rourke shows that he considered none of them disabled (i.e., a 100% denial rate). Dr. O'Rourke concluded that Mr. Olawale was not T & P disabled and did not have at least a mild impairment in any one cognitive domain to qualify for the NC benefit.

155.    Plaintiff Olawale was also evaluated by Board-chosen psychiatrist Dr. Norman, whose lucrative compensation from the Board and history concerning Players' benefit claims are recounted above. Dr. Norman failed to consider whether Plaintiff Olawale was T & P disabled from the cumulative impact of his impairments. Dr. Norman's conclusion was inconsistent with findings in his report that Mr. Olawale had "self-reported a moderately severe depression" and "thoughts of suicide or being better off dead." He unjustifiably dismissed these subjective complaints with circular reasoning that "[a]lthough Mr. Olawale endorsed many symptoms of depression when asked on a symptom inventory, he did not spontaneously report any symptoms except agitation, irritability, depressed mood, and mood volatility."

156.    The Committee issued a decision on Mr. Olawale's application on August 13, 2021. Neither the letter nor the summary sheet mentioned that Mr. Olawale claimed benefits based on the cumulative impact of his impairments. Although the Committee asserted that it had considered all evidence, the July 1, 2021 "E-Ballot" indicated denial was warranted because "No

42

Plan Neutral Finds T&P."  The record reflects that, rather than review all of the records submitted, the Committee merely defaulted to the conclusions rendered by the Board's hired physicians.

157.    Mr. Olawale appealed the Committee's decision to the Board.  In connection with his 2022 T & P, LOD, and NC appeals, Mr. Olawale was evaluated by Board-paid Dr. Elkousy, whose lush, seven-figure compensation from the Board and history of rendering opinions adverse to claimants are recounted above.  As was the case with most Players whom he has evaluated, Dr. Elkousy concluded that Mr. Olawale was not T & P disabled and failed to consider the cumulative impact of his ailments. Rather, he opined that Mr. Olawale was not T & P disabled "from an orthopedic standpoint."

158.    Dr. Elkousy unreasonably dismissed Mr. Olawale's complaints of pain and his report contained inconsistencies. Whereas even Dr. Saenz found that knee and ankle X-rays showed moderate and marked DJD, Dr. Elkousy maintained that only mild DJD was present. Although more than a third (36.3%) of retired NFL Players report suffering from DJD, not one Player in the sample of 15 Players whom Dr. Elkousy evaluated for LOD benefits purposes received points for DJD for any body part for which the Plan's terms award Points.  (For example, moderate DJD is three points for each knee, shoulder, elbow, wrist, hip, ankle, and two points for hind or mid-foot.)  Similarly, despite the prevalence of hamstring injuries, disc herniations, and shoulder instability amongst NFL Players, Dr. Elkousy likewise never awarded any Player in the sample points for hamstring tears, disc herniations, or shoulder instability.

159.    Although he reported that his imaging of Mr. Olawale showed a lumbar spine stress fracture with spondylolysis, Dr. Elkousy nonetheless failed to award Mr. Olawale the three points pursuant to the Plan's terms. No one in the sample of 15 LOD Players evaluated by Dr. Elkousy received points for lumbar stress fracture with spondylolysis.

160.     In all, Dr. Elkousy awarded Plaintiff Olawale not a single point of the nine needed to qualify for LOD benefits.

161.     On June 6, 2022, the Board issued a decision denying Mr. Olawale's appeal. Although the Board represented in the letter that it had reviewed all of the evidence in Mr. Olawale's file, there is no evidence in the record that the Board had actually done so. Also, the Board incorrectly stated that Mr. Olawale had been evaluated by Dr. Strassnig, when he had not.

162.     Nor did the Board address the cumulative effect of Mr. Olawale's conditions, even though Plaintiff Olawale had listed the cumulative impact as a condition that rendered him T & P disabled.

**Plaintiff Daniel Loper**

163.     Plaintiff Daniel Loper is a resident of Gallatin, Tennessee. He applied for LOD benefits in March 2018.  In connection with his application, Mr. Loper was evaluated by the Board-chosen orthopedist Dr. Murray, whose lush compensation from the Board and history of rendering opinions adverse to claimants are recounted above.  Dr. Murray awarded Mr. Loper only six LOD Points.

164.     On April 26, 2018, an advisor from Groom emailed the Plan's director, Mr. Sam Vincent, Mr. Loper's summary sheet for the upcoming Committee meeting.  The summary sheet presented to the Committee emphasized:

> **THIS IS A SUMMARY ONLY. The entire administrative record compiled in conjunction with this claim has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits.**

165.     Although the Committee indicated in its initial denial letter dated April 30, 2018 that it had reviewed the entire record, there is no evidence in the record that the Committee actually did so.  Rather, the Committee defaulted to Dr. Murray's conclusions.

166.     Mr. Loper appealed the Committee's determination on October 26, 2018, and submitted additional medical evidence.  In connection with his appeal, he was evaluated by Board-paid orthopedist Dr. Glenn Perry.  Dr. Perry was compensated at least $1,811,566 by the Board.  Not surprisingly, in a sample of seven Players whom he evaluated for T & P benefits, Dr. Perry recommended in every case that the Player be found not to be T & P disabled (i.e., a 100% T & P denial rate).

167.     In his narrative report, Dr. Perry avoided crucial details.  For example, despite moderate right and severe left acromioclavicular ("AC"; the joint formed by the cap of the shoulder and the collar bone) joint arthrosis shown by MRIs, Dr. Perry failed to acknowledge those impairments.  Dr. Perry awarded only six of the ten points required to qualify for LOD benefits.

168.     On December 7, 2018, an advisor from Groom emailed a benefits coordinator Mr. Loper's summary sheet prepared by the advisors at Groom.  The Groom advisor failed to mention his AC joint impairments.  Although the Groom advisor in the summary sheet emphasized that "[t]he administrative record compiled in conjunction with this claim has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits," there is no evidence in the administrative record that the Board reviewed all of the records submitted.

169.     The Board issued a decision on February 19, 2019, denying Mr. Loper's appeal.

170.     In March 2020, Mr. Loper reapplied for LOD benefits, and he submitted club medical records, imaging, and a surgery report in support of that reapplication.  In connection with this second application, Mr. Loper was evaluated by Board-chosen orthopedist Dr. David Apple.  Between April 2009 and March 2020, the Board paid Dr. Apple the astonishing total of at least $2,407,994.  Not surprisingly, Dr. Apple has a 100% T & P benefits denial rate.

171.     As recounted above, even though more than a third of retired NFL Players report

45

suffering from DJD, *no* Player in the sample of 15 Players whom Dr. Apple evaluated for LOD received *any* points for DJD for *any* of the body parts for which the Plan's terms award points. Similarly, despite the prevalence of hamstring injuries, disc herniations, and rotator cuff injuries in the NFL, Dr. Apple never awarded any Player in the sample any points for those impairments.

172.   Dr. Apple awarded a mere three points out of the 10 needed to qualify for LOD benefits.  Despite acknowledging that Mr. Loper's left wrist carpal tunnel release is worth 2 points, Dr. Apple commented that he was not awarding Mr. Loper the points for his condition because the "[s]urgery occurred after [Mr. Loper's] NFL career."  Dr. Apple ignored or was unaware that a material modification to the Plan clarified that Players who apply after April 1, 2019 may receive points for surgeries after the end of their NFL career that occurred prior to their deadline to apply for LOD.  Mr. Loper's deadline to apply for LOD benefits was August 31, 2020 and he had undergone surgery on January 9, 2020.  Therefore, Mr. Loper should have received these two points.  Moreover, Dr. Apple disregarded documented club records discussing NFL injuries to Mr. Loper's left wrist.

173.   Also, Dr. Apple noted that Mr. Loper had a symptomatic rotator cuff tendon tear. Nevertheless, he failed to award the prescribed two points for "Symptomatic Rotator Cuff Tear."

174.   Groom stated in the summary sheet concerning Mr. Loper's LOD benefits claim that it prepared for the Committee that Mr. Loper had been awarded no points for carpal tunnel release because it was "[n]ot NFL Related."  The summary sheet, however, failed to specify that Dr. Apple awarded no points for this for a different reason—because the surgery had taken place after the end of Mr. Loper's NFL career.

175.   The Committee issued a decision denying Plaintiff Loper's second LOD benefits application on January 22, 2021.  It stated in its denial letter that it had denied Mr. Loper's

application after reviewing the record. The Committee did not delve into the administrative record or attempt to reconcile Dr. Apple's inconsistencies with the Plan's terms.  Instead, it rubber-stamped Dr. Apple's incorrect conclusion.

