# EXHIBIT X

## Page 1

```
              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
                    DALLAS DIVISION
****************************************************************
MICHAEL CLOUD,
      Plaintiff,
VS.
                              CASE NO. 3:20-cv-1277-S

THE BERT BELL/PETE ROZELLE
NFL PLAYER RETIREMENT PLAN,
      Defendant.

****************************************************************

              TRANSCRIPT OF BENCH TRIAL
      HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
              UNITED STATES DISTRICT JUDGE

                    MAY 23, 2022

****************************************************************

APPEARANCES:
FOR THE PLAINTIFF:      Christian Dennie
                        BARLOW GARSEK & SIMON, LLP
                        920 Foch
                        Fort Worth, Texas 76107
                        cdennie@bgsfirm.com
                        Paul J. Vitanza
                        BARLOW GARSEK & SIMON, LLP
                        920 Foch
                        Fort Worth, Texas 76107
                        pvitanza@bgsfirm.com
```

## Page 2

```
 1              A P P E A R A N C E S
                    (Continued)
 2
 3  FOR THE DEFENDANT:      Mr. Edward J. Meehan
                            GROOM LAW GROUP CHARTERED
 4                          1701 Pennsylvania Avenue NW
                            Washington, D.C. 20006
 5                          emeehan@groom.com
 6                          Michael Lee Junk
                            GROOM LAW GROUP CHARTERED
 7                          1701 Pennsylvania Avenue NW
                            Washington, D.C. 20006
 8                          mjunk@groom.com
 9                          Nolan Knight
                            MUNSCH HARDT KOPF & HARR, PC
10                          3800 Lincoln Plaza
                            500 North Akard Street
11                          Dallas, Texas 75201
                            nknight@munsch.com
12
13  Official Court Reporter:    Thu Bui, CSR, RMR, CRR
                                1100 Commerce Street, #1654
14                              Dallas, Texas 75242
                                (214) 753-2354
15
...
24      Proceedings recorded by mechanical stenography,
25  transcript produced via computer.
```

## Page 3

```
 1              I N D E X
 2
 3                                    PAGE
 4  Appearances...........................  1
 5  Proceedings...........................  4
 6  JENNIFER CLOUD (by videotape)
 7       Direct      Cross
                       6
 8  DICK CASS (by videotape)
 9       Direct
          17
10
    DICK CASS
11       Direct      Cross
         36, 214    136, 216
12
    PATRICK REYNOLDS (by deposition)
13
         Direct      Cross
14       237         245
15  Adjournment........................... 288
16  Reporter's Certificate................ 289
```

## Page 4

```
 1              P R O C E E D I N G S
 2          (Call to order of the court.)
 3      THE COURT:  This is the continuation of the trial in
 4  3:20-cv-1277-S, Michael Cloud versus the Bert Bell/Pete Rozelle
 5  NFL Player Retirement Plan.
 6      Counsel, please make your appearance on the record.
 7      MR. DENNIE:  Good morning, Your Honor.  Christian
 8  Dennie and Paul Vitanza on behalf of the plaintiff.  Also with
 9  plaintiff, Michael Cloud.  Thank you.
10      THE COURT:  Thank you.
11          And on behalf of the defendant?
12      MR. MEEHAN:  Good morning, Your Honor.  Edward Meehan
13  with Michael Junk and Nolan Knight.
14      THE COURT:  Thank you.
15          Where we left off on Friday is -- the plan was to
16  pick up this morning with the defendant's tender of Jennifer
17  Cloud's portions of her deposition that they to want play.  We
18  had some technical issues going on.  I think they've been
19  resolved.
20          Is that still the plan?
21      MR. MEEHAN:  Yes, Your Honor.
22      THE COURT:  Okay.  And that being the case, unless
23  there's anything you-all want to take up before we start in
24  with defendant's offer of Jennifer Cloud, is there anything?
25      MR. DENNIE:  Your Honor, the only thing I wanted to
```

