# EXHIBIT C

# BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN

## AMENDED AND RESTATED AS OF APRIL 1, 2021

# BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN

### Table of Contents

INTRODUCTION ............................................................................................................... 1

ARTICLE 1    DEFINITIONS ................................................................................. 3

| | | |
|---|---|---|
| SECTION 1.1 | ACTIVE PLAYER | 3 |
| SECTION 1.2 | ACTUARIAL EQUIVALENT | 3 |
| SECTION 1.3 | ADMINISTRATOR | 3 |
| SECTION 1.4 | AFFILIATE | 3 |
| SECTION 1.4A | ARTICLE 5 ELIGIBLE PLAYER | 3 |
| SECTION 1.5 | BENEFIT ARBITRATOR | 3 |
| SECTION 1.6 | BENEFIT CREDIT | 3 |
| SECTION 1.7 | BENEFIT CREDIT ANNUITY STARTING DATE | 3 |
| SECTION 1.8 | BENEFIT CREDIT PENSION | 4 |
| SECTION 1.8A | CHILD | 4 |
| SECTION 1.9 | CODE | 4 |
| SECTION 1.10 | COLLECTIVE BARGAINING AGREEMENT OR CBA | 4 |
| SECTION 1.11 | CREDITED SEASON | 4 |
| SECTION 1.12 | DEPENDENT | 6 |
| SECTION 1.12A | DISABILITY CREDITS | 6 |
| SECTION 1.13 | DISABILITY INITIAL CLAIMS COMMITTEE | 7 |
| SECTION 1.13A | DISABILITY PLAN | 7 |
| SECTION 1.14 | EMPLOYEE | 7 |
| SECTION 1.15 | EMPLOYER | 7 |
| SECTION 1.16 | ERISA | 7 |
| SECTION 1.16A | EXPANSION PENSION | 7 |
| SECTION 1.16B | EXPANSION PENSION ANNUITY STARTING DATE | 7 |
| SECTION 1.16C | EXPANSION CREDIT | 7 |
| SECTION 1.17 | GAME | 7 |
| SECTION 1.18 | HOUR OF SERVICE | 7 |
| SECTION 1.19 | LEAGUE | 8 |
| SECTION 1.20 | LEGACY CREDITS | 8 |
| SECTION 1.21 | LEGACY CREDIT ANNUITY STARTING DATE | 8 |
| SECTION 1.22 | LEGACY CREDIT PENSION | 8 |
| SECTION 1.23 | LEGACY ELIGIBLE PLAYER | 8 |
| SECTION 1.24 | LIFE AND CONTINGENT ANNUITANT PENSION | 9 |
| SECTION 1.25 | LIFE ONLY PENSION | 9 |
| SECTION 1.26 | MANAGEMENT COUNCIL | 9 |
| SECTION 1.27 | MEDICAL ADVISORY PHYSICIAN OR MAP | 9 |
| SECTION 1.28 | MEDICAL DIRECTOR | 9 |
| SECTION 1.29 | NEUTRAL PHYSICIAN | 9 |
| SECTION 1.30 | NFLPA | 9 |
| SECTION 1.31 | NORMAL RETIREMENT DATE | 9 |
| SECTION 1.31A | PENSION EXPANSION PLAYER | 9 |
| SECTION 1.32 | PLAN | 9 |
| SECTION 1.33 | PLAN DIRECTOR | 9 |
| SECTION 1.34 | PLAN YEAR | 10 |
| SECTION 1.35 | PLAYER | 10 |
| SECTION 1.36 | PRIOR BENEFIT CREDIT PENSION | 10 |
| SECTION 1.37 | QDRO | 10 |

SECTION 1.38    QUALIFIED ELECTION ..................................................................10
SECTION 1.39    QUALIFIED JOINT AND SURVIVOR ANNUITY ...............................11
SECTION 1.40    QUALIFIED OPTIONAL JOINT AND SURVIVOR ANNUITY ...............11
SECTION 1.41    RETIREMENT BOARD ..................................................................11
SECTION 1.41A   SPECIAL CREDIT ........................................................................11
SECTION 1.42    SPOUSE .....................................................................................11
SECTION 1.43    SURVIVOR CREDITS ....................................................................11
SECTION 1.44    TRUST ........................................................................................11
SECTION 1.45    TRUSTEE .....................................................................................11
SECTION 1.46    VESTED INACTIVE PLAYER .........................................................12
SECTION 1.47    VESTED PLAYER .........................................................................12
SECTION 1.48    YEAR OF SERVICE ......................................................................13

**ARTICLE 2        PARTICIPATION ............................................................... 14**

SECTION 2.1     PARTICIPATION ..........................................................................14

**ARTICLE 3        CONTRIBUTIONS .............................................................. 15**

SECTION 3.1     CONTRIBUTIONS .........................................................................15
SECTION 3.2     EMPLOYER OBLIGATIONS .............................................................15
SECTION 3.3     EXCLUSIVE BENEFIT OF CONTRIBUTIONS ......................................15

**ARTICLE 4        BENEFIT CREDIT PENSION ............................................ 17**

SECTION 4.1     BENEFIT CREDITS AND SPECIAL CREDITS .....................................17
**SECTION 4.2     MONTHLY AMOUNT ....................................................................17**
SECTION 4.3     NORMAL, DEFERRED AND EARLY RETIREMENT .............................17
SECTION 4.4     NORMAL AND OPTIONAL FORMS OF PAYMENT; QUALIFIED JOINT AND SURVIVOR ANNUITY
                REQUIREMENTS ..........................................................................18
SECTION 4.5     EARLY PAYMENT BENEFIT ..........................................................19
SECTION 4.6     DEEMED DISTRIBUTIONS .............................................................21
SECTION 4.7     REQUIRED DISTRIBUTIONS ..........................................................21
SECTION 4.8     ROLLOVERS OUT OF THE PLAN .....................................................23
SECTION 4.9     [RESERVED] ................................................................................24
SECTION 4.10    ADDITIONAL RULES FOR CERTAIN VETERANS ...............................24
SECTION 4.11    ADDITIONAL RULES FOR PLAYERS VESTED SOLELY BECAUSE OF SECTION 1.47(I) ...........24
SECTION 4.12    SPECIAL RULES REGARDING PAYMENT OPTIONS FOR CERTAIN VESTED PLAYERS ....................24
SECTION 4.13    LEGACY FLOOR ..........................................................................25
SECTION 4.14    ENHANCED BENEFITS FOR 2011 LEGACY SURVIVORS .....................25

**ARTICLE 4A       LEGACY CREDIT PENSION ............................................. 27**

SECTION 4A.1    LEGACY CREDITS ........................................................................27
SECTION 4A.2    MONTHLY AMOUNT ....................................................................27
SECTION 4A.3    LEGACY CREDIT PENSION ELECTION AND PAYMENT .......................27
SECTION 4A.4    NORMAL AND OPTIONAL FORMS OF PAYMENT .............................28
SECTION 4A.5    REQUIRED DISTRIBUTIONS ..........................................................29

**ARTICLE 4B       EXPANSION PENSION ...................................................... 30**

SECTION 4B.1    EXPANSION CREDITS ...................................................................30
SECTION 4B.2    MONTHLY AMOUNT ....................................................................30
SECTION 4B.3    EXPANSION PENSION ELECTION AND PAYMENT ...........................30
SECTION 4B.4    NORMAL AND OPTIONAL FORMS OF PAYMENT .............................30
SECTION 4B.5    REQUIRED DISTRIBUTIONS ..........................................................31

**ARTICLE 4C       INCREASES FOR THE 2020 CBA ...................................... 32**

SECTION 4C.1    PROCEDURE FOR CALCULATING INCREASED BENEFITS FOR PLAYERS ...............32

SECTION 4C.2   PROCEDURE FOR CALCULATING INCREASED BENEFITS FOR SURVIVORS RECEIVING
BENEFITS UNDER ARTICLE 4, ARTICLE 4A, OR SECTION 7.3 AS OF APRIL 1, 2020 ......................33
SECTION 4C.3   PROTECTED BENEFITS...........................................................................................................33
SECTION 4C.4   PRIOR PERIODS.....................................................................................................................33

**ARTICLE 5**   **PLAN TOTAL AND PERMANENT DISABILITY BENEFITS
RESULTING FROM APPLICATIONS RECEIVED BEFORE
JANUARY 1, 2015.................................................................. 34**

SECTION 5.1    ELIGIBILITY...........................................................................................................................34
SECTION 5.2    DEFINITION OF TOTAL AND PERMANENT DISABILITY .............................................................34
SECTION 5.2A   RULES AND PROCEDURES .....................................................................................................35
SECTION 5.3    CLASSIFICATION....................................................................................................................36
SECTION 5.4    [RESERVED]...........................................................................................................................36
SECTION 5.5    AMOUNT OF MONTHLY BENEFIT ...........................................................................................36
SECTION 5.6    CONTINUATION OF T&P BENEFITS .........................................................................................39
SECTION 5.7    SPECIAL RULES .....................................................................................................................40
SECTION 5.8    [RESERVED]...........................................................................................................................41
SECTION 5.9    DURATION OF PLAN T&P BENEFITS .......................................................................................41
SECTION 5.10   [RESERVED]...........................................................................................................................41
SECTION 5.11   PRIOR DETERMINATIONS OF ABILITY TO WORK ....................................................................41

**ARTICLE 6**   **LINE-OF-DUTY DISABILITY BENEFITS ............................................. 42**

SECTION 6.1    LINE-OF-DUTY DISABILITY BENEFITS .....................................................................................42
SECTION 6.2    RELATIONSHIP TO OTHER BENEFITS .......................................................................................42
SECTION 6.3    PROCEDURES .........................................................................................................................43
SECTION 6.4    DEFINITIONS..........................................................................................................................44
SECTION 6.5    ONE APPLICATION .................................................................................................................44
SECTION 6.6    TRANSITION OF BENEFITS .....................................................................................................44

**ARTICLE 7**   **SURVIVOR BENEFITS ........................................................................ 46**

SECTION 7.1    AFTER RETIREMENT ...............................................................................................................46
SECTION 7.2    SURVIVING SPOUSE'S AND SURVIVING CHILDREN'S BENEFIT FOR DEATHS BEFORE APRIL 1,
2020.....................................................................................................................................46
SECTION 7.3    SPOUSE'S PRE-RETIREMENT SURVIVOR BENEFIT ....................................................................47
SECTION 7.4    ELECTIONS ............................................................................................................................49
SECTION 7.5    MISCREANT RULE ..................................................................................................................50
SECTION 7.6    EARLY PAYMENT BENEFIT REDUCTION ...................................................................................50

**ARTICLE 8**   **THE RETIREMENT BOARD AND DISABILITY INITIAL CLAIMS
COMMITTEE ........................................................................................ 51**

SECTION 8.1    SELECTION OF THE RETIREMENT BOARD .................................................................................51
SECTION 8.2    AUTHORITY ...........................................................................................................................51
SECTION 8.3    MEDICAL ISSUES AND DISPUTES OF THE RETIREMENT BOARD ................................................52
SECTION 8.4    SELECTION OF THE DISABILITY INITIAL CLAIMS COMMITTEE...................................................53
SECTION 8.5    AUTHORITY OF THE DISABILITY INITIAL CLAIMS COMMITTEE ................................................54
SECTION 8.6    DISPUTES OF THE DISABILITY INITIAL CLAIMS COMMITTEE ....................................................54
SECTION 8.7    MEETINGS .............................................................................................................................54
SECTION 8.8    DUTY OF CARE ......................................................................................................................55
SECTION 8.9    DISCRETIONARY ACTS ...........................................................................................................55
SECTION 8.10   INDEMNIFICATION ..................................................................................................................55

**ARTICLE 9**   **RECORDS AND REPORTS ................................................................. 57**

SECTION 9.1    RECORDS ...............................................................................................................................57

SECTION 9.2      STATEMENT OF CREDITS ................................................................57

**ARTICLE 10      AMENDMENT OR TERMINATION OF THE PLAN ............................ 58**

SECTION 10.1     RETIREMENT BOARD ....................................................................58
SECTION 10.2     BARGAINING PARTIES ..................................................................58
SECTION 10.3     GENERAL LIMITATIONS ................................................................58
**SECTION 10.4     MERGERS** ....................................................................................58

**ARTICLE 11      MEDICAL PROFESSIONALS ........................................................ 59**

SECTION 11.1     MEDICAL DIRECTOR .....................................................................59
SECTION 11.2     MEDICAL ADVISORY PHYSICIAN ...................................................59
SECTION 11.3     NEUTRAL PHYSICIANS ..................................................................60

**ARTICLE 12      MISCELLANEOUS ...................................................................... 61**

SECTION 12.1     USE OF ASSETS .............................................................................61
**SECTION 12.2     SPENDTHRIFT PROVISION** .............................................................61
SECTION 12.3     QDRO EXCEPTION ........................................................................61
SECTION 12.4     ADDRESSES AND PAYMENT IN EVENT OF INCAPACITY ....................61
SECTION 12.5     MAXIMUM LIMITATION ON BENEFITS .............................................62
SECTION 12.6     CLAIMS PROCEDURE .....................................................................63
SECTION 12.7     LIMITATION ON ACTIONS ..............................................................68
SECTION 12.8     RECEIPT OF DOCUMENTS ..............................................................68
SECTION 12.9     NO EMPLOYMENT CONTRACT ........................................................69
SECTION 12.10    GOVERNING LAW ..........................................................................69
SECTION 12.11    SEVERABILITY ..............................................................................69
SECTION 12.12    RECOVERY OF CERTAIN OVERPAYMENTS .......................................69
SECTION 12.13    QUALIFIED MILITARY SERVICE ......................................................69
SECTION 12.14    LOCATION OF PAYEE UNKNOWN ....................................................69
SECTION 12.15    RETROACTIVE CREDITED SEASON AWARDS .....................................69
SECTION 12.16    COUNTERPARTS .............................................................................71

**APPENDIX A      FUNDING ASSUMPTIONS AND ACTUARIAL COST METHOD ....... 72**

**APPENDIX B      ACTUARIAL ASSUMPTIONS AND CONVERSION FACTORS FOR
                 BENEFIT CALCULATIONS ........................................................ 75**

TABLE I         SOCIAL SECURITY ADJUSTMENT ....................................................77
TABLE II        SOCIAL SECURITY ADJUSTMENT ....................................................78
TABLE III       EARLY RETIREMENT REDUCTION FACTORS & DEFERRED RETIREMENT INCREASE FACTORS.....79
TABLE IV        TABLE TO CONVERT BENEFIT CREDITS TO JOINT AND SURVIVOR OPTIONS WHEN THE
                PLAYER'S SPOUSE IS THE BENEFICIARY AND THE PLAYER HAD NOT ATTAINED AGE 55 AS
                OF SEPTEMBER 1, 2007 ...................................................................80
TABLE V         TABLE TO CONVERT BENEFIT CREDITS TO JOINT AND SURVIVOR OPTIONS WHEN PLAYER'S
                BENEFICIARY IS NOT HIS SPOUSE OR WHEN PLAYER HAD ATTAINED AGE 55 AS OF
                SEPTEMBER 1, 2007 ...................................................................88
TABLE VI        LIFE AND TEN YEAR CERTAIN PENSION OPTION ................................96

**EXECUTION .....................................................................................................97**

# BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN

## INTRODUCTION

Since 1962, the Bert Bell NFL Player Retirement Plan ("Bert Bell Plan") has provided retirement, disability, and related benefits to eligible professional football players. Benefits were continued and increased under collective bargaining agreements entered into in 1970, 1977, and 1982. When the 1982 agreement expired in 1987, the National Football League Players Association ("NFLPA") and the National Football League Management Council ("Management Council") did not reach a comprehensive new agreement. In 1989, a new plan, the Pete Rozelle NFL Player Retirement Plan ("Pete Rozelle Plan"), was established to provide benefit accruals and ancillary benefits from that point forward in a manner similar to the Bert Bell Plan.

In 1993, the NFLPA and the Management Council entered into a collective bargaining agreement ("1993 CBA"). As part of that agreement, the Bert Bell Plan and the Pete Rozelle Plan were merged, effective March 30, 1994, to form this Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Plan"). This merged Plan has been further revised in accordance with 1996, 1998, 2002, and 2006 amendments to the 1993 CBA, to comply with applicable law, and for other reasons.

On August 4, 2011, the NFLPA and the Management Council entered into a collective bargaining agreement ("2011 CBA") that continued and improved benefits under the Plan, and made other changes. The Plan was amended and restated as of August 1, 2011 and again as of April 1, 2012 to reflect the 2011 CBA. The Plan was amended and restated as of April 1, 2014 to, among other things, provide that total and permanent disability benefits for initial claims filed on and after January 1, 2015 will be paid out of the NFL Player Disability & Neurocognitive Benefit Plan, which is now called the NFL Player Disability & Survivor Benefit Plan ("Disability Plan"), and that all line-of-duty disability benefits for periods on and after January 1, 2015, other than line-of-duty disability benefits paid to a Player who elected as of November 12, 2014 to roll over those benefits, will be paid out of the Disability Plan.

On March 15, 2020, the NFLPA and the Management Council entered into a new collective bargaining agreement ("2020 CBA") that continued and improved benefits under the Plan, expanded benefits to certain Players who were previously not vested, and made other changes. In August 2020, the NFLPA and the Management Council further agreed to special rules for earning a Credited Season for the 2020 Season.

This document contains the amended and restated Plan as of April 1, 2021. Unless otherwise stated, this amended and restated Plan applies to benefits payable, and claims for benefits made, on or after April 1, 2021. Benefits payable for periods prior to April 1, 2021 will be determined based on the versions of the Plan in effect for such periods.

This Plan document contains detailed rules to comply with federal law. The Summary Plan Description ("SPD") provides a summary of how the Plan works. A copy of the SPD is available online at nflplayerbenefits.com, and may also be obtained by calling the NFL Player

Benefits Office at 800-638-3186.  All decisions on benefit eligibility are made by the Disability Initial Claims Committee or the Retirement Board.  Each is comprised of equal numbers of voting members selected by the NFLPA and the Management Council, who are required by federal law to follow the terms of the Plan.

# ARTICLE 1

# DEFINITIONS

The terms below have the following meanings unless the context clearly indicates otherwise.

**1.1** **"Active Player"** means a Player who is obligated to perform football playing services under a contract with an Employer; provided, however, that for purposes of Article 5 only, Active Player will also include a Player who is no longer obligated to perform football playing services under a contract with an Employer, but is within the period beginning when his last such contract expired or was terminated for any reason, and ending on the later of (a) the July 15 following the beginning of the period, or (b) the first day of pre-season training camp.

**1.2** **"Actuarial Equivalent"** means a benefit of equal value when computed in accordance with the interest rate and mortality assumptions defined in Appendix B. For this purpose, a benefit determinable from the assumptions defined in Appendix B will always be deemed to be of equal value.

**1.3** **"Administrator"** means the Retirement Board, which will be considered to be the administrator of the Plan within the meaning of section 3(16)(A) of ERISA.

**1.4** **"Affiliate"** means, with respect to a particular Employer, (a) any corporation, other than the Employer, which is a member of a controlled group of corporations (within the meaning of Code section 414(b)) of which such Employer is a member, (b) any trade or business, other than the Employer, which together with such Employer are under common control (within the meaning of Code section 414(c)), (c) any employer, other than the Employer, which is a member of an affiliated service group (within the meaning of Code section 414(m)) of which such Employer is a member, and (d) any other entity required to be aggregated with the Employer under Code section 414(o).

**1.4A** **"Article 5 Eligible Player"** means a Player whose written application or similar letter was received before January 1, 2015 and resulted in an award of Plan T&P benefits, and whose total and permanent disability benefits under Article 5 have not been discontinued by a final determination of the Retirement Board or a decision of the Disability Initial Claims Committee which has not been timely appealed.

**1.5** **"Benefit Arbitrator"** means the arbitrator described in Article 64 of the 2020 CBA to resolve certain disputes specifically described therein relating to employee benefits.

**1.6** **"Benefit Credit"** means the credit described as a Benefit Credit in Section 4.1(a) for the corresponding Credited Season.

**1.7** **"Benefit Credit Annuity Starting Date"** means the first day of the first period for which an amount is received as an annuity under Article 4, including any amount received as an early payment benefit under Section 4.5. A Player's Benefit Credit Annuity Starting Date will not be earlier than the first day of the month coincident with or next following the date that

3

the Player's benefit election form is received by the Retirement Board, except as provided in Sections 4.10, 4.11, and 4.12 (if elected in accordance with Treasury Regulations section 1.417(e)-1(b)(3)(v)).

**1.8    "Benefit Credit Pension"** means the pension payable under Article 4 based on the sum of a Player's Benefit Credits and Special Credits.

**1.8A    "Child"** means any natural or legally adopted child.  Child does not include a child who was conceived after a Player's death, such as through *in vitro* fertilization.

**1.9    "Code"** means the Internal Revenue Code of 1986, as amended.

**1.10    "Collective Bargaining Agreement" or "CBA"**  means the Collective Bargaining Agreement, as amended, and any such future negotiated agreement, as applicable, between the Management Council and the NFLPA.  The term **"2020 CBA"** means the Collective Bargaining Agreement entered into on March 15, 2020.

**1.11    "Credited Season"** means a Plan Year in which a Player:

(a)    is an Active Player (including an injured Player who otherwise satisfies the definition of "Active Player") on the date of three or more Games for his Employer, not including Game dates when he was on the Future List (for purposes of this subsection, a Player who was waived by his Employer on or before the date of a Game of that Employer in a particular week of the League schedule, and who is not eligible to be and is not an Active Player for another Employer for that same week of the League schedule, will be deemed to be an Active Player on the date of that Game for that week only);

(b)    after April 1, 1970, is injured in the course and scope of his employment for an Employer and by reason of such injury, and pursuant to an injury grievance settlement or an injury settlement waiver, receives payment equivalent to his salary for three or more Games or for a number of Games which, when added to the number of Games in such Plan Year for which he otherwise has credit, totals three or more;

(c)    after reporting to at least one official pre-season training camp or official practice session during such Plan Year: (1) dies; (2) becomes totally and permanently disabled under (i) Section 5.3(a) or 5.3(b) of the Plan (or the corresponding section of prior Plan documents), or (ii) Section 3.4(a) or 3.4(b) of the Disability Plan; or (3) incurs a disability that subsequently qualifies for a benefit under (i) Section 6.1 of the Plan, or (ii) Section 5.1 of the Disability Plan;

(d)    is absent from employment by an Employer while serving in the Armed Forces of the United States, provided such Player returns as an Active Player, after first being eligible for discharge from military service, by the later of (1) ninety days or any longer period prescribed by applicable law, or (2) the opening of the official pre-season training camp;

(e)    for payments on or after June 1, 1993, was absent from employment by an Employer while serving in the Armed Forces of the United States during the periods set forth in the table below if (1) during the one-year period ending on the date he entered the Armed Forces,

such Player either played professional football for an Employer or signed a contract (or a similar document) stipulating his intent to play professional football for an Employer, and (2) such Player was alive on the date set forth in the table below for the corresponding period:

| For Plan Years: | Such Player Was Alive On: |
| --- | --- |
| April 1, 1941 through March 31, 1947 | June 6, 1994 |
| April 1, 1950 through March 31, 1955 | May 1, 1996 |
| April 1, 1960 through March 31, 1976 | January 13, 2000 |

provided that Credited Seasons under this Section 1.11(e) will be granted only if and to the extent necessary for such Player to become a Vested Player;

(f)    effective April 1, 2001, has a season with at least eight games on the practice squad (as such term is defined in Article 33 of the 2020 CBA) in a Plan Year (either before or after April 1, 2001) in which he did not otherwise earn a Credited Season, provided that he is otherwise vested and earns a Credited Season in 2001 or later. A Player may earn a maximum of one Credited Season under this Section 1.11(f) regardless of the number of seasons in which he has at least eight games on the practice squad (as such term is or may be defined in Article 33 of the 2020 CBA); or

(g)    effective for the 2020 Plan Year only, is:

(1)    a Higher-Risk Player or a Changed Circumstances Higher-Risk Player, as those terms are defined in Sections 12(b)(i) and 12(b)(iii) of the agreement between the Management Council and NFLPA dated August 3, 2020 and titled "COVID-19 Related Operational Adjustments" ("2020 COVID side-letter") who opts out of the 2020 season; or

(2)    an Active Player, who for the first game of the regular season:

(i)    is on a Club's Active, Inactive, Reserve/Injured, Reserve/COVID-19, or Reserve/Physically Unable to Perform list;

(ii)    is on a Club's Practice Squad; provided, however, that he must be on a Club's Active/Inactive list for at least one Game in the 2020 Plan Year;

(iii)    is on the Commissioner Exempt list;

(iv)    has a Reserve/COVID-19 exemption; or

(v)    is on a suspended list for either the League's Drug or Steroid Policy; provided, however, that he must be on a Club's Active/Inactive list for at least one Game in the 2020 Plan Year.

Any term above in Section 1.11(g)(2) which is not defined in this Plan will have the meaning ascribed to it in the Constitution and By-Laws of the League, 2020 CBA, or 2020 COVID side-letter, as the case may be.

(3)    A Player who does not satisfy the requirements of Sections 1.11(g)(1) or 1.11(g)(2) during the 2020 Plan Year may nonetheless earn a Credited Season for such Plan Year if he otherwise qualifies for a Credited Season during such Plan Year. A Player who voluntarily opts out during the 2020 Plan Year as described in Section 12(a) of the 2020 COVID side-letter, and who has not qualified for a Credited Season for such Plan Year as of his opt-out date, will not be entitled to a Credited Season for the 2020 Plan Year.

(h)    effective for the 2021 Plan Year only, is

(1)    a Higher-Risk Player or Changed Circumstances Higher-Risk Player, as those terms are defined in Section 1(b) of the agreement between the Management Council and NFLPA dated June 22, 2021 and titled "2021 Opt-Outs and COVID-19 Related Contractual Changes" ("2021 COVID side-letter"), who opts out of the 2021 season.

