# EXHIBIT Y

```
 1                  UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF TEXAS
 2                       DALLAS DIVISION

 3   ***************************************************************

 4   MICHAEL CLOUD,

 5        Plaintiff,

 6   VS.
                                      CASE NO.  3:20-cv-1277-S
 7
     THE BERT BELL/PETE ROZELLE
 8   NFL PLAYER RETIREMENT PLAN,

 9        Defendant.

10
     ***************************************************************
11
                       TRANSCRIPT OF BENCH TRIAL
12          HEARD BEFORE THE HONORABLE KAREN GREN SCHOLER
                    UNITED STATES DISTRICT JUDGE
13
                          MAY 23, 2022
14
     ***************************************************************
15

16   APPEARANCES:

17   FOR THE PLAINTIFF:           Christian Dennie
                                  BARLOW GARSEK & SIMON, LLP
18                                920 Foch
                                  Fort Worth, Texas 76107
19                                cdennie@bgsfirm.com

20                                Paul J. Vitanza
                                  BARLOW GARSEK & SIMON, LLP
21                                920 Foch
                                  Fort Worth, Texas 76107
22                                pvitanza@bgsfirm.com

23

24

25
```

Thu Bui, RMR, CRR    (214) 753-2354

```
 1                    A P P E A R A N C E S
                            (Continued)
 2

 3   FOR THE DEFENDANT:           Mr. Edward J. Meehan
                                  GROOM LAW GROUP CHARTERED
 4                                1701 Pennsylvania Avenue NW
                                  Washington, D.C. 20006
 5                                emeehan@groom.com

 6                                Michael Lee Junk
                                  GROOM LAW GROUP CHARTERED
 7                                1701 Pennsylvania Avenue NW
                                  Washington, D.C. 20006
 8                                mjunk@groom.com

 9                                Nolan Knight
                                  MUNSCH HARDT KOPF & HARR, PC
10                                3800 Lincoln Plaza
                                  500 North Akard Street
11                                Dallas, Texas 75201
                                  nknight@munsch.com
12

13   Official Court Reporter:     Thu Bui, CSR, RMR, CRR
                                  1100 Commerce Street, #1654
14                                Dallas, Texas 75242
                                  (214) 753-2354
15

16

17

18

19

20

21

22

23

24          Proceedings recorded by mechanical stenography,
25   transcript produced via computer.
```

```
 1                          I N D E X

 2

 3                                                    PAGE

 4   Appearances............................          1

 5   Proceedings............................          4

 6   JENNIFER CLOUD (by videotape)

 7            Direct         Cross
                             6
 8   DICK CASS (by videotape)

 9            Direct
              17
10
     DICK CASS
11            Direct         Cross
              36, 214        136, 216
12
     PATRICK REYNOLDS (by deposition)
13
              Direct         Cross
14            237            245

15   Adjournment............................          288

16   Reporter's Certificate.................          289
```

1  whole system worked, we had a medical advisor.  And the medical
2  advisor then helped us set up a network of independent neutral
3  physicians around the country.  And those independent neutral
4  physicians would be the ones who would do -- for the most part,
5  do the medical examination of a player, both at the initial
6  claims level and on appeal.
7       And then we had the third type of doctor we had.  In
8  addition to the medical director and the independent neutral
9  physicians, we had the medical advisory physician.  So we had
10 three types of doctors that were advising the board on
11 these -- on the various medical issues that confronted us.
12 Q.   Just to fill in a few details.  What was the role, as you
13 perceived it, of the Initial Claims Committee?
14 A.   The Initial Claims Committee would -- would make a
15 judgment on, you know, basically initial claims.  An
16 application would be filed with the Plan Benefits Office which
17 is in Baltimore.  They would pull together the papers, send it
18 out to the two members of the Initial Claims Committee.  And
19 like everything else in this process, it's a check-and-balance
20 system.
21      So there's two members of the Initial Claims Committee,
22 one appointed by the League and one appointed by the union.
23 And so that -- that would -- and then they would get it, they
24 would process the papers, they would receive a neutral
25 physician opinion.  And normally, based on that opinion, they

