# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF MARYLAND

# BALTIMORE DIVISION

| | |
|---|---|
| JASON ALFORD, DANIEL LOPER, WILLIS MCGAHEE, MICHAEL MCKENZIE, JAMIZE OLAWALE, ALEX PARSONS, ERIC SMITH, CHARLES SIMS, JOEY THOMAS, and LANCE ZENO, Individually and on Behalf of All Others Similarly Situated,<br><br>                     Plaintiffs,<br><br>      vs.<br><br>THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN; THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; THE BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN; THE DISABILITY BOARD OF THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; LARRY FERAZANI; JACOB FRANK; BELINDA LERNER; SAM MCCULLUM; ROBERT SMITH; HOBY BRENNER; and ROGER GOODELL,<br><br>                     Defendants. | **Case No. 1:23-cv-00358-JRR** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT RULE 12(b)(6) MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................. 1

STATEMENT OF FACTS .................................................................................... 1

    A.    The Plan ..................................................................................... 2

    B.    The Types of Disability Benefits the Plan Provides ................................. 2

    C.    The Benefit Claims Process ............................................................. 5

    D.    "Neutral Physicians" .................................................................... 5

    E.    Physician Bias Impacting Benefits Decisions......................................... 6

    F.    Plaintiffs' Benefits Applications ....................................................... 8

        1.    Plaintiff Jason Alford ........................................................... 8

        2.    Plaintiff Daniel Loper ........................................................... 9

        3.    Plaintiff Willis McGahee ....................................................... 9

        4.    Plaintiff Michael McKenzie....................................................11

        5.    Plaintiff Jamize Olawale ...................................................... 12

        6.    Plaintiff Alex Parsons .......................................................... 13

        7.    Plaintiff Charles Sims .......................................................... 14

        8.    Plaintiff Eric Smith ............................................................ 15

        9.    Plaintiff Joey Thomas .......................................................... 16

        10.    Plaintiff Lance Zeno ........................................................... 18

STANDARD OF REVIEW .................................................................................. 19

ARGUMENT—THE AMENDED COMPLAINT PLAINLY STATES
COGNIZABLE CLAIMS ................................................................................... 20

  I.    COUNT I STATES A WRONGFUL DENIAL OF BENEFITS CLAIM ......................... 20

    A.    The Plan's Language Demonstrates That the Board Acted Unreasonably .......... 21

    B.    The Board Acted Inconsistently with the Plan's Purpose and Goal.................... 24

    C.    The Inadequacy of the Materials Considered Demonstrates Unreasonableness .. 25

    D.    The Board's Interpretations Are Inconsistent with Other Plan Provisions .......... 26

    E.    The Board's Decision-Making Process Was Not Reasoned or Principled............ 26

    F.    The Board's Decisions Were Inconsistent with ERISA's Requirements ............. 27

    G.    The Board Also Acted Inconsistently with a Relevant External Standard............ 28

H.    Bad Faith Motives and Bias Affected the Decisions ................................ 28

II.   PLAINTIFFS STATE BREACH OF FIDUCIARY DUTY CLAIMS ............................. 33

A.    Defendants Breached Their Fiduciary Duty of Loyalty by Deceiving Players .... 33

B.    The Board Falsely Asserted in Its Decisions That It Reviewed All Evidence ...... 35

C.    Fiduciary Duties of Care and Loyalty Were Breached in Sundry Other Ways ..... 36

D.    Plaintiffs Plausibly Allege Discriminatory Treatment Based on Race ................ 37

E.    Breaches of Fiduciary Duties Based on Defendants' SPDs ................................. 37

      1.    Defendants Misrepresent That Players Will Receive a "neutral exam".... 38

      2.    Defendants Also Misrepresent in SPDs That Neutral Physicians Are "neutral physicians" ................................................................................. 39

      3.    Defendants' SPDs Failed to Reasonably Apprise Players of the Board's Plan-Wide True, Flawed Practices ................................. 39

F.    Plaintiffs Allege with Particularity a Breach of the Fiduciary of Loyalty Premised on a Plan-Wide Scheme to Defraud Players ......................... 40

G.    Defendants Breached Their Duty of Care by Not Exercising Prudence in Compensating, Rewarding, and Relying on Biased Physicians Who Performed Inadequately .............................................................. 43

H.    Defendants' Cumulative Conduct Establishes a Breach of Fiduciary Duties ....... 45

III.  COUNT IV PLEADS INJURIES AND SEEKS REMEDIES DISTINCT FROM A WRONGFUL DENIAL OF BENEFITS CLAIM ................................................. 45

IV.  COUNTS II AND III PLEAD DISTINCT, COGNIZABLE CLAIMS .......................... 52

V.   PLAINTIFFS STATE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ......... 57

CONCLUSION ..................................................................................................... 60

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acosta v. Chimes District of Columbia, Inc.*,
No. 15-3315, 2019, 2019 WL 931710 (D. Md. Feb. 26, 2019) .................................................. 36

*Acosta v. WH Administrators, Inc.*,
449 F. Supp. 3d 506 (D. Md. 2020) ........................................................................................ 57

*Adams v. Brink's Company*,
261 F. App'x 583 (4th Cir. 2008) ............................................................................................ 59

*Anglemyer v. WCS Construction, LLC*,
No. 8:18-cv-02198, 2019 WL 3458951 (D. Md. July 31, 2019) .............................................. 32

*Archer v. SunTrust Bank*,
No. 3:17-cv-616, 2017, 2017 WL 6550390 (E.D. Va. Dec. 22, 2017) ...................................... 51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................ 19, 20

*Augenstein v. McCormick & Company, Inc.*,
581 F. Supp. 452 (D. Md. 1984) .............................................................................................. 20

*Austin v. Continental Casualty Company*,
216 F. Supp. 2d 550 (W.D.N.C.2002) ..................................................................................... 25

*Bedrick ex rel. Humrickhouse v. Travelers Insurance Company*,
93 F.3d 149 (4th Cir. 1996) ............................................................................................ 29, 30

*Black & Decker Disability Plan v. Nord*,
538 U.S. 822 (2003) ................................................................................................................ 53

*Booth v. Wal-Mart Stores, Incorporated Associates Health & Welfare Plan*,
201 F.3d 335 (4th Cir. 2000) ................................................................................................... 21

*Boyd v. Coventry Health Care Inc.*,
828 F. Supp. 2d 809 (D. Md. 2011) ......................................................................................... 38

*Brewer v. Unum Group Corporation*,
622 F. Supp. 3d 1113 (N.D. Ala. 2022) .................................................................................. 27

*Brumm v. Bert Bell NFL Retirement Plan*,
995 F.2d 1433 (8th Cir. 1993) ........................................................................................ 22, 25

*Brundle ex rel. Constellis Employee Stock Ownership Plan v.*
*Wilmington Trust, N.A.*,
  919 F.3d 763 (4th Cir. 2019)............................................................. 36, 37, 43, 44, 45

*Burdette v. Mees*,
  933 F.2d 1001 (table), 1991 WL 84160 (4th Cir. May 23, 1991)............................................ 53

*Caplan v. CNA Financial Corporation*,
  544 F. Supp. 2d 984 (N.D. Cal. 2008) ........................................................ 27, 29, 30

*Carter v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
  No. CV-11-BE-3821-KOB, 2012 WL 6043050 (N.D. Ala. Dec. 3, 2012)............................... 25

*Chao v. Malkani*,
  452 F.3d 290 (4th Cir. 2006)................................................................ 59

*Chavis v. Plumbers and Steamfitters Local 486 Pension Plan*,
  No. ELH-17-2729, 2018 WL 4052182 (D. Md. Aug. 23, 2018) .............................. 58

*Christine S. v. Blue Cross Blue Shield of New Mexico*,
  428 F. Supp. 3d 1209 (D. Utah 2019)........................................................ 51

*CIGNA Corporation v. Amara*,
  563 U.S. 421 (2011)................................................................ 35, 38, 46, 49

*Clark v. Federal Express Corp.*,
  No. RDB-07-897, 2009 WL 10727182 (D. Md. Apr. 1, 2009)........................... 27, 51

*Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
  No. 3:20-CV-1277, 2022 WL 2237451 (N.D. Tex. June 21, 2022)....................... 1, 24, 26, 54

*Connecticut General Life Insurance Company v. Advanced Surgery*
*Center of Bethesda, LLC*,
  No. 14-2376, 2015 WL 4394408 (D. Md. July 15, 2015) ...................................... 51

*De Sole v. United States*,
  947 F.2d 1169 (4th Cir. 1991)................................................................ 20

*Demer v. IBM Corporation LTD Plan*,
  835 F.3d 893 (9th Cir. 2016)........................................................ 30, 31, 35

*Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
  No. 16-cv-01413-JD, 2016 WL 7971198 (N.D. Cal. June 14, 2016)........................... 51

*Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
  No. 16-cv-01413-JD, 2018 WL 1258147 (N.D. Cal. Mar. 12, 2018)................................... 26, 30

*Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
No. 19-cv-05360-JSC, 2022 WL 1786576 (N.D. Cal. June 1, 2022)............................ 22, 25, 40

*Doe v. Chesapeake Medical Solutions, LLC*,
No. SAG-19-2670, 2019 WL 6497962 (D. Md. Dec. 2, 2019) ................................. 20

*Donovan v. Mazzola*,
716 F.2d 1226 (9th Cir. 1983).................................................................... 44

*DuPerry v. Life Insurance Company of North America*,
632 F.3d 860 (4th Cir. 2011)..................................................................... 25

*Durakovic v. Building Service 32 BJ Pension Fund*,
609 F.3d 133 (2d Cir. 2010)...................................................................... 29

*E.I. du Pont de Nemours & Co. v. Kolon Industries, Incorporated*,
637 F.3d 435 (4th Cir. 2011)..................................................................... 19

*Edmonds v. Hughes Aircraft Company*,
145 F.3d 1324 (table), 1998 WL 228200 (4th Cir. May 8, 1998).......................... 58

*England v. Marriott International, Inc.*,
764 F. Supp. 2d 761 (D. Md. 2011) ........................................................ 49, 50

*Environmental Products Corporation v. King Companies, Inc.*,
47 F.3d 1164 (table), 1995 WL81740 (4th Cir. Feb. 21, 1995) ................................. 39

*Estate of Saunders v. Commissioner of Internal Revenue*,
745 F.3d 953 (9th Cir. 2014)..................................................................... 60

*Ethridge v. American Airlines, Inc.*,
No. 5:05-CV-630-H(2), 2007 WL 9718535 (E.D.N.C. Sept. 26, 2007).................................... 51

*Evans v. Eaton Corporation Long Term Disability Plan*,
514 F.3d 315 (4th Cir. 2008)..................................................................... 21

*Exact Sciences Corporation v. Blue Cross and Blue Shield of North Carolina*,
No. 1:16-CV-125, 2017 WL 1155807 (M.D.N.C. Mar. 27, 2017) ...................................... 51, 55

*Faircloth v. Lundy Packing Company*,
91 F.3d 648 (4th Cir. 1996)...................................................................... 58

*Firestone Tire and Rubber Company v. Bruch*,
489 U.S. 101 (1989) ........................................................................... 1, 20

*Frankenstein v. Host International, Inc.*,
No. 20-1100 PJM, 2021 WL 826378 (D. Md. Mar. 4, 2021) .................................. 37, 46, 50, 51

*Gardner, Jr. v. TIMCO Aviation Services, Inc.*,
No. 1:10-CV-429, 2010 WL 3282662 (M.D.N.C. Aug. 19, 2010) ........................................... 51

*Giles v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
925 F. Supp. 2d 700 (D. Md. 2012) ......................................................................................... 21

*Giles v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
No. ELH-12-634, 2013 WL 6909200 (D. Md. Dec. 31, 2013) .................................... 21, 22, 26

*Giraldo v. Building Service 32B-J Pension Fund*,
No. 04-CV-3595 (GBD), 2006 WL 380455 (S.D.N.Y. Feb. 16, 2006) .................................... 53

*Gordon v. CIGNA Corporation*,
890 F.3d 463 (4th Cir. 2018) .................................................................................................... 59

*Gore v. El Paso Energy Corporation Long Term Disability Plan*,
477 F.3d 833 (6th Cir. 2007) .................................................................................................... 51

*Gorski v. ITT Long Term Disability Plan for Salaried Employees*,
314 F. App'x 540 (4th Cir. 2008) ............................................................................................. 23

*Greenwell v. Group Health Plan for Employees of Sensus USA, Inc.*,
505 F. Supp. 3d 594 (E.D.N.C. 2020) ...................................................................................... 51

*Griggs v. E.I. DuPont de Nemours & Company*,
237 F.3d 371 (4th Cir. 2001) .................................................................................................... 34

*Guardian Life Insurance Company of America v. Reinaman*,
No. WDQ-10-1374, 2011 WL 2133703 (D. Md. May 26, 2011) ............................................ 50

*Hall v. Metropolitan Life Insurance Company*,
259 F. App'x 589 (4th Cir. 2007) ............................................................................................. 51

*Hall v. Metropolitan Life Insurance Company*,
398 F. Supp. 2d 494 (W.D. Va. 2005) ...................................................................................... 51

*Harris v. Hutchinson*,
209 F.3d 325 (4th Cir. 2000) .................................................................................................... 49

*Harrison v. Westinghouse Savannah River Company*,
176 F.3d 776 (4th Cir. 1999) .............................................................................................. 40, 42

*Hayes v. Prudential Insurance Company of America*,
   60 F.4th 848 (4th Cir. 2023) ................................................................... 48

*Hertz v. Hartford Life and Accident Insurance Company*,
   991 F. Supp. 2d 1121 (D. Nev. 2014) ................................................. 31, 34

*Hill v. Blue Cross and Blue Shield of Michigan*,
   409 F.3d 710 (6th Cir. 2005) ............................................................. 40, 52

*Howley v. Mellon Financial Corporation*,
   625 F.3d 788 (3d Cir. 2010) ................................................................... 49

*Huff v. Board of Governors of University of North Carolina*,
   334 F. App'x 583 (4th Cir. 2009) ............................................................ 48

*In re Birmingham*,
   846 F.3d 88 (4th Cir. 2017) ................................................................... 19

*In re Marshall*,
   261 F. App'x 522 (4th Cir. Jan. 2008) .................................................... 27

*Irwin v. Department of Veterans Affairs*,
   498 U.S. 89 (1990) ............................................................................... 48

*Jani v. Bell*,
   209 F. App'x 305 (4th Cir. 2006) ............................................................ 24

*Jenkins v. McKeithen*,
   395 U.S. 411 (1969) ............................................................................. 19

*Johnson v. NFL Player Disability, Neurocognitive & Death Benefit Plan*,
   No. 22-10327, 2023 WL 2059033 (E.D. Mich. Feb. 16, 2023) ................. 59

*Jorstad v. Connecticut General Life Insurance Company*,
   844 F. Supp. 46 (D. Mass. 1994) ........................................................... 53

*Juric v. USALCO, LLC*,
   No. JKB-22-0179, 2023 WL 2332352 (D. Md. Mar. 2, 2023) ................... 51

*Kasko v. Aetna Life Insurance Company*,
   33 F. Supp. 3d 782 (E.D. Ky. 2014) .................................................. 29, 31

*KDW Restructuring & Liquidation Services LLC v. Greenfield*,
   874 F. Supp. 2d 213 (S.D.N.Y. 2012) ..................................................... 59

*Keegan v. Steamfitters Local Union No. 420 Pension Fund*,
174 F. Supp. 2d 332 (E.D. Pa. 2001) ................................................................. 57

*Keir v. UnumProvident Corporation*,
No. 02 Civ. 8781 (DLC), 2003 WL 2004422 (S.D.N.Y. Apr. 29, 2003) .................. 44

*Koman v. Reliance Standard Life Insurance Company*,
No. 1:22CV595, 2022 WL 17607056 (M.D.N.C. Dec. 13, 2022).......................... 51

*Korotynska v. Metropolitan Life Insurance Company*,
474 F.3d 101 (4th Cir. 2006)......................................................................... 45, 46

*Lafleur v. Louisiana Health Service and Indemnity Company*,
563 F.3d 148 (5th Cir. 2009)................................................................................ 56

*Love v. National City Corporation Welfare Benefits Plan*,
574 F.3d 392 (7th Cir. 2009)................................................................................ 53

*Marchese v. JPMorgan Chase Bank, N.A.*,
917 F. Supp. 2d 452 (D. Md. 2013) ..................................................................... 19

*Massachusetts Mutual Life Insurance Company v. Russell*,
473 U.S. 134 (1985) ....................................................................................... 58, 59

*McCravy v. Metropolitan Life Insurance Company*,
690 F.3d 176 (4th Cir. 2012)............................................................................... 47

*Metropolitan Life Insurance Company v. Glenn*,
554 U.S. 105 (2008) ........................................................................................... 29

*Mickell v. Bell/Pete Rozelle NFL Players Retirement Plan*,
832 F. App'x 586 (11th Cir. 2020)............................................................. 24, 25, 39

*Moler v. University of Maryland Medical System*,
No. 1:21-cv-01824-JRR, 2022 WL 2756290 (D. Md. Jul. 13, 2022)............... 28, 32, 44

*Montage Furniture Services, LLC v. Regency Furniture, Inc.*,
966 F. Supp. 2d 519 (D. Md. 2013) ..................................................................... 60

*Moore v. Verizon Communications, Inc.*,
No. 1:22-cv-51 (RDA/IDD), 2022 WL 16963245 (E.D. Va. Nov. 15, 2022)............ 51

*Moyle v. Liberty Mutual Retirement Benefit Plan*,
823 F.3d 948 (9th Cir. 2016)............................................................................... 51

*Mylan Laboratories, Incorporated v. Matkari*,
    7 F.3d 1130 (4th Cir. 1993) ................................................................. 19

*National Foreign Trade Council v. Natsios*,
    181 F.3d 38 (1st Cir. 1999); ............................................................... 60

*Neitzke v. Williams*,
    490 U.S. 319 (1989) ........................................................................... 19

*O'Dell v. Zurich American Insurance Company*,
    No. 2:13-12894, 2015 WL 5724376 (S.D.W. Va. Sept. 29, 2015) ............ 53

*Otsuka Pharmaceutical Co., Ltd. v. Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012) ........................................................... 60

*Owens v. Baltimore City State's Attorneys Office*,
    767 F.3d 379 (4th Cir. 2014) ............................................................... 20

*Pennsylvania Chiropractic Association v. Blue Cross Blue Shield Association*,
    No. 09 C 5619, 2010 WL 1979569 (N.D. Ill. May 17, 2010) ................ 55

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
    905 F. Supp. 2d 675 (D. Md. 2012) ..................................................... 19

*Pancurak v. McFly's, Inc.*,
    No. 1:22-cv-2019, 2023 WL 2867485 (D. Md. Apr. 10, 2023) ............... 33

*Peters v. Aetna Inc.*,
    2 F.4th 199 (4th Cir. 2021) ........................................................... 57, 58

*Price v. UNUM Life Insurance Company of North America*,
    No. GJH-16-2037, 2018 WL 1352965 (D. Md. Mar. 14, 2018) ............... 31

*Rawls v. Unum Life Insurance Company of America*,
    219 F. Supp. 2d 1063 (C.D. Cal. 2002) ................................................ 52

