**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-00358-JRR |
| THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN *et al.*, | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 4

ARGUMENT ....................................................................................................................... 4

    I.      PLAINTIFFS HAVE NOT PROVED RULE 23'S REQUIREMENTS ARE MET. ................................................................................................ 4

    II.     PLAINTIFFS' PROPOSED CLASSES DO NOT SATISFY RULE 23(a) ........... 8

         A.     There Are No Common Answers That Will Resolve Plaintiffs' Claims. ................................................................................................ 8

         B.     Plaintiffs' Claims Are Not Typical Of Absent Class Members'. ............. 28

    III.    PLAINTIFFS' PROPOSED CLASSES ARE OVERBROAD .......................... 31

    IV.    PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b) ...................................................................................................... 33

         A.     Plaintiffs cannot satisfy Rule 23(b)(3). ..................................................... 33

         B.     Plaintiffs cannot certify a class under Rule 23(b)(1). .............................. 36

         C.     Plaintiffs cannot certify a class under Rule 23(b)(2). .............................. 39

CONCLUSION ..................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adams v. Henderson*,
197 F.R.D. 162 (D. Md. 2000) ........................................................................... 33, 35

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ................................................................................... 34

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................ 36

*Balkin v. Unum Life Ins. Co.*,
2024 WL 1346789 (D. Md. Mar. 29, 2024) ............................................................ 13

*Becher v. Long Island Lighting Co.*,
164 F.R.D. 151 (E.D.N.Y. 1996) ............................................................................ 27

*Bellon v. PPG Emp. Life & other Benefits Plan*,
2023 WL 4155362 (N.D.W. Va. May 23, 2023), *R. & R. adopted sub nom.*,
2024 WL 1303911 (N.D.W. Va. Mar. 27, 2024) ..................................................... 33

*Berry v. Schulman*,
807 F.3d 600 (4th Cir. 2015) ....................................................................... 33, 34, 39

*Boyd v. Coventry Health Care Inc.*,
299 F.R.D. 451 (D. Md. 2014) ................................................................................ 37

*Brieger v. Tellabs, Inc.*,
245 F.R.D. 345 (N.D. Ill. 2007) .............................................................................. 30

*Cahoo v. Fast Enters. LLC*,
508 F. Supp. 3d 138 (E.D. Mich. 2020) .................................................................. 29

*Career Counseling, Inc. v. AmeriFactors Fin. Grp., LLC*,
91 F.4th 202 (4th Cir. 2024) ..................................................................................... 4

*Clark v. Creative Hairdressers, Inc.*,
2005 WL 3008511 (D. Md. Nov. 9, 2005) ................................................................ 7

*Cockerill v. Corteva, Inc.*,
345 F.R.D. 81 (E.D. Pa. 2023) ................................................................................ 27

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ........................................................................................... 4, 5, 7

*Cusack-Acocella v. Dual Diagnosis Treatment Ctr., Inc.*,
2019 WL 2621920 (C.D. Cal. Apr. 8, 2019) .......................................................... 32

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Deiter v. Microsoft Corp.*,
    436 F.3d 461 (4th Cir. 2006) .............................................. 28

*Dykes v. Portfolio Recovery Assocs., LLC*,
    2016 WL 346959 (E.D. Va. Jan. 28, 2016) ................................ 31

*EEOC v. Freeman*,
    961 F. Supp. 2d 783 (D. Md. 2013) ........................................ 7

*EQT Prod. Co. v. Adair*,
    764 F.3d 347 (4th Cir. 2014) ........................................ 4, 31, 33

*Equal Rights Ctr. v. Kohl's Corp.*,
    2017 WL 1652589 (N.D. Ill. May 2, 2017) ................................ 7

*Falberg v. Goldman Sachs Grp., Inc.*,
    2022 WL 538146 (S.D.N.Y. Feb. 14, 2022) .............................. 37

*Fisher v. Va. Elec. & Power Co.*,
    217 F.R.D. 201 (E.D. Va. 2003) ......................................... 35

*Fitzwater v. CONSOL Energy, Inc.*,
    2019 WL 5191245 (S.D.W. Va. Oct. 15, 2019) .......................... 25

*Fuller v. Fruehauf Trailer Corp.*,
    168 F.R.D. 588 (E.D. Mich. 1996) ...................................... 27

*G.T. v. Bd. of Educ. of Cnty. of Kanawha*,
    117 F.4th 193 (4th Cir. 2024) ......................................... 8, 9

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982) .................................................... 28

*Gruber v. Grifols Shared Servs. N. Am., Inc.*,
    2023 WL 8610504 (C.D. Cal. Nov. 2, 2023) ............................. 26

*Hayes v. Prudential Ins. Co. of Am.*,
    60 F.4th 848 (4th Cir. 2023) ........................................... 14

*Helton v. AT&T Inc.*,
    709 F.3d 343 (4th Cir. 2013) ............................................ 5

*In re Broadwing, Inc. ERISA Litig.*,
    252 F.R.D. 369 (S.D. Ohio 2006) ....................................... 37

*In re Enron Corp.*,
    2006 WL 1662596 (S.D. Tex. June 7, 2006) ............................. 30

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In re Kirschner Med. Corp. Sec. Litig.*,
    139 F.R.D. 74 (D. Md. 1991)................................................................27

*In re Marsh ERISA Litig.*,
    265 F.R.D. 128 (S.D.N.Y. 2010) .......................................................26

*In re Polaroid ERISA Litig.*,
    240 F.R.D. 65 (S.D.N.Y. 2006) .........................................................37

*In re Schering Plough Corp. ERISA Litig.*,
    589 F.3d 585 (3d Cir. 2009).............................................................37

*In re Zetia (Ezetimibe) Antitrust Litig.*,
    7 F.4th 227 (4th Cir. 2021) .................................................................4

*Jacobs v. Verizon Commc'ns Inc.*,
    2020 WL 4601243 (S.D.N.Y. June 1, 2020) ..........................................26

*Jennifer W. v. Kijakazi*,
    2023 WL 2245635 (D. Md. Feb. 27, 2023) .........................................35

*Joncek v. Loc. 714 Int'l of Teamsters Health & Welfare Fund*,
    1999 WL 755051 (N.D. Ill. Sept. 3, 1999) .........................................27

*Judge v. Metro. Life Ins. Co.*,
    710 F.3d 651 (6th Cir. 2013) ............................................................39

*Kadel v. Folwell*,
    100 F.4th 122 (4th Cir. 2024) ...........................................................31

*Knight v. Lavine*,
    2013 WL 427880 (E.D. Va. Feb. 4, 2013)..........................................30

*Lutz Surgical Partners PLLC v. Aetna, Inc.*,
    2023 WL 2153806 (D.N.J. Feb. 21, 2023) .........................................36

*Miller v. Balt. Gas & Elec. Co.*,
    202 F.R.D. 195 (D. Md. 2001)..........................................................35

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
    2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017).......................................26

*Neil v. Zell*,
    275 F.R.D. 256 (N.D. Ill. 2011).........................................................37

*Parke v. First Reliance Standard Life Ins. Co.*,
    368 F.3d 999 (8th Cir. 2004) ............................................................30

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Peoples v. Wendover Funding*,
    179 F.R.D. 492 (D. Md. 1998) ......................................................................... 36

*Pfeifer v. Wawa, Inc.*,
    2018 WL 4203880 (E.D. Pa. Aug. 31, 2018) ..................................................... 27

*Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
    654 F.3d 618 (6th Cir. 2011) .......................................................................... 36

*Potter v. Blue Cross Blue Shield of Michigan*,
    2011 WL 9378789 (E.D. Mich. July 14, 2011) .................................................. 23

*Premier Health Center, P.C. v. UnitedHealth Group.*,
    292 F.R.D. 204 (D.N.J. 2013); 2014 WL 4271970 (D.N.J. Aug. 28, 2014) ............ 38

*Ramos v. Banner Health*,
    325 F.R.D. 382 (D. Colo. 2018) ..................................................................... 26

*Roman v. ESB, Inc.*,
    550 F.2d 1343 (4th Cir. 1976) ........................................................................ 30

*Romberio v. UnumProvident Corp.*,
    385 F. App'x 423 (6th Cir. 2009) .............................................................. 30, 33

*Rosedale v. CarChex, LLC*,
    2020 WL 998740 (D. Md. Mar. 2, 2020) ......................................................... 32

*Schuman v. Aetna Life Ins. Co.*,
    2017 WL 1053853 (D. Conn. Mar. 20, 2017) ................................................... 22

*Small v. Sullivan*,
    820 F. Supp. 1098 (S.D. Ill. 1992) ............................................................ 23, 24

*Southwood v. Credit Card Sol.*,
    2014 WL 10677478 (E.D.N.C. Mar. 27, 2014) ................................................. 31

*Soutter v. Equifax Servs. LLC*,
    498 F. App'x 260 (4th Cir. 2012) .............................................................. 28, 29

*Spano v. The Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011) .......................................................................... 32

*Stanford v. Foamex L.P.*,
    263 F.R.D. 156 (E.D. Pa. 2009) ..................................................................... 26

*Stegemann v. Gannett Co.*,
    2022 WL 17067496 (E.D. Va. Nov. 17, 2022) .................................................. 37

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Sweet v. Advance Auto Stores Co.*,
  2023 WL 3959779 (W.D. Va. June 12, 2023) ......................................................... 26

*Thomas v. SmithKline Beecham Corp.*,
  201 F.R.D. 386 (E.D. Pa. 2001) .............................................................................. 26

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) .............................................................................. 4, 8

*Tootle v. ARINC, Inc.*,
  222 F.R.D. 88 (D. Md. 2004) .................................................................................. 25

*Tracey v. MIT*,
  2018 WL 5114167 (D. Mass. Oct. 19, 2018) ......................................................... 26

*Tussey v. ABB, Inc.*,
  2007 WL 4289694 (W.D. Mo. Dec. 3, 2007) ......................................................... 30

*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016) ................................................................................................. 8

*Wagner v. White Castle Sys., Inc.*,
  309 F.R.D. 425 (S.D. Ohio 2015) ............................................................................. 7

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ....................................................................................... passim

*Wit v. United Behavioral Health*,
  79 F.4th 1068 (9th Cir. 2023) ...................................................... 21, 37, 39, 40

**Statutes**

29 U.S.C. § 1333(2) ....................................................................................... 22

**Rules**

Fed. R. Civ. P. 23(a) ......................................................................................... 8

Fed. R. Civ. P. 23(b)(1)(A) ............................................................................. 37

Fed. R. Civ. P. 23(b)(2) ............................................................................ 40, 41

Fed. R. Civ. P. 23(b)(3) .................................................................................. 36

**Regulations**

29 C.F.R. § 2560.503-1(b)(5) ......................................................................... 23

29 C.F.R. § 2560.503-1(b)(7) ......................................................................... 23

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

29 C.F.R. § 2560.503-1(h)(2)(iv).................................................................... 20

29 C.F.R. § 2560.503-1(h)(3)(ii) ................................................................... 22

29 C.F.R. § 2560.503-1(m)(8) ....................................................................... 23

**Other Authorities**

2 Newberg & Rubenstein on Class Actions § 4:7 (6th ed. 2024) .................... 37

## INTRODUCTION[1]

The nine named Plaintiffs[2] are former NFL players who allege that their applications for Plan[3] disability benefits were improperly denied. Each alleges that Defendants committed a litany of errors adjudicating their individual benefit claims in violation of Employee Retirement Income Security Act ("ERISA"). Each also contends that the notice he received denying his particular benefits application was deficient; that his particular benefits process denied him "full and fair review" of his claims; and that, across numerous individual benefits decisions, Defendants breached their fiduciary duties by failing to properly review claims and to ensure that the particular Neutral Physicians who evaluated each Plaintiff were unbiased. Plaintiffs now ask the Court to certify a class of all Plan participants who have filed an application for benefits with the Plan since 1970, as well as subclasses that would divide the class based on the specific type of disability benefit sought. Mot. 1. That proposed class spans decades of benefits decisions that involve three different benefit plans, dozens of doctors and examinations, thousands of claims, countless pages of medical records, and numerous individualized reasons for the approvals and denials of different benefit applications. Plaintiffs assert that certification of this sprawling class is appropriate because they "seek to vindicate group rather than individual rights," and because "their claims center on whether Defendants have erected a sham claim process." *Id.* at 2.

