**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>THE NFL PLAYER DISABILITY &<br>SURVIVOR BENEFIT PLAN *et al.*,<br><br>Defendants. | Case No. 1:23-cv-00358-JRR |

**DECLARATION OF ROBERT SMITH IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF
PLAINTIFF DANIEL LOPER'S CLAIMS**

I, Robert Smith, hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct; that I have personal knowledge of the matters set forth herein, or knowledge based on my review of business records; and that, if called to testify as a witness in this action, I could and would testify competently thereto:

### I.     BACKGROUND

1. My NFL career began in 1993, when I was drafted by the Minnesota Vikings. I played running back for that team for eight years, from 1993 to 2000.

2. I have worked with the NFL Players Association for over 30 years, beginning as an assistant player representative in 1994. In 1996, I became the Minnesota Vikings' player representative to the NFL executive committee. Since approximately 2010, I have held a volunteer position as one of three NFL Players Association-appointed members (also called "Trustees") of the Disability Board of the NFL Player Disability & Survivor Benefit Plan (the "Plan"). I have served in a similar capacity on the Bert Bell/Pete Rozelle NFL Player Retirement Plan since 2010, and on the other collectively bargained pension- and welfare-benefit plans established by the League and the NFL Players Association. I currently also work for Fox Sports, as a commentator for both college football and NFL games.

3. The Plan is funded by a revenue-sharing agreement between the NFL (including the NFL Management Council) and the Players Association. No funds left over after benefits are paid or denied go to the Board, the Management Council, or the Players Association.

### II.    DISABILITY BOARD AND ITS MEETINGS

4. As a Disability Board member, I attend the Board's quarterly meetings, during which the other Board members and I are responsible for reviewing and deciding players' appeals of Disability Initial Claims Committee ("Committee") decisions, among other responsibilities.

5.  The number of appeals we decide at a Board meeting varies, but can exceed 100, and each player's appeal may include over a thousand pages of records.

6.  The NFL Management Council and NFL Players Association each employ a separate advisor (the "Party Advisors").  The current Players Association Party Advisor is Adora Williams.

7.  The Party Advisors separately prepare recommendations to their Board members regarding the applications and also meet and discuss these recommendations with one another before the quarterly Board meetings in order to identify any potential areas of disagreement.

8.  Separate from the review performed by the Party Advisors, the Committee undertakes its own independent review of the relevant records.  I have no involvement in any Committee-level decision.

9.  The Board members and Party Advisors have access to a secure online portal (called the "Meetings Website") where, beginning about a month before the quarterly Board meeting, the NFL Player Benefits Office uploads players' applications, Neutral Physician and MAP Report Forms, medical records, player correspondence, records of the player's "transaction history" within the NFL, any other documents players submit in connection with their applications and appeals, and case summaries prepared by Plan counsel.  As a Board member, I review those summaries.  If I have questions about anything in the summary, I discuss my questions with Ms. Williams.  If I want to review any information in greater depth, I review the source documents through the Meetings Website before the Board meeting.

10. In consultation with the Party Advisors, the Board members take into account the documents in each player's file before we render a decision.  Different cases may require different levels of attention—for instance, a case in which a player simply did not play enough

credited seasons for his benefits to vest may require less attention than a more complex case.

11. While the Plan permits the Board to delegate tasks to and rely upon the opinions of its consultants and advisors, it is my normal practice to review the relevant Plan provisions that apply to the particular cases at issue; the summaries prepared by Plan counsel; the recommendations of Ms. Williams, who reviews each player's record; as well as source documents as necessary to understand the summaries or recommendations and any questions I have about them.

12. Board meetings are usually held over a two-day period. The first day customarily involves presentations from financial advisors regarding investments of plan funds. The second day customarily begins with two separate meetings (each referred to as a final "pre-meeting")—one with the Players Association Trustees and one with the Management Council Trustees.

13. The two sets of Trustees convene separately at these pre-meetings, before the formal Board meeting is called to order, to receive presentations from their respective Party Advisors and recommendations for the appeals to be decided at the Board meeting. We discuss the relevant Plan provisions, the Neutral Physicians' and Medical Advisory Physicians' findings, and any other complexity, including whether Mr. Reynolds's recommendations differ from Ms. Williams's, and the reasons for any disagreements.

14. The Party Advisors lead these discussions and answer Board members' questions. Plan counsel are present at these meetings, but do not offer recommendations regarding case dispositions.

15. After the separate sessions with the Party Advisors, the full Board convenes for the joint formal Board meeting. In that meeting, the Board Trustees vote on each case and Plan counsel memorializes their decisions.

16. The six Board members unanimously voted to deny Mr. Loper's 2020 disability appeal; he was not entitled to benefits because no Neutral Physician found he met the standard for LOD benefits. This decision is consistent with my decision on other LOD applications where no Neutral Physician found that the player met the standard for LOD benefits

17. In all of my years as a Board member I have never felt pressure to make a decision for or against a player's application. My objective is to ensure that every application is fairly and correctly decided according to the terms of the Plan.

18. As a Trustee appointed by the NFL Players Association, I understand that I have fiduciary responsibilities to the Plan and to players alike, and I take those responsibilities seriously. In each case, we apply the relevant Plan rules and federal law to the facts presented. We understand that, unfortunately, this means some players will be denied benefits based on the particular circumstances of their individual case.

Executed this 18th day of November, 2024 at Arlington, Texas.

*[signature]*
Robert Smith