# EXHIBIT A

# NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN

## AMENDED AND RESTATED AS OF APRIL 1, 2021

**JO-00001**

NFL_ALFORD-0000304

# NFL Player Disability & Survivor Benefit Plan

## Table of Contents

INTRODUCTION .................................................................................................................. 1

**ARTICLE 1    DEFINITIONS** ..................................................................................... 2

SECTION 1.0    88 ELIGIBLE PLAYER .......................................................................... 2
SECTION 1.0A    2011 LEGACY CREDITS ..................................................................... 2
SECTION 1.0B    2020 LEGACY CREDITS ..................................................................... 2
SECTION 1.1    ACTIVE PLAYER .................................................................................. 2
SECTION 1.2    ADMINISTRATOR ................................................................................ 2
SECTION 1.3    ARTICLE 3 ELIGIBLE PLAYER ............................................................ 2
SECTION 1.4    ARTICLE 4 ELIGIBLE PLAYER ............................................................ 2
SECTION 1.5    BENEFIT ARBITRATOR ........................................................................ 2
SECTION 1.6    BENEFIT CREDIT ................................................................................ 2
SECTION 1.7    BENEFIT CREDIT ANNUITY STARTING DATE ....................................... 3
SECTION 1.8    BERT BELL/PETE ROZELLE PLAN ....................................................... 3
SECTION 1.9    COLLECTIVE BARGAINING AGREEMENT OR CBA ................................ 3
SECTION 1.10    CODE ................................................................................................ 3
SECTION 1.11    CREDITED SEASON ............................................................................ 3
SECTION 1.12    DISABILITY BOARD ........................................................................... 3
SECTION 1.13    DISABILITY CREDITS ......................................................................... 3
SECTION 1.14    DISABILITY INITIAL CLAIMS COMMITTEE ........................................ 3
SECTION 1.15    EMPLOYER ........................................................................................ 3
SECTION 1.16    ERISA .............................................................................................. 3
SECTION 1.17    LEAGUE ............................................................................................ 3
SECTION 1.18    [RESERVED] ..................................................................................... 3
SECTION 1.19    LEGACY CREDIT ANNUITY STARTING DATE ...................................... 3
SECTION 1.20    LIFE ONLY PENSION .......................................................................... 3
SECTION 1.21    MANAGEMENT COUNCIL .................................................................. 3
SECTION 1.22    MEDICAL ADVISORY PHYSICIAN OR MAP .......................................... 3
SECTION 1.23    MEDICAL DIRECTOR .......................................................................... 4
SECTION 1.24    MEDICAL RECORDS ........................................................................... 4
SECTION 1.25    NEUTRAL PHYSICIAN ........................................................................ 4
SECTION 1.26    NFLPA ............................................................................................. 4
SECTION 1.27    NORMAL RETIREMENT DATE .............................................................. 4
SECTION 1.28    PLAN ................................................................................................ 4
SECTION 1.29    PLAN DIRECTOR ................................................................................ 4
SECTION 1.30    PLAN YEAR ....................................................................................... 4
SECTION 1.31    PLAYER ............................................................................................. 4
SECTION 1.32    QDRO .............................................................................................. 4
SECTION 1.33    SPECIAL CREDITS .............................................................................. 4
SECTION 1.34    TRUST ............................................................................................... 4
SECTION 1.35    TRUSTEES ......................................................................................... 4
SECTION 1.36    VESTED INACTIVE PLAYER ................................................................ 4

**ARTICLE 2    PARTICIPATION** ................................................................................ 5

SECTION 2.1    PARTICIPATION .................................................................................. 5

i

**JO-00002**

**ARTICLE 3**       **TOTAL AND PERMANENT DISABILITY BENEFITS RESULTING FROM APPLICATIONS RECEIVED ON AND AFTER JANUARY 1, 2015** ................................................................................................6

SECTION 3.1    GENERAL STANDARD FOR ELIGIBILITY ....................................................6
SECTION 3.2    SOCIAL SECURITY STANDARD FOR ELIGIBILITY .......................................7
SECTION 3.3    APPLICATION RULES AND PROCEDURES....................................................8
SECTION 3.4    CLASSIFICATION ...................................................................................10
SECTION 3.5    SPECIAL RULES ....................................................................................11
SECTION 3.6    AMOUNT OF MONTHLY BENEFIT ...........................................................12
SECTION 3.7    SUPPLEMENT FOR INACTIVE B T&P BENEFITS .......................................16
SECTION 3.8    CONTINUATION OF T&P BENEFITS ........................................................16
SECTION 3.9    OTHER CLASSIFICATION RULES..............................................................18
SECTION 3.10   EFFECTIVE DATE OF T&P BENEFITS ......................................................19
SECTION 3.11   DURATION OF T&P BENEFITS ...............................................................19
SECTION 3.12   PRIOR DETERMINATIONS OF ABILITY TO WORK .....................................19

**ARTICLE 4**       **TOTAL AND PERMANENT DISABILITY BENEFITS RESULTING FROM APPLICATIONS RECEIVED BEFORE JANUARY 1, 2015** .....20

SECTION 4.1    ELIGIBILITY ..........................................................................................20
SECTION 4.2    AMOUNT FOR ACTIVE FOOTBALL, ACTIVE NONFOOTBALL, AND INACTIVE A T&P BENEFITS ...................................................................................20
SECTION 4.2A   SSDI OFFSET ........................................................................................22
SECTION 4.3    SUPPLEMENT FOR INACTIVE B T&P BENEFITS .......................................23
SECTION 4.4    DEEMED PAYMENTS ..............................................................................23
SECTION 4.5    DEATH ..................................................................................................24
SECTION 4.6    ARTICLE 4 DISABILITY DETERMINATIONS...............................................24
SECTION 4.7    ARTICLE 4 CLAIMS PROCEDURE.............................................................24
SECTION 4.8    SUNSET ................................................................................................24

**ARTICLE 5**       **LINE-OF-DUTY DISABILITY BENEFITS BEGINNING JANUARY 1, 2015** ................................................................................................25

SECTION 5.1    ELIGIBILITY ..........................................................................................25
SECTION 5.2    AMOUNT OF LINE-OF-DUTY DISABILITY BENEFITS .................................25
SECTION 5.3    RELATIONSHIP TO RETIREMENT BENEFITS ..............................................26
SECTION 5.4    PROCEDURES.........................................................................................27
SECTION 5.5    DEFINITIONS .........................................................................................30
SECTION 5.6    DEATH ..................................................................................................31
SECTION 5.7    TRANSITION OF BENEFITS ......................................................................31

**ARTICLE 6**       **NEUROCOGNITIVE DISABILITY BENEFITS** ......................................32

SECTION 6.1    ELIGIBILITY ..........................................................................................32
SECTION 6.2    DETERMINATION OF NEUROCOGNITIVE IMPAIRMENT ...............................33
SECTION 6.3    RELEASE ...............................................................................................36
SECTION 6.4    AMOUNT OF NC BENEFIT ......................................................................37
SECTION 6.5    EFFECTIVE DATE OF NC BENEFIT ..........................................................38
SECTION 6.6    DURATION OF NC BENEFITS AND RE-EXAMINATION .................................39
SECTION 6.7    PLAYER REQUESTS FOR RECLASSIFICATION ...........................................39
SECTION 6.8    RELATIONSHIP TO RETIREMENT BENEFITS ..............................................39
SECTION 6.9    APPLICATION DEADLINE .......................................................................39
SECTION 6.10   SUNSET ................................................................................................39

**ARTICLE 7**       **COORDINATION OF BENEFITS** ........................................................40

SECTION 7.1    ONE APPLICATION AT A TIME .................................................................40

**JO-00003**

Confidential Information                                    NFL_ALFORD-0000306

| SECTION 7.2 | ONE BENEFIT AT A TIME | 40 |
| SECTION 7.3 | UNIFORM PROCEDURES | 40 |
| SECTION 7.4 | DEEMED PAYMENTS | 41 |
| SECTION 7.5 | QDROS | 41 |

**ARTICLE 7A    SURVIVOR BENEFITS .........................................42**

| SECTION 7A.1 | DEFINITIONS | 42 |
| SECTION 7A.2 | BENEFITS FOR PLAYER DEATHS ON AND AFTER APRIL 1, 2020 | 42 |
| SECTION 7A.3 | SUPPLEMENTAL SURVIVOR BENEFITS FOR PLAYER DEATHS PRIOR TO APRIL 1, 2020 | 45 |
| SECTION 7A.4 | QDROS | 46 |

**ARTICLE 8    CONTRIBUTIONS.....................................47**

| SECTION 8.1 | SCHEDULE OF CONTRIBUTIONS | 47 |
| SECTION 8.2 | EXCLUSIVE BENEFIT OF CONTRIBUTIONS | 47 |

**ARTICLE 9    THE DISABILITY BOARD AND DISABILITY INITIAL CLAIMS COMMITTEE ......................................48**

| SECTION 9.1 | SELECTION OF THE DISABILITY BOARD | 48 |
| SECTION 9.2 | AUTHORITY | 48 |
| SECTION 9.3 | MEDICAL ISSUES AND DISPUTES OF THE DISABILITY BOARD | 49 |
| SECTION 9.4 | SELECTION OF THE DISABILITY INITIAL CLAIMS COMMITTEE | 50 |
| SECTION 9.5 | AUTHORITY OF THE DISABILITY INITIAL CLAIMS COMMITTEE | 51 |
| SECTION 9.6 | DISPUTES OF THE DISABILITY INITIAL CLAIMS COMMITTEE | 51 |
| SECTION 9.7 | MEETINGS | 51 |
| SECTION 9.8 | DUTY OF CARE | 52 |
| SECTION 9.9 | DISCRETIONARY ACTS | 52 |
| SECTION 9.10 | INDEMNIFICATION | 52 |

**ARTICLE 10    AMENDMENT AND TERMINATION ......................54**

| SECTION 10.1 | AMENDMENT AND TERMINATION | 54 |
| SECTION 10.2 | MERGERS | 54 |

**ARTICLE 11    RECORDS AND REPORTS ......................55**

| SECTION 11.1 | RECORDS | 55 |

**ARTICLE 12    MEDICAL PROFESSIONALS ......................56**

| SECTION 12.1 | MEDICAL DIRECTOR | 56 |
| SECTION 12.2 | MEDICAL ADVISORY PHYSICIAN | 56 |
| SECTION 12.3 | NEUTRAL PHYSICIANS | 57 |

**ARTICLE 13    MISCELLANEOUS ......................58**

| SECTION 13.1 | GOVERNING LAW | 58 |
| SECTION 13.2 | ADDRESSES AND PAYMENT IN EVENT OF INCAPACITY | 58 |
| SECTION 13.3 | RECEIPT OF DOCUMENTS | 58 |
| SECTION 13.4 | LIMITATION ON ACTIONS | 58 |
| SECTION 13.5 | "SPENDTHRIFT" PROVISION | 59 |
| SECTION 13.6 | QDRO EXCEPTION | 59 |
| SECTION 13.7 | COUNTERPARTS | 59 |
| SECTION 13.8 | LOCATION OF PAYEE UNKNOWN | 59 |
| SECTION 13.9 | NO EMPLOYMENT CONTRACT | 59 |
| SECTION 13.10 | SEVERABILITY | 59 |
| SECTION 13.11 | RECOVERY OF CERTAIN OVERPAYMENTS | 60 |
| SECTION 13.12 | USERRA COMPLIANCE | 60 |
| SECTION 13.13 | EXPENSES | 60 |

iii

**JO-00004**

SECTION 13.14    CLAIMS PROCEDURE............................................................................60

**APPENDIX A — POINT SYSTEM FOR ORTHOPEDIC IMPAIRMENTS.......................66**

INTRODUCTION ....................................................................................................................66
CERVICAL SPINE IMPAIRMENT................................................................................................68
THORACIC SPINE IMPAIRMENT ..............................................................................................69
LUMBAR SPINE IMPAIRMENT..................................................................................................70
SHOULDER IMPAIRMENT ........................................................................................................71
ELBOW IMPAIRMENT ..............................................................................................................72
WRIST IMPAIRMENT ...............................................................................................................73
HAND IMPAIRMENT.................................................................................................................74
HIP IMPAIRMENT ....................................................................................................................75
KNEE IMPAIRMENT .................................................................................................................76
ANKLE IMPAIRMENT ...............................................................................................................78
FOOT IMPAIRMENT .................................................................................................................79

**EXECUTION ..............................................................................................................80**

**JO-00005**

Confidential Information

NFL_ALFORD-0000308

# NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## INTRODUCTION

The 1993 Collective Bargaining Agreement ("CBA") between the National Football League Players Association ("NFLPA") and the National Football League Management Council ("Management Council") provided, in Article LI, for the establishment of the NFL Player Supplemental Disability Plan to provide supplemental disability benefits to certain Players who become totally and permanently disabled.

On August 4, 2011, the NFLPA and the Management Council entered into a CBA that provided for the design and implementation of a disability benefit for certain Players suffering from neurocognitive impairments. The NFL Player Supplemental Disability Plan was later amended to include this new benefit, and was renamed the NFL Player Supplemental Disability & Neurocognitive Benefit Plan.

Effective April 1, 2014, the NFL Player Supplemental Disability & Neurocognitive Benefit Plan was renamed the NFL Player Disability & Neurocognitive Benefit Plan.

On March 15, 2020, the NFLPA and the Management Council entered into a CBA that provided for the continuation and improvement of benefits provided by the Plan, and the addition of certain survivor benefits. The Plan was amended and restated as of April 1, 2020 to incorporate the CBA's changes and to rename the Plan the NFL Player Disability, Neurocognitive & Death Benefit Plan. This document contains the amended and restated Plan as of April 1, 2021, which has been renamed the NFL Player Disability & Survivor Benefit Plan ("Plan"). Unless otherwise stated, this amended and restated Plan applies to benefits payable, and claims for benefits made, on or after April 1, 2021. Benefits payable for periods prior to April 1, 2021 will be determined based on the versions of the Plan in effect for such periods.

The Plan is jointly administered pursuant to the requirements of the Taft-Hartley Act. It is intended that this Plan constitutes an employee welfare benefit plan within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974, as amended, and that the Trust accompanying this Plan will constitute a voluntary employees' beneficiary association, or "VEBA," within the meaning of section 501(c)(9) of the Internal Revenue Code of 1986, as amended.

The Plan provides valuable benefits to eligible Players and their beneficiaries. In the Plan Year ended March 31, 2020 over 2,200 Players received more than $200 million in disability benefits (including the smaller portion of disability benefits still paid out of the Bert Bell/Pete Rozelle NFL Player Retirement Plan).

This Plan document contains detailed rules to comply with federal law. The Summary Plan Description ("SPD") provides a summary of how the Plan works. A copy of the SPD is available online at nflplayerbenefits.com, and may also be obtained by calling the NFL Player Benefits Office at (800) 638-3186. All decisions on benefit eligibility are made by the Disability Initial Claims Committee or the Disability Board. Each is comprised of equal numbers of voting members selected by the NFLPA and the Management Council, who are required by federal law to follow the terms of the Plan.

Confidential Information

NFL_ALFORD-0000309

# ARTICLE 1

## DEFINITIONS

The terms below will have the following meanings unless the context clearly indicates otherwise:

**1.0**    **"88 Eligible Player"** has the same meaning as defined in the 88 Plan.

**1.0A**    **"2011 Legacy Credits"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.0B**    **"2020 Legacy Credits"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.1**    **"Active Player"** means a Player who is obligated to perform football playing services under a contract with an Employer; provided, however, that for purposes of Article 3 only, Active Player will also include a Player who is no longer obligated to perform football playing services under a contract with an Employer up until the July 31 next following or coincident with the expiration or termination of his last contract.

**1.2**    **"Administrator"** means the Disability Board, which will be considered to be the administrator of this Plan within the meaning of section 3(16)(A) of ERISA.

**1.3**    **"Article 3 Eligible Player"** means an Active Player or a Vested Inactive Player, other than a Player who:

(a)    has no Credited Seasons after 1958;

(b)    is vested solely because of Section 1.47(f) through (j) of the Bert Bell/Pete Rozelle Plan; or

(c)    is an Article 4 Eligible Player.

A Pension Expansion Player, as defined in the Bert Bell/Pete Rozelle Plan, is not an Article 3 Eligible Player.

**1.4**    **"Article 4 Eligible Player"** means: (a) any Player who is receiving total and permanent disability benefits under the Bert Bell/Pete Rozelle Plan; (b) any Player who (1) was receiving total and permanent disability benefits under Section 5.1(a), (b), or (c) of the prior versions of the Bert Bell/Pete Rozelle Plan, (2) converted to retirement benefits under  prior versions of the Bert Bell/Pete Rozelle Plan, and (3) remains totally and permanently disabled; and (c) any Player who would receive total and permanent disability benefits under the Bert Bell/Pete Rozelle Plan but for Section 5.5(d) or (e) of that Plan.

**1.5**    **"Benefit Arbitrator"** means the arbitrator described in Article 64 of the 2020 CBA to resolve certain disputes specifically described therein relating to employee benefits.

2

**JO-00007**

NFL_ALFORD-0000310

**1.6** **"Benefit Credit"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.7** **"Benefit Credit Annuity Starting Date"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.8** **"Bert Bell/Pete Rozelle Plan"** means the Bert Bell/Pete Rozelle NFL Player Retirement Plan, or its predecessors, the Bert Bell NFL Player Retirement Plan and the Pete Rozelle NFL Player Retirement Plan.

**1.9** **"Collective Bargaining Agreement" or "CBA"** means the Collective Bargaining Agreement, as amended, and any such future negotiated agreement, as applicable, between the Management Council and the NFLPA. The term "**2020 CBA**" means the Collective Bargaining Agreement entered into on March 15, 2020.

**1.10** **"Code"** means the Internal Revenue Code of 1986, as amended.

**1.11** **"Credited Season"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.12** **"Disability Board"** means the Board described in Article 9.

**1.13** **"Disability Credits"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.14** **"Disability Initial Claims Committee"** means the Committee described in Article 9.

**1.15** **"Employer"** means a member club of the League.

**1.16** **"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**1.17** **"League"** means the National Football League.

**1.18** **[Reserved].**

**1.19** **"Legacy Credit Annuity Starting Date"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.20** **"Life Only Pension"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.21** **"Management Council"** means the National Football League Management Council, which is the sole and exclusive collective bargaining representative of the Employers.

**1.22** **"Medical Advisory Physician" or "MAP"** means the health care professional(s) designated under Section 12.2.

3

**JO-00008**

NFL_ALFORD-0000311

**1.23**    **"Medical Director"** means the health care professional designated under Section 12.1.

**1.24**    **"Medical Records"** means one or more documents or other records prepared by a physician, institution, or other health care professional relating to the Player's medical condition.

**1.25**    **"Neutral Physician"** means the health care professional(s) designated under Section 12.3.

**1.26**    **"NFLPA"** means the National Football League Players Association, which is the sole and exclusive bargaining representative of League professional football players.

**1.27**    **"Normal Retirement Date"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.28**    **"Plan"** means this NFL Player Disability & Survivor Benefit Plan.

**1.29**    **"Plan Director"** means the individual named by the Disability Board to act on its behalf in performing ministerial functions.  The Plan Director will not have any discretionary authority or discretionary responsibility in the administration of the Plan, nor any discretionary control with respect to the management of the Plan or its assets.

**1.30**    **"Plan Year"** means the 12-month period from April 1 to March 31.  A Plan Year is identified by the calendar year in which it begins.

**1.31**    **"Player"** means any person who is or was employed under a contract by an Employer to play football in the League.

**1.32**    **"QDRO"** means a Qualified Domestic Relations Order as defined in Code section 414(p).

**1.33**    **"Special Credits"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**1.34**    **"Trust"** means the trust agreement for the NFL Player Disability Plan Trust, as amended or restated from time to time.

**1.35**    **"Trustees"** means the trustees of the Trust and any successor trustees of the Trust.

**1.36**    **"Vested Inactive Player"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

4

**JO-00009**

Confidential Information

## ARTICLE 2

## PARTICIPATION

**2.1**     **Participation.**  All Players participate in the Plan.

## JO-00010

Confidential Information

NFL_ALFORD-0000313

# ARTICLE 3

## PLAN TOTAL AND PERMANENT DISABILITY BENEFITS RESULTING FROM APPLICATIONS RECEIVED ON AND AFTER JANUARY 1, 2015

**3.1    General Standard for Eligibility.**  An Article 3 Eligible Player will receive monthly Plan total and permanent disability benefits ("Plan T&P benefits") in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11, if and only if all of the conditions in (a) through (f) below are met:

(a)    The Player's application is received by the Plan on or after January 1, 2015 and results in an award of Plan T&P benefits.

(b)    The Player is not receiving monthly retirement benefits under Article 4 or Article 4A of the Bert Bell/Pete Rozelle Plan.

(c)    The Player submits Medical Records with his initial application or appeal, as the case may be, subject to the rules of Section 3.3.

(d)    At least one Plan Neutral Physician must find, under the standard of Section 3.1(e), that (1) the Player has become totally disabled to the extent that he is substantially unable to engage in any occupation or employment for remuneration or profit, excluding any disability suffered while in the military service of any country, and (2) such condition is permanent.  If no Plan Neutral Physician renders such a conclusion, then this threshold requirement is not satisfied, and the Player will not be eligible for and will not receive Plan T&P benefits, regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record.

(e)    After reviewing the report(s) of the Plan Neutral Physician(s), along with all other facts and circumstances in the administrative record, the Disability Initial Claims Committee or the Disability Board, as the case may be, must conclude, in its absolute discretion, that (1) the Player has become totally disabled to the extent that he is substantially prevented from or substantially unable to engage in any occupation or employment for remuneration or profit, but expressly excluding any disability suffered while in the military service of any country, and (2) that such condition is permanent.  The following rules will apply:

(1)    The educational level and prior training of a Player will not be considered in determining whether such Player is "unable to engage in any occupation or employment for remuneration or profit."

(2)    A Player will not be considered to be able to engage in any occupation or employment for remuneration or profit within the meaning of this Section 3.1 merely because such person is employed by the League or an Employer, manages personal or family investments, is employed by or associated with a charitable organization, is employed out of benevolence, or receives up to $30,000 per year in earned income.

6

**JO-00011**

                    NFL_ALFORD-0000314

(3)    A disability will be deemed to be "permanent" if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period.

(f)    The Player satisfies all other applicable requirements of this Article 3.

**3.2    Social Security Standard for Eligibility.**

(a)    For applications received prior to April 1, 2024, an Article 3 Eligible Player who is not receiving monthly pension benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan, who has been determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, and who is still receiving such benefits at the time he applies, will receive Plan T&P benefits in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11, unless four or more voting members of the Disability Board determine that such Player is not totally and permanently disabled, despite receiving Social Security disability benefits.

If his Social Security disability benefits are revoked, a Player will no longer be entitled to receive Plan T&P benefits by reason of this Section 3.2(a), effective as of the date of such revocation.  However, if such Player establishes that the sole reason for the loss of his Social Security disability or Supplemental Security Income benefits was his receipt of benefits under this Plan, Plan T&P benefits will continue provided the Player satisfies the rules for continuation of benefits in Section 3.8(a).

(b)    For applications received prior to April 1, 2024, an Article 3 Eligible Player who elects to begin receiving pension benefits under the Bert Bell/Pete Rozelle Plan prior to his Normal Retirement Date, who is subsequently determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income program, who satisfies the other conditions of this paragraph, and who is still receiving such benefits at the time he applies, will receive Plan T&P benefits in the amount described in Section 3.6, for the months described in Sections 3.10 and 3.11, unless four or more voting members of the Disability Board determine that such Player is not totally and permanently disabled, despite receiving Social Security disability benefits.  To be eligible for benefits under this paragraph, the Player must apply for such Social Security disability benefits prior to his Normal Retirement Date, and the award of disability benefits by the Social Security Administration must occur prior to the Player's Normal Retirement Date.  An award of disability benefits by the Social Security Administration after a Player's Normal Retirement Date that such Player was disabled as of a date prior to his Normal Retirement Date does not qualify such Player for Plan T&P benefits under this paragraph.

If his Social Security disability benefits are revoked, a Player will no longer be entitled to receive Plan T&P benefits by reason of this Section 3.2(b), effective as of the date of such revocation.  However, if such Player establishes that the sole reason for the loss of his Social Security disability or Supplemental Security Income benefits was his receipt of benefits under this Plan, Plan T&P benefits will continue provided the Player satisfies the rules for continuation of benefits in Section 3.8(a).

