**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-00358-JRR |
| THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF
DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT OF
PLAINTIFF JAMIZE OLAWALE'S CLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................................... 3

LEGAL STANDARD............................................................................................................ 12

ARGUMENT ........................................................................................................................ 13

    I.      THE BOARD DID NOT ABUSE ITS DISCRETION IN DETERMINING
           THAT MR. OLAWALE WAS NOT ENTITLED TO BENEFITS UNDER
           THE PLAN'S TERMS .................................................................................. 13

           A.      The Board's Decision Was Consistent With the Plan's Terms,
                      Which Are Plain and Unambiguous. ...................................................... 15

           B.      The Board's Decision Was Consistent with the Plan's Purposes
                      and Goals. .............................................................................................. 17

           C.      The Materials the Board Considered Were Adequate to Support Its
                      Decision. ................................................................................................ 17

           D.      The Remaining *Booth* Factors All Support Finding that the Board's
                      Decision Was Reasonable. ..................................................................... 23

    II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
           COUNT II BECAUSE THE DENIAL LETTERS SENT TO MR.
           OLAWALE COMPLY WITH ERISA'S CLAIMS PROCEDURES ................ 27

    III.    THE BOARD A CONDUCTED FULL AND FAIR REVIEW OF MR.
           OLAWALE'S BENEFITS CLAIM.................................................................... 29

    IV.    MR. OLAWALE'S ALLEGATIONS OF BREACH OF FIDUCIARY
           DUTY FALL FAR SHORT OF CREATING A TRIABLE ISSUE OF
           FACT ............................................................................................................ 30

CONCLUSION.................................................................................................................... 30

i

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Balkin v. Unum Life Ins. Co.*,
    2024 WL 1346789 (D. Md. Mar. 29, 2024)............................................................. 22

*Bidwell v. Garvey*,
    743 F. Supp. 393 (D. Md. 1990) ....................................................................... 30

*Blackshear v. Reliance Standard Life Ins. Co.*,
    509 F.3d 634 (4th Cir. 2007) ........................................................................... 16

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*,
    201 F.3d 335 (4th Cir. 2000) .................................................................... passim

*Boyce v. Eaton Corp. Long Disability Plan*,
    2017 WL 3037392 (W.D.N.C. July 18, 2017)..................................................... 26

*Boyd v. Bell*,
    796 F. Supp. 2d 682 (D. Md. 2011)........................................................... 13, 26

*Brown v. Covestro LLC Welfare Benefits Plan*,
    2023 WL 8481914 (W.D. Pa. Nov. 15, 2023) *R&R adopted*, 2023 WL
    8481352 (W.D. Pa. Dec. 7, 2023)..................................................................... 27

*Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*,
    919 F.3d 763 (4th Cir. 2019) ........................................................................... 24

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 324 (1986).................................................................................. 12

*Chao v. Malkani*,
    452 F.3d 290 (4th Cir. 2006) ........................................................................... 30

*Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*,
    2018 WL 4052182 ........................................................................................... 29

*CIGNA Corp. v. Amara*,
    563 U.S. 421 (2011)......................................................................................... 17

*Colucci v. Agfa Corp. Severance Pay Plan*,
    431 F.3d 170 (4th Cir. 2005) *abrogated on other grounds by Champion v.*
    *Black & Decker (U.S.) Inc.*, 550 F.3d 353, 355 (4th Cir. 2008) .............. 15, 16, 26

*Cosey v. Prudential Ins. Co. of Am.*,
    735 F.3d 161 (4th Cir. 2013) ........................................................................... 14

*Courson v. Bert Bell NFL Player Ret. Plan*,
    75 F. Supp. 2d 424 (W.D. Pa. 1999), *aff'd*, 214 F.3d 136 (3d Cir. 2000) ............. 26

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
    487 F. Supp. 3d 807 (N.D. Cal. 2020) *aff'd and remanded on other grounds*,
    855 F. App'x 332 (9th Cir. 2021)...................................................................... 25

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Donnell v. Metro. Life Ins. Co.*,
  165 F. App'x 288 (4th Cir. 2006), *aff'd*, 584 F. App'x 109 (4th Cir. 2014) ........................ 18

*Elliott v. Sara Lee Corp.*,
  190 F.3d 601 (4th Cir. 1999) ........................................................................................ 19, 20

*Evans v. Eaton Corp. Long Term Disability Plan*,
  514 F.3d 315 (4th Cir. 2008) ........................................................................................ 14, 17

*Everette v. Liberty Life Assurance Co. of Bos.*,
  2017 WL 2829673 (D. Md. June 29, 2017) .......................................................................... 26

*Firestone Tire & Rubber Co. v. Bruch*,
  489 U.S. 101 (1989) ...................................................................................................... 13, 15

*Fortier v. Principal Life Ins. Co.*,
  666 F.3d 231 (4th Cir. 2012) ............................................................................................... 25

*Friz v. J&H Marsh & McLennan, Inc.*,
  2 F. App'x 277 (4th Cir. 2001) ....................................................................................... 17, 24

*Garner v. Cent. States, Se. & Sw. Areas Health & Welfare Fund Active Plan*,
  31 F.4th 854 (4th Cir. 2022) ................................................................................................ 24

*Geddes v. United Staffing All. Emp. Med. Plan*,
  469 F.3d 919 (10th Cir. 2006) ............................................................................................. 24

*Geiger v. Zurich Am. Ins. Co.*,
  72 F.4th 32 (4th Cir. 2023) ............................................................................................ 13, 14

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  925 F. Supp. 2d 700 (D. Md. 2012) ......................................................................... 14, 15, 26

*Gregg v. Transp. Workers of Am. Int'l*,
  343 F.3d 833 (6th Cir. 2003) ............................................................................................... 24

*Hall v. Standard Ins. Co.*,
  2005 WL 348266 (W.D. Va. Feb. 10, 2005) ......................................................................... 26

*Harrison v. Wells Fargo Bank, N.A.*,
  773 F.3d 15 (4th Cir. 2014) ................................................................................................. 14

*Hayes v. Prudential Ins. Co. of Am.*,
  60 F.4th 848 (4th Cir. 2023) ................................................................................................ 13

*Hilton v. Unum Life Ins. Co. of Am.*,
  967 F. Supp. 2d 1114 (E.D. Va. 2013) ................................................................................. 24

*Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  468 F.3d 1082 (8th Cir. 2006) ............................................................................................. 25

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

*Kane v. UPS Pension Plan Bd. of Trustees*,
  2013 WL 6502874 (D. Md. Dec. 11, 2013)................................................... 18

*Kress v. Food Emps. Lab. Rels. Ass'n*,
  391 F.3d 563 (4th Cir. 2004) ........................................................................ 17

*Metro. Life Ins. Co. v. Glenn*,
  554 U.S. 108 (2008)....................................................................................... 25

*Mid Atl. Med. Servs., LLC v. Sereboff*,
  407 F.3d 212 (4th Cir. 2005), *aff'd*, 547 U.S. 356 (2006) ......................... 15

*Morris v. Nat'l Football League Ret. Bd.*,
  833 F. Supp. 2d 1374 (S.D. Fla. 2011) *aff'd*, 482 F. App'x 440 (11th Cir.
  2012) ............................................................................................................... 26

*Mullins v. AT&T Corp.*,
  424 F. App'x 217 (4th Cir. 2011) ................................................................. 23

*Pender v. Bank of Am. Corp.*,
  788 F.3d 354 (4th Cir. 2015) ........................................................................ 17

*Ricci v. DeStefano*,
  557 U.S. 557 (2009)........................................................................................ 12

*Schkloven v. Hartford Life & Accident Ins. Co.*,
  2022 WL 2869266 (D. Md. July 21, 2022).............................................. 14, 18

*Smith v. NFL Player Disability & Neurocognitive Benefit Plan*,
  2024 WL 722594 (W.D. Tex. Jan. 9, 2024) *R&R adopted*, 2024 WL 1123588
  (W.D. Tex. Mar. 13, 2024) ...................................................... 13, 16, 23

*Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2012 WL 2374661 (D. Md. June 19, 2012)........................................... 24, 25, 26

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
  559 U.S. 662 (2010)........................................................................................ 15

*Switzer v. Benefits Admin. Comm.*,
  2014 WL 4052855 (D. Md. Aug. 13, 2014) ................................................. 27

*Tatum v. RJR Pension Inv. Comm.*,
  761 F.3d 346 (4th Cir. 2014) ........................................................................ 24

*United States v. 8.929 Acres of Land in Arlington Cnty., Va.*,
  36 F.4th 240 (4th Cir. 2022) ........................................................................ 12

*US Airways, Inc. v. McCutchen*,
  569 U.S. 88 (2013).......................................................................................... 15

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996)........................................................................................ 29

