# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

JASON ALFORD *et al.*,

       Plaintiffs,

    v.

THE NFL PLAYER DISABILITY &
SURVIVOR BENEFIT PLAN *et al.*,

       Defendants.

Case No. 1:23-cv-00358-JRR

**DEFENDANTS' JOINT OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ...................................................................................................I

**TABLE OF AUTHORITIES** ..........................................................................................I

**INTRODUCTION**......................................................................................................... 1

**BACKGROUND** ........................................................................................................... 4

**LEGAL STANDARD** ................................................................................................... 7

**ARGUMENT**................................................................................................................ 10

    I.     THE ADDITIONAL DISCOVERY DEMANDED IS NEITHER
         NECESSARY NOR PROPORTIONATE.......................................................... 11

        A.     The Administrative Records, Plan-Wide Claims Data, and
              Documents Showing the Plan's Neutrality Safeguards That
              Defendants Have Already Produced Are More Than Sufficient to
              Decide Plaintiffs' Claims. ....................................................................... 11

        B.     Plaintiffs Cannot Rely on Unsupported and Refuted Allegations in
              the Complaint as Justification for Their Extra-Record Discovery
              Requests. .................................................................................................. 14

        C.     Plaintiffs' Requests Are Particularly Unnecessary and
              Disproportionate Because Their Lawsuit Is Based on the Premise
              That Their Own Claim Experience Is "Typical" of All Other
              Claimants. ................................................................................................ 16

        D.     The Motion Must Be Denied Because Plaintiffs Fail to Show the
              Requested Discovery Is Essential to Oppose the Pending Summary
              Judgment Motions.................................................................................... 18

        E.     The Cases Plaintiffs Cite in Their Motion Support Denying Their
              Discovery Request for Other Claimants' Records................................... 18

**CONCLUSION** ............................................................................................................ 20

# TABLE OF AUTHORITIES

**Cases**

*Abromitis v. Cont'l Cas. Co./CNA Ins. Cos.*, 114 F. App'x 57 (4th Cir. 2004) ............................ 12

*Agelli v. Sebelius*, 2014 WL 347630 (D. Md. Jan. 30, 2014) ................................................. 13, 18

*Balkin v. Unum Life Ins. Co.*, 2022 WL 4316270 (D. Md. Sept. 19, 2022) ........................... 13, 19

*Betof v. Suburban Hosp., Inc.*, 2012 WL 2564781 (D. Md. June 29, 2012) ........................... 10, 18

*Blanch v. Chubb & Son, Inc.*, 2014 WL 6473741 (D. Md. Nov. 18, 2014) ................................. 8

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000) ...... 9

*Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 796 F. Supp. 2d 682 (D. Md. 2011) ......... 20

*Boyd v. Sysco Corp.*, 2014 WL 12814548 (D.S.C. July 3, 2014) ............................................. 9, 12

*Campbell v. Perkins*, 2023 WL 6161086 (D. Md. Sept. 21, 2023) ........................................ 10, 18

*Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*, 2019 WL 4879015 (D. Md. Oct. 3, 2019) ................................................................................................................ 13, 19

*Chughtai v. Metro. Life Ins. Co.*, 2019 WL 4199036 (D. Md. Sept. 5, 2019) ............................. 13

*Clark v. Unum Life Ins. Co.*, 799 F. Supp. 2d 527 (D. Md. 2011) ............................................. 19

*Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 95 F.4th 964 (5th Cir. 2024) ................. 17

*Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 2021 WL 4477720 (N.D. Tex. Sept. 30, 2021) ................................................................................................................ 17, 18

*Colvin v. 88 Bd., Joint Bd. of Trustees for 88 Plan*, 2018 WL 1756738 (W.D. Tex. Apr. 11, 2018) ................................................................................................................................ 16

*Conkright v. Frommert*, 559 U.S. 506, 517 (2010) ............................................................. 3, 8, 12

*Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 903 (9th Cir. 2016) ........................................ 20

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807 (N.D. Cal. 2020) ... 19

*First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968) ............................................. 10

*Gardner v. United States*, 184 F. Supp. 3d 175 (D. Md. 2016) ................................................. 13

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700 (D. Md. 2012) ........ 19

*Griffin v. Hartford Life & Accident Ins. Co.*, 2016 WL 8794470 (W.D. Va. Sept. 27, 2016) ... 9, 15

*Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013) ........................................................ passim

*Hughes v. Hartford Life & Accident Ins. Co.*, 507 F. Supp. 3d 384 (D. Conn. 2020) ................. 12

*Hulst v. Aetna Life Ins. Co.*, 2013 WL 5675513 (E.D. Ky. Oct. 17, 2013) ................................. 12

*Jani v. Bell*, 209 F. App'x 305 (4th Cir. 2006) .............................................................................. 20

*Kane v. UPS Pension Plan Bd. of Trs.*, 2012 WL 5869307 (D. Md. Nov. 19, 2012) ................... 19

*Kasko v. Aetna Life Ins. Co.*, 33 F. Supp. 3d 782 (E.D. Ky. 2014) ............................................. 13

*Mickell v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586 (11th Cir. 2020) ..... 16

*Mickell v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 2019 WL 656328 (S.D. Fla. Jan. 15, 2019) ................................................................................................................................... 16

*Miles v. Colvin*, 2015 WL 12867003 (N.D. Ga. Aug. 12, 2015) .................................................... 16

*Reichard v. United of Omaha Life Ins. Co.*, 805 F. App'x 111 (3d Cir. 2020) .......................... 9, 12

*United States v. Rudisill*, 43 F. Supp. 2d 1 (D.D.C. 1999) ........................................................... 16

*Wall v. Reliance Standard Life Ins. Co.*, 341 F.R.D. 1 (D.D.C. 2022) ..................................... 9, 12

*Walsh v. Peters*, 2021 WL 8316262 (D. Md. Nov. 10, 2021) ...................................................... 8

*Wilkinson v. Sun Life & Health Ins. Co.*, 674 F. App'x 294 (4th Cir. 2017) .............................. 3, 8

*Williams v. Md. Dep't of Health*, 2024 WL 2746979, at *5 (4th Cir. May 29, 2024) ........ 3, 10, 18

*Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*, 2020 WL 5628020, at *6 (S.D. Tex. Aug. 17, 2020) ................................................................................................................... 19

*Zahariev v. Hartford Life & Accident Ins. Co.*, 2020 WL 12783951 (D.S.C. Aug. 11, 2020) .. 9, 12

*Zogenix, Inc. v. Fed. Ins. Co.*, 2021 WL 4026911 (N.D. Cal. Sept. 3, 2021) .............................. 12

**Other Authorities**

Local Rules, United States District Court for the District of Maryland, Appendix A, Guideline 1 (2023) ....................................................................................................................................... 8

**Rules**

Fed R. Civ. P. 26(b) ................................................................................................................. 10

Fed R. Civ. P. 56(d) ................................................................................................................. 11

# INTRODUCTION

Plaintiffs seek to compel Defendants the NFL Player Disability & Survivor Benefit Plan, the NFL Player Disability & Neurocognitive Benefit Plan (collectively, the "Disability Plan" or "Plan"), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan," and with the Disability Plan, the "Plans"), and the Disability Board of the NFL Player Disability & Neurocognitive Benefit Plan (the "Board") to produce every "benefit determination decision letter," every Physician Report Form ("PRF"), and every physician narrative for every claim that any claimant has filed with the Plan since April 1, 2018—more than six years' worth of claims. Memo. in Supp. of Pls.' Mot. to Compel Disc. ("Mot.") at 1, 3.  No court has ever ordered such expansive discovery regarding a plan's Employee Retirement Income Security Act ("ERISA") claim determinations, and the request is wildly disproportionate to Plaintiffs' legitimate discovery needs in this case.  For multiple reasons, the request should be denied.

***First***, Plaintiffs fail to inform the Court that Defendants have already produced ***all*** of the requested documents for the nine named Plaintiffs, totaling 68 decision letters, 101 PRFs, and 108 physician narratives.[1]  Plaintiffs further bury at page 19 of their brief the fact that Defendants have already produced the Plan's data showing ***all*** claim determinations for ***every*** completed claim since the beginning of 2018, including the mix of Neutral Physicians who conducted the medical examinations for each claim.  The data shows that the Plan has robust approval rates for all types of disability claims, and that the central premise of Plaintiffs' Amended Class Action Complaint ("AC" or "Complaint"), ECF No. 56, that the Plan skews medical examination assignments to Neutral Physicians who are associated with high rates of

---

[1] The Court dismissed Plaintiff Alex Parsons's denial of benefits claims as barred by the statute of limitations.  *See* ECF No. 78 at 13-14.  He is therefore no longer a party to this lawsuit.  Defendants nevertheless furnished a copy of Mr. Parsons's administrative record to Plaintiffs as a courtesy upon their request.

claim denials, is false.  Defs.' Opp'n to Pls.' Mot. for Class Cert. ("Class Cert. Opp'n") at 2, 7, 19 & n.10, ECF No. 111.  There is no justification for Plaintiffs' burdensome demand that Defendants produce the individual records for the thousands of claims and appeals that underlie the claims data, and Plaintiffs do not cite any authority countenancing their sweeping Plan-wide request.

      **Second**, the burden associated with Plaintiffs' demand for additional productions would be enormous.  The produced administrative records for the named Plaintiffs and Mr. Parsons total 11,694 pages, and their produced player files total 55,217 pages.  The additional requested documents pertaining to the thousands of applications and appeals filed by other claimants would all need to be individually collected, and collecting the decision letters alone would require the Plan's limited staff to review and cull them from millions of pages of administrative records.  No case supports imposing on the Plan that overwhelming burden.

      **Third**, the premise of Plaintiffs' putative class action is that the claims records of the named Plaintiffs are typical of those of **all other claimants** encompassed by the claims data.  If that were true, the named Plaintiffs should be able to show typicality among the 68 decision letters, 101 PRFs, and 108 physician narratives Defendants have already produced—a showing that does not require the records of any other claimant.  But Plaintiffs did not even attempt to make that minimal showing when they filed their class certification motion, and Defendants' opposition papers demonstrate it is a burden they cannot meet.  Class Cert. Opp'n at 28-30. Plaintiffs' new contention that they should be permitted to go fishing among Plan-wide records to find examples of **inconsistent** treatment of other claimants, Mot. at 13-14, 20-22, is utterly irreconcilable with Plaintiffs' bid for class certification, and offers no justification for expansive discovery into the records underlying the claims data that Defendants have already produced.

**Fourth**, in addition to Plaintiffs' inability to show that their exorbitant discovery demand satisfies the relevance and proportionality requirements of Rule 26(b)(1), Plaintiffs' request for additional discovery is further constrained by the principle that court review of benefit claim denials under ERISA is presumptively limited to the administrative record, a limitation that avoids undue costs of plan administration. *See Wilkinson v. Sun Life & Health Ins. Co.*, 674 F. App'x 294, 300 (4th Cir. 2017); *see also Conkright v. Frommert*, 559 U.S. 506, 517 (2010). As explained further below, the cases that Plaintiffs cite in their Motion in fact show that the Motion should be denied, emphasizing that a plaintiff must make a "particularized" and "sufficient" showing to support even "limited" discovery outside the administrative record—which Plaintiffs have not made—and denying expansive requests like Plaintiffs' for Plan-wide discovery. Defendants' extra-record production of Plan-wide claims data, together with documentation showing the extensive measures the Plan has instituted to direct Neutral Physicians to exercise their best professional judgment when conducting medical examinations, more than satisfies any entitlement Plaintiffs might have to discovery outside their administrative records.

