# EXHIBIT B

**O'Melveny**

O'Melveny & Myers LLP
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660-6429

T: +1 949 823 6900
F: +1 949 823 6994
omm.com

December 18, 2024

**Elizabeth L. McKeen**
D: +1 949 823 7150
emckeen@omm.com

Benjamin R. Barnett, Esq.
Seeger Weiss LLP
325 Chestnut St. Suite 917
Philadelphia, PA 19106
(215) 553-7990
bbarnett@seegerweiss.com

Re: *Alford v. The NFL Player Disability & Survivor Benefit Plan*, Civil Action No. 1:23-cv-00358-JRR (D. Md.): Outstanding Discovery Discussions

Dear Ben:

Defendants write in response to Plaintiffs' December 11, 2024 letter ("Letter"), as well as to close out various outstanding discovery issues raised in Plaintiffs' October and November correspondence.

As a preliminary matter, Plaintiffs' letter mischaracterizes the discovery record in this matter. Plaintiffs say that Defendants have failed to engage with Plaintiffs' discovery requests in a timely manner. This is not true. Defendants timely served written responses and objections to all of Plaintiffs' Requests for Production and Interrogatories and have participated in six discovery-related meet and confer sessions with Plaintiffs. During these conferences, which exceeded five and a half hours, Defendants were cooperative and responsive to Plaintiffs' questions, including identifying categories of documents Defendants were agreeing or declining to produce, and clearly articulating the bases for their positions. In the spirit of cooperation, and at Plaintiffs' request, Defendants have amended their written discovery responses to include information that Defendants already previously provided to Plaintiffs, either orally during meet and confers, or in Defendants' letters, emails, and briefs, and are serving these concurrently herewith.

Plaintiffs complain that discovery has moved at a "glacial pace," but the only delay has been a result of Plaintiffs' own conduct in the discovery process:

(1) Plaintiffs waited **nearly three months** after the discovery period began to serve even a single discovery request—even though Plaintiffs themselves requested that their deadline for filing their motion for class certification be set just 90 days from the start of the discovery period.

(2) Plaintiffs waited **more than six months** to serve their initial disclosures. They finally served them, following repeated requests from Defendants, on December 2, 2024—nearly two months after Defendants served theirs. And despite informing Defendants

during the parties' October 17, 2024 meet and confer that there was no reason for Plaintiffs to provide their initial disclosures earlier because they would likely only contain information pertaining to the named Plaintiffs, when Plaintiffs did finally serve their initial disclosures, they included 16 pages of vague and broad disclosures and identified 149 individuals as likely to have discoverable information.

(3) Plaintiffs insisted on conducting protracted and needlessly time-consuming meet and confers and negotiations regarding the Stipulated Protective Order and the ESI Protocol, often taking weeks to respond to Defendants' proposed redlines, and ultimately causing a process that should have been accomplished in a matter of weeks to balloon to over three months.

(4) Plaintiffs waited more than six weeks to resolve a production issue involving 26 corrupted files that they produced to Defendants.  In contrast, when Plaintiffs contacted Defendants on Saturday, August 10, 2024, because they had a problem accessing Defendants' production of administrative records, Defendants resolved the issue within a matter of hours.

(5) Plaintiffs have also steadfastly refused to produce any analysis whatsoever supporting the numerous purported statistical allegations that Plaintiffs repeatedly invoke in the Amended Complaint, and have yet to produce a privilege log for any purported attorney work product underlying those calculations.  In so doing they have violated the requirements of the parties' agreed-upon ESI Protocol by failing to meet the deadline to produce the privilege log (which elapsed six weeks ago).

To the extent that Plaintiffs complain about delay in the discovery process, they only have themselves to blame.

