# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

## BALTIMORE DIVISION

JASON ALFORD, DANIEL LOPER, WILLIS
MCGAHEE, MICHAEL MCKENZIE, JAMIZE
OLAWALE, ALEX PARSONS, ERIC SMITH,
CHARLES SIMS, JOEY THOMAS, and LANCE
ZENO, Individually and on Behalf of All Others
Similarly Situated,

          Plaintiffs,

    vs.

THE NFL PLAYER DISABILITY & SURVIVOR
BENEFIT PLAN; THE NFL PLAYER
DISABILITY & NEUROCOGNITIVE BENEFIT
PLAN; THE BERT BELL/PETE ROZELLE NFL
PLAYER RETIREMENT PLAN; THE
DISABILITY BOARD OF THE NFL PLAYER
DISABILITY & NEUROCOGNITIVE BENEFIT
PLAN; LARRY FERAZANI; JACOB FRANK;
BELINDA LERNER; SAM MCCULLUM;
ROBERT SMITH; HOBY BRENNER; and
ROGER GOODELL,

          Defendants.

No. 1:23-cv-00358-JRR

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO COMPEL DISCOVERY

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   THE DISCOVERY REQUESTS IN DISPUTE ................................................. 1

III.  ARGUMENT:  THE COURT SHOULD COMPEL DEFENDANTS TO
      PRODUCE ALL OF THE DOCUMENTS THAT PLAINTIFFS SEEK
      IN REQUESTS 2 & 3 ..................................................................................... 4

A.    Requests 2 & 3 Are Reasonably Calculated to Lead to Admissible Evidence
      Pertinent to Plaintiffs' Breaches of Fiduciary Duties Claim ................................ 5

B.    Requests 2 & 3 Are Reasonably Calculated to Lead to Admissible Evidence
      Pertaining to Plaintiffs' Wrongful Denial of Benefits Claim ........................... 11

      1.    Defendants Can Be Charged with Knowledge of Their Own Decision
            Letters and Plan-Commissioned Physician Reports ............................... 12

      2.    Requests 2 & 3 Will Help Fill in the Gaps in the ARs to Adequately
            Assess the Fourth Circuit's *Wal-Mart v. Booth* Factors ....................... 12

      3.    *Booth* Factor 4:  Inconsistencies With Earlier Interpretations of the Plan............ 13

      4.    *Booth* Factor 8:  Motives, Bias, and Any Conflicts of Interest............................. 14

            a.    Discovery as to Other Claimants Is Necessary to Fill in the
                  Gaps on the Impact of Defendants' History of Bad Faith
                  Motives, Conflicts of Interest, and Failure to Take Active
                  Steps to Reduce Bias and Promote Accuracy ............................... 14

      5.    *Booth* Factor 6:  Discovery Is Necessary to Explore Defendants' Pattern and
            Practice of ERISA Violations .............................................................. 20

            a.    Discovery Is Necessary to Adequately Assess Defendants'
                  Pattern or Practice of Failing to Ensure Consistent Treatment
                  of Similarly Situated Claimants .................................................... 20

            b.    Discovery Is Necessary to Supplement the ARs Respecting
                  Defendants' Pattern or Practice of Communicating Inadequate
                  Decision Letters That Do Not Comport with ERISA
                  Requirements .............................................................................. 22

    c.    Extra-Record Discovery Is Necessary to Assess Defendants'
Pattern or Practice of ERISA Violations Through Their
ailure to Review All Documents and Information ........................ 23

    d.    Defendants' Pattern or Practice of Failing to Ensure the
Independence and Impartiality of Plan-Selected Physicians ........ 24

    e.    Discovery Outside the ARs Is Necessary to Assess
Defendants' Pattern or Practice of Ignoring Governing Plan
Documents ................................................................................... 26

    f.    Discovery Outside the ARs Is Necessary for the Court to
Assess Defendants' Pattern or Practice of Failing to Afford
De Novo Review of Committee Decisions ................................... 26

    g.    Discovery Is Necessary for the Court to Assess Defendants'
Pattern and Practice of Failing to Provide Relevant Documents .. 27

    6.    *Booth* Factor 3: Adequacy of the Materials Used to Support Defendants'
Decisions, and the Degree to Which They Support Them .................................... 28

    7.    *Booth* Factor 5:  Other Similar Situated Claimants' Decision Letters and
Physicians Reports Are Necessary to Fill in the Gaps in the ARs to
Assess Whether Defendants' Decision-Making Process Was Reasoned
and Principled ......................................................................................... 29

CONCLUSION ...................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Symetra Life Ins. Co.*,
No. CV-18-0378-TUC-JGZ (LAB), 2020 WL 1275721 (D. Ariz. Mar. 17, 2020) ................. 16

*Balkin v. Unum Life Ins. Co.*,
No. GLS 21-1623, 2022 WL 1136887 (D. Md. Apr. 18, 2022) ................................ 5, 11, 12-13

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*,
201 F.3d 335 (4th Cir. 2000) .............................................................................. 12, 14

*Briggs v. Marriott Int'l, Inc.*,
368 F. Supp. 2d 461 (D. Md. 2005) ...................................................................... 2, 4

*Caplan v. CNA Fin. Corp.*,
544 F. Supp. 2d 984 (N.D. Cal. 2008) ............................................................... 26, 29

*Chao v. Malkani*,
452 F.3d 290 (4th Cir. 2006) .................................................................................. 6

*Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*,
No. 1:17-CV-02729-ELH, 2019 WL 4879015 (D. Md. Oct. 3, 2019) ............................ *passim*

*Chughtai v. Metro. Life Ins. Co.*,
No. PWG-19-CV-848, 2019 WL 4199036 (D. Md. Sept. 5, 2019) ................................ 5, 9, 17

*Clark v. Unum Life Ins. Co. of Am.*,
799 F. Supp. 2d 527 (D. Md. 2011) ...................................................................... 15

*Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
No. 3:20-CV-1277-S, 2021 WL 4477720 (N.D. Tex. Sept. 30, 2021) .............. 5, 14, 21, 27

*Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
2022 WL 2237451 (N.D. Tex. June 21, 2022), *rev'd*, 95 F.4th 964 (5th Cir. 2024),
*cert. denied*, No. 24-61, 2024 WL 4427195 (U.S. Oct. 7, 2024). .......................... 10, 24, 27, 29

*Colvin v. 88 Bd., Joint Bd. of Trs. for 88 Plan*,
No. SA-17-CV-974-XR, 2018 WL 1756738 (W.D. Tex. Apr. 11, 2018) .............................. 18

*Demer v. IBM Corp. LTD Plan*,
835 F.3d 893 (9th Cir. 2016) ............................................................................... 15

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  487 F. Supp. 3d 807 (N.D. Cal. 2020), *aff'd and remanded,*
  855 F. App'x 332 (9th Cir. 2021) ................................................................... 14

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  No. 19-cv-05360-JSC, 2022 WL 1786576 (N.D. Cal. June 1, 2022) ...................................... 18

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  No. 16-cv-01413-JD, 2018 WL 1258147 (N.D. Cal. Mar. 12, 2018) ...................................... 14

*Faircloth v. Lundy Packing Co.,*
  91 F.3d 648 (4th Cir. 1996) .......................................................................... 6

*Ferguson v. United of Omaha Life Ins. Co.,*
  3 F. Supp. 3d 474 (D. Md. 2014) .................................................................... 28

*Griffin v. Hartford Life & Accident Ins. Co.,*
  2016 WL 8794470 (W.D. Va. Sept. 27, 2016) ...................................................... 2, 4

*Helton v. AT & T Inc.,*
  709 F.3d 343 (4th Cir. 2013) ................................................................. *passim*

*Hertz v. v. Hartford Life & Acc. Ins. Co.,*
  991 F. Supp. 2d 1121 (D. Nev. 2014) ............................................................... 26

*Jani v. Bell,*
  209 F. App'x 305 (4th Cir. 2006) ................................................................... 13

*Jefferson v. Sellers,*
  250 F. Supp. 3d 1340 (N.D. Ga. 2017) .......................................................... 18, 21

*Kane v. UPS Pension Plan Bd. of Trs.,*
  No. RDB-11-03719, 2012 WL 5869307 (D. Md. Nov. 19, 2012) ....................................... 5, 15

*Kasko v. Aetna Life Ins. Co.,*
  33 F. Supp. 3d 782 (E.D. Ky. 2014) ............................................................. 9, 26

*Mator v. Wesco Distrib., Inc.,*
  102 F.4th 172 (3d Cir. 2024) ........................................................................ 19

*Metro. Life Ins. Co. v. Glenn,*
  554 U.S. 105 (2008) ........................................................................ *passim*

*Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan,*
  832 F. App'x 586 (11th Cir. 2020) ............................................................. 18, 28-29

*Oppenheimer Fund, Inc. v. Sanders*,
  437 U.S. 340 (1978) ............................................................................................ 19

*Savage v. State*,
  166 A.3d 183 (Md. 2017).................................................................................... 18

*Smith v. Reliance Standard Life Ins. Co.*,
  No. 5:17-CV-00056-BR, 2018 WL 4760490 (E.D.N.C. Oct. 2, 2018),
  *aff'd*, 78 F. App'x 207 (4th Cir. 2019) .............................................................. 29

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  860 F.3d 259 (4th Cir. 2017) .............................................................................. 29

*Spry v. Eaton Corp. Long Term Disability Plan*,
  326 F. App'x 674 (4th Cir. 2009)........................................................................ 16

*State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic, LLC*,
  No. 18-CV-1279, 2019 WL 4722675 (D. Md. Sept. 25, 2019) .............................. 10

*Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  No. WDQ-09-2612, 2012 WL 2374661 (D. Md. June 19, 2012) ............................ 29

*Suchin v. Fresenius Med. Care Holdings, Inc.*,
  715 F. Supp. 3d 703 (D. Md. 2024) .................................................................... 10

*Watson v. UnumProvident Corp.*,
  185 F. Supp. 2d 579 (D. Md. 2002) .................................................................... 10

