**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN *et al.*, <br><br> Defendants. | Case No. 1:23-cv-00358-JRR |

**DECLARATION OF HESSAM ("SAM") VINCENT IN SUPPORT OF
DEFENDANTS' JOINT OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL**

I, Hessam ("Sam") Vincent, hereby declare pursuant to 28 U.S.C. § 1746, under the penalty of perjury, that the following is true and correct; that I have personal knowledge of the matters set forth herein, or knowledge based on my review of business records; and that, if called to testify as a witness in this action, I could and would testify competently thereto:

I.  **BACKGROUND**

1. I am employed at the NFL Player Benefits Office ("NFLPBO") in Baltimore, Maryland. The NFLPBO is the administrative office for the NFL Player Disability & Survivor Benefit Plan (the "Plan," formerly known as the NFL Player Disability & Neurocognitive Benefit Plan and the NFL Player Disability, Neurocognitive & Death Benefit Plan) and other Taft-Hartley Act pension- and/or welfare-benefit plans maintained pursuant to collective-bargaining agreements between the NFL Players Association and the NFL Management Council.

2. I have been employed by the NFLPBO since 2008, first as a Benefits Coordinator, working primarily with the group responsible for handling court orders that direct a participant's benefits to an alternate payee, such as a player's former spouse or child.

3. In approximately 2009, I became a Disability Benefits Coordinator in the disability group. As a Disability Benefits Coordinator, I helped process disability applications, including by: (i) helping players apply for benefits, (ii) receiving and maintaining records related to applications, and (iii) preparing application-related materials for presentation to the Plan's fiduciaries, i.e., Disability Initial Claims Committee (the "Committee") and the Disability Board (the "Board").

4. I was promoted in 2016 and became the Disability Manager, managing the day-to-day activities of the other Disability Benefits Coordinators and overseeing the disability program in general. I worked in that role for approximately five years.

5. In 2021, I became the Disability Relations Manager, and my title was recently

changed to Director of Disability, though my responsibilities remain the same. My primary responsibility is to manage the Plan's relationship with the physicians appointed to the Plan's Neutral Physician panel. When the Players Association and Management Council appoint new physicians to the Neutral Physician panel, I am the primary point of contact for those physicians if they have any questions about their retention, their responsibilities, or the Plan's procedures. I also oversee the process of coordinating medical examinations of players with the Plan's Neutral Physicians; maintaining files and records relating to players' applications; and supervising the preparation and presentation of all application-related materials to the Committee and Board.

6. When I became Disability Relations Manager, my work with the Neutral Physician panel expanded and became my main focus. Although I no longer have day-to-day supervisory responsibility over the Disability Benefits Coordinators, I continue to work closely with the disability group and have first-hand knowledge of their practices.

7. In addition to me, there are 31 full-time staff members who work in the NFL Plan Benefits Office. Of those, only 10 have the necessary training to be able to review player application files.

## II.   **NFLPBO RECORDKEEPING**

8. The system of record for processing and tracking applications and appeals, including Neutral Physicians assigned and visited is known as "V3." As part of my role I am familiar with the V3 system and have experience using it.

9. I understand that Plaintiffs have requested the following documents or the period from April 1, 2018 through February 9, 2023: (1) all T&P, LOD, and NC decision letters communicated to players; and (2) all Physician Report Forms and narratives that any Neutral Physician or Medical Advisory Physician worked on, drafted, completed, or signed (including any drafts, handwritten notes, comments, correspondence, test sheets, testing data, or other

attachments).

10. Based on my review of the V3 system, Plaintiffs are requesting documents relating to over 4,500 benefits applications and 1,200 appeals. The process involved in collecting these documents would require significant and very burdensome manual review. For example, each application decision letter would need to be separately identified and collected from each individual player's file; the letters are not stored in such a way that they could be batch collected. Collecting these files would therefore require manual review of many thousands of files. It would also be extremely time-consuming to collect and review all of the Physician Report Forms and narratives that Plaintiffs have requested. This process would be very difficult and burdensome for our limited office staff to accomplish.

11. I cannot identify the precise number of pages of documents that the files Plaintiffs have requested contain, but I understand that the comparable documents produced for the nine named Plaintiffs and Mr. Alex Parsons included 101 Physician Report Forms, 108 physician narratives, and 68 decision letters. If I add those together and divide by ten, the result is approximately 28 documents per claimant. Across the over 4,500 applications and 1,200 appeals at issue, I estimate that between 100,000 and 150,000 documents would need to be individually collected and produced. Moreover, decision letters in particular would need to be individually culled from the claimants' player files through a manual review. For the nine named Plaintiffs and Mr. Parsons, the administrative records and player files collectively totaled more than 60,000 pages. I estimate that identifying and producing the requested records across the over 4,500 applications and appeals at issue would thus require manual review of millions of pages of records.

12. If I multiply that number by 4,500, the total is 126,000 documents for the

underlying applications, plus an additional 33,600 documents for the appeals. Collecting and reviewing that volume of documents would take thousands of hours to complete. Such a process would be logistically crippling for the Plan Benefit Office to undertake and would significantly impact our ability to fulfill our responsibilities and our ability to process and facilitate the timely adjudication of benefits applications.

Executed this 10th day of December, 2024 at Baltimore, Maryland.

*Hessam Vincent*
Hessam ("Sam") Vincent
