**O'Melveny**

O'Melveny & Myers LLP  T: +1 202 383 5300
1625 Eye Street, NW    F: +1 202 383 5414
Washington, DC 20006-4061  omm.com

February 14, 2025

**Greg Jacob**
D: +1 202 383 5110
gjacob@omm.com

The Honorable Erin Aslan
United States Magistrate Judge
101 West Lombard Street, Chambers 7B
Baltimore, MD 21201

Re: **Alford v. The NFF Player Disability & Survivor Benefit Plan, No. 1:23-cv-00358-JRR (D. Md.): Defendants' Position as to Plaintiffs' Statistical Evidence Spreadsheet**

Dear Judge Aslan:

  Defendants seek to compel Plaintiffs to produce a spreadsheet that contains purely factual information regarding the contents of alleged "statistical samples" that Plaintiffs invoke in their Amended Complaint[1] and recurrently cite to in their briefing.[2] To the extent the spreadsheet contains any attorney mental impressions, Defendants have consented to their redaction. Plaintiffs do not dispute that the spreadsheet contains purely factual information pertaining to the contents of the alleged samples, but they have refused to produce it on the grounds that attorneys created it, and that Defendants possess the underlying disconnected records that comprise the samples and should be forced to attempt to recreate them on their own.

  ***Factual and Procedural Background.*** Under the NFL's collectively bargained disability plan ("Plan"), Neutral Physicians who are jointly designated by the NFL Players Association and NFL Management Council are assigned to conduct examinations of former players who apply for disability benefits. The record shows that the Neutral Physicians' contracts, orientation manuals, and examination forms, as well as the terms of the Plan itself, instruct them to exercise their best professional judgment when examining players, require them to certify that they conduct their examinations without bias, and compensate them with flat fees that do not vary based on examination outcomes. It further shows that Neutral Physicians are assigned to examine players based on neutral criteria such as location, specialty, and availability, and that the outcome of a Neutral Physician's past examinations is never considered.

  Plaintiffs nevertheless claim that the various "statistical samples" that are repeatedly alleged in the Amended Complaint (more than 72 times) demonstrate that Neutral Physicians are

---

[1] *See, e.g.*, AC ¶ 107 ("There is powerful statistical evidence that strongly suggests a systematic pattern that the more the Defendants compensate their hired physicians, the higher the likelihood that those physicians will render flawed, inadequate, result-oriented opinions adverse to benefits applicants."). *See also id.* ¶¶ 108-146, 283, 286-87, 290, 296, 299, 300-01, 305, 318, 321, 324-26, 328, 330, 333, 335-41.
[2] *See, e.g.*, ECF No. 134-1 at 32 ("Plaintiffs allege overwhelming evidence of extensive bias by Plan physicians, including those promoted and provided extra compensation to teach new Plan physicians."); ECF No. 102-1 at 22-27, 39 (listing common questions relating to alleged physician bias, and invoking Athlaw's development of "statistical evidence demonstrating disturbing patterns of bias" to show adequate representation).

systemically biased against making disability findings.  Plaintiffs allege, for instance, that the highest-paid Neutral Physician neuropsychologists have never found a player T&P disabled "across the combined 107 T&P disability evaluations they performed in the sample of 784 T&P disability evaluations," AC ¶ 122, and that "[o]f a sample of six evaluations for T&P disability benefit purposes, Dr. Detterline found no Player T&P disabled," *id.* ¶ 223.

In October 2024, Plaintiffs produced more than 2,000 individual claim records that they say were used to construct these and other alleged samples, but they *did not* produce any documents showing which claims were included in which samples, the calculation of the purported statistics, or the criteria that were applied to include or exclude specific examinations when the samples were grouped.  Plaintiffs first identified the existence of the spreadsheet containing that information on January 17, 2025, in a long-overdue privilege log entry.  The spreadsheet is responsive to Defendants Request for Production No. 2, served on August 30, 2024, which seeks: "All Documents that were used to calculate each numerical allegation cited, referenced, or discussed in Your Complaint, or which otherwise informs or relates to those calculations. This Request includes but is not limited to the data, statistics, totals, averages, rates, and other calculations referenced in Paragraphs 25, 33 and 107-266 in Your Complaint."

***Plaintiffs' Spreadsheet Identifying the Statistical Samples.***  The spreadsheet is the only document listed on Plaintiffs' privilege log.  Plaintiffs describe the spreadsheet in the log as an Excel file containing "information regarding Defendants' benefit decisions for Athlaw clients, benefit determinations by individual physicians for Athlaw clients, annual compensation paid to individual physicians, and counsel's mental impressions, strategic assessments, factual and legal judgments, and conclusions."  Defendants have agreed not to divulge information that they learned about the spreadsheet from the parties' meet-and-confers, but upon information and belief, it contains the very factual material that Defendants need to understand and to challenge Plaintiffs' purported statistical samples: the groupings of the claims records into samples, the calculations showing the numbers stated in the Amended Complaint, and the criteria to include or exclude claims records in Plaintiffs' possession from the samples.

