# EXHIBIT A

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3

 4   JASON ALFORD, ET AL.,          )
                                    )
 5        Plaintiff,                )
                                    )Civil No.
 6        vs.                       )1:23-cv-0358-JRR
                                    )
 7   THE NFL PLAYER DISABILITY &    )Baltimore, Maryland
     SURVIVOR BENEFIT PLAN, ET AL.  )
 8                                  )February 21, 2025
          Defendants.              )10:02 a.m.
 9   _____)

10

11                      TRANSCRIPT OF PROCEEDINGS
                            MOTIONS HEARING
                  BEFORE THE HONORABLE JULIE R. RUBIN
12

13

14                       A P P E A R A N C E S

15   On Behalf of the Plaintiff:
          Benjamin R. Barnett, Esquire
16        Julie M. Damron, Esquire
          Samuel L. Katz, Esquire
17
     On Behalf of the Defendant:
18        Gregory F. Jacob, Esquire
          Meredith N. Garagiola, Esquire
19        John J. Lapin, Esquire

20

21

22        (Computer-aided transcription of stenotype notes)

23                          Reported by:
                       Ronda J. Thomas, RMR, CRR
24                     Federal Official Reporter
                    101 W. Lombard Street, 4th Floor
25                     Baltimore, Maryland 21201
```

1  (10:02 a.m.)

2          **THE COURT:**  Denis, would you call the case.

3          **THE CLERK:**  Yes, Your Honor.

4      The matter now pending before this court is civil matter

5  JRR-23-0358, Alford, et al. v. The NFL Player Disability &

6  Survivor Benefit Plan, et al.  This matter comes before this

7  Court for the purposes of a motions hearing.

8      Counsel for the record, starting with the plaintiff.

9          **MR. BARNETT:**  Good morning, Your Honor.  Benjamin

10 Barnett from Seeger Weiss on behalf of the named plaintiffs.

11         **THE COURT:**  Good morning.

12         **MR. KATZ:**  Samuel Katz on behalf of Athlaw LLP.

13         **THE COURT:**  Good morning.

14         **MS. DAMRON:**  Good morning, Your Honor.  Julia Damron

15 on behalf of the plaintiffs for Athlaw LLP.

16         **THE COURT:**  Good morning.

17         **MR. JACOB:**  Your Honor, Gregory Jacob on behalf of the

18 defendant plans.

19         **THE COURT:**  Good morning.

20         **MR. LAPIN:**  John Lapin on behalf of the plans.

21         **MS. GARAGIOLA:**  Meredith Garagiola on behalf of the

22 plans.

23         **THE COURT:**  Good morning, everyone.  I hope everyone's

24 travel was uneventful.  Have a seat and make yourselves

25 comfortable.

1    I'll get my act together here.

2        As Denis said, we are here on Plaintiffs' Motion to Compel

3    Discovery, that is document ECF-134.  And I have a couple of

4    questions.  I want to hear everybody's argument.  Last time we

5    were here, because of the then-pending, still sort of pending

6    motion to hold in abeyance the discovery deadlines pertaining

7    to the 26(a)(2) expert disclosures as well as the class

8    certification reply papers, and Plaintiffs' Opposition to the

9    various individual motions for summary judgment, we talked a

10   little bit about the Motion to Compel that was pending.

11       I was not yet prepared to really rule on it.  I hadn't dug

12   into it.  And at that time it had been referred to Magistrate

13   Aslan.  I have taken it back, given the fact that it really

14   does bear so materially on where the merits of the case will

15   go.

16       So I am prepared to hear full argument now, and depending

17   on how this morning goes, we'll then talk about the motion at

18   132 about the abeyance of deadlines.  So I'm happy to hear full

19   argument, Mr. Barnett.  And, Mr. Jacob, obviously I'll hear

20   from you after that.

21       I might have some preliminary questions for you,

22   Mr. Barnett.  And I saw obviously the excerpted portions of

23   requests 2 and 3 that are the subject of the motion in the body

24   of the motion --

25       **MR. BARNETT:**  Right.

1          THE COURT:  -- and in the response, and not that

2    you're required to, but the actual discovery requests

3    themselves were not appended.  So I was on a mission to find

4    out the definition of the relevant time period as that term is

5    described or defined.

6          As far as I can tell, based on the content of

7    Mr. Vincent's declaration and the objections, I've sort of

8    discerned that the relevant time period is April 1st, 2018

9    through February 9, 2023; is that correct?

10          MR. BARNETT:  That's correct, Your Honor.

11          THE COURT:  So before we begin, as far as the -- why

12    you should get the stuff, tell me why that's an appropriate

13    time period?

14          MR. BARNETT:  So we picked that time period, Your

15    Honor, very specifically because that is when on behalf of the

16    10 named plaintiffs they started the process of applying for

17    benefits.

18          THE COURT:  That's the earliest date.

19          MR. BARNETT:  The earliest date, correct.  And the

20    2023 date is I believe when that period concluded.  And we were

21    aware under the *Chavis* case that certain qualifiers need to be

22    established to focus the discovery on what's actually relevant

23    in the case.  So by focusing for those five years, we think the

24    decision letters and physician reports are clearly relevant to

25    our claim.

1    **THE COURT:**  And I take it that you contend that if you
2    don't get the stuff for that earliest date going forward to
3    February 9, 2023, that that impairs your ability to demonstrate
4    the *Booth* factors that you contend are relevant for the court's
5    consideration.
6    **MR. BARNETT:**  Not only the *Booth* factors, it would be
7    relevant to the 502(a)(2) claims as well as the other breaches
8    of fiduciary duty.  But absolutely it would be critical for the
9    evaluation that ultimately has to be done by the court under
10   the *Booth* factors.
11   **THE COURT:**  My next question is, and I don't mean to
12   speak for Mr. Jacob, and he'll disabuse me of any
13   misapprehension I might have in this summary, so I'm going to
14   kind of lay a foundation for a question.  Basically it's not
15   really a question, at the end I'm going to say "respond."
16   So as far as I can tell, defendant asserts or defendants
17   assert that the motion for class cert does not rely on any
18   administrative record produced -- I'm going to call it AR -- or
19   any statistical evidence or calculations, and based on that
20   defendants assert that plaintiffs may not now complain that
21   that they, plaintiffs, cannot ably reply to the opposition
22   without the information demanded in requests 2 and 3.
23   As far as I understand it, defendants suggest further that
24   because a party may not make new argument in a reply that this
25   assertion about needing more documents is additionally

1  unsupportable.

2      And I recognize further that plaintiffs also contend that

3  responding to the Rule 56 motions without that information sort

4  of impairs plaintiffs' capacity to do that.

5      But can you please respond to defendants' contention?

6      MR. BARNETT:  Certainly, Your Honor.  So the

7  defendants themselves -- putting aside the question of whether

8  the decision letters and physician reports are relevant to our

9  claims, we believe they are -- they have put this information

10 directly at issue through their class certification briefing

11 and affirmative motions for summary judgment where they try to

12 rely on the V3 data to support their claims.

13     The problem for them is that the V3 data, by their own

14 admission from Mr. Vincent's affidavit and from other

15 statements made by their putative expert, Dr. Lasater, is very

16 clear that the V3 data is incomplete for that process.  It does

17 not have two key pieces of information.  It does not have the

18 individual recommendation of individual physicians as to the

19 applicants, and it does not have their compensation.

20     THE COURT:  Yes.  So as far -- the way that I read

21 Mr. Vincent's declaration is he basically says -- I think this

22 is at paragraphs 42 and 43 -- that if an application, if the

23 committee or the board approves, one may assume that somewhere

24 along the line a neutral physician gave it the green light for

25 the criteria necessary for whatever benefits were sought by

7

1    that player.  If there's a deny, one may assume that the board

2    was informed by a neutral physician or more than one neutral

3    physician that those criteria were not met; but it's not

4    populated with the underlying basis for that committee decision

5    or the actual documents demonstrating that that assumption is

6    valid.

7            MR. BARNETT:  I think your reading of the Vincent

8    information is correct, Your Honor.  But the problem is what

9    the defendants have done here is -- so, for example, say four

10   doctors review a benefits application and three of those

11   doctors say, "No, the applicant is not entitled to benefits,"

12   one doctor says "Yes," that yes is then attributed or credited

13   to the other three doctors even though in reality they all

14   voted against the benefit application.

15           THE COURT:  Explain that again, I'm confused.

16           MR. BARNETT:  My understanding -- and I should have

17   said this earlier, Your Honor, but I am not by background an

18   ERISA attorney.  I am surrounded by those who are more learned

19   in ERISA.

20           THE COURT:  So am I.

21       (Laughter.)

22           MR. BARNETT:  Well, I'm learning on a daily basis as

23   quickly as I can.  But if there is a question that is

24   particularly technical in terms of ERISA, I hope it's okay if I

25   turn to Mr. Katz --

8

1        **THE COURT:**  Yes.

2        **MR. BARNETT:**  -- because you're likely to get a

3    quicker answer and one more accurate.

4        **THE COURT:**  All right.

5        **MR. BARNETT:**  So putting that aside, my understanding

6    is what the defendants have done here in their V3 data, or in

7    the Lasater analysis of the V3 data, is not to track what the

8    individual recommendations were, but then take the final

9    decision and credit it regardless of how the physicians voted.

10        **THE COURT:**  Okay.

11        **MR. BARNETT:**  So, again, an example is if you had four

12    physicians and three of which said "No, this applicant is not

13    qualified for these benefits for which they applied," and one

14    says "Yes," then all four of them get credited for that one

15    yes.  And that is just -- it's inaccurate.

16        And the only source -- the only source that exist that

17    actually captures what individual physicians recommended are

18    the decision letters that we're seeking for our motion.

19        **THE COURT:**  And those are not banked in V3?

20        **MR. BARNETT:**  No.  Our understanding is that is not

21    information that is captured in V3.  And it apparently was a

22    business decision that was made not to capture that information

23    in order to try to enhance the independence of the retention

24    decision of the neutral physicians.

25        Of course we think that's nonsense.  But that's not for

```
 1  today.  That's for another time.
 2         THE COURT:  Okay.  All right.  All right.  I think I'm
 3  going to hold back on any other questions.  If I interrupt you
 4  I apologize in advance.  Go ahead.
 5         MR. BARNETT:  No, I would welcome, they're not
 6  interruptions.  We have prepared a PowerPoint presentation for
 7  today.  I pledge to you we are not going to read through it,
 8  but you did set aside two hours for argument which in my
 9  experience is an extraordinary amount of time.
10         THE COURT:  Well, my objective is, you know, I may rue
11  the moment I said this, but I am not one for time limits
12  unless, you know, my experience with particular lawyers
13  recommends that path.
14     (Laughter.)
15         THE COURT:  I don't find that to be the case here.  So
16  that's just sort of a rough sketch of what, you know, but I
17  want to get this right and be thorough.  So no one's here on a
18  clock.
19         MR. BARNETT:  Well, again, we very much appreciate all
20  of the time and attention that the court has devoted to the
21  motion.  I will work my way through the PowerPoint.
22         THE COURT:  Okay.
23         MR. BARNETT:  I will try to do it quickly and just
24  highlight the key points.  Obviously if you have questions,
25  that's why we're here.  So we're not locked into going through
```

```
 1  it.  And just so the court knows, we provided a copy of the
 2  PowerPoint to defense counsel this morning.  We were -- we
 3  tried to be absolutely scrupulous.  It's all the same case law
 4  in our briefing.  It's all the same facts in the briefing.
 5  There's nothing new.
 6          THE COURT:  Nothing extra.
 7          MR. BARNETT:  There's nothing extra, there's nothing
 8  new.  This will be addressed down the road.
 9          THE COURT:  Is this the slides?  Are these --
10          MR. BARNETT:  We do have a hard copy.
11          THE COURT:  Oh, this is Defense Exhibit 1.  Yeah, if
12  you have a copy of the slides I would -- if you don't, don't
13  fret.  It would be helpful if you have it.
14          MR. BARNETT:  Permission to approach?
15          THE COURT:  Yes, please.  Thanks.
16          MR. BARNETT:  Thank you very much.
17          THE COURT:  Yes.  Ready to roll.
18          MR. BARNETT:  Ms. Damron and I are going to try to
19  communicate telepathically.
20          THE COURT:  You do what you need to do.
21          MR. BARNETT:  We're here, Your Honor, obviously on the
22  plaintiffs' motion to compel.
23          THE COURT:  Mr. Barnett, I'm going to ask you to hold
24  off one second.  I neglected stupidly to bring out a copy of
25  the complaint itself.  I attempted to make a mental note to do,
```

1  which you can see how that pans out when I don't write it down

2  so just give me a moment to get that out here.

3         MR. BARNETT:  We're having technical issues, Your

4  Honor, so . . .

5         THE COURT:  Okay.

6         MR. BARNETT:  Maybe while we're waiting for that, Your

7  Honor, and I don't want to introduce an extraneous issue but I

8  think it is going to come up.  So defense counsel did give us a

9  few documents today that they're apparently planning to use in

10 the argument and they were produced in discovery.

11        THE COURT:  Okay.

12        MR. BARNETT:  But they were not relied on, as I

13 understand it, Mr. Jacob can correct me if I'm wrong, they were

14 not relied on the briefing.

15        THE COURT:  Okay.

16        MR. BARNETT:  So we just want to lodge an objection.

17        THE COURT:  Okay.

18        MR. BARNETT:  Obviously it's up to you what you want

19 to hear, but we just object to them being introduced at this

20 point.

21        THE COURT:  I understand.

22        MR. BARNETT:  This has come up before and the court's

23 been very clear that briefing is complete on the motion.

24        THE COURT:  Yeah, my response about the briefing being

25 complete was more in response to Mr. Jacob's position that he

1  was unable to respond to the motion to compel without

2  plaintiffs' 26 disclosure.

3         **MR. BARNETT:**  Ah.

4         **THE COURT:**  But I hear you, so we'll get there.

5      Well, in any event, go forward.  It's coming.

6         **MR. BARNETT:**  So if we go to the next slide.  So the

7  court's clear on why we're here today, we're seeking the court

8  granting our Motion to Compel the Production of the Decision

9  Letters and the Physician Reports that are relevant to all of

10  our claims under 502(a)(2) and 502(a)(1)(B).

11      There is a plethora of case law starting with *Glenn*, to

12  the Fourth Circuit's decision in *Helton*, to multiple District

13  of Maryland decisions, including *Chavis*, *Chughtai* and *Balkin*

14  that fully support the targeted discovery that we're seeking

15  here.

16      This information is relevant to our claims.  It's relevant

17  to their defenses.  And as we discussed briefly during the

18  January 16th conference, it's ultimately relevant to the

19  court's assessment of the *Booth* factors.

20      As we just discussed in response to your question, it's

21  also relevant because it actually will do what the V3 data

22  won't do, which is give us the individual recommendations of

23  those physicians.

24      We start with these files specifically, Your Honor, as our

25  first motion to compel because they're critical, and they're

1   important to all of our claims.  They relate to inconsistent

2   interpretations, misrepresentations as to what documents were

3   actually reviewed.  They go to the defendants' conflicts and

4   potentially bad faith motives, the misrepresentation about

5   doctors being absolutely neutral.

6        We will address -- the court raised it before, the pattern

7   and practices of ERISA violations required by federal law.

8   Ultimately, a fraudulent scheme that denies applicants the

9   benefits that they're entitled to under the plans and under

10  ERISA.  And all of that is separate and apart from the wrongful

11  denial benefit applications.  That is just one claim that we're

12  making, and all of the other claims are independent of that,

13  and this is the key information that will address all of those.

14       All right.  As set out in our briefing, Your Honor, the

15  discovery standard for discovery sought under 502(a)(2) is Rule

16  26 and it just has to be relevant and proportionate.

17       And we are alleging, you know, more than seven breaches of

18  fiduciary duty.  And all of this evidence goes directly to

19  those claims, and it's evidence that has been recognized both

20  by the Fourth Circuit in *Helton* and Judge Coulson in the *Chavis*

21  case as being relevant to 502(a)(2) claims.

22       Go to the next one, please.

23       I'm going to tick through these quickly.  You'll see that

24  we tried to adopt a common structure here regarding all of our

25  502(a)(2) claims.  We highlight obviously the discovery

1    standard, the existing legal authority that exists and to the
2    extent that if the defendants responded to this in their
3    opposition.
4         And the first claim is really a bit of an umbrella claim
5    and courts have recognized that a claim can be -- exist where a
6    plan has objectively unreasonable conduct considered in the
7    aggregate.  This touches on many of our claims, but it is a
8    separate claim.  And this evidence is directly relevant to it
9    because it would allow us to show, as mentioned in *Chavis*, that
10   the plans continuously act in an objectively unreasonable
11   manner.
12        Again, as I referenced before, unlike other cases, we
13   believe that there is evidence that this plan is actually a
14   fraudulent scheme, which these physicians, these,
15   quote/unquote, "neutral physicians" are fraudulently
16   represented as being absolutely neutral when they are not.
17        And those decisions, those benefits decisions are built on
18   flawed physician reports that minimize genuine medical
19   conditions.
20        The court has actually in some respects already addressed
21   this issue in part in the context of the 12(b)(6) motions where
22   you ruled that the allegations met the standard for Rule 9(b).
23        In our view, we don't have to show that we're entitled to
24   discovery.  All we have to do is show that it is relevant and
25   proportionate under Rule 26, and we're entitled to this

1  discovery.

2      Next slide, please.

3      This one is a relatively simply one but it's a critical

4  one, and it goes to which documents were actually reviewed.

5  And there are instances in which these decision letters say all

6  of the information was reviewed in making that decision.  And

7  we're allowed to test whether, in fact, that is actually true.

8      And, in fact, after the *Cloud* case, we're permitted to try

9  to find out whether any of the information was actually

10 reviewed before they made those decisions.

11     Next slide, please.

12     The next claim is grounded in the bias of the physicians

13 themselves.  And, again, this goes to the heart of what the

14 claims are because our contention is that the evidence in terms

15 of the individual recommendation made by physicians, coupled

16 with the compensation information, will demonstrate that the

17 reason that there is a connection and a correlation between

18 those recommendations and the amount of money that the

19 physicians receive.

20     Excuse me one second.

21     The next claim goes to the failure to investigate bias and

22 inadequate work performance on the part of the physicians.

23     So if, in fact, you know, the plan learns that a physician

24 is biased in making their decisions or is not performing at the

25 level that the plan expects, then the plan is obligated to take

1  actions.  The plan is obligated to remove that bias or remove

2  that physician if they're unable to do so or they're unable to

3  perform.  And getting the decision letters involving the

4  individual recommendations is critical to us pursuing this

5  claim.

6      Next one, please.

7      There we go.  So this is a little bit of a preview slide,

8  and we'll get back to this.  But we need the decision letters,

9  and we need the physician reports, including the PRFs and the

10 narratives, to see if these physicians improperly applied race

11 and ethnicity factors in making their decisions.

12     And we're going to jump back to this with respect to

13 Dr. Macciocchi in a little bit.

14         THE COURT:  Are you seeking to demonstrate that based

15 on the impact?

16         MR. BARNETT:  So it's a couple of things.  So, for

17 example, in terms of T&P benefits, the plan documents say that

18 education shall not be considered, but we have seen decision

19 letters or -- I'm sorry -- physician reports that clearly

20 include education level in reaching their decision, and that's

21 improper.  That's inconsistent with the plan terms.  They say

22 they wouldn't do that.

23     And we also -- and, again, we can jump ahead if you want

24 to --

25         THE COURT:  But I take it that there's another bridge

```
 1    to cross there?  In other words, by virtue of an inappropriate

 2    consideration of education, assuming that one can, you know,

 3    assume that mention of it means it was a considered factor,

 4    that that has a disproportionately adverse impact on a

 5    protected status class?

 6           MR. BARNETT:  No, I think it's not -- it's not like a

 7    Title 7 issue.

 8           THE COURT:  Right.

 9           MR. BARNETT:  It's that it impacts this decision.

10           THE COURT:  Okay.

11           MR. BARNETT:  If a doctor says, "Well, he can continue

12    to work based on his educational level," and the plan documents

13    say you shall not consider educational level then that means

14    the decision is improper.

15           THE COURT:  I see.

16           MR. BARNETT:  It's inconsistent with the plan terms.

17           THE COURT:  I see.

18           MR. KATZ:  Your Honor, you are correct.  It is based

19    on inconsistent treatment based on race.  Based on the factor

20    of race, which is being considered or being treated differently

21    based on the color of their skin or their ethnicity.  And we do

22    have documents that we attached as an exhibit to the motion to

23    compel on Plaintiff ████, for example, where the doctor

24    explicitly considers his ethnicity when determining whether he

25    has an impairment or not.
```

1          **THE COURT:**  Okay.

2          **MR. BARNETT:**  Does that answer your question?

3          **THE COURT:**  Yeah.

4          **MR. BARNETT:**  Then we obviously have other claims

5   related to the breaches of fiduciary duty related to loyalty

6   and care.  And the examples of those, again, come directly from

7   the decision letters in terms of bizarre interpretations done

8   by the plan, you know, the continuous disregard for legal

9   precedent.

10      I mean, there have been instances where a federal court

11  says, "Hey, NFL plan, you can't do this anymore," and then

12  another court years later says, "We told you not to do this.

13  You are still doing that."

14      In doing that, they're disregarding legal precedent.

15      And, ultimately, we want to piece together whether they

16  have multiple erroneous interpretations of the same or similar

17  provisions because all of that would violate ERISA.  And we've

18  included a couple of case cites there.  For example, in *Brumm*

19  and *Mickell*, the federal courts specifically criticized the

20  defendants from ignoring prior rulings from federal courts.

21      So, ultimately, the cases that the defendants cite in

22  their opposition, none of them really relate to 502(a)(2)

23  claims for fraud schemes.  They're not applicable to the facts

24  of this case as pled, and therefore they really have not

25  presented the court with any legal authority to deny the

1  discovery that we're seeking.  So that's 502(a)(2).

2      Now we want to shift focus -- I'm sorry, any questions on

3  502(a)(2) before I shift?

4          THE COURT:  Before I say no, let me -- I'm trying to

5  track it with the claims as identified as counts.  But maybe

6  that doesn't make sense.  Okay.  Go ahead.

7          MR. BARNETT:  So now we're going to shift to

8  502(a)(1)(B).  And, again, the discovery standard is obviously

9  somewhat different but there is, again, a significant amount of

10 case law in the Fourth Circuit and the District of Maryland

11 that specifically approve of what we're asking to do here,

12 which is to go beyond the administrative record, because the

13 administrative record by definition is not going to contain the

14 evidence or the information that's relevant to our claims.

15      And the standard is actually relatively modest.

16      The evidence has to be known by the plan, by the

17 defendants, and clearly decision letters, physician reports,

18 PRFs, narratives are all known to the plan.  They're the ones

19 who created them or asked them to be created.  And it's

20 necessary to address the *Booth* factors.

21          THE COURT:  So that restriction, or I shouldn't say

22 restriction, but that proviso that it can't be based on

23 documents that were not before the decision-maker is quite

24 separate and apart from the fraud-based claims?

25          MR. BARNETT:  Correct.

1      **THE COURT:**  Okay.

2      **MR. BARNETT:**  And so we've identified five *Booth*

3  factors.  And, again, we'll try to move through them relatively

4  quickly.  But we don't have a single basis to discover -- to

5  get this discovery, we have multiple bases.  And any one of

6  them alone would be sufficient to entitle us to this discovery.

7      Again, I'll try to march through them as quickly as

8  possible.  All of this is in our briefing.  We are just trying

9  to consolidate it for the convenience of the court and try to

10 organize our discussion today.

11      So in each of these sections we've laid out the applicable

12 law at the top.  And we've tried -- one of the criticisms in

13 the opposition is that we hadn't made a sufficient showing, we

14 hadn't alleged particularized facts.  To address that point, we

15 had included here both the showing and the particularized facts

16 with cites to the record that exists before the court.  But

17 these are only examples.  There are others in the briefing.

18 These are ones we just wanted to highlight.

19      **THE COURT:**  Yep.

20      **MR. BARNETT:**  So obviously, you know, how a plan

21 has -- if a plan interprets a plan which is inconsistent with

22 other terms in the plan, or is inconsistent with how they

23 previously interpreted the plan, that's a relevant

24 consideration for the court to consider.  And that's exactly

25 what the court did in *Cloud* and that's what the court

1 acknowledged in *Helton*.

2      And here we have, you know, one of the key plan terms is

3 "adequate determination," and we've already identified, as have

4 prior federal courts, inconsistencies in how these defendant

5 plans interpret the term "adequate determination."

6      And we have other examples in terms of the plan terms for

7 line-of-duty points and where points are awarded for one

8 case -- I'm sorry, let me start again.

9      So you have two applicants who basically have the same

10 physical condition and in one case they're awarded LOD points

11 and in another case they're not.  It's that kind of discrepancy

12 that we believe fully justifies us getting discovery outside of

13 the administrative record.

14      We can go to the next one.

15      Factor 8.  Obviously this is a -- this is a huge factor.

16          THE COURT:  I want to back up for a second.

17          MR. BARNETT:  Sure.

18          THE COURT:  You've identified on slide 13 factor 3,

19 but there's no standalone slide for that, is that because it's

20 sort of self-evident?

21          MR. BARNETT:  So it's coming later.

22          THE COURT:  Okay.

23          MR. BARNETT:  We put them at the numerical order at

24 the beginning --

25          THE COURT:  Do I get points for paying attention?

1          **MR. BARNETT:**  Yes, you do.  Huge points.

2          **THE COURT:**  All right.  Go ahead.

3          **MR. BARNETT:**  That was actually something we debated

4  because some people said, no, we have to go in order.

5          **THE COURT:**  I'm very linear.

6      (Laughter.)

7          **MR. BARNETT:**  Huge credit for noticing that this is

8  technically a little bit out of order.

9      So factor 8, obviously it's the fiduciary's motives and,

10  and this is important, any conflict of interest.  And, again,

11  we will get to this later, the defendants suggest that there's

12  a requirement for us to show a structural conflict.  That's not

13  consistent with the case law.  The case law is any conflict of

14  interest.

15      So again, as *Helton* said, the courts need access to this

16  evidence to see how a conflict may have impacted the adequacy

17  of the administrative record or the benefits determination.

18      And, in fact, some courts have said it's evidence to show

19  a pattern in their practice of denying meritorious claims.

20  Again, this is key information.  It's not going to be in the

21  administrative record, and the starting place for us to get

22  this information is the decision letters and the physician

23  reports.

24      Let's go to the next slide, please.

25      And this is particularly important in this case because we

1    do have a history of bias claims administration.  You know, in
2    the *Cloud* case, the defendants there were arguing that what the
3    plaintiffs were seeking or what the court was requiring was
4    unprecedented.  It was unprecedented.  And it apparently came
5    up many times.
6        And the judge in *Cloud* said it's hardly unprecedented
7    because dozens of former NFL players have lodged similar
8    challenges and the court's findings echo the concerns already
9    expressed by those courts across the country.
10        And just to give the court a snapshot of what we're
11    talking about here, and we couldn't fit everyone into one
12    Hollywood Squares slide but we did our best, and these are
13    instances of NFL retirees being denied benefits under the plan
14    either totally or at the level that they requested; bringing
15    suit against these defendants and the courts' conclusions about
16    the bias that's evident in these plans and how they're
17    administered.
18            THE COURT:  Can you just, I want to read these for a
19    second.  Give me a moment.  I read the *Cloud* case.
20            MR. BARNETT:  These are taken from footnote, it's
21    either in the motion to compel or it's in the reply.
22            THE COURT:  I think it's in the reply.
23            MR. BARNETT:  But they're all directly taken from what
24    we filed with the court.
25            THE COURT:  Now that I'm reading this, it's familiar.

 1          **MR. BARNETT:**  In part we do this because these aren't
 2  just case citations, but these are actually retired players who
 3  have been through the same gauntlet to try to get benefits
 4  under the plan, and federal courts in reviewing the actions of
 5  these plans have criticized them heavily for what they're
 6  doing.  We think this alone is sufficient basis to order -- to
 7  target a discovery that we're seeking here.
 8          **THE COURT:**  Okay.
 9          **MR. BARNETT:**  So now we're going to drill down into
10  some of the particularized facts regarding Dr. Macciocchi.
11  Again, to us, this is just an example.  It's possibly the most
12  egregious.  But it's an example of why we absolutely need this
13  discovery.
14      So Dr. Macciocchi, he's the highest paid
15  neuropsychologist.  He's making, you know, over $1.6 million,
16  and he has -- we've gathered this through our research -- he
17  has made a number of -- I'm not even sure what the right word
18  is -- but alarming publications and even marketing materials
19  that talks about injuries, that talks about diminishing
20  injuries, that the role of race that can be played in terms of
21  test performance and that demographic factors can be more
22  important than test scores.
23          **MR. KATZ:**  He said demographic factors are more
24  important or lead to more variance than the impact of traumatic
25  brain injuries.

1           **MR. BARNETT:**  All right.  Let's go to the next slide.

2       So, again, we have found marketing materials from a

3  seminar in 2016 where he's talking about defending

4  psychological injury claims and traumatic brain injuries.  He's

5  talking about ways to defeat those claims and convince juries

6  that a plaintiff's brain is hard boiled and not scrambled.

7       And this --

8           **THE COURT:**  Are these -- you may not know, I know

9  you're referring to that as -- well, I'm looking at the second

10  bullet point -- I'm just spitballing -- was this a presentation

11  at some sort of an educational seminar on helping people become

12  expert witnesses?  What was this?

13           **MR. BARNETT:**  Sam.  Go ahead and stand.

14           **MR. KATZ:**  Sorry, Your Honor.  It was a seminar

15  dealing with a law firm where the stated aim of the panel was

16  what you see at the top, defending against psychological injury

17  claims and mild traumatic brain injury claims in the wake of

18  DSM-5.

19           **THE COURT:**  I see.

20           **MR. KATZ:**  So the seminar or the panel was about how

21  to defend against claims, and he's introduced in the materials,

22  his panel in particular, will inform on ways to defeat or

23  mitigate these claims based on current science and explore how

24  best to convince a jury that a plaintiff's brain is hard boiled

25  and not scrambled, which goes to the heart of his biased views

1  and why the defendants have this knowing use or why they should

2  know at a minimum of his bias.

3         THE COURT:  Okay.

4         MR. BARNETT:  Can we go to the -- we just want to

5  highlight for the court, and again this is fully in our briefs

6  as well, but it's the *Jefferson v. Sellers* case, which came

7  out -- was issued by the district court in the Northern

8  District of Georgia two months before Dr. Macciocchi was

9  actually promoted by the plan for expert consulting services.

10        And the district court was -- and this involved a case of

11  a two year old who was run over by a car, and there was a

12  question about whether the child had a brain injury.  And

13  Dr. Macciocchi concluded that there was no moderate to severe

14  brain injury because there was no skull fracture.

15        And the district court judge completely rejected that

16  conclusion pointing to, of all people, football players who

17  suffer brain injuries even though they're wearing a helmet and

18  they don't necessarily fracture their skull playing the game.

19        Equally troubling is the fact that Dr. Macciocchi, he's

20  not a neurologist, he's not a medical doctor.

21        THE COURT:  What is he?

22        MR. BARNETT:  I think he's a Ph.D., I believe.

23        THE COURT:  Well, I should hope so if he's calling

24  himself a doctor and he's not a medical doctor.  But I'm

25  interested in his field of expertise.

1           MR. BARNETT:  Sam, do you know?

2           MR. KATZ:  He's a neuropsychologist.

3           THE COURT:  Okay.

4           MR. BARNETT:  In any event, the *Jefferson v. Sellers*

5   district court decision is pretty scathing in attacking

6   Dr. Macciocchi's opinions in that case.

7       Let's go to the next slide.

8       I mentioned that he had been promoted.  In the plans, in

9   the wake of the *Jefferson* decision, two months after that they

10  decide to promote him.  And his new responsibilities, for which

11  he's paid more money, not just the exam fees but now he's paid

12  a consulting services fee is to, quote/unquote, "teach the

13  other physicians," and help prepare training materials for the

14  plan-neutral physicians, and provide recommendations in terms

15  of the plan's form, processes, and neurological medical exams.

16          THE COURT:  And I take it this is in some kind of

17  engagement.

18          MR. BARNETT:  It's in a contract.

19          THE COURT:  A contract.

20          MR. BARNETT:  Yes, Your Honor.

21          THE COURT:  Okay.

22          MR. BARNETT:  So in our view, Dr. Macciocchi's

23  involvement, and clear bias, it infects the entire evaluation

24  process because he's teaching other plan physicians.  And we've

25  actually already seen this in the limited production to date

 1    made by the defendants.

 2            **THE COURT:**  What the "this"?

 3            **MR. BARNETT:**  We've seen -- I'm sorry, I should have

 4    added that.  What we've seen is that racial and educational

 5    norms are being included by other neuropsychologists in their

 6    review.  And we've included references to the plaintiffs where

 7    we've seen that in consideration of their disability

 8    applications where they weren't necessarily reviewed by

 9    Dr. Macciocchi.  Correct, Sam?  They were reviewed by other --

10            **MR. KATZ:**  Some were reviewed by Dr. Macciocchi,

11    others were not.  But in all of these examples, demographic

12    norms, which include both education level and racial norms that

13    treat Caucasians differently from African Americans, are being

14    applied in all of these cases.

15            **THE COURT:**  Okay.

16            **MR. KATZ:**  The impact of these racial norms is that

17    somebody that's African American, even if their IQ without

18    considering race would be higher, they're being normed to be

19    lower as a result of that, whereas Caucasians are being upward

20    adjusted.

21        So, for example, ██████████ who's mentioned here, who is

22    Caucasian, his IQ when considering demographic norms was -- I

23    want to say it was definitely above average, if not whatever is

24    higher than an above-average IQ.  Whereas, the other plaintiffs

25    here, who are not Caucasian, they're saying demographically

1    adjusted norms applied to them as well.

2            THE COURT:  Okay.

3            MR. BARNETT:  And the other critical piece here is

4    that this had to have been known by the plans.  The plans had

5    to know that Dr. Macciocchi had these views.  And so they are

6    continuing not only to employ but to have him teach other

7    neutral physicians as well.  It's the knowing use of a biased

8    physician that really goes to the core of our claims.

9            THE COURT:  And I'm not saying that this is

10   determinative, but are you saying that they would have to know

11   for a couple of reasons, one, because he's included what you've

12   described as inappropriate factors in the letter but also

13   because of just what is generally publicly available about him?

14           MR. BARNETT:  Correct.  Correct, Your Honor.

15           THE COURT:  All right.

16           MR. BARNETT:  Now we're going to shift and spend a

17   little bit of time in factor 6.  Unless I've exhausted your

18   patience already?

19           THE COURT:  No.

20           MR. BARNETT:  Okay, good.  And this is a key area, and

21   it's one that the court picked up already on back during the

22   January 16th conference, which is a pattern or practice of

23   ERISA violations.

24       So there were regulations issued in 2018 by the Department

25   of Labor that were incorporated into the statutes that set out

1  certain requirements that all ERISA plans have to meet.

2      I'm going to try to move through them quickly, but all of

3  them are relevant here because they show a pattern and practice

4  which is illegal.

5          THE COURT:  Those DOL factors are relevant here?

6          MR. BARNETT:  Yes.

7          THE COURT:  Go ahead.  Because it shows a pattern and

8  practice of ERISA violations you're saying?

9          MR. BARNETT:  Right.  Let's go to the next slide.

10      The first one is consistent treatment of similarly

11  situated claimants.  These plans are required to ensure that

12  claimants that are similarly situated are treated consistently.

13  And the only way to do that is to look at the decision letters

14  and physician reports across multiple claimants, and that's

15  exactly what the district court ordered in the *Cloud* case.  The

16  *Cloud* case was a single plan.  It didn't have 10 plaintiffs.

17          THE COURT:  Yep.

18          MR. BARNETT:  And so ultimately the district court, on

19  this basis, ordered the defendants to produce thousands of

20  pages of decision letters to allow them to do that analysis to

21  see if, in fact, there was consistent treatment.

22      Again, we have already, through the limited production, we

23  have already identified inconsistent treatment between

24  similarly situated applicants and that is set out in the

25  exhibits to our motions.

1            Let's go to the next one.

2            This is actually a pretty easy one.  So there are now

3    requirements in place for ERISA plans that decision letters

4    must meet certain requirements.  There are five of them, and

5    we've highlighted them in this slide.

6            And so as, in a very practical way, we're entitled to

7    production of these decision letters to see if, in fact, the

8    decision letters issued by the plan comply with all five of

9    these requirements.

10           Again, the next one is, it's really common sense.  The

11   requirement is that the plan review all comments, documents,

12   and records or other information.  They are obligated by law to

13   do so.  If, in fact, we determine through the production that

14   they did not review all of that information then they have

15   violated ERISA.

16           And, again, *Cloud* has led the way in this case because in

17   *Cloud* the court determined through discovery as a result of

18   discovery that board members do not review all the documents in

19   the administrative record and was not their practice to review

20   all the documents in the administrative record.  So, again --

21           THE COURT:  Am I remembering, this is where the judge

22   found that they employed a law firm whose associate or

23   paralegal would come and present in an off-record meeting a

24   summary, and then they would reach sort of an informal

25   conclusion at that off-record meeting, and then go have the

```
 1   record meeting with minutes and take a vote.

 2              MR. BARNETT:  Correct.  It's the Groom law firm that

 3   was involved, and they didn't actually review the materials

 4   themselves.  They didn't even tell the paralegals to read all

 5   the documents.  They just completely outsourced the function to

 6   the Groom law firm.

 7        Let's go to the next one.

 8              THE COURT:  I have a question.

 9              MR. BARNETT:  Sure.

10              THE COURT:  On slide 26, the particularized facts -- I

11   know these are just sort of snapshot samples.  When you

12   articulate that the letters contain defendants' representations

13   of what materials, documents, and records were allegedly

14   reviewed, and you cite to Exhibit D to the Motion to Compel

15   where, you know, various and sundry committee letters

16   indicating sort of a -- the language of "we reviewed everything

17   you submitted."

18        So are you taking the position that these examples, just

19   as a standalone, isolated example should raise an adequate

20   concern about the board's decision not articulating what

21   exactly was reviewed because the summary itself is not

22   adequate, or we don't believe them?

23              MR. BARNETT:  So it's really just a starting point,

24   Your Honor.  We need to establish what they have represented

25   they reviewed.
```

1          THE COURT:  But why are these examples the examples
2    you're using?  In other words, what's problematic about them?
3          MR. BARNETT:  Because at least two of them, I'm
4    looking at them quickly, they say that we've looked at all of
5    the records.  And if it turns out they didn't actually look at
6    all of the records, or it turns out they didn't look at any of
7    the records then that's evidence of the support of our claim.
8          THE COURT:  Right.  But what I'm saying is that's your
9    conclusion.  Where is it coming from?  In other words, the
10   letters say we reviewed everything, and you're using this as an
11   example to support the suggestion that extra AR documents
12   should be produced.  Why, in terms of these examples?  In other
13   words, if they say what they say, what are the things that
14   you're relying on that suggest that that's not the case?
15         MR. KATZ:  Your Honor, it is what -- the extra record
16   discovery that was produced in *Cloud* where the multiple board
17   members, including a current board member, stated that their
18   practice is that they do not review all of the records.
19         THE COURT:  Right.
20         MR. KATZ:  Which is why we would, it would render it
21   necessary for the court to adequately assess whether there's a
22   pattern or practice given a suggestion that there is this
23   particularized fact or particularized support that they have
24   this practice of it.  And really, it goes to another factor,
25   the inconsistent interpretations or inconsistent treatment.

1  Where sometimes they're saying they reviewed everything in the

2  plan file.  Sometimes they're saying they reviewed the

3  materials in the file.  Sometimes they're saying they reviewed

4  medical records.  And sometimes they're just saying they

5  reviewed the application.

6          THE COURT:  Okay.

7          MR. KATZ:  And we would need to see whether there is

8  this pattern or practice.

9          THE COURT:  So I'm going to put *Cloud* aside for a

10 second.

11     So in this cited examples you've got sort of an

12 inconsistent way of describing what was reviewed and a lot of

13 those descriptions, if taken on their own, are insufficient to

14 reach the conclusion that the board reviewed everything in the

15 record.

16         MR. KATZ:  For some of them.

17         THE COURT:  For some of them.  For some of them not.

18 And then taken as a total it demonstrates an inconsistency

19 you're saying or it suggests an inconsistency.

20         MR. KATZ:  Correct.

21         THE COURT:  And then against the backdrop of the very

22 strongly worded opinion in *Cloud*.

23         MR. KATZ:  Correct.

24         THE COURT:  All right.  I got it.

25         MR. KATZ:  As well as the depositions themselves in

1    *Cloud* which used the phrase "as practice."

2            THE COURT:  Okay.  Yeah.

3            MR. KATZ:  Thank you, Your Honor.

4            MR. BARNETT:  All right.  Let's move on to the next

5    one.  And this one I do want to spend a minute on, Your Honor,

6    because it's extremely important.  And we've cited the language

7    from the reg at the top.

8            THE COURT:  Let me read it all.

9            MR. BARNETT:  Okay.  Just read the first part.

10           THE COURT:  Yeah, the purple.  That's what I meant.

11           MR. BARNETT:  Exactly.

12           THE COURT:  Is that for the Ravens?

13      (Laughter.)

14           THE COURT:  Okay.  Got it.

15           MR. BARNETT:  So, by law, these defendants are

16   obligated to ensure that all claims and appeals for benefits

17   are adjudicated in a manner designed to ensure the independence

18   and impartiality of the persons involved in making a decision.

19   That's an obligation under federal law.

20      And we are seeking this discovery because allowing --

21   it'll allow us and potentially eventually the court to assess

22   whether, in fact, the defendants have a pattern and practice of

23   failing to do so, of failing to ensure that everyone involved

24   in the process is independent and impartial.

25      All right.  This one is an easy one, which is we need

1    them -- we need the decision letters to see whether, in fact,

2    the defendants are ignoring governing plan documents.  If their

3    letter is inconsistent with the plan, the terms of the plan

4    documents, again, that is evidence of pattern and practice of

5    ERISA violations.

6         By regulations, the plans are obligated to conduct the de

7    novo review of the committee decisions.  Committee makes the

8    initial decision then it can be appealed to the board.  The

9    board has to do a de novo review and come up with its own

10   decision with no deference to the committee.

11        But, again, they're using the same advisors for both the

12   committee and the board, and they are outsourcing that work to

13   those advisors.  They're not conducting, at least our

14   contention, they're not conducting a de novo review, and having

15   the decision letters will allow us to try to establish that

16   fact.

17        This is a -- it's a smaller but it's an important example,

18   and it's something we have specifically asserted with evidence

19   in support of our motion.  One of our plaintiffs requested

20   information from the plans related to the reputation, bias, and

21   predisposition of the plan physicians; and they rejected that

22   request to provide that information deeming that it was not

23   relevant to the claim and that they disagreed with a federal

24   judge's conclusion -- is it a federal judge -- federal judge

25   that in fact the physician was conflicted.

1          All right.  That was it for factor number 6.

2          And now, out of order, we will take factor number 5 which

3   really goes to, you know, the reasonableness of the

4   decision-making process.

5          And, again, there have been multiple federal courts,

6   multiple federal courts have reviewed the decision-making

7   process of these plans and found them to be wanting.  And we've

8   identified the three cases in this slide.

9          But, again, as I said previously, any one of these factors

10  is sufficient to give us this discovery, and we're presenting

11  the court with five, including factor number 5 which allows us

12  to test how these decisions were made.

13         And then last but not least is number 3, you know, what is

14  the adequacy of the materials that they used to make that

15  decision, and are those materials actually consistent with the

16  decision that they reached?  And the only way that we get to

17  that is through the decision letters and the physician reports,

18  the PRFs and the narratives.

19         I wanted to address three issues that came up both in the

20  briefing and to some degree in the prior argument.

21         And I am headed towards the homestretch.

22         THE COURT:  I'm not complaining.

23         MR. BARNETT:  There was discussion about *Abromitis*,

24  and in our view that decision does not foreclose at all the

25  discovery that we're seeking in this case.  It was issued prior

1  in the Supreme Court's decision in *Glenn* and it doesn't address

2  at all our claims under 502(a)(2).  And actually, *Abromitis* is

3  a different case because there was not information in that case

4  about false, inaccurate information in the decision-making

5  process when obviously that sort of allegation and information

6  is critical to our case.

7      Equally important, other courts in this district, Judge

8  Simms and Judge Grimm, have ordered this kind of discovery,

9  including the doctor's recommended denial rates both in

10 *Chughtai* and in the *Balkin* case.

11     And the statement in the *Abromitis* case in terms of the

12 discovery, it may not have been endorsed but it wasn't

13 foreclosed.  The court didn't say this was not permitted.

14     And the *Glenn* case, the Supreme Court decision said that

15 the conflict may extend to its selections of physicians, which

16 is exactly what the situation is here.

17     And in the *Adams* case at the bottom, the court noted that:

18 The knowing use of biased doctors would be some evidence of bad

19 faith.

20     So we don't believe *Abromitis* forecloses the discovery

21 that we're seeking here.

22     Next slide, please.

23     An issue that came up is the suggestion that we must, in

24 order to get this discovery, you know, we have to prove that

25 there's a structural conflict.  Again, we don't believe that

1    that is at all the case.  Whether a structural conflict with

2    this plan exists has no bearing on our 502(a)(2) claims.  And

3    the Supreme Court in *Glenn* was very clear in saying that they

4    weren't going to try to delineate or describe all of the types

5    of conflicts that might exist because benefits decisions arise

6    in too many contexts, concern too many circumstances, and can

7    relate to too many different ways of conflicts.  They vary in

8    degree of seriousness to come up with a one-size-fits-all

9    system.

10            **THE COURT:**  Also somewhat necessitates a mini-trial

11    within a trial.

12            **MR. BARNETT:**  Absolutely.  And, again, the *Cloud* case

13    ordered this extra AR discovery without any showing of a

14    structural conflict.  So we don't believe there's any

15    obligation on our part to establish as a threshold that there's

16    a structural conflict with the plan.

17        All right.  Next slide.

18        The defendants, they point to the V3 data.  I'm just going

19    to touch on this briefly.  We talked about it towards the

20    beginning.  But the V3 data is it doesn't provide a sufficient

21    back-factual basis because it's incomplete.  And it's also,

22    based on work we've done to date, it's also inaccurate.  It

23    doesn't accurately contain the decisions that are in the

24    defendants' own documents in terms of the decision letters and

25    the physician reports.

1    But, again, it does not contain the individual physician
2    conclusions or the rationales, and it does not include the
3    annual compensation that the plans paid to the defendants.
4    You don't have to take our words for it, you know, the
5    declarants from the defendants admit that the V3 data does not
6    have that information and that producing it would require a
7    manual review.
8    So, in summary, Your Honor, at least for now, you had said
9    at the last conference that you were willing to walk out on the
10   precipice but we need to give a darn good reason, and we think
11   there are many darn good reasons for you to grant the
12   discovery.  And it's all of the case law and all of the
13   precedent, either from the Supreme Court or the Fourth Circuit,
14   or all of the district court decisions that we've listed here.
15   And you had said, you know -- we don't think you need to
16   put a helmet on -- you said you would have to put your helmet
17   on, we think that this precedent gives you a rock-solid
18   foundation to grant this motion for this critical evidence that
19   we need in this case.
20        **THE COURT:**  Thank you.  Yeah, I wasn't intending to
21   make a joke about football, I just more meant that I understand
22   that the defendants will be vigorous.
23   I appreciate that.  I'm going to take a brief recess.
24   Everybody can stretch their legs and use the restroom.  We'll
25   come back in 10 minutes.

1            **(There was a break at 11:07 a.m. to 11:26 a.m.)**

2            **MR. JACOB:**  Thank you, Your Honor.  May it please the

3   court.  Before I get into the meat of the motion to compel, I

4   just wanted to address the two preliminary questions that you

5   asked Mr. Barnett in the discussion that you had with him.

6            The first of those is what is the relevant period?

7            And in your Motion to Dismiss Order, this is ECF-82 at 3,

8   you determined that in order for any benefit claim to be

9   operative because of the statute of limitations that's built

10  into the plan, the final board decision had to be issued by

11  August of 2019.

12           So Mr. Barnett said, "Hey, some applications may have been

13  filed before August of 2019," we agree with that.  But the

14  relevant date isn't to just randomly pick April of 2018 as the

15  date that an application might have been filed and count that

16  as the relevant date.  Rather, any decision, any board decision

17  that was issued in August of 2019, or later, would constitute

18  the universe of relevant claims.

19           **THE COURT:**  Well, that's the universe of claims for

20  which they could recover, but I'm not sure that it's exactly

21  the same -- I'm not sure that I agree with that logic in terms

22  of what might -- and I'm not telegraphing -- I'm just saying

23  I'm not sure that I agree that that would necessarily then

24  dictate the cut-off period of evidence that might be

25  discoverable for purposes of demonstrating what the issues are

1    and that I would have to evaluate.

2          MR. JACOB:  As Your Honor knows, when we produced

3    claims data, much for that reason, we gave a birth all the way

4    back to January 1st of 2018, so that we could see the

5    progression to the extent that plaintiffs would have an

6    argument that patterns began to develop a year before, or a

7    year and a half before.  We've already done that with respect

8    to the claims data.

9          But when we're talking about producing 20,000 underlying

10   documents, which is what they're asking for here, we think that

11   the most relevant cut-off point would be where the court has

12   said benefit claims may be live.  That's still going to

13   generate, were the court to order those produced, thousands and

14   thousands and thousands of documents.  There's no reason to

15   inject benefit claims that aren't live into the universe of any

16   production in light of that.

17         The second point that I wanted to cover that came up in

18   that discussion with Mr. Barnett is his assertion that we just

19   don't know what the individual doctors' recommendations were

20   from the V3 data.  And Your Honor correctly pointed him to the

21   Vincent declaration that says, this is in part because of the

22   way the neutral role operates:  If the assigned neutral

23   physicians have not found the individual to be disabled,

24   benefits can't be awarded.

25         And because the claims data shows whether each application

 1  was approved or denied, we know that every approval, the

 2  neutral physician -- at least one of the neutral physicians

 3  assigned did find the player to be disabled.

 4      THE COURT:  But isn't that the very issue that

 5  plaintiffs are pinging on as far as that issue is concerned

 6  that they're entitled to know what somebody else might have

 7  said?

 8      MR. JACOB:  I'm not quite sure --

 9      THE COURT:  In other words, as I understand it, you

10  know, the decision of one in certain circumstances is

11  attributed to all, even if they all didn't reach the same

12  conclusion.  And my question is, doesn't the failure to provide

13  that information make it difficult for plaintiffs to

14  demonstrate in that particular circumstance for that particular

15  applicant that, you know, the physicians had a disagreement

16  about the outcome or their conclusion and that, you know, the

17  breadcrumbs might lead somewhere that's beneficial for

18  plaintiffs as a result of that.

19      MR. JACOB:  So the key point here, and we discussed

20  this a little bit at the last hearing, but if you take a look

21  at both -- take the combination of the paragraphs of the

22  Vincent declaration that you've already pointed to, and then

23  Dr. Lasater's report, this is docket 111-2.  His footnote 12,

24  at page 8 as well as table 3.3 on page 51.

25      So what those show the court is that in the overwhelming

1 majority of claims, from August of 2018 until today, we do know

2 what the individual physician found because there was only one

3 neutral physician assigned to evaluate the claim.

4     So if you take a look at footnote 12, it points out that

5 there are 1,936 line-of-duty applications in the claims data

6 during that period of time.  1,866 of those, 96.4 percent of

7 them, had only one neutral physician assigned.  So, we know if

8 it was an approval, the neutral physician found the person to

9 be disabled based on the neutral rule in 96.4 percent of those

10 cases.

11     Now, to the extent that they're saying, well, there's

12 3-and-a-half percent that we don't know, the court is of course

13 familiar that when you're dealing large amounts of data

14 statistical sampling is one of the things that is often

15 resorted to.

16     And the court said, hey, try to resolve things with

17 plaintiff.  So we pointed out to them that a statistically

18 significant sample out of 1,936 line-of-duty applications would

19 be 316.  But they don't have 316, they've got 1,866 of them.

20     So whereas a standard, reliable statistical sample that

21 gave you a 95 percent confidence interval would be 316 of them,

22 their 1,866 would provide them a 99 percent confidence

23 interval.  They had a super-statistical majority with respect

24 to line-of-duty.

25     With respect to T&P.  If you look at footnote 12, you'll

1    see that 897 out of the 1,324 T&P applications had only one
2    neutral physician assigned.  So, again, the same dynamic
3    applies, that's 67.6 percent.
4        A statistical sample out of 1,324 would be 298; but they
5    have three times that, 897 of them.
6        So to the extent that they don't like the attribution
7    analysis that we apply where there are multiple doctors
8    assigned, they have a super-duper, statistical sample for each
9    of those that they can test whether the conclusions that the
10   statistics would lead one to.  If you just take a look at the
11   universe where we know for sure what the neutral physician
12   found, whether those align, and they will in every single case,
13   the statistical sample, the super-statistical sample that they
14   can use.
15       And of course the final kind of benefit is the
16   neurocognitive benefit.  The court -- we have an example of a
17   neurocognitive report that's in the record.  It's attached to
18   the Olawale summary judgment motion, and it's a Dr. Brahin,
19   Dr. O'Rourke joint report.  And that's at administrative record
20   JO925-26.
21       So when a neurocognitive benefit application is put in,
22   both a neurologist and a neuropsychologist are, in every
23   instance, assigned to evaluate it.  And they do a joint report
24   where they make a joint recommendation based on their mutual
25   conclusions as to whether the person should be found to be

1   disabled or not.

2        So for all of the neurocognitive ones we do know because

3   it's a joint recommendation on behalf of the neutral physician.

4   So there you have the entire universe where we do know what the

5   neutral physicians recommended with respect to that

6   application.

7        So that is to say -- and I'll get into the substance of

8   the motion now -- but that's what's in the claims data for that

9   period of time.  They have all of that that their statistician

10  can analyze.

11       And, notably, the court suspended, put in abeyance, the

12  expert disclosure deadline about three weeks before their

13  expert disclosure was due.  They must have an expert who has

14  been lined up to crunch the numbers and present statistical

15  analysis.  But they, glaringly, did not bring in any

16  statistician or any kind of evidence to say, yeah, we can't

17  actually crunch the numbers based on what is in that claims

18  data.  We've given them what we have with respect to the claims

19  data.

20            THE COURT:  Well, I don't know that -- I'm sure that

21  that's true, but -- well, I'm not sure that that's true.  But I

22  understood it more to be to the point that we have our expert

23  lined up and on deck and now we need the stuff that we're

24  allowed to have to get him to crunch the numbers.

25            MR. JACOB:  Correct.  But what I'm saying is the data

1  that we've provided allows them to know what the outcome was of

2  every single benefit application filed since April 1st of 2018.

3       They can crunch the numbers --

4       **THE COURT:**  Isn't that just scratching the surface,

5  though?  I mean, in other words -- I mean, for purposes of our

6  discussion, I don't mean to make it sound as though I've, you

7  know, agreed.  But what I'm asking you is knowing what the

8  outcome is, in other words, the lion's share of the decisions

9  were one-physician decisions; or, if they weren't, there's no

10  question about what both physicians would have concluded based

11  on what you told me.

12      So I understand what you're saying as far as understanding

13  whether if there were a case where an applicant had multiple

14  neutral-physician examinations and hypothetically, you know,

15  two said "yes," one said "no," or two said "no," and one said

16  "yes," that that hypothetical is so statistically anomalous

17  that it's not fair in terms of proportionate to make defendants

18  produce that information.

19      But knowing that there was only one physician who made the

20  decision in the overwhelming majority of cases, isn't that just

21  one minor issue that plaintiffs are urging me to look at

22  because of what their claims are as matched up by the *Booth*

23  factors?  I have summarized that in a very, very generalized

24  way.  But, essentially, you know, each and every one of the

25  claims requires a heck of a lot more than just knowing what the

1  one physician said and whether the board acted consistently

2  with that physician?

3      MR. JACOB:  Yes.  And I'm going to walk the court

4  through every one of the *Booth* factors because we have to look

5  at all of the different allegations.

6      My point is that with respect to the allegation of neutral

7  physician bias, that one in particular, which is, as the court

8  has seen in the amended complaint, it's paragraph after

9  paragraph after paragraph of alleged statistics, the basis of

10  which they've never provided or produced.

11      But if it's the statistics that govern whether a neutral

12  physician is biased or not, that they have everything of.  I'll

13  go through all of the claims letters and the review process and

14  everything else.  But for those purposes, the claims data that

15  has already been produced, again, this is 57 fields of V3

16  claims data that provides for every single application since

17  the beginning of 2018.

18      THE COURT:  Okay.

19      MR. JACOB:  The type of claim, the benefit type, all

20  of the relevant dates for it, the specific neutral physicians

21  that were assigned, what the benefit decision was and whether

22  it was on a medical or administrative basis.  So that is all

23  that they would need in order to assess bias.  Both based on --

24  again, I'll point the court to paragraph 112 of the amended

25  complaint.

1      **THE COURT:**  Let me get there.

2      **MR. JACOB:**  Sure.

3      **THE COURT:**  Okay.

4      **MR. JACOB:**  You don't even have to get to the

5   single-doctor analysis that I just described using the

6   statistical samples to assess what is the heart of their

7   allegation in this case.

8      They say there is a larger, systematic practice of

9   providing more compensation to and more frequently retaining

10  physicians with extremely high benefits denial rates.  They

11  focus in on the benefit denials.

12     And again, at the end of that paragraph, the history of

13  these highly paid physicians' conclusions provides evidence of

14  the systematic practice and shows that the higher a physician's

15  compensation from defendants, the higher their tendency to

16  render flawed or spurious medical justifications to support the

17  denial of benefits to deserving claimants.

18     **THE COURT:**  Uh-huh.

19     **MR. JACOB:**  They focus on denial of benefits, and that

20  makes sense because that's what matters at the end of the day

21  to a claimant.  Did my benefits get approved or not?  And they

22  know that with respect to every single application who were the

23  neutral physicians who were assigned and what was the benefit

24  outcome.  And they can calculate for every single neutral

25  physician, for all of the claims, what is the rate of that

1  neutral physician's association with denied benefits or not.

2      Of course the single doctor ones that we've pointed the

3  court to where there are super-statistical samples available,

4  those are the ones where the neutral physician would actually

5  have the most power because it's just them at the end of the

6  day.  If you actually believed that the neutral physicians --

7          THE COURT:  But absent information about the terms of

8  retention, how could that possibly be of any note in a case?

9          MR. JACOB:  So we have produced the contracts for all

10  of the neutral physicians so they know the terms of retention.

11  Maybe I should just walk through everything that's been

12  produced.

13          THE COURT:  That's fine.

14          MR. JACOB:  So we've produced the neutral physician

15  contracts, which show that they received, as the plan requires,

16  a flat fee that does not vary based on the outcome of the

17  examination.  We have produced the neutral physician manuals,

18  the orientation manuals that they get when they come into the

19  program and it described what we want from them.  It says we

20  want your best professional judgment, and we don't want any

21  bias, and you're going to get paid on a flat-fee basis.

22      We've produced the PRF forms.  These are the forms that

23  the neutral physicians fill out at the end, and they're

24  required to certify at the end of that:  I had no bias in this,

25  I didn't have anything that influenced me one way or another,

1   other than to exercise my best professional judgment.

2        And we've provided the Vincent declaration, two of them,

3   one for the Class Certification at 111-3, and one for Summary

4   Judgment at 115-4, rather on the Motion to Compel.  And he,

5   there, describes when I'm assigning neutral physicians not only

6   do we not have the statistics of the neutral physicians, so I

7   couldn't do what they're suggesting that I do, which is to

8   assign based on the benefit denial rate, but I only ever use

9   neutral criteria.  Like, the location.  What's the proximity of

10  the doctor?  Are they available or not?  What is their

11  specialty?  And I never use denial rates.  I don't even know

12  what they are.

13       THE COURT:  So couldn't a conflict be demonstrated

14  looking at it through the other end of the camera lens?  In

15  other words, it may be that Mr. Vincent does not know who they

16  are and so he's not really, you know, no one is in a position

17  to inappropriately assign a physician based on his denial

18  rates.  But could there not also be evidence of an

19  inappropriate conflict by looking at continued retention or

20  compensation of neutral physicians who tend to have a higher

21  denial rate?

22       MR. JACOB:  So that's one of the things that the data

23  allows them to calculate.  The court can see it is calculated

24  in the Lasater declaration.  If they want to contest that and

25  do it differently they can.  But they know for every single

1  neutral physician exactly how many times they got assignments.

2      THE COURT:  Okay.

3      MR. JACOB:  So not only can they calculate their

4  denial rate, and not only can they know what their individual

5  recommendation was in the overwhelming number of cases, but

6  they know exactly how many times they were assigned

7  examinations, and they know that for every single year.

8      And what you can see in the Lasater report, and again I

9  know this is on the merits, but what it shows is there is no

10 skew.  The fourth quartile for every benefit type of the

11 neutral physicians who are most frequently assigned to evaluate

12 each type of benefit have the lowest denial rate.  And the

13 first quartile for almost all of them has the highest denial

14 rate, so the ones who are least frequently assigned to evaluate

15 claims.  They can contest those statistics.  They can try --

16      THE COURT:  I suspect they're going to try to.

17      MR. JACOB:  But the point is, they have all of the

18 information in the claims data that you would need to explore

19 that hypothesis.  They don't need the underlying claims

20 records.  I am --

21      THE COURT:  Well, they may not for that point.  I'll

22 go with you there hypothetically.  But, I mean, there's so much

23 more that they're seeking to demonstrate.

24      MR. JACOB:  Yes.  And the other thing that I want to

25 point out, two things, and then I'll get into where I was

1  intending to start the argument.

2      There are in the record in this case already -- as the

3  court knows we produced everything for the named plaintiffs.

4  That's more than a hundred evaluations by neutral physicians.

5  They, themselves, also produced 1,361 of them.  So there are,

6  in the record, about 1,500 sets of underlying documents, the

7  evaluations for these things, hundreds of decision letters.  To

8  the extent that -- I'll get into this as I go through the *Booth*

9  factors.  It is not going to serve the court's interests or the

10 parties' interests to take a record that already has 1,500 of

11 the underlying records and expand that out by 20,000 more in

12 terms of trying to evaluate these claims.

13     And I'll walk that through, but I think it's important

14 because I don't think that their briefing in any way

15 acknowledged the sheer number of evaluations that they already

16 have in their possession, if they wanted to try to make these

17 cases of a pattern or practice.

18     So, with that, let me get to what I wanted to say on the

19 Motion to Compel itself.  So I'm going to cover three points in

20 order.

21     First, no court has ever ordered the scope of extra record

22 discovery in an ERISA case that plaintiffs are seeking through

23 this Motion to Compel.  And that's largely because, as

24 plaintiffs admit in their briefing, ERISA has uniquely tighter

25 discovery standards.

1          Second, I'm going to describe -- and I'll summarize this
2    when I get to it because we've covered this to a substantial
3    extent, but the substantial extra record discovery plaintiffs
4    already have because we've already produced it.  And I'm going
5    to walk the court through the court decisions to show that it
6    already goes to the outer bounds of what those courts have
7    permitted.
8          And third, I'm going to walk through each of the five
9    *Booth* factors that plaintiff invoked one by one and show how
10   the court has everything it needs to conduct the full
11   assessment.
12         So, first the case law.  So it's black-letter law in the
13   Fourth Circuit, this is the *Wilkinson* case and this is the
14   *Helton* case, that in a case that hinges on ERISA benefit
15   denials as this case does -- you have nine named plaintiffs,
16   each of whom are contesting their benefit denial, and then they
17   try to throw some glue together to stitch them together but
18   it's all about the benefit claims -- discovery is presumptively
19   limited to the administrative record.
20         And the Supreme Court explained why in the *Conkright*
21   decision.  They said that the administrative and the litigation
22   costs, if we allow full-blown discovery under just a normal
23   Rule 26 standard, it would overwhelm plans and because these
24   are voluntary plans, employers just wouldn't offer them if we
25   didn't have the expedited procedures that ERISA provides.  And

1    the *Helton* case in the Fourth Circuit again says we want

2    expedited, efficient, and inexpensive resolution of claims.

3            THE COURT:  Well, that's why the default is the

4    default.  But it goes on to say a lot more than just that.

5            MR. JACOB:  It does, Your Honor.  Then we go -- so how

6    do you get beyond the administrative record?  Under what

7    circumstances?  I'm going to refer only to the cases that the

8    plaintiff cites with respect to this.

9        So the *Balkin* case, which they cited several times in

10   their presentation says:  The burden is on plaintiffs to get

11   beyond the administrative record and it is to show

12   "particularized facts," that's the phrasing of *Balkin*, the

13   *Clark* decision says the "factual basis," that demonstrates

14   evidence needing to assess either a structural conflict or a

15   specific gap in the administrative record.

16       And plaintiffs acknowledge this.  Again, it's page 4 of

17   their Motion to Extend Deadlines Reply.  They say, quote, "In

18   ERISA cases, the completeness of the administrative records

19   informs the scope of discovery."

20       And in Mr. Barnett's declaration, paragraph 7 at

21   ECF-137-1, he said, "Counsel for plaintiffs were well aware of

22   decisional law in ERISA litigation that imposes initial limits

23   on discovery to information relevant to their claims missing

24   from the administrative record or gaps in the record required

25   to fully and properly evaluate the claimed and wrongful

1    conduct."

2        So the first defense exhibit that I believe was handed to

3    you before is, it's just a quick summary of the cases cited by

4    both parties with respect to extra record discovery in this

5    case.

6        So plaintiffs' own cases start -- so the first two pages

7    are sort of what I would call the majority of decisions, 12 of

8    them.  Half of them in this district, a Fourth Circuit

9    decision, a Third Circuit decision, and several -- a few other

10   out-of-district Fourth Circuit decisions and a few

11   out-of-circuit authorities that have denied discovery of this

12   kind outright.

13       The third and fourth page --

14            THE COURT:  Can you address Mr. Barnett's assertion

15   that the cases which you relied chiefly are inapposite because

16   they do not reflect the sorts of claims at issue here.

17            MR. JACOB:  So, again, so we agree that most of the

18   cases that have denied discovery did not have fiduciary breach

19   claims included.  However, again, we have gone to the outer

20   bounds of what was permitted by the cases that they cited.  And

21   among their cases, there were fiduciary breach claims; in the

22   *Chavis* case, the *Chughtai* case; the *Kane* case initially had

23   them, they were dismissed along the way; the *Caplan* case; the

24   *Cloud* case had three claims in it in addition to the benefit

25   claim as well as a full and fair review claim.

1        And none of those cases allowed the kind of discovery that
2    they're seeking here, which is the wholesale production of all
3    of the underlying claims records.  That's never happened.  Not
4    in any of the ERISA case, not in any of the cases that they've
5    cited.

6        That's in part because plaintiffs' own cases acknowledge
7    that courts are required to apply very careful scrutiny when
8    taking look at their asserted needs:  The *Chughtai* case, the
9    *Balkin* case both use those terms, "very careful scrutiny."  And
10    an extra record discovery has to be limited to narrow
11    circumstances, and that's the *Chavis* case, and must be tailored
12    to the unidentified gap.

13        In the *Chavis* case, for example, broad requests for
14    discovery as to the entire plan were denied.  And only
15    discovery was allowed as to a very narrow category of similarly
16    situated participants who initially had been granted benefits
17    and later those benefits were suspended.  Only that fact
18    pattern was allowed.  All others were denied.

19        Similarly, the *Kane* case that they cite expressly denied
20    all discovery that was unrelated to the structural conflict.
21    So we're going to look into the structural conflict but we're
22    not going to look into anything else.

23        And *Clark*, which is really the seminal case in this
24    district.  It is a decision by Judge Bredar.  It's cited in the
25    *Balkin*, the *Chughtai*, and the *Kane* decisions that they rely on,

1  establishes that the standard is that a court needs to, where
2  there has already been a substantial production of the evidence
3  in the case, as there has in this one, the court needs to weigh
4  the asserted need against the record of what has already been
5  produced.  They've got to identify the gaps across that record.

6       And in that particular case, Judge Bredar said the
7  defendant has come in and presented all of these different
8  indicia of neutrality and the plaintiffs have not adequately
9  assessed that or shown what additional steps would allow me to
10 conclude that the plan had not been neutral.

11      And on claims data, although this isn't one of the extra
12 record discovery cases they cite, they rely a lot in their
13 briefing in the Ninth Circuit's *Demer* decision.

14      If you take a look at note 8 in that decision where there
15 were all of these allegations of bias, the Ninth Circuit said,
16 well, what the defendant could have done to stave off where we
17 went with this would have been to produce the underlying data
18 to show that there wasn't the kind of skew that they're
19 asserting.  That's precisely what we've done here.

20      So that frame is an important part of the factual
21 background that this court needs to look at in assessing is
22 what is already produced adequate.  I'll walk through that as
23 we go through the *Booth* factors.

24      As the court takes a look at the chart, what it can see is
25 where statistical and compensation discovery of third-party

 1  reviewers, retained third parties has been denied.  The

 2  *Abromitis* case from the Fourth Circuit denied it.  The *Reichard*

 3  case from the Third Circuit denied it.  And the *Reichard* case

 4  in particular makes a very important point; the *Zahariev* case

 5  that we cite makes a similar point; and it goes to a comment

 6  that Your Honor made when talking to plaintiffs during their

 7  argument about mini-trials within trials.

 8        THE COURT:  But part of the citation of the *Abromitis*

 9  case, just to bring you back to that, that's somewhat

10  problematic because the language, you know, the language of the

11  court there would seem to sort of, in some measure, block what

12  plaintiffs are seeking here, I don't disagree with you, except

13  when you compare it against what is the essential evidence for

14  that plaintiff to prove that case versus the essential evidence

15  for these plaintiffs to prove this case, it's not on all fours.

16     I mean, I appreciate, you know, the issue of information

17  that's sought has to do with whether the fiduciary made a

18  decision in violation of duties, not a contractor, and I

19  understand that.  But that's -- the reason that that is sort of

20  a -- is inapplicable here is because that fails to address the

21  very nature of evidence that's essential for the plaintiffs

22  here to demonstrate what they're called upon to prove.

23        MR. JACOB:  So, again, the allegation there -- and I

24  think what the Fourth Circuit was responding to was the bias

25  allegation.

1          THE COURT:  Right.

2          MR. JACOB:  And the Fourth Circuit said, in this

3    circuit we don't look at whether the independent reviewer was

4    biased or not --

5          THE COURT:  We look at the fiduciary.

6          MR. JACOB:  We look at the fiduciary.  Here, that's

7    the board.  All of this discovery is not aimed at looking at

8    the board.  If you're looking at the board, what you would look

9    at would be does the claims data show a skew in the

10   assignments.

11         THE COURT:  Well, but they are looking at the board in

12   terms of was the full record reviewed?  Did they review what

13   they were supposed to?  Those sorts of things.  So I don't know

14   that I'm with you on that.

15         MR. JACOB:  Well, then again, I'm going to go through

16   the *Booth* factors one by one.

17         THE COURT:  Okay.

18         MR. JACOB:  I know that that's important.  Just the

19   last thing I want to --

20         THE COURT:  Yes.

21         MR. JACOB:  -- to leave the court with in that record.

22   *Abromitis*, what the *Reichard* court says is one of the reasons

23   that we don't do these statistical analyses on third-party

24   reviewers is because there isn't a platonic ideal on what the

25   right rate is of approving or denying claims.  It's only

1  relevant if the number that was approved is wrong.  And the
2  only way the court is ever going to be able to figure that out
3  is if it conducts a mini-trial on each individual claim that
4  that third-party reviewer reviewed and determine is the batting
5  average wrong or not.

6       If the court could imagine, for example, it's probably of
7  no surprise to the court when a case gets assigned to a
8  district judge, defense counsel, one of the things they might
9  early on do is say, what percentage of the time does that judge
10  grant a motion to dismiss?  For some judges it's 25 percent of
11  the time, for some judges it's 5 percent of the time.  But
12  neither of those is right or wrong.  It depends upon the merits
13  of the individual cases that that particular judge received,
14  and it depends upon some cases judgment calls.

15       THE COURT:  Might you not also conclude that a judge
16  who grants 95 percent of motions to dismiss might be making
17  more errors than a judge who's more middle-of-the-road on her
18  statistics?

19       MR. JACOB:  So there have been, again, a few cases
20  that have allowed discovery into an individual on that basis.
21  So, but the theory of this complaint is not we need to find the
22  outliers, we need to find the bad judges who do too few or too
23  many.  The theory is that the plan knows who they are, and it
24  is deliberately assigning claims to particular ones in order to
25  have them approved or denied.  The claims data that is already

1    produced allows for full assessment of that theory.

2           THE COURT:  I hear you.  I understand you to say that

3    you acknowledge the other stuff that they're claiming but that

4    that, on your read, is their chief, loudest complaint in terms

5    of the basis of their claim?

6           MR. JACOB:  Yes.  Yes, Your Honor.

7           THE COURT:  I understand.

8           MR. JACOB:  And the other thing, if you look at the

9    chart, pages 3 and 4, their cases.  The other thing that stands

10   out is even the cases that have allowed some kind of extra

11   record discovery.  So in this district the *Balkin* case, the

12   *Chavis* case, the *Chughtai* case, the discovery was limited to

13   interrogatory responses that provided the batting average for a

14   couple of specific doctors.  That was it.  Take a look at your

15   claims data and fill out the interrogatory that gives them the

16   numbers.  We've already done that by giving them all of the

17   claims data from April 2018 forward.  So they will have those

18   batting averages that they can calculate.

19        But they did not order the production of the underlying

20   claims records.  The only cases that ordered any underlying

21   claims records were *Cloud*, as they've pointed out.  *Cloud* was

22   limited to a production of underlying claims records for

23   similarly situated claimants that had the terms "changed

24   circumstances" or "clear and convincing" applied to it.

25          THE COURT:  Because that was relevant in that case.

1          **MR. JACOB:**  Because it was specific to that particular

2    case.

3          And similarly, the *Adams* case that they cite to.  It's an

4    out-of-district case.  It doesn't talk about ERISA limitations

5    on discovery at all, and it ordered seven reports produced.

6    That does not at all help them with respect to this; and, in

7    fact, denied a broader request for 530 reports associated with

8    the people.

9          So here what we're dealing with is a sweeping request for

10   all of the underlying documents underneath the claims data.

11         Now let me fulfill my promise to go through the *Booth*

12   factors because the court keeps asking that question and I

13   think it's fair enough.

14         So I'm going to address *Booth* factor 8 first.  I think all

15   of their factors, they raise five of them, factors 8, 4, 6, 3

16   and 5.  Eight and 6 both include or concentrate on the bias

17   question.  And then most of the other ones deal with these

18   pattern or practice-type allegations across the body of

19   evidence.

20         So with respect to *Booth* factor 8, assessing bias or

21   conflict.  Again, I've already demonstrated that the evidence

22   that we produced would allow you to calculate -- with respect

23   to the board, which *Abromitis* tells you is the relevant

24   inquiry, these additional documents won't help them at all.

25         But, if what we were doing is assessing bias of individual

1  neutral physicians and if we rejected *Reichard's* observation

2  that the batting averages shouldn't matter without underlying

3  assessments, they can already do those assessments based on the

4  statistics presented.

5      I particularly want to walk the court through.  So at page

6  16 of their brief they have a list of the things that they say

7  they need.

8          THE COURT:  Let me get there because I have 10,000

9  documents in front of me.  Bear with me a second.  In their

10  opening brief?

11          MR. JACOB:  Yes, Your Honor.  Their opening brief,

12  page 16.

13          THE COURT:  Okay.

14          MR. JACOB:  So they say -- and again it's the only

15  full paragraph on the page.  They say, "The informational gaps

16  that we need to assess the bias are, 1) which plan-compensated

17  physicians were selected and compensated by defendants to

18  evaluate other claimants."

19      That is already all in the claims data.  I'll note that

20  they say that they don't have all the compensation information

21  that they want.  I'll point the court in that regard, we

22  produced the form 5500s, as did they, and I'll note that they,

23  in their own reply brief on the Motion to Extend, on page 3,

24  say that the form 5500s, quote, "Reflect the compensation paid

25  neutral physicians by defendants that's alleged in defendant

1    complaint."  So they, themselves, identify those as a

2    sufficient source of compensation.

3        There is detailed compensation information, business

4    expenses, that sort of thing, that is housed in a different

5    part of V3.  That's not what is at issue in this motion.  If

6    they want to have a later motion about whether the 5500s are

7    adequate on the compensation front or whether they need

8    underlying itemized data that's in V3, we can have that

9    discussion then.  But these underlying claims records that

10   they're seeking today, none of that is going to provide

11   additional compensation information to the court.

12       The second thing that they say they need is:  Each

13   evaluating plan-selected physicians' conclusions as to whether

14   other claimants met the line-of-duty T&P or NC benefit

15   standards.  Again, I've already explained how we know that for

16   the overwhelming number of the neutral physicians and a

17   super-statistical majority of them.

18       Third, they say they need:  Defendants' pattern and

19   practice decision letters --

20           THE COURT:  Let me take you back to the second

21   feature, about each evaluating plan-selected physicians

22   conclusions.  I understand what you're saying about that point.

23   There's a second phrase to that sentence, or fragment,

24   "including any knowing use of or reliance on inconsistencies

25   with plan terms by plan physicians or other inadequacies in

1  their reports."

2      Do you contend that the documents you've already produced

3  give them that?

4          MR. JACOB:  So, I have two contentions with respect to

5  that.  So they have about 1,500 evaluations to use, to piece

6  together their allegations that there are inconsistencies among

7  those reports.

8      Let me start now to sort of go through these allegations

9  that they have --

10         THE COURT:  Can you answer my question directly

11 though?  Do you contend that the information you've already

12 produced satisfies their request on the second portion of

13 number two?

14         MR. JACOB:  So I do contend that the record that they

15 have is wholly adequate to assess whether there was a pattern

16 or practice of that.

17         THE COURT:  That's not my question.

18         MR. JACOB:  Yes.

19         THE COURT:  My question is whether you contend that

20 the documents that you already produced satisfy their request

21 for the second part of number two:  Including any knowing use

22 of or reliance on inconsistencies with plan terms by plan

23 physicians or other inadequacies in their reports.

24     So I'm not asking whether you think they have enough to

25 prove their case.  I'm asking whether you take the position

1  that you produced documents that would satisfy that request?

2           MR. JACOB:  No, Your Honor.  Their request is for

3  20,000 documents so they can evaluate all of those --

4           THE COURT:  Can you answer my question?

5           MR. JACOB:  So no.

6           THE COURT:  Okay.

7           MR. JACOB:  Yes.

8           THE COURT:  All right.

9           MR. JACOB:  Because they, again, so their request is

10 for every claim decided by the plan and every neutral physician

11 report since April 2018, so . . .

12          THE COURT:  Have you produced that subset or

13 descriptive documentation for the claimants here?

14          MR. JACOB:  Yes, for every one of them we have

15 produced --

16          THE COURT:  The whole thing?

17          MR. JACOB:  Again, that's more than --

18          THE COURT:  Yeah, you've told me.

19          MR. JACOB:  It's 68 decision letters and more than 100

20 PRFs and narratives.  So for every single one, every single

21 evaluation that applied to them, that has already been

22 produced.

23          THE COURT:  Let me ask you one question before you

24 proceed, and I'm prepared to ask Mr. Barnett this question as

25 well.  But in the cases where there have been orders for the

1  defense to produce extra administrative record documentation,

2  we talked earlier about the fact that in those cases the judges

3  narrowly tailored those orders to similarly situated claimants,

4  et cetera, et cetera.

5      Do you agree that this case is somewhat of an ill-fit for

6  that sort of narrow tailoring?

7          MR. JACOB:  No, I do not.

8          THE COURT:  Okay.  Tell me why?

9          MR. JACOB:  For two reasons:  First, if the notion is

10  that if plaintiffs can come in and allege that there are

11  inconsistencies across six years that a plan or reviewer of

12  claims is then required to produce every underlying record for

13  that entire period of time -- and I represented United

14  Healthcare, it would be a million claims every month.  The

15  production would be limitless based on that.

16          THE COURT:  So I hear you on that.  But let's just

17  assume, you know, this is not a fishing expedition.  Let's

18  assume that I'm satisfied that they've demonstrated,

19  generally -- and this is a hypothetical, please understand

20  that -- that they have demonstrated for each of the categories

21  of documents that they're seeking that there is something in

22  the actual record here that is smoke and they claim there's

23  fire.  And so they think that there's some sort of

24  particularized need that's been articulated and supported by

25  what has already been.

1      So, in other words, they're not just anybody can sue
2  anybody for anything on that level, but that there's some
3  legitimate cry for that information and for the claim and the
4  accusation and the allegations.  So just buy into that with me.
5  That the nature of this claim isn't about a particularized kind
6  of injury or -- obviously it's not Mr. Cloud, or it's not one
7  claimant.  Rather, it's a description of a class and subclasses
8  that is not constrained by the kind of injury that that person
9  asserts he suffered.

10      In other words, it's not constrained to a change of -- a
11  change of circumstances, for example; but rather it's an
12  allegation of a more overarching fraud scheme.

13      So I'm trying to understand how, in this instance, would a
14  court narrowly tailor extra administrative record discovery in
15  the way that other courts have and that you say, if I ever were
16  to I should here.

17          MR. JACOB:  Right.  So, first, the fraud allegation is
18  the skewing of assignments.  Claims data, we produced
19  everything that you could want.  Basically everything that we
20  have to evaluate that is sufficient for an evaluation.

21      With respect to the other items, let me go through their
22  set of alleged inconsistencies.  So they summarize these -- let
23  me see.  It's in their reply brief at page 7.  They have eight
24  bullets.  And they went through these with the court in their
25  presentation.

1        They've got eight bullets, and they say, here's our

2   demonstration, Court, that this is a plan that is

3   inconsistently applying plan terms and we want additional

4   discovery.  So I want to frame this by saying, to the extent

5   the court is convinced by any of these examples that they come

6   forward with, the correct thing to do would be to limit any

7   extra record discovery allowed to the specific places where

8   they have made a demonstration.  It wouldn't be to produce

9   everything across 20,000 documents, most of which have nothing

10  to do with the demonstrated inconsistencies.

11       But I want to walk the court through because, in fact,

12  there are no demonstrated inconsistencies from the record that

13  they've put in front of the court when you actually look at the

14  complaint paragraphs they cite to and the evidence that they

15  attached for the court.

16       And I will note in this regard that they rely a lot on the

17  *Cloud* case.  In the *Cloud* case, there was, as the court knows,

18  some targeted production of decision letters on changed

19  circumstances and on clear and convincing.

20       This is what the Fifth Circuit ultimately found when it

21  took a look at what came out of that process.  It found, quote,

22  "The variations identified by the district court are not

23  significant and *Cloud* doesn't show how he can meet the standard

24  for changed circumstances under any of those definitions

25  anyway."

1    And the court ultimately concludes that the plan's

2  interpretation of the term was reasonable.  And all of that

3  underlying discovery to identify minor variations in the way

4  that those terms had been defined amounted to nothing because

5  at the end of the day the Fifth Circuit said the decision as

6  applied to Mr. Cloud, quote, "was a reasonable and fair reading

7  of the phrase."  And that is what the decision would ultimately

8  be to the court in each instance.  The court would look and say

9  is that a reasonable reading of the phrase --

10         THE COURT:  But that doesn't mean that her decision to

11  grant extra record discovery was ill-founded.  It means they

12  disagreed with her on the ultimate merits issue.

13         MR. JACOB:  Again, what I'm -- the only point I'm

14  trying to impress upon Your Honor --

15         THE COURT:  Yeah.

16         MR. JACOB:  -- is that that is not an example of

17  material inconsistent application of plan terms.  The ultimate

18  determination by the Fifth Circuit Court of Appeals was not a

19  significant inconsistent --

20         THE COURT:  But they're not impugning her decision to

21  explore it.  They're disagreeing with the outcome.

22         MR. JACOB:  Well, I will say, they reversed her

23  decision on a grounds that basically the application of that

24  term meant that all of the discovery that was ordered in that

25  case, because she made an error of law as to that, all that

 1   discovery was completely unnecessary.  It was unrelated to the

 2   key legal issue in the case.

 3        That said, I don't disagree, the Fifth Circuit wasn't

 4   reviewing the discovery decision.

 5             THE COURT:  Yeah.

 6             MR. JACOB:  Again, the point --

 7             THE COURT:  I hear you.

 8             MR. JACOB:  All I want the court to take away from it

 9   is *Cloud* is not an example of a federal court finding that this

10   plan has inconsistently applied the plan terms.

11             THE COURT:  I understand that.

12             MR. JACOB:  Quite the opposite.

13             THE COURT:  I understand that.

14             MR. JACOB:  So let me go through each of the eight

15   bullets.  Again, page 7 and 8 of the reply.  Purported

16   inconsistency number one, they say:  Plan terms within the

17   definition of neutral physician including, quote, "adequate

18   determination," and, quote, "maintain a network."

19        Then they point the court to a series of amended complaint

20   paragraphs.  None of these identify any inconsistent

21   application of the term "maintain a network" at all, although

22   they purport to be demonstrating that here.

23        And with respect to adequate determination, not only do

24   none of the complaint paragraphs show an inconsistent

25   application of that term, they don't even purport to show two

1   instances in which the court applied the term "adequate
2   determination" and to say that they're different.
3       All they do in their reply brief is identify Exhibit E,
4   which is a McKenzie evaluation.  And they just say the court
5   relied on even though it's not adequate.  That is not a remote
6   demonstration.  They don't say how it was inadequate.  They
7   don't show any misapplication of that plan term.  That is not
8   an example of inconsistent application of plan terms or
9   inconsistent treatment.  It's just a generalized allegation
10  that this plan accepts neutral physician reports that are
11  inadequate.
12      Their second point they say, they point to the plan's
13  total and permanent general standard including the plan terms,
14  quote, "substantially prevented from or substantially unable to
15  engage in any occupation or employment for remuneration or
16  profit," and, quote, "educational level and prior training of a
17  player will not be considered in determining whether such
18  player's T&P disabled."
19      With respect to the first of those, substantially
20  prevented from or substantially unable to engage in any
21  occupation, they do not point to any examples at all of that
22  term having been inconsistently applied by the board or by
23  neutral physicians.
24      The only thing that comes close to that is they point to
25  paragraph 179 where they say that Dr. ██████ acknowledged in

1  her report, that, quote, "It is not likely that Mr. ██████
2  would be able to maintain employment" and yet ultimately found
3  that he was not disabled.  They're essentially alleging that
4  that neutral physician was acting inconsistent with their own
5  conclusion.
6      But if you actually take a look at Dr. ██████'s report
7  that they point to, there's not even an internal inconsistency.
8      Dr. ██████ found, quote, "At this time, based on his
9  fragile psychological state, it is not likely that he would be
10 able to maintain employment."  That phrase, "at this time," is
11 not a finding that this person is totally and permanently
12 unable to find employment over a prolonged period of time.
13     So goes on to say that, quote, "Due to low scores on all
14 performance validity measures, it is not possible to make a
15 determination at this time.  However, there are psychiatric
16 concerns that require Mr. ██████ get psychiatric treatment
17 and care," and recommends further evaluation.
18     So there isn't even an internal inconsistency with respect
19 to this neutral physician.  All of this would be reviewed by
20 the court in a summary judgment context.  But certainly this is
21 not an example of an inconsistent application of a plan term.
22 The plan term isn't even quoted in the neutral physician report
23 with respect to this particular point that they point to.
24     And the second one, and they made much of this in their
25 presentation to the court, is about education level.  There,

1    they point to paragraphs 168, paragraph 188, and paragraph 225

2    of the complaint.  And in each instance, all they point to is a

3    neutral physician who states at the end of the report that this

4    person could perform -- because there's a place on the form,

5    they're supposed to fill out what work could they perform.  And

6    the neutral physician says, "They could perform work consistent

7    with their education and training."  That is not the use of

8    education to determine whether the person is disabled or not.

9    And they, glaringly, don't point to anything in the internals

10   of those evaluations, all of which they had before they filed a

11   complaint, that is a use of the education of a person to find

12   that the person is not disabled.

13        So that's the second one.  No demonstration of any

14   inconsistent application.

15        Purported inconsistency number three.  They say, "plan

16   terms for line-of-duty points."  When you look, here they point

17   to paragraphs of the complaint, but ultimately they attach

18   Exhibits H, I, and J.  And they say that these neutral

19   physician evaluations demonstrate inconsistent determinations

20   of whether a particular injury is worthy of points or not.

21        If the court takes a look at H, I, and J, the court will

22   find that that's not the case.

23        So with respect to Dr. ████, his evaluation of ████ in

24   Exhibit J.  Dr. ████ says, you know, their allegation of

25   inconsistency is that he found joint inflammation but failed to

1    award points for it.  Well, if you take a look at the PRF,

2    which again is attached to Exhibit H, Dr. ████ says he, quote,

3    "had joint inflammation which resolved four days later."

4        So that would, again, not be an indication of long-term

5    disability which is what he would have had to find.  There's no

6    internal inconsistency with him not awarding points in that

7    instance.

8        With respect to Exhibit I.  This is Dr. ████'s

9    examination of Mr. ████.  Here, they say there was a failure to

10   award points because he was able to play after the injury while

11   he was in the NFL while another doctor did award points in

12   Exhibit J, Dr. Selesnick did award points even though the

13   person was able to later play in the NFL.

14       If the court looks at Exhibit I, what the court will find

15   is that what Dr. ████ said is, quote, "He does have a right

16   knee MCL injury sustained while playing football in the NFL.

17   However, on examination, the most-recent MRI in 2020 did not

18   mention any MCL pathology and Mr. ████ was able to play after

19   the injury while in the NFL.  This does not constitute systemic

20   instability."

21       So three reasons are cited.  It's not just that he was

22   able to play after the fact.  He's got minimal laxity and

23   nothing is showing up on the MCL report today.  That is not any

24   kind of inconsistency with Dr. Selesnick's report.  They're

25   just discreet medical judgments based on medical evidence.

1   That is not anything that warrants 20,000 documents produced to

2   see if we can find additional alleged instances of

3   misapplication of the line-of-duty standards.

4        The next one, purported inconsistency number four.  They

5   say:  Planned terms describing NC benefit standard for mild and

6   moderate impairments include in it impairments, quote, "reflect

7   acquired brain dysfunction."

8        The court will note that they do not cite any evidence,

9   even though they've got 1,500 evaluations to rely on, they

10  don't cite anything.  All they rely on is paragraphs from their

11  complaint.

12       The only paragraphs that they do cite to that could

13  potentially be relevant to this, none of them show an

14  inconsistent application of the terms "reflect acquired brain

15  dysfunction."  But they cite one at paragraph 1 of 53 where

16  they vaguely allege that several of Mr. ████'s test scores were

17  described by other board physicians for other players as

18  showing mild impairments.  They don't say who.  They don't

19  present the examples.  We don't know what they're talking about

20  in that regard.

21       If they have examples of that happening, it would be their

22  duty -- again, the burden is on plaintiffs, that's *Balkin*,

23  that's *Clark* -- for them to come forward and show the specific

24  thing that warrants getting to the extra record discovery.

25  They have not done that with this vague allegation about

1   Mr. ███.

2       Then in paragraphs 251 through 55, they have several

3   allegations about Mr. ███.  The first of those in 251 is

4   Dr. ████████.  They say:  Although his testing for

5   Plaintiff ███ demonstrated the presence of at least a mild

6   cognitive impairment, Dr. ███ found no cognitive impairment.

7       This is an allegation essentially that this neutral

8   physician was inconsistent with himself, that would be

9   evaluated by the court in summary judgment on Mr. ███'s

10  application.

11      But, if the court actually looks at Mr. Murphy's

12  evaluation -- Dr. ███'s evaluation -- the answer is in there

13  because he says:  Mr. ███ presented with, quote, "cognitive

14  complaints involving mainly memory, organization, attendance to

15  the task," but notes that Mr. ███ has, quote, "employed a

16  number of pneumonic techniques to compensate and has good

17  support assistance from his wife."  Dr. ███ also noted that,

18  quote, "diet and positive attitude and understanding his

19  deficits have helped him to handle it," and on the basis of all

20  those things, quote, "do not rise to the level of a

21  neurocognitive disorder."

22      There are several things cited by Dr. ███ to justify

23  the decision.  The court can evaluate those on summary

24  judgment, but this is not an example of inconsistent

25  application of plan terms.

1      The same is true of paragraph 253, which is the
2  examination of Dr. ███████.  They say that Dr. ███████ concluded
3  that there was no evidence of cognitive impairment, even though
4  his score testing, quote, "could be consistent with mild
5  cognitive impairment."
6      Now, if you take a look at the underlying record, the
7  answer is in there.  Dr. ██████ did just say that in a single
8  sentence.  Dr. ██████ explained, yes, it could be consistent
9  with mild cognitive impairment, but, quote, "there were many
10  inconsistencies during Mr. ██████'s neuropsychological
11  testing," which make him question the accuracy of the diagnosis
12  and, quote, "scoring a 24 out of 30 on the MOCA," which could
13  be consistent with mild and cognitive impairment, but
14  Mr. ██████, quote, "had no other deficiencies on exam."
15      Again, you might dig into whether that conclusion was
16  ultimately supportable under an abuse of discretion review for
17  the board's determination to accept it but it is not an
18  inconsistent application of plan terms.
19      And this, again, just recurs in example after example in
20  these paragraphs that they cite.  They don't support -- they
21  don't attach any of the underlying evaluations for these.  They
22  just give the court a tiny snippet and don't present an actual
23  inconsistent application of anything.
24      Purported inconsistency number five.  They say, the plan
25  terms for the active and inactive categories of T&P disability

1  as well as the special rules in plan section 3.5.  They attach

2  no evidence.  None of the evaluations at all.  They cite only

3  to paragraphs of the complaint.  They don't cite any alleged

4  inconsistent application of the special rules in plan 3.5.  And

5  the only thing in these paragraphs that even comes remotely

6  close to being an alleged inconsistent application of active

7  and inactive categories, paragraph 193, quote, "Contrary to the

8  plan's terms and omitted from the decision letter was the

9  clandestine interpretation that the board has applied," which

10 they say is that active benefits are only given to players for

11 a catastrophic injury, such as a paralyzing collision during a

12 game.

13      They take that from testimony from *Cloud*, from Trustee

14 Smith, which they misquote and take out of context.  If the

15 court actually was to look at the testimony of Trustee Smith in

16 that case, he was merely giving an example of the kind of

17 injury that could qualify for active benefits.  He doesn't use

18 the word "only," he doesn't use the word "sole."  And, in fact,

19 it's quite obvious that this plan does not apply any such

20 limitation.  They don't cite to a single decision letter which

21 says, "You didn't suffer a catastrophic injury, therefore you

22 don't qualify for plan benefits."

23      Again, no demonstration of inconsistent application of

24 plan terms.

25      And paragraph 284, they say defendants unreasonably

1   interpreted the plan to ignore consideration of whether a

2   player is T&P disabled from the cumulative impact and effect of

3   his impairments.  They cite no examples at all of inconsistency

4   in that regard.

5       In fact, if anything, if the court reads the complaint,

6   the real allegation is the court consistently fails to assess

7   cumulative impact in the pending Summary Judgment Motions that

8   we have filed where a plaintiff alleges, "Hey, I had alleged a

9   cumulative impact, and they didn't assess it."  There's no

10  inconsistency in the application of any plan term there.  Nor

11  do any of the plaintiffs who say my cumulative impact was

12  ignored have a single doctor of any kind who presented evidence

13  that said, "Yeah, you did have a cumulative disability and the

14  plan ignored it."

15      So, again, not an example of inconsistent application of

16  plan terms.  And their own allegation is that is consistently

17  misapplied.

18      Inconsistency number seven.  They say, plan terms

19  concerning what documents and information defendants must

20  review.  They said there was inconsistent application.

21      They cite only to paragraphs in the complaint.  They

22  provide no examples of this.  And this is another place where,

23  again, the actual key allegation here is an alleged

24  consistency.  According to them, never do all of the underlying

25  records get reviewed.  In fact, what I would refer the court to

1  is the evidence that has been put in, which is the declaration

2  of Trustee Smith and the declaration of two party advisors.

3      So, I think as the court is aware, one of the reasons that

4  court after court after court has determined that this plan

5  does not have a structural conflict is because the board is

6  equally composed of three members of management and three

7  members of the players' association, all of whom are former

8  players, and who want to make sure that they're conscientiously

9  discharging their duty to make sure that people get benefits

10  where they deserve it.  That's what Trustee Smith says.

11      I'll note, we offered depositions of all these people.

12  Some of those depositions were scheduled and others were

13  offered.  They pulled them all down rather than proceed with

14  them prior to this hearing.  Said, oh, deadlines were held in

15  abeyance so let's not develop any more evidence about whether

16  the underlying record that's established here --

17      THE COURT:  Well, because certainly it would aid those

18  depositions if they had the documents they're asking for me to

19  produce.  I can't fault them for that.

20      MR. JACOB:  Well, I don't -- I'm, again, if I'm going

21  to have to prepare a witness on 20,000 underlying

22  evaluations --

23      THE COURT:  I'm not quarreling with you about, you

24  know, I'm just saying pulling them down, you know, they're

25  waiting for me to render a decision that will materially alter

1    the trajectory of the case.  I can't say that I quarrel with

2    their decision to hold off.

3            MR. JACOB:  Fair enough, Your Honor.  But, again, the

4    point is that on this their depositions of the party advisors

5    or of Smith, I mean, they can't quiz them on 20,000 different

6    evaluations.

7            THE COURT:  Yeah, yeah, I hear you.  I understand.

8            MR. JACOB:  And they've got all of the ones for the

9    named plaintiffs already.  And the key point here is that what

10   Trustee Smith and the party advisors explained -- and the party

11   advisor are not Grimm, it's not the law firm.  The *Cloud* case,

12   in fact, was quite incorrect about this particular conclusion,

13   as the evidence in this case will show.

14       Both the management side and the players' association side

15   have a party advisor who the declarations say:  I review every

16   page of those records and I then make recommendations, the

17   trustees quiz me about them, we have a back and forth, and

18   that's how we get to the final determinations.

19       And the trustees say:  I review the parts of the record

20   that I need to in order to understand the recommendations.  And

21   there we go.

22       But, again, this is not an allegation of any

23   inconsistency.  And it's inconceivable that producing 20,000

24   underlying evaluations is going to add one iota to the corpus

25   of evidence that the court will ultimately use to assess

1    whether they are indeed reviewing the records or not.

2         The records, as they've pointed out, all of them

3    consistently say, your records were reviewed.  That's what all

4    of the claim records -- again, they've got a thousand five

5    hundred of these.  It's not as though there's inconsistency

6    among them on that point.

7         What it's all going to come down to does the court credit

8    Trustee Smith and the party advisors that the trustees have

9    delegated the responsibility to make sure that everything is

10   reviewed.  And the neutral physicians as well certify that they

11   review all of the medical records that were submitted to them.

12   That's a certification on the form.

13        So you've got the neutral physicians certifying that

14   they've reviewed everything.  It's a certification on every

15   single one of those 1,500 evaluations that's in the record.

16   Then it goes -- those get submitted in at the committee level,

17   the party advisors are not there.  I know that they said a lot

18   about needing to make sure that the committee has different

19   advisors.

20        Again, what the record shows here is Groom will create a

21   factual summary, that just summarizes the facts, but it's only

22   the party advisors that present any kind of recommendation.

23   They're the ones that review all of the pages of the record at

24   the board level.  The party advisors do not participate at all

25   at the committee level.  It's in the declarations that are

1  before the court.

2        And, again, we offered their depositions because we fully

3  agreed, to the extent that the process on that is important to

4  the resolution of the claim, you need to talk to the people who

5  can say, "Do we regularly review them or not?"  But 20,000

6  additional documents beyond the 1,500 that are already in is

7  not going to help the court assess whether or not the

8  representations in all of those letters that the records were

9  reviewed are true or not.  You need to talk to the people who

10  are making the representations.

11        Finally, their last purported inconsistency, their last

12  bullet is:  Inconsistent and discriminatory treatment of

13  similarly situated players based on race.  This was the Heaton

14  norming issue that they discussed with the court at length.

15        So, first of all, they point to their footnote 6 where

16  they describe what the Heaton norms are, demographically

17  corrected or adjusted and take into account such factors as

18  race, age, gender, and educational level.

19        So here's what the record on this will ultimately show.

20  So, as the court can tell from the fact that these are called

21  the Heaton norms, this is an available body of testing

22  adjustments that many neutral physicians or many just

23  physicians who practice generally may or may not apply

24  depending on what their professional judgment is.

25        And prior to 2021, there was no position that the plan

 1  ever took as to whether you should apply Heaton norms or not.

 2  The individual neutral physicians were exercising their own

 3  professional judgment as to how to do the test scoring.

 4          THE COURT:  Is it accurate though that the Heaton

 5  norms also include factors that are, on their own, disallowed

 6  by DOL, that has been interpreted to be disallowed?

 7          MR. JACOB:  So I was the solicitor in the Labor

 8  Department, and I am not aware of any instance in which the

 9  Labor Department has said that you're not allowed to make

10  standardized adjustments based on --

11          THE COURT:  I guess what I'm asking is, like, is it

12  correct that it has been incorporated into the statute that

13  issues or factors such as race should not be considered?

14          MR. JACOB:  So it's a more complex answer than that.

15          THE COURT:  I'm sure.

16          MR. JACOB:  So you should obviously not consider race

17  in determining whether a human being is disabled --

18          THE COURT:  Right.

19          MR. JACOB:  -- well, I would have determined that you

20  were disabled but because you are Caucasian I'm going to say

21  you are not.  That would obviously be improper and prohibited

22  by the rules.  I don't think that there's anything in the rules

23  that say that demographic adjustments are not permitted.  But

24  one of the key --

25          THE COURT:  Because they're considered predictive in

1  determining whether somebody has a T&P?

2       MR. JACOB:  And often -- yes, Your Honor.  And often

3  in a way that's designed to just bring things down as much as

4  possible to the level of the individual in front of you and to

5  take into account factors that they had standardized

6  information they could take into place.

7       But I think the key point here is, the plan did, in the

8  middle of 2021, when they became aware that this practice

9  existed, issue a directive that hence forward, without regard

10 to whether Heaton norms have merit or not, we just don't want

11 to deal with this issue being raised by people and anybody

12 thinking that we're doing anything --

13      THE COURT:  Yeah, it's not a good look.

14      MR. JACOB:  Yeah, so they stopped it at that point.

15 And they issued a directive.  And they don't present a single

16 instance of a neutral physician who after the middle of 2021,

17 when that directive was answered, acting inconsistent with the

18 plan.

19      THE COURT:  Okay.

20      MR. JACOB:  Nor do they point to any plan term that

21 would have been inconsistent for a neutral physician to

22 exercise their best professional judgment prior to that point

23 in time in deciding whether to use --

24      THE COURT:  Okay, got it.

25      MR. JACOB:  So, again, it is not an example of an

1   inconsistency of application.  And those are all eight of their

2   examples.

3       So when the court asked me, you know, isn't this -- you

4   know, shouldn't narrow tailoring apply in a case like this --

5           THE COURT:  Well, what I was asking you is how would

6   that occur in a case like this.  And I understand your

7   explanation for why you really couldn't answer that question

8   directly.

9           MR. JACOB:  Yes, Your Honor.  And I do think any one

10  of these individual plaintiffs -- what they've tried to do here

11  is, this is a sweeping motion that asks for all 20,000 records,

12  everything from middle of 2018 to -- give us all 20,000 of

13  those, which of course is going to necessitate then the court

14  evaluating, every claim that they make based on this set of

15  20,000 records is going to be something that is a contested

16  issue before the court.  And we will be here for 20 years going

17  through 20,000 documents to figure out, is this one actually

18  inconsistent with this one, et cetera, because none of this is

19  targeted.  If they have specific targeted complaints -- and,

20  again, I wanted to walk the court through the ones that they

21  purport to present as targeted claims --

22          THE COURT:  I'm here.

23          MR. JACOB:  -- none of which I think would warrant

24  doing any kind of targeted discovery because they don't point

25  to an alleged inconsistent application of a plan term that has

```
 1  any basis, particularly where they've got 1,500 records to draw
 2  that from.
 3       So let me walk through the rest of their *Booth* factor
 4  allegations.  Actually, I pointed the court to page 16 where
 5  they say:  Here are the things that we need in order to assess
 6  bias.  I've covered the third one there, which is the alleged
 7  pattern or practice in decision letters and how that's not
 8  going to be held.
 9       The next one they say:  We need the dates of other
10  claimants' physician evaluations.  That's all in the claims
11  data.
12       The next one, number five, they say:  We need the plan
13  physicians' alleged relevant specialties and expertise.  All in
14  the claims data.
15       The next one, number six, they say:  Whether defendants
16  disregarded evidence in favor of plan-selected physicians'
17  opinions.  That, again, they've got 1,500 examples out there,
18  if they want to come to the court -- in fact, in every single
19  one of these -- and the court can see this in the three MSJs
20  that have been filed -- every single time the allegation is
21  going to be, hey, I had other evidence here that you
22  disregarded.  And the court is going to have to make a
23  determination on every one of those under an abuse of
24  discretion standard, did the board make, you know, abuse its
25  discretion in accepting these neutral physician reports as
```

 1    adequate evidence to support the determination or not.  Every

 2    single one of those times, the court is going to have to look

 3    at the underlying record.  And the court can see that from

 4    seeing how the summary judgments get written out.  Each of them

 5    have individual complaints about specific alleged

 6    inconsistencies, but adding 20,000 documents into the record,

 7    beyond the 1,500 that are already in there, is not going to add

 8    anything and is just going to render this case completely

 9    unmanageable.

10         THE COURT:  So I think -- I don't mean to sound dense,

11    but I think what I hear you saying on this particular issue

12    alone, is that if there is such a -- I'm going to use this one

13    example from, you know, the complaint.  If there is such a

14    pattern and practice of which plaintiffs complain, it would be

15    demonstrable through what has already been produced.

16         MR. JACOB:  If you can't demonstrate it in 1,500

17    records, Your Honor, you're not going to be able to demonstrate

18    in 20,000.

19         THE COURT:  And you're saying that the plaintiffs have

20    failed to demonstrate a particularized need or sufficient

21    material for me to go along with them that something more is

22    necessary?

23         MR. JACOB:  Correct.  Under the standard of *Clark* and

24    the other cases that we cited, they need to say -- they need to

25    actually measure it against what's already in the record and

1    let that then be the basis for saying why some additional

2    imposition on the plan to produce a bunch of additional things

3    is actually warranted under the narrowly tailored

4    circumstances.  And they haven't even tried to do that in this

5    motion, beyond the limited ones that I just walked through one

6    by one.

7        And this equally applies, you know, *Booth* factor 3, they

8    say we need these to assess whether they had adequate material

9    to support decisions.

10        *Booth* factor 5, are they arriving at reasoned and

11    principle decisions.

12        The court has three summary judgment motions already.

13    Ultimately it's going to have nine.  And the court is going to

14    need to assess with respect to each of those records under an

15    abuse of discretion standard is that the case or not.  Again,

16    if they can't show that in 1,500 records, they're not even

17    going to be able to show it among the nine records.

18        But it's also important for the court to weigh that their

19    claim that their individual experiences of these nine

20    plaintiffs is typical of all of the class members.  We disagree

21    with that but that is their claim.  And for them to say, sure,

22    we've got the hundred evaluations for them, plus we've got an

23    additional 1,361 evaluations, but we need still more in order

24    to evaluate whether our typical plaintiffs were infected by a

25    problem of reasoned decision-making.  That is not the way that

1    *Booth* factors 3 or 5 are supposed to work.

2         You take a look at the summary judgment record that's

3    there, and if there's a particular problem that arises with the

4    evaluation of that record, where they can say, well, to

5    evaluate this particular problem in this record we would need

6    to know this additional thing.  And so then we might -- we

7    would have a discussion with each other, and then ultimately

8    with the court if we can't agree, whether some narrow

9    additional targeted discovery is needed to resolve that.

10        All of the things that they said about Dr. Macciocchi are

11   a great example of this.  He only evaluated Plaintiff McKenzie,

12   one person out of all of these nine people.

13        The other things I'll say about their invocations of

14   Dr. Macciocchi, and why that doesn't warrant this kind of

15   additional discovery.  This is not a particularized request

16   based on anything that he allegedly did wrong with respect to

17   his evaluation of Mr. McKenzie.  They cite to quotes from what

18   they say were presentations at conferences or here was the

19   title of the presentation of the panel.  But they don't attach

20   any of that to demonstrate that Dr. Macciocchi actually had

21   some kind of problem.

22        Again, they're trying to get 20,000 records -- I see the

23   court's raised eyebrows.  You know, I look at the allegations

24   in the complaint and say the same thing.  But the way this

25   should work is we would take Plaintiff McKenzie's summary

1  judgment record.  We would take a look at that administrative

2  record.  We would see what Dr. Macciocchi did there.  They

3  would present the actual evidence that they have of some

4  alleged problem with Dr. Macciocchi.  We would be able to come

5  in and rebut that and say, actually, they're misquoting the

6  presentation, Your Honor, or that was actually just what

7  somebody wrote for the name of the panel as a whole and not a

8  direct quote attributable to Dr. Macciocchi.  We would have

9  that discussion.  And then the court would determine whether

10  some limited targeted discovery into Dr. Macciocchi in

11  particular was warranted.

12          THE COURT:  And his decision-makings.

13          MR. JACOB:  Exactly.  But that's not been briefed

14  because that's not this motion.  This motion is 20,000

15  documents irrespective of any particular doctor.

16      And the last thing that I wanted to make sure that I

17  address here is they're pointing to all of these cases that

18  they say, well, because courts have criticized the plan in

19  certain cases, that warrants all of this additional discovery.

20  I've got several responses to that.

21      First, they lay all of these cases out, they had a lot of

22  them in their presentation, but they're all in footnote 3 of

23  their reply.  They have 13 cases over the course of 40 years.

24  That's less than one every three years during that period of

25  time that had some harsh judgment about what had been done in a

1  particular case.  That is not remotely unusual for a plan to

2  have that kind of track record, particularly where they,

3  themselves, allege it's typical to have a thousand claims filed

4  in a given year.

5      So over a three-year span where you have 3,000 claims

6  filed and one case that adjudicates that the court got it

7  wrong?

8          **THE COURT:**  Well, that's because most things don't go

9  to adjudication.  We both know that.  But I understand what you

10 mean.

11         **MR. JACOB:**  A lot of things don't.  But also, again,

12 the approval rates for these disability benefits, higher than

13 50 percent for both line-of-duty and for T&P, and the

14 neurocognitive I think is around 26 percent.  Those are high

15 approval rates.

16     We also have, you know, in addition to that, you know,

17 completely inconsistent with what they allege, but this is a

18 plan that paid out a billion dollars in benefits between 2017

19 and 2022, all of the evidence is cited at page 2 of our class

20 certification opposition.  In 2022, paid out 257 million in

21 benefits.  I can represent to the plan that in 2024 it was

22 366 million.  So it's an upward trajectory.

23     Again, the Miller declaration to the class certification

24 papers at paragraph 5, 23 percent of participants in this plan

25 were getting disability benefits.  I don't think there's any

1  other disability plan in existence where 23 percent of those

2  eligible to get benefits are getting benefits from it for an

3  average of $86,000 a year.

4       So, again, when you actually look at the factual record

5  here, which they don't engage with, it's completely

6  inconsistent with this notion that this whole thing is a sham.

7  But when the court takes a look at those cases -- so, in

8  addition to the fact that it's 13 over a 40-year period -- I

9  presented the court with Exhibit 2.  This is just a list of

10 cases, 21 of them over the same span, that affirmed the court's

11 decisions and found that the court, that the plan didn't abuse

12 its discretion.

13      So to the extent that they just want to play a numbers

14 game, hey, we had 13 that we lost over a 40-year period.

15 There's 21, and, again, I'm not commenting on the substance of

16 them at all, but those are all merits wins for the board where

17 the board's judgment ultimately got affirmed.

18           **THE COURT:**  I understand.

19           **MR. JACOB:**  For the 13 they do cite, all of them

20 predated the neutral role.  So the neutral role, which is the

21 key thing that's at issue in this case, whether, you know,

22 because a neutral physician finds that a person is not, you

23 know, if no neutral physician finds that the player is disabled

24 then they can't award benefits.  That is the setting for this

25 whole case.  All of those decisions took place under a

1  different set of rules.

2        And that's particularly relevant because cases like the

3  *Jani* case in the Fourth Circuit and the *Stewart* case in the

4  District of Maryland that they cite to, the criticism in both

5  of those cases is that the plan failed to defer to the neutral

6  physician.  There was a neutral physician opinion that the

7  person was disabled, and the board in those cases, because it

8  predated the neutral rule, didn't find the person was disabled.

9  Those cases would actually support what the plan is doing in

10  these cases today, which is saying that we're accepting the

11  judgments of neutral physicians here.

12        Similarly, the *Armstrong* case that they cite.  There, they

13  said that there were delays caused by the arbitration process

14  that existed at that point in time, 40 years ago.  That has

15  been completely changed and amended in the plan so now it is a

16  much more faster process.

17        The *Ashmore* case that they cite where somebody was denied

18  benefits because they failed to attend a scheduled neutral

19  physician examination.

20              THE COURT:  Do you take the position, and I don't mean

21  as a general proposition for every case, but do you take the

22  position in this case that because it is, you know, there's a

23  putative class and there's multiple named plaintiffs, and so

24  the record discovery, the administrative record discovery ends

25  up just by a matter of necessity because of the number of named

1  plaintiffs is whatever number of thousands of documents that

2  you said that it is.

3      Do you take the position or are you of a mind that

4  although as a sort of generic proposition extra record

5  discovery to thoroughly and adequately evaluate the *Booth*

6  factors is always sort of a -- of course that's a possibility,

7  it depends on what a given case is about, and that in a case

8  where, like, *Cloud* or like other single claimant cases there

9  isn't the robust body of evidence that's been produced; that

10 those cases might cry out more for extra record discovery, more

11 than this case?

12      **MR. JACOB:**  Yes, exactly.  The *Clark* case, again, says

13 where the record is there you have to evaluate it in light of

14 the existing record.  And, again, *Cloud* did not -- if you look

15 at the discovery order in that case, it denied the broad

16 requests for all benefits across the plan.  It denied the

17 requests for all underlying claim record.  It only allowed a

18 limited one.  But I think that's exactly right.

19      Had the plan, in that case, come forward and presented a

20 record of consistent application of those plan terms prior to

21 that discovery determination being made, the court would have

22 needed to assess that.

23      Now, of course it's an out-of-circuit decision so we

24 didn't have the Fourth Circuit and Maryland law --

25      **THE CLERK:**  Yep.

1          **MR. JACOB:**  -- that counseled that that is the correct
2    approach.  But, absolutely, we think -- we absolutely agree
3    that those cases need to sort of be put to the side because
4    that's not this case.

5          Here, we do have a specific record and that's why --
6    again, they may have targeted discovery motions to particular
7    summary judgment records for particular plaintiffs where they
8    can show some particular gap, but what they have not done in
9    this case, in light of the very expansive record that's there,
10   is demonstrate this kind of sweeping discovery, again,
11   unprecedented, none of the courts that they cite have granted
12   this sort of thing.

13         It would literally break ERISA if plaintiffs could come
14   into court with allegations like these where they cite, almost
15   entirely just to their own complaint allegations, present a
16   couple of records that I've walked the court through that don't
17   demonstrate inconsistent application at all, and then use that
18   to get every claim record that has been decided over the course
19   of a six-year period of time.  It would just be completely
20   unworkable.

21         And, again, that's the insight of the *Reichard* case, of
22   the mini-trials that that would give rise to.

23         The only other things, I just wanted to make sure I
24   complete their *Booth* factor 6 on pattern and practice.  We've
25   talked about consistent treatment and we've talked about

 1    ignoring plan documents.  Those are all of those allegations of
 2    inconsistency that don't flush out.
 3        Impartiality of the physicians they say is one of the
 4    things they need.  Again, the claims data fully allows for
 5    processing of that.
 6        Failure to review all documents.  Adding these into the
 7    record is not going to allow an additional assessment of that.
 8    It's all going to be about deposing these particular witnesses
 9    who say here's the way that the record gets done through a
10    delegation to the party advisors, and this is the way the
11    process works.
12        But they've got 1,500 records and the court can see when
13    it takes a look at those records, those are not going to add
14    anything to the court's knowledge of whether the underlying
15    records really were reviewed or not.  They all represent that
16    they were.  And so it's the people who are making those
17    representations that are relevant there.
18        And then they talk about the inadequacy of the decision
19    letters.  They say, "Hey, these aren't giving us fair notice of
20    what is in there."
21        Again, the summary judgment motions are pending but the
22    court can see, with respect to each of these, you have to take
23    a look at each individual decision letter to see whether did
24    they actually describe the adequate basis on which this claim
25    was decided or not?

1          If the court looks at the summary judgment briefing, I'm

2    confident the court will be completely convinced that we've put

3    in everything that ERISA requires on each of them.  But adding

4    20,000 additional records into the, you know, thousand plus

5    that are already in there is not going to help the court

6    evaluate that.

7          And then their last one was failure to provide requested

8    documents.  Of the named plaintiffs, Mr. McKenzie is the only

9    one who even alleges that he requested documents that were

10   denied.  That is not a basis to say, let's go searching among

11   20,000 other plan documents to see whether anybody else

12   requested plan documents that were denied.  Particularly where

13   each denial is going to have to be individually assessed as to

14   whether it was warranted or not under ERISA standards for the

15   kind of information that is supposed to be given.

16         So unless the court has -- I really appreciate the court's

17   time, particularly, I know I did a very long walk through the

18   *Booth* factors.

19              THE COURT:  No, it's helpful.

20              MR. JACOB:  If the court doesn't have any other

21   questions, I'll end my argument.

22              THE COURT:  I do not have any other questions.

23              MR. JACOB:  Thank you, Your Honor.

24              THE COURT:  Why don't we take another short recess and

25   we'll come back for rebuttal.  Just about five or 10 minutes.

1  I know everybody is probably getting hungry, including my very

2  dedicated court staff.  So I just want to be mindful of their

3  wishes.  Thanks.

4          **THE CLERK:**  All rise.  This Court stands in recess.

5          **(There was a break at 12:52 p.m. to 1:08 p.m.)**

6          **THE COURT:**  Please don't apologize.  When I came out

7  and saw you weren't here, I said it was unfair for me to come

8  out without fair warning so take your time.

9      I have one more question, Mr. Barnett, for Mr. Jacob.  So

10 I'm going to ask that question.  Mr. Jacob, please be

11 comfortable and stay wherever you would like.

12     One of the things that plaintiffs present to the court is

13 the idea that the plan-wide V3 data or that I should say that

14 your client is not able to discharge its duties adequately

15 based on use of V3 plan-wide data.  And that, if that is the

16 case, that that is a problem for you on this motion, can you

17 respond to that?

18         **MR. JACOB:**  Yes, Your Honor.  First, there is no such

19 duty.  So they don't cite a single case that has ever held that

20 an ERISA fiduciary conducting a disability plan or a health

21 plan that has third-party reviewers is required to maintain

22 statistics about the individual findings of those reviews.

23 There simply is no such duty.  So they've got no citation on

24 that.

25     And, in fact, if you take a look at the *Zahariev* case,

1  which we cited, there the fiduciary said, "We don't have any

2  such data."  The court said, "Yeah, I'm not going to make them

3  produce all of the underlying record if they --"

4          THE COURT:  If they don't maintain it.

5          MR. JACOB:  Correct.  And similarly, in the *Casco*

6  case, which is one of the ones that they cite, there they did

7  have data about recommendations, but they didn't have data

8  about the ultimate claim determinations.  So we have the

9  opposite.  Different administrators of plans do different

10 things.  But for us, it actually, for the reasons that we've

11 cited and that are described in Mr. Vincent's declaration, it

12 would actually be affirmatively harmful to the plan to have a

13 database that tracked all of these things because then we would

14 have constructive knowledge of the denial rates of all of the

15 neutral physicians, and that would be charged to us.  And then,

16 even though he only wants to be using these neutral factors,

17 and I think, you know, I know Mr. Vincent, I think as a human

18 being he only would still use those neutral factors --

19         THE COURT:  It's like blind grading your students'

20 blue books.

21         MR. JACOB:  Yes.

22         THE COURT:  I get it.

23         MR. JACOB:  But the constructive knowledge would be

24 there, and it's one of the potential harms to us in creating

25 the kind of database that plaintiffs --

1          **THE COURT:**  And so the ARs for the named plaintiffs

2     are what they are and the V3 database, you know, and I'm not

3     getting into whether it was disclosed that it existed or blah,

4     blah, blah, but that's really of no moment.

5          **MR. JACOB:**  That is of no moment.  And, again, I can

6     just represent to the court as well, there is a process by

7     which a randomized sample of neutral physician evaluations are

8     sort of reviewed at the end of the year so there can be a

9     quality check, as to putting the things in them that need to be

10    in there, et cetera.

11         It's not that there's no process there, but statistics,

12    there's no court that has ever held that that is something that

13    needs to be done and it would not be useful to us.  In fact, it

14    would be harmful.

15         **THE COURT:**  Okay.  Thank you.

16         **MR. JACOB:**  Thank you.

17         **THE COURT:**  Mr. Barnett, or whoever is going to rebut,

18    I'm happy to hear from you.

19         **MR. BARNETT:**  I'm going to start, Your Honor, and

20    depending how the discussion goes, Mr. Katz may be involved as

21    well.

22         **THE COURT:**  That's fine.

23         **MR. BARNETT:**  I'm going to say what attorneys always

24    say at the start of rebuttal, I'm going to be brief.  But given

25    the hour, I really am going to try to be very brief.

1   Obviously, if you have any questions --

2          **THE COURT:**  I'm not shy.

3          **MR. BARNETT:**  I'm happy to respond to those.

4      I'm actually going to start where you just ended, which is

5   the requirement in terms of a system.  There is a requirement

6   to have an adequate system in place and presumably as a

7   fiduciary under duty of loyalty and care, there is some

8   obligation to see whether the benefits decisions are made are

9   consistent with ERISA and with the plan documents.  And my

10  understanding is that these defendants currently have no audit

11  in place to do that.  If I'm wrong, I apologize, Mr. Jacob can

12  correct me.

13     But it's inadequacy of the system, in our view is the V3

14  system, is inadequate because it does not contain the

15  individual recommendations of individual physicians.  And not

16  having that information does in fact result in blindness.  We

17  think that blindness is willful because they don't really know

18  whether the safeguards they put in place are actually working.

19         **THE COURT:**  When you say "they don't really know that

20  their safeguards are really working," and I don't mean this to

21  sound smart because the transcripts are lousy for tone so this

22  is a legit question, I'm not being sarcastic --

23         **MR. BARNETT:**  No.

24         **THE COURT:**  -- you are saying that a sort of

25  conclusion that you wish me to agree with, not based on any

 1  testimony, because I know depositions have been stalled, that
 2  where, you know, a 30(b)(6) or someone who is an administrator
 3  or responsible at the administrator level agrees with you that
 4  we do not have the kind of check, like Mr. Jacob just
 5  described?  Which also is not evidence, I'm just asking the
 6  question.
 7        MR. BARNETT:  You're absolutely right.  What I am
 8  suggesting is we are alleging --
 9        THE COURT:  I got it.
10        MR. BARNETT:  -- we are arguing that the lack of a
11  system in place, an adequate system that allows a plan to
12  monitor and potentially audit whether the benefits decisions
13  they are making are consistent with ERISA with their own plan
14  documents.  That is something we're working to prove through
15  discovery.  We're not there right now.
16        THE COURT:  Uh-huh.
17        MR. BARNETT:  Now, I'm sorry, I'm going to jump back
18  in time and just hit a couple of points.
19        THE COURT:  Okay.
20        MR. BARNETT:  Early on you raised the statute of
21  limitations and whether there's a different statute of
22  limitations based on the claims and the short answer is yes,
23  there is a different statute of limitations that applies to
24  502(a)(2) claims that doesn't apply to wrongful denial of
25  benefits claims.

106

```
 1       The court in Cloud denied the discovery for other decision
 2  letters because Mr. Cloud sought discovery for benefits he
 3  didn't apply for.  We did not repeat that mistake.  We only are
 4  seeking discovery for T&P, for line-of-duty, and for
 5  neurocognitive.
 6       And the decision in Cloud to deny -- the judge in Cloud
 7  did grant him extra record discovery of other decision letters
 8  but not for benefits he didn't apply for.
 9           THE COURT:  Yes, she gave plaintiff a haircut on that
10  request.
11           MR. BARNETT:  Right.  And we're not in that situation
12  because we're not seeking anything that our named plaintiffs
13  didn't apply for.  And we've excluded other benefit
14  applications for, like, the 88 plan and that sort of thing.
15  And, ultimately, we're only asking for decision letters that
16  were actually communicated to the applicants, which eliminates
17  a lot of bureaucratic paperwork that has nothing to do with the
18  final decision.  That's what we're after.
19       The V3 data, it's both incomplete and it's inaccurate.  It
20  contains the physician names, we believe those were redacted
21  when they were produced, and it doesn't contain the
22  compensation information.
23       There was a question about the, quote/unquote, "claims
24  data" and we know what the final decision was because at least
25  one of the physicians had voted in favor of the benefits.  The
```

1   important thing to keep in mind is that individual physicians

2   can only control what they can control.  And so certainly a

3   neutral physician can't anticipate what other doctor may decide

4   in terms of eligibility and awarding benefits.

5        But, if we get the information as to the individual

6   physicians, we will know exactly what the recommendations were.

7   And ultimately we'll get their -- we have their compensation

8   information.  So we will be able to graph this out and present

9   it to the court down the road.  We can't do that with the V3

10  data.

11       Respectfully, the defendants really want to have it both

12  ways.  They're refusing to produce the only source of

13  information that, again, is relevant to our claims and to their

14  defendants, and then arguing that we don't have enough

15  information to prove our claims.  And it's clear what the

16  strategy is.  Mr. Jacob just described it.  They've moved

17  affirmatively for summary judgment on three of the plaintiffs,

18  their intention to move forward on nine.

19       And so they can't have it both ways.  There has to be --

20            THE COURT:  What do you mean both ways?

21       MR. BARNETT:  They can't refuse to produce discovery

22  that we believe is essential to our claims and then turn around

23  and based on that refusal and not having that information and

24  say we can't go forward with our claims, including our 502 --

25  sorry (a)(2) claims.

1          **THE COURT:**  Well, but that, you know, that ignores to

2    some extent the fact that they disagree with you that the

3    information you're seeking is essential to begin with.

4          **MR. BARNETT:**  Well, and to that -- we, we're operating

5    under fairly stringent page limitations in terms of what we

6    could move.  We didn't throw everything in that we could have.

7    We had to be selective in terms of what we're alleging.

8          Also, candidly, we're at the beginning of discovery.

9    We're not in a position where we can prove everything.  That's

10   what we're working to do.

11         There was a suggestion made that we had not produced the

12   data underlying the statistics in the allegations in the

13   amended complaint.  That is flatly wrong.

14         **THE COURT:**  I've seen that correspondence.

15         **MR. BARNETT:**  Okay.  I just wanted the court to assure

16   that all of that information --

17         **THE COURT:**  I understand everybody's position.

18         **MR. BARNETT:**  -- all of that information has been

19   produced.

20         Also, very key point.  We're not asking for a mini-trial

21   on each of these claims.  Nor is a mini-trial going to be

22   necessary.  We're just asking simply for the foundational

23   discovery that we're entitled to under Fourth Circuit and

24   District of Maryland decisional law.

25         Now, you had asked a question about whether extra

1  administrative record discovery is an ill-fit for this case, we
2  do think this case is different from the other cases.  In part
3  because of the 502(a)(2) claims, because of the allegations
4  related to a fraudulent scheme, because of the allegations and
5  the evidence of pattern and practice of ERISA violations which
6  the defendants really didn't address today in their argument at
7  all.
8       And finally, again, we were hopefully thoughtful and
9  strategic in terms of identifying the applications that we're
10 asking for.  We limited it by time frame and by benefits and
11 the fact that they were only communicated to applicants.
12      So pardon me one second.
13      There was discussion about the 1,500 decision letters.
14 Just to be clear, most of those 1,500 decision letters were
15 produced by us.  The defendants have produced a very small
16 fraction of decision letters and in some cases those are
17 incomplete.
18      So it would be weird in a situation where we would somehow
19 be punished by not being permitted to pursue discovery because
20 we have produced a much larger volume of documents than the
21 defendants have.
22      Without appearing to be cavalier, the argument at the end
23 really boils down to, you know, the defendants have approved a
24 lot of applications, we've paid a lot of money, there's really
25 nothing for the court to see here, please don't allow this

1  discovery.

2      Again, this discovery is critical.  There's a reason we

3  started with this discovery because it relates to all of our

4  claims and our allegations.  It will become the building blocks

5  for taking additional discovery.  And we have a whole series of

6  discovery issues that we intend to bring to Magistrate Judge

7  Aslan in a schedule and a structure that she approves.  But we

8  wanted to start here because this is so important to our case.

9      That's all I have, Your Honor.  I think that was

10  relatively brief.  I'm happy to respond to you.

11      **THE COURT:**  It was.  I might have a few questions so

12  just bear with me.  Please have a seat and make yourselves

13  comfortable.  I just need to look through a few things.

14      Well, Mr. Jacob, I'll ask you then to address what

15  Mr. Barnett contends you didn't address, which was the pattern

16  and practice of ERISA violations and how that relates to the

17  plaintiffs' request for extra record discovery.

18      **MR. JACOB:**  Your Honor, actually, their pattern and

19  practice is *Booth* 6, and I actually walked through every one of

20  those.  This is pages 20 to 27 of their brief.  And I talked

21  about their factor A is alleged consistency of treatment

22  which -- we extensively walked through their alleged

23  inconsistencies that aren't actually inconsistencies.

24      Their factor B is inadequate decision letters.  We talked

25  about the fact that you have to evaluate each decision letter

1  on its own, the summary judgment motions show that.

2       Their factor C is a failure to review all documents.  We

3  talked about the fact that, again, all of the documents

4  represent that everything was reviewed.  The neutral physician

5  says, I reviewed all of the decision -- all of the medical

6  records, et cetera, and it's going to be the depositions of

7  Trustee Smith and the party advisors, not the production of

8  20,000 more documents that'll help with that.

9       D is the impartiality of physicians.  That's the claims

10  data which can be fully used to assess bias.

11       E is allegedly ignoring plan documents.  That's the same

12  as the consistency of treatment.  We walked through all their

13  alleged examples of that.

14       F is the de novo committee review.  Again, producing

15  20,000 of these isn't going to help with that.  And then there

16  was the request for documents.  We did walk through them all.

17       THE COURT:  Okay.  I don't have anymore questions.

18       Here's what I want to do, I'm going to do.  I fairly know

19  what I'm going to do, but I want to give myself time to sleep

20  on some of these cases.  I find that that's always a benefit,

21  if for no other reason than I come across more articulate than

22  I might otherwise be.  So what I'm going to do is do just that,

23  as opposed to rule from the bench.

24       What I will do is I will send an email to counsel off

25  record to propose an agreed upon date to do an on-the-record

1   telephone oral ruling so that nobody has to come all the way
2   back in just to hear me read something.  I do not plan to issue
3   a written opinion because I believe that you need a decision
4   faster than you need a pretty document, as I said before.  And
5   it will take me far longer to put together a publishing worthy
6   piece of writing than it would be to put my thoughts together
7   in a cogent way that you will understand, in candor.  So that's
8   what I'm going to do.
9       I will sit with this over the weekend, and I will put
10  together some thoughts that make sense, hopefully, and I will
11  get with you about a time that would be appropriate to do that.
12      So, again, not that you're not entitled to come back to
13  court, I don't know if you're really that into finding parking
14  in Baltimore City, you're welcome to come back to court.
15      (Laughter.)
16      THE COURT:  But my plan is to do just a telephone on
17  the record.  So I'll be here so that it technically is open to
18  the public.  And then we'll open up the phone line for counsel
19  to join and you'll be on the record but just disembodied voice,
20  as far as I'm concerned.  Okay.
21      (All Counsel - "Thank you, Your Honor.")
22      THE COURT:  I appreciate your thoughtful arguments and
23  the importance of the issue to the case.  Thank you.  Court's
24  adjourned.
25      THE CLERK:  All rise.  This Honorable Court is now

1  adjourned.

2       (Court adjourned at 1:26 p.m.)

```
 1                     CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4        I, Ronda J. Thomas, Registered Merit Reporter, Certified

 5   Realtime Reporter, in and for the United States District Court

 6   for the District of Maryland, do hereby certify, pursuant to 28

 7   U.S.C. § 753, that the foregoing is a true and correct

 8   transcript of the stenographically-reported proceedings held in

 9   the above-entitled matter and the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12                          Dated this 7th day of March 2025.

13

14

15                          _____

16                          Ronda J. Thomas, RMR, CRR
                            Federal Official Reporter
17

18

19

20

21

22

23

24

25
```

THE COURT: [189]
62/11 65/12

**MR. BARNES: [13]**
2/9 3/25 4/10 4/14
4/19 5/6 6/6 7/7
7/16 7/22 8/2 8/5
8/11 8/20 9/5 9/19
9/23 10/7 10/10
10/14 10/16 10/18
10/21 11/3 11/6
11/12 11/16 11/18
11/22 12/3 12/6
16/16 17/6 17/9
17/11 17/16 18/2
18/4 19/7 19/25
20/2 20/20 21/17
21/21 21/23 22/1
22/3 22/7 23/20
23/23 24/1 24/9
25/1 25/13 26/4
26/22 27/1 27/4
27/18 27/20 27/22
28/3 29/3 29/14
29/16 29/20 30/6
30/9 30/18 32/2
32/9 32/23 33/3
35/4 35/9 35/11
35/15 37/23 39/12
103/19 103/23 104/3
104/23 105/7 105/10
105/17 105/20
106/11 107/21 108/4
108/15 108/18

**MR. JACOB: [80]**
2/17 41/2 42/2 43/8
43/19 46/25 48/3
48/19 49/2 49/4
49/19 50/9 50/14
51/22 52/3 52/17
52/24 55/5 56/17
59/23 60/2 60/6
60/15 60/18 60/21
61/19 62/6 62/8
63/1 64/11 64/14
66/4 66/14 66/18
67/2 67/5 67/7 67/9
67/14 67/17 67/19
68/7 68/9 69/17
71/13 71/16 71/22
72/6 72/8 72/12
72/14 82/20 83/3
83/8 86/7 86/14
86/16 86/19 87/2
87/14 87/20 87/25
88/9 88/23 90/16
90/23 93/13 94/11
95/19 97/12 98/1
100/20 100/23
101/18 102/5 102/21
102/23 103/5 103/16
110/18

**MR. KATZ: [16]**
2/12 17/18 24/23
25/14 25/20 27/2
28/10 28/16 33/15
33/20 34/7 34/16
34/20 34/23 34/24
35/3

**MR. LAPIN: [1]**
2/20

**MS. DAMRON: [1]**
2/14

**MS. GARAGIOLA: [1]**
2/21

**THE CLERK: [4]**   2/3
97/25 101/4 112/25

---

THE COURT: [189]
2019 [3]   41/11
41/13 41/17
2020 [1]   76/17
2021 [3]   85/25 87/8
87/16
2022 [2]   94/19
94/20
2023 [3]   4/9 4/20
5/3
2024 [1]   94/21
2025 [2]   1/8 114/12
21 [3]   1/8 95/10
95/15
21201 [1]   1/25
225 [1]   75/1
23 percent [2]
94/24 95/1
24 [1]   79/12
25 percent [1]
61/10
251 [2]   78/2 78/3
253 [1]   79/1
257 million [1]
94/20
26 [7]   3/7 12/2
13/16 14/25 32/10
45/20 54/23
26 percent [1]
94/14
27 [1]   110/20
28 [1]   114/6
284 [1]   80/25
298 [1]   45/4

**3**
3,000 [1]   94/5
3.3 [1]   43/24
3.5 [2]   80/1 80/4
30 [2]   79/12 105/2
316 [3]   44/19 44/19
44/21
366 million [1]
94/20

**4**
40 [2]   93/23 96/14
40-year [2]   95/8
95/14
42 [1]   6/22
43 [1]   6/22
4th [1]   1/24

**5**
50 percent [1]
94/13
502 [15]   5/7 12/10
12/10 13/15 13/21
13/25 18/22 19/1
19/3 19/8 38/2 39/2
105/24 107/24 109/3
51 [1]   43/24
53 [1]   77/15
530 [1]   63/7
55 [1]   78/2
5500s [3]   64/22
64/24 65/6
56 [1]   6/3
57 [1]   48/15

**6**
67.6 percent [1]
45/3
68 [1]   67/19

---

**MR. BARNES: [13]**
2019 [3]   41/11
47/2 48/17 62/17

$1.6 [1]   24/15
$1.6 million [1]
24/15
$86,000 [1]   95/3

**0**
0358 [1]   2/5

**1**
1,324 [2]   45/1 45/4
1,361 [2]   53/5
91/23
1,500 [14]   53/6
53/10 66/5 77/9
84/15 85/6 89/1
89/17 90/7 90/16
91/16 99/12 109/13
109/14
1,866 [3]   44/6
44/19 44/22
1,936 [2]   44/5
44/18
10 [4]   4/16 30/16
40/25 100/25
10,000 [1]   64/8
100 [1]   67/19
101 [1]   1/24
10:02 [2]   1/8 2/1
111-2 [1]   43/23
111-3 [1]   51/3
112 [1]   48/24
115-4 [1]   51/4
11:07 [1]   41/1
11:26 [1]   41/1
12 [5]   14/21 43/23
44/4 44/25 56/7
12:52 [1]   101/5
13 [5]   21/18 93/23
95/8 95/14 95/19
132 [1]   3/18
134 [1]   3/3
16 [3]   64/6 64/12
89/4
168 [1]   75/1
16th [2]   12/18
29/22
179 [1]   73/25
188 [1]   75/1
193 [1]   80/7
1:08 [1]   101/5
1:23-cv-0358-JRR [1]
1/6
1:26 [1]   113/2
1st [3]   4/8 42/4
47/2

**2**
20 [2]   88/16 110/20
20,000 [20]   42/9
53/11 67/3 70/9
77/1 83/5 83/23
85/5 88/11 88/12
88/15 88/17 90/6
90/18 92/22 93/14
100/4 100/11 111/8
111/15
20,000 underlying
[1]   82/21
2016 [1]   25/3
2017 [1]   94/18
2018 [10]   4/8 29/24
41/14 42/4 44/1

---

**7**

**7th [1]**   114/12

**8**

82 [1]   41/7
88 [1]   106/14
897 [2]   45/1 45/5

**9**

95 percent [2]
44/21 61/16
96.4 percent [2]
44/6 44/9
99 percent [1]
44/22

**A**

a.m [4]   1/8 2/1
41/1 41/1
abeyance [4]   3/6
3/18 46/11 82/15
ability [1]   5/3
able [12]   61/2 74/2
74/10 76/10 76/13
76/18 76/22 90/17
91/17 93/4 101/14
107/8
ably [1]   5/21
about [65]   3/10
3/17 3/18 5/25
11/24 13/4 23/11
23/15 24/19 24/19
25/3 25/5 25/20
26/12 29/13 32/20
33/2 37/23 38/4
39/19 40/21 42/9
43/16 46/12 47/10
50/7 53/6 54/18
59/7 63/4 65/6
65/21 65/22 66/5
68/2 69/5 74/25
77/19 77/25 78/3
82/15 82/23 83/12
83/17 84/18 90/5
92/10 92/13 93/25
97/7 98/25 98/25
99/8 99/18 100/25
101/22 102/7 102/8
106/23 108/25
109/13 110/21
110/25 111/3 112/11
above [3]   28/23
28/24 114/9
above-average [1]
28/24
above-entitled [1]
114/9
Abromitis [8]   37/23
38/2 38/11 38/20
59/2 59/8 60/22
63/23
absent [1]   50/7
absolutely [9]   5/8
10/3 13/5 14/16
24/12 39/12 98/2
98/2 105/7
abuse [5]   79/16
89/23 89/24 91/15
95/11
accept [1]   79/17
accepting [2]   89/25
96/10
accepts [1]   73/10
access [1]   22/15

---

**According [1]**   81/24
account [2]   85/17
97/5
accuracy [1]   79/11
accurate [2]   8/3
86/4
accurately [1]
39/23
accusation [1]   69/4
acknowledge [3]
55/16 57/6 62/3
acknowledged [3]
21/1 53/15 73/25
acquired [2]   77/7
77/14
across [8]   23/9
30/14 58/5 63/18
68/11 70/9 97/16
111/21
act [2]   3/1 14/10
acted [1]   48/1
acting [2]   74/4
87/17
actions [2]   16/1
24/4
active [4]   79/25
80/6 80/10 80/17
actual [6]   4/2 7/5
68/22 79/22 81/23
93/3
actually [44]   4/22
8/17 12/21 13/3
14/13 14/20 15/4
15/7 15/9 19/15
22/3 24/2 26/9
27/25 31/2 32/3
33/5 37/15 38/2
46/17 50/4 50/6
70/13 74/6 78/11
80/15 88/17 89/4
90/25 91/3 92/20
93/5 93/6 95/4 96/9
99/24 102/10 102/12
104/4 104/18 106/16
110/18 110/19
110/23
Adams [2]   38/17
63/3
add [3]   83/24 90/7
99/13
added [1]   28/4
adding [3]   90/6
90/6 100/3
addition [3]   56/24
94/16 95/8
additional [16]
58/9 63/24 65/11
70/3 77/2 85/6 91/1
91/2 91/23 92/6
92/9 92/15 93/19
99/7 100/4 110/5
additionally [1]
5/25
address [14]   13/6
13/13 19/20 20/14
37/19 38/1 41/4
56/14 59/20 63/14
93/17 109/6 110/14
110/15
addressed [2]   10/8
14/20
adequacy [2]   22/16
37/14
adequate [16]   21/3
21/5 32/19 32/22

---

**115**

# A

**adequate [8]**
58/22 65/7 66/15
72/17 72/23 73/1
73/5 90/1 91/8
99/24 104/6 105/11
**adequately [4]**
33/21 58/8 97/5
101/14
**adjourned [3]**
112/24 113/1 113/2
**adjudicated [1]**
35/17
**adjudicates [1]**
94/6
**adjudication [1]**
94/9
**adjusted [3]** 28/20
29/1 85/17
**adjustments [3]**
85/22 86/10 86/23
**administered [1]**
23/17
**administration [1]**
23/1
**administrative [22]**
5/18 19/12 19/13
21/13 22/17 22/21
31/19 31/20 45/19
48/22 54/19 54/21
55/6 55/11 55/15
55/18 55/24 68/1
69/14 93/1 96/24
109/1
**administrator [2]**
105/2 105/3
**administrators [1]**
102/9
**admission [1]** 6/14
**admit [2]** 40/5
53/24
**adopt [1]** 13/24
**advance [1]** 9/4
**adverse [1]** 17/4
**advisor [2]** 83/11
83/15
**advisors [12]** 36/11
36/13 82/2 83/4
83/10 84/8 84/17
84/19 84/22 84/24
99/10 111/7
**affidavit [1]** 6/14
**affirmative [1]**
6/11
**affirmatively [2]**
102/12 107/17
**affirmed [2]** 95/10
95/17
**African [2]** 28/13
28/17
**after [13]** 3/20
15/8 27/9 48/8 48/9
76/10 76/18 76/22
79/19 82/4 82/4
87/16 106/18
**again [86]** 7/15
8/11 9/19 14/12
15/13 16/23 18/6
19/8 19/9 20/3 20/7
21/8 22/10 22/15
22/20 24/11 25/2
26/5 30/22 31/10
31/16 31/20 36/4
36/11 37/5 37/9
38/25 39/12 40/1
45/2 48/15 48/24
48/25 53/25 55/1
58/20 59/1 59/4
59/23 60/15 61/19
63/21 64/14 65/15
67/9 67/17 71/13
72/6 72/15 76/2
76/4 77/22 79/15
79/19 80/23 81/15
81/23 82/20 83/3
83/22 84/4 84/20
85/2 87/25 88/20
89/17 91/15 92/22
94/11 94/23 95/4
95/15 97/12 97/14
98/6 98/10 98/21
99/4 99/21 103/5
107/13 109/8 110/2
111/3 111/14 112/12
**against [8]** 7/14
23/15 25/16 25/21
34/21 58/4 59/13
90/25
**age [1]** 85/18
**aggregate [1]** 14/7
**ago [1]** 96/14
**agree [8]** 41/13
41/21 41/23 56/17
68/5 92/8 98/2
104/25
**agreed [3]** 47/7
85/3 111/25
**agrees [1]** 105/3
**Ah [1]** 12/3
**ahead [6]** 9/4 16/23
19/6 22/2 25/13
30/7
**aid [1]** 82/17
**aided [1]** 1/22
**aim [1]** 25/15
**aimed [1]** 60/7
**al [4]** 1/4 1/7 2/5
2/6
**alarming [1]** 24/18
**ALFORD [2]** 1/4 2/5
**align [1]** 45/12
**all [155]**
**allegation [16]**
38/5 48/6 49/7
59/23 59/25 69/12
69/17 73/9 75/24
77/25 78/7 81/6
81/16 81/23 83/22
89/20
**allegations [17]**
14/22 48/5 58/15
63/18 66/6 66/8
69/4 78/3 89/4
92/23 98/14 98/15
99/1 108/12 109/3
109/4 110/4
**allege [4]** 68/10
77/16 94/3 94/17
**alleged [17]** 20/14
48/9 64/25 69/22
77/2 80/3 80/6 81/8
81/23 88/25 89/6
89/13 90/5 93/4
110/21 110/22
111/13
**allegedly [3]** 32/13
92/16 111/11
**alleges [2]** 81/8
100/9
**alleging [4]** 13/17
74/3 105/8 108/7
105/20 105/21 106/1
106/10 95/21 36/19
54/22 58/9 63/22
99/7 109/25
**allowed [10]** 15/7
46/24 57/1 57/15
57/18 61/20 62/10
70/7 86/9 97/17
**allowing [1]** 35/20
**allows [6]** 37/11
47/1 51/23 62/1
99/4 105/11
**almost [2]** 52/13
98/14
**alone [3]** 20/6 24/6
90/12
**along [3]** 6/24
56/23 90/21
**already [38]** 14/20
21/3 23/8 27/25
29/18 29/21 30/22
30/23 42/7 43/22
48/15 53/2 53/10
53/15 54/4 54/4
54/6 58/2 58/4
58/22 61/25 62/16
63/21 64/3 64/19
65/15 66/2 66/11
66/20 67/21 68/25
83/9 85/6 90/7
90/15 90/25 91/12
100/5
**also [18]** 6/2 12/21
16/23 29/12 39/10
39/21 39/22 51/18
53/5 61/15 78/17
86/5 91/18 94/11
94/16 105/5 108/8
108/20
**alter [1]** 82/25
**although [4]** 58/11
72/21 78/4 97/4
**always [3]** 97/6
103/23 111/20
**am [11]** 3/16 7/17
7/18 7/20 9/11
31/21 37/21 52/20
86/8 103/25 105/7
**amended [5]** 48/8
48/24 72/19 96/15
108/13
**American [1]** 28/17
**Americans [1]** 28/13
**among [5]** 56/21
66/6 84/6 91/17
100/10
**amount [3]** 9/9
15/18 19/9
**amounted [1]** 71/4
**amounts [1]** 44/13
**analyses [1]** 60/23
**analysis [5]** 8/7
30/20 45/7 46/15
49/5
**analyze [1]** 46/10
**annual [1]** 40/3
**anomalous [1]** 47/16
**another [9]** 9/1
16/25 18/12 21/11
33/24 50/25 76/11
81/22 100/24
**answer [9]** 8/3 18/2
66/10 67/4 78/12
79/7 86/14 88/7
105/22
**anticipate [1]**
107/3
**any [64]** 5/12 5/17
5/19 9/3 12/5 15/9
18/25 19/2 20/5
22/10 22/13 27/4
33/6 37/9 39/13
39/14 41/8 41/16
41/16 42/15 46/15
46/16 50/8 50/20
53/14 57/4 57/4
62/20 65/24 66/21
70/5 70/6 70/24
72/20 73/7 73/15
73/20 73/21 75/13
76/18 76/23 77/8
79/21 80/3 80/19
81/10 81/11 81/12
82/15 83/22 84/22
86/8 87/20 88/9
88/24 89/1 92/20
93/15 94/25 100/20
100/22 102/1 104/1
104/25
**anybody [4]** 69/1
69/2 87/11 100/11
**anymore [2]** 18/11
111/17
**anything [14]** 50/25
57/22 69/2 75/9
77/1 77/10 79/23
81/5 86/22 87/12
90/8 92/16 99/14
106/12
**anyway [1]** 70/25
**apart [2]** 13/10
19/24
**apologize [3]** 9/4
101/6 104/11
**apparently [3]** 8/21
11/9 23/4
**appealed [1]** 36/8
**appeals [2]** 35/16
71/18
**appearing [1]**
109/22
**appended [1]** 4/3
**applicable [2]**
18/23 20/11
**applicant [4]** 7/11
8/12 43/15 47/13
**applicants [6]** 6/19
13/8 21/9 30/24
106/16 109/11
**application [33]**
6/22 7/10 7/14 34/5
41/15 42/25 45/21
46/6 47/2 48/16
49/22 71/17 71/23
72/21 72/25 73/8
74/21 75/14 77/14
78/10 78/25 79/18
79/23 80/4 80/6
80/23 81/10 81/15
81/20 88/1 88/25
92/20 98/17
**applications [9]**
13/11 28/8 41/12
44/5 44/18 45/1
106/14 109/9 109/24
**applied [11]** 8/13
16/10 28/14 29/1
62/24 67/21 71/6
72/10 73/1 73/22
**applies [3]** 45/3
91/7 105/23
**apply [10]** 45/7
57/7 80/19 85/23
86/1 88/4 105/24
106/3 106/8 106/13
**applying [2]** 4/16
70/3
**appreciate [5]** 9/19
40/23 59/16 100/16
112/22
**approach [2]** 10/14
98/2
**appropriate [2]**
4/12 112/11
**approval [4]** 43/1
44/8 94/12 94/15
**approve [1]** 19/11
**approved [5]** 43/1
49/21 61/1 61/25
109/23
**approves [2]** 6/23
110/7
**approving [1]** 60/25
**April [5]** 4/8 41/14
47/2 62/17 67/11
**April 1st [2]** 4/8
47/2
**April 2018 [1]**
62/17
**AR [3]** 5/18 33/11
39/13
**arbitration [1]**
96/13
**are [145]**
**area [1]** 29/20
**aren't [4]** 24/1
42/15 99/19 110/23
**arguing [3]** 23/2
105/10 107/14
**argument [13]** 3/4
3/16 3/19 5/24 9/8
11/10 37/20 42/6
53/1 59/7 100/21
109/6 109/22
**arguments [1]**
112/22
**arise [1]** 39/5
**arises [1]** 92/3
**Armstrong [1]** 96/12
**around [2]** 94/14
107/22
**arriving [1]** 91/10
**ARs [1]** 103/1
**articulate [2]**
32/12 111/21
**articulated [1]**
68/24
**articulating [1]**
32/20
**as [120]**
**Ashmore [1]** 96/17
**aside [4]** 6/7 8/5
9/8 34/9
**ask [5]** 10/23 67/23
67/24 101/10 110/14
**asked [4]** 19/19
41/5 88/3 108/25
**asking [14]** 19/11
44/10 44/17 63/12
62/24 66/25 82/18
86/11 88/5 105/5
106/15 108/20

# A

**asking [2]** 108/22 109/10
**asks [1]** 88/11
**Aslan [2]** 3/13 110/7
**assert [2]** 5/17 5/20
**asserted [2]** 36/18 57/8 58/4
**asserting [1]** 36/18
**assertion [3]** 5/25 42/18 56/14
**asserts [2]** 5/16 69/9
**assess [16]** 33/21 35/21 48/23 49/6 55/14 64/16 66/15 81/6 81/9 83/25 85/7 89/5 91/8 91/14 97/22 111/10
**assessed [2]** 58/9 100/13
**assessing [3]** 58/21 63/20 63/25
**assessment [4]** 12/19 54/11 62/1 99/7
**assessments [2]** 64/3 64/3
**assign [2]** 51/8 51/17
**assigned [13]** 42/22 43/3 44/3 44/7 45/2 45/8 45/23 48/21 49/23 52/6 52/11 52/14 61/7
**assigning [2]** 51/5 61/24
**assignments [3]** 52/1 60/10 69/18
**assistance [1]** 78/17
**associate [1]** 31/22
**associated [1]** 63/7
**association [3]** 50/1 82/7 83/14
**assume [5]** 6/23 7/1 17/3 68/17 68/18
**assuming [1]** 17/2
**assumption [1]** 7/5
**assure [1]** 108/15
**Athlaw [2]** 2/12 2/15
**attach [4]** 75/17 79/21 80/1 92/19
**attached [4]** 17/22 45/17 70/15 76/2
**attacking [1]** 27/5
**attempted [1]** 10/25
**attend [1]** 96/18
**attendance [1]** 78/14
**attention [2]** 9/20 21/25
**attitude [1]** 78/18
**attorney [1]** 7/18
**attorneys [1]** 103/23
**attributable [1]** 93/8
**attributed [2]** 7/12 43/11
**attribution [1]** 45/6

**audit [2]** 104/10
**August [4]** 41/13 41/17 44/1
**authorities [1]** 56/11
**authority [2]** 14/1 18/25
**available [4]** 29/13 50/3 51/10 85/21
**average [5]** 28/23 28/24 61/5 62/13 95/3
**averages [2]** 62/18 64/2
**award [5]** 76/1 76/10 76/11 76/12 95/24
**awarded [1]** 21/7 21/10 42/24
**awarding [2]** 76/6 107/4
**aware [5]** 4/21 55/21 82/3 86/8 87/8
**away [1]** 72/8

# B

**back [17]** 3/13 9/3 16/8 16/12 21/16 29/21 39/21 40/25 42/4 59/9 65/20 83/17 100/25 105/17 112/2 112/12 112/14
**back-factual [1]** 39/21
**backdrop [1]** 34/21
**background [2]** 7/17 58/21
**bad [3]** 13/4 38/18 61/22
**Balkin [8]** 12/13 38/10 55/9 55/12 57/9 57/25 62/11 77/22
**Baltimore [3]** 1/7 1/25 112/14
**banked [1]** 8/19
**Barnett [12]** 1/15 2/10 3/19 3/22 10/23 41/5 41/12 42/18 67/24 101/9 103/17 110/15
**Barnett's [2]** 55/20 56/14
**based [32]** 4/6 5/19 16/14 17/12 17/18 17/19 17/19 17/21 19/22 19/24 25/23 39/22 44/9 45/24 46/17 47/10 48/23 50/16 51/8 51/17 64/3 68/15 74/8 76/25 85/13 86/10 88/14 92/16 101/15 104/25 105/22 107/23
**bases [1]** 20/5
**basically [5]** 5/14 6/21 21/9 69/19 71/23
**basis [17]** 7/4 7/22 20/4 24/6 30/19 39/21 48/9 48/22 50/21 55/13 61/20

62/5 78/19 89/1 90/13 94/1 100/14
**batting [5]** 61/7 62/13 62/18 64/2
**be [114]** 4/21 5/6 5/8 5/9 9/15 9/17 10/3 10/8 10/13 13/16 14/5 16/18 19/16 19/19 19/22 20/6 22/20 24/20 24/21 28/18 28/18 33/12 36/8 37/7 38/18 40/22 41/4 41/10 41/24 42/11 42/12 42/23 42/24 43/3 44/9 44/19 44/21 45/4 45/25 45/25 46/22 50/8 51/12 51/15 51/18 57/10 57/11 60/9 61/2 61/16 68/14 68/15 70/6 70/8 71/8 72/22 73/17 74/2 74/9 74/19 76/4 77/13 77/21 78/8 79/4 79/8 79/13 86/6 86/13 86/21 88/15 88/16 89/8 89/21 90/14 90/17 91/1 91/17 93/4 98/3 98/19 99/8 100/2 100/13 100/15 101/2 101/10 102/12 102/15 102/16 102/23 103/8 103/9 103/13 103/13 103/14 103/20 103/24 103/25 107/8 107/19 108/7 108/21 109/14 109/18 109/19 109/22 111/6 111/10 111/22 112/6 112/11 112/17
**bear [3]** 3/14 64/9 110/12
**bearing [1]** 39/2
**became [1]** 87/8
**because [91]** 3/5 4/15 5/24 8/2 12/21 12/25 14/9 15/14 18/17 19/12 21/19 22/4 22/25 23/7 24/1 26/14 27/24 29/11 29/13 30/3 30/7 31/16 32/21 33/3 35/6 35/20 38/3 39/5 39/21 41/9 42/21 42/25 44/2 46/2 47/22 48/4 49/20 50/5 53/14 53/23 54/2 54/4 54/23 56/15 57/6 59/10 59/20 60/24 62/25 63/1 63/12 64/8 67/9 70/11 71/4 71/25 75/4 76/10 78/13 82/5 82/17 85/2 86/20 86/25 88/18 88/24 93/14 93/18 94/8 95/22 96/2 96/7 96/18 96/22 96/25 98/3 102/13 104/14 104/17

104/21 105/1 106/2 107/22 108/16 108/21
**because it [1]** 96/22
**become [2]** 25/11 110/4
**been [40]** 3/12 11/23 13/19 18/10 24/3 27/8 29/4 37/5 38/12 41/12 42/15 46/14 48/15 50/5 57/16 58/2 58/4 58/10 58/17 59/1 61/19 67/21 67/25 68/24 68/25 71/4 73/22 82/1 86/6 86/12 87/21 89/20 90/15 93/13 93/25 96/15 97/9 98/18 105/1 108/18
**before [24]** 1/11 2/4 4/11 11/22 13/6 14/12 15/10 19/3 19/4 19/23 20/16 26/8 41/3 41/13 42/6 42/7 46/12 56/3 67/23 75/10 85/1 88/16 112/4
**began [1]** 42/6
**begin [2]** 4/11 108/3
**beginning [4]** 21/24 39/20 48/17 108/8
**behalf [10]** 1/15 1/17 2/10 2/12 2/15 2/17 2/20 2/21 4/15 46/3
**being [19]** 11/19 11/24 13/5 13/21 14/16 17/20 17/20 23/13 28/5 28/13 28/18 28/19 80/6 86/17 87/11 97/21 102/18 104/22 109/19
**believe [13]** 4/20 6/9 14/13 21/12 26/22 32/22 38/20 38/25 39/14 56/2 106/20 107/22 112/3
**believed [1]** 50/6
**bench [1]** 111/23
**beneficial [1]** 43/17
**benefit [26]** 1/7 2/6 7/14 13/11 41/8 42/12 42/15 45/15 45/16 45/21 47/2 48/19 48/21 49/11 49/23 51/8 52/10 52/12 54/14 54/16 54/18 56/24 64/5 77/5 106/13 111/20
**benefits [42]** 4/17 6/25 7/10 7/11 8/13 13/9 14/17 16/17 22/17 23/13 24/3 35/16 39/5 42/24 49/10 49/17 49/19 49/21 50/1 57/16 57/17 80/10 80/17 80/22 82/9 94/12

94/18 94/21 94/25 95/2 95/24 97/16 104/8 105/12 105/25 106/2 106/8 106/25 107/4 109/10
**Benjamin [2]** 1/15 2/9
**best [5]** 23/12 25/24 50/20 51/1 87/22
**between [3]** 15/17 30/23 94/18
**beyond [6]** 19/12 55/6 55/11 85/6 90/7 91/5
**bias [20]** 15/12 15/21 16/1 23/1 23/16 26/2 27/23 36/20 48/7 48/23 50/21 50/24 58/15 59/24 63/16 63/20 63/25 64/16 89/6 111/10
**biased [6]** 15/24 25/25 29/7 38/18 48/12 60/4
**billion [1]** 94/18
**birth [1]** 42/3
**bit [7]** 3/10 14/4 16/7 16/13 22/8 29/17 43/20
**bizarre [1]** 18/7
**black [1]** 54/12
**black-letter [1]** 54/12
**blah [3]** 103/3 103/4 103/4
**blind [1]** 102/19
**blindness [2]** 104/16 104/17
**block [1]** 59/11
**blocks [1]** 110/4
**blown [1]** 54/22
**blue [1]** 102/20
**board [25]** 6/23 7/1 31/18 33/16 33/17 34/14 36/8 36/9 36/12 41/10 41/16 48/1 60/7 60/8 60/8 60/11 63/23 73/22 77/17 80/9 82/5 84/24 89/24 95/16 96/7
**board's [3]** 32/20 79/17 95/17
**body [4]** 3/23 63/18 85/21 97/9
**boiled [2]** 25/6 25/24
**boils [1]** 109/23
**books [1]** 102/20
**Booth [23]** 5/4 5/6 5/10 12/19 19/20 20/2 47/22 48/4 53/8 54/9 58/23 60/16 63/11 63/14 63/20 89/3 91/7 91/10 92/1 97/5 98/24 100/18 110/19
**both [21]** 13/19 20/15 28/12 36/11 37/19 38/9 43/21 45/22 47/10 48/23 56/4 57/9 63/16

**B**

both... [14] 54/1
94/9 94/13 96/4
106/19 107/11
107/19 107/20
**bottom [1]** 38/17
**bounds [2]** 54/6
56/20
**Brahin [5]** 45/18
79/2 79/4 79/7 79/8
**brain [10]** 24/25
25/4 25/6 25/17
25/24 26/12 26/14
26/17 77/7 77/14
**breach [2]** 56/18
56/21
**breaches [3]** 5/7
13/17 18/5
**breadcrumbs [1]**
43/17
**break [3]** 41/1
98/13 101/5
**Bredar [2]** 57/24
58/6
**bridge [1]** 16/25
**brief [11]** 40/23
64/6 64/10 64/11
64/23 69/23 73/3
103/24 103/25
110/10 110/20
**briefed [1]** 93/13
**briefing [14]** 6/10
10/4 10/4 11/14
11/23 11/24 13/14
20/8 20/17 37/20
53/14 53/24 58/13
100/1
**briefly [2]** 12/17
39/19
**briefs [1]** 26/5
**bring [5]** 10/24
46/15 59/9 87/3
110/6
**bringing [1]** 23/14
**broad [2]** 57/13
97/15
**broader [1]** 63/7
**Brumm [1]** 18/18
**building [1]** 110/4
**built [2]** 14/17
41/9
**bullet [2]** 25/10
85/12
**bullets [3]** 69/24
70/1 72/15
**bunch [1]** 91/2
**burden [2]** 55/10
77/22
**bureaucratic [1]**
106/17
**business [2]** 8/22
65/3
**buy [1]** 69/4

**C**

**calculate [5]** 49/24
51/23 52/3 62/18
63/22
**calculated [1]**
51/23
**calculations [1]**
5/19
**call [3]** 2/2 5/18
56/7
**called [2]** 59/22

85/20
**calling [1]** 26/23
**calls [1]** 61/14
**came [7]** 23/4 26/6
37/19 38/23 42/17
70/21 101/6
**camera [1]** 51/14
**can [60]** 4/6 5/16
6/5 7/23 11/1 11/13
14/5 16/23 17/2
17/11 21/14 23/18
24/20 24/21 26/4
36/8 39/6 40/24
45/9 45/14 46/10
47/3 49/24 51/23
51/25 52/3 52/4
52/8 52/15 52/15
56/14 58/24 62/18
64/3 65/8 66/10
67/3 67/4 68/10
69/1 70/23 77/2
78/23 85/5 85/20
89/19 90/3 92/4
94/21 98/8 99/12
99/22 101/16 103/5
103/8 104/11 107/2
107/2 108/9 111/10
**can't [16]** 18/11
19/22 42/24 46/16
82/19 83/1 83/5
90/16 91/16 92/8
95/24 107/3 107/9
107/19 107/21
107/24
**candidly [1]** 108/8
**candor [1]** 112/7
**cannot [1]** 5/21
**capacity [1]** 6/4
**Caplan [1]** 56/23
**capture [1]** 8/22
**captured [1]** 8/21
**captures [1]** 8/17
**car [1]** 26/11
**care [3]** 18/6 74/17
104/7
**careful [2]** 57/7
57/9
**Casco [1]** 102/5
**case [125]**
**cases [46]** 14/12
18/21 28/14 37/8
44/10 47/20 52/5
53/17 55/7 55/18
56/3 56/6 56/15
56/18 56/20 56/21
57/1 57/4 57/6
58/12 61/13 61/14
61/19 62/9 62/10
62/20 67/25 68/2
90/24 93/17 93/19
93/21 93/23 95/7
95/10 96/2 96/5
96/7 96/9 96/10
97/8 97/10 98/3
109/2 109/16 111/20
**catastrophic [2]**
80/11 80/21
**categories [3]**
68/20 79/25 80/7
**category [1]** 57/15
**Caucasian [3]** 28/22
28/25 86/20
**Caucasians [2]**
28/13 28/19
**caused [1]** 96/13

**cavalier [1]** 109/22
**certain [2]** 4/2
30/1 31/4 43/10
93/19
**certainly [4]** 6/6
74/20 82/17 107/2
**CERTIFICATE [1]**
113/4
**certification [7]**
3/8 6/10 51/3 84/12
84/14 94/20 94/23
**Certified [1]** 114/4
**certify [3]** 50/24
84/10 114/6
**certifying [1]**
84/13
**cetera [5]** 68/4
68/4 88/18 103/10
111/6
**challenges [1]** 23/8
**change [2]** 69/10
69/11
**changed [4]** 62/23
70/18 70/24 96/15
**charged [1]** 102/15
**chart [2]** 58/24
62/9
**Chavis [8]** 4/21
12/13 13/20 14/9
56/22 57/11 57/13
62/12
**check [2]** 103/9
105/4
**chief [1]** 62/4
**chiefly [1]** 56/15
**child [1]** 26/12
**Chughtai [6]** 12/13
38/10 56/22 57/8
57/25 62/12
**circuit [23]** 13/20
19/10 40/13 54/13
55/1 56/8 56/9
56/10 56/11 58/15
59/2 59/3 59/24
60/2 60/3 70/20
71/5 71/18 72/3
96/3 97/23 97/24
108/23
**Circuit's [2]** 12/12
58/13
**circumstance [1]**
43/14
**circumstances [9]**
39/6 43/10 55/7
57/11 62/24 69/11
70/19 70/24 94/4
**citation [2]** 59/8
101/23
**citations [1]** 24/2
**cite [26]** 18/21
32/14 57/19 58/12
59/5 63/3 70/14
77/8 77/10 77/12
77/15 79/20 80/2
80/3 80/20 81/3
81/21 92/17 95/19
96/4 96/12 96/17
98/11 98/14 101/19
102/6
**cited [13]** 34/11
35/6 55/9 56/3
56/20 57/5 57/24
76/21 78/22 90/24
94/19 102/1 102/11

**cites [3]** 18/18
**citing [1]** 112/4
**civil [2]** 1/5 2/4
**claim [31]** 4/25
13/11 14/4 14/4
14/5 14/8 15/12
15/21 16/5 33/7
36/23 41/8 44/3
48/19 56/25 56/25
61/3 62/5 67/10
68/22 69/3 69/5
84/4 85/4 88/14
91/19 91/21 97/17
98/18 99/24 102/8
**claimant [3]** 49/21
69/7 97/8
**claimants [9]** 30/11
30/12 30/14 49/17
62/23 64/18 65/14
67/13 68/3
**claimants' [1]**
89/10
**claimed [1]** 55/25
**claiming [1]** 62/3
**claims [94]** 5/7 6/9
6/12 12/10 12/16
13/1 13/12 13/19
13/21 13/25 14/7
15/14 18/4 18/23
19/5 19/14 19/24
22/19 23/1 25/4
25/5 25/17 25/17
25/21 25/23 29/8
35/16 38/2 39/2
41/18 41/19 42/3
42/8 42/12 42/15
42/25 44/1 44/5
46/8 46/17 46/18
47/22 47/25 48/13
48/18 48/16 49/25
52/15 52/18 52/19
53/12 54/18 55/2
55/23 56/16 56/19
56/21 56/24 57/3
58/11 60/9 60/25
61/24 61/25 62/15
62/17 62/20 62/21
62/22 63/10 64/19
65/9 68/12 68/14
68/18 88/21 89/10
89/14 94/3 94/5
99/4 105/22 105/24
105/25 106/23
107/13 107/15
107/22 107/24
107/25 108/21 109/3
110/4 111/9
**clandestine [1]**
80/9
**Clark [5]** 55/13
57/23 77/23 90/23
97/12
**class [10]** 3/7 5/7
6/10 17/5 51/3 69/7
91/20 94/19 94/23
96/23
**clear [9]** 6/16
11/23 12/7 27/23
39/3 62/24 70/19
107/15 109/14
**clearly [4]** 4/24
16/19 19/17
**client [1]** 101/14
**clock [1]** 9/18

**close [2]** 73/24
102/7
**closed [1]** 12/6
**cloud [31]** 15/8
20/25 23/2 23/6
23/19 30/15 30/16
31/16 31/17 33/16
34/9 34/22 35/1
39/12 56/24 62/21
62/21 69/6 70/17
70/17 70/23 71/6
72/9 80/13 83/11
97/8 97/14 106/1
106/2 106/6 106/6
**cogent [1]** 112/7
**cognitive [7]** 78/6
78/6 78/13 79/3
79/5 79/9 79/13
**collision [1]** 80/11
**color [1]** 17/21
**combination [1]**
43/21
**come [23]** 11/8
11/22 18/6 31/23
36/9 39/8 40/25
50/18 58/7 68/10
70/5 77/23 84/7
89/18 93/4 97/19
98/13 100/25 101/7
111/21 112/1 112/12
112/14
**comes [3]** 2/6 73/24
80/5
**comfortable [3]**
2/25 101/11 110/13
**coming [2]** 12/5
21/21 33/9
**comment [1]** 59/5
**commenting [1]**
95/15
**comments [1]** 31/11
**committee [11]** 6/23
7/4 32/15 36/7 36/7
36/10 36/12 84/16
84/18 84/25 111/14
**common [2]** 13/24
31/10
**communicate [1]**
10/19
**communicated [2]**
106/16 109/11
**compare [1]** 59/13
**compel [13]** 3/2
3/10 10/22 12/1
12/8 12/25 17/23
23/21 32/14 41/3
51/4 53/19 53/23
**compensate [1]**
78/16
**compensated [2]**
64/16 64/17
**compensation [15]**
6/19 15/16 40/3
49/9 49/15 51/20
58/25 64/20 64/24
65/2 65/3 65/7
65/11 106/22 107/7
**complain [2]** 5/20
90/14
**complaining [1]**
37/22
**complaint [20]**
10/25 48/8 48/25
61/21 62/4 65/1
70/14 72/19 72/24
75/2 75/11 75/17

**C**

complained [3] 77/11 80/3 81/5 81/21 90/13 92/24 98/15 108/13
complaints [3] 78/14 88/19 90/5
complete [3] 11/23 11/25 98/24
completely [9] 26/15 32/5 72/1 90/8 94/17 95/5 96/15 98/19 100/2
completeness [1] 55/18
complex [1] 86/14
comply [1] 31/8
composed [1] 82/6
Computer [1] 1/22
Computer-aided [1] 1/22
concentrate [1] 63/16
concern [2] 32/20 39/6
concerned [2] 43/5 112/20
concerning [1] 81/19
concerns [2] 23/8 74/16
conclude [2] 58/10 61/15
concluded [4] 4/20 26/13 47/10 79/2
concludes [1] 71/1
conclusion [11] 26/16 31/25 33/9 34/14 36/24 43/12 43/16 74/5 79/15 83/12 104/25
conclusions [7] 23/15 40/2 45/9 45/25 49/13 65/13 65/22
condition [1] 21/10
conditions [1] 14/19
conduct [4] 14/6 36/6 54/10 56/1
conducting [3] 36/13 36/14 101/20
conducts [1] 61/3
conference [4] 12/18 29/22 40/9 114/10
conferences [1] 92/18
confidence [2] 44/21 44/22
confident [1] 100/2
conflict [16] 22/10 22/12 22/13 22/16 38/15 38/25 39/1 39/14 39/16 51/13 51/19 55/14 57/20 57/21 63/21 82/5
conflicted [1] 36/25
conflicts [3] 13/3 39/5 39/7
conformance [1] 114/10
confused [1] 7/15
Conkright [1] 54/20

connection [1] 82/8
consider [3] 17/13 20/24 86/16
consideration [5] 5/5 17/2 20/24 28/7 81/1
considered [7] 14/6 16/18 17/3 17/20 73/17 86/13 86/25
considering [2] 28/18 28/22
considers [1] 17/24
consistency [3] 81/24 110/21 111/12
consistent [12] 22/13 30/10 30/21 37/15 75/6 79/4 79/8 79/13 97/20 98/25 104/9 105/13
consistently [5] 30/12 48/1 81/6 81/16 84/3
consolidate [1] 20/9
constitute [2] 41/17 76/19
constrained [2] 69/8 69/10
constructive [2] 102/14 102/23
consulting [2] 26/9 27/12
contain [6] 19/13 32/12 39/23 40/1 104/14 106/21
contains [1] 106/20
contend [7] 5/1 5/4 6/2 66/2 66/11 66/14 66/19
contends [1] 110/15
content [1] 4/6
contention [2] 6/5 15/14 36/14
contentions [1] 66/4
contest [2] 51/24 52/15
contested [1] 88/15
contesting [1] 54/16
context [3] 14/21 74/20 80/14
contexts [1] 39/6
continue [1] 17/11
continued [1] 51/19
continuing [1] 29/6
continuous [1] 18/8
continuously [1] 14/10
contract [2] 27/18 27/19
contractor [1] 59/18
contracts [2] 50/9 50/15
Contrary [1] 80/7
control [2] 107/2 107/2
convenience [1] 20/9
convince [2] 25/5 25/24

convinced [2] 70/5 100/2
convincing [2] 62/24 70/19
Cook [3] 75/23 75/24 76/2
copy [4] 10/1 10/10 10/12 10/24
core [1] 29/8
corpus [1] 83/24
correct [21] 4/9 4/10 4/19 7/8 11/13 17/18 19/25 28/9 29/14 29/14 32/2 34/20 34/23 46/25 70/6 86/12 90/23 98/1 102/5 104/12 114/7
corrected [1] 85/17
correctly [1] 42/20
correlation [1] 15/17
correspondence [1] 108/14
costs [1] 54/22
could [19] 41/20 42/4 50/8 51/18 58/16 61/6 69/19 75/4 75/5 75/6 77/12 79/4 79/8 79/12 80/17 87/6 98/13 108/6 108/6
couldn't [4] 23/11 51/7 51/13 88/7
Coulson [1] 13/20
counsel [8] 2/8 10/2 11/8 55/21 61/8 111/24 112/18 112/21
counseled [1] 98/1
count [1] 41/15
country [1] 23/9
counts [1] 19/5
couple [2] 3/3 16/16 18/18 29/11 62/14 98/16 105/18
coupled [1] 115/15
course [9] 8/25 44/12 45/15 50/2 88/13 93/23 97/6 97/23 98/18
court [158]
court's [12] 5/4 11/22 12/7 12/19 23/8 38/1 53/9 92/23 95/10 99/14 100/16 112/23
courts [16] 14/5 18/19 18/20 21/4 22/15 22/18 23/9 24/4 37/5 37/6 38/7 54/6 57/7 69/15 93/18 98/11
courts' [1] 23/15
cover [2] 42/17 53/19
covered [2] 54/2 89/6
create [1] 84/20
created [2] 19/19 19/19
creating [1] 102/24
credit [3] 8/9 22/7 84/7
credited [2] 7/12

8/14
critical [8] 5/8 12/25 15/3 16/4 29/3 38/6 40/18 110/2
criticism [1] 96/4
criticisms [1] 20/12
criticized [3] 18/19 24/5 93/18
cross [1] 17/1
CRR [2] 1/23 114/16
crunch [4] 46/14 46/17 46/24 47/3
cry [2] 69/3 97/10
cumulative [5] 81/2 81/7 81/9 81/11 81/13
current [2] 25/23 33/17
currently [1] 104/10
cut [2] 41/24 42/11
cut-off [2] 41/24 42/11
cv [1] 1/6

**D**

daily [1] 7/22
Damron [3] 1/16 2/14 10/18
darn [2] 40/10 40/11
data [46] 6/12 6/13 6/16 8/6 8/7 12/21 39/18 39/20 40/5 42/3 42/8 42/20 42/25 44/5 44/13 46/8 46/18 46/19 46/25 48/14 48/16 51/22 52/18 58/11 58/17 60/9 61/25 62/15 62/17 63/10 64/19 65/8 69/18 89/11 89/14 99/4 101/13 101/15 102/2 102/7 102/7 106/19 106/24 107/10 108/12 111/10
database [3] 102/13 102/25 103/2
date [10] 4/18 4/19 4/20 5/2 27/25 39/22 41/14 41/15 41/16 111/25
Dated [1] 114/12
dates [2] 48/20 89/9
day [4] 49/20 50/6 71/5 114/12
days [1] 76/3
de [4] 36/6 36/9 36/14 111/14
deadline [1] 46/12
deadlines [4] 3/6 3/18 55/17 82/14
deal [2] 63/17 87/11
dealing [3] 25/15 44/13 63/9
debated [1] 22/3
decide [2] 27/10 107/3

decided [3] 67/10 99/25
deciding [1] 87/23
decision [92] 4/24 6/8 7/4 8/9 8/18 8/22 8/24 12/8 12/12 15/5 15/6 16/3 16/8 16/18 16/20 17/9 17/14 18/7 19/17 19/23 22/22 27/5 27/9 30/13 30/20 31/3 31/7 31/8 32/20 35/18 36/1 36/8 36/10 36/15 37/4 37/6 37/15 37/16 37/17 37/24 38/1 38/4 38/14 39/24 41/10 41/16 41/16 43/10 47/20 48/21 53/7 54/21 55/13 56/9 56/9 57/24 58/13 58/14 59/18 65/19 67/19 70/18 71/5 71/7 71/10 71/20 71/23 72/4 78/23 80/8 80/20 82/25 83/2 89/7 91/25 93/12 97/23 99/18 99/23 106/6 106/7 106/15 106/18 106/24 109/13 109/14 109/16 110/24 110/25 111/5 112/3
decision-maker [1] 19/23
decision-making [4] 37/4 37/6 38/4 91/25
decision-makings [1] 93/12
decisional [2] 55/22 108/24
decisions [23] 12/13 14/17 14/17 15/10 15/24 16/11 36/7 37/12 39/5 39/23 40/14 47/8 47/9 54/5 56/7 56/10 57/25 91/9 91/11 95/11 95/25 104/8 105/12
deck [1] 46/23
declarants [1] 40/5
declaration [11] 4/7 6/21 42/21 43/22 51/2 51/24 55/20 82/1 82/2 94/23 102/11
declarations [2] 83/15 84/25
dedicated [1] 101/2
deeming [1] 36/22
default [2] 55/3 55/4
defeat [2] 25/5 25/22
defend [1] 25/21
defendant [7] 1/17 2/18 5/16 21/4 58/7 58/16 64/25
defendants [38] 1/8 5/16 5/20 5/23 6/7 7/9 8/6 14/2 18/20

**D**

defendant [23] 1/18 18/21 19/17 22/11 23/2 23/15 26/1 28/1 30/19 35/15 35/22 36/2 39/18 40/3 40/5 40/22 47/17 49/15 64/17 64/25 80/25 81/19 89/15 104/10 107/11 107/14 109/6 109/15 109/21 109/23
defendants' [5] 6/5 13/3 32/12 39/24 65/18
defending [2] 25/3 25/16
defense [6] 10/2 10/11 11/8 56/2 61/8 68/1
defenses [1] 12/17
defer [1] 96/5
deference [1] 36/10
deficiencies [1] 79/14
deficits [1] 78/19
defined [2] 4/5 71/4
definitely [1] 28/23
definition [3] 4/4 19/13 72/17
definitions [1] 70/24
degree [2] 37/20 39/8
delays [1] 96/13
delegated [1] 84/9
delegation [1] 99/10
deliberately [1] 61/24
delineate [1] 39/4
demanded [1] 5/22
Demer [1] 58/13
demographic [5] 24/21 24/23 28/11 28/22 86/23
demographically [2] 28/25 85/16
demonstrable [1] 90/15
demonstrate [13] 5/3 15/16 16/14 43/14 52/23 59/22 75/19 90/16 90/17 90/20 92/20 98/10 98/17
demonstrated [7] 51/13 63/21 68/18 68/20 70/10 70/12 78/5
demonstrates [2] 34/18 55/13
demonstrating [3] 7/5 41/25 72/22
demonstration [5] 70/2 70/8 73/6 75/13 80/23
denial [16] 13/11 38/9 49/10 49/17 49/19 51/8 51/11 51/17 51/21 52/4 52/12 52/13 54/16 100/13 102/14

105/24
105/18 [2] 49/1
97/13
denied [19] 23/13 43/1 50/1 56/11 56/18 57/14 57/18 57/19 59/1 59/2 59/3 61/25 63/7 96/17 97/15 97/16 100/10 100/12 106/1
denies [1] 31/8
Denis [2] 2/2 3/2
dense [1] 90/10
deny [3] 7/1 18/25 106/6
denying [2] 22/19 60/25
Department [3] 29/24 86/8 86/9
depending [3] 3/16 85/24 103/20
depends [3] 61/12 61/14 97/7
deposing [1] 99/8
depositions [8] 34/25 82/11 82/12 82/18 83/4 85/2 105/1 111/6
describe [6] 39/4 54/1 85/16 99/24
described [8] 4/5 29/12 49/5 50/19 77/17 102/11 105/5 107/16
describes [1] 51/5
describing [2] 34/12 77/5
description [1] 69/7
descriptions [1] 34/13
descriptive [1] 67/13
deserve [1] 82/10
deserving [1] 49/17
designed [2] 35/17 87/3
detailed [1] 65/3
determination [12] 21/3 21/5 22/17 71/18 72/18 72/23 73/2 74/15 79/17 89/23 90/1 97/21
determinations [3] 75/19 83/18 102/8
determinative [1] 29/10
determine [4] 31/13 61/4 75/8 93/9
determined [4] 31/17 41/8 82/4 86/19
determining [4] 17/24 73/17 86/17 87/1
develop [2] 42/6 82/15
devoted [1] 9/20
diagnosis [1] 79/11
dictate [1] 41/24
did [28] 9/8 11/8 20/25 23/12 31/14 43/3 46/15 49/21 56/18 60/12 62/19 64/22 76/11 76/12

76/17 79/7 81/13
81/22 [2] 49/11
97/25 99/1 99/14
100/17 102/6 106/3
106/7 111/16
didn't [21] 30/16 32/3 32/4 33/5 33/6 38/13 43/11 50/25 54/25 80/21 81/9 95/11 96/8 97/24 102/7 106/3 106/8 106/13 108/6 109/6 110/15
diet [1] 78/18
different [15] 19/9 38/3 39/7 48/5 58/7 65/4 73/2 83/5 84/18 96/1 102/9 102/9 105/21 105/23 109/2
differently [3] 17/20 28/13 51/25
difficult [1] 43/13
dig [1] 79/15
diminishing [1] 24/19
direct [1] 93/8
directive [3] 87/9 87/15 87/17
directly [7] 6/10 13/18 14/8 18/6 23/23 66/10 88/8
disability [10] 1/7 2/5 28/7 76/5 79/25 81/13 94/12 94/25 95/1 101/20
disabled [14] 42/23 43/3 44/9 46/1 73/18 74/3 75/8 75/12 81/2 86/17 86/20 95/23 96/7 96/8
disabuse [1] 5/12
disagree [4] 59/12 72/3 91/20 108/2
disagreed [2] 36/23 71/12
disagreeing [1] 71/21
disagreement [1] 43/15
disallowed [2] 86/5 86/6
discerned [1] 4/8
discharge [1] 101/14
discharging [1] 82/9
disclosed [1] 103/3
disclosure [3] 12/2 46/12 46/13
disclosures [1] 3/7
discover [1] 20/4
discoverable [1] 41/25
discovery [90] 3/3 3/6 4/2 4/22 11/10 12/14 13/15 13/15 13/25 14/24 15/1 19/1 19/8 20/5 20/6 21/12 24/7 24/13 31/17 31/18 33/16 35/20 37/10 37/25 38/8 38/12 38/20 38/24 39/13 40/12

53/22 53/25 54/3 54/7 54/10 54/17 54/22 55/19 55/24 55/25 56/18 57/1 57/10 57/14 57/15 57/20 58/12 58/25 60/7 61/20 62/11 62/12 63/5 69/14 70/4 70/7 71/3 71/11 71/24 72/1 72/4 77/24 88/24 92/9 92/15 93/10 93/19 96/24 96/24 97/5 97/10 97/15 97/21 98/6 98/10 105/15 106/1 106/2 106/4 106/7 107/21 108/8 108/23 109/1 109/19 110/1 110/2 110/3 110/5 110/6 110/17
discreet [1] 76/25
discrepancy [1] 21/11
discretion [5] 79/16 89/24 89/25 91/15 95/12
discriminatory [1] 85/12
discussed [4] 12/17 12/20 43/19 85/14
discussion [10] 20/10 37/23 41/5 42/18 47/6 65/9 92/7 93/9 103/20 109/13
disembodied [1] 112/19
dismiss [3] 41/7 61/10 61/16
dismissed [1] 56/23
disorder [1] 78/21
disproportionately [1] 17/4
disregard [1] 18/8
disregarded [2] 89/16 89/22
disregarding [1] 18/14
district [24] 1/1 1/1 12/12 19/10 26/7 26/8 26/10 26/15 27/5 30/15 30/18 38/7 40/14 56/8 56/10 57/24 61/8 62/11 63/4 70/22 96/4 108/24 114/5 114/6
DIVISION [1] 1/2
do [91] 6/4 9/23 10/10 10/20 10/25 12/21 12/22 14/24 16/2 16/22 17/21 18/11 18/12 19/11 21/25 22/1 23/1 24/1 27/1 30/13 30/20 31/13 31/18 33/18 35/5 35/23 36/9 44/1 45/23 46/2 46/4 51/6 51/7 51/7 51/25 55/6 56/16 59/17 60/23 61/9 61/22 64/3 66/2 66/11 66/14 68/5 68/7 70/6 70/10

72/23 73/3 73/21 77/6 77/12 78/20 81/24 84/24 85/5 86/3 87/20 88/9 88/10 91/4 95/19 96/20 96/21 97/3 98/5 100/22 102/9 104/11 105/4 106/17 107/9 107/20 108/10 109/2 111/18 111/18 111/19 111/22 111/22 111/24 111/25 112/2 112/8 112/11 112/16 114/6
docket [1] 43/23
doctor [13] 7/12 17/11 17/23 26/20 26/24 26/24 49/5 50/2 51/10 76/11 81/12 93/15 107/3
doctor's [1] 38/9
doctors [7] 7/10 7/11 7/13 13/5 38/18 45/7 62/14
doctors' [1] 42/19
document [2] 3/3 112/4
documentation [2] 67/13 68/1
documents [52] 5/25 7/5 11/9 13/2 15/4 16/17 17/12 17/22 19/23 31/11 31/18 31/20 32/5 32/13 33/11 36/2 36/4 39/24 42/10 42/14 53/6 63/10 63/24 64/9 66/2 66/20 67/1 67/3 68/21 70/7 79/11 81/19 82/18 85/6 88/17 90/6 93/15 97/1 99/1 99/6 100/8 100/9 100/11 100/12 104/9 105/14 109/20 111/2 111/3 111/8 111/11 111/16
does [24] 3/14 5/17 6/16 6/17 6/19 18/2 37/24 40/1 40/2 40/5 50/16 51/15 54/15 55/5 60/9 61/9 63/6 76/15 76/19 80/19 82/5 84/7 104/14 104/16
doesn't [14] 19/6 38/1 39/20 39/23 43/12 63/4 70/23 71/10 80/17 80/18 92/14 100/20 105/24 106/21
doing [7] 18/13 18/14 24/6 63/25 87/12 88/24 96/9
DOL [2] 30/5 86/6
dollars [1] 94/18
don't [73] 5/2 5/11 9/15 10/12 10/12 11/1 11/7 14/23 20/4 26/18 32/22 38/20 38/25 39/14 40/4 40/15 42/19 44/12 44/19 45/6 46/20 47/6 49/4

**D**

**don't...** [35] 50/17
51/11 52/19 53/14
59/12 60/3 60/13
60/23 64/20 72/3
72/25 73/6 73/7
75/9 77/10 77/18
77/18 77/19 79/20
79/21 79/22 80/3
80/20 80/22 82/20
86/22 87/10 87/15
88/24 90/10 92/19
94/8 94/11 94/25
95/5 96/20 98/16
99/2 100/24 101/6
101/19 102/1 102/4
104/17 104/19
104/20 107/14
109/25 111/17
112/13
**done** [14] 5/9 7/9
8/6 18/7 39/22 42/7
58/16 58/19 62/16
77/25 93/25 98/8
99/9 103/13
**down** [9] 10/8 11/1
24/9 82/13 82/24
84/7 87/3 107/9
109/23
**dozens** [1] 23/7
**Dr** [1] 79/8
**Dr.** [40] 6/15 16/13
24/10 24/14 26/8
26/13 26/19 27/6
27/22 28/9 28/10
29/5 43/23 45/18
45/19 73/25 74/6
74/8 75/23 75/24
76/2 76/8 76/12
76/15 76/24 78/4
78/6 78/12 78/17
79/22 79/2 79/2
79/7 92/10 92/14
92/20 93/2 93/4
93/8 93/10
**Dr. Brahin** [4]
45/18 79/2 79/2
79/7
**Dr. Cook** [3] 75/23
75/24 76/2
**Dr. Elkousy** [1]
76/15
**Dr. Elkousy's** [1]
76/8
**Dr. Lasater** [1]
6/15
**Dr. Lasater's** [1]
43/23
**Dr. Lawrence** [1]
78/4
**Dr. Macciocchi** [16]
16/13 24/10 24/14
26/8 26/13 26/19
28/9 28/10 29/5
92/10 92/14 92/20
93/2 93/4 93/8
93/10
**Dr. Macciocchi's** [2]
27/6 27/22
**Dr. Mercado** [2]
73/25 74/8
**Dr. Mercado's** [1]
74/6
**Dr. Murphy** [3] 78/6
78/17 78/22

**Dr. Murphy's** [1]
78/12
**Dr. O'Rourke** [1]
45/19
**Dr. Selesnick** [1]
76/12
**Dr. Selesnick's** [1]
76/24
**draw** [1] 89/1
**drill** [1] 24/9
**DSM** [1] 25/18
**DSM-5** [1] 25/18
**due** [2] 46/13 74/13
**dug** [1] 3/11
**duper** [1] 45/8
**during** [7] 12/17
29/21 44/6 59/6
79/10 80/11 93/24
**duties** [2] 59/18
101/14
**duty** [17] 5/8 13/18
18/5 21/7 44/5
44/18 44/24 65/14
75/16 77/3 77/22
82/9 94/13 101/19
101/23 104/7 106/4
**dynamic** [1] 45/2
**dysfunction** [2]
77/7 77/15

**E**

**each** [23] 20/11
42/25 45/8 47/24
52/12 54/8 54/16
61/3 65/12 65/21
68/20 71/8 72/14
75/2 90/4 91/14
92/7 99/22 99/23
100/3 100/13 108/21
110/25
**earlier** [2] 7/17
68/2
**earliest** [3] 4/18
4/19 5/2
**early** [2] 61/9
105/20
**easy** [2] 31/2 35/25
**ECF** [3] 3/3 41/7
55/21
**ECF-134** [1] 3/3
**ECF-137-1** [1] 55/21
**ECF-82** [1] 41/7
**echo** [1] 23/8
**education** [8] 16/18
16/20 17/2 28/12
74/25 75/7 75/8
75/11
**educational** [6]
17/12 17/13 25/11
28/4 73/16 85/18
**effect** [1] 81/2
**efficient** [1] 55/2
**egregious** [1] 24/12
**eight** [5] 63/16
69/23 70/1 72/14
88/1
**either** [4] 23/14
23/21 40/13 55/14
**eligibility** [1]
107/4
**eligible** [1] 95/2
**eliminates** [1]
106/16
**Elkousy** [1] 76/15
**Elkousy's** [1] 76/8

**else** [4] 43/6 48/14
50/23 108/17
**email** [1] 11/21
**employ** [1] 29/6
**employed** [2] 31/22
78/15
**employers** [1] 54/24
**employment** [4]
73/15 74/2 74/10
74/12
**end** [12] 5/15 49/12
49/20 50/5 50/23
50/24 51/14 71/5
75/3 100/21 103/8
109/22
**ended** [1] 104/4
**endorsed** [1] 38/12
**ends** [1] 96/24
**engage** [3] 73/15
73/20 95/5
**engagement** [1]
27/17
**enhance** [1] 8/23
**enough** [4] 63/13
66/24 83/3 107/14
**ensure** [4] 30/11
35/16 35/17 35/23
**entire** [4] 27/23
46/4 57/14 68/13
**entirely** [1] 98/15
**entitle** [1] 20/6
**entitled** [9] 7/11
13/9 14/23 14/25
31/6 43/6 108/23
112/12 114/9
**equally** [4] 26/19
38/7 82/6 91/7
**Eric** [1] 28/21
**ERISA** [28] 7/18
7/19 7/24 13/7
13/10 18/17 29/23
30/1 30/8 31/3
31/15 36/5 53/22
53/24 54/14 54/25
55/18 55/22 57/4
63/4 98/13 100/3
100/14 101/20 104/9
105/13 109/5 110/16
**erroneous** [1] 18/16
**error** [1] 71/25
**errors** [1] 61/17
**Esquire** [6] 1/15
1/16 1/16 1/18 1/18
1/19
**essential** [5] 59/13
59/14 59/21 107/22
108/3
**essentially** [3]
47/24 74/3 78/7
**establish** [3] 32/24
36/15 39/15
**established** [2]
4/22 82/16
**establishes** [1]
58/1
**et** [9] 1/4 1/7 2/5
2/6 68/4 68/4 88/18
103/10 111/6
**ethnicity** [3] 16/11
17/21 17/24
**evaluate** [17] 42/1
44/3 45/23 52/11
52/14 53/12 55/25
64/18 67/3 69/20
78/23 91/24 92/5

97/5 97/13 100/6
97/11
**evaluated** [2] 78/3
92/11
**evaluating** [3]
65/13 65/21 88/14
**evaluation** [11] 5/9
27/23 67/21 69/20
73/4 74/17 75/23
78/12 78/12 92/4
92/17
**evaluations** [17]
53/4 53/7 53/15
66/5 75/10 75/19
77/9 79/21 80/2
82/22 83/6 83/24
84/15 89/10 91/22
91/23 103/7
**even** [23] 7/13
24/17 24/18 26/17
28/17 32/4 43/11
49/4 51/11 62/10
72/25 73/5 74/7
74/18 74/22 76/12
77/9 79/3 80/5 91/4
91/16 100/9 102/16
**event** [2] 12/5 27/4
**eventually** [1]
35/21
**ever** [7] 51/8 53/21
61/2 69/15 86/1
101/19 103/12
**every** [30] 43/1
45/12 45/22 47/2
47/24 48/4 48/16
49/22 49/24 51/25
52/7 52/10 67/10
67/10 67/14 67/20
67/20 68/12 68/14
83/15 84/14 88/14
89/18 89/20 89/23
90/1 93/24 96/21
98/18 110/19
**everybody** [2] 40/24
101/1
**everybody's** [2] 3/4
108/17
**everyone** [2] 2/23
23/11 35/23
**everyone's** [1] 2/23
**everything** [19]
32/16 33/10 34/1
34/14 48/12 48/14
50/11 53/3 54/10
69/19 69/19 70/9
84/9 84/14 88/12
100/3 108/6 108/9
111/4
**evidence** [44] 5/19
13/18 13/19 14/8
14/13 15/14 19/14
19/16 22/16 22/18
33/7 36/4 36/18
38/18 40/18 41/24
46/16 49/13 51/18
55/14 58/2 59/13
59/14 59/21 63/19
63/21 70/14 76/25
77/8 79/3 80/2
81/12 82/1 82/15
83/13 83/25 89/16
89/21 90/1 93/3
94/19 97/9 105/5
109/5
**evident** [2] 21/20

23/16
**exactly** [12] 20/24
30/20 32/21 35/11
38/16 41/20 52/1
52/6 93/13 97/12
97/18 107/6
**exam** [2] 27/11
79/14
**examination** [5]
50/17 76/9 76/17
79/2 96/19
**examinations** [2]
47/14 52/7
**example** [27] 7/9
8/11 16/17 17/23
18/18 24/11 24/12
28/21 32/19 33/11
36/17 45/16 57/13
61/6 69/11 71/16
72/9 73/8 74/21
78/24 79/19 79/19
80/16 81/15 87/25
90/13 92/11
**examples** [18] 18/6
20/17 21/6 28/11
32/18 33/1 33/1
33/12 34/11 70/5
73/21 77/19 77/21
81/3 81/22 88/2
87/17 111/13
**exams** [1] 27/15
**except** [1] 59/12
**excerpted** [1] 3/22
**excluded** [1] 106/13
**Excuse** [1] 15/20
**exercise** [2] 51/1
87/22
**exercising** [1] 86/2
**exhausted** [1] 29/17
**exhibit** [11] 10/11
17/22 32/14 56/2
73/3 75/24 76/2
76/8 76/12 76/14
76/16
**Exhibit 2** [1] 95/9
**exhibits** [2] 30/25
75/18
**exist** [3] 8/16 14/5
39/5
**existed** [3] 87/9
96/14 103/3
**existence** [1] 95/1
**existing** [2] 14/1
97/14
**exists** [3] 14/1
20/16 39/2
**expand** [1] 53/11
**expansive** [1] 98/9
**expects** [1] 15/25
**expedited** [2] 54/25
55/2
**expedition** [1]
68/17
**expenses** [1] 65/4
**experience** [2] 9/9
9/12
**experiences** [1]
91/19
**expert** [8] 3/7 6/15
25/12 26/9 46/12
46/13 46/13 46/22
**expertise** [2] 26/25
89/13
**Explain** [1] 7/15
**explained** [4] 54/20

**E**

**explained [3]** 65/15 79/8 83/10
**explanation [1]** 88/7
**explicitly [1]** 17/24
**explore [3]** 25/23 52/18 71/21
**expressed [1]** 23/9
**expressly [1]** 57/19
**extend [3]** 38/15 55/17 64/23
**extensively [1]** 110/22
**extent [10]** 14/2 42/5 44/11 45/6 53/8 54/3 70/4 85/3 95/13 108/2
**extra [21]** 10/6 10/7 33/11 33/15 39/13 53/21 54/3 56/4 57/10 58/11 62/10 68/1 69/4 70/7 71/11 77/24 97/4 97/10 106/7 108/25 110/17
**extraneous [1]** 11/7
**extraordinary [1]** 9/9
**extremely [2]** 35/6 49/10
**eyebrows [1]** 92/23

**F**

**fact [33]** 3/13 15/7 15/8 15/23 22/18 26/19 30/21 31/7 31/13 33/23 35/22 36/1 36/16 36/25 57/17 63/7 68/2 70/11 76/22 80/18 81/5 81/25 83/12 85/20 89/18 95/8 101/25 103/13 104/16 108/2 109/11 110/25 111/3
**factor [20]** 17/3 17/19 21/15 21/15 21/18 22/9 29/17 33/24 37/1 37/2 37/11 63/14 63/20 89/3 91/7 91/10 98/24 110/21 110/24 111/2
**factors [30]** 5/4 5/6 5/10 12/19 16/11 19/20 20/3 24/21 24/23 29/12 30/5 37/9 47/23 48/4 53/9 54/9 58/23 60/16 63/12 63/15 63/15 85/17 86/5 86/13 87/5 92/1 97/6 100/18 102/16 102/18
**facts [8]** 10/4 18/23 20/14 20/15 24/10 32/10 55/12 84/21
**factual [5]** 39/21 55/13 58/20 84/21 95/4
**failed [4]** 75/25 90/20 96/5 96/18

**failing [2]** 35/23
**fails [21]** 59/20 81/6
**failure [6]** 15/21 43/12 76/9 99/6 100/7 111/2
**fair [7]** 47/17 56/25 63/13 71/6 83/3 99/19 101/8
**fairly [2]** 108/5 111/18
**faith [2]** 13/4 38/19
**false [1]** 38/4
**familiar [2]** 23/25 44/13
**far [9]** 4/6 4/11 5/16 5/23 6/20 43/5 47/12 112/5 112/20
**faster [2]** 96/16 112/4
**fault [1]** 82/19
**favor [2]** 89/16 106/25
**feature [1]** 65/21
**February [3]** 1/8 4/9 5/3
**February 9 [2]** 4/9 5/3
**federal [15]** 1/24 13/7 18/10 18/19 18/20 21/4 24/4 35/19 36/23 36/24 36/24 37/5 37/6 72/9 114/16
**fee [3]** 27/12 50/16 50/21
**fees [1]** 27/11
**few [7]** 11/9 56/9 56/10 61/19 61/22 110/11 110/13
**fiduciary [11]** 5/8 13/18 18/5 56/18 56/21 59/17 60/5 60/6 101/20 102/1 104/7
**fiduciary's [1]** 22/9
**field [1]** 26/25
**fields [1]** 48/15
**Fifth [4]** 70/20 71/5 71/18 72/3
**figure [2]** 61/2 88/17
**file [2]** 34/2 34/3
**filed [9]** 23/24 41/13 41/15 47/2 75/10 81/8 89/20 94/3 94/6
**files [1]** 12/24
**fill [3]** 50/23 62/15 75/5
**final [6]** 8/8 41/10 45/15 83/18 106/18 106/24
**finally [2]** 85/11 109/8
**find [14]** 4/3 9/15 15/9 43/3 61/21 61/22 74/12 75/11 75/22 76/5 76/14 77/2 96/8 111/20
**finding [3]** 72/9 74/11 112/13

**findings [2]** 23/8 101/21
**finds [2]** 95/22 95/23
**fine [2]** 50/13 103/22
**fire [1]** 68/23
**firm [5]** 25/15 31/22 32/2 32/6 83/11
**first [18]** 12/25 14/4 30/10 35/9 41/6 52/13 53/21 54/12 56/2 56/6 63/14 68/9 69/17 73/19 78/3 85/15 93/21 101/18
**fishing [1]** 68/17
**fit [3]** 23/11 68/5 109/1
**fits [1]** 39/8
**five [11]** 4/23 20/2 31/4 31/8 37/11 54/8 63/15 79/24 84/4 89/12 100/25
**flat [2]** 50/16 50/21
**flat-fee [1]** 50/21
**flatly [1]** 108/13
**flawed [2]** 14/18 49/16
**Floor [1]** 1/24
**flush [1]** 99/2
**focus [4]** 4/22 19/2 49/11 49/19
**focusing [1]** 4/23
**football [3]** 26/16 40/21 76/16
**footnote [6]** 23/20 43/23 44/4 44/25 85/15 93/22
**foreclose [1]** 37/24
**foreclosed [1]** 38/13
**forecloses [1]** 38/20
**foregoing [1]** 114/7
**form [5]** 27/15 64/22 64/24 75/4 84/12
**format [1]** 114/9
**former [2]** 23/7 82/7
**forms [2]** 50/22 50/22
**forth [1]** 83/17
**forward [5]** 5/2 12/5 62/17 70/6 77/23 87/9 97/19 107/18 107/24
**found [15]** 25/2 31/22 37/7 42/23 44/2 44/8 45/12 45/25 70/20 70/21 74/2 74/8 75/25 78/6 95/11
**foundation [2]** 5/14 40/18
**foundational [1]** 108/22
**founded [1]** 71/11
**four [5]** 7/9 8/11 8/14 76/3 77/4
**fours [1]** 59/15
**fourth [16]** 12/12

13/20 19/10 40/13 55/9 55/17 58/25 59/2 59/24 60/2 96/3 97/24 108/23
**fraction [1]** 109/16
**fracture [2]** 26/14 26/18
**fragile [1]** 74/9
**fragment [1]** 65/23
**frame [3]** 58/20 70/4 109/10
**fraud [2]** 18/23 19/24 69/12 69/17
**fraud-based [1]** 19/24
**fraudulent [3]** 13/8 14/14 109/4
**fraudulently [1]** 14/15
**frequently [3]** 49/9 52/11 52/14
**fret [1]** 10/13
**front [4]** 64/9 65/7 70/13 87/4
**fulfill [1]** 63/11
**full [8]** 3/16 3/18 54/10 54/22 56/25 60/12 62/1 64/15
**full-blown [1]** 54/22
**fully [7]** 12/14 21/12 26/5 55/25 85/2 99/4 111/10
**function [1]** 32/5
**further [3]** 5/23 6/2 74/17

**G**

**game [3]** 26/18 80/12 95/14
**gap [3]** 55/15 57/12 98/8
**gaps [3]** 55/24 58/5 64/15
**Garagiola [2]** 1/18 2/21
**gathered [1]** 24/16
**gauntlet [1]** 24/3
**gave [4]** 6/24 42/3 44/21 106/9
**gender [2]** 85/18
**general [2]** 73/13 96/21
**generalized [2]** 47/23 73/9
**generally [3]** 29/13 68/19 85/23
**generate [1]** 42/13
**generic [1]** 97/4
**genuine [1]** 14/18
**Georgia [1]** 26/8
**get [44]** 3/1 4/12 5/2 8/2 8/14 9/17 11/2 12/4 16/8 20/5 21/25 22/11 22/21 24/3 37/16 38/24 41/3 46/7 46/24 49/1 49/4 49/21 50/18 50/21 52/25 53/8 53/18 54/2 55/6 55/10 64/8 74/16 81/25 82/9 83/18 84/16 90/4 92/22 95/2 98/18

102/22 107/5 107/7
**gets [2]** 61/7 99/9
**getting [7]** 16/3 21/12 77/24 94/25 95/2 101/1 103/3
**give [12]** 11/2 11/8 12/22 23/10 23/19 37/10 40/10 66/3 79/22 88/12 98/22 111/19
**given [8]** 3/13 33/22 46/18 80/10 94/4 97/7 100/15 103/24
**gives [2]** 40/17
**giving [3]** 62/16 80/16 99/19
**glaringly [2]** 46/15 75/9
**Glenn [4]** 12/11 38/1 38/14 39/3
**glue [1]** 54/17
**go [37]** 3/15 9/14 12/5 12/6 13/3 13/22 16/7 19/6 19/12 21/14 22/2 22/4 22/24 25/1 25/13 26/4 27/7 30/7 30/9 31/1 31/25 32/7 48/13 52/22 53/8 55/5 58/23 60/15 63/11 66/8 69/21 72/14 83/21 90/21 94/8 100/10 107/24
**goes [15]** 3/17 13/18 15/4 15/13 15/21 25/25 29/8 33/24 37/3 54/6 55/4 59/5 74/13 84/16 103/20
**going [78]** 5/2 5/13 5/15 5/18 9/3 9/7 9/25 10/18 10/23 11/8 13/23 16/12 19/7 19/13 22/20 24/9 29/16 30/2 34/9 39/4 39/18 40/23 42/12 48/3 50/21 52/16 53/9 53/19 54/1 54/4 54/8 55/7 57/21 57/22 60/15 61/2 63/14 65/10 82/20 83/24 84/7 85/7 86/20 88/13 88/15 88/16 89/8 89/21 89/22 90/2 90/7 90/8 90/12 90/17 91/13 91/13 91/17 99/7 99/8 99/13 100/5 100/13 101/10 102/2 103/17 103/19 103/25 103/24 103/25 104/4 105/17 108/21 111/6 111/15 111/18 111/19 111/22 112/8
**gone [1]** 56/19
**good [12]** 2/9 2/11 2/13 2/14 2/16 2/19 2/23 29/20 40/10 40/11 78/16 87/13

**G**

got [23] 3/12 8/11 34/24 35/14 44/19 52/1 58/5 70/1 76/22 77/9 83/8 84/4 84/13 87/24 89/1 89/17 91/22 91/22 93/20 94/6 95/17 99/12 101/23 105/9
govern [1] 48/11
governing [1] 36/2
grading [1] 102/19
grant [5] 40/11 40/18 61/10 71/11 106/7
granted [2] 57/16 98/11
granting [1] 12/8
grants [1] 61/16
graph [1] 107/8
great [1] 92/11
green [1] 6/24
Gregory [2] 1/18 2/17
Grimm [2] 38/8 83/11
Groom [3] 32/2 32/6 84/20
grounded [1] 15/12
grounds [1] 71/23
guess [1] 86/11

**H**

had [43] 3/12 8/11 20/15 26/12 27/8 29/4 29/4 29/5 40/8 40/15 41/5 41/10 43/15 44/7 44/23 45/1 47/13 50/24 56/22 56/24 57/16 58/10 62/23 71/4 75/10 76/3 76/5 79/14 81/8 82/18 87/5 89/21 91/8 92/20 93/21 93/25 93/25 95/14 97/19 106/25 108/7 108/11 108/25
hadn't [3] 3/11 20/13 20/14
haircut [1] 106/9
half [3] 42/7 44/12 56/8
handed [1] 56/2
handle [1] 78/19
happened [1] 57/3
happening [1] 77/21
happy [4] 3/18 103/18 104/3 110/10
hard [3] 10/10 25/6 25/24
hardly [1] 23/6
harmful [2] 102/12 103/14
harms [1] 102/24
harsh [1] 93/25
has [58] 5/9 9/20 11/22 13/16 13/19 14/6 14/20 17/4 17/25 19/16 20/21 24/16 24/17 31/16 36/9 39/2 42/11 46/13 48/8 48/15 52/13 53/10 53/21

53/24 54/10 57/10 58/7 62/2 64/17 64/18 67/21 67/22 68/25 72/10 78/15 78/16 80/9 82/1 82/4 84/18 86/6 86/9 86/12 87/1 88/25 90/15 91/12 96/14 98/18 100/16 101/19 101/21 103/12 106/17 107/19 108/18 112/1
have [201]
haven't [1] 91/4
having [5] 11/3 36/14 73/22 104/16 107/23
he [33] 6/21 11/25 17/11 17/24 24/16 24/16 24/23 26/21 27/8 51/4 55/21 69/9 70/23 74/3 74/9 75/25 76/2 76/5 76/10 76/11 76/15 76/21 78/13 80/16 80/17 80/18 92/11 92/16 100/9 102/16 102/18 106/2 106/8
he'll [1] 5/12
he's [17] 24/14 24/15 25/3 25/4 25/21 26/19 26/20 26/22 26/23 26/24 27/2 27/11 27/11 27/24 29/11 51/16 76/22
headed [1] 37/21
health [1] 101/20
Healthcare [1] 68/14
hear [13] 3/4 3/16 3/18 3/19 11/19 12/4 62/2 68/16 72/7 83/7 90/11 103/18 112/2
hearing [4] 1/11 2/7 43/20 82/14
heart [3] 15/13 25/25 49/6
Heaton [6] 85/13 85/16 85/21 86/1 86/4 87/10
heavily [1] 24/5
heck [1] 47/25
held [5] 82/14 89/8 101/19 103/12 114/8
helmet [3] 26/17 40/16 40/16
help [7] 27/13 63/6 63/24 85/7 100/5 111/8 111/15
helped [1] 78/19
helpful [2] 10/13 100/19
helping [1] 25/11
Helton [6] 12/12 13/20 21/1 22/15 54/14 55/1
hence [1] 87/9
her [6] 61/17 71/10 71/12 71/20 71/22 74/1
here [61] 3/1 3/2 3/5 7/9 8/6 9/15

9/17 9/25 10/21 14/14 15/1 17/12/18 20/19 21/2 23/11 24/7 28/21 28/25 29/3 30/3 30/5 38/16 38/21 40/14 42/10 43/19 56/16 57/2 58/19 59/12 59/20 59/22 60/6 63/9 67/13 68/22 69/16 72/22 75/16 76/9 81/23 82/16 83/9 84/20 87/7 88/10 88/16 88/22 89/5 89/21 92/18 93/17 95/5 96/11 98/5 101/7 109/25 110/8 112/17
here's [4] 70/1 85/19 99/9 111/18
hereby [1] 114/6
hey [7] 18/11 41/12 44/16 81/8 89/21 95/14 99/19
high [2] 49/10 94/14
higher [6] 28/18 28/24 49/14 49/15 51/20 94/12
highest [2] 24/14 52/13
highlight [4] 9/24 13/25 20/18 26/5
highlighted [1] 31/5
highly [1] 49/13
him [10] 27/10 29/6 29/13 41/5 42/20 46/24 76/6 78/19 79/11 106/7
himself [2] 26/24 78/8
hinges [1] 54/14
his [20] 17/12 17/24 25/22 25/25 26/2 26/25 27/10 28/22 42/18 43/23 51/17 74/8 75/23 78/4 78/17 78/18 79/4 81/3 92/17 93/12
history [2] 23/1 49/12
hit [1] 105/18
hold [4] 3/6 9/3 10/23 83/2
Hollywood [1] 23/12
homestretch [1] 37/21
Honor [42] 2/3 2/9 2/14 2/17 4/10 4/15 6/6 7/8 7/17 10/21 11/4 11/7 12/24 13/14 17/18 25/14 27/20 29/14 32/24 33/15 35/3 35/5 40/8 41/2 42/2 42/20 55/5 59/6 62/6 64/11 67/2 71/14 83/3 87/2 88/9 90/17 93/6 100/23 101/18 103/19 110/9 110/18 112/21

HONORABLE [2] 1/11 1/18
hope [3] 2/23 24/22 26/23
hopefully [2] 109/8 112/10
hour [1] 103/25
hours [1] 9/8
housed [1] 65/4
how [27] 3/17 8/9 11/1 20/20 20/22 21/4 22/16 23/16 25/20 25/23 37/12 50/8 52/1 52/6 54/9 55/5 65/15 69/13 70/23 73/6 83/18 86/3 88/5 89/7 90/4 103/20 110/16
However [3] 56/19 74/15 76/17
huge [3] 21/15 22/1 22/7
huh [2] 49/18 105/16
human [2] 86/17 102/17
hundred [3] 53/4 84/5 91/22
hundreds [1] 53/7
hungry [1] 101/1
hypothesis [1] 52/19
hypothetical [2] 47/16 68/19
hypothetically [2] 47/14 52/22

**I**

I'll [20] 3/1 3/19 20/7 46/7 48/12 48/24 52/21 52/25 53/8 53/13 54/1 58/22 64/19 64/21 64/22 82/11 92/13 100/21 110/14
I'm [88] 3/18 5/13 5/15 5/18 7/15 7/22 9/2 10/23 11/13 13/23 16/19 19/2 19/4 21/8 22/5 23/25 24/17 25/9 25/10 26/24 28/3 29/9 30/2 33/3 33/8 34/9 37/22 39/18 40/23 41/20 41/21 41/22 41/22 41/23 43/8 46/20 46/21 46/25 47/7 48/3 51/5 53/19 54/1 54/4 54/8 55/7 60/14 60/15 63/14 66/24 66/25 67/24 68/18 69/13 71/13 71/13 82/20 82/20 82/23 82/24 86/11 86/15 86/20 88/22 90/12 95/15 100/1 101/10 102/2 103/2 103/18 103/19 103/23 103/24 104/2 104/3 104/4 104/11 104/22 105/5 105/17 105/17 110/10 110/18 111/19

111/22 112/8 112/20
I've [10] 4/7 29/17 47/6 55/21 65/15 89/6 93/20 98/16 108/14
idea [1] 101/13
ideal [1] 60/24
identified [7] 19/5 20/2 21/3 21/18 30/23 37/8 70/22 73/3
identify [5] 58/5 65/1 71/3 72/20 73/3
identifying [1] 109/9
ignore [1] 81/1
ignored [2] 81/12 81/14
ignores [1] 108/1
ignoring [4] 18/20 36/2 99/1 111/11
ill [3] 68/5 71/11 109/1
ill-fit [2] 68/5 109/1
ill-founded [1] 71/11
illegal [1] 30/4
imagine [1] 61/6
impact [8] 16/15 17/4 24/24 28/16 81/2 81/7 81/9 81/11
impacted [1] 22/16
impacts [1] 17/9
impairment [7] 17/25 78/6 78/6 79/3 79/5 79/9 79/13
impairments [4] 77/6 77/6 77/18 81/3
impairs [2] 5/3 6/4
impartial [1] 35/24
impartiality [3] 35/18 99/3 111/9
importance [1] 112/23
important [16] 13/1 22/10 22/25 24/22 24/24 35/6 36/17 38/7 53/13 58/20 59/4 60/18 85/3 91/18 107/1 110/8
imposes [1] 55/22
imposition [1] 91/2
impress [1] 71/14
improper [3] 16/21 17/14 86/21
improperly [1] 16/10
impugning [1] 71/20
inaccurate [4] 8/15 38/4 39/22 106/19
inactive [2] 79/25 80/7
inadequacies [2] 65/25 66/23
inadequacy [2] 99/18 104/13
inadequate [5] 15/22 73/6 73/11 104/14 110/24
inapplicable [1] 59/20

123

**I**

**inapposite [1]**
56/15
**inappropriate [3]**
17/1 29/12 51/19
**inappropriately [1]**
51/17
**include [6]**   16/20
28/12 40/2 63/16
77/6 86/5
**included [6]**   18/18
20/15 28/5 28/6
29/11 56/19
**including [11]**
12/13 16/9 33/17
37/11 38/9 65/24
66/21 72/17 73/13
101/1 107/24
**incomplete [4]**   6/16
39/21 106/19 109/17
**inconceivable [1]**
83/23
**inconsistencies [12]**
21/4 65/24 66/6
66/22 68/11 69/22
70/10 70/12 79/10
90/6 110/23 110/23
**inconsistency [19]**
34/18 34/19 72/16
74/7 74/18 75/15
75/25 76/6 76/24
77/4 79/24 81/3
81/10 81/18 83/23
84/5 85/11 88/1
99/2
**inconsistent [39]**
13/1 16/21 17/16
17/19 20/21 20/22
30/23 33/25 33/25
34/12 36/3 71/17
71/19 72/20 72/24
73/8 73/9 74/4
74/21 75/14 75/19
77/14 78/8 78/24
79/18 79/23 80/4
80/6 80/23 81/15
81/20 85/12 87/17
87/21 88/18 88/25
94/17 95/6 98/17
**inconsistently [3]**
70/3 72/10 73/22
**incorporated [2]**
29/25 86/12
**incorrect [1]**   83/12
**indeed [1]**   84/1
**independence [2]**
8/23 35/17
**independent [3]**
13/12 35/24 60/3
**indicating [1]**
32/16
**indication [1]**   76/4
**indicia [1]**   58/8
**individual [28]**   3/9
6/18 6/18 8/8 8/17
12/22 15/15 16/4
40/1 42/19 42/23
44/2 52/4 61/3
61/13 61/20 63/25
86/2 87/4 88/10
90/5 91/19 99/23
101/22 104/15
104/15 107/1 107/5
**individually [1]**
100/13

**inexpensive [1]**
13/2 18/7 18/16
20/25
**infected [1]**   91/2
**infects [1]**   27/23
**inflammation [2]**
75/25 76/3
**influenced [1]**
50/25
**inform [1]**   25/22
**informal [1]**   31/24
**information [47]**
5/22 6/3 6/9 6/17
7/8 8/21 8/22 12/16
13/13 15/6 15/9
15/16 19/14 22/20
22/22 31/12 31/14
36/20 36/22 38/3
38/4 38/5 40/6
43/13 47/18 50/7
52/18 55/23 59/16
64/20 65/3 65/11
66/11 69/3 81/19
87/6 100/15 104/16
106/22 107/5 107/8
107/13 107/15
107/23 108/3 108/16
108/18
**informational [1]**
64/15
**informed [1]**   7/2
**informs [1]**   55/19
**initial [2]**   36/8
55/22
**initially [2]**   56/22
57/16
**inject [1]**   42/15
**injuries [5]**   24/19
24/20 24/25 25/4
26/17
**injury [14]**   25/4
25/16 25/17 26/12
26/14 69/6 69/8
75/20 76/10 76/16
76/19 80/11 80/17
80/21
**inquiry [1]**   63/24
**insight [1]**   98/21
**instability [1]**
76/20
**instance [7]**   45/23
69/13 71/8 75/2
76/7 86/8 87/16
**instances [5]**   15/5
18/10 23/13 73/1
77/2
**insufficient [1]**
34/13
**intend [1]**   110/6
**intending [2]**   40/20
53/1
**intention [1]**
107/18
**interest [2]**   22/10
22/14
**interested [1]**
26/25
**interests [2]**   53/9
53/10
**internal [3]**   74/7
74/18 76/6
**internals [1]**   75/9
**interpret [1]**   21/5
**interpretation [2]**
71/2 80/9
**interpretations [4]**

13/2 18/7 18/16
20/25
**interpreted [3]**
20/23 81/1 86/6
**interprets [1]**
20/21
**interrogatory [2]**
62/13 62/15
**interrupt [1]**   9/3
**interruptions [1]**
9/6
**interval [2]**   44/21
44/23
**introduce [1]**   11/7
**introduced [2]**
11/19 25/21
**investigate [1]**
15/21
**invocations [1]**
92/13
**invoked [1]**   54/9
**involved [5]**   26/10
32/3 35/18 35/23
103/20
**involvement [1]**
27/23
**involving [2]**   16/3
78/14
**iota [1]**   83/24
**IQ [3]**   28/17 28/22
28/24
**irrespective [1]**
93/15
**is [425]**
**isn't [12]**   41/14
43/4 47/4 47/20
58/11 60/24 69/5
74/18 74/22 88/3
97/9 111/15
**isolated [1]**   32/19
**issue [2]**   6/10
11/7 14/21 17/7
38/23 43/4 43/5
47/21 56/16 59/16
65/5 71/12 72/2
85/14 87/9 87/11
88/16 90/11 95/21
112/2 112/23
**issued [7]**   26/7
29/24 31/8 37/25
41/10 41/17 87/15
**issues [5]**   11/3
37/19 41/25 86/13
110/6
**it [193]**
**it'll [1]**   35/21
**it's [107]**   5/14 7/3
7/24 8/15 10/3 10/4
11/18 12/5 12/16
12/18 12/20 13/19
15/3 16/16 17/6
17/6 17/9 17/16
19/19 21/11 21/19
21/21 22/9 22/18
22/20 23/6 23/20
23/21 23/22 23/25
24/11 24/12 26/6
27/18 29/7 29/21
31/10 32/2 32/23
35/6 36/17 36/17
36/18 39/21 39/21
39/22 40/12 41/20
45/17 45/18 46/3
47/17 48/8 48/11
50/5 53/13 54/12

54/18 55/16 56/3
59/15 60/25
59/15 60/25
63/3 63/13 64/14
67/19 69/6 69/6
69/7 69/10 69/11
69/23 73/5 73/9
76/21 80/19 83/11
83/23 84/5 84/7
84/14 84/21 84/25
86/14 87/13 91/13
91/18 94/3 94/22
95/5 95/8 97/23
99/8 99/16 100/19
102/19 102/24
103/11 104/13
106/19 106/19
107/15 111/6
**itemized [1]**   65/8
**items [1]**   69/21
**its [6]**   36/9 38/15
89/24 95/12 101/14
111/1
**itself [3]**   10/25
32/21 53/19

**J**

**Jacob [11]**   1/18
2/17 3/19 5/12
11/13 101/9 101/10
104/11 105/4 107/10
110/14
**Jacob's [1]**   11/25
**Jani [1]**   96/3
**January [3]**   12/18
29/22 42/4
**January 16th [2]**
12/18 29/22
**January 1st [1]**
42/4
**JASON [1]**   1/4
**Jefferson [3]**   26/6
27/4 27/9
**JO925 [1]**   45/20
**JO925-26 [1]**   45/20
**John [2]**   1/19 2/20
**join [1]**   112/19
**joint [6]**   45/19
45/23 45/24 46/3
75/25 76/3
**joke [1]**   40/21
**JRR [2]**   1/6 2/5
**JRR-23-0358 [1]**   2/5
**judge [17]**   13/20
23/6 26/15 31/21
36/24 36/24 38/7
38/8 57/24 58/6
61/8 61/9 61/13
61/15 61/17 106/6
110/6
**Judge Bredar [1]**
57/24
**Judge Grimm [1]**
38/8
**judge's [1]**   36/24
**judges [4]**   61/10
61/11 61/22 68/2
**judgment [24]**   3/9
6/11 45/18 50/20
51/1 51/4 61/14
74/20 78/9 78/24
81/7 85/24 86/3
87/22 91/12 92/2
93/1 93/25 95/17
98/7 99/21 100/1

107/17 111/1
107/25
59/15 60/25
72/4 76/11
**Judicial [1]**   114/10
**Julia [1]**   2/14
**JULIE [2]**   1/11 1/16
**jump [2]**   16/12
16/23 105/17
**juries [1]**   25/5
**jury [1]**   25/24
**just [86]**   8/15 9/16
9/23 10/1 11/2
11/16 11/19 12/20
13/11 13/16 20/8
20/18 23/10 23/18
24/2 24/11 25/10
26/4 27/11 29/13
32/5 32/11 32/18
32/23 34/4 35/9
39/18 40/21 41/4
41/14 41/22 42/18
45/10 47/4 47/20
47/25 49/5 50/5
50/11 54/22 54/24
55/4 56/3 59/9
60/18 68/16 69/1
69/4 73/4 73/9
76/21 76/25 79/7
79/19 79/22 82/24
84/21 85/22 87/3
87/10 90/8 91/5
93/6 95/9 95/13
96/25 98/15 98/19
98/23 100/25 101/2
103/6 104/4 105/4
105/5 105/18 107/16
108/15 108/22
109/14 110/12
110/13 111/22 112/2
112/16 112/19
**justifications [1]**
49/16
**justifies [1]**   21/12
**justify [1]**   78/22

**K**

**Kane [3]**   56/22
57/19 57/25
**Katz [4]**   1/16 2/12
7/25 103/20
**keep [1]**   107/1
**keeps [1]**   63/12
**key [14]**   6/17 9/24
13/13 21/2 22/20
29/20 43/19 72/2
81/23 83/9 86/24
87/7 95/21 108/20
**kind [24]**   5/14
21/11 27/16 38/8
45/15 46/16 56/12
57/1 58/18 62/10
69/5 69/8 76/24
80/16 81/12 84/22
88/24 92/14 92/21
94/2 98/10 100/15
102/25 105/4
**knee [1]**   76/16
**know [91]**   9/10 9/12
9/16 13/17 15/23
17/2 18/8 20/20
21/2 23/1 24/15
25/8 25/8 26/2 27/1
29/5 29/10 32/11
32/15 37/3 37/13
32/18 40/4 40/15

## K

know... [36]   43/1 43/6 43/10
43/15 43/16 44/1
44/7 44/12 45/11
46/2 46/4 46/20
47/1 47/7 47/14
47/24 49/22 50/10
51/11 51/15 51/16
51/25 52/4 52/6
52/7 52/9 59/10
59/16 60/13 60/18
65/15 68/17 75/24
77/19 82/24 82/24
84/17 88/3 88/4
89/24 90/13 91/7
92/6 92/23 94/9
94/16 94/16 95/21
95/23 96/22 100/4
100/17 101/1 102/17
102/17 103/2 104/17
104/19 105/1 105/2
106/24 107/6 108/1
109/23 111/18
112/13
**knowing [8]**   26/1
29/7 38/18 47/7
47/19 47/25 65/24
66/21
**knowledge [3]**   99/14
102/14 102/23
**known [3]**   19/16
19/18 29/4
**knows [5]**   10/1 42/2
53/3 61/23 70/17

## L

**Labor [3]**   29/25
86/7 86/9
**lack [1]**   105/10
**laid [1]**   20/11
**language [4]**   32/16
35/6 59/10 59/10
**Lapin [2]**   1/19 2/20
**large [1]**   44/13
**largely [1]**   53/23
**larger [2]**   49/8
109/20
**Lasater [4]**   6/15
8/7 51/24 52/8
**Lasater's [1]**   43/23
**last [9]**   3/4 37/13
40/9 43/20 60/19
85/11 85/11 93/16
100/7
**later [8]**   18/12
21/21 22/11 41/17
57/17 65/6 76/3
76/13
**Laughter [5]**   7/21
9/14 22/6 35/13
112/15
**law [22]**   10/3 12/11
13/7 19/10 20/12
22/13 22/13 25/15
31/12 31/22 32/2
32/6 35/15 35/19
40/12 54/12 54/12
55/22 71/25 83/11
97/24 108/24
**Lawrence [1]**   78/4
**lawyers [1]**   9/12
**laxity [1]**   76/22
**lay [2]**   5/14 93/21
**lead [3]**   24/24

43/17 45/10
learns... [see 7/18
learns [1]   15/23
**least [8]**   33/3
36/13 37/13 40/8
43/2 52/14 78/5
106/24
**leave [1]**   60/21
**led [1]**   31/16
**legal [5]**   14/1 18/8
18/14 18/25 72/2
**legit [1]**   104/22
**legitimate [1]**   69/3
**legs [1]**   40/24
**length [1]**   85/14
**lens [1]**   51/14
**less [1]**   93/24
**let [15]**   19/4 21/8
35/8 49/1 53/18
63/11 64/8 65/20
66/8 67/23 69/21
69/22 72/14 89/3
91/1
**let's [11]**   22/24
25/1 27/7 30/9 31/1
32/7 35/4 68/16
68/17 82/15 100/10
**letter [7]**   29/12
36/3 54/12 80/8
80/20 99/23 110/25
**letters [38]**   4/24
6/8 8/18 12/9 15/5
16/3 16/8 16/19
18/7 19/17 22/22
30/13 30/20 31/3
31/7 31/8 32/12
32/15 33/10 36/1
36/15 37/17 39/24
48/13 53/7 65/19
67/19 70/18 85/8
89/7 99/19 106/2
106/7 106/15 109/13
109/14 109/16
110/24
**level [16]**   15/25
16/20 17/12 17/13
23/14 28/12 69/2
73/16 74/25 78/20
84/16 84/24 84/25
85/18 87/4 105/3
**light [4]**   6/24
42/16 97/13 98/9
**like [14]**   17/6 45/6
51/9 86/11 88/4
88/6 96/2 97/8 97/8
98/14 101/11 102/19
105/4 106/14
**likely [3]**   8/2 74/1
74/9
**limit [1]**   70/6
**limitation [1]**
80/20
**limitations [6]**
41/9 63/4 105/21
105/22 105/23 108/5
**limited [10]**   27/25
30/22 54/19 57/10
62/12 62/22 91/5
93/10 97/18 109/10
**limitless [1]**   68/15
**limits [2]**   9/11
55/22
**line [11]**   6/24 21/7
44/5 44/18 44/24

65/14 75/16 77/3
94/13 96/4 110/13
**linear [1]**   3/10
**lined [2]**   46/14
46/23
**lion's [1]**   47/8
**list [2]**   64/6 95/9
**listed [1]**   40/14
**literally [1]**   98/13
**litigation [2]**
54/21 55/22
**little [6]**   3/10
16/7 16/13 22/8
29/17 43/20
**live [2]**   42/12
42/15
**LLP [2]**   2/12 2/15
**location [1]**   51/9
**locked [1]**   9/25
**LOD [1]**   21/10
**lodge [1]**   11/16
**lodged [1]**   23/7
**logic [1]**   41/21
**Lombard [1]**   1/24
**long [2]**   76/4
100/17
**long-term [1]**   76/4
**longer [1]**   112/5
**look [42]**   30/13
33/5 33/6 43/20
44/4 44/25 45/10
47/21 48/4 57/8
57/21 57/22 58/14
58/21 58/24 60/3
60/5 60/6 60/8 62/8
62/14 70/13 70/21
71/8 74/6 75/16
75/21 76/1 79/6
80/15 87/13 90/2
92/2 92/23 93/1
95/4 95/7 97/14
99/13 99/23 101/25
110/13
**looked [1]**   33/4
**looking [7]**   25/9
33/4 51/14 51/19
60/7 60/8 60/11
**looks [3]**   76/14
78/11 100/1
**Loper [1]**   75/23
**lost [1]**   95/14
**lot [11]**   34/12
47/25 55/4 58/12
70/16 84/17 93/21
94/11 106/17 109/24
109/24
**loudest [1]**   62/4
**lousy [1]**   104/21
**low [1]**   74/13
**lower [1]**   28/19
**lowest [1]**   52/12
**loyalty [2]**   18/5
104/7

## M

**Macciocchi [16]**
16/13 24/10 24/14
26/8 26/13 26/19
28/9 28/10 29/5
92/10 92/14 92/20
93/2 93/4 93/8
93/10
**Macciocchi's [2]**
27/6 27/22
**made [17]**   6/15 8/22

15/10 15/15 20/13
20/23 20/25 21/7
70/8 71/25 74/24
97/21 104/8 108/11
**Magistrate [2]**   3/12
110/6
**mainly [1]**   78/14
**maintain [6]**   72/18
72/21 74/2 74/10
101/21 102/4
**majority [5]**   44/1
44/23 47/20 56/7
65/17
**make [27]**   2/24 5/24
10/25 19/6 37/14
40/21 43/13 45/24
47/6 47/17 53/16
74/14 79/11 82/8
82/9 83/16 84/9
84/18 86/9 88/14
89/22 89/24 93/16
98/23 102/2 110/12
112/10
**maker [1]**   19/23
**makes [4]**   36/7
49/20 59/4 59/5
**making [14]**   13/12
15/6 15/24 16/11
24/15 35/18 37/4
37/6 38/4 61/16
85/10 91/25 99/16
105/13
**makings [1]**   93/12
**management [2]**   82/6
83/14
**manner [2]**   14/11
35/17
**manual [1]**   40/7
**manuals [2]**   50/17
50/18
**many [12]**   14/7 23/5
39/6 39/6 39/7
40/11 52/1 52/6
61/23 79/9 85/22
85/22
**march [2]**   20/7
114/12
**marketing [2]**   24/18
25/2
**MARYLAND [9]**   1/1
1/7 1/25 12/13
19/10 96/4 97/24
108/24 114/6
**matched [1]**   47/22
**material [3]**   71/17
90/21 91/8
**materially [2]**   3/14
82/25
**materials [9]**   24/18
25/2 25/21 27/13
32/3 32/13 34/3
37/14 37/15
**matter [6]**   2/4 2/4
2/6 64/2 96/25
114/9
**matters [1]**   49/20
**may [19]**   5/20 5/24
6/23 7/1 9/10 12/16
25/8 38/12 38/15
41/2 41/12 42/12
51/15 52/21 85/23
85/23 98/6 103/20
107/3
**maybe [3]**   11/6 19/5

50/11
**McKenzie [6]**   73/4
74/16 92/11
92/17 100/8
**McKenzie's [1]**
92/25
**MCL [3]**   76/16 76/18
76/23
**me [41]**   4/12 5/12
11/2 11/13 15/20
19/4 21/8 23/19
35/8 47/11 47/21
49/1 50/25 53/18
58/9 63/11 64/8
64/9 64/9 65/20
66/8 67/18 67/23
68/8 69/4 69/21
69/23 72/14 82/18
82/25 83/17 88/3
89/3 90/21 101/7
104/12 104/25
109/12 110/12 112/2
112/5
**mean [14]**   5/11
18/10 47/5 47/5
47/6 52/22 59/16
71/10 83/5 90/10
94/10 96/20 104/20
107/20
**means [2]**   17/3
17/13 71/11
**meant [3]**   35/10
40/21 71/24
**measure [2]**   59/11
90/25
**measures [1]**   74/14
**meat [1]**   41/3
**medical [11]**   14/18
26/20 26/24 27/15
34/4 48/22 49/16
76/25 76/25 84/11
111/5
**meet [3]**   30/1 31/4
70/23
**meeting [3]**   31/23
31/25 32/1
**member [1]**   33/17
**members [5]**   31/18
33/17 82/6 82/7
91/20
**memory [1]**   78/14
**mental [1]**   10/25
**mention [2]**   17/3
76/18
**mentioned [3]**   14/9
27/8 28/21
**Mercado [2]**   73/25
74/8
**Mercado's [1]**   74/6
**Meredith [2]**   1/18
2/21
**merely [1]**   80/16
**merit [2]**   87/10
114/4
**meritorious [1]**
22/19
**merits [5]**   3/14
52/9 61/12 71/12
95/16
**met [3]**   7/3 14/22
65/14
**Mickell [1]**   18/19
**middle [4]**   61/17
87/8 87/16 88/12
**might [16]**   3/21

**M**

might... [15]   2/24
39/5 41/15 41/22
41/24 43/6 43/17
61/8 61/15 61/16
79/15 92/6 97/10
110/11 111/22
**mild** [7]   25/17 77/5
77/18 78/5 79/4
79/9 79/13
**Miller** [1]   94/23
**million** [4]   24/15
68/14 94/20 94/22
**mind** [2]   97/3 107/1
**mindful** [1]   101/2
**mini** [6]   39/10 59/7
61/3 98/22 108/20
108/21
**mini-trial** [4]
39/10 61/3 108/20
108/21
**mini-trials** [2]
59/7 98/22
**minimal** [1]   76/22
**minimize** [1]   14/18
**minimum** [1]   26/2
**minor** [2]   47/21
71/3
**minute** [1]   35/5
**minutes** [3]   32/1
40/25 100/25
**misapplication** [2]
73/7 77/3
**misapplied** [1]
81/17
**misapprehension** [1]
5/13
**misquote** [1]   80/14
**misquoting** [1]   93/5
**misrepresentation**
[1]   13/4
**misrepresentations**
[1]   13/2
**missing** [1]   55/23
**mission** [1]   4/3
**mistake** [1]   106/3
**mitigate** [1]   25/23
**MOCA** [1]   79/12
**moderate** [2]   26/13
77/6
**modest** [1]   19/15
**moment** [5]   9/11
11/2 23/19 103/4
103/5
**money** [3]   15/18
27/11 109/24
**monitor** [1]   105/12
**month** [1]   68/14
**months** [2]   26/8
27/9
**more** [34]   5/25 7/2
7/18 8/3 11/25
13/17 24/21 24/23
24/24 27/11 40/21
46/22 47/25 49/9
49/9 52/23 53/4
53/11 55/4 61/17
61/17 67/17 67/19
69/12 82/15 86/14
90/21 91/23 96/16
97/10 97/10 101/9
111/8 111/21
**morning** [9]   2/9
2/11 2/13 2/14 2/16
2/19 2/23 3/17 10/2

**most** [10]   24/11
56/1 59/15 65/24
76/17 94/8 109/14
**most-recent** [1]
76/17
**motion** [36]   3/2 3/6
3/10 3/17 3/23 3/24
5/17 8/18 9/21
10/22 11/23 12/1
12/8 12/25 17/22
23/21 32/14 36/19
40/18 41/3 41/7
45/18 46/8 51/4
53/19 53/23 55/17
61/10 64/23 65/5
65/6 88/11 91/5
93/14 93/14 101/16
**motions** [13]   1/11
2/7 3/9 6/3 6/11
14/21 30/25 61/16
81/7 91/12 98/6
99/21 111/1
**motives** [2]   13/4
22/9
**move** [5]   20/3 30/2
35/4 107/18 108/6
**moved** [1]   107/16
**Mr** [6]   56/14 69/6
71/6 76/9 76/18
106/2
**Mr.** [42]   3/19 3/19
3/22 4/7 5/12 6/14
6/21 7/25 10/23
11/13 11/25 41/5
41/12 42/18 51/15
55/20 67/24 74/1
74/16 77/16 78/1
78/3 78/9 78/11
78/13 78/15 79/10
79/14 92/17 100/8
101/9 101/9 101/10
102/11 102/17
103/17 103/20
104/11 105/4 107/16
110/14 110/15
**Mr. Barnett** [10]
3/19 3/22 10/23
41/5 41/12 42/18
67/24 101/9 103/17
110/15
**Mr. Barnett's** [1]
55/20
**Mr. Jacob** [9]   3/19
5/12 11/13 101/9
101/10 104/11 105/4
107/16 110/14
**Mr. Jacob's** [1]
11/25
**Mr. Katz** [2]   7/25
103/20
**Mr. McKenzie** [4]
74/1 74/16 92/17
100/8
**Mr. Murphy's** [1]
78/11
**Mr. Thomas** [4]   78/3
78/13 78/15 79/14
**Mr. Thomas's** [2]
78/9 79/10
**Mr. Vincent** [2]
51/15 102/17
**Mr. Vincent's** [4]
4/7 6/14 6/21
102/11

**Mr. Zeno** [1]   78/1
**Mr. Zeno's** [1]
78/18
**MRI** [1]   76/17
**Ms.** [1]   10/18
**Ms. Damron** [1]
10/18
**MSJs** [1]   89/19
**much** [8]   9/19 10/16
42/3 52/22 74/24
87/3 96/16 109/20
**multiple** [10]   12/12
18/16 20/5 30/14
33/16 37/5 37/6
45/7 47/13 96/12
**Murphy** [4]   78/4
78/6 78/17 78/22
**Murphy's** [2]   78/11
78/12
**must** [5]   31/4 38/23
46/13 57/11 81/19
**mutual** [1]   45/24
**my** [24]   3/1 5/11
7/16 8/5 9/8 9/10
9/12 9/21 11/24
43/12 48/6 49/21
51/1 63/11 66/10
66/17 66/19 67/4
81/11 100/21 101/1
104/9 112/6 112/16
**myself** [1]   111/19

**N**

**name** [1]   93/7
**named** [10]   2/10
4/16 53/3 54/15
83/9 96/23 96/25
100/8 103/1 106/12
**names** [1]   106/20
**narratives** [4]
16/10 19/18 37/18
67/20
**narrow** [5]   57/10
57/15 68/6 88/4
92/8
**narrowly** [3]   68/3
69/14 91/3
**nature** [2]   59/21
69/5
**NC** [2]   65/14 77/5
**necessarily** [3]
26/18 28/8 41/23
**necessary** [5]   6/25
19/20 33/21 90/22
108/22
**necessitate** [1]
88/13
**necessitates** [1]
39/10
**necessity** [1]   96/25
**need** [45]   4/21
10/20 16/8 16/9
22/15 24/12 32/24
34/7 35/25 36/1
40/10 40/15 40/19
46/23 48/23 52/18
52/19 58/4 61/21
61/22 64/7 64/16
65/7 65/12 65/18
68/24 83/20 85/4
85/9 89/5 89/9
89/12 90/20 90/24
90/24 91/8 91/14
91/23 92/5 98/3
99/4 103/9 110/13

112/3 112/4
**needing** [3]   5/25
55/14 84/18
**needs** [6]   54/10
57/8 58/1 58/3
58/21 103/13
**neglected** [1]   10/24
**neither** [1]   61/12
**network** [2]   72/18
72/21
**neurocognitive** [7]
45/16 45/17 45/21
46/2 78/21 94/14
106/5
**neurological** [1]
27/15
**neurologist** [2]
26/20 45/22
**neuropsychological**
[1]   79/10
**neuropsychologist**
[3]   24/15 27/2
45/22
**neuropsychologists**
[1]   28/5
**neutral** [78]   6/24
7/2 7/2 8/24 13/5
14/15 14/16 27/14
29/7 42/22 42/22
43/2 43/2 44/3 44/7
44/8 44/9 45/2
45/11 46/3 46/5
47/14 48/6 48/11
48/20 49/23 49/24
50/1 50/4 50/6
50/10 50/14 50/17
50/23 51/5 51/6
51/9 51/20 52/1
52/13 53/4 58/10
64/1 64/25 65/16
67/10 72/17 73/10
73/23 74/4 74/19
74/22 75/3 75/6
75/18 78/7 84/10
84/13 85/22 86/2
87/16 87/21 89/25
95/20 95/20 95/22
95/23 96/5 96/6
96/8 96/11 96/18
102/15 102/16
102/18 103/7 107/3
111/4
**neutral-physician**
[1]   47/14
**neutrality** [1]   58/8
**never** [4]   48/10
51/11 57/3 81/24
**new** [4]   5/24 10/5
10/8 27/10
**next** [23]   5/11 12/6
13/22 15/2 15/11
15/12 15/21 16/6
21/14 22/24 25/1
27/7 30/9 31/1
31/10 32/7 35/4
38/22 39/17 77/4
89/9 89/12 89/15
**NFL** [9]   1/7 2/5
11/11 23/7 23/13
76/11 76/13 76/16
76/19
**nine** [6]   54/15
91/13 91/17 91/19

92/12 107/18
**Ninth** [2]   58/13
83/9
**no** [51]   1/5 7/11
8/12 8/20 9/5 17/7
17/6 19/4 21/19
22/4 26/13 26/14
29/19 36/10 39/2
42/14 47/9 47/15
47/15 50/24 51/16
52/9 53/21 61/7
67/2 67/5 68/7
70/12 75/13 76/5
78/6 79/13 79/14
80/2 80/23 81/3
81/9 81/22 85/25
95/23 100/19 101/18
101/23 101/23 103/4
103/5 103/11 103/12
104/10 104/23
111/21
**nobody** [1]   112/1
**none** [10]   18/22
57/1 65/10 72/20
72/24 77/13 80/2
88/18 88/23 98/11
**nonsense** [1]   8/25
**normal** [1]   54/22
**normed** [1]   28/18
**norming** [1]   85/14
**norms** [11]   28/5
28/12 28/12 28/16
28/22 29/1 85/16
85/21 86/1 86/5
87/10
**NORTHERN** [2]   1/2
26/7
**not** [238]
**notably** [1]   46/11
**note** [8]   10/25 50/8
58/14 64/19 64/22
70/16 77/8 82/11
**noted** [2]   38/17
78/17
**notes** [2]   1/22
78/15
**nothing** [9]   10/5
10/6 10/7 10/7 70/9
71/4 76/23 106/17
109/25
**notice** [1]   99/19
**noticing** [1]   22/7
**notion** [2]   68/9
95/6
**novo** [4]   36/7 36/9
36/14 111/14
**now** [24]   2/4 3/16
5/20 19/2 19/7
23/25 24/9 27/11
29/16 31/2 37/2
40/8 44/11 46/8
46/23 63/11 66/8
79/6 96/15 97/23
105/15 105/17
108/25 112/25
**number** [21]   24/17
37/1 37/2 37/11
37/13 52/5 53/15
61/1 65/16 66/13
66/21 72/16 75/15
77/4 78/16 79/24
81/18 89/12 89/15
96/25 97/1
**numbers** [6]   46/14
46/17 46/24 47/3

**N**

numbers [2] 47/24
62/16 95/13
numerical [1] 21/23

**O**

O'Rourke [1] 45/19
object [1] 11/19
objection [1] 11/16
objections [1] 4/7
objective [1] 9/10
objectively [2]
14/6 14/10
obligated [5] 15/25
16/1 31/12 35/16
36/6
obligation [3]
35/19 39/15 104/8
observation [1]
64/1
obvious [1] 80/19
obviously [16] 3/19
3/22 9/24 10/21
11/18 13/25 18/4
19/8 20/20 21/15
22/9 38/5 69/6
86/16 86/21 104/1
occupation [2]
73/15 73/21
occur [1] 88/6
off [8] 10/24 31/23
31/25 41/24 42/11
58/16 83/12 111/24
off-record [2]
31/23 31/25
offer [1] 54/24
offered [3] 82/11
82/13 85/2
Official [3] 1/24
114/1 114/16
often [3] 44/14
87/2 87/2
oh [2] 10/11 82/14
okay [38] 7/24 8/10
9/2 9/22 11/5 11/11
11/15 11/17 17/10
18/1 19/6 20/1
21/22 24/8 26/3
27/3 27/21 28/15
29/2 29/20 34/6
35/2 35/9 35/14
48/18 49/3 52/2
60/17 64/13 67/6
68/8 87/19 87/24
103/15 105/19
108/15 111/17
112/20
Olawale [1] 45/18
old [1] 26/11
omitted [1] 80/8
one [107] 6/23 7/1
7/2 7/12 8/3 8/13
8/14 9/11 10/24
13/11 13/22 15/3
15/3 15/4 15/20
16/6 17/2 20/5
20/12 21/2 21/7
21/10 21/14 23/11
29/11 29/21 30/10
31/1 31/2 31/10
32/7 35/5 35/5
35/25 35/25 36/19
37/9 39/8 43/2
43/10 44/2 44/7
44/14 45/1 45/10

47/9 47/15 47/15
49/18 49/24 50/7
50/25 51/3 51/3
51/16 51/22 54/9
54/9 58/3 58/11
60/16 60/16 60/22
61/8 67/14 67/20
67/23 69/6 72/16
74/24 75/13 77/4
77/15 82/3 83/24
84/15 86/24 88/9
88/17 88/18 89/6
89/9 89/12 89/15
89/19 89/23 90/2
90/12 91/5 91/6
92/12 93/24 94/6
97/18 99/3 100/7
100/9 101/9 101/12
102/6 102/24 106/25
109/12 110/19
one's [1] 9/17
one-physician [1]
47/9
one-size-fits-all
[1] 39/8
ones [13] 19/18
20/18 46/2 50/2
50/4 52/14 61/24
63/17 83/8 84/23
88/20 91/5 102/6
only [43] 5/6 8/16
8/16 20/17 29/6
30/13 37/16 44/2
44/7 45/1 47/19
51/5 51/8 52/3 52/4
55/7 57/14 57/17
60/25 61/2 62/20
64/14 71/13 72/23
73/24 77/12 80/2
80/5 80/10 80/18
81/21 84/21 92/11
97/17 98/23 100/8
102/16 102/18 106/3
106/15 107/2 107/12
109/11
open [2] 112/17
112/18
opening [2] 64/10
64/11
operates [1] 42/22
operating [1] 108/4
operative [1] 41/9
opinion [3] 34/22
96/6 112/3
opinions [2] 27/6
89/17
opposed [1] 111/23
opposite [2] 72/12
102/9
opposition [2] 3/8
5/21 14/3 18/22
20/13 94/20
oral [1] 112/1
order [18] 8/23
21/23 22/4 22/8
24/6 37/2 38/24
41/7 41/8 42/13
48/23 53/20 61/24
62/19 83/20 89/5
91/23 97/15
ordered [8] 30/15
30/19 38/18 39/13
53/21 62/20 63/5
71/24

orders [2] 67/25
68/3
organization [1]
78/14
organize [1] 20/10
orientation [1]
50/18
other [62] 5/7 6/14
7/13 9/3 13/12
14/12 17/1 18/4
20/22 21/6 27/13
27/24 28/5 28/9
28/24 29/3 29/6
31/12 33/2 33/9
33/12 38/7 43/9
47/5 47/8 51/1
51/14 51/15 52/24
56/9 62/3 62/8 62/9
63/17 64/18 65/14
65/25 66/23 69/1
69/10 69/15 69/21
77/17 77/17 79/14
89/9 89/21 90/24
92/7 92/13 95/1
97/8 98/23 100/11
100/20 100/22 106/1
106/7 106/13 107/3
109/2 111/21
others [4] 20/17
28/11 57/18 82/12
otherwise [1]
111/22
our [49] 4/25 6/8
8/18 8/20 10/4 12/8
12/10 12/16 12/24
13/1 13/14 13/24
14/7 14/23 15/14
19/14 20/8 20/10
23/12 24/16 26/5
27/22 29/8 30/25
33/7 36/13 36/19
36/19 37/24 38/2
38/6 39/2 39/15
40/4 46/22 47/5
70/1 91/24 94/19
104/13 106/12
107/13 107/15
107/22 107/24
107/24 110/3 110/4
110/8
out [48] 4/4 10/24
11/1 11/2 13/14
15/9 20/11 22/8
26/7 29/25 30/24
33/5 33/6 37/2 40/9
44/4 44/17 44/18
45/1 45/4 50/23
52/25 53/11 56/10
56/11 61/2 62/10
62/15 62/21 63/4
70/21 75/5 79/12
80/14 84/2 88/17
89/17 90/4 92/12
93/21 94/18 94/20
97/10 97/23 99/2
101/6 101/8 107/8
outcome [6] 43/16
47/1 47/8 49/24
50/16 71/21
outer [2] 54/6
56/19
outliers [1] 61/22
outright [1] 56/12
outside [1] 21/12
outsourced [1] 32/5

outsourcing [1]
68/6
over [10] 24/25
26/11 74/12 93/23
94/5 95/8 95/10
95/14 98/18 112/9
overarching [1]
69/12
overwhelm [1] 54/23
overwhelming [4]
43/25 47/20 52/5
65/16
own [14] 6/13 34/13
36/9 39/24 56/6
57/6 64/23 74/4
81/16 86/2 86/5
98/15 105/13 111/1

**P**

p.m [3] 101/5 101/5
113/2
page [15] 43/24
43/24 55/16 56/13
64/5 64/12 64/15
64/23 69/23 72/15
83/16 89/4 94/19
108/5 114/9
pages [5] 30/20
56/6 62/9 84/23
110/20
pages 20 [1] 110/20
pages 3 [1] 62/9
paid [10] 24/14
27/11 27/11 40/3
49/13 50/21 64/24
94/18 94/20 109/24
panel [5] 25/15
25/20 25/22 92/19
93/7
pans [1] 11/1
papers [2] 3/8
94/24
paperwork [1]
106/17
paragraph [15] 48/8
48/9 48/9 48/24
49/12 55/20 64/15
73/25 75/1 75/1
77/15 79/1 80/7
80/25 94/24
paragraph 1 [1]
77/15
paragraph 112 [1]
48/24
paragraph 193 [1]
80/7
paragraph 225 [1]
75/1
paragraph 284 [1]
80/25
paragraphs [14]
6/22 43/21 70/14
72/20 72/24 75/1
75/17 77/10 77/12
78/2 79/20 80/3
80/5 81/21
paralegal [1] 31/23
paralegals [1] 32/4
paralyzing [1]
80/11
pardon [1] 109/12
parking [1] 112/13
part [12] 14/21
15/22 24/1 35/9
39/15 42/21 57/6

58/20 59/8 65/5
66/24 85/20 109/2
participants [2]
57/16 94/24
participate [1]
84/24
particular [23]
9/12 25/22 43/14
43/14 48/7 58/6
59/4 61/13 61/24
63/1 74/23 75/20
83/12 90/11 92/3
92/5 93/11 93/15
94/1 98/6 98/7 98/8
99/8
particularized [11]
20/14 20/15 24/10
32/10 33/23 33/23
55/12 68/24 69/5
90/20 92/15
particularly [8]
7/24 22/25 64/5
89/1 94/2 96/2
100/12 100/17
parties [2] 56/4
59/1
parties' [1] 53/10
parts [1] 83/19
party [16] 5/24
58/25 60/23 61/4
82/2 83/4 83/10
83/10 83/15 84/8
84/17 84/22 84/24
99/10 101/21 111/7
path [1] 9/13
pathology [1] 76/18
patience [1] 29/18
pattern [20] 13/6
22/19 29/22 30/3
30/7 33/22 34/8
35/22 36/4 53/17
57/18 63/18 65/18
66/15 89/7 90/14
90/24 109/5 110/15
110/18
patterns [1] 42/6
paying [1] 21/25
pending [6] 2/4 3/5
3/5 3/10 81/7 99/21
people [11] 22/4
25/11 26/16 63/8
82/9 82/11 85/4
85/9 87/11 92/12
99/16
percent [13] 44/6
44/9 44/12 44/21
44/22 45/3 61/10
61/11 61/16 94/13
94/14 94/24 95/1
percentage [1] 61/9
perform [6] 16/3
75/4 75/5 75/6
performance [3]
15/22 24/21 74/14
performing [1]
15/24
period [15] 4/4 4/8
4/13 4/14 4/20 41/6
41/14 44/6 46/9
68/13 74/12 93/24
95/8 95/14 98/19
permanent [1] 73/13
permanently [1]
74/11
Permission [1]

**P**

**Permission [1]**
10/14

**permitted [6]** 15/8
38/13 54/7 56/20
86/23 109/19

**person [13]** 44/8
45/25 69/8 74/11
75/4 75/8 75/11
75/12 76/13 92/12
95/22 96/7 96/8

**persons [1]** 35/18

**pertaining [1]** 3/6

**Ph.D [1]** 26/22

**phone [1]** 112/18

**phrase [5]** 35/1
65/23 71/7 71/9
74/10

**phrasing [1]** 55/12

**physical [1]** 21/10

**physician [63]** 4/24
6/8 6/24 7/2 7/3
12/9 14/18 15/23
16/2 16/9 16/19
19/17 22/22 29/8
30/14 36/25 37/17
39/25 40/1 43/2
44/2 44/3 44/7 44/8
45/2 45/11 46/3
47/9 47/14 47/19
48/1 48/2 48/7
48/12 49/25 50/4
50/14 50/17 51/17
52/1 67/10 72/17
73/10 74/4 74/19
74/22 75/3 75/6
75/19 78/8 87/16
87/21 89/10 89/25
95/22 95/23 96/6
96/6 96/19 103/7
106/20 107/3 111/4

**physician's [2]**
49/14 50/1

**physicians [57]**
6/18 8/9 8/12 8/17
8/24 12/23 14/14
14/15 15/12 15/15
15/19 15/22 16/10
27/13 27/14 27/24
29/7 36/21 38/15
42/23 43/2 43/15
46/5 47/10 48/20
49/10 49/23 50/6
50/10 50/23 51/5
51/6 51/20 52/11
53/4 64/1 64/17
64/25 65/16 65/21
65/25 66/23 73/23
77/17 84/10 84/13
85/22 85/23 86/2
96/11 99/3 102/15
104/15 106/25 107/1
107/6 111/9

**physicians' [4]**
49/13 65/13 89/13
89/16

**pick [1]** 41/14

**picked [2]** 4/14
29/21

**piece [4]** 18/15
29/3 66/5 112/6

**pieces [1]** 6/17

**pinging [1]** 43/5

**place [10]** 22/21
31/3 75/4 81/22

**places [1]** 70/7

**plaintiff [13]** 1/5
1/15 2/8 17/23
44/17 54/9 55/8
59/14 78/5 81/8
92/11 92/25 106/9

**plaintiff's [2]**
25/6 25/24

**plaintiffs [48]**
2/10 2/15 4/16 5/20
5/21 6/2 23/3 28/6
28/24 30/16 36/19
42/5 43/5 43/13
43/18 47/21 53/3
53/22 53/24 54/3
54/15 55/10 55/16
55/21 58/8 59/6
59/12 59/15 59/21
68/10 77/22 81/11
83/9 88/10 90/14
90/19 91/20 91/24
96/23 97/1 98/7
98/13 100/8 101/12
102/25 103/1 106/12
107/17

**plaintiffs' [8]** 3/2
3/8 6/4 10/22 12/2
56/6 57/6 110/17

**plan [115]**
101/13 101/15

**plan's [4]** 27/15
71/1 73/12 80/8

**plan-compensated [1]**
64/16

**plan-neutral [1]**
27/14

**plan-selected [3]**
65/13 65/21 89/16

**plan-wide [2]**
101/13 101/15

**Planned [1]** 77/5

**planning [1]** 11/9

**plans [21]** 2/18
2/20 2/22 13/9
14/10 21/5 23/16
24/5 27/8 29/4 29/4
30/1 30/11 31/3
36/6 36/20 37/7
40/3 54/23 54/24
102/9

**platonic [1]** 60/24

**play [5]** 76/10
76/13 76/18 76/22
95/13

**played [1]** 24/20

**player [7]** 1/7 2/5
7/1 43/3 73/17 81/2
95/23

**player's [1]** 73/18

**players [7]** 23/7
24/2 26/16 77/17
80/10 82/8 85/13

**players' [2]** 82/7
83/14

**playing [2]** 26/18
76/16

**please [14]** 6/5
10/15 13/22 15/2
15/11 16/6 22/24
38/22 41/2 68/19
101/6 101/10 109/25
110/12

**pled [1]** 18/24

**pledge [1]** 9/7

**plethora [1]** 12/11

**plus [2]** 31/22
100/4

**pneumonic [1]** 78/16

**point [43]** 11/20
20/14 25/10 32/23
39/18 42/11 42/17
43/19 46/22 48/6
48/24 52/17 52/21
52/25 59/4 59/5
64/21 65/22 71/13
72/6 72/19 73/12
73/12 73/21 73/24
74/7 74/23 74/23
75/1 75/2 75/9
75/16 83/4 83/9
84/6 85/15 87/7
87/14 87/20 87/22
88/24 96/14 108/20

**pointed [7]** 42/20
43/22 44/17 50/2
62/21 84/2 89/4

**pointing [2]** 26/16
93/17

**points [16]** 9/24
21/7 21/7 21/10
21/25 22/1 44/4
53/19 75/16 75/20
76/1 76/6 76/10
76/11 76/12 105/18

**populated [1]** 7/4

**portion [1]** 66/12

**portions [1]** 3/22

**position [10]** 11/25
32/18 51/16 66/25
85/25 96/20 96/22
97/3 108/9 108/17

**positive [1]** 78/18

**possession [1]**
53/16

**possibility [1]**
97/6

**possible [3]** 20/8
74/14 87/4

**possibly [2]** 24/11
50/8

**potential [1]**
102/24

**potentially [4]**
13/4 35/21 77/13
105/12

**power [1]** 50/5

**PowerPoint [3]** 9/6
9/21 10/2

**practical [1]** 31/6

**practice [26]** 22/19
29/22 30/3 30/8
31/19 33/18 33/22
33/24 34/8 35/1
35/22 36/4 49/8
49/14 53/17 63/18
65/19 66/16 85/23
87/8 89/7 90/14
98/24 109/5 110/16
110/19

**practice-type [1]**
63/18

**practices [1]** 13/7

**precedent [4]** 18/9
18/14 40/13 40/17

**precipice [1]** 40/10

**precisely [1]** 58/19

**predated [2]** 95/20
96/8

**predictive [1]**
36/21

**predisposition [1]**
36/21

**preliminary [2]**
3/21 41/4

**prepare [2]** 27/13
82/21

**prepared [4]** 3/11
3/16 9/6 67/24

**presence [1]** 78/5

**present [11]** 31/23
46/14 77/19 79/22
84/22 87/15 88/21
93/3 98/15 101/12
107/8

**presentation [8]**
9/6 25/10 55/10
69/25 74/25 92/19
93/6 93/22

**presentations [1]**
92/18

**presented [7]** 18/25
58/7 64/4 78/13
81/12 95/9 97/19

**presenting [1]**
37/10

**presumably [1]**
104/6

**presumptively [1]**
54/18

**pretty [3]** 27/5
31/2 112/4

**prevented [2]** 73/14
97/20

**preview [1]** 16/7

**previously [2]**
20/23 37/9

**PRF [2]** 50/22 76/1

**PRFs [4]** 16/9 19/18
37/18 67/20

**principle [1]** 91/11

**prior [9]** 18/20
21/4 37/20 37/25
73/16 82/14 85/25
87/22 97/20

**probably [2]** 61/6
101/1

**problem [8]** 6/13
7/8 91/25 92/3 92/5
92/21 93/4 101/16

**problematic [2]**
33/2 59/10

**procedures [1]**
54/25

**proceed [2]** 67/24
82/13

**proceedings [2]**
1/10 114/8

**process [15]** 4/16
6/16 27/24 35/24
37/4 37/7 38/5
48/13 70/21 85/3
96/13 96/16 99/11
103/6 103/11

**processes [1]** 27/15

**processing [1]** 99/5

**produce [11]** 30/19
47/18 58/17 68/1
68/12 70/8 82/19
91/2 102/3 107/12
107/21

**produced [39]** 5/18
11/10 33/12 33/16
42/2 42/13 48/10

48/15 50/9 50/12
50/14 50/17 50/22
50/25 50/25 54/4 54/8
58/22 62/1 63/5
63/22 64/22 66/2
66/12 66/20 67/1
67/12 67/15 67/22
69/18 77/1 90/15
97/9 106/21 108/11
108/19 109/15
109/15 109/20

**producing [4]** 40/6
42/9 83/23 111/14

**production [13]**
12/8 27/25 30/22
31/7 31/13 42/16
57/2 58/2 62/19
62/22 68/15 70/18
111/7

**professional [5]**
50/20 51/1 85/24
86/3 87/22

**profit [1]** 73/16

**program [1]** 50/19

**progression [1]**
42/5

**prohibited [1]**
86/21

**prolonged [1]** 74/12

**promise [1]** 63/11

**promote [1]** 27/10

**promoted [2]** 26/9
27/8

**properly [1]** 55/25

**proportionate [3]**
13/16 14/25 47/17

**propose [1]** 111/25

**proposition [2]**
96/21 97/4

**protected [1]** 17/5

**prove [6]** 38/24
59/14 59/15 59/22
66/25 105/14 107/15
108/9

**provide [8]** 27/14
36/22 39/20 43/12
44/22 65/10 81/22
100/7

**provided [5]** 10/1
47/1 48/10 51/2
62/13

**provides [3]** 48/16
49/13 54/25

**providing [1]** 49/9

**provisions [1]**
18/17

**proviso [1]** 19/22

**proximity [1]** 51/9

**psychiatric [2]**
74/15 74/16

**psychological [3]**
25/4 25/16 74/9

**public [1]** 112/18

**publications [1]**
24/18

**publicly [1]** 29/13

**publishing [1]**
112/5

**pulled [1]** 82/13

**pulling [1]** 82/24

**punished [1]** 109/19

**purple [1]** 35/10

**purport [3]** 72/22
72/25 88/21

**purported [5]** 72/15

**P**

**purported [1]** 75/15 77/4 79/24 85/11
**purposes [4]** 2/7 41/25 47/5 48/14
**pursuant [1]** 114/6
**pursue [1]** 109/19
**pursuing [1]** 16/4
**put [15]** 6/9 21/23 34/9 40/16 40/16 45/21 46/11 70/13 82/1 98/3 100/2 104/18 112/5 112/6 112/9
**putative [2]** 6/15 96/23
**putting [3]** 6/7 8/5 103/9

**Q**

**qualified [1]** 8/13
**qualifiers [1]** 4/21
**qualify [2]** 80/17 80/22
**quality [1]** 103/9
**quarrel [1]** 83/1
**quarreling [1]** 82/23
**quartile [2]** 52/10 52/13
**question [27]** 5/11 5/14 5/15 6/7 7/23 12/20 18/2 26/12 32/8 43/12 47/10 63/12 63/17 66/10 66/17 66/19 67/4 67/23 67/24 79/11 88/7 101/9 101/10 104/22 105/6 106/23 108/25
**questions [11]** 3/4 3/21 9/3 9/24 19/2 41/4 100/21 100/22 104/1 110/11 111/17
**quick [1]** 56/3
**quicker [1]** 8/3
**quickly [7]** 7/23 9/23 13/23 20/4 20/7 30/2 33/4
**quite [5]** 19/23 43/8 72/12 80/19 83/12
**quiz [2]** 83/5 83/17
**quote [27]** 14/15 27/12 55/17 64/24 70/21 71/6 72/17 72/18 73/14 73/16 76/2 76/15 77/6 78/13 78/15 78/18 78/20 79/4 79/9 79/12 79/14 80/7 93/8 106/23
**quote/unquote [3]** 14/15 27/12 106/23
**quoted [1]** 74/22
**quotes [1]** 92/17

**R**

**race [9]** 16/10 17/19 17/20 24/20 28/18 85/13 85/18 86/13 86/16
**racial [3]** 28/4

28/12 28/16
**radar [2]** 32/19
65/15
**raised [4]** 13/6 87/11 92/23 105/20
**randomized [1]** 103/7
**randomly [1]** 41/14
**rate [7]** 49/25 51/8 51/21 52/4 52/12 52/14 60/25
**rates [7]** 38/9 49/10 51/11 51/18 94/12 94/15 102/14
**rather [5]** 41/16 51/4 69/7 69/11 82/13
**rationales [1]** 40/2
**Ravens [1]** 35/12
**reach [3]** 31/24 34/14 43/11
**reached [1]** 37/16
**reaching [1]** 16/20
**read [9]** 6/20 9/7 23/18 23/19 32/4 35/8 35/9 62/4 112/2
**reading [1]** 7/7 23/25 71/6 71/9
**reads [1]** 81/5
**Ready [1]** 10/17
**real [1]** 81/6
**reality [1]** 7/13
**really [26]** 3/11 3/13 5/15 14/4 18/22 18/24 29/8 31/10 32/23 33/24 37/3 51/16 57/23 88/7 99/15 100/16 103/4 103/25 104/17 104/19 104/20 107/11 109/6 109/23 109/24 112/13
**Realtime [1]** 114/5
**reason [7]** 15/17 40/10 42/3 42/14 59/19 110/2 111/21
**reasonable [3]** 71/2 71/6 71/9
**reasonableness [1]** 37/3
**reasoned [2]** 91/10 91/25
**reasons [7]** 29/11 40/11 60/22 68/9 76/21 82/3 102/10
**rebut [2]** 93/5 103/17
**rebuttal [2]** 100/25 103/24
**receive [2]** 15/19
**received [2]** 50/15 61/13
**recent [1]** 76/17
**recess [3]** 40/23 100/24 101/4
**recognize [1]** 6/2
**recognized [2]** 13/19 14/5
**recommendation [6]** 6/18 15/15 45/24 46/3 52/5 84/22
**recommendations [11]** 8/8 12/22 15/18 16/4 27/14 42/19

83/16 83/20 102/7
10/4[1]5 07/6
**recommended [3]** 8/17 38/9 46/5
**recommends [2]** 9/13 74/17
**record [83]** 2/8 5/18 19/12 19/13 20/16 21/13 22/17 22/21 31/19 31/20 31/23 31/25 32/1 33/15 34/15 45/17 45/19 53/2 53/6 53/10 53/21 54/3 54/19 55/6 55/11 55/15 55/24 55/24 56/4 57/10 58/4 58/5 58/12 60/12 60/21 62/11 66/14 68/1 68/12 68/22 69/14 70/7 70/12 71/11 77/24 79/6 82/16 83/19 84/15 84/20 84/23 85/19 90/3 90/6 90/25 92/2 92/4 92/5 93/1 93/2 94/2 95/4 96/24 96/24 97/4 97/10 97/13 97/14 97/17 97/20 98/5 98/9 98/18 99/7 99/9 102/3 106/7 109/1 110/17 111/25 111/25 112/17 112/19
**record that's [1]** 82/16
**records [38]** 31/12 32/13 33/5 33/6 33/7 33/18 34/4 52/20 53/11 55/18 57/3 62/20 62/21 62/22 65/9 81/25 83/16 84/1 84/2 84/3 84/4 84/11 85/8 88/11 88/15 89/1 90/17 91/14 91/16 91/17 92/22 98/7 98/16 99/12 99/13 99/15 100/4 111/6
**recover [1]** 41/20
**recurs [1]** 79/19
**redacted [1]** 106/20
**refer [2]** 55/7 81/25
**referenced [1]** 14/12
**references [1]** 28/6
**referred [1]** 3/12
**referring [1]** 25/9
**reflect [4]** 56/16 64/24 77/6 77/14
**refusal [1]** 107/23
**refuse [1]** 107/21
**refusing [1]** 107/12
**reg [1]** 35/7
**regard [5]** 64/21 70/16 77/20 81/4 87/9
**regarding [2]** 13/24 24/10
**regardless [1]** 8/9
**Registered [1]** 114/4

**regularly [1]** 85/5
**regulations [3]** 37/24 43/6 96/6
**Reichard [4]** 59/2 59/3 60/22 98/21
**Reichard's [1]** 64/1
**rejected [3]** 26/15 36/21 64/1
**relate [3]** 13/1 18/22 39/7
**related [4]** 18/5 18/5 36/20 109/4
**relates [2]** 110/3 110/16
**relatively [4]** 15/3 19/15 20/3 110/10
**relevant [36]** 4/4 4/8 4/22 4/24 5/4 5/7 6/8 12/9 12/16 12/16 12/18 12/21 13/16 13/21 14/8 14/24 19/14 20/23 30/3 30/5 36/23 41/6 41/14 41/16 41/18 42/11 48/20 55/23 61/1 62/25 62/23 77/13 89/13 96/2 99/17 107/13
**reliable [1]** 44/20
**reliance [2]** 65/24 66/22
**relied [4]** 11/12 11/14 56/15 73/5
**rely [7]** 5/17 6/12 57/25 58/12 70/16 77/9 77/10
**relying [1]** 33/14
**remembering [1]** 31/21
**remote [1]** 73/5
**remotely [2]** 80/5 94/1
**remove [2]** 16/1 16/1
**remuneration [1]** 73/15
**render [4]** 33/20 49/16 82/25 90/8
**repeat [1]** 106/3
**reply [11]** 3/8 5/21 5/24 23/21 23/22 55/17 64/23 69/23 72/15 73/3 93/23
**report [12]** 43/23 45/17 45/19 45/23 52/8 67/11 74/1 74/6 74/22 75/3 76/23 76/24
**reported [2]** 1/23 114/8
**Reporter [5]** 1/24 114/1 114/4 114/5 114/16
**reports [18]** 4/24 6/8 12/9 14/18 16/9 16/19 19/17 22/23 30/14 37/17 39/25 63/5 63/7 66/1 66/7 66/23 73/10 89/25
**represent [4]** 94/21 99/15 103/6 111/4
**representations [4]** 32/12 85/8 85/10 99/17
**represented [3]**

14/16 32/24 68/13
**reputation [1]** 46/23
**request [12]** 36/22 63/7 63/9 66/12 66/20 67/1 67/2 67/9 92/15 106/10 110/17 111/16
**requested [5]** 23/14 36/19 100/7 100/9 100/12
**requests [6]** 3/23 4/2 5/22 57/13 97/16 97/17
**require [2]** 40/6 74/16
**required [8]** 4/2 13/7 30/11 50/24 55/24 57/7 68/12 101/21
**requirement [4]** 22/12 31/11 104/5 104/5
**requirements [4]** 30/1 31/3 31/4 31/9
**requires [3]** 47/25 50/15 100/3
**requiring [1]** 23/3
**research [1]** 24/16
**resolution [2]** 55/2 85/4
**resolve [2]** 44/16 92/9
**resolved [1]** 76/3
**resorted [1]** 44/15
**respect [24]** 16/12 42/7 44/23 44/25 46/5 46/18 48/6 49/22 55/8 56/4 63/6 63/20 63/22 66/4 69/21 72/23 73/19 74/18 74/23 75/23 76/8 91/14 92/16 99/22
**Respectfully [1]** 107/11
**respects [1]** 14/20
**respond [6]** 5/15 6/5 12/1 101/17 104/3 110/10
**responded [1]** 14/2
**responding [2]** 6/3 59/24
**response [4]** 4/1 11/24 11/25 12/20
**responses [2]** 62/13 93/20
**responsibilities [1]** 27/10
**responsibility [1]** 84/9
**responsible [1]** 105/3
**rest [1]** 89/3
**restriction [2]** 19/21 19/22
**restroom [1]** 40/24
**result [4]** 28/19 31/17 43/18 104/16
**retained [1]** 59/1
**retaining [1]** 49/9
**retention [4]** 8/23 50/8 50/10 51/19
**retired [1]** 24/2
**retirees [1]** 23/13

**R**

**reversed [1]** 47/5
**review [25]** 7/10
28/6 31/11 31/14
31/18 31/19 32/3
33/18 36/7 36/9
36/14 40/7 48/13
56/25 60/12 79/16
81/20 83/15 83/19
84/11 84/23 85/5
99/6 111/2 111/14
**reviewed [31]** 13/3
15/4 15/6 15/10
28/8 28/9 28/10
32/14 32/16 32/21
32/25 33/10 34/1
34/2 34/3 34/5
34/12 34/14 37/6
60/12 61/4 74/19
81/25 84/3 84/10
84/14 85/9 99/15
103/8 111/4 111/5
**reviewer [3]** 60/3
61/4 68/11
**reviewers [3]** 59/1
60/24 101/21
**reviewing [3]** 24/4
72/4 84/1
**reviews [1]** 101/22
**right [30]** 3/25 8/4
9/2 9/2 9/17 13/14
17/8 22/2 24/17
25/1 29/15 30/9
33/8 33/19 34/24
35/4 35/25 37/1
39/17 60/1 60/25
61/12 67/8 69/17
76/15 86/18 97/18
105/7 105/15 106/11
**rise [4]** 78/20
98/22 101/4 112/25
**RMR [2]** 1/23 114/16
**road [3]** 10/8 61/17
107/9
**robust [1]** 97/9
**rock [1]** 40/17
**rock-solid [1]**
40/17
**role [4]** 24/20
42/22 95/20 95/20
**roll [1]** 10/17
**Ronda [3]** 1/23
114/4 114/16
**rough [1]** 9/16
**RUBIN [1]** 1/11
**rue [1]** 9/10
**rule [9]** 3/11 6/3
13/15 14/22 14/25
44/9 54/23 96/8
111/23
**ruled [1]** 14/22
**rules [5]** 80/1 80/4
86/22 86/22 96/1
**ruling [1]** 112/1
**rulings [1]** 18/20
**run [1]** 26/11

**S**

**safeguards [2]**
104/18 104/20
**said [43]** 3/2 7/17
8/12 9/11 22/4
22/15 22/18 23/6
24/23 37/9 38/14
40/8 40/15 40/16
41/12 42/12 43/7
47/7 47/15 48/2
54/21 55/21 58/6
58/15 60/2 71/5
72/3 76/15 81/13
81/20 82/14 84/17
86/9 92/10 96/13
97/2 101/7 102/1
102/2 112/4
**Sam [3]** 25/13 27/1
28/9
**same [13]** 10/3 10/4
18/16 21/9 24/3
36/11 41/21 43/11
45/2 79/1 92/24
95/10 111/11
**sample [7]** 44/18
44/20 45/4 45/8
45/13 45/13 103/7
**samples [3]** 32/11
49/6 50/3
**sampling [1]** 44/14
**Samuel [2]** 1/16
2/12
**sarcastic [1]**
104/22
**satisfied [1]** 68/18
**satisfies [1]** 66/12
**satisfy [2]** 66/20
67/1
**saw [2]** 3/22 101/7
**say [83]** 5/15 7/9
7/11 15/5 16/17
16/21 17/13 19/4
19/21 28/23 33/4
33/10 33/13 33/13
38/13 46/7 46/16
49/8 53/18 55/4
55/17 61/9 62/2
64/6 64/14 64/15
64/20 64/24 65/12
65/18 69/15 70/1
71/8 71/22 72/16
73/2 73/4 73/6
73/12 73/25 74/13
75/15 75/18 76/9
77/5 77/18 78/4
79/2 79/7 79/24
80/10 80/25 81/11
81/18 83/1 83/15
83/19 84/3 85/5
86/20 86/23 89/5
89/9 89/12 89/15
90/24 91/8 91/21
92/4 92/13 92/18
92/24 93/5 93/18
99/3 99/9 99/19
100/10 101/13
103/23 103/24
104/19 107/24
**saying [23]** 28/25
29/9 29/10 30/8
33/8 34/1 34/2 34/3
34/4 34/19 39/3
41/22 44/11 46/25
47/12 65/22 70/4
82/24 90/11 90/19
91/1 96/10 104/24
**says [20]** 6/21 7/12
8/14 17/11 18/11
18/12 42/21 50/19
55/1 55/10 55/13
60/22 75/6 75/24
76/2 78/13 80/21

**seathing [1]** 2/1
**schedule [1]** 11/6
**scheduled [2]** 82/12
96/18
**scheme [4]** 13/8
14/14 69/12 109/4
**schemes [1]** 18/23
**science [1]** 25/23
**scope [2]** 53/21
55/19
**score [1]** 79/4
**scores [3]** 24/22
74/13 77/16
**scoring [2]** 79/12
86/3
**scrambled [2]** 25/6
25/25
**scratching [1]** 47/4
**scrupulous [1]** 10/3
**scrutiny [2]** 57/7
57/9
**searching [1]**
100/10
**seat [2]** 2/24
110/12
**second [18]** 10/24
15/20 21/16 23/19
25/9 34/10 42/17
54/1 64/9 65/12
65/20 65/23 66/12
66/21 73/12 74/24
75/13 109/12
**section [1]** 80/1
**section 3.5 [1]**
80/1
**sections [1]** 20/11
**see [29]** 11/1 13/23
16/10 17/15 17/17
22/16 25/16 25/19
30/21 31/7 34/7
36/1 42/4 45/1
51/23 52/8 58/24
69/23 77/2 89/19
90/3 92/22 93/2
99/12 99/22 99/23
100/11 104/8 109/25
**Seeger [1]** 2/10
**seeing [1]** 90/4
**seeking [19]** 8/18
12/7 12/14 16/14
19/1 23/3 24/7
35/20 37/25 38/21
52/23 53/22 57/2
59/12 65/10 68/21
106/4 106/12 108/3
**seem [1]** 59/11
**seen [7]** 16/18
27/25 28/3 28/4
28/7 48/8 108/14
**selected [4]** 64/17
65/13 65/21 89/16
**selections [1]**
38/15
**selective [1]** 108/7
**Selesnick [1]** 76/12
**Selesnick's [1]**
76/24
**self [1]** 21/20
**self-evident [1]**
21/20
**Sellers [2]** 26/6
27/4
**seminal [1]** 57/23
**seminar [4]** 25/3

**25/11 25/14 25/20**
**25/23/25 [1]** 2/1
**sense [4]** 13/2
31/10 49/20 112/10
**sentence [2]** 65/23
79/8
**separate [3]** 13/10
14/8 19/24
**series [2]** 72/19
110/5
**seriousness [1]**
39/8
**serve [1]** 53/9
**services [2]** 26/9
27/12
**set [7]** 9/8 13/14
29/25 30/24 69/22
88/14 96/1
**sets [1]** 53/6
**setting [1]** 95/24
**seven [3]** 13/17
63/5 81/18
**several [6]** 55/9
56/9 77/16 78/2
78/22 93/20
**severe [1]** 26/13
**shall [2]** 16/18
17/13
**sham [1]** 95/6
**share [1]** 47/8
**she [3]** 71/25 106/9
110/7
**sheer [1]** 53/15
**shift [4]** 19/2 19/3
19/7 29/16
**short [2]** 100/24
105/22
**should [15]** 4/12
7/16 26/1 26/23
28/3 32/19 33/12
45/25 50/11 69/16
86/1 86/13 86/16
92/25 101/13
**shouldn't [3]** 19/21
64/2 88/4
**show [25]** 14/9
14/23 14/24 22/12
22/18 30/3 43/25
50/15 54/5 54/9
55/11 58/18 60/9
70/23 72/24 72/25
73/7 77/13 77/23
83/13 85/19 91/16
91/17 98/8 111/1
**showing [5]** 20/13
20/15 39/13 76/23
77/18
**shown [1]** 58/9
**shows [5]** 30/7
42/25 49/14 52/9
84/20
**shy [1]** 104/2
**side [3]** 83/14
83/14 98/3
**significant [4]**
19/9 44/18 70/23
71/19
**similar [3]** 18/16
23/7 59/5
**similarly [11]**
30/10 30/12 30/24
57/15 57/19 62/23
63/3 68/3 85/13
96/12 102/5
**Simms [1]** 38/8

**simply [3]** 15/3
100/23 108/22
**Sims [5]** 17/23 76/9
76/18
**since [3]** 47/2
48/16 67/11
**single [23]** 20/4
30/16 45/12 47/2
48/16 49/5 49/22
49/24 50/2 51/25
52/7 67/20 67/20
79/7 80/20 81/12
84/15 87/15 89/18
89/20 90/2 97/8
101/19
**single-doctor [1]**
49/5
**sit [1]** 112/9
**situated [7]** 30/11
30/12 30/24 57/16
62/23 68/3 85/13
**situation [3]** 38/16
106/11 109/18
**six [3]** 68/11 89/15
98/19
**six-year [1]** 98/19
**size [1]** 39/8
**sketch [1]** 9/16
**skew [1]** 52/10
58/18 60/9
**skewing [1]** 69/18
**skin [1]** 17/21
**skull [2]** 26/14
26/18
**sleep [1]** 111/19
**slide [16]** 12/6
15/2 15/11 16/7
21/18 21/19 22/24
23/12 25/1 27/7
30/9 31/5 32/10
37/8 38/22 39/17
**slides [2]** 10/9
10/12
**small [1]** 109/15
**smaller [1]** 36/17
**smart [1]** 104/21
**Smith [9]** 28/21
80/14 80/15 82/2
82/10 83/5 83/10
84/8 111/7
**smoke [1]** 68/22
**snapshot [2]** 23/10
32/11
**snippet [1]** 79/22
**so [191]**
**sole [1]** 80/18
**solicitor [1]** 86/7
**solid [1]** 40/17
**some [36]** 3/21
14/20 22/4 22/18
24/10 25/11 27/16
28/10 34/16 34/17
34/17 37/20 38/18
41/12 54/17 59/11
61/10 61/11 61/14
62/10 68/23 69/2
70/18 82/12 91/1
92/8 92/21 93/3
93/10 93/25 98/8
104/7 108/2 109/16
111/20 112/10
**somebody [5]** 28/17
43/6 87/1 93/7
96/17
**somehow [1]** 109/18

**130**

**S**

someone [4] 32/2
something [8] 22/3 36/18 68/21 88/15 90/21 103/12 105/14 112/2
sometimes [4] 34/1 34/2 34/3 34/4
somewhat [4] 19/9 39/10 59/9 68/5
somewhere [2] 6/23 43/17
sorry [7] 16/19 19/2 21/8 25/14 28/3 105/17 107/25
sort [25] 3/5 4/7 6/3 9/16 21/20 25/11 31/24 32/11 32/16 34/11 38/5 56/7 59/19 59/19 65/4 66/8 68/6 68/23 97/4 97/6 98/3 98/12 103/8 104/24 106/14
sorts [2] 56/16 60/13
sought [4] 6/25 13/15 59/17 106/2
sound [3] 47/6 90/10 104/21
source [4] 8/16 8/16 65/2 107/12
span [2] 94/5 95/10
speak [1] 5/12
special [2] 80/1 80/4
specialties [1] 89/13
specialty [1] 51/11
specific [9] 48/20 55/15 62/14 63/1 70/7 77/23 88/19 90/5 98/5
specifically [5] 4/15 12/24 18/19 19/11 36/18
spend [2] 29/16 35/5
spitballing [1] 25/10
spurious [1] 49/16
Squares [1] 23/12
staff [1] 101/2
stalled [1] 105/1
stand [1] 25/13
standalone [2] 21/19 32/19
standard [14] 13/15 14/1 14/22 19/8 19/15 44/20 54/23 58/1 70/23 73/13 77/5 89/24 90/23 91/15
standardized [2] 86/10 87/5
standards [4] 53/25 65/15 77/3 100/14
stands [2] 62/9 101/4
start [9] 12/24 21/8 53/1 56/6 66/8 103/19 103/24 104/4 110/8
started [2] 4/16 110/3

starting [4] 2/8
state [1] 74/9
stated [2] 25/15 33/17
statement [1] 38/11
statements [1] 6/15
states [4] 1/1 75/3 114/5 114/11
statistical [14] 5/19 44/14 44/20 44/23 45/4 45/8 45/13 45/13 46/14 49/6 50/3 58/25 60/23 65/17
statistically [2] 44/17 47/16
statistician [2] 46/9 46/16
statistics [10] 45/10 48/9 48/11 51/6 52/15 61/18 64/4 101/22 103/11 108/12
status [1] 17/5
statute [5] 41/9 86/12 105/20 105/21 105/23
statutes [1] 29/25
stave [1] 58/16
stay [1] 101/11
stenographically [1] 114/8
stenographically-reported [1] 114/8
stenotype [1] 1/22
steps [1] 58/9
Stewart [1] 96/3
still [5] 3/5 18/13 42/12 91/23 102/18
stitch [1] 54/17
stopped [1] 87/14
strategic [1] 109/9
strategy [1] 107/16
Street [1] 1/24
stretch [1] 40/24
stringent [1] 108/5
strongly [1] 34/22
structural [9] 22/12 38/25 39/1 39/14 39/16 55/14 57/20 57/21 82/5
structure [2] 13/24 110/7
students' [1] 102/19
stuff [4] 4/12 5/2 46/23 62/3
stupidly [1] 10/24
subclasses [1] 69/7
subject [1] 3/23
submitted [3] 32/17 84/11 84/16
subset [1] 67/12
substance [2] 46/7 95/15
substantial [3] 54/2 54/3 58/2
substantially [4] 73/14 73/14 73/19 73/20
such [10] 73/17 80/11 80/19 85/17 86/13 90/12 90/13 101/18 101/23 102/2

sue [1] 69/1
suffer [2] 26/17
suffered [1] 69/9
sufficient [8] 20/6 20/13 24/6 37/10 39/20 65/2 69/20 90/20
suggest [3] 5/23 22/11 33/14
suggesting [2] 51/7 105/8
suggestion [4] 33/11 33/22 38/23 108/11
suggests [1] 34/19
suit [1] 23/15
summarize [2] 54/1 69/22
summarized [1] 47/23
summarizes [1] 84/21
summary [23] 3/9 5/13 6/11 31/24 32/21 40/8 45/18 51/3 56/3 74/20 78/9 78/23 81/7 84/21 90/4 91/12 92/2 92/25 98/7 99/21 100/1 107/17 111/1
sundry [1] 32/15
super [5] 44/23 45/8 45/13 50/3 65/17
super-duper [1] 45/8
super-statistical [4] 44/23 45/13 50/3 65/17
support [12] 6/12 12/14 33/7 33/11 33/23 36/19 49/16 78/17 79/20 90/1 91/9 96/9
supportable [1] 79/16
supported [1] 68/24
supposed [4] 60/13 75/5 92/1 100/15
Supreme [5] 38/1 38/14 39/3 40/13 54/20
sure [19] 21/17 24/17 32/9 41/20 41/21 41/23 43/8 45/11 46/20 46/21 49/2 82/8 82/9 84/9 84/18 86/15 91/21 93/16 98/23
surface [1] 47/4
surprise [1] 61/7
surrounded [1] 7/18
SURVIVOR [2] 1/7 2/6
suspect [1] 52/16
suspended [2] 46/11 57/17
sustained [1] 76/16
sweeping [3] 63/9 88/11 98/10
system [7] 39/9 104/5 104/6 104/13 104/14 105/11

105/11
systematic [3] 49/8
systemic [1] 76/19

**T**

table [1] 43/24
tailor [1] 69/14
tailored [3] 57/11 68/3 91/3
tailoring [2] 68/6 88/4
take [38] 5/1 8/8 15/25 16/25 27/16 32/1 37/2 40/4 40/23 43/20 43/21 44/4 45/10 53/10 58/14 62/14 65/20 66/25 72/8 74/6 76/1 79/6 80/13 80/14 85/17 87/5 87/6 92/2 92/25 93/1 96/20 96/21 97/3 99/22 100/24 101/8 101/25 112/5
taken [5] 3/13 23/20 23/23 34/13 34/18
takes [4] 58/24 75/21 95/7 99/13
taking [3] 32/18 57/8 110/5
talk [5] 3/17 63/4 85/4 85/9 99/18
talked [8] 3/9 39/19 68/2 98/25 98/25 110/20 110/24 111/3
talking [6] 23/11 25/3 25/5 42/9 59/6 77/19
talks [2] 24/19 24/19
target [1] 24/7
targeted [9] 12/14 70/18 88/19 88/19 88/21 88/24 92/9 93/10 98/6
task [1] 78/15
teach [2] 27/12 29/6
teaching [1] 27/24
technical [2] 7/24 11/3
technically [2] 22/8 112/17
techniques [1] 78/16
telegraphing [1] 41/22
telepathically [1] 10/19
telephone [2] 112/1 112/16
tell [6] 4/6 4/12 5/16 32/4 68/8 85/20
tells [1] 63/23
tend [1] 51/20
tendency [1] 49/15
term [15] 4/4 21/5 71/2 71/24 72/21 72/25 73/1 73/7 73/22 74/21 74/22 76/4 81/10 87/20

88/25
terms [50] 7/24 16/16 16/17 16/21 17/16 18/7 20/22 21/2 21/6 21/6 24/20 27/14 33/12 36/3 38/11 39/24 41/21 47/17 50/7 50/10 53/12 57/9 60/12 62/4 62/23 65/25 66/22 70/3 71/4 71/17 72/10 72/16 73/8 73/13 75/16 77/5 77/14 78/25 79/18 79/25 80/8 80/24 81/6 81/18 97/20 104/5 107/4 108/5 108/7 109/9
test [7] 15/7 24/21 24/22 37/12 45/9 77/16 86/3
testimony [3] 80/13 80/15 105/1
testing [4] 78/4 79/4 79/11 85/21
than [22] 7/2 13/17 24/22 24/24 28/24 47/25 51/1 53/4 55/4 61/17 67/17 67/19 82/13 86/14 93/24 94/12 97/11 109/20 111/21 111/21 112/4 112/6
Thank [9] 10/16 35/3 40/20 41/2 100/23 103/15 103/16 112/21 112/23
Thanks [2] 10/15 101/3
that [859]
that'll [1] 111/8
that's [94] 4/10 4/12 4/18 8/25 8/25 9/1 9/16 9/25 16/20 16/21 19/1 19/14 20/23 20/24 20/25 22/12 23/16 28/17 30/14 33/7 33/8 33/14 35/10 35/19 41/9 41/19 42/12 43/17 45/3 45/17 45/19 46/8 46/21 46/21 49/20 50/11 50/13 51/22 53/4 53/23 55/3 55/12 57/3 57/6 57/11 58/19 59/9 59/17 59/19 59/21 60/6 60/18 64/25 65/5 65/8 66/17 67/17 68/24 75/13 75/22 77/22 77/23 82/10 82/16 83/18 84/3 84/12 84/15 87/3 89/7 89/10 92/2 93/13 93/14 93/24 94/8 95/21 96/2 96/2 97/6 97/9 97/18 98/4 98/5 98/9 98/21 103/4 103/22 106/18 108/9 110/9 111/9 111/11 111/20 112/7

**their [123]**   6/16 6/18
6/12 6/13 6/15 6/19
8/6 12/17 14/2
15/24 16/11 16/20
17/21 17/21 18/22
22/19 26/18 28/5
28/7 28/17 31/19
33/17 34/13 36/2
40/24 43/16 44/22
45/24 46/9 46/12
47/22 49/6 49/15
51/10 52/3 52/4
53/14 53/16 53/24
54/16 55/10 55/17
55/23 56/21 57/8
58/12 59/6 62/4
62/5 62/9 63/15
64/6 64/9 64/11
64/23 66/1 66/6
66/12 66/20 66/23
66/25 67/2 67/9
69/21 69/23 69/24
73/3 73/12 74/4
74/24 75/7 75/24
77/10 77/21 81/16
82/9 83/2 83/4 85/2
85/11 85/11 85/15
85/24 86/2 86/5
87/22 88/1 89/3
91/18 91/19 91/21
92/13 93/22 93/23
98/15 98/24 100/7
101/2 104/20 105/13
107/7 107/7 107/13
107/18 109/6 110/18
110/22 110/24 111/2
111/12

**them [80]**   6/13 8/14
11/19 18/22 19/19
19/19 20/3 20/6
20/7 21/23 24/5
29/1 30/2 30/3
30/20 31/4 31/5
32/22 33/2 33/3
33/4 34/16 34/17
34/17 36/1 37/7
44/7 44/17 44/19
44/21 44/22 45/5
46/18 47/1 50/5
50/19 51/2 51/23
52/13 53/5 54/17
54/24 56/8 56/8
56/23 61/25 62/15
62/16 63/6 63/15
63/24 65/17 66/3
67/14 67/21 77/13
77/23 81/24 82/13
82/14 82/19 82/24
83/5 83/17 84/2
84/6 84/11 85/5
90/4 90/21 91/21
91/22 93/22 95/10
95/16 95/19 100/3
102/2 103/9 111/16

**them with [1]**   63/6
**themselves [8]**   4/3
6/7 15/13 32/4
34/25 53/5 65/1
94/3
**then [46]**   3/5 3/17
7/12 8/8 8/14 15/25
17/13 18/4 18/11
31/14 31/24 31/25

33/7 34/18 34/21
41/2 41/18 41/22
41/23 44/8 45/7 51/4
55/5 60/15 63/17
65/9 68/12 72/19
78/2 83/16 84/16
88/13 91/1 92/6
92/7 93/9 95/24
98/17 99/18 100/7
102/13 102/15
107/14 107/22
110/14 111/15
112/18
**then-pending [1]**
3/5
**theory [3]**   61/21
61/23 62/1
**there [109]**   7/23
12/4 12/11 14/13
15/5 15/17 16/7
17/1 18/10 18/18
19/9 20/17 23/2
26/11 26/13 26/14
29/24 30/21 31/2
31/4 33/22 34/7
37/5 37/23 38/3
40/11 41/1 44/2
44/5 45/7 46/4
47/13 47/19 49/1
49/8 50/3 51/5
51/18 52/9 52/22
53/2 53/5 56/21
58/2 58/3 58/14
58/18 59/11 59/23
60/24 61/19 64/8
65/3 66/6 66/15
67/25 68/10 68/21
70/12 70/17 74/15
74/18 74/25 76/9
78/12 78/22 79/3
79/7 79/9 81/10
81/20 83/21 84/17
85/25 89/6 89/17
90/7 90/12 90/13
92/3 93/2 96/6
96/12 96/13 97/8
97/13 98/9 99/17
99/20 100/5 101/5
101/18 101/23 102/1
102/6 102/24 103/6
103/8 103/10 103/16
104/5 104/7 105/15
105/23 106/23
107/19 108/11
109/13 111/15
**there's [35]**   7/1
10/5 10/7 10/7
16/25 21/19 22/11
33/21 38/25 39/14
39/15 42/14 44/11
47/9 52/22 65/23
68/22 68/23 69/2
74/7 75/4 76/5 81/9
84/5 86/22 92/3
94/25 95/15 96/22
96/23 103/11 103/12
105/21 109/24 110/2
**therefore [2]**   18/24
80/21
**these [83]**   8/13
10/9 12/24 13/23
14/14 14/14 15/5
16/10 20/11 20/17
20/18 21/4 23/12
23/15 23/16 23/18

23/20 24/1 24/2
24/18 24/25 28/16
29/5 30/11 31/7
31/9 32/11 32/18
33/1 33/12 35/15
37/7 37/9 37/12
49/13 50/22 53/7
53/12 53/16 54/23
58/7 58/15 59/15
60/23 63/17 63/24
65/9 66/8 69/22
69/24 70/5 72/20
75/18 79/20 79/21
80/5 82/11 84/5
85/20 88/10 89/19
89/25 91/8 91/19
92/12 93/17 93/21
94/12 96/10 98/14
99/6 99/8 99/19
99/22 102/13 102/16
104/10 108/21
111/15 111/20
**they [309]**
**they're [57]**   9/5
11/9 12/25 12/25
13/9 16/2 16/2
18/14 18/23 19/18
21/10 21/11 23/16
23/23 24/5 26/17
28/18 28/25 34/1
34/2 34/3 34/4
36/11 36/13 36/14
42/10 43/6 44/11
50/23 51/7 52/16
52/23 57/2 58/18
59/22 62/3 65/10
68/21 69/1 71/20
71/21 73/2 74/3
75/5 76/24 77/19
82/8 82/18 82/24
84/23 86/25 91/16
92/22 93/5 93/17
93/22 107/12
**they've [19]**   44/19
48/10 57/4 58/5
62/21 68/18 70/1
70/13 77/9 83/8
84/2 84/4 84/14
88/10 89/1 89/17
99/12 101/23 107/16
**thing [19]**   52/24
60/19 62/8 62/9
65/4 65/12 67/16
70/6 73/24 77/24
93/16 95/6 95/21
98/12 106/14 107/1
**things [26]**   16/16
33/13 44/14 44/16
51/22 52/25 53/7
60/13 61/8 64/6
78/20 78/22 87/3
89/5 91/2 92/10
92/13 94/8 94/11
98/23 99/4 101/12
102/10 102/13 103/9
110/13
**think [37]**   4/23
6/21 7/7 8/25 9/2
11/8 17/6 23/22
24/6 26/22 40/10
40/15 40/17 42/10
53/13 53/14 59/24
63/13 63/14 66/24

23/20 24/1 24/2
... 

68/23 82/3 86/22
90/11 90/24 91/22
94/25 97/18 98/2
102/17 102/17
104/17 109/2 110/9
**thinking [1]**   87/12
**third [11]**   54/8
56/9 56/13 58/25
59/1 59/3 60/23
61/4 65/18 89/6
101/21
**third-party [4]**
58/25 60/23 61/4
101/21
**this [227]**
**Thomas [8]**   1/23
78/3 78/5 78/13
78/15 79/14 114/4
114/16
**Thomas's [2]**   78/9
79/10
**thorough [1]**   9/17
**thoroughly [1]**   97/5
**those [83]**   4/23 7/3
7/10 7/18 8/19
12/23 13/13 13/19
14/17 14/17 15/10
15/18 18/6 23/9
25/5 30/5 34/13
36/13 37/15 41/6
42/13 43/25 44/6
44/9 45/9 45/12
48/14 50/4 52/15
54/6 57/1 57/9
57/17 60/13 61/12
62/17 64/3 65/1
66/7 67/3 68/2 68/3
70/24 71/4 73/19
75/10 78/3 78/20
78/23 82/12 82/17
83/16 84/15 84/16
85/8 88/1 88/13
89/23 90/2 91/14
94/14 95/1 95/7
95/16 95/25 96/5
96/7 96/9 97/10
97/20 98/3 99/1
99/1 99/13 99/13
99/16 101/22 102/18
104/3 106/20 109/14
109/16 110/20
**though [12]**   7/13
26/17 47/5 47/6
66/11 73/5 76/12
77/9 79/3 84/5 86/4
102/16
**thoughtful [2]**
109/8 112/22
**thoughts [2]**   112/6
112/10
**thousand [3]**   84/4
94/3 100/4
**thousands [5]**   30/19
42/13 42/14 42/14
97/1
**three [18]**   7/10
7/13 8/12 37/8
37/19 45/5 46/12
53/19 56/24 75/15
76/21 82/6 82/6
89/19 91/12 93/24
94/5 107/17
**three-year [1]**   94/5
**threshold [1]**   39/15

68/23 82/3 86/22
... 

**through [49]**   4/9
6/7 7/4 7/17 9/7
9/21 10/7 9/21 9/25
10/13 10/20 20/7
24/3 24/16 30/2
30/22 31/13 31/17
37/17 48/4 48/13
50/11 51/14 53/8
53/13 53/22 54/5
54/8 58/22 58/23
60/15 63/11 64/5
66/8 69/21 69/24
70/11 72/14 78/2
88/17 88/20 89/3
90/15 91/5 98/16
99/9 100/17 105/14
110/13 110/19
110/22 111/12
111/16
**throw [2]**   54/17
108/6
**tick [1]**   13/23
**tighter [1]**   53/24
**time [32]**   3/4 3/12
4/4 4/8 4/13 4/14
9/1 9/9 9/11 9/20
29/17 44/6 46/9
61/9 61/11 61/11
68/13 74/8 74/10
74/12 74/15 87/23
89/20 93/25 96/14
98/19 100/17 101/8
105/18 109/10
111/19 112/11
**times [6]**   23/5 45/5
52/1 52/6 55/9 90/2
**tiny [1]**   79/22
**title [2]**   17/7
92/19
**today [10]**   9/1 9/7
11/9 12/7 20/10
44/1 65/10 76/23
96/10 109/6
**together [8]**   3/1
18/15 54/17 54/17
66/6 112/5 112/6
112/10
**told [3]**   18/12
47/11 67/18
**tone [1]**   104/21
**too [5]**   39/6 39/6
39/7 61/22 61/22
**took [3]**   70/21 86/1
95/25
**top [3]**   20/12 25/16
35/7
**total [2]**   34/18
73/13
**totally [2]**   23/14
74/11
**touch [1]**   39/19
**touches [1]**   14/7
**towards [2]**   37/21
39/19
**track [3]**   8/7 19/5
94/2
**tracked [1]**   102/13
**training [3]**   27/13
73/16 75/7
**trajectory [2]**   83/1
94/22
**transcript [3]**   1/10
114/8 114/9
**transcription [1]**
1/22
**transcripts [1]**

**T**

transcribes [1]
104/21

traumatic [3]   24/24
25/4 25/17

travel [1]   2/24

treat [1]   28/13

treated [2]   17/20
30/12

treatment [11]
17/19 30/10 30/21
30/23 33/25 73/9
74/16 85/12 98/25
110/21 111/12

trial [5]   39/10
39/11 61/3 108/20
108/21

trials [3]   59/7
59/7 98/22

tried [5]   10/3
13/24 20/12 88/10
91/4

troubling [1]   26/19

true [6]   15/7 46/21
46/21 79/1 85/9
114/7

Trustee [7]   80/13
80/15 82/2 82/10
83/10 84/8 111/7

trustees [3]   83/17
83/19 84/8

try [18]   6/11 8/23
9/23 10/18 15/8
20/3 20/7 20/9 24/3
30/2 36/15 39/4
44/16 52/15 52/16
53/16 54/17 103/25

trying [6]   19/4
20/8 53/12 69/13
71/14 92/22

turn [2]   7/25
107/22

turns [2]   33/5 33/6

two [19]   6/17 9/8
21/9 26/8 26/11
27/9 33/3 41/4
47/15 47/15 51/2
52/25 56/6 66/4
66/13 66/21 68/9
72/25 82/2

type [5]   48/19
48/19 52/10 52/12
63/18

types [1]   39/4

typical [3]   91/20
91/24 94/3

**U**

U.S.C [1]   114/7

Uh [2]   49/18 105/16

Uh-huh [2]   49/18
105/16

ultimate [3]   71/12
71/17 102/8

ultimately [19]   5/9
12/18 13/8 18/15
18/21 30/18 70/20
71/1 71/7 74/2
75/17 79/16 83/25
85/19 91/13 92/7
95/17 106/15 107/7

umbrella [1]   14/4

unable [6]   12/1
16/2 16/2 73/14
73/20 74/12

under [24]   4/21 5/9
5/9 6/6 8/16 9/3/9
9/25/3 15/10 19/15
24/4 35/19 38/2
54/22 55/6 70/24
79/16 89/23 90/23
91/3 91/14 95/25
100/14 104/7 108/5
108/23

underlying [27]   7/4
42/9 52/19 53/6
53/11 57/3 58/17
62/19 62/20 62/22
63/10 64/2 65/8
65/9 68/12 71/3
79/6 79/21 81/24
82/16 82/21 83/24
90/3 97/17 99/14
102/3 108/12

underneath [1]
63/10

understand [21]
5/23 11/13 11/21
40/21 43/9 47/12
59/19 62/2 62/7
65/22 68/19 69/13
72/11 72/13 83/7
83/20 88/6 94/9
95/18 108/17 112/7

understanding [6]
7/16 8/5 8/20 47/12
78/18 104/10

understood [1]
46/22

uneventful [1]   2/24

unfair [1]   101/7

unidentified [1]
57/12

uniquely [1]   53/24

UNITED [4]   1/1
68/13 114/5 114/11

universe [5]   41/18
41/19 42/15 45/11
46/4

unless [3]   9/12
29/17 100/16

unlike [1]   14/12

unmanageable [1]
90/9

unnecessary [1]
72/1

unprecedented [4]
23/4 23/4 23/6
98/11

unquote [3]   14/15
27/12 106/23

unreasonable [2]
14/6 14/10

unreasonably [1]
80/25

unrelated [2]   57/20
72/1

unsupportable [1]
6/1

until [1]   44/1

unusual [1]   94/1

unworkable [1]
98/20

up [17]   11/8 11/18
11/22 21/16 23/5
29/21 36/9 37/19
38/23 39/8 42/17
46/14 46/23 47/22
76/23 96/25 112/18

upon [5]   59/22

61/12 61/14 71/14
104/25

upward [2]   28/7
94/22

urging [1]   47/21

us [20]   11/8 12/22
14/9 16/4 20/6
21/12 22/12 22/21
24/11 35/21 36/15
37/10 37/11 88/12
99/19 102/10 102/15
102/24 103/13
109/15

use [22]   11/9 26/1
29/7 38/18 40/24
45/14 51/8 51/11
57/9 65/24 66/5
66/21 75/7 75/11
80/17 80/18 83/25
87/23 90/12 98/17
101/15 102/18

used [3]   35/1 37/14
111/10

useful [1]   103/13

using [5]   33/2
33/10 36/11 49/5
102/16

**V**

V3 [21]   6/12 6/13
6/16 8/6 8/7 8/19
8/21 12/21 39/18
39/20 40/5 42/20
48/15 65/5 65/8
101/13 101/15 103/2
104/13 106/19 107/9

vague [1]   77/25

vaguely [1]   77/16

valid [1]   7/6

validity [1]   74/14

variance [1]   24/24

variations [2]
70/22 71/3

various [2]   3/9
32/15

vary [2]   39/7 50/16

versus [1]   59/14

very [23]   4/15 6/15
9/19 10/16 11/23
22/5 31/6 34/21
39/3 43/4 47/23
47/23 57/7 57/9
57/15 59/4 59/21
98/9 100/17 101/1
103/25 108/20
109/15

view [4]   14/23
27/22 37/24 104/13

views [2]   25/25
29/5

vigorous [1]   40/22

Vincent [6]   7/7
42/21 43/22 51/2
51/15 102/17

Vincent's [4]   4/7
6/14 6/21 102/11

violate [1]   18/17

violated [1]   31/15

violation [1]   59/18

violations [6]   13/7
29/23 30/8 36/5
109/5 110/16

virtue [1]   17/1

voice [1]   112/19

volume [1]   109/20

voluntary [1]   54/24

voted [1]   33/4/2
106/25

vs [1]   1/6

**W**

waiting [2]   11/6
82/25

wake [2]   25/17 27/9

walk [13]   40/9 48/3
50/11 53/13 54/5
54/8 58/22 64/5
70/11 88/20 89/3
100/17 111/16

walked [5]   91/5
98/16 110/19 110/22
111/12

want [36]   3/4 9/17
11/7 11/16 11/18
16/23 18/15 19/2
21/16 23/18 26/4
28/23 35/5 50/19
50/20 50/20 51/24
52/24 55/1 60/19
64/5 64/21 65/6
69/19 70/3 70/4
70/11 72/8 82/8
87/10 89/18 95/13
101/2 107/11 111/18
111/19

wanted [11]   20/18
37/19 41/4 42/17
53/16 53/18 88/20
93/16 98/23 108/15
110/8

wanting [1]   37/7

wants [1]   102/16

warning [1]   101/8

warrant [2]   88/23
92/14

warranted [3]   91/3
93/11 100/14

warrants [3]   77/1
77/24 93/19

was [128]

wasn't [4]   38/12
40/20 58/18 72/3

way [23]   6/20 9/21
30/13 31/6 31/16
34/12 37/16 42/3
42/22 47/24 50/25
53/14 56/23 61/2
69/15 71/3 87/3
91/25 92/24 99/9
99/10 112/1 112/7

ways [6]   25/5 25/22
39/7 107/12 107/19
107/20

we [226]

we'll [8]   3/17 12/4
16/8 20/3 40/24
100/25 107/7 112/18

we're [48]   8/18
9/25 9/25 10/21
11/3 11/6 12/7 12/7
12/14 13/11 14/23
14/25 15/7 15/8
16/12 19/1 19/7
19/11 23/10 24/7
24/9 29/16 31/6
37/10 37/25 38/21
42/9 46/23 57/21
57/21 63/9 87/12
96/10 105/14 105/15

106/11 106/12
106/15 106/18 108/4
108/5 108/8 109/9
108/10 108/20
108/22 108/23 109/9

we've [36]   18/17
20/2 20/11 20/12
21/3 24/16 27/24
28/3 28/4 28/6 28/7
31/5 33/4 35/6 37/7
39/22 40/14 42/7
46/18 47/1 50/2
50/14 50/22 51/2
54/2 54/4 58/19
62/16 91/22 91/22
98/24 98/25 100/2
102/10 106/13
109/24

wearing [1]   26/17

weekend [1]   112/9

weeks [1]   46/12

weigh [2]   58/3
91/18

weird [1]   109/18

Weiss [1]   2/10

welcome [2]   9/5
112/14

well [42]   3/7 5/7
7/22 9/19 12/9 12/5
17/11 25/9 26/6
26/23 29/1 29/7
34/25 41/19 43/24
44/11 46/20 46/21
52/21 55/3 55/21
56/25 58/16 60/11
60/15 67/25 71/22
76/1 80/1 82/17
82/20 84/10 86/19
88/5 92/4 93/18
94/8 103/6 103/21
108/1 108/4 110/14

went [2]   58/17
69/24

were [68]   3/5 4/3
4/20 6/25 7/3 8/8
10/2 11/10 11/12
11/13 13/2 15/4
19/23 23/2 23/3
28/9 28/10 28/11
29/24 29/25 32/13
37/12 40/9 42/13
42/19 47/9 47/13
48/21 49/22 49/23
52/6 55/21 56/21
56/23 57/14 57/17
57/18 58/15 60/13
62/21 63/25 64/17
69/15 77/16 79/9
82/12 82/12 82/14
84/3 84/11 85/8
86/2 86/20 91/24
92/18 94/25 96/13
99/15 99/16 100/9
100/12 106/16
106/20 106/21 107/6
109/8 109/11 109/14

weren't [4]   28/8
39/4 47/9 101/7

what [149]

what's [5]   4/22
33/2 46/8 51/9
90/25

whatever [3]   6/25
28/23 97/1

when [31]   4/15 4/20

133

**W**

**when...** [72]   14/12
14/16 17/24 28/22
32/11 38/5 42/2
42/9 44/13 45/21
50/18 51/5 54/2
57/7 59/6 59/13
61/7 70/13 70/20
75/16 87/8 87/17
88/3 95/4 95/7
99/12 99/12 101/6 104/19
106/21

**where** [54]   3/14
6/11 14/5 14/21
17/23 18/10 21/7
25/3 25/15 28/6
28/8 31/21 32/15
33/9 33/16 34/1
42/11 45/7 45/11
45/24 46/4 47/13
50/3 50/4 52/25
58/1 58/14 58/16
58/25 67/25 70/7
73/25 77/15 81/8
81/22 82/10 85/15
89/1 89/4 92/4 94/2
94/5 95/1 95/16
96/17 97/8 97/13
98/7 98/14 100/12
104/4 105/2 108/9
109/18

**whereas** [3]   28/19
28/24 44/20

**wherever** [1]   101/11

**whether** [57]   6/7
15/7 15/9 17/24
18/15 26/12 33/21
34/7 35/22 36/1
39/1 42/25 45/9
45/12 45/25 47/13
48/1 48/11 48/21
59/17 60/3 65/6
65/7 65/13 66/15
66/19 66/24 66/25
73/17 75/8 75/20
79/15 81/1 82/15
84/1 85/7 86/1
86/17 87/1 87/10
87/23 89/15 91/8
91/24 92/8 93/9
95/21 99/14 99/23
100/11 100/14 103/3
104/8 104/18 105/12
105/21 108/25

**which** [68]   8/12
8/13 9/8 11/1 12/22
14/14 15/4 15/5
17/20 19/12 20/21
25/25 26/6 27/10
28/12 29/22 30/4
33/20 35/1 35/25
37/2 37/11 38/15
41/20 42/10 48/7
48/10 50/15 51/7
55/9 56/15 57/2
57/23 63/23 64/16
70/9 73/1 73/4
75/10 76/2 76/3
76/5 79/1 79/11
79/12 80/9 80/14
80/20 82/1 86/8
88/13 88/23 89/6
90/14 95/5 95/20
96/19 99/24 102/1
102/6 103/7 104/4

**while** [5]   11/6
76/10 76/11 76/16
76/19

**who** [34]   7/18 19/19
21/9 24/2 26/11
26/16 28/21 28/25
46/13 47/19 49/22
49/23 51/15 51/20
52/11 52/14 57/16
61/16 61/22 61/23
75/3 77/18 81/11
81/12 82/8 83/15
85/4 85/9 85/23
87/16 99/9 99/16
100/9 105/2

**who's** [2]   28/21
61/17

**whoever** [1]   103/17

**whole** [5]   67/16
93/7 95/6 95/25
110/5

**wholesale** [1]   57/2

**wholly** [1]   66/15

**whom** [2]   54/16 82/7

**whose** [1]   31/22

**why** [18]   4/11 4/12
9/25 12/7 24/12
26/1 26/1 33/1
33/12 33/20 54/20
55/3 68/8 88/7 91/1
92/14 98/5 100/24

**wide** [2]   101/13
101/15

**wife** [1]   78/17

**Wilkinson** [1]   54/13

**will** [38]   3/14 9/21
9/23 10/8 12/21
13/6 13/13 15/16
22/11 25/22 36/15
37/2 40/22 45/12
62/17 70/16 71/22
73/17 75/21 76/14
77/8 82/25 83/13
83/25 84/20 85/19
88/16 100/2 107/6
107/8 110/4 111/24
111/24 112/5 112/7
112/9 112/9 112/10

**willful** [1]   104/17

**willing** [1]   40/9

**wins** [1]   95/16

**wish** [1]   104/25

**wishes** [1]   101/3

**within** [3]   39/11
59/7 72/16

**without** [9]   5/22
6/3 12/1 28/17
39/13 64/2 87/9
101/8 109/22

**witness** [1]   82/21

**witnesses** [2]   25/12
99/8

**won't** [2]   12/22
63/24

**word** [3]   24/17
80/18 80/18

**worded** [1]   34/22

**words** [11]   17/1
33/2 33/9 33/13
40/4 43/9 47/5 47/8
51/15 69/1 69/10

**work** [9]   9/21 15/22

**working** [4]   104/18
104/20 105/14
108/10

**works** [1]   99/11

**worthy** [2]   75/20
112/5

**would** [89]   2/2 5/6
5/8 9/5 10/12 10/13
14/9 18/17 20/6
28/18 29/10 31/23
31/24 33/20 33/20
34/7 38/18 40/6
40/16 41/17 41/23
42/1 42/5 42/11
44/18 44/21 44/22
45/4 45/10 47/10
48/23 50/4 52/18
54/23 56/7 58/9
58/17 59/11 60/8
60/9 63/22 67/1
68/14 68/15 69/13
70/6 71/7 71/8 74/2
74/9 74/19 76/4
76/5 77/21 78/8
81/25 82/17 86/19
86/21 87/21 88/5
88/23 90/14 92/5
92/7 92/25 93/1
93/2 93/3 93/4 93/8
93/9 96/9 97/21
98/13 98/19 98/22
101/11 102/12
102/13 102/15
102/20 102/23
103/13 103/14
109/18 109/18 112/6
112/11

**wouldn't** [3]   16/22
54/24 70/8

**write** [1]   11/1

**writing** [1]   112/6

**written** [2]   90/4
112/3

**wrong** [8]   11/13
61/1 61/5 61/12
92/16 94/7 104/11
108/13

**wrongful** [3]   13/10
55/25 105/24

**wrote** [1]   93/7

**Y**

**yeah** [16]   10/11
11/24 18/3 35/2
35/10 40/20 46/16
67/18 71/15 72/5
81/13 83/7 83/7
87/13 87/14 102/2

**year** [11]   26/11
42/6 42/7 52/7 94/4
94/5 95/3 95/8
95/14 98/19 103/8

**years** [7]   4/23
18/12 68/11 88/16
93/23 93/24 96/14

**Yep** [3]   20/19 30/17
97/25

**yes** [31]   2/3 6/20
7/12 7/12 8/1 8/14
8/15 10/15 10/17
22/1 27/20 30/6
47/15 47/16 48/3

**17/12** 36/12 39/22
76/6 76/6 92/1
98/15

**52/24** 60/20 62/6
72/16 76/17 80/11
87/2 88/9 97/12
101/18 102/21
105/22 106/9

**yet** [2]   3/11 74/2

**you** [219]

**you'll** [3]   13/23
44/25 112/19

**you're** [21]   4/2 8/2
25/9 30/8 33/2
33/10 33/14 34/19
44/13 47/12 50/21
60/8 65/22 86/9
90/17 90/19 105/7
108/3 112/12 112/13
112/14

**you've** [8]   21/18
29/11 34/11 43/22
66/2 66/11 67/18
84/13

**your** [60]   2/3 2/9
2/14 2/17 4/10 4/14
5/3 6/6 7/7 7/8
7/17 10/21 11/3
11/6 12/20 12/24
13/14 17/18 18/2
25/14 27/20 29/14
29/17 32/24 33/8
33/15 35/3 35/5
40/8 40/16 41/2
41/7 42/2 42/20
50/20 55/5 59/6
62/4 62/6 62/14
64/11 67/2 71/14
83/3 84/3 87/2 88/6
88/9 90/17 93/6
100/23 101/8 101/14
101/18 102/19
103/19 110/9 110/18
112/21 112/22

**yourselves** [2]   2/24
110/12

**Z**

**Zahariev** [2]   59/4
101/25

**Zeno** [1]   78/1

**Zeno's** [1]   77/16