# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

## BALTIMORE DIVISION

| | |
|---|---|
| JASON ALFORD, DANIEL LOPER, WILLIS McGAHEE, MICHAEL McKENZIE, JAMIZE OLAWALE, ALEX PARSONS, ERIC SMITH, CHARLES SIMS, JOEY THOMAS, and LANCE ZENO, Individually and on Behalf of All Others Similarly Situated, | No. 1:23-cv-00358-JRR |
| Plaintiffs, | |
| v. | |
| THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN; THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; THE BERT BELL/PETE ROZELLE NFL PLAYER RETIREMENT PLAN; THE DISABILITY BOARD OF THE NFL PLAYER DISABILITY & NEUROCOGNITIVE BENEFIT PLAN; LARRY FERAZANI; JACOB FRANK; BELINDA LERNER; SAM McCULLUM; ROBERT SMITH; HOBY BRENNER; and ROGER GOODELL, | |
| Defendants. | |

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFFS <u>DANIEL LOPER, JAMIZE OLAWALE, AND CHARLES SIMS</u>**

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 1

APPLICABLE STANDARDS ................................................................................................ 1

ARGUMENT .......................................................................................................................... 2

I.  There Is a Genuine Issue of Material Fact That Defendants' Objectively Unreasonable Conduct Considered in The Aggregate Breaches Fiduciary Duties to the Plan, Requiring Appropriate Relief for the Plan's Benefit ........................................................... 2

    A.  There Is a Genuine Issue of Material Fact That Defendants Have a Fraudulent Scheme That Misuses Plan Assets and Harms the Plan's Integrity ....................... 3

        1.  Inclusion of Dr. Macciocchi as Part of the Fraudulent Scheme ................ 7

        2.  Use of Dr. Garmoe as Part of the Larger Systematic Fiduciary Duty Breaches ............................................................................................. 9

    B.  Failure to Monitor Neutral Physicians and Imprudent Retention and Reliance on Conflicted Advisors with Histories of Bias and Inadequate Work Performance ............................................................................................... 11

    C.  Fraudulent Misrepresentations in Statutory Disclosures to Players ..................... 14

    D.  False Representations That Board Members Themselves Review All Information .......................................................................................................... 16

    E.  Racially Discriminatory Policies ........................................................................... 19

    F.  Disregard of Legal Precedent ................................................................................ 20

    G.  Board Members Are Unqualified to Discharge Their Fiduciary Responsibilities, as Are Those to Whom They Secretly Delegate Them ............. 21

II.  Defendants Provided Inadequate Notice .......................................................................... 23

III.  Defendants Deprived Plaintiffs of Full and Fair Review ................................................. 25

    A.  Defendants' Failure to Ensure Plan Physicians' Impartiality and Independence ........................................................................................................ 26

    B.  Defendants' Failure to Review All Documents ..................................................... 28

C.      Defendants Failed to Ensure That Their Decisions Were Made in Accordance with Plan Documents and That Plan Provisions Were Applied Consistently ................................................................. 30

IV.     There Is a Genuine Dispute of Material Fact Concerning Defendants' Wrongful Denial of Benefits to Plaintiffs ........................................................................ 32

     A.      The Plan's Language Demonstrates That the Board Acted Unreasonably .......... 33

         1.      Failure to Consider Evidence Generally .................................... 33

         2.      The Board Unreasonably Interpreted the Plan's Active Football and Active NonFootball T&P Standards   34

             a.      The Board's Interpretation That Diagnosed Disorders While an Active Player Were Not Manifestations of The Disability Is Unreasonable ....................................... 34

             b.      The Board Unreasonably Interpreted the Plan by Failing to Consider the Special Rules of Section 3.5 ............................... 35

         3.      The Board's Interpretation of "Neutral Physician" Is Inconsistent with the Plan's Terms ................................................. 36

         4.      The Board Acted Inconsistently with the Plan's Terms by Rendering Inadequate Determinations Based on Flawed and Otherwise Legally Insufficient Reports .................................... 38

         5.      The Board Acted Inconsistently with the Plan's Terms by Permitting Consideration of Expressly Prohibited Factors ..................... 46

         6.      Defendants Violated Section 3.3(d) of the Plan Because They Failed to Consider Conditions Listed in Plaintiffs' Applications, Including the Cumulative Effect of Conditions ......................................... 47

         7.      Defendants Abused Their Discretion by Imposing an Objective Evidence Standard That Appears Nowhere in the Plan's T&P Provisions ................................................................. 49

     B.      The Board Acted Inconsistently with the Plan's Purpose and Goals ................... 50

     C.      Defendants Relied on Inadequate Evidence and Other Materials That Did Not Support Their Adverse Benefit Decisions ...................................... 51

     D.      Defendants' Interpretations in the Decision Letters Issued to Plaintiffs Were Inconsistent with Earlier Interpretations of the Plan and Other Terms ....... 53

     E.      Defendants' Decision-Making Process Was Not Reasoned or Principled .......... 57

F.  Multiple Genuine Issues of Material Fact Exist as to Whether Defendants' Actions in Denying Benefits to Plaintiffs Were Inconsistent With ERISA .......... 60

G.  Genuine Issues of Material Fact Exist as to Whether Defendants' Benefit Decisions Are Consistent with Relevant External Standards ............................... 62

H.  The Board's Bad Faith Motives Impacted Plaintiffs' Adverse Decisions ............ 63

    1.  Substantial Statistical Evidence, Improper Incentives, and Flawed Reports Demonstrate Bad Faith Administration of the Plans ................. 66

        a.  Statistics Based on Plaintiffs' Sample and Defendants' V3 Data Provide Additional Evidence That the Plan's Highly Compensated Neuropsychologists Who Examined Plaintiffs Are Biased Against Players ............................................ 67

        b.  Based on the Data Produced, None of the Four Plan Orthopedists Who Examined Plaintiffs Has Ever Deemed an Applicant Eligible for T&P Benefits ......................................... 69

        c.  Bad Faith Use of Biased Psychiatrists .......................................... 71

        d.  Knowing Use of Biased Neurologists ........................................... 72

CONCLUSION ..................................................................................................................... 74

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abromitis v. Cont'l Cas. Co./CAN Ins. Cos.*,
 114 F. App'x 57 (4th Cir. 2004) ................................................................... 59, 60

*Acosta v. Chimes D.C., Inc.*,
 2019 WL 931710 (D. Md. Feb. 26, 2019) ............................................................. 12

*Adams v. Symetra Life Ins. Co.*,
 2020 WL 1275721 (D. Ariz. Mar. 17, 2020) ........................................................ 67

*Atkins v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
 694 F.3d at 565 (5th Cir. 2012) ............................................................................ 54

*Austin v. Continental Cas. Co.*,
 216 F. Supp. 2d 550 (W.D.N.C. 2002) .................................................................. 48

*Balkin, v. Unum Life Insurance Co.*,
 2024 WL 1346789 (D. Md. 2024) ................................................... 67, 68, 70, 72

*Bedrick ex rel. Humrickhouse v. Travelers Ins.*,
 93 F.3d 149 (4th Cir. 1996) ........................................................................... 63, 72

*Bidwell v. Garvey*,
 743 F. Supp. 393 (D. Md. 1990) ........................................................ 3, 12, 63, 64

*Bidwill v. Garvey*,
 943 F.2d 498 (4th Cir. 1991) ................................................................................ 61

*Blackshear v. Reliance Standard Life Ins. Co.*,
 509 F.3d 634 (4th Cir. 2007) ................................................................................ 37

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*,
 201 F.3d 335 (4th Cir. 2000) ..................................................................... 33, 50, 63

*Boyd v. Coventry Health Care Inc.*,
 828 F. Supp. 2d 809 (D. Md. 2011) ...................................................................... 16

*Boyd v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
 796 F. Supp. 2d (D. Md. 2011) ............................................................................. 54

*Brumm v. Bert Bell NFL Ret. Plan*,
 995 F.2d 1433 (8th Cir. 1993) ....................................................................... *passim*

*Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.*,
 919 F.3d 763 (4th Cir. 2019) ......................................................................... *passim*

*Campbell v. Hewitt, Coleman & Assocs., Inc.*,
  21 F.3d 52 (4th Cir. 1994) ........................................................................ 2

*Caplan v. CNA Fin. Corp.*,
  544 F. Supp. 2d 984 (N.D. Cal. 2008) ................................... 67, 68, 71, 72

*Carter v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2012 WL 6043050 (N.D. Ala. Dec. 3, 2012) ........................................... 17

*Chao v. Malkani*,
  452 F.3d 290 (4th Cir. 2006) .................................................................. 3

*Chao v. Malkani*,
  216 F. Supp. 2d 505 (D. Md. 2002) ......................................................... 2

*Chughtai v. Metro. Life Ins. Co.*,
  2019 WL 4199036 (D. Md. Sept. 5, 2019) ............................................. 66

*CIGNA Corp. v. Amara*,
  563 U.S. 421 (2011).......................................................................... 14, 16

*Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2022 WL 2237451 (N.D. Tex. June 21, 2022) .................................. *passim*

*Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2025 WL 82450 (N.D. Tex. Jan. 13, 2025) ................................... 16-17, 66

*Conkright v. Frommert*,
  559 U.S. 506 (2010).............................................................................. 65

*Cosey v. Prudential Ins. Co. of Am.*,
  735 F.3d 161 (4th Cir. 2013) ................................................................. 50

*de Nobel v. Vitro Corp.*,
  885 F.2d 1180 (4th Cir. 1989) ............................................................... 55

*Demer v. IBM Corp. LTD Plan*,
  835 F.3d 893 (9th Cir. 2016) ........................................................... 66, 67

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  487 F. Supp. 3d 807 (N.D. Cal. June 1, 2020)........................................ 21

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2022 WL 1786576 (N.D. Cal. June 1, 2022)........................... 21, 38, 39, 50

*Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2018 WL 1258147 (N.D. Cal. June 1, 2018) ................................... *passim*

*Donovan v. Mazzola,*
    716 F.2d 1226 (9th Cir. 1983) ............................................ 12

*DuPerry v. Life Ins. Co. of N. Am.,*
    632 F.3d 860 (4th Cir. 2011) .......................................... 48, 50

*Durakovic v. Bldg. Serv. 32 BJ Pension Fund,*
    609 F.3d 133 (2d Cir. 2010) .............................................. 63

*Edmonds v. Hughes Aircraft Co.,*
    145 F.3d 1324 (4th Cir. May 8, 1998) .................................. 16

*Evans v. Eaton Corp. Long Term Disability Plan,*
    514 F.3d 315 (4th Cir. 2008) .......................................... 33, 58

*Everette v. Liberty Life Assurance Co. of Bos.,*
    2017 WL 2829673 (D. Md. June 29, 2017) ............................. 73

*Firestone Tire and Rubber Co. v. Bruch,*
    489 U.S. 101 (1989) ....................................................... 32

*Garner v. Cent. States, Se. & Sw. Areas Health & Welfare Fund Active Plan,*
    31 F.4th 854 (4th Cir. 2022) ...................................... *passim*

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
    925 F. Supp. 2d 700 (D. Md. 2012) ............................... *passim*

*Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
    2013 WL 6909200 (D. Md. Dec. 31, 2013) ....................... *passim*

*Griggs v. E.I. DuPont de Nemours & Co.,*
    237 F.3d 371 (4th Cir. 2001) ............................................ 14

*Guthrie v. National Rural Elec. Cooperative Ass'n Long-Term Disability Plan,*
    509 F.3d 644 (4th Cir. 2007) ............................................ 61

*Hainey v. SAG-AFTRA Health Plan,*
    2023 WL 3645514 (D. Md. May 25, 2023) ............................. 11

*Harrison v. Wells Fargo Bank, N.A.,*
    773 F.3d 15 (4th Cir. 2014) .......................................... 16, 58

*Helton v. AT&T Inc.,*
    709 F.3d 343 (4th Cir. 2013) ........................................ 33, 53

*Hertz v. Hartford Life & Acc. Ins. Co.,*
    991 F. Supp. 2d 1121 (D. Nev. 2014) ................................... 68

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
  751 F.3d 740 (6th Cir. 2014) ................................................................... 4, 14

*In re Marshall*,
  261 F. App'x 522 (4th Cir. 2008) ............................................................ 16, 59

*In re Nat'l Football Lague Players Concussion Inj. Litig.*,
  821 F.3d 410 (3d Cir. 2016) .......................................................................... 65

*Jani v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  209 F. App'x 305 (4th Cir. 2006) ........................................................... *passim*

*Jefferson v. Sellers*,
  250 F. Supp. 3d 1340 (N.D. Ga. 2017), *aff'd*, 941 F.3d 452 (11th Cir. 2019) .............. 7, 19, 63

*Keir v. UnumProvident Corp.*,
  2003 WL 2004422 (S.D.N.Y. Apr. 29, 2003) ................................................. 4

*Leigh v. Engle*,
  727 F.2d 113 (7th Cir. 1984) .................................................................. *passim*

*Mass. Mut. Life Ins. Co. v. Russell*,
  473 U.S. 134 (1985) ............................................................................. *passim*

*McDevitt v. Reliance Standard Life Ins. Co.*,
  663 F. Supp. 2d 419 (D. Md. 2009) ................................................................ 1

*Metro. Life Ins. Co. v. Glenn*,
  554 U.S. 105 (2008) ............................................................................. *passim*

*Meyer v. Berkshire Life Ins. Co.*,
  128 F. Supp. 2d 831 (D. Md. 2001) ................................................................ 2

*Mickell v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  832 F. App'x 586 (11th Cir. 2020). .......................................................... *passim*

*Moore v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  282 F. App'x 599 (9th Cir. 2008) ................................................................ 45

*Openshaw v. Cohen, Klingenstein & Marks, Inc.*,
  320 F. Supp. 2d 357 (D. Md. 2004) .............................................................. 11

*Peters v. Aetna Inc.*,
  2 F.4th 199 (4th Cir. 2021) ...................................................................... 3, 4

*Peters v. Aetna, Inc*,
  2023 WL 3829407 (W.D.N.C. June 5, 2023) ................................................... 4

*Price v. UNUM Life Ins. Co. of Am.*,
  2018 WL 1352965 (D. Md. Mar. 14, 2018)..........................................................................66

*Pulliam Inv. Co. v. Cameo Props.*,
  810 F.2d 1282 (4th Cir. 1987) ........................................................................................1

*Rawls v.Unum Life Ins. Co. of Am.*,
  219 F. Supp. 2d 1063 (C.D. Cal. 2002) ..........................................................................11

*Richardson v. Perales*,
  402 U.S. 389 (1971)......................................................................................................51

*Savage v. State*,
  166 A.3d 183 (Md. 2017) ..............................................................................................10

*Schindler v. Unum Life Ins. Co. of Am.*,
  2013 WL 4499146 (D.S.C. Aug. 19, 2013) ...................................................................65

*Scott v. PNC Bank Corp. and Affiliates Long Term Disability Plan*,
  2011 WL 693286 (D. Md. Feb. 15, 2011) ....................................................................53

*Shea v. Esensten*,
  107 F.3d 625 (8th Cir. 1997) ........................................................................................15

*Shin v. Shalala*,
  166 F. Supp. 2d 373 (D. Md. 2001) ..............................................................................10

*Skelton v. Radisson Hotel Bloomington*,
  33 F.4th 968 (8th Cir. 2022) .........................................................................................18

*Smith v. Cox Enters.  Inc. Welfare Benefits Plan*,
  127 F.4th 541 (4th Cir. 2025) ...............................................................................*passim*

*Smith v. Reliance Standard Life Ins. Co.*,
  2018 WL 4760490 (E.D.N.C. Oct. 2, 2018), *aff'd*, 778 F. App'x 207 (4th Cir. 2019) ............51

*Smith v. Sydnor*,
  184 F.3d 356 (4th Cir. 1999) ..........................................................................................3

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  860 F.3d 259 (4th Cir. 2017) ................................................................................*passim*

*Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*,
  2016 WL 852732 (D. Md. Mar. 4, 2016)........................................................................35

*Spry v. Eaton Corp. Long Term Disability Plan*,
  326 F. App'x 674 (4th Cir. 2009) .............................................................................67, 70

*St. John v. State of N.C. Parole Comm'n,*
  764 F. Supp. 403 (W.D.N.C. 1991) ...................................................................... 10

*Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,*
  2012 WL 2374661 (D. Md. June 19, 2012) .................................................. *passim*

*Tate v. King,*
  2025 WL 509133 (D. Md. Feb. 14, 2025) ................................................... 2, 10-11

*Tekmen v. Reliance Standard Life Ins. Co.,*
  55 F.4th 951 (4th Cir. 2022) ............................................................................... 2

*Varity Corp. v. Howe,*
  516 U.S. 494 (1996) ........................................................................................... 14

*Vetter v. Am. Airlines, Inc. Pilot Long-Term Disability Plan,*
  299 F. Supp. 3d 714 (D. Md. 2018) .................................................................. 48

