# EXHIBIT 11

```
                                                              Page 1

 1
                    IN THE UNITED STATES DISTRICT COURT
 2                      FOR THE DISTRICT OF MARYLAND
                             BALTIMORE DIVISION
 3
    JASON ALFORD, DANIEL            §
 4  LOPER, WILLIS McGAHEE,          §
    MICHAEL McKENZIE, JAMIZE        §
 5  OLAWALE, ALEX PARSONS,          §
    ERIC SMITH, CHARLES SIMS,       §
 6  JOEY THOMAS and LANCE           §
    ZENO, Individually and on       §
 7  Behalf of All Others            §
    Similarly Situated,             §
 8                                  §
              Plaintiffs,           §
 9                                  §  CIVIL ACTION NO.:
    vs.                             §  1:23-cv-00358-JRR
10                                  §
    THE NFL PLAYER DISABILITY       §
11  & SURVIVOR BENEFIT PLAN,        §
    THE NFL PLAYER DISABILITY       §
12  & NEUROCOGNITIVE BENEFIT        §
    PLAN, THE BERT BELL PETE        §
13  ROZELLE NFL PLAYER              §
    RETIREMENT PLAN, THE            §
14  DISABILITY BOARD OF THE         §
    NFL PLAYER DISABILITY &         §
15  NEUROCOGNITIVE BENEFIT          §
    PLAN, LARRY FERAZANI,           §
16  JACOB FRANK, BELINDA            §
    LERNER, SAM McCULLUM,           §
17  ROBERT SMITH, HOBY              §
    BRENNER, and ROGER GOODELL,     §
18                                  §
              Defendants.           §
19
20       *******************************************
                    VIDEOTAPED DEPOSITION OF
21                       ADORA WILLIAMS
                         MARCH 28, 2025
22       *******************************************
```

Page 22

1  benefit plans?
2     A.   Yes.  It's a -- it's a -- it does.
3  They're a certification in employee benefit plans, so
4  it runs the gamut of -- of different plans.
5     Q.   So your background is in human resources
6  and benefit administration, not in healthcare and
7  medicine; is that fair to say?
8     A.   Yes.
9     Q.   And you did not attend medical school?
10    A.   No.
11    Q.   And you've never worked in a clinical
12 setting, such as a hospital or doctor's office, in
13 any medical capacity, correct?
14    A.   Not professionally, unless you're counting
15 my high school stint as a receptionist in a doctor's
16 office.
17    Q.   Okay.  Fair enough.  Thank you.
18         And you don't hold any certificates or
19 certifications related to evaluating or interpreting
20 medical records?
21    A.   No.
22    Q.   And you've never received training in how

Page 23

1  to diagnose or assess medical conditions; is that
2  correct?
3     A.   No.
4     Q.   In the course of your employment at the
5  PA, were you ever provided any training as it relates
6  to orthopedic impairments by players who are
7  former -- who formerly played in the NFL?
8         MR. JACOB:  Object to the form.
9         THE WITNESS:  When you say "training,"
10 what do you mean?  There is lots of types of
11 training, so ...
12 BY MS. FIDLER:
13    Q.   Well, how do you -- how would you describe
14 any training that you've received?
15    A.   I've received training in how to evaluate
16 the -- the cases, the disability claims in the -- in
17 the Plan.  We have received -- I mean, I have
18 received training on the different pieces, you know,
19 of the -- of the puzzle.
20    Q.   Can you describe that training?
21    A.   We are -- so it's -- you know, I have a
22 process that I go to, so training on a -- on my

Page 24

1  process, where I will walk through each of the
2  piece -- the documents provided in any particular
3  case.  I will go through all the reports, pulling out
4  the information that I need to apply it to our Plan.
5  And then I've received training, obviously, on our
6  Plan terms.
7     Q.   Who conduct -- or, who conducted the
8  trainings that you're referring to?
9     A.   It would be -- depends.  It would be a
10 variety.  When I was trained on how to do the claims,
11 that was by my predecessors.  Training on the Plans
12 happens with our Plan counsel.  We have received --
13 we do receive training from the -- or did receive
14 training from the doctors, when we implemented, for
15 example, the new -- the point system, training on --
16 on that, on how to work through that point system,
17 from Dr. Selesnick.
18         We received -- we had received -- I had
19 received training also, in the past, from Dr. Garmoe
20 on the neurocognitive, when that benefit was coming
21 in place, on how to read those reports.
22    Q.   Okay.  I'd like to -- thank you for that.

Page 25

1  I'd like to unpack that a little bit.
2         When you said that the training was
3  provided by Plan counsel, are you referring to
4  Groom Law?
5     A.   Yes.
6     Q.   And specifically what training did
7  Groom Law provide you?
8     A.   We go over -- or, Groom Law will go over
9  one annual kind of fiduciary, HIPAA training, that
10 type -- sort of thing.  They go over the Plan terms
11 with us.  So maybe "training" might not be the right
12 word.  It's -- you know, we -- understanding of the
13 terms of the -- of the Plan, if we have questions,
14 or anything like that.  Particularly when there's
15 new ...
16    Q.   And is -- are those -- is that like a
17 formal training process where other employees within
18 the PA attend and Groom puts on a seminar related to
19 how to interpret new Plan terms?
20         MR. JACOB:  Object to the form of the
21 question.
22 BY MS. FIDLER:

7 (Pages 22 - 25)

Page 26

1  Q.  Or is it more of an informal process
2  where --
3      MR. JACOB:  Same objection.
4      THE WITNESS:  There is multiple ways that
5  we get information and training.  So sometimes it's
6  informal.  Sometimes it's a -- you know, HIPAA
7  training is more formal, fiduciary is more formal,
8  with a presentation and whatnot.  Sometimes it's
9  informal gatherings where we can ask questions and
10 talk out the -- the Plan terms.  It -- it just
11 depends on what the need is.
12 BY MS. FIDLER:
13  Q.  And then you had also mentioned that
14 your -- I think you said that your predecessors had
15 provided trainings on -- on the claims process.  Who
16 are those individuals?
17  A.  The first would have been Chris Smith, the
18 prior Disability Initial Claims Committee member.
19 That's where I started in this with respect to the --
20 the disability Plan.
21     I started as kind of working under her or
22 learning under her on the initial process, earlier in

Page 27

1  that -- when the -- when that kind of first came in.
2      So she would -- helped me.  You know, we
3  would go through all the claims.  She would give me
4  the basics, and then I would just -- it's practice,
5  right, no one can really tell you how to do it, you
6  just have to do it.  So I would do all of the initial
7  claims alongside Chris.
8      I would have to -- if there was a time
9  when she couldn't make the Disability Initial Claims
10 Committee meeting, a handful of times I would step in
11 and be her proxy; and so deliver her -- her decisions
12 at that or -- at that level.
13     So I was basically training alongside
14 Chris doing all of the cases that she was doing at
15 the initial level.
16     When I moved over to the -- doing the
17 appeals, it was under Bethany Marshall, who was the
18 predecessor.
19     And the similar thing I'm doing, which was
20 doing all the claims that she was doing.  We were
21 reviewing together as a way for me to learn the
22 process and learn how to -- to evaluate things.

