# EXHIBIT 23

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              FOR THE NORTHERN DISTRICT OF TEXAS
 3                        DALLAS DIVISION
 4
 5   MICHAEL CLOUD,              )
                                 )
 6       Plaintiff,              )
                                 )      CIVIL ACTION
 7   VS.                         )      No. 3:20-CV-01277-E
                                 )
 8   THE BERT BELL/PETE ROZELLE  )
     NFL PLAYER RETIREMENT PLAN, )
 9                               )
         Defendant.              )
10
11            ORAL AND VIDEOTAPED DEPOSITION OF
12                         DICK CASS
13                     OCTOBER 28, 2021
14
15            ORAL AND VIDEOTAPED DEPOSITION of
16   DICK CASS, produced as a witness at the instance of the
17   Plaintiff, and duly sworn, was taken in the
18   above-styled and -numbered cause on the 28th of
19   October, 2021, from 8:56 a.m. to 4:35 p.m., before
20   Therese J. Casterline, CSR in and for the State of
21   Texas, reported by machine shorthand, at the offices of
22   Munsch Hardt Kopf & Harr, PC, 500 North Akard Street,
23   Suite 3800, in the City of Dallas, County of Dallas
24   State of Texas, pursuant to the Federal Rules of Civil
25   Procedure and the provisions stated on the record.
```

Page 1

**Page 42**

1 Exhibit 6 inadvertently has CLOUD-AR-521 through 523
2 missing?
3     A.  Uh-huh.
4     Q.  As we go forward throughout the day referring
5 to the board's November 23rd, 2016, letter, are you
6 comfortable referring to Exhibit 6, or would you prefer
7 we mark the entire document?
8     A.  I'm very comfortable using Exhibit 6.
9         MR. DENNIE:  Okay.  Can we go off the
10 record for one second?
11        THE VIDEOGRAPHER:  We are off the record.
12 The time is 9:40 a m.
13        (Recess 9:40-9:41 a.m.)
14        THE VIDEOGRAPHER:  We are back on the
15 record.  The time is 9:41 a m.
16    Q.  Okay.  We took a very short break.
17    A.  Yes.
18    Q.  Do you understand you're still under oath?
19    A.  I do.
20    Q.  Looking at Deposition Exhibit 6 -- let me know
21 when you're there.
22    A.  I'm there.
23    Q.  Okay.  Did you review Deposition Exhibit 6
24 before it was sent to Mr. Cloud?
25    A.  I did not.

**Page 43**

1    Q.  Did you provide any input on Deposition
2 Exhibit 6 before it was sent to Mr. Cloud?
3    A.  No.  Only in the sense that this is a type of
4 template we use in all of our decisions.  The only
5 thing that's unique in any letter such as this would be
6 the very -- one -- basically, a couple of paragraphs on
7 the reason for the decision.
8        Everything else is pretty much a template
9 that was used, depending on whether it was a total and
10 permanent disability case or a line-of-duty disability
11 case.
12        And so there's a formula to it.  Part of
13 the provisions here relate to ERISA requirements like
14 the appeal rights.  Another ERISA provision is you need
15 to put in the provisions of the plan you relied upon in
16 your decision.
17        The first paragraph always states what the
18 decision of the board was.  And it became the practice
19 of the board, just generally, I believe, to attach the
20 relevant plan provisions to the letter but also to
21 discuss the plan provisions in the letter.
22        So, no, but -- I did not -- did not review
23 this letter, but I knew what it was going to say
24 because it was the basis for our decision.
25    Q.  And my question was a tad bit different.  So

**Page 44**

1 I'm just going to maybe ask it a little bit different
2 way.
3        Did you, yourself, provide any specific
4 input for the letter marked as Deposition Exhibit 6?
5    A.  Only indirectly in the sense that our
6 practice -- I was part of determining how the practice
7 would be done.
8        We are under -- we have to get these --
9 these decisions out in a timely manner in accordance
10 with ERISA, and so it was -- we were under a lot of
11 pressure to get the letters out quickly.
12        So we developed the system of a
13 template-type decision where the lawyers would draft
14 the letter, send it to the plan office, the plan office
15 would review it and then send it out.
16    Q.  Okay.  And when you say the lawyers drafted
17 the letter, do you know who drafted Deposition
18 Exhibit 6?
19    A.  I assume the Groom law firm did.  I assume
20 Alvaro did, Alvaro Anillo.
21        THE WITNESS:  Am I pronouncing Alvaro's
22 name correctly?
23        MR. MEEHAN:  Yes.
24        THE WITNESS:  Thank you.
25    Q.  Okay.  So I just want to make sure I'm

**Page 45**

1 following up and make sure I'm understanding you.
2        Ultimately, a decision is reached by the
3 board.  Mr. Anillo from the Groom firm will draft that
4 letter --
5    A.  Yes.
6    Q.  -- and then provide it to the plan office to
7 be submitted to the athlete; is that correct?
8    A.  That's correct.  We had authorized Alvaro and
9 the Groom law firm to draft these letters.  We
10 delegated that responsibility to him.  He performed
11 that responsibility in accordance with the templates
12 that had been developed over many years by the
13 retirement board.
14    Q.  Okay.  As we sit here today, you don't recall
15 making any changes to the letter marked as Deposition
16 Exhibit 6; is that correct?
17    A.  That is correct.
18    Q.  So I take it my -- some of these questions in
19 Deposition Exhibit 23 are pertaining specifically to
20 whether there was an exchange of emails or some other
21 correspondence where you reviewed Deposition Exhibit 6
22 prior to it being sent to Mr. Cloud.
23        I take it from your responses the answer
24 would be there are no such emails, correct?
25    A.  There are no such emails.

12 (Pages 42 - 45)