176.     Mr. Loper appealed the Committee's denial to the Board in May 2021. He submitted new records, including two surgery reports.  In connection with his appeal, Mr. Loper was evaluated by Board-paid orthopedist Dr. Marcus Cook, who awarded nine points out of the 10 needed to qualify.  Although he noted in his narrative report that Mr. Loper was status post-carpal tunnel release surgery, Dr. Cook failed to award Mr. Loper the two points for the "S/P Carpal Tunnel Release" condition noted in the PRF that he completed.

177.     The Board issued a decision on November 15, 2021, denying Mr. Loper's appeal. In its decision, the Board represented that it had "reviewed the current record."  Mr. Loper first became aware from the June 2022 *Cloud* decision that multiple Board members had testified that the Board does *not*, in fact, review all of the records submitted and that the denial letter he received from the Board contained boilerplate language that misrepresented the extent of what it had considered on his appeal.

**Plaintiff Eric Smith**

178.     Plaintiff Eric Smith is a resident of Whippany, New Jersey.

179.     Plaintiff Smith played safety in the NFL for seven credited seasons and suffered thirteen documented traumatic brain injuries.  His brain imaging showed white matter changes.

180.     Mr. Smith was denied LOD benefits on an application he filed in 2013. At the time, he was examined by orthopedist Dr. Terry Thompson, who has a 100% T & P benefits denial rate.

181.     Mr. Smith appealed that denial, but the Board denied his appeal in 2014.

182.     Because his NFL-related conditions continued to deteriorate, Mr. Smith reapplied

in 2015.  In connection with his 2015 application, Mr. Smith was examined by an orthopedist, Dr. Charles Bush-Joseph.

183.     From April 1, 2015 through March 31, 2016, Dr. Bush-Joseph was paid the modest sum of $34,268 by the Board.  Over the 11 years that he has conducted examinations at the Board's behest, Dr. Bush-Joseph has never been paid by the Board more than $72,765 in a single year.  He found 20 LOD impairment points. Consequently, Mr. Smith was awarded LOD benefits.  The following year, Dr. Bush-Joseph's compensation from the Board fell sharply, to only $16,711.

184.     Plaintiff Smith applied for T & P and NC benefits in December 2018. In connection with those applications, he was evaluated by Board-paid orthopedist Dr. Perry, whose lucrative compensation and history of rendering adverse T & P evaluations are recounted above. Like other Players whom he evaluated, Dr. Perry avoided crucial details in his report and did not explain why he believed that Mr. Smith was not T & P disabled.  Dr. Perry did not reconcile his claim that Mr. Smith could perform "moderate lifting" with his own findings of marked decreased shoulder range of motion, rotator cuff weakness, and moderate to severe shoulder arthritis. Moreover, Dr. Perry failed to mention Mr. Smith's head, neck, and lumbar spine impairments and there is no evidence in the narrative report that he inquired into documented work difficulties.

185.     In connection with his 2018 T & P and NC applications, Mr. Smith was evaluated by Board-paid neuropsychologist Dr. Sutapa McNasby, who was paid at least $1,569,000 from the Board.  Not surprisingly, a sample of nine T &  P and LOD evaluations rendered by Dr. McNasby shows that she has found no Player to qualify for a Plan disability benefit. The Board knows that Dr. McNasby benefits financially from doing repeat business with it, having reaped more than $1.5 million from the Board.  It follows that the Board knows that Dr. McNasby has an incentive to provide it with reports that will increase the chances that the Board will frequently return to her in

the future—in other words, reports upon which the Board may rely in justifying its decision to deny benefits to a Plan participant.  Dr. McNasby failed to reconcile her finding that Mr. Smith was not T & P disabled with her significant concerns about an elevated risk of harm to himself and to others.

186.     Plaintiff Smith was also evaluated by Board-chosen neurologist Dr. Chad Hoyle, who concluded that Mr. Smith did not qualify for either applied for benefit. From April 2017 through March 31, 2020, Dr. Hoyle was paid at least $335,500 by the Board, including $171,000 from April 1, 2018 through March 31, 2019.  A sample of nine Players whom he evaluated for T & P benefits shows that Dr. Hoyle recommended finding the Player not qualified in eight of nine cases (i.e., a denial rate of 88.89%).  Dr. Hoyle did not mention Mr. Smith's three brain MRIs. Also, like Dr. McNasby, Dr. Hoyle also failed to discuss the MRI findings, including white matter changes, and the possibility of demyelinating disease.

187.     Mr. Smith was also evaluated by Board-paid psychiatrist Dr. Moira Artigues. In a sample of four Player benefit evaluations that he rendered, Dr. Artigues found no Player to qualify for benefits (i.e., a 100% denial rate).  She unjustifiably found that Mr. Smith was not T & P disabled, asserting that there were "[n]o employment restrictions from a psychiatric standpoint." That statement was inconsistent with her own finding of a severe major depressive disorder. Moreover, it was nearly identical language that she used in the report of another T & P applicant whom a court deemed mentally incapacitated.  Dr. Artigues also failed to consider whether Plaintiff Smith was T & P disabled from the cumulative impact of his impairments.

188.     In as denial letter issued on February 6, 2019, the Committee represented that it had reviewed the materials in his file, and that the Committee did not disagree with the statements in the medical records that Mr. Smith had submitted. There is no evidence that the Committee

members reviewed the entire record or considered the cumulative impact of his impairments.

189.     Plaintiff Smith appealed the Committee's denial to the Board on August 5, 2019. In connection with his appeal, Mr. Smith was evaluated by Board-paid orthopedist Dr. Alvin Detterline. In a sample of five evaluations for T & P benefits purposes, Dr. Detterline found no Player qualified for benefits (i.e., a 100% T & P denial rate).  In his report on his evaluation of Mr. Smith, Dr. Detterline failed to discuss the cumulative impact of Mr. Smith's impairments.  His report also contained several inconsistencies.  For example, although Dr. Detterline concluded that Mr. Smith was not T & P disabled, he indicated in his report that Mr. Smith had significant impairments and that  Mr. Smith had described how these impairments affected his daily function. Also, although he described injuries from NFL football play to Mr. Smith's wrist, lumbar spine, hip, and both knees, Dr. Detterline oddly concluded that the cause of the impairments to those body parts was "[u]nknown."

190.     Mr. Smith was also evaluated by Board-paid neuropsychologist Dr. Nicole Werner, who concluded that he did not qualify for benefits.  For the twelve-month period from April 2019 through March 31, 2020, she was paid at least $126,000 by the Board.  The preceding year she was paid at least $112,000 by the Board. Not surprisingly, a sample of 12 benefit evaluations rendered by Dr. Werner shows she found *none* of the Players in question to qualify for benefits (i.e., a 100% denial rate).  The Board knows that Dr. Werner benefits financially from doing repeat business with it.  It follows that the Board knows that she has an incentive to provide it with reports that will increase the chances that the Board will frequently return to her in the future—in other words, that she will render reports upon which it may rely in justifying its decision to deny benefits.

191.     Although the Plan's terms state explicitly that "prior training of a Player will not

be considered in determining" T & P eligibility, Dr. Werner acted inconsistently with the Plan by concluding that Mr. Smith could engage in "[e]mployment consistent with his training."

192.     Also, Dr. Werner inexplicably indicated that the cause of Mr. Smith's post-concussive memory loss was "unknown," despite acknowledging in her report that his concussions had "resulted in altered awareness or memory loss."  Moreover, Dr. Werner failed to consider the cumulative impact of Mr. Smith's impairments.

193.     On November 22, 2019, the Board issued a decision denying Mr. Smith's appeal. In its letter, the Board failed to reconcile the tension between Dr. Werner's opinion and the explicit terms of the Plan.  In addition, the Board failed to address or even acknowledge Mr. Smith's claim that he qualified for T & P disability benefits based on the cumulative impact of his impairments. Finally, there is no evidence in the record that the Board reviewed all of the evidence.  Indeed, the Board in its letter indicated that it had defaulted to its paid physicians' opinions.

194.     Mr. Smith became aware from the June 2022 *Cloud* decision that multiple Board members had testified that, contrary to the representation in his decision letter, the Board's standard practice is *not* to review all of the records submitted and that the denial letter he received from the Board contained boilerplate language that misrepresented its consideration of his appeal.

**Plaintiff Alex Parsons**

195.     Plaintiff Alex Parsons is a resident of Mesa, Arizona.

196.     Mr. Parsons submitted an LOD benefits application in 2017.  In connection with that application, he was evaluated by Board-paid orthopedist Dr. Steven Meier, who has been paid at least $753,674 from the Board.  Not surprisingly, a sample of eight T & P evaluations rendered by Dr. Meier shows that he found no Player qualified for T & P (i.e., a 100% denial rate). The Board knows that, having collected more than $750,000 from it, Dr. Meier benefits financially from doing repeat business with the Board.  It follows that the Board knows that he has an incentive

51

to provide it with reports that will increase the chances that it will frequently return to him in the future—in other words, that he will render reports upon which the Board may rely in justifying its decision to deny benefits.