Page 53

1  doctor's opinion.  We would send out the player for another
2  opinion.  If that second opinion came back positive, saying he
3  was entitled, then generally that would just -- that would end
4  the appeal.  The player would receive the benefit.
5       Sometimes the opinions would come back so varied and so
6  different in nature that we would then send it -- that's when
7  we would send it out to a medical advisory physician because
8  there was a sort of conflict in the two opinions -- two
9  doctors' opinions -- or it wasn't clear.  And we had a medical
10 advisor who was a medical advisor to the board, and Dr. Jackson
11 was the medical -- the medical director -- I'm sorry -- the
12 medical director of the board.  He would help advise us on
13 whether or not it made sense to what we would say "map a
14 decision," meaning send it out to a medical advisory physician.
15 So the vast majority of our decisions were very straightforward
16 if there was -- based on what the doctor said.
17      And then we had a subset of decisions which were different
18 in nature.  You know, reclassification was one where it didn't
19 necessarily involve a medical decision.  It could have, but
20 many times it didn't.  It was a matter of applying a couple of
21 provisions to the facts at hand.
22      So just going through that gives you some flavor of what
23 our job was.  This was a job, in reviewing appeals, that was
24 heavily, heavily determined by what a doctor -- an independent
25 doctor said.  And I think the way the doctors -- the way the

Page 54

1  whole system worked, we had a medical advisor.  And the medical
2  advisor then helped us set up a network of independent neutral
3  physicians around the country.  And those independent neutral
4  physicians would be the ones who would do -- for the most part,
5  do the medical examination of a player, both at the initial
6  claims level and on appeal.
7       And then we had the third type of doctor we had.  In
8  addition to the medical director and the independent neutral
9  physicians, we had the medical advisory physician.  So we had
10 three types of doctors that were advising the board on
11 these -- on the various medical issues that confronted us.
12 Q.  Just to fill in a few details.  What was the role, as you
13 perceived it, of the Initial Claims Committee?
14 A.  The Initial Claims Committee would -- would make a
15 judgment on, you know, basically initial claims.  An
16 application would be filed with the Plan Benefits Office which
17 is in Baltimore.  They would pull together the papers, send it
18 out to the two members of the Initial Claims Committee.  And
19 like everything else in this process, it's a check-and-balance
20 system.
21      So there's two members of the Initial Claims Committee,
22 one appointed by the League and one appointed by the union.
23 And so that -- that would -- and then they would get it, they
24 would process the papers, they would receive a neutral
25 physician opinion.  And normally, based on that opinion, they

Page 55

1  would decide it.
2       And, again, if they couldn't agree, it would be called a
3  "deemed denial" unless the medical advisory said, I think
4  this -- I think you're reading it wrong.  On this medical
5  issue, I think this is the way we should go; then that would
6  become the decision of the Initial Claims Committee.  So their
7  job was really to make the initial decision, and then -- then
8  it was up to the player to decide whether or not if -- if he
9  did get it, whether or not he wanted to appeal.
10 Q.  Okay.  Sir, you've talked a lot about doctors and medical
11 opinions.  You've also indicated that there was something
12 different about a reclassification request.  I want to bring
13 that out a little bit now.
14      Was it the practice of the board to always, each and every
15 case, send a claim out to a doctor?
16 A.  No, it was not.
17 Q.  And can you explain why some cases were not sent out to
18 the doctors?
19 A.  Well, I think --
20 Q.  At the board level, I should say?
21 A.  Yeah.  I mean, at the -- on appeal -- in this case, for
22 example, Mr. Cloud's case, we didn't think -- I didn't think
23 there was a medical issue involved because it was clear, I
24 thought, in this case --
25      MR. DENNIE:  I'm going to object, Your Honor.  It's not

Page 56

1  personal knowledge.  Lack of foundation.
2       THE COURT:  Sustained.  All his review for Mr. Cloud is
3  preparing for a deposition.  He's already testified under oath
4  that he has no personal knowledge of what happened to
5  Mr. Cloud.  So if he's pulling out Mr. Cloud, there needs to be
6  some kind of foundation as to why he didn't go to the doctor.
7  So the objection is sustained.  For many reasons.
8  Q.  Okay.  Mr. Cass, I'm going to ask you a question, but I'm
9  going to ask you to confine yourself to your understanding of
10 the general process.  We're not going to apply it to Mr. Cloud
11 at this point.
12 A.  Okay.
13      THE COURT:  The Court has heard nothing, direct
14 evidence, as to Mr. Cloud in the testimony to date.  From what
15 this witness has said, he can not add to that other than
16 talking about generalities.  If the Court is misunderstanding
17 that, please clarify.
18      You may ask your next question.
19      MR. MEEHAN:  Okay.  Thank you, Your Honor.  Your Honor,
20 if it's acceptable to the Court, what I'm going to do is lay
21 out -- or give Mr. Cass an opportunity to lay out his general
22 approach.
23      THE COURT:  Sure.  And that's what you've been doing,
24 and I understand that.  And you kind of diverted to something
25 he has no personal knowledge or memory of, as of I've been