(2)    Any term in Section 1.11(h)(1) which is not defined in this Plan will have the meaning ascribed to it in the Constitution and By-Laws of the League, 2020 CBA, or 2021 COVID side-letter, as the case may be.

(3)    A Player who does not satisfy the requirements of Section 1.11(h)(1) during the 2021 Plan Year may nonetheless earn a Credited Season for such Plan Year if he otherwise qualifies for a Credited Season during such Plan Year. A Player who voluntarily opts out of the 2021 season, and who has not qualified for a Credited Season for such Plan Year as of his opt-out date, will not be entitled to a Credited Season for the 2021 Plan Year.

(i)    A Player may earn no more than one Credited Season during a Plan Year. A Credited Season is identified by the calendar year in which it begins.

**1.12    "Dependent"** means an individual who satisfies the definition of 'dependent' in Code Section 152.

**1.12A    "Disability Credits"** means the sum of a Player's:

(a)    Benefit Credits as provided in Section 4.1(a) for all of his Credited Seasons, excluding his Special Credits described in Section 4.1(a); and

(b)    Legacy Credits as provided in Section 4A.1 for his applicable Credited Seasons, excluding 2020 Legacy Credits described in Section 4A.1(b).

**1.13** **"Disability Initial Claims Committee"** means the committee described in Article 8.

**1.13A** **"Disability Plan"** means the NFL Player Disability & Survivor Benefit Plan.

**1.14** **"Employee"** means an individual who (a) is employed by an Employer as an Active Player, or (b) is employed by an Employer or an Affiliate in a capacity other than as an Active Player (provided that such employment immediately precedes or immediately follows, without interruption, employment as an Active Player).

**1.15** **"Employer"** means a member club of the League.

**1.16** **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**1.16A** **"Expansion Pension"** means the monthly pension payable to a Pension Expansion Player under Article 4B.

**1.16B** **"Expansion Pension Annuity Starting Date"** means the first day of the first period for which an amount is received as an annuity under Article 4B.  A Pension Expansion Player's Expansion Pension Annuity Starting Date will not be earlier than the first day of the month coincident with or next following the date that the Player's benefit election form is received by the Retirement Board, except as provided in Sections 4B.3(b) (if elected in accordance with Treasury Regulations section 1.417(e)-1(b)(3)(v)).

**1.16C** **"Expansion Credit"** means the credit described in Section 4B.1 for the corresponding Credited Season.

**1.17** **"Game"** means any regular-season League game and any post-season League game except the Pro Bowl.

**1.18** **"Hour of Service"** means:

(a)    An hour for which an Employee is paid, or entitled to payment, for the performance of duties for an Employer or Affiliate during a Plan Year, with such an Hour of Service being credited for the Plan Year in which the duties were performed;

(b)    An hour for which an Employee is paid, or entitled to payment, by an Employer or Affiliate on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence, with such an Hour of Service being credited for the Plan Year or, on a ratable basis, for the Plan Years with respect to which the payments are made; provided, however, that (1) no more than 501 Hours of Service will be credited under this paragraph to an Employee on account of any single continuous period during which the Employee performs no services (whether or not such period occurs in a single Plan Year), (2) Hours of Service will not be credited for any payment made or due under a plan maintained solely for the purpose of complying with applicable workers' compensation,

unemployment compensation or disability insurance laws or for any payment which solely reimburses an Employee for medical or medically related expenses incurred by the Employee, and (3) a payment will be deemed to be made by or due from an Employer or Affiliate regardless of whether such payment is made by or due from the Employer directly, or indirectly through, among others, a trust fund or insurance company to which the Employer or Affiliate contributes or pays premiums and regardless of whether contributions made or due to the trust fund, insurance company or other entity are for the benefit of particular Employees or on behalf of a group of Employees in the aggregate; and

(c)    An hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by an Employer, with such Hours of Service being credited for the Plan Year or Plan Years to which the award or agreement pertains (rather than the Plan Year or Plan Years in which the award, agreement or payment is made).  An Hour of Service credited under subsections (a) or (b) above will not also be credited under this subsection (c).  Crediting of Hours of Service for back pay awarded or agreed to with respect to periods described in subsection (b) will be subject to the limitations set forth therein.  The determination of Hours of Service for reasons other than the performance of services and the crediting of Hours of Service to the appropriate Plan Year will be made on a basis consistent with 29 C.F.R. § 2530.200b-2(b) and (c), which is incorporated herein by reference.

An Employee's total Hours of Service in a Plan Year are determined as follows, without regard to whether the Employee actually completes more or less than the applicable number of Hours of Service indicated:  (a) from July 1 through the following January 31, the Employee will be credited with ten Hours of Service for each day on which he completes at least one Hour of Service; and (b) from February 1 through the following June 30, the Employee will be credited with 190 Hours of Service for each calendar month in which he completes at least one Hour of Service.  Notwithstanding the prior sentence, an Employee whose first Hour of Service is after March 31, 2010 shall be credited at all times with ten Hours of Service for each day in which he completes at least one Hour of Service.

**1.19**    **"League"** means the National Football League.

**1.20**    **"Legacy Credits"** means both the 2011 Legacy Credits described in Section 4A.1(a) and the 2020 Legacy Credits described in Section 4A.1(b) for the corresponding Credited Season.

**1.21**    **"Legacy Credit Annuity Starting Date"** means the first day of the first period for which an amount is received as an annuity under Article 4A.  A Player's Legacy Credit Pension Annuity Starting Date will not be earlier than (1) the later of (a) the Player's Benefit Credit Annuity Starting Date or (b) the first day of the month coincident with or next following the date that the Player's Legacy Credit Pension election form is received by the Retirement Board, or (2) August 1, 2011.

**1.22**    **"Legacy Credit Pension"** means the monthly pension payable to Legacy Eligible Players under Article 4A.

**1.23**    **"Legacy Eligible Player"** means a Player who is (a) a Vested Player taking into

account only his Credited Seasons prior to 1993, and (b) alive on August 4, 2011.

**1.24** **"Life and Contingent Annuitant Pension"** means a monthly annuity for the life of the Player, and if the Player predeceases the person designated by him as his contingent annuitant, a monthly survivor annuity equal to all or a fraction of the Player's monthly annuity payment, as designated by the Player in writing, payable for the life of the Player's contingent annuitant.  The contingent annuitant must be the Player's Spouse, parent, child, brother, sister or Dependent, and the fraction must be one of the following percentages: 25%, 50%, 75%, or 100%.  Notwithstanding the above, if the maximum percentage allowed by the incidental benefit rule of Section 4.7(b)(2) is less than 100%, then a Life and Contingent Annuitant Pension with such maximum percentage will be offered, and Life and Contingent Annuitant Pension forms with a higher survivor percentage will not be offered.

**1.25** **"Life Only Pension"** means a monthly annuity for the life of the Player only, with no benefit payable for any month which begins after the date of the Player's death.

**1.26** **"Management Council"** means the National Football League Management Council, which is the sole and exclusive collective bargaining representative of the Employers.

**1.27** **"Medical Advisory Physician" or "MAP"**  means the health care professional(s) designated under Section 11.2.

**1.28** **"Medical Director"** means the health care professional designated under Section 11.1.

**1.29** **"Neutral Physician"** means the health care professional(s) designated under Section 11.3.

**1.30** **"NFLPA"** means the National Football League Players Association, which is the sole and exclusive bargaining representative of League professional football players.

**1.31** **"Normal Retirement Date"** means the first day of the calendar month coincident with or next following a Player's fifty-fifth birthday.

**1.31A** **"Pension Expansion Player"** means a Player who (a) is alive on March 15, 2020, (b) has three or more Credited Seasons, and (c) does not at any time satisfy the criteria of Section 1.47 to be a Vested Player.  A Pension Expansion Player is vested in and has a non-forfeitable right to the benefits described in Article 4B, but is not entitled to any other benefits under this Plan, and, except as provided in Article 4B where a survivor form of benefit is elected, and as provided in Section 7.3(c), a surviving spouse or other beneficiary of a Pension Expansion Player is not entitled to any benefits under this Plan.

**1.32** **"Plan"** means this Bert Bell/Pete Rozelle NFL Player Retirement Plan.

**1.33** **"Plan Director"** means the individual named by the Retirement Board to act on its behalf in performing ministerial functions.  The Plan Director will not have any discretionary authority or discretionary responsibility in the administration of the Plan, nor any discretionary

control with respect to the management of the Plan or its assets.

**1.34    "Plan Year"** means the twelve-month period from April 1 to March 31.  A Plan Year is identified by the calendar year in which it begins.

**1.35    "Player"** means any person who is or was employed under a contract by an Employer to play football in the League and who is or was:  (a) on the Active List or the Inactive List (as such lists are or have been defined in the Constitution and By-Laws of the League) of an Employer; (b) on an Employer's roster without being on the Active List by reason of injuries sustained in the Chicago Tribune All-Star Game; (c) injured in the course and scope of his employment for an Employer and by reason of such injury paid under such contract for all or part of the Plan Year in which the injury occurs or occurred; (d) on the Move List, or, for the purposes of the benefits provided by Articles 5, 6, and 7 of the Plan, on the Future List of an Employer after April 1, 1970 (as such lists have been defined in the Constitution and By-Laws of the League); or (e) on the Reserve/Physically Unable to Perform or the Reserve/NFI-EL Lists of an Employer (as such lists have been defined in the Constitution and By-Laws of the League).

**1.36    "Prior Benefit Credit Pension"** means the Benefit Credit Pension that a Legacy Eligible Player in pay status as of August 4, 2011 was receiving as of August 2011, taking into account any adjustments for early or deferred retirement, the form of payment elected, and the prior election of an early payment benefit.

**1.37    "QDRO"** means a Qualified Domestic Relations Order as defined in Code section 414(p).

**1.38    "Qualified Election"** means a waiver of a Qualified Joint and Survivor Annuity. The waiver must be in writing and must be consented to by the Player's Spouse.  The Spouse's consent to a waiver must be witnessed by a notary public and, if benefits are to be paid to an alternate beneficiary, must be limited to a benefit for a specific alternate beneficiary or beneficiaries.  Notwithstanding this consent requirement, if the Player establishes to the satisfaction of the Retirement Board that such written consent cannot be obtained because there is no Spouse, because the Spouse cannot be located, or because of such other circumstances as may be provided in Treasury Regulations, a Player's waiver will be deemed a Qualified Election without a Spouse's consent.  Any consent (or establishment that consent is not required) necessary under this provision will be valid only with respect to such consenting Spouse, who may not revoke such consent.  A revocation of a prior waiver may be made by a Player without the consent of the Spouse at any time before the commencement of benefits.  The number of revocations by a Player is not limited.  Any new waiver or change of beneficiary will require a new spousal consent.

The Retirement Board will give each Player, not more than 180 days before each of his Benefit Credit Annuity Starting Date and his Legacy Credit Annuity Starting Date, as applicable, a written explanation of (a) the terms and conditions of the Qualified Joint and Survivor Annuity, (b) the Player's right to make (and the effect of) an election to waive the Qualified Joint and Survivor Annuity, (c) the rights of the Player's Spouse, (d) the Player's right to make (and the effect of) a revocation of a previous election to waive the Qualified Joint and Survivor Annuity, and (e) the amounts of the various optional forms of benefit.

A Player will have at least thirty days to decide whether to waive the Qualified Joint and Survivor Annuity with respect to his Benefit Credit Pension or Legacy Credit Pension, as applicable.  A Player may waive his right to this thirty-day period by making an affirmative election to commence benefits, with, if applicable, spousal consent; however, benefits will not commence before the expiration of the seven-day period that begins on the day after the Player receives the written explanation of the Qualified Joint and Survivor Annuity.  Additionally, the Player has the right to revoke an affirmative election to commence benefits until the Benefit Credit Annuity Starting Date or the Legacy Credit Annuity Starting Date, as applicable, or, if later, until the expiration of the seven-day period referred to in the preceding sentence.

**1.39**    **"Qualified Joint and Survivor Annuity"** means a monthly annuity for the life of the Player with a monthly survivor annuity beginning after the death of the Player for the life of the Spouse equal to 50% of the amount of the monthly annuity payable during the life of the Player.  The Qualified Joint and Survivor Annuity will be the Actuarial Equivalent of the Life Only Pension.

**1.40**    **"Qualified Optional Joint and Survivor Annuity"** means a monthly annuity for the life of the Player with a monthly survivor annuity beginning after the death of the Player for the life of the Spouse equal to 75% of the amount of the monthly annuity payable during the life of the Player.  The Qualified Optional Joint and Survivor Annuity will be the Actuarial Equivalent of the Life Only Pension.

**1.41**    **"Retirement Board"** means the board described in Article 8.

**1.41A**   **"Special Credit"** means the credit described as a Special Credit in Section 4.1(a) for the corresponding Credited Season.

**1.42**    **"Spouse"** means a Player's lawful spouse provided that the Player and such person were legally married under the laws of any U.S. or foreign jurisdiction.  A Spouse shall also include a former spouse to the extent provided under a QDRO.  A Player's Spouse on his Benefit Credit Annuity Starting Date or Legacy Credit Annuity Starting Date, as applicable, will be the Player's Spouse for purposes of Sections 1.38, 1.39, 1.40 and, if the beneficiary is the Spouse, Section 1.24, except as may be provided in a QDRO.

**1.43**    **"Survivor Credits"** means the sum of a Player's:

(a)    Benefit Credits as provided in Section 4.1(a) for all of his Credited Seasons;

(b)    Special Credits as provided in Section 4.1(a) for all of his Credited Seasons; and

(c)    Legacy Credits as provided in Section 4A.1(a) and (b) for all of his Credited Seasons.

**1.44**    **"Trust"** means the trust agreement for the Bert Bell/Pete Rozelle NFL Player Retirement Plan, as amended or restated from time to time.

**1.45**    **"Trustee"** means the trustee of the Trust and any successor trustee(s) of such Trust.

11

**1.46    "Vested Inactive Player"** means a Vested Player who is not an Active Player.

**1.47    "Vested Player"** means a Player who:

(a)    earns five Credited Seasons;

(b)    earns four Credited Seasons, including a Credited Season after the 1973 Plan Year;

(c)    earns three Credited Seasons, including a Credited Season after the 1992 Plan Year;

(d)    after the 1975 Plan Year, is an Employee on his Normal Retirement Date;

(e)    after receiving total and permanent disability benefits under (i) Article 5 of this Plan, or (ii) Article 3 of the Disability Plan, is found to no longer qualify for total and permanent disability;

(f)    is an Employee after the 1975 Plan Year and has at least ten Years of Service (only for the purpose of applying Article 4 or Section 7.3 and not for any other purpose);

(g)    is an Employee after the 1988 Plan Year and has at least four Years of Service, at least one of which occurred after the 1988 Plan Year and is a Plan Year in which the Employee did not earn a Credited Season (only for the purpose of applying Article 4 or Section 7.3 and not for any other purpose);

(h)    is an Employee after the 1992 Plan Year and has at least three Years of Service, at least one of which occurred after the 1992 Plan Year and is a Plan Year in which the Employee did not earn a Credited Season (only for the purpose of applying Article 4 or Section 7.3 and not for any other purpose); or

(i)    (1) earned at least four Credited Seasons, the last of which is earned prior to the 1974 Plan Year, and (2) was alive on June 1, 1998 (only for the purpose of applying Article 4, 4A, or Section 7.3, and not for any other purpose).

(j)    Notwithstanding the foregoing, effective April 1, 2012, a Player who first earns an Hour of Service during or after the 2012 Plan Year, and does not have three Credited Seasons, will not be a Vested Player (only for the purpose of applying Article 4 or Section 7.3, and not for any other purpose) until he has earned five Years of Service.

(k)    The Benefit Credits, Legacy Credits, and Special Credits of a Vested Player are nonforfeitable, and the Benefit Credits, Legacy Credits, Special Credits, and Disability Credits, of a Player who is not vested are forfeitable.

(l)    A Pension Expansion Player is not a "Vested Player" under this Section 1.47. Nevertheless, a Pension Expansion Player has a nonforfeitable right to the benefits described in Article 4B.

**1.48** **"Year of Service"** means a Plan Year in which an Employee completes at least 1,000 Hours of Service or earns a Credited Season.

**ARTICLE 2**

**PARTICIPATION**

**2.1**     **Participation.**  All Players participate in the Plan.

## ARTICLE 3

## CONTRIBUTIONS

**3.1    Contributions.**  Contributions will be made to the Trust by or on behalf of each Employer for the Plan Year.  Contributions will be made in the amount as determined by the 2020 CBA, as amended by letter agreements between the Management Council and NFLPA from time to time, in accordance with the assumptions in Appendix A.  Contributions shall not be less than the minimum required contributions under ERISA.

In addition to the contribution required under Article 53, Section 2 of the 2020 CBA, the Employers will collectively make a special contribution for each Plan Year at the minimum amount necessary, if any, to allow the Plan to certify under Internal Revenue Code Section 432(b)(5)(A) that it will not be in endangered status at the end of the 10th Plan Year following the Plan Year for which the certification is made.

If Benefit Credits, Legacy Credits, and Special Credits are discontinued after the League Year ending in 2031, the Employers shall continue to make annual contributions in the amount necessary to satisfy the requirements of ERISA § 302 unless and until the Employers elect to withdraw under ERISA § 4203.

The Employers will make contributions to the Plan on or before the last day of the Plan Year, which will be used exclusively to provide benefits and pay expenses.

Contributions will be made only to the extent they are within the deduction limits of Code section 404 for the Plan Year for which they are made.  Except as provided above, contributions, if any, for Plan Years beginning on or after April 1, 2031 will be determined pursuant to future Collective Bargaining Agreements, if any.

Any contribution not received by the Trustee on or before the date it is due will bear interest from the due date to the date of receipt by the Trustee at an annual rate of 6% interest.  It will be the duty of the Retirement Board to pursue all available legal remedies in an effort to ensure payment of all contributions due under any Collective Bargaining Agreement.

**3.2    Employer Obligations.**  The Employers do not guarantee any benefits under the Plan, except as provided under applicable law.  The Employers will have no obligation to make contributions to the Trust, except as provided under Section 3.1 above, a Collective Bargaining Agreement, or ERISA.

**3.3    Exclusive Benefit of Contributions.**  All contributions under this Plan will be held by the Trust for the exclusive benefit of Players and their beneficiaries.  Notwithstanding the above, any contribution made by or on behalf of an Employer to the Plan due to a mistake of fact or law, including contributions that are not within the deduction limits of Code section 404 for the Plan Year for which they are made, will be returned to such Employer within six months of the determination by the Retirement Board that such contribution was in error.  The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact

15

or law.  A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution.

**ARTICLE 4**

**BENEFIT CREDIT PENSION**

**4.1    Benefit Credits and Special Credits.**

(a)    Effective April 1, 2020, a Player's Benefit Credit and Special Credit for each of his Credited Seasons will be determined according to the following table:

| Credited Season | Benefit Credit | Special Credit |
|---|---|---|
| Before 1982 | $ 250 | $ 300 |
| 1982 through 1992 | 255 | 295 |
| 1993 and 1994 | 265 | 285 |
| 1995 and 1996 | 315 | 235 |
| 1997 | 365 | 185 |
| 1998 through 2011 | 470 | 80 |
| 2012 through 2014 | 560 | 56 |
| 2015 through 2017 | 660 | 66 |
| 2018 and 2019 | 760 | 76 |
| 2020 through 2030 | 836 | 0 |

A Player is not entitled to a Special Credit for any Credited Season for which he is entitled to a 2020 Legacy Credit under Section 4A.1(b).

(b)    For payments for periods prior to April 1, 2020, a Player's Benefit Credit and Special Credit for each of his Credited Seasons will be determined based on the versions of the Plan in effect for such periods.

(c)    For purposes of this Article 4, the term Player refers only to a Player entitled to a Benefit Credit Pension.

**4.2    Monthly Amount.**  A Vested Player's monthly Benefit Credit Pension at any time is the sum of his Benefit Credits and Special Credits for each of his Credited Seasons.  A Vested Player's monthly Benefit Credit Pension may also be adjusted according to the date he begins to receive benefits (see Section 4.3 below), and the form or manner in which benefits are paid (see Sections 4.4 and 4.5 below).

**4.3    Normal, Deferred and Early Retirement.**  A Vested Player may elect to begin

17

to receive his Benefit Credit Pension as of his Normal Retirement Date or, subject to Section 4.7 below, as of the first day of any month following his Normal Retirement Date. A Vested Inactive Player with at least one Credited Season prior to the 1993 Plan Year, and who is no longer an Employee, may also elect to begin to receive his Benefit Credit Pension as of the first day of any month coincident with or next following such Vested Inactive Player's forty-fifth birthday and before his Normal Retirement Date. All such elections (including the election of the form of payment pursuant to Sections 4.4 and 4.5 below) must be filed in writing with the Retirement Board and may not be revoked after the initial payment is mailed or otherwise transmitted to the Player. Except as provided in Section 4.11, the Benefit Credit Pension of a Vested Inactive Player who begins to receive benefits after his Normal Retirement Date will be increased so as to be the Actuarial Equivalent of the Benefit Credit Pension he could have elected to receive at his Normal Retirement Date. The Benefit Credit Pension of a Vested Player who begins to receive benefits before his Normal Retirement Date will be decreased so as to be the Actuarial Equivalent of the Benefit Credit Pension he could have elected to receive at his Normal Retirement Date. Further adjustments to a Vested Player's Benefit Credit Pension may also be made as described in Sections 4.4 and 4.5 below depending on the form or manner in which benefits are paid.

**4.4    Normal and Optional Forms of Payment; Qualified Joint and Survivor Annuity Requirements.**

(a)    Unless an optional form of benefit is selected pursuant to a Qualified Election within the 180-day period ending on a Vested Player's Benefit Credit Annuity Starting Date, a married Vested Player's Benefit Credit Pension will be paid in the form of a Qualified Joint and Survivor Annuity, and an unmarried Vested Player's Benefit Credit Pension will be paid in the form of a Life Only Pension. A married Player must obtain spousal consent pursuant to a Qualified Election to select an optional form under Section 4.4(b) unless the Player elects (1) a Qualified Joint and Survivor Annuity, (2) a Qualified Optional Joint and Survivor Annuity, or (3) a 100% Life and Contingent Annuitant Pension with the Player's Spouse as the contingent annuitant.

(b)    Subject to Section 4.4(a) above, a Vested Player may elect to receive benefits in any one of the following forms.

(1)    Life Only Pension.

(2)    Qualified Joint and Survivor Annuity.

(3)    Qualified Optional Joint and Survivor Annuity.

(4)    "Life only pension with Social Security adjustment" – Benefit Credit Pension payments payable during the Player's lifetime adjusted such that the sum of such payment plus the Player's expected Social Security benefit beginning at age sixty-two is the same before and after age sixty-two, and further adjusted such that the Player's Benefit Credit Pension from the Plan will not be less than $50. Except as provided in Section 4.11, this option may only be elected by a Player who has at least one Credited Season prior to the 1993 Plan Year. This option is not available with respect to Benefit

Credits for Credited Seasons prior to 1959.  For purposes of this Section 4.4(b)(4), for Players with at least one Credited Season within the period 1959 through 1963, Credited Seasons prior to 1959 needed to reach five Credited Seasons (when added to the Player's Credited Seasons after 1958) will be treated as having occurred after 1958.

      (5)     Life and Contingent Annuitant Pension.

      (6)     "Life and ten-year certain pension" – equal Benefit Credit Pension payments payable for the greater of 120 months or the Player's lifetime, with any remaining guaranteed payments being continued after the Player's death to his designated beneficiary or, if none, the Player's estate.

Benefits payable for the life of a Player, Spouse, or contingent annuitant will continue through the month in which such person's death occurs.  Where a Player receives his Benefit Credit Pension under any optional form of benefit described in paragraphs (2), (3), (4), (5) or (6) above (with spousal consent if required), his Benefit Credit Pension will be reduced to be the Actuarial Equivalent of his Benefit Credit Pension under the form of benefit described in paragraph (1) above.

The monthly benefit of a Player who (i) has elected a Qualified Joint and Survivor Annuity under Section 4.4(b)(2), a Qualified Optional Joint and Survivor Annuity under Section 4.4(b)(3), or a Life and Contingent Annuitant Pension under Section 4.4(b)(5) with his Spouse as the beneficiary and (ii) survives or has survived his Spouse, will increase to the amount that would have been paid if the Player had elected a Life Only Pension under Section 4.4(b)(1) as of his Benefit Credit Annuity Starting Date (including subsequent benefit increases).  The increase in benefit under the previous sentence will be paid beginning as of the first day of the month following the date of his Spouse's death, and will continue for the life of the Player; provided, however, no increase will be paid for any month that begins more than forty-two months before the date upon which the Player first notifies the Retirement Plan of his Spouse's death.  For purposes of this paragraph, a Player will be deemed to survive his Spouse if either of the following occur: (1) the Spouse predeceases the Player, or (2) the Retirement Board determines that the Player and the Spouse are divorced and the Spouse has waived and relinquished all rights to benefits in the event of the Player's death, in which case the date the Spouse waives and relinquishes such benefits will be treated as if it were the date of the Spouse's death.

**4.5    Early Payment Benefit.**

      (a)    <u>Eligibility and Amount of Early Payment Benefit.</u>  A Vested Player who leaves League football on or after March 1, 1977, who has at least one Credited Season prior to the 1993 Plan Year, and who is no longer an Employee may elect to receive an "early payment benefit" in the form of: (1) a lump sum, (2) a Life Only Pension, (3) a Qualified Joint and Survivor Annuity, or (4) a Qualified Optional Joint and Survivor Annuity. This election must be filed in writing with the Retirement Board, and must be consented to by the Player's Spouse with a Qualified Election, unless the Player elects either: (A) a Qualified Joint and Survivor Annuity or (B) a Qualified Optional Joint and Survivor Annuity.  The amount of an early payment benefit will be the Actuarial Equivalent of 25% of the sum of a Player's Benefit Credits (not including any Special Credits). The early payment benefit will be payable as soon as administratively

practicable after the later of: (i) the date of the Player's election, or (ii) the one year anniversary of the date the Player ceases to be an Active Player.