1  would decide it.
2      And, again, if they couldn't agree, it would be called a
3  "deemed denial" unless the medical advisory said, I think
4  this -- I think you're reading it wrong.  On this medical
5  issue, I think this is the way we should go; then that would
6  become the decision of the Initial Claims Committee.  So their
7  job was really to make the initial decision, and then -- then
8  it was up to the player to decide whether or not if -- if he
9  did get it, whether or not he wanted to appeal.
10 Q.  Okay.  Sir, you've talked a lot about doctors and medical
11 opinions.  You've also indicated that there was something
12 different about a reclassification request.  I want to bring
13 that out a little bit now.
14     Was it the practice of the board to always, each and every
15 case, send a claim out to a doctor?
16 A.  No, it was not.
17 Q.  And can you explain why some cases were not sent out to
18 the doctors?
19 A.  Well, I think --
20 Q.  At the board level, I should say?
21 A.  Yeah.  I mean, at the -- on appeal -- in this case, for
22 example, Mr. Cloud's case, we didn't think -- I didn't think
23 there was a medical issue involved because it was clear, I
24 thought, in this case --
25     MR. DENNIE:  I'm going to object, Your Honor.  It's not

1 personal knowledge. Lack of foundation.
2     THE COURT: Sustained. All his review for Mr. Cloud is
3 preparing for a deposition. He's already testified under oath
4 that he has no personal knowledge of what happened to
5 Mr. Cloud. So if he's pulling out Mr. Cloud, there needs to be
6 some kind of foundation as to why he didn't go to the doctor.
7 So the objection is sustained. For many reasons.
8 Q. Okay. Mr. Cass, I'm going to ask you a question, but I'm
9 going to ask you to confine yourself to your understanding of
10 the general process. We're not going to apply it to Mr. Cloud
11 at this point.
12 A. Okay.
13     THE COURT: The Court has heard nothing, direct
14 evidence, as to Mr. Cloud in the testimony to date. From what
15 this witness has said, he can not add to that other than
16 talking about generalities. If the Court is misunderstanding
17 that, please clarify.
18     You may ask your next question.
19     MR. MEEHAN: Okay. Thank you, Your Honor. Your Honor,
20 if it's acceptable to the Court, what I'm going to do is lay
21 out -- or give Mr. Cass an opportunity to lay out his general
22 approach.
23     THE COURT: Sure. And that's what you've been doing,
24 and I understand that. And you kind of diverted to something
25 he has no personal knowledge or memory of, as of I've been

1 advised.
2     MR. MEEHAN: Right. Sorry, Your Honor.
3     THE COURT: Why don't you just ask your next question.
4 And the objection's sustained.
5     MR. MEEHAN: Fair enough.
6 Q. Okay. So, Mr. Cass, we were going to -- what I'm asking
7 you is, was it the practice, in all cases, of the board to send
8 every claim out for a medical review at the board level?
9 A. It was not.
10 Q. Okay. And can you explain the situations in which the
11 board determined not to send a particular case out for an
12 additional medical review?
13 A. It would typically be an issue where there was not a
14 medical issue involved in the appeal -- where the board
15 determined that there was not a medical issue involved in the
16 appeal.
17 Q. And can you illustrate what types of issues the -- that
18 you, while you were on the board, had concluded were not
19 necessary to have a new medical --
20 A. There were times when reclassification opinions fell under
21 that category.
22 Q. Okay. And can you explain why, in your view,
23 reclassification opinions did not fall into that category?
24 A. It depended on the situation. There could be cases where
25 a reclassification case would require an opinion of a doctor.

1   But where -- in a situation where there's -- on its face, the
2   board did not believe that there was a -- that there was a new
3   impairment alleged, then it wouldn't -- it might well be a case
4   where there's no obligation to get a medical opinion because it
5   was not a medical issue.
6   Q.   Okay.  All right, sir.  Let me take you now back again to
7   your practices and your habits with respect to review of claims
8   and how these board meetings worked.
9       Were there materials available to you, as a board member,
10  to review in advance of board meetings that concerned these
11  disability claims?
12  A.   Yes.
13  Q.   Okay.  And can you describe how you accessed materials --
14  you know, how you went about that?
15  A.   There was a website you could go onto and read about the
16  cases.
17  Q.   And what types of materials were -- were posted on that
18  website?
19  A.   Usually the Administrative Record on appeal -- what I
20  understood to be the Administrative Record on appeal.
21  Q.   And what -- if you could give your understanding, what
22  does that term "Administrative Record on appeal" mean to you as
23  you were applying it while you were on the board?
24  A.   You know, it was -- it was whatever the player had
25  submitted either to the Initial Claims Committee.  It was the