*Rogers v. Jefferson-Pilot Life Insurance Company*,
    883 F.2d 324 (4th Cir. 1989) ............................................................... 20

*Sconiers v. First Unum Life Insurance Company*,
    830 F. Supp. 2d 772 (N.D. Cal. 2011) ................................................. 51

*Scott v. PNC Bank Corp. & Affiliates Long Term Disability Plan*,
    No. WDQ-09-3239, 2011 WL 2601569 (D. Md. June 28, 2011) ............ 53

*Shea v. Esensten*,
  107 F.3d 625 (8th Cir. 1997) ........................................................................ 35, 38

*Skinner v. Switzer*,
  562 U.S. 521 (2011) ............................................................................................ 19

*Sloan v. Life Insurance Company of North America*,
  No. BPG-18-3055, 2019 WL 6173410 (D. Md. Nov. 20, 2019) ........................ 47, 50

*Smith v. Sydnor*,
  184 F.3d 356 (4th Cir. 1999) ............................................................................. 28

*Soland v. George Washington University*,
  916 F. Supp. 2d 33 (D.D.C. 2013) ...................................................................... 51

*Solomon v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
  No. MJG-14-3570, 2016 WL 852732 (D. Md. Mar. 4, 2016) .......................... 21, 25

*State Farm Mutual Automobile Insurance Company v. Carefree Land
  Chiropractic, LLC*,
  No. 18-CV-1279, 2019 WL 4722675 (D. Md. Sept. 25, 2019) ........................ 40, 42

*State Farm Mutual Automobile Insurance Company v. Slade Healthcare, Inc.*,
  381 F. Supp. 3d 536 (D. Md. 2019) ..................................................................... 40

*Stewart v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*,
  No. WDQ-09-2612, 2012 WL 2374661 (D. Md. June 19, 2012) .......................... 23, 25, 26, 27

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ........................................................................................... 31

*United States v. White*,
  879 F.2d 1509 (7th Cir. 1989) ........................................................................... 60

*Virginia Citizens Defense League v. Couric*,
  910 F.3d 780 (4th Cir. 2018) ............................................................................. 19

*Varity Corporation v. Howe*,
  516 U.S. 489 (1996) ................................................................................. 1, 34, 46

*Watson v. UnumProvident Corp.*,
  185 F. Supp. 2d 579 (D. Md. 2002) ........................................................ 27, 35, 43

*Waugh Chapel South, LLC v. United Food and Commercial Workers
  Union Local 27*,
  728 F.3d 354 (4th Cir. 2013) ............................................................................. 32

*Weaver v. Phoenix Home Life Mutual Insurance Company,*
   990 F.2d 154 (4th Cir. 1993) ........................................................................... 53

*Wheeless v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan,*
   39 F. Supp. 2d 577 (E.D.N.C. 1998) ............................................................... 55

*White Glove Staffing, Incorporated v. Methodist Hospitals of Dallas,*
   947 F.3d 301 (5th Cir. 2020) ........................................................................... 60

*Willett v. Blue Cross & Blue Shield of Alabama,*
   953 F.2d 1335 (11th Cir. 1992) ................................................................. 36, 37

*Woods v. City of Greensboro,*
   855 F.3d 639 (4th Cir. 2017) ........................................................................... 19

## Statutes

Pub. L. No. 93-406, 88 Stat. 829 (1974) ............................................................... 1

29 U.S.C. § 1002(1) ................................................................................................ 2

29 U.S.C. § 1002(7) ................................................................................................ 2

29 U.S.C. § 1002(16)(A) ......................................................................................... 2

29 U.S.C. § 1002(21)(A) ....................................................................................... 57

29 U.S.C. § 1002(37) .............................................................................................. 2

29 U.S.C. § 1102(a)(2) ............................................................................................ 2

29 U.S.C. § 1104 ................................................................................................... 33

29 U.S.C. § 1104(a)(1) ............................................... 1, 34, 38, 39, 40, 41, 48

29 U.S.C. § 1104(a)(1)(B) .......................................................... 1. 36, 43. 44

29 U.S.C. § 1105(a)(1) .......................................................................................... 36

29 U.S.C. § 1109(a) ............................................................................................... 58

29 U.S.C. § 1132(a)(1)(B) ............................................................................. *passim*

29 U.S.C. § 1132(a)(2) .......................................................................................... 58

29 U.S.C. § 1132(a)(3) ................................................................ *passim*

29 U.S.C. § 1132(d)(2) ................................................................ 57

29 U.S.C. § 1133(1) ................................................................ 34, 35, 53

29 U.S.C. § 1133(2) ................................................ 28, 34, 35, 36, 44, 55

## Rules

Fed. R. Civ. P. 20(a)(1)(B) ................................................................ 60

## Regulations

29 C.F.R. § 2560.503-1(b)(1) ................................................................ 53

29 C.F.R. § 2560.503-1(b)(5) ................................................................ 56

29 C.F.R. § 2560.503-1(d) ................................................................ 53

29 C.F.R. § 2560.503-1(h)(3)(ii) ................................................................ 56

29 C.F.R. § 2560.503-1(h)(4) ................................................................ 56

29 C.F.R. § 2560.503-1(l)(2)(i) ................................................................ 27

29 C.F.R. § 2560.503-1(m)(8) ................................................................ 57

29 C.F.R. § 2560.503-1(m)(8)(iii) ................................................................ 57

## Other Authorities

*Black's Law Dictionary* (11th ed. 2019) ................................................ 23, 39, 59

## INTRODUCTION

Congress enacted the Employee Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat. 829 (1974) ("ERISA"), "to protect contractually defined benefits" and "the interests of participants," and to "ensur[e] that the individual participant knows exactly where he stands." *Varity Corp. v. Howe*, 516 U.S. 489, 513 (1996); *accord Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989). ERISA imposed obligations on plan fiduciaries who must "discharge [their] duties ... solely in the interest of the participants," and exercise "care, skill, prudence, and diligence" under the circumstances. 29 U.S.C. § 1104(a)(1), (a)(1)(B).

As one court put it last year, however, once "[t]he curtain ... [is] pulled back" as to this plan's inner workings "what lies behind it is far from pretty." *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2022 WL 2237451, at *1, *44 (N.D. Tex. June 21, 2022) (concluding that Board "shirked its fiduciary obligations under both ERISA and the Plan itself"), *appeal pending*, No. 22-10710 (5th Cir. arg. scheduled Sept. 7, 2023). The facts detailed here warrant extraordinary relief for the good of plan participants and the plan itself. To suggest, as Defendants do in their motion to dismiss, that the Court ignore detailed facts grounded in relevant, admissible documents from Defendants' own files and sworn testimony concerning the same plan simply defies logic. As discussed below, Plaintiffs plead viable ERISA claims—not only as to their individual denial of benefits claims, but also as to their challenges to Defendants' systemic abuses of the process and breaches of fiduciary duties—and Defendants' sundry arguments to the contrary are meritless.

## STATEMENT OF FACTS

The ten plaintiffs ("Plaintiffs")—in alphabetical order, Jason Alford, Daniel Loper, Willis McGahee, Michael McKenzie, Jamize Olawale, Alex Parsons, Charles Sims, Eric Smith, Joey Thomas, and Lance Zeno—are retired NFL players ("Players") who applied for one or more of the disability benefits available under the NFL Player Disability & Survivor Benefit Plan and NFL

Player Disability & Neurocognitive Benefit Plan (collectively, the "Plan").  ¶¶ 1, 147-266.[1]

### A.    The Plan

The Plan is an employee welfare benefit plan, as defined in ERISA § 3(1), 29 U.S.C. § 1002(1).  ¶ 16.  It is jointly administered by employee and employer representatives and is a multi-employer plan as defined in ERISA § 3(37), 29 U.S.C. § 1002(37).  ¶ 31.  According to testimony given in *Cloud*, the Plan's assets exceed $9 billion.  ¶ 17.  Plaintiffs are participants in the Plan, as that term is defined in ERISA § 3(7), 29 U.S.C. § 1002(7).  ¶ 14.  A seven-member Disability Board ("Board") serves as the Plan's Administrator, as that term is defined in ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), and is its named fiduciary within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2).  ¶¶ 19, 39.[2]

### B.    The Types of Disability Benefits the Plan Provides

The Plan provides for three general categories of disability benefits to eligible Players (as defined in the Plan):  Total and Permanent (or "T&P") Disability benefits; Line of Duty (or "LOD") Disability benefits; and Neurocognitive Disability (or "NC") benefits.  ¶¶ 32, 59-81.  For all three benefits, a "Neutral Physician" (*see* Section D, *infra*) must find a Player meets the Plan's

---

[1] "¶"and "¶¶" refer to the Amended Class Action Complaint (ECF No. 56), and "DM" refers to pages of the Memorandum in Support of Defendants' Joint Rule 12(b)(6) Motion to Dismiss Plaintiffs Amended Class Action Complaint (ECF No. 69-1).  Except where otherwise indicated, citations, quotation marks, and footnotes are omitted from quotations and emphasis is added.

[2] The Board has 6 voting members—3 appointed by the NFL's Management Council (NFL team owners) and 3 by the National Football League Players Association ("NFLPA") (the players' union).  ¶¶ 19, 44.  Defendants Larry Ferazani, Belinda Lerner, Jacob Frank, Sam McCullum, Robert Smith, and Hoby Brenner are the Board's six voting members.  ¶ 20.  Messrs. Ferazami and Frank and Ms. Lerner are its NFL Management Council appointees, while Messrs. McCullum, Smith, and Brenner are its NFLPA appointees.  *Id.*  Defendant Roger Goodell, the NFL's Commissioner, is the Board's non-voting honorary Chairman.  *Id.*  Pursuant to section 9.1 of the Plan (which Defendants have annexed as an exhibit in their motion papers (ECF No. 69-7)), "the Commissioner or, in his absence, his designee, will preside at all meetings of the Board."  ¶ 44.

standard and must provide a complete report on the Player's disability(ies) as necessary for the Disability Initial Claims Committee ("Committee") or the Board "to make an adequate determination" on the Player's benefits claim.  ¶¶ 46, 71, 76, 80.[3]  Although the Plan requires that, for all three benefits, Committee or Board members must review *all* facts and circumstances in the administrative record before rendering a decision (¶¶ 37, 41), courts in recent years have found that they fail to review all facts and circumstances in the administrative record.  *E.g.*, ¶¶ 21, 173.

 ***T&P Disability Benefits***.   There are four subcategories of T&P benefits:  (i) Active Football (paying $265,000 annually), (ii) Active Nonfootball (paying $165,000), (iii) Inactive A (paying $135,000), and (iv) Inactive B (paying $65,000).  ¶ 63.  An eligible Player may receive Active Football benefits if (i) his "disability(ies)" "arises out of League football activities while he is an Active Player," and causes him to be T&P disabled; and (ii) the Plan receives his application within 18 months after he ceases to be an Active Player.  ¶ 64.  (Prior versions of the Plan required that the disability(ies) have rendered the Player T&P disabled shortly after the disability(ies) first arose.  *Id.*)   "[A]rises out of League football activities" means a disablement arising out of any League game (pre-, post-, or regular-season) or out-of-League football activity supervised by an Employer, including all required or directed activities.  ¶ 67.  A "psychological/psychiatric disorder" may qualify for Active Football if a Player meets any of three Plan-specified requirements.  ¶ 69.  A Player's educational level and prior training are not to be considered in determining whether he is T&P disabled.  ¶ 61.  The cumulative impact of a Player's impairments must be considered, and objective medical evidence is not required.  ¶¶ 86-87.

---

[3] Applicants who receive Social Security disability benefits, however, are *ipso facto* deemed T&P disabled, and are not required to be evaluated by a "Neutral Physician."  ¶ 70.  Also, for LOD disability benefits applications received on or after April 1, 2020, a Player who submits sufficient medical records is not subject to evaluation by a Neutral Physician.  ¶ 76.

According to the district court in *Cloud*, out of the thousands of Players who have applied for T&P benefits, as of 2022 a mere 30 Players were receiving Active Football T&P benefits.  ¶ 65.[4]

***LOD Disability Benefits.*** Players are eligible for LOD benefits if they incurred a "substantial disablement" "arising out of League football activities."  ¶ 72.  "Arising out of League football activities" has the same meaning as it does for T&P disability benefits purposes.  ¶ 73.  A "substantial disablement" either (1) rates at least 10 points (or at least 9 points for applications received on and after April 1, 2020) on the Plan's point system; (2) "[i]s the primary or contributory cause of the … major functional impairment of a vital bodily organ or part of the central nervous system"; or (3) meets other requirements listed in the Plan.  *Id.*  Previously, Players could receive LOD disability benefits for a major functional impairment of the brain (e.g., a post-concussion syndrome).  ¶ 75.  For orthopedic impairments, the Plan employs a point system under which a Player will receive points for each occurrence of each listed impairment in the Plan's tables (*e.g.*, "Symptomatic Shoulder Instability" is worth 3 points).  ¶ 74.

***NC Disability Benefits.***   NC benefits are available to Players who have a "mild neurocognitive" or "moderate neurocognitive" impairment, which are defined in the Plan.  ¶¶ 77-78.  An impairment need not arise out of League football activities, but if it results primarily from a non-cognitive condition such as depression, the Player may not qualify.  ¶¶ 79-80.  Despite the extremely high prevalence of cognitive impairments among Players (*see* ¶¶ 26-27), only 124 were receiving NC benefits as of 2018.  ¶ 81.

---

[4] Active Nonfootball eligibility does not require that the disability(ies) arose out of League football activities.  *See* ¶ 66.  Inactive A benefits are available to an eligible Player whose T&P disability(ies) does not qualify him for either Active Football or Active Nonfootball, so long as his application is received within 15 years after the end of his last Credited Season.  ¶ 68.  Inactive B benefits are available to a Player whose T&P disability(ies) does not entitle him to any of the 3 other categories.  ECF No. 69-7 at 16 (Plan § 3.4(d)).

### C.    The Benefit Claims Process

The Committee renders the initial decision on Players' benefits claims.  ¶ 35.  It consists of 3 members, one each appointed by the NFL Management Council and the NFLPA, and one who is the Plan's Medical Director, jointly designated by the NFLPA and the NFL Management Council.  *Id.*    If the Committee's NFLPA and NFL Management Council appointees are deadlocked on a claim, it will be treated as a "deemed denial."  ¶ 36.  Players may appeal Committee decisions to the Board, which may not accord any deference to the Committee's determination.  ¶ 38.  As required by both ERISA and the Plan, the Board's review must take into account *all* available information, documents, and evidence, irrespective of whether that information was presented or available to the Committee.  ¶ 40.  If three or more Board members conclude that a specific medical issue exists as to whether a Player qualifies for a benefit, the Board may submit the issue to a "Medical Advisory Physician" ("MAP") for a final decision.  ¶ 56.  Like "Neutral Physicians" (*see* Section D, *infra*), an MAP must provide complete reports on the Player's disability(ies) as necessary for the Board to make an "adequate determination."  ¶¶ 46, 57.  Should a question arise as to whether the MAP has properly applied Plan terms, the Board must bring such questions to the MAP's attention.  ¶ 58.

### D.    "Neutral Physicians"

Section 12.3 of the Plan requires that the Board "maintain a network of 'Neutral Physicians' to examine Players who apply for benefits under this Plan."  ¶ 45.  *Id*.  Players are oftentimes forced to travel long distances for examinations by these physicians of Defendants' choosing, and such travel has sometimes exacerbated their conditions.  ¶ 54.[5]

---

[5] That is no small irony given changes to settlement implementation rules in the multidistrict *NFL Players' Concussion Injury Litigation* settlement that the NFL successfully lobbied for to

A Neutral Physician must provide a complete report on the Player's disability as necessary for the Committee or Board "to make an adequate determination" on the Player's benefits claim. ¶ 46.  The Plan provides that the Committee and Board cannot "make an adequate determination" on the Player's benefits claim if a Neutral Physician renders an incomplete, inconsistent, flawed, or otherwise insufficient report respecting a Player's condition.  ¶ 113.  Neutral Physicians are paid a "flat-fee" for each evaluation, but the Plan does not limit the annual or total compensation they may earn from the Plan. ¶ 49.  Although ERISA-mandated notices and decision letters inform Players that the Neutral Physicians are *absolutely neutral*" in the claims process and that the examinations they perform are "*neutral* exams," the Plan does not state that Neutral Physicians are indeed neutral.  ¶¶ 51, 53.  The Board has rejected Players' requests for information pertaining to Neutral Physicians' neutrality, including statistics concerning their rate of finding of disability, insisting that it does not maintain such statistics.  ¶¶ 51, 55.

### E.    Physician Bias Impacting Benefits Decisions

In reality, many "Neutral Physicians" have proven to be anything but neutral.  Statistical evidence—based on 784 compiled T&P benefits Neutral Physician reports—strongly suggests that the more that Defendants compensate their maintained physicians, the higher the likelihood that they will render result-oriented opinions adverse to benefits applicants.  ¶¶ 107, 116, 137; *see generally* ¶¶ 116-46.  For example, across 51 evaluations in the statistical sample of 784 T&P reports that were rendered by 7 physicians whom Defendants have compensated an average of $200,000 or more annually, all 7 have a 100% T&P denial rate.  ¶ 117.  This includes Defendants' highest-paid neurologist since 2012, Dr. Barry McCasland, who received $373,000 in the most

---

prevent what it claimed was physician-shopping by applicants.  ¶ 54 n.6.  Revised rules adopted in 2019 impose tight radius limits for physician and neuropsychological examinations.  *See id.*

recent year, more than $1.8 million in total from the Board, and has a 100% T&P denial rate across all 24 T&P disability evaluations he rendered in the sample. ¶¶ 146, 164. Also, Dr. McCasland has expressed his predispositions that "[t]he likelihood of any headache disorder constituting a total disability … is practically zero," and "if somebody has progressively worsening and worsening and worsening symptoms, it just can't be due to a concussion." ¶¶ 166, 181. One recent court noted concerns with his Player evaluation. ¶ 165.

In contrast, across all T&P evaluations in the sample that were rendered by physicians whom Defendants have compensated an average of $50,000 or less annually, nearly 26% of Players were found T&P disabled. ¶ 120; *see* ¶¶ 136-45 (identifying highest-paid physicians for each year from April 1, 2015 to March 30, 2022 and their evaluation histories overwhelmingly adverse to Players, and contrasting lower-paid physicians' evaluation history). Overall, the statistical sample shows that, out of 118 different Defendant-compensated physicians who rendered at least one T&P evaluation, nearly 3 out of 5 physicians have a 100% T&P benefits denial rate. ¶ 146.