The motion should be denied. Plaintiffs are required to present actual evidence, not just unsubstantiated rhetoric, showing that the proposed class satisfies each of Rule 23's requirements for certification. Yet Plaintiffs fail to demonstrate that their proposed class or subclasses satisfy

---

[1] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

[2] The Court dismissed Plaintiff Alex Parsons's denial of benefits claims as barred by the statute of limitations. *See* ECF No. 78 at 13-14. He is therefore no longer a party to this lawsuit.

[3] The "Plan" refers to the NFL Player Disability & Survivor Benefit Plan; the Bert Bell/Pete Rozelle NFL Player Retirement Plan; the Bert Bell NFL Player Retirement Plan; and the Pete Rozelle NFL Player Retirement Plan. *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Class Certification ("Mot.") at 1.

Rule 23(a)'s bedrock requirements of commonality and typicality, or any of the subparts of Rule 23(b). Plaintiffs avoid the evidence with good reason. The record refutes any notion that Plaintiffs could present common proof of a "sham claim process" that resulted in the improper adjudication of the putative class members' benefit claims. In fact, of the applications for disability benefits that Defendants determined on the basis of Neutral Physician medical examinations since 2018, benefits were awarded to approximately 50.8% of applicants for Line of Duty Disability ("LOD") benefits, 51.2% of applicants for Total & Permanent Disability ("T&P") benefits, and 23.9% of applicants for Neurocognitive Disability ("NC") benefits. Decl. of D. Lasater in Support of Defs.' Opp. to Pl. Mot. for Class Cert. ("Lasater Decl.") ¶ 42 & Table 4. The Plan's disability benefit payment records tell the same story: the Plan paid more than $1 billion in disability benefits[4] to former NFL players and their beneficiaries between 2017 and 2022. Miller Decl. ¶ 5. In 2022 alone, the Plan paid more than $257 million to roughly 23% of Plan participants, for an average annual benefit payment of more than $86,000. *Id.* ¶ 6. Those generous approval rates and payments are the antithesis of a plan-wide "sham claim process."

The application approval rates also cannot be reconciled with Plaintiffs' unsupported assertion that Defendants implemented "systemic practices and policies" that "financially incentivized" Neutral Physicians to "render opinions adverse to them." Mot. 17. Under the collectively bargained "Neutral Rule," no benefits can be awarded unless at least one Neutral Physician finds that the applicant satisfies the relevant Plan disability standard. 2017 DPD

---

[4] This figure does not include disability benefits paid out of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan"). *See* Ex. A, Apr. 1, 2021 Disability Plan Doc. ("2021 DPD"), at JO-6 (explaining that a portion of disability benefits are still paid out of the Retirement Plan); Ex. B, Apr. 1, 2017 Disability Plan Doc. ("2017 DPD"), at JO-113 (Retirement Plan will continue to pay certain T&P and line-of-duty ("LOD") benefits); Decl. of M. Miller in Support of Defs.' Joint MSJs ("Miller Decl.") ¶ 4. "Ex." refers to the exhibits attached to Mr. Vincent's Declaration in Support of Defendants' Motion for Summary Judgment of Pl. D. Loper's Claims ("Vincent Decl. ISO Loper MSJ"). Exhibits are sequentially paginated, beginning with "DL-1," and omitting leading zeroes.

§§ 3.1(c), 5.1(b), 6.1(e).[5]  And Plaintiffs do not (and cannot) point to any evidence of a Plan policy or practice that improperly incentivized Neutral Physicians to find they do not meet the disability standards.  To the contrary, the record shows that the Plan's official policies in fact require Neutral Physicians to offer their best professional judgment, prohibit bias, and pay flat fees that do not vary based on examination outcomes.  And while the Amended Complaint cites sensational purported "statistics" that supposedly demonstrate that Neutral Physicians who are paid more (because they have conducted more examinations) are more likely to render adverse opinions, Plaintiffs fail to support their bid for certification with any form of statistical analysis.  Nor could they.  Statistical analysis supported by actual data shows that there is no relationship of the kind Plaintiffs suggest, *see infra* at 19 n.10, and thus no common proof that could be used to demonstrate a systemic pattern of Neutral Physician bias that could have affected the entire putative class.

Simply put, Plaintiffs bear the burden to show with actual evidence that their proposed class and subclasses meet all of the requirements of Rule 23, and they have not even tried to do that.  The motion must be denied for that reason alone.  Moreover, even a cursory review of the named Plaintiffs' disparate complaints about the denial of their individual benefit claims makes it obvious that no glue holds them together in a way that would allow them to be adjudicated *en masse*.  They have not satisfied Rule 23(a)'s commonality or typicality requirements.  None of the indiscriminate laundry list of 45 "common questions" Plaintiffs propose, Mot. 10-15, are capable of supplying answers common to the proposed class that could drive resolution of all of the claims in a single stroke.  The named Plaintiffs' claims are not typical even of one another, let alone of absent individuals in the overbroad proposed class, which, among other problems, improperly

---

[5] The only exceptions to the Rule are in instances in which the player is independently awarded disability status from the Social Security Administration.  2017 DPD § 3.2.  These applications are deemed administratively approved, as opposed to medically approved, and do not require a Neutral Physician's evaluation.  The availability of benefits under the Plan through a Social Security Administration approval further undermines Plaintiffs' theory of the case.

sweeps in claims that predate ERISA's repose period, claims denied because they were untimely filed, claims denied because the applicant did not meet non-medical criteria, and claims denied because the applicant failed to show up for a scheduled medical examination. Finally, class certification must be denied for the independent reason that Plaintiffs have not shown (and cannot show) that the proposed class satisfies any of the subparts of Rule 23(b).

## STATEMENT OF FACTS

Defendants follow Plaintiffs' lead in referring the Court to pages 5-15 of Defendants' Memorandum in Support of their Motion to Dismiss (ECF No. 69.1), and assuming the Court's familiarity with the facts relevant to the disposition of Plaintiffs' motion that are described there.

## ARGUMENT

To warrant certification, Plaintiffs must prove that their purported classes satisfy the requirements of Rule 23(a) and at least one subpart of Rule 23(b). *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 318 (4th Cir. 2006). Plaintiffs seeking to represent a class "must affirmatively demonstrate [their] compliance with [Rule 23], and must do so with evidentiary proof." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021). Recognizing the important due process concerns inherent in determining whether a class should be certified, the Supreme Court has directed courts to conduct a "rigorous analysis" of "the factual and legal issues comprising the plaintiff's cause of action" before certifying a class. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *see EQT Prod. Co. v. Adair*, 764 F.3d 347, 363 (4th Cir. 2014).

## I.    PLAINTIFFS HAVE NOT PROVED RULE 23'S REQUIREMENTS ARE MET

Plaintiffs' motion should be denied because it utterly lacks evidence that the proposed class or subclasses satisfy key requirements of Rule 23. Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). To successfully certify a class, Plaintiffs "must *present evidence* and demonstrate compliance with Rule 23." *Career Counseling,*

*Inc. v. AmeriFactors Fin. Grp., LLC*, 91 F.4th 202, 206 (4th Cir. 2024); *see also EQT*, 764 F.3d at

357 (same). A party seeking certification is required to "prove that there are *in fact* sufficiently

numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy

of representation, as required by Rule 23(a)," and "satisfy through evidentiary proof" that "at least

one of the provisions of Rule 23(b)" applies. *Behrend*, 569 U.S. at 33 (emphasis in original).

      In their entire 40-page motion, the only evidence that Plaintiffs cite in support of class

certification relates to the adequacy of class counsel. Plaintiffs' discussion of their own law firms'

qualifications, and production of supporting evidence, shows that Plaintiffs are aware of their

obligation to support their request for class certification with evidence demonstrating that the

requirements of Rule 23 "are *in fact*" satisfied. *Behrend*, 569 U.S. at 33 (emphasis in original).

Yet no similar evidentiary proffer supports their arguments concerning the remaining Rule 23

requirements. That failure is not attributable to a lack of sufficient discovery. As pleaded, the

Amended Complaint's class allegations are founded on (1) a litany of errors allegedly committed

in the adjudication of the named Plaintiffs' individual benefit claims, ECF No. 56, Pls.' Am. Class

Action Compl. ("AC") AC ¶¶ 147-266, and (2) a purported "pattern" of Neutral Physician bias in

conducting medical examinations that Plaintiffs assert is demonstrated by analysis of one or more

"statistical samples," *id.* AC ¶¶ 107-46. Plaintiffs have in hand the core evidence that is relevant

to both of these allegations, but use none of it.

      Start with the alleged errors in Plaintiffs' benefits decisions. ERISA claims challenging

adverse benefit determinations are typically decided exclusively on the administrative record—the

collection of documents and information that the fiduciary considered when deciding the

applicant's claim. *See Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013) ("Generally,

consideration of evidence outside the administrative record is inappropriate" where, as here, "a

coverage determination is reviewed for abuse of discretion.").  Plaintiffs had the contents of their own administrative records when they filed the Amended Complaint.  *See* 2021 DPD § 13.14(a).  Defendants also produced the administrative records in this litigation in early August, before Plaintiffs even served written discovery requests.  If the various claim adjudication errors alleged in the Amended Complaint were, in fact, common to the proposed class, they should, at a minimum, be common among the named Plaintiffs.  Yet Plaintiffs offer no citations to their administrative records in their motion.

The same is true of Plaintiffs' statistical allegations.  The Amended Complaint invokes purported statistics that it asserts show a "systemic practice" of Neutral Physician bias that allegedly impacted all putative class members.  AC ¶¶ 107-46.  Plaintiffs say that they derived these "statistics" from a "statistical sample" that they constructed using 784 "T&P disability evaluations" and other smaller "samples" they hand-picked for their allegations.  *Id.* ¶¶ 112, 116-46.  Presumably these "samples" are the evidence that Plaintiffs believe unites all of the putative class members' claims.  But Plaintiffs' motion fails to offer any evidentiary support for those statistics, much less any supporting analysis or methodology.  This is precisely the kind of information that Plaintiffs are required to submit to prove that they can satisfy the requirements of Rule 23.  Their motion is more notable for what it does not say than for what it does.