7

**JO-00012**

NFL_ALFORD-0000315

(c)    For applications received on or after April 1, 2024, this Section 3.2 will not apply, and a Social Security determination of disability under the Social Security disability insurance program and Supplemental Security Income program will not establish a Player's eligibility for Plan T&P benefits.  Any Player applying for Plan T&P benefits on or after April 1, 2024 must satisfy the General Standard in Section 3.1.

**3.3    Application Rules and Procedures.**  In addition to the requirements of Article 7 and Section 13.14 (claims procedures), Players must comply with the rules and procedures of this Section 3.3 in connection with an application for Plan T&P benefits.

(a)    <u>Medical Records and Evaluations.</u>

A Player applying for Plan T&P benefits under the General Standard of Section 3.1 on and after October 1, 2020 must submit Medical Records with his application.  A Player who does not do so will be given 45 days to submit Medical Records and thereby complete his application.  The Player's application will not be complete, and will not be processed, until the Plan receives Medical Records.  The Player's application will be denied if he does not submit any Medical Records within the 45 day period.  If such a Player's application is denied by the Disability Initial Claims Committee because the Player failed or refused to submit Medical Records, and the Player appeals that determination, he must submit Medical Record with his appeal.  A Player who does not do so will be given 45 days to submit Medical Records and thereby complete his appeal.  The Player's appeal will not be complete, and will not be processed, until the Plan receives Medical Records.  Any such Player in this situation who does not submit any Medical Records within the 45 day period will not be entitled to Plan T&P benefits, and his appeal will be denied.  This paragraph does not apply to applications received prior to October 1, 2020.

Whenever the Disability Initial Claims Committee or the Disability Board reviews the application or appeal of any Player for Plan T&P benefits under Section 3.1 or Section 3.2, such Player may first be required to submit to an examination scheduled by the Plan with a Neutral Physician or physicians, or institution or institutions, or other medical professional or professionals, selected by the Disability Initial Claims Committee or the Disability Board and may be required to submit to such further examinations scheduled by the Plan as, in the opinion of the Disability Initial Claims Committee or the Disability Board, are necessary to make an adequate determination respecting his physical or mental condition.

Any Player refusing to submit to any examination required by the Plan will not be entitled to Plan T&P benefits.  If a Player fails to attend an examination scheduled by the Plan, his application for Plan T&P benefits will be denied, unless the Player provided at least two business days' advance notice to the Plan that he was unable to attend.  The Plan will reschedule the Player's exam if two business days' advance notice is provided.  The Player's application for Plan T&P benefits will be denied if he fails to attend the rescheduled exam, even if advance notice is provided.  The Disability Initial Claims Committee or the Disability Board, as applicable, may waive a failure to attend if they find that circumstances beyond the Player's control precluded the Player's attendance at the examination.

8

**JO-00013**

                                                                                  NFL_ALFORD-0000316

A Player or his representative may submit to the Plan additional Medical Records or other materials for consideration by a Neutral Physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by a Neutral Physician, institution, or medical professional.

(b)      Requests for Information.  Whenever the Disability Initial Claims Committee or the Disability Board reviews the application or appeal of any Player, or the eligibility of any Player to continue receiving Plan T&P benefits, such Player may be required to provide any additional documents or information that, in the opinion of the Disability Initial Claims Committee or the Disability Board, are necessary to decide the Player's application, appeal, or eligibility to continue receiving Plan T&P benefits.  Any Player refusing or failing to provide the requested documents or information will not be entitled to Plan T&P benefits.

(c)      Serial Applications.

(1)      A Player whose claim for benefits under this Article has been denied and is not subject to further administrative review will be presumed conclusively to be not totally and permanently disabled under the provisions of Section 3.1 for twelve months following the date of such final denial, unless one of the exceptions below applies.

(2)      Exceptions.

(i)      The Player shows that he became totally and permanently disabled due to a new injury or condition that arose after the date of his original claim; or

(ii)      The Player submits a subsequent application under Section 3.2 that first informs the Plan that he has been awarded disability benefits under the Social Security disability insurance program or Supplemental Security Income program; or

(iii)      The Player submits a subsequent application for Plan T&P benefits after his previous application was denied for failure to attend a scheduled examination, but only if the Player has not been denied Plan T&P benefits more than once in his lifetime for failure to attend a scheduled examination; or

(iv)      The Player submits a subsequent application for Plan T&P benefits after his previous application was denied because the Player's disability was not permanent within the meaning of Section 3.1(e) due to a recent surgery or other medical procedure, and any reasonably possible expected recovery period has ended.

(d)      Consideration of Impairments.  To ensure an orderly and efficient administrative process, a Player may not seek Plan T&P benefits based upon any impairment not identified in his application.  The Disability Initial Claims Committee or the Disability Board, as the case may be, will consider only those impairments that they find, in their discretion, were adequately

9

**JO-00014**

NFL_ALFORD-0000317

identified by the Player in his application.  The Disability Initial Claims Committee and the Disability Board may consider additional impairments if those additional impairments are identified by a Plan Neutral Physician, and the Disability Initial Claims Committee or the Disability Board determine, in their discretion, that the additional impairments should be considered in conjunction with the Player's pending application or appeal.

(e)    <u>Withdrawal of Application or Appeal.</u>  A Player may withdraw a pending, initial application before it is presented to the Disability Initial Claims Committee by informing the Plan, in writing, of his intent to withdraw the application.  A Player may not withdraw a pending application after it has been presented to the Disability Initial Claims Committee for a decision.

A Player may withdraw a pending appeal if he has not been evaluated by a Plan Neutral Physician on appeal by informing the Plan, in writing, of his intent to withdraw the appeal.  A Player may not withdraw a pending appeal after he has been evaluated by a Plan Neutral Physician on appeal or has failed to attend a medical examination in violation of the rules in Section 3.3(a).

**3.4    Classification.**  Each Player who is determined to be eligible for Plan T&P benefits in accordance with Section 3.1 or 3.2 will be awarded benefits in one of the four categories below.

(a)    <u>Active Football.</u>  Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) his disability(ies) arises out of League football activities while he is an Active Player, and causes him to be totally and permanently disabled, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within 18 months after he ceases to be an Active Player.

(b)    <u>Active Nonfootball.</u>  Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) his disability(ies) does not arise out of League football activities but does arise while he is an Active Player, and causes him to be totally and permanently disabled, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within 18 months after he ceases to be an Active Player.

(c)    <u>Inactive A.</u>  Subject to the special rules of Section 3.5, a Player will qualify for Plan T&P benefits in this category if (i) the Player does not qualify for benefits in categories (a) or (b) above, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within fifteen (15) years after the end of his last Credited Season.  This category does not require that the disability arise out of League football activities.

(d)    <u>Inactive B.</u>  A Player who is determined to be eligible for Plan T&P benefits in accordance with Section 3.1 or 3.2 but who does not qualify for such benefits in categories (a), (b), or (c) above will be awarded Plan T&P benefits in this category.  This category does not require that the disability arise out of League football activities.

10

**JO-00015**

(e)    "Arising out of League football activities" means:

(1)    a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities; or

(2)    notwithstanding anything to the contrary in Section 3.4(e)(1), "arising out of League Football Activities" includes an Active Player's positive diagnosis for coronavirus or his illness resulting from or related to coronavirus in the 2020 and 2021 Plan Years only, such that it satisfies Section 9 of the amendment to the 2020 CBA, dated August 3, 2020, entitled "COVID-19 Related Operational Adjustments."

(f)    Classification of Social Security Disability Awards.  Each Player who is determined to be eligible for Plan T&P benefits in accordance with Section 3.2 will be awarded benefits in one of the four categories above using the date that he is determined by the Social Security Administration to be eligible for disability benefits in place of the date that his application is received by the Plan.  However, if the Player notifies the Plan of such Social Security determination more than six months after the date of determination, then the Player will be awarded benefits in one of the four categories above using the date that he notifies the Plan of his Social Security determination.  For purposes of this paragraph, the date as of which the Social Security Administration deems a Player to have been disabled (also known as the onset date) and the date as of which such benefits become payable do not matter.  Applications received on and after April 1, 2024 must satisfy the General Standard of Section 3.1, and therefore this Section 3.4(f) does not apply to those applications.

**3.5    Special Rules.**

(a)    Substance Abuse.  Sections 3.4(a), 3.4(b), and 3.4(c) will not apply to a total and permanent disability caused by the use of, addiction to, or dependence upon (1) any controlled substance (as defined in 21 U.S.C. § 802(6)), unless the requirements of those sections are otherwise met and (i) such use of, addiction to, or dependence upon results from the substantially continuous use of a controlled substance that was prescribed for League football activities or for an injury (or injuries) or illness arising out of League football activities of the applicant while he was an Active Player, and (ii) an application for Plan T&P benefits is received based on such use of, addiction to, or dependence upon a controlled substance no later than eight years after the end of the Player's last Credited Season; (2) alcohol; or (3) illegal drugs.  For purposes of this section, the term "illegal drugs" includes all drugs and substances (other than alcohol and controlled substances, as defined above) used or taken in violation of law or League policy.

(b)    Psychological/Psychiatric Disorders.  A payment for total and permanent disability as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 3.4(b), Section 3.4(c), or Section 3.4(d),

**JO-00016**

Confidential Information                                                                                    NFL_ALFORD-0000319

except that a total and permanent disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 3.4(a) if the requirements for a total and permanent disability are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for Plan T&P benefits under Section 3.4(a).

3.6    **Amount of Monthly Benefit.**  An Article 3 Eligible Player who is awarded Plan T&P benefits will receive the following monthly amount for the months described in Sections 3.10 and 3.11.  The monthly payment determined below will be offset by any disability benefits provided by an employer other than the League or an Employer, but will not be offset by worker's compensation.

(a)    <u>Amount.</u>  Unless modified by Sections 3.6(b), (c), (d), or (e), the amount of the monthly benefit will equal the sum of the Player's Disability Credits.

(b)    <u>Minimum Amounts.</u>  The minimum amount of monthly Plan T&P benefits depends on the category awarded and the months of payment, as set forth below:

| Minimum Monthly Benefit | | |
|---|---|---|
| **Category** | **Effective Jan. 1, 2016** | **Effective Apr. 1, 2031** |
| **Active Football** | $22,084 | $4,000 |
| **Active Nonfootball** | $13,750 | $4,000 |
| **Inactive A** | $11,250 | $4,000 |
| **Inactive B** | $5,000 | $3,334 |

(c)    <u>Early Payment Benefit Reduction.</u>

(1)    <u>Active Football, Active Nonfootball, or Inactive A.</u>  If a Player elects an early payment benefit under the Bert Bell/Pete Rozelle Plan, his subsequent monthly benefits for Active Football, Active Nonfootball, or Inactive A under this Article 3 will be the greater of (A) the amount in the chart below, or (B)(i) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (ii) 100% of any Benefit Credit (not including any Special Credits) increases that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (iii) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits).

12

**JO-00017**

Confidential Information                                                                NFL_ALFORD-0000320

| Minimum Monthly Benefit | | |
|---|---|---|
| Category | Effective Jan. 1, 2016 | Effective Apr. 1, 2031 |
| Active Football | $21,084 | $3,000 |
| Active Nonfootball | $12,750 | $3,000 |
| Inactive A | $10,250 | $3,000 |

(2)    Inactive B.

(A)   If a Player elects an early payment benefit under the Bert Bell/Pete Rozelle Plan, his subsequent monthly Inactive B benefits under this Article 3 for months prior to April 2031 will be the greater of:

(i)    (I) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (II) 100% of any Benefit Credit (not including any Special Credits) increases that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (III) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); or

(ii)    the minimum dollar benefit in the chart below, reduced by 25% of the greater of: (I) such minimum dollar benefit in effect as of the effective date of the Player's award of Inactive B T&P benefits, or (II) $3,334.

| Inactive B Minimum Monthly Benefit | |
|---|---|
| Effective Sept. 1, 2011 | Effective Jan. 1, 2016 |
| $4,167 | $5,000 |

(B)    If a Player elects an early payment benefit under the Bert Bell/Pete Rozelle Plan, his subsequent monthly Inactive B benefits under this Article 3 for months on and after April 2031 will be the greater of:

(i)    (I) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (II) 100% of any Benefit Credit (not including any Special Credits) increases that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (III) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); or

(ii)    $2,500.

13

**JO-00018**

NFL_ALFORD-0000321

(d)    <u>Reduction for Awards Prior to Normal Retirement Date.</u>  If a Player whose Normal Retirement Date is on or after August 1, 2011, receives an award of Plan T&P benefits prior to his Normal Retirement Date and prior to electing to receive his monthly pension under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan, his monthly Plan T&P benefit will be reduced, beginning as of his Normal Retirement Date, by the sum of the monthly amounts he would have received under Articles 4 and 4A of the Bert Bell/Pete Rozelle Plan had he elected to receive Life Only Pensions.

If additional benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan are awarded to a Player after the date of the offset described in this subsection (d), then an additional offset shall be made for the benefit amount attributable to such additional benefits as of the date(s) the additional benefits commence in the Bert Bell/Pete Rozelle Plan.

(e)    <u>Reduction for Awards on and after Normal Retirement Date.</u>  For a Player who receives an award of Plan T&P benefits on or after his Normal Retirement Date and prior to electing to receive his monthly pension under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan, the following rules will apply.

(1)    If such Player's Normal Retirement Date is on or after August 1, 2011, his monthly Plan T&P benefit will be reduced immediately by the sum of the monthly amounts he would have received under Articles 4 and 4A of the Bert Bell/Pete Rozelle Plan had he elected to receive Life Only Pensions with annuity starting dates coincident with the effective date of his Plan T&P benefit.

(2)    If such Player's Normal Retirement Date is prior to August 1, 2011, his monthly Plan T&P benefit will be reduced by (i) beginning as of his Benefit Credit Annuity Starting Date, the amount of his monthly pension under Article 4 of the Bert Bell/Pete Rozelle Plan had he elected a Life Only Pension, and (ii) beginning as of his Legacy Credit Annuity Starting Date, further reduced by the amount of his monthly pension under Article 4A of the Bert Bell/Pete Rozelle Plan had he elected a Life Only Pension.

(3)    If additional benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan are awarded to a Player after the date of the offset described in this subsection (e), then an additional offset shall be made for the benefit amount attributable to such additional benefits as of the date(s) the additional benefits commence in the Bert Bell/Pete Rozelle Plan.

(f)    <u>Not Below Zero.</u>  In no event will a Player's monthly Plan T&P benefit be reduced below zero.

(g)    <u>Special Offsets.</u>

(1)    For a Player who receives an award of Plan T&P benefits under Section 3.2 after he has elected to receive his monthly pension under Article 4 or 4A of the Bert

**JO-00019**

NFL_ALFORD-0000322

Bell/Pete Rozelle Plan, his monthly Plan T&P benefit will be reduced, but not below zero, by (i) the amount of his monthly benefit under Article 4 of the Bert Bell/Pete Rozelle Plan had he elected a Life Only Pension on his Benefit Credit Annuity Starting Date, and (ii) the amount of his monthly benefit under Article 4A of the Bert Bell/Pete Rozelle Plan had he elected a Life Only Pension on his Legacy Credit Annuity Starting Date.

(2)    For a Player who is receiving Plan T&P benefits and elects to receive his monthly pension under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan before his Normal Retirement Date, his monthly Plan T&P benefit will be reduced, but not below zero, by (i) beginning as of his Benefit Credit Annuity Starting Date, the amount of his monthly benefit under Article 4 of the Bert Bell/Pete Rozelle Plan, had he elected a Life Only Pension, and (ii) beginning as of his Legacy Credit Annuity Starting Date, the amount of his monthly benefit under Article 4A of the Bert Bell/Pete Rozelle Plan had he elected a Life Only Pension.

(3)    If additional benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan are awarded to a Player after the date of the offset described in this subsection (g), then an additional offset shall be made for the benefit amount attributable to such additional benefits as of the date(s) the additional benefits commence in the Bert Bell/Pete Rozelle Plan.

(4)    A Player whose benefits are reduced under this Section 3.6(g) will not be subject to further reduction under Section 3.6(d) or (e).

(h)    <u>No Impact Due to Transition of Benefits.</u>  Notwithstanding the above, a Player's benefits under Article 3 will not be less than the total amount he would have received from this Plan and the Bert Bell/Pete Rozelle Plan had he been eligible for Article 4 benefits.

(i)    <u>No Impact Due to Benefit Increases.</u>  Notwithstanding the above, for as long as a Player is an Article 3 Eligible Player, but not later than March 31, 2031, the monthly benefit of such Player who was receiving benefits under this Section immediately prior to April 1, 2020, will not be less than the amount necessary to ensure that his combined monthly T&P benefit for this Plan and the Bert Bell/Pete Rozelle Plan for periods beginning on and after April 1, 2020 is at least equal to his combined monthly benefits from such plans prior to that date.  For purposes of the prior sentence, any reductions in benefits relating to (1) early payment benefits, (2) a qualified domestic relations order, (3) an IRS levy, (4) a criminal garnishment, and (5) other similar court orders will not be taken into account.

(j)    <u>SSDI Offset.</u>  Effective January 2024 through and including March 2031, the monthly benefit otherwise payable to a Player who is receiving Plan T&P benefits in the Inactive A category of Section 3.4(c), and who receives Social Security Disability Insurance ("SSDI") benefits for that month, will be reduced, but not below zero, by the Social Security Disability Insurance offset ("SSDI Offset") described below, except that the SSDI Offset will not apply to such Player for any month in which, for all or part of that month, he is age 65 or older or is an 88 Eligible Player as defined in the 88 Plan.

15

**JO-00020**

(1)     The SSDI Offset in effect for each month in a calendar year will equal either: (A) the regular monthly amount of the SSDI benefit paid to the Player in January of the prior calendar year, minus any governmental insurance premium, if the Player was receiving SSDI benefits as of that prior January, or (B) if the Player was not receiving SSDI benefits as of that prior January, the full SSDI benefit as of the first month thereafter for which it is paid.

(2)     It is the responsibility of any Player receiving T&P benefits in the Inactive A category of Section 3.4(c), who is not excluded by reason of being age 65 or older or an 88 Eligible Player, to inform the Plan of the amount of his SSDI benefits and the months for which they are paid.  If the Plan is aware that a Player is receiving SSDI benefits, but is not aware of the actual amount of the Player's SSDI benefit, the SSDI Offset will equal $3,000 until the Player provides satisfactory evidence of his actual SSDI benefit.  Upon receipt of such satisfactory evidence, the Player's T&P benefits will be adjusted to reflect the amount of any underpayments or overpayments for prior months.

(3)     If a Player who is awarded Plan T&P benefits in the Inactive A category of Section 3.4(c) fails to inform the Plan that he receives SSDI benefits altogether, and the Plan learns that the Player is receiving SSDI benefits, the Plan will suspend the Player's Plan T&P benefits until such time as the Player provides documentation from the Social Security Administration sufficient to allow the Plan to determine the amount of the SSDI Offset, including for each past year in which the Player was subject to this Section 3.6(j).  The Player's benefit will remain suspended until the Plan has recouped all past overpayments caused by the failure to apply the SSDI Offset.

**3.7**    **Supplement for Inactive B Plan T&P Benefits.**  A Player who (1) qualifies for moderate impairment neurocognitive disability benefits described in Section 6.2(b) of this Plan within 15 years after the end of his last Credited Season, and (2) qualifies for Inactive B Plan T&P benefits under this Plan or the Bert Bell/Pete Rozelle Plan after the date of the award of moderate impairment neurocognitive disability benefits, will receive an additional $1,667 per month under this Article beginning with the month in which he is awarded such Inactive B benefits and continuing until the earliest of (a) the month in which his Plan T&P benefits cease, (b) the month following the month in which he attains age 55, at which time such Player will receive no further benefits under this Section, or (c) March 31, 2031.

**3.8**    **Continuation of Plan T&P Benefits.**

(a)    <u>General Standard.</u>  Any Player who qualifies for Plan T&P benefits under Section 3.1 may be required to submit to periodic examinations for the purpose of re-examining his condition.  The examinations will occur not more often than once every five years, except that upon request of three or more voting members of the Disability Board, examinations may occur as frequently as once every six months.

Any person refusing to submit to any examination will not be entitled to continuation of Plan T&P benefits under this Article.

16

**JO-00021**

NFL_ALFORD-0000324

If a Player fails to attend an examination scheduled by the Plan, his Plan T&P benefits will be suspended, unless the Player provided at least two business days' advance notice to the Plan that he was unable to attend. The Plan will reschedule the Player's exam if two business days' advance notice is provided. The Player's Plan T&P benefits will be suspended if he fails to attend the rescheduled exam, even if advance notice is provided. The Disability Board or the Disability Initial Claims Committee, as applicable, may waive a failure to attend if circumstances beyond the Player's control preclude the Player's attendance at the examination. A Player or his representative may submit to the Plan medical records or other materials for consideration by a Neutral Physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by the Neutral Physician, institution, or medical professional.

For each calendar year in which a Player receives Plan T&P benefits, he must submit an executed copy of IRS Form 4506 by November 1 of the subsequent calendar year. A Player who has not filed his annual federal income tax return by the date in the preceding sentence, also must either (1) submit a signed statement that he does not intend to file such tax return, and state the amount of total income from all sources for that year, or (2) submit an accounting of his total income from all sources for that year. Players who have attained age 65 as of the November 1 due date are exempt from the requirements of this paragraph.

If the Disability Board or the Disability Initial Claims Committee determines that such Player is no longer totally and permanently disabled, his Plan T&P benefits will terminate.

The Plan T&P benefits of any Player refusing or failing to submit to a required examination without the required notice described above, or to submit an IRS Form 4506 annually will be suspended until such refusal or failure is resolved to the satisfaction of the Disability Initial Claims Committee or the Disability Board. If such refusal or failure is not so resolved within one year after such Player is notified of the consequences of his refusal or failure, his Plan T&P benefits will be terminated. In that event, such Player must submit a new application to be eligible to receive any further Plan T&P benefits.

If a Player submits such application within one year of the termination of his Plan T&P benefits and that Player's Plan T&P benefits are reinstated, the prior classification of his Plan T&P benefits under Section 3.4 will apply and the effective date rules of Section 3.10 will not apply, provided that such application results in the award of the benefit. If a Player submits such application more than one year after the termination of his Plan T&P benefits, the Plan's normal classification and effective date rules under Sections 3.4 and 3.10 will apply to such application, without regard to the Player's prior classification.

Notwithstanding the above, prior to April 1, 2024, a Player who is eligible for Plan T&P benefits under the General Standard of Section 3.1 may establish that he qualifies for continuation of his Plan T&P benefits by showing that he is receiving disability benefits under the Social Security disability insurance program or Supplemental Security Income program because he is unable to work, unless four or more voting members of the Disability Board

17

**JO-00022**

                                          NFL_ALFORD-0000325

determine that such Player is not totally and permanently disabled, despite receiving Social Security disability benefits.

(b)    <u>Social Security Awards.</u>  Prior to April 1, 2024, any Player who is eligible for T&P benefits under Section 3.2 must submit proof annually of his continued receipt of Social Security disability insurance program or Supplemental Security Income program benefits, and must immediately report any revocation of those benefits to the Plan.  If the Disability Board or the Disability Initial Claims Committee determines that a Player has failed to comply with this requirement, his Plan T&P benefits will terminate effective as of the date of such revocation.

Effective April 1, 2024, receipt of Social Security disability insurance program or Supplemental Security Income program benefits will not establish that a Player qualifies for continuation of his Plan T&P benefits.  Any Player seeking to establish that he qualifies for continuation of his Plan T&P benefits on or after April 1, 2024 must satisfy the General Standard set forth in Section 3.1 and thereafter comply with the continuation provisions set forth in Section 3.8(a).

**3.9    Other Classification Rules.**

(a)    <u>Initial Classification.</u>  Classification of Plan T&P benefits under Section 3.4 will be determined by the Disability Board or the Disability Initial Claims Committee in all cases on all of the facts and circumstances in the administrative record.  Determinations by the Social Security Administration as to the timing and causation of total and permanent disability are not binding and will be given less weight than contemporaneous medical evidence.