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Vaughan v. Celanese Ams. Corp.*,
    339 F. App'x 320 (4th Cir. 2009) ............................................................. 14, 23, 25

*Waldoch v. Medtronic*,
    757 F.3d 822 (8th Cir. 2014) ............................................................................ 24

*Williams v. Metro. Life Ins. Co.*,
    609 F.3d 622 (4th Cir. 2010) ............................................................................ 13

*Wilson v. UnitedHealthcare Ins. Co.*,
    27 F.4th 228 (4th Cir. 2022) ................................................................ 18, 23, 25

*Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*,
    2020 WL 5628020 (S.D. Tex. Aug. 17, 2020) .................................................. 25

*Youboty v. NFL Player Disability*,
    856 F. App'x 497 (5th Cir. 2021) ........................................................ 13, 16, 23

**Statutes**

29 U.S.C. § 1002(16)(A) ............................................................................................ 3

29 U.S.C. § 1002(16)(B) ............................................................................................ 3

29 U.S.C. § 1002(37)(A) ............................................................................................ 3

29 U.S.C. § 1132(a)(1)(B) ........................................................................................ 15

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 12

**Regulations**

29 C.F.R. § 2560.503-1(g)(1) .................................................................................... 7

29 C.F.R. § 2560.503-1(j)(6) ............................................................................. 27, 28

29 C.F.R. § 2560.503-1(o) .......................................................................................... 9

## INTRODUCTION

Plaintiff Jamize Olawale is one of nine plaintiffs bringing disparate Employee Retirement Income Security Act ("ERISA") claims within this single lawsuit to contest the decision on his applications for disability benefits.  Mr. Olawale alleges that his 2021 application for total-and-permanent ("T&P"), line-of-duty ("LOD"), and neurocognitive ("NC") disability benefits under the NFL Player Disability & Survivor Benefit Plan (the "Plan") was improperly denied.  He alleges the Board charged with administering the Plan failed to provide adequate notice or a full and fair review of that claim and that the Board should be removed for breaching its fiduciary duties, both by failing to properly review his claim and by failing to ensure that the Neutral Physicians who evaluated him were unbiased.  He makes these arguments even though he subsequently applied for and was granted LOD benefits by the same Board.

Defendants are entitled to summary judgment as to each of Mr. Olawale's claims.  His benefits claim (Count I) is foreclosed by the plain text of the Plan—negotiated by the NFL teams and Mr. Olawale's union—which expressly provides that NFL players are not entitled to benefits unless at least one Neutral Physician finds that they meet the Plan's standard for disability.  None of the eight Neutral Physicians who evaluated Mr. Olawale for his 2021 application and appeal found that he met the Plan's eligibility requirements, and the Board did not abuse its discretion in relying on the Neutral Physicians' well-reasoned reports.

Mr. Olawale likewise cannot prevail on his claim that his denial notices were defective (Count II) because an examination of the relevant notices makes plain that they provided the required information.  His attacks on the Board's processes, including his assertions that the Board breached its fiduciary duties, fare no better (Counts III, V).  Although the Court was required at the motion to dismiss stage to credit Plaintiffs' unsupported allegations that the Board

"designed a sham claim process" that uses "financial incentives" to induce Neutral Physicians to find that players are not disabled, Pls.' Am. Class Action Compl. ("AC" or the "Complaint") ¶¶ 334-36, ECF No. 56, the undisputed facts demonstrate the contrary. The eight Neutral Physicians who evaluated Mr. Olawale were assigned based solely on neutral criteria, were directed to provide their best professional judgment, and were not offered any financial incentive to reach a particular determination. Decl. of H. Vincent in Support of Defs.' Joint MSJ of Pl. J. Olawale's Claims ("Vincent Decl.") ¶¶ 20, 22. And expert analysis of six years of Neutral Physician assignments and compensation disproves Plaintiffs' theories about any supposed financial incentive to deny claims. *See* Decl. of D. Lasater Support of Defs.' Opp. to Pl. Mot. for Class Cert. ("Lasater Decl.") ¶¶ 7-10. Mr. Olawale's allegations of a "sham process" are particularly baseless given that the Plan has paid nearly $1.2 billion in disability benefits[1] from the beginning of the 2017 plan year through the 2022 plan year to thousands of players, and has awarded benefits in approximately 51.2% of T&P applications, 50.8% of LOD applications, and 23.9% of NC applications between January 1, 2018 and July 31, 2024. *See* Lasater Decl. ¶ 42 & Table 4; Miller Decl. ¶¶ 5-6.

Mr. Olawale cannot maintain his claims for fiduciary breach in Count V, because these allegations are derivative of the same alleged failures underlying Counts I, II, and III. Moreover, even if the Court were to find that the Board committed an error in denying Mr. Olawale's claim (which finds no support in the record) or that Mr. Olawale's notices were deficient (they were

---

[1] This figure does not include disability benefits paid out of the Bert Bell/Pete Rozelle NFL Player Retirement Plan ("Retirement Plan"). *See* Ex. A, Apr. 1, 2021 Disability Plan Doc. ("DPD" or "2021 DPD"), at JO-6 (explaining that a portion of disability benefits are still paid out of the Retirement Plan); Ex. B, Apr. 1, 2017 Disability Plan Doc. ("2017 DPD"), at JO-113 (Retirement Plan will continue to pay certain T&P and line-of-duty ("LOD") benefits); Decl. of M. Miller in Support of Defs.' Joint MSJs ("Miller Decl.") ¶ 4. "Ex." refers to the exhibits attached to Mr. Vincent's declaration. Exhibits are sequentially paginated, beginning with "JO-1," and omitting leading zeroes.

not), these kinds of alleged errors do not even come close to meeting the standard to demonstrate a fiduciary breach.  For these reasons, as set forth more fully below, the Court should enter summary judgment for Defendants on all of Mr. Olawale's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### The Disability Plan & The Board

The Plan is a Taft-Hartley, multi-employer benefit plan established, negotiated, and maintained through collective bargaining between the NFL Players Association ("Players Association"), which represents NFL players; and the NFL Management Council ("Management Council"), which represents the NFL teams.  *See* DPD JO-6; 29 U.S.C. §§ 1002(16)(A)-(B), 1002(37)(A).  It is governed by ERISA.  *See* DPD JO-6.

For the 2017 through 2022 plan years, the NFL teams contributed $1.33 billion to fund the Plan; in the 2022 plan year alone, the teams contributed $298,400,000.  Miller Decl. ¶ 3. During that time, the Plan paid nearly $1.2 billion in benefits to former NFL players and their beneficiaries, including, in 2022, $257,463,357 to roughly 23% of Plan participants, for an average annual benefit of $86,455.  *Id.* ¶¶ 5-6.

The Board is the administrator and named fiduciary of the Plan.  DPD §§ 1.2, 9.2; *see* 29 U.S.C. §§ 1002(16)(A)-(B).  The Board has six voting members, three appointed by the Players Association and three by the Management Council, DPD § 9.1; all Players Association members of the Board are former NFL players, Vincent Decl. ¶ 31.  The Board is "responsible for implementing and administering the Plan, subject to the terms of the Plan," and it has "full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan." DPD §§ 9.2, 9.9; *see* 29 U.S.C. § 1002(21)(A); *see also* AC ¶ 43.  The Board's discretion extends to "decid[ing] claims for benefits"; adopting procedures for the Plan's administration;

and delegating certain tasks to other persons—including advisors, counsel, consultants, and physicians. DPD §§ 9.2(c), (e), (f). The Plan specifies that the Board is entitled to rely conclusively upon the advice or opinion of such persons. *Id.* § 9.2(f). Neither Committee nor Board members are paid for their service, and no Committee or Board member receives any remuneration or pecuniary gain if there is any residual or remainder in Plan assets after benefits are paid. Miller Decl. ¶ 7.

### *Neutral Physicians and Benefits Eligibility*

Since 2017, the Plan has included a collectively bargained "Neutral Rule," which provides that a player is only eligible for benefits if at least one Neutral Physician finds him disabled under the relevant Plan standard. Vincent Decl. ¶ 14; 2017 DPD §§ 3.1(c) (T&P standard), 5.1(b) (LOD standard), 6.1(e) (NC standard). "Neutral Physicians" is defined by the Plan to mean physicians or other health care professionals who "examine each Player referred by the Plan and … provide such report or reports on the Player's condition as necessary for the Disability Board or Disability Initial Claims Committee to make an adequate determination as to that Player's physical or mental condition." DPD §§ 1.25, 12.3(b). Neutral Physicians are "jointly designate[d]" by the Players Association and Management Council to a panel available to conduct medical examinations; the Board plays no role in that process. Vincent Decl. ¶ 15.