**Fifth**, on November 21, 2024, the Court granted Defendants permission to file multiple Rule 56 motions that between them cover **all** of the claims raised by each of Plaintiffs' proposed classes and subclasses. ECF Nos. 121, 122. Under Rule 56(d), where such motions are pending, "a court need not allow discovery when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Williams v. Md. Dep't of Health*, 2024 WL 2746979, at *5 (4th Cir. May 29, 2024) (quotations omitted). Plaintiffs have made no such showing, instead relying exclusively on unsupported speculation about the Plan's claim denial rates that is flatly contradicted by the claims data that Defendants have already produced.

For these reasons and those explained below, Plaintiffs' Motion should be denied.

## BACKGROUND

The discovery already produced by Defendants demonstrates that additional discovery is unnecessary and inappropriate. To date, Defendants have produced the following responsive documents and data:

- The complete administrative records for the disability claims filed by the named Plaintiffs, and the named Plaintiffs' complete player files. The administrative records for the named Plaintiffs and Mr. Parsons total approximately 11,694 pages. The player files for the named Plaintiffs and Mr. Parsons total approximately 55,217 pages. These records include approximately 68 decision letters, 101 PRFs, and 108 physician narratives, which are the specific documents that are requested by Plaintiffs' Requests for Production ("RFPs") 2 and 3. *See* Decl. of Meredith Garagiola in Supp. of Defs.' Joint Opp'n to Pls.' Mot. to Compel Disc. ("Garagiola Decl.") ¶¶ 2, 4.

- Data files showing, *inter alia*, (1) the outcomes of all disability benefit applications and appeals filed by all claimants beginning January 1, 2018, with an application status of "Completed" or blank; (2) whether the applications were decided based on medical criteria or on administrative criteria (such as failure to show up for a required medical examination); and (3) the mix of Neutral Physicians who conducted the medical examinations for each application. *Id.* ¶ 5.[2] These files contain the file names "Disability

---

[2] On November 18, 2024, Defendants produced R code scripts in support of the Declaration of David B. Lasater in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Lasater Decl. ISO Class Cert. Opp'n"), ECF No. 111-2. Plaintiffs inaccurately assert that Defendants did not "produce the data in a reasonably usable format." Mot. at 19-20 n.21. In fact, Plaintiffs' counsel acknowledged to Defendants on November 25, 2024 that they "are familiar with R file," which is the standard data format used by most statisticians. Garagiola Decl. ¶ 6, Exhibit A. On November 26, 2024, at Plaintiffs' request, Defendants re-produced the "Disability Appeals" and

Appeals" and "Disability Applications."

- Documents showing the extensive safeguards implemented by the Plan to direct and instruct Neutral Physicians to exercise their best professional judgment when conducting medical examinations, including:

  o All relevant Plan documents and amendments for the relevant time period. Garagiola Decl. ¶ 2. The Plan requires that for every examination, the Neutral Physician must "(1) certify that any opinions offered as a Neutral Physician will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a 'flat-fee' agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits." Apr. 1, 2021

---

"Disability Applications" data text files in Excel format,and produced data extracted from the R files that were previously produced in a format that could be opened in Excel—as the R files themselves cannot be directly converted into Excel and must be opened using the R program, which is a free, open-source software program. Garagiola Decl. ¶ 7. Specifically, Defendants produced the following .CSV files generated as output from the R script that are relied upon by Dr. Lasater and the following Excel spreadsheets that prepare the .CSV files for presentation in Dr. Lasater's declaration:
- FN Application Encounters.csv
- FN Appeal Encounters.csv
- LOD Chi Square Table - Median.csv
- LOD Chi Square Table - Quartile.csv
- LOD Chi Square Table - Appeals -Quartile.csv
- LOD Chi Square Table - Median - Appeals.csv
- NCD Chi Square Table - Median.csv
- NCD Chi Square Table - Quartile.csv
- NCD Chi Square Table - Appeals - Quartile.csv
- NCD Chi Square Table - Median - Appeals.csv
- Summary Table for Report Appendix - Application Median.xlsx
- Summary Table for Report Appendix - Application Quartile.xlsx
- Summary Table for Report Appendix - Appeal Median.xlsx
- Summary Table for Report Appendix - Appeal Quartile.xlsx
- T&P Chi Square Table - Median.csv
- T&P Chi Square Table - Quartile.csv
- T&P Chi Square Table - Appeals - Quartile.csv
- T&P Chi Square Table - Median - Appeals.csv
- Duplicates.csv

*Id.*

Disability Plan Doc. § 12.3(a); Decl. of H. Vincent in Supp. of Defs.' Joint MSJ of

Pl. D. Loper's Claims ("Vincent Decl. ISO Loper MSJ") ¶ 25, ECF No. 115-4.

o   Neutral Physician contracts covering the relevant period for the 48 different

Neutral Physicians who examined the named Plaintiffs.  Garagiola Decl. ¶ 3.  The

contracts confirm that Neutral Physicians are paid a flat fee for each examination

that does not vary based on the examination's outcome.  Vincent Decl. ISO Loper

MSJ ¶ 22; Ex. C to Vincent Decl. ISO Loper MSJ, Contract of Dr. David Apple at

3 ("Apple Contract"), DL-219, ECF No. 115-8 at 4.  The contracts also require

Neutral Physicians, among other things, "[t]o personally review and evaluate any

and all medical records and materials provided to you by the Plan, and "[t]o

personally conduct each test and examination, and prepare each report, according

to the highest applicable professional standards, without any bias or favoritism for

or against any Player."  Vincent Decl. ISO Loper MSJ ¶ 25; Apple Contract ¶¶ 3-

5, 11.

o   Neutral Physician orientation manuals for the following areas: General,

Neurology and Neuropsychology, Orthopedics, and Psychiatry.  Garagiola Decl. ¶

3.  The manuals instruct Neutral Physicians that they cannot be biased against

former players who are applying for disability benefits, and that they must render

their best professional judgment when deciding claims. Vincent Decl. ISO Loper

MSJ ¶ 27; Ex. E to Vincent Decl. ISO Loper MSJ, Orientation Manual, DL-629.

o   A declaration from the Disability Relations Manager of the NFL Player Benefit

Office ("NFLPBO") affirming that (1) Neutral Physicians are "jointly

designate[d]" by the NFL Players Association (which represents NFL players) and

the NFL Management Council (which represents NFL teams) to serve on the
panel of physicians who are available to conduct Plan and medical evaluations,
and the Board plays no role in that designation process, Vincent Decl. ISO Loper
MSJ ¶ 15; and (2) the NFLPBO assigns Neutral Physicians to conduct
examinations using neutral criteria, such as area of specialty, proximity to the
applicant, and availability to conduct a timely evaluation, and never considers a
Neutral Physician's propensity to find that former players are or are not disabled
when making examination assignments.  *Id.* ¶ 19.

In support of this Opposition to the Motion, Defendants have submitted a declaration
from the NFLPBO's Disability Relations Manager describing the extreme burden that would be
imposed on the Plan if it was required to produce all of the decision letters, PRFs, and physician
narratives for all of the disability benefit claims that are encompassed by the produced claims
data, beginning on April 1, 2018.  The declaration explains that collecting all of the decision
letters, PRFs, and physician narratives underlying the more than 4,500 benefit applications and
1,200 appeals at issue "would require significant and very burdensome manual review" that
"would take thousands of hours to complete" and "would be logistically crippling" for the
NFLPBO's limited staff.  *See* Decl. of H. Vincent in Supp. of Defs.' Joint Opp'n to Pls' Mot. to
Compel Disc. ("Vincent Decl.") ¶¶ 10-12.

## <u>LEGAL STANDARD</u>

To demonstrate entitlement to an order compelling additional discovery, Plaintiffs must
show that their requests satisfy the proportionality standard of Rule 26(b), ERISA's stringent
standard for extra-record discovery, and Rule 56(d)'s requirement that the discovery requested is
"essential to justify" Plaintiffs' opposition to the pending summary judgment motions.

"Fed R. Civ. P. 26 requires that discovery be relevant to any party's claim or defense;

proportional to what is at issue in a case; and not excessively burdensome or expensive as compared to the likely benefit of obtaining the discovery being sought."  Local Rules, United States District Court for the District of Maryland, Appendix A, Guideline 1 (2023).  Rule 26(b)(2)(C) "cautions that all permissible discovery must be measured against the yardstick of proportionality."  *Walsh v. Peters*, 2021 WL 8316262, at *2 (D. Md. Nov. 10, 2021) (quoting *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 523 (D. Md. 2010)).  "[T]he court … 'must limit the frequency or extent of discovery' if: (i) 'the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive'; (ii) 'the party seeking discovery has had ample opportunity to obtain the information by discovery in the action'; or (iii) 'the proposed discovery is outside the scope permitted by Rule 26(b)(1),' considering 'the importance of the issues at stake in the action, the amount in controversy, ... the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.'"  *Walsh*, 2021 WL 8316262, at *2 (quoting Fed. R. Civ. P. 26(b)(2)(C)(i)-(iii); 26(b)(1)).

This Court has already determined that the abuse of discretion standard of review applies to the benefit claims at issue in this case.  ECF No. 78 at 15.  Under ERISA, "[w]hen a court reviews a coverage determination under the abuse of discretion standard, generally, consideration of evidence outside of the administrative record is inappropriate."  *Wilkinson*, 674 F. App'x at 300 (citing *Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013)); *Blanch v. Chubb & Son, Inc.*, 2014 WL 6473741, at *2 (D. Md. Nov. 18, 2014) (denying request for discovery outside administrative record).  This rule "furthers ERISA's goals of expeditiously, efficiently, and inexpensively resolving coverage disputes."  *Helton*, 709 F.3d at 352; *see also*

*Conkright*, 559 U.S. at 517 ("Congress sought 'to create a system that is [not] so complex that administrative costs, or litigation expenses, unduly discourage employers from offering [ERISA] plans in the first place.'" (quoting *Varity Corp. v. Howe*, 497 U.S. 489, 497 (1996)).

A narrow exception to this general rule allows courts to consider "evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary for the court to adequately assess the *Booth* factors and the evidence was known to the plan administrator when it rendered its benefits determination." *Helton*, 709 F.3d at 356 (citing *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000)). But this exception does not provide "*carte blanche* authority to seek discovery outside of the administrative record." *Griffin v. Hartford Life & Accident Ins. Co.*, 2016 WL 8794470, at *2 (W.D. Va. Sept. 27, 2016). In particular, absent a "sufficient showing," such discovery does not extend to "the facts behind other health claims" determined by the same defendant. *Boyd v. Sysco Corp.*, 2014 WL 12814548, at *4 (D.S.C. July 3, 2014) (denying request for discovery into other health claims processed by the same company); *Zahariev v. Hartford Life & Accident Ins. Co.*, 2020 WL 12783951, at *4-5 (D.S.C. Aug. 11, 2020) (denying request for discovery into denials and acceptances of other claimants' disability claims); *Wall v. Reliance Standard Life Ins. Co.*, 341 F.R.D. 1, 5, 8-9 (D.D.C. 2022) (explaining Rule 26 was amended in 2015 to emphasize proportionality and to "encourage judges to be more aggressive in identifying and discouraging discovery overuse," and denying motion to compel 10 years' of disability claim reviews as irrelevant and not proportional); *Reichard v. United of Omaha Life Ins. Co.*, 805 F. App'x 111, 117 (3d Cir. 2020) (affirming denial of request for discovery into medical reviewer's claims denial rate because of the "high cost of producing the evidence and its minimal probative value").