I. **Defendants' Discovery Responses, Productions, and Positions**

   A. **Depositions Noticed on December 12, 2024 for Early January 2025**

On December 12, 2024, without any prior discussions with Defendants, Plaintiffs noticed depositions of Mr. Vincent, Mr. Smith, and Dr. Lasater, all for the first full week of January, and all purportedly to take place at their offices in New Jersey.  Although Plaintiffs are not entitled to this extra-record discovery for reasons previously explained by Defendants in response to other discovery requests, in light of the impending January 16 briefing deadlines pertaining to Defendants' three pending summary judgment motions, and in the interest of avoiding a dispute, Defendants will agree to accommodate depositions of those three individuals on dates during that week on which they are available.  Defendants will thereafter oppose any attempts to re-depose Mr. Vincent, Mr. Smith, or any other fact witness, or to re-depose Dr. Lasater concerning his previously filed declarations.

Defendants note that the three witnesses are located across the country.  Mr. Vincent can be made available for deposition on January 9, on which date his deposition will need to occur virtually or, if in person, in Washington, D.C.  Mr. Smith can be made available for deposition on January 9 or 10, on which dates his deposition will need to occur virtually or, if in

2

person, in Arlington, TX.  Dr. Lasater can be made available for deposition on January 10, on which date his deposition will need to occur virtually.

### B. Defendants' Production of Plaintiffs' Administrative Records and Player Files

Plaintiffs state in their Letter that "[t]o date, Defendants have failed to confirm whether they have completed their productions of Administrative Records or Player Files for the Named Plaintiffs."  Letter at 2.  This is false.  The administrative record and player file productions are complete and have been for quite some time, as Plaintiffs are well aware.  Defendants could not have been clearer, via multiple oral and written communications and multiple sets of briefing, that the complete administrative records and player files have already been produced.

Defendants produced the administrative record for each of Plaintiffs' at-issue claims on August 1 and 7, 2024, and further made clear in their Responses & Objections to Plaintiffs' First Set of Requests for Production of Documents ("Requests") on September 27, 2024 ("September 27 R&Os"), that "Defendants have already produced the administrative record for each of Plaintiffs' at-issue claims."  September 27 R&Os to Request Nos. 2–3, 5, 7, 9, 11, 12, 14–17.  Defendants also filed with the Court the complete administrative record for each of the named Plaintiffs on November 19, 2024 (ECF Nos. 113, 117), and excerpts from the administrative records were attached to Defendants' Motions for Summary Judgment of Plaintiffs Loper, Olawale, and Sims' claims.

Plaintiffs have repeatedly made inaccurate statements concerning which documents qualify as part of the administrative record for a claim.[1]  As an accommodation and in the interest of avoiding a discovery dispute, Defendants provided Plaintiffs with the named Plaintiffs' and Mr. Parsons's player files (which are not the same as the administrative records) on October 25, November 1, and November 18, 2024.[2]

---

[1] As Defendants have explained multiple times, the Committee and Board review the materials that are uploaded to the Meetings Website to inform their decision making on disability benefit claims; documents that are not uploaded to the Meetings Website are not reviewed by the Committee or Board members as part of their decision making, and by definition are therefore not part of the administrative record.  The player file is the NFLPBO's day-to-day, running file or repository for application- and Player-related materials, and may contain copies of ministerial correspondence (with the player, between staff, or with Plan Neutral Physicians); phone notes; historical records relating to the Player, if any; and additional copies of the administrative record.  Some documents that are included in the player file may also have been uploaded to the Meetings Website for review by the Committee or Board, in which case they would be included in the administrative record.  Other documents in the player file that were not uploaded to the Meetings Website are not included in the administrative record.  The fact that the NFLPBO may have sometimes produced both administrative records and player files in response to other claimants' past requests for "all documents" or for "complete records" relating to a claim or claimant does not mean that the two sets of records are one and the same; they are not.

[2] As previously stated, notwithstanding Defendants' voluntary production of documents outside of the Plaintiffs' administrative records for their at-issue claims—including but not limited to Plaintiffs' and Mr.