*Wilkinson v. Sun Life & Health Ins. Co.*,
  674 F. App'x 294 (4th Cir. 2017).................................................................... 2, 4

**Statutes**

29 U.S.C. § 1109..................................................................................................... 7

29 U.S.C. § 1113..................................................................................................... 9

29 U.S.C. § 1132(a)(1)(B) .................................................................................. 6, 9

29 U.S.C. § 1132(a)(2).................................................................................... 5, 6, 9

29 U.S.C. § 1133................................................................................................... 24

29 U.S.C. § 1133(1) ............................................................................................. 22

29 U.S.C. § 1133(2) .................................................................................................... 23

**Rules**

Fed. R. Civ. P. 37(a) ..................................................................................................... 1

D. Md. Civ. R. 104.8 .................................................................................................... 1

**Regulations**

29 C.F.R. § 2560.503-1(b)(5) ..................................................................................... 20

29 C.F.R. § 2560.503-1(b)(7) ..................................................................................... 25

29 C.F.R. § 2560.503-1(g)(1)(i)-(iv) .......................................................................... 22

29 C.F.R. § 2560.503-1(g)(1)(vii) .............................................................................. 22

29 C.F.R. § 2560.503-1(h)(2)(iv) ............................................................................... 23

29 C.F.R. § 2560.503-1(h)(3)(ii) ................................................................................ 27

29 C.F.R. § 2560.503-1(h)(4) ..................................................................................... 27

29 C.F.R. § 2560.503-1(l)(2)(ii) ................................................................................. 20

29 C.F.R. § 2560.503-1(m)(8)(iii) .............................................................................. 20

## I.    INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 37(a) and Local Rule 104.8, Plaintiffs move the Court to compel Defendants to produce all documents responsive to Requests Nos. 2 and 3 of Plaintiffs' First Set of Requests to Defendants for Production of Documents ("Requests 2 & 3" or "Requests").  The Parties met and conferred on several occasions but were unable to resolve their differences over Defendants' response to the Requests.  For the reasons discussed below, the Court should compel Defendants to produce all documents responsive to Requests 2 & 3 because the documents in question are undeniably pertinent to the resolution of Plaintiffs' claims.[1]

## II.    THE DISCOVERY REQUESTS IN DISPUTE

Set forth below are Requests 2 & 3 and Defendants' responses thereto.

### 1.    <u>Plaintiffs' Request No 2</u>

**Plaintiffs' Request**:  All notices of LOD, T & P, and NC benefit determination decision letters communicated to all Claimants during the Relevant Time Period.

**Defendants' Response**:  Defendants incorporate by reference each of the above-stated General Objections and Specific Objections to the Definitions and Instructions as if fully set forth herein.

Defendants further object that this Request is vague and ambiguous as to Plaintiffs' intended meaning of the phrase "benefit determination letters"; Defendants will interpret this phrase to mean final claims decision letters from the Board.

Defendants further object that this Request is overly broad and unduly burdensome at this stage in the litigation, where the Court has not certified a class, yet the Request calls for the production of "all" decision letters communicated to "all" "Player[s] who applied for one or more of any of the disability benefits under the Plan" during the stated period, and is not limited to the Plaintiffs' remaining claims, which are the exclusive claims at issue in this Action. All of the decision letters for the claims at issue in this Action have already been produced as part of the administrative record. Moreover, to the extent Plaintiffs are seeking certification of

---

[1] Plaintiffs adopt the definitions and shorthand terms in the Amended Class Action Complaint (ECF No. 56) ("Amended Complaint").  "Ex." refers to exhibits to the accompanying Declaration of Benjamin R. Barnett, dated Nov. 26, 2024 ("Barnett Decl."), while "¶"and "¶¶" refer to paragraphs of the Amended Complaint.  Except where otherwise indicated, internal citations, internal quotation marks, and footnotes are omitted from all quotations and emphasis is added.

one or more classes that would consist of a broader number of Claimants, Plaintiffs have brought their class allegations asserting that Plaintiffs' claims are representative and typical of the claims of other putative class members, rendering a demand for records pertaining to "all Claimants" overbroad, unduly burdensome, and grossly disproportionate to the needs of the case. This Request is also overbroad, unduly burdensome, and not proportional to the needs of the case to the extent the period identified is not limited to the period between August 9, 2019, and February 9, 2023, which is the period consistent with the Plan's 42-month limitations period preceding the filing of Plaintiffs' complaint. Plaintiffs' claims relying on applications with final decision letters dated prior to August 9, 2019, were dismissed by the Court's Order Granting Reconsideration. Defendants further object that the burden of identifying, locating, collecting, and producing irrelevant letters for players who are not parties to this Action would be extensive and would infringe on the privacy of those players; this Request is therefore disproportional to the needs of the case in that respect as well. Defendants further object that all "benefit determination letters" for Plaintiffs were necessarily communications with Plaintiffs, and are therefore already within Plaintiffs' possession, custody, or control.

Subject to and without waiving the foregoing objections, Defendants respond as follows: Defendants have already produced the administrative record for each of Plaintiffs' at-issue claims. To the extent any of Plaintiffs' benefit determination letters have inadvertently not been produced, Defendants will produce them. Plaintiffs' request for "[a]ll notices of LOD, T & P, and NC benefit determination decision letters communicated to all Claimants during the Relevant Time Period" seeks discovery relating to thousands of Claimants other than Plaintiffs that is outside Plaintiffs' administrative records and not necessary to assess Plaintiffs' claims. *See Wilkinson v. Sun Life & Health Ins. Co.*, 674 F. App'x 294, 352, 356 (4th Cir. 2017) ("[w]hen a court reviews a coverage determination … consideration of evidence outside of the administrative record is inappropriate") (quoting *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)); *Briggs v. Marriott Int'l, Inc.*, 368 F. Supp. 2d 461, 467 n. 4 (D. Md. 2005) ("due to the deferential standard of review in ERISA cases… this Court's review of the administrator's decision should be based on the record before the administrator"). Plaintiffs have not made any showing that could justify discovery outside the administrative records of the named Plaintiffs' claims. *See Griffin v. Hartford Life & Accident Ins. Co*., 2016 WL 8794470, at *2 (W.D. Va. Sept. 27, 2016) (holding that where a plaintiff makes a "bare assertion" that "discovery may reveal internal incentives ... to deny claims," without any facts to support bias or gaps in the record, that request should be denied). The requested discovery therefore exceeds the scope of permissible discovery. Defendants are willing to meet and confer in good faith to understand Plaintiffs' position as to why this discovery is appropriate here based on the current posture of the litigation.

2.    **Plaintiffs' Request No 3**

**Plaintiffs' Request:**  For each Neutral Physician or MAP identified in your response to Your [sic] Interrogatory No. 1,[2] all of the following Documents Concerning Claimants' LOD, NC, and T & P benefit claims during the Relevant Time Period:  (1) all PRFs worked on, drafted, completed, or signed by the Neutral Physician or MAP and provided to Defendants, (including any drafts, handwritten notes, comments, correspondence with Defendants, Joint Physician Report form, or other attachments to the PRF); and (2) all physician narratives (Neutral Physician or MAP reports) worked on, drafted, completed, or signed by the Neutral Physician or MAP and provided to Defendants (including any MoCA test sheets, drafts, handwritten notes, comments, correspondences with Defendants, neuropsychological testing data, or other attachments to the narratives).

**Defendants' Response:**  Defendants incorporate by reference each of the above-stated General Objections and Specific Objections to the Definitions and Instructions as if fully set forth herein. Defendants further object that this Request is overly broad and unduly burdensome at this stage in the litigation, where the Court has not certified a class, yet the Request calls for the production of "all" PRFs "worked on, drafted, completed, or signed" including "any drafts, handwritten notes, comments, correspondence with Defendants, Joint Physician Report form, or other attachments to the PRF" and "all" "physician narratives ... worked on, drafted, completed, or signed by the Neutral Physician or MAP" including "any MoCA test sheets, drafts, handwritten notes, comments, correspondences with Defendants, neuropsychological testing data, or other attachments to the narratives" during the stated period, and is not limited to the Plaintiffs' remaining claims, which are the exclusive claims at issue in this Action, or involve neutral physicians or MAPs who examined Plaintiffs.  All of the PRFs and Joint PRFs—many of which contain the physician's handwritten notes—for Plaintiffs regarding their at-issue claims in this Action have already been produced as part of the administrative record. Moreover, to the extent Plaintiffs are seeking certification of one or more classes that would consist of a broader number of Claimants, Plaintiffs have brought their class allegations asserting that Plaintiffs' claims are representative and typical of the claims of other putative class members, rendering a demand for records pertaining to "Claimants" overbroad, unduly burdensome, and grossly disproportionate to the needs of the case.  This Request is also overbroad, unduly burdensome, and not proportional to the needs of the case to the extent the period identified is not limited to the period between August 9, 2019, and February 9, 2023, which is the period consistent with the Plan's 42-month limitations period preceding the filing of Plaintiffs' complaint. Plaintiffs' claims relying on applications with final decision letters dated prior to August 9, 2019, were

---

[2] Interrogatory No. 1 of Plaintiffs' First Set of Interrogatories to Defendants directed Defendants to "[i]dentify the total compensation and annual compensation paid to each Neutral Physician or MAP (including all entities, clinics, companies, organizations, or institutes with whom the Neutral Physicians or MAPs are associated) who performed file reviews or evaluated Claimants for Benefit Claims during the Relevant Time Period."

dismissed by the Court's Order Granting Reconsideration. The burden of identifying, locating, collecting, and producing irrelevant materials for players, Neutral Physicians, and MAPs who are not themselves Plaintiffs and did not evaluate Plaintiffs would be extensive and would infringe on the privacy of those players; this Request is therefore disproportional to the needs of the case in that respect as well.