***Rule 26 Requires Production of the Spreadsheet.***  Plaintiffs must produce the spreadsheet because it is relevant, proportional, and contains non-privileged factual information.  *See* Fed. R. Civ. P. 26(b)(1).  Plaintiffs have steadfastly maintained that the alleged statistical samples are centrally relevant to the lawsuit. And on information and belief, the spreadsheet is the only document that describes which of the more than 2,000 individual claim records that Plaintiffs produced are included in which sample; how they calculated their statistics; and the inclusion or exclusion criteria they used.  The factual information in the document is plainly relevant, and Plaintiffs have not identified any material burden associated with producing it.

Plaintiffs argue that Defendants have the underlying individual records and can reconstruct the statistics.  That is no different than saying Defendants could "reconstruct" Act I of *Hamlet* because they have a dictionary; the pieces may all be there, but how they are put together matters.  Defendants still need the spreadsheet so that they can reliably reconstruct each

purported statistical sample and then challenge its accuracy or validity.[3]

**Plaintiffs Have No Valid Privilege Argument.**  Defendants are entitled to the spreadsheet because they must know the composition of Plaintiffs' samples in order to test and defend against Plaintiffs' allegations.  Plaintiffs contend they should not have to produce the spreadsheet because it contains work product.  But courts differentiate between fact and opinion work product.  *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019).  The former does not contain an attorney's mental impressions and may be obtained upon a showing of substantial need and an inability to secure the equivalent information without undue hardship.  *Id.*  The latter reflects the attorney's actual thoughts and has near absolute immunity.  *Id.*

Defendants do not seek Plaintiffs' opinion work product.  To the extent the spreadsheet contains attorneys' "strategic assessments" or "factual and legal judgments" *why* they consider the criteria they used to be strategically important, that should be redacted, with the redactions noted in a privilege log.  *See Nutramax Lab'ys, Inc. v. Twin Lab'ys Inc.*, 183 F.R.D. 458, 465 (D. Md. 1998) (permitting redaction of opinion work product "commingled with traditional 'fact' work product").  But Defendants are entitled to know the contents, calculations, and criteria for each alleged "statistical sample" in the Amended Complaint.  Moreover, Plaintiffs have waived any work-product protection over the factual information in the spreadsheet because they have put those facts directly at issue in their numerous public filings stating the purported statistics.[4]

**Conclusion.**  Defendants have sought to obtain the contents, calculations, and inclusion criteria for Plaintiffs' statistical allegations since a July 22, 2024 meet-and-confer.  For months, Plaintiffs have withheld the spreadsheet containing that information, and only disclosed its existence for the first time on January 17, 2025.  Defendants now find it necessary to move to compel its production, as Plaintiffs are seeking to leverage their inaccurate and misleading statements regarding the purported "statistical samples" in the Amended Complaint to secure additional extra-record discovery, while concealing and refusing to disclose non-privileged factual information that Defendants require to contest the validity of the statements.  Defendants also intend to request fees and costs for the expense associated with the motion.

Thank you for your consideration.  We look forward to discussing the matter with you further at the February 18, 2025 pre-motion conference.

---

[3] Further complicating matters, Plaintiffs admit that their mass production of disconnected individual claims records *omits* some claims in Plaintiffs' possession that prove certain statistical allegations in the Amended Complaint are false, and also contains *extra* individual claims that they failed to count when calculating the statistical figures stated in the Amended Complaint.  This combination of missing and extra components—none of them marked as such— literally renders reconstruction of the purported statistical samples in the Amended Complaint impossible without the factual information that the spreadsheet contains.

[4] *See United States v. Nobles*, 422 U.S. 225, 239-40 (1975) (explaining that a party waives the work-product privilege by putting the information at issue); *Congregation ARIEL Russian Cmty. Synagogue, Inc. v. Bd. of Appeals*, 2021 WL 1734442, at *2 (D. Md. May 3, 2021) (explaining that work product privilege is waived "[w]hen a party injects into a case an issue that in fairness requires examination of otherwise protected communications" because "[t]he law prohibits a party from using information as a sword to prove its case while shielding the information from disclosure by asserting privilege" (quotations omitted)); *Black & Decker Corp. v. United States*, 219 F.R.D. 87, 91-92 (D. Md. 2003) ("The case law clearly recognizes that there may be a waiver of attorney work product doctrine where the information has been placed 'at issue' by the holder of the privilege.").

Sincerely,

*Gregory F. Jacob*

Gregory F. Jacob