*Watson v. UnumProvident Corp,*
  185 F. Supp. 2d 579 (D. Md. 2002) ................................................. 16, 29, 53, 66

*Weaver v. Phoenix Home Life Mut. Ins. Co.,*
  990 F.2d 154 (4th Cir. 1993) ............................................................................. 2

**Statutes**

8 U.S.C. § 1133 ...................................................................................................... 4

8 U.S.C. § 1133(1) ............................................................................................... 23

8 U.S.C. § 1104(a)(1)(A)(i) ................................................................................. 23

8 U.S.C. § 1104(a)(1)(A)(ii) ................................................................................ 23

8 U.S.C. § 1104(a)(1)(B) ..................................................................................... 23

8 U.S.C. § 1106 .................................................................................................... 23

8 U.S.C. § 1106(b)(1) .......................................................................................... 23

8 U.S.C. § 1106(b)(2) .......................................................................................... 23

29 U.S.C. § 1022(a) ............................................................................................. 16

29 U.S.C. § 1022(a)(1) ......................................................................................... 61

29 U.S.C. § 1022(b) ............................................................................................. 61

29 U.S.C. § 1104(a)(1)(B) .............................................................................. 11, 21

29 U.S.C. § 1109(a) .................................................................................................. 3

29 U.S.C. § 1132(a)(2) ............................................................................................. 2

29 U.S.C. § 1133(1) ................................................................................................ 23

29 U.S.C. § 1133(2) ........................................................................................... 26, 28

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................ 1

**Regulations**

29 C.F.R. Pt. 2560 .................................................................................................. 5

29 C.F.R. § 2560.503-1(b)(5) ................................................................................ 30

29 C.F.R. § 2560.503-1(b)(7) ................................................................................ 26

29 C.F.R. § 2560.503-1(g)(1)(i) ....................................................................... 23, 24

29 C.F.R. § 2560.503-1(g)(1)(ii) ........................................................................... 24

29 C.F.R. § 2560.503-1(g)(1)(iv) .......................................................................... 23

29 C.F.R. § 2560.503-1(g)(1)(vii) ......................................................................... 23

29 C.F.R. § 2560.503-1(g)(1)(vii) ......................................................................... 23

29 C.F.R. § 2560.503-1(g)(1)(j) ............................................................................ 23

29 C.F.R. § 2560.503-1(h)(2)(iv) .......................................................................... 28

29 C.F.R. § 2560.503-1(l)(ii) ................................................................................. 23

29 C.F.R. § 2560.503-1(j)(vii) ............................................................................... 23
.

## INTRODUCTION

Plaintiffs Daniel Loper, Jamize Olawale, and Charles Sims (collectively, "Plaintiffs") respectfully submit this consolidated memorandum in opposition to Defendants' motions for summary judgment on their claims (ECF Nos. 115, 123, 125).  For the reasons set forth below, the Court should deny Defendants' motions.

## STATEMENT OF FACTS

The factual background relevant to Defendants' motions is set forth at length on pages 1-19 of the memorandum in opposition to Defendants' motion to dismiss the Amended Complaint (ECF No. 70 at 14-32).[1]  Plaintiffs incorporate by reference the Statement of Facts from that memorandum, as well as the allegations respecting Plaintiffs in Amended Complaint ¶¶ 190-214.

## APPLICABLE STANDARDS

To be granted summary judgment the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "carries the burden of showing that there is no genuine issue as to any material fact in the case."  *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).  "A genuine dispute about a material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *McDevitt v. Reliance Standard Life Ins. Co.*, 663 F. Supp. 2d 419, 421-22 (D. Md. 2009).  "[T]he evidence of the party

---

[1] "Amended Complaint" refers to the Amended Class Action Complaint (ECF No. 56).  Plaintiffs adopt the definitions and shorthand terms in their memorandum in opposition to Defendants' motion to dismiss the Amended Complaint (ECF No. 70).  "LM," "OM," and "SM" refer to pages of Defendants' memoranda in support of their respective motions for summary judgment as to Plaintiffs Loper (ECF No. 115-2), Olawale (ECF No. 123-1), and Sims (ECF No. 125-1).  "DL-," "JO-," and "CS-" refer to the exhibits in support of Defendants' respective summary judgment motions as to Messrs. Loper, Olawale, and Sims, as paginated according to the key supplied in the Index of Exhibits that Defendants filed in each motion.  *See* ECF Nos. 115-5 (Loper), 123-4 (Olawale), and 125-4 (Sims).  "Ex." refers to the exhibits to the Declaration of Benjamin R. Barnett, dated Apr. 25, 2025 ("Barnett Declaration").  References to ERISA include its implementing regulations.  Except where noted, internal citations, quotation marks, and footnotes are omitted from all quotations and emphasis is added.

opposing summary judgment is to be believed," *Meyer v. Berkshire Life Ins. Co.*, 128 F. Supp. 2d 831, 833 (D. Md. 2001), and "[t]he facts, and the inferences to be drawn from the facts, must be viewed in the light most favorable to the party opposing the motion." *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 157 (4th Cir. 1993); *accord Chao v. Malkani*, 216 F. Supp. 2d 505, 511 (D. Md. 2002) (acknowledging this standard in the ERISA context). Ultimately, "a court should not grant summary judgment unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under *any* circumstances." *Campbell v. Hewitt, Coleman & Assocs., Inc.*, 21 F.3d 52, 55 (4th Cir. 1994).[2]

## ARGUMENT

## I.    There Is a Genuine Issue of Material Fact That Defendants' Objectively Unreasonable Conduct Considered in The Aggregate Breaches Fiduciary Duties to the Plan, Requiring Appropriate Relief for the Plan's Benefit

Giving them short shrift, Defendants argue that Plaintiffs cannot maintain their claim for breaches of fiduciary duties to the Plan in Count V of the Amended Complaint because their allegations are derivative of the same alleged failures underlying Counts I, II, and III, and that "these kinds of alleged errors do not even come close to meeting the standard to demonstrate a fiduciary breach." LM2-3, OM2-3, SM2. Plaintiffs, however, have sufficient evidence that "a reasonable jury could return a verdict for" Plaintiffs, on behalf of the Plan, regarding Defendants' breaches of fiduciary duties, requiring appropriate relief benefiting the Plan. *Tate v. King*, 2025 WL 509133, at *2 (D. Md. Feb. 14, 2025).

ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits derivative actions on behalf of a Plan

---

[2] Where there are disputed issues of material fact on an ERISA 502(a)(1)(B) wrongful denial of benefits claim—as is the case here—a Rule 52 bench trial is appropriate. *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 961 (4th Cir. 2022).

to obtain relief under ERISA § 409(a), 29 U.S.C. § 1109(a), and such claims may be asserted concurrently with 502(a)(1)(B) claims. *See Peters v. Aetna Inc.*, 2 F.4th 199, 215-16 (4th Cir. 2021). A 502(a)(2) claim must seek remedies that provide a "benefit [to] the plan as a whole" *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 (1985).[3]

Plaintiffs have triable fiduciary duty breach claims. To begin with, Plaintiffs have "not asked the Court to review the … trustees' interpretation of the Plan's governing documents." *Bidwell v. Garvey*, 743 F. Supp. 393, 397 (D. Md. 1990). Rather, there are genuine issues of material that Defendants' "set of[] acts that, if proven, would constitute breaches of fiduciary duties … independent of a claim for benefits." *Smith v. Sydnor*, 184 F.3d 356, 363 (4th Cir. 1999) (citing cases).[4] Plaintiffs have adduced more than mere speculation or conclusory statements that, when their conduct is "considered in the aggregate" and "cumulatively," Defendants "continually acted in an objectively unreasonable manner that conflicted with their duties of loyalty and care,"[5] warranting extensive Plan-wide declaratory and injunctive relief, restitution, reformation, removal of Board members, and stripping of the Board's discretion prospectively.

### A. There Is a Genuine Issue of Material Fact That Defendants Have a Fraudulent Scheme That Misuses Plan Assets and Harms the Plan's Integrity

Defendants' contention that "there is no evidence of … egregious misconduct" (LM28, OM30, SM28) is unavailing. A fraudulent scheme in which plan assets are not used exclusively

---

[3] For example, removal is an appropriate remedy expressly permitted under Section 409 "[i]f the plan administrator's refusal to pay contractually authorized benefits had been willful and part of a larger systematic breach of fiduciary obligations." *Id.* at 147.

[4] *See Peters*, 2 F.4th at 231 ("course of conduct that is relevant," including "scheme"); *Chao v. Malkani*, 452 F.3d 290, 298 (4th Cir. 2006) ("repeated and questionable conduct established … breach").

[5] *Chao*, 452 F.3d at 298; *Brundle ex rel. Constellis Emp. Stock Ownership Plan v. Wilmington Tr., N.A.,* 919 F.3d 763, 774 (4th Cir. 2019) ("[a]lthough these failings independently might not be dispositive, *cumulatively* they demonstrated ... fail[ure] to meet its duty under ERISA").

in the beneficiaries' interests is a breach of fiduciary duties.  *See Peters v. Aetna, Inc.*, 2023 WL 3829407, at *2, *6, *11 (W.D.N.C. June 5, 2023); *Leigh v. Engle*, 727 F.2d 113, 124 (7th Cir. 1984).  These are distinct injuries to the Plan itself resulting from breaches of the fiduciary duties of loyalty, care, and the exclusive benefit rule.[6]

Here, there is evidence that Defendants breached fiduciary duties to the Plan by engaging in a fraudulent scheme in which they misused Plan assets by promoting perverse incentives on a larger systematic basis and made misrepresentations concealing their web of misconduct. Multiple courts and members of Congress have found "that the NFL sort of has this kind of blanket denial or minimizing of the fact that there may be this … link" between head injuries and permanent problems, sought to "downplay" these "dangers," and that these "abuses by the Board are part of a *larger strategy* engineered to ensure that former NFL players suffering from the devastating effects of severe head trauma are not awarded."  *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2022 WL 2237451, at *43 (N.D. Tex. June 21, 2022).  The evidence that the Board's larger strategy is "willful and part of a larger systematic breach of fiduciary obligations" is reflected in the fiduciaries' actions regarding compensation, rewards, maintenance, monitoring, retention, and training of Plan physicians with histories of inadequate work performance and significant biases against recognizing NFL play-related impairments, in violation of 8 U.S.C. §§ 1104(a)(1)(A)(i)-(ii), 1104(a)(1)(B), 1106, and 1106(b)(1)-(2) and 1133.[7]  *Russell*, 473 U.S at 147.

---

[6] *E.g., Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 748 (6th Cir. 2014) (breaching fiduciary duties when "committed fraud"); *see also Peters*, 2 F.4th at 236 ("produced sufficient evidence to create a genuine issue of material fact as to whether" scheme and "practice constituted separate actionable misrepresentations and amounted to breaches of fiduciary duty"); *Keir v. UnumProvident Corp.*, 2003 WL 2004422, at *1 (S.D.N.Y. Apr. 29, 2003) (breach of fiduciary duty where "defendants rewarded physicians … with bonuses or financial incentives for denying or terminating claims regardless of the merits of the claims and for fabricating medical justifications").

[7] Indeed, the U.S. Department of Labor has instructed that

For example, Defendants retained Dr. Eric Brahin, whose stated view akin to the Board's larger strategy is that "[c]ognitive symptoms that begin days, weeks, or months after an accident are not consistent with posttraumatic encephalopathy." Ex. 1 (NFLPLTFS-0000024 at 16). Similarly, Defendants retained Dr. Barry McCasland, who testified that "if somebody has progressively worsening and worsening and worsening symptoms, it just can't be due to a concussion. That isn't what concussions do." Ex. 2 (NFLPLTFS-0000118). Dr. McCasland also confirmed at that time that, through January 2012, "a hundred percent" of his "witness work was for defendants, insurance companies, or defense lawyers." *Id.* As a Plan Neutral Physician ("NP"), he expressed the view ███████████████████████████████████████████████████

███████████████████████ Ex. 3 ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ (ECF

No. 172-5 at ████. Not surprisingly, the Board has rewarded Drs. Brahin and McCasland █████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* Similarly,

Dr. Dean Delis has expressed his belief "that it would be rare for an individual to be left with even mild cognitive deficits following a mild concussion" (Amended Complaint ¶ 152). Not surprisingly, Dr. Delis, █████████████████████████████████████████████████████

---

a plan cannot contract with a medical expert based on the expert's reputation for outcomes in contested cases, rather than based on the expert's professional qualifications. These added criteria for disability benefit claims address *practices and behavior* which cannot be reconciled with the 'full and fair review' guarantee in section 503 of ERISA, *and with the basic fiduciary standards that must be followed in implementing the plan's claims procedures*.

(Ex. 4 NFLPLTFS-0000151 at 10, Claims Procedure for Plans Providing Disability Benefits, U.S. Dep't of Labor, Employee Benefits Sec. Admin., 81 Fed. Reg. 92316; 29 C.F.R. Pt. 2560 (Dec. 19, 2016)).

████████████████████████████████████████████████████████

████████████████ ECF No. 172-5 at ████████████████████████

████████████████████████████████████████████████████████

Importantly, these are not aberrations. Rather, they have become the norm in a larger systematic scheme designed to falsely and inaccurately downplay the effects of NFL football play-related impairments, reflecting how Plan assets have not been used exclusively in the interests of Plan participants. Dr. Anthony Hayter, a professor at the University of Denver and expert in statistics (*id.* at 11-13, 200-35), concludes that both the ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████ *Id.* at ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ *Id.*

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████. *Id.* at

████████████████████████████████████████████████████████

██████████████████████████████████ *See id.* at ██████. The design and implementation of this incentive scheme is facilitated by Defendants' decisions regarding the Plan-wide selection, monitoring, and training of NPs, which is clear from their fiduciary decision ████████████████████████████████████████

███████████████████████.[8]  The evidence demonstrates a larger strategy by ███
███████████████ and the Board.  Defendants pay lavish compensation to these two "medical consultants" to monitor, investigate, train, refer, recommend, and effectively select new neuropsychologists for inclusion in the network of NPs as part of Defendants' fraudulent scheme, systematically breaching their fiduciary duties.[9]

### 1.    Inclusion of Dr. Macciocchi as Part of the Fraudulent Scheme

Only two months before Defendants rewarded Dr. Macciocchi with a promotion, a court shredded his result-oriented testimony.[10]  Moreover, while retained and compensated with Plan assets, and only a year before Defendants rewarded him with a promotion to teach other Plan physicians, marketing materials were made for a 2016 seminar, featuring Dr. Macciocchi as a panelist for "*DEFENDING* A TRAUMATIC BRAIN INJURY CLAIM - THE TERROR TO COME."  Ex. 6 (NFLPLTFS-0000167, at 6).  His panel in particular had the stated aim of "*defending* psychological injury claims and mild traumatic brain injury claims in the wake of DSM



[8] ECF No.135-5, at 7 ████████████████; ECF No. 172-11 ███████████ t); Ex. 5 ███ ██████████████ *Id.* ██████████████

[9] Ex. 5 ███████████████████████████████████████

[10] Namely, for (i) failure to read the medical literature he attempted to apply, resulting in his "inappropriate" application of discriminatory racial norms to people with brain injuries; (ii) rendering neurological opinions, even though he's not a neurologist; (or even a physician); (iii) medically incorrect views against concluding that one could suffer a brain injury without a skull fracture that are inconsistent with common medical findings in "[f]ootball players"; (iv) his dismissal of all other experts' reasoned views that supported finding brain damage; and (v) other flawed reasoning.  *Jefferson v. Sellers*, 250 F. Supp. 3d 1340, 1364-69 (N.D. Ga. 2017).

V." *Id.* He was introduced in the promotional materials for that panel as "a lead reviewer *for the NFL*" and would "inform on *ways to defeat or mitigate these claims based on current science and explore how best to convince a jury that a plaintiff's brain is hard boiled and not scrambled.*" *Id.*[11]

Dr. Macciocchi has been the Plan's highest-paid neuropsychologist since 2009, having received a total of $2,009,800 in Plan assets. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ECF No. 172-11.  Given the indisputable biases that he harbored, "the potential conflicts in this case were substantial enough to create the risk of misuse of plan assets" on Dr. Macciocchi to repeatedly select, monitor, and instruct other Plan physicians on how to evaluate applicants suffering from brain injuries resulting from NFL play.[12]

Notably, *none* of the ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ ECF No. 172-5, ████████████████████████

████████████████████████████████████████████████████████████

---

[11]  In addition, Dr. Macciocchi has stated that "sustaining MTBI did not significantly contribute to neuropsychological test performance," Ex. 7 (NFLPLTFS-0000156, at 9; NFLPLTFS-0000163, at 8) and "although undesirable, 2 grade 1 concussions occurring at least 2 weeks apart did not appear to produce significantly greater impairment than a single injury, at least in this population of collegiate football players." On top of all this, he has expressed a bias that racially discriminatory "demographic" "factors explain more in variance in neuropsychological test scores than MTBI." *Id.* (NFLPLTFS-0000156, at 14).