Page 28

1  Q.  Okay.  So that was more of on-the-job
2  training?
3  A.  Yes.
4  Q.  Okay.  And when you -- you referred to
5  Chris Smith, and you were -- you said that you were
6  doing it at the initial level.  Do you mean the --
7  are you referring to the committee-level decisions?
8  A.  The committee --
9  Q.  Yeah --
10 A.  -- yes.
11 Q.  -- okay.
12     And then you also had mentioned that you
13 have received training from doctors; specifically,
14 you said Dr. Selinsky and Dr. Garmoe.  Can you
15 describe the training that you have received from
16 Dr. Selinsky?
17 A.  Selesnick.
18 Q.  Selesnick.  I apologize.
19 A.  This was -- the Plan changed from a
20 different way of evaluating line-of-duty to the
21 current point system.  So Selesnick was the, kind of,
22 the brain behind that system.  He gave us training

Page 29

1  on, you know, the new system, the terms, how
2  to -- how to go through those.
3      With Garmoe, it was when the
4  neurocognitive benefit was being created; again, it
5  was a new benefit in a new arena that we weren't
6  working in.  So Garmoe gave us training in how to
7  read the reports, the neurocognitive reports,
8  et cetera.
9  Q.  Do you recall when the training
10 with Dr. Garmoe was, around what -- what year?
11 A.  I don't recall exactly.  It was around the
12 time the neurocognitive disability came in.
13 Q.  And can you describe, like, what those
14 training sessions were like; were they in person,
15 over the phone?
16 A.  Those were in person.
17 Q.  In person?
18 A.  Um-hmm.
19 Q.  Where were they held at?
20 A.  I don't remember exactly where they were
21 held.  If I -- yeah, I don't remember exactly.  I
22 think Garmoe's was at the league office.

8 (Pages 26 - 29)

Page 30

1  Q. And so when you went through the training
2 with Dr. Garmoe, did you receive training on how to
3 administer, conduct, and interpret tests from the
4 neurocognitive test battery?
5      MR. JACOB: Object to the form.
6      THE WITNESS: So you're asking if I, if he
7 taught us how to be a neurocogni- -- a
8 neuropsychologist?
9 BY MS. FIDLER:
10  Q. I'm asking if he had -- if he taught you
11 how to read and interpret test results based on the
12 neurocognitive test battery.
13      MR. JACOB: Object to the form.
14      THE WITNESS: Yeah, I'm not sure if I am
15 fully -- fully grasping the question. What we went
16 through was how to read the Neutral Physician Report
17 form, where to look in there for the -- the
18 information we're needing, how to -- how to follow
19 along the, the narrative that the doctor was -- was
20 placing in the forms.
21 BY MS. FIDLER:
22  Q. So it's fair to say that your process

Page 31

1 was -- the training was related to how to read the
2 various neurocog reports that you would be receiving;
3 it wasn't related to the substance of the test?
4      MR. JACOB: Object to the form.
5      THE WITNESS: The -- so it was relating to
6 what the -- what we need to know in order to evaluate
7 the claim as how to go through the Neutral Report and
8 how to highlight, how to identify the information
9 that's needed in order to assess whether or not a
10 player meets the standard. So, you know, it's how to
11 follow that narrative, figuring out what -- you know,
12 following along so that we can see the narrative, see
13 the reports.
14      I'm not -- you know, there's -- that was
15 what we -- that's what we need in order to evaluate
16 the claim.
17 BY MS. FIDLER:
18  Q. Okay. Can you give some examples of what
19 Dr. Garmoe suggested that you look for in the Neutral
20 Physician Reports?
21  A. In gen- -- like I said, that training was
22 a long time ago. In general, what we're looking for

Page 32

1 is the narratives from the physicians. They explain
2 what they've -- you know, they give a history of the
3 players, they explain what their findings are, and
4 then they explain the basis for those findings. So
5 that's what we're look -- that's what I'm looking for
6 in the reports is the -- that's the narrative that
7 the -- that the doctors will place for us. That's
8 their way of explaining all of the medical -- the
9 technical medical that as, you know, you pointed out,
10 I'm not a doctor.
11      So the technical medical, the doctors will
12 explain all of the technical medical behind all the
13 testing for their narrative. So that's the -- those
14 are the things that we're looking for, or that I'm
15 looking for when I'm reviewing.
16  Q. And when you say "technical," the
17 "technical medical" parts, did you receive training
18 on, you know, the various types that -- of tests that
19 are included in the neurocog test battery?
20      MR. JACOB: Object to the form.
21      MS. FIDLER: Can you give me Tab 4.
22      THE WITNESS: So the particular tests,

Page 33

1 like the intricacies of the tests are you asking, or
2 just the general, what the tests are?
3 BY MS. FIDLER:
4  Q. I guess both. I'm asking if you were
5 taught how to interpret a test result from the --
6 from the battery.
7      MR. JACOB: Object to the form.
8      THE WITNESS: Like I said, what we were
9 taught was how to go through the narrative reports
10 so that we can understand what was -- what was
11 presented, how the player presented, so we can -- we
12 can find the information that is needed in order to
13 assess on the claim.
14 BY MS. FIDLER:
15  Q. Do you know what the neurocog -- cognitive
16 test battery is?
17  A. There is a test battery that is prescribed
18 by the -- by the Plan. I couldn't -- I couldn't list
19 it off the top of my head.
20  Q. Were you ever -- did you ever receive any
21 training on how to interpret tests from the -- from
22 the TOPF test, or the Test of the Premorbid

9 (Pages 30 - 33)

Page 34

 1  Functioning?
 2       MR. JACOB:  Object to the form.
 3  BY MS. FIDLER:
 4    Q.  Oh, I'd like you to answer first, please.
 5    A.  So, like I said, the -- what we received
 6  was the -- you know, how to go through that
 7  physician's report.  The intricacies of the -- a
 8  particular test and how to interpret the test, I
 9  believe that is the work of the -- the neutral
10  physician.
11    Q.  So it's fair to say that the neutral
12  physician has to explain the technical medical aspect
13  of the -- of the neurocog reports?
14       MR. JACOB:  Object to the form.
15       THE WITNESS:  So, I mean, what I would say
16  is that the neutral report, the narrative report that
17  we receive, or report we receive, provides all of the
18  information that we need, but the -- you know, the
19  doctors, the neutrals, spend time creating a
20  narrative that explains all of their findings that we
21  can understand.
22  BY MS. FIDLER:

Page 35

 1    Q.  Ms. Williams, are you familiar with the
 2  Neurology or Neuropsychology Neutral Physician
 3  Orientation Manual?
 4    A.  Yes.
 5       (Exhibit 3 marked.)
 6  BY MS. FIDLER:
 7    Q.  I'm going to hand you what's been marked
 8  as Exhibit 3 to your deposition.
 9       And I'd like to direct you to the page
10  that ends in the Bates number at the bottom of the
11  document, it ends in 479.
12       Do you recognize this document -- this
13  page and the pages that follow?
14       (Pause.)
15  BY MS. FIDLER:
16    Q.  Have you -- have you seen this document
17  before?
18    A.  Yes.
19    Q.  Okay.  And do you recognize the page
20  that starts with -- it's a little strange because
21  it's printed double-sided, but it says the
22  "Neuropsychology Data Report Form and Narrative