```
 1  that's communicated to a player?
 2      A.  Well, it's -- you know, back then, my
 3  understanding was a letter would be drafted and signed
 4  and sent out immediately with some type of return
 5  receipt so that we could verify when -- that it was
 6  received.
 7      Q.  And if I understood correctly earlier -- so
 8  correct me if I'm wrong -- that letter is drafted by
 9  someone at the Groom firm, signed by someone at the
10  plan office, and sent without the board reviewing it,
11  correct?
12      A.  I believe the letters and the board's
13  decisions are drafted by -- you're correct -- by
14  someone at the zoom -- the Groom law firm, sent to the
15  plan office.  Mike Miller reviews it.  He's the
16  director of the plan office.
17          And if it's all in order, he will send it
18  out.  And it does not and did not get reviewed by board
19  members before it was sent.  Again, as I think I said
20  this morning, we have -- we delegated to the Groom law
21  firm the task of drafting letters, sending it out based
22  on the decision we had made at the board and based on
23  the fact that they were basically following a template
24  that we had seen many times before.
25      Q.  How do you make sure a decision doesn't
                                                   Page 166
```

```
 1  contain an error?
 2      A.  Well, there are some things you just have to
 3  trust your lawyers to get right, and I -- you know,
 4  they've been doing this for years and years and years.
 5  And, you know, I don't recall a situation where someone
 6  complained that the letter that was sent to them was
 7  inconsistent with the decision made by the board.
 8      Q.  How would someone know what the decision made
 9  by the board would be if it's outside of what the
10  letter says?
11      A.  Well, they would know if they -- if they sued
12  us.  So, if someone went to court, they would find out,
13  as you have done, you know, what's -- what's in the
14  board decision and what's in the letter.
15      Q.  What do you understand the meaning of a
16  de novo review to be, if at all?
17      A.  Depends on the context.
18      Q.  As it pertains to disability decisions, what
19  is your understanding of a de novo review to be?
20      A.  What we did here, where we look at the --
21  what's in the administrative record and render a
22  decision based on what's in the administrative record
23  and what our advisers are -- are helping us understand
24  about the record.
25          The -- you know, we had all these lawyers
                                                   Page 167
```

```
 1  telling us how to -- that we had to comply with ERISA,
 2  and they helped us make sure that we were complying
 3  with ERISA.  So I'm comfortable we did comply with
 4  ERISA requirements.
 5      Q.  What -- what did they advise you as it
 6  pertains to Mr. Cloud's case?
 7      A.  I don't remember anything specific about what
 8  they advised us.
 9      Q.  Do you remember --
10      A.  I mean -- I mean, we had a specific -- as you
11  well know, we had a specific interpretation of the --
12  of the reclassification section, but I don't remember
13  that it came up in particular in Mr. Cloud's case
14  because that interpretation had been in effect for as
15  long as I was on the board.
16      Q.  Say -- what -- what provision one more time?
17      A.  It's the -- the reclassification provision.
18      Q.  Right.  I think you said that was 5.7(b)
19  earlier.
20      A.  Yes.
21      Q.  Is that what you're talking about?
22      A.  Yes.  The Changed Circumstances section of
23  that -- provision in that section.
24      Q.  Did you come up with the definition of changed
25  circumstances?
                                                   Page 168
```

```
 1      A.  No.  That had been determined before I was on
 2  the board.
 3      Q.  Do you know who came up with that?
 4      A.  I think the lawyers came up with it,
 5  recommended it to the board -- the then-board, and the
 6  board approved it.
 7          But I don't know who -- which lawyers
 8  recommended it and who the board members were at the
 9  time.  But when I came on the board, that was already
10  the accepted -- the accepted definition of changed
11  circumstances.
12      Q.  You would agree changed circumstances is not
13  defined in the plan, correct?
14      A.  It's not -- there -- there's not a
15  definition -- the Definitions section, there is not a
16  definition of that term.  That is correct.
17      Q.  Outside of the Definitions section, is there
18  any definition of changed circumstance --
19      A.  Well, there is --
20      Q.  -- in Exhibit 1?
21      A.  There is in the -- in the practices of the --
22  of the board and an interpretation of the board, and we
23  recite that in every letter we send out.
24      Q.  And I understand.
25          MR. DENNIE:  Object as nonresponsive.
                                                   Page 169
```