197.    Dr. Meier was also the physician at issue in the *Dimry* case noted in paragraph 18 above.  In *Dimry*, the court explained:

> Dimry tenders evidence that the Plan paid Dr. Meier … approximately $188,683 in direct compensation between April 2014 and May 2015. … The amount paid to Dr. Meier is substantial and exceeds the amounts found to be of concern in *Demer* [*v. IBM Corp. LTD Plan*, 835 F.3d 893, 901 (9th Cir. 2016)].
>
> The Plan has not rebutted this showing. It does not contest the dollar amounts paid to Dr. Meier, and says mainly that they are of no moment because the Plan's referral physicians are paid a fixed fee for examinations regardless of their final conclusions.  That may be, but the observation is off point because the inquiry under *Demer* is whether the magnitude of the payments raises a fair inference of a financial conflict.  The sizable payments to Dr. Meier do just that, and the Plan has not negated the inference by tendering evidence of "neutrality in practice."
>
> …
>
> The problem is that the Board denied benefits based upon an unreasonable bias in favor of Plan-selected physicians.  Although the Board noted "potentially conflicting medical evidence contained in the record," it did not resolve the conflicts by examining the evidence or delving into the record before it.  It simply adopted the opinions of its retained physicians by default.  The Board underscored the reflexive and non-discretionary quality of this action by stating that it "uniformly" accepts and relies upon the reports of its retained doctors. … But it was not entitled to decide a benefits claim by mere default to a Plan-selected physician.  That is the abandonment of discretion, not the exercise of it.

*Dimry*, 2018 WL 1258147, at *3-4.

198.    Although more than a third of retired NFL Players report DJD, *no* Player in the sample of 15 Players whom Dr. Meier evaluated under the LOD point system received *any* points for DJD for *any* of the body parts for which the Plan's terms award points.  Similarly, despite the prevalence among  NFL Players of cervical spine impairments, shoulder instability, rotator cuff

tears, shoulder loss of motion, and hamstring injuries, Dr. Meier awarded no Player in the sample LOD points for any of those conditions.

199.    Dr. Meier's report contained various inconsistencies. For example, Dr. Meier noted imaging submitted by Mr. Parsons that demonstrated DJD "with bone on bone contact."  He failed, however, to award Mr. Parsons points for DJD.  He also failed to award points for Mr. Parson's shoulder instability and disc herniations.  In total, Dr. Meier awarded Plaintiff Parsons only two LOD points.

200.    In its October 31, 2017 letter denying Mr. Parsons' application, the Committee, stated it had reviewed the materials in his file.  There is no evidence, however, that the Committee reviewed the entire record.

201.    In its denial letter, the Committee effectively defaulted to Dr. Meier's report regarding Mr. Parsons by accepting the conclusions in Dr. Meier's report without discussing or even acknowledging Mr. Parsons' bone-on-bone knee DJD, multiple lumbar disc herniations, or symptomatic shoulder impairments.

202.    Plaintiff Parsons appealed the Committee's denial to the Board on April 9, 2018.

203.    In connection with his appeal, Mr. Parsons submitted more evidence of his disc herniations and DJD, as well as an abnormal EMG test of his spine indicating radiculopathy.

204.    In connection with his appeal, Mr. Parsons was evaluated by Board-paid orthopedist Dr. Gregory Mack.  The Board has paid Dr. Mack at least $943,157.  In a sample of 15 T & P evaluations that he rendered, Dr. Mack concluded 14 of the Players—or 93.33%—were not entitled to T & P disability benefits.

205.    In a sample of 290 LOD evaluations overall, points for non-surgery hand ailments were given to a Player in 15.86% of the evaluations.  As to Dr. Mack in particular, although he

claims to be a hand specialist, in a sample of 27 LOD Player evaluations that he rendered, Dr. Mack did not award any Player points for a non-surgery hand ailment.

206.     Dr. Mack's report contained various inconsistencies.[8] For example, although he reported that Mr. Parsons' "shoulder does not feel stable … The 'left shoulder feels a lot looser' than the right," and correctly diagnosed Mr. Parsons shoulder "instability, status post AC joint separation, left shoulder," Dr. Mack failed to provide any reasoning as to why he did not award the three points for "Symptomatic Shoulder Instability."

207.     Indeed, notwithstanding the prevalence of common NFL disablements, in a sample of 27 Players evaluated for LOD benefits, Dr. Mack failed to award points to *any* Player for common impairments such as herniations, shoulder instability, and rotator cuff or hamstring tears.

208.     In his evaluation of Mr. Parsons, Dr. Mack awarded only 5 of the 10 points required, including DJD in the knee, but failed to award points for the other impairments discussed above, such as shoulder instability.

209.     The summary sheet allegedly presented to the Board likewise made no mention of Mr. Parsons' symptomatic shoulder instability. The summary sheet emphasized to the Board:

**THIS IS A SUMMARY ONLY. The entire administrative record compiled in conjunction with this claim/appeal has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits.**

210.     The Board issued a final denial on Mr. Parson's application on May 18, 2018.  In that denial letter, the Board stated that it had reviewed the entire record. The letter, however, neither discussed nor even acknowledged the findings in the new medical reports.

---

[8] Dr. Mack also provided a lengthy medical record review on appeal of Dr. Meier's report from Mr. Parsons' initial application, including Dr. Meier's incorrect conclusions.

211.     Plaintiff Parsons became aware from the June 2022 *Cloud* decision that multiple Board members had testified that the Board's standard members' practice is *not* to review all of the records submitted and that the denial letter he received from the Board contained boilerplate language that inaccurately represented the extent of what it had considered on his appeal.

**Plaintiff Joey Thomas**

212.     Plaintiff Joseph "Joey" Thomas is a resident of Seattle, Washington.

213.     Plaintiff Thomas suffered a career-ending concussion on August 28, 2010 while playing for the Oakland Raiders during a game against the San Francisco 49ers.

214.     Plaintiff Thomas applied for LOD benefits in 2010.  His application was denied. In connection with his application, he was evaluated by Board-paid orthopedist Dr. James Glick, who concluded that he did not qualify for LOD benefits.  Dr. Glick disregarded impairments to Mr. Thomas' neck, back, and hips, and his report contained various inconsistencies.

215.     In connection with his 2010 LOD benefits application, Plaintiff Thomas was evaluated by Board-paid neurologist Dr. Jonathan Schleimer, who found that he did not qualify. The Board has paid Dr. Schleimer at least $605,300.  Not surprisingly, from a sample of 23 LOD and T & P evaluations, Dr. Schleimer found that none of the Players qualified for either benefit (i.e., a 100% denial rate).  The Board knows that having collected more than $605,000 from the Board, Dr. Schleimer benefits financially from doing repeat business with it.  It follows that the Board knows that he has an incentive to provide it with reports that will increase the chances it will frequently return to him in the future-in other words, reports upon which the Board may rely in justifying its decision to deny benefits.

216.     Like most reports that he rendered, Dr. Schleimer provided an inconsistent and incomplete report.  For example, Dr. Schleimer reported that Mr. Thomas had an "Impairment [due] to … Post concussion syndrome Recent injury 8/2010," that this injury resulted from football

play, and that Mr. Thomas's condition was "permanent" under the Plan's terms.  Dr. Schleimer, though, did not explain why, in light of those reported facts, Mr. Thomas did not have a Major Functional Impairment to his brain sufficient to qualify him for LOD benefits pursuant to Section 6.4(a)(3) of the Plan.

217.     The Committee denied Mr. Thomas' application on January 25, 2011.  Although Dr. Schleimer conceded that Plaintiff Thomas suffers from a permanent post-concussion syndrome impairment from football play, the Committee stated in the letter that Dr. Schleimer "did not report a substantial neurological disablement."

218.     Mr. Thomas applied for T & P disability benefits in 2011.  In connection with his application, he was evaluated by Board-paid orthopedist Dr. Mack, whose lush compensation from the Board and history of rendering opinions adverse to Players seeking benefits are recounted above.  Dr. Mack failed to consider the combination of Mr. Thomas' impairments, and even discounted that "Mr. Thomas' current treating neurologist, Lily Jung Henson, M.D., has stated that Mr. Thomas is unable to engage in any occupation for remuneration or profit" because "[t]he stated basis for her opinion appears to include the diagnosis of post concussion syndrome."

219.     Moreover, although multiple courts have held that the Plan's terms do not require contemporaneous documentation, Dr. Mack claimed that "[n]o contemporaneous documents regarding musculoskeletal injury were available for review."

220.     Mr. Thomas was examined in connection with his T & P benefits application by Dr. Delis, whose lush seven-figure compensation from the Board and history of rendering opinions adverse to Players seeking T & P or LOD disability benefits are recounted above.  Dr. Delis opined that Mr. Thomas was not T & P disabled.  He did not discuss the combined impact of all of Plaintiff Thomas' impairments.  Moreover, Dr. Delis did not discuss findings favorable to Mr. Thomas

reported by his treating physician.