Page 57

```
 1   advised.
 2              MR. MEEHAN:  Right.  Sorry, Your Honor.
 3              THE COURT:  Why don't you just ask your next question.
 4   And the objection's sustained.
 5              MR. MEEHAN:  Fair enough.
 6   Q.  Okay.  So, Mr. Cass, we were going to -- what I'm asking
 7   you is, was it the practice, in all cases, of the board to send
 8   every claim out for a medical review at the board level?
 9   A.  It was not.
10   Q.  Okay.  And can you explain the situations in which the
11   board determined not to send a particular case out for an
12   additional medical review?
13   A.  It would typically be an issue where there was not a
14   medical issue involved in the appeal -- where the board
15   determined that there was not a medical issue involved in the
16   appeal.
17   Q.  And can you illustrate what types of issues the -- that
18   you, while you were on the board, had concluded were not
19   necessary to have a new medical --
20   A.  There were times when reclassification opinions fell under
21   that category.
22   Q.  Okay.  And can you explain why, in your view,
23   reclassification opinions did not fall into that category?
24   A.  It depended on the situation.  There could be cases where
25   a reclassification case would require an opinion of a doctor.
```

Page 58

```
 1   But where -- in a situation where there's -- on its face, the
 2   board did not believe that there was a -- that there was a new
 3   impairment alleged, then it wouldn't -- it might well be a case
 4   where there's no obligation to get a medical opinion because it
 5   was not a medical issue.
 6   Q.  Okay.  All right, sir.  Let me take you now back again to
 7   your practices and your habits with respect to review of claims
 8   and how these board meetings worked.
 9        Were there materials available to you, as a board member,
10   to review in advance of board meetings that concerned these
11   disability claims?
12   A.  Yes.
13   Q.  Okay.  And can you describe how you accessed materials --
14   you know, how you went about that?
15   A.  There was a website you could go onto and read about the
16   cases.
17   Q.  And what types of materials were -- were posted on that
18   website?
19   A.  Usually the Administrative Record on appeal -- what I
20   understood to be the Administrative Record on appeal.
21   Q.  And what -- if you could give your understanding, what
22   does that term "Administrative Record on appeal" mean to you as
23   you were applying it while you were on the board?
24   A.  You know, it was -- it was whatever the player had
25   submitted either to the Initial Claims Committee.  It was the
```

Page 59

```
 1   medical opinions that had been rendered at the -- at the -- to
 2   the -- at the Initial Claims Committee level.  It would include
 3   whatever additional medical opinions had been received at the
 4   appeal -- at the appellate level.  It would include
 5   the -- whatever additional -- the player was allowed to submit
 6   additional materials after the Initial Claims decision.  So it
 7   would include, on appeal, of -- the Administrative Record would
 8   exclude whatever additional materials the player had submitted.
 9        It would also, generally, include, if there were prior
10   proceedings regarding the player where he had applied earlier
11   for other benefits under the disability plan, there would be
12   additional materials relating to that, typically.
13   Q.  And did you, sir, have a personal practice as to the type
14   of review you conducted of materials available to you on the
15   board concerning claims?
16   A.  I would look at the materials and see what -- try to
17   understand exactly what the issues were on appeal.  Then I
18   would look at the documents that I thought were pertinent to
19   that issue.
20   Q.  Okay.  Did you have criteria that you followed during the
21   time to help you determine what you thought were pertinent to
22   the issues when you're reviewing a reclassification claim?
23   A.  Well, I would -- on a reclassification claim?
24   Q.  Yes.
25   A.  You know, I always -- in looking at the appeal, I would
```