(b)    <u>Reduction to Benefit Credit Pension.</u>  If a Player receives an early payment benefit, his Benefit Credit Pension will be based upon 75% of the sum of his Benefit Credits at the time of the early payment benefit distribution (but 100% of any Benefit Credit increases that take effect after the early payment benefit is paid and 100% of any Special Credits), with such remaining Benefit Credit Pension being payable under Sections 4.3 and 4.4.

(c)    <u>Reduction to Total and Permanent Disability Benefits.</u>

(1)    If a Player elects an early payment benefit after March 31, 1982, for months prior to April 2031 any monthly subsequent total and permanent disability benefits under Article 5 will be the greater of:

(A)    (i) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (ii) 100% of any Benefit Credit increases (not including any Special Credits) that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (iii) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); or

(B)    the minimum dollar benefit for such month in Section 5.5(b) reduced by 25% of the greater of: (i) such minimum dollar benefit in effect as of the effective date of the Player's award of total and permanent disability benefits, or (ii) $3,334.

Total and permanent disability benefits are further reduced at Normal Retirement Date as set forth in Sections 5.5(d) and 5.5(e).

(2)    If a Player elects an early payment benefit after March 31, 1982, for months on and after April 2031 his monthly total and permanent disability benefits under Article 5 will be the greater of:

(A)    (i) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (ii) 100% of any Benefit Credit increases (not including any Special Credits) that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (iii) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); or

(B)    75% of the minimum benefit for that month under Section 5.5(b).

Total and permanent disability benefits are further reduced at Normal Retirement Date as set forth in Sections 5.5(d) and 5.5(e).

(d)    Reduction to Line-of-Duty Disability Benefits.  If a Player elects an early payment benefit after March 31, 1982, any monthly subsequent line-of-duty disability benefits under Article 6 will be the greater of:

(1)    (i) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (ii) 100% of any Benefit Credit increases (not including any Special Credits) that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (iii) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); or

(2)    the minimum dollar benefit for such month in Section 6.1 reduced by 25% of such minimum dollar benefit in effect as of the effective date of the Player's award of line-of-duty disability benefits.

(e)    Reduction to Survivor Benefits.  A Player who elects an early payment benefit after March 31, 1982 will have his survivor benefits reduced as follows:

(1)    For Players who die on or after April 1, 2020:  the Spouse's pre-retirement survivor benefit under Section 7.3(a) shall be determined based on the Player's Benefit Credit Pension after reduction pursuant to Section 4.5(b); and

(2)    For Players who die before April 1, 2020:  the survivor benefits under Section 7.2 and Section 7.3 will be determined in accordance with the terms of the Plan in effect at the time of the Player's death.

**4.6    Deemed Distributions.**  If the present value of a Player's vested Benefit Credit Pension is zero at the time he terminates employment as an Employee, the Player will be deemed to have received a distribution of all of his vested Benefit Credit Pension.  The present value of any Benefit Credit Pension will be the Actuarial Equivalent of the normal form of benefit.

If a Player receives a deemed distribution pursuant to this Section and then resumes employment as an Active Player prior to the termination of the Plan, he will be deemed to have repaid his deemed distribution, and any forfeited Benefit Credit Pension will be restored.  The re-employed Player's Years of Service and Credited Seasons before the deemed distribution will be counted for vesting purposes.

**4.7    Required Distributions.**

(a)    Payment of benefits to a Player, other than a Player who earns a Credited Season during the 1989, 1990, 1991, or 1992 Plan Years, will begin no later than the first day of the month after the Player's sixty-fifth birthday, without regard to whether the Player remains employed by an Employer and without regard to any election to defer benefits under Section 4.3. Payment of benefits to any other Player will begin no later than the April 1 of the calendar year following the calendar year in which such Player attains age 70½.

(b)    Notwithstanding any other Plan provision:

(1)     Benefits will be distributed over a period of not longer than:  (i) the life of the Player; (ii) the lives of the Player and his Spouse; or (iii) a period not extending beyond the life expectancy of the Player or the joint and last survivor life expectancies of the Player and his Spouse.  For purposes of this Section, life expectancy will be determined in accordance with Treasury Regulation section 1.401(a)(9)-6 Q&A 3, which is incorporated herein by reference;

(2)     Any annuity payments made under this Section will be made on a monthly basis and may not increase (except as a result of any additional accruals or benefit increases under this Plan).  Further, any distributions under this Plan must satisfy the minimum distribution incidental benefit requirement of Code section 401(a)(9)(G) and Treasury Regulation section 1.401(a)(9)-6Q&A 2, which is incorporated herein by reference.

(3)     If a Player dies after distribution of his monthly pension has commenced, any remaining portion of such Player's monthly pension will continue to be distributed at least as rapidly as under the method of distribution being used prior to the Player's death; and

(4)     If a Player dies before distribution of his monthly pension commences, any remaining portion of such Player's monthly pension will be distributed no later than five years after the date of the Player's death, except that:

(i)     If the beneficiary is the Player's surviving Spouse, distributions will begin by the later of (A) December 31 of the calendar year immediately following the calendar year in which the Player died, or (B) December 31 of the calendar year in which the Player would have attained age 70½, and will be made over a period not exceeding the life expectancy of such Spouse; or

(ii)     If any portion of the benefit is payable to a designated beneficiary, distributions will begin on or before the December 31 of the calendar year immediately following the calendar year in which the Player died, and will be made over a period not exceeding the life expectancy of such designated beneficiary.

(5)     All distributions under the Plan will be made in accordance with Code section 401(a)(9) and Treasury Regulations sections 1.401(a)(9)-2 through 1.401(a)(9)-6.

(c)

(1)     Unless otherwise elected in writing by a Player to begin earlier, distribution of benefits will begin not later than sixty days after the close of the Plan Year in which the latest of the following occurs:

(i)     The Player's Normal Retirement Date;

(ii)     The 10th anniversary of the date the Player commenced

participation in the Plan; or

(iii)    The date the Player ceases to be an Employee.

(2)    However, notwithstanding Section 4.7(c)(1) above, distribution of benefits will not commence until a Player makes such elections and submits such information as are required by the Retirement Board; except that, if a Player does not make such elections and submit such information by the date that the payment of benefits is required to begin in accordance with Section 4.7(a), the Player's benefits will be paid in accordance with Section 4.7(a) based upon certain assumptions made by the Plan regarding the Player's marital status and, if the Player is assumed to be married, the age of the Player's Spouse. Such assumptions will be made based upon all information in the possession of the Plan. If the Plan has no information regarding a Player's marital status, the Plan will assume that the Player is married. If a Player is married or is assumed to be married, the Player's benefits will be paid in the form of a Qualified Joint and Survivor Annuity, unless the Player elects otherwise. If the Plan has no information regarding the age of a Player's Spouse, the Plan will assume that the Spouse is ten years younger than the Player. If the Player later makes such elections and provides such information as are required by the Retirement Board, or if additional information is obtained by the Retirement Board, the Player's benefit payments will be recalculated and adjusted retroactively (without interest) back to the date payments began.

**4.8    Rollovers Out of the Plan.** Notwithstanding any provision in the Plan to the contrary, a "Distributee" may elect, at the time and in the manner prescribed by the Retirement Board, to have any portion of an "Eligible Rollover Distribution" paid directly to an "Eligible Retirement Plan" specified by the Distributee in a "Direct Rollover." For purposes of this Section, the following terms will be defined as follows:

(a)    "Distributee" means a person who is entitled to a distribution under the Plan and who is a Player, a Player's surviving Spouse, or a Player's Spouse or former Spouse who is the alternate payee under a QDRO, or a non-Spouse beneficiary;

(b)    "Eligible Rollover Distribution" means any distribution of all or any portion of a Distributee's benefit under the Plan, except that an Eligible Rollover Distribution does not include: (1) any distribution that is one of a series of substantially equal periodic payments (payable not less frequently than annually) made for the life (or life expectancy) of the Distributee or the joint lives (or joint life expectancies) of the Distributee and the Distributee's designated beneficiary, or for a specified period of ten years or more; and (2) any distribution to the extent such distribution is required under Code section 401(a)(9);

(c)    "Eligible Retirement Plan" means an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in Code section 408(b) of the Code, a Roth IRA described in Code section 408A, an annuity plan described in Code section 403(a), an annuity contract described in Code section 403(b), an eligible plan under Code section 457(b) which is maintained by a state, political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state and which agrees to separately account for amounts transferred into such plan from this Plan, or a qualified trust described in

Code section 401(a), that accepts the Distributee's Eligible Rollover Distribution. The same definition of Eligible Retirement Plan will also apply in the case of a distribution to a surviving Spouse, or to a former Spouse who is the alternate payee under a QDRO; however, for a non-Spouse beneficiary, Eligible Retirement Plan is limited to an inherited IRA pursuant to Code section 402(c)(11); and

(d)　　"Direct Rollover" means a payment by the Plan to the Eligible Retirement Plan specified by the Distributee.

**4.9　　[Reserved].**

**4.10　　Additional Rules for Certain Veterans.**　A Player who is vested solely because of Section 1.11(e) may elect to commence receiving benefits as of the later of June 1, 1993 or his Normal Retirement Date, under any optional form of benefit described in Section 4.4(b)(1), (2), (3), (5) or (6), but not Section 4.4(b)(4). Such benefits will be actuarially increased to the extent the Player's Benefit Credit Annuity Starting Date is after the later of June 1, 1993 or his Normal Retirement Date. Such benefits will be paid to a Player or his beneficiary retroactive to the later of June 1, 1993 or his Normal Retirement Date and will begin as soon as practicable after a completed application for the benefits is submitted to the Retirement Board. The surviving Spouse of a Player who is entitled to benefits solely because of Section 1.11(e) will receive a benefit as if the Player had elected one day before his death a 100% contingent annuity pension under Section 4.4(b)(5) with the Spouse as the contingent annuitant, unless the Player, with spousal consent, elected a different form of benefit prior to his death.

**4.11　　Additional Rules for Players Vested Solely Because of Section 1.47(i).** Notwithstanding any other Plan provisions, the following additional rules will apply to any Player who is vested solely because of Section 1.47(i):

(a)　　Such a Player may elect to receive benefits under any of the forms described in Section 4.4(b)(1), (2), (3), (5), or (6), but not Section 4.4(b)(4);

(b)　　Such a Player will be entitled to receive benefits pursuant to a Benefit Credit Annuity Starting Date of June 1, 1998 or later;

(c)　　A benefit paid to such a Player will be actuarially increased to the extent his Benefit Credit Annuity Starting Date is after the later of June 1, 1998 or the Player's Normal Retirement Date; and

(d)　　No beneficiary of such a Player who dies prior to his Benefit Credit Annuity Starting Date will be entitled to receive any benefit, except that the surviving Spouse of such a Player will be entitled to receive, as of the first day of the month following the date of the Player's death, a benefit equal to the amount the surviving Spouse would have received had the Player elected a Qualified Joint and Survivor Annuity with respect to his Benefit Credit Pension on the day prior to his death, unless he elected another form of benefit.

**4.12　　Special Rules Regarding Payment Options for Certain Vested Players.** Notwithstanding Section 4.11, Players who became Vested Players in 2002 or 2003 because of

an interpretation of Section 1.11(a) or Section 1.11(e) by the Retirement Board that relates to Credited Seasons for Plan Years prior to the 1970 Plan Year may elect to receive a retroactive distribution for the sum of monthly benefits from the later of (a) June 1, 1998 or (b) the Player's Normal Retirement Date to the date of payment, and his monthly benefit will not be actuarially increased. If the Player elects a Benefit Credit Annuity Starting Date after the later of (a) or (b) above, his monthly benefit will be actuarially increased.

### 4.13   Legacy Floor.

(a)     The minimum Prior Benefit Credit Pension is $600, effective as of August 1, 2011 for Legacy Eligible Players whose Benefit Credit Annuity Starting Date is on or before August 1, 2011. Adjustments shall be made as soon as reasonably practicable, with a lump-sum payment for retroactive payments. This minimum $600 monthly benefit also applies to the Prior Benefit Credit Pension paid when a Legacy Eligible Player who elected payment in the form of a life only pension with Social Security adjustment under Section 4.4(b)(4) reaches age 62.

(b)     For Legacy Eligible Players whose Benefit Credit Annuity Starting Date is after August 1, 2011, the $600 floor will be applied as follows. If a single Player elects to receive his Benefit Credit Pension in the form described in Section 4.4 (b)(1), his monthly Benefit Credit Pension will be at least $600. If a single Player elects to receive his Benefit Credit Pension in one of the forms described in Section 4.4 (b)(2), (3), (4), (5) or (6), his monthly Benefit Credit Pension will not be less than the actuarial equivalent of a $600 per month Life Only Pension. If a married Player elects to receive his Benefit Credit Pension in the form described in Section 4.4(b)(2), his monthly Benefit Credit Pension will be at least $600. If a married Player elects to receive his Benefit Credit Pension in one of the forms described in Section 4.4(b)(1), (3), (4), (5) or (6), his monthly Benefit Credit Pension will not be less than the actuarial equivalent of a $600 per month Qualified Joint and Survivor Annuity. The $600 minimums in this paragraph will be reduced to $450 where a Player elects after August 4, 2011 to receive an early payment benefit as described in Section 4.5. Election of an early payment benefit on or before August 4, 2011 will not reduce these $600 minimums. The $600 floor will be applied after taking into account any applicable Special Credits. For instance, if a married Player elects to receive his Benefit Credit Pension in the form described in Section 4.4(b)(2), and his monthly Benefit Credit Pension taking into account his Special Credits is $600 or more, the $600 floor does not apply.

(c)     If a Player's monthly Benefit Credit Pension is subject to any reduction or offset because of a QDRO or any other assignment of benefits required under Code section 401(a)(13), subsections (a) and (b) above will first be computed as if such reduction or offset did not exist, and then such reduction or offset will be applied to reduce the resulting benefit.

### 4.14   Enhanced Benefits for 2011 Legacy Survivors.

(a)     <u>2011 Legacy Survivor</u>. A surviving Spouse, contingent annuitant, or beneficiary is a "2011 Legacy Survivor" for purposes of this Section 4.14 if both of the following conditions are met:

(1)     The surviving Spouse, contingent annuitant, or beneficiary was receiving

25

benefits on August 1, 2011 under Section 4.4(b)(2), (3), (5), or (6) pursuant to the election of a Player who died prior to August 4, 2011; and

      (2)     The deceased Player would have qualified for a 2011 Legacy Credit under Article 4A had he survived to August 4, 2011.

      (b)     For each month on and after August 1, 2011 in which a 2011 Legacy Survivor receives a benefit under Section 4.4(b)(2), (3), (5), or (6), that benefit will be calculated by adding to the Player's Benefit Credits any and all 2011 Legacy Credits to which the Player would have been entitled had he been alive on August 4, 2011.

# ARTICLE 4A

# LEGACY CREDIT PENSION

**4A.1    Legacy Credits.**

(a)    <u>2011 Legacy Credits</u>.

(1)    Effective August 1, 2011, a Legacy Eligible Player's 2011 Legacy Credit for each of his Credited Seasons prior to 1993 will be determined according to the following table:

| Credited Season | 2011 Legacy Credit |
|---|---|
| Before 1975 | $ 124 |
| 1975 through 1992 | 108 |

(2)    Effective April 1, 2020, a credit classified as a "Legacy Credit" prior to April 1, 2020 is reclassified as a "2011 Legacy Credit." Such reclassification will have no economic effect on a Player's Legacy Credit Pension.

(b)    <u>2020 Legacy Credits</u>. Effective April 1, 2020, a Legacy Eligible Player's 2020 Legacy Credit for each of his Credited Seasons will be determined according to the following table:

| Credited Season | 2020 Legacy Credit |
|---|---|
| Before 1975 | $ 176 |
| 1975 through 1981 | 192 |
| 1982 through 1992 | 187 |

**4A.2    Monthly Amount.** A Legacy Eligible Player's monthly Legacy Credit Pension at any time is the sum of his 2011 Legacy Credits and 2020 Legacy Credits. A Legacy Eligible Player's monthly Legacy Credit Pension may be adjusted according to the date he begins to receive benefits (see Section 4A.3 below), and the form or manner in which benefits are paid (see Section 4A.4 below).

**4A.3    Legacy Credit Pension Election and Payment.** A Legacy Eligible Player may elect to begin to receive his Legacy Credit Pension as of the first day of any month coincident with or next following his forty-fifth birthday and no later than the first day of the month coincident with or next following his sixty-fifth birthday or, for a Player who earned a Credited

Season during the 1989, 1990, 1991 or 1992 Plan Years, the April 1 of the calendar year following the calendar year in which the Player attains age 70½.

All such elections (including the election of the form of payment pursuant to Section 4A.4 below and which is separate from the election under Section 4.3) must be filed in writing with the Retirement Board and may not be revoked after the initial payment is mailed or otherwise transmitted to the Player. The Legacy Credit Pension of a Legacy Eligible Player who begins to receive benefits after his Normal Retirement Date will be increased so as to be the Actuarial Equivalent of the Legacy Credit Pension he could have elected to receive at the later of (1) his Normal Retirement Date or (2) August 1, 2011. The Legacy Credit Pension of a Legacy Eligible Player who begins to receive benefits before his Normal Retirement Date will be decreased so as to be the Actuarial Equivalent of the Legacy Credit Pension he could have elected to receive at his Normal Retirement Date. Further adjustments to a Legacy Credit Pension may also be made as described in Section 4A.4 below depending on the form or manner in which benefits are paid.

### 4A.4    Normal and Optional Forms of Payment.

(a)    <u>Normal Form of Payment</u>. Unless an optional form of benefit is selected pursuant to a Qualified Election within the 180-day period ending on the Legacy Credit Annuity Starting Date, a married Legacy Eligible Player's Legacy Credit Pension will be paid in the form of a Qualified Joint and Survivor Annuity, and an unmarried Legacy Eligible Player's Legacy Credit Pension will be paid in the form of a Life Only Pension. A married Legacy Eligible Player must obtain the consent of his Spouse pursuant to a Qualified Election to select an optional form under Section 4A.4(b) unless the Player elects (1) a Qualified Joint and Survivor Annuity, (2) a Qualified Optional Joint and Survivor Annuity, or (3) a 100% Life and Contingent Annuitant Pension with the Player's Spouse as the contingent annuitant.

(b)    <u>Optional Forms of Payment</u>. Subject to Section 4A.4(a) above, a Legacy Eligible Player may elect to receive benefits in any one of the following forms:

(1)    Life Only Pension;

(2)    Qualified Joint and Survivor Annuity;

(3)    Qualified Optional Survivor Annuity; or

(4)    Life and Contingent Annuity Pension.

Benefits payable for the life of a Player, Spouse, or contingent annuitant will continue through the month in which such person's death occurs. The present value of the Legacy Credit Pension will be the Actuarial Equivalent of the normal form of benefit.

The monthly benefit of a Player who (i) has elected a Qualified Joint and Survivor Annuity under Section 4A.4(b)(2), a Qualified Optional Survivor Annuity under Section 4A.4(b)(3), or a Life and Contingent Annuity Pension under Section 4A.4(b)(4) with his Spouse as the beneficiary and (ii) survives or has survived his Spouse, will increase to the amount that

would have been paid if the Player had elected a Life Only Pension under Section 4A.4(b)(1) as of his Legacy Credit Annuity Starting Date (including subsequent benefit increases).  The increase in benefit under the previous sentence will be paid beginning as of the first day of the month following the date of his Spouse's death, and will continue for the life of the Player; provided, however, no increase will be paid for any month that begins more than forty-two months before the date upon which the Player first notifies the Retirement Plan of his Spouse's death.  For purposes of this paragraph, a Player will be deemed to survive his Spouse if either of the following occur: (1) the Spouse predeceases the Player, or (2) the Retirement Board determines that the Player and the Spouse are divorced and the Spouse has waived and relinquished all rights to benefits in the event of the Player's death, in which case the date the Spouse waives and relinquishes such benefits will be treated as if it were the date of the Spouse's death.

    **4A.5   Required Distributions.**  Payment of benefits to a Legacy Eligible Player will begin no later than the first day of the month coincident with or next following the Player's sixty-fifth birthday or, for a Player who earned a Credited Season during the 1989, 1990, 1991 or 1992 Plan Years, the April 1 of the calendar year following the calendar year in which the Player attains age 70½, without regard to whether the Player remains employed by an Employer.  The required distribution rules of Section 4.7(b) and (c) also apply to the payment of Legacy Credit Pensions.

# ARTICLE 4B

# EXPANSION PENSION

**4B.1   Expansion Credits.**  Effective April 1, 2020, a Pension Expansion Player will receive an Expansion Credit of $550 for each of his Credited Seasons.

**4B.2   Monthly Amount.**  A Pension Expansion Player's monthly Expansion Pension is the sum of his Expansion Credits, as adjusted using Actuarial Equivalent factors according to the date he begins to receive benefits (see Section 4B.3 below), and the form or manner in which benefits are paid (see Section 4B.4 below).  Expansion Pensions will not be paid for periods prior to April 1, 2020.

**4B.3   Expansion Pension Election and Payment.**

(a)      A Pension Expansion Player may elect to begin to receive his Expansion Pension as of the first day of any month coincident with or next following his forty-fifth birthday and no later than the later of (a) the first day of the month coincident with or next following his sixty-fifth birthday; or (b) April 1, 2020.

(b)      A Pension Expansion Player who is otherwise eligible for a distribution and whose Expansion Pension election form is received by the Retirement Board before October 1, 2020 may elect April 1, 2020 as his Expansion Pension Annuity Starting Date.  Notwithstanding the foregoing, a Pension Expansion Player will have at least ninety (90) days from the date he received his election materials to make the retroactive annuity election described in the previous sentence.  In no event, however, may such an election be made on or after April 1, 2021.

(c)      All elections (including the election of the form of payment pursuant to Section 4B.4 below) must be filed in writing with the Retirement Board and may not be revoked after the initial payment is mailed or otherwise transmitted to the Player.

(d)      The Expansion Pension of a Pension Expansion Player who begins to receive benefits after the later of (1) his Normal Retirement Date or (2) April 1, 2020 will be increased so as to be the Actuarial Equivalent of the Expansion Pension he could have elected to receive at the later of (1) his Normal Retirement Date or (2) April 1, 2020.  The Expansion Pension of a Pension Expansion Player who begins to receive benefits before his Normal Retirement Date will be decreased so as to be the Actuarial Equivalent of the Expansion Pension he could have elected to receive at his Normal Retirement Date.  Further adjustments to an Expansion Pension may also be made as described in Section 4B.4 below depending on the form or manner in which benefits are paid.

**4B.4   Normal and Optional Forms of Payment.**

(a)      <u>Normal Form of Payment</u>.  Unless an optional form of benefit is selected pursuant to a Qualified Election within the 180-day period ending on the Expansion Pension Annuity Starting Date, a married Pension Expansion Player's Expansion Pension will be paid in the form of a Qualified Joint and Survivor Annuity, and an unmarried Pension Expansion Player's

30

Expansion Pension will be paid in the form of a Life Only Pension. A married Pension Expansion Player must obtain the consent of his Spouse pursuant to a Qualified Election to select an optional form under Section 4B.4(b) unless the Player elects (1) a Qualified Joint and Survivor Annuity, (2) a Qualified Optional Joint and Survivor Annuity, or (3) a 100% Life and Contingent Annuitant Pension with the Player's Spouse as the contingent annuitant.

(b)    Optional Forms of Payment. Subject to Section 4B.4(a) above, a Pension Expansion Player may elect to receive benefits in any one of the following forms:

(1)    Life Only Pension;

(2)    Qualified Joint and Survivor Annuity;

(3)    Qualified Optional Survivor Annuity;

(4)    Life and Contingent Annuity Pension; or

(5)    "Life and ten-year certain pension" – equal Expansion Pension payments payable for the greater of 120 months or the Player's lifetime, with any remaining guaranteed payments being continued after the Player's death to his designated beneficiary or, if none, the Player's estate.

Benefits payable for the life of a Player, Spouse, or contingent annuitant will continue through the month in which such person's death occurs. The present value of the Expansion Pension will be the Actuarial Equivalent of the normal form of benefit.

The monthly benefit of a Player who (i) has elected a Qualified Joint and Survivor Annuity under Section 4B.4(b)(2), a Qualified Optional Survivor Annuity under Section 4B.4(b)(3), or a Life and Contingent Annuity Pension under Section 4B.4(b)(4) with his Spouse as the beneficiary and (ii) survives or has survived his Spouse, will increase to the amount that would have been paid if the Player had elected a Life Only Pension under Section 4B.4(b)(1) as of his Expansion Pension Annuity Starting Date. The increase in benefit under the previous sentence will be paid beginning as of the first day of the month following the date of his Spouse's death, and will continue for the life of the Player; provided, however, no increase will be paid for any month that begins more than forty-two months before the date upon which the Player first notifies the Retirement Plan of his Spouse's death. For purposes of this paragraph, a Player will be deemed to survive his Spouse if either of the following occur: (1) the Spouse predeceases the Player, or (2) the Retirement Board determines that the Player and the Spouse are divorced and the Spouse has waived and relinquished all rights to benefits in the event of the Player's death, in which case the date the Spouse waives and relinquishes such benefits will be treated as if it were the date of the Spouse's death.

**4B.5    Required Distributions.** Payment of benefits to a Pension Expansion Player will begin no later than (a) the first day of the month coincident with or next following the Player's sixty-fifth birthday; or (b) April 1, 2020. The required distribution rules of Section 4.7(b) and (c) also apply to the payment of Expansion Pensions.