Thu Bui, RMR, CRR     (214) 753-2354

1   medical opinions that had been rendered at the -- at the -- to
2   the -- at the Initial Claims Committee level.  It would include
3   whatever additional medical opinions had been received at the
4   appeal -- at the appellate level.  It would include
5   the -- whatever additional -- the player was allowed to submit
6   additional materials after the Initial Claims decision.  So it
7   would include, on appeal, of -- the Administrative Record would
8   exclude whatever additional materials the player had submitted.
9        It would also, generally, include, if there were prior
10  proceedings regarding the player where he had applied earlier
11  for other benefits under the disability plan, there would be
12  additional materials relating to that, typically.
13  Q.   And did you, sir, have a personal practice as to the type
14  of review you conducted of materials available to you on the
15  board concerning claims?
16  A.   I would look at the materials and see what -- try to
17  understand exactly what the issues were on appeal.  Then I
18  would look at the documents that I thought were pertinent to
19  that issue.
20  Q.   Okay.  Did you have criteria that you followed during the
21  time to help you determine what you thought were pertinent to
22  the issues when you're reviewing a reclassification claim?
23  A.   Well, I would -- on a reclassification claim?
24  Q.   Yes.
25  A.   You know, I always -- in looking at the appeal, I would

1    always -- whatever the appeal, I would generally look at
2    the -- many players would submit a letter with the appeal, or a
3    memo or something, so I would typically start with that, look
4    at that 'cause that would sort of indicate what the issues
5    were.  I would look at the decision of the Initial Claims
6    Committee -- the Initial Claims Committee letter.  I would
7    look -- if there were new materials submitted on appeal, I
8    would probably look at those if the player submitted something
9    new.
10        We also had a Plan summary that was on top, that I would
11   look at that.  Those are generally the things I would make sure
12   to look at.  And then, based on that, I might look at some
13   other materials.
14   Q.   Okay.  So have you now described your practice that you
15   followed in reviewing these reclassification claims while you
16   were on the board?
17   A.   Yes.
18   Q.   Let me step back a little bit to get a little broader
19   sense of how this worked.  The quarterly board meetings, over
20   what period of time were they conducted?
21   A.   It was always -- well, I wouldn't say always.  Maybe there
22   were some exceptions.  But almost always, as far as I can
23   remember, it was a two-day meeting.
24   Q.   And can you describe what happens on day one and then what
25   happens on day two?

1   A.   Well, I think --  you know, I think on day one it was
2   generally we would be meeting on financial issues and -- at the
3   board level.  Talking to the -- the financial meetings, getting
4   reports from the financial advisors, getting reports on various
5   matters relating to the pension plan and sort of aggregate
6   numbers on the disability plan.  But there's also a time in
7   between the meetings to talk to others.  And so it was a way
8   of -- you would get an idea of what other issues were in front
9   of us on the cases and on other matters.
10       And then, while we were formally meeting --  I mean, there
11  was -- ongoing work was going on on the cases among -- between
12  the union representatives and the League representatives.  And
13  Groom law firm.
14  Q.   All right.  And in the excerpts of your testimony that
15  were played, there were references to what was called
16  "premeetings."  Can you explain in more detail what were the
17  premeetings?
18  A.   Well, there was -- on the morning the second day, there
19  was a premeeting where the board members on -- for the NFL
20  would meet separately from the board members for the union.
21  And we would be -- at those meetings, there would be the
22  management -- in our meetings, we'd have the NFL lawyers,
23  the -- and also our outside -- the Akin Gump lawyers.  Staff of
24  the Plan Benefit Office would come in and give a report.
25  Perhaps, the Groom law firm lawyers would come in and give a