Similarly, despite the high prevalence of neurocognitive impairments in Players, *all 14* neuropsychologists having the highest average annual compensation from Defendants have a 100% T&P denial rate across the combined 107 T&P evaluations they performed in the sample of 784 T&P reports. ¶ 122. This group includes MAP Dr. William Garmoe, who has been paid at least $1,351,000 and whose public statements have manifested a predisposition towards rejecting traumatic brain injury ("TBI")-based disability claims. ¶¶ 124-26, 157; *see also* ¶¶ 129-35 (highest-paid neuropsychologists for each year from Apr. 1, 2015 to Mar. 30, 2022, and their evaluation histories overwhelmingly adverse to Players). One court excluded Dr. Garmoe's testimony because he failed to "adequately connect[] the dots" between the information available to him and his conclusion. ¶ 126. This group also includes the Board's highest-paid

neuropsychologist since 2012, Dr. Stephen Macciocchi, who has received well over $1.6 million, and who endorsed discriminatory treatment of African-Americans, marketed that he was a lead reviewer for the NFL in defending against TBI-related claims, and promoted that he "will inform on ways to *defeat or mitigate these claims* based on current science and *explore how best to convince a jury that a plaintiff's brain is hard boiled and not scrambled*."  ¶¶ 127-28.

Across the 199 total T&P reports rendered by all neuropsychologists in the sample, only 14 Players were deemed T&P disabled (*i.e.*, an overall denial rate of nearly 93%), and 26 out of the 35 neuropsychologists in the sample who provided at least one T&P report have a 100% T&P benefits denial rate.  ¶¶ 124-25.   In contrast, neuropsychologists having an annual average compensation of $50,000 or less concluded that 25% of the Players were T&P disabled.  ¶ 123.

### F.    Plaintiffs' Benefits Applications

#### 1.    Plaintiff Jason Alford

Plaintiff Alford suffered repetitive head trauma from NFL football play and still experiences cognitive symptoms.  ¶ 257.  He applied for NC benefits in 2019.  ¶ 258.  Mr. Alford was examined by neuropsychologist Dr. Robert Bornstein, who has received at least $637,500 in compensation from the Plan, and a sample of 12 T&P disability evaluations that he rendered shows that he found no Player qualified.  *Id.*   Dr. Bornstein concluded that Mr. Alford did not qualify for NC benefits and inconsistently reported that "overall pattern of performance *does* suggest a clear pattern of cognitive impairment.  Therefore[,] these results *do not* provide evidence of acquired neurocognitive impairment."  *Id.*   The Committee denied Mr. Alford's application, and the Board affirmed the denial in February 2020.  ¶ 260. The Board represented in its decision that it had "reviewed *all* of the evidence in [Mr. Alford's] Plan file."  *Id.*

Mr. Alford applied again for NC benefits in 2022.  ¶ 261.  He was examined by a neurologist and neuropsychologist, samples of whose evaluations showed a 100% benefits denial

rate.  ¶¶ 261-62.  Mr. Alford appealed the Committee's April 2022 denial of his application to the Board.  ¶¶ 263-64.  He was then examined by neurologist Dr. McCasland, who has confirmed that "a hundred percent" of his "witness work was for defendants, insurance companies or defense lawyers."  ¶¶ 166, 264-65; *see* ¶¶ 130, 134-35, 164-65, 181.  Because Dr. McCasland discounted evidence weighing in Mr. Alford's favor, including short-term memory problems, the Board denied Mr. Alford's appeal in March 2023.  ¶¶ 265-66.

### 2.    **Plaintiff Daniel Loper**

Plaintiff Loper applied for LOD disability benefits in March 2018, and was evaluated by orthopedist Dr. Herndon Murray, who has earned at least $1.1 million from the Plan and found no Player T&P disabled in a sample of 10 evaluations that he rendered.  ¶ 203; *see* ¶¶ 134, 171.  Dr. Murray awarded Mr. Loper only 6 of the 10 points needed to qualify for LOD benefits.  ¶ 203.  After the Committee denied his application in April 2018, Mr. Loper appealed to the Board.  ¶¶ 205-06.  Mr. Loper was then examined by orthopedist Dr. Glenn Perry, who has earned nearly $2 million from the Plan and showed a 100% denial rate across all of his T&P evaluations in the sample.  ¶ 206.  Dr. Perry awarded Mr. Loper only 6 LOD points.  *Id.*  The Board denied Mr. Loper's appeal in February 2019.  ¶ 207.  Plaintiff Loper applied again for LOD disability benefits in March 2020.  ¶ 208.  He was examined by orthopedist Dr. David Apple, who has earned nearly $2.5 million from the Plan and has a 100% T&P denial rate.  ¶ 209.  Dr. Apple overlooked several impairments that required an award of points, awarded Mr. Loper only 3 LOD points, and ignored or was unaware of a crucial amendment to the Plan.  ¶ 210.  The Board denied Mr. Loper's appeal in January 2021, rubber-stamping Dr. Apple's erroneous conclusion.  ¶¶ 211-12.  In its decision letter, the Board represented that it had reviewed the entire record.  ¶ 214.

### 3.    **Plaintiff Willis McGahee**

Plaintiff McGahee, who played in the NFL for 11 seasons, applied for T&P benefits in

2016.  ¶¶ 162-63.  In connection with his application, Mr. McGahee was examined by neurologist Dr. McCasland, who asserted that Mr. McGahee was not T&P disabled, failing to address the cumulative impact of his impairments.   ¶¶ 164, 166. Mr. McGahee was also evaluated by neuropsychologist Dr. Rodney Vanderploeg, who has earned over $1.1 million from the Plan.  ¶ 167.  Dr. Vanderploeg found Mr. McGahee not disabled, failing to consider the cumulative impact of his impairments and improperly considering Mr. McGahee's "demographic background."  *Id.*[6] The Committee denied his application, without identifying the evidence it had considered.  *Id.*

In 2020, Mr. McGahee applied again for T&P benefits, and was evaluated by several physicians, including Dr. Martin Strassnig. the Board's highest-paid psychologist during the April 1, 2020-March 31, 2021 period, and who found no Player disabled in a sample of 15 T&P evaluations that he rendered.  ¶¶ 130, 168.  Dr. Strassnig opined that Mr. McGahee was not T&P disabled.  ¶ 169.  A neuropsychologist who examined Mr. McGahee, Dr. Thomas Crum, failed to address the combined impact of his impairments and likewise improperly considered his "demographic."  *Id.*  In a March 2021 denial letter, the Committee failed to address Mr. McGahee's claim that the cumulative effect of his ailments rendered him T&P disabled.  ¶ 170.  Mr. McGahee timely appealed to the Board and was then evaluated by several physicians.  ¶¶ 171-73.[7]  The

---

[6] In the multidistrict *NFL Players' Concussion Injury Litigation* settlement, the parties negotiated modifications to the settlement agreement that proscribe the use of race norms and demographic estimates based on race from the settlement program.  ¶ 182 n.16.

[7] Among them was psychiatrist Dr. Matthew Norman, who has been compensated at least $884,000 and found 31 Players not disabled in a sample of 33 whom he evaluated.   ¶ 171.  Dr. Norman failed to address whether Mr. McGahee was T&P disabled from the cumulative impact of his impairments.  *Id.*  Neurologist Dr. Matthew Gwynn dismissed Mr. McGahee's self-reported symptoms and even his own objective evidence and admission that his cognitive test score indicated cognitive impairment.   ¶ 172.  Neuropsychologist Dr. Jason King opined that Mr. McGahee was not T&P disabled, despite noting that he suffered from "clinically significant depression," failing to consider the combined impact of Mr. McGahee's impairments and giving little to no weight to his self-reported symptoms.  *Id.*

Board denied his appeal on November 22, 2022, failing to address the cumulative effect of his conditions, which he had listed as a disabling condition on his application. ¶ 173. It represented that "the Plan's physicians are absolutely neutral" and that it had reviewed the entire record. *Id.*

### 4.    Plaintiff Michael McKenzie

Plaintiff McKenzie played in the NFL for 11 years. ¶ 175. He applied for T&P benefits in December 2018, and was evaluated by, among others, neurologist Dr. Eric Brahin, who has received at least $1,711,000 in compensation, and has a history of conducting inadequate examinations and rendering questionable opinions downplaying the impact of TBIs. ¶ 178. Due to the severity of Mr. McKenzie's conditions and the added stress resulting from his being forced to travel long distances for numerous examinations over a short period of time, Dr. Brahin terminated his examination early due to "serious psychiatric issues" that necessitated "emergent psychiatric" care for Mr. McKenzie. ¶ 177. Despite this, Dr. Brahin opined that Mr. McKenzie was not T&P disabled. *Id.*[8]

Mr. McKenzie appealed the Committee's denial to the Board. ¶ 180. He was evaluated by neurologist Dr. McCasland, who failed to address the overall impact of his impairments and explicitly discounted his headache disorder based on his predetermined views, self-reported symptoms, and objective evidence. ¶ 181. Neuropsychologist Dr. Macciocchi also evaluated Mr. McKenzie, opining that he could perform an "occupation consistent with educational and experiential background and interest"—contrary to the Plan's provision that educational level will not be considered—and applied discriminatory race norms to his test results. ¶ 182. The Board

---

[8] Mr. McKenzie was also evaluated by neuropsychologist Dr. Janyna Mercado, who has averaged annual Plan compensation of $211,000, and a sample of 14 reports that she provided shows that she found no Player qualified. ¶ 179. She concluded that Mr. McKenzie was not T&P disabled, despite finding that, based on his fragile psychological state, he would not likely be able to maintain employment. *Id.*

denied Mr. McKenzie's appeal in November 2019, failing to address the combined effect of his ailments, which he had listed as a disabling condition on his application, and representing that it had reviewed the entire administrative record.  ¶ 184.

Plaintiff McKenzie applied again for T&P benefits in April 2021.  ¶ 185.  One of the physicians who evaluated him was neurologist Dr. Clark, who concluded that he was not T&P disabled, despite reporting a "totally" disabling psychiatric status.  *Id.*  The Committee denied Mr. McKenzie's application, failing to mention that he claimed benefits based on the cumulative impact of his impairments or Dr. Clark's finding that he appeared totally disabled.  ¶ 186.   Mr. McKenzie appealed the denial to the Board.  ¶ 187.[9]  The Board denied his appeal on June 6, 2022, erroneously stating that he was ineligible for NC benefits—even though what he had applied for was T&P benefits—and representing that it had reviewed all of the evidence.  ¶ 189.

### 5.    Plaintiff Jamize Olawale

Plaintiff Olawale played in the NFL for eight credited seasons.  ¶ 195.  He applied for T&P, LOD, and NC disability benefits in March 2021, and was evaluated by orthopedist Dr. Paul Saenz, who failed to award 3 points for a lumbar fracture, inconsistently claiming on one page that the cause was unknown, yet reporting on another that the cause was NFL activities, and awarded only 6 out of the 9 points needed to qualify for LOD benefits.  ¶¶ 195-96.  Mr. Olawale was also evaluated by, among others, neurologist Dr. Brahin, who incorrectly marked that Mr. Olawale was

---

[9] In connection with his appeal, Mr. McKenzie was evaluated by psychiatrist Dr. Strassnig, who, at odds with other evidence concerning Mr. McKenzie's mental state, made a conclusory statement that he had "[n]o psychiatric restrictions or limitations to gainful employment," and did not consider the cumulative impact of his ailments.  *Id.*  Mr. McKenzie was also evaluated by neuropsychologist Dr. Laura Lacritz and orthopedist Dr. Hussein Elkousy.  ¶¶ 187-88.  Dr. Lacritz, who found no Player disabled in a sample of 6 evaluations that she rendered, failed to consider the combined impact of Mr. McKenzie's impairments.  ¶ 187.  Dr. Elkousy has received nearly $1.3 million in compensation.  ¶ 188.  In opining that Mr. McKenzie was not T&P disabled, Dr. Elkousy failed to consider the cumulative impact of his ailments, ignored self-reported chronic pain, and presented findings and conclusions completely at odds with those of other physicians.  *Id.*

unimpaired on a cognitive test, despite results that showed impairment.  ¶ 197.  He concluded that Mr. Olawale was not T&P disabled.  *Id.*  The Committee denied Mr. Olawale's application in August 2021.  ¶ 199.  Neither the decision letter nor the summary sheet in his claim file mentioned that he had claimed benefits based on the overall impact of his impairments.  *Id.*  Mr. Olawale appealed the Committee's decision to the Board.  ¶ 200.  He was then evaluated by orthopedist Dr. Elkousy, who issued a report rife with inconsistencies, failed to consider the cumulative impact of Mr. Olawale's ailments, dismissed his complaints of pain, and did not award a single LOD point. *Id.*  On June 6, 2022, the Board denied Mr. Olawale's appeal, failing to address the cumulative effect of his conditions, which he had listed as a disabling condition on his application, and representing that it had reviewed all of the evidence in his file.  ¶ 201.

### 6.    Plaintiff Alex Parsons

Plaintiff Parsons applied for LOD disability benefits in 2017.  ¶ 229.   In connection with that application, he was evaluated by orthopedist Dr. Steven Meier, who has been paid at least $753,674 from the Board and a sample of 8 T&P disability evaluations that he rendered shows that he found no Player disabled.  *Id.*  Dr. Meier awarded Mr. Parsons only 2 LOD points.  *Id.* [10]

Mr. Parsons appealed the Committee's October 2017 denial of his application to the Board, submitting additional evidence of his disc herniations and DJD, as well as an abnormal EMG test of his spine, indicating radiculopathy.  ¶¶ 232-33.  He was then evaluated by orthopedist Dr. Gregory Mack, who failed to award 3 points for "Symptomatic Shoulder Instability" without explanation, despite a diagnosis of "instability, status post AC joint separation, left shoulder."  ¶

---

[10]   Although more than a third of Players report degenerative joint disease ("DJD"), and cervical spine impairments, symptomatic shoulder instability, symptomatic rotator cuff tears, shoulder loss of motion, and hamstring injuries are prevalent among Players, *no* Player in the sample of Dr. Meier's 15 LOD evaluations received any points for those ailments.  ¶ 231.

235.[11]  The Board denied Mr. Parsons' appeal in May 2018, failing to address the reports submitted

on appeal, and representing that it had reviewed the entire record.  ¶¶ 237-38.

### 7.    Plaintiff Charles Sims

Plaintiff Sims played in the NFL for four years as a running back.  ¶ 191.  He applied for

T&P disability benefits in 2020.  *Id.*  Although Mr. Sims was deemed T&P disabled, the Committee

advised in its June 11, 2021 decision letter that because members had been deadlocked as to the

appropriate classification, he would not receive Active Football benefits.  *Id.*  One member, without

explanation, believed that Mr. Sims' conditions had not begun during his NFL career.  *Id.*  The

Committee omitted that he had also applied for T&P disability based on the combined impact of

his NFL football play-related impairments.  *Id.*  On December 7, 2021, Plaintiff Sims appealed to

the Board, pointing out that the physician who deemed him T&P disabled reported that his

conditions had started while he was an Active Player.  ¶ 192.  He submitted additional medical

records, including team records discussing that his conditions had arisen while he was an Active

Player.  *Id.*  Although the Plan rules for Active T&P benefits contain no objective evidence standard

and despite the uncontradicted objective evidence, the MAP who reviewed Mr. Sims' claim file

contended that his conditions lacked objective corroboration.  *Id.*  Based on her report, the Board

denied Mr. Sims' appeal on June 3, 2022.  *Id.*  Omitted from the decision were relevant Plan

provisions and the Board's clandestine interpretation of the Active Football category.  ¶ 193.  In

*Cloud*, Board members testified that this category is meant only for cases where Players suffer a

catastrophic injury, such as a paralyzing collision, during a game.  *Id.*

---

[11]    Dr. Mack has been paid at least $1,043,527.  ¶ 234. Although a purported hand specialist, in a sample of 28 Players whom he evaluated for LOD benefits, he did not award any Player points for any non-surgery hand or wrist ailment, whereas a sample of 295 LOD Neural Physician reports shows that points were accorded for such ailments in nearly 19% of all cases.  ¶ 235.

### 8.    Plaintiff Eric Smith

Plaintiff Smith played safety in the NFL for seven credited seasons and suffered thirteen documented traumatic brain injuries, with brain imaging showing white matter changes.   ¶ 216. His 2013 application for LOD benefits was denied, and the Board denied his appeal in 2014.  ¶ 217.  Mr. Smith applied again for LOD benefits in 2015.  ¶ 218.  He was then examined by orthopedist Dr. Charles Bush-Joseph, who has received modest average annual compensation of $46,123.  *Id.*  Dr. Bush-Joseph awarded 20 LOD points, resulting in approval of Mr. Smith's application.  *Id.*  The following year, Dr. Bush-Joseph's compensation fell to $16,711.  *Id.*

Mr. Smith applied for both T&P and NC disability benefits in December 2018.  ¶ 219.  In connection with those applications, the Committee forced him to travel from New Jersey to North Carolina and Ohio for examinations.  *Id.*  Mr. Smith was evaluated by orthopedist Dr. Perry, who avoided crucial details in his report, failed to reconcile his opinions with his findings, omitted mention of certain impairments altogether, and did not explain why he believed that Mr. Smith was not T&P disabled.  *Id.*[12]  The Committee denied Mr. Smith's application in February 2019, but it did not address the overall effect of his impairments, which he had listed as a disabling condition on his application.  ¶ 222.

Mr. Smith appealed the denial to the Board in August 2019.  ¶ 223.  The Board forced him to travel from New Jersey to Missouri and Maryland for examinations.  *Id.*  Among those evaluated

---

[12] Plaintiff Smith was also evaluated by neuropsychologist Dr. Sutapa McNasby-Ford, who has been compensated at least $1,569,000, at the time of her examination of Mr. Smith was the Board's highest-paid neuropsychologist that year, and who found no Player to qualify for benefits out of a sample of 9 T&P and LOD evaluations that she rendered.  ¶ 220.  She concluded that Mr. Smith was not T&P disabled.  *Id.*  Mr. Smith was also evaluated by psychiatrist Dr. Moira Artigues, whose opinion that he had "[n]o employment restrictions from a psychiatric standpoint" was contravened by her finding of a severe major depressive disorder, and who failed to consider the cumulative impact of Mr. Smith's impairments.  ¶ 221.

Mr. Smith were orthopedist Dr. Alvin Detterline, who found no Player disabled in a sample of 6 T&P evaluations that he performed. *Id.* Dr. Detterline failed to discuss the cumulative impact of Mr. Smith's impairments and opined that he was not T&P disabled despite noting significant impairments affecting his daily functioning, and he oddly indicated that injuries from NFL play to Mr. Smith's wrist, lumbar spine, hip, and both knees had an unknown cause. *Id.* In November 2019, the Board denied Mr. Smith's appeal, representing that it had reviewed the entire administrative record. ¶ 226.

### 9. Plaintiff Joey Thomas

Plaintiff Thomas suffered a career-ending concussion during an August 2010 game. ¶ 240. He applied for LOD and T&P benefits that year, both of which the Committee denied. ¶¶ 241, 243-45. In connection with those applications, Mr. Thomas was evaluated by orthopedist Dr. Mack, who failed to consider the combination of his impairments, and even discounted his treating neurologist's statement that he was "unable to engage in any occupation for remuneration or profit." ¶ 244. Mr. Thomas was also examined by Dr. Dean Delis, one of the Board's highest-compensated neuropsychologists, having been paid at least $1,407,120. ¶¶ 129, 131-32, 135, 149, 245. Dr. Delis' publications downplay the effects of TBIs or shift those effects to non-cognitive causes. ¶ 152. A sample of 36 T&P and LOD reports that he rendered showed that he found no Player entitled to either benefit. ¶ 150. Dr. Delis did not discuss the overall impact of Mr. Thomas' conditions or views favorable to Mr. Thomas' claim reported by his treating physician. ¶ 245.