Moreover, even crediting Plaintiffs' "statistical" allegations for purposes of their motion (which the Court should not), the pleaded statistical facts do not even come close to demonstrating a "systemic practice" capable of uniting Plaintiffs' claims.  Plaintiffs' allegations do not provide any facts or context concerning the construction of the supposed statistical samples that would be necessary to draw any inference that Neutral Physicians are systemically biased.  Lasater Decl. ¶¶ 55-58.  Plaintiffs do not describe how their "sample" was compiled, the population from which

the sample was taken, what time period the sample covers, or the method by which the sample was obtained. Lasater Decl. ¶¶ 59-63. Without that information, Plaintiffs' purported "statistics" are meaningless, and offer no support for their *ipse dixit* contention that all putative class members experienced a common injury of biased Neutral Physician examinations. *See EEOC v. Freeman*, 961 F. Supp. 2d 783, 793 (D. Md. 2013) ("[A] court should exclude expert statistical testimony when the data relied upon is connected to the expert's opinion only by the ipse dixit of the expert."). Indeed, the pleaded statistics do not even support an inference that *any* of the putative class members experienced biased Neutral Physician examinations. Lasater Decl. ¶ 64.

For example, Plaintiffs allege that "[i]n a sample of five T & P disability evaluations that [Dr. George Diaz] conducted, Dr. Diaz "found that *no* Player qualified." AC ¶ 168. Even if it were true (which Plaintiffs have not shown), that fact would be meaningless without knowing the total number of evaluations he conducted. *See* Lasater Decl. ¶¶ 59-63. Plaintiffs do not offer evidence as to whether Dr. Diaz evaluated only those five players, or 100 others, much less the results of other evaluations. The Amended Complaint is filled with similar allegations concerning so-called "sample sets" that lack the information necessary to give those samples meaning.

Plaintiffs' failure to offer evidence that each requirement is satisfied is fatal to their motion. *Behrend*, 569 U.S. at 33; *see, e.g.*, *Equal Rights Ctr. v. Kohl's Corp.*, 2017 WL 1652589, at *2-3 (N.D. Ill. May 2, 2017) (denying certification where plaintiffs did "not point[] to evidence of systemic policies or procedures" to establish commonality); *Wagner v. White Castle Sys., Inc.*, 309 F.R.D. 425, 431 (S.D. Ohio 2015) (denying certification where plaintiffs "present[ed] no evidence of a common design or blueprint" or "a common policy" proving class-wide treatment was appropriate); *Clark v. Creative Hairdressers, Inc.*, 2005 WL 3008511, at *5 (D. Md. Nov. 9, 2005) (denying certification where there was "no evidence that Defendants had a unified policy" of

misconduct that "would tie the putative class members together"). It is also strategic. As explained below, an actual examination of the relevant evidence demonstrates that Plaintiffs' claims cannot be decided *en masse*, but instead require consideration of myriad individualized facts.

## II.    PLAINTIFFS' PROPOSED CLASSES DO NOT SATISFY RULE 23(a)

Rule 23(a) has four familiar requirements for class certification: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). *Thorn*, 445 F.3d at 318. While Defendants do not contest numerosity or adequacy of representation for purposes of this opposition, Plaintiffs have not—and cannot—demonstrate commonality or typicality.

### A.    There Are No Common Answers That Will Resolve Plaintiffs' Claims.

Although the text of Rule 23 speaks of common questions, "[w]hat matters to class certification … [is] the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (emphasis in original). Put differently, certification requires a common question whose answer "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* To satisfy this requirement, Plaintiffs must "demonstrate that the class members have suffered the same injury," and not merely "a violation of the same provision of law." *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 202 (4th Cir. 2024). Certification must be denied where class members' claims are "vastly diverse" and "require[] individualized determinations." *Id.* at 203, 206; *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (questions are not common where "members of a proposed class will need to present evidence that varies from member to member").

In *Wal-Mart Stores, Inc. v. Dukes*, for example, the Supreme Court held that 1.5 million former and current female employees alleging violations of Title VII based on Wal-Mart's pay and management track promotion policies failed to satisfy commonality. 564 U.S. at 346. Simply working at the same company and asserting claims under the same statute was "no cause to believe

that all their claims [could] be productively litigated at once." *Id.* at 350. To demonstrate commonality, the plaintiffs were required to offer "[s]ignificant proof" that Wal-Mart "operated under a general policy of discrimination" that was applied on a class-wide basis. *Id.* at 353. Plaintiffs attempted to make this showing using statistical and anecdotal evidence, but failed. Although they presented numerous individual instances of alleged gender discrimination, that was not sufficient to prove commonality: "demonstrating the invalidity of one manager's use of discretion [did] nothing to demonstrate the invalidity of another's." *Id.* at 355-56. "Without some glue holding the alleged *reasons* for all those decisions together," it was not possible to conclude that "all the class members' claims for relief [would] produce a common answer to the crucial question *why was I disfavored*." *Id.* at 352 (emphases in original).

This case is the ERISA version of *Dukes.* Substantial differences between putative class members and their benefit claims defeat commonality here. Plaintiffs allege that their benefits applications were wrongfully denied (Count I), that they received inadequate decision letters regarding these applications (Count II), that their applications did not receive a full and fair review (Count III), and that all these alleged failures constituted a breach of the Board's fiduciary duties (Count V). Resolving these counts as to each class member will depend on "vastly diverse," highly individualized player-specific and claim-specific proof. *G.T.*, 117 F.4th at 203. Each named Plaintiff's claims involve a unique benefits application, a unique medical record, unique Neutral Physician evaluations, and a unique determination about whether the application was meritorious. Those material differences among different players' applications, injuries, medical assessments, and benefits decisions will only be magnified across the proposed class.

The individualized nature of Plaintiffs' claims means that whether any one class member was wrongfully denied benefits, or received inadequate determination letters, or was denied a full

9

and fair review, or was harmed by a fiduciary breach cannot be resolved with a "common answer." *Dukes*, 564 U.S. at 350. Plaintiffs attempt to distract from this problem by posing a laundry list of 45 repetitive and supposedly common questions. Mot. 10-15. But raising common questions, "even in droves," does not establish commonality. *Dukes*, 564 U.S. at 350. Plaintiffs cannot make up for a lack of class-wide proof that advances all class members' claims "in one stroke." *Id.* Common proof—capable of generating a common answer—is lacking for all of Plaintiffs' claims.

***Whether Defendants wrongfully denied class members' benefits (Count I).*** Plaintiffs identify no cases in which the court has certified a class asserting wrongful denial of benefits claims. Instead, they identify a number of supposedly common questions asking whether Defendants wrongfully denied their benefits, including by ignoring relevant evidence, misinterpreting and inconsistently applying Plan provisions, and relying on the findings of "biased" Neutral Physicians. Mot. 10-15. Critically, resolving *whether* and *how* these allegations apply to each putative class member will require the Court to consider proof that is not common to the class. That is obvious from reviewing the disparate allegations in the Amended Complaint concerning the adjudication of each named Plaintiff's individual benefit claim(s). It is even more obvious when the evidence relevant to resolving those allegations is examined—which is presumably why Plaintiffs failed to include or discuss it in their motion. This obvious lack of commonality among the named Plaintiffs will multiply exponentially across the proposed class.

The named Plaintiffs that are the subjects of Defendants' concurrently filed summary judgment motions prove the point. Daniel Loper complains that he was wrongfully denied LOD benefits because the Committee "rubber-stamped" his Neutral Physicians' decisions not to award LOD points for an alleged carpal tunnel condition on his left wrist and asymptomatic rotator cuff tendon tear on his right shoulder. AC ¶¶ 210-12; *see* Defs.' MSJ of Pl. D. Loper's Claims ("Loper

MSJ") at  Part I.C.  Putting aside that those points would not have changed the outcome of his

benefits decision, *see* Loper MSJ Part I.C, his claims have little in common with those of Charles

Sims, whose Neutral Physician found him T&P disabled (and therefore satisfied the Neutral Rule),

but claims the Committee and Board improperly concluded that his alleged psychiatric

impairments did not begin during his football career.  AC ¶¶ 190-93; *see* Defs.' MSJ of Pl. C.

Sim's Claims Part I.C.  And both Mr. Loper's and Mr. Sims's complaints are different from those

of Mr. Jamize Olawale, who alleges that his Neutral Physicians failed to award LOD points for a

"Lumbar Stress Fracture with Spondylolysis," misinterpreted his cognitive assessment results,

improperly "considered [his] educational level and prior training," and ignored his self-reported

complaints of depression.  AC ¶¶ 194-201, 283; *see* Defs.' MSJ of Pl. J. Olawale's Claims

("Olawale MSJ") Part I.C.  In each case, the named Plaintiff raises different reasons why their

benefits application was wrongfully denied.  Resolving whether any one of their complaints are

valid (they are not) will have no impact on resolving the others.

Other differences permeate all of the named Plaintiffs' claims.  Consider their medical

evidence allegations.  Some named Plaintiffs complain that medical evidence—specific to them

and to their claims—was improperly missed by the Neutral Physicians who examined them or by

the Board.  Table 1, *infra*.  Other named Plaintiffs, however, do not allege any failure to review or

identify the relevant medical evidence, but rather contend that medical evidence expressly noted

by their Neutral Physician should have been treated as qualifying them for benefits, but was not.

*Id.*  And others complain that their Neutral Physicians failed to credit self-reported symptoms.  *Id.*

| Table 1 – Differences in Medical Evidence Allegations | | |
|---|---|---|
| **Plaintiff** | **Reason for Alleged Improper Denial of Benefits** | **Example Allegations** |
| Jason | Failed to recognize | Dr. Bornstein identified "a clear pattern of cognitive |

| Alford | that cited evidence qualified player for benefits | impairment" but "concluded that Plaintiff … did not qualify for NC benefits" (AC ¶ 258) |
| | | Dr. McCasland noted but "discounted" medical evidence "weighing in Mr. Alford's favor" (AC ¶ 264) |
| | | Dr. Fung "described Mr. Alford's scores on a cognitive memory test and language test as 'Low Average,'" which should have entitled to him to NC benefits (AC ¶ 265) |
| Daniel Loper | Missed evidence <br> **and** <br> Failed to recognize that cited evidence qualified player for benefits | Dr. Apple "disregarded documented NFL football play-related injuries to Mr. Loper's left wrist" (AC ¶ 210) |
| | | Dr. Cook "noted in his narrative report that Mr. Loper was status post-carpal tunnel release surgery" but "failed to award Mr. Loper the two points for an "S/P Carpal Tunnel Release" condition (AC ¶ 213) |
| Willis McGahee | Dismissed self-reported evidence | Dr. Strassnig dismissed Mr. McGahee's self-reported complaints, including "very severe depression" (AC ¶169) |
| | | Dr. Crum found Mr. McGahee was not T&P disabled even though he expressed "thoughts that he would be better off dead" and experienced substantial dysfunction with daily tasks (AC ¶169) |
| | | Drs. Murray, Gwynn, and King discounted Mr. McGahee's self-reported symptoms (AC ¶¶ 171-72) |
| Michael McKenzie | Dismissed self-reported evidence | Dr. Elkousy unreasonably ignored Mr. McKenzie's self-reported chronic pain (AC ¶ 188) |
| Jamize Olawale | Dismissed self-reported evidence | Dr. Norman dismissed Mr. Olawale's self-reported moderately severe depression and "thoughts of suicide or being better off dead" (AC ¶ 198) |
| | | Dr. Elkousy dismissed Mr. Olawale's complaints of pain (AC ¶ 200) |
| Charles Sims | Missed evidence <br> **and** <br> Dismissed self-reported evidence | Mr. Sims submitted "team records" indicating that his conditions arose "while he was an active player," yet his MAP opined that his alleged impairments were "primarily via self-report" and that there was "no evidence that [his] disability arose while an Active Player" (AC ¶¶ 192-93) |
| Eric Smith | Failure to recognize that cited evidence qualified player for benefits | Dr. Detterline described injuries from NFL football play to Mr. Smith's wrist, lumbar spine, hip, and both knees, but concluded that the cause of the impairments to those body |

| | | parts was "[u]nknown." (AC ¶ 223)<br><br>Dr. Werner's report indicated the cause of Mr. Smith's post-concussive memory loss was "unknown," despite acknowledging in her report that his concussions had "resulted in altered awareness or memory loss" (AC ¶ 225) |
|---|---|---|
| Joey Thomas | Failed to recognize that cited evidence qualified player for benefits | Dr. Brahin concluded that there was no evidence Mr. Thomas had cognitive impairment, but his report stated that Mr. Thomas' MoCA testing "could be consistent with mild cognitive impairment" (AC ¶ 253)<br><br>Dr. Perez concluded that Mr. Thomas' "neurological status ha[d] remained normal in all the medical evaluations," but in each of Mr. Thomas' previous MoCA evaluations he showed cognitive impairment (AC ¶ 254) |
| Lance Zeno | Missed evidence<br><br><u>and</u><br><br>Failed to recognize that cited evidence qualified player for benefits | Dr. Delis concluded that Mr. Zeno showed "no" evidence of even mild acquired neurocognitive impairment, but several of Mr. Zeno's test scores were described as impairment by other Board physicians for other Players (AC ¶ 153)<br><br>Dr. Garmoe's did not find a "mild language impairment," but his report states that Mr. Zeno's performance on a cognitive test "declined" and that he "showed a mild reduction across two assessments" (AC ¶ 159) |