(b)    <u>Reclassification.</u>  A Player who is awarded Plan T&P benefits in the Active Nonfootball category may request that his benefits be reclassified into the Active Football category if his request is received by the Plan within 18 months after he ceases to be an Active Player.  For purpose of this Section 3.9(b), the Player must show by evidence, found by the Disability Board or the Disability Initial Claims Committee to be clear and convincing, that he satisfies the criteria for the Active Football category due to a new impairment that did not exist during his original application, or due to an impairment that did exist but has become totally and permanently disabling following his original award of Plan T&P benefits in the Active Nonfootball category.  If a Player's request for reclassification is granted, the increase will be paid retroactive to the first day of the month that is two months prior to the date the written request for reclassification was received by the Plan.

No other requests for reclassification are permitted or will be considered by the Disability Board or the Disability Initial Claims Committee.

(c)    <u>Subsequent Periods of Total and Permanent Disability.</u>  A Player whose Plan T&P benefits terminate under this Plan or the Bert Bell/Pete Rozelle Plan will thereafter remain eligible to receive Plan T&P benefits in accordance with Section 3.4 should the Player experience a subsequent period of total and permanent disability.  If the Player was awarded Plan T&P benefits under this Plan or the Bert Bell/Pete Rozelle Plan on or after September 1, 2011, any such subsequent total and permanent disability will be classified in accordance with the

18

**JO-00023**

provisions of Section 3.4, without regard to the classification of any previous period of total and permanent disability.  If the Player was awarded Plan T&P benefits under the Bert Bell/Pete Rozelle Plan before September 1, 2011, any such subsequent total and permanent disability will be classified in accordance with the provisions of the Bert Bell/Pete Rozelle Plan in effect immediately prior to September 1, 2011 (and not in accordance with Section 3.4), except that the dispute resolution procedures of Section 9.3 of this Plan will apply.

**3.10    Effective Date of Plan T&P Benefits.**  Plan T&P benefits will be paid retroactive to the first day of the month that is two months prior to the date an application for Plan T&P benefits was received by the Plan.

This paragraph applies where, prior to April 1, 2024, a Player originally applies for Plan T&P benefits under Section 3.1, and ultimately does not qualify for Plan T&P benefits under that General Standard, but during the processing of that application becomes eligible for Plan T&P benefits under Section 3.2 because he is determined by the Social Security Administration to be eligible for disability benefits under either the Social Security disability insurance program or Supplemental Security Income Program.  In such cases, if the original application is still pending, the Player need not file a new application for Plan T&P benefits; he need only provide satisfactory evidence of such Social Security determination to the Plan.  In such cases, Plan T&P benefits will be paid retroactive to the first day of the month that is two months prior to the date of such Social Security determination, unless the Plan receives evidence of such Social Security determination more than six months after the date of the Social Security determination, in which case Plan T&P benefits will be paid retroactive to the first day of the month that is two months prior to the date such evidence is received by the Plan.  For purposes of this paragraph, the date as of which the Social Security Administration deems a Player to have been disabled (also known as the onset date) and the date as of which such benefits become payable do not matter.

**3.11    Duration of Plan T&P Benefits.**  All benefits provided by this Article, except under Section 3.7, will be payable until the earliest of (a) the cessation of the Player's total and permanent disability, (b) the termination of his benefits under Section 3.8, or (c) the Player's death.  The full monthly benefit will be paid for the month in which such an event occurs, but no benefit provided by this Article will be provided for any subsequent months.

**3.12    Prior Determinations of Ability to Work.**  If a Player receives a final determination that he is not totally and permanently disabled, then, for purposes of any subsequent application for Plan T&P benefits, it will be conclusively presumed that the Player is not totally and permanently disabled for all months prior to and including the date of such final determination.  This conclusive presumption applies regardless of whether the conditions or impairments at issue in the final determination differ from the conditions or impairments giving rise to the Player's subsequent application.

For purposes of this section a final determination includes a final decision of either the Disability Board or the Retirement Board of the Bert Bell/Pete Rozelle Plan.  A decision of the Disability Initial Claims Committee of either this Plan or of the Bert Bell/Pete Rozelle Plan that is not timely appealed will also be a final determination for purposes of this section.

19

**JO-00024**

NFL_ALFORD-0000327

# ARTICLE 4

## TOTAL AND PERMANENT DISABILITY BENEFITS RESULTING FROM APPLICATIONS RECEIVED BEFORE JANUARY 1, 2015

**4.1    Eligibility.**  An Article 4 Eligible Player will receive monthly T&P benefits in the amount described in Section 4.2 and Section 4.2A if the following conditions are met:

(a)    his written application, or similar letter initiating the administrative process, was received prior to January 1, 2015 and resulted in an award of T&P benefits from the Bert Bell/Pete Rozelle Plan; and

(b)    he satisfies the other requirements of this Article 4.

**4.2    Amount for Active Football, Active Nonfootball, and Inactive A T&P Benefits.**

(a)    <u>General Rule.</u>  An Article 4 Eligible Player who is receiving benefits under Sections 5.3(a) (Active Football), 5.3(b) (Active Nonfootball), or 5.3(c) (Inactive A) of the Bert Bell/Pete Rozelle Plan will receive a monthly benefit equal to (1) the amount in the table below reduced (but not below zero) by (2) his Bert Bell/Pete Rozelle Plan offset.

| Players Receiving Benefits Under the Following Sections of the Bert Bell/Pete Rozelle Plan | Effective Jan. 1, 2016 | Effective Apr. 1, 2031 |
|---|---|---|
| 5.3(a) (Active Football) | $22,084 | $0 |
| 5.3(b) (Active Nonfootball) | $13,750 | $0 |
| 5.3(c) (Inactive A) | $11,250 | $0 |

(b)    <u>Bert Bell/Pete Rozelle Plan Offset.</u>  An Article 4 Eligible Player's Bert Bell/Pete Rozelle Plan offset equals the amount in (1), (2) or (3) below, as the case may be, and as adjusted by (4) and (5) below.

(1)    <u>For T&P awards prior to the Player's Normal Retirement Date and payments prior to the earlier of the Player's Normal Retirement Date or Benefit Credit Annuity Starting Date</u>:  The monthly benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, without regard to (A) the reductions or offsets described in the rest of Section 5.5 of the Bert Bell/Pete Rozelle Plan, and (B) any court order that assigns all or a portion of a Player's Bert Bell/Pete Rozelle Plan benefits to an alternate payee.

(2)    <u>For T&P awards prior to the Player's Normal Retirement Date and payments after the earlier of the Player's Normal Retirement Date or Benefit Credit Annuity Starting Date</u>:

20

**JO-00025**

(i)    The monthly benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, without regard to (A) the reductions or offsets described in the rest of Section 5.5 of the Bert Bell/Pete Rozelle Plan, and (B) qualified domestic relations orders, IRS levies, criminal garnishments, and similar court orders,

Plus

(ii)    For a Player whose Total Credits (meaning the sum of a Player's Benefit Credits, Special Credits, 2011 Legacy Credits, and 2020 Legacy Credits) exceed his monthly benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan:

(A)    For a Player who reaches his Normal Retirement Date first, the difference between the Player's Total Credits and his benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, but not below zero.

(B)    For a Player who reaches his Benefit Credit Annuity Starting Date first, the difference between (I) the amount of his monthly pension based on his Total Credits had he elected his benefit in a Life Only Pension as of his Benefit Credit Annuity Starting Date, as reduced for early commencement, and (II) his benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, but not below zero.

(3)    <u>For T&P awards on and after the Player's Normal Retirement Date</u>:

(i)    The monthly benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, without regard to (A) the reductions or offsets described in the rest of Section 5.5 of the Bert Bell/Pete Rozelle Plan, and (B) qualified domestic relations orders, IRS levies, criminal garnishments, and similar court orders,

Plus

(ii)    For a Player who was receiving a monthly pension benefit from the Bert Bell/Pete Rozelle Plan at the time of the T&P Award, the difference between (A) the amount of his monthly pension based on his Total Credits had he elected his benefit in a Life Only Pension as of his Benefit Credit Annuity Starting Date, as reduced for early commencement, and (B) his benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, but not below zero.

(iii)    For a Player who had not commenced his Bert Bell /Pete Rozelle Plan pension benefit at the time of the T&P Award, the difference between the

21

**JO-00026**

Confidential Information

NFL_ALFORD-0000329

Player's Total Credits and his benefit under Section 5.5(a) or (b) of the Bert Bell/Pete Rozelle Plan, but not below zero

    (4)    <u>Normal Retirement Dates Prior to August 1, 2011.</u>  In the case of a Player whose Normal Retirement Date is prior to August 1, 2011 and who is subject to the reduction in paragraph (2)(ii)(A) or paragraph (3)(iii) above, the Bert Bell/Pete Rozelle Plan offset will apply for the Benefit Credits and Special Credits as of his Benefit Credit Annuity Starting Date and for his Legacy Credits as of his Legacy Credit Annuity Starting Date.

    (5)    <u>Increases in Bert Bell/Pete Rozelle Plan Offset.</u>  Under the following situations the Bert Bell/Pete Rozelle offset will increase.

        (i)    If any additional Credited Seasons under the Bert Bell/Pete Rozelle Plan are awarded to the Player after the commencement of the offset described above, an additional offset shall be made to reflect the Benefit Credits, 2011 Legacy Credits, 2020 Legacy Credits, and Special Credits applicable to such Credited Seasons.

        (ii)    If a Player's Benefit Credits, 2011 Legacy Credits, 2020 Legacy Credits, and Special Credits are otherwise increased after the commencement of the offset described above, an additional offset  shall be made to reflect such increases in accordance with the provisions above.  Such additional offset shall apply as of the effective date of such increases.

(c)    <u>Protected Benefit Amount.</u>  Notwithstanding anything in this Plan to the contrary, in the case of an Article 4 Eligible Player who was receiving benefits under this Section immediately prior to any of September 1, 2011, September 1, 2014, or April 1, 2020, the benefit under this Section 4.2 will not be less than the amount necessary to ensure that his combined monthly T&P benefit from this Plan and the Bert Bell/Pete Rozelle Plan for periods beginning on and after any such applicable date(s) is at least equal to his combined monthly benefits from such plans prior to such applicable date(s).  Any additional reductions in the Player's benefits pursuant to (1) Sections 5.5(c) through 5.5(h) of the Bert Bell/Pete Rozelle Plan (relating to reductions for early payment benefits and deferred retirement), (2) a qualified domestic relations order, (3) an IRS levy, (4) criminal garnishment, and (5) any other court order will not be taken into account.  This Section (c) will apply as long as such Player remains an Article 4 T&P Eligible Player, but no later than March 31, 2031.

(d)    <u>Waiver.</u>  Benefits will be paid automatically to each Article 4 Eligible Player described in this Section unless such Player has previously filed a written waiver of benefits with the Disability Board.  A Player may revoke such a waiver at any time by filing a written revocation with the Disability Board, but any such revocation will not apply to benefits that would have been paid prior to the date the revocation is received by the Disability Board.

**4.2A    SSDI Offset.**  Effective January 2024, the monthly benefit otherwise payable to a Player who is receiving Plan T&P benefits in the Inactive A category of Section 5.3(c) of the

**JO-00027**

Confidential Information

NFL_ALFORD-0000330

Bert Bell/Pete Rozelle Plan, and who receives Social Security Disability Insurance ("SSDI") benefits for that month, will be reduced, but not below zero, by the Social Security Disability Insurance offset ("SSDI Offset") described below, except that the SSDI Offset will not apply to such Player for any month in which, for all or part of that month, he is age 65 or older or is an 88 Eligible Player as defined in the 88 Plan.

(a)     The SSDI Offset in effect for each month in a calendar year will equal either: (1) the regular monthly amount of the SSDI benefit paid to the Player in January of the prior calendar year, minus any governmental insurance premium, if the Player was receiving SSDI benefits as of that prior January; or (2) if the Player was not receiving SSDI benefits as of that prior January, the full SSDI benefit as of the first month thereafter for which it is paid.

(b)     It is the responsibility of any Player receiving T&P benefits in the Inactive A category of Section 5.3(c) of the Bert Bell/Pete Rozelle Plan, who is not excluded by reason of being age 65 or older or an 88 Eligible Player, to inform the Plan of the amount of his SSDI benefits and the months for which they are paid. If the Plan is aware that the Player is receiving SSDI benefits, but is not aware of the actual amount of the Player's SSDI benefit, the SSDI Offset will equal $3,000 until the Player provides satisfactory evidence of his actual SSDI benefit. Upon receipt of such satisfactory evidence, the Player's T&P benefits will be adjusted to reflect the amount of any underpayments or overpayments for prior months.

(c)     If a Player who is awarded Plan T&P benefits in the Inactive A category of Section 5.3(c) of the Bert Bell/Pete Rozelle Plan fails to inform the Plan that he receives SSDI benefits altogether, and the Plan learns that the Player is receiving SSDI benefits, the Plan will suspend the Player's Plan T&P benefits until such time as the Player provides documentation from the Social Security Administration sufficient to allow the Plan to determine the amount of the SSDI Offset for each past year in which the Player was subject to this Section 4.2A. The Player's benefit will remain suspended until the Plan has recouped all past overpayments caused by the failure to apply the SSDI Offset.

**4.3     Supplement for Inactive B T&P Benefits.** A Player who (1) qualifies for moderate impairment neurocognitive disability benefits described in Section 6.2(b) of this Plan within 15 years after the end of his last Credited Season, and (2) qualifies for Inactive B T&P benefits under Section 5.3(d) of the Bert Bell/Pete Rozelle Plan after the date of the award of moderate impairment neurocognitive disability benefits, will receive an additional $1,667 per month under this Article beginning with the month in which he is awarded such Inactive B benefits and continuing until the earliest of (a) the month in which his T&P benefits cease, (b) the month following the month in which he attains age 55, at which time such Player will receive no further benefits under this Section, or (c) March 31, 2031.

**4.4     Deemed Payments.** Any T&P benefit payments and any interest thereon from the Bert Bell/Pete Rozelle Plan to or on behalf of an Article 4 Eligible Player for periods prior to July 1, 1993, which exceed the sum of (a) the T&P benefits paid to him or on his behalf prior to July 1, 1993 under the Bert Bell NFL Player Retirement Plan and/or Pete Rozelle NFL Player Retirement Plan for periods prior to that date, and (b) the benefit improvements of the CBA for such periods, will be deemed advance payments under this Plan. The monthly benefit amount otherwise payable under Section 4.2 with respect to such an Article 4 Eligible Player will not be

23

**JO-00028**

NFL_ALFORD-0000331

paid, but will be permanently applied to reduce the amount of such deemed advance payments. This application of monthly benefit amounts to reduce deemed advance payments will cease when those deemed advance payments, when credited with interest at a rate of 6% per year, are reduced to zero.

    **4.5**    **Death.**  In the case of the death of an Article 4 Eligible Player, the last payment will be a full monthly payment for the month in which his death occurs.

    **4.6**    **Article 4 Disability Determinations.**  For purposes of this Article 4 only, the determinations of the Disability Initial Claims Committee and the Retirement Board of the Bert Bell/Pete Rozelle Plan as to whether a Player is totally and permanently disabled and as to his total and permanent disability category will be final and binding on this Plan and the Disability Board.  The Disability Initial Claims Committee of this Plan and the Disability Board will not make any determinations as to whether a Player subject to this Article is totally and permanently disabled.  Such Players seeking T&P benefits under this Article must properly apply for and obtain an award of T&P benefits under the Bert Bell/Pete Rozelle Plan.

    **4.7**    **Article 4 Claims Procedure.**  For purposes of this Article 4 only, on the date that a participant becomes an Article 4 Eligible Player in accordance with the procedures referenced in Section 4.6, he will be deemed automatically to have applied for disability benefits under this Plan, and automatically granted supplemental T&P benefits under Section 4.2 of this Plan if he is receiving benefits under Section 5.3(a), (b), or (c) of the Bert Bell/Pete Rozelle Plan.

    **4.8**    **Sunset.**  Unless this Plan is subsequently amended to the contrary, no benefit under this Article is payable for months after March 2031.

**JO-00029**

Confidential Information    NFL_ALFORD-0000332

# ARTICLE 5

## LINE-OF-DUTY DISABILITY BENEFITS BEGINNING JANUARY 1, 2015

**5.1    Eligibility.**  Effective January 1, 2015, a Player will receive monthly line-of-duty disability benefits from this Plan in the amount described in Section 5.2 if and only if all of the conditions in (a) through (f) below are met:

(a)    The Player is not an Active Player.

(b)    The Player submits Medical Records with his initial application or appeal, as the case may be, subject to the rules of Section 5.4(b).

(c)    At least one Plan Neutral Physician must find that the Player incurred a "substantial disablement" (as defined in Section 5.5(a) and (b)) "arising out of League football activities" (as defined in Section 5.5(c)).  If no Plan Neutral Physician renders such a conclusion, then this threshold requirement is not satisfied, and the Player will not be eligible for and will not receive line-of-duty disability benefits, regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record.

(d)    After reviewing the report(s) of the Plan Neutral Physician(s), along with all other facts and circumstances in the administrative record, the Disability Initial Claims Committee or the Disability Board, as the case may be, must conclude, in its absolute discretion, that the Player incurred a "substantial disablement" (as defined in Section 5.5(a) and (b)) "arising out of League football activities" (as defined in Section 5.5(c)).

(e)    The Player satisfies the other requirements of this Article 5 or Article 6 of the Bert Bell/Pete Rozelle Plan, as appropriate.

(f)    The Player is not receiving line-of-duty disability benefits from the Bert Bell/Pete Rozelle Plan pursuant to Article 6 of that plan.

**5.2    Amount of Line-of-Duty Disability Benefits.**  The amount of monthly line-of-duty disability benefits is set forth in the following chart:

**JO-00030**

Confidential Information                                                                                  NFL_ALFORD-0000333

| For Line-of-Duty Disability Benefits Payable for These Months | The Greater Of: |
|---|---|
| Jan. 1, 2019 through Dec. 31, 2020 | $4,000 OR The Player's Disability Credits |
| Jan. 1, 2021 through Mar. 31, 2031 | $4,500 OR The Player's Disability Credits |
| Apr. 1, 2031 and thereafter | $1,000 OR The Player's Benefit Credits |

For payments for periods prior to January 1, 2019, the amount of monthly line-of-duty disability benefits will be determined based on the versions of the Plan in effect for such periods. The benefit will be payable monthly, beginning retroactive to the first day of the month that is two months prior to the date a written application for line-of-duty disability benefits or similar letter that began the administrative process that resulted in an award of line-of-duty disability benefits was received, and continuing for the duration of such substantial disablement but in no case shall the benefit be payable from either this Plan or the Bert Bell/Pete Rozelle Plan for more than a combined total of ninety (90) months.

### 5.3    Relationship to Retirement Benefits.

(a)    A Player may not receive benefits under this Article for any months in which he is receiving monthly retirement benefits under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan. No benefits under this Article will be payable with respect to a future or past month or other period of time to a Player who first makes a claim for benefits under this Article after he begins to receive his monthly pension under Article 4 or 4A of the Bert Bell/Pete Rozelle Plan.

(b)    If the Player elects an early payment benefit under the Bert Bell/Pete Rozelle Plan, any monthly subsequent line-of-duty disability benefits under this Article 5 will be the greater of:

(1)    (A) 75% of the sum of his Benefit Credits (not including any Special Credits) at the time of the early payment benefit distribution, plus (B) 100% of any Benefit Credit (not including any Special Credits) increases that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (C) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); or

(2)    the fixed dollar amount for such month as described in Section 5.2 reduced by the applicable reduction pertaining to the effective date of the Player's line-of-duty disability benefits as shown below:

Confidential Information                                                                NFL_ALFORD-0000334

| For line-of-duty disability benefit awards effective | Applicable Reduction |
|---|---|
| Aug. 1, 2011 through Dec. 31, 2012 | $500 |
| Jan. 1, 2013 through Dec. 31, 2014 | $625 |
| Jan. 1, 2015 through Dec. 31, 2016 | $750 |
| Jan. 1, 2017 through Dec. 31, 2018 | $875 |
| Jan. 1, 2019 through Dec. 31, 2020 | $1,000 |
| Jan. 1, 2021 through Mar. 31, 2031 | $1,125 |
| Apr. 1, 2031 and thereafter | $250 |

**5.4     Procedures.**

(a)     <u>Application Deadline.</u>  Any claim for line-of-duty disability benefits must be submitted in writing to the Disability Board within forty-eight months after a Player ceases to be an Active Player.  A Player with five or more Credited Seasons has a number of years equal to his number of Credited Seasons in which to submit an application.

(b)     <u>Medical Records and Evaluations.</u>

A Player applying for line-of-duty benefits on and after October 1, 2020 must submit Medical Records with his application.  A Player who does not do so will be given 45 days to submit Medical Records and thereby complete his application.  The Player's application will not be complete, and will not be processed, until the Plan receives Medical Records.  The Player's application will be denied if he does not submit any Medical Records within the 45 day period.  If such a Player's application is denied by the Disability Initial Claims Committee because the Player failed or refused to submit Medical Records, and the Player appeals that determination, he must submit Medical Records with his appeal.  A Player who does not do so will be given 45 days to submit Medical Records and thereby complete his appeal.  The Player's appeal will not be complete, and will not be processed, until the Plan receives Medical Records.  Any such Player in this situation who does not submit any Medical Records within the 45 day period will not be entitled to line-of-duty benefits, and his appeal will be denied.  This paragraph does not apply to applications received prior to October 1, 2020.

Whenever the Disability Initial Claims Committee or Disability Board reviews the application or appeal of any Player for line-of-duty benefits, such Player may first be required to submit to an examination scheduled by the Plan with a Neutral Physician, or any other physician or physicians, institution or institutions, or other medical professional or professionals, selected by the Disability Initial Claims Committee or the Disability Board, and may be required to submit to such further examinations scheduled by the Plan as, in the opinion of the Disability

Confidential Information

NFL_ALFORD-0000335

Initial Claims Committee or the Disability Board, are necessary to make an adequate determination respecting his physical or mental condition.

Any Player refusing to submit to any examination required by the Plan will not be entitled to any line-of-duty disability benefits under this Article. If a Player fails to attend an examination scheduled by the Plan, his application for line-of-duty disability benefits will be denied, unless the Player provided at least two business days' advance notice to the Plan that he was unable to attend. The Plan will reschedule the Player's exam if two business days' advance notice is provided. The Player's application for line-of-duty disability benefits will be denied if he fails to attend the rescheduled exam, even if advance notice is provided. The Disability Initial Claims Committee or the Disability Board, as applicable, may waive a failure to attend if they find that circumstances beyond the Player's control precluded the Player's attendance at the examination.

A Player or his representative may submit to the Plan additional Medical Records or other materials for consideration by a Neutral Physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by a Neutral Physician, institution, or medical professional.

With respect to applications received on and after April 1, 2020, a Player who submits operative reports or NFL Club records documenting surgical procedures deemed sufficient, by the Disability Initial Claims Committee or the Disability Board, to establish that he has a "substantial disablement" arising out of League football activities will not be subject to a medical evaluation under this Section 5.4(b).

(c)    <u>Continuation of Line-of-Duty Disability Benefits.</u>  A Player receiving line-of-duty disability benefits will be subject to further examinations to determine whether he remains eligible for the benefit. Such further examinations will occur any time requested by three or more voting members of the Disability Board, but not more frequently than once every six months. Any person refusing to submit to any examination will not be entitled to continuation of line-of-duty disability benefits under this Article. If a Player fails to attend a scheduled examination, his line-of-duty disability benefits will be suspended, unless the Player provided at least two business days advance notice to the Plan that he was unable to attend. The Disability Board or the Disability Initial Claims Committee, as applicable, may waive the rule in the prior sentence if circumstances beyond the Player's control preclude the Player's attendance at the examination. A Player or his representative may submit to the Plan medical records or other materials for consideration by the physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by the physician, institution, or medical professional.

(d)    <u>Requests for Information.</u>  Whenever the Disability Initial Claims Committee or the Disability Board reviews the application or appeal of any Player, or the eligibility of any Player to continue receiving line-of-duty benefits, such Player may be required to provide any additional documents or information that, in the opinion of the Disability Initial Claims

Confidential Information                                    NFL_ALFORD-0000336

Committee or Disability Board, are necessary to decide the Player's application, appeal, or eligibility to continue receiving line-of-benefits. Any person refusing or failing to provide the requested documents or information will not be entitled to any line-of-duty benefits.