When a former player submits an application or appeal, the NFL Player Benefits Office ("NFLPBO") assigns one or more Neutral Physicians from the panel to evaluate the applicant. DPD §§ 3.3(a), 5.4(b), 6.2(d); Vincent Decl. ¶¶ 19-20. Assignments are made solely using neutral criteria such as area of specialty, proximity, and availability to conduct a timely evaluation. Vincent Decl. ¶ 20. Neither the NFLPBO nor the Board maintains statistics concerning individual Neutral Physicians' past disability determinations. *Id.*; Miller Decl. ¶ 8.

Neutral Physicians "must (1) certify that any opinions offered … will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a 'flat-fee' agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits."  DPD § 12.3(a).[2] Neutral Physicians complete standard Physician Report Forms and write narrative reports for each examination ("PRF").  Vincent Decl. ¶ 26; DPD § 12.3(b).  Since October 1, 2020, players are required to submit medical records with their applications.  DPD §§ 3.3(a), 5.4(b), 6.2(d).

For a player to be awarded T&P benefits, a Neutral Physician must find that the player "is substantially unable to engage in any occupation or employment for remuneration or profit" and that "such condition is permanent."  *Id.* § 3.1(d); AC ¶ 60.  A disability is "permanent" if it has "persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period."  DPD § 3.1(e)(3); AC ¶ 62.  If no Neutral Physician finds the player T&P disabled, the player will not be eligible for T&P benefits "regardless of other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record."  DPD § 3.1(d); *see* Vincent Decl. ¶ 14.

To receive LOD benefits, a player must have incurred a "substantial disablement" "arising out of League football activities."  *Id.* § 5.1(c); AC ¶ 76.  A "substantial disablement," for applications based on orthopedic impairments received on or after April 1, 2020, are those impairments due to League football-related injuries that are, in the aggregate, "rated at least 9 points" on the Plan's Point System for Orthopedic Impairments (the "Point System"), which "assigns points to each orthopedic impairment recognized under the Plan."  DPD §§ 5.1(c),

---

[2] Neutral Physicians' contracts similarly require them to "personally conduct each test and examination, and prepare each report, according to the highest applicable professional standards, without any bias or favoritism for or against any Player."  *See, e.g.*, Ex. C, Dr. Paul Saenz Contract, at JO-218.

5.5(a)(4)(B), 12.3, JO-71-84 (App'x A); AC ¶ 73. "A player is awarded a specified number of points agreed to by the Players Association and Management Council for each orthopedic impairment, but only where that impairment both arose out of League football activities and has persisted or is expected to persist for at least 12 months from the date of its occurrence." DPD JO-71. If no Neutral Physician awards the player the required nine points, the "threshold requirement" is not met, and the player will not be eligible for LOD benefits "regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record." *Id.* § 5.1(b); *see* Vincent Decl. ¶ 14.

To receive NC benefits, a Neutral Physician must find that he "has mild or moderate neurocognitive impairment." DPD § 6.1(e); AC ¶ 80. A "mild impairment" is a "mild objective impairment in one or more domains of neurocognitive functioning which reflect acquired brain dysfunction, but not severe enough to interfere with his ability to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit." DPD § 6.2(a); AC ¶ 77. A "moderate impairment" is a "mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations in order to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit." DPD § 6.2(b); AC ¶ 78. If no Neutral Physician finds the player has a mild or moderate impairment, the "threshold requirement" is not met, and the player is ineligible for NC benefits "regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record." DPD § 6.1(e); *see* Vincent Decl. ¶ 14.

The NFLPBO holds orientation sessions for newly appointed Neutral Physicians, where it provides and explains the relevant Orientation Manual for the physician's specialty, the

Disability Plan Summary Plan Description ("SPD"), and other key information.  Vincent Decl. ¶ 28; DPD JO-71-84.  The Orientation Manuals direct the physicians to personally evaluate players, review and evaluate all submitted records, conduct examinations and prepare reports to the "highest professional standards without any bias or favoritism for or against any Player," complete reports no later than 10 days after an examinations, verify that test results and other data are accurate and thorough, and have no conflict of interest.  Ex. D, Ortho. Manual, at JO-224; Ex. E, Psych. Manuals, at JO-254 (2019), 283 (2023); Ex. F, Neuro. Manuals, at JO-312 (2018), 374 (2024); Ex. G, General Manual, at JO-440.

### Claims Process

Players may apply for benefits online or by mail and are directed to include information about any and all impairments they believe support their application.  Ex. H, Oct. 2022 SPD, at JO-493.  Upon receipt of an application, the NFLPBO assigns one or more Neutral Physicians to examine the player, and the Neutral Physician(s) send PRFs back to the NFLPBO after completing their examinations.  DPD §§ 3.3(a), 5.4(b), 6.2(d); *see* Vincent Decl. ¶ 19.  The Plan provides that a Committee of three members—one appointed by the Players Association, one appointed by the Management Council, and the Medical Director, DPD § 9.4(a)—makes the initial benefits determination, based on the Neutral Physicians' reports and the information the player submits.  *Id.* §§ 3.1(e), 5.1(d), 6.1(f), 9.4-9.6.  The Committee members have access to all application records through an online portal.  Vincent Decl. ¶ 31.  If the Committee finds the player eligible, benefits are awarded.  *See* DPD § 13.14(a).  If the Committee finds the player ineligible, including because no Neutral Physician found the player disabled, the Committee advises the player of the "specific reason(s)," the relevant Plan provisions, that he is entitled to free copies of all "relevant" records, and that he may appeal to the Board.  *Id.*; *see* 29 C.F.R.

§ 2560.503-1(g)(1).

On appeal, the NFLPBO assigns one or more new Neutral Physicians who did not examine the player at the Committee level to examine the player, and the player may submit additional information not presented to the Committee. *Id.* §§ 3.1(e), 5.1(d), 6.1(f), 13.14(a). The Board has "full and absolute discretion" to "[d]ecide claims for benefits," and "to determine the relative weight to give" supplemental information. *Id.* §§ 9.2, 9.9. The Board reviews the Committee's determination but determines *de novo* whether a player is entitled to benefits. *Id.* §§ 3.1(e), 5.1(d), 6.1(f), 13.14(a).

Board members have access to all information in the record through an online portal. Vincent Decl. ¶ 31; Decl. of R. Smith in Support of Defs.' Joint MSJ of Pl. J. Olawale's Claims ("Smith Decl.") ¶ 9. The Management Council and the Players Association separately employ advisors ("Party Advisors") to assist with review of applications. Smith Decl. ¶ 6. Prior to the quarterly Board meetings, the Party Advisors review each individual case file associated with each appeal that will be presented to the Board. Decl. of P. Reynolds in Support of Defs.' Joint MSJs ("Reynolds Decl.") ¶ 7; Decl. of A. Williams in Support of Defs.' Joint MSJs ("Williams Decl.") ¶ 6. The Party Advisors independently prepare recommendations for their respective Board members, and also meet with their counterparts to discuss cases. Reynolds Decl. ¶ 9; Williams Decl. ¶ 8. The Board members from the Management Council and Players Association convene separately before the full Board meeting to review appeal presentations from their respective Party Advisors. Reynolds Decl. ¶ 11; Williams Decl. ¶ 10. Representatives of the NFLPBO and Plan counsel attend these meetings; their role is to observe discussions and provide guidance on questions from the Party Advisors. Reynolds Decl. ¶ 10; Williams Decl. ¶ 9.

The full Board convenes for the joint formal Board meeting, where Board members vote

on each case and memorialize their decisions.  Smith Decl. ¶ 15.  If the Board finds a player

eligible, benefits are awarded.  *See* DPD §§ 3.1(e), 5.1(d), 6.1(f).  If the Board denies the claim,

it provides a written explanation of the denial, citing the specific Plan provisions that are the

basis for the denial, informing the player of his right to sue under the Plan and ERISA.  *Id.*

§ 13.14(a); *see also* 29 C.F.R. § 2560.503-1(o).

### *Mr. Olawale's Application for T&P, LOD, and NC Benefits*

Mr. Olawale's application for T&P, LOD, and NC benefits, which included roughly 200

pages of supporting records, was received on March 29, 2021.  Ex. I, Admin. Record ("AR"), at

JO-554, 663-858; AC ¶ 195.  The Committee directed the NFLPBO to refer Mr. Olawale for

evaluations by four Neutral Physicians: Dr. Matthew Norman, a psychiatrist; Dr. Paul Saenz, an

orthopedist; Dr. Eric Brahin, a neurologist; and Dr. Justin O'Rourke, a neuropsychologist.  AR

JO-927-291; AC ¶¶ 195, 197-98.