Under Rule 56, the discovery obtainable "to oppose a summary judgment motion would normally be less extensive in scope than the general discovery obtainable under Rule 26." *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 298 (1968).  When a summary judgment motion is pending, "[t]o raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, 'for specified reasons, it cannot present facts essential to justify its opposition,' without needed discovery." *Campbell v. Perkins*, 2023 WL 6161086, at *5 (D. Md. Sept. 21, 2023) (quoting Fed. R. Civ. P. 56(d)).  When discovery requests are subject to the strictures of Rule 56(d), "a court need not allow discovery when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment." *Williams*, 2024 WL 2746979 at *5 (quotations omitted).  The nonmovant "must clearly demonstrate the need for discovery pursuant to Rule 56(d)," which cannot "be based on speculation as to what potentially could be discovered." *Betof v. Suburban Hosp., Inc.*, 2012 WL 2564781, at *8-9 (D. Md. June 29, 2012) (quotations and citations omitted).  "Rule 56(d) does not authorize 'fishing expedition[s].'" *Id.* at *9 (quoting *Morrow v. Farrell*, 187 F. Supp. 2d 548, 551 (D. Md. 2002), *aff'd*, 50 F. App'x 179 (4th Cir. 2002)).

## ARGUMENT

Because Plaintiffs' additional discovery demands flunk every applicable discovery standard, the Motion to Compel must be denied.  Plaintiffs completely ignore the productions that Defendants have already made, and offer no explanation why the extensive claims data that Defendants have already produced, together with the 68 decision letters, 101 PRFs, and 108 physician narratives pertaining to the named Plaintiffs' claims, are insufficient to meet Plaintiffs' discovery needs.  Producing the records underlying the Plan-wide claims data would be enormously burdensome, and Plaintiffs fail to make any demonstration that their request is

proportionate to the needs of the case, Fed R. Civ. P. 26(b), necessary for the court to adequately assess the *Booth* factors, *Helton*, 709 F.3d at 356, or essential to justify their opposition to Defendants' pending Rule 56 motions, Fed R. Civ. P. 56(d).  Notably, Plaintiffs do not cite a single case that has required an ERISA plan to produce the individual claim records underlying produced plan-wide claims data.

## I.      THE ADDITIONAL DISCOVERY DEMANDED IS NEITHER NECESSARY NOR PROPORTIONATE.

### A.      The Administrative Records, Plan-Wide Claims Data, and Documents Showing the Plan's Neutrality Safeguards That Defendants Have Already Produced Are More Than Sufficient to Decide Plaintiffs' Claims.

Each of the nine named Plaintiffs contends that his claim for disability benefits was improperly denied (Count I), that the letters he received denying his claims were deficient under ERISA (Count II), and that Defendants failed to provide a "full and fair" review of his claims (Count III).  Courts routinely decide such claims based on ERISA claimants' administrative records, and Plaintiffs do not contest that the complete administrative records and player files that Defendants have already produced for each of the named Plaintiffs are sufficient to decide those claims.  The administrative records and player files that have been produced contain all of the denial notices, PRFs, and physician narratives for the named Plaintiffs' at-issue disability claims, and more than adequately respond to Plaintiffs' RFP 2 (requesting denial notices) and RFP 3 (requesting PRFs and physician narratives).

The Complaint further contends in Count V that Defendants breached their fiduciary duties by administering a "sham" claims approval process, that Defendants have implemented a "fraudulent scheme" to skew medical examination assignments toward Neutral Physicians who are associated with high rates of benefit claim denial, and that Defendants misrepresent to Plan participants that Neutral Physicians are neutral when they are in fact biased against them.  Mot. 6

11

& n.4.  It is not uncommon for ERISA plaintiffs to contend that the administrator responsible for adjudicating their benefit claims has a history of biased claims administration, and to demand discovery pertaining to the administrator's determinations of other claimants' claims.  Courts routinely deny such discovery requests—including requests for claims data showing claims denial rates—absent a "sufficient showing" that such extra-record discovery is warranted.  *See, e.g.*, *Boyd*, 2014 WL 12814548, at *4 (denying request for discovery for "the facts behind other health claims"); *Zahariev*, 2020 WL 12783951, at *5 ("the Court denies [plaintiff's] request to propound discovery into statistical data concerning third-party medical review"); *Wall*, 341 F.R.D. at 8-9 (denying motion to compel 10 years of disability claim reviews); *Reichard*, 805 F. App'x at 117 (affirming denial of request for discovery into medical reviewer's claims denial rate).[3]  If courts did not deny such requests for extra-record discovery into the records of other claimants, ERISA plans would fast be overwhelmed with extensive discovery burdens that would undermine "ERISA's goals of expeditiously, efficiently, and inexpensively resolving coverage disputes."  *Helton*, 709 F.3d at 352; *Conkright*, 559 U.S. at 517.  And while a handful of cases that Plaintiffs cite in their Motion have permitted targeted extra-record discovery based on a sufficient and particularized showing of need, none of the cases that Plaintiffs cite have required

---

[3] *See also Hughes v. Hartford Life & Accident Ins. Co.*, 507 F. Supp. 3d 384, 399 (D. Conn. 2020) (denying request for discovery into "the numbers or percentages of administrative appeals approved or rejected by individual appeals specialists" and explaining that "courts have refrained from ordering compliance with similar requests because bare numbers or percentages of claim denials are meaningless without additional context—and that context cannot be provided without holding mini-trials on the other claims" (collecting cases); *Abromitis v. Cont'l Cas. Co./CNA Ins. Cos.*, 114 F. App'x 57, 61 (4th Cir. 2004) (in appeal of ERISA disability claim denial, affirming denial of plaintiff's motion to compel production of "number of contracts between [an administrator] and [a physician] over the previous three years and the total amount of money that [the administrator] paid [the physician] under those contracts," despite allegations that the physician was biased and consistently tailored her reports "to support claim denials," because it is "irrelevant how much business [the administrator] provided to [the physician]."); *Hulst v. Aetna Life Ins. Co.*, 2013 WL 5675513, at *3 (E.D. Ky. Oct. 17, 2013) (denying discovery into the number of times each reviewing doctor was previously retained because "whether a reviewing doctor has previously reviewed 10 or 100 claims is not relevant to the issue of whether there is support in the administrative record for the determination made regarding [plaintiff's] claim"); *Zogenix, Inc. v. Fed. Ins. Co.*, 2021 WL 4026911, at *4 (N.D. Cal. Sept. 3, 2021) (in a non-ERISA case, denying a motion to compel "information regarding [the defendant's] handling of other insureds' requests").

an ERISA plan to produce on a plan-wide basis other claimants' individual claim records.[4]

Defendants thus would have been justified in refusing to produce to Plaintiffs any extra-record information about the determination of other claimants' disability claims. But Defendants instead went beyond their discovery obligations and produced Plan-wide claims data from the beginning of 2018 so that Plaintiffs' baseless allegations that the Plan has low claim approval rates, and that it skews medical examination assignments toward Neutral Physicians who are associated with high rates of benefit claim denials, could be conclusively refuted. Defendants also produced substantial extra-record documentation showing the extensive safeguards the Plan has instituted to ensure that Neutral Physicians conduct medical examinations exercising their best professional judgment and without bias. Plaintiffs ignore these productions in their Motion, which dispositively undermine any basis for Plaintiffs' demands for additional extra-record discovery. *See, e.g.*, *Agelli v. Sebelius*, 2014 WL 347630, at *10 (D. Md. Jan. 30, 2014) (denying request for additional discovery where the defendants' completed productions undermined asserted basis for further discovery); *Gardner v. United States*, 184 F. Supp. 3d 175, 184 (D. Md. 2016) (denying additional discovery where "the Individual Defendants have adduced evidence that seems flatly at odds" with the plaintiff's unsupported allegations).

---

[4] *See Balkin v. Unum Life Ins. Co.*, 2022 WL 4316270, at *4-6, 6 n.4 (D. Md. Sept. 19, 2022) (holding that to support extra-record discovery a plaintiff cannot use "bare assertion[s]" but must assert "particularized facts," and granting an interrogatory for "the number of claims" that were referred to three specific doctors and "the number of cases in which each doctor found claimants to be disabled"); *Chughtai v. Metro. Life Ins. Co.*, 2019 WL 4199036, at *1-2 (D. Md. Sept. 5, 2019) (based on specific allegations pertaining to two doctors, granting interrogatories for a "breakdown of each of the two doctors' recommendations during that period"); *Kasko v. Aetna Life Ins. Co.*, 33 F. Supp. 3d 782, 786-89 (E.D. Ky. 2014); Mem. Supp. Pl.'s Rule 37 Mot. Compel Disc. Resps. at 5, *Kasko v. Aetna Life Ins. Co.*, No. 5:13-cv-00243 (D. Md. Mar. 14, 2014), ECF No. 15 (requiring ERISA plaintiff to make a "factual showing" to garner "strictly confined" and "tailored" extra-record discovery, and granting an interrogatory for "the number of files" in which four reviewing doctors recommended disability findings over a three-year period); *Helton*, 709 F.3d at 356-57 (affirming district court's consideration of limited extra-record evidence showing the date on which the participant received an update from the plan); *Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*, 2019 WL 4879015, *9-10 (D. Md. Oct. 3, 2019) (granting "limited discovery" regarding the contact information of "similarly-situated plan participants" who were also granted retirement benefits that were later suspended due to "unauthorized employment," but denying broader discovery requests seeking the contact information for other benefit claimants).

### B.    Plaintiffs Cannot Rely on Unsupported and Refuted Allegations in the Complaint as Justification for Their Extra-Record Discovery Requests.