### C. Defendants' Productions in Response to Plaintiffs' Requests for Production and Interrogatories (Set One) Are Complete

Throughout your Letter, you make various statements that Defendants' productions are "inadequate," are otherwise "deficient," or that Plaintiffs require clarification as to whether Defendants' productions are complete. Letter at 2, 3. This is not true. Defendants quickly and efficiently produced the documents and information they agreed to produce in their September 27 R&Os, and their productions are complete. Indeed, Defendants made clear in their September 27 R&Os exactly what Defendants would agree to produce and what Defendants would not agree to produce. During subsequent meet and confers, Defendants orally reaffirmed what Defendants would be producing and the bases on which Defendants were refusing to produce any requested documents that were withheld. Defendants have gone *well beyond* their discovery obligations in ERISA litigation by providing Plaintiffs with extra-record productions, including but not limited to Plan-wide claims data, Neutral Physician contracts, and Neutral Physician orientation manuals.

1. Request No. 8

Plaintiffs contend that Defendants' response to Request No. 8 is inadequate. Letter at 3. Not so. Defendants have completed their production in response to Request No. 8. Defendants made clear in their September 27 R&Os to Request No. 8 that

> Defendants will produce Documents sufficient to show the "contracts and agreements between any of the Defendants and the Named Doctors" who evaluated Plaintiffs for their at issue claims, including contracts with the hospitals with which those physicians were affiliated, if any, and Documents sufficient to show "records of payments by any of the Defendants to any of the Named Doctors" who evaluated Plaintiffs for their at issue claims. Plaintiffs' Request for "[a]ll Documents Concerning legal or financial relationships between any of the Defendants and any of the Named Doctors, including any entities, clinics, companies, organizations, or institutions with whom the Named Doctors are or were affiliated, during the Relevant Time Period," seeks discovery relating to thousands of Claimants other than Plaintiffs that is outside Plaintiffs' administrative records and not necessary to assess Plaintiffs' claims. . . . Defendants have already produced the administrative records for each of Plaintiffs' at issue claims, and Plaintiffs have not made any showing that could justify discovery outside the administrative records of the named Plaintiffs' claims. . . . The requested discovery therefore exceeds the scope of permissible discovery. Defendants are willing to meet and confer in good faith to understand Plaintiffs' position as to why this discovery is appropriate here based on the current posture of the litigation.

Sept. 27 R&Os at 20–21. On October 2, 2024, Defendants produced the Neutral Physician contracts covering the Relevant Period, defined in Defendants' September 27 R&Os as from

---

Parsons's full player files—Defendants fully reserve the right to move to strike any documents or evidence that is not part of the administrative record for any at-issue claims before the Court.

4

August 9, 2019 to February 9, 2023, for all Neutral Physicians who evaluated Plaintiffs for their at-issue claims. Defendants have not agreed to produce contracts for Neutral Physicians who did not evaluate Plaintiffs for their at-issue claims. Defendants produced the Form 5500s reflecting payment records for all Neutral Physicians for the Relevant Period on November 18, 2024. (The Form 5500s were already publicly available to Plaintiffs prior to that production, and indeed Plaintiffs used the Form 5500s to make allegations in their Amended Complaint pertaining to compensation paid to specific Neutral Physicians.) Defendants confirmed on the October 17, 2024 meet and confer that they would not be producing additional reimbursement records for Neutral Physicians, first and foremost because the Form 5500s already contain the requested compensation information, but also because numerous courts have denied similar discovery requests for amounts paid to third-party medical professionals as irrelevant and inappropriate. Defendants' productions of these documents satisfy what Defendants agreed to produce in the September 27 R&Os.