Subject to and without waiving the foregoing objections, Defendants respond as follows: Defendants have already produced the administrative record for each of Plaintiffs' at-issue claims. To the extent any of Plaintiffs' PRFs or Joint PRFs have inadvertently not been produced, Defendants will produce them. Plaintiffs' Request for "all PRFs worked on, drafted, completed, or signed by the Neutral Physician or MAP and provided to Defendants" and "all physician narratives (Neutral Physician or MAP reports) worked on, drafted, completed, or signed by the Neutral Physician or MAP and provided to Defendants" "[c]oncerning Claimants' LOD, NC, and T & P benefit claims during the Relevant Time Period" for "each Neutral Physician or MAP identified in your response to Your Interrogatory No. 1," seeks discovery relating to thousands of Claimants other than Plaintiffs that is outside Plaintiffs' administrative records and not necessary to assess Plaintiffs' claims. *See Wilkinson v. Sun Life & Health Ins. Co.*, 674 F. App'x 294, 352, 356 (4th Cir. 2017) ("[w]hen a court reviews a coverage determination … consideration of evidence outside of the administrative record is inappropriate") (quoting *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)); *Briggs v. Marriott Intern., Inc.*, 368 F. Supp. 2d 461, 467 n. 4 (D. Md. 2005) ("due to the deferential standard of review in ERISA cases… this Court's review of the administrator's decision should be based on the record before the administrator"). Plaintiffs have not made any showing that could justify discovery outside the administrative records of the named Plaintiffs' claims. *See Griffin v. Hartford Life & Accident Ins. Co.*, 2016 WL 8794470, at *2 (W.D. Va. Sept. 27, 2016) (holding that where a plaintiff makes a "bare assertion" that "discovery may reveal internal incentives ... to deny claims," without any facts to support bias or gaps in the record, that request should be denied). The requested discovery therefore exceeds the scope of permissible discovery. Defendants are willing to meet and confer in good faith to understand Plaintiffs' position as to why this discovery is appropriate here based on the current posture of the litigation.

## III.   ARGUMENT

### THE COURT SHOULD COMPEL DEFENDANTS TO PRODUCE ALL OF THE DOCUMENTS THAT PLAINTIFFS SEEK IN REQUESTS 2 & 3

In this Circuit and District, discovery is often permitted outside the administrative record ("AR") in ERISA breach of fiduciary duty and wrongful denial of benefits claims, and courts have allowed discovery as to other claimants even where no class has been certified—which puts paid to Defendants' principal objection that they need not produce documents that touch on other

4

claimants' applications because no class has yet been certified in this case.[3]  Notably, the district

court in the *Cloud* action—which involved an individual benefits claim—mandated that the Plan

provide decision letters relating to other claimants.  *See Cloud v. Bert Bell/Pete Rozelle NFL Player*

*Ret. Plan* ["*Cloud*"], No. 3:20-CV-1277-S, 2021 WL 4477720, at \*6 (N.D. Tex. Sept. 30, 2021).

For the reasons discussed below, Defendants should be compelled to produce the requested

documents outside Plaintiffs' ARs, including decision letters and physician reports relating to other

disability benefits claimants, because that information is directly relevant to Plaintiffs' allegations

concerning Defendants' wrongful denial of benefits, their pattern and practice of ERISA

violations, and their breaches of fiduciary duties to the Plan.

### A.    Requests 2 & 3 Are Reasonably Calculated to Lead to Admissible Evidence Pertinent to Plaintiffs' Breaches of Fiduciary Duties Claim

Taking the latter clam first, the Court should compel Defendants to produce the documents

sought in Requests 2 & 3 because broad discovery outside the ARs is permitted for materials

relevant to Defendants' breaches of fiduciary duties of loyalty and care on behalf of the Plan itself.

In 2019, another judge of this Court reasoned that the Court can "allow[] discovery beyond

the AR in breach of fiduciary duty claims … if any of the materials sought ... are relevant and

---

[3] *E.g.*, *Balkin v. Unum Life Ins. Co.*, No. GLS 21-1623, 2022 WL 1136887, at \*1 (D. Md. Apr. 18, 2022) (granting discovery outside AR, including on plan physician denial rates involving other claimants, compensation, and expertise); *Chughtai v. Metro. Life Ins. Co.*, No. PWG-19-CV-848, 2019 WL 4199036, at \*3 (D. Md. Sept. 5, 2019) ("approv[ing] Plaintiff's request for extra-record discovery" as to physicians' recommendations for other claimants); *Kane v. UPS Pension Plan Bd. of Trs.*, No. RDB-11-03719, 2012 WL 5869307, at \*5 (D. Md. Nov. 19, 2012) (granting extra-record discovery requests relevant to defendants' history of biased claims administration, including evidence relevant to claim process, referral process, and prior dealings); *see also Helton v. AT & T Inc.*, 709 F.3d 343, 354 (4th Cir. 2013) ("[W]ithout discovery, a claimant may not have access to the information necessary to establish the seriousness of the conflict [of interest].");  *Chavis v. Plumbers & Steamfitters Loc. 486 Pension Plan*, No. 1:17-CV-02729-ELH, 2019 WL 4879015, at \*9 (D. Md. Oct. 3, 2019) (extrinsic evidence on other claimants "relevant both to Plaintiffs' benefits denial and to Plaintiffs' § 502(a)(2) claims on behalf of the Plan (asserting that the Trustees should be removed because of misrepresentations made to those Plan participants)").

proportional to the ... breach of fiduciary duty claim." *Chavis*, 2019 WL 4879015, at *8 (allowing plaintiffs "information for other similarly situated plan participants" could allow them to determine whether defendants also engaged in misrepresentations to others). Here, Plaintiffs' requests for limited subsets of decision letters communicated to other claimants and physician reports pertaining to other claimants' benefits applications during a similar timeframe are relevant and proportional to whether Defendants breached fiduciary duties of loyalty and care to the Plan itself through objectively unreasonable conduct "considered in the aggregate," including false representations provided to applicants in decision letters and systematic reliance and waste of Plan assets on biased Plan physicians having a track record of generating result-oriented reports, as part of Defendants' fraudulent scheme.[4]

---

[4] *See* ECF No. 78 at 36-37 (Court's motion to dismiss ruling, stating that Plaintiffs' allegations were "more than ample to satisfy [the Rule 9(b)] standard, including dates that the Board issued its denial letters to Plaintiffs, the contents of alleged false representations, and the like"); ¶¶ 160, 170, 173, 184, 186, 189, 201, 214, 222, 237, 252, 263, 266; *Chao v. Malkani*, 452 F.3d 290, 294 (4th Cir. 2006) ("While one of their several dubious actions standing alone may have made the extraordinary remedy of removal a closer call, when their behavior is considered in the aggregate, it becomes evident that defendants abdicated their fiduciary obligations."). As *Chavis* made clear:

> [T]he Fourth Circuit instructs that removal of trustees is proper under § 502(a)(2) when the plan fiduciaries "continu[ously] act[ ] in an objectively unreasonable manner that conflict[s] with their duties of loyalty and care." *Chao v. Malkani*, 452 F.3d 290, 298 (4th Cir. 2006); *see also Faircloth v. Lundy Packing Co.*, 91 F.3d 648, 659 n.6 (4th Cir. 1996) ("Removal of trustees is appropriate when the trustees have engaged in repeated or substantial violations of their fiduciary duties....").Thus, allowing Plaintiffs … information for *other* similarly situated plan participants could allow them to determine whether Defendants also misrepresented… to *others*. For example, *other* beneficiaries could share whether any Plan fiduciaries communicated with them regarding whether [the defendants made misrepresentations to them].

*Chavis*, 2019 WL 4879015, at *8. *see also Helton*, 709 F.3d at 361 n.6 ("Unlike with actions brought under [29 U.S.C.] Section 1132(a)(1)(B), when adjudicating a claim for violation of an ERISA statutory provision, a district court is not barred from considering evidence unknown to the administrator[.]").

The requested decision letters and physician reports during a similar timeframe "for other similarly situated plan participants could allow [Plaintiffs] to determine whether Defendants" knowingly wasted Plan assets on flawed Plan physician reports, and "fraudulently misrepresent … biased physicians as 'absolutely neutral in this process'" to other claimants warranting removal, restitution and injunctive and other relief.  ¶ 333.[5]  Also, the requested documents could reasonably lead to admissible evidence regarding the plan-wide extent to which "Board members themselves do not review the entire administrative record as required by statute and in stark contrast to what Players are lulled into believing from information … in … decision letters."  ¶ 344. Similar to *Chavis*, compelling Defendants to produce documents for other claimants would allow Plaintiffs to determine whether Defendants systematically made misrepresentations in decision letters to other claimants sufficient to warrant the remedies available under ERISA § 409, 29 U.S.C. § 1109.

Importantly, decision letters and physician reports are critical underlying documentation from which the statistical samples of physician denial-rate breakdowns cited in the Amended Complaint (¶¶ 117-46) are derived.  The documents requested in Requests 2 & 3 are relevant and proportional to whether "the Board's repeated refusal to pay contractually authorized benefits has been willful and part of a larger systematic breach of its fiduciary obligations on a plan-wide basis" and that "[t]he magnitude of these plan-wide perverse incentives, particularly when correlated with their irreconcilable conclusions [in physician reports and decision letters]; solicitation of and reliance upon flawed [physician] reports; and retention and lavish remuneration of physicians

---

[5]  *See* ¶ 53 ("In various ERISA-mandated notices to Players, Defendants affirmatively tout to Players and their beneficiaries that the 'Neutral Physicians' are indeed 'absolutely neutral,' and that the examinations they perform are 'neutral exams.'"); *see also* ¶ 336 ("The Board has deliberately perpetuated and designed a sham claims process through plan-wide methodical implementation and plan-wide misinformation that has injured the integrity of the process. For example, the Board touts to Players through repeated misrepresentations that these biased physicians are '*absolutely neutral* in the process.'") (emphasis added in Amended Complaint).

having a track record of minimizing genuine medical conditions [in their physician reports] shows that there is a plan-wide conflict that does, in fact, repeatedly and on an ongoing basis, significantly harm and negatively influence the plan-wide implementation and integrity of the claims administration process, in violation of ERISA." ¶ 333.