[12]  *See Leigh*, 727 F.2d at 127-35 (relevant factors in deciding whether plan administrators acted solely in plan beneficiaries' interests include "risk of conflicts between the interests of the fiduciaries and beneficiaries," which "is the key warning signal"; "to the extent that they performed fiduciary functions in selecting and retaining," they had "duties of surveillance and oversight").



*Id.* at 152.

ECF No. 172-11; Ex. 6 (NFLPLTFS-0000167) (lecturing on how to defeat disability claims).

### 2.    Use of Dr. Garmoe as Part of the Larger Systematic Fiduciary Duty Breaches

Similarly, a prudent fiduciary would not have used Plan assets to promote Dr. Garmoe in 2013. (ECF 134-5 at 7) ▇▇▇▇▇▇▇▇▇▇▇▇ Approximately a year after his promotion, Dr. Garmoe gave a televised interview in which he repeatedly downplayed the danger of concussions. Among his claims were that "[o]ne of the things that's important to know about concussion is that people are living in fear of them right now" and that it is "rarely the case" that concussions lead to long-term brain damage.[14]

Despite his bias that concussions rarely lead to long-term brain damage, ▇▇▇▇▇▇

---

[13] Despite a court's shredding of his testimony, his ▇▇▇▇▇▇ and marketing of his expertise in "ways to defeat or mitigate [brain injury] claims" (Ex. 6 (NFLPLTFS-0000167)), ▇▇▇▇▇▇ ECF No. 172-11, ▇▇

[14] This interview is available at https://www.youtube.com/watch?v=my3pyLWZ2Io.  Furthermore, Dr. Garmoe has published in journals, advocating that "neuropsychologists must also establish the economic value, or return on investment, of their services."  *See* Tannahill Glen *et al.*, "Return on investment and value research in Neuropsychology: A call to arms," 35 Archives of Clinical Neuropsychology 459-68 (2020) (Dr. Garmoe a co-author) (abstract available at https://academic.oup.com/acn/article-abstract/35/5/459/5812708).

███████████████████████████████████████████████████

███████████████████████████    ECF No. 134-5, at 7 ███████████████

Ex. 8 ████████████████████████ ), Ex. 9 ████████████████████████

████████    Meanwhile, the Maryland Court of Appeals was "unable to conclude that Dr. Garmoe's ultimate opinion adequately reflect[ed] the data and information available to him." *Savage v. State*, 166 A.3d 183, 195-96 (Md. 2017) ("[Dr. Garmoe's] analysis did not bridge the analytical gap between the data available to him and his ultimate conclusions."). Defendants misused Plan assets that were meant to ensure data consistency for the benefit of the Plan and its participants by retaining a neuropsychologist whom Maryland's highest court determined was unable to ensure consistencies with data in his *own* report. A prudent fiduciary would not "ask[] the fox to guard the hen house." *St. John v. State of N.C. Parole Comm'n*, 764 F. Supp. 403, 411 (W.D.N.C. 1991). This problem is compounded when the Board members admit that their education on neurocognitive injury comes from such a biased source.[15]

Plaintiffs' production of powerful evidence is more than a compilation of inferences. The extraordinary magnitude of these plan-wide perverse incentives when considered with (i) their irreconcilable conclusions; (ii) the Plan's solicitation of and reliance upon flawed reports; (iii) retention and lavish payments to biased or unqualified NPs (with a track record of minimizing genuine medical conditions, failing to adequately draw conclusions from data, failing to review all records, and fabricating inaccurate and false medical justifications), demonstrates that this fraudulent scheme is "willful and part of a larger systematic breach of fiduciary obligations." *Russell*, 473 U.S at 147; *see Shin v. Shalala*, 166 F. Supp. 2d 373, 375 (D. Md. 2001); *Tate*, 2025

---

[15] *See* Ex. 10 ███████████████████████████████████████████████
████████████████████████████ Ex. 11 (Williams Tr. 24:18-21 (received training from Dr. Garmoe as to how to read reports when Neurocognitive Disability benefits were established).

WL 509133, at *2. There is a genuine issue of material fact that the Plan itself has been harmed because the fiduciaries' fraudulent scheme misuses the Plan's assets, fails at defraying reasonable expenses, and harms the integrity of the Plan's administration, including the Plan's referral and appeal processes.[16]

### B. Failure to Monitor Neutral Physicians and Imprudent Retention and Reliance on Conflicted Advisors with Histories of Bias and Inadequate Work Performance

In retaining experts, a trustee "must at least show that it (1) *investigate[d] the expert's qualifications*, (2) provide[d] the expert with complete and accurate information, and (3) *[made] certain that reliance on the expert ... was reasonably justified under the circumstances*." *Brundle*, 919 F.3d at 773-74. Moreover, "[b]ecause ERISA demands a high level of scrutiny from fiduciaries, a trustee must prove that it considered … any … relevant [facts] under the particular circumstances it faced at the time of the decision and *took care to avoid any identified conflicts of interest*." *Id.*[17] Thus, fiduciaries may breach their ERISA § 404(a)(1)(B) fiduciary duties based on imprudence in their investigation, compensation, monitoring, selection, training, rewards, retention, and similar decisions regarding Plan physicians, such as "in circumstances where they

---

[16] *Russ*ell, 473 U.S. at 140 (discussing "integrity of the plan"); *Rawls v.Unum Life Ins. Co. of Am.*, 219 F. Supp. 2d 1063, 1066 (C.D. Cal. 2002) ("preservation of the *integrity* of the appeal process is a valuable distinct right under ERISA that is separate from just the benefits decision"); *Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357, 360 (D. Md. 2004) ("If an ERISA fiduciary takes unreasonable risks with plan assets to increase its professional reputation, the fiduciary has not administered the plan for the exclusive purpose of providing benefits to plan beneficiaries."); *Hainey*, 2023 WL 3645514, at *5 ("scope of [502(a)(2) and 409] suit relates to 'the proper management, administration, and investment of fund assets, with an eye toward ensuring that 'the benefits authorized by the plan are ultimately paid to participants and beneficiaries").

[17] ERISA § 404(a)(1)(B) requires that a fiduciary must discharge its duties solely in the interest of participants "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B).

should know [their] performance to be inadequate."[18]

Here, Defendants have violated various ERISA provisions (*see* Section I.A *supra*) by failing to monitor NPs who have a history of bias and inadequate work performance. Because "simply delegat[ing] and then turn[ing] a blind eye" demonstrates imprudence, *Acosta v. Chimes D.C., Inc.*, 2019 WL 931710, at *19 (D. Md. Feb. 26, 2019), Defendants have acted imprudently. The NFL Player Benefits Office's Disability Relations Manager, Hessam ("Sam") Vincent,

███████████████████████████████████ Ex. 5 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████ *Id.*

████████████████████████████████████████████████████████

██████████████████████████████████████████████

The conflicts of Defendants' hired physicians, however, are manifest and legion. For example, Dr. ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(Ex. 12 ████████████████████ Dr. Riggio, though, was the Medical Director for the NFL Neurological Care Program, established in 2010" (Ex. 13 (NFLPLTFS-0000071, at 1), and served as a "Neuro Trauma Consultant for the NFL" (Ex. 14 (NFLPLTFS-0000073).  Likewise, Dr. Macciocchi is promoted in marketing materials as a former "lead reviewer for the NFL"

---

[18] *Donovan v. Mazzola*, 716 F.2d 1226, 1234 (9th Cir. 1983); *see Brundle*, 919 F.3d at 773; *see also Bidwell*, 743 F. Supp. at 397 (fiduciaries "are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options").

(Section I.A.1, *supra*) and promotes on his website his work for Defendants— ████████

████████████████████████████████████████████ ECF No. 172-11.  Dr. Garmoe publicly downplayed on television the long-term impact of traumatic brain injuries.  *See* https://www.youtube.com/watch?v=my3pyLWZ2Io.  Other examples abound.[19]

What is more, there is evidence of Defendants' willful blindness to all of this.  It is to the biased ████████████████████████████████████████████████

████████████████████████████████ Ex. 5 ███████████ *see also id.* ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*  (██████).[20]  Merely waving "a magic wand" and making "an assumption that carried such weighty consequences,"  the Board repeatedly—and blindly—defaulted to such biased physicians; "a reasonably prudent fiduciary would have probed the issue further." *Brundle*, 919 F.3d at 773, 778.[21]

---

[19] *Compare, e.g,* Ex. ████████████████████████████

████████████████████████████████████████████ *with* Ex. 16 (collecting examples of NPs advertising their NFL, NFLPA, or Plan affiliation).

[20] This involves ████████████████████████████████████

████████████████████████████ *Id.* ████████████████████████

████████████████████████████████████████████████

████. *Id.* ████████████████████████

[21] Nor would a prudent fiduciary have rewarded Dr. McCasland with extravagant compensation the year following publicly available evidence of inadequate work performance and bias against concussion-related disability findings, including (i) a court noting his admission that he had reviewed only "certain" records, *Mickell*, 832 F. App'x at 589; (ii) knowledge that 100% of his expert work was in defending against claims; and (iii) his testimony that concussion symptoms do not worsen. Ex. 2 (NFLPLTFS-0000118 at 29:1-24, 75:2-76:2). A prudent fiduciary would have investigated Dr. McCasland or would not have imprudently continued to retain and even reward him with the highest compensation paid to any Plan physician that year.

## C.    Fraudulent Misrepresentations in Statutory Disclosures to Players

Misinformation, dishonesty, deception, or "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."[22] Moreover, a fiduciary "breache[s] its fiduciary duty by committing fraud and then acting to conceal that fraud." *Hi-Lex Controls, Inc*, 751 F.3d at 748.

Here, Defendants continually violate ERISA §§ 404(a)(1), 503(1), and 503(2) by stating in statutory disclosures to applicants, including Plaintiffs, that ███████████████████████████

███████████████████ Ex. 17 ██████████████████████████████████████

██████████████████████████████ That is a false assurance given how many

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████ Ex. 18 ██████████████████████████████

██████████████████ ECF No. 172-11. Moreover, Defendants "committed fraud by knowingly misrepresenting and omitting information," *Hi-Lex Controls*, 751 F.3d at 748, namely that Plan physicians have biased views against individuals claiming TBI-related impairments, *see* Sections I.A-B, *supra*, and have been financially incentivized to render opinions adverse to applicants, as confirmed by Plaintiffs' statistical correlation. *See* Amended Complaint ¶¶ 116-46; ECF No. 172-5, *passim*. Defendants have made repeated false reassurances that ████████████

██████████████████████████████ Ex. 19 ████████████████████████████

██████████████████████████████████████████████████████████████

██████ They have also made assurances that ████████████████████████████████



---

[22] *Varity Corp. v. Howe,* 516 U.S. at 494 (1996) (ERISA § 404 violated because "reality was very different" from what was falsely conveyed to participants); *CIGNA Corp. v. Amara*, 563 U.S. 421, 428 (2011) ("descriptions of … plan were significantly incomplete and misled"); *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001) ("ERISA administrators have a fiduciary obligation not to misinforms").

███████████████████████████████████████████████████

███████████████████ Ex. 20 ████████████████████████

███████████████████████████████████ Meanwhile,

Plaintiffs "had the right to know" that Defendants, as the Plan's fiduciaries, were "offering

financial incentives that could have colored [their Plan] doctor[s'] medical judgment." *Shea v.*

*Esensten*, 107 F.3d 625, 629 (8th Cir. 1997). Defendants have omitted from SPDs and decision

letters that some NPs, such as Drs. Macciocchi and Garmoe, receive more than just a fixed fee for

each evaluation—receiving, as medical consultants, additional monthly Plan compensation that is

not disclosed in the SPDs or decision letters.[23]

Additionally, Defendants mislead participants by employing the deceptive words "neutral

physician" or "neutral orthopedist" in ERISA-mandated SPDs and decision letters, as well as e-

mails to Plan participants, rather than the Plan-defined term "Neutral Physician." The average

person would understand the uncapitalized word "neutral" to have its ordinary meaning of

impartial or unbiased. Notably, the Plan provides no promise of a "neutral exam" or "neutral

examination" because it nowhere uses either term. *See* ECF No. 69-7, *passim*. Indeed, even after

the Plan was amended in April 2022 to ███████████████████████████████████

███████████████████████████████ (JO-1, at 94), Defendants continued to

misrepresent to Players through 2024 that ████████████████ *E.g.*, ██████ Ex. 22

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████ Moreover, the false SPD statements about "neutral physicians" and "neutral exams" are

material because there is a substantial likelihood that a reasonable Player would find them

---

[23] *Compare* ECF Nos. 172-11 and 135-5 (█████████████████████) *with* Ex. 21 ████████

███████████████████████████.

"important," and would want to know that the Plan does *not* actually promise a "neutral examination"—meaning by a completely impartial physician.[24] Such material misinformation as the foregoing has harmed the Plan's integrity of and has wasted Plan assets through lavish payments to physicians who are not "absolutely neutral" but, rather, have a history of bias.[25]

## D.    False Representations That Board Members Themselves Review All Information

In addition, Defendants have repeatedly made false assertions that the Board undertakes a specific review of records. These are "far more than mere negligent inattention to its important procedural and substantive responsibilities … under ERISA" and "border[] on outright fraud."[26]

Many courts, including within this Circuit, found these fiduciaries' repeated claims that they "reviewed [the] entire file" to be false.[27] Here, evidence shows that, in violation of ERISA

---

[24] *See* 29 U.S.C. § 1022(a) (SPDs "shall be written in a manner calculated to be understood by the average plan participant"); *Amara*, 563 U.S. at 431 ("focused on NOT providing employees [the information]").

[25] *See* *Russell*, 473 U.S. at 142 ("abundantly clear" that "draftsmen [of section 409(a)] were primarily concerned with the possible misuse of plan assets"); *cf. Edmonds v. Hughes Aircraft Co.*, 145 F.3d 1324 (table), 1998 WL 228200, at *9 (4th Cir. May 8, 1998) (unpublished) ("We wonder whether a conflict-free ERISA fiduciary would even spend $472 of *the plan's money* for a terse, conclusory opinion[.]").

[26] *Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579, 585 (D. Md. 2002); *see Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 818 (D. Md. 2011); *see also Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 24-25 (4th Cir. 2014) ("fiduciary breached the fiduciary duty" "when it neither sought readily available records" "that might have confirmed [a claimants] theory of disability nor informed … in clear terms that those records were necessary").

[27] *See Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 860 F.3d 259, 265-66 (4th Cir. 2017) (Board summarily dismissed medical evidence by "*erroneously stating*" it had already previously reviewed in 2009 claim and appeal, whereas new evidence did not exist until 2010 and 2011); *Mickell v. Bell/Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 593 (11th Cir. 2020) (Board said "it 'reviewed [the] *entire* file,' but that statement [was] belied by the record"); *In re Marshall*, 261 F. App'x 522, 523, 526 (4th Cir. 2008) (Board ignored the record, which contained evidence favorable to applicant); *Jani v. Bell*, 209 F. App'x 305, 307 (4th Cir. 2006) ("Board ignored the unanimous medical evidence, including that of its own expert, disregarded the conclusion of its own appointed investigator, and relied for its determination on factors disallowed by the Plan."); *Cloud*, 2022 WL 2237451, at *12 ("Board members do not review *all* of the documents in the administrative record," citing board member's testimony); *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2025 WL 82450, at *5 (N.D. Tex. Jan. 13, 2025) ("summary *falsely stated* that a doctor's report that supported Plaintiff's position …was included in the original 2014 request despite the report having a watermark showing that it was not."); *Carter v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2012 WL 6043050, at *3 (N.D. Ala. Dec. 3, 2012) ("the

§§ 503(1), 503(2), and 1104, the fiduciaries' fraudulent conduct includes a plan-wide "practice" in "breach of the duty of loyalty by showing that administrators were dishonest … while acting in a fiduciary capacity," by repeatedly conveying ███████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████ *see also* Ex. 23 (*Cloud*, Board member Cass Tr. 44:8-15) ("we developed the system of a template-type decision").  Plaintiffs all have ███████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████ In reality, although the fiduciary informed Plaintiffs that it reviewed "all" of the records in the file, that statement is belied by the Record. Documents show that the Committee and Board failed to *actually* review multiple medical reports that included favorable views supporting a finding of disability from Mr. Olawale's treating orthopedic physician, ██████████████████, or Mr. Loper's treating physician, ███████████.[28] Neither the Committee nor the Board mentioned or listed their findings in the "documents provided," let alone discussed either of the treating physician's reports in the summary sheets or their decision letters. Ex. 24 ██████████████████████████████████████████████ ██████████████████. Moreover, although the Board also represented that the ██████████████ ███████████████████████████████████████████████████████████████████████

_____

Plan conceded that it was a '*misstatement*' that it considered the Report"); *see also* Ex. 10 ████████████ ████████████████████████████████████

    [28] *See* ████████████████████████; *compare* ████████████████████████████████████ *with Cloud*, 2022 WL 2237451, at *12 (citing trial testimony from Board member Smith that it is not his practice to review all documents in an application).