Page 36

 1  Template."
 2    A.  Yes.
 3    Q.  Okay.
 4    A.  I see that.  I see that.
 5       MR. JACOB:  Wait.  Where does it say
 6  "template"?
 7       THE WITNESS:  Right here.
 8       MS. FIDLER:  There.
 9       MR. JACOB:  Oh, there.
10       MS. FIDLER:  Sorry.  It printed
11  double-sided, unfortunately.
12  BY MS. FIDLER:
13    Q.  And so what I was curious about, and it
14  might be helpful to have this to look at as we're
15  putting context on it, I was curious if, in the
16  training from Dr. Garmoe, if he had given you
17  instructions or training on how to interpret specific
18  results that would be entered from the various tests
19  onto this sheet, the template, if you will.
20       MR. JACOB:  Object to the form.
21       THE WITNESS:  So with -- I guess, I mean,
22  make sure I'm understanding your question.  In

Page 37

 1  his -- when we went through this some years ago, did
 2  he give us specific instruction on how to interpret
 3  the test results that the neutral physicians have
 4  interpreted?
 5  BY MS. FIDLER:
 6    Q.  Exactly.
 7    A.  He -- what we need to understand is, the
 8  neutral physicians give us a narrative that explains
 9  how -- what their interpretations are, explains
10  the -- explains the findings.  So those -- that's
11  where the focus is for us.  I'm not a neuro-
12  psychologist or a neurologist, so I don't do that
13  testing.
14    Q.  Okay.  So fair to say that the answer to
15  my question was, no, that you did not receive that
16  type of training?
17    A.  I don't -- I don't need that type of
18  training.
19       MR. JACOB:  Object.  Object to the form.
20       THE WITNESS:  Oh.
21  BY MS. FIDLER:
22    Q.  Well, regardless if -- if you believe you

Page 38

1  need it or not, you were not provided that; is that
2  fair to say?
3      A.   I said what -- yeah, what we were provided
4  was the, you know, guidance on how to go through the
5  narratives and follow along the doctor's findings.
6  The doctors explain their findings.
7      Q.   And so you were never given training on
8  what the TOPF, the first test listed, what that
9  tests, for example?  You were taught how to read the
10 narrative that the neutral physician is providing?
11         MR. JACOB:  Object to the form of the
12 question.
13         THE WITNESS:  Again, this -- it's the
14 same, right.  The tests, the particular tests
15 themselves, those are interpreted by the neutrals, by
16 the providers.  You know, an orthopedist wouldn't be
17 able to interpret that either.
18         So it's -- that's not what -- what's
19 important to me is the -- being able to understand
20 where the doctor came up with his findings, how the
21 doctor came to his findings.
22 BY MS. FIDLER:

Page 39

1      Q.   Okay.  You can set that aside.
2          (Exhibit 4 marked.)
3  BY MS. FIDLER:
4      Q.   Ms. Williams, I'm going to hand you what's
5  been marked as Exhibit 4 to your deposition.
6      A.   Okay.
7      Q.   And you recognize this document to be the
8  Declaration that you submitted in this matter?
9      A.   Yes, this is my Declaration.
10     Q.   And I'd just like to walk through some of
11 this with you.
12         So the first paragraph discusses your
13 employment history at the PA, which we had previously
14 kind of touched base on.  And it says that you
15 previously served on the Disability Initial Claims
16 Committee when an active member was unable to do so.
17         What period of time was that from?
18     A.   I was working under Chris on the committee
19 approximately in the early 2010-ish, '08, '09-ish
20 days, early on, not too long after the committee was
21 created.  I don't remember the exact time frame.
22     Q.   I'm sorry, did -- you said the 20 --

Page 40

1      A.   2010-ish, '11-ish.  I'm not --
2      Q.   Okay.
3      A.   -- I'm not exactly sure when I started
4  doing that with her.
5      Q.   Okay.  I think I -- I think I misheard
6  you.
7          So it was before you were promoted to the
8  senior benefit manager; is that accurate?
9      A.   Yes.
10     Q.   Okay.  Do you know how many times you
11 served on the committee?
12         MR. JACOB:  Object to the form.
13         THE WITNESS:  It -- I don't remember the
14 exact number.  There were a handful of times when
15 I -- when Chris was unable to attend their meeting,
16 and I had her proxy.
17 BY MS. FIDLER:
18     Q.   So you said a "handful," like some --
19 sometime between like five and ten times; is that a
20 fair estimate?
21     A.   I don't remember exactly.  There -- it
22 wasn't often.

Page 41

1      Q.   And the last committee that you served on
2  would have been prior to when you were promoted in
3  2012?
4      A.   No.  You -- what do you --
5      Q.   Have you -- have you served on a commit --
6  let me ask it this way.
7          Have you served on a committee since
8  becoming a senior benefit manager in 2012?
9          MR. JACOB:  Object to the form of the
10 question.
11         THE WITNESS:  Have I served as her
12 proxy --
13 BY MS. FIDLER:
14     Q.   Yes.
15     A.   -- on the committee?
16         Like I said, I don't remember exactly when
17 they were.  It could have -- I don't exact --
18 remember exactly when.  It was maybe a handful times
19 that I stepped in.  Chris was regular.  She never --
20 she didn't miss meetings.  I was serving -- I was
21 working with her past the time that I was a senior
22 benefits manager.

Page 66

1 BY MS. FIDLER:
2  Q. Yes.
3  A. That is how I was trained to do cases.
4 That is how we've been doing them for the past, I
5 don't know, for me, you know, over a decade, and for
6 the people that preceded me, that's our understanding
7 of what is required because -- by -- you know, by
8 fiduciary standards.
9  Q. And so when you --
10  A. And --
11  Q. Oh, sorry, were you finished?
12  A. No, you're fine.
13  Q. I apologize.
14     So when you say that you were trained to
15 do that, that training came from Bethany Marshall?
16  A. And Chris Smith before her.
17  Q. And Chris Smith, yes.
18     And so that is who told you that you must
19 review the -- every document in the administrative
20 record, not the board?
21     MR. JACOB: Objection; form.
22     THE WITNESS: So we work collective, you

Page 67

1 know, for our board. Our trustees expect that, when
2 we all come together, that there is -- you know, that
3 there's been a full review. That's -- that's our
4 role as party advisor.
5 BY MS. FIDLER:
6  Q. And I understand that. I think my
7 question is a little different, though. I'm asking
8 if anyone from the board specifically communicated to
9 you directly that you must read every record in the
10 admin -- you must read every document in the
11 administrative record.
12  A. So I'll say that that has been how I was
13 trained. That was what I was told in my training.
14 The board -- you know, I got -- I get my -- I got my
15 directives on how to do the process from the party
16 advisors prior to me and the committee member that I
17 worked under on the training.
18     I cannot speak to the instruction that
19 they received from the board. I -- the process that
20 I have in place is what I -- what I use in order to
21 fully assess the clai- -- each of the claims. That's
22 my role as a party advisor.

Page 68

1  Q. And so I think the answer to my question
2 is that -- is, no, that no one from the board has
3 specifically told that to you?
4     MR. JACOB: Objection; misstates prior
5 testimony.
6 BY MS. FIDLER:
7  Q. You can answer.
8  A. I can -- okay.
9     I was told -- like I said, I was told
10 by -- through my training how to do the different --
11 to do the -- how to evaluate the cases.
12  Q. Okay. And your training is done by former
13 party advisors, not the board. So your -- any
14 instructions that you received to review every
15 document in the administrative record was by
16 giving -- was through -- pardon me -- was given to
17 you by former advisors, not directly through the
18 board?
19     MR. JACOB: Object to the form.
20 BY MS. FIDLER:
21  Q. Yes, correct?
22     MR. JACOB: Object to the form.