221.     The Committee issued a denial letter to Mr. Thomas on December 20, 2011.  In that letter, the Committee indicated that it defaulted to the opinion of the Board's physicians and it did not list other evidence submitted that it had purportedly reviewed in making its decision. Also, both the denial letter and summary sheet reflected an incorrect standard for T & P disability.

222.     Mr. Thomas applied for LOD benefits in 2012.  In connection with his application, Mr. Thomas was evaluated by Board-paid orthopedist Dr. Robert Rovner.  Dr. Rovner explained in his report that the Board had failed to provide him various medical records.

223.     Dr. Rovner unambiguously checked "Yes" on the PRF when asked "Is the patient's condition the primary or contributory cause of the… major functional impairment of a vital bodily organ…?".  Nonetheless, the Committee issued a denial letter on January 24, 2013, in which it failed to award Mr. Thomas LOD benefits on that basis, disregarding its own hired physician's opinion that satisfied the Plan's explicit terms in Section 6.4(a)(3) for entitlement to LOD benefits.

224.     Despite Mr. Thomas having submitted overwhelming evidence of documented post-concussion syndrome while playing in the NFL, the Committee contended that he had presented "no evidence that this condition arises out of League football activities."

225.     The Committee omitted in its denial letter that Dr. Rovner had reported that Plaintiff Thomas satisfied the explicit requirements for LOD based on Plan Section 6.4(a)(3) at the time.  Moreover, the Committee did not have Plaintiff Thomas examined by a neurologist to evaluate his post-concussion syndrome, despite it being claimed in his application.

226.     Plaintiff Thomas applied for LOD and NC benefits in 2014. In connection with his application, he was evaluated by Board-paid orthopedist Dr. Meier. As recounted above, the

court in *Dimry* reasoned that "[t]he amount paid to Dr. Meier [wa]s substantial and exceed[ed] the amounts found to be of concern in *Demer*. 835 F.3d at 902." 2018 WL 1258147, at *3. As is true for other Player benefit applicants whom he evaluated, Dr. Meier discounted evidence favorable to Mr. Thomas, provided inconsistencies, and used various template language.

227.    In connection with his applications, Mr. Thomas was also evaluated by Board-paid neurologist Dr. Edward O'Connor. The Board has paid Dr. O'Connor at least $673,300 in compensation. Not surprisingly, a sample of 20 LOD benefits evaluations rendered by Dr. O'Connor showed that he found *no* Player to qualify for LOD benefits (i.e., a 100% denial rate). The Board knows that, having collected more than $670,000 from it, Dr. O'Connor benefits financially from doing repeat business with the Board. It follows that the Board knows that he has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, reports upon which the Board may rely in justifying its decision to deny benefits.

228.    Dr. O'Connor provided a report containing various inconsistencies and dismissed both self-reported complaints and objective evidence of cognitive impairment.

229.    In connection with his 2014 applications, Plaintiff Thomas was also evaluated by Board-paid neuropsychologist Dr. Johnny Wen. From April 1, 2013 through March 31, 2018, the Board paid Dr. Wen at least $820,500. Not surprisingly, a sample of 29 benefit evaluations rendered by Dr. Wen show that he found *no* Player qualified for any benefits (i.e., a 100% denial rate). The Board knows that, having collected more than $820,000 from the Board, Dr. Wen benefits financially from doing repeat business with it. It follows that the Board knows that Dr. Wen has an incentive to provide it with reports that will increase the chances that the Board will frequently return to him in the future—in other words, that he will render reports upon which the

Board may rely in justifying its decision to deny benefits to a Plan participant.

230.    As with many Players whom he evaluated, Dr. Wen misrepresented Mr. Thomas's valid results as invalid.  For example, Dr. Wen claimed that Plaintiff Thomas' TOMM results were egregiously invalid.  In accordance with the TOMM manual, however, Mr. Thomas had valid scores on both trial 1 and 2.

231.    Confusingly, when asked whether Mr. Thomas "show[ed] evidence of acquired neuro-cognitive impairment," Drs. O'Connor and Wen appear to answer both "Yes" and "No." Also, when asked,  "If yes, is the Player's acquired neuro-cognitive impairment mild or moderate," both responded affirmatively, indicating a "Mild" impairment.

232.    In a denial letter issued on May 23, 2014, however, the Committee omitted findings favorable to Mr. Thomas and appeared to default to its desired outcome from its physicians. Specifically, the Committee endorsed the outcome the Board-paid physicians determined without addressing the inconsistencies in the physicians' reports.  There is no indication that the Committee reviewed Mr. Thomas' entire file.

233.    Mr. Thomas again applied for NC benefits in 2019. In connection with this application, he was evaluated by Board-paid neurologist Dr. Lawrence Murphy.  A sample of 17 benefit conclusions rendered by Dr. Murphy shows that he found *none* of the Players qualified for any benefit (i.e., a 100% denial rate).  Not surprisingly, Dr. Murphy concluded that Mr. Thomas did not qualify for NC benefits.

234.    Dr. Murphy made findings that were not consistent with the objective evidence and the terms of the Plan.  For example, although Mr. Thomas's MoCA testing demonstrated at least a mild cognitive impairment, Dr. Murphy found "[n]o cognitive impairment."

235.    In connection with his 2019 application, Mr. Thomas was also evaluated by

Board-paid neuropsychologist Dr. Alan Breen.  From a sample of six evaluations for NC benefits, Dr. Breen found that *none* of the Players were entitled to the benefit (i.e., a 100% NC denial rate). Not surprisingly, Dr. Breen provided a report that contained inconsistencies with the terms of the Plan.

236.    The Committee issued a denial letter on April 23, 2019, stating that it had considered the materials in Plaintiff Thomas' file but that it had "reached its decision despite potentially conflicting medical evidence in those records."  The Committee also failed to reconcile Dr. Breen's reasoning with the terms of the Plan.

237.    Mr. Thomas submitted an appeal on October 1, 2019.  In connection with his appeal, he was evaluated by neurologist Dr. Brahin, whose lucrative compensation from the Board and history concerning Players' benefit claims are recounted above.  Dr. Brahin provided a report that contained various inconsistencies with even his own the objective testing and the plain terms of the Plan.  For example, he concluded there was no evidence of cognitive impairment but he stated in his report that Mr. Thomas' score on the MoCA testing "could be consistent with mild cognitive impairment."  Also, he incorrectly marked multiple tests within the MoCA battery as showing Mr. Thomas to be unimpaired.

238.    Mr. Thomas was also evaluated by Board-paid neuropsychologist Dr. Francisco Perez, who has received at least $250,500 from the Board. In a sample of four benefit evaluations that he rendered, Dr. Perez found that no player qualified for a benefit (i.e., a 100% denial rate).

239.    Dr. Perez made factually inconsistent statements in his report.  For example, he alleged that Mr. Thomas's "neurological status ha[d] remained normal in all the medical evaluations."  In fact, the opposite was true.  Each of Mr. Thomas' previous MoCA evaluations showed cognitive impairment. When his own testing demonstrated cognitive impairments, Dr.

Perez dismissed even his own results:   "Some of the data may suggest a mild cognitive impairment.  However, in my opinion, … the present results … do not provide consistent evidence of a cognitive impairment."  Dr. Perez belittled Mr. Thomas' application as a "quest for disability benefits."

240.    On February 13, 2020, the Board issued a decision denying Mr. Thomas' appeal. In its letter, the Board claimed that it had "reviewed all of the evidence in [Mr. Thomas'] Plan file and unanimously concluded that [he was] ineligible for NC benefits."  Moreover, the Board stated that "Dr. Perez had concluded that while some data may suggest a mild cognitive impairment, it is not related to an acquired disorder."  The Board did not explain or attempt to reconcile how Plaintiff Thomas' post-concussion syndrome was not an acquired cognitive disorder.

241.    Mr. Thomas again submitted an NC benefits application in 2021. In connection with his 2021 application, he was evaluated by Board-paid neuropsychologist Dr. Crum, and Board-paid neurologist Dr. Diaz, whose histories of rendering opinions adverse to Players seeking benefits are recounted above.  Not surprisingly, neither physician concluded that Mr. Thomas qualified for benefits.

242.    The Committee denied Mr. Thomas's application for NC benefits on February 25, 2022.  It stated in its denial letter that the Committee reviewed the entire record. Mr. Thomas appealed the Committee's decision on July 29, 2022.  That appeal remains pending.

**Plaintiff Jason Alford**

243.    Plaintiff Jason "Jay" Alford is a resident of Bloomfield, New Jersey.

244.    Plaintiff Alford suffered repetitive head trauma from NFL football play and still experiences cognitive symptoms.

245.    Plaintiff Alford applied for NC benefits in 2019.   In connection with that application, Mr. Alford was examined by Board-paid neuropsychologist Dr. Robert Bornstein.  A

sample of 10 T & P disability evaluations rendered by Dr. Bornstein shows that he found no Player qualified.