Page 60

```
 1   always -- whatever the appeal, I would generally look at
 2   the -- many players would submit a letter with the appeal, or a
 3   memo or something, so I would typically start with that, look
 4   at that 'cause that would sort of indicate what the issues
 5   were.  I would look at the decision of the Initial Claims
 6   Committee -- the Initial Claims Committee letter.  I would
 7   look -- if there were new materials submitted on appeal, I
 8   would probably look at those if the player submitted something
 9   new.
10        We also had a Plan summary that was on top, that I would
11   look at that.  Those are generally the things I would make sure
12   to look at.  And then, based on that, I might look at some
13   other materials.
14   Q.  Okay.  So have you now described your practice that you
15   followed in reviewing these reclassification claims while you
16   were on the board?
17   A.  Yes.
18   Q.  Let me step back a little bit to get a little broader
19   sense of how this worked.  The quarterly board meetings, over
20   what period of time were they conducted?
21   A.  It was always -- well, I wouldn't say always.  Maybe there
22   were some exceptions.  But almost always, as far as I can
23   remember, it was a two-day meeting.
24   Q.  And can you describe what happens on day one and then what
25   happens on day two?
```

```
                                                Page 61                                                  Page 62
 1   A.  Well, I think -- you know, I think on day one it was    1   report.  And we would discuss the cases, among other things.
 2   generally we would be meeting on financial issues and -- at the  2   Q.  There was also a reference to a process of interacting
 3   board level.  Talking to the -- the financial meetings, getting  3   between the management side and the labor side concerning these
 4   reports from the financial advisors, getting reports on various  4   claims in advance of the formal vote on claims.  Can you
 5   matters relating to the pension plan and sort of aggregate    5   describe that?
 6   numbers on the disability plan.  But there's also a time in   6   A.  I think leading up to the meetings, and at the meetings,
 7   between the meetings to talk to others.  And so it was a way  7   the lawyers for both the -- the players union and for the NFL
 8   of -- you would get an idea of what other issues were in front 8   would get together and discuss the cases.  And you would
 9   of us on the cases and on other matters.                      9   have -- and then the Groom law firm would be involved, as well,
10       And then, while we were formally meeting -- I mean, there 10   because there might be questions for them.  So -- and they
11   was -- ongoing work was going on on the cases among -- between 11   would see if there was a consensus on -- if they had major
12   the union representatives and the League representatives.  And 12   disagreements on any -- on any of the appeals that were before
13   Groom law firm.                                                13   us at that upcoming meeting.
14   Q.  All right.  And in the excerpts of your testimony that    14   Q.  What was the purpose of the two sides -- management and
15   were played, there were references to what was called         15   labor -- having these discussions in advance of the vote on any
16   "premeetings."  Can you explain in more detail what were the  16   claim?
17   premeetings?                                                   17   A.  It was really to try to focus and present the issue to the
18   A.  Well, there was -- on the morning the second day, there   18   full board and to see -- to see if there's any disagreement.
19   was a premeeting where the board members on -- for the NFL    19   As I said, because of the way the process here worked and it
20   would meet separately from the board members for the union.   20   was so heavily dependent on medical decisions, it was rare that
21   And we would be -- at those meetings, there would be the      21   there was a disagreement.  And if there were a disagreement on
22   management -- in our meetings, we'd have the NFL lawyers,     22   a medical issue, it usually resulted in sending it
23   the -- and also our outside -- the Akin Gump lawyers.  Staff of 23   out -- tabling the decision and sending it out for an
24   the Plan Benefit Office would come in and give a report.      24   additional opinion from a medical advisory physician.
25   Perhaps, the Groom law firm lawyers would come in and give a  25   Q.  In the instances of reclassification appeals, what was the

                                                Page 63                                                  Page 64
 1   purpose of having the two sides' advisors having these         1   Q.  Sir, the decision letters that were prepared --
 2   premeeting discussions?                                        2   A.  Yes.
 3   A.  Well, just to lay out the issues to see if they saw the    3   Q.  -- reflecting board -- the board conclusion here, how did
 4   issues the same way so when they'd present it to the board,    4   that process --
 5   each set of board members would know whether or not there was a 5       MR. DENNIE:  I'm going to object 'cause that calls for
 6   disagreement on the issue that had to be resolved.             6   speculation for this witness.
 7   Q.  And what was it -- as a board member -- you were expecting 7       THE COURT:  He didn't ask his question yet.  Overruled.
 8   the advisors to accomplish in those premeeting discussions?    8   A premature objection.
 9   A.  Really to identify issues for us that were -- if there was 9       MR. DENNIE:  I'll wait.  Sorry.
10   a major disagreement and a problem.  You know, I think the way 10   Q.  Sir, the process for drafting decision letters for the
11   the Plan is set up, if there's an agreement on a medical issue, 11   board, can you explain, sir, why that was delegated to the
12   we sent it out to a medical advisory physician, as I've said a 12   Groom Law Group?
13   couple of times.  If it's a disagreement on something else, you 13   A.  It really was a -- an issue of the way ERISA works and the
14   would have to send it to arbitration, and that's what would    14   way our Plan worked.  Our Plan document really has to comply
15   happen if you couldn't agree on an appeal.                     15   with ERISA.  There's a provision in ERISA, as I understand it,
16       I think in my 11 years on the board, while we had many,   16   that requires once a board makes a decision on a disability
17   many -- I don't want to call them disagreements, but a decision 17   matter, we had to inform the affected person, in this case a
18   basically to table it because it was uncertain, then it would  18   retired player, of our decision.  It had -- that decision had
19   go out to a medical advisory opinion on medical issues.  But on 19   to be -- go out -- the plan says five days.  We understood that
20   other issues -- I can recall one case where it went to         20   it was okay to be five business days.
21   arbitration.  I don't even remember what that case was.  But in 21       And so that's -- that's -- we didn't have the -- there
22   the 11 years I was on the board, I only remember one case that 22   wasn't time in a situation where you've got six board
23   required us to go to arbitration.                              23   members -- each board member lives in a different city.  We're
24   Q.  Are you certain it was not the Michael Cloud case?         24   in a -- we're in yet another city where we're holding the board
25   A.  It was -- it was not the Michael Cloud case.               25   meeting.  Most of the staff who was going to be doing the
```