## ARTICLE 4C

## INCREASES FOR THE 2020 CBA

**4C.1    Procedure for Calculating Increased Benefits for Players.**

(a)    <u>Annuity Starting Dates on or after April 1, 2020</u>.

    (1)    If a Vested Player's Benefit Credit Annuity Starting Date is on or after April 1, 2020, his Benefit Credits and Special Credits will be determined under the applicable sections of Article 4.

    (2)    If a Vested Player's Legacy Credit Annuity Starting Date is on or after April 1, 2020, his Legacy Credits will be determined under the applicable sections of Article 4A.

(b)    <u>Annuity Starting Dates before April 1, 2020</u>.

    (1)    If a Vested Player's Benefit Credit Annuity Starting Date is before April 1, 2020, effective for payments for the period on and after April 1, 2020, the Player's Benefit Credit Pension will continue to be paid in the form previously elected by the Player, and in the amount determined by multiplying the Player's Benefit Credit Pension prior to April 1, 2020, by the following fraction:  The numerator is the sum of his Benefits Credits and Special Credits from Section 4.1(a), and the denominator is the sum of his Benefit Credits and Special Credits immediately prior to the 2020 CBA.

    (2)    If a Vested Player's Legacy Credit Annuity Starting Date is before April 1, 2020, effective for payments for the period on and after April 1, 2020, his Legacy Credit Pension will continue to be paid in the form previously elected by the Player, and in the amount determined by multiplying the Player's Legacy Credit Pension prior to April 1, 2020, by the following fraction:  The numerator is his Legacy Credits determined in Section 4A.1, and the denominator is his Legacy Credits immediately prior to the 2020 CBA

(c)    <u>Players Electing Early Payment Benefits</u>.  Any Player who elects an early payment benefit (either before or after April 1, 2020) will have his Benefit Credit Pension calculated based on the provisions of Section 4.5(b) so that he receives 100% of the benefit increases resulting from the 2020 CBA.

**4C.2    Procedure for Calculating Increased Benefits for Survivors Receiving Benefits under Article 4, Article 4A, or Section 7.3 as of April 1, 2020.**

(a)    A surviving Spouse, contingent annuitant, or beneficiary will be entitled to an increased benefit if the surviving Spouse, contingent annuitant, or beneficiary was receiving a benefit as of April 1, 2020 under Article 4, Article 4A, or Section 7.3.

(b)    The amount of the increased benefit payable to the surviving Spouse, contingent annuitant, or beneficiary will be determined based on the procedure in 4C.1 above as if the Player had been alive on April 1, 2020 and been entitled to the benefit.

**4C.3    Protected Benefits.**  A Player or beneficiary's total pension benefit under Sections 4 and 4A of this Plan on and after April 1, 2020 (other than a benefit payable to an alternate payee) will not be less than the total pension benefit under Sections 4 and 4A payable to such person immediately prior to April 1, 2020 using the applicable actuarial assumptions and conversion factors in Appendix B as of April 1, 2020.

**4C.4    Prior Periods.**  For payments for periods prior to April 1, 2020, benefits for Players and other beneficiaries will be determined based on the versions of the Plan in effect for such periods.

## ARTICLE 5

## PLAN TOTAL AND PERMANENT DISABILITY BENEFITS RESULTING FROM APPLICATIONS RECEIVED BEFORE JANUARY 1, 2015

**5.1    Eligibility.**  An Article 5 Eligible Player is entitled to receive monthly total and permanent disability benefits ("Plan T&P benefits") from this Plan in the amount described in Section 5.5 for the months described in Sections 5.8 and 5.9, provided he satisfies the standard in either Section 5.2(a) or 5.2(b) and complies with all other applicable requirements of this Article 5.

**5.2    Definition of Total and Permanent Disability.**

(a)    <u>General Standard</u>.  An Article 5 Eligible Player who was awarded Plan T&P benefits and is sent for examination under Section 5.6(a) for the purpose of re-examining his condition, continues to be totally and permanently disabled if and only if all of the conditions in Sections 5.2(a)(1) and (2) below are met:

(1)    At least one Plan Neutral Physician must find under the standard of Section 5.2(a)(2) below that (i) the Player has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country, and (ii) that such condition is permanent.  If no Plan Neutral Physician renders such a conclusion, then this threshold requirement is not satisfied, and the Player will not continue to receive Plan T&P benefits, regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record.

(2)    After reviewing the report(s) of the Plan Neutral Physician(s), along with all other facts and circumstances in the administrative record, the Disability Initial Claims Committee or the Retirement Board, as the case may be, must conclude, in its absolute discretion, that (i) the Player has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country, and (ii) that such condition is permanent. The following rules will apply:

(A)    The educational level and prior training of a Player will not be considered in determining whether such Player is "unable to engage in any occupation or employment for remuneration or profit."

(B)    A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 5.2(a) merely because such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated

34

with a charitable organization, is employed out of benevolence, or receives up to $30,000 per year in earned income.

(C)    A disability will be deemed to be "permanent" if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period.

(b)    Social Security Standard.  Prior to April 1, 2024, an Article 5 Eligible Player who was awarded Plan T&P benefits based on a Social Security Administration disability award will continue to receive Plan T&P benefits in the amount described in Section 5.5, for the months described in Sections 5.8 and 5.9, unless four or more voting members of the Retirement Board determine that such Player is not totally and permanently disabled, despite receiving Social Security disability benefits.  If his Social Security disability benefits are revoked, a Player will no longer be entitled to receive Plan T&P benefits by reason of this Section 5.2(b), effective as of the date of such revocation.  However, if such Player establishes that the sole reason for the loss of his Social Security disability or Supplemental Security Income benefits was his receipt of benefits under this Plan, Plan T&P benefits will continue provided the Player satisfies the rules for continuation of benefits in Section 5.6(a).

Effective April 1, 2024, receipt of Social Security disability insurance program or Supplemental Security Income program benefits will not establish that a Player qualifies for continuation of his Plan T&P benefits.  Any Player seeking to establish that he qualifies for continuation of his Plan T&P benefits on or after April 1, 2024 must satisfy the General Standard set forth in Section 5.2(a) and thereafter comply with the continuation provisions set forth in Section 5.6(a).

**5.2A    Rules and Procedures.**  In addition to the requirements of Section 12.6 (claims procedures), Players must comply with the rules and procedures of this Section 5.2A.

(a)    Medical Evaluations.  Whenever the Disability Initial Claims Committee or the Retirement Board reviews a Player for Plan T&P benefits under Section 5.2(a) above, such Player may first be required to submit to an examination scheduled by the Plan with a Neutral Physician or physicians, or institution or institutions, or other medical professional or professionals, selected by the Disability Initial Claims Committee or the Retirement Board, and may be required to submit to such further examinations scheduled by the Plan as, in the opinion of the Disability Initial Claims Committee or the Retirement Board, are necessary to make an adequate determination respecting his physical or mental condition.

Whenever the Disability Initial Claims Committee or the Retirement Board reviews a Player for Plan T&P benefits under Section 5.2(b) above, such Player may be required to submit to an examination scheduled by the Plan with a Neutral Physician or physicians, or institution or institutions, or other medical professional or professionals, selected by the Disability Initial Claims Committee or the Retirement Board, and may be required to submit to such further examinations scheduled by the Plan as, in the opinion of the Disability Initial Claims Committee or the Retirement Board, are necessary to make an adequate determination respecting his physical or mental condition.

Any person refusing to submit to any examination required by the Plan will not be entitled to Plan T&P benefits. If a Player fails to attend an examination scheduled by the Plan, continuation of Plan T&P benefits will be denied, unless the Player provided at least two business days advance notice to the Plan that he was unable to attend. The Plan will reschedule the Player's exam if two business days' advance notice is provided. Continuation of Plan T&P benefits will be denied if he fails to attend the rescheduled exam, even if advance notice is provided. The Disability Initial Claims Committee or the Retirement Board, as applicable, may waive a failure to attend if circumstances beyond the Player's control preclude the Player's attendance at the examination. A Player or his representative may submit to the Plan medical records or other materials for consideration by the Neutral Physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by the Neutral Physician, institution, or medical professional.

(b)    Requests for Information. Whenever the Disability Initial Claims Committee or the Retirement Board reviews the eligibility of any Player to continue receiving Plan T&P benefits, such Player may be required to provide additional documents or information that, in the opinion of the Disability Initial Claims Committee or the Retirement Board, are necessary to decide the Player's eligibility to continue receiving Plan T&P benefits. Any person refusing or failing to provide the requested documents or information will not be entitled to Plan T&P benefits.

(c)    Withdrawal of Appeal. A Player may withdraw a pending appeal if he has not been evaluated by Plan Neutral Physician on appeal by informing the Plan, in writing, of his intent to withdraw the appeal. A Player may not withdraw a pending appeal after he has been evaluated by a Plan Neutral Physician on appeal or has failed to attend a medical examination in violation of the rules in Section 3.3(a).

**5.3    Classification.** Each Article 5 Eligible Player was awarded Plan T&P benefits in one of the four categories below according to the rules of the Plan as in effect when the Player's T&P benefits were awarded. Each Article 5 Eligible Player's classification is final and not subject to administrative review.

(a)    Active Football.

(b)    Active Nonfootball.

(c)    Inactive A.

(d)    Inactive B.

**5.4    [Reserved].**

**5.5    Amount of Monthly Benefit.** An Article 5 Eligible Player satisfies the requirements of this Article will receive the following monthly amount for the months described in Sections 5.8 and 5.9. The monthly payment determined below will be offset by any disability

36

benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation.

(a)     Amount.  Unless modified by Sections 5.5(b), (c), (d), (e) or (g) below, the amount of the monthly benefit will equal the Disability Credits, including, if applicable, the Benefit Credit (based on Section 4.1(a) only) and any 2011 Legacy Credit for the Plan Year in which the total and permanent disability occurs.

(b)     Minimum Amounts.  The minimum amount of monthly Plan T&P benefits depends on the category awarded and the months of payment, as set forth below:

| Category | Effective September 1, 2011 | Effective January 1, 2016 | Effective April 1, 2031 |
|---|---|---|---|
| **Active Football** | $4,000 | $4,000 | $4,000 |
| **Active Nonfootball** | $4,000 | $4,000 | $4,000 |
| **Inactive A** | $4,000 | $4,000 | $4,000 |
| **Inactive B** | $4,167 | $5,000 | $3,334 |

(c)     Early Payment Benefit Reduction.  The monthly payment to a Player who has received an early payment benefit will be reduced in accordance with Section 4.5.

(d)     Reduction for Awards Prior to Normal Retirement Date.  For a Player who receives an award of Plan T&P benefits prior to his Normal Retirement Date and prior to electing to receive his monthly pension under Article 4 or 4A, the following rules apply.

(1)     If such Player's Normal Retirement Date is on or after August 1, 2011, his monthly Plan T&P benefit will be reduced immediately, beginning as of his Normal Retirement Date, by the sum of the monthly amounts he would have received under Articles 4 and 4A had he elected to receive Life Only Pensions.

(2)     If such Player's Normal Retirement Date is prior to August 1, 2011, his monthly Plan T&P benefit will be reduced by (i) beginning as of his Benefit Credit Annuity Starting Date, the amount of his monthly pension under Article 4 had he elected a Life Only Pension, and (ii) beginning as of his Legacy Credit Annuity Starting Date, the amount of his monthly pension under Article 4A had he elected a Life Only Pension.

(3)     If additional Benefit Credits, Legacy Credits, and Special Credits are awarded to a Player after the date of the offset described above in this subsection (d), then an additional offset for such benefits will occur as of the date(s) the additional benefits commence.

37

(e)    <u>Reduction for Awards on and after Normal Retirement Date</u>.  For a Player who receives an award of Plan T&P benefits on or after his Normal Retirement Date and prior to electing to receive his monthly pension under Article 4 or 4A, the following rules will apply.

(1)    If such Player's Normal Retirement Date is on or after August 1, 2011, his monthly Plan T&P benefit will be reduced immediately by the sum of the monthly amounts he would have received under Articles 4 and 4A had he elected to receive Life Only Pensions with annuity starting dates coincident with the effective date of his Plan T&P benefit.

(2)    If such Player's Normal Retirement Date is prior to August 1, 2011, his monthly Plan T&P benefit will be reduced by (i) beginning as of his Benefit Credit Annuity Starting Date, the amount of his monthly pension under Article 4 had he elected a Life Only Pension (the total amount of the reduction will be his monthly pension under Article 4 had he elected a Life Only Pension, and (ii) beginning as of his Legacy Credit Annuity Starting Date, further reduced by the amount of his monthly pension under Article 4A had he elected a Life Only Pension.

(3)    If additional Benefit Credits, Legacy Credits, and Special Credits are awarded to a Player after the date of the offset described above in this subsection (e), then an additional offset for such benefits will occur as of the date(s) the additional benefits commence.

(f)    <u>Not Below Zero</u>.  In no event will a Player's monthly Plan T&P benefit be reduced below zero.

(g)    <u>Special Offsets</u>.

(1)    For a Player who receives an award of Plan T&P benefits under Section 5.2 after he has elected to receive his monthly pension under Article 4 or 4A, his monthly Plan T&P benefit will be reduced, but not below zero, by (i) the amount of his monthly benefit under Article 4 had he elected a Life Only Pension on his Benefit Credit Annuity Starting Date, and (ii) the amount of his monthly benefit under Article 4A had he elected a Life Only Pension on his Legacy Credit Annuity Starting Date.

(2)    For a Player who is receiving Plan T&P benefits and elects to receive his monthly pension under Article 4 or 4A before his Normal Retirement Date, his monthly Plan T&P benefit will be reduced, but not below zero, by (i) beginning as of his Benefit Credit Annuity Starting Date, the amount of his monthly benefit under Article 4 had he elected a Life Only Pension, and (ii) beginning as of his Legacy Credit Annuity Starting Date, the amount of his monthly benefit under Article 4A had he elected a Life Only Pension.

(3)    If additional Benefit Credits, Legacy Credits, and Special Credits are awarded to a Player after the date of the offset described above in this subsection (g),

then an additional offset for such benefits will occur as of the date(s) the additional benefits commence.

(4)    A Player whose benefits are reduced under this Section 5.5(g) will not be subject to further reduction under Section 5.5(d) & (e).

(h)    <u>No Reduction for Certain Changes in Credits</u>.  Notwithstanding anything in this Plan to the contrary:

(1) the total payments from this Plan to a Player who immediately prior to September 1, 2014 was receiving a Plan T&P benefit, a Benefit Credit Pension, or a Legacy Credit Pension will not be reduced by reason of the addition of Special Credits effective September 1, 2014.  Such total payments may be reduced if the Player no longer qualifies for Plan T&P benefits; and

(2) the total payments from this Plan to a Player who immediately prior to April 1, 2020 was receiving a Plan T&P benefit, a Benefit Credit Pension, or a Legacy Credit Pension will not be reduced by reason of the increases to Special Credits and Legacy Credits pursuant to the 2020 CBA.  Such total payments may be reduced if the Player no longer qualifies for Plan T&P benefits.

**5.6    Continuation of T&P Benefits.**

(a)    <u>General Standard</u>.  Any Article 5 Eligible Player receiving Plan T&P benefits under the standard of Section 5.2(a) may be required to submit to periodic examinations for the purpose of re-examining his condition.  The examinations will occur not more often than once every five years, except that upon request of three or more voting members of the Retirement Board, examinations may occur as frequently as once every six months.  Any person refusing to submit to any examination will not be entitled to continuation of Plan T&P benefits under this Article.  If a Player fails to attend an examination scheduled by the Plan, his Plan T&P benefits will be suspended, unless the Player provided at least two business days' advance notice to the Plan that he was unable to attend.  The Plan will reschedule the Player's exam if two business days' advance notice is provided.  The Player's Plan T&P benefits will be suspended if he fails to attend the rescheduled exam, even if advance notice is provided.  The Retirement Board or the Disability Initial Claims Committee, as applicable, may waive a failure to attend if circumstances beyond the Player's control preclude the Player's attendance at the examination.  A Player or his representative may submit to the Plan medical records or other materials for consideration by a Neutral Physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by the Neutral Physician, institution, or medical professional.

For each calendar year in which a Player receives Plan T&P benefits, he must submit an executed copy of IRS Form 4506 by July 1 of the subsequent calendar year (effective April 1, 2015, such submission must be made by November 1 of the subsequent calendar year).  A Player who has not filed his annual federal income tax return by the date in the preceding sentence, also must either (1) submit a signed statement that he does not intend to file such tax return, and state

39

the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year.  Players who have attained age 65 as of the November 1 due date are exempt from the requirements of this paragraph.

If the Retirement Board or the Disability Initial Claims Committee determines that such Player is no longer totally and permanently disabled under Section 5.2(a), his Plan T&P benefits will terminate.  The Plan T&P benefits of any Player refusing or failing to submit to a required examination without the required notice described above, or to submit an IRS form 4506 annually will be suspended until such refusal or failure is resolved to the satisfaction of the Retirement Board.  If such refusal or failure is not resolved to the satisfaction of the Retirement Board within one year after such Player is notified of the consequences of his refusal or failure, his Plan T&P benefits will be terminated.  In that event, such Player must submit a request for reinstatement within one year of the termination of his Plan T&P benefits to be eligible to receive any further Plan T&P benefits.  If such Player's Plan T&P benefits are reinstated, the prior classification of his Plan T&P benefits under Section 5.3 will apply and the effective date rules of Section 5.8 will not apply.  Reinstatement requests received more than one year after the termination of a Player's Plan T&P benefits will not be considered.

Notwithstanding the above, an Article 5 Eligible Player who is receiving Plan T&P benefits under Section 5.2(a) may establish that he qualifies for continuation of his Plan T&P benefits by showing that he is receiving disability benefits under the Social Security disability insurance program or Supplemental Security Income program because he is unable to work, unless four or more voting members of the Retirement Board determine that such Player is not totally and permanently disabled, despite receiving Social Security disability benefits.

(b)    Social Security Awards.  Prior to April 1, 2024, any Article 5 Eligible Player receiving Plan T&P benefits under Section 5.2(b) must submit proof annually of his continued receipt of Social Security disability insurance program or Supplemental Security Income program benefits, and must immediately report any revocation or termination of those benefits to the Plan.  If the Retirement Board or the Disability Initial Claims Committee determines that a Player has failed to comply with this requirement, his Plan T&P benefits will terminate effective as of the date of such revocation.  However, if such Player establishes that the sole reason for the loss of his Social Security disability or Supplemental Security Income benefits was his receipt of benefits under this Plan, Plan T&P benefits will continue provided the Player satisfies the General Standard set forth in Section 5.2(a) and the rules for continuation of benefits set forth in Section 5.6(a).

Effective April 1, 2024, receipt of Social Security disability insurance program or Supplemental Security Income program benefits will not establish that a Player qualifies for continuation of his Plan T&P benefits.  Any Player seeking to establish that he qualifies for continuation of his Plan T&P benefits on or after April 1, 2024 must satisfy the General Standard set forth in Section 5.2(a) and thereafter comply with the continuation provisions set forth in Section 5.6(a).

**5.7    Special Rules.**

(a)    <u>Requests for Reclassification or for Earlier Effective Date</u>.  Any requests for reclassification or for an earlier effective date will be denied.

(b)    <u>Transition Rule</u>.  A Player receiving Plan T&P benefits as of April 1, 2018, who later has such benefits terminated because he is no longer totally and permanently disabled under Sections 5.2(a) or 5.2(b), will not be eligible for further disability benefits from this Plan if he experiences a subsequent disability; instead, such Player must apply for disability benefits under the Disability Plan, and the Disability Plan provisions in effect at the time of the Player's application will govern.  This paragraph does not apply to requests for reinstatement described in Plan Section 5.6(a).

**5.8    [Reserved].**

**5.9    Duration of Plan T&P Benefits.**  All benefits provided by this Article will be payable until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under Section 5.6, or (c) the Player's death.  The full monthly benefit will be paid for the month in which such an event occurs, but no benefit provided by this Article will be provided for any subsequent months.

**5.10    [Reserved].**

**5.11    Prior Determinations of Ability to Work.**  If a Player receives a final determination that he is not totally and permanently disabled, then, for purposes of any subsequent application for Plan T&P benefits, it will be conclusively presumed that the Player is not totally and permanently disabled for all months prior to and including the date of such final determination.  This conclusive presumption applies regardless of whether the conditions or impairments at issue in the final determination differ from the conditions or impairments giving rise to the Player's subsequent application.

For purposes of this section a final determination includes a final decision of either the Retirement Board or the Disability Board of the Disability Plan.  A decision of the Disability Initial Claims Committee of either this Plan or of the Disability Plan that is not timely appealed will also be a final determination for purposes of this section.

# ARTICLE 6

## LINE-OF-DUTY DISABILITY BENEFITS

**6.1** **Line-of-Duty Disability Benefits.** For periods prior to January 1, 2015 (and such later periods for certain Players as described in Section 6.6), any Player who is not an Active Player and who incurred a "substantial disablement" (as defined in Section 6.4(a) and (b)) "arising out of League football activities" (as defined in Section 6.4(c)) will receive from this Plan a monthly line-of-duty disability as set forth in the following chart:

| For Line-of-Duty Disability Benefits Payable for These Months | The Greater Of: |
|---|---|
| April 1, 2019 through December 31, 2020 | $4,000 OR The Player's Disability Credits |
| January 1, 2021 through March 31, 2031 | $4,500 OR The Player's Disability Credits |
| April 1, 2031 and thereafter | $1,000 OR The Player's Benefit Credits (excluding Special Credits and Legacy Credits) |

For payments for periods prior to April 1, 2019, the amount of the monthly line-of-duty disability benefits will be determined based on the versions of the Plan in effect for such periods. The benefit will be payable monthly, beginning as of the first day of the month following the date the disability qualifies as a substantial disablement, and continuing for the duration of such substantial disablement but no longer than ninety months. The benefit will be payable monthly, beginning retroactive to the first day of the month that is two months prior to the date a written application for line-of-duty disability benefits or similar letter that began the administrative process that resulted in an award of line-of-duty disability benefits was received, and continuing for the duration of such substantial disablement but in no case shall the benefit be payable for more than a total of ninety months.

**6.2** **Relationship to Other Benefits.** If both a line-of-duty disability benefit and a T&P benefit are otherwise payable during a month, only the larger of the two benefits will be paid. After line-of-duty disability benefit payments end, a Player may continue to receive T&P benefits if he is eligible for such benefits under Article 5. A Player may not receive benefits under this Article 6 for any months in which he is receiving monthly retirement benefits under Article 4 or 4A. No benefits under this Article 6 will be payable with respect to a future or past month or other period of time to a Player who first makes a claim for benefits under this Article after he begins to receive his monthly pension under Article 4 or 4A. The monthly payment to a Player who has received an early payment benefit will be reduced in accordance with Section

42

4.5.

### 6.3    Procedures.

(a)    <u>No New Applications</u>.  Any claim for line-of-duty disability benefits must be submitted in writing to the Retirement Board before April 1, 2015.

(b)    <u>Medical Evaluations</u>.  A Player may be required to submit to an examination by a Neutral Physician, or any other physician or physicians, institution or institutions, or other medical professional or professionals, selected by the Retirement Board or the Disability Initial Claims Committee, and may be required to submit to such further examinations as, in the opinion of the Retirement Board or the Disability Initial Claims Committee, are necessary to make an adequate determination respecting his physical or mental condition.  Any person refusing to submit to any examination will not be entitled to any line-of-duty disability benefits under this Article.

(c)    <u>Continuation of Line-of-Duty Disability Benefits</u>.  A Player receiving line-of-duty disability benefits will be subject to further examinations to determine whether he remains eligible for the benefit.  Such further examinations will occur any time requested by three or more voting members of the Retirement Board, but not more frequently than once every six months.  Any person refusing to submit to any examination will not be entitled to continuation of line-of-duty disability benefits under this Article.  If a Player fails to attend a scheduled examination, his line-of-duty disability benefits will be suspended, unless the Player provided at least two business days advance notice to the Plan that he was unable to attend.  The Retirement Board or the Disability Initial Claims Committee, as applicable, may waive the rule in the prior sentence if circumstances beyond the Player's control preclude the Player's attendance at the examination.  A Player or his representative may submit to the Plan medical records or other materials for consideration by the physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by the physician, institution, or medical professional.

(d)    <u>Requests for Information</u>.  Whenever the Retirement Board or the Disability Initial Claims Committee reviews the application or appeal of any Player for line-of-duty benefits, such Player may be required to provide any additional documents or information that, in the opinion of the Retirement Board or the Disability Initial Claims Committee, are necessary to decide the Player's application or appeal.  Any person refusing or failing to provide the requested documents or information will not be entitled to any line-of-duty benefits under this Article.

(e)    <u>Early Termination of Line-of-Duty Disability Benefits</u>.  If the Retirement Board or the Disability Initial Claims Committee determines that the substantial disablement of the Player has terminated, the line-of-duty disability benefit payments will cease.

**6.4    Definitions.**

(a)    A "substantial disablement" is a "permanent" disability that:

    (1)    Results in a 50% or greater loss of speech or sight; or

    (2)    Results in a 55% or greater loss of hearing; or

    (3)    Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or

    (4)    For orthopedic impairments, using the American Medical Association *Guides to the Evaluation of Permanent Impairment* (Fifth Edition, Chicago, IL) ("AMA Guides"), is (a) a 38% or greater loss of use of the entire lower extremity; (b) a 23% or greater loss of use of the entire upper extremity; (c) an impairment to the cervical or thoracic spine that results in a 25% or greater whole body impairment; (d) an impairment to the lumbar spine that results in a 20% or greater whole body impairment; or (e) any combination of lower extremity, upper extremity, and spine impairments that results in a 25% or greater whole body impairment.