1  report.  And we would discuss the cases, among other things.
2  Q.   There was also a reference to a process of interacting
3  between the management side and the labor side concerning these
4  claims in advance of the formal vote on claims.  Can you
5  describe that?
6  A.   I think leading up to the meetings, and at the meetings,
7  the lawyers for both the -- the players union and for the NFL
8  would get together and discuss the cases.  And you would
9  have -- and then the Groom law firm would be involved, as well,
10 because there might be questions for them.  So -- and they
11 would see if there was a consensus on -- if they had major
12 disagreements on any -- on any of the appeals that were before
13 us at that upcoming meeting.
14 Q.   What was the purpose of the two sides -- management and
15 labor -- having these discussions in advance of the vote on any
16 claim?
17 A.   It was really to try to focus and present the issue to the
18 full board and to see -- to see if there's any disagreement.
19 As I said, because of the way the process here worked and it
20 was so heavily dependent on medical decisions, it was rare that
21 there was a disagreement.  And if there were a disagreement on
22 a medical issue, it usually resulted in sending it
23 out -- tabling the decision and sending it out for an
24 additional opinion from a medical advisory physician.
25 Q.   In the instances of reclassification appeals, what was the

1    purpose of having the two sides' advisors having these
2    premeeting discussions?
3    A.   Well, just to lay out the issues to see if they saw the
4    issues the same way so when they'd present it to the board,
5    each set of board members would know whether or not there was a
6    disagreement on the issue that had to be resolved.
7    Q.   And what was it -- as a board member -- you were expecting
8    the advisors to accomplish in those premeeting discussions?
9    A.   Really to identify issues for us that were -- if there was
10   a major disagreement and a problem.  You know, I think the way
11   the Plan is set up, if there's an agreement on a medical issue,
12   we sent it out to a medical advisory physician, as I've said a
13   couple of times.  If it's a disagreement on something else, you
14   would have to send it to arbitration, and that's what would
15   happen if you couldn't agree on an appeal.
16        I think in my 11 years on the board, while we had many,
17   many -- I don't want to call them disagreements, but a decision
18   basically to table it because it was uncertain, then it would
19   go out to a medical advisory opinion on medical issues.  But on
20   other issues -- I can recall one case where it went to
21   arbitration.  I don't even remember what that case was.  But in
22   the 11 years I was on the board, I only remember one case that
23   required us to go to arbitration.
24   Q.   Are you certain it was not the Michael Cloud case?
25   A.   It was -- it was not the Michael Cloud case.

1   Q.  Sir, the decision letters that were prepared --
2   A.  Yes.
3   Q.  -- reflecting board -- the board conclusion here, how did
4   that process --
5        MR. DENNIE:  I'm going to object 'cause that calls for
6   speculation for this witness.
7        THE COURT:  He didn't ask his question yet.  Overruled.
8   A premature objection.
9        MR. DENNIE:  I'll wait.  Sorry.
10  Q.  Sir, the process for drafting decision letters for the
11  board, can you explain, sir, why that was delegated to the
12  Groom Law Group?
13  A.  It really was a -- an issue of the way ERISA works and the
14  way our Plan worked.  Our Plan document really has to comply
15  with ERISA.  There's a provision in ERISA, as I understand it,
16  that requires once a board makes a decision on a disability
17  matter, we had to inform the affected person, in this case a
18  retired player, of our decision.  It had -- that decision had
19  to be -- go out -- the plan says five days.  We understood that
20  it was okay to be five business days.
21       And so that's -- that's -- we didn't have the -- there
22  wasn't time in a situation where you've got six board
23  members -- each board member lives in a different city.  We're
24  in a -- we're in yet another city where we're holding the board
25  meeting.  Most of the staff who was going to be doing the

```
 1                    REPORTER'S CERTIFICATE

 2             I, Thu Bui, CRR, RMR, Official Court Reporter,
     United States District Court, Northern District of Texas, do
 3   hereby certify that the foregoing is a true and correct
     transcript, to the best of my ability and understanding, from
 4   the record of the proceedings in the above-entitled and
     numbered matter.
 5

 6                              /s/ Thu Bui
                                Official Court Reporter
 7
```