In 2012, Mr. Thomas applied again for LOD benefits. ¶ 246. He was evaluated by orthopedist Dr. Robert Rovner, who stated that his condition was a cause of a major functional impairment. *Id.* Nonetheless, the Committee denied Mr. Thomas' application in January 2013, disregarding its own physician's opinion that satisfied the Plan's terms for LOD entitlement. *Id.* Despite Mr. Thomas having submitted overwhelming evidence of documented post-concussion

syndrome resulting from football play, the Committee contended that he had presented "no evidence" that his condition "ar[ose] out of League football activities." ¶ 247.

Plaintiff Thomas applied for LOD and NC benefits in 2014. ¶ 248. He was then evaluated by orthopedist Dr. Meier, who discounted evidence favorable to Mr. Thomas, provided inconsistencies, and used boilerplate language in his report. *Id.*[13] In a May 23, 2014 denial letter, the Committee omitted findings favorable to Mr. Thomas. ¶ 250.

Mr. Thomas applied again for NC benefits in 2019 and was evaluated by neurologist Dr. Lawrence Murphy, who found no Player qualified in a sample of 17 benefit evaluations that he rendered. ¶ 251. Dr. Murphy opined that Mr. Thomas did not qualify for NC benefits based on conclusory assertions inconsistent with objective evidence and Plan terms. *Id.* Neuropsychologist Dr. Alan Breen, who found no Player entitled in a sample of 6 NC benefit evaluations that he rendered, also evaluated Mr. Thomas and issued a report containing inconsistencies with Plan terms. *Id.* The Committee denied Mr. Thomas' application in April 2019. ¶ 252.

Plaintiff Thomas appealed to the Board in October 2019, and was then evaluated by neurologist Dr. Brahin, whose report contained various inconsistencies with Plan terms and his own objective testing, incorrectly marking multiple tests as showing no impairment. ¶ 253. Mr. Thomas was also evaluated by neuropsychologist Dr. Francisco Perez, who has received at least $250,500 from the Board. ¶ 254. Dr. Perez made factually inconsistent statements in his report,

---

[13] Mr. Thomas was also evaluated by neurologist Dr. Edward O'Connor and neuropsychologist Dr. Johnny Wen. ¶¶ 248-50. The Board has paid Dr. O'Connor at least $673,300 and he found no Player to qualify for benefits in a sample of 20 LOD evaluations that he rendered. ¶ 248. Dr. O'Connor's report contained various inconsistencies and dismissed both self-reported complaints and objective evidence of cognitive impairment. *Id.* Dr. Wen has received at least $820,500 in compensation from the Board and a sample of 30 benefit evaluations he rendered shows that he found no Player qualified. ¶ 249. Dr. Wen's report contained various errors. ¶ 250.

dismissed his own testing showing cognitive impairment, and belittled Mr. Thomas' application as a "quest for disability benefits." *Id.* On February 13, 2020, the Board denied Mr. Thomas' appeal, stating that "Dr. Perez had concluded that while some data may suggest a mild cognitive impairment, it [wa]s not related to an acquired disorder," but not reconciling how Mr. Thomas' post-concussion syndrome was not an acquired cognitive disorder. ¶ 255. The Board represented that it had "reviewed *all* of the evidence in [Mr. Thomas'] Plan file." *Id.*

### 10.    Plaintiff Lance Zeno

Plaintiff Zeno played the particularly vulnerable position of center in the NFL, suffering multiple concussions and head trauma. ¶ 148. He applied for NC benefits in September 2020 and was evaluated by neuropsychologist Dr. Delis, who concluded that Mr. Zeno was not entitled to benefits in a report containing numerous inconsistencies and downplaying test results that showed cognitive impairment. ¶¶ 149, 153. The Committee denied Mr. Zeno's application in December 2021. ¶ 154. In his appeal to the Board, Mr. Zeno provided evidence of a Qualifying Diagnosis of Level 1 Neurocognitive Impairment (*i.e.*, moderate impairment in two or more cognitive domains) received through the *NFL Players' Concussion Injury Litigation* settlement. ¶ 155. Mr. Zeno was then evaluated by a neuropsychologist and neurologist, who had only recently been hired by the Board and thus not paid substantial sums at that time, and who concluded that he did, in fact, show objective evidence of acquired mild neurocognitive impairment. *Id.*

In an August 31, 2022 letter, the Board advised that it planned to send Mr. Zeno's case to MAP physicians for a record review and final decision on the issue of whether he suffers from a mild cognitive impairment. ¶ 156. MAP Dr. Garmoe performed that review, dismissing unanimous findings and, consistent with his published predispositions, contended that Mr. Zeno's objective impairment "might relate to other factors" than a cognitive ailment, without explaining what those "other factors" might be. ¶¶ 126, 157, 159. Because no other physician had concluded

that "other factors" bore on Mr. Zeno's test results, this was not even a medical issue in dispute for the MAP to decide.   ¶ 159.   Dr. Garmoe dismissed, without explanation, neurocognitive test results showing a language impairment as a "trivial error."  *Id.*   The Board denied Mr. Zeno's appeal on November 22, 2022, parroting the MAP's conclusion that his impairment might relate to non-cognitive factors.  ¶ 160.   It represented that it had reviewed the record.  *Id.*

## STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim. the issue is not whether the plaintiff "will ultimately prevail ... but whether his complaint [is] sufficient to cross the federal court's threshold."  *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).[14]  In deciding a Rule 12(b)(6) motion to dismiss, a court must "accept as true all of the factual allegations contained in the complaint."  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  It must read the complaint as a whole, *Marchese v. JPMorgan Chase Bank, N.A.*, 917 F. Supp. 2d 452, 463 (D. Md. 2013); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 680 (D. Md. 2012), and in context, *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Also, it must construe the complaint liberally in the plaintiff's favor, *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969); *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993), and "draw[] all reasonable inferences" in the plaintiff's favor.  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017).

"To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018).  A complaint is facially plausible "when the plaintiff

---

[14] *Accord Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations."); *Woods v. City of Greensboro*, 855 F.3d 639, 652 (4th Cir. 2017) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.").

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, and will not be dismissed "as long as [the plaintiff] provides sufficient detail … to show that he has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014). Ultimately, a plaintiff's burden at the 12(b)(6) stage "is quite minimal," *Doe v. Chesapeake Med. Sols., LLC*, 2019 WL 6497962, at *5 (D. Md. Dec. 2, 2019), whereas a defendant bears a "heavy burden." *Augenstein v. McCormick & Co.*, 581 F. Supp. 452, 456 (D. Md. 1984). Overall, a Rule 12(b)(6) motion "should be granted only in very limited circumstances." *De Sole v. United States*, 947 F.2d 1169, 1171 (4th Cir. 1991); *Rogers v. Jefferson-Pilot Life Ins. Co.*, 883 F.2d 324, 325 (4th Cir. 1989).

## ARGUMENT

### THE AMENDED COMPLAINT PLAINLY STATES COGNIZABLE CLAIMS

### I.    COUNT I STATES A WRONGFUL DENIAL OF BENEFITS CLAIM

Defendants first argue that the complaint fails, on its face, to state a claim under ERISA § 502(a)(1)(B), which entitles participants to bring an action "to recover benefits due … under the terms of [their] plan." 29 U.S.C. § 1132(a)(1)(B) ("502(a)(1)(B)"). DM14-23. They assert that Plaintiffs are not entitled to benefits under the Plan's terms and that they do not plausibly plead an abuse of discretion in the rejection of their claims. DM14-18. These arguments do not hold water.

A denial of benefits challenged under 502(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan expressly gives the plan administrator discretionary authority to determine benefits eligibility or to construe the plan's terms, in which case an abuse of discretion standard applies. *Firestone*, 489 U.S. at 102. Here, the Plan grants the Board discretion, but it does *not*

20

have discretion to act unreasonably.[15]  In *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000), the Fourth Circuit outlined eight factors to be considered in evaluating the reasonableness of benefit decisions.[16]  Application of these factors to the complaint's allegations shows that Plaintiffs plead an abuse of the Board's discretion on their applications and hence a cognizable 502(a)(1)(B) claim.

### A.    The Plan's Language Demonstrates That the Board Acted Unreasonably

"[T]o ignore the plain language of the plan constitutes an abuse of discretion."  *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 716 (D. Md. 2012) (Board abused discretion because it acted inconsistently with Plan's plain language).  Here, Plaintiffs allege that the Board's decisions are inconsistent with the Plan's plain terms.  Section 3.1(e) of the Plan provides that "[t]he educational level and prior training of a Player will *not* be considered in determining whether such Player is" T&P disabled (¶ 61), yet, in deciding whether Plaintiffs Smith, McKenzie, McGahee, and others are T&P disabled, "educational level and prior training" were improperly considered.  *E.g.*, ¶¶ 168, 182, 225; ECF Nos. 69-17 at 3, 69-23 at 3.  Similarly, Defendants acted inconsistently with the Plan's terms because they failed to award LOD points

---

[15] *See Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (ERISA abuse of discretion standard "equates to reasonableness" because "[t]he word 'abuse' recognizes that authority can be misused"); *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2016 WL 852732, at *7 (D. Md. Mar. 4, 2016) ("decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence"), *aff'd*, 860 F.3d 259 (4th Cir. 2017); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2013 WL 6909200, at *26 (D. Md. Dec. 31, 2013) (Board's "discretion is not without limit").

[16] These are:  (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and  (8) the fiduciary's motives and any conflict of interest it may have.  *Id.* at 342-43.

pursuant to the Plan's terms, which state that Players will be awarded the prescribed number of points for each occurrence of each listed impairment. *E.g.*, ¶¶ 200, 210, 213, 283.

Furthermore, "adding a requirement" that is absent from the Plan's terms "is contrary to the Plan's terms," and thus an abuse of discretion. *Giles*, 2013 WL 6909200, at *26 (analogizing Board's unreasonable additional requirement to a "Hail Mary" pass). The Plan's terms for Active Football T&P benefits do *not* contain a requirement of "a catastrophic injury," but Board members have testified that "Active Football T & P disability benefits are intended *only* for cases where Players suffer a catastrophic injury, such as a paralyzing collision, during a game." ¶ 193. Indeed, the Plan's standard for Active Football provides that a Player "will qualify… in this category if … his *disability(ies)* arises out of League football activities while he is an Active Player, and causes him to be" T&P disabled. ¶ 64. The Plan term "disability(ies)" explicitly permits the plural forms of a singular disability, and accordingly, that a Player can be disabled by multiple disabilities and injuries *combined*, as opposed to "only" a *singular* "catastrophic injury." *See Brumm v. Bert Bell NFL Ret. Plan*, 995 F.2d 1433, 1440 (8th Cir. 1993) ("could refer to either a single injury… *or* … cumulative … result"). Thus, the Board acted unreasonably because it applied an incorrect standard to Plaintiff Sims—one that has resulted in "a mere 30 Players … receiving Active Football T & P" as of 2022. ¶¶ 65, 193, 283; *see Cloud*, WL 2805527, at *7 ("Defendant denies Active Football benefits to former NFL players suffering from the debilitating effects of head trauma, irrespective of the plain language of the Plan."). Likewise, although the Plan's terms do not limit proof to objective evidence, Defendants unreasonably dismiss reliable evidence of self-reported symptoms for lack of objective medical evidence.[17]

---

[17] *Compare Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2022 WL 1786576, at *2 (N.D. Cal. June 1, 2022) ("unreasonable to reject a claimant's self-reported evidence where [there

Additionally, the Plan's definition of "Neutral Physician" mandates that "Neutral Physicians" are required to examine and provide a complete report on the Players conditions as necessary for the Committee or Board to render an "*adequate* determination" on the Player's conditions. ¶ 46. "Adequate" means "legally sufficient." *Black's Law Dictionary* (11th ed. 2019). Accordingly, this Court has held that the terms of the Plan prohibit the Board from rendering an "*inadequate*" determination based on a "Neutral Physician's" report or opinion that is legally insufficient or unreasonable. *See Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2012 WL 2374661, at *14 (D. Md. June 19, 2012) ("[A] reasoning mind would not accept the undetailed reports of [two Neutral Physicians] as sufficient to support a particular conclusion[.].").  Moreover, this Court reasoned that Defendants' decisions are *inadequately* based on Neutral Physicians' opinions if their reports or opinions are "flawed," inconsistent, "unexplained," "undetailed," "unreasoned," or "conclusory." *Id.* at *9, *12-13.[18]

Here, Plaintiffs allege that the Board acted inconsistently with the Plan's terms by rendering inadequate decisions based on legally insufficient reports and opinions.  As noted above, the Board ignored the Plan's terms by inadequately basing its decisions on the flawed reports of Drs. Werner, Diaz, and Macciocchi that considered Plaintiffs' educational level or prior training, which is explicitly prohibited by the Plan's plain terms.  Furthermore, Plaintiffs plead extensive facts that the Board rendered inadequate decisions on their claims that were based on "Neutral Physicians'"

---

is] no basis for believing it is unreliable, and where the ERISA plan does not limit proof to 'objective' evidence.") *with* ¶¶ 169, 171-72, 176, 180-81, 183, 188, 193, 197-98, 248, 264.

[18] *See Gorski v. ITT Long Term Disability Plan for Salaried Employees*, 314 F. App'x 540, 547 (4th Cir. 2008) (because physician "never explained on what basis he doubted" plaintiff's disability, his report was "an unreasoned and unexplained rejection of the objective evidence in the record").

unreasonable, flawed, inconsistent, and legally insufficient reports.[19]    Although the Board construes the Plan in a manner that permits it to simply default blindly to Neutral Physicians' opinions, without ensuring that those opinions provide an adequate basis for a determination, such an interpretation renders section 12.3's requirement that decisions have an adequate basis "meaningless," and thus "cannot be reasonable." *Jani v. Bell*, 209 F. App'x 305, 318 (4th Cir. 2006). The Board's unreasonable interpretation allowing inadequate decisions based on reports that conflict with Plan terms strongly points to an abuse of discretion.

Finally, section 3.1(e) of the Plan requires that "[a]fter reviewing the report(s) of the Plan Neutral Physician(s), along with *all* other facts and circumstances in the administrative record," the Committee or Board will make a decision.  ECF No. 69-7 at 63.  As Plaintiffs allege, however, Defendants ignored the Plan's plain terms because Board members testified in *Cloud* that their "practice" is not to review "all" of the "facts and circumstances in the administrative record" and courts have recently found that the "Board wholly failed to consider record evidence that contradicted the opinions of the Plan Neutral Physicians."  *E.g.*, ¶¶ 226, 238, 284, 313; *see Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 593 (11th Cir. 2020) (denial of benefits unreasonable because "Board said it 'reviewed [the] *entire* file,' but that statement [was] belied by the record"); *Cloud*, 2022 WL 2237451, at *12; *infra* at 36, 46-47, 54 n.47.

## B.    The Board Acted Inconsistently with the Plan's Purpose and Goal

"[A] primary purpose of the Plan is to provide disability benefits to qualifying NFL players

---

[19] *E.g.*,  ¶¶  153, 155, 157, 159, 166-69 (Dr. Diaz "checked off that the cause of [Mr. McGahee's] 'concussions' was 'illness,' 'other,' and 'unknown,' instead of 'injury'"), 171-72, 176-77, 179-83 (Dr. Mercado concluded "not T & P disabled, despite also finding that ... it is not likely that he would be able to maintain employment"), 182, 185 ("Dr. Clark concluded that Mr. McKenzie was not T & P disabled, despite … noting that Mr. McKenzie's psychiatric status appeared to be 'totally' disabling"); 187-88, 193, 195-98, 200, 206, 209-10 212-13, 219-21, 223, 225, 231, 235, 241-42, 244-45, 248, 250-53, 258-59, 261, 265.

and their beneficiaries," *Stewart*, 2012 WL 2374661, at *10, and "the Plan's goal is to take care of the players … for investing themselves in the sport." *Brumm*, 995 F.2d at 1439. That being the case, "players who suffer a series of" impairments "are as entitled to consideration as those suffering a single" impairment. *Id.* Plaintiffs allege that the Board's failure to consider the cumulative impact of Players' impairments is inconsistent with the Plan's goal. *E.g.*, ¶¶ 166-67, 169, 171-72, 177, 180-82, 187, 195, 198, 200, 221, 223, 225, 244-45. The Board's failure to consider the "combined effect" of "impairments, ignore[s] an important consideration in the question of whether [a Player is] disabled" and is therefore unreasonable. *Mickell*, 832 F. App'x at 594-95.[20]

### C.    The Inadequacy of the Materials Considered Demonstrates Unreasonableness

The Plan requires that, "[i]n deciding claims for benefits … the … Board … will consider *all* information in the Player's administrative record." *Solomon*, 2016 WL 852732, at *7 (quoting Plan § 8.9). In this respect, Plaintiffs allege that the Board's decisions were unreasonable because it has a "practice" of failing to review *all* of the evidence. ¶ 173. "Instead, the … Board simply adopted the opinions of its retained physicians by default. In so doing, the … Board showed an unreasonable bias in favor of Plan-selected physicians."[21]

---

[20] *See DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 870-71 (4th Cir. 2011) (discretion abused due to failure to consider "combined effect of *all* of the problems," even if conditions, "in isolation," were not disabling) (emphasis in original); *Austin v. Continental Cas. Co.*, 216 F. Supp. 2d 550, 558 (W.D.N.C. 2002) ("consideration of the full panoply of ailments and their *combined impact* on capacity for work … is important, as appellate courts consistently have found").

[21] *Dimry*, 2022 WL 1786576, at *3 (Board did not resolve conflicts "by examining the evidence or delving into the record before it," and it was "owed little deference" because its "course of dealing suggests an intent to deny [Player] benefits application regardless of the evidence"); *accord Mickell*, 832 F. App'x at 593 ("The Board said it 'reviewed [the] *entire* file,' but that statement [was] belied by the record."); *Carter v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2012 WL

Furthermore, as discussed above, this Court has held that a reasoning mind would not accept the flawed, inconsistent, or undetailed reports of the Board's Neutral Physicians as adequate materials to support a denial of benefits.  *Stewart*, 2012 WL 2374661, at *14-15.  Plaintiffs allege that the Board defaulted to Neutral Physicians' conclusions and reports without delving into the entire record.  ¶ 289.  That is the "abandonment of discretion, not the exercise of it."[22]

### D.    The Board's Interpretations Are Inconsistent with Other Plan Provisions

"Ambiguous language in one portion of an ERISA plan may well be clarified by reference to unambiguous language in another portion of the plan." *Giles*, 2013 WL 6909200, at *3.  Here, Defendants' interpretation of the Plan that fails to consider that a Player may be T&P disabled from the combination of all of his impairments is inconsistent with other Plan provisions.  For example, the Plan's plain terms provide that a T&P disability may arise out of a "*combination*" of activities causing the T&P disablement (¶ 67), and the Plan's unambiguous terms, including the definition of Active Football, state that "a Player will qualify for Plan T&P benefits … if (i) his *disability(ies)* ... causes him to be totally and permanently disabled" (¶ 64).  Also, Plaintiffs allege that the Board acted inconsistently with earlier LOD benefits interpretations.  *E.g.*, ¶¶ 196, 200.