Resolving whether any medical evidence was, in fact, missed during the adjudication of a given putative class member's benefit claim, or whether any medical evidence that was identified in a Neutral Physician's report should have qualified that putative class member for a particular disability benefit, or whether a Neutral Physician dismissed self-reported symptoms, requires an individualized assessment of the unique facts in each putative class member's claim. Take, for example, the four named Plaintiffs that allege one or more examining Neutral Physicians improperly discounted their self-reported symptoms. *See* Table I, *supra*. Self-reported symptoms can be subjective, and each Neutral Physician must exercise their own professional judgment in determining whether a self-report is credible and adequately corroborated by medical evidence. *See, e.g.*, *Balkin v. Unum Life Ins. Co.*, 2024 WL 1346789, at *20-21 (D. Md. Mar. 29, 2024) (no

requirement to defer to a patient's subjective complaints where objective evidence supports a finding of no disability).  For example, if a patient's reported symptoms were inconsistent with test results, a physician might rightly question the severity of that symptom.  And even then, the ultimate question whether the Board abused its discretion by denying each of those four named Plaintiffs' claims requires consideration of each of their administrative records as a whole, including any contradictory evidence regarding the Plaintiffs' reported symptoms.

The same is true of the named Plaintiffs' other allegations of errors in the adjudication of their benefit claims.  Some of the named Plaintiffs contend that Plan terms were applied to their claims in a manner that was inconsistent with the way those same Plan terms were applied to other benefits claims, while other Plaintiffs have no such complaints.  Michael McKenzie, for example, alleges that his Physician's opinion that a headache disorder was not likely to constitute T&P disability was "inconsistent with prior interpretations" of the Plan's terms, AC ¶¶ 180-81, while Daniel Loper alleges that his Physician "ignored or was unaware" of Plan terms for LOD benefits that clarified when players could "receive [disability] points for surgeries after the end of their NFL career," AC ¶ 210.  By contrast, Willis McGahee and Lance Zeno make no allegations that their Physicians acted inconsistently with Plan terms.  *See* AC ¶¶ 147-73, 288.

The named Plaintiffs' numerous claim-specific grievances concerning their benefit determinations are not even common among the named Plaintiffs, let alone across the putative class.  And to resolve those grievances, the Court must review administrative records on a player-by-player basis, precluding certification.  Moreover, in all of these examples, individualized fact questions are antecedent to the ultimate question that the Court would actually be required to answer with respect to each individual benefit claim:  whether, in light of the entire administrative record, the Board abused its discretion by denying it. *See Hayes v. Prudential Ins. Co. of Am.*, 60

F.4th 848, 851 (4th Cir. 2023).  Plaintiffs make no effort to explain how that question can be adjudicated on a class-wide basis, and a cursory review of the named Plaintiffs' allegations and the relevant administrative records makes it obvious that they cannot.  Plaintiffs have offered no evidence that litigating class members' claims together would "produce a common answer to the crucial question *why [were my benefits denied]*."  *Dukes*, 564 U.S. at 352.

The motion's proposed subclasses, which purport to divide the putative Plan-wide class consisting of all former players who have applied for disability benefits according to the specific benefit type for which each putative class member applied, offer no help with this insuperable obstacle to certification.  *See* Mot. 1-2, 40.  Plaintiffs offer no analysis supporting the independent certifiability of the proposed subclasses.  *See, e.g., id.* at 18-19 (asserting without any supporting analysis that the named Plaintiffs' claims are "typical of those of the absent members" of the proposed subclasses).  And they are not certifiable, because all of the differences among the named Plaintiffs' benefits claims exist *within* each proposed subclass as well.[6]

***Whether examining Neutral Physicians are "biased" (Counts I, III, and V)*.**  Several of Plaintiffs' proposed common questions related to Counts I, III, and V ask whether the Neutral Physicians who examined them were "biased."  Mot. 10-15.  For example, "[w]hether Defendants' practice and process of selecting and lavishly compensating 'Neutral Physicians' with reputations

---

[6] *Compare* AC ¶¶ 168-73 (putative T&P subclass representative Mr. McGahee complains that Neutral Physicians discounted self-reported symptoms of "very severe depression") *with id.* ¶¶ 185-86 (putative T&P subclass representative Mr. McKenzie complains that identified evidence of migraines and psychiatric issues should have been deemed totally disabling); *compare id.* ¶¶ 264-65 (putative NC subclass representative Mr. Alford complains that Neutral Physicians discounted evidence that he had "problems with short-term memory") *with id.* ¶¶ 155-56 (putative NC subclass representative Mr. Zeno complains that Neutral Physicians and Board ignored fact that he was found to have a neurocognitive impairment under the NFL Concussion settlement); *compare id.* ¶¶ 195-96 (putative LOD subclass representative Mr. Olawale alleges that Neutral Physician erred in finding no evidence that his "Lumbar Stress Fracture with Spondylolysis" arose during NFL career) *with id.* ¶ 210 (putative LOD subclass member Mr. Loper complains that Plan terms were misapplied to discount his carpal tunnel condition based on the surgical date); *compare id.* ¶ 193 (putative Active class representative Mr. Sims complains that a "clandestine interpretation" of the Plan was applied to deny his benefit claim) *with* Mot. at 18-19 (providing no evidence suggesting any other individuals were denied Active benefits on the same basis).

for minimizing genuine impairments and bias against disabled Players to evaluate applicants has infected the Board's decision-making, which routinely accepts and defaults to their reports." *Id.* at 11. In short, Plaintiffs claim that the alleged bias among the Neutral Physicians has rendered the entire claim administration process biased. *See, e.g., id.* at 12.

Once again, Plaintiffs provide no analysis or any supporting evidence showing that their proposed questions relating to Neutral Physician bias can be answered using common evidence capable of supplying class-wide answers. And once again, both the specific allegations of Neutral Physician bias that are pleaded in the Amended Complaint, and examination of the actual evidence that would be relevant to determining whether any given putative class member experienced Neutral Physician bias, show that they cannot.

To begin, Plaintiffs fail to identify any official policy of the Plan that improperly encourages or incentivizes Neutral Physicians to do anything other than render their best professional judgment when they examine players. The record shows the Plan's processes are ERISA-compliant and designed to promote neutrality. Neutral Physicians are "jointly designate[d]" by the NFL Players Association (which represents NFL players) and the NFL Management Council (which represents NFL teams) to serve on the panel of physicians that are available to conduct Plan and medical evaluations, and the Board plays no role in that designation process. Vincent Decl. ISO Loper MSJ ¶ 15. Once a Neutral Physician is designated to the panel, they receive orientation manuals instructing Neutral Physicians that they should not be biased against former players applying for disability benefits, and must render their best professional judgment when deciding claims. *Id.* ¶ 27; Ex. E, Orientation Manual, at DL-639.

The NFL Player Benefits Office ("NFLPBO") then assigns Neutral Physicians from that panel to conduct examinations of former players who have filed an application or appeal seeking

disability benefits using neutral criteria, such as area of specialty, proximity to the applicant, and availability to conduct a timely evaluation. Vincent Decl. ISO Loper MSJ ¶ 19. The NFLPBO does not consider a Neutral Physician's propensity to find that former players are or are not disabled when making examination assignments. *Id.*. Neutral physicians are paid a flat fee for each examination that does not vary based on the examination's outcome. 2021 DPD § 12.3(a); Vincent Decl. ISO Loper MSJ ¶ 22. And for every examination that a Neutral Physician conducts, the Plan specifically requires the Neutral Physician to "(1) certify that any opinions offered as a Neutral Physician will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a 'flat-fee' agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits." 2021 DPD § 12.3(a); Vincent Decl. ISO Loper MSJ ¶ 25. Plaintiffs thus cannot (and do not) rely on any Plan policy that caused all Neutral Physicians to be biased against them.

In the absence of any problematic Plan policy, Plaintiffs are instead left to press a theory that—across thousands of individual examinations—Neutral Physicians routinely *inferred* that Defendants would continue to assign them examinations (and pay them for those examinations) only if they skewed their diagnoses against a finding of disability. Plaintiffs have offered no evidence that Neutral Physicians made that inference—and certainly not in a way that could be shown with common proof. The only support for that theory is in the Amended Complaint, which invokes (1) anecdotes concerning specific alleged comments or actions taken by certain Neutral Physicians that it asserts are indicative of bias, and (2) purported "statistics" relating to Neutral Physician "denial percentages" that Plaintiffs assert show that the most highly compensated Neutral Physicians are improperly financially incentivized to find that players are not disabled.

None of these allegations support commonality.

The Amended Complaint's anecdotes themselves demonstrate the impropriety of class treatment. The named Plaintiffs were examined by 48 different Plan-assigned Neutral Physicians between 2017 and 2022. Decl. of H. Vincent in Support of Defs.' Opp to Pl. Class Cert. Mot. ("Vincent Decl. ISO Class Cert. Opp.") ¶¶ 2-21. And even among that set, their allegations do not show any consistent pattern. The named Plaintiffs admit that several Neutral Physicians found that they *were* disabled, yet do not suggest they were biased.[7] And while they do allege that some Neutral Physicians who found that they were not disabled were biased, they raise no challenge to other Neutral Physicians who made the same finding.[8] Moreover, many of Plaintiffs' bias allegations are based on anecdotal complaints about purported comments by Neutral Physicians, or testing methodologies that specific Neutral Physicians allegedly applied to specific examinations, none of which are common to the class.[9] The variance between each class member's alleged experience of bias makes it "impossible to say that examination of all the class members' claims for relief will produce a common answer." *Dukes*, 564 U.S. at 352.