(e)    Early Termination of Line-of-Duty Disability Benefits. If the Disability Board or the Disability Initial Claims Committee determines that the substantial disablement of the Player has terminated, the line-of-duty disability benefit payments will cease.

(f)    Serial Applications for Line-of-Duty Disability Benefits.

(1)    A Player whose claim for benefits under this Article has been denied and is not subject to further administrative review will be presumed conclusively to not have a substantial disablement for twelve months following the date of such final denial, unless one of the exceptions below applies.

(2)    Exceptions.

(i)    The Player shows that he incurred a substantial disablement due to a new injury or condition that arose after the date of his original claim; or

(ii)    The Player submits a subsequent application for line-of-duty disability benefits after his previous application was denied for failure to attend a scheduled examination, but only if the Player has not been denied line-of-duty benefits more than once in his lifetime for failure to attend a scheduled examination; or

(iii)    The Player submits a subsequent application for line-of-duty disability benefits after his previous application was denied because the Player's disability was not permanent within the meaning of Section 5.5(b) due to a recent surgery or other medical procedure, and any reasonably possible expected recovery period has ended; or

(iv)    The Player submits a subsequent application for line-of-duty disability benefits after choosing to withdraw his application and appeal pursuant to Section 5.4(g).

(g)    Special Procedures for Administrative Denials. Where the Disability Initial Claims Committee denies a Player's application for non-medical, administrative reasons, and the Disability Board disagrees with the administrative reason for denial, the Player may withdraw both his application and his appeal, and reapply for line-of-duty disability benefits. If the Player chooses to withdraw his application and appeal and reapply for line-of-duty disability benefits, the date of the Player's original application will be used to determine the effective date for any line-of-duty disability benefits awarded to the Player under Section 5.2.

(h)    Consideration of Impairments. To ensure an orderly and efficient administrative process, a Player may not seek line-of-duty disability benefits based upon any impairment not

29

**JO-00034**

                                                                NFL_ALFORD-0000337

identified in his application.  The Disability Initial Claims Committee or the Disability Board, as the case may be, will consider only those impairments that they find, in their discretion, were adequately identified by the Player in his application.  The Disability Initial Claims Committee and the Disability Board may consider additional impairments if those additional impairments are identified by a Plan Neutral Physician, and the Disability Initial Claims Committee or the Disability Board determine, in their discretion, that the additional impairments should be considered in conjunction with the Player's pending application or appeal.

(i)      Withdrawal of Application or Appeal.  A Player may withdraw a pending, initial application before it is presented to the Disability Initial Claims Committee by informing the Plan, in writing, of his intent to withdraw the application.  A Player may not withdraw a pending application after it has been presented to the Disability Initial Claims Committee for a decision.

A Player may withdraw a pending appeal if he has not been evaluated by a Plan Neutral Physician on appeal by informing the Plan, in writing, of his intent to withdraw the appeal.  A Player may not withdraw a pending appeal after he has been evaluated by a Plan Neutral Physician on appeal or failed to attend a medical examination in violation of Section 5.4(b).

**5.5    Definitions.**

(a)      With respect to applications received on and after April 1, 2020, a 'substantial disablement' is a 'permanent' disability other than a neurocognitive, brain-related neurological (excluding nerve damage), or psychiatric impairment that:

(1)      Results in a 50% or greater loss of speech or sight; or

(2)      Results in a 55% or greater loss of hearing; or

(3)      Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or

(4)      For orthopedic impairments,

(A)      With respect to applications received before April 1, 2020, is rated at least 10 points, using the Point System set forth in Appendix A, Version 2 to this Plan.  Surgeries, injuries, treatments, and medical procedures that occur after a Player's application deadline in Section 5.4(a) will not receive points and will be disregarded by the Committee and Board.

(B)      With respect to applications received on and after April 1, 2020, is rated at least 9 points, using the Point System set forth in Appendix A, Version 2 to this Plan.  Surgeries, injuries, treatments, and medical procedures that occur after a Player's application deadline in Section 5.4(a) will not receive points and will be disregarded by the Committee and Board.

**JO-00035**

Confidential Information                                                                 NFL_ALFORD-0000338

(b)    A disability will be deemed to be "permanent" if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period.

(c)    "Arising out of League football activities" means a disablement arising out of any League pre-season, regular-season, or post-season game, or any combination thereof, or out of League football activity supervised by an Employer, including all required or directed activities. "Arising out of League football activities" does not include, without limitation, any disablement resulting from other employment, or athletic activity for recreational purposes, nor does it include a disablement that would not qualify for benefits but for an injury (or injuries) or illness that arises out of other than League football activities.

**5.6    Death.**  In the case of the death of a Player receiving benefits under this Article, the last payment will be a full monthly payment for the month in which his death occurs.

**5.7    Transition of Benefits.**

(a)    Except as provided in subsection (b), all line-of-duty disability benefits for periods on and after January 1, 2015 will be paid out of this Plan, and not the Bert Bell/Pete Rozelle Plan.  It is intended that Article 5 of this Plan and Article 6 of the Bert Bell/Pete Rozelle Plan be interpreted to transition the payment for and oversight of line-of-duty disability benefits from the Bert Bell/Pete Rozelle Plan to this Plan, with no effect on the amount of benefits payable.  Effective January 1, 2015, the fiduciaries of this Plan will make all decisions relating to: (i) initial eligibility for line-of-duty disability benefits, and (ii) continued receipt of line-of-duty disability benefits.

(b)    Notwithstanding subsection (a), line-of-duty disability benefits will continue to be paid out of the Bert Bell/Pete Rozelle Plan to Players who, as of November 12, 2014, had elected a direct rollover of those benefits to an Eligible Retirement Plan (as defined in Section 4.8(c) of the Bert Bell/Pete Rozelle Plan).  The fiduciaries of the Bert Bell/Pete Rozelle Plan will make all decisions relating to the continued receipt of those line-of-duty disability benefits.

31

**JO-00036**

Confidential Information

NFL_ALFORD-0000339

# ARTICLE 6

## NEUROCOGNITIVE DISABILITY BENEFITS

**6.1    Eligibility.**  For applications received before April 1, 2020, a Player will receive a monthly neurocognitive disability benefit ("NC benefit") in the amount described in Section 6.4 for the months described in Section 6.6 if and only if all of the conditions in (a), (b), (c), (d), (e), (f), (g), (h), and (i) below are met.

Effective for applications received on and after April 1, 2020 and through March 31, 2021, the requirements of (a) and (b) will not apply, and a Player will receive an NC benefit in the amount described in Section 6.4 for the months described in Section 6.6 if and only if all of the conditions in (c), (d), (e), (f), (g), (h), (i), (j), and (m) below are met.

Effective for applications received on and after April 1, 2021, the requirements of (a) and (b) will not apply, and a Player will receive an NC benefit in the amount described in Section 6.4 for the months described in Section 6.6 if and only if all of the conditions in (c), (d), (e), (f), (g), (h), (i), (j), (k), (l), and (m) below are met.

(a)    The Player must be a Vested Inactive Player based on his Credited Seasons only, and must be under age 55.

(b)    The Player must have at least one Credited Season under the Bert Bell/Pete Rozelle Plan after 1994.

(c)    The Player must not receive monthly retirement benefits under Articles 4 or 4A of the Bert Bell/Pete Rozelle Plan or be a Pension Expansion Player within the meaning of the Bert Bell/Pete Rozelle Plan.

(d)    The Player must not be receiving T&P benefits under this Plan or the Bert Bell/Pete Rozelle Plan.

(e)    At least one Plan Neutral Physician must find that the Player has a mild or moderate neurocognitive impairment in accordance with Section 6.2.  If no Plan Neutral Physician renders such a conclusion, then this threshold requirement is not satisfied, and the Player will not be eligible for and will not receive NC benefits, regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record.

(f)    After reviewing the report(s) of the Plan Neutral Physician(s), along with all other facts and circumstances in the administrative record, the Disability Initial Claims Committee or the Disability Board, as the case may be, must conclude, in its absolute discretion, that the Player has a mild or moderate neurocognitive impairment in accordance with Section 6.2.

(g)    The Player must execute the release described in Section 6.3.

**JO-00037**

NFL_ALFORD-0000340

(h)    The Player must not have a pending application for T&P benefits or for line-of-duty disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan, except that a Player can file a claim for the NC benefit simultaneously with either or both of those benefits.

(i)    The Player must satisfy the other requirements of this Article 6.

(j)    The Player must not have previously received the NC benefit and had those benefits terminate at age 55 before April 1, 2020 by virtue of earlier versions of this Plan.

(k)    If the Player is not a Vested Inactive Player, his application for the NC benefit must be received by the Plan within eighty-four (84) months after the end of his last contract with a Club under which he is a Player, as defined under Section 1.35 of the Bert Bell/Pete Rozelle Plan, for at least one Game, as defined under Section 1.17 of the Bert Bell/Pete Rozelle Plan.

(l)    The Player must be under age 65.

(m)    For applications received on and after October 1, 2020, the Player must submit Medical Records with his initial application or appeal, as the case may be, subject to the rules of Section 6.2(d).  This paragraph (m) does not apply to applications received prior to October 1, 2020.

**6.2    Determination of Neurocognitive Impairment.**

(a)    <u>Mild Impairment.</u>  A Player eligible for benefits under this Article 6 will be deemed to have a mild neurocognitive impairment if he has a mild objective impairment in one or more domains of neurocognitive functioning which reflect acquired brain dysfunction, but not severe enough to interfere with his ability to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit.

(b)    <u>Moderate Impairment.</u>  A Player eligible for benefits under this Article 6 will be deemed to have a moderate neurocognitive impairment if he has a mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations in order to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit.

(c)    <u>Substance Abuse and Psychiatric Exclusion.</u>  A Player who otherwise satisfies the requirements for mild or moderate neurocognitive impairment will not be eligible for NC benefits if his neurocognitive impairment is caused by substance abuse or a psychiatric condition.  The prior sentence does not apply to a Player eligible for benefits under this Article 6 whose neurocognitive impairment is not caused by substance abuse or a psychiatric condition, but who abuses substances or has a psychiatric condition.  Substance abuse means the use of, addiction to, or dependence upon any controlled substance (as defined in 21 U.S.C. § 802(d)), alcohol, or illegal drugs (including all drugs and substances, other than controlled substances or alcohol, used or taken in violation of law or League policy).

**JO-00038**

Confidential Information                    NFL_ALFORD-0000341

(d)    <u>Medical Records and Evaluations.</u>

A Player applying for NC benefits on and after October 1, 2020 must submit Medical Records with his application.  A Player who does not do so will be given 45 days to submit Medical Records and thereby complete his application.  The Player's application will not be complete, and will not be processed, until the Plan receives Medical Records.  The Player's application will be denied if he does not submit any Medical Records within the 45 day period. If such a Player's application is denied by the Disability Initial Claims Committee because the Player failed or refused to submit Medical Records, and the Player appeals that determination, he must submit Medical Record with his appeal.  A Player who does not do so will be given 45 days to submit Medical Records and thereby complete his appeal.  The Player's appeal will not be complete, and will not be processed, until the Plan receives Medical Records.  Any such Player in this situation who does not submit any Medical Records within the 45 day period will not be entitled to NC benefits, and his appeal will be denied.

Whenever the Disability Initial Claims Committee or Disability Board reviews the application or appeal of any Player for NC benefits, such Player will first be required to submit to an examination scheduled by the Plan with a Neutral Physician, or any other physician or physicians, institution or institutions, or other medical professional or professionals, selected by the Disability Initial Claims Committee or the Disability Board, and may be required to submit to such further examinations scheduled by the Plan as, in the opinion of the Disability Initial Claims Committee or the Disability Board, are necessary to make an adequate determination respecting his physical or mental condition.

Any Player refusing to submit to any examination required by the Plan will not be entitled to NC benefits.  If a Player fails to attend an examination scheduled by the Plan, his application for NC benefits will be denied, unless the Player provided at least two business days' advance notice to the Plan that he was unable to attend.  The Plan will reschedule the Player's exam if two business days' advance notice is provided.  The Player's application for NC benefits will be denied if he fails to attend the rescheduled exam, even if advance notice is provided.  The Disability Initial Claims Committee or the Disability Board, as applicable, may waive a failure to attend if they find that circumstances beyond the Player's control precluded the Player's attendance at the examination.

A Player or his representative may submit to the Plan additional medical records or other materials for consideration by a Neutral Physician, institution, or medical professional, except that any such materials received by the Plan less than 10 days prior to the date of the examination, other than radiographic tests, will not be considered by a Neutral Physician, institution, or medical professional.

(e)    <u>Validity Testing.</u>  A Player who is otherwise eligible for benefits under this Article 6 and who is referred for neuropsychological testing will undergo, among other testing, two validity tests.  A Player who fails both validity tests will not be eligible for the NC benefit. A Player who fails one validity test may be eligible for the NC benefit, but only if the neuropsychologist provides an explanation satisfactory to the Disability Board or the Disability Initial Claims Committee (as applicable) for why the Player should receive the NC benefit despite the failed validity test.

34

**JO-00039**

NFL_ALFORD-0000342

(f)    Requests for Information.  Whenever the Disability Initial Claims Committee or the Disability Board reviews the application or appeal of any Player, or the eligibility of a Player to continue receiving for NC benefits, such Player may be required to provide any additional documents or information that, in the opinion of the Disability Initial Claims Committee or the Disability Board, are necessary to decide the Player's application, appeal, or eligibility to continue receiving Plan NC benefits.  Any person refusing or failing to provide the requested documents or information will not be entitled to any NC benefits under this Article.

(g)    Serial Applications.

(1)    A Player whose claim for benefits under this Article has been denied and is not subject to further administrative review will be presumed conclusively to not have a mild or moderate neurocognitive impairment under the provisions of Section 6.2(a) or (b) for twelve months following the date of such final denial, unless one of the exceptions below applies.

(2)    Exceptions.

(i)    The Player shows that he incurred a mild or moderate neurocognitive impairment due to a new injury or condition that arose after the date of his original claim; or

(ii)    The Player submits a subsequent application for NC benefits after his previous application was denied for failure to attend a scheduled examination, but only if the Player has not been denied NC benefits more than once in his lifetime for failure to attend a scheduled examination; or

(iii)    The Player submits a subsequent application for NC benefits after choosing to withdraw his application and appeal pursuant to Section 6.2(h).

(h)    Special Procedures for Administrative Denials.  Where the Disability Initial Claims Committee denies a Player's application for non-medical, administrative reasons, and the Disability Board disagrees with the administrative reason for denial, the Player may withdraw both his application and his appeal, and reapply for NC benefits.   If the Player chooses to withdraw his application and appeal and reapply for NC benefits, the date of the Player's original application will be used to determine the effective date for any NC benefits awarded to the Player under Section 6.5.

(i)    Withdrawal of Application or Appeal.  A Player may withdraw a pending, initial application before it is presented to the Disability Initial Claims Committee by informing the Plan, in writing, of his intent to withdraw the application.  A Player may not withdraw a pending application after it has been presented to the Disability Initial Claims Committee for a decision.

A Player may withdraw a pending appeal if he has not been evaluated by a Plan Neutral Physician on appeal by informing the Plan, in writing, of his intent to withdraw the appeal.  A Player may not withdraw a pending appeal after he has been evaluated by a Plan Neutral Physician on appeal or failed to attend a medical examination in violation of Section 6.2(d).

35

**JO-00040**

**6.3**    **Release.**

(a)    To apply for and receive the NC benefit, a Player must execute a release in the following form:

> In consideration for the benefit provided under Article 60 of the Collective Bargaining Agreement between the NFL Management Council and the NFLPA, Player, on his own behalf and on behalf of his personal representatives, heirs, next of kin, executors, administrators, estate, assigns, and/or any person or entity on his behalf, hereby waives and releases and forever discharges the NFL and its Clubs, and their respective past, current and future affiliates, directors, officers, owners, stockholders, trustees, partners, servants and employees (excluding persons employed as players by a Club) and all of their respective predecessors, successors and assigns (collectively, the "NFL Releasees") of and from any and all claims, actions, causes of actions, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses, accounts, in law or equity, contingent or non-contingent, known or unknown, suspected or unsuspected ("Claims") that the Player has, had, may now have, or may have in the future arising out of, relating to, or in connection with any head and/or brain injury sustained during his employment by the Clubs, including without limitation head and/or brain injury of whatever cause and its damages (whether short-term, long-term, or death) whenever arising, including without limitation neurocognitive deficits of any degree, and Player covenants not to sue the NFL Releasees with respect to any such Claim or pursue any such Claim against the NFL Releasees in any forum. This release, waiver and covenant not to sue includes without limitation all Claims arising under the tort laws of any state and extends to all damages (including without limitation short-term and/or long-term effects of such injury and death) whenever arising, including without limitation after execution of this release, waiver and covenant not to sue. Player further acknowledges that he has read and understands Section 1542 of the California Civil Code, which reads as follows:
>
>> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.
>
> Player expressly waives and relinquishes all rights and benefits under that section and any law of any jurisdiction of similar effect with respect to the release of any unknown or unsuspected claims

Confidential Information                                                                                        NFL_ALFORD-0000344

released hereunder that Player may have against the NFL Releasees.  This release, waiver and covenant not to sue shall have no effect upon any right that Player may have to insurance or other benefits available under (1) any Collective Bargaining Agreement between the NFL Management Council and the NFLPA, (2) the Final Class Action Settlement in *In re: National Football League Players' Concussion Injury Litigation*, Civ. Action No. 2:12-md-02323-AB, MDL No. 2323, or (3) the workers' compensation laws, and Player acknowledges and agrees that such rights, if any, are his sole and exclusive remedies for any Claims.

Player acknowledges and agrees that the provision of the benefit under Article 60 shall not be construed as an admission or concession by the NFL Releasees or any of them that NFL football caused or causes, in whole or in part, the medical conditions covered by the benefit, or as an admission of liability or wrongdoing by the NFL Releasees or any of them, and the NFL Releasees expressly deny any such admission, concession, liability or wrongdoing.

(b)      The release will be null and void if (1) the Player's application for NC benefits is denied and is not subject to further administrative review, or (2) under Section 7.2(a) or (b), the Player never received NC benefits because he qualified for T&P benefits or line-of-duty disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan that are more generous than the NC benefit.

(c)      Notwithstanding the provisions of subparagraph (b), the release will remain in effect if (1) the Disability Initial Claims Committee or Disability Board determines the Player is medically eligible for NC benefits, but the Player declines to receive them, or (2) the Player has received NC benefits for any period.

**6.4      Amount of NC Benefit.**  For payments prior to January 1, 2019, the amount of NC benefits will be determined based on the versions of the Plan in effect for such periods.

(a)      <u>Mild Neurocognitive Impairment.</u>  Except as provided in subsection (c), the monthly benefit for a Player who meets the requirements of Sections 6.1 and 6.2(a) will be equal to the greater of (1) 50% of his Disability Credits, or (2) the minimum amount set forth in the following chart.

**JO-00042**

Confidential Information

NFL_ALFORD-0000345

| For NC Benefits Payable In These Months: | Minimum Monthly Amount |
|---|---|
| 4/1/2020 through 3/31/2022 | $3,000 |
| 4/1/2022 through 3/31/2024 | $3,500 |
| 4/1/2024 through 3/31/2026 | $4,000 |
| 4/1/2026 through 3/31/2028 | $4,500 |
| 4/1/2028 through 3/31/2031 | $5,000 |

(b)    <u>Moderate Neurocognitive Impairment.</u>  Except as provided in subsection (c) below, the monthly benefit for a Player who meets the requirements of Sections 6.1 and 6.2(b) will be equal to the greater of (1) his Disability Credits, or (2) the minimum amount set forth in the following chart.

| For NC Benefits Payable In These Months: | Minimum Monthly Amount |
|---|---|
| 4/1/2020 through 3/31/2022 | $5,000 |
| 4/1/2022 through 3/31/2024 | $5,500 |
| 4/1/2024 through 3/31/2026 | $6,000 |
| 4/1/2026 through 3/31/2028 | $6,500 |
| 4/1/2028 through 3/31/2031 | $7,000 |

(c)    <u>Early Payment Benefit Reduction.</u>  The monthly payment to a Player who has received an early payment benefit under the Bert Bell/Pete Rozelle Plan will be the greater of:

(1)    75% of the monthly amount of the minimum dollar benefit for mild or moderate neurocognitive impairment, as applicable in the Player's situation, or

(2)    for moderate neurocognitive impairment, an amount equal to (i) 75% of the sum of the Player's Benefit Credits at the time of the early payment benefit distribution, plus (ii) 100% of any Benefit Credit increases that take effect after the early payment benefit is paid and not reflected in the early payment benefit, plus (iii) 100% of any 2011 Legacy Credits (excluding 2020 Legacy Credits); for mild neurocognitive impairment, the amount in this Section 6.4(c)(2) shall equal 50% of the amount determined pursuant to the previous clause for moderate neurocognitive impairment.

**6.5    Effective Date of NC Benefit.**  NC benefits will be paid retroactive to the first day of the month that is two months prior to the date a written application for NC benefits or

38

**JO-00043**

NFL_ALFORD-0000346

similar letter that began the administrative process that resulted in an award of NC benefits was received.

**6.6    Duration of NC Benefits and Re-examination.**

(a)    Except as described in subsection (c), all benefits provided by this Article will be payable for no more than 180 months, but in no case will continue beyond the month in which occurs the earliest of (1) the cessation of the Player's neurocognitive impairment, (2) the Player's death, or (3) the date the Player attains age 65.

(b)    A Player who qualifies for benefits under this Article 6 may be required to submit to periodic examinations for the purpose of re-examining his condition upon the request of three or more Disability Board members, but not more often than once every two years.  If the Disability Board or the Disability Initial Claims Committee then determines that such Player no longer has a neurocognitive impairment, his NC benefits will terminate.  If the Disability Board or the Disability Initial Claims Committee determines that such Player meets the requirements for the other category of NC benefits, such Player's NC benefits will be reclassified effective immediately.

(c)    In the case of a Player who (1) is not a Vested Inactive Player; (2) filed his claim for NC benefits between April 1, 2020 and March 31, 2021; and (3) filed his claim for NC benefits later than the date that is eighty-four (84) months after the date he ceased to be an Active Player, NC benefits will not continue beyond the month in which occurs the earliest of (1) the cessation of the Player's neurocognitive impairment, (2) the Player's death, or (3) March 2021.

**6.7    Player Requests for Reclassification.**  A Player who is awarded "mild impairment" benefits under this Article 6 may request reclassification to the "moderate impairment" category, but not more often than once every three years.  Notwithstanding the previous sentence, a Player who has sustained a new injury or illness that causes cognitive impairment following the decision and original award of "mild impairment" benefits may request reclassification at any time.  The standards for "mild impairment" and "moderate impairment" in effect on the date a request for reclassification is received will govern such request for reclassification.

**6.8    Relationship to Retirement Benefits.**  A Player who is eligible for and who is receiving NC benefits and who subsequently elects to receive retirement benefits under Article 4 or Article 4A of the Bert Bell/Pete Rozelle Plan will not receive NC benefits for any month following the annuity starting date of such retirement benefits.

**6.9    Application Deadline.**  All applications for NC benefits must be received by the Plan in complete form on or before March 31, 2031.  Applications for NC benefits received after that date, and applications for NC  Benefits that are not complete by that date, will have no effect and will not be processed, unless and until the NFLPA and the Management Council amend this Plan to so provide.

**6.10    Sunset.**  Unless this Plan is subsequently amended to the contrary, no benefit under this Article is payable for months after March 2031.

39

**JO-00044**

## ARTICLE 7

## COORDINATION OF BENEFITS

**7.1      One Application At a Time.**  At any time, a Player may have only one application pending for disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan. Subject to the rules relating to serial applications, a Player may apply for T&P benefits, line-of-duty disability benefits, or NC benefits individually, or in any combination of the three simultaneously, but once an application for disability benefits to either this Plan or the Bert Bell/Pete Rozelle Plan has been received, a Player may not apply for additional disability benefits until one of the following occurs: (1) such application was denied by the Disability Initial Claims Committee of this Plan or the Bert Bell/Pete Rozelle Plan and the time for appeal has expired; (2) his appeal was denied by the Disability Board or the Retirement Board of the Bert Bell/Pete Rozelle Plan and is not subject to further administrative review; or (3) the Player withdraws the application.