Each Neutral Physician was appointed to the panel pursuant to the NFLPBO's standard

procedures.  Vincent Decl. ¶¶ 19-22; DPD §§ 3.3(a), 5.4(b), 6.2(d), 12.3(a).  Each was paid a flat

fee, and each was assigned to examine Mr. Olawale based on the NFLPBO's previously

described Neutral Physician selection procedures.  Vincent Decl. ¶ 23; DPD § 12.3.  Each

personally examined Mr. Olawale for disability within the physician's specialty.  AR JO-859-60

(Norman PRF), 876-880 (Saenz PRF), 889-890 (Brahin PRF), 907-908 (O'Rourke PRF), 925-26

(Brahin/O'Rourke Joint PRF); AC ¶¶ 195, 197-98.  Each of their reports states that the physician

reviewed all of Mr. Olawale's medical records; that the report accurately documents the

physician's findings, which reflect the physician's best professional judgment; and that the

physician is not biased.  AR JO-860, 878, 880, 890, 908, 926.  All of these facts are also true of

the four Neutral Physicians who subsequently examined Mr. Olawale.  *See* AR JO-978-83

(Elkousy PRF), 993-94 (Rabun PRF), 1012-13 (Okai PRF), 1026-27 (Salisbury PRF), 1038-39 (Okai/Salisbury Joint PRF).

Mr. Olawale applied for benefits based on the effects of "lasting concussions and degenerative changes in his knees, ankles, and feet." AR JO-558. He alleges orthopedic impairments to his lumbar spine and hips, as well as cognitive and psychiatric impairments. AC ¶¶ 196-98, 200. However, he reported during the Neutral Physician examinations that he was not under the care of any physician; was not attending physical therapy or receiving alternative care; was not taking prescription anti-inflammatory analgesic medications; avoids taking over-the-counter medications; lifts "light weights"; walks on a treadmill; and does "light jogging." AR JO-884.

No Neutral Physician found that Mr. Olawale met the T&P, LOD, or NC disability standards. The Committee accordingly determined had not met the Neutral Rule threshold requirements for benefits and denied his claim. AR JO-927-30. The Committee informed Mr. Olawale of his appeal rights and deadlines and provided him with a copy of the relevant Plan provisions. AR JO-930-44.

Mr. Olawale timely appealed to the Board. AR JO-946; *cf.* AC ¶ 200. Applying the Plan's standard, neutral criteria, the NFLPBO assigned referred Mr. Olawale to evaluations by four different Neutral Physicians: Dr. Hussein Elkousy, an orthopedist; Dr. John Rabun, a psychiatrist; Dr. Annette Okai, a neurologist; and Dr. David Salisbury, a neuropsychologist. AR 1048, 1050, 1052; Vincent Decl. ¶¶ 19-22; *see* AC ¶ 200. Each personally examined Mr. Alford, and none found him disabled. AR JO-978-83, 993-94, 1012-13, 1026-27, 1038-39.

Dr. Rabun noted that Mr. Olawale "did not voice or endorse any negative thoughts about himself such as worthlessness or hopelessness," and found him to be not depressed. AR JO-

1010.  Dr. Okai concluded that Mr. Olawale's self-reported complaints are "not consistent with testing," which showed "no cognitive impairment," and, neurologically no deficits.  AR JO-1025.  And Dr. Salisbury found that Mr. Olawale had "generally preserved cognitive functioning at this time which would not meet criteria for a level of neurocognitive impairment" and that "neuropsychological testing in isolation would suggest that he has the cognitive ability to work in some capacity and he would not meet cognitive criteria for a [T&P] [d]isability."  AR JO01933-34.  The Amended Complaint does not allege any defects in Dr. Rabun's, Dr. Okai's, or Dr. Salisbury's reports, examinations, or conclusions.  AC ¶¶ 194-201.

The NFLPBO sent Mr. Olawale and his attorney, Sam Katz, copies of the Neutral Physicians' reports and advised him of his right to respond before the Board issued a final decision.  AR JO-1040-41.  Mr. Katz responded with a letter arguing only that Mr. Olawale qualified for NC benefits.  Specifically—in an argument that Mr. Olawale does not repeat in the Complaint—Mr. Katz contended that he qualified for NC benefits based on low test results and Dr. Salisbury's report notations Mr. Olawale "showed inefficient learning of new verbal information" and that his "relative difficulty initially acquiring new verbal information may contribute to his reported cognitive complaints."  AR JO-1047.

The Board unanimously denied Mr. Olawale's appeal because no Neutral Physician found him disabled.  AR JO-1048-53; AC ¶ 201.  The Board's letter stated the reasons for the denial, cited the relevant Plan provisions, and described Mr. Olawale's appeal rights.  AR JO-1048-53.  The letter acknowledged Mr. Katz's challenge to Dr. Salisbury's NC determination, but explained that Dr. Salisbury's evaluation revealed "generally preserved cognitive functioning … which would not meet criteria for a level of neurocognitive impairment."  AR JO-1052.  Dr. Salisbury in fact concluded that Mr. Olawale showed "adequate retention of information over

time," that "[n]europsychological testing results shows generally preserved cognitive functioning," and "that he has the cognitive ability to work in some capacity."  AR JO-1033-34.

Mr. Olawale filed this lawsuit on February 9, 2023.  ECF No. 1.

**Mr. Olawale's Post-Complaint Approval for LOD Benefits**

On November 14, 2023, Mr. Olawale applied for LOD and NC benefits.  Ex. J, Dec. 27, 2023 Comm. Decision Letter, at JO-1066.  The Committee referred Mr. Olawale to three Neutral Physicians: Dr. Prem Parmar, an orthopedist; Dr. David Clark, a neurologist; and Dr. Neal Deutch, a neuropsychologist.  *Id.* at JO-1066-67.  Dr. Parmar concluded that Mr. Olawale's orthopedic impairments render him LOD disabled, while Dr. Clark and Dr. Deutch found that Mr. Olawale did not have a mild or moderate neurocognitive impairment.  *Id.* at JO-1066-68.  The Neutral Rule having been satisfied for LOD benefits, the Committee awarded them to Mr. Olawale.  *Id.* at JO-1066.  He currently receives $5,180.00 each month.  *Id.*; Vincent Decl. ¶ 40.

## LEGAL STANDARD

A party is entitled to summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the Court construes "all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party."  *United States v. 8.929 Acres of Land in Arlington Cnty. Va.*, 36 F.4th 240, 252 (4th Cir. 2022) (quotation omitted).  However, it is not Defendants' burden to disprove Plaintiffs' allegations.  Rather, Mr. Olawale "bears the burden of production under Rule 56 to 'designate specific facts showing that there is a genuine issue for trial.'"  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## ARGUMENT

**I.    THE BOARD DID NOT ABUSE ITS DISCRETION IN DETERMINING THAT MR. OLAWALE WAS NOT ENTITLED TO BENEFITS UNDER THE PLAN'S TERMS**

In Count I, Mr. Olawale claims that his Plan benefits were wrongly denied under ERISA § 502(a)(1)(B).  AC ¶¶ 280-89.  Because the Plan gives the Board full and absolute discretion in "construing its terms and determining eligibility for benefits," the Court reviews the Board's denial of benefits for abuse of discretion.  *See Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 851 (4th Cir. 2023) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). Under that standard, a court "will not disturb a plan administrator's decision if the decision is reasonable, even if [it] would have come to a contrary conclusion independently."  *Geiger v. Zurich Am. Ins. Co.*, 72 F.4th 32, 37 (4th Cir. 2023) (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629-30 (4th Cir. 2010)).  Applying this standard, courts have regularly granted summary judgment to the Plan in cases in which the Board exercised its discretion in applying Plan terms.  *See, e.g.*, *Boyd v. Bell*, 796 F. Supp. 2d 682, 692 (D. Md. 2011) (granting summary judgment for the Board and finding no abuse of discretion); *Youboty v. NFL Player Disability*, 856 F. App'x 497, 500-01 (5th Cir. 2021) (affirming district court's use of abuse-of-discretion standard and grant of summary judgment for the Board); *Smith v. NFL Player Disability & Neurocognitive Benefit Plan*, 2024 WL 722594, at *6 (W.D. Tex. Jan. 9, 2024) (granting summary judgment for the Plan), *R&R adopted*, 2024 WL 1123588 (W.D. Tex. Mar. 13, 2024).

The Fourth Circuit applies an eight-factor test when reviewing the reasonableness of a denial of a benefit claim by an ERISA-governed plan's administrator.  *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000).  The factors are:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent

with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Id.* at 342-43; *see Vaughan v. Celanese Ams. Corp.*, 339 F. App'x 320, 329 (4th Cir. 2009) (affirming grant of summary judgment for administrator under *Booth* factors); *Geiger*, 72 F.4th at 40 (affirming grant of judgment on the record for administrator under *Booth* factors).