Throughout their Motion, Plaintiffs repeatedly rely on the Complaint's unsupported allegations of systemic bias and low claim approval rates to support their demands for extra-record discovery. But if Plaintiffs' claims were valid, the produced claims data would show it.[5] Instead, statistical analysis of the Plan's claims data demonstrates that the Complaint's allegations are false. Of the applications for disability benefits that Defendants determined on the basis of Neutral Physician medical examinations since 2018, benefits were awarded to approximately 50.8% of applicants for line of duty benefits, 51.2% of applicants for total-and-permanent benefits, and 23.9% of applicants for neurocognitive benefits. Lasater Decl. ISO Class Cert. Opp'n ¶ 42 & Table 4. Moreover, the data shows that for all three types of disability benefits, the quartile of Neutral Physicians who received the *greatest* number of medical examination assignments were associated with the *lowest* rates of denials for both applications

---

[5] Defendants produced the claims data on a de-identified basis. Dr. Lasater explains in his expert opinion that because Neutral Physicians are paid a flat fee for each examination, examination frequency is a good proxy for aggregate Neutral Physician compensation, and can reliably be used to test whether the NFLPBO skews Neutral Physician medical examination assignments toward Neutral Physicians who are associated with high application denial rates. Lasater Decl. ISO Class Cert. Opp'n ¶ 17 n.10. The de-identified data that Defendants already produced is thus all that Plaintiffs require to run the statistical analyses for which they say they are seeking the underlying individual claims records. *See* Mot. 10. The Plan has a material interest in de-identifying the names of individual Neutral Physicians because it does not maintain statistics concerning individual Neutral Physicians' rates of finding that claimants are or are not disabled, Vincent Decl. ISO Loper MSJ ¶ 19, a prophylactic safeguard that renders it impossible for the NFLPBO to make Neutral Physician assignments on that basis. But if such statistics were generated for the first time as part of this litigation, it would be impossible to thereafter put the toothpaste back in the tube, and repeat players like Plaintiffs' counsel would thereafter recurrently allege that the NFLPBO is relying on the newly generated statistics to make Neutral Physician assignments. De-identification of the data thus protects an important Plan interest, while giving Plaintiffs everything they need to run statistical analyses. Furthermore, Plaintiffs specifically seek through their lawsuit to compel Defendants to create a similar statistical database and to use it to audit the performance of Neutral Physicians, AC ¶ 373, a remedy that no case identified by Plaintiffs has ever awarded or suggested is required by ERISA. Plaintiffs should not be permitted to use a discovery motion to force the creation of the very statistical database the Complaint demands, particularly where its creation would generate irremediable problems for the Plan. Plaintiffs inaccurately claim that the Plan has already created such a database, Mot. 27-28, but Dr. William Garmoe has supplied a declaration averring that the database that he maintains outside the NFLPBO to track trends in neuropsychological and neurological test data has *never* been used to generate aggregate or summary statistics about decisions made or trends in decision-making by individual Neutral Physicians. Decl. of Dr. William Garmoe in Supp. of Defs.' Joint Opp'n to Pls.' Mot. to Compel ¶¶ 6-12.

and appeals—the exact *opposite* of the Complaint's core allegation.  *Id.* ¶ 29 & Table 2; ¶ 49 &

Table 6.  There is no indication in the claims data of *any* statistically significant skew against

claimants of the kind the Complaint alleges.  *Id.* ¶ 7.

Plaintiffs nonetheless repeatedly rely on the Complaint's refuted allegations as purported

support for their expansive extra-record discovery requests.  *See, e.g.*, Mot. 6 n.4, 8, 10-11, 16-17

& n.18, 26 n.26.  But none of the cases that Plaintiffs cite hold that a plaintiff can rely on

unsupported pleadings to justify extra-record discovery into the individual records of other

claimants, particularly where Defendants have already produced claims data covering all of the

claims that are encompassed by Plaintiffs' requests.  *See supra* at 13 n.4.  And although Plaintiffs

aver in the Complaint that their allegations of systematic bias against claimants are based on

analysis of various "statistical samples" they purportedly possess, *see, e.g.*, AC ¶¶ 116-46,

Plaintiffs have not produced any such statistical analysis in discovery, did not furnish *any*

statistical analysis in support of their Motion for Class Certification, and offer no statistical

analysis as part of the "sufficient showing" that they are required to make to establish their

entitlement to additional discovery.  Plaintiffs absurdly contend in the Motion that they "*allege*

overwhelming evidence of extensive bias," Mot. 25 (emphasis added), but Plaintiffs must use

*actual* evidence to justify their specific demands for extra-record discovery.[6]  *See Griffin*, 2016

WL 8794470, at *2 (a "bare assertion, without any factual support" of potential bias among

third-party claim reviewers is not sufficient to justify extra-record discovery in an ERISA case).

Plaintiffs already have in hand through Defendants' substantial discovery productions all of the

---

[6] Dr. Lasater's expert opinion explains that the Complaint's various purported "statistical" allegations, even if taken at face value, are completely meaningless absent substantial additional contextual information that Plaintiffs have failed to supply.  Lasater Decl. ISO Class Cert. Opp'n ¶¶ 55-63.  Dr. Lasater has also provided a supplemental opinion demonstrating that the specific purported "statistics" from the Complaint that Plaintiffs rely on in support of their Motion, *see* Mot. at 17 n.18, 26 n.26, are false.  Decl. of Dr. David Lasater in Supp. of Defs.' Joint Opp'n to Pls.' Mot. to Compel Disc. at ¶¶ 6-10.

evidence they would need to show systemic bias in the claims adjudication process if those allegations were true, and Plaintiffs cannot in the face of those productions revert to their refuted pleadings as the required "sufficient showing" to justify additional discovery.[7]

### C.    Plaintiffs' Requests Are Particularly Unnecessary and Disproportionate Because Their Lawsuit Is Based on the Premise That Their Own Claim Experience Is "Typical" of All Other Claimants.

Both in their Complaint and in their Motion for Class Certification, Plaintiffs allege that their own claim determinations are "typical" of those of all other claimants.  ECF No. 102-1 at 29-31; AC ¶¶ 276-77.  This claim of typicality (which Defendants' class certification opposition refutes, *see* Class Cert. Opp'n at 28-30) renders particularly inexplicable Plaintiffs' demand for the individual claim records of all other claimants since April 1, 2018.  If the named Plaintiffs' claims are typical, then Plaintiffs should at minimum be able to demonstrate that typicality among the 68 decision letters, 101 PRFs, and 108 physician narratives that Defendants have already produced.  Moreover, Plaintiffs aver in their Complaint that they had in hand at the time they filed their Complaint an additional set of 784 "Defendant-commissioned T&P disability evaluations," *see, e.g.*, AC ¶ 116, which could also be used to demonstrate typicality.  Yet Plaintiffs have made no effort to do so: their Motion for Class Certification does not attach or use

---

[7] Plaintiffs also rely as support for their discovery requests on misleading representations concerning other court's treatment of four specific Neutral Physicians: Dr. Eric Brahin, Dr. Barry McCasland, Dr. Stephen Macciocchi, and Dr. Garmoe.  Mot. at 18 n.19, 26 n.26.  First, Plaintiffs imply in a parenthetical that a district court held that "Dr. Brahin 'conducted only a short meeting' with the plaintiff and his report contained 'many factual errors,'" *id.* at 18 n.19, when in fact the court did not criticize Dr. Brahin at all, and the quoted language is actually attributable to the plaintiff's counsel in that case and another physician, not the court.  *See Colvin v. 88 Bd., Joint Bd. of Trustees for 88 Plan*, 2018 WL 1756738, at *2 (W.D. Tex. Apr. 11, 2018).  Courts have relied on or cited the opinions of both Dr. Garmoe and Dr. McCasland without criticism.  *United States v. Rudisill*, 43 F. Supp. 2d 1, 3-4 (D.D.C. 1999) (noting the court was "inclined to concur" with Dr. Garmoe's conclusions); *Miles v. Colvin*, 2015 WL 12867003, at *10 (N.D. Ga. Aug. 12, 2015) (citing opinion of Dr. McCasland), *aff'd sub nom. Miles v. Comm'r of Soc. Sec.*, 652 F. App'x 923 (11th Cir. 2016).  And although Plaintiffs criticize Dr. McCasland's and Dr. Macciocchi's examinations of the plaintiff in *Mickell v. Bert Bell/Pete Rozelle NFL Players Retirement Plan*, 2019 WL 656328, (S.D. Fla. Jan. 15, 2019), the district court entered summary judgment for the defendant consistent with both doctors' findings that the plaintiff was not disabled, and the Eleventh Circuit's subsequent opinion reversing the district court did not criticize the findings of Dr. McCasland or Dr. Macciocchi.  *Mickell v. Bert Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586 (11th Cir. 2020).

a single one of the hundreds of records that Plaintiffs already possess to support their request for class certification.

If Plaintiffs could demonstrate typicality among the large set of records in their possession—which they cannot—then they would have no need for the additional extra-record discovery they are requesting. A central purpose of class certification under Rule 23 is to avoid the need to engage in individual discovery as to each similarly situated class member. Conversely, if the thousands of claimants at issue are not similarly situated—and they are not— then the Plaintiffs have no justifiable basis for intrusive and burdensome discovery into the individual claims records of other claimants. The Motion should be denied on this basis alone.

Nor are Plaintiffs entitled to go combing through the records of other claimants in a search for ***inconsistent*** adjudications or ***inconsistent*** application of Plan terms. Plaintiffs offer nothing but vague, non-specific, and unsupported ipse dixit allegations that such inconsistencies exist, and Defendants have supplied an RFP response to Plaintiffs declaring that they are not aware of any. *See* Defendants' Responses and Objections to Plaintiffs' RFP No. 13. Plaintiffs cite *Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 2021 WL 4477720 (N.D. Tex. Sept. 30, 2021), as support for extra-record discovery into inconsistent application of Plan terms, but the *Cloud* court actually denied the plaintiff's generalized request for "each disability claim" and "all Article 65 Neuro-Cognitive Disability Benefit Awards," while permitting only targeted discovery into the Plan's specific application of the particular Plan terms "changed circumstance" and "clear and convincing." *Id.* at *5 n.9, 7 (denying discovery pursuant to RFPs 37 and 58). Moreover, on appeal the Fifth Circuit determined that the "variations identified by the district court" were "not significant," and affirmed the Plan's denial of the benefit claim. *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 95 F.4th 964, 973 (5th Cir. 2024). Rule

26(b), Rule 56(d), and ERISA do not countenance Plaintiffs' unsupported request to engage in a generalized and burdensome fishing expedition looking for unidentified "inconsistencies," and neither *Cloud* nor any of the other cases that Plaintiffs cite suggest that they do.

**D.    The Motion Must Be Denied Because Plaintiffs Fail to Show the Requested Discovery Is Essential to Oppose the Pending Summary Judgment Motions.**

The Motion fails even to acknowledge that Defendants have, with the Court's permission, filed three pending summary judgment motions, each supported by full evidentiary records, that between them cover all of the claims raised by Plaintiffs' proposed classes and subclasses.  When such Rule 56 motions are pending, plaintiffs are required to show that the additional discovery they seek is "essential to justify [their] opposition" to the motions, *Campbell*, 2023 WL 6161086, at *5, and would by itself "create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment,: *Williams*, 2024 WL 2746979 at *5.  *See Agelli*, 2014 WL 347630, at *10.  Moreover, the required showing cannot "be based on speculation as to what potentially could be discovered."  *Betof*, 2012 WL 2564781, at *8-9.  Plaintiffs make no attempt to show that they have met the Rule 56(d) standard for additional discovery, and Rule 56(d) requires that the Motion be denied.