Plaintiffs' Letter identifies two specific issues regarding the contracts for Dr. Macciocchi and Dr. McNasby-Ford. As to Dr. Macciocchi, Plaintiffs state that "the only contract for Dr. Macciocchi is from 2017, despite the undisputed fact that Dr. Macciocchi performed numerous examinations prior to 2017." Letter at 3. Defendants produced only the Neutral Physician contracts that were in effect during the Relevant Period (as defined by Defendants) for the Neutral Physicians who evaluated Plaintiffs for their at-issue claims. Dr. Macciocchi's 2017 contract explicitly "supersedes any prior agreements," and therefore any contracts prior to 2017 fall well outside of the Relevant Period. As to Dr. McNasby-Ford, it appears that her contract was inadvertently omitted from the production, which you brought to our attention for the first time in your Letter on December 11, 2024, and Defendants will produce it concurrently herewith.

Defendants have also produced claims data that provides everything required to evaluate Plaintiffs' baseless allegation that the NFLPBO skews Neutral Physician medical examination assignments toward Neutral Physicians who are associated with high application denial rates. *See* Section C, *infra*. Additional physician contracts and compensation records are not necessary—and would be unduly burdensome to collect and produce—in light of the flat fee and examination frequency evidence that Defendants have already provided, which is the best possible proxy for aggregate Neutral Physician compensation. *See* Lasater Decl. ISO Class Cert. Opp'n ¶ 17 n.10.

2. Request No. 10

The Letter asserts that Defendants have "failed to provide … the *specific* bases for the benefit decisions" since August 9, 2019 in response to Request No. 10. Letter at 3. Defendants produced all decision letters for the Plaintiffs' claims at issue in this action on August 1 and 7, 2024, as those documents are part of the Plaintiffs' administrative records, and those decision letters contain the specific bases for the benefits decisions for Plaintiffs' at-issue claims. Defendants further produced claims data showing the determination of **every** completed claim between January 1, 2018 and July 31, 2024, including whether each claim was determined specifically on an administrative or medical basis, and the mix of Neutral Physicians who

conducted examinations for each claim.[3]  Defendants also created and provided a data dictionary describing the fields in the produced data for Plaintiffs' ease of use.  In short, Defendants have completed their production in response to Request No. 10 and Plaintiffs have had all of this information in hand for nearly a month.

Defendants have at all times been clear that they will not be producing the decision letters, PRFs, or physician narratives underlying the produced Plan-wide claims data **other than for the named Plaintiffs and Mr. Parsons**, and Defendants' declination to produce those documents is the subject of the Motion to Compel that Plaintiffs served on Defendants on November 26, 2024, and which Defendants timely responded to on December 10, 2024.

### 3. Request No. 15

Plaintiffs write that they "still require confirmation of whether Defendants will produce ESI responsive to RFP No. 15." Letter at 6.  Defendants made clear in the October 17, 2024 meet and confer that even if it were possible to obtain the tracking information Plaintiffs seek in response to Request No. 15, which the *Cloud* declaration indicates it is not, Defendants have not agreed to produce that information.  *See* September 27 R&Os for Request No. 15; Sept. 27, 2024 Responses and Objections to Plaintiffs' Interrogatories (Set One) No. 14 ("Review of specific records by Neutral Physicians, Board members, and Board advisors is not tracked at a document-by-document level.").  Defendants have determined that the requested information is not recorded or tracked within the systems maintained by the NFLPBO.  A third party maintains the Meetings website.  Defendants do not themselves maintain or use the information requested