Other claimants' decision letters (and physicians' reports) could reasonably lead to information identifying the breakdown of particular Plan-compensated physicians' recommended conclusions on whether a claimant met the LOD, T & P, and NC benefits standards during the same timeframe as Plaintiffs' applications.  Moreover, the requested discovery could reasonably lead to probative evidence on which particular Plan-hired physicians' "views" were commissioned by the Board to support desired outcomes as part of Defendants' "repeated refusal to pay contractually authorized benefits [that] has been willful and part of a larger systematic breach of its fiduciary obligations on a plan-wide basis." *Id.*

Also, the decision letters and physician reports requested could reasonably lead to probative evidence regarding "the Board's bizarre interpretations, continuous disregard for legal precedent, and multiple erroneous interpretations of the same or similar provisions, evinc[ing] violations of both the Plan and ERISA that support the overall conclusion that the Board has not acted prudently … and has failed to act solely in the interest of Plan participants." ¶ 342.  For example, "although federal courts have repeatedly held that the Board acts unreasonably when failing to consider the collective impact of all elements and impairments asserted by Players," decision letters and physician reports for other claimants could reveal the extent to which Defendants "continue[], on a plan-wide basis, to blatantly disregard those holdings." *Id.*

Notably, Plaintiffs' limited requests are narrowly tailored by multiple qualifiers. *First*, Request No. 2 requires Defendants to produce decision letters and physician reports for the

timeframe encompassed by Plaintiffs' own applications. Plaintiffs requested decision letters and physicians reports only from April 1, 2018 onwards—the start of the Plan Year in which Plaintiff McKenzie filed an application for T & P benefits that eventually resulted in a final decision letter after August 9, 2019. *See* ¶¶ 176, 184. Courts have permitted discovery in ERISA cases on physician denial-rate breakdowns over much broader periods than requested by Plaintiffs.[6] Although Defendants assert that matters before August 9, 2019 are outside the relevant time period because "Plaintiffs' claims relying on applications with final decision letters dated prior to August 9, 2019, were dismissed," they ignore that, unlike their ERISA § 502(a)(1)(B) wrongful denial of benefits claim, Plaintiffs' ERISA § 502(a)(2) breach of fiduciary duties claim is not governed by the Plan's 42-month limitations period but, rather, by the longer breach of fiduciary duties limitations period in ERISA § 413, 29 U.S.C. § 1113.[7]

*Second*, Requests 2 & 3 are narrowly tailored in that they do not seek Defendants' production of decision letters or physician reports for claimants who applied for benefits other than LOD, T & P, and NC benefits (such as 88 Plan benefits, which no plaintiff applied for). Nor did Plaintiffs request production of every communication or notice sent to claimants, such as application confirmation letters, appointment scheduling letters, appointment rescheduling letters, tolling letters, opportunity to respond letters, or incomplete application notices.

---

[6] *E.g.*, *Kasko v. Aetna Life Ins. Co.*, 33 F. Supp. 3d 782, 789 (E.D. Ky. 2014) (granting discovery outside ARs on "financial incentives, combined with the physicians' recommendations" for three-year period, while noting that "similar discovery has been found to be sufficiently narrow when it is limited to … [a] ten-year period"); *Chughtai*, 2019 WL 4199036, at *1 (granting discovery outside AR "between 2011-2016" on "breakdown of … doctors' recommendations during that period (how many recommended denials and how many recommended payments); and … breakdown of [defendant's] decisions in response to those recommendations").

[7] Setting aside that a longer limitations period governs, the Court's statute of limitations ruling concerned only Plaintiffs' 502(a)(1)(B) wrongful denial of benefits claim. The Court did not hold that Plaintiffs' 502(a)(2) claim for breaches of fiduciary duties on behalf of the Plan itself based on underlying ERISA violations was time-barred. *See* ECF No. 78 at 13 n.8.

Significantly, information contained in other claimants' decision letters and physician reports is relevant and proportional to various aspects of the specifically pled fraudulent scheme and fraudulent misrepresentations. *E.g.*, ¶ 344 ("Board members themselves do not review the entire administrative record as required by statute and in stark contrast to what Players are lulled into believing from information about the Plan in … decision letters.").[8]  Moreover, Requests 2 & 3 could reasonably lead to evidence of the contents of decision letters that include misrepresentations about what records were reviewed, flaws and inconsistencies in the physician reports that Defendants relied upon, and inconsistencies between what is actually in those reports and what Defendants communicate to other claimants in decision letters.[9]

Indeed, factors relevant to proving whether a fraud has been committed include whether misrepresentations were made and "whether there is information asymmetry in the defendant's favor." *Suchin v. Fresenius Med. Care Holdings, Inc.*, 715 F. Supp. 3d 703, 719 (D. Md. 2024). Here, only Defendants have access to the complete universe of accurate probative information necessary to run a complete regression analysis and shed light on Defendants' scheme by correlating the more than 118 physicians' high or low compensation with the resulting Defendant-commissioned physicians' reports demonstrating patterns of recommending denial of meritorious claims.  *See Chavis*, 2019 WL 4879015, at *9 (defendants presumably had sought-after

---

[8] *See Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579, 585 (D. Md. 2002) (defendant's false assertion that specific review of records had been undertaken "bordered on outright fraud"); *compare*, *e.g.*, Ex. A (NFL_ALFORD-0000919) ("At its February 23, 2023 meeting, the Disability Board reviewed all of the evidence in your Plan file") *with Cloud*, 2022 WL 2237451, at *12 (N.D. Tex. June 21, 2022) ("Board members do not review *all* of the documents in the administrative record.") (emphasis in original), *rev'd on other grounds*, 95 F.4th 964 (5th Cir. 2024), *cert. denied*, No. 24-61, 2024 WL 4427195 (U.S. Oct. 7, 2024).

[9] *See State Farm Mut. Auto. Ins. Co. v. Carefree Land Chiropractic, LLC*, No. 18-CV-1279, 2019 WL 4722675, at *4 (D. Md. Sept. 25, 2019) (fraudulent scheme pled with particularity where plaintiff identified patients, physicians, dates of physician visits, and specific instances "of internal inconsistencies").

information "at their fingertips").

Additionally, Plaintiffs assert that Defendants breached their fiduciary duties through "a systematic disparity between those highly compensated" Plan-selected physicians "and those with an annual average compensation from Defendants" below certain amounts.   ¶ 340.   Other claimants' decision letters and physician reports could reasonably lead to evidence demonstrating that Defendants systematically relied on the flawed, biased, and otherwise deficient physician recommendations without proper investigation.   Correlated with the lavish compensation paid to those Plan-selected physicians, Requests 2 & 3 could reasonably lead to necessary evidence for the remedial and equitable remedies that Plaintiffs seek, including but not limited to, restitution for waste of Plan assets on biased physicians who have demonstrated inadequate work performance, injunctive relief to remove those biased physicians from the claims process, and "requiring Defendants to issue accurate … decision letters."  ¶¶ 375, 379.

**B.     Requests 2 & 3 Are Reasonably Calculated to Lead to Admissible Evidence Pertaining to Plaintiffs' Wrongful Denial of Benefits Claim**

The Court should also compel Defendants to produce the requested decision letters and physician reports for other claimants because that is evidence that was known or should have been known to Defendants, and it would supplement the ARs for the Court to adequately assess the reasonableness of Defendants' decisions on Plaintiffs' claims.  The Fourth Circuit and this District have held that the Supreme Court's decision in *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008), "opened the door" to discovery beyond the AR in wrongful denial of benefits claims.  *Balkin*, 2022 WL 1136887, at *3; *see supra* at p. 5 n.3 (citing additional cases).  "[A] district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when

such evidence is necessary to adequately assess the *Booth* factors[10] and the evidence was known to the plan administrator when it rendered its benefits determination." *Helton*, 709 F.3d at 356.

### 1. Defendants Can Be Charged with Knowledge of Their Own Decision Letters and Plan-Commissioned Physician Reports

To begin with, decision letters and physician reports relating to other claims are materials that Defendants presumably had "at their fingertips," *Chavis,* 2019 WL 4879015, at *9, and were known to them at the time they rendered their decisions on Plaintiffs' claims. *See Helton*, 709 F.3d at 356 (defendants have "knowledge of the contents of their records"). Therefore, Defendants can be charged with knowledge of the documents sought through Requests 2 & 3, and judicial review here should not be limited solely to what Defendants placed in the ARs.[11]

### 2. Requests 2 & 3 Will Help Fill in the Gaps in the ARs to Adequately Assess the Fourth Circuit's *Wal-Mart v. Booth* Factors

Plaintiffs seeking extra-record discovery need to assert "particularized facts that render extra-record discovery necessary," *Balkin*, 2022 WL 1136887, at *3, to explore *Booth* factors, such as any conflict of interest in adjudication of their particular claim, and "provide a basis for the court to determine whether such discovery would fill gaps in the record." *Balkin*, 2022 WL

---

[10] Referring to *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000). Those factors are (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Id.*

[11] *See Helton*, 709 F.3d at 353 (had the Fourth Circuit "allowed plan administrators the unchecked opportunity to pick and choose what evidence in their possession to include in the administrative record … [courts] would have effectively surrendered [their] ability to review ERISA benefits determinations because plan administrators could simply omit any evidence from the administrative record that would suggest their decisions were unreasonable").

1136887, at *3.[12]  In this case, decision letters and reports for other claimants contain necessary information to fill in the gaps in the ARs as to several of the *Booth* factors in Plaintiffs' particular claims.

### 3.  *Booth* Factor 4:  Inconsistencies With Earlier Interpretations of the Plan

Plaintiffs' ARs contain gaps that must be supplemented because the ARs are silent as to whether the Committee's and Board's interpretations of Plan terms in Plaintiffs' decision letters and Plan physician reports are consistent with earlier interpretations of the Plan in other claimants' decision letters and Plan physician reports, as is required to assess the fourth *Booth* factor.[13]

The Court "would have to look at extrinsic evidence concerning the plan administrator's prior … determinations," *Helton*, 709 F.3d at 354, and physician reports to assess how Defendants previously interpreted the numerous relevant Plan terms at issue for Plaintiffs.[14]  Therefore,

---

[12] *See Chavis*, 2019 WL 4879015, at *8 (even if materials fell outside AR, "at least two *Booth* factors provide[d] the bridge to relevance for purposes of establishing the scope of discovery:  (1) whether the provisions at issue have been applied consistently; and (2) whether the fiduciary's interpretation was consistent with ... earlier interpretations of the plan").