[29]

Nor have Defendants been truthful in telling claimants that ███████████

ECF No. 172-4; *accord* Ex. 10 ██████████. Putting aside the

evident deceit, Defendants' failure to have a document-by-document tracking system in place—or

their possible conscious decision to downgrade the Plan's systems, given that they now have no

system in place to track review of each document when they previously told another judge of this

Court that they did,[30] demonstrates that they acted imprudently, to the point of acting with willful

blindness. *See Skelton*, 33 F.4th at 978 (fiduciary cannot escape liability by designing system that

---

[29] In addition, Defendants falsely represent in SPDs and decision letters that the "Committee or Board will [consider] all facts and circumstances" in an applicant's record, and that Neutral Physicians are "specialists in the medical fields encompassing your claimed impairments." Ex. 25 (NFL_ALFORD-0012016, at -2050 (2019 SPD)); Ex. 26 (NFLPLTFS-0000107 at 36 (2021 SPD) ("Be sure to include ALL impairments you want considered on your initial application for benefits.")); ██████████). Plaintiffs Olawale and Sims, however, explicitly claimed ██████████

██████). Despite this, Defendants ██████████ Ex. 5

Ex. 27 ██████ Ex. 5

Ex. 5

[30] *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 723 (D. Md. 2012) (date stamps on documents in the administrative record indicated the date that the Board reviewed a document).

amounts to "willful blindness").[31]

### E.    Racially Discriminatory Policies

Plaintiffs have uncovered in discovery the indisputable fact that Defendants had a clandestine practice of applying discriminatory racial and ethnic norms to neuropsychological test results, embodied in written policies. The ██████████████████████████████████████ ████████████████████████████████████████; Ex. 28 (Feb. 21, 2025 Hr'g Tr. 87:8-9) (Defs.' counsel conceding "this practice existed"); *see also Jefferson*, 250 F. Supp. at 1365 (Heaton Norms "are demographically corrected or adjusted and take into account such factors as race"). As noted above in Section 1.A.1, the manual's author, Dr. Macciocchi, has expressed a bias that racial factors "explain more in variance in neuropsychological test scores than MTBI."

Consequently, Caucasian applicants' IQ scores were ████████████████████████████ ████████████████████████████████████. *E.g.*, Ex. 29 ██████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ In March 2021, after pointing out that Plaintiff Sims is "African American" in the first sentence of ████████████████████████ ████████████████████████████████████████████████████████████████████████████.

Defendants' counsel told the Court that when the Plan became aware of this practice in the middle of 2021, a "directive" was issued that it be halted. Ex. 29 (Feb. 21, 2025 Hr'g Tr. 87:7-18). That, however, is inaccurate. Putting aside that Defendants never produced the alleged directive halting the practice, ████████████████████████████████████████████████████████████████ ███████████████████████ ECF No. 172-12, at ████████████

---

[31] Finally, rather than prudently following the ████████████████████████████████ ████████████████ (Ex. 24 (at ███████████████████████, Defendants have instead simply delegated such review to Party Advisors and NPs, which is evidence of imprudence.



The same NP who █████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████. In fact, in examining Plaintiff Olawale in ███████████

███████████████████████████████████████████████████

████████████████████████1.[32]

The evidence shows that Defendants knew or should have known of this discriminatory practice at least as early as 2018 because ███████████████████████

███████████████████████████████████████████████████

████████████████████ He was contractually required ███████████████

███████████████████████████████████████████████████

████████████████████████[33]

## F.    Disregard of Legal Precedent

Defendants' repeated imprudent decisions to disregard federal court decisions adverse to them further demonstrates that they have failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity

---

[32] Board member Smith█████████████████████████████████████
███████████████████████████Ex. 10█████████
██████████████████████████*See* ECF No. 172-13. In fact, it was not until after this Court's ruling on Defendants' motion to dismiss that ████████████████
████████████████████████.

[33] Dr. Garmoe was also aware of this racially discriminatory practice, █████████████
███████████████████████████████████████████████████
███████████████████████████████ECF No. 134-5 at 7; Exs. 8, 9
██████████████

20

and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).

For example, in the face of federal courts determining that they acted unreasonably in (i) failing to consider the cumulative effect of applicants' impairments[34]; (ii) failing to review all of the evidence, *see supra* at 16-17 n.27; (iii) requiring self-reported symptoms to be supported by objective evidence, even though the Plan does not so provide[35]; and (iv) requiring contemporaneous medical evidence,[36] a reasonable fiduciary would conform to such legal precedent.  Defendants, however, continue to disregard such precedent on a Plan-wide basis.[37] Meanwhile, Defendants mislead participants in SPDs by advising them that the Board *will* consider "ALL" impairments listed in a disability application.[38]

### G.    Board Members Are Unqualified to Discharge Their Fiduciary Responsibilities, as Are Those to Whom They Secretly Delegate Them

"[T]he extent and duration of" the Board's actions congruent with the NFL's historical interest in delegating consideration of brain injuries to those without the proper medical qualifications "are also relevant for courts in deciding whether plan fiduciaries were acting solely in the interests of plan beneficiaries." *Leigh*, 727 F.2d at 126.  The Board "ha[s] a duty to monitor

---

[34] *See Mickell*, 832 F. App'x at 594-95; *see also Brumm v. Bert Bell NFL Ret. Plan*, 995 F.2d 1433, 1435-40 (8th Cir. 1993).

[35] *See Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 487 F. Supp. 3d 807, 816 (N.D. Cal. 2020); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2022 WL 1786576, at *2-3 (N.D. Cal. June 1, 2022).

[36] *See Solomon,* 860 F.3d at 266 (Plan terms did not require applicant to submit contemporaneous evidence to show onset of T&P disabling impairments during 15-year period from date of retirement from NFL); *Jani*, 209 F. App'x at 316 (rejection of expert's testimony because it was not contemporaneous was insufficient basis for Board's denial).

[37] *See* Ex. 5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 32 ▮▮▮▮

[38] Ex. 25 at 35 (2019 SPD); Ex. 26 at 36 (2021 SPD); ▮▮▮▮▮▮▮▮▮▮

appropriately [its delegates'] actions. *Id.* at 135. Board members cannot "abdicate their duties under ERISA merely through the device of giving their lieutenants primary responsibility" for evaluating claims. *Id.* at 135. Instead, they are "obliged to act with an appropriate prudence and reasonableness in overseeing" the "management" and implementation of the Plan. *Id.*

Board members, however, are, by their own admission, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 10 ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮. Instead, the Board has implemented surreptitious practices to shift its responsibilities to others without ensuring that those upon whom it relies are qualified to provide such advice or that they receive adequate training or direction.[39] Thus, while the Board ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 10 ▮▮▮▮▮▮▮▮▮▮▮▮▮

Furthermore, SPDs and decision letters ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ *see also* Ex. 25 at -2050 (2019 SPD); Ex. 26. The truth, however, is, as noted above, that the Board covertly abdicates this responsibility to unqualified Party Advisors. Although Defendants "were not obliged to examine every action taken by" their Party Advisors, "under these circumstances," they "were obliged to take prudent and reasonable action to determine whether"

---

[39] Party Advisor Adora Williams testified that she has no background in evaluating medical records, and the training that she received for purposes of reviewing administrative records consisted of little more than how to read and follow the physician report forms and accompanying narratives. Ex. 11 (Williams Tr. 22:5-34:21, 36:13-38:6, 32:10 ("I'm not a doctor")). She was never given training on how to interpret Plan terms concerning the LOD point system and is unable to interpret most of the LOD terms. *Id.* (Tr. 83:22-87:10). She was not told by the Board to review all records. *Id.* (Tr. 68:12-69:3). *See* Ex. 5 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ that Ms. Williams reviews 80-100 cases before every Board meeting and dedicates about an hour to each case (ECF No. 115-21, at 3 (¶ 7)), she would have spent about 4 seconds per page reviewing the files of Plaintiffs Loper (649 pages) and Olawale (701). Ex. 11 (Williams Tr. 89:18–21, 95:2-19).

those to whom fiduciary duties were delegated "were fulfilling their fiduciary obligations." *Leigh*, 727 F.2d at 135-36.

In sum, contrary to Defendants' contention (LM2, 28; OM2, 30; SM2, 28), Plaintiffs' 502(a)(2) claim for breach of fiduciary duty to the Plan is not derivative of their individual claims but, rather, is based on the cumulative misconduct that has harmed both the Plan's integrity and its financial well-being through the misuse of Plan assets.

## II.    Defendants Provided Inadequate Notice

Defendants argue that the decision letters issued to Plaintiffs comported with ERISA's notice requirements (LM24-26, OM27-29, SM24-26),[40] but the evidence shows that, as is their "pattern" and "practice,"[41] Defendants' decision letters employ "[b]ald-faced conclusions [that] do not satisfy the requirement" to provide adequate notice under ERISA because much of Plaintiffs' decision letters consist of "meaningless boilerplate" language.[42] First, in several of the decision letters, Defendants failed to explain the basis for disagreeing with the views of treating

---

[40] Section 503(1) of ERISA provides that every plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 8 U.S.C. § 1133(1). The regulations implementing Section 503(1) require that disability benefits decisions must: (i) provide "[t]he specific reason or reasons for the adverse determination"; (ii) "[r]eference to the specific plan provisions on which the determination is based"; (iii) include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary"; (iv) "[a] discussion of the decision, including an explanation of the basis for disagreeing with or not following: (i) The views presented by the claimant to the plan of health care professionals treating the claimant and vocational professionals who evaluated the claimant;" and (v) include the "specific internal rules, guidelines, protocols, standards or other similar criteria of the plan relied upon in making the adverse determination." 29 C.F.R. §§ 2560.503-1(g)(1)(i)-(iv) & (vii), (j)(vii).

[41] Critically, Defendants cannot claim that these failures are excusable as merely *de minimis*, in good faith, and not likely to cause prejudice or harm because the statute and its implementing regulations explicitly prohibit any exception to applying de novo review and deeming administrative remedies exhausted when, like here, "the violation is part of a pattern or practice of violations by the [P]lan." 29 C.F.R. § 2560.503-1(l)(ii).

[42] *Smith v. Cox Enters. Inc. Welfare Benefits Plan*, 127 F.4th 541, 546 (4th Cir. 2025) (ERISA § 503 violated where decision "never engage[d] in a meaningful discussion" and "appeal denial letter ma[de] no mention of" conflicting evidence); *Brumm*, 995 F.2d at 1436-37 ("Plan trustees are 'obligated to briefly state' … the rationale for their decision[.]").

physicians. For example, neither adverse decision letter for Mr. Olawale ███████████
██████████████████████████████████ Similarly, the decision letters for Mr.
Loper did not ███████████████████████████████████████████████████
██████████████████

 Mr. Sims submitted an additional 6 pages of ████████ medical evidence in support of his
appeal, containing the views of his treating physician, ████████████████████████
████████████████████████████████████████████████
██████████████ Ex. 33 ███████████████████. The Board's decision letter did
not ████████████████████████████[43]

 Likewise, the decision letters issued to Mr. Olawale provided ████████████████
████████████████████████████████████████████████████
████████████████████████████████████ ████████████████

Although Defendants point to Dr. Saenz's statement that there was ████████████████
████████████████████████████████████████████████████

(OM20), the evidence reveals that, in violation of 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii), this
"specific reason or reasons for the adverse determination" was not mentioned in either denial letter.
Furthermore, no "description" that "any additional material or information" that his lumbar spine
impairment arose from League football activities is "necessary for the claimant to perfect the claim
and an explanation of why such material or information is necessary" was provided. *Id.*
Additionally, although Plaintiffs Sims listed ██████████████████████████████

---

[43] Outside of ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Similarly, the decision letters in Mr. Loper's case ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████

Overall, evidence shows that Defendants acknowledge applicants' submission of medical

records only perfunctorily, ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████     In *Cloud*, a Board member admitted that there is a "system of a template-

type decision," and that the Board in that case "basically follow[ed] a template."  Ex. 23 (*Cloud*,

Board member Cass Tr. at 44:8-15, 166:19-24).  Plaintiffs' plan expert here reviewed numerous

decision letters and ████████████████████████████████████     ECF

No. 172-14 ██████████████     In short, consistent with their pattern and practice,

Defendants' decision letters simply sidestepped evidence favorable to Plaintiffs.

## III.     Defendants Deprived Plaintiffs of Full and Fair Review

Barely addressing Count III, Defendants maintain that Plaintiffs received full and fair

review of their claims (LM26-27, OM29-30, SM26-28).  The facts, however, show otherwise.

A.    **Defendants' Failure to Ensure Plan Physicians' Impartiality and Independence**

Pursuant to the statutory mandate that benefits claimants receive "full and fair review …

[a] decision denying the[ir] claim," 29 U.S.C. § 1133(2), ERISA's implementing regulations

stipulate that disability plans

> must ensure that *all* claims and appeals for disability benefits are adjudicated in a manner *designed to ensure* the *independence* and *impartiality* of the persons involved in making the decision. Accordingly, decisions regarding hiring, compensation, termination, promotion, or other similar matters with respect to any individual (such as a … medical … expert) must not be made based upon the likelihood that the individual will support the denial of benefits.

29 C.F.R. § 2560.503-1(b)(7).  Here, Defendants failed to fulfill this mandate.

The Plan's physician referral process is tainted by bias and is designed to ensure the

opposite of what the statute and its implementing regulations require.  As discussed in Sections

I.A & I.B above, Defendants have delegated the NP selection process to Drs. Macciocchi and

Garmoe, who have avowed biases against individuals claiming disability on the basis of TBI (and,

in fact, who have counseled others on how to defeat such claims) or in favor of applying racially

discriminatory adjustments to neurocognitive test results.  Similarly, Dr. Brahin, who evaluated

Plaintiffs Sims and Olawale, and Dr. McCasland have deserved reputations for defending against

and downplaying the long-term effects of brain injuries.  *See* Section I.A, *supra.* Defendants

contend that the Board has "no role" in the hiring or maintenance of the Plan physician network

(LM4, OM4, SM4), but evidence shows that is inaccurate.[44]

What is more, ██████████████████████████████████████████████

---

[44] *See* Ex. 10 ██████████████████████████████ ECF No. 53-29 at 53:25-54:3 (Board member Cass testifying in *Cloud* that "the way the whole system worked" is "the medical advisor then *helped us* set up a network of … physicians around the country."). Board member Smith testified that ████████████████████████. Ex. 10 ████████████████████████



ECF No. 172-5, at ██. For example,

*Id.* at ██.[45]

*Id.* at

██[46] Defendants' contention that assignments of physicians to evaluate applicants "are made

---

[45] Notably,

*Id.* at

*Id.*; Ex. 5

ECF No. 172-5, at

[46]

ECF No. 172-5, at

*Id.* at

solely using neutral criteria such as area of specialty, *proximity*, and availability to conduct a timely evaluation" (OM4) is false because applicants are frequently required to travel long distances, some over a thousand miles, and many across states despite Defendants having physicians available in proximity.[47]

Defendants assert that a plan is not required to perform third-party audits and that such audits would add significant expense to the Plan's administration (LM27, SM28). The Plan's failure to do so, however, reflects Defendants' *choice* (despite the Plan having over $9 billion in assets) to not ensure that all claims and appeals for disability benefits are adjudicated in a manner designed to ensure the independence and impartiality of the persons involved.

**B.    Defendants' Failure to Review All Documents**

Defendants failed to review "*all* comments, documents, records, and other information submitted by the claimant," as required under ERISA § 503(2), 29 U.S.C. § 1133(2), and its implementing regulation at 29 C.F.R. § 2560.503-1(h)(2)(iv). As to Plaintiff Olawale, "there [wa]s not one sentence dedicated to ███████████ s findings in [the Defendants'] appeal denial letter[, summary sheets,] or … [their] independent medical evaluations ███████████████]." *Smith*, 127 F.4th at 547.[48]   Similarly, Defendants failed to review ████████████████

████████████████████████████████████████████████████



---

[47] Ex. 34 ████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

[48] *See* ████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████.[49]

No Plan physician evaluation of ████████████████████████████████

████████████████████  For Plaintiff Sims, neither Dr. ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.[50]

Similarly, there is nothing in the administrative records that even suggests that Defendants or their physicians "genuinely considered" a vast array of critical *NFL team* medical records. *Watson v. UnumProvident Corp.*, 185 F. Supp. 2d 579, 587 (D. Md. 2002). Although there are too many overlooked NFL club records to list, one example is that ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████  For Mr. Olawale, ████████████████████████████████████

████████████████████████████████████████████████████████████

---

[49] *See* ████████████████████████████████████████████

[50] In fact, Plan neuropsychologist ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

████████████████.

Moreover, while Drs. ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████ These

failures to consider evidence favorable to Plaintiffs are hardly unique.  They are the latest in a long

series of such failures on Defendants' part.  *See supra at* 16-18 nn.27 & 29 (collecting cases).

      **C.**     **Defendants Failed to Ensure That Their Decisions Were Made in Accordance
with Plan Documents and That Plan Provisions Were Applied Consistently**

A plan must "contain administrative processes and safeguards designed to ensure and to

verify that benefit claim determinations are made in accordance with governing plan documents

and … plan provisions have been applied consistently with respect to similarly situated claimants."