Page 69

1     THE WITNESS: My -- my training came from
2 the former party advisors and the former committee
3 member.
4 BY MS. FIDLER:
5  Q. Okay. When you're reviewing the
6 administrative record, do you take notes?
7  A. I will jot down information so -- that I
8 need to remember, relevant information for the -- for
9 the -- for the claim.
10  Q. What do you mean by "relevant
11 information"?
12  A. There's certain things, you know, you need
13 to know. You need to know what type of benefit
14 they're applying for. You need to know when -- when
15 they applied is the basis for effective dates, if
16 it's approved. You need to know what the -- what the
17 neutrals said so you can pull out information.
18     So when I go through each of the pages, I
19 may jot down some notes just to make sure I have
20 those on-hand when I get to the end and I need to
21 make a recommendation.
22  Q. And you said that you will "jot down."

18 (Pages 66 - 69)

Page 70
1  Does that mean your notes are handwritten, or do you
2  type them out?
3      A.   I handwrite them as I'm doing the cases.
4  I -- I put them into a typed form because we use -- I
5  use that later on.
6      Q.   So you take handwritten notes while
7  reviewing in realtime, and then later transcribe that
8  in the typed form?
9      A.   Yes.
10     Q.   And where are those notes kept in the
11 normal course of business?
12     A.   The typed notes?
13     Q.   Yeah, or either.
14     A.   The typed notes I just keep in a
15 spreadsheet.
16     Q.   And that's stored on your computer at
17 your -- at the PA's office?
18     A.   Yes.
19     Q.   Have you ever stored those notes anywhere
20 else?
21     A.   No.  I use my work computer.
22     Q.   And then you later rely on those notes

Page 71
1  when making your recommendations to the board?
2      A.   Those notes form the basis for our
3  discussions with the board.  So that -- so that when
4  we go through the cases and discuss the cases with
5  them, they'll have the notes along with the
6  recommendations.
7      Q.   And you said that "they'll have the notes
8  along with the recommendations."  So do you share
9  your notes directly with the trustees?
10     A.   The spreadsheet gets shared with the
11 trustees.
12     Q.   Do you share that over email, or do you
13 print it out; how is it shared with the trustees?
14     A.   Both.  I print it out and then email it to
15 them for their -- for our -- for our pre-meeting.
16     Q.   And I understand that the board meets four
17 times a year.
18          Do you -- is that spreadsheet a running
19 list, if you will, of all of the -- of all the notes
20 you've made during an administrative record for a
21 particular board meeting, or -- sorry, strike that.
22          Do you update the same spreadsheet over

Page 72
1  time, or do you have separate spreadsheets kept for
2  each board meeting?
3          MR. JACOB:  Object to the form.
4  BY MS. FIDLER:
5      Q.   If that makes sense.
6          MR. JACOB:  Object to the form of the
7  question.
8          THE WITNESS:  The spreadsheet -- I use a
9  different spreadsheet every board meeting.
10 BY MS. FIDLER:
11     Q.   Okay.  And you retain the spreadsheets
12 from the prior board meetings, correct?
13     A.   The spreadsheets, yes.
14     Q.   Okay.  So if we look back at your
15 Declaration.  On -- in Paragraph 6, you describe the
16 Meetings Website where the materials for your review
17 are uploaded; is that correct?
18     A.   Yes, correct, Paragraph 6 talks about the
19 "Meetings Website."
20     Q.   And you describe the Meeting Website as
21 the repository of player applications, medical
22 records the players provide, neutral physician

Page 73
1  reports, NFL transaction histories, and
2  correspondence with the players, Committee decisions,
3  appeals, and any other documents players submit in
4  connection with their application and appeal,
5  correct?
6      A.   Yes.
7      Q.   And that's what you would call the
8  administrative record; is that fair?
9      A.   Yes.
10     Q.   Is there correspondence between the
11 benefits office and the doctors included on the
12 Meetings Website?
13     A.   If there was correspondence between the
14 Plan benefit office and the doctor by email, then
15 that would be part of the record.
16     Q.   On the Meetings Website?
17     A.   All of the record goes on the Meetings
18 Website.
19     Q.   And I'm just -- I just would like to
20 understand the Meeting Websites a little bit more.
21          Previously when you had served on the
22 Committee, you accessed the same Meeting Website for

19 (Pages 70 - 73)

Page 82

1 familiarity with it, but ...
2      MR. JACOB: Correct. But she has to
3 confirm. In order to answer your question, she needs
4 to confirm that it is the document she's familiar
5 with. And that, as we know, requires looking through
6 it. So she's not taking an extensive amount of time,
7 but you gave her a document that's 79 pages; and just
8 looking at the signature page is not going to let her
9 answer your question accurately. Just give her --
10      MS. FIDLER: Okay. We --
11      MR. JACOB: Just give her a moment.
12      MS. FIDLER: There is no dispute. She can
13 look at the record. I would just ask that if it's
14 going to take a significant amount of time to confirm
15 that this is the Plan document, that we can go off
16 the record while she has her review.
17 BY MS. FIDLER:
18   Q.   And then after you have confirmed that
19 this is, in fact, the document that you are familiar
20 with in the course of your employment to the, as a
21 party advisor, the trustees who are responsible for
22 executing this document, I would like to direct your

Page 83

1 attention to the page that ends in 376 on the Bates
2 number.
3      Oh, I ...
4      Yeah. And when you are looking at this
5 document, and I -- I may have directed you to one
6 page further, if you could flip it back.
7      This is the LOD point system that you
8 testified earlier to that you -- that you received
9 training on, correct?
10      MR. JACOB: Sorry. When you say "flip it
11 back," do you mean --
12      MS. FIDLER: Well, the -- that is --
13      MR. JACOB: -- the page --
14      MS. FIDLER: This is just the start of the
15 document, one page back is.
16      THE WITNESS: So 37 --
17 BY MS. FIDLER:
18   Q.   On 374.
19   A.   -- 4?
20   Q.   Yep.
21      Sorry.
22      And so to ask my question. This is the

Page 84

1 LOD point system, or the line-of-duty point system,
2 that you testified to earlier you had received
3 training on. Is that accurate?
4   A.   Yes, this outlines the point system.
5   Q.   And you said that -- which doctor provided
6 you the training on this?
7   A.   Selesnick.
8   Q.   Selesnick.
9      And in that training, were you given
10 instructions or guidance on how to interpret the
11 terms in this point system?
12   A.   To interpret the different impairment
13 terms or ...
14   Q.   Yes. The Plan terms as it relates to
15 orthopedic impairments.
16   A.   We were -- we went through the point, you
17 know, system, I guess the system. I don't -- I guess
18 I'm unclear on when you mean we would have received
19 guidance on the specific terms.
20   Q.   So if you look at Page -- that ends in
21 378.
22   A.   Okay.