246.     Dr. Bornstein concluded that that Plaintiff Alford did not qualify for NC benefits. Confusingly, Dr. Bornstein stated in his report that Mr. Alford's "overall pattern of performance *does* suggest a clear pattern of cognitive impairment. Therefore these results *do not* provide evidence of acquired neurocognitive impairment."  (Emphasis added.)

247.     Plaintiff Alford was also evaluated by Board-paid neurologist Dr. Chad Hoyle, whose history of rendering opinions adverse to Players seeking benefits are recounted above.  In concluding that Mr. Alford did not qualify for NC benefits, Dr. Hoyle applied an incorrect standard for NC eligibility.

248.     The Committee issued a denial letter on May 29, 2019, in which it did not even attempt to reconcile Dr. Bornstein's contradictory statements.  The Committee claimed in its denial letter that it had reviewed the entire record. Mr. Alford appealed the Committee's decision on November 24, 2019, but the Board denied Mr. Alford's appeal on February 14, 2020.  Like the Committee, the Board claimed in its final denial letter that it had reviewed the entire record.

249.     Plaintiff Alford again submitted an NC benefits application in 2022.  In connection with that reapplication, he was evaluated by Board-paid neurologist Dr. Salman Azhar. From a sample of 5 benefit evaluations for NC benefits that he rendered, Dr. Azhar found that none of the Players qualified (i.e., a 100% denial rate).  His reports also include various inconsistencies with the objective evidence and the plain terms of the Plan.

250.     Plaintiff Alford was also examined by Board-paid neurologist Dr. McCasland, whose lush seven-figure compensation from the Board and history of rendering opinions adverse to Players are recounted above.  Dr. McCasland discounted evidence weighing in Mr. Alford's

favor, including problems with short-term memory. Instead, he concluded that "the player's neurological examination was normal."

251.    The Committee denied Mr. Alford's application on April 12, 2022. The Committee stated in its denial letter that it had reviewed the entire record.

252.    Plaintiff Alford submitted an appeal on October 3, 2022.  In connection with his 2022 NC benefits appeal, he was evaluated by Board-hired neuropsychologist Dr. Ernest Fung. Although Dr. Fung described Mr. Alford's scores on a cognitive memory test, and language test as "Low Average," other Board-hired physicians have classified the same scores as showing "mild" impairments.  Mr. Alford's appeal remains pending with the Board.

**I.    Powerful Statistical Evidence That Many Board-Hired Physicians Have Financial Conflicts of Interest That Have Infected the Board's Decision-Making and Resulted in a Pattern of Parsimonious Assessments, Resulting in Decisions Unfavorable to Benefits Applicants**

253.    There is powerful statistical evidence that strongly suggests a systematic pattern that the more the Board pays a physician, the more likely the physician is to have a high rate of rendering opinions adverse to benefits applicants.  As a result, a pattern of assessments unfavorable to benefits claimants has infected the Board's decision-making.

254.    Defendants breached their fiduciary duty of loyalty to Plaintiffs by misrepresenting that all Board-hired physicians are "neutral" when, in fact, most are biased, and there is a correlation between the amount of income they derive from business they do with the Board and conclusions they render that are adverse to Player benefits applicants.  Conversely, the less income that physicians derive from business with the Board the greater the likelihood that they will render an impartial assessment.

255.    Indeed, multiple courts have determined that a sample of statistics can show a parsimonious pattern of assessments unfavorable to claimants, demonstrating "powerful evidence"

of financial conflict.  Also, a court has already expressed concern about the possibility that Board-paid physicians like Dr. Meier, who reap substantial income or business benefits from Board referrals may allow economic self-interest to influence medical opinions about a claimant's disabilities. The foregoing statistics concerning highly compensated Board-hired physicians and the opinions they have rendered, in the great majority of cases at the expense of claimants, demonstrate that such concerns have come to fruition.  At a bare minimum, they give rise to a strong inference of bias.

256.    As recounted above, Board-hired physicians with an 85-100% T & P denial rate, like Drs. Meier, Wen, McCasland, Delis, Garmoe, and Macchiocchi amongst many others, stood to benefit financially from the repeat business that might come from providing Defendants with reports that were to their liking. Their history of conclusions provides evidence of this conflict and shows that many reports frequently support a decision to deny benefits to deserving claimants.

257.    Section 3.1(d) of the Plan, for example, states that at least one Board selected *Neutral* Physician must find, under the standard of 3.1(e), that the Player is T & P disabled. If no Board *Neutral* Physician renders such a conclusion, then the threshold for eligibility is not satisfied.

258.    By misrepresenting to Players that conflicted physicians are "neutral" physicians, Defendants have created a sham process for Plaintiffs and absent members of the proposed Class (defined below).

259.    Defendants paid many allegedly Neutral Physicians substantial amounts of money for a high volume of repeat work evaluating Plaintiffs, as alleged herein. The magnitude of these numbers, particularly when combined, show that there is a financial conflict that did, in fact, influence the Plan-hired Physicians' assessments of Plaintiffs and absent Class members.

260.     As shown in the graphs below, the powerful evidence of bias is not an aberration.

261.     The vertical line in the charts represents the amount of Board compensation to the physicians each year between 2015-20.  The horizontal line represents that physician's overall T & P denial rate in the statistical sample across all years.

262.     In each year, there is a clear correlation proving the more the Board pays a physician, the more likely the physician is to have a high denial rate.



**Powerful Evidence of Statistics Showing a Parsimonious Pattern of Assessments Unfavorable to Claimants**
Neutral Physicians for Total & Permanent Disability Evaluation, ≥ 4 Evaluations

## Powerful Evidence of Statistics Showing a Parsimonious Pattern of Assessments Unfavorable to Claimants

Neutral Physicians for Total & Permanent Disability Evaluation, ≥ 4 Evaluations



## Powerful Evidence of Statistics Showing a Parsimonious Pattern of Assessments Unfavorable to Claimants

Neutral Physicians for Total & Permanent Disability Evaluation, ≥ 4 Evaluations







263.   Although the Board misrepresents to Players that the medical professionals it

employs are "neutral," a statistical sample that included Class member benefit records shows that from March 31, 2015 through April 1, 2016, the physicians paid more than $137,000 by the Board that year had an infinitesimal 1 out of 175 evaluations in which they concluded a Player was T & P disabled (i.e., 0.5%).

264.    Only 2.5% of Players were found T & P disabled by physicians paid more than $200,000 by the Board from March 31, 2016 through April 1, 2017.

265.    Only 2.2% of Players were found T & P disabled by physicians paid more than $190,000 by the Board from March 31, 2017 through April 1, 2018.

266.    Only 3.8% of Players were found T & P disabled by physicians paid more than $215,000 by the Board from March 31, 2018 through April 1, 2019.

267.    Only 4.5% of Players were found T & P disabled by physicians paid more than $210,000 from March 31, 2019 through April 1, 2020.

268.    In contrast, 26.67% of Players were found T & P disabled by the Board-hired physicians paid between $52,000-$60,000 in 2015-16.  Similarly, 20% of Players were found T & P disabled by Board-hired physicians who were paid between $60,000-$72,000 in 2016-17; more than 44% for physicians paid between $75,000-$90,000 in 2017-18; 39.7% for physicians paid between $56,000-$64,000 in 2018-19; and 30% for physicians paid between $54,000-$60,000 in 2019-20.

269.    In the sample, more than 45% of the 707 T & P evaluations were performed by Board-hired physicians with a 100% T & P denial rate.  Moreover, over 58% of those evaluations were performed by Board-paid physicians with a 90% or higher T & P denial rate.  Also, 65.6% of those evaluations were performed by Board-paid physicians with an 85% T & P denial rate.

270.    The statistical sample shows that 112 different Board-paid physicians performed T

& P evaluations. *No* Player was deemed T & P disabled by 58% of the Board-hired physicians.

## V.   CLASS ACTION ALLEGATIONS

271.     Plaintiffs assert Counts I-VIII below (paragraphs 283-324) on behalf of a proposed

nationwide class ("Class"), pursuant to Federal Rule of Civil Procedure 23.

272.     The proposed Class is defined as follows:

> **All participants in the Plan who filed an application for one or more categories of disability benefits under the Plan on or after August 1, 1970.**

273.     In addition, the Class consists of four proposed Subclasses, which are defined as:

> **(a) The T & P SUBCLASS: All members of the Class who filed an application seeking Total & Permanent Disability benefits on or after August 1, 1970, except for the members of the ACTIVE FOOTBALL SUBCLASS.**

> **(b) The ACTIVE FOOTBALL SUBCLASS: All members of the Class who filed an application for Total & Permanent Disability benefits on or after August 1, 1970 and were within the timeframe to qualify for Active Football benefits at the time they applied.**

> **(c) The LOD SUBCLASS: All members of the Class who filed an application for Line-of-Duty Disability Benefits on or after August 1, 1970.**

> **(d) The NC SUBCLASS: All members of the Class who filed an application for Neurocognitive Disability benefits on or after April 1, 2012.**

274.     Upon completion of discovery with respect to the scope of the Class and

Subclasses, Plaintiffs reserve the right to amend the Class and Subclass definitions.