Page 173

1  fiduciary duties, correct?
2  A. I cannot delegate a fiduciary duty.
3  Q. Okay. So you delegated the review of the records for
4  disability decisions, correct?
5  A. We delegated some responsibilities, yes.
6  Q. You can't cast a vote on what a disability decision is or
7  isn't if you haven't actually reviewed the documents, right?
8  A. That's completely incorrect. I don't agree with that at
9  all. I mean, these are -- when you've been on the board a long
10 time and you understand the Plan document well and you
11 understand the issues on appeal, it wasn't necessary for me to
12 read all of the medical information, much of which came back
13 from 2009, 2014, that long predated the 2016 application.
14    It wasn't necessary. And I relied on the lawyers. If
15 there was something in that -- in those documents, they would
16 bring it to my attention or to the board's attention. So, no,
17 I don't think I had to do that to perform my fiduciary duties.
18 Q. So wasn't it your Plan practice to actually review the
19 decision letters before they went out, correct?
20 A. It was not -- I did not review decision letters before
21 they went out, correct. And I think, as I explained to you
22 before, it's not practical to do that with the time limit we
23 had.
24 Q. You didn't review decision letters nor comment on them,
25 correct?

Page 174

1  A. Correct.
2  Q. So if you haven't reviewed the decision letters, you don't
3  know how certain terms were defined in those decision letters;
4  is that correct?
5  A. No, that's not correct. There's a practice that we had,
6  and a way and a process that we followed. Again, we had a
7  checks-and-balances system. I knew I had lawyers looking at
8  these documents from different perspectives. We had been doing
9  this together for many years. We felt -- I felt personally
10 comfortable relying on them once we made a decision to get out
11 a template decision, consistent with many letters we had done,
12 to let the player know what the decision of the board was. So
13 I felt comfortable in the system.
14 Q. Mr. Cass, this will go a lot faster if you'll just answer
15 my question. If Mr. Meehan has follow-up, he can certainly ask
16 it. I'm not asking you to argue the case here. Just answer my
17 questions, okay?
18    It wasn't your practice to review any decision letters
19 once they were sent out, correct?
20 A. That's true.
21 Q. So whoever wrote the decision letters is actually who came
22 up with the definitions in those documents, correct?
23 A. No.
24 Q. Do you know how many different definitions of "changed
25 circumstances" have been used over the years?