    In accordance with the AMA Guides, up to three percentage points may be added for excess pain in each category above ((a) through (e)).  The range of motion test will not be used to evaluate spine impairments.

(b)    A disability will be deemed to be "permanent" if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period.

(c)    "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

**6.5    One Application.**    At any time, a Player may have only one application pending for line-of-duty disability benefits.  A Player may apply for both T&P benefits and line-of-duty disability benefits, or for either benefit separately.  A Player may not apply for line-of-duty benefits while he has a pending application for neurocognitive disability benefits under the Disability Plan.

**6.6    Transition of Benefits.**    Effective January 1, 2015, all line-of-duty disability benefits will be paid from the Disability Plan, and not from this Plan; provided that line-of-duty disability benefits to a Player being paid as a direct rollover to an Eligible Retirement Plan (as defined in Section 4.8(c)) as of November 12, 2014 will continue to be paid from this Plan. Effective January 1, 2015, decisions relating to initial disability and continued receipt of line-of-

duty disability benefits transitioned to the Disability Plan will be made by the fiduciaries of the Disability Plan.

## ARTICLE 7

## SURVIVOR BENEFITS

**7.1     After Retirement.**

(a)     If a Vested Inactive Player dies on or after his Benefit Credit Annuity Starting Date, a monthly Benefit Credit Pension will continue to be paid only if (1) the form of benefits is a Qualified Joint and Survivor Annuity or Qualified Optional Survivor Annuity and the Player is survived by his Spouse, (2) the form of benefits is a Life and Contingent Annuitant Pension and the Player is survived by his contingent annuitant, or (3) the form of benefits is a life and ten-year certain pension and the ten-year guaranteed period has not yet expired.  In each of these cases, the survivor benefits paid following such Player's death will be limited to those payable under the applicable form of benefits.

(b)     If a Legacy Eligible Player dies on or after his Legacy Credit Annuity Starting Date, a monthly Legacy Credit Pension will continue to be paid only if (1) the form of benefits is a Qualified Joint and Survivor Annuity or Qualified Optional Survivor Annuity and the Player is survived by his Spouse, or (2) the form of benefits is a Life and Contingent Annuitant Pension and the Player is survived by his contingent annuitant.  In each of these cases, the survivor benefits paid following such Player's death will be limited to those payable under the applicable form of benefits.

**7.2     Surviving Spouse's and Surviving Children's Benefit for Deaths Before April 1, 2020.**  If a Player who is not a Pension Expansion Player dies before April 1, 2020 and before his Benefit Credit Annuity Starting Date, and he was, at the time of his death, (a) an Active Player, (b) a Vested Inactive Player who is vested solely because of Credited Seasons (other than a Player described in 1.47(i)), and not by reason of Years of Service after ceasing to be an Active Player, or (c) entitled to disability benefits under Article 5 or 6 of this Plan or Article 3 or 5 of the Disability Plan (regardless of when such entitlement is determined), his surviving Spouse, or if there is no surviving Spouse, his surviving minor children, if any, will, subject to Section 7.4 below, receive a monthly surviving Spouse's and surviving children's benefit equal to the greater of (1) 50% of the Player's Survivor Credits, or (2) $4,400.

Further, for the first forty-eight months following such Player's death, the amount of this benefit will be (i) for a Player who is an Active Player after the 1976 Plan Year, no less than $6,000 per month, and (ii) for a Player who is an Active Player after the 1981 Plan Year, no less than $9,000 per month.  For payments with respect to months prior to April 1, 2020, the surviving Spouse's and surviving children's benefit will be determined based on the Plan in effect for such periods.

A surviving Spouse will receive the first payment of this benefit beginning as of the first of the month following the Player's death, and the last payment as of the first of the month in which she dies or remarries, whichever occurs sooner.  Following the death or remarriage of the surviving Spouse, this benefit will be divided equally among the surviving minor children, if any.  For purposes of this Section, a child will be considered to be a minor child until he or she reaches age nineteen (or, age twenty-three if in college), or continuously if the child has a mental

or physical incapacity that started before age nineteen (or, age twenty-three if in college), and if, before reaching age 19 (or, age twenty-three if in college), the child  (1) is eligible for and receives disability benefits under either the Social Security disability insurance program or Supplemental Security Income program due to such incapacity, or (2) is under a state law guardianship due to such incapacity.  Benefits paid to an adult child under this Section 7.2 will cease upon revocation of such child's Social Security disability benefits or guardianship.

Benefit Credits for Credited Seasons prior to 1959 will not be included to determine the benefit, if any, paid under this Section 7.2.  For purposes of the preceding sentence, for Players with at least one Credited Season within the period 1959 through 1963, Credited Seasons prior to 1959 needed to attain five Credited Seasons (when added to the Player's Credited Seasons after 1958) will be treated as having occurred after 1958.

Players described in Sections 1.47(f) through (j) are not Vested solely because of Credited Seasons and their surviving spouses and surviving children are not eligible for the Surviving Spouse and Surviving Children's Benefit.

### 7.3    Spouse's Pre-Retirement Survivor Benefit.

(a)    <u>Benefit Credit Pension Pre-Retirement Survivor Benefit</u>.  If a married Vested Player dies before his Benefit Credit Annuity Starting Date, his surviving Spouse will, subject to Section 7.4 below, receive payments as described below:

(1)    If the Player dies after his "Earliest Retirement Age," the Player's surviving Spouse will receive the same benefit that would be payable if the Player had begun to receive his Benefit Credit Pension in the form of an immediate Qualified Joint and Survivor Annuity on the day before the Player's death; or

(2)    If the Player dies on or before his "Earliest Retirement Age," the Player's surviving Spouse will receive the same survivor benefit that would be payable if the Player had:

(i)    Survived to his Earliest Retirement Age;

(ii)    Begun to receive his Benefit Credit Pension in the form of an immediate Qualified Joint and Survivor Annuity at his Earliest Retirement Age; and

(iii)    Died on the day after his Earliest Retirement Age.

(3)    For purposes of this Section, "Earliest Retirement Age" means, for a Player who has a Credited Season prior to the 1993 Plan Year, the first day of the calendar month in which he would have attained age forty-five, and, for any other Player, the first day of the calendar month in which he would have attained age fifty-five.

(4)    For a Player who died prior to August 4, 2011, and effective for months beginning on and after August 1, 2011, his surviving Spouse's benefit under this Section

47

will be calculated by including any and all Legacy Credits to which the Player would have been entitled had he been alive on August 4, 2011.

(5)    For a Player who died prior to September 1, 2014, and effective for months beginning on and after September 1, 2014, his surviving Spouse's benefit under this Section will be calculated by including all Special Credits pursuant to Section 4.1(a) to which the Player would have been entitled had he been alive on September 1, 2014.

(6)    For a Player who died prior to April 1, 2020, and effective for months beginning on and after April 1, 2020, his surviving Spouse's benefit under this Section will be calculated by including any benefit increases resulting from the 2020 CBA to which the Player would have been entitled had he been alive on April 1, 2020.

(b)    <u>Legacy Credit Pension Pre-Retirement Survivor Benefit</u>.  If a married Legacy Eligible Player dies before his Legacy Credit Annuity Starting Date, his surviving Spouse will receive payments as described below:

(1)    If the Legacy Eligible Player dies after his "Earliest Retirement Age," the Player's surviving Spouse will receive the same benefit that would be payable if the Player had begun to receive his Legacy Credit Pension in the form of an immediate Qualified Joint and Survivor Annuity on the day before the Player's death; or

(2)    If the Player dies on or before his "Earliest Retirement Age," the Player's surviving Spouse will receive the same survivor benefit that would be payable if the Player had:

(i)    Survived to his Earliest Retirement Age;

(ii)    Begun to receive his Legacy Credit Pension in the form of an immediate Qualified Joint and Survivor Annuity at his Earliest Retirement Age; and

(iii)    Died on the day after his Earliest Retirement Age.

(3)    For purposes of this Section, "Earliest Retirement Age" means, for a Player who has a Credited Season prior to the 1993 Plan Year, the first day of the calendar month in which he would have attained age forty-five, and, for any other Player, the first day of the calendar month in which he would have attained age fifty-five.

(4)    If an unmarried Legacy Eligible Player with a Prior Benefit Credit Pension dies before August 4, 2012 and before making an election under Section 4A.3, and has no surviving Spouse on the date of his death, his estate will receive a lump-sum survivor benefit equal to the total monthly amount he would have received had he elected to receive his Legacy Credit Pension in the form of a Life Only Pension with a Legacy

Credit Annuity Starting Date of August 1, 2011, but only for each full or partial month during which he was alive.

(5)    For a Player who died prior to April 1, 2020, and effective for months beginning on and after April 1, 2020, his surviving Spouse's benefit under this Section will be calculated by including any 2020 Legacy Credits to which the Player would have been entitled had he been alive on April 1, 2020.

(c)    If a married Legacy Eligible Player dies before his Benefit Credit Annuity Starting Date and his Legacy Credit Annuity Starting Date, his surviving Spouse will receive a combined survivor benefit equal to the amounts under Section 7.3(a) and (b).

(d)    Expansion Pension Pre-Retirement Survivor Benefit.  If a married Pension Expansion Player dies before his Expansion Pension Annuity Starting Date, his surviving Spouse will receive payments as described below:

(1)    If the Pension Expansion Player dies after his "Earliest Retirement Age," the Player's surviving Spouse will receive the same benefit that would be payable if the Player had begun to receive his Expansion Pension in the form of an immediate Qualified Joint and Survivor Annuity on the day before his death; or

(2)    If the Player dies on or before his "Earliest Retirement Age," the Player's surviving Spouse will receive the same survivor benefit that would be payable if the Player had:

(i)    Survived to his Earliest Retirement Age;

(ii)    Begun to receive his Expansion Pension in the form of an immediate Qualified Joint and Survivor Annuity at his Earliest Retirement Age; and

(iii)    Died on the day after his Earliest Retirement Age.

(3)    For purposes of this Section, "Earliest Retirement Age" means the first day of the calendar month in which the Player would have attained age forty-five.

(4)    If an unmarried Pension Expansion Player with an Expansion Pension dies on and after April 1, 2020 and before April 1, 2021, and before making an election under Section 4B.3, and has no surviving Spouse on the date of his death, then his estate will receive a lump-sum survivor benefit equal to the total monthly amount he would have received had he elected to receive his Expansion Pension in the form of a Life Only Pension with an Expansion Pension Annuity Starting Date of April 1, 2020, but only for each full or partial month during which he was alive.

**7.4    Elections.**  For Player deaths before April 1, 2020, if both a surviving Spouse's and surviving children's survivor benefit, as described in Section 7.2, and a Spouse's pre-retirement survivor benefit, as described in Section 7.3, might be payable, the surviving Spouse

may elect to receive one or the other, but not both, of these survivor benefits. This election must be in writing and may not be revoked after the initial payment is mailed or otherwise transmitted to the surviving Spouse. Prior to the surviving Spouse's election, the surviving Spouse will be provided with an explanation of the terms and conditions of the two survivor benefits and the financial effect of the election of one such benefit over the other.

**7.5    Miscreant Rule.** No benefits otherwise payable under this Article on behalf of a Player will be paid to a person who is convicted, pleads guilty, or pleads no contest in connection with the death of such Player. Any benefits paid under this Article will be determined as if such person does not exist.

**7.6    Early Payment Benefit Reduction.** Survivor benefits with respect to a Player who elected an early payment benefit after March 31, 1982 will be reduced in accordance with Section 4.5.

# ARTICLE 8

## THE RETIREMENT BOARD AND
## DISABILITY INITIAL CLAIMS COMMITTEE

**8.1    Selection of the Retirement Board.**  The Retirement Board will consist of seven members.  The members of the Retirement Board are as follows:

(a)    Three voting members appointed by the NFLPA;

(b)    Three voting members appointed by the Management Council; and

(c)    The Commissioner of the NFL will be an ex-officio, non-voting member.

The Commissioner will be the honorary Chairman of the Retirement Board, and either the Commissioner or, in his absence, his designee, will preside at all meetings of the Retirement Board.  The Commissioner's duties and responsibilities under and with respect to the Plan are limited to those that are specifically described in the Plan.

The NFLPA and the Management Council will each be entitled to name a proxy for each member on the Retirement Board which it has appointed.  Such proxy may be designated any time prior to or during any Retirement Board meeting.  This proxy will remain in effect until revoked or the end of that Retirement Board meeting, whichever occurs first.

The NFLPA and the Management Council will have the authority to remove and appoint a replacement for any member on the Retirement Board either has respectively appointed.  Any member on the Retirement Board may resign by notice to the appointing party.  If there is a vacancy on the Retirement Board, the appointing party will designate a successor.  Until a successor is appointed, the remaining members on the Retirement Board may act on behalf of the Retirement Board; provided, however, that in order to act, the Retirement Board always must have at least four voting members.  Notwithstanding any provision in the Plan to the contrary, the Retirement Board may remove the legal counsel for the Plan and/or the benefit consultant/ actuary, or any local counsel or local benefit consultant/actuary or local management company by an affirmative vote of three Retirement Board members.

**8.2    Authority.**  The Retirement Board will be the "named fiduciary" of the Plan within the meaning of ERISA section 402(a)(2), and will be responsible for implementing and administering the Plan, subject to the terms of the Plan and Trust.  The Retirement Board will have full and absolute discretion, authority and power to interpret, control, implement, and manage the Plan and the Trust.

Such authority includes, but is not limited to, the power to:

(a)    Define the terms of the Plan and Trust, construe the Plan and Trust, and reconcile any inconsistencies therein;

(b)    Manage and operate the Plan and Trust and receive, hold, invest and reinvest

contributions made under this Plan;

(c)     Decide claims for benefits (except that initial claims for disability benefits under this Plan will be decided by the Disability Initial Claims Committee, and that the Retirement Board will abide by the provisions of Section 8.3);

(d)     Pay all reasonable and necessary expenses of the Plan, including benefits;

(e)     Adopt procedures, rules, and forms for the administration of the Plan;

(f)     Delegate its power and duties to other persons and appoint and assign authority to other persons (including, but not limited to accountants, investment managers, counsel, actuaries, recordkeepers, appraisers, consultants, professional plan administrators, physicians, and other specialists), or otherwise act to secure specialized advice or assistance, as it deems necessary or desirable in connection with the administration of the Plan (with the Retirement Board, to the extent not prohibited by applicable law, being entitled to rely conclusively upon and being fully protected in acting or in declining to act in good faith reliance upon, the advice or opinion of such persons, provided that such persons are prudently chosen and retained by the Retirement Board);

(g)     Establish an investment policy for the Plan;

(h)     Select the Trustee(s) and enter into an agreement(s) with the Trustee(s) setting forth the terms of the Trust;

(i)     Select an investment manager(s), within the meaning of section 3(38) of ERISA, to assume investment responsibility with respect to some or all of the assets of the Trust;

(j)     Commence or defend suits or legal proceedings involving the Plan or Trust;

(k)     Settle, compromise or submit to arbitration any claims, debts or damages due or owing to or from the Plan or Trust;

(l)     Inspect the records of any Employer as reasonably necessary for the Retirement Board to perform its obligations under the Plan and Trust;

(m)     Obtain fidelity bonds and fiduciary insurance coverage;

(n)     Delegate authority to any one of their number to sign documents on behalf of the Retirement Board and to perform other ministerial acts, when acting by a majority of voting members of the Retirement Board; and

(o)     Recover any overpayment of benefits through reduction or offset of future benefit payments or other method chosen by the Retirement Board.

**8.3     Medical Issues and Disputes of the Retirement Board.**

(a)     <u>Medical Issues</u>.  If three or more voting members of the Retirement Board conclude that a medical issue exists as to whether a Player qualifies for a benefit under this Plan

(such as where physician reports are in conflict or ambiguous), such members may submit such issue to a Medical Advisory Physician for a final and binding determination.  The Medical Advisory Physician will have full and absolute discretion, authority and power to decide such medical issues.  In all other respects, including the interpretation of this Plan and whether the claimant is entitled to benefits, the Retirement Board will retain its full and absolute discretion, authority and power under Sections 8.2 and 8.9.  If there is a question as to whether the Medical Advisory Physician properly applied the terms of the Plan, such as with respect to the standards for line-of-duty disability benefits, the Retirement Board will have the right and duty to bring such questions to the attention of the Medical Advisory Physician.  After all such questions have been addressed, the ultimate medical decision of the Medical Advisory Physician will be final and binding.

(b)    Benefits Disputes.  If the voting members of the Retirement Board are deadlocked with respect to a decision as to whether or to what extent any person is eligible for or entitled to benefits under this Plan, the Retirement Board may by an affirmative vote of three voting members submit such dispute for final and binding arbitration in accordance with the procedures and practices in use prior to the 2020 CBA.

(c)    Other Disputes.  If the voting members of the Retirement Board are deadlocked for any other reason, the Retirement Board may by an affirmative vote of three voting members submit such disputes to the Benefit Arbitrator for a final and binding determination in accordance with the procedures of the 2020 CBA.

(d)    Arbitration Procedures.  For benefit disputes arising under Section 8.3 (b) above, any arbitrator selected to resolve a dispute must base his or her decision solely on the administrative record that was before the Retirement Board, as may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator.  In addition, both parties to the arbitration are permitted to take depositions of any expert relied on by the other side based on the administrative record, as may be supplemented by records in existence prior to the date the dispute is referred to the arbitrator.

**8.4    Selection of the Disability Initial Claims Committee.**

(a)    The Disability Initial Claims Committee will consist of three members.  One member will be appointed by the NFLPA.  One member will be appointed by the Management Council.  One member will be the Plan's Medical Director or another medical professional jointly designated by the NFLPA and Management Council.

(b)    The NFLPA and the Management Council will each be entitled to name a proxy for the member of the Disability Initial Claims Committee each has appointed.  Such proxy may be designated any time prior to or during any Disability Initial Claims Committee meeting.  This proxy will remain in effect until revoked or the end of that Disability Initial Claims Committee meeting, whichever occurs first.

(c)    The NFLPA and the Management Council will have the authority to remove and appoint a replacement for the member of the Disability Initial Claims Committee each has appointed.  A member of the Disability Initial Claims Committee may resign by notice to the

appointing party of the Retirement Board.  If there is a vacancy on the Disability Initial Claims Committee, the appointing party will designate a successor.  In order to act, the Disability Initial Claims Committee always must have two members.

8.5    **Authority of the Disability Initial Claims Committee.**  The Disability Initial Claims Committee will be responsible for the initial determination of any and all disability benefits under this Plan and initial decisions under Article 5 as to whether Players currently receiving disability benefits should continue to receive those benefits.  The Disability Initial Claims Committee also will make initial decisions under Article 6 as to whether Players currently receiving disability benefits should continue to receive those benefits.  At the request of a member of the Disability Initial Claims Committee, the Disability Initial Claims Committee will reconsider any decision it has made.  When making the decisions described in this Section 8.5, the Disability Initial Claims Committee will have full and absolute discretion, authority, and power to interpret the Plan and the Trust.

8.6    **Disputes of the Disability Initial Claims Committee.**  If the members of the Disability Initial Claims Committee are deadlocked with respect to a decision as to whether a claimant is entitled to a benefit, the claim will be deemed denied.  However, if such claimant is currently receiving disability benefits, and if such deemed denial is appealed to the Retirement Board within sixty days from the date the notice of the deemed denial was mailed to the claimant, benefits will continue to be paid until and unless the Retirement Board determines on appeal that the claimant is no longer entitled to the benefits.  If such claimant is currently receiving disability benefits and if such deemed denial is not appealed to the Retirement Board within sixty days from the date the notice of the deemed denial was mailed to the claimant, benefits will not be paid with respect to any month that begins more than sixty days from the date of the deemed denial.  If the deemed denial is later appealed to the Retirement Board within the 180-day period described in Section 12.6(a) and the Retirement Board upholds the claimant's appeal, benefits will be paid retroactive to a date on or after the benefits ceased, as determined by the Retirement Board.

The member of the Disability Initial Claims Committee who is a medical professional shall cast the deciding vote only on those cases that are preliminarily "deemed denials" because of a disagreement between the other two members of the Disability Initial Claims Committee over a medical aspect of the case.  Notwithstanding the foregoing, in situations where the designated health care professional determines that the medical evidence is either inconclusive or insufficient, he or she will abstain from voting resulting in the "deemed denial" becoming the final decision of the Disability Initial Claims Committee.

8.7    **Meetings.**

(a)    <u>Retirement Board</u>.  The Retirement Board will meet at least quarterly, and a member on the Retirement Board may participate in a meeting by means of conference telephone or similar communications equipment.  Except as provided in Sections 8.1, 8.3, and 11.1, any action by the Retirement Board will require at least four affirmative votes.  Except as provided in Sections 8.1, 8.3, and 11.1, the Retirement Board may make decisions to take any action without calling a meeting, but any decisions so made, or action so taken, will be evidenced by a written instrument signed by at least four voting members of the Retirement Board, or by electronic

communication sent by at least four voting members of the Retirement Board, or by a combination of written instruments and electronic communications signed or sent by at least four members of the Retirement Board.

(b)     Disability Initial Claims Committee.  The Disability Initial Claims Committee will meet periodically, and the members of the Disability Initial Claims Committee may participate in a meeting by means of conference telephone or similar communications equipment.  Any action by the Disability Initial Claims Committee will require two affirmative votes.  The Disability Initial Claims Committee may make decisions and take any action without calling a meeting, but any decisions so made, or action so taken, will be evidenced by an electronic transmission or a written instrument signed by the members of the Disability Initial Claims Committee, or by a combination of written instruments and electronic communications signed or sent by both members of the Disability Initial Claims Committee.

**8.8     Duty of Care.**  The Retirement Board and the Disability Initial Claims Committee will discharge their duties with respect to the Plan and Trust solely and exclusively in the interest of the Players and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. The duties of the Retirement Board and the Disability Initial Claims Committee will only be those specifically undertaken pursuant to the Plan and Trust.  No member of the Retirement Board or the Disability Initial Claims Committee will be liable for the act of any other member, except to the extent required by law.  In the event that any dispute arises as to any act to be performed by the Retirement Board, the members may, to the extent permitted by ERISA, postpone the performance of such act until (a) actual adjudication of such dispute has been made in a court of competent jurisdiction, or (b) they are indemnified against any liability.

**8.9     Discretionary Acts.**   Benefits under this Plan will be paid only if the Disability Initial Claims Committee, or the Retirement Board, or a designee of either, decides in its discretion that the applicant is entitled to them.  In exercising their discretionary powers under the Plan and Trust, the Retirement Board and the Disability Initial Claims Committee will have the broadest discretion permissible under ERISA and any other applicable laws, and their decisions will be binding upon all persons affected thereby.  In deciding claims for benefits under this Plan, the Retirement Board and Disability Initial Claims Committee will consider all information in the Player's administrative record, and shall have full and absolute discretion to determine the relative weight to give such information.

**8.10    Indemnification.**

(a)     To the extent permitted by applicable law, each member of the Retirement Board, the Disability Initial Claims Committee, their alternates, the Medical Director, Medical Advisory Physicians, and employees of the Plan will be indemnified and saved harmless by the Plan and Trust from and against any and all claims of liability arising in connection with the exercise of their duties and responsibilities with respect to the Plan and Trust by reason of any act or omission, including all expenses reasonably incurred in the defense of such act or omission, unless (1) it is established by final judgment of a court of competent jurisdiction that such act or omission involved a violation of the duties imposed by Part 4 of Subtitle B of Title I of ERISA

on the part of such person, or (2) in the event of settlement or other disposition of such claim involving the Plan or Trust, it is determined by written opinion of independent counsel that such act or omission involved a violation of the duties imposed by Part 4 of Subtitle B of Title I of ERISA on the part of such person.  The independent counsel referred to in subparagraph (2) will be selected by mutual agreement of the NFLPA and the Management Council.  If those parties cannot agree, an independent counsel will be selected by the Benefit Arbitrator.

(b)     To the extent permitted by applicable law, the Trust will pay expenses (including reasonable attorneys' fees and disbursements), judgments, fines and amounts paid in settlement incurred by a member of the Retirement Board, the Disability Initial Claims Committee, their alternates, the Medical Director, and employees of the Plan in connection with any of the proceedings described above, provided that (1) each such person will repay such advanced expenses to the Trust, plus reasonable interest, if it is established by a final judgment of a court of competent jurisdiction, or by written opinion of independent counsel under the circumstances described in Section 8.10(a)(2) above, that such person violated duties under Part 4 of Subtitle B of Title I of ERISA, and (2) each such person will make appropriate arrangements for repayment of advanced expenses.

## ARTICLE 9

## RECORDS AND REPORTS

**9.1    Records.**  The Retirement Board and the Disability Initial Claims Committee will keep records of the operation of the Plan, including records that show each Player's Credited Seasons under the Plan as of each Plan Year.  Upon reasonable demand, a Player may receive a copy of the Plan's records with respect to his status under the Plan but will have no right to information concerning any other person.  Any qualified representative of the Employers or of the NFLPA may, at any time, inspect the records of the Plan.

**9.2    Statement of Credits.**  As soon as practicable after each Plan Year, the Retirement Board will furnish a written statement of pension benefits under this Plan to each Player who received a Credited Season for that Plan Year and to each Vested Inactive Player and Pension Expansion Player who has not commenced his pension as of that Plan Year.

# ARTICLE 10

## AMENDMENT OR TERMINATION OF THE PLAN

**10.1    Retirement Board.**  The Retirement Board may generally amend this Plan, but may not:

(a)    Alter the amount of contributions payable to the Plan;

(b)    Cause the Plan and Trust to fail to qualify under sections 401(a) and 501(a) of the Code, or cause any portion of contributions to the Plan to fail to be currently deductible to the Employers when paid under section 404(a) of the Code;

(c)    Reduce, as a direct result of an amendment, the value of any benefit already earned and otherwise payable under the Plan;

(d)    Amend the Plan in a manner which will render the Plan actuarially unsound; or

(e)    Increase benefits during the term of the CBA.