### E.    The Board's Decision-Making Process Was Not Reasoned or Principled

This Court has held that when an administrator "never looked at the records in the first instance[,] [i]t is impossible to conclude, therefore, that [the] review process was principled or

---

6043050, at *4 (N.D. Ala. Dec. 3, 2012) (Plan's failure to consider report "made its determination incomplete and unjust").

[22] *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2018 WL 1258147, at *3, *4 (N.D. Cal. Mar. 12, 2018) (Board "simply adopted the opinions of its retained physicians by default. … But it was not entitled to decide a benefits claim by mere default to a Plan-selected physician"); *accord Cloud*, 2022 WL 2237451, at *43 ("[T]he Board relied almost exclusively on compromised advisors, [and] failed to consider important—let alone *all*—information in plaintiff's file[.]") (emphasis in original).

reasonable." *Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579, 585 (D. Md. 2002); *accord In re Marshall*, 261 F. App'x 522, 526 (4th Cir. Jan. 2008) (ignoring findings favorable to Player was not "result of a deliberate, principled reasoning process").  Plaintiffs allege that Defendants "abdicated their decision-making by rubber-stamping reports from biased physicians who acted inconsistently with Plan terms … and whose reports amounted … to an inadequate basis for basing claims decisions" and that "Defendants routinely failed to review all of the evidence in the administrative record."  ¶ 286.  Simply stated, the decisions on Plaintiffs' applications were mechanical rather than the product of principled and reasoned decision-making.[23]

### F.    The Board's Decisions Were Inconsistent with ERISA's Requirements

Plaintiffs further allege that Defendants' decisions were inconsistent with ERISA's procedural requirements, including their failure to review the entire administrative record and to explain why they disagreed with medical views in the record supporting the award of benefits.  ¶ 289.  Therefore, Plaintiffs properly plead the Board's "fail[ure] to strictly adhere to all the requirements of this section with respect to a claim," and they and absent class members are "deemed to have exhausted the administrative remedies available under the plan." 29 C.F.R. § 2560.503–1(l)(2)(i); *see Clark v. Fed. Express Corp.*, 2009 WL 10727182, at *5 (D. Md. Apr. 1, 2009).  Defendants admit that "procedural violations, such as of [a] pertinent regulation, remove a Plan's discretionary authority for purposes of benefits claim review."  DM41; *see Brewer v. Unum Grp. Corp.*, 622 F. Supp. 3d 1113, 1128-29 (N.D. Ala. 2022).  Although they contend that their repeated violations were *de minimis*, "at this stage, Defendants' fact-based challenge … does not

---

[23] *See Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 992 (N.D. Cal. 2008) (administrator's "reliance on … apparently biased sources casts serious doubt on the neutrality of its decision-making process"); *Stewart*, 2012 WL 2374661, at *14 (D. Md. June 19, 2012) ("The Board failed to apply a reasoned and principled decision-making process as required by the Plan" because it "simply accepted" "flawed" Neutral Physician opinions without adequate explanation).

diminish the inference of [violations of the regulations] raised by Plaintiffs' allegations." *Moler v. Univ. of Md. Med. Sys.*, 2022 WL 2756290 at *3 n.2 (D. Md. Jul. 13, 2022) (Rubin, J.).

Moreover, Plaintiffs allege that such violations were not for good cause, and that the exception is unavailable because there is a pattern and practice of such violations. ¶¶ 21 (*Mickell* and *Cloud* courts finding that Board failed to review entire record), 173, 193. Because Plaintiffs allege that the Board's decisions are inconsistent with the full and fair review requirement under ERISA § 503(2), 29 U.S.C. § 1133(2), by reason of its failure to review all evidence, Defendants' exhaustion of administrative remedies argument (DM23) is unavailing. Putting to one side that exhaustion of administrative remedies is not a condition precedent to Plaintiffs' separate assertion of breach of fiduciary duty claims, *see Smith v. Sydnor*, 184 F.3d 356, 364-66 (4th Cir. 1999), administrative remedies are, as noted above, deemed exhausted and *de novo* review applies.

### G.    The Board Also Acted Inconsistently with a Relevant External Standard

Plaintiffs also allege that Defendants have acted inconsistently with external standards relevant to the exercise of discretion, pointing to Plaintiff Zeno having been found under the *NFL Players' Concussion Injury* settlement to have a moderate to severe cognitive impairment and the Board's irreconcilable decision that he did not qualify for even the mild NC benefit. ¶¶ 159, 288; *see also* ¶ 157 n.14 (2 of 3 Players in sample whom MAP Dr. Garmoe found not entitled to benefits received Notice of Monetary Awards in *NFL Players' Concussion Injury* settlement).

### H.    Bad Faith Motives and Bias Affected the Decisions

Defendants spill a good deal of ink arguing that the Neutral Physicians' opinions—which they say the Board was bound to follow—were dispositive of Plaintiffs' benefits applications because they showed that Plaintiffs did not satisfy the Plan's "Neutral Rule." DM14-17. Their argument, however, not only impermissibly renders language in section 12.3 of the Plan superfluous, but also, more importantly, sidesteps the core allegations in this case that the entire

benefit claims process was tainted by significant bias that rendered the physicians' reports an inadequate basis for determinations. The Supreme Court has reasoned that a "conflict … should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it *affected the benefits decision*, including, but not limited to, cases where an … administrator has a history of biased claims administration." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).[24] Here, Plaintiffs present three discrete categories of allegations that support the existence of a conflict affecting the decisions on their claims.

*First*, Plaintiffs detail a history of biased claims administration as recognized by courts. ¶ 21 (citing numerous cases).

*Second*, promotional or "marketing material[s]" may "suggest[] ... services that will support a parsimonious approach to administering claims." *Caplan*, 544 F. Supp. 2d at 990, 992 (bias evinced by marketing materials, including a promoted deemphasis of claimants' subjective symptoms). A physician's stated beliefs can also demonstrate bias.[25] Also, a reasonable inference of conflict may be drawn where physicians have been "criticized by other courts for the content" of their reports. *Kasko v. Aetna Life Ins. Co.*, 33 F. Supp. 3d 782, 687 (E.D. Ky. 2014). Plaintiffs allege numerous facts concerning Neutral Physicians' predisposition against Players—namely, statements, marketing materials, and writings by Drs. Garmoe, Macchiocchi, Delis, Brahin, and McCasland, minimizing the effects of TBI-related ailments, and even boasting in marketing

---

[24] *See Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010) ("Here, as in *Glenn*, the evaluation of claims is entrusted (at least in part) to representatives of the entities that ultimately pay the claims allowed. … That the board is (by requirement of statute) evenly balanced between union and employer does not negate the conflict.")

[25] *Bedrick ex rel. Humrickhouse v. Travelers Ins. Co.*, 93 F.3d 149, 153 (4th Cir. 1996) (stated beliefs and views provided "evidence that [physician's] exercise of judgment is not disinterested"); *Caplan*, 544 F. Supp. 2d at 990-93 ("reliability of [physician's] report as a neutral evaluation of … condition [was] dubious" based on his financial interest and stated belief).

materials on how to defeat claims based on such impairments, as well as endorsing improper race norming of neurocognitive test results—and published decisions criticizing their opinions, including as to Players.   ¶¶ 126-28, 152, 165-66, 178, 181, 327.

*Third*, the complaint presents robust allegations of a financial conflict that has infected the Board's decision-making.  Defendants imply that because Neutral Physicians are paid a flat fee irrespective of outcome (DM2 n.2) there is no financial incentive for bias.  Even if Neutral Physicians are paid a fixed fee for each examination, however, the *frequency and magnitude* of sizable financial compensation they receive permit an eminently reasonable inference of a financial conflict that is a factor in reviewing for abuse of discretion.[26]  Here, the complaint is replete with allegations from which a fair inference of financial conflicts of interest may plausibly be drawn based on the magnitude of income—often reaching into seven figures—earned by the Neutral Physicians who evaluated Plaintiffs from their repeat business with the Plan.   ¶¶ 109, 112, 127, 129-30, 132-34, 149, 151, 157-58, 165, 167, 169, 171, 176, 178-79, 183, 188, 197, 206, 209, 217, 220, 224, 227, 229-30, 234, 242, 248-49, 254, 258, 262, 264-65; *see also supra* at 6-8.

Relatedly, based on a sample of 784 T&P reports—which includes many of the physicians who inadequately evaluated Plaintiffs—the complaint alleges a statistical pattern of parsimonious findings unfavorable to Players, permitting the reasonable inference that the financial conflict and

---

[26] *See Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902 (9th Cir. 2016) ("fair inference" of financial conflict that "influenced assessments" where physician "earned a substantial amount of money… ($125,000-$175,000 each year)"); *id.* at 904 (noting "unremarkable proposition that the number of examinations referred and the size of the professional fees paid … may compromise the neutrality of an expert"); *Bedrick*, 93 F.3d at 154 (physicians may "unconsciously" have financial conflict); *Caplan*, 544 F. Supp. 2d at 992 (physician "stood to benefit financially from the repeat business that might come from providing [administrator] with reports that were to its liking"); *Dimry,* 2018 WL 1258147, at *3-4 (finding "*magnitude* of the payments raise[d] a fair inference of a financial conflict" because evidence of "sizable payments" to Neutral Physician of $188,683 from 2014-15 exceeded amount in concern in *Demer*, and rejecting Board's argument that Neutral Physicians are not financially conflicted because they receive fixed fee).

bias of those physicians has infected the Board's decision-making.  *See generally* ¶¶ 116-46.  The Supreme Court has noted that "[i]n many cases, a representative sample is the only practicable means to collect and present relevant data establishing a defendant's liability." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 455 (2016).  As is pertinent here, "statistics showing a parsimonious pattern of assessments disfavorable" [sic] to claimants are "*powerful* evidence" of a conflict of interest. *Demer*, 835 F.3d at 902-03.[27]

Specifically, Plaintiffs allege a large statistical sample with analysis and graphs, corroborated by identified instances, which show a correlation between (1) total and annual compensation on a year-after-year basis since at least 2015-16; and (2) the specific identified physicians' overall denial rate, in a statistical sample of 784 T&P reports.  ¶¶ 107, 109, 111-12, 115-46.  These allegations soundly support their claim that financial conflicts are tied to the "pattern of parsimonious assessments unfavorable to Players seeking benefits [and] infected the Board's decision-making." ¶ 107.[28]  What is more, Plaintiffs tie the sizable compensation to individual physicians to their evaluation histories—which, for most of them, reaches a 100%

---

[27] *See Hertz v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1136 (D. Nev. 2014) ("it [could] be reasonably inferred … that … bias infiltrated the entire administrative decision-making process" where "statistics strongly suggest[ed] that both MLS and Dr. Rim harbored a significant bias towards finding" no disability because "of those fourteen (14) claims [he] reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work" and "[i]n a sampling of 75 of those medical reviews [performed by MLS], only four (4) were determined to be completely unable to work"); *Kasko*, 33 F. Supp. 3d at 787 ("sufficient showing of potential bias to permit further discovery" where plaintiff "offered proof that approximately 85% to 90%" of [physician's] reports "recommended 'not disabled'"); *Caplan*, 544 F. Supp. 2d at 990-93 ("the history of [the physician's] conclusions provides evidence of … conflict" where statistics showed physician found large percentage of disability claimants capable of working).  Also, evidence that a physician's high pay in one year is not an "aberration" suggests a "parsimonious pattern of assessment unfavorable to claimants." *Demer*, 835 F.3d at 903 n.8.

[28] *See Price v. UNUM Life Ins. Co. of Am.*, 2018 WL 1352965, at *15-16 (D. Md. Mar. 14, 2018) ("connections between" history of biased administration "and the actual process undertaken by" administrator when reviewing a plaintiff's claim, such as failing to "consider[] all of the medical evidence" could demonstrate that bias affected decision-making).

benefits denial rate—and plausibly establishes that the magnitude of payments to them influenced the decisions on Plaintiffs' claims. *E.g.*, ¶¶ 122, 128-30, 134-35, 150, 157, 165, 161, 168-69, 171-72, 176, 179, 183, 187, 197, 206, 217, 220-21, 223-24, 227, 229, 242, 248-49, 251, 254, 258, 261.

Defendants' contention that Plaintiffs' statistical allegations "lack sufficient context" and do not plausibly support their claims (DM18-21) is unavailing. Plaintiffs allege detailed and contextualized statistics that identify with particularity the names of the physicians (*e.g.*, Dr. Macciocchi); the approximate years and amounts many of them were paid in specific years, on average, or in total (*e.g.*, ¶¶ 127, 132-34 (Dr. Macciocchi paid $1,652,800 since approximately 2012, including $217,500 for 2018-19, $191,500 in 2017-18, and $172,000 in 2016-17)); the total number of examinations within the statistical sample (*e.g.*, ¶¶ 116, 122, 131-35, 235 (784 T&P evaluations and 295 LOD evaluations)); the number of examinations performed by identified physicians (*e.g.*, ¶ 128 (Dr. Macciocchi performed 14 T&P evaluations)), and specific instances and dates that identify particular Players who saw the identified physician, including inconsistencies and flaws in the physicians' reports (*e.g.*, ¶ 182 (Plaintiff McKenzie evaluated by Dr. Macciocchi in 2019, who considered educational level and prior training, and applied improper racial norms)), among other well-pleaded details. *E.g.*, ¶¶ 127-28 (allegations concerning Dr. Macciocchi's reputation for minimizing symptoms of concussive injuries and endorsing use of improper race norms in evaluating African-Americans' neurocognitive test results).

Next, Defendants maintain that Plaintiffs' statistical allegations "are utterly devoid of context" and that Plaintiffs draw "unwarranted" inferences and "unreasonable" conclusions. DM19-20. In other words, Defendants say that Plaintiffs' allegations lack credence.[29] But "[t]he

---

[29] To defuse Plaintiffs' allegations, Defendants point to IRS Form 5500s covering 2016-21, and tout how much the Plan paid out in benefits. DM1, 3, 15, 21; ECF No. 69-6. Setting aside that Defendants deceptively encompass many Players who received T&P benefits by virtue of Social

plausibility requirement does not pertain to whether the facts plead[ed] are *believable*. The plausibility requirement asks whether the facts plead[ed], *if believed*, animate the essential legal elements of the claim that would result in the defendant's liability." *Pancurak v. McFly's, Inc.*, 2023 WL 2867485, at *3 (D. Md. Apr. 10, 2023) (Rubin, J.). "If believed," common sense dictates that the complaint's allegations plausibly show that the Board's decision-making was impacted by conflicts where, for example, its highest-paid neuropsychologist, neurologist, and orthopedist since at least 2012 each have a 100% T&P denial rate in a large statistical sample.

In short, all eight *Booth* factors strongly point to the Board's abuse of its discretion, and that the complaint therefore states a 502(a)(1)(B) claim for wrongful denial of benefits.

## II.   PLAINTIFFS STATE BREACH OF FIDUCIARY DUTY CLAIMS

Also without merit is Defendants' challenge to Plaintiffs' breach of fiduciary duty claim. *See* DM34-42.  Plaintiffs plausibly establish more than a sheer possibility of Defendants' deceit and misinformation about the Plan, imprudence under the circumstances, systemic plan-wide defects, and other breaches of the fiduciary duty of loyalty and care in violation of ERISA.

### A.   Defendants Breached Their Fiduciary Duty of Loyalty by Deceiving Players

Defendants' first contention—that their decision letters and Summary Plan Descriptions ("SPDs") did not violate ERISA § 404, 29 U.S.C.  § 1104 (DM34-37)—is easily refuted.

---

Security disability entitlement without the need for a "Neutral Physician" evaluation and that the 5500s shed no light on how much the Plan has *avoided* in benefits payouts, the Court should disregard them because they are offered to support a fact-based argument that is inappropriate on a motion to dismiss.  *See Moler*, 2022 WL 2756290, at *5.   Defendants contend that the Court may take judicial notice of them as public records (DM1 n.1), but judicial notice cannot "be used as an expedient for courts to consider matters beyond the pleadings."  *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 360 (4th Cir. 2013) (citing cases).  In any event, only the *existence* of a public record, not of the truth of its contents, may be judicially noticed.  *Anglemyer v. WCS Constr., LLC*, 2019 WL 3458951, at *5 (D. Md. July 31, 2019) (citing cases).

Misinformation, dishonesty, deception, or "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." *Varity Corp.*, 516 U.S. at 494 (violation of ERISA § 404 because "reality was very different" from what was falsely conveyed to participants). Moreover, "ERISA administrators have a fiduciary obligation not to misinform employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures." *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001). Here, Plaintiffs allege that Defendants violated ERISA §§ 404(a)(1), 503(1), and 503(2) by making false statements in statutory disclosures to Players that "Neutral Physicians" are "*absolutely neutral* in this process." *E.g.*, ¶¶ 48-49, 53, 102, 108, 114-46, 149-54, 173, 226, 326. As in *Varity*, Plaintiffs present well-pleaded facts that the "reality [is] very different" from what Defendants informed Players because the Plan does not state that "Neutral Physicians" are "*absolutely neutral* in this process," and, in reality, most "Neutral Physicians" are actually significantly biased against finding Players disabled, not "*absolutely* neutral" as claimed. *E.g.*, ¶¶ 52, 115-46, 326-29, 333, 336-40, 365.

For Defendants to represent to Players that physicians such as Dr. Macciocchi, who "harbored a significant bias towards finding" no disability, are "*absolutely* neutral" in decision letters is manifestly false and a breach of the fiduciary duty to act solely in Players' best interests. *Compare Hertz*, 991 F. Supp. 2d at 1136 ("statistics strongly suggest" that physician "harbored a significant bias towards finding" no disability) *with* ¶¶ 127-28 (allegations concerning Dr. Macciocchi's biased predispositions and marketing materials, and 100% T&P denial rate). Defendants themselves acknowledge that there is a material difference between the Plan's

34

definition of "Neutral Physicians" and physicians who are "truly neutral."  DM36.[30]

Moreover, Plaintiffs plausibly allege that Defendants' false representation was material because "at least some [Players] might have preferred" to see "absolutely neutral" physicians, might not have appealed or submitted a new application putting their bodies and minds through the aggravation and deterioration of their health by being forced to travel by Defendants, or would have appealed or sued on those specific grounds—"and consequently could reasonably have thought it important to know that" that Neutral Physicians were significantly biased against them, which "they might not have wanted." *CIGNA Corp. v. Amara*, 563 U.S. 421, 429-30 (2011); *see*, *e.g.*, *Shea v. Esensten*, 107 F.3d 625, 629 (8th Cir. 1997) (plaintiff's decedent "had the right to know [insurer] was offering financial incentives that could have colored his doctor's medical judgment").  Plaintiffs plausibly allege harm, including reliance, prejudice, and losses because, "[f]or example, due to the added physical and psychological health stressors caused by being forced to travel long distances for his numerous biased examinations over a short period of time, Plaintiff McKenzie required "emergent psychiatric care."  ¶ 177; *see* ¶¶ 54, 329.