The purported statistics in the Amended Complaint also cannot unify Plaintiffs' bias allegations. Plaintiffs fail to present any actual data or statistical analysis in support of their unsubstantiated allegations, despite the clear indication that Plaintiffs have had the relevant so-called "statistical sample" in hand since at least May of 2023, when they filed the Amended

---

[7] For instance, Mr. Sims, who was awarded T &P disability benefits following Neutral Physician examinations, does not allege that any of his examining Neutral Physicians were biased, but instead challenges the Committee's failure to award those benefits at the "Active" level due to a "deadlock" concerning whether there was sufficient evidence that his impairments arose "during his NFL career." *See* AC ¶¶ 191-93

[8] Mr. Olawale, for example, does not identify any errors in the reports of at least three of the Neutral Physicians who evaluated him and determined that he was not disabled, nor does he allege that those Neutral Physicians were biased in any way. Olawale MSJ at 10-11 (Dr. Okai, Dr. Salisbury, and Dr. Rabun, examined Mr. Olawale and found that he was not disabled); AC ¶¶ 194-201(raising no challenge to any of those doctors).

[9] *See, e.g.*, AC ¶ 166 (complaint that Dr. McCasland has expressed unsound views about concussion symptoms); AC ¶ 169 (complaint that Dr. Crum improperly considered "demographic" data).

Complaint.  *See* AC at 119.  And like the statistical analysis proffered by the plaintiffs in *Dukes*, "[e]ven if … taken at face value," Plaintiffs' statistical allegations would supply no evidence of the "uniform, [application-by-application bias] upon which [P]laintiffs' theory of commonality depends."  *Dukes*, 564 U.S. at 356-57; *infra* at 19 n.10.  The record evidence and *actual* statistical analysis that Defendants have supplied in conjunction with their opposition to the motion demonstrate that Plaintiffs could not possibly demonstrate a "systemic pattern" of Neutral Physician bias that has pervasively slanted the Plan's entire claim adjudication system against awarding disability benefits.  The Plan has generous benefit application approval rates for all disability types that cannot be reconciled with Plaintiffs' unsupported allegation of a scheme to pervasively deny benefit claims.  *See supra* at 2.  And a statistical analysis of all benefit application determinations based on Neutral Physician examinations since the beginning of 2018 shows that there is no correlation between higher aggregate Neutral Physician compensation and higher application denial rates.  In fact, as the Declaration of David B. Lasater explains, the data is inconsistent with—and in most instances directly contrary to—what Plaintiffs allege.[10]  In sum, Plaintiffs do not point to any common proof that could be used to demonstrate a pervasive pattern of Neutral Physician bias, and the record evidence makes it clear that no such pattern can be shown.

   ***Whether Defendants provided inadequate notice (Count II).***  Plaintiffs' questions about Defendants' alleged "routine[]" failure "to explain in decision letters why they disagree with medical findings and reports that support an applicant's entitlement to benefits" in violation of

---

[10] For LOD and NC disability application determinations, the relationship is in the opposite direction of what Plaintiffs have alleged:  Neutral Physicians with more examinations (and therefore higher income from Plan-related assignments) were associated with a lower denial rate than Neutral Physicians with fewer examinations.  Lasater Decl. ¶¶ 24-26.  For T&P disability applications, the data show no statistically significant relationship between number of encounters and denial rates.  *Id.* ¶ 27.  And the results are similar for Plan appeals.  For LOD, NC, and T&P appeals, the relationship is the opposite of what Plaintiffs suggest:  Neutral Physicians with more examinations were associated with a lower denial rate.  Lasater Decl. ¶¶ 45-47.

ERISA § 503(1)'s notice requirements are not common, either.  Mot. 11-13.

Plaintiffs' ERISA § 503(1) claim turns entirely on the contents of each putative class member's benefit determination letter and its ability to allow them to perfect their claims.  Whether Defendants offered any individual class member an adequate explanation will always depend on what the asserted disability was, what the determination letter said, and the details about what information was allegedly excluded.  The named Plaintiffs are no exception.  Mr. McKenzie, for example, alleges that his decision letter did not explain why the Committee determined that some of his Neutral Physicians "independently concluded that [he was] capable of employment" when other Neutral Physicians determined that he was not.  AC ¶ 179.  Mr. Olawale separately complains that his decision letter "incorrectly stated that [he] had been evaluated by Dr. Strassnig" and failed to explain the "cumulative effect" of his conditions.  *Id.* ¶ 201.  Mr. Smith, by contrast, complains that in his denial letter, "the Board failed to reconcile the tension between Dr. Werner's opinion and the explicit terms of the Plan."  *Id.* ¶ 226.  Mr. Thomas complains that the Board did not explain "how [his] post-concussion syndrome was not an acquired cognitive disorder."  *Id.* ¶ 255.  And Mr. Sims separately objects to his decision letter on the grounds that the Committee and Board allegedly failed to cite relevant Plan provisions.  *Id.* ¶ 193.  All of these assertions are individually meritless.  But none of them are bound together by any common factual basis, and thus resolution of similar assertions will necessarily be specific to each class member.

***Whether Defendants engaged in a "full and fair review" (Count III).***  Plaintiffs also assert there are common questions as to whether Defendants engaged in a "full and fair review" of their benefit applications in violation of ERISA § 503(2).  Mot. 10-15.  These issues are again dependent on a specific assessment of each putative class member's individual application.

Plaintiffs first claim that there is a common question as to whether "Defendants have

routinely failed to review 'all comments, documents, records, and other information submitted by the claimant.'"  Mot. 10 (citing 29 U.S.C. § 1333(2) and 29 C.F.R. § 2560.503-1(h)(2)(iv)). Plaintiffs do not point to any common proof that would allow the Court to determine that all putative class members' benefit claims were impacted—and impacted in the same way—by a failure to review records or submitted information.  *Cf. Wit v. United Behavioral Health*, 79 F.4th 1068, 1084-84 (9th Cir. 2023) (reversing certification of class asserting full and fair review claim because it required assessing the "individual circumstances" of each class member's claim to determine whether the "application of the wrong standard could have prejudiced the claimant").

To the contrary, the record shows that any failures that may have occurred (Plaintiffs present no evidence that any actually did) would necessarily be idiosyncratic and specific to particular benefit claims.  Neutral Physicians are required to review all submitted records before making their disability determination and certify they have done so.  *See* Vincent Decl. ISO Loper MSJ ¶ 25; *see also, e.g.*, Ex. D, Admin. Record, at DL-430 (certification that Dr. Apple reviewed all of Mr. Loper's records).  And the record shows that working in tandem, the Board and its advisors comprehensively review case files before the Board decides appeals, with the specific records that Board members personally review varying from claim to claim.  Decl. of P. Reynolds in Support of Defs.' Joint MSJs ¶¶ 7-8; Decl. of A. Williams in Support of Defs.' Joint MSJs ¶¶ 6-7; Decl. of R. Smith in Support of Defs.' MSJ of Pl. D. Loper's Claims ¶¶ 8-10.

Plaintiffs do not point to any evidence indicating that Defendants have a uniform practice of departing from these stated ERISA-compliant policies (there is none), and thus have not supplied any basis for commonality.  *See Dukes*, 564 U.S. at 353-54 (no commonality where the "announced policy" forbids the challenged conduct and plaintiff failed to offer evidence of a common departure from that policy).  Indeed, the Amended Complaint's own allegations are based

on individualized objections—most named Plaintiffs do not allege that any records or information submitted as part of their application was *missed*, but rather contend that their medical evidence was misinterpreted, or that Plan terms should have been applied differently. *See supra* at 11-14 & Table 1.

Next, Plaintiffs assert that there is a common question as to "[w]hether the Board has improperly afforded deference . . . to the Committee's decisions." Mot. 12. Allegations of improper deference to the initial Committee-level benefit determination require a specific demonstration that the Board failed to make an independent judgment when reviewing the application. *See* 29 C.F.R. § 2560.503-1(h)(3)(ii); *cf. Schuman v. Aetna Life Ins. Co.*, 2017 WL 1053853, at *16 (D. Conn. Mar. 20, 2017) (explaining that § 2560.503-1(h)(3)(ii) violations must be tied to specific failures by appellate reviewers, like "simply cop[ying] down" conclusions from flawed medical reports, or relying "exclusively on the same doctor who provided the basis for the initial review"). These claims would depend on unique facts showing that either the particular Board-level Neutral Physicians who evaluated a player, or the Board itself as comprised at the time it reviewed the application, failed to make an independent judgment about the application's merits. Yet Plaintiffs do not identify any common proof demonstrating that improper deference occurred in adjudicating the claims of all class members.

Plaintiffs also broadly assert that Defendants "treated similarly situated applicants differently," including by treating applicants with "similar neuropsychological scores" inconsistently and distinguishing between applicants based on "demographics," like "ethnicity and race." Mot. 13. But again, Plaintiffs have not provided any evidence that these complaints are common to the class or to any of the proposed subclasses. And again, the named Plaintiffs' own highly disparate allegations show that these complaints are in fact application-specific and not

class-wide. Of the named Plaintiffs, only Mr. McGahee and Mr. McKenzie raise allegations about their "ethnicity and race," *see* AC ¶¶ 127, 167, 182, 327, while other named Plaintiffs who applied for the same benefit types and underwent the same kind of testing do not, *id.* ¶¶ 197-98 (Mr. Olawale), 219-221 (Mr. Smith). Any claim that requires a factfinder to identify and compare the unique circumstances of various individuals is the antithesis of commonality.[11]

Plaintiffs cite no authority (and we are aware of none) supporting class certification of ERISA full and fair review claims that involve such individualized issues. Although Plaintiffs point to two cases in which the court found that challenges to the fairness of benefits proceedings were appropriate for certification,[12] both are plainly inapposite. *Potter* concerned an insurance company's uniform decision to deny all claims for medical costs associated with an autism treatment on the grounds that it was considered "experimental." 2011 WL 9378789 at *1. Commonality was satisfied because every class member's claim depended on two common contentions: whether there was a "reasonable basis" for the insurer's blanket determination that the treatment was "experimental," and whether the insurer "uniformly" failed to provide claimants evidence and an explanation supporting that blanket determination. *Id.* at *6. The insurer "acted in the *same manner* with respect to each member regardless of the particulars of the members' individual situations." *Id.* at *9. That is not the case here, where no blanket determination has

---

[11] Plaintiffs allege that Defendants engaged in two other procedural violations in their Amended Complaint that are not specifically referenced in their motion. *See* AC ¶¶ 299 (alleging violation of 29 C.F.R. § 2560.503-1(b)(7)), 303 (alleging violation of 29 C.F.R. § 2560.503-1(b)(5) and (m)(8)). To the extent Plaintiffs attempt to prove commonality based on those violations, they cannot do so. Plaintiffs' claim that Defendants violated 29 C.F.R. § 2560.503-1(b)(7) by failing to "ensure the independence and impartiality of the persons involved in making the decision" is not a common issue because there is no evidence of plan-wide Neutral Physician bias. *Supra* at 15-19. Likewise, their claim that Defendants "failed to produce requested information" in violation of 29 C.F.R. § 2560.503-1(b)(5) and (m)(8) is not a common issue because resolving it would require an individualized determination about whether each class member made an information request that was covered by the claims regulations in the first place. Indeed, only one named Plaintiff, Mr. McKenzie, alleges that he made such a request. AC ¶ 303.

[12] *See Potter v. Blue Cross Blue Shield of Michigan*, 2011 WL 9378789, at *9 (E.D. Mich. July 14, 2011) ; *Small v. Sullivan*, 820 F. Supp. 1098, 1110 (S.D. Ill. 1992)).

been alleged and the "manner" that Defendants allegedly treated class members differs from applicant to applicant, as the named Plaintiffs' complaints illustrate. *Supra* 11-14 & Table 1.