**7.2      One Benefit At a Time.**
(a)      Except as provided in Sections 3.7 and 4.3, if two or more disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan are payable during a month, only the larger monthly disability benefit will be paid, subject to the following rules.

(b)      A Player who is eligible for and who is receiving NC benefits and subsequently is awarded T&P benefits under this Plan or the Bert Bell/Pete Rozelle Plan will not receive NC benefits for any month for which such T&P benefits are paid, except as provided in Sections 3.7 and 4.3.

(c)      A Player who is eligible for and who is receiving NC benefits and who subsequently is awarded line-of-duty disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan, or who is eligible for and who is receiving line-of-duty disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan and who subsequently is awarded NC benefits, will receive only the larger of the two disability benefits for months in which both are payable.  In cases where the monthly NC benefit is equal to the monthly line-of-duty disability benefit, the Player will receive only one payment.  Months in which both are payable will be counted against both the 90-month maximum for line-of-duty disability benefits and the 180-month maximum for NC benefits under Article 6.

**7.3      Uniform Procedures.**  Article 3 and Article 5 will be interpreted and administered to allow in all cases a smooth transition in the processing and evaluation of disability applications.  For example, materials submitted to or obtained by the Bert Bell/Pete Rozelle Plan relating to an application will become part of the administrative record of this Plan. Decisions of the Bert Bell/Pete Rozelle Plan will, where appropriate, be reviewed by this Plan as if they were prior decisions of this Plan.  Rules on serial applications, reexaminations, tax returns, continuation of benefits, reclassification, duration of benefits, and similar provisions will be interpreted and administered as if this Plan and the Bert Bell/Pete Rozelle Plan were a single plan.

40

Confidential Information                                                                  NFL_ALFORD-0000348

**7.4    Deemed Payments.**  Overpayments by the Bert Bell/Pete Rozelle Plan of T&P benefits or line-of-duty disability benefits that are not collectible from disability benefits under the Bert Bell/Pete Rozelle Plan because of the transition of such benefits to this Plan will be deemed advance payments under this Plan.  The monthly benefit amounts otherwise payable under Article 3, Article 4, and Article 5 of this Plan will be reduced by the amount of the deemed advance payment divided by the remaining number of months that the benefit is expected to be paid.  The reduction under this Section 7.4 will cease when those deemed advance payments are reduced to zero.  This Section does not apply if Section 13.11 applies.  The Disability Board may exercise discretion to apply any deemed advance payment to payments under this Plan more quickly in the circumstances of particular cases.

**7.5    QDROs.**  Qualified domestic relations orders received by the Bert Bell/Pete Rozelle Plan prior to January 1, 2015 that provide disability benefits to an alternate payee under the Bert Bell/Pete Rozelle Plan will be deemed to apply to disability benefits paid under this Plan on and after January 1, 2015, to the extent those benefits are now paid out of this Plan.

**JO-00046**

Confidential Information

NFL_ALFORD-0000349

## ARTICLE 7A

## SURVIVOR BENEFITS

**7A.1    Definitions.**   The following definitions will apply for purposes of this Article 7A.

(a)    **"Pension Expansion Player"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.  A surviving Spouse, Minor Child, Parent, or Sibling of a Pension Expansion Player is not entitled to benefits under this Article 7A.

(b)    **"Adult Child"** means a Player's child who is no longer a Minor Child.

(c)    **"Minor Child"** means a Player's child until the child reaches age nineteen (or, age twenty-three if in college), or continuously if the child has a mental or physical incapacity that started before age nineteen (or, age twenty-three if in college), and if, before reaching age 19 (or, age twenty-three if in college), the child (1) is eligible for and receives disability benefits under either the Social Security disability insurance program or Supplemental Security Income program due to such incapacity, or (2) is under a state law guardianship due to such incapacity. Any benefits paid to a Minor Child solely because of Social Security disability benefits or a state law guardianship will cease upon revocation of such child's Social Security disability benefits or guardianship.

(d)    **"Parent"** means either of the two biological parents of the Player.  Step-parents are not eligible for benefits under this Article.

(e)    **"Sibling"** means a Player's brother, sister, half-brother, or half-sister.

(f)    **"Spouse"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

(g)    **"Survivor Credits"** has the same meaning as defined in the Bert Bell/Pete Rozelle Plan.

**7A.2    Benefits for Player Deaths on and after April 1, 2020.**

(a)    <u>Covered Players.</u>  Effective April 1, 2020, benefits will be paid under this Section 7A.2 following the death of a Player who meets each of the following requirements:

(1)    he dies on or after April 1, 2020;

(2)    he dies before his Benefit Credit Annuity Starting Date;

(3)    he is not a Pension Expansion Player; and

(4)    he was, at the time of his death, (a) an Active Player, (b) a Vested Inactive Player who is vested solely because of Credited Seasons (other than a Player described in 1.47(i) of the Bert Bell/Pete Rozelle Plan), and not by reason of Years of Service after

42

**JO-00047**

    NFL_ALFORD-0000350

ceasing to be an Active Player, or (c) entitled to disability benefits under Article 5 or Article 6 of the Bert Bell/Pete Rozelle Plan or Article 3 or Article 5 of this Plan (regardless of when such entitlement is determined).

(b)    <u>Amount.</u>  Except as provided in subsection (c), the benefit will be $13,000 per month for the first sixty (60) months following the Player's death, and $6,000 per month for any months thereafter for which this survivor benefit is payable. Effective April 1, 2025, the $13,000 amount will increase to $15,000. The benefit for any month will not be less than 50% of the Player's Survivor Credits. Where the benefit is paid to a surviving Spouse, or the surviving Spouse disclaims the benefit under subsection (j) below, then the benefit will be reduced, but not below zero, by the amount of the Spouse's Pre-Retirement Death Benefit that is payable under section 7.3 of the Bert Bell/Pete Rozelle Plan, or would have been payable without regard to any QDRO applicable to the Player's Survivor Credits.

(c)    <u>Effect of Early Payment Benefit.</u>  If the Player has been paid an early payment benefit after March 31, 1982, under section 4.5 of the Bert Bell/Pete Rozelle Plan: (1) the $13,000 monthly benefit in subsection (b) is reduced to $10,750, (2) the $6,000 monthly benefit in subsection (b) is reduced to $4,900, and (3) the $15,000 monthly benefit in subsection (b) is reduced to $12,750.

(d)    <u>Priority of Beneficiaries.</u>  Benefits will be paid under this Section 7A.2 to beneficiaries in the following order of priority classes:

    (1)    first, to a surviving Spouse;

    (2)    second, to any surviving Minor Children;

    (3)    third, to any surviving Adult Children;

    (4)    fourth, to any Parents who survive the Player; and

    (5)    fifth, to any Siblings who survive the Player.

(e)    <u>Only One Priority Class.</u>

    (1)    In general, benefits will be paid to only one of the above classes of beneficiaries, according to the above order of priority. Once there are no members in that priority class who are eligible to receive benefits, no further benefits are payable under this Article 7A to persons in any other priority class. For example, if there is a surviving Spouse or a surviving Minor Child upon the death of the Player, then benefits under this Section 7A.2 will never be paid to any then Adult Children of the Player, or to the Player's Parents or Siblings.

    (2)    The sole exception is that if benefits to a surviving Spouse cease under subsection (f)(1) because of the Spouse's death or remarriage, and there is at the time of

**JO-00048**

Confidential Information
NFL_ALFORD-0000351

such death or remarriage a Minor Child or Minor Children, then benefits will continue to be paid to such surviving Minor Child or Minor Children.

(f)    Duration of Benefits.

(1)    A surviving Spouse will receive benefits under this Section 7A.2 until the surviving Spouse dies or remarries.

(2)    In general, a Minor Child will receive benefits under this Section 7A.2 until that child no longer meets the requirements of Section 7A.1(c), or until the Minor Child dies, if sooner.  Subsection (i) below provides additional benefits in some situations.

(3)    An Adult Child will receive benefits under this Section 7A.2 for sixty (60) months, or until the Adult Child dies, if sooner.

(4)    A Parent will receive benefits under this Section 7A.2 for sixty (60) months, or until the Parent dies, if sooner.

(5)    A Sibling will receive benefits under this Section 7A.2 for sixty (60) months, or until the Sibling dies, if sooner.

(g)    Beginning and Ending Months.  Benefits will begin as of the first day of the month following the Player's death.  Where benefits cease because of death or remarriage, a full month's benefit will be paid for the month of such death or remarriage.  Where benefits to a child cease because the child is no longer meets the requirements for a Minor Child under Section 7A.1(c), a full month's benefit will be paid for the month in which the child ceases to be a Minor Child.

(h)    Multiple Members of a Priority Class.  Benefits will be divided equally among multiple members of a priority class for as long as each remains eligible for benefits.  For example, if benefits are paid to the Player's Parents, the benefit will be divided between the Parents.  If one Parent dies before the sixty (60) months of benefits cease, the full benefit will be paid to the then surviving Parent for the remainder of the sixty (60) months.  If a beneficiary is determined to be eligible for benefits under this Article 7A after such benefits have commenced to another beneficiary or beneficiaries (either in the same Priority Class or in a Priority Class that would not have been eligible for benefits if the new beneficiary had been identified earlier), benefits will be adjusted prospectively only and will not be adjusted for payments already made.

(i)    Special Rule for Minor Children.  Notwithstanding subsection (f)(2), a surviving Minor Child will receive or share in benefits under this Section 7A.2 for at least sixty (60) months, provided such child remains alive.  For example, if a Player dies leaving no surviving Spouse but two surviving children, then aged 12 and 18, the $13,000 monthly benefit ($15,000 monthly benefits beginning April 2025) will be divided equally between them for sixty (60) months, assuming both remain alive.  After sixty (60) months, if the child originally age 18 does not satisfy at that time the definition of a Minor Child in subsection 7A.1(c), the entire benefit,

44

**JO-00049**

                                                      NFL_ALFORD-0000352

now reduced to $6,000 per month, will be paid to the child originally aged 12, for as long as that child remains a Minor Child. Any months for which benefits are paid to a surviving Spouse who later dies or remarries will be counted for purposes of this special rule as if the Minor Child had received the benefit for that month.

(j)    Waiver by Surviving Spouse. A surviving Spouse may irrevocably waive benefits under this Section 7A.2 in favor of the Player's Minor Child or Minor Children. Such waiver must be made in writing and in accordance with procedures established by the Disability Board, and must be made before benefits under this Article begin to be paid to such Spouse. If such a waiver is made, benefits will be payable to the surviving Minor Child or Children, regardless of the Surviving Spouse's remarriage, and the monthly amount paid will be reduced, but not below zero, by the amount of the Spouse's Pre-Retirement Death Benefit that is payable under section 7.3 of the Bert Bell/Pete Rozelle Plan, or would have been payable without regard to any QDRO applicable to the Player's Survivor Credits. Benefits will not be paid to Adult Children, Parents, or Siblings in the event of a surviving Spouse's waiver.

(k)    No Double Payment. To the extent death benefits are paid under section 7.2 of the Bert Bell/Pete Rozelle Plan with respect to a Player who dies on or after April 1, 2020, such benefits reduce, on a dollar-for-dollar basis, the benefits payable under this Section 7A.2.

**7A.3    Supplemental Survivor Benefits for Player Deaths Prior to April 1, 2020.**

(a)    Covered Players. Supplemental survivor benefits will be paid under this Section 7A.3 for months beginning April 1, 2020, following the death of a Player who (1) died prior to April 1, 2020, and (2) with respect to whom benefits are payable under section 7.2 of the Bert Bell/Pete Rozelle Plan.

(b)    Amount.

(1)    Except as provided in (3) and (4) below, effective April 1, 2020, for surviving Spouses or Minor Children who have received benefits under section 7.2 of the Bert Bell/Pete Rozelle Plan for fewer than 48 months as of April 1, 2020, the supplemental benefit payable under this Section 7A.3 will be:

(i)    $4,000 per month for month up to and including the 48th (forty-eighth) month after the Player's death;

(ii)    $8,600 per month for each month beginning with the 49th (forty ninth) month after the Player's death and continuing through and including the 60th (sixtieth) month after the Player's death; and

(iii)    $1,600 per month for each month beginning with the 61st (sixty-first) month after the Player's death for any month thereafter for which a benefit under section 7.2 of the Bert Bell/Pete Rozelle Plan is payable.

(2)    Except as provided in (3) below, for surviving Spouses or Minor Children who have received benefits under section 7.2 of the Bert Bell/Pete Rozelle Plan for at

**JO-00050**

Confidential Information

NFL_ALFORD-0000353

least 48 months as of April 1, 2020, the supplemental benefit payable under this Section 7A.3 will be $1,600 per month for each month after the Player's death for which a benefit under section 7.2 of the Bert Bell/Pete Rozelle Plan is payable.

(3)    Effect of Early Payment Benefit.  If a Player has been paid an early payment benefit after March 31, 1982, from the Bert Bell/Pete Rozelle Plan, effective April 1, 2020, for surviving Spouses or Minor Children who have received benefits under section 7.2 of the Bert Bell/Pete Rozelle Plan for fewer than 48 months as of April 1, 2020, the supplemental benefit payable under this Section 7A.3 will be:

(i)    $4,000 per month for month up to and including the 48th (forty-eighth) month after the Player's death;

(ii)    $7,450 per month for each month beginning with the 49th (forty-ninth) month after the Player's death and continuing through and including the 60th (sixtieth) month after the Player's death; and

(iii)    $1,600 per month for each month beginning with the 61st (sixty-first) month after the Player's death for any month thereafter for which a benefit under section 7.2 of the Bert Bell/Pete Rozelle Plan is payable.

(4)    For any month in which the benefit paid under section 7.2 of the Bert Bell/Pete Rozelle Plan is increased because 50% of the Player's Survivor Credits exceeds the otherwise applicable minimum, the amount of such excess will reduce, but not below zero, the benefit payable under this Section 7A.3.

(c)    <u>Beneficiaries.</u>  Supplemental survivor benefits will be paid only to the surviving Spouse or Minor Children, as the case may be, who is receiving benefits under section 7.2 of the Bert Bell/Pete Rozelle Plan for that month.  If there is more than one such individual, these supplemental survivor benefits will be divided equally among them.  Supplemental survivor benefits under this Section 7A.3 will not be paid to Adult Children, Parents, or Siblings.

(d)    <u>Duration of Benefits.</u>  Benefits under this Section 7A.3 will stop at the same time as benefits under section 7.2 of the Bert Bell/Pete Rozelle Plan cease.  No benefit is payable under this Section 7A.3 for any month in which a benefit is not payable under section 7.2 of the Bert Bell/Pete Rozelle Plan.

(e)    <u>No Double Payment.</u>  To the extent the supplemental survivor benefits described in this Section 7A.3 are paid under section 7.2 of the Bert Bell/Pete Rozelle Plan with respect to a Player who dies prior to April 1, 2020, such benefits reduce, on a dollar-for-dollar basis, the benefits payable under this Section 7A.3.

**7A.4    QDROs.**  Qualified domestic relations orders received by the Bert Bell/Pete Rozelle Plan that provide survivor benefits to an alternate payee will be deemed to apply to survivor benefits paid under this Article.

46

**JO-00051**

NFL_ALFORD-0000354

# ARTICLE 8

## CONTRIBUTIONS

**8.1    Schedule of Contributions.**  A contribution to the Trust will be made by or on behalf of the Employers at least quarterly in amounts sufficient to allow the Plan to pay estimated Plan benefits and expenses.  It will be the duty of the Disability Board to pursue all available legal remedies in an effort to ensure payment of all contributions due under the Plan.

**8.2    Exclusive Benefit of Contributions.**  All contributions under this Plan will be held by the Trust for the exclusive benefit of Players eligible for benefits under this Plan, and under no circumstances will any assets of the Plan ever revert to, or be used by, an Employer, the League, or the NFLPA.  Notwithstanding the above, any contribution made by or on behalf of an Employer to the Plan due to a mistake of fact or law will be returned to such Employer within six (6) months of the determination by the Disability Board that such contribution was in error.  The return of contributions is limited to that portion of the contribution as to which there was a mistake of fact or law.  A returned contribution will not include any earnings attributable to the contribution, but will be reduced by any losses attributable to the contribution.

**JO-00052**

Confidential Information

NFL_ALFORD-0000355

## ARTICLE 9

### THE DISABILITY BOARD
### AND DISABILITY INITIAL CLAIMS COMMITTEE

**9.1    Selection of the Disability Board.**  The Disability Board will consist of seven members.  The members of the Disability Board are as follows:

(a)    Three voting members appointed by the NFLPA;

(b)    Three voting members appointed by the Management Council; and

(c)    The Commissioner of the NFL will be an ex-officio, non-voting member.

The Commissioner will be the honorary Chairman of the Disability Board, and either the Commissioner or, in his absence, his designee, will preside at all meetings of the Disability Board.  The Commissioner's duties and responsibilities under and with respect to the Plan are limited to those that are specifically described in the Plan.

The NFLPA and the Management Council will each be entitled to name a proxy for each member on the Disability Board which it has appointed.  Such proxy may be designated any time prior to or during any Disability Board meeting.  This proxy will remain in effect until revoked or the end of that Disability Board meeting, whichever occurs first.

The NFLPA and the Management Council will have the authority to remove and appoint a replacement for any member on the Disability Board either has respectively appointed.  Any member on the Disability Board may resign by notice to the appointing party.  If there is a vacancy on the Disability Board, the appointing party will designate a successor.  Until a successor is appointed, the remaining members on the Disability Board may act on behalf of the Disability Board; provided, however, that in order to act, the Disability Board always must have at least four voting members.  Notwithstanding any provision in this Plan to the contrary, the Disability Board may remove the legal counsel for the Plan, and/or the benefit consultant/actuary/recordkeeper for the Plan, and/or any local counsel or local benefit consultant/actuary/recordkeeper by an affirmative vote of three Disability Board members.

**9.2    Authority.**  The Disability Board will be the "named fiduciary" of the Plan within the meaning of section 402(a)(2) of ERISA, and will be responsible for implementing and administering the Plan, subject to the terms of the Plan and Trust.  The Disability Board will have full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan and the Trust.

Such authority includes, but is not limited to, the power to:

(a)    Define the terms of the Plan and Trust, construe the Plan and Trust, and reconcile any inconsistencies therein;

(b)    Manage and operate the Plan and Trust and receive, hold, invest and reinvest contributions made under this Plan;

48

**JO-00053**

NFL_ALFORD-0000356

(c)    Decide claims for benefits (except that initial claims for disability benefits will be decided by the Disability Initial Claims Committee, and that the Disability Board will abide by the provisions of Section 9.3);

(d)    Pay all reasonable and necessary expenses of the Plan;

(e)    Adopt procedures, rules, and forms for the administration of the Plan;

(f)    Delegate its power and duties to other persons and appoint and assign authority to other persons (including, but not limited to accountants, investment managers, counsel, actuaries, recordkeepers, appraisers, consultants, professional plan administrators, physicians, and other specialists), or otherwise act to secure specialized advice or assistance, as it deems necessary or desirable in connection with the administration of the Plan (with the Disability Board, to the extent not prohibited by applicable law, being entitled to rely conclusively upon, and being fully protected in acting or in declining to act in good faith reliance upon, the advice or opinion of such persons, provided that such persons are prudently chosen and retained by the Disability Board);

(g)    Establish an investment policy for the Plan;

(h)    Select the Trust custodian(s) and enter into custody agreement(s) with Trust custodian(s) with respect to the assets of the Trust;

(i)    Select an investment manager(s) within the meaning of section 3(38) of ERISA, to assume investment responsibility with respect to some or all assets of the Trust;

(j)    Commence or defend suits or legal proceedings involving the Plan or Trust;

(k)    Settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Plan or Trust;

(l)    Inspect the records of any Employer as reasonably necessary for the Disability Board to perform its obligations under the Plan and Trust;

(m)    Obtain fidelity bonds and fiduciary insurance coverage;

(n)    Delegate authority to any one of their number to sign documents on behalf of the Disability Board and to perform other ministerial acts, when acting by a majority of voting members on the Disability Board; and

(o)    Recover any overpayment of benefits through reduction or offset of future benefit payments or other method chosen by the Disability Board.

**9.3    Medical Issues and Disputes of the Disability Board.**

(a)    <u>Medical Issues.</u>  If three or more voting members of the Disability Board conclude that a medical issue exists as to whether a Player qualifies for a benefit under this Plan (such as where physician reports are in conflict or ambiguous, or in the case of ascertaining mild

49

**JO-00054**

NFL_ALFORD-0000357

or moderate cognitive impairment under Section 6.2 of this Plan) such members may submit such issue to a Medical Advisory Physician for a final and binding determination regarding such medical issues.  In the case of NC benefits, such determination will be based on the written evidence in the Player's file, and will not involve a new examination by the Medical Advisory Physician.  The Medical Advisory Physician will have full and absolute discretion, authority, and power to decide such medical issues.  In all other respects, including the interpretation of this Plan and whether the claimant is entitled to benefits, the Disability Board will retain its full and absolute discretion, authority, and power under Sections 9.2 and 9.9.  If there is a question as to whether the Medical Advisory Physician properly applied the terms of the Plan, such as with respect to the standards for line-of-duty disability benefits, the Disability Board will have the right and duty to bring such questions to the attention of the Medical Advisory Physician.  After all such questions have been addressed, the ultimate decision of the Medical Advisory Physician will be final and binding.

(b)    Benefits Disputes.  If the voting members of the Disability Board are deadlocked with respect to a decision as to whether or to what extent any person is eligible for or entitled to benefits under this Plan, the Disability Board may by an affirmative vote of three voting members submit such dispute for final and binding arbitration in accordance with the procedures and practices in use prior to the 2020 CBA.

(c)    Other Disputes.  If the voting members of the Disability Board are deadlocked for any other reason, the Disability Board may by an affirmative vote of three voting members submit such disputes to the Benefit Arbitrator for a final and binding determination in accordance with the procedures of the 2020 CBA.

(d)    Arbitration Procedures.  For benefit disputes arising under this Section 9.3, any arbitrator selected to resolve a dispute must base his or her decision solely on the administrative record that was before the Disability Board, as may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator.  In addition, both parties to the arbitration are permitted to take depositions of any expert relied on by the other side based on the administrative record, as may be supplemented by records in existence prior to the date the dispute is referred to the arbitrator.

**9.4    Selection of the Disability Initial Claims Committee.**

(a)    The Disability Initial Claims Committee will consist of three members.  One member will be appointed by the NFLPA.  One member will be appointed by the Management Council.  One member will be the Plan's Medical Director or another medical professional jointly designated by the NFLPA and Management Council.

(b)    The NFLPA and the Management Council will each be entitled to name a proxy for the member of the Disability Initial Claims Committee each has appointed.  Such proxy may be designated any time prior to or during any Disability Initial Claims Committee meeting.  This proxy will remain in effect until revoked or the end of that Disability Initial Claims Committee meeting, whichever occurs first.

Confidential Information                                                        NFL_ALFORD-0000358

(c)      The NFLPA and the Management Council will have the authority to remove and appoint a replacement for the member of the Disability Initial Claims Committee each has appointed.  A member of the Disability Initial Claims Committee may resign by notice to the appointing party.  If there is a vacancy on the Disability Initial Claims Committee, the appointing party will designate a successor.  In order to act, the Disability Initial Claims Committee always must have two members.

**9.5      Authority of the Disability Initial Claims Committee.**  The Disability Initial Claims Committee will be responsible for the initial determination of any and all disability benefits under this Plan, except Article 4 T&P benefits.  At the request of a member of the Disability Initial Claims Committee, the Disability Initial Claims Committee will reconsider any decision it has made.  When making the decisions described in this Section 9.5, the Disability Initial Claims Committee will have full and absolute discretion, authority, and power to interpret the Plan and the Trust.