Courts must consider the *Booth* factors "in the context of a 'highly deferential' standard of review." *Geiger*, 72 F.4th at 38 (citing *Cosey v. Prudential Ins. Co. of Am.*, 735 F.3d 161, 168 (4th Cir. 2013)). The question is not whether the Court would have reached the same conclusion, but rather whether the Board's decision resulted from a "deliberate, principled reasoning process," and was "supported by substantial evidence,"[3] i.e., "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Id.* (citation omitted). It "does not mean a large or considerable amount of evidence," *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 715 (D. Md. 2012) (alteration omitted)—but rather is "less than a preponderance," *Schkloven v. Hartford Life & Accident Ins. Co.*, 2022 WL 2869266, at *23 (D. Md. July 21, 2022).

As discussed below, each of the *Booth* factors weighs in favor of a determination that the Board's decision was reasonable and that it did not abuse its discretion in denying Mr. Olawale's application. The Board reasonably relied on eight Neutral Physicians' reports that provided substantial evidence supporting the Board's decision, and the denial of the claim was the product

---

[3] This highly deferential standard of review recognizes that in deciding benefit claims, plan fiduciaries must strike "a balance between the obligation to guard the assets of the trust from improper claims" and "the obligation to pay legitimate claims." *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 20-21 (4th Cir. 2014) (citation omitted). This balance "ensure[s] that individual claimants get the benefits to which they are entitled" while "protect[ing] employees … from a contraction in the total pool of benefits available." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 326 (4th Cir. 2008).

14

of reasoned decision making in accordance with the Plan's procedures.  Accordingly, Defendants are entitled to summary judgment in their favor as to Mr. Olawale's denial of benefits claim because there is no triable issue of fact regarding the reasonableness of the Board's decision.

### A.    The Board's Decision Was Consistent With the Plan's Terms, Which Are Plain and Unambiguous.

The first *Booth* factor weighs in favor of finding that the Board did not abuse its discretion because its determination was consistent with the plain "language of the [P]lan." *Booth*, 210 F.3d at 342.  ERISA's central tenet is that plan participants may only recover benefits owed to them "under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); *see US Airways, Inc. v. McCutchen*, 569 U.S. 88, 102 (2013).  Indeed, ERISA's entire "statutory scheme … is built around reliance on … written plan documents." *McCutchen*, 569 U.S. at 100-01.  In deciding an ERISA claim, a court's "principal function" is thus to "protect contractually defined benefits" according to the "terms of the plan." *Id.* at 100; *see Firestone*, 489 U.S. at 115 (ERISA analysis "turn[s] on the interpretation of the terms in the plan").

ERISA requires the Court to enforce the plain language of the Plan.  *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) ("[A]s with any other contract, the parties' intentions control."); *Mid Atl. Med. Servs., LLC v. Sereboff*, 407 F.3d 212, 220 (4th Cir. 2005), *aff'd*, 547 U.S. 356 (2006).  The Board, as administrator, must also enforce the Plan terms as written.  *See Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005), *abrogated on other grounds by Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 355 (4th Cir. 2008).  Although the Board has absolute discretion to interpret the Plan, DPD § 9.2, "the administrator is not free to alter the terms of the [P]lan or to construe unambiguous terms other than as written." *Colucci*, 341 F.3d at 176; *see also Giles*, 925 F. Supp. 2d at 716.  Disregarding or altering the Plan's terms "constitutes an abuse of discretion."  *Giles*, 925 F. Supp. at 716

15

(quoting *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007)).

Here, Mr. Olawale concedes that under the Plan's terms, he cannot qualify for benefits unless at least one Neutral Physician finds he meets the relevant Plan standard, AC ¶¶ 71, 76, 80, and that he did not satisfy those standards in connection with his 2021 application or appeal because none of the eight Neutral Physicians who examined him at that time found he met those requirements. *Id.* ¶¶ 195, 197-98, 200; DPD §§ 3.1(d), 5.1(c), 6.1(e); AR AR JO-859-60, 876-880, 889-890, 907-908, 925-26, 978-83, 993-94, 1012-13, 1026-27, 1038-39. Because Mr. Olawale does not dispute that he failed to meet the Plan's unambiguous "threshold requirement," AC ¶¶ 195, 197-98, 200; DPD §§ 3.1(d), 5.1(c), 6.1(e), it is undisputed that he did not qualify for benefits under the Plan terms, AR JO-1048-53; DPD §§ 3.1(d), 5.1(c), 6.1(e).

Proper application of the Plan terms thus not only permitted denial of Mr. Olawale's claim, it required it. *See Youboty*, 856 F. App'x at 499 (affirming summary judgment for Plan where no Neutral Physician awarded the requisite points). As another district court recently held, summary judgment for the Plan is warranted where, as here, there is "no question that the Disability Board's denial of [the player's] appeal based on his failure to meet the Neutral Rule is consistent with the terms of the Disability Plan." *Smith*, 2024 WL 722594, at *6.

Although the Board has "full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan," DPD § 9.2, it has no discretion to deviate from the collectively bargained Plan terms. *See Colucci*, 431 F.3d at 176; *Smith*, 2024 WL 722594, at *6; DPD § 9.2 (the Board is responsible for "implementing and administering the Plan, *subject to the terms of the Plan*" (emphasis added)). Awarding Mr. Olawale benefits without a Neutral Physician's finding of entitlement would have constituted a breach of the Board's discretion, regardless of Mr. Olawale's arguments that the Plan should operate differently. *See CIGNA*

*Corp. v. Amara*, 563 U.S. 421, 436 (2011) (explaining that § 502(a)(1)(B) does not allow a court to change or alter the terms of a plan); *Kress v. Food Emps. Lab. Rels. Ass'n*, 391 F.3d 563, 569 (4th Cir. 2004); *Pender v. Bank of Am. Corp.*, 788 F.3d 354, 362 (4th Cir. 2015).

###### B.     The Board's Decision Was Consistent with the Plan's Purposes and Goals.

The second *Booth* factor weighs for finding that the Board did not abuse its discretion. Applying the Neutral Rule to deny Mr. Olawale's claim is consistent with the goal the Players Association and Management Council sought to achieve, in their capacity as Plan settlors, when they collectively bargained to add the Neutral Rule to the Plan. *See Booth*, 201 F.3d at 343 ("The Plan does not authorize its administrators to make determinations … that frustrate the purposes and goals of the Plan."). The Neutral Rule balances "the need to ensure that individual claimants get the benefits to which they are entitled with the need to protect employees and their beneficiaries as a group from a contraction in the total pool of benefits available." *See Evans*, 514 F.3d at 326. Eight Neutral Physicians evaluated Mr. Olawale and none found that he satisfied the Plan's standards for benefits. *See supra* at 9-12. Applying the Neutral Rule to deny Mr. Olawale's claim was consistent with the Plan's goal to ensure its limited benefit resources are preserved for participants who are entitled to them. *Cf. Friz v. J&H Marsh & McLennan, Inc.*, 2 F. App'x 277, 281 (4th Cir. 2001) (paying only those benefits that are authorized by plan terms is consistent with the purposes and goals of the plan).

###### C.     The Materials the Board Considered Were Adequate to Support Its Decision.

The third *Booth* factor weighs for finding the Board did not abuse its discretion because the materials the Board considered were adequate to support its decision.[4] *Booth*, 201 F.3d at 342 (factor 3). The Board's decision was supported by substantial evidence, including the

---

[4] The Plan permits the Board to review materials in part through appointed advisors. *See, e.g.*, DPD §§ 9.2(f), 9.9.

Neutral Physicians' reports, the records Mr. Olawale submitted, and the Neutral Physicians' expert analysis and clinical assessments of those records. AR JO-1048-53. Each Neutral Physician certified that they personally examined Mr. Olawale, and that they reviewed all of the medical records submitted by him. AR JO-860, 878, 880, 890, 908, 926, 979, 983, 994, 1013, 1027, 1039. Each Neutral Physician accurately stated the relevant Plan standard for disability and provided a reasoned explanation supporting their conclusions that neither their examination nor Mr. Olawale's records established that the standard was met. AR JO-859-60, 876-880, 889-890, 907-908, 925-26, 978-83, 993-94, 1012-13, 1026-27, 1038-39; DPD §§ 3.1(d), 5.1(c), 6.1(e); *supra* at 9-12. Cumulatively, these materials provide more than adequate support for the Board's denial of Mr. Olawale's benefit application. *See Booth*, 201 F.3d at 342; *Schkloven*, 2022 WL 2869266, at *25-26 (granting summary judgment for administrator where it relied on the opinions of physicians retained to review the plaintiff's medical records).