**E.    The Cases Plaintiffs Cite in Their Motion Support Denying Their Discovery Request for Other Claimants' Records.**

None of the cases that Plaintiffs cite in their Motion grant plan-wide discovery into the claims records of other claimants, *see supra* 13 n.4, but several of the cited cases expressly ***deny*** such requests.  In *Cloud*, the court denied the plaintiff's request for information on "each disability claim" and "Article 65 Neuro-Cognitive Disability Benefit Awards," finding that "these requests are overly broad and not reasonably calculated to lead to the discovery of information relevant to Plaintiff's claim."  *Cloud*, 2021 WL 4477720 at *7.  In *Chavis*, the court denied the plaintiff's broad request for discovery into other plan participants whose benefits had

not been suspended specifically because of "unauthorized employment." *Chavis*, 2019 WL 4879015 at *10. And in *Clark v. Unum Life Insurance Company of America*, following a further round of briefing, the district court denied all of the plaintiff's requested extra-record discovery, including for "statistical data regarding findings of disability" pertaining to other claimants, 799 F. Supp. 2d 527, 531 (D. Md. 2011), because the plaintiff "has offered the Court no appraisal whatever of the information in the record and has instead simply repeated her generalized allegations that Defendant's claims handling procedures are biased." Mem. & Order at 3-4, *Clark v. Unum Life Ins. Co. of Am.*, No. 1:10-cv-03107-JKB (D. Md. Sep. 28, 2011), ECF No. 48. The same is true here—Plaintiffs entirely ignore Defendants' substantial productions, and instead rely entirely on the baseless allegations in the Complaint to support their request—and the Motion should similarly be denied.

In addition, the cases Plaintiffs cite make clear that extra-record discovery that is unrelated to a "structural conflict of interest issue" should be denied. *Kane v. UPS Pension Plan Bd. of Trs.*, 2012 WL 5869307, *1, *4 (D. Md. Nov. 19, 2012); *see also Balkin*, 2022 WL 1136887, at *4 (extra-record discovery is permissible "[i]f a structural conflict of interest exists"). But courts have uniformly found that the Plan does not have a structural conflict of interest, because as a Taft-Hartley plan "the Board is staffed equally by three individuals appointed by the NFL and by three former players" and "[a]ction by the Board requires four votes." *Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*, 2020 WL 5628020, at *6 (S.D. Tex. Aug. 17, 2020), *aff'd*, 856 F. App'x 497 (5th Cir. 2021); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807, 813 (N.D. Cal. 2020), *aff'd and remanded on other grounds*, 855 F. App'x 332 (9th Cir. 2021); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 716 (D. Md. 2012); *Boyd v. Bert Bell/Pete Rozelle NFL Player*

*Ret. Plan*, 796 F. Supp. 2d 682, 690-91 (D. Md. 2011).  In the face of this overwhelming authority Plaintiffs make no argument that the Plan operates under a structural conflict of interest, yet the absence of any structural conflict alone distinguishes virtually every case Plaintiffs cite granting even limited extra-record discovery.[8]  The Motion should be denied.

## **CONCLUSION**

For the foregoing reasons, this Court should deny Plaintiffs' Motion to Compel.

Date: December 10, 2024

Respectfully submitted,

*/s/ Gregory F. Jacob*
Gregory F. Jacob (D. Md. Bar No. 06769)
Meredith N. Garagiola (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W., 10th Floor
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: gjacob@omm.com
Email: mgaragiola@omm.com

Elizabeth L. McKeen (*pro hac vice*)
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994

---

[8] Two of the cases that Plaintiffs cite do not relate to discovery issues.  Plaintiffs rely on *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 903 (9th Cir. 2016), as support for the proposition that "'statistics showing a parsimonious pattern of assessments disfavorable to claimants' would be 'more powerful evidence' of a fiduciary's motives, conflict, or bias."  Mot. at 15.  But Plaintiffs provide no evidence of such a "parsimonious pattern," which the Plan-side claims data that Defendants have already produced conclusively refutes.  Indeed, the *Demer* court made clear that if a defendant proffers evidence that there is *not* a "parsimonious pattern" of assessments—as Defendants have in this case through Dr. Lasater's analysis of the Plan-wide claims data—that evidence is sufficient to refute a claim of bias.  *Demer*, 835 F.3d at 903 n.8.  *Jani v. Bell*, 209 F. App'x 305 (4th Cir. 2006), similarly did not involve a discovery issue.  That case, which was decided more than a decade before the Neutral Rule was adopted, criticized the Board for failing to credit a Neutral Physician's finding that a player was disabled, while noting the existence of eight other benefit claims in which the Board "chose to follow" a Neutral Physician's recommendation that a player was disabled.  *Id.* at 317 n.8.  Plaintiffs' complaint in this case is the exact opposite: they want the Board to award them disability benefits (in contravention of the Neutral Rule) even though none of the Neutral Physicians who examined them determined that they are disabled.  *Jani* provides no support for Plaintiffs' discovery request.

Email: emckeen@omm.com

*Attorneys for Defendants The NFL Player
Disability & Survivor Benefit Plan, The NFL
Player Disability & Neurocognitive Benefit
Plan, The Bert Bell/Pete Rozelle NFL Player
Retirement Plan, and The Disability Board of
the NFL Player Disability & Neurocognitive
Benefit Plan*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

JASON ALFORD *et al.*,

        Plaintiffs,

    v.

THE NFL PLAYER DISABILITY &
SURVIVOR BENEFIT PLAN *et al.*,

        Defendants.

Case No. 1:23-cv-00358-JRR

**DECLARATION OF DAVID B. LASATER IN SUPPORT OF**
**DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**
**DISCOVERY**

**I.    BACKGROUND** ................................................................................................ **3**

**II.   MY ASSIGNMENT** ........................................................................................... **4**

**III.  APPENDIX 1 – R SCRIPT** ............................................................................... **6**

   A.    R Script for this Declaration's Analyses ...................................................... 6

I, David B. Lasater, hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct to the best of my knowledge, information, and belief; that I have personal knowledge of the matters set forth herein, or knowledge based on my review of business records; and that, if called to testify as a witness in this action, I could and would testify competently thereto.

## I.    BACKGROUND

1.    I am a Senior Managing Director at FTI, a publicly-held, global consulting firm.  I have been providing statistical and econometrics consulting to clients since 1979.  During that time, I have provided deposition, trial, and administrative hearings testimony using large volumes of accounting and other operational data and applying statistical and econometric analyses to those data in a wide variety of forums, including U.S. District Courts, state courts, international arbitrations, and U.S. administrative tribunals.

2.    I hold a Ph.D. in Accounting Research Methodologies, Capital Markets, and Quantitative Methods from The University of Texas at Austin (1982), a Masters degree in Professional Accounting from The University of Texas at Austin (1979), and a Bachelors in Business Administration degree from the University of Houston (1973).  I am a licensed Certified Public Accountant in New York (since 1990) and Texas (since 1982).  I incorporate by reference my curriculum vitae attached as Appendix 1 to the November 18, 2024 Declaration of David B. Lasater in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (the "November 18, 2024 Lasater Declaration") in this matter.

3.    This Declaration is based on my analysis of data received from counsel in this matter, which is listed as Appendix 2 to my November 18, 2024 Lasater Declaration in this

matter.  This declaration is also based on my training, knowledge, and experience, as described more fully herein.

4.      My employer, FTI Consulting, charges $695 per hour for my time in this matter. FTI charges between $300 and $695 per hour for members of my team, who performed work at my direction in connection with my preparation of this declaration.  I am independent of the parties in this matter, and my compensation is not dependent on the outcome of this matter.

## II.    MY ASSIGNMENT

5.      Counsel for Defendants have asked me to analyze the validity of specific purported statistical assertions that Plaintiffs make at page 17, at FN 18, and at FN 26 of their Motion to Compel as purported support for their discovery request, citing to Paras 117, 118, 122, 123, 146, 199, 301, 328, 337, 338 of the Amended Class Action Complaint.[1]

6.      I have performed (or directed my team to perform) statistical analyses using applications and appeals data provided to me by Defendants in connection with this litigation[2] to test whether the data support these hypotheses.  I find that the data do not support Plaintiffs' allegations.

7.      My analysis of the data reveals that 48.4% percent of all single-type, medical-decision T&P disability applications are approved.[3,4]  My November 18, 2024 Lasater Declaration explains that many claims denials are appealed through the Plan's administrative

---

[1] Memorandum of Law in Support of Plaintiffs' Motion to Compel Discovery, November 26, 2024. See also, Amended Class Action Complaint, May 12, 2023.
[2] *See* Appendix 3 to my November 18, 2024 Lasater Declaration in this matter for a description of the data provided. The relevant population underlying my calculations in this Declaration are those T&P applications described in Appendix Table 3.6 of my November 18, 2024 Lasater Declaration.
[3] Table 3, November 18, 2024 Lasater Declaration, p. 16.
[4] The application approval rate is calculated as the total approved applications divided by the total applications. Alternatively, I note that physicians' approval rates are calculated as a physician's encounters associated with approved applications divided by the physician's total encounters.

appeal process, and because some applications are approved on appeal, the overall approval rate of T&P disability applications following appeal is 51.2%, or 2.8% higher.[5]

8.    There are 148 physicians that have performed T&P disability evaluations.  Because Neutral Physicians ("NPs") are paid a flat fee per examination that is the same for all members of a specialty, frequency of retention is a good proxy for aggregate compensation to a Neutral Physician.[6]  With reference to the quartile split of the array of NPs who conducted examinations of the applicants in the dataset I evaluated in my November 18, 2024 Lasater Declaration, the upper quartile of the retained NPs was associated with higher approval rates than the bottom three quartiles.[7]  None of the NPs in the upper quartile was associated with a 100% denial rate.

9.    I have analyzed the seven most frequently retained NPs, ordered by total encounters, and averaged those seven NPs' associated approval rates.  The average of the associated approval rates of the seven most frequently retained NPs is 45.3%.  None of these seven retained NPs was associated with a 100% denial rate.

10.    Among single-type, medical-decision T&P applications, my analysis of the data reflects that the average of the associated approval rates of the 13 most frequently retained neuropsychologists is 35.5%.[8]  The average 33.8% rate of associated application approvals is lower for less frequently retained neuropsychologists. None of these top 13 neuropsychologists was associated with a 100% denial rate.

---

[5] November 18, 2024 Lasater Declaration at ¶ 42 and Table 4.
[6] *See,* November 18, 2024 Lasater Declaration at ¶ 17 fn. 10.
[7] November 18, 2024 Lasater Declaration at Table 2.
[8] The top 14 neuropsychologists are not well-defined due to ties in the number of encounters within the encounter dataset. Instead, the top 13 neuropsychologists have at least 8 encounters and the top 16 neuropsychologists have at least 7 encounters. The top 16 neuropsychologists are associated with an average application approval rate of 34.2%.

***

The analyses reflected in this Declaration and its Appendices are based on data I have received to date. Should additional facts or data be produced in this matter, I respectfully reserve the right to evaluate whether such facts or data would change in any material way my analyses, interpretations or opinions expressed herein, and also to discuss with counsel for the Defendants whether I would need to supplement this Declaration.

Executed this 10th day of December, 2024 at New York, NY.

David B. Lasater, Ph.D., CPA

David B. Lasater, Ph.D., CPA

## III.    Appendix 1 – R Script

### A.    R Script for this Declaration's Analyses

6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

JASON ALFORD *et al.*,

        Plaintiffs,

    v.

THE NFL PLAYER DISABILITY &
SURVIVOR BENEFIT PLAN *et al.*,

        Defendants.