---

[3] Defendants produced the claims data on a de-identified basis.  Dr. Lasater explains in his expert opinion that because Neutral Physicians are paid a flat fee for each examination, examination frequency is a good proxy for aggregate Neutral Physician compensation, and can reliably be used to test whether the NFLPBO skews Neutral Physician medical examination assignments toward Neutral Physicians who are associated with high application denial rates.  Lasater Decl. ISO Class Cert. Opp'n ¶ 17 n.10.  The de-identified data that Defendants already produced is thus all that Plaintiffs require to run the statistical analyses for which they say they are seeking the underlying individual claims records.  See Mot. 10.  The Plan has a material interest in de-identifying the names of individual Neutral Physicians because it does not maintain statistics concerning individual Neutral Physicians' rates of finding that claimants are or are not disabled, Vincent Decl. ISO Loper MSJ ¶ 19, a prophylactic safeguard that renders it impossible for the NFLPBO to make Neutral Physician assignments on that basis.  But if such statistics were generated for the first time as part of this litigation, it would be impossible to thereafter put the toothpaste back in the tube, and repeat players like Plaintiffs' counsel would thereafter recurrently allege that the NFLPBO is relying on the newly generated statistics to make Neutral Physician assignments. De-identification of the data thus protects an important Plan interest, while giving Plaintiffs everything they need to run statistical analyses.  Furthermore, Plaintiffs specifically seek through their lawsuit to compel Defendants to create a similar statistical database and to use it to audit the performance of Neutral Physicians, Amended Complaint ¶ 373, a remedy that no case identified by Plaintiffs has ever awarded or suggested is required by ERISA.  Plaintiffs should not be permitted to use a discovery motion to force the creation of the very statistical database the Complaint demands, particularly where its creation would generate irremediable problems for the Plan.

by Plaintiffs, and disclaim any obligation to attempt to seek such extra-record information from third parties.

4. <u>Interrogatory No. 3</u>

As to Interrogatory No. 3, Plaintiffs' characterization of Defendants' data production is wrong. The data files Defendants produced provide the "total number of benefit clams reviewed or evaluated by Neutral Physicians or MAPs." Letter at 3. The data provided is not "a limited subset of de-identified data relied on by Defendants' statistical expert" (*id.* at 3), but rather covers all claims filed after January 1, 2018 through July 31, 2024, as described herein.

5. <u>Revised Responses and Objections to Requests for Production (Set One)</u>

Defendants serve concurrently herewith their Revised Responses and Objections to Plaintiffs' Requests for Production (Set One), which addresses your stated concerns seeking clarity as to the documents Defendants are agreeing to produce, the grounds upon which Defendants are not producing other requested documents, and removing all "meet and confer" language.

**D. Production of De-Identified Data**

Defendants have repeatedly made clear that they will not produce identified data in response to Request No. 10 and Interrogatory No. 3.

In Plaintiffs' October 17, 2024 email regarding the meet and confer agenda and in subsequent meet and confers, Plaintiffs questioned the basis upon which Defendants were producing the data with de-identification of the claimants and of the names of the specific Neutral Physicians who examined them, in light of the Protective Order entered. As you know, Neutral Physician names were replaced with identification numbers that allow for cross-referencing and statistical analysis of the full set of each individual Neutral Physician's medical examination assignments. As we have explained several times, the Plan has a material interest in de-identifying the names of the individual Neutral Physicians because it does not maintain statistics concerning individual Neutral Physicians' rates of finding that claimants are or are not disabled (ECF No. 115-4 (Vincent Decl.) ¶ 19), a prophylactic safeguard that literally renders it impossible for the NFLPBO to make Neutral Physician assignments on that basis. If such statistics were generated as part of this litigation, claimants might thereafter recurrently allege that the NFLPBO was relying on those newly generated statistics to make Neutral Physician assignments. Indeed, Plaintiffs specifically seek through their lawsuit to compel Defendants to create a similar statistical database and to use it to audit the performance of Neutral Physicians (Amended Complaint ¶ 373), a remedy that no case identified by Plaintiffs has ever awarded or suggested is required by ERISA. As Defendants have communicated, it is improper for Plaintiffs to attempt to use the discovery process to force Defendants to create the very remedy that Plaintiffs are seeking in this lawsuit, without ever having established a substantive right to it.