[13] *See Jani v. Bell*, 209 F. App'x 305, 317 n.8 (4th Cir. 2006) (comparing defendants' inconsistent interpretation of Plan in NFL player's claim with evidence of "eight other cases of T & P disability" produced following motion to compel); *Cloud*, 2022 WL 2805527, at *5 (court had compelled Plan to produce relevant documents, including its prior decision letters for other claimants, in order to assess whether Plan terms had been defined consistently).

[14] *See, e.g.*, ¶¶ 45-53, 71, 113, 154, 168 (Plan terms within the definition of "Neutral Physician" including "adequate determination" and "maintain a network"); ¶¶ 60, 61, 71, 168, 179-82, 225, 283 (Plan's T & P General Standard, including Plan terms "educational level and prior training of a Player will not be considered in determining whether such Player is" T & P disabled); ¶¶ 73-74, 196, 210, 235, 285 (Plan terms for LOD Points); ¶¶ 77-79, 153, 155, 156, 159, 160, 197, 251-55, 258, 261, 264-65 (Plan terms prescribing NC benefits standard for mild and moderate impairments, including that impairments "reflect acquired brain dysfunction"); ¶¶ 63-69, 191-93, 284, 293-94 (Plan terms for the Active and Inactive categories of T & P disability, as well as Special Rules in Plan § 3.5); ¶¶ 64-69, 72-73 (Plan terms "Arising out of League football activities" including Plan term "combination" and "disability(ies)"); ¶¶ 37, 40-42, 99, 214, 226, 238, 284, 298, 312-15 (Plan terms concerning what documents and information Defendants must review).

Defendants' earlier interpretations in "previous claims [are] relevant to determining whether the Board applied these terms inconsistently in reviewing Plaintiff's claim[s]." *Cloud*, 2021 WL 4477720, at *6 (citing cases).

### 4. *Booth* Factor 8: Faith Motives, Bias, and Any Conflicts of Interest

The eighth *Booth* factor requires consideration of "the fiduciary's motives and any conflict of interest." *Booth*, 201 F.3d at 342. The Supreme Court has explained that courts must consider the fact-specific impact, "kind[] and … degree of seriousness" of a fiduciary's bad faith motives or any conflict of interest when evaluating whether an administrator abused its discretion. *Glenn*, 554 U.S. at 116.[15]

The requested benefit decision letters and Plan-commissioned physician reports for other claimants are necessary to fill in the gaps in the ARs to adequately assess the impact of Defendants' motives and various conflicts of interest, including a history of biased claims administration and failures to take active steps to reduce bias and promote accuracy. Plaintiffs' ARs do not contain information necessary for the Court to properly consider the eighth *Booth* factor.

### a. Discovery as to Other Claimants Is Necessary to Fill in the Gaps on the Impact of Defendants' History of Bad Faith Motives, Conflicts of Interest, and Failure to Take Active Steps to Reduce Bias and Promote Accuracy

Discovery is necessary to explore the impact of the Defendants history of bad faith motives and acting as an adversary rather than as a fiduciary. *See Dimry*, 487 F. Supp. 3d at 818. Critically, the Supreme Court in *Glenn* articulated that evidence of "circumstances [that] suggest a higher

---

[15] *See Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-cv-01413-JD, 2018 WL 1258147, at *3-4 (N.D. Cal. Mar. 12, 2018) (Plan's "sizable payments" of nearly $189,000 in a single Plan year to Plan-selected physician Dr. Meier "raise[d] a fair inference of a financial conflict," "even in the absence of a structural conflict"; "problem [was] that the Board denied benefits based upon an unreasonable bias in favor of Plan-selected physicians"), *aff'd and remanded*, 855 F. App'x 332 (9th Cir. 2021).

likelihood that [a conflict] affected the benefits decision, including, but not limited to, cases where an … administrator has a history of biased claims administration" can be important, and even a tie-breaking factor for a court to consider when determining whether a plan fiduciary abused its discretion. *Glenn*, 554 U.S. at 117. "As a result [of *Glenn*], it became all the more important for courts to have access to adequate evidence to assess, for example, how a conflict of interest may have impacted the adequacy of the administrative record and, consequently, a contested benefits determination." *Helton*, 709 F.3d at 355.[16]

Evidence that a plan administrator's conflict influenced or motivated its decision "may take many forms." *Glenn*, 554 U.S. at 123 (Roberts, C.J., concurring). It may be shown by evidence of "improper incentives; or it may be shown by a pattern or practice of unreasonably denying meritorious claims." *Id.* For example, "statistics showing a parsimonious pattern of assessments disfavorable to claimants" would be "more powerful evidence" of a fiduciary's motives, conflict, or bias. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902-03 (9th Cir. 2016).

Here, Plaintiffs are entitled to broad discovery outside the AR, including T & P, LOD, and NC decision letters communicated to other claimants and Plan physician reports for other claims from April 1, 2018 through February 9, 2023, because Plaintiffs have specifically alleged that courts across the country, including in this District and elsewhere in the Fourth Circuit, have found that Defendants have a history of culpable conduct, bad faith motives, and adversarial claims administration, including their "long-history of concealing the impact" of "impairments from

---

[16] "*Glenn* unambiguously requires district courts to determine the likelihood that an administrator's conflict of interest affected its benefits decision and suggests that this determination can be made by reviewing evidence regarding the administrator's *past dealings* and claim review process." *Clark v. Unum Life Ins. Co. of Am.*, 799 F. Supp. 2d 527, 532 (D. Md. 2011). "To make this determination, a court may consider such extrinsic facts as an administrator's history of biased claims administration and any active steps it has taken to reduce bias or improve accuracy." *Kane*, 2012 WL 5869307, at *4 (compelling discovery of evidence outside AR, including "administrator's past dealings and claim review process").

football activities," and "overly aggressive and disturbing pattern of erroneous and arbitrary benefits denials." ¶¶ 4, 21 (collecting cases), 340. The gaps in the ARs need to be filled in to adequately assess the impact of Defendants' historical "pattern or practice" of unreasonably denying meritorious claims.

Such informational gaps requiring supplementation include (i) which Plan-compensated physicians were selected and compensated in the referral process by Defendants to evaluate other claimants; (ii) each evaluating Plan-selected physician's conclusions as to whether other claimants met the LOD, T & P, or NC benefits standards, including any knowing use of or reliance on inconsistencies with Plan terms by Plan physicians or other inadequacies in their reports[17]; (iii) Defendants' pattern or practice in decision letters of defaulting to more lavishly compensated Plan physicians than to lower-compensated physicians with lower recommended denial rates; (iv) the dates of other claimants' physician evaluations; (v) Plan physicians' alleged relevant specialties and expertise; (vi) whether Defendants disregarded evidence in favor of Plan-selected physicians' opinions; (vii) whether Defendants' commissioned physicians' reports reflect Defendants' "long-history of concealing the impact of neurocognitive impairments from football activities" (¶ 340); and (viii) whether Defendants have a history of knowingly relying exclusively on biased and otherwise inadequate Plan physicians' reports, demonstrating a "pattern or practice of unreasonably denying meritorious claims." *Glenn*, 554 U.S. at 123.

---

[17] "Under *Glenn,* proof of facts warranting imputation of improper motives to a plan administrator still aids claimants challenging adverse benefits decisions." *Spry v. Eaton Corp. Long Term Disability Plan*, 326 F. App'x 674, 678 (4th Cir. 2009). Therefore, "knowing use of biased doctors would be some evidence of bad faith." *Adams v. Symetra Life Ins. Co.*, No. CV-18-0378-TUC-JGZ (LAB), 2020 WL 1275721, at *2 (D. Ariz. Mar. 17, 2020) ("doctors' other reports" and their "notes, correspondence, and drafts" were "relevant and discoverable"), *objs. overruled in relevant part*, 2020 WL 6469949 (Nov. 3, 2020).

In *Chughtai*, another judge of this District held that the plaintiff met her burden of demonstrating that the AR did not provide sufficient evidence for the Court to address her assertion that the defendant's disability benefits denial was affected by bias. The *Chughtai* court noted her allegations that the 758-page AR contained only about 34 pages of actual analysis; the denial of her claim was supported by "poorly reasoned" physician reviews that failed to take account various indications that she was unable to work; and that courts had repeatedly reversed denials of claims involving one of the review physicians in her case, with the Sixth Circuit criticizing his opinion as "factually and analytically problematic," and another review physician having worked exclusively for insurance companies in disability cases, having spent just one hour on her claim, and not knowing if the records in her case were even complete. *Chughtai*, 2019 WL 4199036, at *2-3.

Here, there are gaps in the ARs related to the "118 different Board-compensated physicians [that] performed … T & P disability evaluation[s]," as part of Defendants' physician referral process, and that the majority "of those physicians … have a 100% overall T & P disability denial rate" in the underlying information in the statistical sample (*i.e.*, decision letters and Plan physician reports). ¶ 146. There are informational gaps in the ARs because other claimants' decision letters and Plan physicians' reports are clearly not contained within any of the ten plaintiffs' ARs. Their ARs contain gaps as to whether the Plan-selected physicians' past opinions have overwhelmingly concluded that other claimants who applied for the same benefits as Plaintiffs were not disabled.[18]

---

[18] As Plaintiffs allege, in the sample of many hundreds of decision letters and physician reports, when comparing the 100% T & P denial rate of the seven highest-paid physicians with average annual compensation of $200,000 or more, and comparing that rate of denial to the 25.93% overall findings of T & P disability by Plan physicians with an average annual Board compensation of $50,000 or less (¶¶ 117, 199), evidence of the fiduciaries' motives demonstrate that this disparity is not coincidental but, rather, willful, methodical, and systematic. *See generally* ¶¶ 117-46. What is more, despite the high prevalence of neurocognitive impairments in retired NFL players and the NFL's long history of concealing the impact of such impairments from football activities, the 14 Defendant-compensated neuropsychologists having the highest annual average compensation,

Given this alleged correlation, Plaintiffs should also receive extra-record discovery on the Plan's hired physicians' compensation.