29 C.F.R. § 2560.503-1(b)(5).  Here, Defendants failed to adhere to that mandate.

First, discovery showed that Defendants have a pattern of failing to put in place sufficient

administrative processes and safeguards to ensure that factors expressly barred by the Plan's terms

are not considered, such as Plaintiffs' "educational level and prior training."[51]  Indeed, each of

Defendants' physician manuals since at least August 2018 have ████████████████████

---

[51] *Compare* ECF No. 69-7 at 12 (Plan § 3.1(e)(i), stipulating that "[t]he educational level and prior training
of a Player will *not* be considered" in determining whether an applicant is T&P disabled) *with, e.g.,* JO-993
████████████████████ and ████████████████████████



Board member Smith

Ex. 10

Making it worse, there are no administrative processes in place for Party Advisors—

*Id.*

)—to consult prior interpretations (save case-by-case emails to Plan counsel); nor are there internal guidance memoranda or repositories of prior interpretations. Ex. 11 (Williams Tr. 152:11-21, 159:3-161:6, 164:13-166:12). As a result, Defendants have treated similarly situated applicants inconsistently; the alleged (and impermissible) bar on consideration of the cumulative effects of multiple conditions for T&P disability is sometimes no bar at all.[52] As another example, the Board has previously used

*e.g.*, Ex. 30                                 ); Ex. 10                                                   but failed to do so for Plaintiffs Sims and Olawale.

Finally, Board member Smith conceded

*Id.* at                                 To qualify for the mild

---

[52] *Compare* Ex. 5
*ith, e.g.*, Ex. 35

Neurocognitive benefit, an applicant must have a "mild objective impairment" in at least one cognitive domain "which reflect acquired brain dysfunction." ECF No. 69-7 at 39 (Plan § 6.2(a)). Moreover, specific tests that all Plan neuropsychologists perform to determine whether an applicant qualifies for benefits, including LM I and LM II, have frequently been described for other similarly situated Players █████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████ Yet, in ███████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ whereas ████████████

███████████████████████████████████████████████████████████████

████████████████. Ex. 37 ████████████████████████████[53] The failure to ensure a consistent translation of cognitive test scores to levels of impairment meant that similarly impaired applicants qualified for the Neurocognitive benefit, but Mr. Olawale's application was denied.

## IV.    There Is a Genuine Dispute of Material Fact Concerning Defendants' Wrongful Denial of Benefits to Plaintiffs

The Court should also reject Defendants' bid for summary judgment on Plaintiffs' Count I claim for wrongful denial of benefits. Such denials are reviewed under a de novo standard unless the benefit plan expressly gives the administrator discretionary authority to determine benefits eligibility or to construe the Plan's terms, in which case an abuse of discretion standard applies. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Even though the Plan here

---

[53]    This inconsistency continued on the LM II test, ███████████████████████████████. Ex. 38 ████████████ Ex 39 █████████████████

gives the Board (as administrator) discretion, the Section 503 violations discussed above mandate de novo review here. *See supra* at 23 n.41. Even assuming that de novo review is not warranted, however, "the prism of deference does not blind" the Court because the Board does *not* have discretion to act unreasonably.[54] In *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000), the Fourth Circuit outlined eight factors to be considered in evaluating the reasonableness of benefit decisions.[55]

### A.    The Plan's Language Demonstrates That the Board Acted Unreasonably

The Board abuses its discretion if its "interpretation contradicts the plain language of the Plan." *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 723 (D. Md. 2012). "Indeed, to ignore the plain language of the [P]lan constitutes an abuse of discretion." *Id.* at 716 (citing cases).

### 1.    Failure to Consider Evidence Generally

Sections 3.1(e), 3.9(a), 5.1(d), and 6.1(f) of the Plan (ECF No. 69-7 at 12, 24, 31, 38) require that *all* facts and circumstances be considered in deciding claims for benefits, including T&P classification. Here, the evidence reveals that Defendants failed to "genuinely consider" all the evidence in Plaintiffs' records, which violates the Plan's plain terms. For example, *nowhere*

---

[54] *Garner v. Cent. States, Se. & Sw. Areas Health & Welfare Fund Active Plan*, 31 F.4th 854, 858-59 (4th Cir. 2022); *see Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (standard "equates to reasonableness" because "[t]he word 'abuse' recognizes that authority can be misused"); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2013 WL 6909200, at \*26 (D. Md. Dec. 31, 2013) (Board's "discretion is not without limit"). Also, "a district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when such evidence is necessary to adequately assess the [*Booth*] factors and the evidence was known to the plan administrator when it rendered its benefits determination." *Helton v. AT & T Inc.*, 709 F.3d 343, 356 (4th Cir. 2013).

[55] These are (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision-making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have. *Booth*, 201 F.3d at 342-43.

in Defendants' decision letters, Plan counsel's summary sheets, or even the NPs' reports did Defendants even mention ███████████████████████████████████████████ ███████████████████████████████████████ .

### 2.    The Board Unreasonably Interpreted the Plan's Active Football and Active NonFootball T&P Standards

An applicant may receive Active Football benefits if (i) his "disability(ies)" "arises out of League football activities while he is an Active Player," and eventually causes him to be T&P disabled; and (ii) the Plan receives his application within 18 months after he ceases to be an Active Player.  Active Nonfootball benefits have the same requirements except that the disability need not arise out of League football activities, but results in a lower award.  ECF No. 69-7, at 16 (Plan § 3.4(a)-(b)).  Section 3.4(a) is "subject to" the Special Rules in Section 3.5 of the Plan (ECF No. 69-7, at 17-18).  Here, it is undisputed that Mr. Sims' application was received within 18 months after he ceased to be an Active Player, and that he was initially found T&P disabled. Ex. 27 (Groom summary).

### a.    The Board's Interpretation That Diagnosed Disorders While an Active Player Were Not Manifestations of The Disability Is Unreasonable

Mr. Sims submitted medical evidence from his treating physician when he was an Active Player in 2016, ████████████████████████████████████████████ ███████████████████████████ . Ex. 33 (██████████████████████████ 7).  Moreover, Defendants concede that, on appeal, Mr. Sims submitted ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ . One of these medical records from NFL team physician ████████████████████████████████

████████████████████████████████████.[56]

Despite all of this, Defendants rely on an MAP's conclusion that an earlier related "diagnosis itself does not equate [to] disability or impairment." SM11-12. This Court, however, rejected an almost identical unreasonable interpretation of the Plan's terms in *Solomon v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2016 WL 852732 (D. Md. Mar. 4, 2016), concluding that an earlier confirmed diagnosis was "perhaps *the most significant* unrefuted evidence" of when the disability "manifested." *Id*. at *8. As in *Solomon*, the Board's dismissal of Mr. Sims' confirmed first manifestation of his disability as a result of football activity was an unreasonable interpretation of the Plan and a breach of its fiduciary duty to him.

      **b.    The Board Unreasonably Interpreted the Plan by Failing to Consider the Special Rules of Section 3.5**

While the Board's final decision letter for Mr. Sims addressed only why he did not qualify under Section 3.4(a)-(b), the evidence reveals that the Board abused its discretion in failing to apply the "Special Rules" set forth in Section 3.5 of the Plan.[57] The Board's failure to do so evinces a Plan interpretation that "directly contradicts the plain meaning of the Plan language," *Cloud*, 2022 WL 2237451, at *37, because Section 3.4(a) states that it is "*subject to* the special rules of Section 3.5" (ECF No. 69-7, at 16), and thus plainly modified by it. *See Cloud*, 2022 WL 2237451, at *37-39 (interpreting similar "subject to" interplay between Plan §§ 5.3(a) and 5.4).

---

[56] Furthermore, the Plan physician who initially determined that Mr. Sims is T&P disabled noted from his examination of Sims that he ████████████████████████████████████████████████████████████████████████████████████████████

[57] In turn, Section 3.5(b) states the "Special Rule" allows for T&P benefits if "a psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for Plan T&P benefits under Section 3.4(a)." ECF No. 69-7, at 17-18.

Although Mr. Sims included in his appeal to the Board multiple arguments regarding both

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████  A plain reading of the Plan, however, shows that

Section 3.5(b) imposes no timing requirement, and a disability that arises later, as a result of an

occupational injury would still qualify.[58]  Applying the "arises … while he is an Active Player"

Section 3.4(a) rule to Mr. Sims, who otherwise qualified under Section 3.5(b), subordinates

Section 3.5(b) to Section 3.4(a), improperly rendering the former meaningless. *See Jani*, 209 F.

App'x at 318 (interpretation unacceptable where it renders other Plan language "of no moment").

### 3.    The Board's Interpretation of "Neutral Physician" Is Inconsistent with the Plan's Terms

The Board's interpretation of the "Neutral Physician Rule" in Plaintiffs' decisions is

unreasonable because it permits the Board to ignore the "adequate determination" requirement in

the Plan's definition of "Neutral Physician." Although Defendants point to the so-called "Neutral

Physician rule" as dipositive of the adverse determinations on Plaintiffs' applications, application

of the "Neutral Physician rule" necessarily begins with the Plan's explicit requirements for a

"Neutral Physician."  Pursuant to Section 1.25 of the Plan, "'Neutral Physician' means the health

care professional(s) designated under 12.3." ECF No. 69-7 at 10.  Section 12.3, in turn, requires

that "[t]he Disability Board *will* maintain a network of "Neutral Physicians" to examine Players

who apply for benefits under this Plan" and that, for each benefit, each "Neutral Physician *will*

---

[58] Rather, Section 3.5(b) distinctly refers to disabilities resulting from 'head injur[ies]' under subsection (1) or that "relate[] to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player" as separate bases for Active Football benefits, but does not require that the disability manifest simultaneously.

examine each Player referred by the Plan and *will* provide such report or reports on the Players conditions as necessary for the Disability Board or Disability Initial Claims Committee to make an *adequate determination* as to that Player's" conditions. *Id.* at 63.

Although "adequate determination" is not defined in the Plan, "courts must enforce and follow the [P]lan's plain language in its ordinary sense." *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007). If a Plan physician's "opinion was *inadequate*" it necessarily "*cannot*" be "adequate evidence upon which to base the Board's decision." *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 2012 WL 2374661, at *13 (D. Md. June 19, 2012).[59]

Accordingly, under the Plan's provisions the "Board was prohibited by the plain terms of the Plan from relying on" the Plan physicians' opinions and recommendations that would result in *inadequate* determinations. *Giles*, 925 F. Supp. 2d at 720. By deferring reflexively to the so-called "Neutral Physician rule," irrespective of whether an adequate determination could be based upon the Plan physician's opinion, the Board "contravene[d] the plain language of the Plan and thus constitute[d] an abuse of discretion." *Id.* In fact, there is a genuine issue of material fact because the deposition testimony of Board member Smith showed that he



Ex. 10 █████████

Such an interpretation cannot be reasonable. It renders Section 12.3 meaningless if Board members have no responsibility to ensure that an NP report is sufficiently well founded to make an adequate determination and instead defer to the conclusion without question. "[T]he Board

---

[59] "Adequate" means "legally sufficient." *Black's Law Dictionary* (11th ed. 2019). Moreover, "determination" means "[t]he act of deciding something officially; esp., a final decision by a court or administrative agency." *Black's Law Dictionary* (11th ed. 2019).

must interpret … [Plan] provision[s] to give meaning to each word." *Jani*, 209 F. App'x at 319 ("Plans' suggested reading of … provision [wa]s … unreasonable" because Plans' interpretation rendered other Plan term surplusage); *see also Dimry*, 2018 WL 1258147, at *4 (Board "simply adopted the opinions of its retained physicians by default.…  But it was not entitled to decide a benefits claim by mere default to a Plan-selected physician.  That is the *abandonment* of discretion, not the exercise of it.").

### 4.    The Board Acted Inconsistently with the Plan's Terms by Rendering Inadequate Determinations Based on Flawed and Otherwise Legally Insufficient Reports

This Court has held that the Plan's terms prohibit the Board from rendering an "*inadequate*" determination based on a Plan physician's reports or opinions that are legally insufficient or unreasonable.  *See Stewart*, 2012 WL 2374661, at *14 ("[A] reasoning mind would not accept the undetailed reports of [two Neutral Physicians] as sufficient to support a particular conclusion[.]").  Furthermore, this Court reasoned that Defendants' decisions are *inadequately* based on Plan physician's opinions if the Plan physicians' report or opinions are "flawed," inconsistent, "unexplained," "undetailed," "unreasoned," "conclusory," or if the "Board was prohibited by the plain terms of the Plan from relying on" the "recommendation." *Id.* at *9, *12-13; *see also Giles*, 925 F. Supp. 2d at 721.  Other courts have found the Board's reliance on even the Plan Medical Director's opinion is unreasonable where the Plan physician's "opinion is not an adequate reason" for the denial.  *Dimry*, 2022 WL 1786576, at *3 ("opinion [was] not persuasive and [was] instead illogical and implausible").

Here, there is a genuine issue of material fact, because the Board acted inconsistently with the Plan's terms in Plaintiffs' cases by interpreting the Plan to permit it to render *inadequate* decisions based on the legally insufficient Plan physician reports by Drs. ████████████ ███████████████████████████████████████████████████.

38

First, as to Plaintiff Sims, the Board was not permitted to default to █████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████ Moreover, the only mention of ████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████ "was not required to accept" the

findings of Mr. Sims' treating physician, "because [s]he did not address it other than to state that

[s]he reviewed it, h[er] opinion is not an adequate reason for rejecting the … findings." *Dimry*,

2022 WL 1786576, at *3.

As for Plaintiff Olawale, █████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████[60] Although Defendants do not dispute that, pursuant to the Plans terms,

Mr. Olawale's ████████████████████████████████████████████████████

████████████████████████████████[61] and that ████████████████████████

██████████████████████████████"[62] they contend that "there was no finding that

---

[60] Dr █████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
█████████████████████████████████████

[61] *See* ████████████████████████████████████████████████████
█████████████████████████████████████

[62] Dr. ██████████████████████████████████████████████████████████

it did" arise from League football activities because it was the "*timing* aspect rather than *the cause* generally that matters for LOD benefits eligibility." OM20 & n.5. They add that ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

Defendants' interpretation that it is the "*timing* aspect" rather than the "*cause*" that matters is inconsistent with the Plan's plain terms because the identical definitions of "[a]rising out of League football activities" in sections 3.4(e)(1) and 5.5(c) each contain an unambiguous "*but for*" causation provision. ECF No. 69-7 at 17, 37. That aside, Dr. Saenz's opinion is flawed and was thus insufficient for the Board to rely upon to make an "adequate determination." Dr. Saenz stated that there was "no supportive or conclusive[63] *documentation* that this condition was incurred during [sic] scope of NFL career," but the Board abuses its discretion by interpreting the Plan to impose such a contemporaneous evidence requirement. *See Solomon*, 860 F.3d at 266; *Jani*, 209 F. App'x at 316.

Worse, even if it is the "*timing* aspect rather than *the cause* generally that matters" (OM20),

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████  Mr. Olawale

produced ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

─────────────────

███████████████████████████████████████████████████████████

[63] Defendants point to this statement █████, but the Plan's terms do *not* contain a requirement that an applicant must submit "*conclusive* documentation." This is one more instance where Defendants add a requirement, which underscores the abuse of discretion. *See Giles*, 2013 WL 6909200, at *26.

40

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

Similarly, both of the Plan physician reports concerning Plaintiff Loper's LOD application

were legally insufficient bases for an "adequate determination." ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███ *Id.*  Neither ███████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████    Even the Plan's

Medical Director acknowledged ████████████████████████████████████████

██████████████████████████████. Ex. 40████████████████████    Instead,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████

Although ████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ that is absent from the

Plan's terms for Neurocognitive Disability benefits, and "contrary to the Plan's terms." *Giles*, 2013

WL 6909200, at *26.   Although Defendants interpret the Plan's terms to permit the rejection of

objective evidence of mild cognitive impairment in at least one cognitive domain if it "is only one

section of the overall MoCA score" (OM20), the Plan requires *only* that the applicant demonstrate

a "mild objective impairment" in at least *one* cognitive domain that reflects acquired brain

dysfunction.  ECF No. 69-7, at 39 (Plan § 6.2(a)).  ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

    Moreover,  while  ████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Although "ERISA does not require a plan or physician to defer to a patient's subjective

complaints" (OM22), ████████████████████████████████████████████████

████████████████████████████████████████████████████[66]), both

the objective ████████████████████████████████████████████████

████████████████████████████████████

     Furthermore, as discussed above in Section III.B, █████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████. Defendants acted inconsistently with the Plan by defaulting

to ██████████████████████████████, which rendered language in the Plan's General

---

[65] The official MoCA score range for Mild Cognitive Impairment are scores ranging from 19 to 25.2. MoCA Clinic Data, available at https://mocacognition.com/moca-clinic-data/; ████████████████████████
██████████).