Page 85

1   Q.   For Lumbar -- "Lumbar Spine Impairment."
2 Were you ever given training on what any of these
3 terms mean?
4      MR. JACOB: Object to the form.
5      THE WITNESS: It's -- you mean specific
6 training on -- I guess I'm not following. I'm sorry.
7 BY MS. FIDLER:
8   Q.   Sitting here today, do you know what these
9 terms are? Can you tell me the definition of lumbar
10 disk incisions?
11      MR. JACOB: I object to the compound
12 question.
13      THE WITNESS: Yeah.
14      I mean, I'm generally familiar with the
15 terms. The neutral physicians are charged with
16 determining whether or not the player has rateable
17 impairments under each of the different -- the
18 different topics.
19      They -- they will document which
20 impairments the players, that they're rating the
21 players on. You know, as was testified earlier, I'm
22 not a doctor. So, you know, I don't -- I don't know

22 (Pages 82 - 85)

Page 86

1  that I could go through and define each medical term.
2  I have enough of an understanding of our system to be
3  able to apply the -- you know, understand the system
4  and to understand the medical reports that are
5  provided.
6       But, again, our doctors provide us with
7  a -- with a commentary or a narrative that explains
8  these things to us through the -- you know, through
9  the narrative of the Plan.
10      So they will do the chart in the report
11 that will lay out where they've rated the player, and
12 then in their narrative they will provide us with the
13 information that led -- was the basis for their
14 findings.
15 BY MS. FIDLER:
16   Q.   So it's fair to say that, when looking at
17 the LOD point system, which spans, roughly, 12 pages,
18 that you are unable to interpret any of the term --
19 any of the Plan terms in this system without the
20 assistance of the neutral physicians; is that fair?
21      MR. JACOB:  Object to the form.
22      THE WITNESS:  I would say that I am

Page 87

1  familiar with all of the terms in the point system.
2  I'm familiar with how -- how the point system works
3  when evaluating our players.  But, again, I am not an
4  orthopedic doctor.  So if you want me to define what
5  a lumbar fusion -- actually, I don't what that is --
6  you know, what every single one of these terms is
7  medically, that is what the -- what our neutral
8  physicians are charged with doing.  And then they
9  are -- they give us a narrative that supports
10 whatever ratings that they give the players.
11 BY MS. FIDLER:
12   Q.   I understand that.  And, believe me, I'm
13 not asking you to define every Plan term in here.  I
14 think we would -- we'd be here for quite some time.
15      But I just want to get an understanding
16 that when you are reviewing administrative records,
17 as it relates to terms, Plan terms that are contained
18 in this LOD point system, your reliance is on the
19 neutral physicians?
20      MR. JACOB:  Object to the form of the
21 question.
22      THE WITNESS:  When I am going through

Page 88

1  the -- the neutral report that lays out the -- for,
2  in that instance, a line of duty case, that lays out
3  the point system that, that I'm relying on the
4  neutral physician to have everything in his -- in his
5  report.
6       So generally that report is -- is
7  separated into two -- kind of two parts.  One part is
8  a chart where they will record the -- the points, and
9  another part would be the narrative where they will
10 go into more detail of their findings.  They will
11 give the information about the exam, and give the
12 information about where their findings came from.
13 BY MS. FIDLER:
14   Q.   Okay.  And just one last question.
15      This LOD point system, this is contained
16 in the Plan document, correct?
17   A.   Yes.
18   Q.   You can set that aside.  We may come back
19 to the Plan, though.
20   A.   Okay.
21   Q.   And so I wanted to turn back to your
22 Declaration.  And in Paragraph 7 you describe the

Page 89

1  process in which you review files for -- or, files
2  for the administrative record.  Is that -- is that
3  accurate?
4    A.   Yes.
5    Q.   And you state that you personally review
6  approximately 100 appeal files for each board
7  meeting, correct?
8    A.   As I said, you know, earlier, it
9  fluctuates, you know, from board meeting to board
10 meeting.
11   Q.   And I think earlier you testified that it
12 can range somewhere from 80 to 100?
13   A.   On, yeah, on average.  Like I said, again,
14 it just depends on the -- on the board meeting.
15 They're -- you know, it goes -- it fluctuates.
16   Q.   But fair to say that --
17   A.   It's approximately this.
18   Q.   But fair to say that it's typical for you
19 to review somewhere from 80 to 100 appeal files for
20 each board meeting?
21   A.   Typical, yes.
22   Q.   And then you state that -- that it can --

Page 90

1  that it may take you up to an hour to review these
2  player files, correct?
3      MR. JACOB:  Object to the form.
4  Objection; misstates document.
5      THE WITNESS:  Again, it's just, it depends
6  on the case, on the complexity of the case and -- or
7  the volume of the documents that are provided, on how
8  long it takes each case to -- to review.
9      (Telephone interruption.)
10     MS. FIDLER:  A lot of phone calls.  Thank
11 you.  Sorry for the interruption.
12 BY MS. FIDLER:
13   Q.   So similarly to when you testified
14 earlier that you take notes while reviewing the
15 administrative records, do you ever log your review
16 time or document how long you spent on a file?
17   A.   No, I don't log time.  I just take
18 whatever time I need.
19   Q.   Do you keep track of the time you spend on
20 your advisory duties in any way?
21   A.   No, I don't.
22   Q.   And so the hour or so that you take to

Page 91

1  review the administrative files, that covers the
2  review of the medical records that are submitted by
3  the player, the neutral physician reports, committee
4  decisions, correspondence, applications, transaction
5  histories, and any other documents that may happen to
6  be in the Meetings Website.
7      Is that accurate?
8      MR. JACOB:  Objection; misstates
9  testimony.  Object to the form.
10     THE WITNESS:  So for each appeal, I will
11 go into the record that's provided and review all of
12 the documents that are listed there.  So whatever is
13 up there.  In -- you know, those -- those ones that
14 are listed are the, kind of, I guess you would say,
15 standard documents that every case would have.
16 BY MS. FIDLER:
17   Q.   And I think that you had testified earlier
18 when we were doing -- getting your background
19 information, that you said that you had worked
20 typically, you know, 37 and 1/2 hours a week; is that
21 right?
22   A.   That is what my time sheet says.

Page 92

1    Q.   And although you have duties with the
2  Players Association and your advisory duties, those
3  duties tend to pick up around the time surrounding
4  the board meetings.  That's what you testified to
5  earlier; is that right?
6    A.   Yeah.  The -- like I said, everything
7  fluctuates.  It depends on the flow of the work.  But
8  when it's board meeting time, when the cases are
9  posted and I'm working on cases, then I'm obviously
10 using more time on my advisor duties.
11   Q.   And has -- has your review process
12 ever changed?  As we talked about earlier, your
13 Declaration says that this has been the practice for
14 more than two decades.  But your time as serving as
15 an advisor, has the process in which you reviewed the
16 administrative record changed at all?
17     MR. JACOB:  Object to the form.
18     THE WITNESS:  I mean, what do you mean by,
19 has it changed?
20 BY MS. FIDLER:
21   Q.   I mean, from -- from the first time that
22 you reviewed an administrative record when you

Page 93

1  were -- first became a party advisor till perhaps the
2  board meeting that you're going to have in May, have
3  you made any significant changes to the process in
4  which you review files for the board?
5    A.   The -- I mean, the process, you know, is
6  our thorough process.  It's to -- as it's, you know,
7  outlined in the Declaration.  I pull all the
8  information, go through each of the documents.
9  That's a standard -- a standard process.
10   Q.   And that's been the standard --
11   A.   That was how I was trained.
12   Q.   So, yeah, okay.  So that's been the
13 standard process for roughly two decades.
14      And that -- that would be similar to how
15 the party -- or for the advisor for the Management
16 Council also does their review; is that accurate?
17   A.   I can't speak to what the Management
18 Council does.
19   Q.   Fair enough.
20      And so I'd like to put into some context
21 of -- the amount of time spent reviewing the records
22 compared to the volume of it.  You're aware that the