275.     Excluded from the Class and Subclasses are Defendants and any entity in which

any Defendant has a controlling interest, and their legal representatives, officers, directors,

affiliates, assignees, and successors.  Also excluded from the Class and Subclasses are any judge

to whom this action is assigned, together with any relative of such judge within the third degree of

relationship, and the spouse of any such persons.

276.   **Numerosity**:  The members of the Class and Subclasses are so numerous (believed to be at least in the hundreds) and geographically dispersed that it is impractical to join all of them in a single action.  The exact number and the identity of Class and Subclass members can be ascertained from Defendants' benefits application files and records.

277.   **Commonality**: There are numerous questions of law and fact common to the members of the Class and Subclasses.  Among the many common questions are:

(a) Whether Defendants have failed to review and take account of "all comments, documents, records, and other information submitted by the claimant," as required under ERISA implementing regulation 29 C.F.R. § 2560.503-1(h)(2)(iv) and the Plan itself (all Subclasses);

(b) Whether Defendants have failed to adopt procedures to ensure accurate claims processing (all Subclasses);

(c) Whether Defendants failed to put in a place a review system to ensure neutrality in practice (all Subclasses);

(d) Whether Board-hired physicians have had financial conflicts of interest that influenced their opinions (all Subclasses);

(e) Whether Defendants have had a willful and systematic pattern or practice of hiring physicians with the objective of having those physicians render findings and opinions unfavorable to disability benefits applicants (all Subclasses);

(f) Whether Defendants have misrepresented that all Board-paid physicians are "neutral" (all Subclasses);

(g) Whether Defendants repeatedly breached their fiduciary duty of loyalty through repeated misrepresentations to Plaintiffs and Class members that Committee and Board members reviewed the entire administrative record as required by law when, in fact, they did not (all Subclasses);

(h) Whether Defendants breached their fiduciary duty of loyalty by misrepresenting to Plaintiffs and Class members that Committee and Board members considered all of a Player's impairments as required when they did not (all Subclasses);

(i)   Whether Defendants improperly used and relied upon the same advisors at the Committee and Board levels (all Subclasses);

(j)   Whether Defendants routinely failed to consider the cumulative effect of all impairments (T & P Subclass);

(k)   Whether Defendants have unreasonably interpreted the Plan's explicit requirements for Active Football T & P eligibility (T & P Subclass);

(l)   Whether Defendants have routinely failed to specify in decision letters why they disagree with findings and reports that support a Player's entitlement to benefits (all Subclasses);

(m) Whether Defendants have failed to provide adequate notice when impermissibly amending the Plan (all T & P Subclass);

(n)   Whether Defendants have routinely considered factors expressly barred by the Plan's plain terms, such as education and prior training (T & P Subclass);

(o)   Whether Defendants' adversarial conduct towards Plan participants demonstrates bad faith claims administration (all Subclasses); and

(p)   Whether Defendants breached their fiduciary duty of care (all Subclasses).

278.   Because these and similar questions will either focus exclusively on Defendants' practices or will entail consideration of Plan provisions and interpretations uniformly applicable to Class or Subclass members, rather than require an inquiry into the circumstances of individual Plaintiffs' or Class and Subclass members' benefits applications, they are necessarily common. Moreover, the determination of these questions will resolve issues central to the validity of the claims in one stroke, and  a classwide proceeding would generate common answers apt to drive the resolution of this litigation.

279.   **Typicality**: Plaintiffs' claims are typical of the claims of absent Class and Subclass members because they have sustained the same injury—the wrongful denial of benefits on account of Defendants' sundry unlawful practices and violations of Plan terms and of ERISA— as detailed herein.  Moreover, Plaintiffs assert the same causes of action and seek the same relief

as would absent members. Consequently, they have every incentive to pursue these claims vigorously on behalf of absent Class members.

280.  **Adequacy**: Plaintiffs will fairly and adequately protect the interests of absent members of the Class. Their claims are typical of those of absent members, which gives them every incentive to vigorously pursue those claims on behalf of absent members, and they have no conflicts of interest with absent members. Moreover, Plaintiffs have retained counsel who are competent and experienced in class action and ERISA litigation and familiar with the Plan and its disability benefits structure and processes.

281.  Certification of the Class and Subclasses is appropriate under Rule 23(b)(1)(A) of the Federal Rules of Civil Procedure because there is a risk that the prosecution of separate actions would result in inconsistent adjudications, thereby establishing incompatible standards of conduct for the Plan's Administrator and other fiduciaries.

282.  Certification of the Class and Subclasses is also appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted or refused to act on grounds generally applicable to the Class and Subclasses, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class and Subclasses as a whole.

### VI.  CAUSES OF ACTION

**Count I:  Section 502(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B) – Wrongful Denial of Benefits (on Behalf of the Class and Subclasses)**

283.  Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

284.  The Plan is an "employee welfare benefit plan" within the meaning of Section 3(1) of ERISA, 29 U.S.C. § 1002(1).

285.  Defendants wrongfully denied Plaintiffs and absent Class members the benefits

due to them in accordance with Plan documents.  They failed to act in compliance with the Plan's terms.  The actions taken and interpretations made by the Board were wrongful, unreasonable, and in bad faith as described in paragraphs 1-270 above.

286.     For example, Defendants wrongfully denied benefits and abused their discretion when they unreasonably failed to consider that Players may be T & P disabled from the cumulative impact and combined effects of all of a claimant's impairments, rather than compartmentalizing and considering each impairment or type of impairment only "in silo."

287.     Defendants have wrongfully denied benefits and abused their discretion by unreasonably dismissing reliable and undisputed self-reports for lack of objective medical evidence although the Plan does not limit proof to objective evidence.

288.     Moreover, Defendants have unreasonably interpreted the requirements for Active Football T & P.  For example, Plan officials acted inconsistently with the terms of the Plan when they denied Active Football benefits for Charles Sims because, contrary to the Plan's terms, Board members testified in *Cloud* that Active Football T & P disability benefits are available only to those Players who are paralyzed on the field.

289.     Defendants have unreasonably denied benefits when they failed to exercise their discretion by defaulting to their own biased physicians.  They have simply rubber-stamped the opinions of their retained, biased physicians. That is the abandonment of discretion, not the exercise of it.

**Count II:  Violation of Section 503(2) of ERISA, 29 U.S.C. § 1133(2) – Denial of Full and Fair Review (on Behalf of the Class and Subclasses)**

290.     Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

291.     Defendants have violated Section 503(2) of ERISA, 29 U.S.C. § 1133(2), by denied

Plaintiffs and absent Class members full and fair review of adverse benefits determinations. In particular, Defendants have failed to review *all* records and documents in the administrative file.

292.    Committee and Board members testified for the first time in *Cloud* that the Board's members "practice" is that they do not review all evidence in the administrative record.

293.    Also, Defendants have violated 29 U.S.C. § 1133(2) because they have failed to provide fair and neutral physicians.

294.    Moreover, Defendants have violated 29 U.S.C. § 1133(2) through inherent conflicts by relying on the same advisors at the Committee and Board levels.

295.    Similar violations to those in *Cloud* were committed by Defendants with respect to the benefits claims of Plaintiffs here, as well as those of absent members of the proposed Class and Subclasses.[9]

296.    There is no evidence that Board members were ever consulted with respect to all of the reasons for denial stated in Plaintiffs' and Class members' decision letters.

297.    The Board's wholesale adoption of its advisors' reasons for denial, without having contemplated all of those specific reasons, defies any possibility that the "meaningful review" required by ERISA was conducted on Plaintiffs' and Class members' benefits claims.

**Count III:  Breach of Fiduciary Duty of Loyalty – Section 502(a)(3), 29 U.S.C. § 1132(a)(3) by the Board (Equitable, Declaratory and Injunctive Relief) (on Behalf of the Class and Subclasses)**

298.    Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as

---

[9] In *Cloud*, the court found that the Board had "failed to provide Plaintiff a full and fair review in violation of ERISA in connection with its decision to deny Plaintiff's appeal for…Active Football T&P…because (1) it did not clearly identify the specific reasons for denial of Plaintiff's appeal, (2) it did not consider all documents and records submitted…, (3) it afforded deference to the [Committee], and (4) it did not consult with an appropriate health care professional despite basing its determination on a medical judgment. In so doing, the Board failed to substantially comply with ERISA procedural regulations and denied Plaintiff a meaningful dialogue regarding its denial of Plaintiff's reclassification appeal."  *Cloud*, 2022 WL 2237451, at *29.

though fully set forth herein.