Page 175

1  A. There's different languages in some of the letters, but
2  it's not -- it's not really changing the definition or the
3  meaning of "changed circumstances" as we consistently applied
4  it.
5  Q. Were you given various decision letters to review in your
6  preparation here today?
7  A. I really just looked at the -- a decision letter relating
8  to Mr. Cloud. And maybe there were a couple of others I've
9  seen over the last -- maybe from my deposition I looked at some
10 others. I can't remember right now.
11 Q. So I'm going to show you --
12    MR. DENNIE: This is in Tab 85, Your Honor. This is a
13 part of Plaintiff's Exhibit 2-11.
14 Q. Would you agree this is from the same board meeting as to
15 where Mr. Cloud's case was decided?
16 A. Yes.
17 Q. Do you know what this case is?
18 A. I have no idea.
19 Q. You wouldn't be able to know or tell me about this case
20 because you haven't reviewed this letter ever, correct?
21 A. Well, that may not be true. It may come back to us in
22 another form, and so I saw it in a later proceeding. It's
23 possible. But I don't -- with the names and everything blacked
24 out, I have no way of -- of knowing who this is or what it is.
25 Q. So this case says that -- dadgum it -- sorry. This case

Page 176

1  says the record encompassed more than 1,500 pages. Do you see
2  that?
3  A. I do.
4  Q. Fair to say you didn't read those 1,500 pages either?
5  A. It is fair to say that, yes.
6     THE COURT: Did you ever -- or did the board ever
7  direct the people you delegated responsibilities to to read all
8  medical records for the players that were submitting
9  applications, or was it, by the time you got on the board, you
10 just assumed that they were read?
11    THE WITNESS: I never issued a directive to that
12 effect.
13    THE COURT: Have you seen that directive?
14    THE WITNESS: Pardon?
15    THE COURT: Have you ever seen a directive that --
16    THE WITNESS: No, Your Honor, I never saw a directive.
17    THE COURT: Thank you.
18 Q. You would agree that the board is the decision-making
19 fiduciaries as it pertains to determination of disability
20 benefits applications, correct?
21 A. Yes.
22 Q. Do you agree that the decision-making fiduciaries of the
23 Plan must carefully apply the rules of the Plan while reviewing
24 voluminous records?
25 A. I mean, the people involved in the process had to do all

Page 177

1  of that, yes.
2  Q. Okay. But you're testifying here today that you did not
3  review these voluminous records?
4  A. I'm testifying here today that I personally looked at -- I
5  looked at documents that made me comfortable in making a
6  decision. Other documents I may not have reviewed, but I was
7  relying on others to have reviewed that and to bring to my
8  attention something that I may have missed.
9      These voluminous records, you know, lots of times
10 they're -- I'll get into it some other -- I should not be
11 giving testimony unless I get a question. I will not --
12 Q. I agree.
13 A. Yes. I know you do.
14 Q. It will go a lot quicker if we just kind of stick to my
15 questions.
16     THE COURT: Okay. Ask your next question.
17 Q. I'm going to show what's been marked Plaintiff's
18 Exhibit 17. Do you recognize Douglas W. Ell and Alvaro I.
19 Anillo?
20 A. Yes. I know both of them.
21 Q. Those are lawyers at the Groom firm?
22 A. They're both partners at the Groom firm, yes.
23 Q. And they wrote a letter to the Department of Labor dated
24 January 19, 2016?
25 A. I see that, yes.