If no Collective Bargaining Agreement has been in effect for more than one year, then this Plan may be terminated by the Retirement Board.

**10.2    Bargaining Parties.**  The NFLPA and the Management Council, when acting jointly, may amend this Plan in any respect and may terminate this Plan.

**10.3    General Limitations.**  No amendment of the Plan may operate to deprive a Player or beneficiary of any rights or benefits irrevocably vested in him under the Plan.  In the event of the termination or partial termination of the Plan, the right of affected Players to benefits accrued to the date of such termination or partial termination (to the extent funded as of such date and unless previously forfeited) will be nonforfeitable.  No amendment or termination of the Plan may permit Trust assets to revert to, or be used or enjoyed by, an Employer, the League, or the NFLPA.  Notwithstanding the preceding sentence, suspensions, reductions, or eliminations of "adjustable benefits," as defined in Section 432(e)(8) of the Code, may be made as provided therein.

**10.4    Mergers.**  Subject to applicable law, the Management Council and NFLPA, acting jointly, reserve the right at any time to merge or consolidate the Plan with another plan, to transfer assets or liabilities of the Plan to another plan, or to accept a transfer of assets or liabilities from another plan to this Plan.  In the case of any merger or consolidation of this Plan with, or transfer of Plan assets or liabilities to, any other plan, the benefit to which each Player or his beneficiary is entitled will not be reduced.

## ARTICLE 11

## MEDICAL PROFESSIONALS

**11.1    Medical Director.**

(a)    <u>Selection and Termination</u>.  The Retirement Board may designate, by action of at least four members, a board-certified physician as the Plan's Medical Director.  A Medical Director must (1) certify that any services rendered for the Plan, including without limitation any opinions offered as a MAP or Neutral Physician, will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her services or opinions tend to support or refute any given Player's application for benefits.

A Medical Director will serve until at least three members of the Retirement Board agree to remove the Medical Director.

(b)    <u>Duties</u>.  The duties and responsibilities of the Medical Director will be determined by the Retirement Board, and will include medical advice with respect to the Plan's Neutral Physicians and medical examination procedures.  The Medical Director will provide advice on medical issues relating to particular disability benefit claims as requested by a member of the Retirement Board or a member of the Disability Initial Claims Committee.  The Medical Director may examine Players as a Medical Advisory Physician or Neutral Physician in any case where the Medical Director has not voted as a member of the Disability Initial Claims Committee pursuant to Section 8.6.

**11.2    Medical Advisory Physician.**

(a)    <u>Selection and Termination</u>.  The NFLPA and Management Council will jointly designate one or more health care professionals as a Medical Advisory Physician (MAP).  A MAP must (1) certify that any opinions offered as a MAP will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits.

Any MAP will serve until the earliest of (1) the death, disability or retirement of the MAP, (2) the NFLPA and Management Council jointly remove and replace the MAP, or (3) thirty days after either the NFLPA or Management Council gives written notice of the MAP's removal to the other party, the MAP, and the Retirement Board.  The NFLPA and Management Council may, at their discretion, jointly designate a replacement MAP for a removed MAP.  A MAP who is removed or who has received a notice of removal will decide any dispute already referred by the Retirement Board within thirty days after the removal or notice of removal.  The Retirement Board may not refer further disputes to the removed MAP.

(b)    <u>Duties</u>.  A MAP has authority to decide only those medical issues submitted by the Retirement Board under Section 8.3(a).  In making a determination, a MAP will review all material submitted to the Plan and may arrange for any additional consultation, referral, or other

specialized medical services as the MAP deems necessary.  In addition, a MAP may require an applicant to submit to such physical or other examinations as the MAP deems reasonable and necessary in making a determination.  A MAP will submit a written determination to the Retirement Board on a form provided by the Retirement Board.

**11.3    Neutral Physicians.**

(a)    <u>Selection and Termination</u>.  The Retirement Board will maintain a network of Neutral Physicians to examine Players in connection with benefits under this Plan.  The Neutral Physician network may include physicians, institutions, or other health care professionals.  The NFLPA and Management Council will jointly designate such Neutral Physicians.  A Neutral Physician must (1) certify that any opinions offered as a Neutral Physician will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits.

Any Neutral Physician will serve until the earliest of (1) the death, disability or retirement of the Neutral Physician, (2) the NFLPA and Management Council jointly remove and replace the Neutral Physician, or (3) thirty days after either the NFLPA or Management Council gives written notice of the Neutral Physician's removal to the other party, the Neutral Physician, and the Retirement Board.  The NFLPA and Management Council may, at their discretion, jointly designate a replacement Neutral Physician for a removed Neutral Physician.  A Neutral Physician who is removed or who has received a notice of removal will issue any reports on Players who have already been examined by the Neutral Physician within thirty days after the removal.  The Retirement Board may not refer additional Players to the removed Neutral Physician.

(b)    <u>Duties</u>.  The Neutral Physicians will examine each Player referred by the Plan and will provide such report or reports on the Player's condition as necessary for the Retirement Board or Disability Initial Claims Committee to make an adequate determination as to that Player's physical or mental condition.  The Neutral Physician will complete such form or forms as may be provided by the Retirement Board for this purpose.

# ARTICLE 12

## MISCELLANEOUS

**12.1    Use of Assets.**  All amounts contributed to the Trust will be irrevocable contributions, and under no circumstances will any amounts contributed to the Trust, or any assets of the Trust, ever revert to (except as provided by Section 3.3), or be used or enjoyed by, an Employer or the League, nor will any assets ever be used other than for the benefit of the Players and their beneficiaries and the payment of reasonable Plan expenses.  This Plan will be and continue to be operated in a manner so that it will be qualified under Code section 401(a), or any successor to such section 401(a).

**12.2    "Spendthrift" Provision.**  Subject to Section 12.3, and except as provided in Section 401(a)(13)(C) of the Code, no benefit under the Plan will be subject in any manner to anticipation, pledge, encumbrance, alienation, levy or assignment, nor to seizure, attachment or other legal process for the debts of any participant or beneficiary, unless required by law.

**12.3    QDRO Exception.**  In the event a court order purporting to be a QDRO (as defined by section 414(p) of the Code) is issued with respect to any Player, the Retirement Board will notify the Player and the alternate payee(s) of the order received (and, if benefits are already in pay status, separately account for the portion of the Player's benefits which would be payable to the alternate payee(s) as if the order received were a QDRO).  Within 18 months of the order, the Retirement Board will proceed with either (a) or (b) as follows:

(a)    If the order is determined to be a QDRO, the alternate payee(s) will receive a distribution, notwithstanding Articles 4, 4A, 4B, 5 or 6, (1) at the time specified in such order or, if the order permits, (2) as soon as administratively feasible after the Retirement Board approves the order, provided such distribution is permitted under applicable provisions of the Code; or

(b)    If the order is determined not to be a QDRO, or the issue remains undetermined, the Retirement Board will pay the portions of the Player's benefits segregated in accordance with the above to the Player or beneficiary(ies) who is otherwise entitled to such benefit.

If, more than 18 months after issuance of the order, a determination is made that the order is a QDRO, the determination will be applied prospectively only.

This Section 12.3 also applies to a domestic relations order, with an effective date prior to January 1, 1985, that the Retirement Board treats as QDRO.

**12.4    Addresses and Payment in Event of Incapacity.**

(a)    <u>Addresses</u>.  Each Player will be responsible for providing his current mailing address to the Retirement Board.  In the event a Player becomes entitled to a payment under the Plan, payments may be made by check to the order of the payee and mailed to the payee at the current address referred to above.

(b)  _Payment in Event of Incapacity_.  If the Retirement Board determines that a person entitled to receive any benefit payment is under a legal disability or is incapacitated in any way so as to be unable to manage his financial affairs, the Retirement Board may direct that payments be made to such person's legal representative, or to a relative or other individual for such person's benefit, or to otherwise apply the payment for the benefit of such person, subject to such conditions as the Retirement Board deems appropriate.  Alternatively, the Retirement Board may, in its sole discretion, establish a trust to hold the benefits of such Player if he is deemed incapacitated in any way so as to be unable to manage his financial affairs, and who, in the Retirement Board's sole discretion, would benefit from the establishment of such a trust. The Retirement Board may appoint a trustee and successor trustee if needed, and all reasonable expenses of the trust so established and its trustee will be paid by the Plan.  All benefits of such a Player will be paid directly to the trust so established.

If any employee benefit plan that is administered by the NFL Player Benefits Office in Baltimore, Maryland, and maintained pursuant to the Taft-Hartley Act of 1947 ("NFL Player Taft-Hartley Plan"), determines that a Participant is unable to manage his financial affairs and establishes a trust for such Participant, then any benefit payable to such Participant under this Plan will be paid only to such trust, and this Plan will share in the expenses of such trust. Benefits from this Plan will cease to be paid to such trust upon revocation of the trust by the NFL Player Taft-Hartley Plan that established the trust.

Any payment of a benefit in accordance with the provisions of this Section will be a complete discharge of any liability by the Plan to make such payment.

**12.5    Maximum Limitation on Benefits.**

(a)  The "Annual Benefit" (as defined in Code section 415(b)(2)) to which any Player may become entitled under this Plan will not exceed $160,000 per year (as adjusted annually under Code section 415 and applicable Treasury Regulations), which will be deemed to commence on such Employee's attainment of age sixty-five.  For purposes of applying the foregoing limitation on the Annual Benefit to which a Player may become entitled under this Plan, the benefit under this Plan will not be combined or aggregated with the benefit under another multiemployer plan or any other plan.  For purposes of applying the foregoing limitation on the Annual Benefit to which a Player may become entitled under another plan (which is not a multiemployer plan) maintained by an Employer, only the benefits under this Plan that are provided by the Employer will be aggregated with the benefits under the Employer's other plans which are not multiemployer plans.

(b)  Notwithstanding the foregoing, the otherwise permissible Annual Benefits for any individual participating under this Plan may be further reduced to the extent necessary to effectuate the limitations under Code section 415.  The provisions of Code section 415 and related Treasury Regulations, including without limitation the terms and definitions set forth therein, are incorporated by reference.  For this purpose, the limitation year means the Plan Year.

(c)     To the extent that any accrual is reduced because of this Section, such accrual will be immediately reinstated as soon as permitted under this Section, regardless of whether the Player is active, inactive, or retired.

(d)     For purposes of this Section 12.5, the term "Annual Benefit" means a benefit payable annually in the form of a life annuity.  Except as provided below, a benefit payable in a form other than a life annuity must be adjusted to an actuarially equivalent life annuity before applying the limitations of this Section 12.5.  The interest rate assumption used to determine actuarial equivalence will be the greater of the interest rate assumption set forth in Appendix B for converting from a life annuity to the applicable benefit form or an assumption of 5% per year; provided that, with respect to a benefit payable in a form that is subject to section 417(e)(3) of the Code, the interest rate assumption will be the interest rate used for determining the Player's benefit under item 5(b) of Appendix B (but not less than 5.5% for the 2004 or 2005 Plan Years, and beginning with the 2006 Plan Year, subject to the interest rate assumption under Code section 415(b)).  The mortality assumption used to determine actuarial equivalence shall be the "applicable mortality table" under Code section 417(e)(3)(B).  The mortality assumption used to determine actuarial equivalence for distributions commencing (1) before January 1, 2003 was the "applicable mortality table" published in Revenue Ruling 95-6, (2) after December 31, 2002 was the "applicable mortality table" published in Revenue Ruling 2001-62, (3) on or after January 1, 2008, the "applicable mortality table" published in Revenue Ruling 2007-67, (4) on or after January 1, 2009, the "applicable mortality table" published in Notice 2008-85, and (5) on or after April 1, 2018, and until subsequent guidance is issued, the "applicable mortality table" published in Notice 2017-60.  Ancillary benefits (including qualified disability benefits as defined in Code section 411(a)(9)) not directly related to retirement income benefits, the survivor portion of a Qualified Joint and Survivor Annuity, and the cessation or reduction of Social Security supplements will not be taken into account.

(e)     To the extent a married Player's Annual Benefit would be limited pursuant to this Section 12.5, in addition to any forms of benefit available under Articles 4, 4A, or 4B as applicable, he may elect to receive a Qualified Joint and Survivor Annuity, Qualified Optional Joint and Survivor Annuity, or Life and Contingent Annuitant Pension with his Spouse as the beneficiary without the right of a benefit increase to the Player upon the death of the Spouse.

**12.6    Claims Procedure.**  It is intended that the claims procedure of this Plan be administered in accordance with the claims procedure regulations of the U.S. Department of Labor, 29 C.F.R. § 2560.503-1.

(a)     Disability Claims.  Each person must claim any disability benefits to which he believes he is entitled under this Plan by filing a written application with the Retirement Board in accordance with the claims filing procedures established by the Retirement Board, and such claimant must take such actions as the Retirement Board or the Disability Initial Claims Committee may require.  The Retirement Board or the Disability Initial Claims Committee will notify such claimants when additional information is required.  The time periods for decisions of the Disability Initial Claims Committee and the Retirement Board in making an initial determination may be extended with the consent of the claimant.

A claimant's representative may act on behalf of a claimant in pursuing a claim for disability benefits or appeal of an adverse disability benefit determination only after the claimant submits to the Plan a signed written authorization identifying the representative by name. The Retirement Board will not recognize a claimant's representative who has been convicted of, or pled guilty or no contest to, a felony.

If a claim for disability benefits under Articles 5 and 6 of this Plan is wholly or partially denied, the Disability Initial Claims Committee will give the claimant notice of its adverse determination within a reasonable time, but not later than 45 days after receipt of the claim. This determination period may be extended twice by 30 days if, prior to the expiration of the period, the Disability Initial Claims Committee determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the claimant of the circumstances requiring the extension of time and the date by which the Disability Initial Claims Committee expects to render a decision. If any extension is necessary, the notice of extension will specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues. The claimant will be afforded at least 45 days within which to provide the specified information. If the Disability Initial Claims Committee fails to notify the claimant of its decision to grant or deny such claim within the time specified by this paragraph, the claimant may deem such claim to have been denied by the Disability Initial Claims Committee and the review procedures described below will become available to the claimant.

The notice of an adverse determination will be written in a manner calculated to be understood by the claimant, will follow the rules of 29 C.F.R. § 2560.503-1(o) for culturally and linguistically appropriate notices, and will set forth the following:

(1)     the specific reason(s) for the adverse determination;

(2)     reference to the specific Plan provisions on which the adverse determination is based;

(3)     a description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary;

(4)     a description of the Plan's claims review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under ERISA section 502(a) following an adverse determination on review;

(5)     any internal rule, guideline, protocol, or other similar criterion relied on in making the determination (or state that such rules, guidelines, protocols, standards, or other similar criteria do not exist);

(6)     if the determination was based on a scientific or clinical exclusion or limit, an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's circumstances (or state that such explanation is available free of charge upon request);

64

(7)      a discussion of the decision, including an explanation of the basis for disagreeing with or not following the views of (a) medical professionals treating the claimant and vocational professionals who evaluated the claimant presented by the claimant, (b) medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination, or (c) Social Security Administration disability determinations presented by the claimant to the Plan; and

(8)      a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits.

The claimant will have 180 days from the receipt of an adverse determination to file a written request for review of the initial decision to the Retirement Board.

The claimant will have the opportunity to submit written comments, documents, and other information in support of the request for review and will have access to relevant documents, records, and other information in his administrative record.  The Retirement Board's review of the adverse determination will take into account all available information, regardless of whether that information was presented or available to the Disability Initial Claims Committee. The Retirement Board will accord no deference to the determination of the Disability Initial Claims Committee.

On review, the claimant must present all issues, arguments, or evidence supporting the claim for benefits.  Failure to do so will preclude the claimant from raising those issues, arguments, or evidence in any subsequent administrative or judicial proceedings.

If a claim involves a medical judgment question, the health care professional who is consulted on review will not be the individual who was consulted during the initial determination or his subordinate, if applicable.  Upon request, the Retirement Board will provide for the identification of the medical experts whose advice was obtained on behalf of the Plan in connection with the adverse determination, without regard to whether the advice was relied upon in making the benefit determination.

The claimant will receive, free of charge, any new or additional evidence considered, relied upon, or generated by or on behalf of the Plan on review, as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided, so that the claimant can have a reasonable opportunity to respond prior to that date.  The claimant also will receive, free of charge, any new or additional rationale for the denial of the claim that arises during the review, as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided, so that the claimant can have a reasonable opportunity to respond prior to that date.

The Retirement Board meets quarterly.  Decisions by the Retirement Board on review

will be made no later than the date of the Retirement Board meeting that immediately follows the Plan's receipt of the claimant's request for review, unless the request for review is received by the Plan within 30 days preceding the date of such meeting.  In such case, the Retirement Board's decision may be made by no later than the second meeting of the Retirement Board following the Plan's receipt of the request for review.  If a claimant submits a response to new or additional evidence considered, relied upon, or generated by the Plan on review, or to any new or additional rationale for denial that arises during review, and that response is received by the Plan within 30 days preceding the meeting at which the Retirement Board will consider the claimant's request for review, then the Retirement Board's decision may be made by no later than the second meeting of the Retirement Board following the Plan's receipt of the claimant's response. If special circumstances require an extension of time for processing, the Retirement Board will notify the claimant in writing of the extension, describing the special circumstances and the date as of which the determination will be made, prior to the commencement of the extension. The claimant will be notified of the results of the review not later than five days after the determination.

If the claim is denied in whole or in part on review, the notice of an adverse determination will be written in a manner calculated to be understood by the claimant, will follow the rules of 29 C.F.R. § 2560.503-1(o) for culturally and linguistically appropriate notices, and will:

(1)    state the specific reason(s) for the adverse determination;

(2)    reference the specific Plan provision(s) on which the adverse determination is based;

(3)    state that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits;

(4)    state that the claimant has the right to bring an action under ERISA section 502(a) and identify the statute of limitations applicable to such action, including the calendar date on which the limitations period expires;

(5)    disclose any internal rule, guidelines, or protocol relied on in making the determination (or state that such rules, guidelines, protocols, standards, or other similar criteria do not exist); if the determination was based on a scientific or clinical exclusion or limit, contain an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's circumstances (or state that such explanation is available free of charge upon request); and

(6)    discuss the decision, including an explanation of the basis for disagreeing with or not following the views of (a) medical professionals treating the claimant and vocational professionals who evaluated the claimant presented by the claimant, (b) medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the claimant's adverse benefit determination, without regard to whether the advice was relied upon in making

the benefit determination, or (c) Social Security Administration disability determinations presented by the claimant to the Plan.

A claimant may request a written explanation of any alleged violation of these claims procedures. Any such request should be submitted to the plan in writing; it must state with specificity the alleged procedural violations at issue; and it must be received by the Plan no more than 30 days following the claimant's receipt of a decision on the pending application or appeal, as applicable. The Plan will provide an explanation within 10 days of the request.

(b)    <u>All Other Claims</u>. Each claimant or his beneficiary must claim any benefit to which he believes he is entitled under this Plan by filing a written claim with the Retirement Board in accordance with claim filing procedures established by the Retirement Board.

A claimant's representative may act on behalf of a claimant in pursuing a claim for benefits or appeal of an adverse determination only after the claimant submits to the Plan a signed written authorization identifying the representative by name. The Retirement Board will not recognize a claimant's representative who is a convicted felon.

The Retirement Board will decide a claim within 90 days of the date on which the claim is filed in accordance with the Plan's claim filing procedures, unless special circumstances (such as the need to obtain further clarifying information) require a longer period for adjudication and the claimant is notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time and the expected decision date; provided, however, that no extensions will be permitted beyond 90 days after the expiration of the initial 90-day period. If the Retirement Board fails to notify the claimant of its decision to grant or deny such claim within the time specified by this paragraph, the claimant may deem such claim to have been denied by the Retirement Board and the review procedure described below will become available to the claimant.

If a claim is denied, in whole or in part, the claimant must receive a written notice. The notice of an adverse determination will be written in a manner calculated to be understood by the claimant and will set forth the following:

(1)    the specific reason(s) for the denial;

(2)    a reference to the specific Plan provision on which the denial is based;

(3)    a description of additional information necessary for the claimant to perfect his claim, and the reasons such material or information is necessary; and

(4)    an explanation of the Plan's procedure for review of the denied or partially denied claim set forth below, including the claimant's right to bring a civil action under ERISA section 502(a) following an adverse determination on review.

The claimant will have 60 days from the receipt of an adverse determination to request in writing a review of the denial of his claim by the Retirement Board, which will provide a full and fair review.

The claimant or his duly authorized representative will have, upon request and free of charge, reasonable access to, and copies of all, documents, records, and other information relevant to the claimant's claim for benefits, and may submit issues and comments in writing. The review will take into account all available information submitted to the Retirement Board, regardless of whether such information was submitted or considered in the initial benefit determination.  The decision by the Retirement Board with respect to the review will be made no later than the date of the Retirement Board meeting following the Plan's receipt of the claimant's request for review; unless the request for review is received within 30 days preceding the date of such meeting, in which case, a decision will be made no later than the date of the second Retirement Board meeting following the Plan's receipt of the claimant's request for review. Notwithstanding the preceding sentence, if special circumstances (such as the need to obtain further clarifying information) require further extension of time in order for the Retirement Board to make a decision with respect to the review, a decision will be made no later than the third Retirement Board meeting following the Plan's receipt of the claimant's request for review, and the claimant will be notified in writing, prior to the end of the initial review period, of the reasons for the extension and the expected decision date.

The claimant will be notified of the results of the review in writing after the determination.  Any notification of an adverse determination on review will:

(1)     state the specific reason(s) for the adverse determination;

(2)     reference the specific Plan provisions on which the adverse determination is based;

(3)     state that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; and

(4)     state that the claimant has the right to bring a civil action under ERISA section 502(a).

**12.7    Limitation on Actions.**  No suit or legal action with respect to an adverse determination may be commenced more than forty-two months from the date of the final decision on the claim for benefits (including the decision on review).

**12.8    Receipt of Documents.**  Correspondence, applications, forms, elections, designations, and other documents of any type are deemed received by the Retirement Board only if and when actually received by the Retirement Board, and not when mailed or otherwise sent or transmitted to the Retirement Board.  The common law "mailbox rule" is expressly rejected.

**12.9    No Employment Contract.**  This Plan creates no contract of employment between the Employer or the League and any Player.

**12.10    Governing Law.**  To the extent permitted by applicable law, this Plan will be administered, construed, and enforced according to the laws of the State of New York.

**12.11    Severability.**  If any provision of this Plan is held illegal or void, such illegality or invalidity will not affect the remaining provisions of this Plan, but any such provision will be fully severable and the Plan will be construed and enforced as if the illegal or invalid provision had never been included.

**12.12    Recovery of Certain Overpayments.**  If false information submitted by or on behalf of a Player causes the Player to receive amounts under the Disability Plan to which such Player is not entitled, any future disability benefits payable to the Player or his beneficiary (including a Dependent or alternate payee) under Articles 5 or 6 of the Plan will be reduced by the amount of the overpayment from the Disability Plan, plus an interest rate of 6% per year.

**12.13    Qualified Military Service.**

(a)    Notwithstanding any other provision of the Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code section 414(u).

(b)    Effective January 1, 2007, the surviving Spouse or minor children of a Player who dies while performing qualified military service (as defined under section 414(u) of the Code) shall be entitled to any additional benefits (other than benefit accruals relating to the period of qualified military service) that would be provided under the Plan had the Participant died as an Active Player, in accordance with Code section 401(a)(37).

**12.14    Location of Payee Unknown.**  If the Plan Director, after following the procedures adopted by the Retirement Board, cannot locate a Player or beneficiary to whom a benefit is payable, the entire benefit of and amount payable to such Player or beneficiary are forfeited at the end of that Plan Year.  The amounts so forfeited will be separately accounted for as determined by the Retirement Board.  The forfeiture shall be applied to reduce future Employer contributions.  If the Player or beneficiary subsequently applies for the benefit (or, in cases where the right to receive payment of the benefit was previously established, the Plan is provided a proper address for the Player or beneficiary), the amount so forfeited (adjusted for interest or investment experience, if applicable) will be reinstated and all amounts then due will be paid to such Player or beneficiary.

**12.15    Retroactive Credited Season Awards.**

(a)    A Player who is awarded one or more additional Credited Seasons while he is receiving his pension benefit under Articles 4, 4A, or 4B may elect to receive his additional benefits applicable to those Credited Seasons using either method described in (1) or (2) below, each of which are actuarially equivalent:

(1)    A lump sum payment for the benefits attributable to the additional Credited Seasons from the date specified in Sections 1.7, 1.16B, or 1.21 (as applicable) to the date immediately prior to the first month following the award of the additional Credited Seasons plus an increase in the Player's ongoing monthly benefit for the additional Credited Seasons after such date; or

(2)    An actuarially increased benefit (but not increased beyond his required distribution date as described in subsection (d) below) attributable to the additional Credited Seasons.  A Player who makes this election will not receive a lump sum payment except as provided under subsection (d).

(b)    A Player who first becomes eligible for a pension benefit under Articles 4, 4A, or 4B due to an award of one or more Credited Seasons may receive his pension benefit using either method described in (1) or (2) below, each of which will be actuarially equivalent:

(1)    A lump sum payment for the benefits attributable to the period beginning as of any permissible date specified in Articles 4, 4A, or 4B (as applicable), but not later than his required distribution date, to the date immediately prior to the first month following the award of the Credited Season(s), plus ongoing monthly benefits after such date; or

(2)    An actuarially increased benefit (but not increased beyond his required distribution date as described in subsection (d) below.  A Player who makes this election will not receive a lump sum payment except as provided under subsection (d).