## B.    The Board Falsely Asserted in Its Decisions That It Reviewed All Evidence

Plaintiffs plausibly allege that the Board and its members breached the fiduciary duty of loyalty in violation of ERISA §§ 404 and 405 (as well as 503(1) and 503(2)), by falsely stating to Players in decision letters that Defendants reviewed the entire file on their claims.  *See Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579, 585 (D. Md. 2002) (defendant's false assertion that specific review of records had been undertaken was "far more than mere negligent inattention to

---

[30] Hired physicians cannot be equated with those who are "*truly independent*" and "*neutral*"; "the former does not guarantee the latter."  *Demer*, 835 F.3d at 904 (emphasis in original) ("not hard to imagine" that outside medical examiner "does not engage in a neutral, independent review, such as where the examiner receives hundreds of thousands of dollars from a single source").

its important procedural and substantive responsibilities … under ERISA" and "bordered on outright fraud").   They allege a plan-wide "practice" of conveying *false* information to Plaintiffs and absent class members—namely, that the Board "reviewed *all of the evidence in* [*the*] *Plan file*," which is untrue because Board members testified recently that their "practice" is that they do "not review the entire file" and multiple courts have found that to be the case as well.  *E.g.*, ¶¶ 21 (*Mickell* court's conclusions regarding Board's failure to review entire record as it had claimed), 173, 176, 193, 214, 226, 237-38, 298, 316, 318-20, 346.

### C.   Fiduciary Duties of Care and Loyalty Were Breached in Sundry Other Ways

"[S]imply delegat[ing] and then turn[ing] a blind eye" demonstrates imprudence.  *Acosta v. Chimes D.C., Inc.*, 2019 WL 931710, at *19 (D. Md. Feb. 26, 2019).  Plaintiffs allege that the Board acts to the detriment of participants by imprudently "delegating to others *without direction* to actually review the entire administrative record, in violation of ERISA §§ 404(a)(1)(B) and 503(2), 29 U.S.C. §§ 1104[(a)](1)(B) and 1133(2)."  ¶ 315; *see* ¶¶ 298, 344; *infra* at 46-47, 54 n.47.  Instead of merely waving "a magic wand" and making "an assumption that carried such weighty consequences," as the Board has done, "a reasonably prudent fiduciary would have probed the issue further" or would have actually issued a directive to that effect.  *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 773, 778 (4th Cir. 2019).

Also, rather than prudently following the emphatic advice of their legal advisors to review the "*entire* administrative record … prior to making a final determination on the Player's claim for benefits," Defendants' clandestine practice is to imprudently ignore that advice.  ¶¶ 204, 214, 236, 316-17, 345-46.  Compounding this, because Defendants "chose to misrepresent affirmatively" that the Board has "reviewed *all of the evidence in your Plan file*" (*e.g.*, ¶¶ 189, 201, 319) "rather than inform" Players accurately that it does not review all of the evidence, "liability premised on concealment of the breach" also attaches under ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).  *Willett*

*v. Blue Cross & Blue Shield of Ala.*, 953 F.2d 1335, 1342 (11th Cir. 1992).

Defendants contend that a breach of duty of loyalty claim requires a plaintiff to plausibly allege that the fiduciary acted with some specific purpose to benefit itself or a third party. DM39. The Fourth Circuit, though, has noted that the "focus is *not* on [the fiduciary's] motives (good or bad) but on whether it acted '*solely* in the interest' of the plan participants, and … consistent with that of a prudent man in like capacity[.]' … [A] pure heart and an empty head are not enough" to satisfy fiduciary responsibilities under ERISA. *Brundle*, 919 F.3d at 773 (quoting statute). Nevertheless, Plaintiffs' allegations plausibly establish that Defendants acted for the purpose of benefiting themselves by concealing their own "culpable conduct" through affirmative misrepresentations and "concealing the impact of neurocognitive impairments from football activities." ¶ 340; *see* ¶¶ 114, 201, 214, 226, 237-38, 252, 315-16, 319, 326, 352.

### D.    Plaintiffs Plausibly Allege Discriminatory Treatment Based on Race

Plaintiffs also plausibly establish that Defendants breached their fiduciary duties by discriminating against African-American Players. *See Frankenstein v. Host Int'l, Inc.*, 2021 WL 826378, at *3 (D. Md. Mar. 4, 2021) (sustaining breach of fiduciary duty claim based on discriminatory treatment). Their allegations establish, at the very least, that Defendants have sanctioned their physicians' application of discriminatory racial norms to neurocognitive test results, as occurred to the detriment of Plaintiffs McKenzie and McGahee. ¶¶ 127, 167, 169, 182.

### E.    Breaches of Fiduciary Duties Based on Defendants' SPDs

Defendants also assert that Plaintiffs' allegations about the misleading statements in SPDs misapprehend ERISA § 102, 29 U.S.C. § 1102, and its implementing regulations. DM37-38. Plaintiffs, however, plausibly allege that Defendants committed numerous distinct breaches of their fiduciary duty of loyalty based on misinformation in SPDs, in violation of ERISA §§ 102 and 404.

### 1.    Defendants Misrepresent That Players Will Receive a "neutral exam"

To begin, Plaintiffs plausibly establish that Defendants breached their fiduciary duty of loyalty to provide complete and accurate information, and not to mislead or misinform participants, in violation of ERISA §§ 102(a) and 404(a)(1).  In their SPDs, Defendants have lulled reasonable Players into believing that the Plan promises them a "neutral exam." ¶ 53.  The Plan, however, provides no such promise because the phrases "neutral exam" and "neutral examination" are absent from its terms.  ¶¶ 48-49, 53, 92, 310.  Moreover, the false SPD statements about "neutral exams" are material because there is a substantial likelihood that a reasonable employee would find them "important," and would want to know that the Plan does *not* actually promise a neutral exam. Indeed, Plaintiffs plausibly allege that this information was material because they specifically requested that Defendants "produce information relevant to the impartiality and conflicts" of "Neutral Physicians."  ¶¶ 54-55, 104, 303, 329.[31]

In this respect, Defendants' contention that fiduciary dishonesty claims require a showing of detrimental reliance (DM36) is meritless.  Detrimental reliance is not required for all ERISA § 502(a)(3) equitable remedies based on misrepresentation.[32]  At any rate, Plaintiffs' allegations permit a reasonable inference of harm, including but not limited to loss and detrimental reliance. ¶¶ 54, 329 (enumerating ways that Plaintiffs and class members rely upon and are harmed by

---

[31] *See Amara*, 563 U.S. at 431 ("[M]any employees asked CIGNA … to disclose details[.] ... But CIGNA did not do so.  Instead … it focused on NOT providing employees [the requested information].");  *Shea*, 107 F.3d at 628 ("a financial incentive scheme put in place to influence" a physician's practices "is certainly a material piece of information").

[32] *Amara*, 563 U.S. at 443-45 (detrimental reliance not required for all 502(a)(3) equitable remedies based on misrepresentation, especially for surcharge, injunction, and reformation); *see Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 818 (D. Md. 2011) ("Plaintiffs' failure to rely on [the] alleged misrepresentations/omissions would not automatically shield Defendants from duty of loyalty liability.  As mentioned above, economic loss is not a prerequisite for ERISA liability. Rather, plaintiffs may establish a breach of the duty of loyalty by showing that administrators were dishonest to them … while acting in a fiduciary capacity.").

material misinformation conveyed to them in SPDs and decision letters).

> **2.    Defendants Also Misrepresent in SPDs That Neutral Physicians Are "neutral physicians"**

The meaning of uncapitalized words does not refer to the "official" capitalized definition in a contract where the contract itself is "careful to distinguish them by capitalizing the first letter of each word." *Env't Prods. Corp. v. King Cos.*, 47 F.3d 1164 (table), 1995 WL81740, at *5 (4th Cir. Fed. 21, 1995) (unpublished). Defendants argue that "Plaintiffs do not allege that Defendants told Plaintiffs in the SPD or decision letters that 'Neutral Physicians' were anything other than as defined in the Plan." DM35. Plaintiffs, however, allege that, in violation of ERISA §§ 102(a) and 404(a)(1), "[i]n several instances in SPDs, Defendants provided misleading material information by using the term 'neutral physician,' *without capitalizing those words*, to lull Players into believing that 'Neutral Physicians' will be unbiased or fair-minded, even though the Plan's terms do not provide that a 'Neutral Physician' will indeed be impartial." *E.g.*, ¶¶ 45, 48-51, 93-94 (SPD inaccurately refers to "neutral physician" without capitalizing), 103-04, 179, 226, 311, 313; *see* ECF No. 69-7 (amendment effective Apr. 1, 2022, stating that term "Neutral Physician" will be uniformly capitalized throughout the Plan). The average person would understand the uncapitalized word "neutral" to have its ordinary meaning of "[n]ot supporting any[one] … involved in an argument or disagreement; *indifferent to the outcome of a dispute.*" *Black's Law Dictionary* (11th ed. 2019). Defendants, though, inaccurately apprised Players that the Plan promises that "Neutral Physicians" are indeed neutral, even though it does not.

> **3.    Defendants' SPDs Failed to Reasonably Apprise Players of the Board's Plan-Wide True, Flawed Practices**

Courts have repeatedly held that the Board acts unreasonably in (i) failing to consider the cumulative effect of Players' impairments, *e.g.*, *Mickell*, 832 F. App'x at 594-95, and (ii) requiring self-reported symptoms to be supported by objective evidence, even though the Plan does not so

provide. *Dimry*, 2022 WL 1786576, at *2. Defendants, though, continue on a plan-wide basis to disregard such legal precedent. ¶ 342. Far from adhering to it, Defendants mislead Players in SPDs, advising them that they consider all impairments listed in a disability application. ¶¶ 312-13. Thus, not only have Defendants continually disregarded legal precedent, evincing violations of ERISA §§ 404(a)(1) and (1)(B), which require them to act prudently and in Players' best interests, but also they have breached their fiduciary duties under those sections, as well as ERISA § 102(a), by materially misinforming Players that their practice is to consider the cumulative impact of impairments when it really is not, and by failing to disclose in the SPDs their clandestine practice of requiring objective evidence. The *individual* recovery of benefits would not provide a *completely* adequate remedy for Defendants' failure to alter such improper "systemic, *plan-wide*" practices. *See Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 718 (6th Cir. 2005).

### F. Plaintiffs Allege with Particularity a Breach of the Fiduciary of Loyalty Premised on a Plan-Wide Scheme to Defraud Players

Defendants maintain that any claim sounding in fraud fails to satisfy Rule 9(b) pleading standards. DM22-23. Courts, however, "should hesitate to dismiss a complaint under Rule 9(b) if [they are] satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). Rule 9(b) is satisfied where a plaintiff has provided statistical analysis in support of its allegations and has "alleged specific facts and incidents to bolster its claims."[33]

---

[33] *State Farm Mut. Auto. Ins. Co. v. Slade Healthcare, Inc.*, 381 F. Supp. 3d 536, 564 (D. Md. 2019); *see also State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic, LLC*, 2019 WL 4722675, at *4 (D. Md. Sept. 25, 2019) (fraudulent scheme pled with particularity where plaintiff identified patients, physicians, dates of physician visits, location, and specific instances "include[d] examples of internal inconsistencies within the patient records").

Here, the complaint contains extensive statistical analysis of Defendants' fraudulent scheme, in violation of the fiduciary duty of loyalty under ERISA § 404(a)(1), of financially incentivizing physicians to be biased against Players (¶¶ 116-46), and that analysis is corroborated by specific instances (including times, place, who and to whom, the contents of false representations, and why they are false) made by Defendants to specific Players, identifying biased physicians and why Defendants are aware that they are conflicted (*e.g.*, ¶ 104), and the physician's specific financial incentives from Defendants. All of this supports the allegation that "Defendants implemented policies and practices regarding hiring, compensation, termination, promotion, and other similar matters involving Neutral Physicians who are unqualified, inadequate, and biased as part of a plan-wide scheme to defraud Players." ¶ 325; *see* ¶¶ 326-27.

Plaintiffs specifically allege that, as part of a fraudulent physician financial incentive scheme, Defendants made false representations from their offices to specific Plaintiffs in decision letters (whose dates Plaintiffs specify) and SPDs that lured Plaintiffs and absent class members into believing that these physicians are "*absolutely neutral* in this process," and that "neutral physicians" (without capitalizing that term) would perform "neutral exams."[34] Moreover, Plaintiffs specifically allege *why* these representations were false because extensive statistical analysis correlate Defendants' payments of higher annual and total compensation that rewarded identified physicians (many with reputations for minimizing ailments of the type afflicting Plaintiffs) for extremely high denial rates. ¶¶ 107-46, 321-29; *see, e.g.*, ¶¶ 224 (Board rewarded Dr. Werner with $288,000 in compensation for Apr. 1, 2021-Mar. 31, 2022, representing significant

---

[34] *E.g.*, ¶¶ 53, 92, 102-06, 108, 114, 138, 310; ECF No. 69-17 (decision letter issued to Pl. McKenzie, signed by "Michael B. Miller/Plan Director/On behalf of the Disability Board"); *see also* ECF No. 69-30 at 5 (Tr. 54:1-2) (Board member Cass testifying that "[the way] the whole system worked" was "the medical advisor then helped *us* set up a network of … physicians around the country").

increase from $47,500 she received her first year; sample of 16 evaluations she rendered shows 100% denial rate). These statistics are corroborated by "specific instances" for ten identified Plaintiffs evaluated by particular physicians, who provided false representations in the contents of their reports, and explanations of why those representations were false, including similar flaws and "internal inconsistencies" to Plaintiffs' detriment. *See Carefree Land Chiropractic*, 2019 WL 4722675, at *4-5 (fraud sufficiently pled where plaintiff relied on statistics from 550 claims, specifically identified "ten examples of patients," and "include[d] examples of internal inconsistencies within the patient records"). Furthermore, Defendants "ha[ve] been made aware of the particular circumstances for which [they will] have to prepare a defense at trial," and Plaintiffs have "substantial prediscovery evidence of those facts," *Harrison*, 176 F.3d at 784, through a large statistical sample of 784 T&P reports detailing Defendants' retention and reward of biased physicians, and their fraudulent misrepresentation of those biased physicians as "absolutely neutral in this process" to actively conceal their misconduct and downplay disabilities commonly stemming from a football career. ¶¶ 27, 122, 146, 333, 336-37.

The complaint establishes all of the above "essential facts" and more. Plaintiffs specifically identify the numerous highly paid physicians whom Defendants affirmatively misrepresented as "absolutely neutral in this process" in their decision letters, and well as the physicians' compensation history and their evaluation histories overwhelmingly unfavorable to Players. *E.g.*, ¶¶ 116, 122, 126-35, 144, 149-52, 158, 164-69, 171-72, 178-83, 185, 187, 195, 197, 200, 206, 217, 218, 221, 223-24, 227, 229-31, 234-35, 242, 244, 246, 248-49, 251, 253, 258, 261-62, 265. Also, Plaintiffs detail the manifest flaws and shortcomings in the reports prepared by financially incentivized, biased physicians—to which the Committee and Board routinely defaulted as part of the scheme in which they falsely assert that all records were reviewed. *See Watson*, 185 F. Supp.

42

2d at 585 (false assertion that "that a specific review of … records had been undertaken" when it had not "bordered on outright fraud").[35]

### G. Defendants Breached Their Duty of Care by Not Exercising Prudence in Compensating, Rewarding, and Relying on Biased Physicians Who Performed Inadequately

ERISA § 404(a)(1)(B) requires that a fiduciary must discharge its duties solely in the interest of participants "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]"  29 U.S.C. § 1104(a)(1)(B). In retaining experts, a trustee "must at least show that it (1) investigate[d] the expert's qualifications, (2) provide[d] the expert with complete and accurate information, and (3) [made] certain that reliance on the expert ... was reasonably justified under the circumstances."  *Brundle*, 919 F.3d at 773.  Moreover, "[b]ecause ERISA demands a high level of scrutiny from fiduciaries, a trustee must prove that it considered … any … relevant [facts] under the particular circumstances it faced at the time of the decision, and took care to avoid any identified conflicts of interest."  *Id.* A fiduciary breaches its duty under ERISA where it has "not demonstrated that its reliance on [a

---

[35] Plaintiffs identify (i) inadequate reports, ¶¶ 153, 176, 179-80, 182, 198, 200, 210, 212-13, 223, 225, 231, 241, 248, 235, 242, 251-52, 259 261; (ii) inconsistent neuropsychological test scoring, ¶¶ 153, 159, 179, 253, 258, 265; (iii) inconsistent neurological test results, ¶¶ 166, 172, 181, 197, 251, 252, 253, 261; (iv) failure to consider cumulative impairments, ¶¶ 166-67, 169, 171-72, 177, 180-82, 187-88, 195, 198, 200, 221, 223, 225, 244; (v) explicit consideration of education or training, which the Plan prohibits, ¶¶ 168, 182, 225, 283; (vi) inconsistent conclusions regarding impairments, ¶¶ 166, 168, 172, 176, 179, 185, 196, 209, 210, 213, 219, 220, 221, 223, 225, 231, 235, 241, 242, 250; (vii) disregard of opinions of other physicians, medical records, or objective evidence, ¶¶ 155, 157, 159, 172, 181, 187, 188, 196, 200, 206, 210, 220, 231, 244, 245, 248, 251; (viii) disregard of reliable self-reported symptoms despite the Plan not having an objective evidence requirement, ¶¶ 169, 171, 172, 176, 180, 181, 183, 188, 193, 197, 198, 200, 248, 264; (ix) application of discriminatory racial/demographic norms, ¶¶ 167, 169, 182; (x) deference on appeal to evaluations performed at the initial (Committee) level, ¶¶ 187, 235; and (xi) requiring contemporaneous evidence, ¶ 244.

hired expert's] report was reasonably justified in light of all the circumstances because [it had] not shown that it thoroughly probed the gaps and internal inconsistencies in that report."  *Id.* at 774. Similarly, fiduciaries may breach their 404(a)(1)(B) fiduciary duties based on imprudence in their compensation, selection, training, retention, and similar decisions regarding physicians, such as "in circumstances where they should know [their] performance to be inadequate."[36]

Here, Plaintiffs allege facts showing that Defendants have a practice that violates ERISA §§ 404(a)(1)(B) and 503(2) by failing to exercise due care under the circumstances in compensating, retaining, incentivizing, rewarding, promoting, and imprudently relying on physicians routinely without "thoroughly prob[ing] the gaps and internal inconsistencies in [their] report[s]," *Brundle*, 919 F.3d at 774, and the Board knows or should know that physicians have demonstrated inadequate work performance, a bias against finding Players entitled to disability benefits, and have otherwise given reason to doubt their integrity.  *E.g.*, ¶¶ 153, 176, 179-80, 182, 198, 200, 212, 223, 225, 231, 235, 241-42, 248, 251-52, 259, 261.