*Small* is no more relevant. There, commonality was satisfied where the plaintiffs challenged the fairness of decisions made by a single administrative law judge who allegedly engaged in a pervasive pattern of biased behavior. 820 F. Supp. at 1110. Determining whether a single individual was biased is not analogous to challenging decisions made by numerous combinations of Neutral Physicians, Committee members, and Board members. Individual issues permeate any questions related to whether Defendants conducted a "full and fair review" of Plaintiffs' claims, and the cases Plaintiffs cite do not change that fact.

**Whether Defendants breached their fiduciary duties (Count V).** Lastly, Plaintiffs assert that they have raised supposedly common questions about "[w]hether the Board [] breached its fiduciary duties of loyalty and care to the Plan." Mot. 10-15. Plaintiffs assert that the Court can determine on a class-wide basis whether Defendants (i) engaged in a "Plan-wide biased physician compensation scheme," (ii) made "misrepresentations" in Plan documents about that scheme to "conceal misconduct," (iii) failed "to review the entirety of administrative records," (iv) ignored "advice to review all records," and (v) made "untenable Plan interpretations." *Id.* at 13-14. These questions are not common to the class for the same reasons previously discussed.

First, determining whether the Board breached its fiduciary duties by implementing a "[p]lan-wide biased physician compensation scheme" would initially require the Court to consider whether evidence common to the class demonstrates that such a scheme exists. As already explained, Plaintiffs have not presented that evidence. *See supra* Part I. And the opposite is true: statistical analysis shows no correlation of the kind the Amended Complaint asserts between Neutral Physicians' application decisions and their income. *Supra* at 19 n.10. In the absence of

24

any proof of a "general policy" that was itself biased or violated ERISA, Plaintiffs are left to assert nothing more than anecdotal allegations of Neutral Physicians bias—injuries that relate to particular benefit applications and belong to each putative class member, not to the Plan as a whole.

Because Plaintiffs have not established commonality based on a "[p]lan-wide biased physician compensation scheme," they necessarily fail to establish commonality based on alleged "misrepresentations" about that scheme. Plaintiffs assert that Defendants misrepresented in "ERISA-mandated notices" that "the Plan's physicians are *absolutely neutral*" during the claims process, that they "fully underst[ood] the obligation to conduct fair and impartial Player evaluations," and that the examinations they performed were "neutral." AC ¶ 108 (emphasis in original). To prove that any of those statements were actionable misrepresentations, Plaintiffs would have to show that the representations were false and that they relied on them—an analysis that would need to be specific to the context in which the statements were rendered. *See Fitzwater v. CONSOL Energy, Inc.*, 2019 WL 5191245, at *15 (S.D.W. Va. Oct. 15, 2019) ("Courts have denied class certification on ERISA fiduciary claims based on alleged misrepresentations because establishing the detrimental reliance element requires a showing of individualized proof."); *Tootle v. ARINC, Inc.*, 222 F.R.D. 88, 96-97 (D. Md. 2004) (similar). Moreover, as just explained, there is no common proof indicating that the Neutral Physicians' evaluations were not, in fact, "neutral" across all (or even any) of the thousands of adjudicated benefit claims at issue, let alone that class members relied on Defendants' representations that they were.

There is also no commonality based on questions related to Defendants' alleged "fail[ure] to review the entirety of administrative records," alleged decision to "ignor[e] advice to review all records," or alleged misrepresentations in Summary Plan Descriptions ("SPDs") about that conduct. Mot. 13-14; AC ¶¶ 309-15. These allegations merely replicate Plaintiffs' "full and fair

review" claims, and fail to satisfy commonality for the same reason. *Supra* at 20-24. Plaintiffs' misrepresentation claim also fails to satisfy commonality because in the absence of any common proof demonstrating that a non-compliant policy was systematically applied to all putative class members, there can be no common proof that the alleged statements in the SPDs were in fact false.

None of the cases that Plaintiffs cite in support of their commonality arguments change this analysis. *See* Mot. 15 & n.16. As Plaintiffs concede, all of those cases "involve challenges to plan-wide policies or practices," and in every one the plaintiffs identified proof common to the putative class showing that the challenged policy, practice, or decision uniformly applied to all putative class members in the same way. *Id.* But here, Plaintiffs have not identified any evidence showing that such a plan-wide policy, practice, or decision exists. That failure is dispositive of Plaintiffs' bid for certification, and none of the cases Plaintiffs cite suggest otherwise.

For example, Plaintiffs cite several cases in which a plan's fiduciaries were alleged to have engaged in an act or committed some omission that impacted all putative class members in the same way. *See, e.g., Sweet v. Advance Auto Stores Co.*, 2023 WL 3959779, at *1 (W.D. Va. June 12, 2023) (fiduciaries allegedly caused "the Plan" as a whole to be charged costs "higher than that of its peers"); *Ramos v. Banner Health*, 325 F.R.D. 382, 389 (D. Colo. 2018) (fiduciaries allegedly retained a third-party administrator that collected "excessive . . . fees from the Plan" and provided "imprudent investment options" to all Plan participants); *Moreno v. Deutsche Bank Ams. Holding Corp.*, 2017 WL 3868803, at *5 (S.D.N.Y. Sept. 5, 2017) (fiduciaries allegedly breached duty in "assembling and monitoring the Plan's menu of investment options," which was offered to "all participants").[13] The alleged fiduciary breach in each of these cases related to fees, investments,

---

[13] *See also Gruber v. Grifols Shared Servs. N. Am., Inc.*, 2023 WL 8610504, at *4 (C.D. Cal. Nov. 2, 2023); *Jacobs v. Verizon Commc'ns Inc.*, 2020 WL 4601243, at *8 (S.D.N.Y. June 1, 2020*); *Tracey v. MIT*, 2018 WL 5114167, at *4 (D. Mass. Oct. 19, 2018); *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 143 (S.D.N.Y. 2010); *Stanford v. Foamex*

investment menus, or other Plan features that were presented or applied to all of the putative class members in common.

Here, by contrast, Plaintiffs' claims involve countless individual benefits determinations. The Amended Complaint is filled with allegations of specific acts and specific omissions that applied only to particular benefit claims and particular named Plaintiffs, and had no effect on any other Plan participants. Although Plaintiffs make the grandiose assertion that these individualized allegations add up to a "systemic pattern" of bias or uniform mishandling of all benefit claims, that is pure *ipse dixit* that Plaintiffs do not support. *Supra* Part I. Indeed, as explained, examination of the named Plaintiffs' allegations, the relevant administrative records, the Plan's official policies, and the Plan's benefit claim determination data demonstrates that there is no common proof that could be used to demonstrate a class-wide, Plan-wide fiduciary breach. *Supra* at 10-20.

Plaintiffs' citation to cases involving misrepresentations in Plan documents are inapposite for a similar reason. Each of those cases involved a misrepresentation or omission that uniformly applied to plan participants—for example, where the plan document represented that "no amendment to the Plan will reduce the benefit [a participant has] already earned," and the fiduciaries allegedly effectuated a single amendment that violated that provision, *Pfeifer v. Wawa, Inc.*, 2018 WL 4203880, at *1 (E.D. Pa. Aug. 31, 2018); or where fiduciaries made a material change to plan terms that applied to all participants, but the explanation of that change that ERISA required was omitted, *Cockerill v. Corteva, Inc.*, 345 F.R.D. 81, 109 (E.D. Pa. 2023); *Becher v. Long Island Lighting Co.*, 164 F.R.D. 151, 150-51 (E.D.N.Y. 1996); or where fiduciaries made representations that "consistently promised" a particular benefit in documents distributed to all plan participants, and a determination about whether those promises should be deemed binding

---

*L.P.*, 263 F.R.D. 156, 166 (E.D. Pa. 2009); *Thomas v. SmithKline Beecham Corp.*, 201 F.R.D. 386, 394 (E.D. Pa. 2001).

would be common to all class members, *Fuller v. Fruehauf Trailer Corp.*, 168 F.R.D. 588, 596 (E.D. Mich. 1996).[14]  The same is not true here.  Determining whether Defendants misrepresented the neutrality of the Plan's Neutral Physicians, or misrepresented the completeness of the Plan's review of records submitted in support of benefit claims, would require a series of individual determinations that is not suitable for class resolution.  *Supra* at 15-19, 20-24.

**B.    Plaintiffs' Claims Are Not Typical Of Absent Class Members'.**

Typicality "goes to the heart" of a named plaintiff's ability to represent a class.  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006).  Commonality and typicality "tend[] to merge," as both requirements "serve as guideposts" for ensuring that "the named plaintiff's claim[s] and the class claims are so interrelated that the interests of class members will be fairly and adequately protected in their absence."  *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  To satisfy typicality, named plaintiffs must demonstrate that the facts supporting their claims "would also prove the claims of the absent class members."  *Souter v. Equifax Servs. LLC*, 498 F. App'x 260, 265 (4th Cir. 2012).  Their claims "cannot be so different from" absent class members' that resolving them would not advance those of the class.  *Deiter*, 436 F.3d at 466.

For all of the reasons discussed above, Plaintiffs fall well short of meeting this requirement because the proof necessary to adjudicate their individual claims will not apply to absent class members.  Consider Plaintiffs' claims based on Neutral Physician bias (Counts I, III, V).  Plaintiffs argue that their claims are typical because the Board had "systemic practices and policies" that involved relying on determinations by Neutral Physicians who had conflicts of interest.  Mot. 17-18.  But to prevail on that theory, each Plaintiff must prove that the Neutral Physician(s) who evaluated him were, in fact, biased in a way that changed the outcome of his claim.  All of the

---

[14] *See also Joncek v. Loc. 714 Int'l of Teamsters Health & Welfare Fund*, 1999 WL 755051, at *7 (N.D. Ill. Sept. 3, 1999); *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 78 (D. Md. 1991).

Plaintiffs were evaluated by different Neutral Physicians—and different combinations of Neutral Physicians—at different times. *See* AC ¶¶ 147-266. Moreover, certification of Plaintiffs' proposed fiduciary subclass, dating all the way back to 1970, Mot. 1-2, would encompass not only an inordinate number of different Neutral Physicians, Committee members, Board members, and benefits applications, but also different versions of the Plans—for example, versions of the Plan that did not include the Neutral Rule. Vincent Decl. ISO Loper MSJ ¶ 14 (Neutral Rule adopted in 2017). Indeed, Plaintiffs' request for "removal of [the Plan's] fiduciaries," AC ¶ 334, would be impossible to apply on a class-wide basis, since the fiduciaries have changed over the purported 54-year class period, with many of them no longer on the Board. There is no common proof of any "systemic pattern" of pervasive Neutral Physician bias, nor common proof that the Board relied on those biased decisions when making their benefits determinations. *Supra* at 15-19. And even if a particular named Plaintiff were able to prove that a specific Neutral Physician showed bias in his particular case, that would have no bearing on whether that bias necessarily affected other class members, let alone in the same way. *Cf. Dukes*, 564 U.S. at 355-56 ("demonstrating the invalidity of one manager's use of discretion [did] nothing to demonstrate the invalidity of another's"). Thus, proving the named Plaintiffs' claims would not "also prove the claims of the absent class members." *Soutter*, 498 F. App'x at 265; *cf. Cahoo v. Fast Enters. LLC*, 508 F. Supp. 3d 138, 159 (E.D. Mich. 2020) (due process claims based on denial of unemployment benefits atypical because each plaintiff was "harmed by different flaws" in the process at issue).