**9.6      Disputes of the Disability Initial Claims Committee.**  If the members of the Disability Initial Claims Committee are deadlocked with respect to a decision as to whether a claimant is entitled to a benefit, the claim will be deemed denied.  However, if such claimant is currently receiving disability benefits, and if such deemed denial is appealed to the Disability Board within sixty days from the date the notice of the deemed denial was mailed to the claimant, benefits will continue to be paid until and unless the Disability Board determines on appeal that the claimant is no longer entitled to the benefits.  If such claimant is currently receiving benefits and if such deemed denial is not appealed to the Disability Board within sixty days from the date the notice of the deemed denial was mailed to the claimant, benefits will not be paid with respect to any month that begins more than sixty days from the date of the deemed denial.  If the deemed denial is later appealed to the Disability Board within the 180-day appeal period and the Disability Board upholds the claimant's appeal, benefits will be paid retroactive to a date on or after the benefits ceased, as determined by the Disability Board.

The member of the Disability Initial Claims Committee who is a medical professional shall cast the deciding vote only on those cases that are preliminarily "deemed denials" because of a disagreement between the other two members of the Disability Initial Claims Committee over a medical aspect of the case.  Notwithstanding the foregoing, in situations where the designated health care professional determines that the medical evidence is either inconclusive or insufficient, he or she will abstain from voting resulting in the "deemed denial" becoming the final decision of the Disability Initial Claims Committee.

**9.7      Meetings.**

(a)      <u>Disability Board.</u>  The Disability Board will meet at least quarterly, and a member on the Disability Board may participate in a meeting by means of conference telephone or similar communications equipment.  Except as provided in Sections 9.1, 9.3, and 12.1, any action by the Disability Board will require at least four affirmative votes.  Except as provided in Sections 9.1, 9.3, and 12.1, the Disability Board may make decisions to take any action without calling a meeting, but any decisions so made, or action so taken, will be evidenced by a written instrument signed by at least four voting members of the Disability Board, or by electronic communication sent by at least four voting members of the Disability Board, or by a combination

51

**JO-00056**

of written instruments and electronic communications signed or sent by at least four members of the Disability Board.

(b)    <u>Disability Initial Claims Committee.</u>  The Disability Initial Claims Committee will meet periodically, and the members of the Disability Initial Claims Committee may participate in a meeting by means of conference telephone or similar communications equipment.  Any action by the Disability Initial Claims Committee will require two affirmative votes.  The Disability Initial Claims Committee may make decisions and take any action without calling a meeting, but any decisions so made, or action so taken, will be evidenced by an electronic transmission or a written instrument signed by the members of the Disability Initial Claims Committee, or by a combination of written instruments and electronic communications signed or sent by the members of the Disability Initial Claims Committee.

**9.8    Duty of Care.**  The Disability Board and the Disability Initial Claims Committee will discharge their duties with respect to the Plan solely and exclusively in the interest of the Players and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.  The duties of the Disability Board and the Disability Initial Claims Committee will be only those specifically undertaken pursuant to the Plan.  No member of the Disability Board or the Disability Initial Claims Committee will be liable for the act of any other member, except to the extent required by law.  In the event that any dispute arises as to any act to be performed by the Disability Board, the members may, to the extent permitted by ERISA, postpone the performance of such act until (a) actual adjudication of such dispute has been made in a court of competent jurisdiction, or (b) they are indemnified against any liability.

**9.9    Discretionary Acts.**  Benefits under this Plan will be paid only if the Disability Initial Claims Committee, or the Disability Board, or a designee of either, decides in its discretion that the applicant is entitled to them.  In exercising their discretionary powers under the Plan and Trust, the Disability Board and the Disability Initial Claims Committee will have the broadest discretion permissible under ERISA and any other applicable laws, and their decisions will be binding upon all persons affected thereby.  In deciding claims for benefits under this Plan, the Disability Board and Disability Initial Claims Committee will consider all information in the Player's administrative record, and shall have full and absolute discretion to determine the relative weight to give such information.

**9.10    Indemnification.**

(a)    To the extent permitted by applicable law, each member of the Disability Board, the Disability Initial Claims Committee, their alternates, the Medical Director, Medical Advisory Physicians, and employees of the Plan will be indemnified and saved harmless by the Plan and Trust from and against any and all claims of liability arising in connection with the exercise of their duties and responsibilities with respect to the Plan and Trust by reason of any act or omission, including all expenses reasonably incurred in the defense of such act or omission, unless (1) it is established by final judgment of a court of competent jurisdiction that such act or omission involved a violation of the duties imposed by Part 4 of Subtitle B of Title I of ERISA on the part of such person, or (2) in the event of settlement or other disposition of such claim

52

**JO-00057**

involving the Plan or Trust, it is determined by written opinion of independent counsel that such act or omission involved a violation of the duties imposed by Part 4 of Subtitle B of Title I of ERISA on the part of such person.  The independent counsel referred to in subparagraph (2) will be selected by mutual agreement of the NFLPA and the Management Council.  If those parties cannot agree, an independent counsel will be selected by the Benefit Arbitrator.

(b)    To the extent permitted by applicable law, the Trust will pay expenses (including reasonable attorneys' fees and disbursements), judgments, fines and amounts paid in settlement incurred by a member of the Disability Board, Disability Initial Claims Committee, their alternates, the Medical Director, and employees of the Plan in connection with any of the proceedings described above, provided that (1) each such person will repay such advanced expenses to the Trust, plus reasonable interest, if it is established by a final judgment of a court of competent jurisdiction, or by written opinion of independent counsel under the circumstances described in Section 9.10(a)(2), that such person violated duties under Part 4 of Subtitle B of Title I of ERISA, and (2) each such person will make appropriate arrangements for repayment of advanced expenses.

53

**JO-00058**

NFL_ALFORD-0000361

# ARTICLE 10

## AMENDMENT AND TERMINATION

**10.1    Amendment and Termination.**  This Plan may only be amended or terminated by joint action of the NFLPA and the Management Council while there is a Collective Bargaining Agreement in effect.  If no Collective Bargaining Agreement is in effect, then this Plan may be amended by the Disability Board, and if no Collective Bargaining Agreement has been in effect for more than one year, this Plan may be terminated by the Disability Board.  No amendment or termination of the Plan may permit Trust assets to revert to, or be used or enjoyed by, an Employer, the League, or the NFLPA.

**10.2    Mergers.**  Subject to applicable law, the Management Council and NFLPA, acting jointly, reserve the right at any time to merge or consolidate the Plan with another plan, to transfer assets or liabilities of the Plan to another plan, or to accept a transfer of assets or liabilities from another plan to this Plan.

54

**JO-00059**

NFL_ALFORD-0000362

## ARTICLE 11

## RECORDS AND REPORTS

**11.1    Records.**  The Disability Board and the Disability Initial Claims Committee will keep records of the operation of the Plan.  Upon reasonable demand, a Player may receive a copy of the Plan's records with respect to his status under the Plan but will have no right to information concerning any other person.  Any qualified representative of the Employers or of the NFLPA may, at any time, inspect the records of the Plan.

55

**JO-00060**

NFL_ALFORD-0000363

# ARTICLE 12

## MEDICAL PROFESSIONALS

### 12.1    Medical Director.

(a)     <u>Selection and Termination.</u>  The Disability Board may designate, by action of at least four members, a board-certified physician as the Plan's Medical Director.  A Medical Director must (1) certify that any services rendered for the Plan, including without limitation any opinions offered as a MAP or Neutral Physician, will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her services or opinions tend to support or refute any given Player's application for benefits.

A Medical Director will serve until at least three members of the Disability Board agree to remove the Medical Director.

(b)     <u>Duties.</u>  The duties and responsibilities of the Medical Director will be determined by the Disability Board, and will include medical advice with respect to the Plan's Neutral Physicians and medical examination procedures.  The Medical Director will provide advice on medical issues relating to particular disability benefit claims as requested by a member of the Disability Board or a member of the Disability Initial Claims Committee.  The Medical Director may examine Players as a Medical Advisory Physician or Neutral Physician in any case where the Medical Director has not voted as a member of the Disability Initial Claims Committee pursuant to Section 9.6.

### 12.2    Medical Advisory Physician.

(a)     <u>Selection and Termination.</u>  The NFLPA and Management Council will jointly designate one or more health care professionals as a Medical Advisory Physician (MAP).  A MAP must (1) certify that any opinions offered as a MAP will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits.

Any MAP will serve until the earliest of (1) the death, disability or retirement of the MAP, (2) the NFLPA and Management Council jointly remove and replace the MAP, or (3) thirty days after either the NFLPA or Management Council gives written notice of the MAP's removal to the other party, the MAP, and the Disability Board.  The NFLPA and Management Council may, at their discretion, jointly designate a replacement MAP for a removed MAP.  A MAP who is removed or who has received a notice of removal will decide any dispute already referred by the Disability Board within thirty days after the removal or notice of removal.  The Disability Board may not refer further disputes to the removed MAP.

(b)     <u>Duties.</u>  A MAP has authority to decide only those medical issues submitted by the Disability Board under Section 9.3(a).  In making a determination, a MAP will review all material submitted to the Plan and may arrange for any additional consultation, referral, or other specialized medical services as the MAP deems necessary.  In addition, a MAP may require an

**JO-00061**

Confidential Information                                                        NFL_ALFORD-0000364

applicant to submit to such physical or other examinations as the MAP deems reasonable and necessary in making a determination. A MAP will submit a written determination to the Disability Board on a form provided by the Disability Board.

### 12.3   Neutral Physicians.

(a)    <u>Selection and Termination.</u>  The Disability Board will maintain a network of Neutral Physicians to examine Players who apply for benefits under this Plan. The Neutral Physician network may include physicians, institutions, or other health care professionals. The NFLPA and Management Council will jointly designate such Neutral Physicians. A Neutral Physician must (1) certify that any opinions offered as a Neutral Physician will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits.

Any Neutral Physician will serve until the earliest of (1) the death, disability or retirement of the Neutral Physician, (2) the NFLPA and Management Council jointly remove and replace the Neutral Physician, or (3) thirty days after either the NFLPA or Management Council gives written notice of the Neutral Physician's removal to the other party, the Neutral Physician, and the Disability Board. The NFLPA and Management Council may, at their discretion, jointly designate a replacement Neutral Physician for a removed Neutral Physician. A Neutral Physician who is removed or who has received a notice of removal will issue any reports on Players who have already been examined by the Neutral Physician within thirty days after the removal. The Disability Board may not refer additional Players to the removed Neutral Physician.

(b)    <u>Duties.</u>  The Neutral Physicians will examine each Player referred by the Plan and will provide such report or reports on the Player's condition as necessary for the Disability Board or Disability Initial Claims Committee to make an adequate determination as to that Player's physical or mental condition. The Neutral Physician will complete such form or forms as may be provided by the Disability Board for this purpose.

57

**JO-00062**

# ARTICLE 13

## MISCELLANEOUS

**13.1    Governing Law.**  To the extent permitted by applicable law, this Plan will be administered, construed, and enforced according to the laws of the State of New York.

**13.2    Addresses and Payment in Event of Incapacity.**

(a)    Addresses.  Each Player will be responsible for providing his current mailing address to the Disability Board.  In the event a Player becomes entitled to a payment under the Plan, payments may be made by check to the order of the payee and mailed to the payee at the current address referred to above.

(b)    Payment in Event of Incapacity.  If the Disability Board determines that a Player entitled to receive any benefit payment is under a legal disability or is incapacitated in any way so as to be unable to manage his financial affairs, the Disability Board may direct that payments be made to such Player's legal representative, or to a relative or other individual for such Player's benefit, or to otherwise apply the payment for the benefit of such Player, subject to such conditions as the Disability Board deems appropriate.  Alternatively, in the case of a Player who is receiving benefits under this Plan, the Disability Board may, in its sole discretion, establish a trust to hold the benefits of such Player if he is deemed incapacitated in any way so as to be unable to manage his financial affairs, and who, in the Disability Board's sole discretion, would benefit from the establishment of such a trust.  The Disability Board may appoint a trustee and successor trustee if needed, and all reasonable expenses of the trust so established and its trustee will be paid by the Plan.  All benefits of such a Player will be paid directly to the trust so established.

If any employee benefit plan that is administered by the NFL Player Benefits Office in Baltimore, Maryland, and maintained pursuant to the Taft-Hartley Act of 1947 ("NFL Player Taft-Hartley Plan"), determines that a Participant is unable to manage his financial affairs and establishes a trust for such Participant, then any benefit payable to such Participant under this Plan will be paid only to such trust, and this Plan will share in the expenses of such trust.  Benefits from this Plan will cease to be paid to such trust upon revocation of the trust by the NFL Player Taft-Hartley Plan that established the trust.

Any payment of a benefit in accordance with the provisions of this Section will be a complete discharge of any liability by the Plan to make such payment.

**13.3    Receipt of Documents.**  Correspondence, applications, forms, elections, designations, and other documents of any type are deemed received by the Disability Board only if and when actually received by the Disability Board, and not when mailed or otherwise sent or transmitted to the Disability Board.  The common law "mailbox rule" is expressly rejected.

**13.4    Limitation on Actions.**  No suit or legal action with respect to an adverse determination may be commenced more than 42 months from the date of the final decision on the claim for benefits (including the decision on review).

**JO-00063**

Confidential Information
NFL_ALFORD-0000366

**13.5** **"Spendthrift" Provision.** Subject to Section 13.6, and except as allowed under Code section 401(a)(13)(C), no benefit under the Plan will be subject in any manner to anticipation, pledge, encumbrance, alienation, levy or assignment, nor to seizure, attachment or other legal process for the debts of any Player, unless required by law.

**13.6** **QDRO Exception.** In the event a court order purporting to be a QDRO is issued with respect to any Player, the Disability Board will notify the Player and the alternate payee(s) of the order received (and, if benefits are already in pay status, separately account for the portion of the Player's benefits which would be payable to the alternate payee(s) as if the order received were a QDRO). Within 18 months of the order, the Disability Board will proceed with either (a) or (b) as follows:

(a) If the order is determined to be a QDRO, the alternate payee(s) will receive a distribution, notwithstanding anything to the contrary in Article 3, Article 4, Article 5, and Article 6, (1) at the time specified in such order or, if the order permits, (2) as soon as administratively feasible after the Disability Board approves the order, provided such distribution is permitted under applicable provisions of the Code; or

(b) If the order is determined not to be a QDRO, or the issue remains undetermined, the Disability Board will pay the portions of the Player's benefits segregated in accordance with the above to the Player who is entitled to such benefit.

If, more than 18 months after issuance of the order, a determination is made that the order is a QDRO, the determination will be applied prospectively only.

This Section 13.6 also applies to a domestic relations order, with an effective date prior to January 1, 1985, that the Disability Board treats as a QDRO.

**13.7** **Counterparts.** This Plan may be executed in counterparts.

**13.8** **Location of Payee Unknown.** If the Plan Director, after following the procedures adopted by the Disability Board, cannot locate a Player to whom a benefit is payable, the entire benefit of and amount payable to such Player are forfeited at the end of that Plan Year. The amount so forfeited will be separately accounted for as determined by the Disability Board. The forfeiture shall be applied to reduce future Employer contributions. If the Player subsequently applies for the benefit (or, in cases where the right to receive payment of the benefit was previously established, the Plan is provided a proper address for the Player), the amount so forfeited will be reinstated and all amounts then due will be paid to such Player with interest at a reasonable rate. The Employers will make such contributions to the Plan as may be needed to reinstate the benefit.

**13.9** **No Employment Contract.** This Plan creates no contract of employment between the Employer or the League and any Player.

**13.10** **Severability.** If any provision of this Plan is held illegal or void, such illegality or invalidity will not affect the remaining provisions of this Plan, but any such provision will be fully severable and the Plan will be construed and enforced as if the illegal or invalid provision had never been included.

**JO-00064**

Confidential Information

NFL_ALFORD-0000367

**13.11   Recovery of Certain Overpayments.**  If false information submitted by or on behalf of a Player causes the Player to receive disability benefits under the Plan or the Bert Bell/Pete Rozelle Plan to which such Player is not entitled, any future disability benefits payable to the Player or his beneficiary (including a dependent or alternate payee) under this Plan will be reduced by the amount of the overpayment from the Plan, plus an interest rate of 6% per year.

Notwithstanding the foregoing, the Disability Board shall have the full authority granted under Section 9.2(o) to determine the recovery of any overpayments made under this Plan.

**13.12   USERRA Compliance.**  Notwithstanding any other provision of the Plan to the contrary, the Plan will comply with all applicable requirements of the Uniformed Services Employment and Reemployment Rights Act of 1994, as amended, and regulations thereunder (USERRA).

**13.13   Expenses.**  All reasonable expenses incurred in administering the Plan shall be paid from the Trust.

**13.14   Claims Procedure.**  It is intended that the claims procedure of this Plan be administered in accordance with the claims procedure regulations of the U.S. Department of Labor, 29 C.F.R. § 2560.503-1.

(a)    <u>Disability Claims.</u>  Except for Article 4 T&P benefits, each person must claim any disability benefits to which he believes he is entitled under this Plan by filing a written application with the Disability Board in accordance with the claims filing procedures established by the Disability Board, and such claimant must take such actions as the Disability Board or the Disability Initial Claims Committee may require.  The Disability Board or the Disability Initial Claims Committee will notify such claimants when additional information is required.  The time periods for decisions of the Disability Initial Claims Committee and the Disability Board in making an initial determination may be extended with the consent of the claimant.

A claimant's representative may act on behalf of a claimant in pursuing a claim for disability benefits or appeal of an adverse disability benefit determination only after the claimant submits to the Plan a signed written authorization identifying the representative by name.  The Disability Board will not recognize a claimant's representative who has been convicted of, or pled guilty or no contest to, a felony.

If a claim for disability benefits is wholly or partially denied, the Disability Initial Claims Committee will give the claimant notice of its adverse determination within a reasonable time, but not later than 45 days after receipt of the claim.  This determination period may be extended twice by 30 days if, prior to the expiration of the period, the Disability Initial Claims Committee determines that such an extension is necessary due to matters beyond the control of the Plan and notifies the claimant of the circumstances requiring the extension of time and the date by which the Disability Initial Claims Committee expects to render a decision.  If any extension is necessary, the notice of extension will specifically explain the standards on which entitlement to a benefit is based, the unresolved issues that prevent a decision on the claim, and the additional information needed to resolve those issues.  The claimant will be afforded at least 45 days within which to provide the specified information.  If the Disability Initial Claims Committee fails to

60

**JO-00065**

NFL_ALFORD-0000368

notify the claimant of its decision to grant or deny such claim within the time specified by this paragraph, the claimant may deem such claim to have been denied by the Disability Initial Claims Committee and the review procedures described below will become available to the claimant.

The notice of an adverse determination will be written in a manner calculated to be understood by the claimant, will follow the rules of 29 C.F.R. § 2560.503-1(o) for culturally and linguistically appropriate notices, and will set forth the following:

(1)    the specific reason(s) for the adverse determination;

(2)    reference to the specific Plan provisions on which the adverse determination is based;

(3)    a description of additional material or information, if any, needed to perfect the claim and the reasons such material or information is necessary;

(4)    a description of the Plan's claims review procedures and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under ERISA section 502(a) following an adverse determination on review;

(5)    any internal rule, guideline, protocol, or other similar criterion relied on in making the determination (or state that such rules, guidelines, protocols, standards, or other similar criteria do not exist);

(6)    if the determination was based on a scientific or clinical exclusion or limit, an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's circumstances (or state that such explanation is available free of charge upon request);

(7)    a discussion of the decision, including an explanation of the basis for disagreeing with or not following the views of (a) medical professionals treating the claimant and vocational professionals who evaluated the claimant presented by the claimant, (b) medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination, or (c) Social Security Administration disability determinations presented by the claimant to the Plan; and

(8)    a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits.

The claimant will have 180 days from the receipt of an adverse determination to file a written request for review of the initial decision to the Disability Board.

61

**JO-00066**

                                                                 NFL_ALFORD-0000369

The claimant will have the opportunity to submit written comments, documents, and other information in support of the request for review and will have access to relevant documents, records, and other information in his administrative record. The Disability Board's review of the adverse determination will take into account all available information, regardless of whether that information was presented or available to the Disability Initial Claims Committee. The Disability Board will accord no deference to the determination of the Disability Initial Claims Committee.

On review, the claimant must present all issues, arguments, or evidence supporting the claim for benefits. Failure to do so will preclude the claimant from raising those issues, arguments, or evidence in any subsequent administrative or judicial proceedings.

If a claim involves a medical judgment question, the health care professional who is consulted on review will not be the individual who was consulted during the initial determination or his subordinate, if applicable. Upon request, the Disability Board will provide for the identification of the medical experts whose advice was obtained on behalf of the Plan in connection with the adverse determination, without regard to whether the advice was relied upon in making the benefit determination.

The claimant will receive, free of charge, any new or additional evidence considered, relied upon, or generated by or on behalf of the Plan on review, as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided, so that the claimant can have a reasonable opportunity to respond prior to that date. The claimant also will receive, free of charge, any new or additional rationale for the denial of the claim that arises during the review, as soon as possible and sufficiently in advance of the date on which the notice of adverse benefit determination on review is required to be provided, so that the claimant can have a reasonable opportunity to respond prior to that date.

The Disability Board meets quarterly. Decisions by the Disability Board on review will be made no later than the date of the Disability Board meeting that immediately follows the Plan's receipt of the claimant's request for review, unless the request for review is received by the Plan within 30 days preceding the date of such meeting. In such case, the Disability Board's decision may be made by no later than the second meeting of the Disability Board following the Plan's receipt of the request for review. If a claimant submits a response to new or additional evidence considered, relied upon, or generated by the Plan on review, or to any new or additional rationale for denial that arises during review, and that response is received by the Plan within 30 days preceding the meeting at which the Disability Board will consider the claimant's request for review, then the Disability Board's decision may be made by no later than the second meeting of the Disability Board following the Plan's receipt of the claimant's response. If special circumstances require an extension of time for processing, the Disability Board will notify the claimant in writing of the extension, describing the special circumstances and the date as of which the determination will be made, prior to the commencement of the extension.

The claimant will be notified of the results of the review not later than five days after the determination.

**JO-00067**

Confidential Information

NFL_ALFORD-0000370

If the claim is denied in whole or in part on review, the notice of an adverse determination will be written in a manner calculated to be understood by the claimant, will follow the rules of 29 C.F.R. § 2560.503-1(o) for culturally and linguistically appropriate notices, and will:

    (1)    state the specific reason(s) for the adverse determination;

    (2)    reference the specific Plan provision(s) on which the adverse determination is based;

    (3)    state that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits;

    (4)    state that the claimant has the right to bring an action under ERISA section 502(a) and identify the statute of limitations applicable to such action, including the calendar date on which the limitations period expires;

    (5)    disclose any internal rule, guidelines, or protocol relied on in making the determination (or state that such rules, guidelines, protocols, standards, or other similar criteria do not exist);

    (6)    if the determination was based on a scientific or clinical exclusion or limit, contain an explanation of the scientific or clinical judgment for the determination, applying the terms of the Plan to the claimant's circumstances (or state that such explanation is available free of charge upon request); and

    (7)    discuss the decision, including an explanation of the basis for disagreeing with or not following the views of (a) medical professionals treating the claimant and vocational professionals who evaluated the claimant presented by the claimant, (b) medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination, or (c) Social Security Administration disability determinations presented by the claimant to the Plan.

A claimant may request a written explanation of any alleged violation of these claims procedures. Any such request should be submitted to the plan in writing; it must state with specificity the alleged procedural violations at issue; and it must be received by the Plan no more than 45 days following the claimant's receipt of a decision on the pending application or appeal, as applicable. The Plan will provide an explanation within 10 days of the request.

    (b)    <u>All Other Claims.</u> Each claimant or his beneficiary must claim any benefit to which he believes he is entitled under this Plan by filing a written claim with the Disability Board in accordance with claim filing procedures established by the Disability Board.

Confidential Information

A claimant's representative may act on behalf of a claimant in pursuing a claim for benefits or appeal of an adverse determination only after the claimant submits to the Plan a signed written authorization identifying the representative by name. The Disability Board will not recognize a claimant's representative who is a convicted felon.

The Disability Board will decide a claim within 90 days of the date on which the claim is filed in accordance with the Plan's claim filing procedures, unless special circumstances (such as the need to obtain further clarifying information) require a longer period for adjudication and the claimant is notified in writing, prior to the expiration of the 90-day period, of the reasons for an extension of time and the expected decision date; provided, however, that no extensions will be permitted beyond 90 days after the expiration of the initial 90-day period. If the Disability Board fails to notify the claimant of its decision to grant or deny such claim within the time specified by this paragraph, the claimant may deem such claim to have been denied by the Disability Board and the review procedure described below will become available to the claimant.