Although Mr. Olawale disagrees with some of the Neutral Physicians' conclusions, there is no genuine dispute of material fact about adequacy of the materials the Board considered. *See Booth*, 201 F.3d at 342; *Wilson v. UnitedHealthcare Ins. Co.*, 27 F.4th 228, 238 (4th Cir. 2022); *see also Kane v. UPS Pension Plan Bd. of Trustees*, 2013 WL 6502874, at *10 (D. Md. Dec. 11, 2013) (explaining in considering the third *Booth* factor, "the Board needed only 'the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that a reasoning mind would accept as sufficient to support a particular conclusion'" (quoting *Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 295 (4th Cir. 2006)), *aff'd*, 584 F. App'x 109 (4th Cir. 2014). The Board was presented with the four consistent Neutral Physician reports, none of which found that Mr. Olawale met the Plan's disability standards, after thorough examinations, testing, and fulsome review of Mr. Olawale's records. AR JO-978-83, 993-94,

1012-13, 1026-27, 1038-39.   The four Neutral Physicians who evaluated Mr. Olawale at the Committee level also did not find he met the Plan's standards.  AR JO-859-60, 876-80, 889-90, 907-08, 925-26.  The Board lacked authority to award benefits—notwithstanding Mr. Olawale's points of disagreement—because no Neutral Physician found that he met the Plan's standards for benefits.  DPD §§ 3.1(d), 5.1(c), 6.1(e).  Under the Plan's express terms, he was ineligible for benefits "regardless of any other fact(s), statement(s), or determination(s), by any other person or entity, contained in the administrative record."  *Id.*

Significantly, Mr. Olawale does not allege that the reports of four of these Neutral Physicians (Dr. Okai, Dr. Salisbury, Dr. Rabun, and Dr. O'Rourke) contained any errors.  AC ¶¶ 194-201.  Mr. Olawale alleges that the Board's decision was improper, *id.* ¶¶ 200-01, but his arguments do not create a triable issue of fact.

Mr. Olawale alleges that Dr. Saenz's, Dr. Elkousy's, and Dr. Brahin's and reports violated Plan terms because they misinterpreted medical records and tests.  AC ¶¶ 196-97, 200. Most of these claimed inconsistencies misstate the record.  Others merely reflect Mr. Olawale's disagreement with these Neutral Physicians' medical conclusions—which is not sufficient to render their reports an inadequate basis for the Board's determination.  *See Elliott v. Sara Lee Corp.*, 190 F.3d 601, 606 (4th Cir. 1999) ("[I]t is not an abuse of discretion for a plan fiduciary to deny disability pension benefits where conflicting medical reports were presented.").

For example, Mr. Olawale alleges that Dr. Saenz should have awarded points for degenerative joint disease ("DJD") in his hip, AC ¶ 196, but the Committee and Board appropriately did not consider this condition because Mr. Olawale did not raise it in his application, as Plan terms require.  AR JO-570, 584-85; DPD § 5.4(h).  Mr. Olawale also alleges that Dr. Saenz's report was internally inconsistent with regard to Mr. Olawale's "Lumbar Stress

Fracture with Spondylolysis"—specifically, that Dr. Saenz's conclusion that the condition arose from an "injury" was inconsistent with his conclusion that it did not arise from League play. AC ¶ 196.[5] But those determinations are not inconsistent. Dr. Saenz found that there was "[n]o supportive or conclusive documentation that this condition was incurred during scope of NFL career," AR JO-878, and it is that timing aspect rather than the cause generally that matters for LOD benefits eligibility. Moreover, Dr. Saenz's "injury" determination was merely a checkbox indicating that all of Mr. Olawale's complained-of orthopedic conditions were likely caused by injury rather than illness. AR JO-879.

Likewise, Mr. Olawale faults Dr. Elkousy for not awarding points for "lumbar stress fracture with spondylosis" or for DJD of the knee and ankle. AC ¶ 200. But Dr. Elkousy addressed those impairments; he found the spine and knee impairments of unknown etiology but consistent with aging, and found no knee or ankle impairments that would qualify for LOD points. AR JO-992. Mr. Olawale's disagreement with these conclusions does not render Dr. Elkousy's report an inadequate basis for the Board's decision. *See Elliott*, 190 F.3d at 606.

Mr. Olawale similarly claims that Dr. Brahin's determination that his "Visuospatial/Executive Functioning test" results were normal is inconsistent with his below-normal score on the Montreal Cognitive Assessment ("MoCA"). AC ¶ 197. But those determinations are consistent: the Visuospatial/Executive Functioning test is only one section of the overall MoCA score. AR JO-898. Dr. Brahin noted Mr. Olawale's below-average MoCA score, but added that "it is important to note that no other deficiencies were seen on this exam,"

---

[5] Mr. Olawale asserts that a Medical Advisory Physician has at other times awarded three points for "Lumbar Stress Fracture with Spondylosis" for "L5-S1 pars defect," AC ¶ 196 n.17, implying that Dr. Saenz should have awarded Mr. Olawale three points. Defendants do not dispute that a "Lumbar Stress Fracture with Spondylosis" impairment would be worth three points if it arose out of League football activities. *See* DPD § 5.1(c); *id.* at 70. But there was no finding that it did.

and that patients with Mr. Olawale's score "may or may not have true cognitive impairment." AR JO-903-04.

Mr. Olawale also alleges that Defendants improperly "considered educational level and prior training." AC ¶ 283. But he provides no supporting details, *see id.* ¶¶ 194-201, and neither the Committee's nor the Board's decision letters reflect that Defendants considered his educational level or training. *See* AR JO-927-31, 1048-53.

Mr. Olawale alleges that certain Neutral Physicians failed to consider his self-reported symptoms—specifically, that Dr. Brahin and Dr. Norman ignored his self-reported complaints of suicidal thoughts, AC ¶¶ 197-98, and that Dr. Elkousy did not consider his self-reported pain, *id.* ¶ 200. Mr. Olawale ignores portions of these Neutral Physicians' reports. Dr. Brahin checked "Yes" for "Suicidal thoughts" and noted that "Jamize has had fleeting thoughts of suicide, but none that he considers to have been significant." AR JO-896. Similar for Dr. Norman, who concluded that although Mr. Olawale's testing score showed moderately severe depression (based solely on self reports), his full examination was not consistent with that result. AR JO-864. Dr. Norman similarly acknowledged that Mr. Olawale expressed "passive thoughts of not wanting to continue living," but also that he emphasized that his "he is not suicidal," that he "would never attempt suicide," and that he "denied any suicide attempts or current intent." AR JO-862, 866, 871, 873. And notably, Mr. Olawale does not allege any errors by Drs. Okai and Rabun, who following their own examinations determined that Mr. Olawale had no "History of suicide attempt," "History of suicide thoughts," or "Suicidal ideations," AR JO-1018, 1022, and that Mr. Olawale's symptoms "would not qualify for major depression," AR JO-1010.

Mr. Olawale also alleges that Dr. Elkousy unreasonably dismissed his reports of pain. AC ¶ 200. But Dr. Elkousy's report documents complaints of pain, indicating that he considered

21

the complaints and concluded that they did not qualify Mr. Olawale for benefits.  *See* AR JO-984-86, 988-92.  ERISA does not require a plan or physician to defer to a patient's subjective complaints where objective evidence supports a finding of no disability.  *See, e.g.*, *Balkin v. Unum Life Ins. Co.*, 2024 WL 1346789, at *20-21 (D. Md. Mar. 29, 2024).

Finally, Mr. Olawale makes the conclusory assertion that certain Neutral Physicians failed to consider the cumulative impact of his impairments.  *See* AC ¶¶ 198 (Norman), 200 (Elkousy).  But Mr. Olawale does not identify any specific evidence of cumulative impairment that the Neutral Physicians failed to consider, much less evidence that would have altered the professional opinions they rendered.  Each Neutral Physician was asked to apply their particular professional expertise to assess the overarching question posed by the Plan with respect to all disability applicants: whether Mr. Olawale met the Plan's standards for disability benefits.  Neither found that he met those standards.  AR JO-859-60, 978-83.  Neutral Physicians are instructed to inform the Plan if their evaluation identifies an area of medical concern outside of their specialty that they think another specialist should review.  Ortho. Manual JO-632; Psych. Manuals JO-258, 287; Neuro. Manuals JO-317, 379.  Some of the Neutral Physicians did identify a need to consult with or involve a professional with different expertise to assess certain reported symptoms.  *See, e.g.*, AR JO-1025 (Okai suggesting Mr. Olawale see a psychiatrist for an evaluation), 1033 (Salisbury suggesting psychiatric evaluation to rule out potential mood, impulse control, and other disorders).  In each case, a qualified professional performed the noted assessment, but did not find Mr. Olawale disabled.

Put simply, while Mr. Olawale has a litany of disagreements with decisions made in connection with his applications, none of them are sufficient to raise a triable issue of fact because the record is clear that the materials supporting the Board's decision meet Booth's

standard for adequacy.  *See Booth*, 201 F.3d at 342; *Wilson*, 27 F.4th at 238.