Case No. 1:23-cv-00358-JRR

**DECLARATION OF HESSAM ("SAM") VINCENT IN SUPPORT OF
DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

I, Hessam ("Sam") Vincent, hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct; that I have personal knowledge of the matters set forth herein, or knowledge based on my review of business records; and that, if called to testify as a witness in this action, I could and would testify competently thereto:

## I.    **BACKGROUND**

1.      I am employed at the NFL Player Benefits Office ("NFLPBO") in Baltimore, Maryland.  The NFLPBO is the administrative office for the NFL Player Disability & Survivor Benefit Plan (the "Plan," formerly known as the NFL Player Disability & Neurocognitive Benefit Plan and the NFL Player Disability, Neurocognitive & Death Benefit Plan) and other Taft-Hartley Act pension- and/or welfare-benefit plans maintained pursuant to collective-bargaining agreements between the NFL Players Association and the NFL Management Council.

2.      I have been employed by the NFLPBO since 2008, first as a Benefits Coordinator, working primarily with the group responsible for handling court orders that direct a participant's benefits to an alternate payee, such as a player's former spouse or child.

3.      In approximately 2009, I became a Disability Benefits Coordinator in the disability group.  As a Disability Benefits Coordinator, I helped process disability applications, including by: (i) helping players apply for benefits, (ii) receiving and maintaining records related to applications, and (iii) preparing application-related materials for presentation to the Plan's fiduciaries, i.e., Disability Initial Claims Committee (the "Committee") and the Disability Board (the "Board").

4.      I was promoted in 2016 and became the Disability Manager, managing the day-to-day activities of the other Disability Benefits Coordinators and overseeing the disability program in general.  I worked in that role for approximately five years.

5.      In 2021, I became the Disability Relations Manager, and my title was recently

changed to Director of Disability, though my responsibilities remain the same.  My primary responsibility is to manage the Plan's relationship with the physicians appointed to the Plan's Neutral Physician panel.  When the Players Association and Management Council appoint new physicians to the Neutral Physician panel, I am the primary point of contact for those physicians if they have any questions about their retention, their responsibilities, or the Plan's procedures.  I also oversee the process of coordinating medical examinations of players with the Plan's Neutral Physicians; maintaining files and records relating to players' applications; and supervising the preparation and presentation of all application-related materials to the Committee and Board.

6.      When I became Disability Relations Manager, my work with the Neutral Physician panel expanded and became my main focus.  Although I no longer have day-to-day supervisory responsibility over the Disability Benefits Coordinators, I continue to work closely with the disability group and have first-hand knowledge of their practices.

7.      In addition to me, there are 31 full-time staff members who work in the NFL Plan Benefits Office.  Of those, only 10 have the necessary training to be able to review player application files.

## II.    NFLPBO RECORDKEEPING

8.      The system of record for processing and tracking applications and appeals, including Neutral Physicians assigned and visited is known as "V3." As part of my role I am familiar with the V3 system and have experience using it.

9.      I understand that Plaintiffs have requested the following documents or the period from April 1, 2018 through February 9, 2023: (1) all T&P, LOD, and NC decision letters communicated to players; and (2) all Physician Report Forms and narratives that any Neutral Physician or Medical Advisory Physician worked on, drafted, completed, or signed (including any drafts, handwritten notes, comments, correspondence, test sheets, testing data, or other

attachments).

10.    Based on my review of the V3 system, Plaintiffs are requesting documents relating to over 4,500 benefits applications and 1,200 appeals.  The process involved in collecting these documents would require significant and very burdensome manual review.  For example, each application decision letter would need to be separately identified and collected from each individual player's file; the letters are not stored in such a way that they could be batch collected.  Collecting these files would therefore require manual review of many thousands of files.  It would also be extremely time-consuming to collect and review all of the Physician Report Forms and narratives that Plaintiffs have requested.  This process would be very difficult and burdensome for our limited office staff to accomplish.

11.    I cannot identify the precise number of pages of documents that the files Plaintiffs have requested contain, but I understand that the comparable documents produced for the nine named Plaintiffs and Mr. Alex Parsons included 101 Physician Report Forms, 108 physician narratives, and 68 decision letters.  If I add those together and divide by ten, the result is approximately 28 documents per claimant.  Across the over 4,500 applications and 1,200 appeals at issue, I estimate that between 100,000 and 150,000 documents would need to be individually collected and produced.  Moreover, decision letters in particular would need to be individually culled from the claimants' player files through a manual review.  For the nine named Plaintiffs and Mr. Parsons, the administrative records and player files collectively totaled more than 60,000 pages.  I estimate that identifying and producing the requested records across the over 4,500 applications and appeals at issue would thus require manual review of millions of pages of records.

12.    If I multiply that number by 4,500, the total is 126,000 documents for the

underlying applications, plus an additional 33,600 documents for the appeals.  Collecting and reviewing that volume of documents would take thousands of hours to complete.  Such a process would be logistically crippling for the Plan Benefit Office to undertake and would significantly impact our ability to fulfill our responsibilities and our ability to process and facilitate the timely adjudication of benefits applications.

Executed this 10th day of December, 2024 at Baltimore, Maryland.

*Hessam Vincent*
Hessam ("Sam") Vincent

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

JASON ALFORD *et al.*,

        Plaintiffs,

    v.

THE NFL PLAYER DISABILITY &
SURVIVOR BENEFIT PLAN *et al.*,

        Defendants.

Case No. 1:23-cv-00358-JRR

**DECLARATION OF MEREDITH GARAGIOLA IN SUPPORT OF
DEFENDANTS' JOINT OPPOSITION TO
PLAINTIFFS' MOTION TO COMPEL DISCOVERY**

I, Meredith Garagiola, hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct; that I have personal knowledge of the matters set forth herein, or knowledge based on my review of business records; and that, if called to testify as a witness in this action, I could and would testify competently thereto:

1.      I am an attorney at O'Melveny & Myers LLP, counsel of record for Defendants the NFL Player Disability & Survivor Benefit Plan, the NFL Player Disability & Neurocognitive Benefit Plan (collectively, the "Disability Plan" or "Plan"), the Bert Bell/Pete Rozelle NFL Player Retirement Plan (the "Retirement Plan," and with the Disability Plan, the "Plans"), and the Disability Board of the NFL Player Disability & Neurocognitive Benefit Plan (the "Board") in this matter.

2.      Defendants produced the complete administrative records for the at-issue disability claims filed by: Plaintiffs Jason Alford, Daniel Loper, Willis McGahee, and Michael McKenzie on August 1, 2024; and Plaintiffs Jamize Olawale, Eric Smith, Charles Sims, Joey Thomas, and Lance Zeno on August 7, 2024.[1]  The administrative records for the named Plaintiffs and Mr. Parsons total approximately 11,694 pages, and include copies of all documentary evidence presented to the Disability Initial Claims Committee (the "Committee") and Disability Board (the "Board") in connection with each Plaintiff's at-issue application and appeal.  Included in the August 1, 2024 production were all relevant Plan documents and amendments for the relevant time period.

3.      On October 2, 2024, Defendants produced Neutral Physician contracts covering the relevant period for the 48 different Neutral Physicians who examined the named Plaintiffs.

---

[1] On August 26, 2024, consistent with Plan practice, Defendants provided the administrative record for Plaintiff Alex Parsons.  Defendants maintain that Mr. Parsons is no longer a party to this litigation.

On that date, Defendants also produced Neutral Physician orientation manuals for the following areas: General, Neurology and Neuropsychology, Orthopedics, and Psychiatry.

4.      Defendants produced the complete player files that the Plan maintains for Messrs. Alford, Sims, Olawale, McGahee, and Parsons on October 25, 2024; and Messrs. Thomas, McKenzie, Smith, Zeno, and Loper on November 1, 2024 and November 18, 2024.  The complete player files for the named Plaintiffs and Mr. Parsons total approximately 55,217 pages and include approximately 68 decision letters, 101 PRFs, and 108 physician narratives.  A player's "player file" contains all documents related to that player, including, for each Plaintiff, the player's complete administrative record for the at-issue claims, as well as additional PRFs, narratives, and decision letters regarding applications that were not mentioned in the complaint.

5.       On November 18, 2024, Defendants produced data files showing, *inter alia*, (1) the outcomes of all disability benefit applications and appeals filed by all claimants beginning January 1, 2018, with an application status of "Completed" or blank; (2) whether the applications were decided based on medical criteria or on administrative criteria (such as failure to show up for a required medical examination); and (3) the mix of Neutral Physicians who conducted the medical examinations for each application.  These text files contained the file names "Disability Appeals" and "Disability Applications."

6.      On November 18, 2024, Defendants also produced R code scripts in support of the Declaration of David B. Lasater in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.  Plaintiffs inaccurately assert at FN 21 of their Memorandum in Support of Plaintiffs' Motion to Compel Discovery ("Mot.") that Defendants did not "produce the data in a reasonably usable format."  Mot. at 21 n.21.  In fact, Plaintiffs' counsel acknowledged to Defendants on November 25, 2024 that they "are familiar with R file," which is the standard data

3

format used by most statisticians.  A copy of the parties' email correspondence regarding this production is attached as Exhibit A.

7.     On November 26, 2024, at Plaintiffs' request, Defendants re-produced the "Disability Appeals" and "Disability Applications" data text files in Excel format, and produced data extracted from the R files that were previously produced in a format that could be opened in Excel—as the R files themselves cannot be directly converted into Excel and must be opened using the R program, which is a free, open-source software program.  Specifically, Defendants produced the following .CSV files generated as output from the R script that are relied upon by Dr. Lasater and the following Excel spreadsheets that prepare the .CSV files for presentation in Dr. Lasater's declaration:

      a.      FN Application Encounters.csv

      b.      FN Appeal Encounters.csv

      c.      LOD Chi Square Table - Median.csv

      d.      LOD Chi Square Table - Quartile.csv

      e.      LOD Chi Square Table - Appeals -Quartile.csv

      f.      LOD Chi Square Table - Median - Appeals.csv

      g.      NCD Chi Square Table - Median.csv

      h.      NCD Chi Square Table - Quartile.csv

      i.      NCD Chi Square Table - Appeals - Quartile.csv

      j.      NCD Chi Square Table - Median - Appeals.csv

      k.      Summary Table for Report Appendix - Application Median.xlsx

      l.      Summary Table for Report Appendix - Application Quartile.xlsx

      m.      Summary Table for Report Appendix - Appeal Median.xlsx

n.      Summary Table for Report Appendix - Appeal Quartile.xlsx

o.      T&P Chi Square Table - Median.csv

p.      T&P Chi Square Table - Quartile.csv

q.      T&P Chi Square Table - Appeals - Quartile.csv

r.      T&P Chi Square Table - Median - Appeals.csv

s.      Duplicates.csv

Executed this 10th day of December, 2024 at Washington, D.C.

_Meredith Garagiola_
_____
Meredith N. Garagiola

Exhibit A

| From: | Garagiola, Meredith N. |
| --- | --- |
| Sent: | Tuesday, November 26, 2024 6:35 PM |
| To: | Nikki Guntner; Le, Jonathan C. |
| Cc: | McDonnell, Kelly; Jacob, Greg; McKeen, Elizabeth L.; Falcone, Katie; Ben Barnett; Dion Kekatos; Hillary Fidler; Doug Kreis; Brad Bradford; Bryan Aylstock; Samuel Katz; Julia Damron; Caleb Seely (External) |
| Subject: | RE: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7 |

Nikki,

We will be sending a copy of the re-production of the .txt files shortly to you and the others copied on this email via secure file share. To avoid confusion we have given them new Bates numbers.