Plaintiffs (falsely) allege *systemic* claim adjudication bias in the Amended Complaint, and the de-identified data that Defendants produced supplies all that is needed to assess the

7

validity of that claim.  Dr. Lasater explained in his expert declaration that because Neutral Physicians are paid a flat fee for each examination, examination frequency is a good proxy for aggregate Neutral Physician compensation, and can reliably be used to test whether the NFLPBO skews Neutral Physician medical examination assignments toward Neutral Physicians who are associated with high application denial rates.  ECF No. 111-2 (Lasater Decl. ISO Class Cert. Opp'n) ¶ 17 n.10.  The de-identified data that Defendants already produced is thus all that Plaintiffs require to run the statistical analyses for which they say they are seeking the underlying individual claims records.  See Nov. 26, 2024 Mem. ISO Pls.' Mot. to Compel Discovery ("Motion" or "Mot.") at 10.  The identities of the individual Neutral Physicians are irrelevant and add nothing to this analysis.

### E.  Neurocognitive Testing Database

In Plaintiffs' November 15, 2024 email, you demanded that "Defendants need to immediately disclose information regarding the 'statistical database' that Defendants contracted with Dr. Will Garmoe to create and maintain which was never identified or disclosed during our prior Rule 26(f) discussions.  This database apparently contains neuropsychological and neurological examinations of all applicants and is directly relevant to multiple claims in this matter and will need be produced."  Defendants responded that we would look into the database.

Defendants answered Plaintiffs' questions regarding the database via a declaration directly from Dr. Garmoe.  See Dec. 10, 2024 Decl. of Dr. William Garmoe in Supp. of Defs.' Joint Opp'n to Pls.' Mot. to Compel Discovery ("Garmoe Decl.").  In that declaration, Dr. Garmoe explained what the database contains, that it is not accessed by the NFLPBO, and most importantly, that it is not used to assess or evaluate the competency or the efficacy of any Neutral Physicians.  He also stated that the database has never been used to generate aggregate or summary statistics about decisions made or trends in decision-making by individual Neutral Physicians; and all of the data are manually entered into the database in a de-identified format, such that no player could be personally identified on the basis of the entries.  See Garmoe Decl. ¶¶ 6–12.

Plaintiffs now "reiterate their demand for immediate disclosure of this information regarding the statistical database."  Letter at 5.  Defendants have satisfied Plaintiffs' request, so it is not clear what other information about this database Plaintiffs seek.  Defendants will not produce the database or data within it for the reasons described in this letter and in Defendants' Opposition regarding the limited scope of discovery at this stage of litigation in an ERISA case such as this one.

### F.  V3 Database

Defendants furnished Plaintiffs a data dictionary on November 18, 2024 that provides a complete set of definitions for all of the data produced, and is more than adequate for Plaintiffs to understand the data.  Plaintiffs' Letter ignores this data dictionary; there is no other data dictionary for Defendants to produce.

8

The NFL Plan Benefits Office's ("NFLPBO") V3 database from which the produced data was pulled serves as a repository for information pertaining to multiple benefit plans. At your request, Defendants searched for and are herewith producing the only file that they located at the NFLPBO that might be considered a "data map" of an older version of the V3 system. V3 is software produced by Vitech Corp. The files being produced consist of a guide to the V3 system generally and, notably, was likely first created in or around 2011 by a third-party vendor named Embarcadero.

Although this production is a material accommodation of your prior requests relating to the V3 database, your Letter dated December 11 demands that Defendants *additionally* "produce a list of all the current fields in Defendants' V3 or V3loicty system." That is not a reasonable request. As noted, the V3 database serves as a repository for information pertaining to multiple benefit plans that are not at issue in this litigation. Following a reasonable investigation, Defendants produced 59 separate data fields from the V3 database for 6,315 records that Defendants determined (1) relate to the disposition of Plan claims for LOD, NC, or T&P disability benefits, and (2) contain data relating to subjects that Defendants agreed to produce in their written responses and objections to Plaintiffs' various Requests for Production. Moreover, as noted above, Defendants' letter dated November 18, 2024 provides a complete data dictionary explaining the fields. Defendants have thus more than fulfilled their discovery obligations in response to Plaintiffs' Requests for Production, and indeed have exceeded those obligations by accommodating Plaintiffs' request to produce the potential "data map." No further response is required.