Furthermore, Plaintiffs assert that the specified Plan-selected physicians whose recommendations are sought from information contained in other claimants' decision letters and reports, have been criticized by a number of courts for rendering flawed, deficient, biased, conclusory, and otherwise inadequate opinions.[19]  Defendants object in conclusory fashion that "Plaintiffs have not made any showing that could justify discovery outside the administrative records of the named Plaintiffs' claims" and have not put forward "any facts to support bias or gaps in the record."  As shown above and through other allegations,[20] however, that is inaccurate.

---

including the Plan's MAP, have *never* found that any claimant is T & P disabled in any year, across the combined T & P Plan physician reports in the sample.  ¶ 122.  There is a systematic disparity between the high rate of those highly compensated neuropsychologists recommending denials of claims, and the lower rate of recommended denials from those with an annual average compensation from Defendants of $50,000 or less.  ¶ 123.

[19] *See Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 589 (11th Cir. 2020) (Dr. Barry McCasland reviewed only "certain" medical records before rendering his opinion); *Jefferson v. Sellers*, 250 F. Supp. 3d 1340, 1364-70 (N.D. Ga. 2017) (harshly criticizing Dr. Stephen Macciocchi's opinions one month before he received a promotion from Defendants to teach other Plan physicians), *aff'd sub nom. Jefferson v. GDCP Warden*, 941 F.3d 452 (11th Cir. 2019); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 19-cv-05360-JSC, 2022 WL 1786576, at *3 (N.D. Cal. June 1, 2022) (Plan MAP's opinion was "not persuasive and [wa]s instead illogical and implausible"); *Colvin v. 88 Bd., Joint Bd. of Trs. for 88 Plan*, No. SA-17-CV-974-XR, 2018 WL 1756738, at *2 (W.D. Tex. Apr. 11, 2018) (Dr. Brahin "conducted only a short meeting" with the plaintiff and his report contained "many factual errors"); *Savage v. State*, 166 A.3d 183, 202 (Md. 2017) ("[t]he presence of an 'analytical gap' between the information available to him and Dr. Garmoe's ultimate opinion undermine the validity of this evidence"; "we conclude that Dr. Garmoe's ultimate opinions … are conclusory"; "we are unable to conclude that Dr. Garmoe adequately 'connected the dots'"; "Dr. Garmoe does not adequately reveal … how his ultimate conclusions are derived from the evidence he sets forth at the hearing and in his report. No adequate details, for example, are presented").

[20] *E.g.*, ¶¶ 127-28 (allegations concerning over $1.6 million earned by to Plan's highest-paid neuropsychologist, Dr. Stephen Macciocchi; his reputation for minimizing concussion symptoms; and his use of improper race norms in evaluating African-Americans' ailments, as demonstrated by his publications, previous court statements, and marketing materials, including participation in

Nor is there any merit to Defendants' objection that the Requests reach outside the August 9, 2019-February 9, 2023 period. Discovery may be permitted for "events that occurred before an applicable limitations period" if requests focus on relevant issues. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978). Given Plaintiffs' allegations of a long history of biased claims administration, discovery may properly "encompass a longer time period to allow for the necessary context-specific analysis," *Mator v. Wesco Distrib., Inc*., 102 F.4th 172, 188 (3d Cir. 2024), of that history's impact on their benefits claims, as required by *Booth* factor eight and *Glenn*. Thus, while the Requests could justifiably reach back even further in time, a request for decision letters and physician reports only as far back as April 1, 2018 is narrowly tailored and eminently reasonable.

Besides, in opposing Plaintiffs' class certification motion and to support of two of their summary judgment motions—*see* ECF No. 111 at 10, 14-15, 27 (class certification opp. mem.).; ECF Nos. 115-2 (at 9, 31), 123-1 (at 8, 33) (memoranda in supp. of Loper and Olawale summ. j. mots.)— Defendants rely on the declaration of a putative expert, to whom Defendants provided physician data from their V3 database for the period January 1, 2018-July 31, 2024. ECF No. 111-2 at 6, 49-63 (Decl. of David B. Lasater, Ph.D., ¶¶ 11-13 & App. 3). That is a period *21 months broader* than that covered by Requests 2 & 3.[21] Defendants thus have no legitimate grounds to

---

panel that would "inform on ways to defeat or mitigate these claims based on current science and explore how best to convince a jury that a plaintiff's brain is hard boiled and not scrambled"); ¶ 166 (Dr. McCasland confirmed that, through January 2012, "a hundred percent" of his "witness work was for defendants, insurance companies or defense lawyers").

[21] The existence of the V3 database—Defendants' "system of record," according to one of their summary judgment motion declarants, Hessam Vincent (ECF Nos. 115-4 at 13 (¶ 42), 123-3 at 14 (¶ 43)), who manages the Plan's relationship with its hired physicians—was not fully or fairly disclosed to Plaintiffs during the parties' Rule 26(f) and meet-and-confer discussions. Barnett Decl. ¶ 10. The "anonymized physician data" from this database that Defendants' putative statistical expert relies upon were produced to Plaintiffs about one minute before Defendants filed their class certification opposition papers at approximately 11:28 p.m. on November 18, 2024. *Id.* Notably, Defendants both failed to meet and confer with Plaintiffs before producing data from the

object to producing documents covering a much narrower period.  Nor can they legitimately object to producing reports from physicians other than those involved in Plaintiffs' claims, when they themselves have now put at issue *all* Plan-hired physicians' opinions *over a 78-month period*.

### 5. *Booth* Factor 6:  Discovery Is Necessary to Explore Defendants' Pattern and Practice of ERISA Violations

Other claimants' decision letters and Plan-commissioned physician reports are necessary to fill in the gaps in the ARs for the Court to adequately assess Defendants' pattern and practice of ERISA violations, as required by *Booth* factor six.  Courts frequently grant discovery outside the AR to adequately assess non-compliance with ERISA's requirements.  Crucially, for the Court to adequately assess *Booth* factor six, it must determine whether the Defendants have a "pattern or practice" of ERISA violations, resulting in mandated exhaustion of administrative remedies and *de novo* review, pursuant to ERISA regulations.  *See* 29 C.F.R. § 2560.503-1(l)(2)(ii).

#### a. Discovery Is Necessary to Adequately Assess Defendants' Failure to Ensure Consistent Treatment of Similarly Situated Claimants

Decision letters and physician reports concerning other claimants may shed light on the Board's compliance with procedural requirements in rendering its benefits determination.  *Cloud* 2021 WL 4477720, at *4.  ERISA's implementing regulations mandate that certain documents and information are per se relevant.[22]   In *Cloud,* the court compelled discovery from the Plan of

---

V3 database, as mandated by the negotiated ESI Protocol, and to produce the data in a reasonably usable format.  *Id.*; *see* ECF No. 110 at 8, 10 (§§ 11.a, 11.g).

[22] For example, "[a] document, record, or other information shall be considered 'relevant' to a claimant's claim if such document, record, or other information … [d]emonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefit determination."  29 C.F.R. § 2560.503-1(m)(8)(iii).  Moreover, claims procedures must "contain administrative processes and safeguards designed to ensure and to verify that benefit claim determinations are made in accordance with governing plan documents and … plan provisions have been applied consistently with respect to similarly situated claimants."  *Id.* § 2560.503-1(b)(5).

thousands of pages of other claimants' decision letters relevant to whether the Plan had complied

with ERISA's requirements, including inconsistent treatment of similarly situated claimants. The

court reasoned that such discovery was appropriate in light of the plaintiff's claim that he had been

treated inconsistently, the parties' resources were highly asymmetric, and the potential burden and

expense posed by ordering production did not outweigh the benefit of the information that might

be obtained. *Cloud*, 2021 WL 4477720, at *7 ("Information on the bases for granting previous …

Benefits may be relevant to Plaintiff's claim, as it bears on whether Plaintiff was treated

inconsistently with others similarly situated who were granted these benefits.").

    Decision letters and physicians' reports can reasonably lead to evidence that Defendants

failed to put into place administrative processes and safeguards to ensure that Plan provisions have

been applied consistently to similarly situated applicants. Here, there are numerous gaps in

Plaintiffs' ARs as to whether Defendants' inconsistent treatment of claimants is part of a pattern

or practice of ERISA violations.[23]

---

[23] For example, Plaintiff Olawale demonstrated radiographic evidence of L5 pars defect/stress fractures with spondylolysis. ¶ 196. Despite evidence from outside the AR of the Board's current MAP having previously awarded a claimant three LOD points for "Lumbar Stress Fracture with Spondylolysis" for an "L5-S1 pars defect," Defendants failed to award Mr. Olawale these points. ¶ 196 & n.17. Furthermore, Dr. McCasland opined that Plaintiff McKenzie was not T & P disabled and expressed his preordained view, remarking that "[t]he likelihood of any headache disorder constituting a total disability … is practically zero." ¶ 181. That opinion was inconsistent with prior interpretations of even the Board's own MAP, who has previously determined other Players to be T & P disabled due to headache disorders. *Id.* Additionally, Plaintiffs allege that similarly situated claimants have been treated inconsistently based on racial norms and that Defendants have directed their physicians' application of discriminatory racial norms to test results for Plaintiffs McKenzie, McGahee, Olawale, and Sims. ¶¶ 127, 167, 169, 182; Ex. B (NFL_ALFORD-0009965 ("scores were corrected for … ethnicity"). A court criticizing the opinions of Dr. Stephen Macciocchi—Defendants' highest-compensated neuropsychologist, who has promoted strategies for defeating psychological injury and traumatic brain injury claims and who served as a consultant for the NFL in the *NFL Players' Concussion Injury Litigation* (¶¶ 128, 130-35, 327)—discussed how the authors of the demographic "Heaton" norms that Dr. Macciocchi employed in that case had previously stated that the use of such norms in cases "where there is a known history of brain injury … is not appropriate." *Jefferson*, 250 F. Supp. 3d at 1366. Therefore, discovery is necessary

**b.    Discovery Is Necessary to Supplement the ARs Respecting Defendants' Pattern or Practice of Communicating Inadequate Decision Letters That Do Not Comport with ERISA Requirements**

Decision letters for other claimants who applied for the same benefits as Plaintiffs are relevant to whether Defendants have a "pattern or practice" of providing inadequate decision letters in violation of ERISA § 503(1), 29 U.S.C. § 1133(1).[24]  Here, the information contained in other claimants' decision letters is necessary for the Court to adequately assess whether Defendants have a "pattern or practice of violations" of Section 503(1) in decision letters.  This information is absent from Plaintiffs' ARs.  Moreover, Plaintiffs' allegations include that Defendants violated Section 503(1) by providing inadequate notices to Plaintiffs that do not comply with ERISA, including that Defendants failed to specify in decision letters their basis for why they disagreed with medical findings and opinions that supported Plaintiffs' entitlement to benefits and failed to list the specific reasons for adverse determinations.  ¶ 289.