[66] ███████████████████████████████████████████████████████
██████████████

Standard, including the Plan term "substantially," mere surplusage.[67]



Additionally, ███████████████████████████████████

███████████ that statement is belied by the record.  Although he claimed ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████.[68] ███████

███████████████████████████████████████████████

---

[67] *Compare* ECF No. 69-7, at 12 (Plan § 3.1(d)) *with* ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

[68] Additionally, inconsistent with other reports, ███████████



███████████████████████████████████████████████████████████

████████████████████ "[i]n the absence of vocational testimony that there was, in fact, a job" Mr. Olawale "could perform given his substantial impairments, the Board's decision to" deny benefits "was not based upon a reasonable interpretation of the [P]lan's terms." *Moore v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 282 F. App'x 599, 601 (9th Cir. 2008).

Likewise, the reports ████████████████████████████████████ for Mr. Olawale were both legally insufficient. As discussed in Section III.C above, although Mr. Olawale's ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████.[69]

Defendants maintain that, under Section 9.2(f) the Plan, "the Board is entitled to rely conclusively upon the advice or opinion" of NPs (LM4, OM4, SM4), but they sidestep the proviso in the same section that such reliance must be in "*good faith*" and that "such persons [must be] *prudently* chosen and retained by the Disability Board." ECF No. 69-7, at 55 (Plan § 9.2(f)). Reliance on "Neutral Physicians" "is not a magic wand that fiduciaries may simply wave over a transaction to ensure that their responsibilities are fulfilled." *Brundle*, 919 F.3d at 773. Willfully blind or robotic reliance on demonstrably flawed conclusions from biased sources cannot genuinely amount to "good faith reliance" on persons "prudently chosen and retained." "That is the abandonment of discretion, not the exercise of it." *Dimry*, 2018 WL 1258147, at *11.

---

[69] Moreover, as discussed in Section IV.A.3 below, Dr. ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████

**5.    The Board Acted Inconsistently with the Plan's Terms by Permitting Consideration of Expressly Prohibited Factors**

The Board abuses its discretion if it considers a factor that Plan terms explicitly provide "will not be considered." *Jani*, 209 F. App'x at 315.   Here, Section 3.1(e)(1) of the Plan unambiguously provides that "[t]he *educational level* and prior training of a Player *will not be considered* in determining whether such Player is" T&P disabled.  ECF No. 69-7 at 12.

Defendants contend that Plaintiff Olawale "provide[d] no supporting details" that Defendants improperly considered his educational level and prior training (OM21), but the record shows that all three Plaintiffs had their educational level considered in the determination of whether they were T&P disabled.   First, Defendants concede that the Board relied on ███ ████████████   on Mr. Olawale. OM11-12. In that report, Dr. █████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  In accordance with the training materials and narrative template report form prepared by Dr. Macciocchi, ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████   What is more, in determining whether Plaintiffs were T&P disabled, Defendants considered the reports of ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████; ECF No.

46

111-4; Ex. 41 ███████████

Board member Smith acknowledged ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Ex. 10 ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ He stated ██████████

████████████████████████████████████████████

██████████████████ No "directly determine" limitation, however, is to be found

anywhere in the Plan's terms. This interpolated exception "amounts to a 'Hail Mary' pass"; a

prayer for the desired result. *See Giles*, 2013 WL 6909200, at *26.[70]

### 6. Defendants Violated Section 3.3(d) of the Plan Because They Failed to Consider Conditions Listed in Plaintiffs' Applications, Including the Cumulative Effect of Conditions

Section 3.3(d) of the Plan provides that Defendants and their Plan physicians "*will consider*

*only those impairments that … were adequately identified by the Player in his application.*"[71]  ECF

No. 69-7 at 15-16.  Moreover, Section 3.3(a) states that an applicant "may be required to submit

---

[70] At the February 21, 2025 hearing on Plaintiffs' motion to compel, Defendants' counsel maintained that statements that applicants can perform work consistent with their education and training "is not the use of education to determine whether the person is disabled or not."  Ex. 28 (Feb. 21, 2025 Hr'g Tr. 75:5-8).  That contention does not hold up because ████████████████████████████████████████

████████████████████████████████████████████████████

████████████

[71] Furthermore, Section 3.1(e) states that "[a]fter reviewing the report(s) of the Plan Neutral Physician(s), *along with all other facts and circumstances in the administrative record*, the Disability Initial Claims Committee or the Disability Board, as the case may be, must conclude," whether a Player is T&P disabled.  ECF No. 69-7 at 12.   Here, Messrs. Olawale's and Sims' applications explicitly claimed ██████████████

████████████████████████████████████

to such further examinations scheduled by the Plan as, in the opinion of the … Committee or the … Board, are necessary to make an adequate determination" about his conditions with a "Neutral Physician" "selected" by the Committee or Board. *Id.* at 14.

The evidence here reveals a "[f]ailure to look" at or evaluate the "cumulative effect" of "all" of Plaintiffs' impairments, ███████████████████████████████████████ ████████████—which is inconsistent with the Plan's plain terms. *See* Section I.F, *supra* (citing *Mickell*, 832 F. App'x at 594-95, and *Brumm*, 995 F.2d at 1435-40). This is by design. *See supra* at 18 n.29 (citing testimony).

The Board acted inconsistently with 3.3(a) of the Plan because "the *Administrator*" failed to consider the "combined effect of *all* of the problems" listed in Plaintiffs' applications.[72]  For example, the Board conceded in its denial letter for Mr. Olawale ████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████. Mr. Sims also included the ██████████████████ ███████████████████████████████████████████████████ ███████████████████████████████. *See DuPerry*, 632 F.3d at 870-71.

Ignoring the requirement in Section 3.3(a) of the Plan that it will consider the conditions that a *Player* identifies in his application, the Board admitted that it █████████████ ███████████████████████████████████████████████████

---

[72] *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 870-71 (4th Cir. 2011); *Vetter v. Am. Airlines, Inc. Pilot Long-Term Disability Plan*, 299 F. Supp. 3d 714, 723 (D. Md. 2018); *see Austin v. Continental Cas. Co.*, 216 F. Supp. 2d 550, 558 (W.D.N.C. 2002) ("consideration of the full panoply of ailments and their *combined impact* on capacity for work … is important, as appellate courts consistently have found").

██████████████████████████████████████████████

████████████████████████████████ [73] The Board, though, "cannot prevail based on

its claim that the Plan physicians properly limited their conclusions to areas within their expertise."

*Mickell*, 832 F. App'x at 594. The Board could have sent Plaintiffs to a vocational expert, "who

could have provided an opinion about whether … specific impairments—*when considered*

*together*—[substantially] prevented … gainful employment." *Id.*

In fact, in the past, the Board has interpreted "Neutral Physician" to permit the Board to

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ but the Board did not do so

here. Even Board member Smith ██████████████████████████████████

████████████████████████████ Ex. 10 ████████████████████

### 7.    Defendants Abused Their Discretion by Imposing an Objective Evidence Standard That Appears Nowhere in the Plan's T&P Provisions

Defendants insist that they have no obligation to credit subjective complaints (SM19-20),

but the Plan's T&P disability provisions contain no objective proof requirement. Indeed, the *only*

times in the Plan that the word "objective" appears, is with respect to Neurocognitive, not T&P,

benefits. *See* ECF No. 69-7 at 39 (Plan § 6.2(a)-(b)). Defendants unreasonably dismissed reliable

evidence of ████████████████████████████████████████████

---

[73] Nor do Plan physicians ████████████████████████████████

██████████████████ ████████████████████████ Given such failures of evidentiary development, it comes as no

surprise that the ██████████ ████████████████ Exs. 24 ████████████

██████ Ex. 27 ████████████████████████████████████████████s.

███████████████████████████████████████████. Instead, they blindly

accepted their MAP's opinion—████████████████████████████████████

████████████████████████████. Because the Plan does not contain an

objective evidence requirement, it was an abuse of discretion for the Board to deny Mr. Sims

Active Football benefits "on the basis that h[is] proof lacked such objective evidence." *Cosey v.*

*Prudential Ins. Co. of Am.*, 735 F.3d 161, 171 (4th Cir. 2013).[74]

## B.    The Board Acted Inconsistently with the Plan's Purpose and Goals

"[A] primary *purpose* of the Plan is to provide disability benefits to qualifying NFL players

and their beneficiaries." *Stewart*, 2012 WL 2374661, at *10. Moreover, "the Plan's *goal* is to take

care of the players … for investing themselves in the sport." *Brumm*, 995 F.2d at 1439.

Defendants acted inconsistently with these goals because, "[i]f the Plan's goal is to take

care of the players as part of their compensation for investing themselves in the sport, players who

suffer" from a combination of impairment types "resulting in disability are as entitled to

consideration as those suffering a single disabling" impairment. *Brumm*, 995 F.2d at 1439. If "the

Plan's goal [is truly] to ensure its limited benefit resources are preserved for participants who are

entitled to them," an interpretation of the Plan that allows it to disregard evidence; imprudently

select and retain a Plan physician; and rely in bad faith on that physician's flawed, defective,

conclusory, unexplained conclusion, in direct violation of Plan terms, or otherwise legally

insufficient, indisputably "frustrate[s] the purposes and goals of the Plan." *Booth*, 201 F.3d at 343.

---

[74] *Accord DuPerry,* 632 F.3d at 869 (where plan "contained no provision precluding [a claimant] from relying on her subjective complaints as part of her evidence of disability," claim could be denied based on such reliance); *Dimry*, 2022 WL 1786576, at *2 ("It is unreasonable to reject a claimant's self-reported evidence where the plan administrator has no basis for believing it is unreliable, and where the ERISA plan does not limit proof to objective evidence.").

The Plan's terms explicitly include LOD Points for ankle, hip, and knee *degenerative* joint disease, which by its very definition, is a condition that will continue to worsen with the inevitable wear-and-tear from aging. For Defendants to rely on a Plan-selected physician's illogical views, ███████████████████ [75] that a Player cannot qualify on the basis of "*degenerative*" conditions brought on by documented injuries while playing in the NFL and which have *degenerated* over time, is inconsistent with Players' reasonable expectations. *Giles*, 925 F. Supp. 2d at 720-22 (discussing Player expectations that "*degenerative*" "indicates that the Plan expects players' orthopedic impairments to worsen (i.e. *degenerate*) over time."). The Board's reliance on such an illogical report flies in the face of its own recognition that "the purpose of the collective bargaining parties [the NFL and the NFLPA]" in the Plan is "to give higher benefits to Players who have become disabled due to degenerative medical conditions that arise out of League football activities." *Giles*, 2013 WL 6909200, at *25. Plaintiff Sims' claim review further demonstrates the folly of reliance on inadequate Plan physicians. *See* Sections IV.A.2 & IV.A.4, *supra*.

## C.    Defendants Relied on Inadequate Evidence and Other Materials That Did Not Support Their Adverse Benefit Decisions

Substantial evidence sufficient to support a claim denial under ERISA is such relevant and probative evidence that a reasonable mind would accept as adequate to support a particular conclusion. *Richardson v. Perales,* 402 U.S. 389, 401 (1971). "To say the least, to deny benefits on the basis of *inadequate* documentation" supports a finding of abuse of discretion under *Booth* factor 3. *Garner*, 31 F.4th at 858. [76] In this respect, the Board relied on inadequate Plan physician

---

[75] For example, ████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

[76] Errors in physician's notes are pertinent evidence in determining adequacy of materials considered for *Booth* factor 3. *See Smith v. Reliance Standard Life Ins. Co.*, 2018 WL 4760490, at *5 (E.D.N.C. Oct. 2, 2018), *aff'd*, 778 F. App'x 207 (4th Cir. 2019).

reports which failed to consider *all* the medical records for Plaintiffs and failed to engage with medical views from treating physicians that contradicted their findings. *See Smith*, 127 F.4th at 547; *Stewart*, 2012 WL 2374661 at *12, *14, *38-39 ("Boards failing was in crediting the flawed reports.").

The Supreme Court has expressed "serious concerns" that weigh "more heavily" into a finding of abuse of discretion, when, like here, a fiduciary "emphasized a certain medical report that favored a denial of benefits, deemphasized certain other reports that suggested a contrary conclusion, and failed to provide its… medical experts with all of the relevant evidence."[77]  The physicians' reports in the record offer additional evidence that inadequate materials were relied on because the Board failed to provide all records to its Plan physicians.[78]

In the section of



---

[77] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008); *see, e.g., Garner*, 31 F.4th at 858 ("None of the virtues of an independent evaluation are present when the evaluator is denied the very evidence necessary to come to a reasoned judgment.")

[78] For example,

in ███████████████████████████████████████████████████████

███████████████████. This demonstrates that "the adopted [Plan selected physicians'] opinion[s] ha[d] clear flaws," and thus, [their] defective reports "cannot" be "adequate evidence upon which to base the Board's decision."[79] Also, as discussed above concerning *Booth* factor 1—regarding how contemporaneous and objective evidence are *not* required under the Plan's terms—the Board relied on inadequate evidence supporting Plaintiffs' adverse T&P and LOD determinations because "[t]he mere absence of contemporaneous [or objective] evidence is not evidence at all" to justify its denial. *Solomon*, 860 F.3d at 266.  As discussed above concerning factor 1, "any finding by the Board that Plaintiff" Sims ██████████████████████████████████ that eventually caused him to become T&P disabled and relates to League football activities "is not supported by substantial evidence."  *Cloud,* 2022 WL 2237451, at *39. "On the contrary," the evidence discussed concerning *Booth* factor 1 reveals that "it defie[d] credulity to so find" because contemporaneous NFL team evidence from while he was an Active Player demonstrated that Mr. Sims' ████████████████████████████████ *Id*., at *39-40; *see* ███████████

### D.    Defendants' Interpretations in the Decision Letters Issued to Plaintiffs Were Inconsistent with Earlier Interpretations of the Plan and Other Terms

"[T]he fourth [*Booth*] factor requires a court to consider whether the… determination at issue is consistent with earlier interpretations of the plan," and other Plan provisions.[80] The record before the Court contains numerous examples of such inconsistencies in the decisions issued for Plaintiffs and other claimants.  Defendants' interpretation that, as to the Plan term  "[a]rising out

---

[79] *Scott*, 2011 WL 693286, at *5; *Stewart,* 2012 WL 2374661 at *13-14; *see also Watson*, 185 F. Supp. 2d at 588 (abuse of discretion because decision only based on plan's own reviewers' conclusions, which were "based further on their highly selective reliance on incomplete medical records.").

[80] *Helton*, 709 F.3d at 354 ("Because the administrative record focuses on the… determination at hand, courts would have to look at extrinsic evidence concerning the plan administrator's prior… determinations to assess this factor.").

of League football activities," it is the "*timing* aspect rather than *the cause* generally that matters" (OM20), is inconsistent with earlier interpretations of this Plan provision, where the Board hinged on the "*cause* of [a Player's] disabilities."[81] Even Defendants'



"Ambiguous language in one portion of an ERISA plan may well be clarified by reference to unambiguous language in another portion of the plan." *Giles*, 2013 WL 6909200 at *3. For Plaintiff Loper, Defendants' interpretation that it is the timing of

. Defendants' interpretation that Mr. Sims' diagnosed *disorder* while an Active Player is not evidence of a disability that arose while he was an Active Player is inconsistent with other provisions in the Plan that provide for a "psychological/psychiatric *disorder*" rendering a Player disabled. ECF No. 69-7 at 17-18 (Plan § 3.5(b)). The Board's interpretation here also conflicts with the Committee's earlier interpretation of the Plan—

Furthermore, although they contend that the so-called Neutral Physician Rule or Neutral Rule "applies to every type of benefit in the Plan… [a]nd, since it went into effect, … has been applied consistently to deny benefits to players who failed to satisfy it" (OM23), Defendants have

---

[81] *Stewart,* 2012 WL 2374661 at *10; *see also Boyd*, 796 F. Supp. 2d at 687 (discussing Board's interpretation about whether disability(ies) "*caused* by professional football activities"); *see also Atkins*, 694 F.3d at 565 (Player can clearly show his disabilities arose from League football activities, if (1) "incidents" are "set in time": (2) incidents were reported to team trainers or club physicians: (3) they reference which team activities: or (4) symptoms were reported, recorded, or treated).

not applied it consistently.[82]  Moreover, the interpretation of terms contained within the definition of "Neutral Physician," including "adequate determination" as applied to Plaintiffs, are inconsistent with earlier interpretations in other Player's cases. For example, Board Member Smith



Ex. 10 ███████████  Significantly, despite the many flaws in Plaintiffs' Plan physician reports discussed in detail above, the administrative records for Plaintiffs are devoid of any evidence that requests for clarification or additional examinations were sought to remedy such evidentiary flaws.[83]

Despite Mr. Olawale's numerous ████████████████████████████ in the NFL, the Board adopted ████████████████████████████ Defendants' interpretation is inconsistent with earlier Plan interpretations, where the Board indicated that "mere passage of time *or aging*" with "*a worsening or degeneration* of the underlying football-caused medical impairments, 'arise[s] out of League football activities.'"  *Giles*, 2013 WL 6909200, at *24-25.