Page 94
1 administrative record for Mr. Loper in this case was
2 649 pages. So if you review that in one hour, that
3 means you've dedicated about five and a half seconds
4 per page. Is that accurate?
5     MR. JACOB: Objection; misstates
6 testimony. Object to the form.
7 BY MS. FIDLER:
8   Q.  You could answer.
9   A.  So I don't have a specific recollection of
10 the case you referenced, so I can't state that I'm
11 aware of how many pages were in that record because I
12 don't -- I don't -- you know, I wouldn't recall that.
13     I go through, you know, each of the
14 documents that are presented on the record. There
15 are documents that require more time; there are
16 documents that require less time. So I couldn't tell
17 you how much time was spent on any one individual
18 document.
19     My process is to go through each -- each
20 document to, you know, get the information that's
21 needed from each document, to apply Plan terms, and
22 come up with a recommendation for my board to

Page 95
1 discuss.
2   Q.  And I'll represent to you that
3 Mr. Olawale's record that was produced by counsel in
4 this matter was 701 pages. So reviewing that in
5 little -- in an hour would dedicate a little over
6 4 pages -- or a little over 4 seconds per page.
7     Does the math sound right on that?
8   A.  I'm not a mathematician, so if you've done
9 the math. I will say that -- I will say that there
10 is no set time per page that I, you know, would
11 track. I take the time I need on each case to review
12 the documents, to review all of the documents, to
13 pull out the information that's needed so that I can,
14 you know, formulate an informed recommendation.
15     So I couldn't -- I couldn't speak to how
16 much time per page or reduce it down to dividing the
17 number of pages by the time. You know, I don't have
18 a set amount of time per claim that I -- that I work
19 on, so, you know ...
20   Q.  And then I'll represent to you that
21 Mr. Sims' record in this case was 902 pages. So that
22 would reflect a little -- a little under 4 seconds

Page 96
1 per page. And while you represented that you do not
2 have a set amount of time that you spend reviewing
3 the record, your Declaration makes clear that you --
4 that you may take up to an hour to review these
5 administrative records.
6     So I think it's -- is it fair to say that
7 that one hour is the benchmark of the time that you
8 dedicate to reviewing administrative records?
9     MR. JACOB: Object to the form.
10     And, Counsel, you have misrepresented this
11 document multiple times now. It reads "up to or over
12 an hour."
13     So if you're going to misquote the
14 document to the witness, then we might need to have
15 an out of -- out-of-the-room conversation. I'm going
16 to --
17     MS. FIDLER: Well, I --
18     MR. JACOB: -- I'm going to assume that
19 was unintentional.
20     MS. FIDLER: I would appreciate to have an
21 out-of-the-room conversation because I was not -- I
22 was hoping you were not going to testify for the

Page 97
1 witness today.
2 BY MS. FIDLER:
3   Q.  So what I'm asking is if the one hour is
4 the -- is a benchmark of the amount of time that you
5 spend reviewing the administrative records in this
6 case?
7     MR. JACOB: Object to the form.
8     THE WITNESS: Again, I -- as I stated, I
9 don't have a benchmark time frame for each case. I
10 review the cases, I review the full record for each
11 case, and I review it in however much time that
12 takes.
13     There isn't a standard amount of time per
14 page or per case or per record. I review what's
15 in -- you know, what's in the record.
16 BY MS. FIDLER:
17   Q.  If you don't have a benchmark, what
18 compelled you to include the one-hour reference in
19 your Declaration?
20     MR. JACOB: Object to the form.
21     THE WITNESS: To give some context of what
22 could be.

25 (Pages 94 - 97)

| Page 150 | Page 152 |
|---|---|
| 1  A.  Again, I don't, like I can't speak for --<br>2 in one way or another on that because I don't recall<br>3 our specific discussions.  I can tell you that they<br>4 general -- you know, they will ask questions, they<br>5 will challenge, they will want further discussion<br>6 often.<br>7  Q.  So the answer is "no"; fair?<br>8      MR. JACOB:  Object to the form.<br>9 BY MS. FIDLER:<br>10  Q.  You can answer.<br>11  A.  The what -- your question is?<br>12  Q.  I said, so the answer is "no"; is that<br>13 fair?<br>14      MR. JACOB:  Same objection.<br>15      THE WITNESS:  You know, I would continue<br>16 to say that my answer is, I cannot say what, you<br>17 know, specific discussions I've had with trustees.  I<br>18 don't recall any of the specifics.<br>19 BY MS. FIDLER:<br>20  Q.  Ms. Williams, I'd like to just kind of<br>21 take a step back and talk about how you apply the<br>22 terms of the Plan. | 1 the Plan text?<br>2  A.  The Plan document is the main -- is the<br>3 main one.  Maybe the manual, the doctor's manual.<br>4  Q.  Do you ever consult with the Neutral<br>5 Physician Orientation Manuals we've discussed?<br>6  A.  I may check in there.  I don't use those<br>7 often.  It's the Plan document that has the Plan<br>8 terms, so that's where I would get the -- if I need<br>9 to consult the Plan document for any Plan term<br>10 question, I would go to the Plan document.<br>11  Q.  What about internal guidance memos, does<br>12 the PA's office maintain an internal guidance memo<br>13 for you to look at while you're applying the Plan<br>14 provision?<br>15  A.  I don't have any formal memo.  You know,<br>16 my training has been on the job through the years.<br>17 It wasn't in consulting our memos.  The Plan -- the<br>18 Plan documents, those are the Plan rules, so that's<br>19 the main source of if I need -- you know, if I need<br>20 anything about a Plan provision, I will go to the<br>21 Plan.<br>22  Q.  When you have questions about Plan |
| Page 151 | Page 153 |
| 1      In your Declaration on -- in paragraph --<br>2 identify what paragraph -- you discuss that you<br>3 consult the applicable Plan provisions.<br>4      Is that accurate?<br>5  A.  Where are you in the document?  I'm sorry.<br>6  Q.  Paragraph 6.  About three-quarters of the<br>7 way down you say, "I also consult the applicable Plan<br>8 documents when needed as I perform my review to<br>9 assess whether a player's application satisfies the<br>10 Plan criteria for approval."<br>11      Do you see that?<br>12  A.  Yes.<br>13  Q.  When you say "Plan documents," are you<br>14 referring to the document that we looked at earlier,<br>15 like Exhibit 7?<br>16  A.  Was Exhibit 7 the Plan document?<br>17  Q.  I believe so --<br>18  A.  Yes.<br>19  Q.  -- yes.<br>20  A.  So I would consult  -- I can consult that<br>21 Plan document, yes.<br>22  Q.  Are you referring to any other sources in | 1 interpretations, who do you speak to?<br>2  A.  About interpreting the Plan document?<br>3  Q.  Yeah, do you do it -- do you just<br>4 interpret the Plan in your -- by yourself in your own<br>5 review, or who do you reach out to for questions?<br>6  A.  If I have any questions on Plan terms, I<br>7 can -- I can reach out to Plan counsel and ask for<br>8 their input; but generally, the -- I use the Plan<br>9 document.  If we have question -- if there are<br>10 questions that come up that go to Plan counsel, it<br>11 gets -- it goes to both Patrick and I.<br>12  Q.  And earlier we were -- we talked about,<br>13 this morning, about certain training that you had<br>14 been a part of with doctors.  If you had any -- a<br>15 question about neuropsychological issues, would you<br>16 go talk to the same doctors -- strike that.<br>17      Earlier this morning we talked about<br>18 training that you had done with certain doctors.  I<br>19 think we had talked about Dr. Garmoe and another<br>20 doctor who you did training on the LOD point systems,<br>21 correct?  If -- and we also had talked about some, I<br>22 think what you had termed as technical medical terms. |