299.    Defendants have repeatedly breached their fiduciary duty of loyalty through behavior that, in the aggregate, demonstrates that the Board and other Defendants acted as an adversary of participants rather than as a fiduciary, including Defendants' active concealment of their violations through repeated reassurances containing misrepresentations, continuous bad faith, and other actions.

300.    Defendants have breached the fiduciary duty of loyalty through material misrepresentations in their decision letters to Plaintiffs that the Committee and the Board reviewed all of the information in the record as required by law when, in fact, Board members' practice is that they do not, in fact, review all of the medical records and other documents in a claims file. Defendants misrepresented this fact in decision letters and in the SPD.

301.    The Board knows that it must review the entire record.  Indeed, the summary sheets prepared by Groom for the Board repeatedly emphasize and remind the Board that they must review the entire administrative record prior to making a final decision. For example, the summary sheet allegedly reviewed by the Board for Plaintiff Smith explicitly emphasized:

**THIS IS A SUMMARY ONLY.  The administrative record compiled in conjunction with this claim has been made available and should be reviewed prior to making a final determination on the Player's claim for benefits.**

302.    As recounted in paragraph 36 above, the Plan's own lawyers at Groom represented on the Plan's behalf that it had knowledge that "[t]he decision-making fiduciaries of the Plan must not only carefully apply all of these rules, they must do so while reviewing voluminous records."

303.    Defendants have also violated 29 U.S.C. § 1132(a)(3) by repeatedly conveying material misrepresentations that their highly paid and frequently retained physicians are "independent experts, but the former does not guarantee the latter." *Demer*, 835 F.3d 893, 902-03 (9th Cir. 2016).  As described above, sham evaluations with highly paid physicians like Dr.

McCasland are not the fair and neutral evaluations that the Board repeatedly promises.

304.    As described above, Plaintiffs could not have had actual knowledge of the Committee's and Board's systematic practice of misrepresenting that they have considered *all* documents prior to the testimony given in *Cloud*.

305.    Defendants undertook affirmative steps to conceal their unlawful practice because they made repeated misrepresentations to Plaintiffs and Class members in their decision letters and in the SPD by falsely and incorrectly reassuring Plaintiffs and absent Class members that decisions comport with Plan, statutory, and regulatory obligations.

**Count IV:   Violation of 29 C.F.R. § 2560.503-1(h)(3)(ii)'s Mandate to "Not Afford Deference to the Initial Adverse Benefit Determination" and to Have Review Conducted by an Individual Who Did Not "Ma[k]e the Adverse Benefit Determination That Is the Subject of the Appeal" or Its Subordinate (on Behalf of the Class and Subclasses)**

306.    Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

307.    Defendants have violated the mandate in 29 C.F.R. § 2560.503-1(h)(3)(ii) to have reviews conducted by individuals who did not "ma[k]e the adverse benefit determination that is the subject of the appeal" or its subordinate by relying, when deciding appeals, on advisors who heavily influence and are involved in the Committee's initial benefits determinations. The Board has failed to review disability benefits applications appeals *de novo* by relying on such advisors, including from Groom, who were involved in the initial Committee's determinations.

308.    Groom advises both the Committee and the Board, despite the inherent conflict of interest arising from acting in such a dual capacity.

309.    Summary sheets and decision letters of Plaintiffs, as well as those of absent Class members, have been ghost-written by Groom without the benefit of discussion with or input from the Committee or the Board. The Committee and the Board have merely rubber-stamped the

content of the decision letters.

### Count V:  Violation of 29 C.F.R. § 2560.503-1(h)(2)(iv) by the Board in Failing to Consider "All Comments, Documents, Records, and Other Information Submitted by the Claimant" (on Behalf of the Class and Subclasses)

310.    Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

311.    Defendants have violated 29 C.F.R. § 2560.503-1(h)(2)(iv) by failing to consider "all comments, documents, records, and other information submitted by the claimant," as described above.

312.    Rather than review all documents and other information in the claim file as required under ERISA and pursuant to the Plan's terms, the Committee's and Board's practice is to review summary sheets prepared by Groom, but not actual medical records or other relevant documents in the administrative record.

313.    Committee and Board members admitted for the first time in *Cloud* that their "practice" is that they do not actually review all evidence in the administrative record.

### Count VI:  Violation of 29 C.F.R. § 2560.503-1(b)(7) – Failure to Ensure the Independence and Impartiality of Persons Involved in Making Decisions (on Behalf of the Class and Subclasses)

314.    Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

315.    ERISA implementing regulations provide that "[i]n the case of a plan providing disability benefits, the plan must ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a claims adjudicator or medical or vocational expert) must not be made based upon the likelihood that the

individual will support the denial of benefits." 29 C.F.R. § 2560.503-1(b)(7).

316.     Defendants have violated 29 C.F.R. § 2560.503-1(b)(7) by intentionally, consciously, or recklessly employing sham "neutral physicians" whose lack of impartiality is demonstrated by their history of rendering opinions adverse to Players.

317.     As recounted above, powerful statistical evidence exists strongly suggesting a systematic pattern that the more the Board pays a physician, the more likely the physician is to have a high denial rate.  For example, combining the total T & P statistics in the sample for the Board's highest-paid and second-highest paid neuropsychologist in 2020-21, and highest-paid psychiatrist that year, overall there was *no* Player out of 28 total Players evaluated by these three physicians whom they found to qualify for T & P. Similarly, combining the total T & P statistics in the sample for the Board's four highest-paid neuropsychologists from April 1, 2019 through March 31 2020, overall there was *no* Player out of 46 total Players evaluated by those four neuropsychologists whom they found to qualify for T & P. Similarly, combining the total T & P statistics in the sample for the Board's five highest-paid neuropsychologists from April 1, 2017 through March 31 2018, overall there was *no* Player out of 44 total Players evaluated by those five neuropsychologists whom they found to qualify for T & P.

318.     As recounted above, in the statistical sample:  (i) more than 45% of the 707 T & P evaluations were performed by Board-hired physicians with a 100% T & P denial rate; (ii) over 58% of those evaluations were performed by Board-paid physicians with a 90% or higher T & P denial rate; (iii) 65.6% of those evaluations were performed by Board physicians with an 85% T & P denial rate; and (iv) of 112 different Board-paid physicians that performed T & P evaluations, *no* Player was deemed T & P disabled by 58% of those Board-physicians.

319.     As recounted above, Defendants failed to take affirmative steps to reduce bias and

promote accurate claims determinations, such as maintaining statistics of their physicians' findings on claims so as to ensure their neutrality in practice.

### Count VII:  Violation of 29 C.F.R. § 2560.503-1(b)(5) – Failure to Establish Administrative Processes and Safeguards to Ensure That Plan Provisions Have Been Applied Consistently to Similarly Situated Applicants (on Behalf of the Class and Subclasses)

320.     Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

321.     Defendants have violated 29 C.F.R. § 2560.503-1(b)(5) by failing to establish administrative processes and safeguards to ensure that Plan provisions have been applied consistently to similarly situated applicants, by applying inconsistent interpretations of the requirements (such as for Active Football T & P disability), and in interpreting the Plan term "[a]rising out of League football activities" in an unduly restrictive manner, defying logic, common sense, and physicians' medical judgments, as described above.

### Count VIII:  Violation of 29 C.F.R. § 2520.102-3(t)(1) – Contents of Summary Plan Description (on Behalf of the Class and Subclasses)

322.     Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

323.     Defendants have violated 29 C.F.R. § 2520.102-3(t)(1) through the dissemination to Plan participants of inaccurate and misleading explanatory material, as described above.  The Plan's 2019 SPD represented that, "[i]n making its decision on review, the Board will take into account all available information."  The Committee and Board, however, have a practice of not reviewing all of the records in the administrative file. Moreover, they also have a practice of not considering whether a Player is T & P disabled based on the cumulative effect of all conditions listed in his application.

324.     Also, the word "neutral" is used 38 times in the Plan's 2019 SPD when referencing

Board-hired physicians.  Most of those physicians, however, are not "neutral" as claimed.

**Count IX:  Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), for Removal of Board Members for Repeated, Substantial, and Willful Systematic Breaches of Fiduciary Duty (on Behalf of the Plan Only)**

325.     Plaintiffs repeat, reallege, and incorporate by reference Paragraphs 1-270 as though fully set forth herein.

326.     Plaintiffs assert this claim solely on behalf of the Plan itself, pursuant to Sections 409(a) and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109(a) and 1132(a)(2), rather than on behalf of themselves or absent members of the Class or any Subclass.

327.     The Board has engaged in repeated and substantial violations of their fiduciary duties and when the Board's behavior is considered in the aggregate, it becomes evident that Defendants abdicated their fiduciary obligations.  Moreover, the Board's repeated refusal to pay contractually authorized benefits has been willful and part of a larger systematic breach of its fiduciary obligations.  Furthermore, the Board has become subject to demonstrated and statistically proven conflicts to the extent that its members can no longer be trusted to exercise their discretion fairly.