Page 178

1  Q. If we go down to Page 3 here, they represent to the
2  Department of Labor -- that top paragraph there: [As read] The
3  decision-making fiduciaries of the Plan must not only carefully
4  apply all of these rules, they must do so while reviewing
5  voluminous records. It's typical for a claimant to submit
6  hundreds or thousands of pages of documents, including their
7  entire college and NFL player -- or excuse me -- NFL medical
8  records.
9      Did I read that correctly other than that slipup?
10 A. You did. You did.
11 Q. Do you disagree with this?
12 A. No, I don't disagree with it. I don't think it's --I
13 mean, it's not -- again, I think there's a difference between
14 decision-making fiduciaries, meaning me personally, or that I'm
15 okay del- -- I delegated some of this responsibility. Can I
16 just make a quick comment here?
17 Q. I think he can help you with that, so let's kind of stick
18 to the questions.
19     THE COURT: Comments are for later.
20     THE WITNESS: Okay. Okay.
21     THE COURT: I'll let you have a break.
22     THE WITNESS: All right.
23     THE COURT: Go ahead.
24 Q. This doesn't mention anything about delegating tasks to
25 unknown --

Page 179

1  A. No.
2  Q. -- individuals?
3  A. It does not.
4  Q. This says: [As read] The decision-making fiduciaries
5  review this voluminous record, correct?
6  A. Yes. It does say that.
7  Q. And you would expect if something's going to be provided
8  to the Department of Labor, that it should be accurate?
9  A. I think this letter's accurate.
10     MR. DENNIE: Your Honor, we're going to go to Tab 60.
11 Q. So, Mr. Cass, before I pull it up, one quick second.
12     Belinda Lerner was an advisor, correct?
13 A. Is still an advisor, yes.
14 Q. You're not on the board anymore so it doesn't matter to
15 you either way if she's in it or not, correct?
16 A. No, but I'm -- I'm just correcting -- I'm -- you're right.
17 Okay. She is still an advisor, but it doesn't matter for this
18 purpose. Yes.
19 Q. Back in 2016, Patrick Reynolds was also an advisor of the
20 board?
21 A. Patrick Reynolds was the NFL representative on the Initial
22 Claims Committee.
23 Q. So I'm showing you Plaintiff's Exhibit 3-7 starting at
24 XFile 252350. This is an e-mail from Patrick Reynolds to
25 LaShay Rose at the Benefits Office dated November 15, 2016. Do

Page 180

1  you see that?
2  A. I do.
3  Q. Patrick Reynolds is saying: [As read] Would you please
4  have 20 of these packets printed and stapled, sent out to my
5  room.
6      Do you see that?
7  A. I do.
8  Q. Okay. He talked about what was discussed or given to you
9  by Belinda Lerner in those premeetings. Do you recall that?
10 A. I don't recall that premeeting specifically, no.
11 Q. Is this what you were given? If you need me to make it
12 bigger, let me know.
13 A. No, I can read it. This is the type of thing we would
14 have been -- we would have been given, yes.
15 Q. You would agree that this document, dated November 15,
16 2016, doesn't actually give a basis for denial of Mr. Cloud's
17 claim?
18 A. It doesn't. It does not say that right there, no.
19 Q. Okay. And I'll go down to the bottom of it just for
20 clarity; so I don't want you to think I'm holding anything out
21 on you.
22 A. No. She would've -- when in the meeting, she would have
23 given an oral thing about why we were not -- and why she didn't
24 view this as -- that the appeal should be granted.
25 Q. You don't recall that meeting at all from November 16,

Page 181

1   2016, correct?
2   A. Correct. I'm just talking about the practice.
3   Q. Okay. You would agree that this document here, which is a
4   spreadsheet that was sent by Patrick Reynolds, who was a member
5   of the committee on November 15, 2016, doesn't make any
6   reference to any of Mr. Cloud's symptoms; is that correct?
7   From 2016 application?
8   A. I can't tell for certain. He talks about depression,
9   which was in both '14 and '16, so I can't tell from this alone.
10  Q. Okay. This document here that's in front of you,
11  Article 3.7, of plaintiff's exhibit, it doesn't make any
12  reference to changed circumstances, correct?
13  A. It does not.
14  Q. It doesn't make any reference to untimeliness under
15  Section 12.6(a), correct?
16  A. It does not.
17  Q. It doesn't make a single reference to "shortly after"
18  under Section 5.3(e)?
19  A. It does not.
20  Q. Do you know whether Belinda Lerner only reviewed the
21  summary that was prepared by the Groom firm?
22  A. I don't know what Belinda Lerner specifically looked at in
23  connection with Mr. Cloud's appeal.
24  Q. You believe that Alvaro Anillo wrote Mr. Cloud's decision
25  letter; is that correct?