(c)    Any election made by a Player under Section 12.15(a) or Section 12.15(b) must be made within 180 days of the date that the notice of the Credit Season award is mailed to the Player, and if no such election is made, the Player will be deemed to elect the option under Section 12.15(a)(2) or Section 12.15(b)(2), as applicable.  Further, spousal consent will be required for any election under Section 12.15(a)(1) for a Player who elects to begin his applicable pension benefit prior to his Normal Retirement Date, or any election under Section 12.15(b)(1).

(d)    If a Player makes an election under Section 12.15(a)(2) or Section 12.15(b)(2) which commences his benefit after his required distribution date, as provided in Articles 4, 4A, and 4B (as applicable), his monthly benefit will be an actuarially equivalent benefit determined as of his required distribution date, and he will also receive a lump sum payment for benefits due from his required distribution date to the date monthly payments begin.

(e)    Lump sum payments under this Section 12.15 shall include interest at the rate of 6% per year.

(f)    A Player whose award of one or more additional Credited Seasons impacts benefits in both Articles 4 and 4A can make a separate election under this Section 12.15 for each such benefit.

**12.16  Counterparts.**  This Plan may be executed in counterparts.

## APPENDIX A

## FUNDING ASSUMPTIONS AND ACTUARIAL COST METHOD

| | |
|---|---|
| Mortality rates: | Code §430 Mortality with Blue Collar adjustment |
| Disability mortality before age 65: | Code §430 Mortality with Blue Collar adjustment |
| Mortality rates (Beneficiaries and Separate Interest Alternate Payees): | Code § 430 Mortality without adjustments |
| Disability Rates before retirement (for Benefit Commencement only): | Sample Rates |

| Age | Rate |
|---|---|
| 22 | 0.0% |
| 27 | 0.0% |
| 32 | 1.5% |
| 37 | 1.9% |
| 42 | 2.1% |
| 47 | 1.9% |
| 52 | 1.6% |
| 57 | 0.8% |
| 62 | 0.4% |

Withdrawal rates:

| For Players w/ service of: | Rate |
|---|---|
| 1 year | 29.1% |
| 2 years | 14.6% |
| 3 years | 16.3% |
| 4 years | 18.3% |
| 5 years | 17.9% |
| 6 years | 18.2% |
| 7 years | 23.3% |
| 8 years | 24.4% |
| 9 years | 29.6% |
| 10 years | 28.6% |
| 11-12 years | 35.4% |
| 13-14 years | 39.4% |
| 15-16 years | 40.0% |
| 17-19 years | 60.0% |
| 20 years | 100.0% |

| | |
|---|---|
| Election of early payment benefit: | 10% of all eligible Players elect an EPB at commencement of benefits |
| Retirement age (Non-Disabled): | |

72

| Age | Player with Pre-93 Season Rate | Player without Pre-93 Season Rate |
|---|---|---|
| 45 | 5.0% | 0.0% |
| 46-47 | 1.0% | 0.0% |
| 48-51 | 2.0% | 0.0% |
| 52-53 | 1.0% | 0.0% |
| 54 | 7.5% | 0.0% |
| 55 | 22.5% | 50.0% |
| 56-57 | 5.0% | 5.0% |
| 58 | 2.5% | 2.5% |
| 59-60 | 5.0% | 5.0% |
| 61 | 2.5% | 2.5% |
| 62 | 10.0% | 10.0% |
| 63 | 5.0% | 5.0% |
| 64 | 35.0% | 35.0% |
| 65 | 100.0% | 100.0% |

Retirement age (Disabled):          All ages: 55

Optional Payment Form:

| Payment Form | Rate |
|---|---|
| Single Life Annuity | 50% |
| 100% Joint-and-Survivor | 20% |
| 50% Joint-and-Survivor | 20% |
| 75% Joint-and-Survivor | 10% |

Percent married:          100%

Age of Player's spouse:          Three years younger than Player

Remarriage and mortality
rates for widows benefit:          None

Net investment return:          7.25%

Administration expenses:          Actual for prior year

Valuation date:          First day of Plan Year

Actuarial value of assets:          Five-year asset smoothing method

Funding method:          Unit credit cost method

**Amortization period:**  The Plan's net change in unfunded actuarial accrued liability during the preceding Plan Year will be amortized in level amounts over 7 years, beginning with the

73

contribution for the 2020 Plan Year. Notwithstanding the above, the change in liability attributable to a plan amendment adopted during the 2020 Plan Year will be amortized over 11 years. In each Plan Year after the 2020 Plan Year, the change in liability attributable to a plan amendment will be amortized over 7 years (unless the number of years is otherwise agreed upon by the Parties). In no event shall the contribution for a year exceed an amount which is expected to produce a negative unfunded actuarial liability at the end of the plan year; nor shall the contribution be less than the minimum required under ERISA.

**Additional Contributions:**  At their discretion, the Employers may collectively make a contribution to the Pension Plan on behalf of each NFL Club for any Plan Year that is in addition to the minimum contribution amount for such Plan Year set forth above.

**Deferral of Contributions:**  At their discretion, to the extent permitted by ERISA, the Employers may collectively defer some or all of the contributions for any Plan Year during the term of this Agreement, with interest at the rate specified in this Appendix, with such contribution (including interest) to be made and counted as a Player Cost in a future Plan Year occurring during the term of this Agreement and that is agreed to by the Parties.

**Special Contribution:**  In addition to the contribution required under Article 53, Section 2, the Employers will collectively make a special contribution for each Plan Year at the minimum amount necessary, if any, to allow the Plan to certify under Internal Revenue Code Section 432(b)(5)(A) that it will not be in endangered status at the end of the 10th Plan Year following the Plan Year for which the certification is made.

## APPENDIX B

## ACTUARIAL ASSUMPTIONS AND CONVERSION FACTORS
## FOR BENEFIT CALCULATIONS

The following conversion factors will be used in determining actuarial equivalencies of the benefits under the Bert Bell/Pete Rozelle NFL Player Retirement Plan:

1.    Life and Ten-Year Certain Pension Option (Section 4.4(b)(6) and Section 4B.4(b)(5)) –   See Table VI attached.

2.    Life Only Pension with Social Security Adjustment Option (Section 4.4(b)(4)) –

   (a)    For Players with Annuity Starting Dates on or after April 1, 2007, the greater of the benefit calculated using (a) Tables I and II attached, or (b) the assumptions in Sections 5(a) and (b) of this Appendix B.

   (b)    For all other payments, see Tables I and II attached.

3.    Early Retirement Reduction and Deferred Retirement Increases (Section 4.3) – see Table III attached.

4.    Qualified Joint and Survivor Annuity Option (Section 4.4(b)(2)) and Life and Contingent Annuitant Pension Option (Section 4.4(b)(5)) –

   (a)    For Players with an Annuity Starting Date on or after September 1, 2007 who had not attained age fifty-five as of September 1, 2007 and who elect (i) the Qualified Joint and Survivor Annuity Option (Section 4.4(b)(2)), or (ii) the Contingent Annuitant Pension Option (Section 4.4(b)(5)) where the Player's Spouse is the contingent annuitant, see Table IV attached.

   (b)    For all other payments, see Table V attached.

5.    Early Payment Benefit (Section 4.5) – Effective April 1, 2008

   (a)    The mortality rates per the "applicable mortality table" under Code section 417(e)(3)(B), as specified in published guidance from the Internal Revenue Service as in effect at the relevant time, which includes (A) for distributions with an Annuity Starting Date on or after January 1, 2008, Revenue Ruling 2007-67, (B) for distributions with an Annuity Starting Date on or after January 1, 2009, Notice 2008-85, and (C) for distributions with an Annuity Starting Date on or after April 1, 2018, until subsequent guidance is issued, Notice 2017-60.

   (b)    The interest rate assumption used is the applicable interest rate described in section 417(e)(3)(C) for the second month preceding the first day of the

Plan Year for which the calculation is made, as determined in accordance with published guidance from the Internal Revenue Service.

Notwithstanding the foregoing, if they produce a larger benefit than the assumptions set forth in (a) and (b) above, the actuarial assumptions in 6. below will be used.

6. All other calculations – The PRI-2012 Male Retiree Mortality table (Employee Mortality through age 65) projected to 2019 using MP-2019 with blue collar adjustment for participant and PRI-2012 Female Retiree Mortality table (Employee Mortality through age 65) projected to 2019 using MP-2019 for beneficiaries with a 6% per annum interest rate, will be used for all calculations where 1 through 5 of this Appendix B is not applicable.

**Table I**
**Social Security Adjustment**

---

Increase in pension until age 62 for each $100 by which the increased pension is reduced thereafter.

| Player's Age on Effective Date | Increase |
|:---:|:---:|
| 45 | $27.74 |
| 46 | 29.69 |
| 47 | 31.81 |
| 48 | 34.09 |
| 49 | 36.57 |
| 50 | 39.26 |
| 51 | 42.17 |
| 52 | 45.35 |
| 53 | 48.80 |
| 54 | 52.58 |
| 55 | 56.71 |
| 56 | 61.23 |
| 57 | 66.19 |
| 58 | 71.66 |
| 59 | 77.69 |
| 60 | 84.36 |
| 61 | 91.76 |

For example, assume a Player is entitled to an Early Retirement Pension of $1,900 per month at age 49 and that his estimated Social Security benefit at age 62 is $1,500. His benefit would be computed as follows:

| Before age 62 | = | $1,900 + [($1,500/100 x 36.57] |
| | = | $1,900 + $548.55 |
| | = | $2,448.55 |
| | | |
| After age 62 | = | $2,448.55 - $1,500 |
| | = | $948.55 |

Table II - Page 77

**Table II**
**Social Security Adjustment**

If a monthly benefit at age 62 from Table I is less than $50, the increase in the benefit until age 62 is the product of the Early Retirement Pension minus $50 and the appropriate factor from the table shown below.

| Player's Age on Effective Date | Percentage Factor |
|:---:|:---:|
| 45 | 38.38 |
| 46 | 42.23 |
| 47 | 46.64 |
| 48 | 51.73 |
| 49 | 57.65 |
| 50 | 64.62 |
| 51 | 72.93 |
| 52 | 82.97 |
| 53 | 95.33 |
| 54 | 110.87 |
| 55 | 130.97 |
| 56 | 157.92 |
| 57 | 195.81 |
| 58 | 252.86 |
| 59 | 348.24 |
| 60 | 539.46 |
| 61 | 1,114.03 |

For example, assume a Player is entitled to an Early Retirement Pension of $700 per month at age 50 and that his estimated Social Security benefit is $1,500 per month. His benefit, as computed using the first table produces a benefit at age 62 of less than $50 (actually negative $205.70). His benefit would therefore be calculated as follows:

| Before age 62 | = | ($700 - $50) x .6462 |
|---|---|---|
| | = | $650 x .6462 |
| | = | $420.03 |

Therefore, the benefit payable to age 62 is $1,120.03 ($700 + $420.03), and the benefit payable at and after age 62 is $50.

Table IV - Page 78

**Table III**
**Early Retirement Reduction Factors & Deferred Retirement Increase Factors**

---

**Early Retirement Reduction Factors**

Percentage of Normal Retirement Pension payable at specified age.

| Age | Percentage |
|-----|------------|
| 45 | 48.9% |
| 46 | 52.4 |
| 47 | 56.1 |
| 48 | 60.1 |
| 49 | 64.5 |
| 50 | 69.2 |
| 51 | 74.4 |
| 52 | 80.0 |
| 53 | 86.1 |
| 54 | 92.7 |

**Deferred Retirement Increase Factors**

Percentage of Normal Retirement Pension Payable at specified age.

| Age | Percentage |
|-----|------------|
| 56 | 109.1% |
| 57 | 119.2 |
| 58 | 130.5 |
| 59 | 143.1 |
| 60 | 157.3 |
| 61 | 173.3 |
| 62 | 191.3 |
| 63 | 211.8 |
| 64 | 235.2 |
| 65 | 261.9 |

Table V - Page 79

**Table IV**
**Table to Convert Benefit Credits to Joint and Survivor Options When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

---

If 100% of the benefit payable during the lifetime of the Player and his Spouse is paid to the Spouse if the Player dies first, then the applicable factor from this chart is applied to the benefit.

If the Player's Spouse receives less than 100% of the benefit, the appropriate factor is obtained from line 5 of the following worksheet:

(1)    Enter the percent (in decimal form) of the Player's benefit to go to the Player's Spouse on his death:    _____

(2)    Enter the factor from this Table IV if 100% of the benefit was to go to the Player's Spouse:    _____

(3)    Multiply the entries on lines (1) and (2) and enter here:    _____

(4)    Add the entries on lines (1) and (2) and subtract the entry on line (3):    _____

(5)    Divide the entry on line (2) by the entry on line (4) (the answer should be carried to three decimal places):    _____

Table V - Page 80

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**        **Age of Spouse  When Benefits Begin To Be Paid To Player**

|    | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|----|----|----|----|----|----|----|----|
| **45** | 0.889 | 0.891 | 0.893 | 0.895 | 0.896 | 0.898 | 0.900 |
| **46** | 0.882 | 0.884 | 0.885 | 0.887 | 0.889 | 0.891 | 0.893 |
| **47** | 0.874 | 0.876 | 0.878 | 0.879 | 0.881 | 0.883 | 0.885 |
| **48** | 0.866 | 0.868 | 0.869 | 0.871 | 0.873 | 0.875 | 0.877 |
| **49** | 0.857 | 0.859 | 0.861 | 0.862 | 0.864 | 0.866 | 0.868 |
| **50** | 0.848 | 0.850 | 0.851 | 0.853 | 0.855 | 0.857 | 0.859 |
| **51** | 0.838 | 0.840 | 0.842 | 0.843 | 0.845 | 0.847 | 0.849 |
| **52** | 0.828 | 0.830 | 0.831 | 0.833 | 0.835 | 0.837 | 0.839 |
| **53** | 0.817 | 0.819 | 0.821 | 0.823 | 0.824 | 0.826 | 0.829 |
| **54** | 0.806 | 0.808 | 0.809 | 0.811 | 0.813 | 0.815 | 0.817 |
| **55** | 0.794 | 0.796 | 0.798 | 0.800 | 0.801 | 0.803 | 0.806 |
| **56** | 0.782 | 0.784 | 0.785 | 0.787 | 0.789 | 0.791 | 0.793 |
| **57** | 0.769 | 0.771 | 0.773 | 0.774 | 0.776 | 0.778 | 0.780 |
| **58** | 0.756 | 0.758 | 0.759 | 0.761 | 0.763 | 0.765 | 0.767 |
| **59** | 0.742 | 0.744 | 0.745 | 0.747 | 0.749 | 0.751 | 0.753 |
| **60** | 0.727 | 0.729 | 0.731 | 0.732 | 0.734 | 0.736 | 0.738 |
| **61** | 0.712 | 0.714 | 0.715 | 0.717 | 0.719 | 0.721 | 0.723 |
| **62** | 0.696 | 0.698 | 0.699 | 0.701 | 0.703 | 0.705 | 0.707 |
| **63** | 0.680 | 0.681 | 0.683 | 0.684 | 0.686 | 0.688 | 0.690 |
| **64** | 0.663 | 0.664 | 0.665 | 0.667 | 0.669 | 0.671 | 0.672 |
| **65** | 0.644 | 0.646 | 0.647 | 0.649 | 0.650 | 0.652 | 0.654 |

Table V - Page 81

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**     **Age of Spouse  When Benefits Begin To Be Paid To Player**

|    | 32 | 33 | 34 | 35 | 36 | 37 | 38 |
|----|-----|-----|-----|-----|-----|-----|-----|
| **45** | 0.902 | 0.904 | 0.907 | 0.909 | 0.911 | 0.914 | 0.916 |
| **46** | 0.895 | 0.897 | 0.899 | 0.902 | 0.904 | 0.907 | 0.909 |
| **47** | 0.887 | 0.890 | 0.892 | 0.894 | 0.897 | 0.899 | 0.902 |
| **48** | 0.879 | 0.881 | 0.884 | 0.886 | 0.889 | 0.891 | 0.894 |
| **49** | 0.870 | 0.873 | 0.875 | 0.878 | 0.880 | 0.883 | 0.886 |
| **50** | 0.861 | 0.864 | 0.866 | 0.869 | 0.871 | 0.874 | 0.877 |
| **51** | 0.852 | 0.854 | 0.856 | 0.859 | 0.862 | 0.864 | 0.867 |
| **52** | 0.841 | 0.844 | 0.846 | 0.849 | 0.851 | 0.854 | 0.857 |
| **53** | 0.831 | 0.833 | 0.836 | 0.838 | 0.841 | 0.844 | 0.847 |
| **54** | 0.820 | 0.822 | 0.824 | 0.827 | 0.830 | 0.832 | 0.835 |
| **55** | 0.808 | 0.810 | 0.813 | 0.815 | 0.818 | 0.821 | 0.824 |
| **56** | 0.795 | 0.798 | 0.800 | 0.803 | 0.806 | 0.808 | 0.811 |
| **57** | 0.783 | 0.785 | 0.787 | 0.790 | 0.793 | 0.795 | 0.798 |
| **58** | 0.769 | 0.771 | 0.774 | 0.776 | 0.779 | 0.782 | 0.785 |
| **59** | 0.755 | 0.757 | 0.760 | 0.762 | 0.765 | 0.768 | 0.771 |
| **60** | 0.740 | 0.742 | 0.745 | 0.747 | 0.750 | 0.753 | 0.756 |
| **61** | 0.725 | 0.727 | 0.729 | 0.732 | 0.735 | 0.737 | 0.740 |
| **62** | 0.709 | 0.711 | 0.713 | 0.716 | 0.718 | 0.721 | 0.724 |
| **63** | 0.692 | 0.694 | 0.696 | 0.699 | 0.701 | 0.704 | 0.707 |
| **64** | 0.674 | 0.677 | 0.679 | 0.681 | 0.684 | 0.686 | 0.689 |
| **65** | 0.656 | 0.658 | 0.660 | 0.663 | 0.665 | 0.668 | 0.670 |

Table V - Page 82

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**    **Age of Spouse When Benefits Begin To Be Paid To Player**

| | 39 | 40 | 41 | 42 | 43 | 44 | 45 |
|---|---|---|---|---|---|---|---|
| **45** | 0.919 | 0.921 | 0.924 | 0.927 | 0.929 | 0.932 | 0.935 |
| **46** | 0.912 | 0.915 | 0.917 | 0.920 | 0.923 | 0.926 | 0.929 |
| **47** | 0.905 | 0.907 | 0.910 | 0.913 | 0.916 | 0.919 | 0.922 |
| **48** | 0.897 | 0.900 | 0.902 | 0.905 | 0.909 | 0.912 | 0.915 |
| **49** | 0.888 | 0.891 | 0.894 | 0.897 | 0.901 | 0.904 | 0.907 |
| **50** | 0.880 | 0.883 | 0.886 | 0.889 | 0.892 | 0.895 | 0.899 |
| **51** | 0.870 | 0.873 | 0.876 | 0.880 | 0.883 | 0.886 | 0.890 |
| **52** | 0.860 | 0.863 | 0.866 | 0.870 | 0.873 | 0.877 | 0.880 |
| **53** | 0.850 | 0.853 | 0.856 | 0.859 | 0.863 | 0.867 | 0.870 |
| **54** | 0.838 | 0.842 | 0.845 | 0.848 | 0.852 | 0.856 | 0.860 |
| **55** | 0.827 | 0.830 | 0.833 | 0.837 | 0.841 | 0.844 | 0.848 |
| **56** | 0.814 | 0.818 | 0.821 | 0.825 | 0.828 | 0.832 | 0.836 |
| **57** | 0.802 | 0.805 | 0.808 | 0.812 | 0.816 | 0.819 | 0.823 |
| **58** | 0.788 | 0.791 | 0.795 | 0.798 | 0.802 | 0.806 | 0.810 |
| **59** | 0.774 | 0.777 | 0.780 | 0.784 | 0.788 | 0.792 | 0.796 |
| **60** | 0.759 | 0.762 | 0.766 | 0.769 | 0.773 | 0.777 | 0.781 |
| **61** | 0.743 | 0.747 | 0.750 | 0.754 | 0.757 | 0.761 | 0.766 |
| **62** | 0.727 | 0.730 | 0.734 | 0.737 | 0.741 | 0.745 | 0.749 |
| **63** | 0.710 | 0.713 | 0.717 | 0.720 | 0.724 | 0.728 | 0.732 |
| **64** | 0.692 | 0.695 | 0.699 | 0.702 | 0.706 | 0.710 | 0.714 |
| **65** | 0.673 | 0.676 | 0.680 | 0.683 | 0.687 | 0.691 | 0.695 |

Table V - Page 83

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**    **Age of Spouse When Benefits Begin To Be Paid To Player**

|     | 46 | 47 | 48 | 49 | 50 | 51 | 52 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 45 | 0.937 | 0.940 | 0.943 | 0.946 | 0.948 | 0.951 | 0.953 |
| 46 | 0.931 | 0.934 | 0.937 | 0.940 | 0.943 | 0.946 | 0.949 |
| 47 | 0.925 | 0.928 | 0.931 | 0.934 | 0.937 | 0.940 | 0.943 |
| 48 | 0.918 | 0.921 | 0.924 | 0.928 | 0.931 | 0.934 | 0.937 |
| 49 | 0.910 | 0.914 | 0.917 | 0.921 | 0.924 | 0.928 | 0.931 |
| 50 | 0.902 | 0.906 | 0.909 | 0.913 | 0.917 | 0.920 | 0.924 |
| 51 | 0.894 | 0.897 | 0.901 | 0.905 | 0.909 | 0.912 | 0.916 |
| 52 | 0.884 | 0.888 | 0.892 | 0.896 | 0.900 | 0.904 | 0.908 |
| 53 | 0.874 | 0.878 | 0.882 | 0.886 | 0.891 | 0.895 | 0.899 |
| 54 | 0.864 | 0.868 | 0.872 | 0.876 | 0.880 | 0.885 | 0.889 |
| 55 | 0.852 | 0.856 | 0.861 | 0.865 | 0.870 | 0.874 | 0.879 |
| 56 | 0.840 | 0.845 | 0.849 | 0.854 | 0.858 | 0.863 | 0.868 |
| 57 | 0.828 | 0.832 | 0.837 | 0.841 | 0.846 | 0.851 | 0.856 |
| 58 | 0.814 | 0.819 | 0.823 | 0.828 | 0.833 | 0.838 | 0.843 |
| 59 | 0.800 | 0.805 | 0.809 | 0.814 | 0.819 | 0.824 | 0.830 |
| 60 | 0.785 | 0.790 | 0.795 | 0.800 | 0.805 | 0.810 | 0.815 |
| 61 | 0.770 | 0.774 | 0.779 | 0.784 | 0.789 | 0.795 | 0.800 |
| 62 | 0.753 | 0.758 | 0.763 | 0.768 | 0.773 | 0.778 | 0.784 |
| 63 | 0.736 | 0.741 | 0.746 | 0.751 | 0.756 | 0.761 | 0.767 |
| 64 | 0.718 | 0.723 | 0.727 | 0.732 | 0.738 | 0.743 | 0.749 |
| 65 | 0.699 | 0.703 | 0.708 | 0.713 | 0.718 | 0.724 | 0.730 |

Table V - Page 84

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**      **Age of Spouse When Benefits Begin To Be Paid To Player**

|     | 53 | 54 | 55 | 56 | 57 | 58 | 59 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| **45** | 0.956 | 0.959 | 0.961 | 0.963 | 0.966 | 0.968 | 0.970 |
| **46** | 0.951 | 0.954 | 0.957 | 0.959 | 0.962 | 0.964 | 0.967 |
| **47** | 0.946 | 0.949 | 0.952 | 0.955 | 0.958 | 0.960 | 0.963 |
| **48** | 0.941 | 0.944 | 0.947 | 0.950 | 0.953 | 0.956 | 0.959 |
| **49** | 0.934 | 0.938 | 0.941 | 0.944 | 0.948 | 0.951 | 0.954 |
| **50** | 0.928 | 0.931 | 0.935 | 0.938 | 0.942 | 0.945 | 0.949 |
| **51** | 0.920 | 0.924 | 0.928 | 0.932 | 0.936 | 0.939 | 0.943 |
| **52** | 0.912 | 0.916 | 0.920 | 0.924 | 0.928 | 0.932 | 0.936 |
| **53** | 0.903 | 0.908 | 0.912 | 0.916 | 0.921 | 0.925 | 0.929 |
| **54** | 0.894 | 0.899 | 0.903 | 0.908 | 0.912 | 0.917 | 0.922 |
| **55** | 0.884 | 0.889 | 0.893 | 0.898 | 0.903 | 0.908 | 0.913 |
| **56** | 0.873 | 0.878 | 0.883 | 0.888 | 0.893 | 0.899 | 0.904 |
| **57** | 0.861 | 0.866 | 0.872 | 0.877 | 0.883 | 0.888 | 0.894 |
| **58** | 0.849 | 0.854 | 0.860 | 0.865 | 0.871 | 0.877 | 0.883 |
| **59** | 0.835 | 0.841 | 0.847 | 0.853 | 0.859 | 0.865 | 0.871 |
| **60** | 0.821 | 0.827 | 0.833 | 0.839 | 0.845 | 0.851 | 0.858 |
| **61** | 0.806 | 0.812 | 0.818 | 0.824 | 0.831 | 0.837 | 0.844 |
| **62** | 0.790 | 0.796 | 0.802 | 0.809 | 0.815 | 0.822 | 0.829 |
| **63** | 0.773 | 0.779 | 0.785 | 0.792 | 0.799 | 0.806 | 0.813 |
| **64** | 0.755 | 0.761 | 0.768 | 0.774 | 0.781 | 0.788 | 0.796 |
| **65** | 0.736 | 0.742 | 0.748 | 0.755 | 0.762 | 0.769 | 0.777 |