Furthermore, "the fiduciary's choices did not meet ERISA's requirements" because the "allege[d] facts, accepted as true, show[] that a prudent fiduciary in like circumstances would have acted differently."  *Moler*, 2022 WL 2756290, at *2.  A prudent fiduciary would not have rewarded Dr. McCasland with the highest compensation of all physicians (¶ 164 ($373,000 for 2021-22)), the year following publicly available evidence of inadequate work performance and bias against concussion-related disability findings, including (i) a court noting his admission that he had reviewed only "certain" records, (ii) knowledge that 100% of his expert work was in defending

---

[36] *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983); *see Keir v. UnumProvident Corp.*, 2003 WL 2004422, at *1 (S.D.N.Y. Apr. 29, 2003) (allegation that "defendants rewarded physicians … with bonuses or financial incentives for denying or terminating claims regardless of the merits of the claims and for fabricating medical justifications" stated breach of fiduciary duty).

against claims, and (iii) his testimony that concussion symptoms do not worsen.  ¶¶ 165-66.[37]

### H.    Defendants' Cumulative Conduct Establishes a Breach of Fiduciary Duties

Even if a fiduciary's "failings independently might not be dispositive, *cumulatively* they [may] demonstrate[] that [a fiduciary] failed to meet its duty under ERISA." *Brundle*, 919 F.3d at 774.  Therefore, even if particular aspects of Defendants' conduct taken alone may not support Plaintiffs' breach of duty of loyalty and care claims—which they do—and appropriate equitable relief under ERISA § 502(a)(3), Plaintiffs' allegations plausibly establish that, when their conduct is considered in the aggregate, Defendants abdicated their fiduciary obligations, warranting extraordinary remedies distinct from an award of benefits.  ¶¶ 4, 365-82.

### III.   COUNT IV PLEADS INJURIES AND SEEKS REMEDIES DISTINCT FROM A WRONGFUL DENIAL OF BENEFITS CLAIM

Defendants contend that Plaintiffs' breach of fiduciary duty claims should also be dismissed because they merely repackage their 502(a)(1)(B) claim for failure to pay benefits under the Plan's terms.  DM25-28.  Their argument principally rests on *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101 (4th Cir. 2006), which they contend is "dispositive."  DM26.  It is not.

In *Korotynska*, the Fourth Circuit narrowly held that claims for equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) ("502(a)(3)"), must be dismissed where the plaintiff has an *adequate* remedy under 502(a)(1)(B) for the particular injury alleged.  474 F.3d at 106-07. Notably, the *Korotynska* plaintiff did *not* allege *any* injury, theory, fact, or remedy distinct or severable from the wrongful denial of benefits under the plan's terms, such as lies, dishonesty,

---

[37] *See* ¶ 327 (Defendants know or should know that Dr. McCasland and other Defendant-compensated physicians have a history of bias and of providing inadequate, result-driven reports on which to base a decision, but have continued to retain, and even reward them through substantial increases in annual compensation, and have failed to investigate and remedy the situation); *see also*, *e.g.*, ¶¶ 126, 157-59, 178-80, 182-83, 187-88 (allegations concerning inadequacies of Drs. Brahin, Elkousy, Garmoe, Macciocchi, Medlock, and Mercado and incentivization of their bias).

misinformation, or other injuries in violation of ERISA's terms.  *See id.* at 105-07.[38]

In *Amara*—a seminal case decided five years after *Korotynska* and which Defendants do not discuss—the Supreme Court explained that where 502(a)(1)(B) does not afford traditionally equitable relief that a plaintiff seeks—such as injunctive relief, estoppel, restitution, surcharge, or plan reformation—it may be pursued under 502(a)(3).  563 U.S. at 435-42.  The Court noted that 502(a)(1)(B) does not authorize equitable relief for *misrepresentations* in SPDs but that 502(a)(3) does.  *Id.* at 435-38.  Here, *none* of the aforementioned relief is available under 502(a)(1)(B).  Just as importantly, the Court's award of such relief would *not* ensure an award of benefits to Plaintiffs.  For example, an injunction requiring the Defendants to correct inaccurate information in SPDs and decision letters does not equate to an individual award of benefits.  *Id.* at 439-41. This stands in stark contrast to *Korotynska*, where "the only injury of which she complain[ed] [was] the termination of benefits," and "admitted that her *whole purpose* in seeking § 1132(a)(3) relief [was] to enable her to recover the benefits to which she [was] entitled."  *Korotynska*, 474 F.3d at 105.

Count IV alleges breaches of the fiduciary duties of loyalty and care in Defendants' false representations to Players that the Plan's physicians are "*absolutely* neutral in this process" when the Plan does not state that and, in fact, they are not; the Board's false representations that they will receive a "neutral exam" even though the Plan does not state that and, in fact, they do not; and that the Board falsely asserts that it reviewed all of the evidence when, in fact, it does not and, in practice, delegates its decision-making to advisors (employees of its counsel) imprudently without directions to review the entire file, even ignoring their advice that it must review the entire record

---

[38] *Cf. Amara*, 563 U.S. at 440 (misinformation distinct injury requiring 502(a)(3) equitable relief); *Varity*, 516 U.S. at 506 (lies and deception distinct injury requiring 502(a)(3) equitable relief); *Frankenstein*, 2021 WL 826378, at *3 (permitting simultaneous 502(a)(1)(B) and 502(a)(3) claims because discriminatory treatment separate injury remedied only by equitable relief).

before rendering a decision.  ¶¶ 310-17, 319-20, 326, 328.  It further alleges breaches of these duties in Defendants' retention, incentivization, promotion, and compensation of—and imprudent reliance upon—physicians who have demonstrated bias or inadequate performance, often (by their own admission) not reviewing other medical evidence relating to a Player, and in constructing a scheme whereby physicians are compensated and rewarded, based on desired outcomes on Players' claims. ¶¶ 318, 321, 324, 327-28.[39]  Count IV also describes the distinct harms, including reliance and prejudice that applicants face from Defendants' particular breaches, including when deciding whether and on what basis to file a claim or administrative appeal, seek judicial review of a benefits denial, and spend money on retaining individual counsel, as well as the exacerbation of their physical and mental conditions from having to travel ridiculously long distances for examinations that Defendants schedule as part of their physician-shopping.  ¶ 329; *see* ¶ 54.

Moreover, putting aside Defendants' incorrect framing of Counts II-IV as raising only "procedural" deficiencies (DM27)—whereas the foregoing allegations make clear that Plaintiffs challenge Defendants' wholesale rigging of the claims process—Defendants sidestep salient allegations concerning the *relief* that Plaintiffs seek in connection with these Counts.  Plaintiffs seek injunctive relief enjoining Defendants from retaining *over 30* physicians from examining benefits applicants, and enjoining Defendants from compensating any physician more than

---

[39] Although Defendants argue that "if equitable relief under § 502(a)(3) were available in this case or in cases like it, *every* wrongful denial of benefits could be characterized as a breach of fiduciary duty" (DM27), a defendant can fail to review all records or have a conflict *without* the subsequent fact of *lying* about it.  Here, lying is a severable fact that is at least "different, in part," from the mere failure to review all records or conflict itself.  *Sloan v. Life Ins. Co. of N. Am.*, 2019 WL 6173410, at *4 (D. Md. Nov. 20, 2019) (allegation that plaintiff was "materially misled" was "not a 'repackaging' of plaintiff's denial of benefits claim").  To find otherwise would create "perverse incentives" for abuse by employers who wrongfully deny benefits to escape liability for the subsequent and severable fact of lying to cover it up.  *McCravy v. Metro. Life Ins. Co*., 690 F.3d 176, 183 (4th Cir. 2012).

$86,000 for a period of 5 years, so as to remove perverse financial incentives for physicians to render biased evaluations of applicants.  ¶¶ 365, 371-72.  Also, Plaintiffs seek to correct and enjoin Defendants' plan-wide deficient practices and the misinformation they communicate to participants; reformation of Plan terms; injunctions to bring the Plan into compliance with ERISA's requirements; an equitable surcharge for losses separate from the benefits that Plaintiffs are owed; the stripping of the Board's discretion prospectively; and estoppel, to bind Defendants to their (to date false) promises of neutral exams conducted by neutral physicians.  *E.g.*, ¶¶ 114, 160, 170, 173, 189, 201, 214, 226, 237-38, 326, 329, 333, 365-69, 371-73, 379-81.

Besides the foregoing, Plaintiffs seek the relief of equitable tolling of all deadlines.  ¶ 352. Defendants maintain that "the Plan's 42-month limitations deadline precludes court review of any final Board decision that was issued before August 9, 2019," and point to the Board's decision on Plaintiff Parsons' LOD benefits application as having been issued on May 18, 2018.  DM23; *see* ¶ 237.  They ignore, however, that Plaintiffs allege facts supporting their request under 502(a)(3) for equitable tolling (¶ 380) on account of a breach of fiduciary duty in violation of 404(a)(1).[40]

Equitable tolling[41] of the deadline for judicial review applies here, "where—due to

---

[40] For example, Plaintiffs and absent class members frequently rely on and are harmed by the material misinformation conveyed to them in SPDs and decision letters such as, when deciding whether to spend inordinate amounts of time and effort, and on what grounds, to bring an ERISA suit to obtain judicial review of a benefits denial, and, like Mr. Parsons, became aware of the Board's actual practices well after the decision on their respective applications was issued.  ¶¶ 53-54, 102, 105-06, 114, 160, 238, 329.

[41] "Equitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action; equitable estoppel applies where the defendant engages in intentional misconduct to cause a plaintiff to miss a filing deadline."  *Huff v. Board of Governors of Univ. of N.C.*, 334 F. App'x 583, 584 (4th Cir. 2009); *see Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) ("We have allowed equitable tolling in situations … where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.").  Specifically, "equitable tolling may be available for deadlines in ERISA plans

circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result" from "actual harm … com[ing] from the *loss of a right* protected by ERISA." *Amara*, 563 U.S. at 444; *see Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000). The fraudulent scheme to cover up the conflicts and untrue statements that the Board has reviewed records, when it really has not, are the type of extraordinary circumstances warranting equitable tolling and estoppel because "[t]o allow an administrator the benefit of a conflict merely because it managed to successfully keep that conflict hidden during the administrative process would be absurd." *Howley v. Mellon Fin. Corp.*, 625 F.3d 788, 794 (3d Cir. 2010). To conclude that Plaintiffs' claims accrued while the Board was actively concealing its wrongdoing "would make no sense and would undermine ERISA's underlying purposes of promoting the interests of" Plan participants, and "would impose an unfair duty of clairvoyance" on participants "who allege that the detrimental effect on them" of Defendants' "non-compliance with ERISA was not apparent during the many years" in which Defendants perpetuated their scheme. *England v. Marriott Int'l, Inc.*, 764 F. Supp. 2d 761, 772 (D. Md. 2011).

Defendants assert that 502(a)(3) claims in this Circuit are "routinely" dismissed (DM28 n.18), but that is not so. To the contrary, this Court has repeatedly rejected similar efforts to read *Korotynska* so broadly. In *England*, the Court first noted that 502(a)(1)(B)'s plain language "only provides relief to a plaintiff who seeks 'to recover benefits due to him *under the terms of his plan,* to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]'" 764 F. Supp. 2d at 777 (quoting statute). It concluded that "the fairest reading of *Korotynska*'s holding is that where a plaintiff can obtain *complete relief* under Section

---

involving the time to file a lawsuit or appeal the denial of benefits." *Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 851-53 (4th Cir. 2023) (equitable tolling remedy available under 502(a)(3)).

502(a)(1)(B), for example, where he seeks *only* the payment of benefits under the terms of his …

plan, he cannot simultaneously bring a claim under Section 502(a)(3)."  *Id.* at 779 (emphasis in

original and added).  The Court noted that whereas the 502(a)(1)(B) claims there were based on

the refusal to pay benefits *under plan terms*, the 502(a)(3) claims were based on the defendants'

failure to bring awards into *compliance with ERISA*.  *Id.*  Similarly, in *Guardian Life Ins. Co. of*

*Am. v. Reinaman*, 2011 WL 2133703 (D. Md. May 26, 2011), the Court rejected the argument that

*Korotynska* warranted dismissal of the 502(a)(3) claim, holding that the plaintiff's claim that he

was "misinformed" of the process was distinct from his denial of benefits claim.  *Id.* at *1, *8-9.

More recently, in *Sloan*, this post-*Amara* Court permitted concurrent 502(a)(1)(B) and

502(a)(3) claims, rejecting the *Korotynska*-based argument that the plaintiff's 502(a)(3) equitable

relief claim premised on misleading information "simply recast an individual claim for Plan

benefits as a breach of fiduciary duty claim."  2019 WL 6173410, at *2.  Notably, the Court,

quoting *England*, found it "entirely appropriate to bring simultaneous § 502(a)(3) and §

502(a)(1)(B) claims to *address two separate and distinct injuries* that are based in whole or in part

on different facts," and held that *Korotynska* was distinguishable because the plaintiff alleged

distinct theories of recovery, one of them being the wrongful denial of benefits under the plan's

terms, the other being a breach of fiduciary duty based on the  failure to provide her with accurate

information required under ERISA.  *Id.* at *4.  Finally, in *Frankenstein*, this Court again reiterated

that "it is entirely appropriate to bring simultaneous § 502(a)(3) and § 502(a)(1)(B) claims to

address two separate and distinct injuries that are based in whole or in part on different facts."

2021 WL 826378, at *3.  The Court reasoned that the plaintiff's "recovery of benefits claim

center[ed] on the reasonableness of Defendants' interpretation of the Plan's language, whereas his

breach claim center[ed] on the discriminatory treatment[.]  … Thus, although there [was] naturally

some overlap, [the] two claims appear[ed] to be based, at least in part, on different facts[.]" *Id.*[42]

Ignoring all of these in-District precedents adverse to their position, Defendants rely instead on mostly out-of-District cases (DM27-28) that are inapposite or otherwise unpersuasive.[43]

---

[42] Other courts, too, have recognized that where a 502(a)(1)(B) award of benefits would not provide an adequate remedy for the alleged injury, dismissal of a concurrent 502(a)(3) equitable relief claims is inappropriate. *E.g.*, *Moyle v. Liberty Mut. Ret. Ben. Plan*, 823 F.3d 948, 961 (9th Cir. 2016); *Gore v. El Paso Energy Corp. Long Term Disability Plan,* 477 F.3d 833, 839-40 (6th Cir. 2007); *Christine S. v. Blue Cross Blue Shield of N.M.*, 428 F. Supp. 3d 1209, 1220 (D. Utah 2019); *Soland v. George Washington Univ.*, 916 F. Supp. 2d 33, 39 (D.D.C. 2013); *Sconiers v. First Unum Life Ins. Co.*, 830 F. Supp. 2d 772, 778 (N.D. Cal. 2011).

[43] The plaintiffs in *Hall v. Metro. Life Ins. Co.*, 259 F. App'x 589 (4th Cir. 2007), *aff'g*, 398 F. Supp. 2d 494 (W.D. Va. 2005), and *Clark*, 2009 WL 10727182, at *7, did not even assert a 502(a)(3) claim or seek far-reaching equitable relief. Likewise, in *Moore v. Verizon Commc'ns, Inc.*, 2022 WL 16963245, at *7 (E.D. Va. Nov. 15, 2022), the plaintiff sought no equitable relief. The plaintiff in *Gardner, Jr. v. TIMCO Aviation Servs., Inc.*, 2010 WL 3282662, at *2 (M.D.N.C. Aug. 19, 2010), pleaded 502(a)(3) only as an "and/or" jurisdictional basis, without alleging any facts or request for equitable relief to support a 502(a)(3) claim. *See* 2010 WL 2842226 (June 3, 2010). Similarly, the plaintiff in *Archer v. SunTrust Bank*, 2017 WL 6550390, at *2 (E.D. Va. Dec. 22, 2017), set forth no independent factual basis for her fiduciary duty claim. In *Ethridge v. Am. Airlines, Inc.*, 2007 WL 9718535, at *5-6 (E.D.N.C. Sept. 26, 2007), the only equitable relief the plaintiff sought was an injunction ordering reinstatement of coverage and payment of benefits. *See* 2005 WL 2893170 (Sept. 19, 2005). So, too, in *Koman v. Reliance Standard Life Ins. Co.*, 2022 WL 17607056, at *4 (M.D.N.C. Dec. 13, 2022), the plaintiff had "only one theory of recovery"—payment of benefits. *Juric v. USALCO, LLC*, 2023 WL 2332352 (D. Md. Mar. 2, 2023), involved a disjointed claim, for which the plaintiff cited no statutory provision. *Id.* at *4-5. The Court rejected it not only as a reformulated claim for benefits, but also because the defendants were not fiduciaries to begin with and the plaintiff presented no allegations of a fiduciary duty breach. *Id.* at *5-6. In *Connecticut Gen. Life Ins. Co. v. Advanced Surgery Ctr. of Bethesda, LLC*, 2015 WL 4394408, at *30 (D. Md. July 15, 2015), the crux of the 502(a)(3) counterclaim was improper denial of benefits based on "misconstruction or misapplication of the plan terms," plainly making it a rehashed 502(a)(1)(B) claim. In *Greenwell v. Grp. Health Plan for Emps. of Sensus USA, Inc.*, 505 F. Supp. 3d 594, 607 (E.D.N.C. 2020), and *Exact Scis. Corp. v. Blue Cross & Blue Shield of N.C.*, 2017 WL 1155807, at *8-9 (M.D.N.C. Mar. 27, 2017), the courts reasoned that the 502(a)(3) claims (factually unsupported in the latter) aimed at bottom to remedy the same injury as did the 502(a)(1)(B) claims—wrongful benefits denials. Both courts gave *Korotynska* a sweeping application that this District's decisions have rejected post-*Amara*.

No more availing is Defendants' contention that, in some of the cases cited in the complaint, courts dismissed 502(a)(3) claims. DM28 n.17. In *Cloud*, 2021 WL 7708676, at *1 (ECF No. 69-28), the plaintiff sought monetary relief and invoked 502(a)(3) only as an alternative jurisdictional ground, seeking an injunction only to prevent reduction of benefits he was owed. *See* 2020 WL 13527050 (May 15, 2020). Thus, he plainly had an adequate remedy under 502(a)(1)(B). The

## IV.    COUNTS II AND III PLEAD DISTINCT, COGNIZABLE CLAIMS

Equally meritless are Defendants' challenges to Counts II and III (¶¶ 290-329).   They maintain that, like Count IV, these Counts repackage Plaintiffs' 502(a)(1)(B) claim and, aside from that, they present no viable claim.  DM25-34.

Defendants' repackaging argument warrants little discussion.   Counts II-III attack a *process* that denies full and fair review.   This includes Defendants' failure to consider all evidence in the administrative record and address evidence favorable to Players or Plan provisions weighing in their favor, and their inconsistent application of Plan provisions to similarly situated Players. ¶¶ 294-95, 298, 304.   It also includes Defendants' failure to conduct independent audits or otherwise take steps to limit the likelihood of bias in evaluations of Players.   ¶¶ 299-301.   Plaintiffs further challenge Defendants' use of the *same* advisors at both the Committee and Board levels, which defeats the very purpose of what is supposedly *de novo* review of claims.   ¶ 302.   The *individual* recovery of benefits would not provide a completely adequate remedy for these systemic, *plan-wide* improper practices.[44]

Faring no better are Defendants' attacks on the substance of Counts II-III.   First, they argue

---

court in *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2016 WL 7971198, at *1 (N.D. Cal. June 14, 2016) (ECF No. 69-29), noted that the plaintiff had failed to allege *any* facts showing that the plan followed a "uniform practice of misconduct for all NFL disability claims," and that "[t]he only examples of misconduct alleged in the complaint involve[d] *his own* individual claim," not plan-wide misconduct.  As for the cases in ¶ 21 to which Defendants refer, Plaintiffs did not cite them in support of 502(a)(3) jurisdiction but, rather, to illustrate courts' frequent rebukes of Defendants' decisions and decision-making.