Similar issues arise with Plaintiffs' inadequate notice claim (Count II). Plaintiffs allege that Defendants violated ERISA § 503(1) by failing "to list specific reasons for adverse determinations" or the "specific reasons for disagreeing with medical views that favor an award of benefits" in benefit determination letters. AC ¶¶ 293, 295. But proving that one named Plaintiff's

letter failed to explain the Board's "specific reasons" for denying his claim or disagreeing with certain medical opinions says nothing about whether the Board provided specific reasons for its actions in another letter to another class member based on another application. Plaintiffs' own examples illustrate the problem: whether the Board's letter to Mr. Sims did not adequately explain why his "file contain[ed] no evidence that [his] disability arose while an Active Player," AC ¶ 293, does not "advance" the claim that the Board's letter to Mr. McKenzie failed to explain why it disagreed with a certain physician's medical assessment, *id.* ¶ 295. *Supra* at 19-20.

Plaintiffs argue that typicality is automatically satisfied for their fiduciary breach claim (Count V) because ERISA § 502(a)(2) actions asserted on behalf of the Plan are "by [their] very nature typical." Mot. 19. Not so. As Plaintiffs' cited cases explain, typicality can be satisfied in ERISA cases where "each of the claims arises from the same event or course of conduct, and each is based on the same legal theory." *In re Enron Corp.*, 2006 WL 1662596, at *10 (S.D. Tex. June 7, 2006).[15] But it does not follow that typicality is satisfied in ERISA cases where, as here, the named plaintiffs' claims are *not* based on the same events or course of conduct. *See, e.g.*, *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 432 (6th Cir. 2009) (fiduciary breach claims atypical because defendant's "alleged wrongful practices [did] not eliminate the need for an individualized assessment as to the ultimate propriety of the benefits decisions affecting each and every class member"); *Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1004-05 (8th Cir. 2004) (claims atypical because "the question of whether a [fiduciary] breach occurred" when denying disability benefits "remains a case-by-case determination").

---

[15] *See also Brieger v. Tellabs, Inc.*, 245 F.R.D. 345, 350 (N.D. Ill. 2007) (typicality satisfied if a claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory"); *Knight v. Lavine*, 2013 WL 427880, at *3 (E.D. Va. Feb. 4, 2013) (typicality satisfied because "each Plaintiff alleges the same conduct constituted the same breach of fiduciary duty by the same individuals"); *Tussey v. ABB, Inc.*, 2007 WL 4289694, at *7 (W.D. Mo. Dec. 3, 2007) ("[t]ypicality means that there are other members of the class who have the same or similar grievances as the plaintiff").

## III.    PLAINTIFFS' PROPOSED CLASSES ARE OVERBROAD

"[T]he definition of [a] class is an essential prerequisite to maintaining a class action." *Roman v. ESB, Inc.*, 550 F.2d 1343, 1348 (4th Cir. 1976).  Class definitions must be "precise, objective and presently ascertainable" because they serve the "important purposes" of identifying the individuals "entitled to relief" and "bound by a final judgment." *Southwood v. Credit Card Sol.*, 2014 WL 10677478, at *2 (E.D.N.C. Mar. 27, 2014).  For this reason, courts have refused to certify classes that are overbroad—i.e., where "it is apparent that [the putative class] contains a great many persons who have suffered no injury at the hands of the defendant." *Dykes v. Portfolio Recovery Assocs., LLC*, 2016 WL 346959, at *3 (E.D. Va. Jan. 28, 2016).  Moreover, members of a proposed (b)(1) or (b)(3) class must "be readily identifiable." *Kadel v. Folwell*, 100 F.4th 122, 160-61 (4th Cir. 2024).[16]  That requires not only "objective criteria" for identifying class members, but an "administratively feasible" method for determining membership in a class.  *EQT*, 764 F.3d at 358.  "If class members are impossible to identify without extensive and individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *Id.*

Plaintiffs' proposed class definition does not meet this standard.  Their definition includes:

> All participants in the Plan who filed one or more applications for one or more categories of disability benefits under the Plan between August 1, 1970 and [the date of class certification] and are members of at least one of the five Subclasses, defined as the T & P SUBCLASS, the ACTIVE SUBCLASS, the LOD SUBCLASS, the NC SUBCLASS, and the FIDUCIARY SUBCLASS.

Mot. 1.  The T&P, Active, LOD, and NC Subclasses include all Plan participants who filed an application of the relevant disability type that was denied between August 9, 2019, and the date of certification, regardless of the reason it was denied.  *Id.* at 1-2.  And the Fiduciary Subclass encompasses all Plan participants who filed an application for disability benefits dating back to

---

[16] The Fourth Circuit recently held that this requirement does not apply to (b)(2) classes. *Kadel*, 100 F.4th 122 at 160-61.  A (b)(2) class is improper for all of the other reasons stated herein.

August 1, 1970, regardless of whether the application was denied. *Id.* at 2.

These proposed class definitions are unusable because they include individuals who are not conceivably entitled to relief. Under no circumstances could *all* individuals who filed applications and had them denied, let alone all individuals who *ever* filed applications, be appropriate members of the class. *Cf. Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011) (vacating class certification where anyone "who was ever a participant in the Boeing Plan, or who in the future may become a participant in the Boeing Plan, [was] swept into th[e] class"). Some participants, for example, filed applications that were denied for administrative reasons—like untimeliness or failure to exhaust. ECF No. 69-1 at 23-25 (explaining that Mr. McGahee, Mr. Thomas, Mr. Smith, and Mr. Parsons assert claims that they failed to exhaust or are time-barred). Other applications were denied because participants failed to appear for examinations or to cooperate with testing. *E.g.*, 2021 DPD §§ 3.1(d) (requiring Neutral Physician evaluation to obtain disability benefits), 6.2(e) (requiring validity testing for NC benefits). Yet none of Plaintiffs' theories of liability call into question application determinations that were based on such failures. The proposed class definitions are therefore improper because they include absent individuals who do not even purport to share Plaintiffs' theorized injuries. *See Cusack-Acocella v. Dual Diagnosis Treatment Ctr., Inc.*, 2019 WL 2621920, at *3 (C.D. Cal. Apr. 8, 2019) (ERISA class defined as "all participants" in the plan was "too broad for certification" because it was not clear that claimants "all had their claims go unpaid because of Defendants' alleged misconduct"); *cf. Rosedale v. CarChex, LLC*, 2020 WL 998740, at *4 (D. Md. Mar. 2, 2020) (dismissing class allegations at the pleading stage because plaintiff's "grossly overbroad" class definitions included individuals who did not "suffer the same injury" or "suffered no injury whatsoever").

Even if Plaintiffs revised their class definition to be more precise—for example, to be

limited to participants whose benefits were denied because their impairments were discredited as a result of Neutral Physician bias—the redefined class would not be ascertainable because it would require an individualized mini-trial to determine class membership. Indeed, the named Plaintiffs alone saw 48 different Neutral Physicians, some of which are not even alleged to have been biased. Vincent Decl. ISO Class Cert. Opp. ¶¶ 2-21. Such review is not "administratively feasible," and would demand more than Rule 23 permits. *EQT*, 764 F.3d at 358; *Romberio*, 385 F. App'x at 431 (class definition "unsatisfactory" because deciding which benefits claims "were properly denied for valid medical reasons and the set of individuals whose claims were improperly denied for profit-driven reasons" would require "individualized fact-finding" into each participant's record).

## IV.    PLAINTIFFS CANNOT SATISFY THE REQUIREMENTS OF RULE 23(b)

### A.    Plaintiffs cannot satisfy Rule 23(b)(3).

Plaintiffs do not argue that their classes satisfy Rule 23(b)(3). But because individual monetary relief predominates their claims, they are required to do so. Claims for individualized monetary relief "belong in Rule 23(b)(3)," with its procedural protections of "predominance, superiority, mandatory notice, and the right to opt out." *Dukes*, 564 U.S. at 362; *see, e.g.*, *Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015). A class seeking monetary relief may "in some cases" be certified outside of (b)(3), but only where the monetary relief is "incidental to injunctive or declaratory relief." *Berry*, 807 F.3d at 609; *see Dukes*, 564 U.S. at 365. Where "monetary relief predominates," however, (b)(1) and (b)(2) certification are "inappropriate." *Berry*, 807 F.3d at 609 (discussing Rule 23(b)(2)); *Bellon v. PPG Emp. Life & other Benefits Plan*, 2023 WL 4155362, at *18 (N.D.W. Va. May 23, 2023), *R. & R. adopted sub nom.*, 2024 WL 1303911 (N.D.W. Va. Mar. 27, 2024) (citing 1 McLaughlin On Class Actions § 5:3 (17th ed. 2020)) (discussing Rule 23(b)(1)).

Monetary relief "predominates" a claim when it "is less of a group remedy and instead depends more on the varying circumstances and merits of each potential class member's case."

*Adams v. Henderson*, 197 F.R.D. 162, 171 (D. Md. 2000). Monetary relief is "incidental" only if it is "in the nature of a group remedy, flowing directly from liability to the class as a whole." *Berry*, 807 F.3d at 611. Such "incidental damages should not require additional hearings to resolve the disparate merits of each individual's case; [they] should neither introduce new and substantial legal or factual issues, nor entail complex individualized determinations." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998); *see Dukes*, 564 U.S. at 366 (quoting same). Rather, they are limited to circumstances where, if the Plaintiffs prevail, "every class member would be entitled uniformly to the same amount of statutory damages, set by rote calculation." *Berry*, 807 F.3d at 609-10. For that reason, "claims for individualized monetary relief … are not incidental" to the relief a plaintiff seeks. *Id*.; *see Dukes*, 564 U.S. at 360 (similar).

*Dukes* itself is illustrative. There, the plaintiffs sought injunctive relief and backpay on the basis that certain Wal-Mart promotion policies allegedly violated Title VII. 564 U.S. at 342. The Court concluded that the plaintiffs' backpay claims predominated because, even if they were to prove a pattern or practice of discrimination, Wal-Mart would be "entitled to individualized determinations of each employee's eligibility for backpay." *Id*. at 366. In other words, a finding that the policy was discriminatory would not have entitled every class member to backpay *en masse*. Instead, it would have required "a district court … [to] conduct additional proceedings" to determine each member's eligibility, at which point Wal-Mart would have the right to "demonstrate that the individual applicant was denied an employment opportunity for lawful reasons," i.e., to prove that it did not violate Title VII as to that individual plaintiff. *Id*. at 366. The "necessity of that litigation [would] prevent backpay from being 'incidental' to the classwide injunction." *Id*.

Plaintiffs' claims here are analogous. Plaintiffs seek monetary relief in the amount of the benefits they alleged they should have received, *see* AC ¶ 358, and all of the procedural and

systemic defects that they allege (without support) are aimed at obtaining that relief. Even assuming *arguendo* that Plaintiffs could prove some procedural defect, there could be no group monetary relief, but rather the entitlement of each individual applicant to an award of benefits would depend on "varying circumstances and merits of each potential class member's case," *Adams*, 197 F.R.D. at 171, including each former player's unique medical history. Because no "group" monetary remedy is available, Plaintiffs' request for certification must satisfy the requirements of Rule 23(b)(3). *Adams*, 197 F.R.D. at 171.