If a claim is denied, in whole or in part, the claimant must receive a written notice. The notice of an adverse determination will be written in a manner calculated to be understood by the claimant and will set forth the following:

(1)     the specific reason(s) for the denial;

(2)     a reference to the specific Plan provision on which the denial is based;

(3)     a description of additional information necessary for the claimant to perfect his claim, and the reasons such material or information is necessary; and

(4)     an explanation of the Plan's procedure for review of the denied or partially denied claim set forth below, including the claimant's right to bring a civil action under ERISA section 502(a) following an adverse determination on review.

The claimant will have 60 days from the receipt of an adverse determination to request in writing a review of the denial of his claim by the Disability Board, which will provide a full and fair review.

The claimant or his duly authorized representative will have, upon request and free of charge, reasonable access to, and copies of all, documents, records, and other information relevant to the claimant's claim for benefits, and may submit issues and comments in writing. The review will take into account all available information submitted to the Disability Board, regardless of whether such information was submitted or considered in the initial benefit determination. The decision by the Disability Board with respect to the review will be made no later than the date of the Disability Board meeting following the Plan's receipt of the claimant's request for review; unless the request for review is received within 30 days preceding the date of such meeting, in which case, a decision will be made no later than the date of the second Disability Board meeting following the Plan's receipt of the claimant's request for review. Notwithstanding the preceding sentence, if special circumstances (such as the need to obtain further clarifying information) require further extension of time in order for the Disability Board

64

**JO-00069**

NFL_ALFORD-0000372

to make a decision with respect to the review, a decision will be made no later than the third Disability Board meeting following the Plan's receipt of the claimant's request for review, and the claimant will be notified in writing, prior to the end of the initial review period, of the reasons for the extension and the expected decision date.

The claimant will be notified of the results of the review in writing after the determination.  Any notification of an adverse determination on review will:

(1)     state the specific reason(s) for the adverse determination;

(2)     reference the specific Plan provisions on which the adverse determination is based;

(3)     state that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits; and

(4)     state that the claimant has the right to bring a civil action under ERISA section 502(a).

65

**JO-00070**

## APPENDIX A, VERSION 2

## Point System for Orthopedic Impairments

### Introduction

This Point System for Orthopedic Impairments ("Point System") is used to determine whether a Player has a "substantial disablement" within the meaning of Plan Section 5.5(a)(4)(B). The Point System assigns points to each orthopedic impairment recognized under the Plan. A Player is awarded the indicated number of points for each occurrence of each listed orthopedic impairment, but only where the Player's orthopedic impairment arose out of League football activities, and the impairment has persisted or is expected to persist for at least 12 months from the date of its occurrence, excluding any reasonably possible recovery period.

A Player is awarded points only if his orthopedic impairment is documented according to the following rules:

1.   A Player is awarded points for documented surgeries, injuries, and degenerative joint disease only if they are related to League football activities.

2.   A Player is awarded points for a surgical procedure if the record includes an operative report for the qualifying procedure or if NFL Club records document the procedure. Surgical procedures reported through third party evaluations, such as independent medical examinations for workers' compensation, should not be used unless corroborating evidence is available to confirm the procedure and its relationship to League football activities.

3.   Points are awarded for symptomatic soft tissue injuries where the injury is documented and there are appropriate, consistent clinical findings that are symptomatic on the day of exam. For example, AC joint injuries must be documented in medical records and be symptomatic on examination, with appropriate physical findings, to award points.

4.   If an injury or surgery is not listed in the Point System, no points should be awarded.

5.   Medical records, medical history, and the physical examination must correlate before points can be awarded.

6.   If a lateral clavicle resection is given points, additional points cannot be awarded if the AC joint is still symptomatic, such as with AC joint inflammation or shoulder instability.

7.   Moderate or greater degenerative changes must be seen on x-ray to award points (i.e., MRI findings do not count).

66

**JO-00071**

NFL_ALFORD-0000374

8.     Players must have moderate or greater loss of function that significantly impacts activities of daily living, or ADLs, to get points.

9.     Cervical and lumbosacral spine injuries must have a documented relationship to League football activities, with appropriate x-ray findings, MRI findings, and/or EMG findings to be rated.

10.    In cases where an injury is treated surgically, points are awarded for the surgical treatment/repair only, and not the injury preceding the surgical treatment/repair.  For example, a Player may receive points for "S/P Pectoralis Major Tendon Repair," and if so he will not receive additional points for the "Pectoralis Major Tendon Tear" that led to the surgery.

11.    As indicated in the Point System Impairment Tables, some injuries must be symptomatic on examination to merit an award of points under the Point System.

12.    To award points for a subsequent procedure on the same joint/body part, the Player must recover from the first procedure and a new injury must occur to warrant the subsequent procedure.  Otherwise, a revise/redo of a failed procedure would be the appropriate impairment rating.

13.    Hardware removal is not considered a revise/redo of a failed surgery, and points are not awarded for hardware removal.

14.    Multiple impairment ratings may be given related to a procedure on the same date, i.e., partial lateral meniscectomy and microfracture or chondral resurfacing.

15.    When an ankle ORIF with soft tissue occurs, there should be no additional points for syndesmosis repair or deltoid ligament repair.

The Point System Impairment Tables are organized as follows:

- Cervical Spine
- Thoracic Spine
- Lumbar Spine
- Shoulder
- Elbow
- Wrist
- Hand
- Hip
- Knee
- Ankle
- Foot

67

**JO-00072**

NFL_ALFORD-0000375

## POINT SYSTEM IMPAIRMENT TABLES

| Cervical Spine Impairment | Point Value |
|---|---|
| Documented Herniated Cervical Nucleus Pulposus With Radiculopathy (Does Not Include Disc Bulges Or Disc Protrusions) | 5 |
| Documented Cervical Radiculopathy With EMG And MRI, Supported By Findings Observed During Clinical Examination | 5 |
| Symptomatic Cervical Spondylolisthesis Grade I Or II | 5 |
| Symptomatic Cervical Spondylolisthesis Grade III Or IV | 7 |
| Cervical Compression Fracture With Greater Than 50% Compression Without Neurological Symptoms | 8 |
| Cervical Compression Fracture With Greater Than 50% Compression With Neurological Symptoms | 10 |
| Cervical Stress Fracture With Spondylolysis | 3 |
| S/P Cervical Disc Excisions | 3 |
| S/P Cervical Fusion - Single Level | 5 |
| S/P Cervical Fusion – Multiple Levels (add one point for each additional level of cervical fusion) | 2 levels = 6 points, 3 levels = 7 points, etc. |
| Each surgical procedure to revise or redo a failed Cervical Spine Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Symptomatic Documented Acute Unstable Cervical Spine Fracture Treated Non-Surgically | 3 |

68

**JO-00073**

NFL_ALFORD-0000376

| Thoracic Spine Impairment | Point Value |
|---|---|
| Documented Herniated Thoracic Nucleus Pulposus With Radiculopathy (Does Not Include Disc Bulges Or Disc Protrusions) | 5 |
| Thoracic Compression Fracture With Greater Than 50% Compression | 5 |
| S/P Thoracic Disc Excisions | 3 |
| S/P Thoracic Fusion - Single Level | 5 |
| S/P Thoracic Fusion – Multiple Levels (add one point for each additional level of thoracic fusion) | 2 levels = 6 points, 3 levels = 7 points, etc. |
| Each surgical procedure to revise or redo a failed Thoracic Spine Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Symptomatic Documented Acute Unstable Thoracic Spine Fracture Treated Non-Surgically | 3 |

69

**JO-00074**

NFL_ALFORD-0000377

| Lumbar Spine Impairment | Point Value |
|---|---|
| Documented Herniated Lumbar Nucleus Pulposus With Radiculopathy (Does Not Include Disc Bulges Or Disc Protrusions) | 5 |
| Documented Lumbar Radiculopathy With EMG And MRI, Supported By Findings Observed During Clinical Examination | 5 |
| Symptomatic Lumbar Spondylolisthesis Grade I Or II | 5 |
| Symptomatic Lumbar Spondylolisthesis Grade III Or IV | 7 |
| Lumbar Compression Fracture With Greater Than 50% Compression Without Neurological Symptoms | 8 |
| Lumbar Compression Fracture With Greater Than 50% Compression With Neurological Symptoms | 10 |
| Lumbar Stress Fracture With Spondylolysis | 3 |
| S/P Lumbar Disc Excisions | 3 |
| S/P Lumbar Fusion - Single Level | 5 |
| S/P Lumbar Fusion – Multiple Levels (add one point for each additional level of lumbar fusion) | 2 levels = 6 points, 3 levels = 7 points, etc. |
| Each surgical procedure to revise or redo a failed Lumbar Spine Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Symptomatic Documented Acute Unstable Lumbar Spine Fracture Treated Non-Surgically | 3 |

70

**JO-00075**

NFL_ALFORD-0000378

| Shoulder Impairment | Point Value |
|---|---|
| S/P Subacromial Decompression | 1 |
| S/P Lateral Clavicle Resection | 2 |
| S/P Pectoralis Major Tendon Repair | 2 |
| S/P Longhead Biceps Tenodesis Or Tenotomy | 2 |
| S/P  Arthroscopic Stabilization Procedure with or without SLAP Repair | 3 |
| S/P Rotator Cuff Repair With Or Without Subacromial Decompression | 3 |
| S/P Total Shoulder Arthroplasty | 5 |
| Each surgical procedure to revise or redo a failed Shoulder Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Symptomatic Acromioclavicular Joint Inflammation | 2 |
| Longhead Biceps Tendon Tear | 1 |
| Suprascapular Nerve Injury | 1 |
| Symptomatic Rotator Cuff Tendon Tear | 2 |
| Symptomatic Shoulder Instability | 3 |
| Pectoralis Major Tendon Tear | 2 |
| Glenohumeral Joint Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 3 |
| Loss Of Functional Range Of Motion - Moderate Or Greater (i.e., loss of motion that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 2 |
| S/P ORIF Humerus Fracture | 2 |
| S/P Axillary Nerve Release | 1 |
| S/P Open Stabilization Procedure | 4 |
| S/P ORIF - Clavicle | 2 |
| S/P ORIF - Scapula | 2 |

71

**JO-00076**

Confidential Information

NFL_ALFORD-0000379

| Elbow Impairment | Point Value |
|---|---|
| S/P Distal Biceps Tendon Repair | 3 |
| S/P Radial Head Excision | 3 |
| S/P Ulnar Collateral Ligament Repair/Reconstruction | 3 |
| S/P Radial Collateral Ligament Repair/Reconstruction | 3 |
| S/P Arthroscopy - Excision Of Bone Spurs, Removal Of Loose Bodies, Or Chondroplasty | 3 |
| S/P Total Elbow Arthroplasty | 3 |
| S/P Distal Triceps Tendon Repair | 3 |
| S/P Repair Of Medial And Lateral Epicondylitis | 1 |
| Each surgical procedure to revise or redo a failed Elbow Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Symptomatic Complete Ulnar Or Radial Collateral Ligament Tear | 3 |
| Triceps Tendon Tear | 3 |
| Distal Biceps Tendon Tear | 3 |
| Peripheral Nerve Injury – Moderate Or Greater (i.e., nerve injury that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 1 |
| Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 3 |
| Loss Of Functional Range Of Motion - Moderate Or Greater (i.e., loss of motion that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 2 |
| S/P ORIF Radius And/Or Ulna Fracture | 2 |
| S/P Posterior Interosseus Nerve Release | 1 |
| S/P Ulnar Nerve Release Or Transposition | 1 |
| S/P Radial Nerve Release | 1 |

**JO-00077**

Confidential Information

NFL_ALFORD-0000380

| Wrist Impairment | Point Value |
|---|---|
| S/P ORIF - Scaphoid | 2 |
| S/P ORIF - Distal Radius | 2 |
| S/P Scapholunate Ligament Repair | 2 |
| S/P Flexor Tendon Repair | 2 |
| S/P Extensor Tendon Repair | 2 |
| S/P Total Wrist Arthroplasty Or Fusion | 3 |
| Each surgical procedure to revise or redo a failed Wrist Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Wrist Instability On Clinical Examination - Moderate Or Greater (i.e., instability that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 2 |
| Loss Of Functional Range Of Motion - Moderate Or Greater (i.e., loss of motion that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.) | 2 |
| S/P Carpal Tunnel Release | 2 |
| Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 3 |
| S/P TFCC Repair | 2 |

73

**JO-00078**

NFL_ALFORD-0000381

| Hand Impairment | Point Value |
|---|---|
| S/P Thumb Amputation | 4 |
| S/P Hand Arthroplasty | 3 |
| S/P Finger Amputation | 2 |
| S/P ORIF - Metacarpal Or Phalanx Fracture | 1 |
| S/P Ulnar Collateral Ligament Repair | 1 |
| S/P Radial Collateral Ligament Repair | 1 |
| Each surgical procedure to revise or redo a failed Hand Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Mediolateral Ligamentous Instability - Moderate Or Greater (i.e., instability that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 1 |
| Decreased Range Of Thumb Motion Resulting In Loss Of Grip Or Pinch Strength - Moderate Or Greater (i.e., loss of grip or pinch strength that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 2 |
| Decreased Range Of Finger Motion Resulting In Loss Of Grip Or Pinch Strength - Moderate Or Greater (i.e., loss of grip or pinch strength that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 1 |

74

**JO-00079**

NFL_ALFORD-0000382

| Hip Impairment | Point Value |
|---|---|
| S/P Total Hip Arthroplasty | 5 |
| S/P  Arthroscopic Hip Procedure Including Labral Repair, Debridement, Removal Of Loose Bodies, or Chondroplasty | 3 |
| S/P ORIF - Acetabular Fracture | 3 |
| S/P ORIF - Hip Fracture | 3 |
| S/P ORIF - Femur Fracture | 3 |
| Each surgical procedure to revise or redo a failed Hip Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Acetabular Fracture - Closed Treatment | 2 |
| Hip Fracture - Closed Treatment | 2 |
| Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 3 |
| Loss Of Functional Range Of Motion - Moderate Or Greater (i.e., loss of motion that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.) | 3 |
| S/P Athletic Pubalgia Repair, Sports Hernia Repair, Or Adductor Release | 2 |
| S/P Proximal Hamstring Repair | 2 |

75

**JO-00080**

NFL_ALFORD-0000383

| Knee Impairment | Point Value |
|---|---|
| S/P Total Knee Arthroplasty | 5 |
| S/P Unicompartment Knee Arthroplasty | 4 |
| S/P Patellectomy | 4 |
| S/P ACL Or PCL Reconstruction | 4 |
| S/P ACL Or PCL Reconstruction With Partial Meniscectomy(ies) Or Meniscal Repair(s) | 6 |
| S/P ACL Or PCL Reconstruction With Partial Meniscectomy(ies) Or Meniscal Repair(s) And Microfracture Or Chondral Resurfacing | 7 |
| S/P ACL Or PCL Reconstruction With Microfracture Or Chondral Resurfacing | 6 |
| S/P ORIF - Patella Fracture | 3 |
| S/P ORIF - Tibial Plateau Fracture | 3 |
| S/P ORIF - Distal Femur Fracture | 3 |
| S/P Arthroscopy - Microfracture Or Chondral Resurfacing | 3 |
| S/P Posterolateral Corner Reconstruction | 3 |
| S/P Posterolateral Corner Reconstruction With Partial Meniscectomy(ies) Or Meniscal Repair(s) | 5 |
| S/P Posterolateral Corner Reconstruction With Microfracture or Chondral Resurfacing | 5 |
| S/P Posterolateral Corner Reconstruction With Partial Meniscectomy(ies) Or Meniscal Repair(s) And Microfracture Or Chondral Resurfacing | 6 |
| S/P Patellar Tendon Repair | 3 |
| S/P Quadriceps Tendon Repair | 3 |
| S/P Arthroscopy - Partial Lateral Or Medial Meniscectomy(ies) Or Meniscal Repair(s) | 2 |
| S/P MCL Or LCL Repair | 2 |
| S/P MCL Or LCL Repair With Partial Meniscectomy(ies) Or Meniscal Repair(s) | 3 |
| S/P MCL Or LCL Repair With Microfracture Or Chondral Resurfacing | 3 |
| S/P MCL Or LCL Repair With Partial Meniscectomy(ies) Or Meniscal Repair(s) And Microfracture Or Chondral Resurfacing | 4 |
| Each surgical procedure to revise or redo a failed Knee Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Symptomatic ACL Or PCL tear | 3 |
| Patellar Instability | 2 |

**JO-00081**

Confidential Information

NFL_ALFORD-0000384

| | |
|---|---|
| Quadriceps, Hamstring, Adductor, Or Gastroc/Soleus Tear With Residual Weakness - Moderate Or Greater (i.e., weakness that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 2 |
| Peripheral Nerve Injury – Moderate Or Greater (i.e., nerve injury that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 1 |
| Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 3 |
| Loss Of Functional Range Of Motion - Moderate Or Greater (i.e., loss of motion that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 3 |
| S/P Arthroscopy – Chondroplasty Not Performed With Other Procedures) | 1 |
| S/P MCL Or LCL Reconstruction | 3 |
| S/P MCL Or LCL Reconstruction With Partial Meniscectomy(ies) Or Meniscal Repair(s) | 4 |
| S/P MCL Or LCL Reconstruction With Microfracture Or Chondral Resurfacing | 4 |
| S/P MCL Or LCL Reconstruction With Partial Meniscectomy(ies) Or Meniscal Repair(s) And Microfracture Or Chondral Resurfacing | 5 |
| S/P Peroneal Nerve Release | 1 |
| S/P Arthroscopy – Chondroplasty With Lateral Release | 2 |
| S/P Patella Stabilization | 3 |
| Symptomatic MCL Tear with Moderate Or Greater Instability | 2 |
| Symptomatic LCL Tear | 2 |

**JO-00082**

Confidential Information

NFL_ALFORD-0000385

| Ankle Impairment | Point Value |
|---|---|
| S/P Ankle Fusion | 5 |
| S/P ORIF - Ankle Fracture With Or Without Soft Tissue Repair | 3 |
| S/P Arthroscopy - Chondroplasty And Microfracture Or Chondral Resurfacing | 3 |
| S/P Achilles Tendon Repair | 3 |
| S/P Lateral Ligament Repair Or Reconstruction | 3 |
| S/P Deltoid Ligament Repair Or Reconstruction | 3 |
| S/P Arthroscopy - Excision Of Spurs For Impingement | 3 |
| Closed Or Open Treatment Of Subtalar Dislocation | 2 |
| S/P Posterior Tibial Tendon Repair | 2 |
| S/P Tibialis Anterior Tendon Repair | 2 |
| S/P Peroneal Tendon Repair | 2 |
| S/P Tibial Intramedullary Nail Fixation Or ORIF | 2 |
| S/P Arthroscopy - Chondroplasty And Removal Of Loose Bodies | 2 |
| S/P Excision Of Os Trigonum | 1 |
| Each surgical procedure to revise or redo a failed Ankle Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Posterior Tibial Tendon Insufficiency | 3 |
| Tibialis Anterior Tendon Insufficiency | 3 |
| Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 3 |
| Loss Of Functional Range of Motion - Moderate Or Greater (i.e., loss of motion that significantly impairs the Player's ability to perform normal activities of daily living (bathing, grooming, dressing, driving, etc.)) | 3 |
| S/P Syndesmosis Repair | 2 |
| S/P Tarsal Tunnel Release | 1 |

78

**JO-00083**

NFL_ALFORD-0000386

| Foot Impairment | Point Value |
|---|---|
| S/P Subtalar Fusion | 5 |
| S/P Great Toe Amputation | 4 |
| S/P Lisfranc Joint Fusion | 4 |
| S/P ORIF - Lisfranc Injury | 3 |
| S/P ORIF - Navicular Fracture | 3 |
| S/P ORIF - Talus Fracture | 3 |
| S/P ORIF - Calcaneus Fracture | 3 |
| S/P ORIF - Metatarsal Fracture | 2 |
| S/P Great Toe Fusion | 2 |
| S/P Lesser Toe Amputation | 2 |
| S/P Plantar Fascial Release | 1 |
| S/P Cheilectomy | 1 |
| Each surgical procedure to revise or redo a failed Foot Surgery (i.e., procedure that did not achieve intended results) | 1 |
| Hallux Rigidus - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 1 |
| Hind-Foot Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 2 |
| Mid-Foot Degenerative Joint Disease - Moderate Or Greater (i.e., significant loss of joint space as confirmed by clinical examination and x-ray) | 2 |
| S/P Morton's Neuroma Excision | 1 |
| S/P Sesamoid Excision | 1 |

**JO-00084**

Confidential Information

NFL_ALFORD-0000387

## EXECUTION

**IN WITNESS WHEREOF,** the Management Council and the NFLPA have caused this NFL Player Disability & Survivor Benefit Plan, restated as of April 1, 2021, to be executed.

NATIONAL FOOTBALL LEAGUE
MANAGEMENT COUNCIL

By: _Belinda Lerner_

Date: _VP, NFL Collectively Bargained Benefits_

_8/17/2021_

NATIONAL FOOTBALL LEAGUE
PLAYERS ASSOCIATION

By: _Michele Yazus-Dias_

Date: _17 Aug 2021_

80

**JO-00085**

Confidential Information

NFL_ALFORD-0000388

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## FIRST AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended effective April 1, 2021, as follows:

1. Article 7A is amended by adding the following new Section 7A.5 to the end thereof:

    **7A.5    Miscreant Rule.**  No benefits otherwise payable under this Article on behalf of a Player will be paid to a person who is convicted, pleads guilty, or pleads no contest in connection with the death of such Player. Any benefits paid under this Article will be determined as if such person does not exist.

\*          \*          \*          \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this First Amendment to be executed.  This First Amendment may be executed in counterparts.

By: _____    By: _____
NFL Management Council                    NFL Players Association

Date: __11/9/2021__                    Date: __11-4-21__

1

**JO-00086**

Confidential Information                    NFL_ALFORD-0000389

**NFL Player Disability & Survivor Benefit Plan**

**Second Amendment**

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended as of April 1, 2021, as follows:

1. Section 3.3(c)(1) is amended by adding the following at the end thereof: "In the event the Disability Board makes a tentative decision at a quarterly meeting followed by a final decision by mail ballot, the date of the tentative decision will be deemed to be the date of the final denial for purposes of this subsection."

2. Section 5.4(f)(1) is amended by adding the following at the end thereof: "In the event the Disability Board makes a tentative decision at a quarterly meeting followed by a final decision by mail ballot, the date of the tentative decision will be deemed to be the date of the final denial for purposes of this subsection."

3. Section 6.2(g)(1) is amended by adding the following at the end thereof: "In the event the Disability Board makes a tentative decision at a quarterly meeting followed by a final decision by mail ballot, the date of the tentative decision will be deemed to be the date of the final denial for purposes of this subsection."

4. Section 9.5 is amended by replacing the second sentence with the following:

   "At the request of a member of the Disability Initial Claims Committee, the Disability Initial Claims Committee will reconsider any decision it has made, but cannot overturn a prior decision of the Disability Board when it does so."

5. Section 13.14(a) is amended by adding the following at the end of the paragraph that begins "The claimant will have the opportunity to submit written comments, documents, and other information in support of the request for review . . .":

   "The Disability Board will not terminate or reduce a Player's benefit in cases where the Player was awarded the benefit by the Disability Initial Claims Committee and on appeal from that decision, he asks the Disability Board to review his benefit category under Section 3.4(a)-(d) or Section 6.2(a)-(b), including any such appeal that requires review by a Medical Advisory Physician under section 9.3(a). Nothing in the prior sentence shall limit the Disability Board's authority to terminate or reduce a Player's benefits in any situation other than the specific appeal described in the prior sentence, in accordance with Section 3.8 or as otherwise provided under the terms of the Plan."

6. Section 9.6 is amended by replacing the last sentence thereof with the following:

   "Notwithstanding the foregoing, (1) in situations where the designated health care professional determines that the medical evidence is either inconclusive or insufficient, he or

**JO-00087**

NFL_ALFORD-0000390

she will abstain from voting resulting in the 'deemed denial' becoming the final decision of the Disability Initial Claims Committee, and (2) such health care professional shall not cast the deciding vote where members of the Disability Initial Claims Committee agree that the Player is eligible for a benefit, but disagree as to the category under Section 3.4(a)-(d) or Section 6.2(a)-(b)."