D.    **The Remaining *Booth* Factors All Support Finding that the Board's Decision Was Reasonable.**

***Factor 4.***    The Board's decision was consistent with other provisions and earlier interpretations of the Plan.  *See Booth*, 201 F.3d at 342.  The Neutral Rule applies to every type of benefit in the Plan.  DPD §§ 3.1(d), 5.1(c), 6.1(e).  And, since it went into effect, the Neutral Rule has been applied consistently to deny benefits to players who failed to satisfy it.  Vincent Decl. ¶¶ 13-14; *see also Youboty*, 856 F. App'x at 500; *Smith*, 2024 WL 722594, at *5-6.  It has remained unchanged since the Management Council and Players Association collectively bargained for it in 2017—well before the limitations period here.  Vincent Decl. ¶¶ 13-14.

***Factor 5.***    The Board's decision-making processes were "reasoned and principled."  *See Booth*, 201 F.3d at 342.  The Board "followed Plan procedures and policies throughout" its review, *see Wilson*, 27 F.4th at 238-39 (affirming claim denial), including evaluation by eight different Neutral Physicians at the Committee and Board levels who are experts in the fields of Mr. Olawale's claimed impairments.  AR JO-859-60, 876-880, 889-890, 907-908, 925-26, 978-83, 993-94, 1012-13, 1026-27, 1038-39.  The Board provided reasoned explanations for its denial of Mr. Olawale's claim that were grounded in application of the Plan's Neutral Rule.  AR JO-1048-53.  No more was required.  *See Mullins v. AT&T Corp.*, 424 F. App'x 217, 224 (4th Cir. 2011) (administrator's review was reasoned and principled because it substantially complied with plan's procedures); *Vaughan*, 339 F. App'x at 327 (same; administrator acknowledged receipt, allowed submission of additional information, stated why it denied the claims, quoted the plan, and attached a plan summary).

Mr. Olawale alleges that the Board's consideration of analyses or summaries created by the Party Advisors or Plan counsel as part of its review is somehow improper.  *See, e.g.*, AC

23

¶¶ 41, 201, 284, 286, 302.  This is incorrect.  The Plan expressly permits the Board to rely on consultants, professional plan administrators, counsel, and physicians when satisfying its duty to "consider all information in the Player's administrative record" when deciding claims.  DPD §§ 9.2(f), 9.9.  ERISA also permits such reliance.  *See Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*, 919 F.3d 763, 773 (4th Cir. 2019) (seeking expert advice can show prudence); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 358 (4th Cir. 2014) (same); *cf. Garner v. Cent. States, Se. & Sw. Areas Health & Welfare Fund Active Plan*, 31 F.4th 854, 858 (4th Cir. 2022) ("encourag[ing]" plan trustees to "rely on the independence and expertise of unaffiliated doctors in making benefits determinations").[6]  Because Mr. Olawale's records were fully reviewed by the Board's advisors and Neutral Physicians, Reynolds Decl. ¶¶ 7-8; Williams Decl. ¶¶ 6-7;  AR JO-860, 878, 880, 890, 908, 926, 979, 983, 994, 1013, 1027, 1039, the Plan is entitled to summary judgment without being required to show that each individual Board member personally reviewed each page of voluminous underlying materials.  *See Waldoch v. Medtronic*, 757 F.3d 822, 832 (8th Cir. 2014) (permitting fiduciary to "delegate claims processing functions to [a non-fiduciary third party] and rely on [the third party's] reasoning without compromising its obligation to provide a 'full and fair review'"); AC ¶ 41.

**Factor 6.**  The Board complied with ERISA's procedural and substantive requirements because its processes and decision were "consistent with the language of the Plan," and Mr. Olawale "was fully aware of his rights and obligations under the Plan."  *See Friz*, 2 F. App'x at 282; *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2012 WL 2374661, at *14 n.35 (D.

---

[6] *Accord Gregg v. Transp. Workers of Am. Int'l*, 343 F.3d 833, 841 (6th Cir. 2003) ("A fiduciary's effort to obtain an independent assessment serves as evidence that the fiduciary undertook a thorough investigation."); *Geddes v. United Staffing All. Emp. Med. Plan*, 469 F.3d 919, 926 (10th Cir. 2006) (administrator may delegate discretionary authority to non-fiduciaries without compromising fiduciary duties); *Hilton v. Unum Life Ins. Co. of Am.*, 967 F. Supp. 2d 1114, 1116-17, 1124-25 (E.D. Va. 2013) (administrator's benefits decision was not unreasonable where it assigned an "[a]ppeals [s]pecialist" to review the contents of the plaintiff's appeal and consulted two physicians).

Md. June 19, 2012) (same).  Mr. Olawale does not dispute that the Board's determination was

timely, *see id.*, or that Mr. Olawale "was timely notified of [the Board's] findings and next-step

rights to appeal the decision," *see Wilson*, 27 F.4th at 239.

  ***Factor 7.*** This factor is not relevant to Mr. Olawale's application, to which no external

standard applies.  *See Booth*, 201 F.3d at 342-43.  The Complaint suggests the NFL Concussion

Settlement should be considered for certain applications, *see* AC ¶ 288, but it in fact has no

bearing on the Plan's disability eligibility standards.[7]  In any event, Mr. Olawale does not allege

that he received a qualifying diagnosis under the NFL Concussion Settlement, AC ¶¶ 194-201.

  ***Factor 8.*** Finally, the Board had no conflict of interest.  *See Booth*, 201 F.3d at 343.

Structural conflicts of interest occur where the same entity that administers the ERISA plan

determines eligibility and pays benefits out of its own pocket.  *Metro. Life Ins. Co. v. Glenn*, 554

U.S. 108, 108 (2008); *Fortier v. Principal Life Ins. Co.*, 666 F.3d 231, 236 n.1 (4th Cir. 2012)

(affirming grant of summary judgment to administrator despite conflict of interest under *Glenn*);

*Vaughan*, 339 F. App'x at 328 (same).  That is not how this Plan is structured, and courts hearing

challenges to the Plan's benefits denials have consistently found that it does not operate under a

conflict of interest.  *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807,

813 (N.D. Cal. 2020) ("[T]he Plan does not have a structural conflict that needed to be mitigated

as the Board consists equally of player representatives and NFL representatives."), *aff'd and

remanded on other grounds*, 855 F. App'x 332 (9th Cir. 2021); *Youboty v. NFL Player Disability

& Neurocognitive Benefit Plan*, 2020 WL 5628020, at *6 (S.D. Tex. Aug. 17, 2020) (citing

*Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 468 F.3d 1082, 1086 (8th Cir. 2006);

---

[7] Legal standards for other types of benefits outside the Plan are not relevant.  *See, e.g.*, *Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 420 (4th Cir. 2004) ("[W]hat qualifies as a disability for social security disability purposes does not necessarily qualify as a disability for purposes of an ERISA benefit plan.").

*Courson v. Bert Bell NFL Player Ret. Plan*, 75 F. Supp. 2d 424, 431 (W.D. Pa. 1999), *aff'd*, 214 F.3d 136 (3d Cir. 2000); *Morris v. Nat'l Football League Ret. Bd.*, 833 F. Supp. 2d 1374, 1386 (S.D. Fla. 2011), *aff'd*, 482 F. App'x 440 (11th Cir. 2012)), *aff'd*, 856 F. App'x 497 (5th Cir. 2021).   Moreover, the Plan provides "structural protections" that substantially guard against conflicts, including that "the Board's reliance on independent physicians in making benefit determinations would drastically diminish the significance of [the conflict of interest] factor in the analysis."  *Giles*, 925 F. Supp. 2d at 717 (citing *Boyd*, 796 F. Supp. 2d at 691 n.2)); *see also Stewart*, 2011 WL 10005532, at *2.

Mr. Olawale alleges some Neutral Physicians are biased against finding disability based on their higher income.  Specifically, the Complaint alleges a practice of retaining and paying more to Neutral Physicians with "extremely high benefits denial rates," who "stood to benefit financially from the repeat business" by issuing reports that would support a benefits denial "to the Board's liking."  AC ¶ 112.  These arguments fail for several reasons.

First, as a threshold matter, the proper focus of the *Booth* conflict inquiry is the Board, not the Neutral Physicians.  *See, e.g.*, *Hall v. Standard Ins. Co.*, 2005 WL 348266 at *4 (W.D. Va. Feb. 10, 2005) (plaintiff was not entitled to discovery with regard to independent physician consultant because "the relevant conflict of interest is that of the fiduciary"); *Boyce v. Eaton Corp. Long Disability Plan*, 2017 WL 3037392, at *5 (W.D.N.C. July 18, 2017) ("The Fourth Circuit [has] made clear that the pertinent inquiry is not the conflicts of the administrator's attorney but the conflicts of the administrator.") (citing *Colucci*, 431 F.3d at 176); *see also Everette v. Liberty Life Assurance Co. of Bos.*, 2017 WL 2829673, at *11 (D. Md. June 29, 2017) (evidence that doctors are "regularly retained and paid by plan administrators" is insufficient if a plaintiff does "not provide any evidence that [the doctors] w[ere] biased in [his] case").  The

record thus makes clear there was no relevant conflict of any kind under this *Booth* factor. And even if it were the Neutral Physicians who were the proper focus of the inquiry, analysis of the relevant data demonstrates that there are not, in fact, higher denial rates of applications associated with those Neutral Physicians with higher compensation. *See* Lasater Decl. ¶¶ 20-54.