Regarding your question, "Is it Defendants' position that you will not produce any transformed data, outputs, visualizations, or other files actually created by the R scripts and relied upon by Mr. Lasater for his expert report[,]" as we previously explained, the R script that we produced is the most complete, accurate, and comprehensive source document for Dr. Lasater's analysis. That script, coupled with the data files we have already produced (and are voluntarily re-producing today) contains everything Dr. Lasater relied upon.

It is both unnecessary and burdensome for Plaintiffs to request that Defendants separately generate, extract, and produce data and tables that Plaintiffs can easily access themselves via free, open source software by simply inputting the script we produced into R. We furthermore are not aware of any instance where a court has required a party to separately produce the files contained within an R script; on the contrary, it is our experience that courts have required the production of the R script itself as the definitive source.

Nevertheless, in good faith and in an effort to resolve this issue, we have extracted the .CSV files produced as output from the R script that are relied upon by Dr. Lasater, as well as Excel spreadsheets that prepare the .CSV files for presentation in Dr. Lasater's declaration. We will produce these files today alongside the re-production of the data files. It is neither feasible nor necessary for us to attempt to extract every output that appears in R as a separate file; as we have said, anyone who runs the R script in the R console will immediately have access to every output Dr. Lasater relied upon. There is therefore nothing further for us to produce with respect to Dr. Lasater's statistical analysis.

You raised your data dictionary query for the first time on Saturday, and it is now a holiday week. We have passed on your query, and we expect to be able to respond early next week.

Best,
Meredith

## O'Melveny

**Meredith Garagiola**
She, her, hers
mgaragiola@omm.com
O: +1-202-383-5115

O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC  20006
Website | LinkedIn | Twitter

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Nikki Guntner <NGuntner@awkolaw.com>
**Sent:** Monday, November 25, 2024 2:04 PM
**To:** Garagiola, Meredith N. <mgaragiola@omm.com>; Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>; Jacob, Greg <gjacob@omm.com>; McKeen, Elizabeth L. <emckeen@omm.com>; Falcone, Katie <kfalcone@omm.com>; Ben Barnett <BBarnett@SeegerWeiss.com>; Dion Kekatos <DKekatos@seegerweiss.com>; Hillary Fidler <HFidler@SeegerWeiss.com>; Doug Kreis <DKreis@awkolaw.com>; Brad Bradford <BBradford@awkolaw.com>; Bryan Aylstock <BAylstock@awkolaw.com>; Samuel Katz <samkatz@athlawllp.com>; Julia Damron <julia@athlawllp.com>; Caleb Seely (External) <CSeeley@seegerweiss.com>
**Subject:** RE: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Meredith,

Thank you for your response.  We look forward to receiving a re-production of the .txt files in native Excel tomorrow.  Please be certain to copy our ILS team on the production.

We are familiar with R file.  Our concern with Defendants' method of production here is the creation of unnecessary potential evidentiary disputes down the road in terms of Lasaster's analysis.  All of this could have been avoided had Defendants complied with the pre-production meet-and-confer obligations negotiated in the ESI Protocol.  Is it Defendants' position that you will not produce any transformed data, outputs, visualizations, or other files actually created by the R scripts and relied upon by Mr. Lasater for his expert report?

Please let us know as promptly as possible whether you will provide us a data dictionary for V3 or the equivalent information set forth in your November 18th production cover letter.  It is difficult to understand what further investigation would be necessary to satisfy this simple request.  While we did receive the list of fields Defendants produced in your production letter, Plaintiffs require visibility into the total list of data fields available to inform whether the collection and production format is acceptable.  As you know, the ESI protocol required exchange of such information.  This information is particularly relevant given that Defendants are affirmatively relying on V3 data to try to defeat class certification and in seeking summary judgment against Plaintiffs Loper and Olawale.

We clearly disagree that Defendants' "disclosure" of V3 complied with the letter or spirit of Rule 26(f).  Only once was V3 referenced by Defendants as a potential "legacy or decommissioned" platform that Defendants would investigate a source of discoverable information.  We received no further follow-up on the platform and continue to reserve all our rights with respect to Production 7.

In light of your pledge to re-produce the V3 data tomorrow, we are canceling this afternoon's scheduled meet-and-confer.

Thank you,
Nikki

---

**From:** Garagiola, Meredith N. <mgaragiola@omm.com>
**Sent:** Monday, November 25, 2024 11:06 AM
**To:** Nikki Guntner <NGuntner@awkolaw.com>; Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>; Jacob, Greg <gjacob@omm.com>; McKeen, Elizabeth L. <emckeen@omm.com>; Falcone, Katie <kfalcone@omm.com>; Ben Barnett <BBarnett@SeegerWeiss.com>; Dion Kekatos <DKekatos@seegerweiss.com>; Hillary Fidler <HFidler@SeegerWeiss.com>; Doug Kreis <DKreis@awkolaw.com>; Brad Bradford <BBradford@awkolaw.com>; Bryan Aylstock <BAylstock@awkolaw.com>; Samuel Katz <samkatz@athlawllp.com>; Julia Damron <julia@athlawllp.com>; Caleb Seely (External)

<CSeeley@seegerweiss.com>
**Subject:** RE: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Nikki,

We are able to produce the .txt files in excel and will do so on an expedited basis so that you receive them by tomorrow.

Regarding the R file, R is a free and public open source statistical software that anyone can access and is the most widely used software for statistical analysis. If plaintiffs load the script we produced into R and run the code, you will receive the same answers as Dr. Lasater.  Producing an R file is the standard practice for all productions of statistical analysis and is therefore why we produced the code to plaintiffs in this format. All of the information you are requesting will be available if you load the script into R. That said, we will produce the R script as a text file if that is a format you will find easier to work with.  Please do check with your statistical expert to make sure that would actually be helpful, however, as it is an additional burden on our end that we understand is unlikely to actually add any value. The R script should be precisely what your statistical expert is familiar with and can readily use.

We did discuss the V3 system on multiple meet and confers; your assertion that only a "single passing reference" was made is not accurate. We also provided a production letter that describes every data field that was contained in our production.  We are investigating the data dictionary issue you raised and will respond on that point when we have information.

We think these responses address the open issues you identified for now, so we suggest taking down today's meet and confer.

Best,
Meredith

## O'Melveny

**Meredith Garagiola**
She, her, hers
mgaragiola@omm.com
O: +1-202-383-5115
————————————————
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC  20006
Website | LinkedIn | Twitter

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

**From:** Nikki Guntner <NGuntner@awkolaw.com>
**Sent:** Monday, November 25, 2024 10:47 AM
**To:** Garagiola, Meredith N. <mgaragiola@omm.com>; Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>; Jacob, Greg <gjacob@omm.com>; McKeen, Elizabeth L. <emckeen@omm.com>; Falcone, Katie <kfalcone@omm.com>; Ben Barnett <BBarnett@SeegerWeiss.com>; Dion Kekatos <DKekatos@seegerweiss.com>; Hillary Fidler <HFidler@SeegerWeiss.com>; Doug Kreis <DKreis@awkolaw.com>; Brad Bradford <BBradford@awkolaw.com>; Bryan Aylstock <BAylstock@awkolaw.com>; Samuel Katz <samkatz@athlawllp.com>; Julia Damron <julia@athlawllp.com>; Caleb Seely (External) <CSeeley@seegerweiss.com>
**Subject:** Re: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Meredith,

Following up on my email below.  Please confirm whether Defendants agree to provide the information requested below on an expedited basis.

I will circulate a zoom for this afternoon pending your response.  We can cancel if zoom proves unnecessary.

Thank you,
Nikki

**From:** Garagiola, Meredith N. <mgaragiola@omm.com>
**Date:** Saturday, November 23, 2024 at 12:17 PM
**To:** Nikki Guntner <NGuntner@awkolaw.com>, Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>, Jacob, Greg <gjacob@omm.com>, McKeen, Elizabeth L. <emckeen@omm.com>, Falcone, Katie <kfalcone@omm.com>, Ben Barnett <BBarnett@SeegerWeiss.com>, Dion Kekatos <DKekatos@seegerweiss.com>, Hillary Fidler <HFidler@SeegerWeiss.com>, Doug Kreis <DKreis@awkolaw.com>, Brad Bradford <BBradford@awkolaw.com>, Bryan Aylstock <BAylstock@awkolaw.com>, Samuel Katz <samkatz@athlawllp.com>, Julia Damron <julia@athlawllp.com>
**Subject:** Re: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Thanks Nikki, we'll investigate and get back to you as soon as we can.

**From:** Nikki Guntner <NGuntner@awkolaw.com>
**Sent:** Saturday, November 23, 2024 10:04:41 AM
**To:** Garagiola, Meredith N. <mgaragiola@omm.com>; Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>; Jacob, Greg <gjacob@omm.com>; McKeen, Elizabeth L. <emckeen@omm.com>; Falcone, Katie <kfalcone@omm.com>; Ben Barnett <BBarnett@SeegerWeiss.com>; Dion Kekatos <DKekatos@seegerweiss.com>; Hillary Fidler <HFidler@SeegerWeiss.com>; Doug Kreis <DKreis@awkolaw.com>; Brad Bradford <BBradford@awkolaw.com>; Bryan Aylstock <BAylstock@awkolaw.com>; Samuel Katz <samkatz@athlawllp.com>; Julia Damron <julia@athlawllp.com>
**Subject:** Re: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Meredith,

Thank you for your reply and agreement to promptly remedy the issues with Defendants' November 18th Production 7.  We now have more fully investigated the issues surrounding Defendants' production of V3 data contained in Production 7.  The results of that investigation are briefly summarized below.  This is a significant issue for several reasons, including Defendants' reliance on the V3 data in their class certification briefing and motions for summary judgment which, under the current schedule, are being briefed concurrently.

Other than a single passing reference during a July 22, 2024 meet-and-confer discussion, Defendants never identified or provided any information regarding their V3 system during our multiple Rule 26(f) discussions, even though Mr. Vincent, a senior NFLBO official, describes V3 as "[t]he system of record for processing and tracing applications and appeals" in his Declaration in Support of Defendants' Motion for Summary Judgment for Plaintiff Loper.  Given the centrality of ERISA benefit applications and appeals to this case, it is inconceivable that the V3 system was not raised or discussed with your clients.  Moreover, given that defense expert Lasaster relies on a subset of V3 data to support his expert report, it must have been known to your team well in advance of November 18, 2024, when the Lasaster report was served.  Finally, Section 11(g) of the negotiated ESI Protocol required Defendants to "meet and confer to address the production and production format of any relevant data contained in databases."  Defendants plainly failed to comply with these obligations for Production 7.

4

Accordingly, please immediately take the following steps:

1. Although we converted the produced .txt files into Excel files (in order to see the data), file conversion is not an ordinary or accepted part of any eDiscovery production process.  Moreover, we want to avoid future evidentiary disputes about the data produced by Defendants.  Therefore, please re-produce the .txt files in native Excel format as soon as possible.