## II. Plaintiffs' Discovery Deficiencies

### A. Plaintiffs' Failure to Identify Inconsistencies Alleged in the Amended Complaint

Plaintiffs have failed to respond meaningfully to Interrogatory No. 6, which asks Plaintiffs to "identify and describe in detail each alleged inconsistency between the Plan and a Neutral Physician's evaluation, report, or narrative, including but not limited to as alleged in Paragraphs 251, 253, 259, and 261 of Your Complaint." Instead, Plaintiffs responded that, among other things, they "object to this Interrogatory on the grounds that it is a premature contention Interrogatory because it improperly seeks detailed factual and legal contentions from Plaintiff before discovery has been substantially completed." But the Interrogatory merely asks Plaintiffs to direct Defendants to the inconsistencies that they themselves already alleged, and that Plaintiffs must have already identified in order to make such allegations in good faith. Defendants request that Plaintiffs supplement this response as soon as possible to provide Defendants with fair notice and understanding of their allegations.

### B. Plaintiffs' Failure to Produce the Calculations for the Statistical Allegations or a Corresponding Privilege Log

As Defendants explained in their October 9, 2024 letter, work product protection is waived when a party puts materials "at issue" in the litigation. Plaintiffs put their work product at issue when they included calculations and other statistics at issue in the Amended Complaint by

9

relying on that information as evidence of alleged bias by the Plan. Plaintiffs continue to put their statistical calculations—not just their opinions—at issue when they reiterate that they are relying on those calculations as evidence in this litigation: "Plaintiffs allege overwhelming evidence of extensive bias by Plan physicians, including those promoted and provided extra compensation to teach new Plan physicians." Mot. at 25.

In your October 21, 2024 email, Plaintiffs provide a list of cases they rely on to support their position that the "at issue" exception is not recognized in the Fourth Circuit. *See, e.g.*, *Duplan Corp. v. Moulinage et Retorderie de Chavano*, 509 F.2d 730, 735 (4th Cir. 1974); *Muhler Co., Inc. v. State Farm Fire & Cas. Co.*, 2019 WL 2419016, at *3 (D.S.C. June 10, 2019); *Washington v. Follin*, 2016 WL 1614166, at *14 (D.S.C. Apr. 22, 2016). Those cases are not applicable to the circumstances of Plaintiffs' Amended Complaint. "[D]espite the Fourth Circuit's holding that courts are to accord opinion work product 'great protection,' it did not hold that such protection was absolute." *Nutramex Lab'ys, Inc. v. Twin Lab'ys Inc.*, 183 F.R.D. 458, 465 (D. Md. 1998). And *Muhler*, which you cite, recognized that "district courts within the Fourth Circuit have permitted discovery of opinion work product under the at-issue exception" where "the party claiming work product protection relies or represents that it is going to rely on work product in proving its claim." 2019 WL 2419016, at *3 (collecting cases); *see also Congregation ARIEL Russian Cmty. Synagogue, Inc. v. Bd. of Appeals*, 2021 WL 1734442, at *2 (D. Md. May 3, 2021) (protection waived "[w]hen a party injects into a case an issue that in fairness requires examination of otherwise protected communications"); *MAG Mut. Ins. Co. v. Brown*, 2015 WL 13648556, at *14 (D.S.C. July 24, 2015) (protection waived where the party seeks to make "use of the very work product which [is] sought to be shielded from disclosure"); *Cornett Mgmt. Co., LLC v. Lexington Ins. Co.*, 2007 WL 1140253, at *6 (N.D.W. Va. Apr. 17, 2007) (protection waived where the work product was "at the heart of the complaint"); *Black & Decker Corp. v. United States*, 219 F.R.D. 87, 91-92 (D. Md. 2003) ("The case law clearly recognizes that there may be a waiver of attorney work product doctrine where the information has been placed 'at issue' by the holder of the privilege."). If Plaintiffs are now repudiating any reliance on the purported statistical allegations in the Amended Complaint and in their subsequently filed briefs, they should firmly state that in writing, now. If Plaintiffs are not repudiating reliance, however, they should immediately produce the calculations for the statistical allegations.