_____

to determine the degree to which Dr. Macciocchi, whom Defendants knowingly promoted in 2017 to "teach" other Plan physicians, has required or sanctioned the inappropriate application of racial norms, resulting in inconsistent treatment of similarly situated claimants based on race.  *E.g.*, Ex. C (NFL_ALFORD-0011462) (Plan physician instructions include "Enter the raw score/scale score and the T score based on Heaton norms").  Request No. 3 is thus targeted at discovering the extent of inconsistent treatment of similarly situated claimants, including the extent to which Dr. Macciocchi infected the claims process for Plaintiffs through his use of racially discriminatory or otherwise inappropriate norms.

[24] Regulations implementing Section 503(1) stipulate that disability benefits decisions must (i) provide "[t]he specific reason or reasons for the adverse determination"; "(ii) "[r]eference to the specific plan provisions on which the determination is based"; (iii) include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary"; (iv) articulate discussions of decisions, including explanations of the bases for disagreements with or not following medical views favoring awards of benefits; and (v) include the "specific internal rules, guidelines, protocols, standards or other similar criteria of the plan relied upon in making the adverse determination."  29 C.F.R. § 2560.503-1(g)(1)(i)-(iv), (vii).

For example, the Board issued a final decision on Plaintiff Sims' claim in which it incorrectly contended that his "file contain[ed] no evidence that [his] disability arose while an Active Player." ¶¶ 193, 293.  Moreover, the Special Rules of Section 3.5 of the Plan were not cited or referenced in the Board's decision letter, and omitted from the decision letter was that, contrary to Plan terms, the Board has adopted an unreasonable, clandestine interpretation of the Plan that Active Football T & P benefits are intended only for situations where a claimant suffers a catastrophic injury, such as a paralyzing collision, during a game—as Board members acknowledged this crabbed interpretation in the *Cloud* action.  ¶¶ 193, 294.  In Plaintiff McKenzie's case, Defendants' own physician, Dr. Clark, expressed his view in his physician report that if he were permitted to consider neurological impairments *and* psychiatric impairments together, Mr. McKenzie appeared to be "totally" disabled.  ¶ 185.  The decision letter issued to Mr. McKenzie, however, did not even acknowledge this medical view favorable to his claim, let alone explain the Board's disagreement with it.  ¶ 295.  Thus, the requested decision letters, along with the physician reports for other claimants, are necessary Court to adequately assess whether Defendants have a pattern or practice of ERISA noncompliance in decision letters—which would result in administrative remedies being deemed exhausted and de novo review mandated.

### c.    Extra-Record Discovery Is Necessary to Assess Defendants' Pattern or Practice of ERISA Violations Through Their Failure to Review All Documents and Information

Discovery of decision letters communicated to other claimants is further necessary for the Court to adequately weigh, as a factor, the extent of Defendants' pattern or practice of failing to review "*all* comments, documents, records, and other information submitted by the claimant," as required under ERISA § 503(2), 29 U.S.C. § 1133(2), and its implementing regulation at 29 C.F.R. § 2560.503-1(h)(2)(iv).  Indeed, it was extra-record discovery in *Cloud* that led to Plaintiffs' discovery of the Board's admitted, ERISA-violative "practice" that not all evidence is reviewed.

*Cloud*, 2022 WL 2237451, at *12 ("Board members do not review *all* of the documents in the administrative record.") (citing deposition testimony and Board member's trial testimony "that it was not his practice to review all documents") (emphasis in original); *accord id.* at *31.

Here, Request No. 2 could reasonably lead to probative evidence necessary for the Court to adequately assess Defendants' pattern or practice of ERISA violations, as required by *Booth* factor six.  LOD, T & P, and NC decision letters contain Defendants' representations of what materials, documents, and records were allegedly reviewed.[25]  Plaintiffs' individual ARs, however, must be supplemented concerning Defendants' clandestine pattern or practice of failing to review all records for other claimants who applied for similar benefits during the same time period. Consequently, Request No. 2 is reasonably calculated to lead to admissible evidence that would allow the Court to adequately assess whether Defendants' have a pattern or practice of ERISA violations by failing to review "*all* comments, documents, records, and other information."  Thus, the documents sought through Request No. 2 are directly relevant to *Booth* factor six.

> **d.    Defendants' Pattern or Practice of Failing to Ensure the Independence and Impartiality of Plan-Selected Physicians**

Discovery of evidence absent from Plaintiffs' ARs is also necessary for the Court to adequately assess Defendants' pattern or practice of failing to ensure that *all* claims and appeals are adjudicated in a manner designed to ensure the independence and impartiality of Plan compensated physicians. Pursuant to the mandate of ERISA § 503, 29 U.S.C. § 1133, "[i]n

---

[25] *See* Ex. D (decision letters issued to four of the plaintiffs) (NFL_ALFORD-0000919 ("Disability Board reviewed all of the evidence in your Plan file"); NFL_ALFORD-0008983-84 (Committee "reviewed your application and the other materials in your file" and "considered all of the medical records you submitted and referenced in support of your application"); NFL_ALFORD-0004685 ("Disability Board reviewed the record"); NFL_ALFORD-0010258 ("After reviewing the medical evidence in your file"); NFL_ALFORD-0010283 ("Disability Board carefully reviewed the medical evidence"); NFL_ALFORD-0010769 ("Committee reviewed your application and the other materials in your file")).

accordance with regulations of the Secretary," Defendants

> must ensure that *all* claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a … medical … expert) must not be made based upon the likelihood that the individual will support the denial of benefits.

29 C.F.R. § 2560.503-1(b)(7).

Here, Plaintiffs' ARs are silent on whether Defendants' claims and appeals process comports with this mandate. They contain information only as to their own claims. As recounted above and in detail in the Amended Complaint, there is every reason to believe that Defendants' claims process runs afoul of this legal mandate. Plaintiffs allege overwhelming evidence of extensive bias by Plan physicians, including those promoted and provided extra compensation to teach new Plan physicians. Accordingly, Plaintiffs' request for "[a]ll notices of LOD, T & P, and NC benefit determination decision letters communicated to all Claimants during the Relevant Time Period" (*supra* at p. 1) could reasonably lead to probative evidence for the Court to adequately assess Defendants' pattern or practice of ERISA violations for failure to ensure "independence and impartiality" of the Plan's physicians in "*all* claims and appeals." 29 C.F.R. § 2560.503-1(b)(7).

Importantly, decision letters communicated to other claimants and Plan physician reports for other benefits claimants could reasonably lead to probative evidence of Defendants' pattern or practice of making "decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a … medical … expert) ... based upon the likelihood that the individual will support the denial of benefits." *Id.* Discovery could reasonably lead to probative evidence necessary for the Court to adequately assess Defendants' pattern or practice of depriving Plaintiffs of a full and fair review because Plaintiffs were examined by

conflicted physicians selected and compensated handsomely by Defendants.[26]

        **e.    Discovery Outside the ARs Is Necessary to Assess Defendants'**
               **Pattern or Practice of Ignoring Governing Plan Documents**

Discovery of decision letters and Plan physician reports could reasonably lead to probative evidence of Defendants' failure to follow governing Plan documents. For example, they will shed further light on whether Defendants have a pattern or practice of considering factors expressly barred by the Plan's terms, such as Plaintiffs' "educational level and prior training."[27]

        **f.    Discovery Outside the ARs Is Necessary for the Court to Assess**
               **Defendants' Pattern or Practice of Failing to Afford De Novo**
               **Review of Committee Decisions**

Additionally. discovery is appropriate to determine whether the Board has routinely

---

[26] For example, Dr. McCasland, who has received over $1.8 million in compensation from Defendants, examined Plaintiffs McKenzie, McGahee, and Alford. ¶ 301. A sample of decision letters and physician reports outside the ARs showed that he found *no* claimant to be T & P disabled. *Id.* Defendants' contention that Plaintiffs fail to provide particular facts supporting bias is meritless because Plaintiffs specifically allege that, across 51 T & P disability evaluations performed by seven Plan physicians having an average annual compensation from Defendants of $200,000 or more, those physicians have never found that any claimant is T & P disabled in any year (¶¶ 117, 328, 337), and across 291 T & P disability evaluations performed by Plan physicians having an average annual compensation from Defendants of $125,000 or more, those physicians concluded that over 92% of claimants were not T & P disabled and 19 of them have never found *any* claimant T & P disabled (¶¶ 118, 301, 338). *Cf. Kasko*, 33 F. Supp. 3d at 787 ("[Plaintiff] has made a sufficient showing of potential bias to permit further discovery. More specifically, she has offered proof that approximately 85% to 90% of the claims Dr. Mendelssohn has reviewed have been recommended 'not disabled.'"); *Hertz v. v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1136 (D. Nev. 2014) ("statistics strongly suggest[ed]" that plan-hired physician "harbored a significant bias towards finding a claimant capable of performing some type of work" where physician "found that 100% of all claimants could perform some type of work"); *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 990, 992 (N.D. Cal. 2008) (where plan physician had evaluated 217 claimants and found 193 of them able to work, court found that physician "stood to benefit financially from the repeat business that might come from providing Hartford with reports that were to its liking" and that "the history of [his] conclusions provide[d] evidence of [a] conflict").