---

[82] *Compare* ECF No. 123-3 (Vincent Decl. ¶ 41) ("*As a general rule*" a Player is T&P disabled if a Plan physician so finds him) *with* Ex. 42 ████████████████ and Ex. 43 (████████████████ (same).

[83] Defendants' "consistently wrong" interpretations of what suffices to allow for an "adequate determination" "can hardly be sanctioned as right."  *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1191 (4th Cir. 1989); *see, e.g.*, ████████████████ ECF 134-5 ███  *Stewart,* 2012 WL 2374661, at *14-15 (Board unreasonably "accept[ed] the flawed, inconsistent, [and] undetailed reports of … Neutral Physicians as *adequate*" to support determination); *Dimry*, 2018 WL 1258147 at *4 (Board unreasonably permitted "mere default to a Plan-selected physician"); *Mickell*, 832 F. App'x at 594-95 (Board excluded consideration of impairments' cumulative effect).

Although Defendants claim that they could not consider the cumulative effect of all of Plaintiff Olawale's impairments identified in his application, that position is plainly inconsistent with Defendants' position in other ERISA cases in Section I.G above, and the lack of a repository of prior term interpretations, discussed in Section III.C above, there is rampant inconsistency in the application of Plan LOD terms between Plaintiffs' decisions and the historical record. Merely one of many examples is that the Board's interpretation in Mr. Olawale's case was inconsistent with earlier interpretations of Plan terms ███████████████████████████ and "arising out of League football activities" and even a *later* interpretation for Mr. Olawale by the Plan subsequent to the filing of the Amended Complaint.[84] Defendants did consider the cumulative or combined effect of different injuries and disabilities. *See Brumm*, 995 F.2d at 1435–36 (Board found Player met T&P standard after Plan psychiatrist "concluded that Brumm was permanently disabled from a *combination* of *depressive disorder* and *back pain*"); *Stewart*, 2012 WL 2374661 (Board sought retained medical expert to determine "*likely cumulative effect*" for Player, and accepting Plan physician's response regarding whether "*cumulatively*, …[multiple] issues [c]ould … qualify him for total and permanent disability."); *Giles*, 2013 WL 6909200, at *8 ("Noting that its decision was '[b]ased on the reports of [multiple Board-hired physicians],' the Board

---

[84] *Compare* ██████████ ████████████████████████ with Ex. 44 ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████ ; *see also* Ex. 45 ████████████████████████████████████████ ██████████████████████████

determined: 'Mr. Giles has a *combination* of impairments[.]").[85]

Defendants' refusal to evaluate the cumulative disabilities identified by Plaintiffs Olawale and Sims is also inconsistent with Plan provisions. For example, the Plan's plain terms provide that T&P disability(ies) may arise out of a "*combination*" of activities causing the T&P disablement (*e.g.*, NFL-related brain injuries combined with NFL-related back injury), and the Plan's unambiguous terms, including the definitions of Active Football and Active Nonfootball, state that "a Player will qualify for Plan T&P benefits … if (i) his *disability(ies)* ... causes him to be totally and permanently disabled." CS-1, at CS-15. The Plan's use of both one disability (singular) and multiple disabilities (plural) as a basis for finding a Player T&P disabled, further clarifies that Plan terms on their face support that a Player may be T&P disabled due to either a singular disability, or the combination of multiple disabilities.

Finally, as discussed above in inconsistent treatment section, the evidence reveals Defendants' interpretation of the Plan terms "reflects acquired brain dysfunction" in Mr. Olawale's case has been interpreted inconsistently with earlier interpretations in other Players' cases.

**E.    Defendants' Decision-Making Process Was Not Reasoned or Principled**

While Defendants blithely (or boldly) assert that the denials of Plaintiffs' claims were "the

---

[85] Moreover, in cases where Plan physicians have properly considered the "cumulative effect" of all impairments, Defendants *sometimes* reject those reports. *See, e.g.,* Ex 46

Ex. 30

Ex. 47

Ex. 24 (

product of reasoned decision making" (LM14, OM14-15, SM14-15), there are several genuine issues of material fact whether that is true. In fact, the evidence casts serious doubt whether the three denials resulted from a reasoned and principled decision-making process, as mandated by *Booth* factor 5. "A complete record is necessary to make a reasoned decision, which must rest on good evidence and sound reasoning; and ... result from a fair and searching process." *Evans,* 514 F.3d at 322-23; *accord Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014). "A searching process does not permit a plan administrator to shut his eyes to the most evident and accessible sources of information that might support a successful claim." *Harrison*, 773 F.3d at 21; *Garner*, 31 F.4th at 858. "While an administrator has the authority to weigh conflicting pieces of evidence, it abuses its discretion when it fails to address conflicting evidence." *Smith*, 127 F.4th at 547.

Here, as detailed above, the Board "failed to follow a reasoned process… —neither addressing nor even acknowledging … uncontradicted evidence supporting" Plaintiffs' applications. *Solomon*, 860 F.3d at 261. Moreover, as noted in Section I.D above. Defendants have no system in place to ensure that all records supporting the Plaintiff's claims for benefits are reviewed by NPs, Party Advisors, or Board members. This systemic failure—which extends to all Plan beneficiaries and applicants—is particularly troubling given the affirmative representations to the contrary and underscores that Defendants do not have "a 'reasoned and principled' decisionmaking process." *Garner*, 31 F.4th at 858.

The Board's *unprincipled* decision-making processes are "owed little deference" because its "course of dealing suggests an intent to" render adverse determinations to Plaintiffs "regardless of the evidence," as the Board did not delve into the record before it, including investigating or analyzing treating physician reports and even NFL documented injury reports that contradicted

Plan physicians' conclusions.[86]  Defendants' failure "to discuss conflicting evidence" provides additional proof of the absence of *"a principled and reasoned decision-making process*." *Smith*, 127 F.4th at 543.

Also, as discussed above respecting *Booth* factor 4, the evidence shows that "[t]he Board failed to apply *a reasoned and principled decision-making process*" because despite the various flaws and inadequacies in the Plan physician reports, discussed in connection with *Booth* factor 1, "the Board simply accepted those opinions *without adequate explanation*" or otherwise remedying the inadequate report. *Stewart*, 2012 WL 2374661, at *14. Instead, the Board "simply adopted the opinions of its retained physicians by default," and "[i]n so doing, the … Board showed an unreasonable bias in favor of Plan-selected physicians." *Dimry*, 2022 WL 1786576 at *3; *see In re Marshall*, 261 F. App'x at 526 ("Board's exclusive reliance on … the [Plan] doctor's examination did not result in … determination that was 'the result of a deliberate, principled reasoning process.'").

For example, Dr. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████, rendering the "decisionmaking process unreliable." *Abromitis v. Cont'l Cas. Co./CAN Ins. Cos.*, 114 F. App'x 57, 61 n.2 (4th Cir. 2004).



██████████████████████████████ According to the National Institute of Health, "[t]here is no way to reverse" DJD.    https://www.nia.nih.gov/health/osteoarthritis/osteoarthritis.  Despite the evidence ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████[87]

Finally, as discussed above, "[b]ecause the Board failed to consider the combined effect of [Messrs Olawale's and Sims'] many … impairments, [its decision making process] ignored an important consideration in the question of whether [they are] disabled."[88]

### F.    Multiple Genuine Issues of Material Fact Exist as to Whether Defendants' Actions in Denying Benefits to Plaintiffs Were Inconsistent With ERISA

Defendants' assertion that "[t]he Board complied with ERISA's procedural and substantive requirements because" Plaintiffs were "fully aware of [their] rights and obligations under the Plan," elides or ignores the substantial amount of evidence detailed above in section Count II and III demonstrating Defendants' actions that violate ERISA sections 503(1) and 503(2).    *E.g.*,

---



[87] Furthermore, ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ Further examples of Defendants'
unreasoned, unprincipled decision-making process for Plaintiffs are listed above.

[88] *Mickell*, 832 F. App'x at 594-95 (remanding to district court with instruction that it "should consider all evidence of Mr. Mickell's conditions *together*, including any evidence of Mr. Mickell's functional capacity, to determine whether the *combined effects* of his impairments render him disabled").

*Guthrie v. Nat'l Rural Elec. Coop. Ass'n Long-Term Disability Plan*, 509 F.3d 644, 652 (4th Cir. 2007) ("failure to consider [the] constellation of medical issues denied … a full and fair review"). Additionally, ERISA mandates that an SPD "shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a)(1). The description must not mislead, misinform, or fail to inform participants of the full plan requirements. *E.g., Brumm,* 995 F.2d at 1439 (SPD was not "sufficiently accurate and comprehensive").

Here, Plan information in the multiple SPDs (mis)informs all Players, including Mr. Olawale, Sims, and Loper that Defendants will consider "*all* impairments" adequately identified in their applications. Ex. 25 (NFL_ALFORD-0012016, at 12050 (2019 SPD); Ex. 26 (NFLPLTFS-0000107, at 36 (2021 SPD) ("Be sure to include ALL impairments you want considered on your initial application for benefits."); ███████████████████████ ). Critically, the SPD and Plan are silent as to the meaning of "impairments," and neither the Plan nor SPD contains any exception or exclusions notifying Participants that the Board interprets the Plan *to exclude the cumulative effect of all impairments combined*. Accordingly, the SPD fails to inform all Participants that the Plan term means only *single* impairment types will be considered. *Brumm*, 95 F.2d 1433, 1439 (8th Cir. 1993).[89] "The absence of… restriction… must mean that no such limitation was intended." *Bidwill v. Garvey*, 943 F.2d 498, 505 (4th Cir. 1991). Board member Smith testified that ███████████████████████████████████████
███████████████████████████████████████████████████████

---

[89] 29 U.S.C. § 1022(b) (SPD must include "circumstances which may result in disqualification, ineligibility, or denial or loss of benefits").

███████████████████████████████. Ex.10 ████████████████████████████ [90] Therefore, there is a

genuine dispute of material fact because the evidence shows that "[t]he summary plan description

for the … Plan does not comply with ERISA." *Brumm*, 995 F.2d at 1439.

## G.    Genuine Issues of Material Fact Exist as to Whether Defendants' Benefit Decisions Are Consistent with Relevant External Standards

Defendants incorrectly assert that consistency with external standards "is not relevant to"

Plaintiffs' "application[s], to which no external standard applies." OM25, SM29. For example,

the Montreal Cognitive Assessment ("MoCA") test is an external standard for determining whether

one has an objective cognitive impairment and its severity. [91] Here, ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████. [92]

Furthermore, the Heaton norms are a relevant external standard to the Board's discretion

---

[90] "A participant—particularly one without knowledge of the history of conflict over this issue—will surely assume" that Plan and SPD do not exclude the cumulative effect of *all* impairments from consideration, especially when they are identified in a Player's application. *Brumm*, 995 F.2d at 1439; *see*, e.g., *Mickell*, 832 F. App'x. 586 (11th Cir. 2020). "It is hard to imagine a participant who, after reading the language in both the Plan and the summary plan description, would assume that" a single impairment type was necessary in order to qualify for benefits, *see*. *Brumm*, 995 F.2d at 1439, much that the cumulative effect of all impairments was excluded from consideration, especially when the impairments are identified in Players' applications.

[91] The MOCA test itself states the objective standard for "Normal is ≥ 26," and ████████████ ████████████████████████████████████████████████████████████

[92] Additionally, although Defendants contend that the standard under the multidistrict *NFL Players' Concussion Injury* settlement (*see infra* at 64-65) "has no bearing on the Plan's disability eligibility standards," this external objective standard on a nearly identical neuropsychological test battery *is* relevant to the Board's exercise of discretion. OM25. For example, LM I and LM II are required tests in both the *NFL Players' Concussion Injury* settlement program and for Neurocognitive Disability benefits. *Compare* ████████ *with* https://www.nflconcussionsettlement.com/ViewDoc.aspx?dp=neuropsych_test_score_guide.pdf (scoring guide). The *NFL Players Concussion Injury* settlement prescribes that, for someone with ████████ a Level 1 (*i.e.*, Moderate cognitive impairment) in the Memory cognitive domain "requires 2 or more scores below a T score of 38." Here, ██████████████████████████████████████████████ ████████████████████

because, as described above, it was applied as a part of Messrs. Olawale's and Sims's benefit decisions. A court blasting Dr Macciocchi's use of Heaton norms discussed,

> the authors of the norms used by Dr. Macciocchi on several of the tests he administered have stated that *using those norms in a case where there is a known history of brain injury… is not appropriate.* Dr. Macciocchi testified that he found it hard to believe that would be their recommendation, but he admitted that he had not read the literature…

*Jefferson*, 250 F. Supp. 3d at 1366. Despite this public decision, Defendants promoted Dr. Macciocchi and had him create the Plan physician manual, which requires that Heaton norms be applied to *all* Player's T-scores despite how common brain injuries are in NFL Players. In fact,

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████. This external standard shows the Defendants' decisions are unreasonable. [93]

### H.    The Board's Bad Faith Motives Impacted Plaintiffs' Adverse Decisions

Substantial evidence in multiple forms exists that Defendants' decisions to deny benefits to Plaintiffs Olawale, Sims, and Loper under the Plan were unreasonable because they were impacted by bad faith motives, bias, and conflicts of interest. *Booth*, 201 F.3d at 342.[94] The Supreme Court has explained that a fiduciary's bad faith motives, bias, or any conflict

---



[93] ███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████); ECF No. 172-12

[94] The Supreme Court explained in *Glenn* that the Court must consider the fact-specific impact, "kind[] and … degree of seriousness" of a fiduciary's bad faith motives or *any* conflict of interest when evaluating whether an administrator abused its discretion. *Glenn*, 554 U.S. at 116. While Defendants state in their motion that there is no bad faith motive here because "[t]he Board is composed equally of" NFL Owner Members and NFLPA Members, "[h]ere, as in *Glenn,* the evaluation of claims is entrusted (at least in part) to representatives of the entities that ultimately pay the claims allowed. … That the [B]oard is (by requirement of statute) evenly balanced between union and employer *does not* negate the conflict." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 139 (2d Cir. 2010). Even if "unconsciously," "when a fiduciary has dual loyalties, as the management trustees did in their capacities as Plan trustees and club officers or owners," "[a] fiduciary with a conflict of interest must act as if he is 'free' of such a conflict." *Bidwell*, 743 F. Supp. at 397; *Bedrick ex rel. Humrickhouse v. Travelers Ins.*, 93 F.3d 149, 154 (4th Cir. 1996). "'Free' is an *absolute.*" *Id.*

should prove more important (perhaps of great importance) where *circumstances suggest … a higher likelihood that it affected the benefits decision*, including, but not limited to, cases where an… *administrator has a history of biased claims administration*. … It should prove less important… where the administrator has taken active steps to reduce potential bias and to promote accuracy.

*Glenn*, 554 U.S. at 117. Here, the evidence of the *Board's* bad faith motives, conflicts, and history of biased claims administration creates multiple genuine issues of fact under *Booth* Factor 8 foreclosing summary judgment in Defendants' favor.

First, there is no dispute that the NFL Owners fund the Plan, are liable for annual contributions to maintain the financial viability of the Plan, and that the Plan pays for the "Neutral Physicians."[95] Second, the NFL, NFL Owners, and NFLPA have a long history of publicly denying the health effects of football-related injuries on Players, particularly concussions, and TBIs. This "junk science" was the subject of Congressional hearings,[96] widespread critical media coverage,[97] and prompted the filing of hundreds of lawsuits by former NFL players and their families against

---

[95] "If the management trustees had increased benefits…, as club owners, they could have become immediately liable for the contribution." *Bidwell*, 743 F. Supp. at 397; *see* Ex. 57 (Vincent testimony in *Cloud* Tr. 175:19-176:11) ("Q: Who pays the neutral doctors? A: It comes out of the Plan, disability Plan […] Q: How is the Plan funded? A: By the Management Council -- I'm sorry, the league owners."). Even NFLPA-appointed trustees have previously argued that the Owner-appointed trustees have a direct conflict, have failed in its investigations, and have retained advisors who "cannot be considered independent." *Bidwell*, 743 F. Supp. at 395-98.

[96] CBS News, Neurologist Denies Concussion-Disease Link, CBS (Jan. 5, 2010, 8:37AM) https://abcnews.go.com/Health/Healthday/health-highlights-jan-2010/story?id=9484724; *See* S. Hr'g 110-1177 — OVERSIGHT OF THE NATIONAL FOOTBALL LEAGUE (NFL) RETIREMENT SYSTEM | Congress.gov | Library of Congress ("[t]he NFLPA looks at this as protecting themselves against a player," and "disregard any medical finding that does not support the agenda of the… board trustees who, as representatives of the collective bargaining unit, not surprisingly have established a record of disqualifying Players seeking any type of disability unless that Player is a 'friend of the NFLPA.'"); https://www.govinfo.gov/content/pkg/CHRG-111hhrg53092/html/CHRG-111hhrg53092.htm ("history of benefit and disability denials by the NFL and National Football League Players Association a disability system that is conflicted in the way it serves to align the interests of both the NFL and the NFLPA against those of the disabled players whose welfare both organizations are supposed to consider objectively. To date, they have not.").