Page 154

1      Do you recall that?
2   A. Yes.
3   Q. If you had questions about those technical
4 medical terms, would you go speak to the same doctors
5 if you had questions on that?
6   A. If I'm reviewing a case and I have any
7 questions about the clarity of the physician's
8 report, I would ask Sam to reach out to the doctor
9 and get clarification. I don't speak to the neutral
10 physicians.
11  Q. So it would be -- it would be Sam reaching
12 out on your behalf?
13  A. Correct.
14  Q. Have you ever done that?
15  A. We -- we may do that in the course of
16 evaluating or going through the cases. There may be
17 questions about a -- about a report or I just want
18 more clarity, something's not all the way clear, it's
19 to the point where I can make, you know, an adequate
20 review, I will ask, in those instances we -- we can
21 get Sam to go back -- Sam Vincent to go back to the
22 doctors, get them to clarify that. And then that,

Page 155

1 that communication, would become part of the record.
2   Q. And when Sam Vincent reaches out to the
3 doctors, does he do that by email?
4   A. Typically it's by email, and then, again,
5 as I said, it goes into the -- the record.
6   Q. And when you would ask Sam Vincent for you
7 to connect with a doctor that you needed -- that you
8 had a question with, you would do that over email as
9 well, correct?
10  A. It would either be email or it would be
11 during the meeting that we go over all of the cases.
12 And if we have questions that come up during that
13 meeting, Sam is in there observing, so we can ask
14 him, "We need you to go get clarification on, you
15 know, this point." And then Sam will reach out to
16 the doctor from there and get the clarification and
17 put it back in the record.
18  Q. So the meetings that you're talking about
19 are the meetings that you have with Patrick --
20  A. Patrick.
21  Q. -- Reynolds, the pre-pre-meetings --
22  A. Correct.

Page 156

1   Q. -- if you will?
2      Okay. And so Sam Vincent is in attendance
3 in those meetings, and if you guys had a question
4 regarding some type of test results on, like on the
5 battery that we looked at earlier, Sam would reach
6 out to the doctor via email, and then relay that
7 information back to you and Mr. Reynolds in the
8 meeting? Is that accurate? Is that what you just
9 described?
10     MR. JACOB: Object to the form.
11     THE WITNESS: No. If we -- if we have any
12 questions on the neutral's medical report, if we need
13 clarification in any way, then we will ask Sam to
14 contact the doctor, get the clarification, and then
15 he will present that back as part of the record. It
16 doesn't happen during that meeting.
17 BY MS. FIDLER:
18  Q. Do you know if Mr. Vincent ever has these
19 conversations with the doctors over the phone, or is
20 it strictly to email?
21  A. You'd probably have to ask Sam his
22 process. What comes back into the record usually is

Page 157

1 an email or a response from a doctor.
2   Q. So we just have talked about you reaching
3 out to Groom Law if you have questions about Plan
4 interpretations and then also reaching out to doctors
5 if you have questions about medical terms, correct?
6   A. If I have questions about any of the
7 medical reports, then I have Sam reach out to the
8 doctor to get a clarification. I don't reach out to
9 doctors personally.
10  Q. Yes, yes.
11     And that, that is something you do,
12 whether it's reaching out to Groom Law or having Sam
13 reach out to the doctors, that is -- it's done on a
14 case-by-case basis, correct?
15     MR. JACOB: Object to the form.
16     THE WITNESS: It depends on the case, on
17 the facts of the case, and on the -- the report that
18 we're provided.
19 BY MS. FIDLER:
20  Q. Right.
21     And that's a case-by-case --
22  A. Yes.

|  |  |
|---|---|
| Page 158 | Page 160 |
| 1  Q.  -- basis. Okay. | 1  they typically would say, in the past, this. |
| 2      And the reason why that has to be done is | 2  Q.  But Groom Law doesn't track how the Plan's |
| 3  that there is not any type of internal guidance or | 3  been interpreted in the past, does it? |
| 4  memos to know how plans have been interpreted | 4  A.  I don't have a sense on what Groom is |
| 5  historically in the past; is that correct? | 5  tracking. That -- You know, that would be a question |
| 6      MR. JACOB: Object to the form. | 6  for Groom. |
| 7  Objection; misstates testimony. | 7      As I said, my process is, if I have a |
| 8      THE WITNESS: So if I have questions on a | 8  question, I know that I can go to Plan counsel for |
| 9  medical report, there is no -- it would be going back | 9  input on that. |
| 10 to the neutral to get the clarification. That's the | 10 Q.  Right. And so -- |
| 11 internal guidance that I have is that, if you have a | 11 A.  And Management Council does too. |
| 12 question, you need clarity, or the report isn't -- | 12 Q.  Sorry, I didn't mean to cut you off. I'm |
| 13 doesn't have what you need in order to -- to do an | 13 sorry. |
| 14 informed recommendation, then get the clarification | 14 A.  I said -- oh, I just said, and that's the |
| 15 from the -- from the neutral if needed. So that | 15 same with Management Council; they -- they'll |
| 16 would be what we do. I would ask that -- you know, | 16 regularly ask questions too, or Patrick will. |
| 17 we would go back to the doctor to get the | 17 Q.  Right. |
| 18 clarification. We'd have Sam do that. | 18     And so when you testified "they will give |
| 19     If I have questions on any Plan terms, | 19 us a historical reference" -- |
| 20 it's usually just to double-check my knowledge. If | 20 A.  If they have it. |
| 21 we have questions on the Plan terms, then we can | 21 Q.  If they have it. |
| 22 reach out to our Plan counsel to get -- to get some | 22     But you don't know one way or another |
| Page 159 | Page 161 |
| 1  input on that. | 1  whether they have it; fair? |
| 2  BY MS. FIDLER: | 2  A.  Again, I'm not -- I'm not privy to what |
| 3  Q.  Right. And the reason why you have | 3  their -- you know, the -- everyone has the Plan |
| 4  to reach out to Plan counsel is -- for Plan | 4  document. We're all basing on that. Groom has been |
| 5  interpretations is because you don't have a -- a | 5  Plan counsel for several years, so they -- if they |
| 6  guidance memo or a repository or an index that shows | 6  have anything that's relevant, they will -- they will |
| 7  how those terms have been applied historically, or | 7  inform us of that. |
| 8  else presumably you would reference that, correct? | 8  Q.  And then, earlier you talked about that |
| 9      MR. JACOB: Object to the form. | 9  you had -- that you would reference the manual |
| 10 Objection; misstates testimony. | 10 sometimes, correct? But primarily the Plan document |
| 11     THE WITNESS: I reach out to Plan counsel | 11 was your -- |
| 12 because that's -- that -- again, that is our internal | 12 A.  Primarily the Plan -- |
| 13 guidance. If we need -- if we have questions on Plan | 13 Q.  -- But at occasion you would reference the |
| 14 interpretation, then we can talk that -- you know, we | 14 Neutral Physician Orientation Manuals, correct? |
| 15 have that resource to use. They will keep a -- you | 15 A.  That's a document that I can -- that I |
| 16 know, they will -- they will give us historical | 16 have as a resource. As I said, I don't -- I can't |
| 17 reference, if there is any. | 17 speak to specifics, which case I reference, what -- |
| 18 BY MS. FIDLER: | 18 if I referenced anything. That's out there. Those |
| 19 Q.  How do you know they're giving you | 19 are both documents out there that I can use if I have |
| 20 historical reference? | 20 any -- if I need any clarification or if I need to |
| 21 A.  If we -- if I have a question and that | 21 check something. |
| 22 question had a historical reference, they would -- | 22 Q.  If the manuals were inconsistent with Plan |