328.     As recounted above, the Board has continually acted in an objectively unreasonable manner in conflict with their duties of loyalty and care and in such a manner that having the Board continue to act as trustee would be detrimental to the interests of the Plan.

329.     The aggregate of the Board's culpable behavior has demonstrated egregious breaches of their duty of loyalty to Plan participants, including, but not limited to, repeated material misrepresentations to Participants; lack of qualifications; blatant disregard of ERISA's terms and purposes; failure to review favorable evidence in claimants' files and repeated active concealment of this material fact through misleading statements of fact in Player decision letters; repeatedly and unjustifiably dismissing undisputed facts that support a finding of disability; abdication of

decision-making to improper and conflicted advisors, including the Board's attorneys and highly paid medical experts; repeatedly misrepresenting that conflicted Board-hired physicians whom the Board knows or should know render result-oriented findings and opinions adverse to claimants are Neutral Physicians, resulting in a sham process; and failure to conduct proper Board meetings with open discussion or meaningful dialogue or in some cases to even attend such meetings.

330.    These acts and omissions have caused injury to the Plan.

331.    Defendants' breaches of fiduciary duty and significant breaches of trust warrant their replacement and this Court's appointment of new members in their stead, whether entirely on this Court's initiative or through a directive from the Court to Defendants to propose new Board members for the Court's consideration and appointment to replace the current members of the Board.

## VII.    CONDITIONS PRECEDENT

332.    All conditions precedent to the relief being sought by Plaintiffs in this suit have been performed or have occurred.

## VIII.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

333.    Plaintiffs have either exhausted all available administrative remedies under the terms of the Plan or, alternatively, they are deemed to have exhausted administrative remedies because Defendants failed to afford Plan participants a full and fair review process, attempting to receive a fair review would be futile, and the Plan lacks procedures in place that would be adequate to provide a full and fair review. The administrative process that they purport to afford Plan participants is a sham.  In the further alternative, exhaustion of administrative remedies is not required here because Plaintiffs assert claims for breaches of fiduciary duty and also assert statutory violations of ERISA and violations of regulations promulgated thereunder, separate from

violations of Plan terms.

## IX.    TOLLING OF LIMITATIONS PERIODS

334.    Given the continuing nature of Defendants' breaches of their statutory and regulatory obligations and of their fiduciary duties, the limitations periods applicable to Plaintiffs' and absent Class members' claims have not begun to run.   Alternatively, as recounted above, because Defendants have for decades actively concealed their misconduct, including through repeated misrepresentations to Plaintiffs and absent Class members, all applicable statutes of limitations affecting Plaintiffs' and Class members' claims have been tolled.

## X.    ATTORNEY'S FEES AND INTEREST

335.    As a result of Defendants' actions as complained of herein, Plaintiffs have been forced to retain the undersigned counsel to represent them.  Accordingly, Plaintiffs are entitled to reasonable and necessary attorneys' fees and costs incurred and to be incurred in bringing this suit pursuant to all applicable law, including in accordance with ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1).

336.    Plaintiffs are also entitled to recover pre-judgment and post-judgment interest as allowed by law.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that they be granted judgment against Defendants as follows:

337.    That as to Counts I through VIII this action be certified as a class action;

338.    That Plaintiffs be appointed as the representatives of the Class and of their respective Subclasses;

339.    That counsel for Plaintiffs be appointed as counsel for the Class and Subclasses;

340.    A judgment awarding Plaintiffs and Class members monetary relief sufficient to place them in the same position in which they would have been in if Defendants had granted and paid them the full amount of benefits that they deserved, in accordance with the plain terms of the Plan;

341.    Injunctive relief prohibiting Defendants from terminating or reducing Plaintiffs' and Class members' benefits until the end of the maximum benefit period, or such other declaration the Court deems proper;

342.    Injunctive relief prohibiting Defendants from reducing benefits payable to Plaintiffs and Class members due to their participation in this lawsuit;

343.    Injunctive relief prohibiting Defendants from acting inconsistently with the plain terms of the Plan;

344.    A judgment reinstating benefits to Plaintiffs and Class members with respect to whom the Plan terminated benefits previously granted and where significant procedural deficiencies occurred;

345.    A declaration that Defendants did not afford Plaintiffs and Class members full and fair review;

346.    Injunctive relief prohibiting Defendants from conducting the practices described herein that denied Plaintiffs and Class members a full and fair review;

347.    A judgment awarding equitable relief in the form of restitution (disgorgement of profits resulting from the Defendants' breaches of the fiduciary duty of loyalty);

348.    A judgment awarding equitable relief in the form of surcharge (make-whole relief, including relief in the form of monetary compensation, in an amount equal to Plaintiffs' and Class members' losses resulting from Defendants' breaches of the fiduciary duty of loyalty);

349.     A judgment awarding equitable relief in the form of reformation (by rewriting or modifying the Plan to correct Defendants' breaches of the fiduciary duty of loyalty described herein, or by removing any representation that the "Plan Neutral Physicians" are, in fact, neutral;

350.     A judgment awarding equitable relief in the form of penalties against Defendants for unjust enrichment resulting from Defendants' breaches of the fiduciary duty of loyalty;

351.     A declaration that Defendants breached their fiduciary duty of loyalty owed to Plaintiffs and Class members, in violation of ERISA;

352.     An award of reasonable and necessary attorneys' fees and costs, pursuant to ERISA § 502(g)(1), 29 U.S.C. § 1132(g)(1);

353.     Pre-judgment and post-judgment interest at the maximum rate allowed by law;

354.     Such other relief, general or special, at law or in equity, to which Plaintiffs may be justly entitled pursuant to ERISA §§ 502(a) and 503(2), 29 U.S.C. §§ 1132(a) and 1133(2), other applicable law, Rule 54(c) of the Federal Rules of Civil Procedure, or otherwise;

355.     Injunctive and equitable relief, prohibiting Defendants' use of Drs. Meier, McCasland, Strassnig, Delis, Wen, Mercado, Hefferon, Saenz, Macciocchi, Bornstein, Perry, Schleimer, Werner, Greher, Apple, Elkousy, McNasby, Cooper, Thompson, Canizares, Crum, Artigues, Diaz, Medlock, Kaeding, Lacritz, Murphy, O'Connor, Mack, Brahin, Perez, Norman, Hoyle to conduct examinations of Plan benefits applicants in the future, and replacing them with new "Neutral Physicians"; and

356.     An injunction stripping the Board of its discretion as to presently pending and future claims for benefits by reason of its failure to exercise that discretion fairly and competently.

357.     That as to Count IX, the Plan be awarded declaratory, injunctive, and equitable relief:  (a) declaring that the Board's members' acts and omissions evince their willful abdication

of their fiduciary obligations to the Plan in that the Board's members have engaged in repeated and substantial derelictions of their responsibilities, have repeatedly refused to pay contractually mandated benefits, and have statistically proven conflicts, with all of these acts and omissions demonstrating that they can no longer be trusted to exercise their discretion fairly, having continually acted in an objectively unreasonable manner that has conflicted with their duties of loyalty and care to such a manner and degree that their continuing to serve as trustees of the Plan would be detrimental to the interests of the Plan; and (b) removing the members of the Board from their positions on account of their repeated and substantial breaches of the fiduciary duty of loyalty to the Plan, and replacing them with new members.

Dated:  February 9, 2023

**MIGLIACCIO & RATHOD LLP**

By:    */s/ Jason S. Rathod*
Jason S. Rathod
Nicholas A. Migliaccio
412 H Street, N.E.
Washington, DC 20002
Telephone:  (202) 470-3520
Facsimile:   (202) 800-2730
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

Christopher A. Seeger *(pro hac vice admission motion to be filed)*
Diogenes P. Kekatos *(pro hac vice admission motion to be filed)*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegereiss.com

Bryan F. Aylstock *(pro hac vice admission motion to be filed)*
Douglass A. Kreis *(pro hac vice admission motion to be filed)*
D. Nicole Guntner *(pro hac vice admission motion to be filed)*
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200

Pensacola, FL 32502
Telephone:  (850) 202-1010
BAylstock@awkolaw.com
DKreis@awkolaw.com
NGuntner@awkolaw.com

Samuel L. Katz *(pro hac vice admission motion to be filed)*
Julia M. Damron *(pro hac vice admission motion to be filed)*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800
Beverly Hills, CA 90211
Telephone:  (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com

Robert K. Scott *(pro hac vice admission motion to be filed)*
Gerry H. Goldsholle *(pro hac vice admission motion to be filed)*
**ADVOCATE LAW GROUP P.C.**
2330 Marinship Way, Suite 260
Sausalito, CA 94965
Telephone:  (949) 753-4950
bob@advocatelawgroup.com
gerry@advocatelawgroup.com