Page 182

1   A. I don't really know who wrote it. I think people from the
2   Groom law firm wrote it, I think is what I indicated in my
3   deposition, is what I believe. But I'm not sure.
4   Q. You assumed that Alvaro Anillo wrote the decision letter,
5   correct?
6   A. That's what I said in my deposition, yeah, but, as I said,
7   I don't know.
8   Q. So you were asked a question earlier by the Court. Did
9   you know Natallia Maroz was a paralegal in 2016?
10  A. I thought she had gotten her law degree before then and
11  was -- was a member of the bar, but maybe she was -- her title
12  was paralegal, but I think she's a lawyer.
13  Q. She wasn't in 2016 though. Do you understand that?
14  A. I didn't have any understanding, one way or the other,
15  about it really. Except I thought she was a member of the bar.
16  Q. You would agree that paralegals require a different level
17  of oversight than a lawyer, correct?
18  A. My experience is a paralegal depends totally on the
19  paralegal.
20  Q. You're telling me that you believe a partner in a law firm
21  wrote a letter -- a decision of a disability case -- requires
22  the same oversight as a paralegal?
23  A. You know, let me just say this. I thought -- there
24  are -- if you compare a paralegal to an associate, there's a
25  lot of paralegals, in my experience, that I would trust a lot

Page 183

1   more than a young associate, number one. And that's just the
2   reality of the situation. You know, some women who have been
3   paralegals for a long time are very experienced. I -- but I
4   think -- this letter's not only reviewed by -- there's -- a lot
5   of people in the review process over time, so it's not just one
6   person reviewing it.
7   Q. You don't know who reviewed Mr. Cloud --
8   A. No, I don't. I'm talking about practice.
9   Q. Okay. But you're not given the opportunity to review it
10  yourself, correct?
11  A. There's not enough time. That's correct.
12  Q. Natallia Maroz did not attend the November 15, '16, board
13  meeting; is that correct?
14  A. I think that's correct. I don't remember her being there.
15  Q. You didn't talk to Natallia Maroz about any decisions made
16  by the board as it pertains to Mr. Cloud; is that correct?
17  A. I did not.
18  Q. You didn't e-mail Natallia Maroz about any decision made
19  by the board; is that correct?
20  A. That's correct.
21  Q. So I'm going to show you plaintiff --
22      THE COURT: Mr. Dennie, we've been going an hour and
23  45 minutes.
24      MR. DENNIE: Has it been that long? Okay.
25      THE COURT: Yes, it has. So when you get to a stopping

Page 184

1   point, we're going to take a break.
2       MR. DENNIE: Now is fine, Your Honor, if we want to do
3   that.
4       THE COURT: Okay. Everyone, we're going to take a
5   15-minute break. A 15-minute recess. Come back at 2:30.
6       SECURITY OFFICER: All rise.
7       (Off the record.)
8       Back on the record. Continue your cross. Please.
9       MR. DENNIE: Okay. Thank you, Your Honor.
10  Q. Mr. Cass, when we broke there, we were talking a little
11  bit about, you know, the decision itself. So I'm going to kind
12  of go back to that and get some information there and how that
13  information came about.
14      So you indicated earlier that you do not believe that
15  Natallia Maroz attended the November 2016 board meeting,
16  correct?
17  A. I think that's true. I don't think she did.
18  Q. I'm going to show you this e-mail, which is Tab 63 in our
19  book and Plaintiff's Exhibit 3-7, XFILE-2368.
20      So if you see this, does it appear to be an e-mail from
21  Natallia Maroz to Sam Vincent, requesting the basis for a
22  decision in various cases?
23  A. I see that, yes.
24  Q. And if you'll look down here, can you see that okay, sir?
25  A. Yes.

Page 289

```
1              REPORTER'S CERTIFICATE
2         I, Thu Bui, CRR, RMR, Official Court Reporter,
   United States District Court, Northern District of Texas, do
3  hereby certify that the foregoing is a true and correct
   transcript, to the best of my ability and understanding, from
4  the record of the proceedings in the above-entitled and
   numbered matter.
5
6                    /s/ Thu Bui
                  Official Court Reporter
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```