Table V - Page 85

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**    **Age of Spouse When Benefits Begin To Be Paid To Player**

|     | 60 | 61 | 62 | 63 | 64 | 65 | 66 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| **45** | 0.972 | 0.974 | 0.976 | 0.978 | 0.979 | 0.981 | 0.983 |
| **46** | 0.969 | 0.971 | 0.973 | 0.975 | 0.977 | 0.979 | 0.981 |
| **47** | 0.965 | 0.968 | 0.970 | 0.972 | 0.974 | 0.977 | 0.978 |
| **48** | 0.961 | 0.964 | 0.967 | 0.969 | 0.971 | 0.974 | 0.976 |
| **49** | 0.957 | 0.960 | 0.963 | 0.965 | 0.968 | 0.971 | 0.973 |
| **50** | 0.952 | 0.955 | 0.958 | 0.961 | 0.964 | 0.967 | 0.969 |
| **51** | 0.946 | 0.950 | 0.953 | 0.957 | 0.960 | 0.963 | 0.966 |
| **52** | 0.940 | 0.944 | 0.948 | 0.951 | 0.955 | 0.958 | 0.961 |
| **53** | 0.934 | 0.938 | 0.942 | 0.946 | 0.949 | 0.953 | 0.956 |
| **54** | 0.926 | 0.930 | 0.935 | 0.939 | 0.943 | 0.947 | 0.951 |
| **55** | 0.918 | 0.923 | 0.927 | 0.932 | 0.937 | 0.941 | 0.945 |
| **56** | 0.909 | 0.914 | 0.919 | 0.924 | 0.929 | 0.934 | 0.938 |
| **57** | 0.899 | 0.905 | 0.910 | 0.915 | 0.921 | 0.926 | 0.931 |
| **58** | 0.888 | 0.894 | 0.900 | 0.906 | 0.912 | 0.917 | 0.922 |
| **59** | 0.877 | 0.883 | 0.889 | 0.895 | 0.902 | 0.908 | 0.913 |
| **60** | 0.864 | 0.871 | 0.877 | 0.884 | 0.890 | 0.897 | 0.903 |
| **61** | 0.851 | 0.858 | 0.864 | 0.871 | 0.878 | 0.885 | 0.892 |
| **62** | 0.836 | 0.843 | 0.850 | 0.858 | 0.865 | 0.873 | 0.879 |
| **63** | 0.820 | 0.828 | 0.835 | 0.843 | 0.851 | 0.859 | 0.866 |
| **64** | 0.803 | 0.811 | 0.819 | 0.827 | 0.835 | 0.843 | 0.851 |
| **65** | 0.785 | 0.793 | 0.801 | 0.809 | 0.818 | 0.826 | 0.834 |

Table V - Page 86

**Table IV, continued**

**Table to Convert Credits to Joint and Survivor Options**
**When the Player's Spouse is the Beneficiary and the Player Had Not Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**      **Age of Spouse  When Benefits Begin To Be Paid To Player**

|     | 67 | 68 | 69 | 70 |
|-----|-----|-----|-----|-----|
| **45** | 0.984 | 0.985 | 0.986 | 0.988 |
| **46** | 0.982 | 0.984 | 0.985 | 0.986 |
| **47** | 0.980 | 0.982 | 0.983 | 0.985 |
| **48** | 0.978 | 0.979 | 0.981 | 0.983 |
| **49** | 0.975 | 0.977 | 0.979 | 0.981 |
| **50** | 0.972 | 0.974 | 0.976 | 0.978 |
| **51** | 0.968 | 0.971 | 0.973 | 0.975 |
| **52** | 0.964 | 0.967 | 0.970 | 0.972 |
| **53** | 0.960 | 0.963 | 0.966 | 0.969 |
| **54** | 0.955 | 0.958 | 0.961 | 0.965 |
| **55** | 0.949 | 0.953 | 0.956 | 0.960 |
| **56** | 0.943 | 0.947 | 0.951 | 0.955 |
| **57** | 0.935 | 0.940 | 0.944 | 0.949 |
| **58** | 0.927 | 0.932 | 0.937 | 0.942 |
| **59** | 0.919 | 0.924 | 0.929 | 0.935 |
| **60** | 0.909 | 0.915 | 0.921 | 0.926 |
| **61** | 0.898 | 0.905 | 0.911 | 0.917 |
| **62** | 0.886 | 0.893 | 0.900 | 0.906 |
| **63** | 0.873 | 0.880 | 0.888 | 0.895 |
| **64** | 0.858 | 0.866 | 0.874 | 0.882 |
| **65** | 0.842 | 0.851 | 0.859 | 0.867 |

Table V - Page 87

**Table V**
**Table to Convert Benefit Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

---

If 100% of the benefit payable during the lifetime of the Player and his beneficiary is paid to the beneficiary if the Player dies first, then the applicable factor from this chart is applied to the benefit.

If the beneficiary receives less than 100% of the benefit, the appropriate factor is obtained from line 5 of the following worksheet:

(1)    Enter the percent (in decimal form) of the Player's benefit to go to the beneficiary on his death:    _____

(2)    Enter the factor from this Table V if 100% of the benefit was to go to the beneficiary:    _____

(3)    Multiply the entries on lines (1) and (2) and enter here:    _____

(4)    Add the entries on lines (1) and (2) and subtract the entry on line (3):    _____

(5)    Divide the entry on line (2) by the entry on line (4) (the answer should be carried to three decimal places):    _____

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

**Age of Player When Benefits Begin To Be Paid**

**Age of Beneficiary When Benefits Begin To Be Paid To Player**

| | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|
| **45** | 0.889 | 0.890 | 0.892 | 0.894 | 0.896 | 0.897 | 0.899 |
| **46** | 0.881 | 0.883 | 0.885 | 0.886 | 0.888 | 0.890 | 0.892 |
| **47** | 0.874 | 0.875 | 0.877 | 0.879 | 0.880 | 0.882 | 0.884 |
| **48** | 0.865 | 0.867 | 0.869 | 0.870 | 0.872 | 0.874 | 0.876 |
| **49** | 0.856 | 0.858 | 0.860 | 0.862 | 0.863 | 0.865 | 0.867 |
| **50** | 0.847 | 0.849 | 0.851 | 0.852 | 0.854 | 0.856 | 0.858 |
| **51** | 0.838 | 0.839 | 0.841 | 0.843 | 0.845 | 0.846 | 0.849 |
| **52** | 0.827 | 0.829 | 0.831 | 0.832 | 0.834 | 0.836 | 0.838 |
| **53** | 0.817 | 0.818 | 0.820 | 0.822 | 0.824 | 0.826 | 0.828 |
| **54** | 0.805 | 0.807 | 0.809 | 0.811 | 0.812 | 0.814 | 0.816 |
| **55** | 0.794 | 0.795 | 0.797 | 0.799 | 0.801 | 0.803 | 0.805 |
| **56** | 0.781 | 0.783 | 0.785 | 0.786 | 0.788 | 0.790 | 0.792 |
| **57** | 0.769 | 0.770 | 0.772 | 0.774 | 0.775 | 0.777 | 0.779 |
| **58** | 0.755 | 0.757 | 0.758 | 0.760 | 0.762 | 0.764 | 0.766 |
| **59** | 0.741 | 0.743 | 0.744 | 0.746 | 0.748 | 0.750 | 0.752 |
| **60** | 0.727 | 0.728 | 0.730 | 0.732 | 0.733 | 0.735 | 0.737 |
| **61** | 0.712 | 0.713 | 0.715 | 0.716 | 0.718 | 0.720 | 0.722 |
| **62** | 0.696 | 0.697 | 0.699 | 0.700 | 0.702 | 0.704 | 0.706 |
| **63** | 0.679 | 0.681 | 0.682 | 0.684 | 0.685 | 0.687 | 0.689 |
| **64** | 0.662 | 0.663 | 0.665 | 0.666 | 0.668 | 0.670 | 0.672 |
| **65** | 0.644 | 0.645 | 0.647 | 0.648 | 0.650 | 0.651 | 0.653 |

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

**Age of Player When Benefits Begin To Be Paid**          **Age of Beneficiary When Benefits Begin To Be Paid To Player**

| | 32 | 33 | 34 | 35 | 36 | 37 | 38 |
|---|---|---|---|---|---|---|---|
| **45** | 0.901 | 0.903 | 0.906 | 0.908 | 0.910 | 0.912 | 0.915 |
| **46** | 0.894 | 0.896 | 0.898 | 0.901 | 0.903 | 0.905 | 0.908 |
| **47** | 0.886 | 0.889 | 0.891 | 0.893 | 0.895 | 0.898 | 0.900 |
| **48** | 0.878 | 0.880 | 0.883 | 0.885 | 0.887 | 0.890 | 0.892 |
| **49** | 0.869 | 0.872 | 0.874 | 0.876 | 0.879 | 0.881 | 0.884 |
| **50** | 0.860 | 0.863 | 0.865 | 0.867 | 0.870 | 0.872 | 0.875 |
| **51** | 0.851 | 0.853 | 0.855 | 0.858 | 0.860 | 0.863 | 0.866 |
| **52** | 0.840 | 0.843 | 0.845 | 0.848 | 0.850 | 0.853 | 0.856 |
| **53** | 0.830 | 0.832 | 0.834 | 0.837 | 0.839 | 0.842 | 0.845 |
| **54** | 0.819 | 0.821 | 0.823 | 0.826 | 0.828 | 0.831 | 0.834 |
| **55** | 0.807 | 0.809 | 0.811 | 0.814 | 0.816 | 0.819 | 0.822 |
| **56** | 0.794 | 0.797 | 0.799 | 0.802 | 0.804 | 0.807 | 0.810 |
| **57** | 0.782 | 0.784 | 0.786 | 0.789 | 0.791 | 0.794 | 0.797 |
| **58** | 0.768 | 0.770 | 0.773 | 0.775 | 0.778 | 0.780 | 0.783 |
| **59** | 0.754 | 0.756 | 0.759 | 0.761 | 0.764 | 0.766 | 0.769 |
| **60** | 0.739 | 0.741 | 0.744 | 0.746 | 0.749 | 0.751 | 0.754 |
| **61** | 0.724 | 0.726 | 0.728 | 0.731 | 0.733 | 0.736 | 0.739 |
| **62** | 0.708 | 0.710 | 0.712 | 0.715 | 0.717 | 0.720 | 0.723 |
| **63** | 0.691 | 0.693 | 0.695 | 0.698 | 0.700 | 0.703 | 0.706 |
| **64** | 0.673 | 0.676 | 0.678 | 0.680 | 0.682 | 0.685 | 0.688 |
| **65** | 0.655 | 0.657 | 0.659 | 0.661 | 0.664 | 0.666 | 0.669 |

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

Age of Player When
Benefits Begin To Be Paid        Age of Beneficiary When Benefits Begin To Be Paid To Player

|     | 39 | 40 | 41 | 42 | 43 | 44 | 45 |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 45 | 0.917 | 0.919 | 0.922 | 0.924 | 0.927 | 0.930 | 0.932 |
| 46 | 0.910 | 0.913 | 0.915 | 0.918 | 0.921 | 0.923 | 0.926 |
| 47 | 0.903 | 0.906 | 0.908 | 0.911 | 0.914 | 0.916 | 0.919 |
| 48 | 0.895 | 0.898 | 0.901 | 0.903 | 0.906 | 0.909 | 0.912 |
| 49 | 0.887 | 0.889 | 0.892 | 0.895 | 0.898 | 0.901 | 0.904 |
| 50 | 0.878 | 0.881 | 0.884 | 0.887 | 0.890 | 0.893 | 0.896 |
| 51 | 0.868 | 0.871 | 0.874 | 0.877 | 0.881 | 0.884 | 0.887 |
| 52 | 0.858 | 0.861 | 0.864 | 0.868 | 0.871 | 0.874 | 0.878 |
| 53 | 0.848 | 0.851 | 0.854 | 0.857 | 0.861 | 0.864 | 0.867 |
| 54 | 0.837 | 0.840 | 0.843 | 0.846 | 0.850 | 0.853 | 0.857 |
| 55 | 0.825 | 0.828 | 0.831 | 0.835 | 0.838 | 0.842 | 0.845 |
| 56 | 0.813 | 0.816 | 0.819 | 0.822 | 0.826 | 0.830 | 0.833 |
| 57 | 0.800 | 0.803 | 0.806 | 0.810 | 0.813 | 0.817 | 0.821 |
| 58 | 0.786 | 0.789 | 0.793 | 0.796 | 0.800 | 0.803 | 0.807 |
| 59 | 0.772 | 0.775 | 0.779 | 0.782 | 0.786 | 0.789 | 0.793 |
| 60 | 0.757 | 0.760 | 0.764 | 0.767 | 0.771 | 0.774 | 0.778 |
| 61 | 0.742 | 0.745 | 0.748 | 0.752 | 0.755 | 0.759 | 0.763 |
| 62 | 0.725 | 0.729 | 0.732 | 0.735 | 0.739 | 0.743 | 0.746 |
| 63 | 0.708 | 0.711 | 0.715 | 0.718 | 0.722 | 0.725 | 0.729 |
| 64 | 0.691 | 0.694 | 0.697 | 0.700 | 0.704 | 0.707 | 0.711 |
| 65 | 0.672 | 0.675 | 0.678 | 0.681 | 0.685 | 0.688 | 0.692 |

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**      **Age of Beneficiary When Benefits Begin To Be Paid To Player**

|  | 46 | 47 | 48 | 49 | 50 | 51 | 52 |
|---|---|---|---|---|---|---|---|
| **45** | 0.935 | 0.937 | 0.940 | 0.942 | 0.945 | 0.947 | 0.950 |
| **46** | 0.929 | 0.931 | 0.934 | 0.937 | 0.939 | 0.942 | 0.945 |
| **47** | 0.922 | 0.925 | 0.928 | 0.931 | 0.934 | 0.936 | 0.939 |
| **48** | 0.915 | 0.918 | 0.921 | 0.924 | 0.927 | 0.930 | 0.933 |
| **49** | 0.907 | 0.911 | 0.914 | 0.917 | 0.920 | 0.923 | 0.926 |
| **50** | 0.899 | 0.903 | 0.906 | 0.909 | 0.913 | 0.916 | 0.919 |
| **51** | 0.890 | 0.894 | 0.897 | 0.901 | 0.904 | 0.908 | 0.911 |
| **52** | 0.881 | 0.885 | 0.888 | 0.892 | 0.896 | 0.899 | 0.903 |
| **53** | 0.871 | 0.875 | 0.878 | 0.882 | 0.886 | 0.890 | 0.894 |
| **54** | 0.860 | 0.864 | 0.868 | 0.872 | 0.876 | 0.880 | 0.884 |
| **55** | 0.849 | 0.853 | 0.857 | 0.861 | 0.865 | 0.869 | 0.874 |
| **56** | 0.837 | 0.841 | 0.845 | 0.849 | 0.854 | 0.858 | 0.862 |
| **57** | 0.824 | 0.829 | 0.833 | 0.837 | 0.841 | 0.846 | 0.850 |
| **58** | 0.811 | 0.815 | 0.820 | 0.824 | 0.828 | 0.833 | 0.838 |
| **59** | 0.797 | 0.801 | 0.806 | 0.810 | 0.815 | 0.819 | 0.824 |
| **60** | 0.782 | 0.787 | 0.791 | 0.795 | 0.800 | 0.805 | 0.810 |
| **61** | 0.767 | 0.771 | 0.775 | 0.780 | 0.785 | 0.790 | 0.795 |
| **62** | 0.751 | 0.755 | 0.759 | 0.764 | 0.769 | 0.773 | 0.779 |
| **63** | 0.733 | 0.738 | 0.742 | 0.747 | 0.751 | 0.756 | 0.762 |
| **64** | 0.715 | 0.719 | 0.724 | 0.729 | 0.733 | 0.738 | 0.743 |
| **65** | 0.696 | 0.700 | 0.705 | 0.709 | 0.714 | 0.719 | 0.724 |

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

**Age of Player When Benefits Begin To Be Paid**          **Age of Beneficiary When Benefits Begin To Be Paid To Player**

|    | 53 | 54 | 55 | 56 | 57 | 58 | 59 |
|----|-----|-----|-----|-----|-----|-----|-----|
| **45** | 0.952 | 0.954 | 0.957 | 0.959 | 0.961 | 0.963 | 0.965 |
| **46** | 0.947 | 0.950 | 0.952 | 0.955 | 0.957 | 0.959 | 0.961 |
| **47** | 0.942 | 0.945 | 0.947 | 0.950 | 0.952 | 0.955 | 0.957 |
| **48** | 0.936 | 0.939 | 0.942 | 0.945 | 0.947 | 0.950 | 0.953 |
| **49** | 0.930 | 0.933 | 0.936 | 0.939 | 0.942 | 0.945 | 0.948 |
| **50** | 0.923 | 0.926 | 0.929 | 0.932 | 0.936 | 0.939 | 0.942 |
| **51** | 0.915 | 0.919 | 0.922 | 0.925 | 0.929 | 0.932 | 0.936 |
| **52** | 0.907 | 0.910 | 0.914 | 0.918 | 0.922 | 0.925 | 0.929 |
| **53** | 0.898 | 0.902 | 0.906 | 0.910 | 0.914 | 0.917 | 0.921 |
| **54** | 0.888 | 0.892 | 0.897 | 0.901 | 0.905 | 0.909 | 0.913 |
| **55** | 0.878 | 0.882 | 0.887 | 0.891 | 0.895 | 0.900 | 0.904 |
| **56** | 0.867 | 0.871 | 0.876 | 0.881 | 0.885 | 0.890 | 0.894 |
| **57** | 0.855 | 0.860 | 0.865 | 0.869 | 0.874 | 0.879 | 0.884 |
| **58** | 0.843 | 0.847 | 0.852 | 0.857 | 0.862 | 0.867 | 0.873 |
| **59** | 0.829 | 0.834 | 0.839 | 0.844 | 0.850 | 0.855 | 0.860 |
| **60** | 0.815 | 0.820 | 0.825 | 0.831 | 0.836 | 0.842 | 0.847 |
| **61** | 0.800 | 0.805 | 0.811 | 0.816 | 0.822 | 0.827 | 0.833 |
| **62** | 0.784 | 0.789 | 0.795 | 0.800 | 0.806 | 0.812 | 0.818 |
| **63** | 0.767 | 0.772 | 0.778 | 0.784 | 0.790 | 0.796 | 0.802 |
| **64** | 0.749 | 0.754 | 0.760 | 0.766 | 0.772 | 0.778 | 0.784 |
| **65** | 0.730 | 0.735 | 0.741 | 0.747 | 0.753 | 0.759 | 0.766 |

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

**Age of Player When**
**Benefits Begin To Be Paid**    **Age of Beneficiary When Benefits Begin To Be Paid To Player**

|  | 60 | 61 | 62 | 63 | 64 | 65 | 66 |
|---|---|---|---|---|---|---|---|
| **45** | 0.967 | 0.969 | 0.971 | 0.972 | 0.974 | 0.975 | 0.977 |
| **46** | 0.964 | 0.966 | 0.967 | 0.969 | 0.971 | 0.973 | 0.974 |
| **47** | 0.960 | 0.962 | 0.964 | 0.966 | 0.968 | 0.970 | 0.972 |
| **48** | 0.955 | 0.958 | 0.960 | 0.962 | 0.964 | 0.966 | 0.968 |
| **49** | 0.950 | 0.953 | 0.956 | 0.958 | 0.960 | 0.963 | 0.965 |
| **50** | 0.945 | 0.948 | 0.951 | 0.953 | 0.956 | 0.958 | 0.961 |
| **51** | 0.939 | 0.942 | 0.945 | 0.948 | 0.951 | 0.954 | 0.956 |
| **52** | 0.932 | 0.936 | 0.939 | 0.942 | 0.945 | 0.948 | 0.951 |
| **53** | 0.925 | 0.929 | 0.932 | 0.936 | 0.939 | 0.942 | 0.946 |
| **54** | 0.917 | 0.921 | 0.925 | 0.929 | 0.932 | 0.936 | 0.939 |
| **55** | 0.908 | 0.913 | 0.917 | 0.921 | 0.925 | 0.929 | 0.932 |
| **56** | 0.899 | 0.903 | 0.908 | 0.912 | 0.916 | 0.921 | 0.925 |
| **57** | 0.889 | 0.893 | 0.898 | 0.903 | 0.907 | 0.912 | 0.916 |
| **58** | 0.878 | 0.883 | 0.888 | 0.893 | 0.898 | 0.902 | 0.907 |
| **59** | 0.866 | 0.871 | 0.876 | 0.882 | 0.887 | 0.892 | 0.897 |
| **60** | 0.853 | 0.858 | 0.864 | 0.870 | 0.875 | 0.881 | 0.886 |
| **61** | 0.839 | 0.845 | 0.851 | 0.857 | 0.862 | 0.868 | 0.874 |
| **62** | 0.824 | 0.830 | 0.836 | 0.842 | 0.849 | 0.855 | 0.861 |
| **63** | 0.808 | 0.814 | 0.821 | 0.827 | 0.833 | 0.840 | 0.846 |
| **64** | 0.791 | 0.797 | 0.804 | 0.811 | 0.817 | 0.824 | 0.830 |
| **65** | 0.772 | 0.779 | 0.786 | 0.793 | 0.799 | 0.806 | 0.813 |

**Table V, continued**

**Table to Convert Credits to Joint and Survivor Options When Player's Beneficiary is Not His Spouse or When Player Had Attained Age 55 As Of September 1, 2007**

| Age of Player When Benefits Begin To Be Paid | Age of Beneficiary When Benefits Begin To Be Paid To Player | | | |
|---|---|---|---|---|
| | **67** | **68** | **69** | **70** |
| **45** | 0.978 | 0.980 | 0.981 | 0.982 |
| **46** | 0.976 | 0.977 | 0.979 | 0.980 |
| **47** | 0.973 | 0.975 | 0.977 | 0.978 |
| **48** | 0.970 | 0.972 | 0.974 | 0.976 |
| **49** | 0.967 | 0.969 | 0.971 | 0.973 |
| **50** | 0.963 | 0.965 | 0.968 | 0.970 |
| **51** | 0.959 | 0.961 | 0.964 | 0.966 |
| **52** | 0.954 | 0.957 | 0.959 | 0.962 |
| **53** | 0.949 | 0.952 | 0.955 | 0.957 |
| **54** | 0.943 | 0.946 | 0.949 | 0.952 |
| **55** | 0.936 | 0.940 | 0.943 | 0.946 |
| **56** | 0.929 | 0.933 | 0.936 | 0.940 |
| **57** | 0.921 | 0.925 | 0.929 | 0.933 |
| **58** | 0.912 | 0.916 | 0.921 | 0.925 |
| **59** | 0.902 | 0.907 | 0.912 | 0.916 |
| **60** | 0.891 | 0.896 | 0.902 | 0.907 |
| **61** | 0.879 | 0.885 | 0.891 | 0.896 |
| **62** | 0.867 | 0.873 | 0.878 | 0.884 |
| **63** | 0.852 | 0.859 | 0.865 | 0.871 |
| **64** | 0.837 | 0.844 | 0.850 | 0.857 |
| **65** | 0.820 | 0.827 | 0.834 | 0.841 |

**Table VI**
**Life and Ten-Year Certain Pension Option**

| Age | Percentage |
|-----|------------|
| 45 | 99.7% |
| 46 | 99.7 |
| 47 | 99.6 |
| 48 | 99.6 |
| 49 | 99.5 |
| 50 | 99.5 |
| 51 | 99.4 |
| 52 | 99.3 |
| 53 | 99.3 |
| 54 | 99.2 |
| 55 | 99.1 |
| 56 | 99.0 |
| 57 | 98.8 |
| 58 | 98.6 |
| 59 | 98.3 |
| 60 | 98.0 |
| 61 | 97.7 |
| 62 | 97.2 |
| 63 | 96.7 |
| 64 | 96.0 |
| 65 | 95.3 |
| 66 | 94.8 |
| 67 | 94.2 |
| 68 | 93.5 |
| 69 | 92.8 |
| 70 | 92.0 |

## EXECUTION

**IN WITNESS WHEREOF,** the NFLPA and the Management Council have caused this Bert Bell/Pete Rozelle NFL Player Retirement Plan restatement, effective as of April 1, 2021, to be executed.

**NATIONAL FOOTBALL LEAGUE**
**MANAGEMENT COUNCIL**

By: _____

Date: ___8/17/2021___

**NATIONAL FOOTBALL LEAGUE**
**PLAYERS ASSOCIATION**

By: _____

Date: ___17. August 2021___

97

**BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN**

**FIRST AMENDMENT**

The Bert Bell/Pete Rozelle NFL Player Retirement Plan, as amended and restated as of April 1, 2021, is hereby further amended as of the date this amendment is fully executed, as follows:

1.      Section 5.6 is amended to add new section (c) as follows:

(c)      Temporary Suspension.  The provisions of subsections (a) and (b) above are temporarily suspended as follows:

(1)      Players are not required to submit IRS Form 4506s as described in subsection (a) in calendar years 2020, 2021, 2022, and 2023, unless four or more voting members of the Retirement Board vote in favor of requiring a Player to submit such form, and

(2)      Players are not required to submit proof of continued receipt of Social Security disability insurance program or Supplemental Security Income program benefits as described in subsection (b) in calendar years 2020, 2021, 2022, and 2023, unless four or more voting members of the Retirement Board vote in favor of requiring a Player to submit such proof.

In all other respects, the provisions of subsections (a) and (b) remain in force in calendar years 2020, 2021, 2022, and 2023, including the requirement that Players must attend medical examinations as requested by three or more voting members of the Retirement Board as described in subsection (a).

In all cases, a Player's Plan T&P benefits will terminate if the Retirement Board or the Disability Initial Claims Committee determines that such Player is no longer totally and permanently disabled.

2.      Section 8.8 is amended by replacing reference to "prudent man" with "prudent person."

*          *          *          *

1

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this First Amendment to be executed.  This First Amendment may be executed in counterparts.

By: _____
NFL Players Association

By: _____
NFL Management Council

Date: 2 - 13 - 23

Date: 02/13/2023

2