[44]   *See Hill*, 409 F.3d at 718 ("Only injunctive relief of the type available under § 1132(a)(3) will provide the complete relief sought by Plaintiffs … to *alter* the manner in which [defendant] administers all the Program's claims.") (6th Cir. 2005); *Rawls v. Unum Life Ins. Co. of Am.*, 219 F. Supp. 2d 1063, 1066 (C.D. Cal. 2002) (rejecting defendant's argument "that what the plaintiffs seek, in the end, is benefits on behalf of the class"; "the integrity of the appeal process … is a valuable distinct right under ERISA that is separate from just the benefits decision" and thus requested injunctive relief was "not simply equivalent to a request for benefits").

that Count II fails because Committee and Board decisions need not address each scrap of evidence. DM29. Decisions, however, must do more than default in kneejerk fashion to hired physicians' conclusions—with the boilerplate justification that those physicians are "specialists" in their field—while failing to reconcile conflicts between those conclusions and the physicians' actual findings or between their conclusions and evidence that Players submit.[45]

Nor can Defendants genuinely maintain that their decisions provide claimants "with all the information necessary to perfect the claim" (DM30) where, as here, they are based on *sub rosa* interpretations, such as the Board's policy—unmasked in *Cloud*—that the Active Football T&P category is reserved only for Players who suffer a catastrophic injury during a game. ¶¶ 193, 294. *See* 29 C.F.R. § 2560.503-1(b)(1), (d) (plan's claims procedure is reasonable only if it complies with sundry requirements, including that determinations are "made in accordance with governing plan documents"). Equally meritless is Defendants' assertion that even if Plaintiffs' decision letters were deficient, ERISA § 503(1), 29 U.S.C. § 1133(1), provides "no independent recovery." DM30. Section 503(1) violations warrant remand.[46]

---

[45] *E.g.*, ¶¶ 153-60 (Pl. Zeno), 176-88 (Pl. McKenzie), 191-93 (Pl. Sims); ECF Nos. 69-17, -18, -25, and -27 (Board decisions on McKenzie, Sims, and Zeno appeals); *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("Plan administrators … may not arbitrarily refuse to credit a claimant's reliable evidence[.]"); *Love v. Nat'l City Corp. Welfare Benefits Plan*, 574 F.3d 392, 397-98 (7th Cir. 2009) (decision inadequate where it failed to explain why treating physicians' opinions were discounted); *Jorstad v. Conn. Gen. Life Ins. Co.*, 844 F. Supp. 46, 57 (D. Mass. 1994) ("Providing a claimant sparse or conclusory reasons for the denial of benefits … fails to comport with section 1133.") (citing cases); *Giraldo v. Bldg. Serv. 32B-J Pension Fund*, 2006 WL 380455, at *5 (S.D.N.Y. Feb. 16, 2006) ("[T]o fulfill their obligation of conducting a full and fair review, defendants were obligated to explain *why* they found one medical opinion more credible than [an]other, directly conflicting opinion.") (citing cases).

[46] *E.g.*, *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 159 (4th Cir. 1993); *Burdette v. Mees*, 933 F.2d 1001 (table), 1991 WL 84160, at *4 (4th Cir. May 23, 1991) (unpublished); *Scott v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 2011 WL 2601569, at *8 (D. Md. June 28, 2011); *O'Dell v. Zurich Am. Ins. Co.*, 2015 WL 5724376, at *26-27 (S.D.W. Va. Sept. 29, 2015).

Next, Defendants argue that Count II fails because Plaintiffs have not pleaded sufficient facts to support their allegation (¶ 298) that Defendants fail to review the entire administrative record. DM32-33. They complain that Plaintiffs' allegation "relies almost exclusively" on testimony in the *Cloud* action (DM31) but give no *reason why*—save their *ipse dixit*— Plaintiffs may not rely on facts gathered from discovery and trial in another case.[47]

Setting that aside, Defendants are incorrect. Plaintiffs' allegation is also supported by the Committee's and Board's repeated failure (in several instances discernible from the inadequate summary sheets prepared by their advisors) to: (a) identify what evidence they considered; (b) acknowledge, let alone address, evidence favorable to Plaintiffs; (c) reconcile contradictory evidence or physicians' contradictory statements; (d) either consider the cumulative impact of impairments or even acknowledge that the claim was based on a cumulative impact. ¶¶ 167, 170, 173, 169, 184, 186, 199, 207, 211-12, 222, 226, 237, 246-47, 250, 255, 260, 316-17. Plaintiffs' allegation is further supported by *other* courts' findings that the Board failed to consider record evidence or the combined effects of Players' impairments and simply defaulted to its hired physicians' conclusions. ¶ 21.d, 21.e, 21.g (citing cases).

With respect to Count III, Defendants first argue that Plaintiffs' "full and fair review claims

---

[47] Defendants collaterally attack the findings in *Cloud* through an 11-page transcript excerpt. *See* ECF No. 69-30. Overwhelming testimony in *Cloud*, however, refutes it, including that "Board members do not review *all* of the documents in the administrative record"; the Board cedes its responsibility to review evidence to advisors; those advisors have not been directed to review all evidence and receive no performance reviews; individual cases are not discussed in formal Board meetings; and the Board decides cases *en masse* and does not even review decision letters before they are issued. *See Cloud*, 2022 WL 2237451, at *11-13 (citing deposition and trial transcripts; emphasis in original). In fact, other testimony from *Cloud* that Defendants themselves proffered controverts it. *See* ECF Nos. 53-29 at 6 (Ex. X in support of Defs.' mot. to dismiss initial compl.) (Tr. 173:11-12) (former Board member Cass' testimony that "it wasn't necessary for me to read all of the medical information"), 53-30 at 4 (Ex. Y) (Tr. 81:6-8) (Board member Smith's testimony: "Q. You would agree you did not review the entire file, though, correct? A. That is correct.").

are predicated on procedural violations that are not independently actionable under § 503." DM30. Although Defendants cite cases rejecting standalone ERISA § 503 causes of action, other courts have sustained such counts. *E.g., Exact Scis. Corp.*, 2017 WL 1155807, at *9. In any event, Plaintiffs do not invoke 503 as an independent jurisdictional basis. Rather, they assert it in conjunction with 502(a)(3), for which they seek equitable relief. That is hardly unprecedented.[48]

As for the substance of Count III, Defendants maintain that its allegations that they have Players evaluated by conflicted physicians (¶¶ 299-301) fail because "Plaintiffs admit … that the Plan has implemented safeguards to ensure the impartiality and independence of the Neutral Physicians." DM31. Plaintiffs admit no such thing. To the contrary, they allege that Defendants have failed to have independent audits conducted to ensure that physicians are being genuinely neutral or take steps to ensure that Plan provisions are interpreted consistently. ¶¶ 300, 303-04. That physicians must certify by merely checking a box that their opinions are provided without bias and are paid a flat fee (DM31-32) do not ensure the integrity of the claims process. The incentive for bias is not how much physicians are paid for individual examinations but, rather, how much they stand to earn from the volume of business they do with the Plan. ¶ 230; Section I.H, *supra*. Defendants' contention that Plaintiffs' statistics concerning physician bias are legally insufficient (DM32) fails for the reasons discussed in Section I.H above.

Defendants then attack Count III's allegation concerning the Committee's and Board's improper reliance on the same advisors (¶ 302), justifying it on the ground that "[t]he Committee and Board do not have divergent interests." DM32-33. What matters, however, is not whether

---

[48] *E.g., Wheeless v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 39 F. Supp. 2d 577, 579-32 (E.D.N.C. 1998) (addressing 502(a)(3) counts seeking redress for 503(2) violations); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 2010 WL 1979569, at *14-15 (N.D. Ill. May 17, 2010) (sustaining 502(a)(3) count seeking injunctive and declaratory relief for failure to provide full and fair review of claims and rejecting argument that it duplicated 502(a)(1)(B) count).

the Committee's and Board's interests are aligned or unaligned but, rather, that reliance on the same advisors deprives Players of independent review. Advisors heavily influence the Committee's decisions and Board members themselves do not review the full record. ¶¶ 226, 238, 302, 320, 345. The Board's reliance on the same advisors used by the Committee is manifestly improper, making a mockery of the de novo review that is required of the Board under both ERISA and the Plan.[49] Given the Board's de facto abdication of decision-making to advisors (*see supra* at 36, 46-47, 54 n.47), it is even more egregious than having the same law clerk work on a case in the trial court and then again when it is up on appeal, which would be self-evidently outrageous. Defendants deceptively quote from *Lafleur v. La. Health Serv. & Indem. Co.*, 563 F.3d 148 (5th Cir. 2009), that "the same doctor can participate in (rather than conduct) both administrative appeals," omitting language immediately following, which explained that "*exclusive reliance* on the opinion of the same doctor in both appeals runs afoul of § 2560.503–1(h)(3)(ii)." *Id.* at 157.

Finally, as to Plaintiffs' allegation that they failed to furnish requested information concerning their chosen physicians' predisposition (¶ 303), Defendants deny they were obligated to do so. DM33-34. ERISA regulations require that "claims procedures contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and … plan provisions have been applied consistently[.]" 29 C.F.R. § 2560.503-1(b)(5). Documents demonstrating compliance with the administrative processes and safeguards required under this regulation are considered relevant to

---

[49] *See* 29 C.F.R. § 2560.503-1(h)(3)(ii), (h)(iv) (disability plan must "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual"); ECF No. 69-7 at 68 (Plan § 13.14, stipulating that "[t]he Disability Board will accord no deference to the determination of the Disability Initial Claims Committee").

an applicant's claim.  *Id.* § 2560.503-1(m)(8), (m)(8)(iii).  Thus, Defendants plainly have an obligation to furnish such information to Plaintiffs.  Defendants' assertion that Plaintiffs do not allege a refusal to provide such information (DM33-34) is inaccurate.  *See* ¶¶ 51, 55, 104, 303.

## V.    PLAINTIFFS STATE CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS

Defendants further contend that Plaintiffs have not properly pleaded claims against the individual trustees. DM43-45.  Plaintiffs, however, have pleaded both (1) Board members' individual misconduct, and (2) sufficient facts to establish their status as functional fiduciaries in breach of their duties.  *See* 29 U.S.C. §§ 1002(21)(A), 1132(d)(2); *Keegan v. Steamfitters Local Union No. 420 Pension Fund*, 174 F. Supp. 2d 332, 340 (E.D. Pa. 2001).

*First*, Plaintiffs plead individual misconduct, which includes Board members' admitted failure to review all records and imprudently ignoring advice to do so.  ¶¶ 41, 316, 320; Section IV, *supra* (discussing support for allegation of failure to review all evidence).  *Second*, Plaintiffs plausibly allege Board members' discretionary responsibility and authority in administering the Plan, sufficient to permit a reasonable inference that each member is a functional fiduciary.  *See Peters v. Aetna Inc.*, 2 F.4th 199, 227-32 (4th Cir. 2021).  This Court recently held that individual defendants were functional fiduciaries based in part on their testimony acknowledging their "direct involvement in individual claim determinations" and "control" over an ERISA fiduciary.  *Acosta v. WH Admr's, Inc.*, 449 F. Supp. 3d 506, 517 (D. Md. 2020).  Plaintiffs' allegations plausibly establish individual functional fiduciary status based in part on similar testimony,[50] and the Board's counsel *acknowledged* that individual Board members are fiduciaries.  ¶ 42 (obligations of "[t]he decision-making *fiduciaries* of the Plan").  Plaintiffs also describe how Board members, as

---

[50]  ¶¶ 56, 99, 345-46; *see also* ECF 69-30 at 5, 12 (former Board member Cass' testimony, *inter alia*, that "the medical advisor then helped *us* set up a network of independent neutral physicians" and how "*we* would be meeting on financial issues and … getting reports from the financial advisors, getting reports on various matters relating to the pension plan").

functional fiduciaries, breached their duties based on conduct considered in the aggregate. *E.g.*, ¶¶ 101, 204, 298, 315, 319.

Defendants maintain that Plaintiffs' Count V claim on behalf of the Plan (¶¶ 331-32) should be dismissed because Plaintiffs fail to plead fiduciary misconduct on the individual trustees' part. DM45-48. That, too, fails. ERISA § 502(a)(2) 29 U.S.C. § 1132(a)(2), allows a plan participant to bring a derivative action on behalf of a plan to obtain relief under ERISA § 409(a), 29 U.S.C. 1109(a), and such claims may be asserted concurrently with 502(a)(1)(B) and 502(a)(3) claims. *See Peters*, 2 F.4th at 215-16. Here, Board members' breach of their fiduciary obligations—in erecting and maintaining a sham claims process, in which they pay huge sums to physicians having high rates of rendering evaluations adverse to Players in order to obtain result-oriented evaluations to support denials of applications—has not only harmed the Plan's integrity (¶¶ 333-40), but also has cost the Plan at least some $30 million in payments to those biased and inadequate physicians (¶ 341). This misguided squandering of Plan assets is a genuine injury to the Plan itself—distinct from the injuries sustained by Plaintiffs—for which the Plan is entitled to restitution. ¶ 379.[51]

Moreover, on behalf of the Plan, Plaintiffs also seek removal of the Board's current members. ¶ 387. Removal of fiduciaries is an appropriate remedy for "repeated or substantial violations of their fiduciary duties,"[52] and that includes refusal to pay contractually authorized

---

[51] *See Edmonds v. Hughes Aircraft Co.*, 145 F.3d 1324 (table), 1998 WL 228200, at *9 (4th Cir. May 8, 1998) (unpublished) ("We wonder whether a conflict-free ERISA fiduciary would even spend $472 of *the plan's money* for a terse, conclusory opinion[.]"); *see also Russell*, 473 U.S. at 142 ("abundantly clear" that "draftsmen [of section 409(a)] were primarily concerned with the possible misuse of plan assets").

[52] *Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 n.6 (4th Cir. 1996); *accord Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*, 2018 WL 4052182, at *11 (D. Md. Aug. 23, 2018) (502(a)(2) claim viable where plaintiff requested plan-wide relief that court bar each defendant from "ever acting as a fiduciary of any ERISA-covered plan").

benefits that is "willful and part of a larger systematic breach of fiduciary obligations." *Russell*, 473 U.S. at 147.  Even if the individual Board members' actions standing alone may not warrant their removal, "when their behavior is considered in the aggregate, it becomes evident that [they] abdicated their fiduciary obligations." *Chao v. Malkani*, 452 F.3d 290, 294 (4th Cir. 2006).

Finally, Defendants argue that all claims against NFL Commissioner Goodell must be dismissed because he is not a named fiduciary, and implicitly argue that he is not a functional fiduciary, either, because he has no voting authority.  DM48-50.  Fiduciary status, however, is not an all-or-nothing proposition. *Gordon v. CIGNA Corp.*, 890 F.3d 463, 474 (4th Cir. 2018).  Under the Plan, "the Commissioner or, in his absence, his designee, will *preside* at all meetings of the Disability Board."  ¶ 44; *see supra* at 2 n.2.  "Preside" means "[t]o exercise management or control" or "[t]o occupy the place of authority." *Black's Law Dictionary* (11th ed. 2019).  In other words, as the Boad's Chairman, Commissioner Goodell occupied a place of authority over the other members at meetings.[53]  During these meetings, as Plaintiffs allege and as discussed above, Board members collectively breached their fiduciary duties.  Therefore, it can reasonably be inferred that Commissioner Goodell, like the other Board members, participated in or condoned (or at least did not rein in) these breaches of duty.

---

[53]  That distinguishes Commissioner Goodell's role from Defendants' cited cases (DM49-50). *See*, *e.g.*, *Adams v. Brink's Co.*, 261 F. App'x 583, 590-91 (4th Cir. 2008) (vice president of employer that was also plan's sponsor, "who had no responsibilities with respect to the … plan"); *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 224 (S.D.N.Y. 2012) (non-ERISA case involving claims asserted against non-director corporate officers); *Johnson v. NFL Player Disability, Neurocognitive & Death Benefit Plan*, 2023 WL 2059033, at *6-8 (E.D. Mich. Feb. 16, 2023) (claims asserted against NFLPA and NFL Management Council).

**CONCLUSION**

For the foregoing reasons, the Court should deny Defendants' motion.[54]

Dated:  August 11, 2023

                                     Respectfully submitted,

                                     **MIGLIACCIO & RATHOD LLP**

By:     */s/ Jason S. Rathod*
              Jason S. Rathod
              Nicholas A. Migliaccio
              412 H Street, N.E.
              Washington, DC 20002
              Telephone:  (202) 470-3520
              Facsimile:  (202) 800-2730
              jrathod@classlawdc.com
              nmigliaccio@classlawdc.com

Christopher A. Seeger *(admitted pro hac vice)*
Diogenes P. Kekatos *(admitted pro hac vice)*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegereiss.com

Samuel L. Katz *(admitted pro hac vice)*
Julia M. Damron *(admitted pro hac vice)*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800

---

[54] Defendants argue that, even if the Court sustains their claims, Plaintiffs are not properly joined in this action.  DM25 n.14.  Putting aside that they are proposed representatives of a class and subclasses raising plan-wide claims, Plaintiffs challenge common courses of conduct, and their claims present common questions of law and fact.  Hence, Plaintiffs are properly joined.  *See* Fed. R. Civ. P. 20(a)(1)(B).  At any rate, in their motion Defendants have not invoked Rule 21 to request severance as concurrent or alternative relief.  They seek only a Rule 12(b)(6) dismissal.  ECF No. 69 at 1.  Because they relegated their misjoinder argument to a footnote the Court should either follow the overwhelming majority of courts that deem such arguments waived, *e.g.*, *White Glove Staffing, Inc. v. Methodist Hosps. of Dallas*, 947 F.3d 301, 308 (5th Cir. 2020); *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014); *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012); *Nat'l Foreign Trade Council v. Natsios*, 181 F.3d 38, 61 n. 17 (1st Cir. 1999); *United States v. White*, 879 F.2d 1509, 1513 (7th Cir. 1989) (citing cases), or simply disregard it.  *See Montage Furniture Servs., LLC v. Regency Furniture, Inc.*, 966 F. Supp. 2d 519, 522 n.3 (D. Md. 2013) ("[C]ourts have discretion to disregard arguments made in footnotes.").

Beverly Hills, CA 90211
Telephone:  (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com

Bryan F. Aylstock *(admitted pro hac vice)*
Justin G. Witkin *(admitted pro hac vice)*
Douglass A. Kreis *(admitted pro hac vice)*
D. Nicole Guntner *(admitted pro hac vice)*
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone:  (850) 202-1010
BAylstock@awkolaw.com
JWitkin@awkolaw.com
DKreis@awkolaw.com
NGuntner@awkolaw.com

Robert K. Scott *(admitted pro hac vice)*
Gerry H. Goldsholle *(admitted pro hac vice)*
**ADVOCATE LAW GROUP P.C.**
2330 Marinship Way, Suite 260
Sausalito, CA 94965
Telephone:  (949) 753-4950
bob@advocatelawgroup.com
gerry@advocatelawgroup.com