Plaintiffs do not even attempt to argue they can satisfy the (b)(3) standards. Any argument that they did is therefore waived. *See Jennifer W. v. Kijakazi*, 2023 WL 2245635, at *2 (D. Md. Feb. 27, 2023) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue."). But even if they had raised it, the argument fails for the same reasons that Plaintiffs flunk the Rule 23(a) commonality analysis: no common questions "predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Each putative class member's benefit claims are substantially different, as are the Neutral Physicians involved in evaluating those benefit claims. No common questions or answers could resolve each putative class member's claim. A class action can hardly be the "superior" method for resolving a hodgepodge of individualized benefits claims. The Rule 23(b)(3) analysis ends there.

To the extent Courts in this Circuit have permitted "hybrid" certification in cases involving claims for both monetary and injunctive relief, it is inappropriate here. There are two approaches to hybrid certification: "divided certification," where the court certifies the "equitable aspects of a suit under Rule 23(b)(2) and the damages aspects under Rule 23(b)(3)," and "composite certification," which "allows a court to certify the class under Rule 23(b)(2) for both monetary and

equitable remedies and exercise its plenary authority under Rules 23(d)(2) and 23(d)(5) to provide all class members with personal notice and the opportunity to opt out, as if the class were certified under Rule 23(b)(3)." *Fisher v. Va. Elec. & Power Co*., 217 F.R.D. 201, 213 (E.D. Va. 2003); *see Miller v. Balt. Gas & Elec. Co.*, 202 F.R.D. 195 (D. Md. 2001).  But for many of the same reasons that Plaintiffs' claims for monetary relief require individualized adjudication, Plaintiffs cannot possibly be entitled to a class-wide injunction that could resolve their claims in one fell swoop.  As explained below, the entitlement of any putative class member to non-monetary relief also turns on individualized facts, and therefore cannot be resolved by class-wide injunction as (b)(2) certification requires.  *See infra* Part IV.C.

### B.    Plaintiffs cannot certify a class under Rule 23(b)(1).

Plaintiffs instead argue their classes satisfy Rule 23(b)(1)(A).  Mot. 33-36.  They do not. To satisfy Rule 23(b)(1)(A), a plaintiff must demonstrate that separate actions brought by the putative class members would create a risk of "varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A).  Rule 23(b)(1)(A) "takes in cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)."  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  The "mere possibility of success by some class members, and the lack of success of others, will not suffice."  *Peoples v. Wendover Funding*, 179 F.R.D. 492, 500 (D. Md. 1998); 2 Newberg & Rubenstein on Class Actions § 4:7 (6th ed. 2024) ("courts generally will *not* certify a class under Rule 23(b)(1)(A) simply because separate damage actions may reach different results").  Rather, what Rule 23(b)(1)(A) seeks to avoid is the likelihood that inconsistent judgments would lead to conflicting obligations that would preclude the defendant's "ability to

pursue a uniform course of conduct." *Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 633 (6th Cir. 2011) (reversing certification where there was "nothing to indicate" separate adjudications would lead to such conflict); *see, e.g.*, *Lutz Surgical Partners PLLC v. Aetna, Inc.*, 2023 WL 2153806, at *11 (D.N.J. Feb. 21, 2023) (denying certification where plaintiff alleged "a uniform practice of cross-plan offsets" because "varying adjudication regarding that uniform practice" would not result in incompatible standards of conduct).

Here, there is no risk that separate adjudications would place Defendants under *conflicting* obligations with which they cannot simultaneously comply. The substantial factual differences among the class members' benefits applications requires individualized consideration by the Neutral Physicians and by the Board. Rulings on one claim thus will not necessarily apply to other claims. *See supra* Part II.A. Indeed, the separate adjudication of claims raised by health or disability plan participants is the norm, whether those claims seek only monetary benefits or also seek procedural remedies. *See Wit*, 79 F.4th at 1084. Plans can (and do) readily implement any remedies that are ordered in a particular case specific to the participant who garnered the relief. And even if a different court determined that a different participant was not entitled to a similar remedy, that determination would not place the plan under a conflicting *obligation* not to provide the denied remedy if it so chose, which is the type of catch-22 situation that Rule 23(b)(1)(A) is intended to address.

Plaintiffs cite a litany of inapposite cases in which courts concluded that specific kinds of ERISA claims seeking plan-wide relief satisfied Rule 23(b)(1)(A). Mot. 34 & n.46. None support their argument. Most involve alleged breaches of fiduciary duty for causing losses to employee stock ownership plans (ESOPs) or retirement plans, where the plaintiffs were challenging a single

action by the plan fiduciaries that impacted all plan participants as a whole.[17]  In those cases, the courts reasoned that certification under Rule 23(b)(1)(A) was appropriate because the fiduciaries could not take the single action under challenge in two different ways.  Here, by contrast, Plaintiffs do not challenge any such single action that applied to all of the putative class members in the same way.  Rather, Plaintiffs' theory is that each putative class member was impacted by a different action by the Board (the Board's determination of his specific application) that caused him an individualized harm (the rejection of that specific application).

Plaintiffs also cite two opinions from the same litigation, *Premier Health Center, P.C. v. UnitedHealth Group*.  Mot. 34 n.46 (citing 292 F.R.D. 204, 227-28 (D.N.J. 2013); 2014 WL 4271970 (D.N.J. Aug. 28, 2014)).  *Premier*, too, is distinguishable.  There, the parties' dispute turned on "whether an overpayment determination against a provider for out of network services amounts to an [adverse benefit determination ("ABD")] under ERISA," which in turn would determine whether ERISA's notice and other protections for ABDs applied.  292 F.R.D. at 223 (finding Plaintiffs satisfied Rule 23(a) commonality).  The Court found that although United's recoupment notification letters "in fact[] var[ied] substantially," *all* of those letters shared a common omission, as a group, and necessarily either complied or failed to comply with ERISA depending on whether the omitted language was in fact required.  *Id*. at 224.  Under those circumstances, the court reasoned that certification under Rule 23(b)(1)(A) was appropriate because separate adjudications would create "a real risk of establishing inconsistent standards" as to whether the omission common to all of recoupment letters rendered them an ABD subject to

---

[17] *See In re Schering Plough Corp. ERISA Litig.*, 589 F.3d 585, 604 (3d Cir. 2009); *Boyd v. Coventry Health Care Inc.*, 299 F.R.D. 451, 459 (D. Md. 2014); *Neil v. Zell*, 275 F.R.D. 256, 267 (N.D. Ill. 2011); *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 376 (S.D. Ohio 2006); *In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 78 (S.D.N.Y. 2006); *Falberg v. Goldman Sachs Grp., Inc.*, 2022 WL 538146, at *11 (S.D.N.Y. Feb. 14, 2022); *Stegemann v. Gannett Co.*, 2022 WL 17067496, at *11-13 (E.D. Va. Nov. 17, 2022).

ERISA's notice requirements.  292 F.R.D. at 228.  That case has no application here, where each putative class member's entitlement to relief will necessarily depend on the determination of numerous individualized facts specific to them.

### C.    Plaintiffs cannot certify a class under Rule 23(b)(2).

Plaintiffs argue their class also satisfies Rule 23(b)(2).  Mot. 37-40.  To satisfy Rule 23(b)(2), Plaintiffs must show that Defendants "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "[B]ecause of the group nature of the harm alleged and the broad character of the relief sought, the (b)(2) class is, by its very nature, assumed to be a homogenous and cohesive group."  *Berry*, 807 F.3d at 608.

"The key to the (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'"  *Dukes*, 564 U.S. at 360.  In other words, (b)(2) "applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Id*.  Rule 23(b)(2) does not authorize class certification "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant" or "when each class member would be entitled to an individualized award of monetary damages."  *Id*. at 360-61.

Here, Plaintiffs cannot satisfy the Rule (b)(2) requirements because no injunction would properly apply as to the class as a whole.  For example, the putative class could not be entitled to a theoretical injunction ordering reprocessing of all of their benefit applications *en masse*, because each individual's entitlement to such relief would necessarily depend on "the individual circumstances at issue in their claims."  *Wit*, 79 F.4th at 1084.  To be entitled to such injunctive relief, each class member would need to show that the manner in which the Board adjudicated

their particular claim "could have prejudiced the claimant," which in turn requires demonstrating that the particular class member "might be entitled to benefits under the proper standard." *Id.*; *see, e.g.*, *Judge v. Metro. Life Ins. Co.*, 710 F.3d 651, 659-60 (6th Cir. 2013) (concluding that "even if [defendant] were found to have applied an incorrect definition of [the relevant plan term], a remand to [defendant] for reconsideration under the correct definition would be unavailing" where the defendant "would undoubtedly reach the same conclusion").

The necessary showing that each purported class member "might be entitled to benefits" would turn on participant-specific facts. For example, one participant's application may have been denied because he did not timely apply, another's because he failed to attend his Neutral Physician evaluations, and another's because he plainly was not disabled. *Supra* at 32. Those applications were all denied for different and independently sufficient reasons that Plaintiffs are not challenging, not on any "grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). And because these class members could not show they were prejudiced by any misapplication of the Plan standards, they would not be entitled to an injunction requiring reprocessing of those applications. *See Wit*, 79 F.4th at 1084. The same is true of Plaintiffs' claims that their benefits decision letters were inadequate, and their allegations about full and fair review: Plaintiffs allege different defects in their benefits letters that are specific to the adjudication of their applications, and assert a wide variety of alleged deficiencies in the process by which their individual applications were reviewed. *Supra* at 19-20. None of these challenges could be resolved by "a single injunction … [that] would provide relief to each member of the class," *Dukes*, 564 U.S. at 360. Finally, Plaintiffs' fiduciary breach claims are derivative of all of their other individualized complaints, *supra* at 24-26, and cannot be certified under Rule 23(b)(2) for the same reasons.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' Motion for class certification.

40

Date: November 18, 2024                    Respectfully submitted,

                                           */s/ Gregory F. Jacob*
                                           Gregory F. Jacob (D. Md. Bar No. 06769)
                                           Meredith N. Garagiola (*pro hac vice*)
                                           O'MELVENY & MYERS LLP
                                           1625 Eye Street, N.W., 10th Floor
                                           Washington, DC 20006
                                           Telephone: (202) 383-5300
                                           Facsimile: (202) 383-5414
                                           Email: gjacob@omm.com
                                           Email: mgaragiola@omm.com

                                           Elizabeth L. McKeen (*pro hac vice*)
                                           O'MELVENY & MYERS LLP
                                           610 Newport Center Drive, 17th Floor
                                           Newport Beach, CA 92660
                                           Telephone: (949) 823-6900
                                           Facsimile: (949) 823-6994
                                           Email: emckeen@omm.com

                                           *Attorneys for Defendants The NFL Player
                                           Disability & Survivor Benefit Plan, The NFL
                                           Player Disability & Neurocognitive Benefit
                                           Plan, The Bert Bell/Pete Rozelle NFL Player
                                           Retirement Plan, and The Disability Board of
                                           the NFL Player Disability & Neurocognitive
                                           Benefit Plan*

## <u>CERTIFICATE OF SERVICE</u>

I, Gregory F. Jacob, hereby certify that on November 18, 2024, I caused a copy of the

foregoing document to be served upon all counsel of record via the CM/ECF system for the

United States District Court for the District of Maryland.


*/s/ Gregory F. Jacob*
Gregory F. Jacob