\*          \*          \*          \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Second Amendment to be executed.  This Second Amendment may be executed in counterparts.

By: ___Miki Yaras-Davis_____     By: _____
     NFL Players Association                          NFL Management Council

Date: _March 29, 2022_____     Date: _____

**JO-00088**

Confidential Information

NFL_ALFORD-0000391

she will abstain from voting resulting in the 'deemed denial' becoming the final decision of the Disability Initial Claims Committee, and (2) such health care professional shall not cast the deciding vote where members of the Disability Initial Claims Committee agree that the Player is eligible for a benefit, but disagree as to the category under Section 3.4(a)-(d) or Section 6.2(a)-(b)."

\*        \*        \*        \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Second Amendment to be executed.  This Second Amendment may be executed in counterparts.

By: _____

NFL Players Association

Date: _____

By: _____

NFL Management Council

Date: March 31, 2022 _____

**JO-00089**

Confidential Information

NFL_ALFORD-0000392

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN

### THIRD AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended as of April 1, 2022, as follows:

Section 6.1(k) is amended in its entirety to read as follows:

(k)    If the Player is not a Vested Inactive Player, his application for the NC benefit must be received by the Plan within eighty-four (84) months after he ceases to be an Active Player.

\*                 \*                 \*                 \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Third Amendment to be executed.  This Third Amendment may be executed in counterparts.

By: _Miki Yaras-Davis_____     By: _____
　　　NFL Players Association                              NFL Management Council

Date: _May 9, 2022_____     Date: _____

**JO-00090**

                                        NFL_ALFORD-0000393

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN

## THIRD AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended as of April 1, 2022, as follows:

Section 6.1(k) is amended in its entirety to read as follows:

(k)    If the Player is not a Vested Inactive Player, his application for the NC benefit must be received by the Plan within eighty-four (84) months after he ceases to be an Active Player.

\*            \*            \*            \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Third Amendment to be executed.  This Third Amendment may be executed in counterparts.

By: _____          By: _____
    NFL Players Association                          NFL Management Council

Date: _____          Date: _____May 10, 2022_____

**JO-00091**

Confidential Information

# NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN

## FOURTH AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended as of April 1, 2022, as follows:

1. Section 5.4(a) is amended by replacing reference to "Disability Board" with "Plan."

2. Section 5.4(f)(2)(iv) is amended by replacing the "." at the end of that subsection with "; or"

3. Section 5.4(f)(2) is amended by adding the following new subsection (v) to the end thereof:

   (v)    The Player submits a subsequent application for line-of-duty disability benefits after his previous application for line-of-duty disability benefits was denied because he was an Active Player.

4. Section 7.1 is amended in its entirety to read as follows:

   **7.1        One Application At a Time.**  At any time, a Player may have only one application pending for disability benefits under this Plan or the Bert Bell/Pete Rozelle Plan. Subject to the rules relating to serial applications, a Player may apply for T&P benefits, line-of-duty disability benefits, or NC benefits individually, or in any combination of the three simultaneously, but once an application for disability benefits to either this Plan or the Bert Bell/Pete Rozelle Plan has been received, a Player may not apply for additional disability benefits until one of the following occurs:

   (a) such application was denied by the Disability Initial Claims Committee of this Plan or the Bert Bell/Pete Rozelle Plan and the time for appeal has expired;

   (b) his appeal was denied by the Disability Board or the Retirement Board of the Bert Bell/Pete Rozelle Plan and is not subject to further administrative review;

   (c) the Player withdraws the application in writing and in accordance with Sections 3.3(e), 5.4(i), or 6.2(i), as the case may be; or

   (d) the Player submits a subsequent application within the same calendar month as the initial application.  In this case, the Player will be deemed to have withdrawn his initial application and resubmitted it with the subsequent application, except that the initial application date will apply to the initial application for purposes of Sections 3.4(a), 3.4(b), 3.9(b), 5.4(a), and 6.1(k).

**JO-00092**

NFL_ALFORD-0000395

5. Section 9.8 is amended by replacing reference to "prudent man" with "prudent person."

\*              \*              \*              \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Fourth Amendment to be executed.  This Fourth Amendment may be executed in counterparts.

By: _____       By: _____
NFL Players Association                  NFL Management Council

Date: ___8-16-22___                   Date: ___8-16-22___

2

**JO-00093**

Confidential Information

NFL_ALFORD-0000396

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## FIFTH AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended as of April 1, 2022, as follows:

1. The term "Neutral Physician" is capitalized uniformly throughout the document.

2. Section 9.3 is amended in its entirety to read as follows:

### 9.3    Medical Issues and Disputes of the Disability Board.

(a)    <u>Medical Issues.</u>  Except as provided in subsection (b), if three or more voting members of the Disability Board conclude that a medical issue exists as to whether a Player qualifies for a benefit under this Plan, such members may submit such issue to a Medical Advisory Physician for a final and binding determination regarding such medical issues.

(b)    <u>Special Rules.</u>

(1) In cases involving T&P benefits where no Neutral Physician has determined that the Player meets the standard of Section 3.1(d), the case may be submitted to a Medical Advisory Physician under subsection (a) only if the following requirements are met:
    a. at least one Neutral Physician must fail to provide a definitive conclusion as to whether the Player has met the 3.1(d) standard;
    b. at least three members of the Disability Board must request that such Neutral Physician provide a definitive conclusion as to whether the Player meets the standards of Section 3.1(d); and
    c. upon further review, the Neutral Physician either (i) again fails to provide a definitive conclusion as to whether the Player meets the standards of Section 3.1(d), or (ii) then determines that the Player meets the standards of Section 3.1(d).

(2) In cases involving line-of-duty disability benefits where no Neutral Physician has determined that a Player meets the standards of Section 5.5(a) due to orthopedic impairments arising out of League football activities, a substantial rating difference must exist before the Disability Board is permitted to submit the case to a Medical Advisory Physician.  A substantial rating difference exists only when the Neutral Physicians award ratable points for different orthopedic impairments or award different ratable points for the same orthopedic impairments and, when added together, the combined ratings of the Neutral Physicians would meet the standard of Section 5.5(a).  In the case of a

**JO-00094**

NFL_ALFORD-0000397

rating difference involving the same orthopedic impairment, only the high rating will be counted for that orthopedic impairment.

Examples.

    i.  Neutral Physician 1 and Neutral Physician 2 both determine that Player qualifies for 3 points for a cervical stress fracture. Neutral Physician 1 determines that Player also qualifies for 3 points for a moderate or greater loss of functional range of motion in the hip and Neutral Physician 2 determines that Player also qualifies for 5 points for S/P total hip arthroplasty. Both Neutral Physicians determine that the orthopedic impairments that they rated meet the definitions in Section 5.5(b) and (c). This case presents a substantial rating difference because, added together, the combined total of ratable impairments equals 11, which meets the standard of Section 5.5(a)(4).

    ii.  Neutral Physician 1 and Neutral Physician 2 determine that the Player qualifies for 3 points for a cervical stress fracture. Neutral Physician 1 also determines that Player qualifies for 3 points for moderate or greater loss of functional range of motion in the hip, and Neutral Physician 2 reports that the Player also qualifies for 2 points for symptomatic acromioclavicular joint inflammation in the shoulder. Both Neutral Physicians determine that the orthopedic impairments that they rated meet the definitions in Section 5.5(b) and (c). This case does not present a substantial rating difference because, added together, the combined total of ratable impairments equals 8, which does not meet the standard of Section 5.5(a)(4).

(3) A Medical Advisory Physician acting under the provisions of this subsection (b) will be deemed to be a Neutral Physician for the limited purpose of satisfying Sections 3.1(d) or Section 5.1(c), as the case may be, and will retain the discretion, authority, and powers set forth in Section 9.3(c) in all other respects.

(c)    <u>Authority of the Medical Advisory Physician.</u> The Medical Advisory Physician will have full and absolute discretion, authority, and power to decide the medical issues submitted under subsection (a) or (b), and such determinations will be final and binding on the Disability Board. In the case of NC benefits, such determination will be based on the written evidence in the Player's file, and will not involve a new examination by the Medical Advisory Physician. In all other respects, including the

2

**JO-00095**

NFL_ALFORD-0000398

interpretation of this Plan and whether the claimant is entitled to benefits, the Disability Board will retain its full and absolute discretion, authority, and power under Article 9. If there is a question as to whether the Medical Advisory Physician properly applied the terms of the Plan, such as with respect to the standards for line-of-duty disability benefits, the Disability Board will have the right and duty to bring such questions to the attention of the Medical Advisory Physician. After all such questions have been addressed, the ultimate decision of the Medical Advisory Physician will be final and binding.

(d)    Benefits Disputes. If the voting members of the Disability Board are deadlocked with respect to a decision as to whether or to what extent any person is eligible for or entitled to benefits under this Plan, the Disability Board may by an affirmative vote of three voting members submit such dispute for final and binding arbitration in accordance with the procedures and practices in use prior to the 2020 CBA.

(e)    Other Disputes. If the voting members of the Disability Board are deadlocked for any other reason, the Disability Board may by an affirmative vote of three voting members submit such disputes to the Benefit Arbitrator for a final and binding determination in accordance with the procedures of the 2020 CBA.

(f)    Arbitration Procedures. For benefit disputes arising under this Section 9.3, any arbitrator selected to resolve a dispute must base his or her decision solely on the administrative record that was before the Disability Board, as may be supplemented by records that were in existence prior to the date the dispute is referred to the arbitrator. In addition, both parties to the arbitration are permitted to take depositions of any expert relied on by the other side based on the administrative record, as may be supplemented by records in existence prior to the date the dispute is referred to the arbitrator.

*         *         *         *

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Fifth Amendment to be executed. This Fifth Amendment may be executed in counterparts.

By: _____         By: _____
       NFL Players Association                              NFL Management Council

Date: 12-13-22                                             Date: 12/20/22

3

**JO-00096**

**NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN**

**SIXTH AMENDMENT**

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended effective as of the date this amendment is fully executed, unless otherwise noted, as follows:

1.    Effective for withdrawal requests received on and after January 30, 2023, Section 3.3(e) is amended in its entirety to read as follows:

(e)    <u>Withdrawal of Application or Appeal</u>.  A Player may withdraw an application pending before the Disability Initial Claims Committee or an appeal pending before the Disability Board subject to the following rules:

(1)    The withdrawal must be in writing.

(2)    A Player may not withdraw a pending application or appeal if, in connection with that application or appeal (as the case may be), he has already been evaluated by a Plan Neutral Physician or has failed to attend a medical examination in violation of the rules in Section 3.3(a).

(3)    A Player may withdraw an application or appeal that has been submitted to final and binding arbitration pursuant to Section 9.3(b), even if such application or appeal could not otherwise be withdrawn under Section 3.3(e)(2) above.

2.    Section 3.8 is amended to add new subsection (c) as follows:

(c)    <u>Temporary Suspension</u>.  The provisions of subsections (a) and (b) above are temporarily suspended as follows:

(1)    Players are not required to submit IRS Form 4506s as described in subsection (a) in calendar years 2020, 2021, 2022, and 2023, unless four or more voting members of the Disability Board vote in favor of requiring a Player to submit such form, and

(2)    Players are not required to submit proof of continued receipt of Social Security disability insurance program or Supplemental Security Income program benefits as described in subsection (b) in calendar years 2020, 2021, 2022, and 2023, unless four or more voting members of the Disability Board vote in favor of requiring a Player to submit such proof.

In all other respects, the provisions of subsections (a) and (b) remain in force in calendar years 2020, 2021, 2022, and 2023, including the requirement that Players must

**JO-00097**

NFL_ALFORD-0000400

attend medical examinations as requested by three or more voting members of the Disability Board as described in subsection (a).

In all cases, a Player's Plan T&P benefits will terminate if the Disability Board or the Disability Initial Claims Committee determines that such Player is no longer totally and permanently disabled.

3.      Effective for withdrawal requests received on and after January 30, 2023, Section 5.4(e) is amended in its entirety to read as follows:

(e)      <u>Withdrawal of Application or Appeal</u>.  A Player may withdraw an application pending before the Disability Initial Claims Committee or an appeal pending before the Disability Board subject to the following rules:

(1)      The withdrawal must be in writing.

(2)      A Player may not withdraw a pending application or appeal if, in connection with that application or appeal (as the case may be), he has already been evaluated by a Plan Neutral Physician or has failed to attend a medical examination in violation of the rules in Section 5.4(b).

(3)      A Player may withdraw an application or appeal that has been submitted to final and binding arbitration pursuant to Section 9.3(b), even if such application or appeal could not otherwise be withdrawn under Section 5.4(e)(2) above.

4.      Effective for withdrawal requests received on and after January 30, 2023, Section 6.2(i) is amended in its entirety to read as follows:

(i)      <u>Withdrawal of Application or Appeal</u>.  A Player may withdraw an application pending before the Disability Initial Claims Committee or an appeal pending before the Disability Board subject to the following rules:

(1)      The withdrawal must be in writing.

(2)      A Player may not withdraw a pending application or appeal if, in connection with that application or appeal (as the case may be), he has already been evaluated by a Plan Neutral Physician or has failed to attend a medical examination in violation of the rules in Section 6.2(d).

(3)      A Player may withdraw an application or appeal that has been submitted to final and binding arbitration pursuant to Section 9.3(b), even if such application or appeal could not otherwise be withdrawn under Section 6.2(i)(2) above.

2

**JO-00098**

                                                           NFL_ALFORD-0000401

\*          \*          \*          \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Sixth Amendment to be executed.  This Sixth Amendment may be executed in counterparts.

By: _Miki Yaras-Davis_____          By: _____
     NFL Players Association                                   NFL Management Council

Date: February 18, 2023_____          Date: _____

3

**JO-00099**

Confidential Information                                                      NFL_ALFORD-0000402

\*          \*          \*          \*

     **IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Sixth Amendment to be executed.  This Sixth Amendment may be executed in counterparts.

By: _____    By: _~Belinda Lerner~_____
       NFL Players Association                NFL Management Council

Date: _____    Date: 02/13/2023 _____

3

**JO-00100**

Confidential Information                                                                 NFL_ALFORD-0000403

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## SEVENTH AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended effective as of April 1, 2022, as follows:

1.    Section 7A.1(c) is amended in its entirety to read as follows:

(c)    **"Minor Child"** means a Player's child who is (1) born before the Player's death, (2) adopted by, or placed for adoption with the Player, before the Player's death, or (3) born within 43 weeks of a Player's death.

A child ceases to be a Minor Child upon attaining age 19 (or age 23 if in college), or continuously if the child has a mental or physical incapacity that started before age nineteen (or, age twenty-three if in college), and if, before reaching age 19 (or, age twenty-three if in college), the child (1) is eligible for and receives disability benefits under either the Social Security disability insurance program or Supplemental Security Income program due to such incapacity, or (2) is under a state law guardianship due to such incapacity.  Any benefits paid to a Minor Child solely because of Social Security disability benefits or a state law guardianship will cease upon revocation of such child's Social Security disability benefits or guardianship.

2.    A new Section 7A.1(h) is hereby added as follows:

(h)    **"Unborn Child"** means a deceased Player's unborn child of whom the Plan has been notified in writing and who, once born, will meet the definition of Minor Child.

3.    Section 7A.2(d)(2) is amended to read as follows:

(2)    second, to any Unborn Child or surviving Minor Children;

4.    Section 7A.2(e) is amended in its entirety to read as follows:

(e)    <u>Only One Priority Class.</u>

(1)    Except as provided in Section 7A.2(e)(2) and 7A.2(h), benefits will be paid to only one of the above classes of beneficiaries, according to the above order of priority, and once there are no members in that priority class who are eligible to receive benefits, no further benefits are payable under this Article 7A to persons in any other priority class.  For example, if there is a surviving Spouse or a surviving Minor Child

**JO-00101**

NFL_ALFORD-0000404

upon the death of the Player, then benefits under this Section 7A.2 will never be paid to any Adult Child of the Player, or to any Parent or Sibling of the Player.

(2)     Exceptions.

(i)     If benefits to a surviving Spouse cease under subsection (f)(1) because of the Spouse's death or remarriage, and there is at the time of such death or remarriage a Minor Child or Minor Children, then benefits will continue to be paid to such surviving Minor Child or Minor Children.

(ii)     If the sole priority class member is an Unborn Child, and that Unborn Child is not born alive, then the next surviving priority class is eligible to receive benefits under this Article. In such a case, benefits will be paid effective as of the date provided for in Section 7A.2(g)(1).

(iii)     If at least one benefit payment is not made to the members of a priority class because every member of the priority class dies before the first payment can be mailed or otherwise transmitted, the members of that priority class will be deemed to have predeceased the Player and benefits will be paid to the members of the next surviving priority class effective as of the date described in Section 7A.2(g)(1).

5.     Section 7A.2(g) is amended in its entirety to read as follows:

(g)     Beginning and Ending Months.

(1)     Benefits begin as of the first day of the month following the Player's death, except as provided in Section 7A.2(g)(2), below.

(2)     Benefits to an Unborn Child begin as of the first day of the month following the Unborn Child's birth date.

(3)     Where benefits cease because of death or remarriage, a full month's benefit will be paid for the month of such death or remarriage. Where benefits to a child cease because the child no longer meets the requirements for a Minor Child under Section 7A.1(c), a full month's benefit will be paid for the month in which the child ceases to be a Minor Child.

2

**JO-00102**

NFL_ALFORD-0000405

6.     Section 7A.2(h) is amended in its entirety to read as follows:

(h)    Recalculation of Benefits.

    (1)    Benefits will be divided equally among multiple members of a priority class for as long as each remains eligible for benefits.  For example, if benefits are paid to the Player's Parents, the benefit will be divided between the Parents.  If one Parent dies before the sixty (60) months of benefits cease, the full benefit will be paid to the then surviving Parent for the remainder of the sixty (60) months.

    (2)    If a beneficiary is determined to be eligible for benefits under this Article 7A after such benefits have commenced to another beneficiary or beneficiaries (either in the same Priority Class or in a Priority Class that would not have been eligible for benefits if the new beneficiary had been identified earlier), benefits will be adjusted prospectively only and will not be adjusted for payments already made.  Priority class members that were eligible for benefits before such redetermination may no longer be eligible to receive benefits after such redetermination.

7.     Section 7A.2(i) is amended in its entirety to read as follows:

(i)    <u>Special Rules for Minor Children</u>.

    (1)    Notwithstanding subsection (f)(2), a surviving Minor Child will receive or share in benefits under this Section 7A.2 for at least sixty (60) months, provided such child remains alive. For example, if a Player dies leaving no surviving Spouse but two surviving children, then aged 12 and 18, the $13,000 monthly benefit ($15,000 monthly benefits beginning April 2025) will be divided equally between them for sixty (60) months, assuming both remain alive. After sixty (60) months, if the child originally age 18 does not satisfy at that time the definition of a Minor Child in subsection 7A.1(c), the entire benefit, now reduced to $6,000 per month, will be paid to the child originally aged 12, for as long as that child remains a Minor Child. Any months for which benefits are paid to a surviving Spouse who later dies or remarries will be counted for purposes of this special rule as if the Minor Child had received the benefit for that month.

    (2)    Benefits under this Article will be divided pro rata among known Minor Children at the time of the Player's death, except that benefits will not be payable on account of an Unborn Child prior to the birth of the Unborn Child. Benefits will be recalculated pro rata among known Minor Children upon the birth of an Unborn Child or upon discovery of additional Minor Children prospectively only, and will not be adjusted for payments already made.

*      *      *      *

3

**JO-00103**

NFL_ALFORD-0000406

**IN WITNESS WHEREOF,** the NFL Players Association and the NFL Management Council have caused this Seventh Amendment to be executed.  This Seventh Amendment may be executed in counterparts.

By: _____    By: _____
NFL Players Association                NFL Management Council

Date: _____8-8-23_____    Date: _____8/08/23_____

4

**JO-00104**

Confidential Information

NFL_ALFORD-0000407

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## EIGHTH AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended effective as of April 1, 2023, as follows:

1.    Section 3.3(c)(1) is amended in its entirety to read as follows:

(1)    A Player whose claim for benefits under this Article has been denied and is not subject to further administrative review will be presumed conclusively to be not totally and permanently disabled under the provisions of Section 3.1 for twelve months following the date of such final denial, unless one of the exceptions below applies. In the event the Disability Board makes a tentative decision at a quarterly meeting followed by a final decision by mail ballot, the date of the tentative decision will be deemed to be the date of the final denial for purposes of this subsection. The denial of an application based in whole, or in part, because it is submitted before the expiration of the 12-month period does not restart the period

2.    Section 13.4 is amended in its entirety to read as follows:

**13.4    Limitations on Actions**. No suit or legal action with respect to an adverse determination may be commenced if either (a) the claimant has not exhausted the claims procedures described in Section 13.14 (including filing for and receiving a final determination from the Disability Board), or (b) more than 42 months have passed from the date of the final decision on the claim for benefits (including the decision on review).

3.    The thirteenth paragraph of Section 13.14(a) is amended to read as follows:

The claimant will have 180 days from the receipt of an adverse determination to file a written request for review of the initial decision to the Disability Board. A claimant must exhaust this appeal procedure before he is eligible to challenge an adverse determination in a lawsuit.

4.    The ninth paragraph of Section 13.14(b) is amended to read as follows:

The claimant will have 60 days from the receipt of an adverse determination to request in writing a review of the denial of his claim by the Disability Board, which will provide a full and fair review. A claimant must exhaust this appeal procedure before he is eligible to challenge an adverse determination in a lawsuit.

\*            \*            \*            \*

**JO-00105**

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Eighth Amendment to be executed.  This Eighth Amendment may be executed in counterparts.

By: _Michele Yoras-Otis_    By: _Belinda Lerner_
    NFL Players Association        NFL Management Council

Date: _11-7-23_    Date: _11-7-23_

2

**JO-00106**

NFL_ALFORD-0000409

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## NINTH AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended effective as of April 1, 2023, as follows:

1.    The first paragraph of Section 3.6(j) is amended to read as follows:

(j)    <u>SSDI Offset</u>.  Effective for applications received on or after April 1, 2024, through and including March 31, 2031, the monthly benefit otherwise payable to a Player who is receiving Plan T&P benefits in the Inactive A category of Section 3.4(c), and who receives Social Security Disability Insurance ("SSDI") benefits for that month, will be reduced, but not below zero, by the Social Security Disability Insurance offset ("SSDI Offset") below, except the SSDI Offset will not apply to such Player for any month in which, for all or part of that month, he is age 65 or older or is an 88 Eligible Player as defined in the 88 Plan, or for months after March 31, 2031.

2.    Section 4.2A is deleted in its entirety.

\*          \*          \*          \*

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Ninth Amendment to be executed.  This Ninth Amendment may be executed in counterparts.

By _Miki Yaras-Davis_____        By: _____
_____iation                        NFL Management Council

Date: _December 6, 2023_____        Date: _____

**JO-00107**

                                                        NFL_ALFORD-0000410

## NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN
## NINTH AMENDMENT

The NFL Player Disability & Survivor Benefit Plan, as amended and restated as of April 1, 2021, is hereby further amended effective as of April 1, 2023, as follows:

1.   The first paragraph of Section 3.6(j) is amended to read as follows:

(j)   <u>SSDI Offset</u>.  Effective for applications received on or after April 1, 2024, through and including March 31, 2031, the monthly benefit otherwise payable to a Player who is receiving Plan T&P benefits in the Inactive A category of Section 3.4(c), and who receives Social Security Disability Insurance ("SSDI") benefits for that month, will be reduced, but not below zero, by the Social Security Disability Insurance offset ("SSDI Offset") below, except the SSDI Offset will not apply to such Player for any month in which, for all or part of that month, he is age 65 or older or is an 88 Eligible Player as defined in the 88 Plan, or for months after March 31, 2031.

2.   Section 4.2A is deleted in its entirety.

*             *             *             *

**IN WITNESS WHEREOF**, the NFL Players Association and the NFL Management Council have caused this Ninth Amendment to be executed.  This Ninth Amendment may be executed in counterparts.

By: _____
    NFL Players Association

By: _____
    NFL Management Council

Date: _____

Date: __12/6/2023__

**JO-00108**

Confidential Information