As for the Board itself, the undisputed facts show there is no financial conflict. The Board is composed equally of Management Council and Players Association Trustees. DPD § 9.1. The Plan is funded by revenue-sharing agreement between the NFL (including the Management Council) and the Players Association. Smith Decl. ¶ 3. No funds left over after benefits are paid or denied go to the Board, the Management Council, or the Players Association. *Id.* Moreover, Mr. Olawale was subsequently approved for benefits, *see* AR JO-1066, undercutting his argument that the Board denied his previous application for financial reasons.

## II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON COUNT II BECAUSE THE DENIAL LETTERS SENT TO MR. OLAWALE COMPLY WITH ERISA'S CLAIMS PROCEDURES

Mr. Olawale alleges that Defendants violated ERISA Section 503(1)'s requirement to "provide adequate notice in writing to any participant … whose claim … has been denied, setting forth the specific reasons for such denial." AC ¶¶ 290-95. The letters to Mr. Olawale show this claim is meritless. ERISA does not require that decision letters recite every aspect of an applicant's record. *See generally* 29 C.F.R. § 2560.503-1(j)(6). Rather, a letter complies with ERISA if, read in its entirety, it provides the claimant "with all the information necessary to perfect" the claim. *Switzer v. Benefits Admin. Comm.*, 2014 WL 4052855, at *12 (D. Md. Aug. 13, 2014) (denial letters were sufficient because they "stated that they were based upon findings that [applicant] was capable of returning to work without restriction and/or was capable of engaging in substantial gainful employment" (citation omitted)); *Brown v. Covestro LLC Welfare Benefits Plan*, 2023 WL 8481914, at *11 (W.D. Pa. Nov. 15, 2023) (letter "substantially

complied with the regulations by specifying the medical basis for denying benefits and provided a sufficiently clear understanding of the administrator's position to permit effective review" (citation omitted)), *R&R adopted*, 2023 WL 8481352 (W.D. Pa. Dec. 7, 2023).

Both the Committee Decision Letter and the Board Decision Letter satisfy this standard. The letters cite the correct Plan standards, DPD §§ 3.1(d), 5.1(c), 6.1(e), and explain "the specific reasons" for denying Mr. Olawale's application: that no Neutral Physician concluded that he was T&P, LOD, or NC disabled.  AR JO-927-31, 1048-53.  The letters further supply additional information about the basis for the denial, including reliance on "[t]he views of medical or vocational experts whose advice was obtained on behalf of the plan."  29 C.F.R. § 2560.503-1(j)(6); AR JO-927-31, 1048-53.  The Board letter states that the Board considered the Neutral Physicians who examined him are specialists in the fields of Mr. Olawale's claimed impairments, have experience evaluating retired players and other athletes, reviewed all of Mr. Olawale's records, conducted physical examinations of him, and provided detailed reports concluding that he did not meet the Plan's standards for benefits.  AR JO-1049-53.  As the instant lawsuit demonstrates, that was all of the information necessary to perfect Mr. Olawale's claim.  The Committee letter is similar.  *See* AR JO-927-31.

Mr. Olawale alleges that the Committee and Board letters were inadequate because they did not mention that he sought benefits on the basis of the combined effects of his impairments. AC ¶¶ 199, 201.  But the Board letter expressly states that "[t]he Disability Board … did consider *all of the impairments* described by the Plan Neutral Physicians and review the medical records" Mr. Olawale submitted.  AR JO-1049 (emphasis added).  Mr. Olawale's broad *ipse dixit* assertion that he was cumulatively disabled was not supported by any medical opinions or findings that the cumulative impact of different types of claimed impairments rendered him

unable to work, nor did Mr. Olawale present any specific arguments or examples of "cumulative impairment" that the Board failed to consider.

Finally, while Mr. Olawale is correct that the Board's letter mistakenly refers to Dr. Rabun as Dr. Strassnig, *see id.*, this is a scrivener's error. It is clear that the letter is relying on Dr. Rabun's report, not a report of Dr. Strassnig, as the letter accurately quotes findings from Dr. Rabun's report that Mr. Olawale's psychiatric impairments do not render him disabled and that he can engage in "any job from a psychiatric standpoint." *Id.* (quoting Rabun PRF at JO-994). Mr. Olawale does not allege anything incorrect or improper about Dr. Rabun's examination, report, or conclusion. *See* AC ¶¶ 194-201. One typographical error in a six-page letter does not violate ERISA. Because the Board provided the adequate notice in its claim determinations that ERISA requires, it is entitled to judgment on this claim.

## III. THE BOARD A CONDUCTED FULL AND FAIR REVIEW OF MR. OLAWALE'S BENEFITS CLAIM

Count III alleges that Defendants did not conduct a "full and fair review" of certain applications, failed to produce "requested information," and failed to ensure that Plan provisions are applied consistently. The undisputed record shows the Plan's thorough process for reviewing benefit applications and appeals and the thorough review of Mr. Olawale's own claim. *See supra* at 3-12. Mr. Olawale makes only one allegation specific to the Board's treatment of *his* claim—that the Board failed to put in place safeguards to ensure consistent application of Plan standards. AC ¶¶ 296-304. But that allegation is based on the same alleged inconsistent application of Plan standards that Mr. Olawale alleges in Count I, and it fails for the same reason. *Compare id.*, *with id.* ¶ 285; *supra* at 13-28; *see Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*, 2018 WL 4052182, at *12 (citing *Varity Corp. v. Howe*, 516 U.S. 489, 513-15 (1996) ("[A] plaintiff may not simply claim denial of benefits under § 502(a)(1)(B), then

'repackage' that claim as one for breach of fiduciary duty under § 502(a)(3).")).  This Court previously recognized that even if Mr. Olawale were to prevail on Count III, he "would not be entitled to any additional or different remedy not otherwise available through Count I."  ECF No. 78 at 41.  Moreover, there is no record of any information request from Mr. Olawale to which Defendants failed to reply.  Vincent Decl. ¶ 41.

## IV. MR. OLAWALE'S ALLEGATIONS OF BREACH OF FIDUCIARY DUTY FALL FAR SHORT OF CREATING A TRIABLE ISSUE OF FACT

Finally, Mr. Olawale claims on behalf of the Plan that the Board Trustees should be removed for alleged breaches of their fiduciary duties of loyalty and care.  AC ¶¶ 330-49, 387. The substantive allegations in Count V are derivative of Counts I, II, and III, and entry of judgment for Defendants on those counts is dispositive of Count V as well.  Indeed, there is no evidence of the kind of egregious misconduct that could warrant removal, which is an "extraordinary remedy" that should only be employed for "very egregious breaches" involving "repeated and substantial violations of [the trustees'] responsibilities."  *Compare Bidwell v. Garvey*, 743 F. Supp. 393, 399 (D. Md. 1990) (refusing to remove trustees despite imprudence finding) (citations omitted), *with Chao v. Malkani*, 452 F.3d 290, 291 (4th Cir. 2006) (affirming removal of fiduciaries after they repeatedly "attempt[ed] to raid the plan's assets"); Restatement (Second) of Trusts § 107 cmt. b (identifying "serious breach of trust" as a basis for removal). The Fourth Circuit has cautioned that "removal can be detrimental for plan participants and employers alike" because "[i]t imposes significant costs on plans," and can "disrupt plan administration" and "cause delay in participants receiving vital benefits."  *Chao*, 452 F.3d at 294.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment for Defendants on all of Mr. Olawale's claims.

Date: November 18, 2024                    Respectfully submitted,

/s/ Gregory F. Jacob

Gregory F. Jacob (D. Md. Bar No. 06769)
Meredith N. Garagiola (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W., 10th Floor
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: gjacob@omm.com
Email: mgaragiola@omm.com

Elizabeth L. McKeen (*pro hac vice*)
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994
Email: emckeen@omm.com

*Attorneys for Defendants The NFL Player Disability & Survivor Benefit Plan, The NFL Player Disability & Neurocognitive Benefit Plan, The Bert Bell/Pete Rozelle NFL Player Retirement Plan, and The Disability Board of the NFL Player Disability & Neurocognitive Benefit Plan*

## **CERTIFICATE OF SERVICE**

I, Gregory F. Jacob, hereby certify that on November 18, 2024, I caused a copy of the foregoing document to be served upon all counsel of record via the CM/ECF system for the United States District Court for the District of Maryland.


*/s/ Gregory F. Jacob*
Gregory F. Jacob