2. The as-produced version of the R files scripts (in which Mr. Lasaster ran queries and created visualizations of the V3 raw data included in his expert report) are completely unreadable and useless to us.  Please immediately produce any transformed data, outputs, visualizations, or other files actually created by the R scripts and relied upon by Mr. Lasaster for his expert report in support of Defendant's opposition to class certification.  If you are unable to produce such files, please advise us in writing.

3. Please provide us with either a data dictionary for V3 or a list of all data fields available in V3 akin to what is set forth in your November 18th cover letter for Defendants' Production 7.

Please confirm that you will produce or provide all this requested information as quickly as possible given the current schedule for both briefing class certification and Defendants' three separate motions for summary judgment.   Provided you agree to provide all this information to us on an expedited basis, it may be possible to cancel the November 25th meet-and-confer.

In the meantime, we reserve all our rights with respect to Defendants' Production 7.

Thank you,
Nikki

---

**From:** Garagiola, Meredith N. <mgaragiola@omm.com>
**Date:** Thursday, November 21, 2024 at 4:11 PM
**To:** Nikki Guntner <NGuntner@awkolaw.com>, Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>, Jacob, Greg <gjacob@omm.com>, McKeen, Elizabeth L. <emckeen@omm.com>, Falcone, Katie <kfalcone@omm.com>, Ben Barnett <BBarnett@SeegerWeiss.com>, Dion Kekatos <DKekatos@seegerweiss.com>, Hillary Fidler <HFidler@SeegerWeiss.com>, Doug Kreis <DKreis@awkolaw.com>, Brad Bradford <BBradford@awkolaw.com>, Bryan Aylstock <BAylstock@awkolaw.com>, Samuel Katz <samkatz@athlawllp.com>, Julia Damron <julia@athlawllp.com>
**Subject:** RE: Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Nikki,

We are happy to meet and confer about this on November 25th from 3:00-4:00. To try to expedite resolution of this issue, could you please let us know in advance what specifically the problem you are having with the data is, so that we can try to identify potential solutions on our end that we can then discuss together?

Best,
Meredith

**O'Melveny**

**Meredith Garagiola**
She, her, hers
mgaragiola@omm.com
O: +1-202-383-5115

O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC  20006
Website | LinkedIn | Twitter

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

---

**From:** Nikki Guntner <NGuntner@awkolaw.com>
**Sent:** Thursday, November 21, 2024 1:28 PM
**To:** Garagiola, Meredith N. <mgaragiola@omm.com>; Le, Jonathan C. <jle@omm.com>
**Cc:** McDonnell, Kelly <kmcdonnell@omm.com>; Jacob, Greg <gjacob@omm.com>; McKeen, Elizabeth L. <emckeen@omm.com>; Falcone, Katie <kfalcone@omm.com>; Ben Barnett <BBarnett@SeegerWeiss.com>; Dion Kekatos <DKekatos@seegerweiss.com>; Hillary Fidler <HFidler@SeegerWeiss.com>; Doug Kreis <DKreis@awkolaw.com>; Brad Bradford <BBradford@awkolaw.com>; Bryan Aylstock <BAylstock@awkolaw.com>; Samuel Katz <samkatz@athlawllp.com>; Julia Damron <julia@athlawllp.com>
**Subject:** Alford v. NFL - Request for Meet and Confer re: Defendants' Production 7

Meredith & Jonathan,

The message concerns Defendants' Production 7, which you sent us on November 18, 2024.  In your cover letter, you state that the data being produced is responsive to Plaintiffs' First Set of Requests for Production and First Set of Interrogatories, though Defendants fail to identify the individual discovery request for which the production is being made.  You also state that the data supports the Declaration of David B. Lasaster that Defendants attached to their Opposition to Plaintiffs' Motion for Class Certification, also filed on November 18th.

Unfortunately, the data in Production 7 was produced in a manner inconsistent with the requirements negotiated by the parties' ESI protocol (ECF 110) and is unusable.  We request a meet and confer on this issue as soon as possible so that the data is expeditiously reproduced to us in a reasonably usable form, consistent with the requirements of Rule 26, Rule 34, and the ESI Protocol.

Your cover letter to Production 7 states that the production consists of:

1. "a pipe-separated (|) text file that contains 6,315 completed player disability applications,1 exported from the NFLPBO's V3 system, decided between January 1, 2018 and July 31, 2024;" and
2. "a pipe-separated (|) text file that contains 1,733 completed player disability appeal records, exported from the NFLPBO's V3 system, decided between January 1, 2018 and July 31, 2024."

The format of your production renders the data completely unusable (see, e.g., NFL_ALFORD-0067793, attached).  The production and the production format are inconsistent with the parties' negotiated ESI Protocol which requires that the parties "meet and confer to confer to address the production and production format of any relevant data contained in databases, document management systems, collaboration tools or software, and structured, aggregated, or application software[.]"

Defendants made no effort to meet and confer with counsel for Plaintiffs on Production 7 prior to the production on November 18th.  Accordingly, please provide us with your earliest availability to meet and confer on this issue so that the parties may "reasonably cooperate in the exchange of information concerning such databases to facilitate discussions on productions and production format," as required by the ESI protocol.  Currently, Plaintiffs are available on November 25, 2024 from 3:00 to 4:00 p.m. and November 26, 2024 from 2:00 to 4:30 p.m. to discuss re-production of the data in Defendants' Production 7.

Please let us know if you are available during these proposed times.  Given that Mr. Lasaster relied on this data in formulating his expert report which supports Defendants' opposition to class certification, the reliance materials were

provided to us in a wholly unusable format, and the short deadline for Plaintiffs to file their Reply, this matter must be addressed and resolved as soon as possible.

Thank you,
Nikki


**D. Nicole Guntner**

Aylstock, Witkin, Kreis & Overholtz PLLC
17 East Main Street, Suite 200
Pensacola, Florida 32502
Phone:  (850) 202-1010
Fax:      (850) 916-7449
www.awkolaw.com


This electronic message and/or its attachments contain legally privileged and confidential information intended only for the use of the addressee. If the reader of this message is not the intended recipient, you are hereby notified that any reading, dissemination, disclosure, distribution, or copying of this transmission or its attachments is strictly prohibited. If you receive this communication in error, please immediately notify the sender by electronic mail, and delete this message, its attachments and all copies and backups.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>THE NFL PLAYER DISABILITY &<br>SURVIVOR BENEFIT PLAN *et al.*,<br><br>　　　　　Defendants. | Case No. 1:23-cv-00358-JRR |

**DECLARATION OF DR. WILLIAM GARMOE IN SUPPORT OF**
**DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

I, William Garmoe, hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct; that I have personal knowledge of the matters set forth herein, or knowledge based on my review of business records; and that, if called to testify as a witness in this action, I could and would testify competently thereto:

## I.     **BACKGROUND**

1.      I am the Director of Psychology for MedStar National Rehabilitation Network ("MNRN").  I am a board-certified clinical neuropsychologist (ABPP-CN), with active licenses in Washington, D.C., Maryland, and Virginia, specializing in assessment and treatment of individuals who have and are experiencing traumatic brain injury, aneurysm, dementia, and other neurologic syndromes.

2.      I hold appointments as Clinical Associate Professor of Rehabilitation Medicine and Neurology in the Georgetown University Medical School, am a founder and/or current faculty member in the National Rehabilitation Hospital Neuropsychology Fellowship and the Brain Injury Medicine Fellowship programs, and am a Fellow of the National Academy of Neuropsychology.  I have published research in the areas of self-awareness following brain injury, Persistent Covid-19 Condition, and other topics, and I am a contributing author to the Clinical Neuropsychology Study Guide and Board Review.  I am also involved in the Bioethics services at MNRN.

3.      I received my PhD in clinical psychology from Northern Illinois University, and completed my residency at the Edward Hines Jr. Veterans Affairs Hospital, and post-doctoral fellowship in clinical neuropsychology at the Rehabilitation Institute of Chicago.

4.      I have worked as an independent contractor with the NFL Player Disability & Survivor Benefit Plan (the "Plan") and its predecessors since approximately 2012.

II.    **MY WORK FOR THE PLAN**

5.      My primary work for the Plan is as a Neutral Physician and Medical Advisory Physician ("MAP") neuropsychologist.  I am also one of six Plan consultants—roughly one in each specialty of players' most common impairments—orthopedics, psychiatry, neurology, and neuropsychology.  Among other things, consultants help to onboard and orient newly appointed Neutral Physicians, and update Orientation Manuals.

6.      When I first became a consultant to the Plan in approximately 2012 or 2013, I proposed that I create a system to track certain neuropsychological and neurological test data for players examined by the Plan's Neutral Physicians.  My request was granted.  I have since captured these data, which are extracted directly from report forms prepared by neuropsychologist and neurologist Neutral Physicians and from related medical examination tests results and scores.  I use these data, which are maintained in a database using software called "Statistical Package for the Social Sciences ("SPSS"), to identify and analyze trends in neurocognitive and medical data on players, such as patterns of impairment.  Data entered in the database are limited to neuropsychological and neurological exams, and do not contain data from other types of Neutral Physicians.

7.      I created this database in approximately 2012 or 2013, and it contains data from approximately 2013 through April 2024.  The data are extracted directly from Neutral Physician report forms submitted to the Plan, which I receive from the Plan via a secure download portal.  All of the data are manually entered into the database in a de-identified format, such that no player could be personally identified on the basis of the entries.

8.      My staff and I are the exclusive users of this database.  The role of my staff is to perform data entry and maintain records.  I am the only person who uses the database for analytic purposes.  No one is able to access the data or the database without my authorization.  I do not

share, and have not ever shared the database with any Plan personnel, Board or Committee members, or any Neutral Physicians.

9.    I use the database to assess neurocognitive and medical trends observed in Player evaluations, so that I can then provide guidance and recommendations to the Plan based on the relevant data I analyze.  My analyses of the data have, for example, led me to recommend changes in the neuropsychological test battery used by the Plan.

10.    The database has never been used to generate aggregate statistics about the decisions made or trends in decision-making by individual Neutral Physicians.  I have never been asked to generate aggregate or summary statistics about decisions made or trends in decision-making by individual Neutral Physicians.  The database is not used to assess or evaluate the competency or the efficacy of any Neutral Physicians.

11.    No one from the NFL Player Benefits Office, the Board, or the Disability Committee has ever requested access to the database for any purpose, and no one would be able to access the database without authorization from me.

12.    Data are maintained only on stand-alone laptop or desktop computer(s) that are password protected, and kept in a locked file cabinet inside a locked office.  Any back-up copies of the database are similarly stored in locked cabinets, and are never uploaded to any location/network that could be accessed by anyone associated with the Plan.  A separate database file is maintained to link names with identification numbers, which file I maintain in a secure location.

13.    Summaries of my data analyses regarding neuropsychological and medical trends in the data are occasionally shared at meetings of Neutral Physicians and others associated with the Plan.  No identifying information about Players is ever shared, and no summary information

4

or statistics about the performance, trends, or disability findings of Neutral Physicians is ever included in analyses or discussed at meetings.

Executed this 9th day of December, 2024 at Washington, D.C.

_____
William Garmoe, Ph.D., ABPP-CN