Furthermore, to the extent that Plaintiffs choose to maintain the position that their statistical calculations are protected work product that has not been waived, Plaintiffs must produce a privilege log reflecting the responsive documents and communications that have been withheld on the basis of privilege. The ESI Protocol states in Paragraph 17(a) that Plaintiffs are obligated to provide a privilege log "if any Documents are withheld by a producing Party on the basis of attorney-client privilege, the work-product doctrine, a joint-defense privilege, or any other applicable privilege, immunity, or prohibition on production . . . . on a rolling basis **within thirty days following the production from which the ESI or Document was withheld in whole or in part,** subject to the parties' ability to extend such deadline by mutual agreement." Paragraph 17(b) sets the period in which the Parties are relieved of their obligation to log work product or attorney-client communications made in connection with this litigation from February 9, 2023—the date Plaintiffs' complaint was filed. This means that any communications or attorney work product existing before that date must be logged. Because

Plaintiffs' statistical allegations are included in the complaint, the calculations, analyses, communications, and other documents underlying them were necessarily created prior to February 9, 2023.  Plaintiffs served their discovery responses on September 30, 2024—over two months ago—so Plaintiffs' privilege log is delinquent.  **Please produce the privilege log reflecting these documents as soon as possible, but no later than by December 24, 2024**.

### C. Plaintiffs' Failure to Produce Corrupted Evidence Files Regarding Statistical Allegations

Plaintiffs asserted in an October 21, 2024 email that they have produced "all the files underlying [their] sample cited in the Amended Complaint," and that their production will allow Defendants to "fully examine and evaluate the accuracy of [the] allegations and calculations in the Amended Complaint."  But it is not clear to Defendants that Plaintiffs have done so.  Plaintiffs asserted for the first time on December 4, 2024, that the 26 corrupted files that purportedly support these statistical allegations were duplicates of documents already produced by Plaintiffs—*over two months* after Defendants brought this issue to Plaintiffs' attention on October 21, 2024.  The spreadsheet Plaintiffs provided on December 4, 2024, purportedly matches the "Corrupt Bates" and "Corrupt Filename" of the documents to which Defendants do not have access with the "Uncorrupt Bates" and "Uncorrupt Filename (original source)" metadata fields of other purportedly duplicate documents included in Plaintiffs' production.  For example, Plaintiffs' spreadsheet indicates that NFLPLTFS-0001991 (file name "REPORT Sherman LOD_8") is the same document as NFLPLTFS-0000334 (filename "REPORT Sherman LOD").  But the actual file name for NFLPLTFS-0000334 is "61REPORT Sherman LOD."  Indeed, "REPORT Sherman LOD" is the file name for a *different* document in Plaintiffs production, NFLPLTFS-001979.  In short, the file names that Plaintiffs have provided for the uncorrupted documents do not allow Defendants to verify that the corrupted documents are actually duplicates of the uncorrupted documents.  Furthermore, Plaintiffs have not produced any roadmap, analysis, or cross-walk that explain how the haphazardly produced files can be used to recreate the alleged "samples" that Plaintiffs cite as evidence in their Amended Complaint.  Please resolve these errors as soon as possible.

Similarly, Defendants raised Plaintiffs' production of an incomplete document, NFLPLTFS-0000084, on October 24, 2024, but Plaintiffs have yet to produce the full document.  Please produce the full document as soon as possible.

Sincerely,

*/s/ Elizabeth L. McKeen*

Elizabeth L. McKeen