[27] *Compare* ECF No. 69-7 at 12 (Plan § 3.1(e)(i)) *with e.g.*, Ex. E (NFL_ALFORD-0004685) (in denying Plaintiff McKenzie's appeal, Board relied on Plan physician's opinion that he was not T & P disabled based on his "education, and experiential background") and Ex. F (NFL_ALFORD-0011213) (in denying Plaintiff Smith's appeal, Board relied on Plan physician's opinion that he could "engage in employment consistent with your training and experience").

afforded de facto deference to the same advisors involved in the Committee's decisions instead of conducting a genuinely de novo review of the Committee's decisions, as required by both ERISA and the Plan's own terms.[28]  In *Cloud*, following discovery and a bench trial, the court concluded that claimants are not genuinely afforded de novo review on appeal to the Board and that this gives rise to an inherent conflict of interest:

> [I]t has become clear that the Board misplaced its trust in advisors, including advisors at Groom.  These advisors failed to review all documents, drafted Board decision letters reflecting purported reasons for denial that were never actually discussed among Board members, and advised both the Committee and the Board members charged with conducting a *de novo* review of Committee decision— *despite the inherent conflict of interest presented by acting in such a dual capacity.*

*Cloud*, 2022 WL 2237451, at *44.  Thus, consistent with *Booth* factor six, the discovery that Plaintiffs seek is reasonably calculated to yield information that would allow the Court to adequately assess whether Plaintiffs' claims were compromised by a pattern and practice of failing to afford genuinely de novo review on appeal to the Board.

### g.    Discovery Is Necessary for the Court to Assess Defendants' Pattern and Practice of Failing to Provide Relevant Documents

Request No. 2 is also appropriate to help the Court adequately assess Defendants' pattern or practice of failing to provide relevant information. For example, as alleged in the Amended Complaint, Defendants failed to produce requested statistical information relevant to the reputation, bias, and predisposition of Plan-compensated physicians who examined Plaintiff

---

[28] *See Cloud*, 2021 WL 4477720, at *4 ("[I]nformation on the Board's actions is important to determine whether the Board rubber-stamped the Committee's decision instead of conducting a *de novo* review as is required by the Plan documents, and whether it … complied with ERISA procedural regulations."); *see also* 29 C.F.R. §§ 2560.503-1(h)(3)(ii), (h)(4) (disability plan must "[p]rovide for a review that does not afford deference to the initial adverse benefit determination and that is conducted by an appropriate named fiduciary of the plan who is neither the individual who made the adverse benefit determination that is the subject of the appeal, nor the subordinate of such individual"); ECF No. 69-7 at 68 (Plan § 13.14, stipulating that "[t]he Disability Board will accord no deference to the determination of the Disability Initial Claims Committee").

McKenzie.  ¶¶ 104, 303.  In its decision on Mr. McKenzie's claim, the Board rejected his request for relevant information on the Plan physicians who had evaluated him, asserting that "statistics on the outcome of a particular physician's evaluations[] [we]re not relevant to [his] claim," and that it disagreed with a judge's recent conclusion that a Plan physician was conflicted.  Ex. E (NFL_ALFORD-0004686).  Elsewhere, Defendants represent in decision letters that they do not even maintain statistics on Plan physicians (¶ 51), but such representations are false.  Since at least 2013, ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████  Discovery on this point is therefore well justified.[29]

### 6.    *Booth* Factor 3:  Adequacy of the Materials Used to Support Defendants' Decisions, and the Degree to Which They Support Them

Requests 2 & 3 are further necessary to fill in the gaps in the ARs to properly assess the adequacy of the materials used to support Defendants' decisions on Plaintiffs' claims, as prescribed by *Booth* factor three.  In *Helton*, the Fourth Circuit reasoned that there are "many circumstances in which a court would need to look to extrinsic evidence to evaluate the adequacy of the administrative record, as is required by the third factor."  *Helton*, 709 F.3d at 354.[30]

---

[29] *See Ferguson v. United of Omaha Life Ins. Co.*, 3 F. Supp. 3d 474, 480 n.6 (D. Md. 2014) ("One would hope that [the fiduciary] was well aware of, and took into consideration, [the physician's] experience, areas of expertise, potential conflicts of interests, and criticisms of his previous reviews when it assigned him the task of reviewing this case.  … It would be troublesome, indeed, if this information was not before the fiduciary and considered by the fiduciary.").

[30] *See Glenn*, 554 U.S. at 118 ("serious concern[]" that "MetLife had emphasized a certain medical report that favored a denial of benefits, had deemphasized certain other reports that suggested a contrary conclusion, and had failed to provide its independent vocational and medical experts with all of the relevant evidence"); *Helton*, 709 F.3d at 358 (regarding *Booth* factor 3, defendant "withheld from the administrative record highly relevant pieces of information subsequently produced in discovery, including … e-mail and the screen shot"); *Mickell*, 832 F.

The Requests will yield information concerning whether the unfavorable determinations on Plaintiffs' claims were the product of a systematic practice of cherry-picking evidence—namely by placing overriding, if not exclusive, reliance on incomplete, undetailed, or otherwise flawed reports of Defendants' hired physicians—and, thus, whether Defendants truly considered *all* records and information as they represent in their decisions.

> **7.** ***Booth* Factor 5: Other Similar Situated Claimants' Decision Letters and Physicians Reports Are Necessary to Fill in the Gaps in the ARs to Assess Whether Defendants' Decision-Making Process Was Reasoned and Principled**

Finally, the documents sought by Requests 2 & 3 can also shed light on whether Defendants' decision-making process was reasoned and principled in Plaintiffs' cases because the discovery is reasonably calculated to lead to admissible evidence for the Court to adequately assess the degree of Defendants' "reliance on … apparently biased sources casts serious doubt on the neutrality of its decision-making process," as required by *Booth* factor five.[31]

Here, other claimants' decision letters and physicians' reports could reasonably lead to

---

App'x at 593 (minutes for Board's meeting contained itemized list of materials that it reviewed in deciding plaintiff's claim but did not include evidence previously before the Committee, and Board's denial letter did not discuss any evidence that plaintiff had submitted to the Committee); *Cloud*, 2022 WL 2237451, at *43 ("The Board's review process, its interpretation and application of the Plan language, and overall factual context all suggest an intent to deny Plaintiff's … appeal regardless of the evidence."); *Smith v. Reliance Standard Life Ins. Co.*, No. 5:17-CV-00056-BR, 2018 WL 4760490, at *5 (E.D.N.C. Oct. 2, 2018) (relevant to *Booth* factor 3, errors in physician's notes were pertinent evidence in determining adequacy of materials that insurer considered in denying disability benefits claim), *aff'd*, 778 F. App'x 207 (4th Cir. 2019).

[31] *Caplan*, 544 F. Supp. 2d at 992; *see Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 261 (4th Cir. 2017) (Board "failed to follow a reasoned process or explain the basis of its determination [in its decision letters]—neither addressing nor even acknowledging new and uncontradicted evidence supporting Solomon's application."); *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. WDQ-09-2612, 2012 WL 2374661, at *14 (D. Md. June 19, 2012) ("The Board failed to apply a reasoned and principled decision-making process as required by the Plan because it "simply accepted" two Plan physicians' "flawed" and "undetailed" reports "without adequate explanation," and "a reasoning mind would not accept" those reports as adequate to support a denial of benefits).

probative evidence that Defendants' decision-making process on Plaintiffs' claims was not reasoned and principled. They contain information that would allow an adequate assessment of the extent and impact of Defendants' routine reliance on physicians having a known history of issuing flawed, deficient, conclusory, undetailed, or otherwise inadequate reports and reports employing inconsistencies with Plan terms.

## CONCLUSION

For the foregoing reasons, the Court should overrule Defendants' objections and compel Defendants to furnish all documents responsive to Requests 2 & 3.

Dated: November 26, 2024

Respectfully submitted,

**MIGLIACCIO & RATHOD LLP**

By:   /s/ Jason S. Rathod
      Jason S. Rathod
      Nicholas A. Migliaccio
      412 H Street, N.E.
      Washington, DC 20002
      Telephone: (202) 470-3520
      jrathod@classlawdc.com
      nmigliaccio@classlawdc.com

      ***Counsel for Plaintiffs and Liaison Counsel
      for the Proposed Class and Subclasses***

Christopher A. Seeger *(admitted pro hac vice)*
Diogenes P. Kekatos *(admitted pro hac vice)*
Hillary R. Fidler *(admitted pro hac vice)*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegerweiss.com
hfidler@seegerweiss.com

Benjamin R. Barnett
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917

Philadelphia, PA 19106
Telephone:  (215) 553-7980
bbarnett@seegerweiss.com

Samuel L. Katz *(admitted pro hac vice)*
Julia M. Damron *(admitted pro hac vice)*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800
Beverly Hills, CA 90211
Telephone:  (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com

Bryan F. Aylstock *(admitted pro hac vice)*
Justin G. Witkin *(admitted pro hac vice)*
Douglass A. Kreis *(admitted pro hac vice)*
D. Nicole Guntner *(admitted pro hac vice)*
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone:  (850) 202-1010
BAylstock@awkolaw.com
JWitkin@awkolaw.com
DKreis@awkolaw.com
NGuntner@awkolaw.com

***Counsel for Plaintiffs and for the
Proposed Class and Subclasses***

Robert K. Scott *(admitted pro hac vice)*
Gerry H. Goldsholle *(admitted pro hac vice)*
**ADVOCATE LAW GROUP P.C.**
2330 Marinship Way, Suite 260
Sausalito, CA 94965
Telephone:  (949) 753-4950
bob@advocatelawgroup.com
gerry@advocatelawgroup.com

***Additional Counsel for Plaintiffs***