[97] *E.g.*, League of Denial: The NFL's Concussion Crisis | FRONTLINE (NFL commissioner "created a scientific committee, the Mild Traumatic Brain Injury Committee… To lead it, he chose Elliot Pellman, the New York Jets team doctor, a firm believer that concussions were not a serious problem.").

the NFL for cognitive decline stemming from head injuries, which resulted in the multidistrict *NFL Players' Concussion Injury Litigation*. *See In re Nat'l Football Lague Players Concussion Inj. Litig.*, 821 F.3d 410, 421-25, 436-48 (3d Cir. 2016) (affirming final approval of class action seettlement), *aff'g*, 307 F.R.D. 351, 361-70 (E.D. Pa. 2015).

Second, and critically, the Supreme Court in *Glenn* held that evidence of a history of bad faith claims administration can serve as a tie-breaking factor if circumstances suggest it impacted the Plaintiff's decisions. *Glenn*, 554 U.S at 117; *Schindler v. Unum Life Ins. Co. of Am.*, 2013 WL 4499146, at *23 (D.S.C. Aug. 19, 2013) (following *Glenn*, "number of courts have found a history of bad faith *based on prior judicial opinions*.").

Multiple federal courts have found that Defendants have a history of "act[ing] as an adversary, not a fiduciary," are a Player's "most implacable foe," and engage in "bad faith" claims administration. *See* Amended Complaint ¶ 21 (collecting cases). These courts, including the Fourth Circuit and other courts in this District, detail Defendants' extensive history of "culpable conduct, if not bad faith" motives and adversarial claims administration, including concealing the impact of impairments from football activities, and overly aggressive and disturbing pattern of erroneous and arbitrary benefits denials. Moreover, Defendants have a history of multiple erroneous interpretations of the same Plan provisions. For example, because Defendants continued to disregard the Fourth Circuit's holdings in *Jani* for years, the Fourth Circuit "[s]tripped [them] of the arbitrary restrictions on evidence it would consider" for repeating the same erroneous interpretation at issue in *Jani*.[98]

---

[98] *See Solomon*, 860 F.3d at 266. "Multiple erroneous interpretations of the same plan provision, … might well support a finding that a plan administrator is too incompetent to exercise his discretion fairly." *Conkright v. Frommert*, 559 U.S. 506, 521 (2010).

The evidence in the Record discussed above provides the "*connections between*" the fiduciary's history of bad faith motives "*and the actual process undertaken by*" Defendants when reviewing Plaintiff Sims, Loper, and Olawale's claims, such as failing to "consider[] all of the medical evidence" and failing to "set forth a reasoned decision," demonstrating how the Board's history of bad faith affected its decision-making here. *Price v. UNUM Life Ins. Co. of Am.*, 2018 WL 1352965, at *15-16 (D. Md. Mar. 14, 2018).  For example, the evidence discussed *above* supports that the Board "*acted in bad faith* … without reviewing the records from" Plaintiffs' "treating physician[s]." *Watson*, 185 F. Supp. 2d at 585; *see Cloud*, 2025 WL 82450, at *12 ("undisputed facts make clear that Defendant acted in bad faith in its handling of Plaintiff" application….  The Board did not review all the records.").

### 1. Substantial Statistical Evidence, Improper Incentives, and Flawed Reports Demonstrate Bad Faith Administration of the Plans

"In its fiduciary capacity as a claims administrator," the Board "has an obligation to seek out *objective* assistance when it decides that a referral for… an independent medical examination is needed." *Chughtai v. Metro. Life Ins. Co.*, 2019 WL 4199036, at *2 (D. Md. Sept. 5, 2019). "How" the Board "go[es] about developing and maintaining networks of physicians or other medical experts" is "very relevant to the existence of… bias." *Id.*  The record reflects "many forms" of evidence demonstrating how Defendants' bad faith and biased views motivated its referral practice, impacting the adverse decisions in Plaintiffs' cases.  *Glenn*, 554 U.S. at 123 (Roberts, C.J., concurring). The forms include evidence of "improper incentives" and "a pattern or practice of unreasonably denying meritorious claims" *id.*, and "powerful evidence" of the fiduciary's bad faith in the form of "statistics showing a parsimonious pattern of assessments disfavorable [sic] to claimants."  *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 902-03 (9th Cir. 2016).

While "[i]t is hard to imagine that a plan administrator would *explicitly* tie compensation to results, as clearly such a practice would be viewed disapprovingly by courts,"[99] Plaintiffs have developed and produced data showing that Plan-selected physicians with higher percentages of rendering opinions adverse to Players receive more assignments to evaluate applicants, and higher compensation. *E.g.*, Section I.A, *supra*; ECF No. 172-5, *passim*.

> a.  **Statistics Based on Plaintiffs' Sample and Defendants' V3 Data Provide Additional Evidence That the Plan's Highly Compensated Neuropsychologists Who Examined Plaintiffs Are Biased Against Players**

"Under *Glenn,* proof of facts warranting imputation of improper motives to a plan administrator … aids claimants challenging adverse benefits decisions." *Spry v. Eaton Corp. Long Term Disability Plan*, 326 F. App'x 674, 678 (4th Cir. 2009). "The knowing use of biased doctors would be some evidence of bad faith." *Adams v. Symetra Life Ins. Co.*, 2020 WL 1275721, at *2 (D. Ariz. Mar. 17, 2020). Based on the available data, Plan physicians "stood to benefit financially from the repeat business that might come from providing [the Board] with reports that were to its liking" such as those that downplay long-term cognitive loss related to NFL head trauma.[100] Notably, statistics on physicians' individual conclusion rates may be probative of bias if the evidence "support[s] an inference that a similar pool of claims … by a different set of physicians would have had a *lower* unfavorable recommendation rate." *Balkin*, 2024 WL 1346789, at *16.

Notably, *none* ████████████████████████████

████████████████████████████████████████████

---

[99] *Demer*, 835 F.3d at 903-04 (noting "unremarkable proposition that the number of examinations referred and the size of the professional fees paid … may compromise the neutrality of an expert").

[100] *Caplan v. CNA Fin. Corp.*, 544 F. Supp. 2d 984, 992 (N.D. Cal. 2008) ("history of Dr. Mahawar's conclusions provides evidence of this conflict; it demonstrates that he has provided Hartford with reports that frequently support a decision to deny benefits to the claimant.").

████████████████████.[101]  ECF No. 172-5, at ███. The evidence "support[s] an inference that a similar pool of claims… by a different set of physicians would have had a *lower* unfavorable recommendation rate," *Balkin*, 2024 WL 1346789, at *16, because the pool of Plan

████████████████████████████████████████████████████████████████████████

█████████████████████████████████. *Id*. Moreover, the evidence shows that the Board failed to "take[] active steps to reduce potential bias and to promote accuracy," because ███████████████

████████████████████[102] were all jointly recommended to the Plan and trained by Drs. Macciocchi and Garmoe, who share similar stated biases to these Board designees against finding claimants disabled from concussions. *Glenn*, 554 U.S. at 117; Ex. 5 ████████████████████

        While Board Member Smith testified ████████████████████████████████████████

████████████████████████ (Ex. 10 ████████████████, the "evidence of skewed beliefs that affected the… [p]hysicians' decisions," include repeated flaws such as those discussed above and those for other Players, are evidence the "physician's report[s] reflected these beliefs."[103] Like Dr. Macciocchi, ████████████████████████████████████

---

[101] *See Hertz v. Hartford Life & Acc. Ins. Co*., 991 F. Supp. 2d 1121, 1136 (D. Nev. 2014) ("it [could] be reasonably inferred … that … bias infiltrated the entire administrative decision-making process" where "statistics strongly suggest[ed] that both MLS and Dr. Rim harbored a significant bias towards finding" no disability because "of those fourteen (14) claims [he] reviewed, Dr. Rim did not find that a single claimant was completely unable to perform any type of work" and "[i]n a sampling of 75…performed by MLS], only four (4) were determined to be completely unable to work").

[102] Neither ████████████████████████████████████████████████████████████████████

████████████████████████████████████ ECF No. 172-5, at ████. Despite this evidence of bias, ███████████████████████████████████████████████████████████ *Id*. ██████████████████████ . *Id*.

[103] *Balkin*, 2024 WL 1346789, at *16-19; *see Caplan*, 544 F. Supp. 2d at 990-93 ("history of [physician's] conclusions provide[d] evidence of [his] conflict," where statistics showed that he found large percentage of disability claimants capable of working).



                      , [104]

[105]

For example, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. ECF No. 172-5, at ███████████ At the same time, Defendants

knowingly ████████████████████████████████████

██████████████ *Id.* In addition to promoting his work ██████████████

████████████████████████████████████████████████

████████████████████ Ex. 49 (NFLPLTFS-0000045).

      **b.**    **Based on the Data Produced, None of the Four Plan Orthopedists Who Examined Plaintiffs Has Ever Deemed an Applicant Eligible for T&P Benefits**

Here, based on the available data, the four Plan orthopedists who evaluated Plaintiffs, as



[104] *See* Ex. 48

[105] Also, the three Plan neuropsychologists who evaluated Plaintiffs for Neurocognitive benefits, had a combined 9.677% rate of concluding that Players met the Neurocognitive disability standard, compared to a ████████████████████████████. ECF No. 172-5, at ██████

well as ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████. ECF No. 172-5, at ████ [106] Such evidence "support[s] an inference that a similar pool of claims … by a different set of physicians would have had a *lower* unfavorable recommendation rate," *Balkin*, 2024 WL 1346789, at *16.,

Moreover, the combination of evidence of substantial compensation, statistical bias, and repeated acceptance of the flaws and inadequacies in Drs. Saenz's, Elkousy's,[107] Apple's, and Cook's[108] reports for Plaintiffs discussed above, as well as for other Players,[109] are evidence of the

---

[106] Similarly, although Plan orthopedists with ████████████████████████████████ ████████████████████████████████████████████████████████ ECF No. 172-5, at ████

[107] Dr. Elkousy did not render ███████████████████████ ████████████████████████████████████████ ECF No. 172-5, at ███████████████████ Despite this evidence of bias, ████████████████████████████████████████████████ ████████████████████ *Id.*; *cf. Dimry,* 2018 WL 1258147, at *3-4 ("magnitude of the payments raise[d] a fair inference of a financial conflict"; rejecting Board's argument that NPs are not financially conflicted because they receive fixed fee).

[108] Dr. Apple did not render ██████████████████ ████████████████████ ECF NO. 172-5 at ██████. In the evaluations available to Plaintiffs that occurred prior to the V3 data timeframe (January 1, 2018-July 31, 2024), Dr. Apple also had a ██████████████ *E.g.*, Ex 50 ████████████████████████████████████████ ████████████████████████████████████████ *Id.*; *cf. Dimry,* 2018 WL 1258147, at *3-4 ("sizable payments" to Neutral Physician of $188,683 from 2014-15 exceeded amount in concern in *Demer*). Dr. Cook did not render ████████ ██████████████████████████████████████████████████ (ECF No. 172-5, at █████ Despite this evidence of bias, Defendants ██████████ ████ *Id.*

[109] *See* Ex. 51 ████████████████████████████████████████████

fiduciaries' bad faith.  Dr. Saenz, for example, has ███████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████  ECF No. 172-5, a█  Despite this evidence

of bias, Defendants █████████████████████████████████████████████████

████████████████████████████████.  *Id.*  Dr. Saenz promotes his work as the official

NBA *team* physician for the "San Antonio Spurs," ██████████████████████████

██████████████████████████████████████████████████████; Ex.

52 (NFLPLTFS-0003227).[110]

### c.    Bad Faith Use of Biased Psychiatrists

Similarly, the four Plan psychiatrists who have received the highest average annual

compensation from the Plan since 2009 ██████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████  ECF No. 172-5, at ███.  For example,

Dr. Norman has an ████████████████████████████████████████████

█████████████████████████████████████████████████████



---

[110] Promotional or "marketing material[s]" may "suggest[] ... services that will support a parsimonious approach to administering claims." *Caplan*, 544 F. Supp. 2d at 990, 992. Similarly, Dr. Cook promotes his work as the "*team* doctor" for an NBA team who will get Players "back on the court and stay there," and Dr. Elkousy was the *team* physician for the Houston Rockets.  Ex. 53 (NFLPLTFS-0000062).

███████████████████████████████ [111] *Id.* at ████ [112] Despite this evidence of bias,

Defendants ████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.* He was paid █████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████. Once again, the evidence "support[s] an inference that a similar pool of claims

… by a different set of physicians would have had a *lower* unfavorable recommendation rate,"

*Balkin,* 2024 WL 1346789, at *16.

### d.   Knowing Use of Biased Neurologists

The Plan's three highest-paid neurologists in average annual compensation ██████████

████████████████████████████████████████████████████████████

████████████████████████████ ECF No. 172-5, at ████. Moreover, the

"reliability of" ██████████████████████████████████████ as "neutral

evaluation[s]" are "dubious" based on their financial interests in giving the Board reports that are

to its liking, and biased stated beliefs. *See Bedrick ex rel. Humrickhouse*, 93 F.3d at 153; *Caplan*,

---

[111] *See* Ex. 54



[112] Mr. Loper was also denied ██████████████ *See* Ex. 55 ████████████████. Although Defendants point to Mr. Loper's award of T&P benefits in 2024 as evidence that they are not motivated by financial concerns to act against Players (DM11, 23), his T&P award more than a year *after* this case was brought suggests only that the earlier denials of his benefit applications were improper or demonstrate Defendants' manipulation of statistics for purposes of this lawsuit.

544 F. Supp. 2d at 990-93. For example, Dr. Brahin, whose medically incorrect position concerning post-traumatic encephalopathy is noted in Section I.A above.



. ECF No. 172-5, at ▇▇▇ Both he and Dr. Okai also have ▇▇▇

. *Id*.[113] Despite this evidence of bias, Defendants ▇▇▇

. *Id.* In 2021-22, ▇▇▇

. *Id.*

 The evidence in all of the Plan physician reports respecting Plaintiffs, discussed above concerning *Booth* factors 1-7, and bias for rendering adverse disability conclusions to Defendants' liking, discussed above concerning factor 8, that they are regularly retained and paid by [the] [P]lan administrators and the powerful statistical evidence provided by Dr. Hayter is sufficient to demonstrate that Defendants' knowing use of these biased physicians is an abuse of discretion. *Everette v. Liberty Life Assurance Co. of Bos.*, 2017 WL 2829673, at *11 (D. Md. June 29, 2017).

---

[113] *See* Ex. 56 ▇▇▇

).

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions.

Dated:  April 25, 2025

Respectfully submitted,
**SEEGER WEISS LLP**

By:  *s/ Benjamin R. Barnett*
Benjamin R. Barnett
**SEEGER WEISS LLP**
325 Chestnut Street, Suite 917
Philadelphia, PA 19106
Telephone: (215) 553-7980
bbarnett@seegerweiss.com

*Counsel for Plaintiffs and for the*
*Proposed Class and Subclasses*

Christopher A. Seeger *(admitted pro hac vice)*
Diogenes P. Kekatos *(admitted pro hac vice)*
Caleb A. Seeley *(admitted pro hac vice)*
Hillary R. Fidler *(admitted pro hac vice)*
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegerweiss.com
cseeley@seegerweiss.com
hfidler@seegerweiss.com

Samuel L. Katz *(admitted pro hac vice)*
Julia M. Damron *(admitted pro hac vice)*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800
Beverly Hills, CA 90211
Telephone:  (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com

Bryan F. Aylstock *(admitted pro hac vice)*
Justin G. Witkin *(admitted pro hac vice)*
Douglass A. Kreis *(admitted pro hac vice)*
D. Nicole Guntner *(admitted pro hac vice)*
Bobby J. Bradford *(admitted pro hac vice)*
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ, PLLC**

17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone:  (850) 202-1010
BAylstock@awkolaw.com
JWitkin@awkolaw.com
DKreis@awkolaw.com
NGuntner@awkolaw.com
BBradford@awkolaw.com

***Counsel for Plaintiffs and for the
Proposed Class and Subclasses***

Jason S. Rathod
Nicholas A. Migliaccio
**MIGLIACCIO & RATHOD LLP**
412 H Street, N.E.
Washington, DC 20002
Telephone: (202) 470-3520
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

***Counsel for Plaintiffs and Liaison Counsel
for the Proposed Class and Subclasses***

Robert K. Scott *(admitted pro hac vice)*
Gerry H. Goldsholle *(admitted pro hac vice)*
**ADVOCATE LAW GROUP P.C.**
2330 Marinship Way, Suite 260
Sausalito, CA 94965
Telephone:  (949) 753-4950
bob@advocatelawgroup.com
gerry@advocatelawgroup.com

***Additional Counsel for Plaintiffs***