Page 162

 1  terms, would you prioritize what it says in the Plan
 2  over the manual?
 3     A.   The Plan -- the Plan document is the
 4  governing document.  So, you know, like I said, I'm
 5  checking the document primarily.
 6     Q.   So we -- we just talked about also
 7  reaching out to Groom Law for certain Plan
 8  interpretations if you need it.  And fair to say that
 9  you don't maintain your own, like, notes or records
10  of how Plans have been determined historically in the
11  past, correct?
12          MR. JACOB:  Object to the form.
13          THE WITNESS:  I haven't -- I don't keep a
14  log of all of the cases that have come up or all the
15  questions that I have -- that I've had.  Like I said,
16  it's only -- it comes up if I have questions, and
17  I -- we get input from -- from Groom.
18  BY MS. FIDLER:
19     Q.   And when you were doing your on-the-job
20  training, the -- your predecessors also did not
21  maintain such a log, right?
22          MR. JACOB:  Object to the form; calls for

Page 163

 1  speculation.
 2          THE WITNESS:  I don't -- you know,
 3  I don't have a record of what my predecessors kept,
 4  as far as their records, or what records they kept.
 5  BY MS. FIDLER:
 6     Q.   Well, if they had such a record, you think
 7  they would have told you about it?
 8          MR. JACOB:  Object to the form; calls for
 9  speculation.
10          THE WITNESS:  Again, I don't know what
11  they would have -- what -- what they have.
12  BY MS. FIDLER:
13     Q.   So in sum, if you have Plan questions, you
14  reach out to Groom Law.  The Benefits -- or, excuse
15  me, the Players Association does not maintain a
16  repository of prior interpretations.  You don't
17  maintain a log of prior interpretations.  So there
18  are no administrative processes to ensure that the
19  Plan provisions are applied consistently either by
20  the advisor -- by the advisors, correct?
21          MR. JACOB:  Object to the form; misstates
22  testimony.

Page 164

 1          THE WITNESS:  I got lost of what am I
 2  answering here?
 3  BY MS. FIDLER:
 4     Q.   Yes, no problem.  So I'll just ask you a
 5  series of questions.
 6          You testified that if you have a question
 7  about a Plan interpretation, you reach out by email
 8  to Groom; yes?
 9     A.   I said that if I have -- if I have
10  questions and I need -- and I need Groom, then I will
11  reach out to Groom.
12     Q.   Yes.
13          And that is because that they're -- the
14  Benefits Office does not maintain a repository of
15  prior interpretations that you can go look at in your
16  course of employment; you do not maintain a log of
17  prior interpretations that you can go look at while
18  you're applying Plan provisions; and outside of
19  case-by-case emails to Groom Law, there are no
20  administrative processes in place to look at prior
21  interpretations.  Is that correct?
22          MR. JACOB:  Object to the form; misstates

Page 165

 1  testimony.
 2          THE WITNESS:  I reach out to Groom.  That
 3  that's the -- you know, that's one of the tools that
 4  I have when I'm doing my review if I have questions
 5  about the Plan, I can reach out to Groom.
 6  BY MS. FIDLER:
 7     Q.   Yes.  So the answer to my question was
 8  yes, correct?  That the only process to -- to get
 9  information about Plan interpretations is by emailing
10  Groom on a case-by-case basis, correct?
11          MR. JACOB:  Object to the form; misstates
12  testimony.
13          THE WITNESS:  That's not what I said.  So
14  I can reach out to Groom and ask for input if I need
15  it.  Yes, it would be a case-by-case basis because
16  each case is individual.
17          But I -- you know, that is the -- that is
18  the piece of my process is that, if I need any input
19  from Plan counsel, that I can reach out to Plan
20  counsel and get that.
21  BY MS. FIDLER:
22     Q.   Right.  And you have to do that because

42 (Pages 162 - 165)

Page 166

1  there is no other resource, correct?
2      MR. JACOB: Object to the form; misstates
3  testimony.
4      THE WITNESS: If I reach out to Plan
5  counsel for, you know, any input or clarification,
6  I'm doing so because I am ensuring that my review
7  is thorough and complete. I'm gathering all the
8  information.
9      So that's -- that's that -- that's a piece
10 of it is, if I need any -- if I need any input from
11 Plan counsel or if I need -- if I need to ask any
12 questions, that I can do that.
13     MS. FIDLER: Go off the record for a
14 second.
15     THE VIDEOGRAPHER: Off the record at 2:10.
16     (Recess taken.)
17     THE VIDEOGRAPHER: Back on the record at
18 2:27.
19 BY MS. FIDLER:
20  Q.  Welcome back, Mrs. Williams.
21     Earlier we discussed the spreadsheet where
22 you take notes regarding your review of the

Page 167

1  administrative record, note any differences that you
2  and Patrick Reynolds may have, and that is also used
3  to make your recommendations to the board, correct?
4   A.  Yes, we discussed that.
5   Q.  Have you ever transmitted that spreadsheet
6  to either Patrick Reynolds or to a trustee via email?
7   A.  To either Patrick or one of -- or my
8  trustees --
9   Q.  Yes.
10  A.  -- or their trustees?
11  Q.  Either.
12  A.  Because you were using Patrick. I didn't
13 know if you were talking about their side.
14     So I -- you know, that is really just
15 to inform our discussions. I don't share the
16 spreadsheet with Patrick. I will send it to my
17 trustees, you know, to guide our discussion during --
18 during our pre-meeting. So I will either email it to
19 them or I print it out and I deliver it to them in
20 the meeting.
21  Q.  And very early in the deposition we
22 talked about how you have a CEBS certification,

Page 168

1  correct?
2   A.  Yes.
3   Q.  And that provides that you are
4  knowledgeable in the requirements of ERISA?
5   A.  The CEBS?
6   Q.  Yes.
7   A.  It's a -- it's a benefits certification,
8  like a designation.
9   Q.  And you understand that in -- ERISA
10 requires that the plan provide all documentation to
11 plan participants that are relevant to their benefit
12 determination, correct?
13     MR. JACOB: Object to the form.
14 Objection; calls for a legal conclusion.
15     You can answer the question.
16     THE WITNESS: Okay. So in my general
17 understanding, not answering the legal question on
18 that, it's my understanding that participants have a
19 right to the documentations that underlie their
20 decisions.
21 BY MS. FIDLER:
22  Q.  And that includes all documents that were

Page 169

1  submitted, considered, or generated in the course of
2  the benefit determination, as well as documents that
3  demonstrate compliance with the administrative
4  process and safeguards?
5      MR. JACOB: Object to the form.
6  Objection; calls for a legal conclusion.
7      You can answer the question.
8      THE WITNESS: Okay. I just have the
9  general understanding that participants are -- are
10 entitled to certain documentation. That -- and the
11 provision of that is left up to Plan counsel and the
12 Plan office.
13     (Exhibit 10 marked.)
14 BY MS. FIDLER:
15  Q.  I'm going to hand you what's been marked
16 as Exhibit 10 -- 10 to your deposition.
17     Do you recognize this document?
18  A.  This is not one of my regular documents.
19 I have to read through it.
20  Q.  Would you like to take the time to read
21 over it? We can go off the record, if you would
22 like.

43 (Pages 166 - 169)