**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| JASON ALFORD *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-00358-JRR |
| THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN *et al.*, | |
| Defendants. | |

**DEFENDANTS' COMBINED SURREPLY IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND OPPOSITION TO PLAINTIFFS'
MOTION TO EXCLUDE THE TESTIMONY OF DR. DAVID LASATER**

**TABLE OF CONTENTS**

Page

INTRODUCTION ..................................................................................................... 1

ARGUMENT ........................................................................................................... 4

I.    PLAINTIFFS' NEW EVIDENCE SHOWS THAT THEIR CLAIMS
CANNOT BE RESOLVED BY COMMON PROOF ........................................... 4

    A.    A "Panoply" Of Disparate Practices With No Classwide Impact
Cannot Be Used To Establish Commonality Or Typicality Under
Rule 23 .................................................................................................. 6

        1.    Courts have uniformly refused to certify proposed classes
challenging disparate practices with no classwide impact
and no common injury .............................................................. 6

        2.    Rule 23 and Article III both require that all class members
be impacted and harmed by the specific policies, practices,
or decisions they challenge ...................................................... 8

    B.    The Named Plaintiffs' Own Claims Illustrate That Plaintiffs'
Disparate Challenges Cannot Be Resolved By Common Proof On
A Classwide Basis ................................................................................ 10

II.    PLAINTIFFS' ALLEGATIONS OF NEUTRAL PHYSICIAN BIAS
CANNOT BE RESOLVED BY COMMON PROOF ........................................ 16

    A.    The Plan's Overall Claim Approval Rates Are Generous, And
Individual Neutral Physician Rates Of Finding Disability Are Not
Evidence Of Bias ................................................................................. 16

    B.    Alleged Neutral Physician Bias Cannot Be A Common Issue
Because Different Plaintiffs Were Examined By Different Neutral
Physicians ............................................................................................ 19

III.    DR. LASATER'S OPINIONS ARE RELIABLE, RELEVANT, AND
WILL ASSIST THE COURT IN ASSESSING THE EVIDENCE ..................... 20

    A.    Dr. Lasater's Analysis Reliably Finds No Relationship Between
Assignments Of Neutral Physicians To Conduct Examinations And
Claim Denial Rates .............................................................................. 22

    B.    Plaintiffs Do Not Raise Any Material Questions About The
Reliability Of The V3 Data On Which Dr. Lasater Relied ..................... 25

    C.    Dr. Lasater's Analysis Of Physician Compensation Is Reliable ............. 26

CONCLUSION ....................................................................................................... 30

CERTIFICATE OF SERVICE ................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

## <u>CASES</u>

*1411 Div. St. LLC v. First Am. Title Ins. Co.*,
  2025 WL 904709 (D. Md. Mar. 25, 2025)..................................................................... 23

*Abromitis v. Cont'l Cas. Co./CNA Ins. Cos.*,
  114 F. App'x 57 (4th Cir. 2004) ........................................................................... 3, 18

*Adell Plastics, Inc. v. Mt. Hawley Ins. Co.*,
  2019 WL 2524916 (D. Md. June 19, 2019)................................................................. 25

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013).................................................................................................. 4

*Arndt v. City of Colo. Springs*,
  263 F. Supp. 3d 1071 (D. Colo. 2017)..................................................................... 21

*Avritt v. Reliastar Life Ins. Co.*,
  615 F.3d 1023 (8th Cir. 2010) ................................................................................... 9

*Bazemore v. Friday*,
  478 U.S. 385 (1986)................................................................................................. 23

*Boyd v. Coventry Health Care Inc.*,
  299 F.R.D. 451 (D. Md. 2014)................................................................................... 8

*Broussard v. Meinke Disc. Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) ............................................................................... 7, 12

*Burns v. Anderson*,
  123 F. App'x 543 (4th Cir. 2004) ............................................................................ 26

*Califano v. Yamasaki*,
  442 U.S. 682 (1979).................................................................................................. 6

*Clawson v. FedEx Ground Package Sys., Inc.*,
  451 F. Supp. 2d 731 (D. Md. 2006) .......................................................................... 1

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)................................................................................................ 4, 5

*Cordoba v. DIRECTV, LLC*,
  942 F.3d 1259 (11th Cir. 2019) .............................................................................. 10

*Culver v. City of Milwaukee*,
  277 F.3d 908 (7th Cir. 2002) .................................................................................... 7

*Cunningham v. Cornell Univ.*,
  2019 WL 275827 (S.D.N.Y. Jan. 22, 2019) .............................................................. 8

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*DaimlerChrysler Corp. v. Cuno*,
547 U.S. 332 (2006) ............................................................................................ 8

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .......................................................................................... 21

*Deiter v. Microsoft Corp.*,
436 F.3d 461 (4th Cir. 2006) ............................................................................ 12

*DL v. District of Columbia*,
713 F.3d 120 (D.C. Cir. 2013) ........................................................................... 7

*EQT Prod. Co. v. Adair*,
764 F.3d 347 (4th Cir. 2014) ............................................................................ 10

*Farmer v. Wexford Health Sources, Inc.*,
2017 WL 6388614 (D. Md. Dec. 13, 2017) ...................................................... 5

*G.T. v. Bd. of Educ. of Cnty. of Kanawha*,
117 F.4th 193 (4th Cir. 2024) .................................................................. 2, 7, 10

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ........................................................................................ 6, 8

*Glass v. Anne Arundel Cnty.*,
38 F. Supp. 3d 705 (D. Md. 2014) .................................................................... 23

*Heckman v. Ryder Truck Rental, Inc.*,
2014 WL 3405003 (D. Md. July 9, 2014) ................................................... 21, 23

*In re Polaroid ERISA Litig.*,
240 F.R.D. 65 (S.D.N.Y. 2006) ......................................................................... 8

*In re Under Armour Sec. Litig.*,
730 F. Supp. 3d 172 (D. Md. 2024) .................................................................. 20

*In re Zetia (Ezetimibe) Antitrust Litig.*,
7 F.4th 227 (4th Cir. 2021) ................................................................................ 5

*Lewis v. Casey*,
518 U.S. 343 (1996) ........................................................................................... 9

*Piotrowski v. Wells Fargo Bank, NA*,
2015 WL 4602591 (D. Md. July 29, 2015) ....................................................... 5

*Reichard v. United of Omaha Life Ins. Co.*,
805 F. App'x 111 (3d Cir. 2020) ...................................................................... 18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Romberio v. UnumProvident Corp.*,
    385 F. App'x 423 (6th Cir. 2009) ............................................................ 2, 7, 8, 16

*Soutter v. Equifax Info. Servs. LLV*,
    498 F. App'x 260 (4th Cir. 2012) ................................................................. 7, 12

*Synergetics, Inc. v. Hurst*,
    477 F.3d 949 (8th Cir.2007) ............................................................................ 26

*Thole v. U.S. Bank N.A.*,
    590 U.S. 538 (2020) .......................................................................................... 9

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ....................................................................................... 8, 9

*United States v. Crisp*,
    324 F.3d 261 (4th Cir. 2003) .......................................................................... 20

*United States v. Young*,
    916 F.3d 368 (4th Cir. 2019) .......................................................................... 20

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................... 6, 8, 10, 14

*Wit v. United Behav. Health*,
    79 F.4th 1068 (9th Cir. 2023) ......................................................................... 13

*Zahariev v. Hartford Life & Accident Ins. Co.*,
    2020 WL 12783951 (D.S.C. Aug. 11, 2020) ................................................. 18

## RULES

Fed. R. Civ. P. 23 ......................................................................................... 1, 4, 5

Fed. R. Civ. P. 23(a) .......................................................................................... 5

Fed. R. Civ. P. 23(b)(1) ................................................................................. 1, 5

Fed. R. Civ. P. 23(b)(2) ................................................................................. 1, 5

Fed. R. Evid. 702 ........................................................................................ 20, 30

# INTRODUCTION[1]

Plaintiffs filed their Motion without a single piece of evidence in support of class certification., save for law firm credentials intended to address adequacy of counsel.  In their Reply, Plaintiffs engaged in a classic sandbagging exercise, submitting two new expert disclosures and citing for the first time new evidence they contend supports commonality and typicality.[2]  The Court should disregard Plaintiffs' evidence for this reason alone.  *See, e.g.*, *Clawson v. FedEx Ground Package Sys., Inc*., 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule ... is that an argument raised for the first time in a reply brief or memorandum will not be considered.").

But even with this belated evidence, Plaintiffs cannot satisfy Rule 23's requirements.[3]  The evidentiary record merely confirms what Defendants' Opposition previously explained: each Plaintiff asserts disparate injuries arising from different alleged conduct requiring adjudication of different alleged facts specific to their individual benefit claims.  Plaintiffs' claims lack the commonality and typicality required for any form of certification under Rule 23(a), as well as the cohesion required for certification under Rule 23(b)(1) or (b)(2).

The 21 cases involving prior claims against the Plan that Defendants previously cited illustrate the impossibility of certification.  *See* ECF No. 156; ECF No. 163 at 95:4-17.  Each case was brought by a player who is encompassed by Plaintiffs' sweeping class definition.  ECF No. 102-1 at 1-2.  Each brought a benefit claim, just as Plaintiffs do in Count I.  And in each case, the court ruled for the Plan after conducting a fact-specific, individualized analysis.  Yet

---

[1] Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

[2] *See* ECF No. 173.

[3] The Court "for good cause shown" granted Defendants permission to "address class certification issues in Defendants' brief opposing Plaintiffs' Rule 702 motion."  ECF No. 195.

Plaintiffs cannot explain why, if their claims are truly "typical" of these claims that other courts have already considered and rejected, this Court should handle their claims any differently.

In their Reply, ████████████████████████████████████████████████ ████████████████████, *see* ECF No. 173 at 4, 11, ████████████████████ ████████████████████████████████████████████. First, ████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ECF No. 173 at 1, 10-11, 13. But Fourth Circuit law applying Rule 23 prohibits lumping together challenges to disparate policies that impacted some class members but not others. *See, e.g.*, *G.T. v. Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th 193, 206 (4th Cir. 2024) (challenges brought by a group of disabled students to "different practices at different stages" were not certifiable). None of the cases cited by Plaintiffs hold otherwise. This Court should follow the uniform and persuasive authority rejecting such class theories. *See infra* Section I.A; *Romberio v. UnumProvident Corp.*, 385 F. App'x 423, 424-31 (6th Cir. 2009) (proposed class seeking to challenge "a group of loosely-defined practices" of a disability plan could not be certified).

Second, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████ *See* ECF No. 173 at 2, 4-5, 14, 22-23. But Dr. Hayter's report gets Plaintiffs nowhere. ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ *See generally* ECF No. 172-5. ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████ *See generally id.* ████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ *See id.* at 149-60.  That is common proof of

nothing.  Different players were examined by different Neutral Physicians, and in any event

Fourth Circuit law is clear that there is no "correct" grant or denial rate and that such statistics

are therefore not a proper means of assessing bias.  *See Abromitis v. Cont'l Cas. Co./CNA Ins.*

*Cos.*, 114 F. App'x 57, 61 (4th Cir. 2004).  In addition, Dr. Hayter's purported statistics were not

calculated using any scientifically accepted statistical methodology, and they should accordingly

be excluded pursuant to Defendants' concurrently filed Rule 702 motion.  Because none of the

evidence that Plaintiffs identify could prove their claims on a classwide basis, the Court should

deny Plaintiffs' class certification motion.

The Court should also deny Plaintiffs' motion to exclude the opinions of Dr. David

Lasater.  Dr. Lasater applied well-established statistical methods to analyze data from V3, the

Plan's system of record.  He concluded—consistent with undisputed witness testimony about the

Plan's neutrality policies—that there is no statistical evidence that the Plan assigns a greater

number of examinations to Neutral Physicians who are associated with higher rates of claim

denials. ███████████████████████████████████████████

██████████████████████████████████████████, ECF

No. 173 at 24-26, █████████████████████████████, *id.* at 25, and ████

████████████████████████████████████, *id.* at 27-28.  But as explained

further in Section III below, Dr. Lasater provided a reasoned and well-supported basis for each

decision, none of which constitutes grounds to exclude his opinions.

## ARGUMENT

### I.    PLAINTIFFS' NEW EVIDENCE SHOWS THAT THEIR CLAIMS CANNOT BE RESOLVED BY COMMON PROOF

After failing to cite any evidence at all in support of commonality or typicality in their opening brief, Plaintiffs' entire evidentiary demonstration, ECF No. 173 at 16-24, now consists of six documents that pertain solely to the Neutral Physician field of neuropsychology,[4] one interrogatory response, a smattering of deposition testimony, and two new expert reports. The first expert report is from lawyer Joseph A. Garofolo (submitted with no explanation as to its relevance to the issues germane to class certification, ECF No. 173 at 19; *see* ECF No. 172-14[5]), and the other is the report from statistician Dr. Anthony Hayter (which Plaintiffs contend demonstrates a "skewing of the claims and appeals process," ECF No. 173 at 14, 22-23).

Perhaps recognizing that this anemic and late-tendered evidence only underscores that their claims cannot be tried with classwide proof, Plaintiffs first argue that they "are not required to muster evidence" showing that their request for class certification satisfies the various requirements of Rule 23. ECF No. 173 at 15. But as Defendants' Opposition explained, it is well established that Rule 23 "does not set forth a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013); *see* ECF No. 111 at 4-5. Plaintiffs are not required to prove the merits of their case at the class certification stage, ECF No. 173 at 16 n.27 (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013)), but it is black letter law that they

---

[4] These documents include ███████████████████████████████████ (ECF No. 172-11); ███████████████████████████████████ (ECF No. 172-10 at 147:6-148:20; *see* ECF No. 184-8); ███████████████████████████████████ (ECF No. 124-10 (2018) and ECF No. 172-12 (2021)); and ███████████████████████████ (ECF No. 172-13).

[5] In addition to Plaintiffs' failure to explain the relevance of Mr. Garofolo's opinions, they should also be excluded pursuant to Defendants' concurrently filed Rule 702 motion.

"must affirmatively demonstrate [their] compliance with [Rule 23], and must do so with evidentiary proof." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 234 (4th Cir. 2021). And the Supreme Court has explicitly recognized that the required evidence-based certification analysis often "overlap[s] with the merits." *Comcast*, 569 U.S. at 33-34.

Plaintiffs next argue that only Rule 23(b)(3) classes must satisfy this evidentiary requirement. ECF No. 173 at 15-16. That is wrong. The Supreme Court has made clear that, in addition to showing that all of the requirements of Rule 23(a) are met, plaintiffs "must also satisfy ***through evidentiary proof*** at least one of the provisions of Rule 23(b)." *Comcast*, 569 U.S. at 33. For this reason, courts in this district have denied requests for certification under 23(b)(1) and (b)(2) for failing to make this evidentiary showing. *See, e.g.*, *Piotrowski v. Wells Fargo Bank, NA*, 2015 WL 4602591, at *19 (D. Md. July 29, 2015); *Farmer v. Wexford Health Sources, Inc.*, 2017 WL 6388614, at *8 (D. Md. Dec. 13, 2017). Plaintiffs cite a single out-of-jurisdiction case as purported support, but it does not mention (b)(1) or (b)(2), much less contradict *Comcast*.

Finally, Plaintiffs assert, in the alternative, that their newly cited evidence demonstrates that the claims of the proposed class and subclasses can be resolved through common proof. ECF No. 173 at 16-24. It does not. As explained below, it is well established that Plaintiffs' attempt to aggregate challenges to different policies that impacted purported class members differently (or not at all) is improper under Rule 23. Indeed, examination of Plaintiffs' new evidence demonstrates it would not allow for common adjudication even of the claims of the nine remaining Named Plaintiffs, much less a class consisting of thousands of diverse claimants. Defendants' fully briefed motions for summary judgment on the claims of Named Plaintiffs Daniel Loper, Charles Sims, and Jamize Olawale illustrate the impossibility of using any of

Plaintiffs' new evidence to adjudicate their claims in common.  *See* ECF Nos. 115-1, 124-1, and 125-1.  Plaintiffs have simply provided no basis to certify a class in this case.

### A.    A "Panoply" Of Disparate Practices With No Classwide Impact Cannot Be Used To Establish Commonality Or Typicality Under Rule 23

In their Reply, 

ECF No. 173 at 11.

*Id.* at 4.

*Id.* at 10.  The Court should deny certification under this new theory, which flies in the face of Rule 23's bedrock requirements.

### 1.    *Courts have uniformly refused to certify proposed classes challenging disparate practices with no classwide impact and no common injury*

As Defendants' Opposition explained, Rule 23 "[c]ommonality requires the plaintiff to demonstrate that class members 'have suffered ***the same injury***.'"  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)); *see* ECF No. 111 at 8-10.  Thus, for class treatment to be appropriate, the issues involved must be "common to the class as a whole," and the case must "turn on questions of law applicable in the same manner ***to each member of the class***."  *Falcon*, 457 U.S. at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  Each purported class member's claim must be "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  *Dukes*, 564 U.S. at 350; *see also Broussard v. Meinke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 341 (4th

6

Cir. 1998) (class claims must be "readily susceptible to class-wide proof"). For this reason, courts deny class certification where, as here, purported class members' claims are "based on multiple, disparate failures to comply with" a challenged policy, "rather than a 'policy or practice which affects them all.'" *Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th at 206, 209 (quoting *DL v. District of Columbia*, 713 F.3d 120, 128 (D.C. Cir. 2013)) (denying certification of proposed class of disabled students whose "alleged harms involve different practices at different stages of the special education process" "stem[ming] from different alleged policy failures").[6]

Applying these same principles, the Sixth Circuit rejected certification of a putative class of long-term disability claimants nearly identical to the one Plaintiffs propose here. In *Romberio*, plaintiffs challenged a number of the alleged disability claim adjudication policies of the long-term disability carrier Unum (including, *inter alia*, "financial incentives to in-house physicians," "rubber stamp[ing]" of physician reports, and failing to provide an "integrated" assessment of cumulative disability claims). 385 F. App'x at 425-26. Plaintiffs alleged that the various practices amounted to a "uniform, profit-driven scheme" that breached Unum's fiduciary duties and denied them full and fair review of their claims, and they sought certification of a class under Rule 23(b)(2) to "cease the offending practices." *Id.* at 427-28, 430. Plaintiffs' challenge to "a group of loosely-defined practices that were *not* applied uniformly to a discrete,

---

[6] *See also Souter v. Equifax Info. Servs. LLV*, 498 F. App'x 260, 265-66 (4th Cir. 2012) (reversing certification of a class that sought to challenge Equifax's failure to establish "reasonable procedures" because at "a more directly relevant level" the putative class was challenging "at least three different" practices); *Culver v. City of Milwaukee*, 277 F.3d 908, 911 (7th Cir. 2002) (denying certification to proposed class alleging hiring discrimination because they were subject to different practices, and no applicant could challenge an allegedly discriminatory employment test that was "inapplicable to his own situation").

easily defined class" flunked Rule 23's commonality and typicality requirements. *Id.* at 430-31.[7]
The same is true here.

> ### 2. *Rule 23 and Article III both require that all class members be impacted and harmed by the specific policies, practices, or decisions they challenge*

In their Reply, █████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████ ECF No. 173 at 2-8. But Article III and Rule 23 each forbid certifying a class containing uninjured members. *Falcon*, 457 U.S. at 157 (all class members must "have suffered the same injury"); *Dukes*, 564 U.S. at 349-50 (same).

To establish standing, a litigant "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Moreover, Article III requires litigants to demonstrate standing for "each claim [they] seek[] to press" and "for each form of relief sought." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). The rule that each plaintiff's "remedy must … be limited to the inadequacy that produced the injury in fact that the plaintiff has established" is "no less true with respect to class actions than with respect to other suits."

---

[7] █████████████████████████████████████████████████████████████
████████████ . ECF No. 173 at 10 n.20. All are distinguishable. ████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████ .

*Lewis v. Casey*, 518 U.S. 343, 357 (1996) (class-action device "adds nothing to the question of standing"). And it is equally true in ERISA cases, where the Supreme Court has held that a plaintiff must have been ***personally*** injured by an alleged fiduciary breach to have Article III standing to bring a claim alleging harm to the Plan. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540-44 (2020).[8] The class-action device does not eliminate these requirements. *See, e.g.*, *TransUnion*, 594 U.S. at 431 ("Article III does not give federal courts the power to order relief to any uninjured plaintiff, class action or not."); *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1034 (8th Cir. 2010) ("a class cannot be certified if it contains members who lack standing").

Here, Plaintiffs admit that many putative class members were not affected by many—and in some cases were not affected by ***any***—of the "panoply" of purported practices they seek to challenge. ECF No. 173 at 1, 4, 11. Table 1, *infra* at 11, illustrates the lack of a common injury among just the three Named Plaintiffs who are subject to Defendants' pending motions for summary judgment. And as for Plaintiffs' underlying theory of Neutral Physician bias, those putative class members whose claims were denied for failure to attend a scheduled medical examination or other administrative reasons could not possibly have been affected by bias, and among those who were examined, ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████ Decl. of M. Garagiola in Supp. of Defs.' Combined Surreply in Opp. to Pls.' Mot. for

---

[8] ███████████████████████████████████████████████████████████████
███████████ ECF No. 173 at
5. But Plaintiffs do not identify any evidence that Neutral Physicians were compensated at above-market rates. To the extent Plaintiffs' theory is that supposedly poor-performing Neutral Physicians did not earn their pay, that meritless claim would require a plaintiff-specific and physician-specific inquiry. And *Thole* definitively establishes that no member of the proposed class has Article III standing to raise such a claim, because any purported overpayments (there were none) did not affect the Plan's ability to pay approved benefits. *Thole*, 590 U.S. at 540-44.

Class Cert. & Opp. to Pls.' Mot. to Exclude the Test. of D. Lasater ("Garagiola Decl."), Ex. B, A. Hayter May 13, 2025 Dep. Tr. ("Hayter Tr.") 267:18-23.  It would be "impossible to identify" which putative class members have some claim to having been injured by each challenged practice or decision "without extensive and individualized fact-finding or 'mini-trials.'"  *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014); *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1275 (11th Cir. 2019) (denying class certification).[9]

### B.    The Named Plaintiffs' Own Claims Illustrate That Plaintiffs' Disparate Challenges Cannot Be Resolved By Common Proof On A Classwide Basis

In their Reply, Plaintiffs do not even attempt to explain how the Court can adjudicate their claims on a classwide basis when their own claims are entirely distinct from each other, much less the broad class they seek to represent.  Defendants' fully briefed summary judgment motions, which comprehensively address the claims of Named Plaintiffs Daniel Loper, Jamize Olawale, and Charles Sims, illustrate the lack of commonality and typicality across the putative class members' claims.  *See* ECF Nos. 115-1, 124-1, and 125-1.  Each Named Plaintiff brings a distinct complaint, challenging a distinct course of conduct with no classwide impact.  In fact, most of them challenge alleged conduct that, among the nine Named Plaintiffs, applied *only* to him.  *See* Table 1, *infra* at 11.  Adjudication of those allegations cannot be applied to resolve other purported class members' claims and will not "generate common answers apt to drive the resolution of the litigation."  *Dukes*, 564 U.S. at 350; *see also Bd. of Educ. of Cnty. of Kanawha*, 117 F.4th at 202, 206 (declining to certify student disability claims that "require[] individualized

---

[9] None of the cases on which Plaintiffs rely, ECF No. 173 at 3-4 nn.2-8, is to the contrary.  At most, those cases confirm that the availability of affirmative defenses as to some class members does not categorically defeat class certification.  But Plaintiffs have no support for their suggestion that Rule 23 permits certifying a class with numerous members who were not "impacted."

determinations"; "a violation of the same provision of law" is not enough).

**Table 1**

| Claimed Harm | Mr. Loper | Mr. Olawale | Mr. Sims |
|---|---|---|---|
| ███████████ ECF No. 173 at 8. | ECF No. 56 ¶ 210 (████████ . | ECF No. 56 ¶ 196 (████████). | Does not allege. |
| ███████████ *ECF No.* 173 at 16-17. | Does not allege examination by either. | Does not allege examination by either. | Does not allege examination by either. |
| ███████████ ECF No. 173 at 5 n.10, 17-18, 24. | Does not allege. | ECF No. 56 ¶¶ 198, 200. | Does not allege. |
| ███████████ *See* ECF No. 173 at 18. | Does not allege. | ECF No. 56 ¶¶ 199, 201 (██████████ ████████). | ECF No. 56 ¶ 191 (██████████ █████████). |
| ███████████ *ECF No.* 173 at 5 n.10, 8, 12, 16, 20-21. | Does not allege. | ECF No. 197 at 20. | ECF No. 197 at 45 n.69. |
| ███████████ *ECF No.* 173 at 5 n.10, 8, 23. | Does not allege. | ECF No. 56 ¶ 283. | ECF No. 197 at 45 n.69. |
| ███████████ ECF No. 173 at 12, 18-19, 24. | ECF No. 197 at 17-18, 24 ██████ . | ECF No. 197 at 29-30 (██████████ . | ECF No. 197 at 43 (██████████ ). |

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████  ECF No. 173 at 16-24.  ███████████████████████████

████████████████████████████████████████████████████████

████████████  id. at 8, and ████████████████████████████████████

███████████████, id. at 13.[10]  That admission alone precludes certification, because

throwing all of the disparate challenged policies, practices, and decisions into a single

proceeding for some form of "aggregate" assessment of "objective reasonableness" would be

even more impossible to manage, and Plaintiffs offer no plan for doing so.  It would also

contravene Fourth Circuit law that prohibits describing legal challenges "at an unacceptably

general level" when "at a more directly relevant level" there are "meaningful differences"

between putative class members' claims.  *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir.

2006); *Souter*, 498 F. App'x at 265-66; *Broussard*, 155 F.3d at 343 (cannot certify "hodgepodge

of factually as well as legally different plaintiffs").

Most of the alleged policies, practices, and decisions that Plaintiffs describe in their

Reply on their face applied only to some putative class members.  *See* ECF No. 173 at 16-24.

████████████████████████████████████████████████████████," *id*. at 17, but he

examined *only one* of the nine named Plaintiffs,[11] and the trainings he conducted and manuals he

authored, by definition, had no impact on class members who were not examined by

neuropsychologists, *see id.* at 16.  ████████████████████████████████

---

[10] None of the policies, practices, or decisions that Plaintiffs challenge would be susceptible to class certification on a more discrete "conduct-specific" basis, either, but in light of Plaintiffs' concession, Defendants do not discretely analyze them here.

[11] *See* ECF No. 117-9 at NFL_ALFORD-0004478-92; *see generally* ECF Nos. 113-2 to 113-6, 117-2 to 117-28.

█████████████████████████████████████, *id.* at 5 n.10, 17-18, 24, most putative class members did

not claim to suffer from a cumulative disability, and for those who did, individualized review

would be required to assess whether (i) the administrative record contained material medical

evidence of a cumulative disability (rather than just words mouthed in the application), (ii) the

Neutral Physicians, MAP, or Board failed to consider such evidence, and (iii) that failure

negatively affected the outcome of the benefits application.[12]  Only class members who actually

underwent neuropsychological testing could challenge demographic adjustments to their test

scores,[13] *id.* at 16, 20, 23, and it is an inherently claim-specific inquiry whether a particular

adjustment helped or harmed a player's disability claim, or had no material effect at all,[14] just

like it is an inherently claim-specific inquiry whether Neutral Physicians or the Board failed to

---

[12] *See, e.g.*, ECF No. 125-1 at 8 (████████████████████████

████████████████████ . ████████████████████████████

███████████████████████████████████ ECF No. 173 at 17-18, but
they admit in their summary judgment opposition that there is no such categorical policy.  ECF
No. 197 at 56-57 & n.85.

[13] Even among those who underwent testing, application of demographic norming was not
uniform. ███████████████████████████████████████████████████████████

███*See* Garagiola Decl., Ex. M, June 8, 2021 Directive at NFL_ALFORD-0068321 ████

████████████████████████████████████████████████████████████

██████████████████ ; Garagiola Decl., Ex. K, R. Smith Apr. 2, 2025 Dep. Tr. ("Smith
Tr.") 192:1-3; ECF No. 163 at 85:15-87:18.  After June 2021, any ethnicity adjustments that may
have occurred would be departures from official policy not common to the class.

[14] Individuals whose disability claims were not prejudiced by any demographic adjustments that
were made would not have standing to participate in a class challenge  *See Wit v. United Behav.
Health*, 79 F.4th 1068, 1084-85 (9th Cir. 2023) (reversing certification of class asserting "full
and fair review" claim because adjudicating the claim would require assessing the "individual
circumstances" of each class member's benefit denial to determine whether the "application of
the wrong standard could have prejudiced the claimant"). ████████████████████████

████████████████████████████████████████████████████████████
███ ECF No. 125-12 at CS-700; ECF No. 115-6 §§ 3.4(a)-(b), 3.5(b); ECF No. 125-1 at 8.

███████████████████████ *id.* at 18, ████████████████████████, *id*. at 23,

or ███████████████████ *id.* at 16 n.28.

The remaining practices that Plaintiffs challenge are no more suitable for class treatment. Where a defendant's official policies comply with the law, no class can be certified unless the plaintiffs can identify a departure from those policies that uniformly impacted all members of the proposed class. *Dukes*, 564 U.S. at 352-57. But Plaintiffs show no such thing. Consider, for example, ██████████████████████████████████████████████████████ ██████ . ECF No. 173 at 18, 24. ██████████████████████████████████████ ██████████████████████████████████████████████ . Garagiola Decl., Ex. E, J. Garofolo June 10, 2025 Dep. Tr. ("Garofolo Part I Tr.") 176:3-177:5. And the Party Advisors averred that pursuant to this lawfully delegated authority, they *do* review all records for each claim. Smith Tr. 27:19-28:6, 36:12-37:1, 37:17-21, 54:6-11, 54:18-23, 55:12-23; Garagiola Decl., Ex. I, A. Williams Mar. 28, 2025 Dep. Tr. ("Williams Tr.") 57:19-58:14. To have a viable claim for failure to review records, a plaintiff would thus need to provide evidence that the Board and the Party Advisors failed to review a *specific* document that was material to the determination of his particular claim. That claim would necessarily require review of the individual plaintiff's record, precluding certification on that issue.

The same is true of Plaintiffs' other challenges. ███████████████████████ ████████████████████ , ECF No. 173 at 19, 24, but they do not identify any ERISA-mandated training that they lacked,[15] and adjudicating whether a claim was impacted by a

_____

[15] ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████ Williams Tr. 23:15-19, 24:9-21, 25:6-10, 28:1-29:8.

supposed lack of training requires a claim-specific inquiry. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████ [16]  Nor do Plaintiffs present any examples

of Plan counsel making recommendations to the Trustees on claim determinations, much less

improper recommendations that impacted the determination of any of their claims.[17]

     Finally, ███████████████████████████████████. ECF No. 173 at

16-17, 20.  But it is the NFLPA and the NFL Management Council that appoint Neutral

Physicians, not the Board.  ECF No. 115-6 § 12.3(a); ECF No. 115-4 ¶ 15.  Moreover, the

process they employ to vet potential appointees—including resume review, interviews, and

reference checks by a Neutral Physician consultant with expertise in their field, followed by

further review by both the NFLPA and the Council, Garagiola Decl., Ex. J, H. Vincent Apr. 1,

2025 Dep. Tr. ("Vincent Tr.") 58:18-59:5—is consistent with ERISA, and Plaintiffs cite no

authority suggesting otherwise. █████████████████████████████

████████████████████████████████████████████████████

███████. Garofolo Part I Tr. 166:18-22, 167:8-15.[18]  That is not a common issue.

---

[16] The record shows the Trustees in fact probe recommendations and sometimes even reject them.  ECF No. 115-19 ¶¶ 13-14; ECF No. 115-20 ¶ 12; ECF No. 115-21 ¶ 11; Smith Tr. 33:7-22, 39:10-18, 73:9-13.

[17] The uniform evidence is that they do not.  ECF No. 115-19 ¶¶ 14-15; ECF No. 115-20 ¶¶ 10-11; ECF No. 115-21 ¶¶ 9-10.

[18] ██████████████████████████████████████ ECF No. 173 at 18, but the Plan has, in fact, instituted numerous safeguards to ensure Neutral Physician neutrality, *see infra* at 18 n.21, and there is nothing inherently wrong with using the word "neutral" to describe an unbiased professional. █████████████████████████████ ███████████████████████████████. Garofolo Part I Tr. 189:2-7.

## II.    PLAINTIFFS' ALLEGATIONS OF NEUTRAL PHYSICIAN BIAS CANNOT BE RESOLVED BY COMMON PROOF

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████ ECF No. 173 at 14.  The only purported common proof that Plaintiffs say they

will use to prove this is the expert report of Dr. Anthony Hayter, ██████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

ECF No. 173 at 21-22.  But Dr. Hayter's report shows no such thing, and offers no common

proof of a systemic skew of any kind, much less one that adversely affected all benefit claims

classwide.

### A.    The Plan's Overall Claim Approval Rates Are Generous, And Individual Neutral Physician Rates Of Finding Disability Are Not Evidence Of Bias

Plaintiffs do not dispute that the Plan's overall disability claim approval rates are

generous, and that the Plan pays hundreds of millions of dollars of disability benefits each year.

ECF No. 111 at 2; *see generally* ECF No. 173.  As the Sixth Circuit explained in rejecting

certification in *Romberio*, it is plain that "many claimants successfully pass through the process

and receive disability benefits as a result," and any class consisting of all denied claimants

"would necessarily include many individuals whose claims were *properly* denied for medical

reasons."  385 F. App'x at 425, 431 (emphasis in original) (rejecting certification of class

alleging "corporate-wide scheme to illegally deny or terminate [] long-term disability claims"

using, among other things, "financial incentives to in-house physicians" that allegedly caused

them to "overlook strong medical evidence").  Against this background the Sixth Circuit

16

concluded that a proposed injunctive relief class under Rule 23(b)(2) that sought to alter Unum's "alleged unlawful claim review policy" flunked both Rule 23(a)(3)'s typicality requirement and Rule 23(b)(2)'s requirement that a class seeking an injunction must be cohesive, *id.* at 428, 431, 433, because no class member could be entitled to relief without "the need for an individualized assessment as to the ultimate propriety of the benefit decisions affecting each and every class member." *Id.* at 432.

Even if the Court accepted Dr. Hayter's opinions at face value—which it should not[19]— those opinions do not offer common proof of any systemic scheme with classwide impact. Dr. Hayter does not contest the Plan's generous overall disability claim approval rates, nor does he identify any practice that he contends had a classwide impact on all denied disability claimants. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████    *See* ECF No. 172-5 at 180-89.  Dr. Hayter's report does not offer proof that *any* disability claim was decided incorrectly, *see* Hayter Tr. 87:10-19, much less that there was some unlawful systemic bias against players that impacted *all* denied disability claimants, or even that caused a statistically significant number of disability claims to be incorrectly decided, *see id.* 83:8-14.[20] Indeed, the term "statistically significant" does not even appear in Dr. Hayter's report, because

---

[19] For the reasons explained in Defendants' concurrently filed Rule 702 motion, Dr. Hayter's testimony should be excluded because his opinions relating to Neutral Physician bias (1) are based on an unrepresentative data set assembled by Plaintiffs' counsel based on undisclosed criteria (2) to which he applied no actual statistical analyses or any scientifically accepted methodology.

[20] ████████████████████████████████████████████████████
████████████████████████████████████.  During that same period, federal district courts more frequently ruled in the Plan's favor.  *See* ECF No. 156; ECF No. 163 at 95:4-17.  The cases decided against the Plan are thus not common proof of any kind of unlawful systemic bias.

he did not apply any recognized statistical methodologies in formulating his opinions. *See generally* ECF No. 172-5.

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████, do not constitute evidence even that those individual Neutral Physicians were biased, much less that the entire Plan was infected by systemic bias.[21]  Under Fourth Circuit law, there is no "correct" denial rate for third-party reviewers.  *See Abromitis*, 114 F. App'x at 61.  And more generally, statistics on denial are not a proper means of assessing bias, █████████████████████████.

Hayter Tr. 267:18-23 (██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████  "A low reversal rate," on its own, "would not prove bias or a conflict of interest."  *Reichard v. United of Omaha Life Ins. Co.*, 805 F. App'x 111, 116-17 (3d Cir. 2020).  Rather, to demonstrate bias, a plaintiff "would have to show that each of those [review] decisions was unreasonable based on the evidence in each file," which "would require a mini-trial on each of the[] other appeals."  *Id.* at 117; *see also Zahariev v. Hartford Life & Accident Ins. Co.*, 2020 WL 12783951, at *5 (D.S.C. Aug. 11, 2020) (finding

---

[21] To the contrary, the full record shows the Plan has instituted numerous structural neutrality safeguards.  Neutral Physicians are "jointly designate[d]" by the Players Association and Management Council to a panel available to conduct medical examinations.  ECF No. 115-6 §§ 1.25, 12.3(a); ECF No. 115-4 ¶ 15.  Neutral Physicians on the panel are assigned to conduct player evaluations by the NFL Player Benefits Office ("NFLPBO") based solely on neutral criteria such as area of specialty, proximity, and availability to conduct a timely evaluation.  ECF No. 115-4 ¶ 19.  Neither the NFLPBO nor the Board maintains statistics concerning individual Neutral Physicians' past disability determinations, rendering assignment on that basis impossible.  *Id.*; ECF No. 115-18 ¶ 8.  And Neutral Physicians are paid a flat fee untethered to their rate of finding disability, and "must (1) certify that any opinions offered … will be provided without bias for or against any Player."  ECF No. 115-6 § 12.3(a).  ██████████████████████
███████████████████.  Vincent Tr. 60:17-62:12.

that "statistical data" would not "reveal any information about [defendant's alleged] conflict of interest").

**B.    Alleged Neutral Physician Bias Cannot Be A Common Issue Because Different Plaintiffs Were Examined By Different Neutral Physicians**

In their Reply, ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ ECF No. 173 at 5.  But even if that assertion were true—it is not—it does not even come close to constituting a common issue susceptible to common proof, much less the kind of systemic Neutral Physician bias that Plaintiffs allege impacted all claim denials classwide.  Of the 48 Plan-assigned Neutral Physicians who examined the Named Plaintiffs between 2017 and 2022, ECF No. 111-3 ¶¶ 2-21, ███████████████████████████████████████████████.  *See* ECF No. 172-5 at 173-188.  Moreover, in addition to challenging certain "highly paid" Neutral Physicians, Plaintiffs also challenge several others who were not "highly paid" under Plaintiffs' definition, which proposes an $86,000 annual cutoff.  For example, ███████████████████████ ████████████████████.  ECF No. 56 ¶ 193.[22]  But ███████████ has never earned more than $86,000 in a year, including the year she conducted the evaluation of Sims that Plaintiffs challenge.  *See* Garagiola Decl., Ex. N, Compilation of Form 5500s for 2017 to 2022 at NFL_ALFORD-0067964, NFL_ALFORD-0068041, NFL_ALFORD-0068117, NFL_ALFORD-0068194.  And ███████████████████████, ECF No. 56 ¶ 261, who earned only $68,500 in the year he conducted the relevant evaluation.  Garagiola Decl., Ex. N, at NFL_ALFORD-0068183.  Some named Plaintiffs were even *granted* benefits after being examined by Neutral Physicians

---

[22] The Amended Complaint incorrectly identifies Dr. Chang, who conducted Sims's MAP evaluation, as Dr. Riggio.

whom Plaintiffs claim were biased because of their earnings— ███████████████

██████████████████████████████████████████████████████████████

████████████████ . These differences between Plaintiffs' claims show the supposed

"common question" of whether Neutral Physicians were biased is not even common across the

nine Named Plaintiffs, let alone across the class.

In sum, none of the evidence that Plaintiffs identify in their Reply constitutes common

proof that would allow for adjudication of all of the class claims in common.

## III.    DR. LASATER'S OPINIONS ARE RELIABLE, RELEVANT, AND WILL ASSIST THE COURT IN ASSESSING THE EVIDENCE

Under Rule 702, a qualified expert may offer his opinions to aid the Court if his

testimony "involves specialized knowledge that will assist the trier of fact in understanding the

evidence or determining a fact in issue" and is "reliable and relevant." *United States v. Young*,

916 F.3d 368, 379-80 (4th Cir. 2019).  Courts consider five non-exhaustive factors: "(1) whether

the particular scientific theory can be (and has been) tested; (2) whether the theory has been

subjected to peer review and publication; (3) the known or potential rate of error; (4) the

existence and maintenance of standards controlling the technique's operation; and (5) whether

the technique has achieved general acceptance in the relevant scientific or expert community."

*United States v. Crisp*, 324 F.3d 261, 265-66 (4th Cir. 2003).  Although the Court is responsible

for ensuring that expert testimony is reliable and relevant, "[t]he Supreme Court did not intend

[that] gatekeeper role to replace the adversary system." *In re Under Armour Sec. Litig.*, 730 F.

Supp. 3d 172, 176 (D. Md. 2024).  Unlike challenges to scientific validity, "mere disagreement

with the assumptions and methodology used does not warrant exclusion"—"those arguments go

only to the weight of [the expert's] testimony, not its admissibility." *Heckman v. Ryder Truck*

*Rental, Inc.*, 2014 WL 3405003, at *3 (D. Md. July 9, 2014).  "Vigorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof" are typically

the appropriate means of attacking expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509

U.S. 579, 596 (1993).

Dr. Lasater's opinions clear Rule 702's threshold. Dr. Lasater applied well-established

statistical methods to analyze certain application and appeals data from V3, the Plan's system of

record. ECF No. 111-2 ¶¶ 7, 11, 35. Applying a chi-squared methodology—a widely accepted

statistical practice—Dr. Lasater tested Plaintiffs' theory that higher physician compensation is

associated with higher denial rates of players' disability claims. *See* Hayter Tr. 227:11-19 ████

████████████████████████████████████████████████████); *see also*

*Arndt v. City of Colo. Springs*, 263 F. Supp. 3d 1071, 1076 (D. Colo. 2017) ("The chi-square test

is an accepted statistical method of assessing the probability that a disparity is due to chance.").

Dr. Lasater concludes that there is no evidence that physicians associated with higher rates of

claim denials are assigned a greater number of medical examinations (and therefore are more

highly compensated), as Plaintiffs claim. *See* ECF No. 111-2 ¶ 7. Dr. Lasater's conclusions

undermine Plaintiffs' theory of liability and their bid for certification, ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

ECF No. 173 at 24-25. None of these criticisms are correct, much less a basis to exclude his

testimony.[23]

---

[23] Dr. Lasater also offered opinions about (1) the unreliability of the statistics in Plaintiffs'
amended complaint, *see* ECF No. 111-2 ¶¶ 8-9, and (2) the invalidity of various statistical
assertions made in Plaintiffs' motion to compel, *see* ECF No. 134-7 ¶¶ 5-6. Plaintiffs do not
challenge the admissibility of either of these opinions in their motion.

A.   **Dr. Lasater's Analysis Reliably Finds No Relationship Between Assignments Of Neutral Physicians To Conduct Examinations And Claim Denial Rates**

Plaintiffs first take issue with Dr. Lasater's decision to analyze the relationship between Neutral Physician assignments and claim denial rates.  *See* ECF No. 173 at 25-26.  V3 includes data that shows (1) the Neutral Physician(s) assigned to examine each player and (2) whether the claim was approved or denied.  ECF No. 111-2 ¶ 15.  Dr. Lasater applied scientifically accepted statistical techniques to this data to test the Amended Complaint's premise that the Plan "provide[s] more compensation to, and more frequently retain[s] physicians with, ***extremely high benefits denial rates***," and that the Plan skews Neutral Physician assignments "***to support the denial of benefits*** to deserving claimants."  ECF No. 56 ¶ 112.  Sound statistical science shows that there is no such relationship:  Neutral Physicians do not receive more examination assignments if the applications to which they are assigned are more often denied.  ECF No. 111-2 ¶¶ 7, 20-34, 43-54, 65.  That information is plainly relevant to resolving whether there is a systemic skew in Neutral Physician assignments based on "high benefits denial rates."  ECF No. 56 ¶ 112.  There is not.

Plaintiffs' main complaint is that Dr. Lasater's opinions do not directly answer a different question:  Whether the Plan systemically skews Neutral Physician assignments based on "an individual physician's recommendation."  ECF No. 173 at 25.  That is not grounds to exclude Dr. Lasater's opinions, for multiple reasons.  First, as Dr. Lasater explained in his report, the premise of the Amended Complaint is that the Plan and players care first and foremost whether claims are approved or denied, such that dollars are paid out by the Plan to the players.  *See* ECF No. 111-2 ¶¶ 14-18; Garagiola Decl., Ex. A, D. Lasater Mar. 19, 2025 Dep. Tr. ("Lasater Tr.") 95:19-96:2.  That is what Dr. Lasater tested.  Plaintiffs contend that Dr. Lasater should have focused on the ***input*** of individual physician findings rather than on the ***outcome*** of benefit claim

determinations, but the statistical fact that there was no skew in assignments relative to claim outcomes demonstrates (1) that assignments did not have any systemic negative impact on claim determinations, and (2) any theoretical "fraudulent scheme" to skew Neutral Physician assignments in violation of the Plan's policies prohibiting bias was completely ineffective—strong and relevant evidence that there was no fraudulent scheme at all.  Merely disagreeing with the framing of Dr. Lasater's analysis is not a basis for exclusion.  *See Heckman*, 2014 WL 3405003, at *3.

Second, Plaintiffs are wrong that Dr. Lasater's opinion has no bearing on whether the Plan skews assignments based on individual physician findings.  Dr. Lasater's report acknowledges that planwide data did not allow him to directly answer that specific question, because V3 data does not record individual physician findings.  ECF No. 111-2 ¶¶ 14-18.[24] However, under the Plan's Neutral Rule, a player cannot qualify for benefits unless at least one Neutral Physician finds that he satisfies the Plan's requirements for disability.[25]  Thus, as Dr. Lasater explained, where a player was examined by only one Neutral Physician and was ultimately awarded benefits, it can be known with certainty that the Neutral Physician found that the player was disabled.  ECF No. 111-2 ¶ 18 n.12; *see* ECF No. 115-4 ¶ 14; *see also* ECF No. 115-7 §§ 3.1(d), 5.1(c), 6.1(e).  The vast majority of the Plan's claim determinations involved only one examining Neutral Physician (or, for NCD benefits, a joint report in which

---

[24] Plaintiffs' contention that this limitation warrants exclusion under Rule 702 finds no support in the law.  *See, e.g.*, *1411 Div. St. LLC v. First Am. Title Ins. Co.*, 2025 WL 904709, at *6 (D. Md. Mar. 25, 2025) (citing *Glass v. Anne Arundel Cnty.*, 38 F. Supp. 3d 705, 716 (D. Md. 2014), *aff'd*, 716 F. App'x 179 (4th Cir. 2018) (challenge that expert failed to take certain data into account went "to the weight of the report, not its admissibility, and may be challenged on cross-examination"); *Bazemore v. Friday,* 478 U.S. 385, 400 (1986) (exclusion of certain variables in a regression analysis affects the probative weight of the analysis, not its admissibility)).

[25] The only exception to this rule is where the player qualifies via an external administrative process, such as qualifying for Social Security disability benefits.

two examining Neutral Physicians make a joint finding on disability), in numbers that are more than sufficient to derive statistically significant conclusions.[26] And Dr. Lasater has supplied further statistical analysis specific to the supermajority of "single doctor" claims that shows that just as there is no skew of Neutral Physician assignments based on claim denial outcomes, there also is no skew based on individual physician findings. Decl. of D. Lasater in Reb. to the Expert Rpt. of Dr. A. Hayter ("Lasater Reb. Decl.") ¶¶ 19-29.

██████████████████████████████

██████████████████████████

██████████████████████, ECF No. 173 at 25-26, are thus misplaced. ████████

████████████████████████████████

██████████████████████████████

████ are neither errors nor methodological flaws. But the sizable single doctor claim universe in which individual doctor findings are known is susceptible to statistically valid analysis, and that analysis confirms that there is no skew.[27]

---

[26] Of the 1,936 LOD applications Dr. Lasater analyzed, 1,866 of them involved a single physician, and of the 1,324 T&P applications, 897 involved a single physician. ECF No. 111-2 ¶ 18 n.12. And although the 1,509 NCD applications Dr. Lasater evaluated involved two physicians (a neurologist and a neuropsychologist), *see id.* at 53, those two physicians are required to prepare a joint report, which contains a single, unified recommendation that the Committee and the Board rely upon. Decl. of H. Vincent in Supp. of Defs.' Surreply in Opp. to Pls.' Mot. for Class Cert. & Opp. to Pls.' Mot. to Exclude the Test. of Dr. D. Lasater ("Vincent Decl."), ¶¶ 3-6; ECF No. 124-10 at 4, 10; ECF No. 172-12 at 5, 11. So for 4,272 of the 4,769 applications that Dr. Lasater considered, 89% reliably indicate the individual physician findings.
[27] ███████████████████████████████████ ECF No. 173 at 26. But Plaintiffs never explain how this additional analysis would have changed Dr. Lasater's results. Plaintiffs' claims are based on a purported "systematic" scheme to deny benefits to players. *Supra* Section I.A. Plaintiffs have never alleged there is a particular kind of physician "bias" regarding disability award levels, and Plaintiffs have not constructed any statistical analyses of their own that take that consideration into account. *See, e.g.*, ECF No. 56 ¶¶ 116-46; *see also* ECF No. 172-5 at 171-89.

**B.    Plaintiffs Do Not Raise Any Material Questions About The Reliability Of The V3 Data On Which Dr. Lasater Relied**

Next, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████    ECF No. 173 at 24.  But V3 is the Plan's system of record for disability claims, and Plaintiffs offer no evidence that the data was unreliable or that any of Dr. Lasater's calculations were wrong.  ███████████████████████████████████████████████████████,

*id.* at 25, but ██████████████    amount to only twelve out of over 7,000 application encounters and one out of over 3,000 appeal encounters.  *See* ECF No. 111-2 at 53-55, 61-62.  Thirteen ████████████████    in over 10,000 encounters—which Dr. Lasater specifically recognized and addressed in his analysis—do not suggest that the data, on the whole, was suspect in any way.

██████████████████████████████████████████████████████████████

██████████████████████████████.  ECF No. 173 at 25.  But these decisions were identified in his report and justified with express reasoning.  *See* ECF No. 111-2 at 49-74; *Adell Plastics, Inc. v. Mt. Hawley Ins. Co.*, 2019 WL 2524916, at *4 (D. Md. June 19, 2019) (denying motion to exclude fire safety expert's opinion and noting expert was "transparent about the limitations" in his experiment).  For example, applications that were decided on non-medical grounds were excluded because they were not decided on the basis of a Plan physician's assessment and are therefore not relevant to Plaintiffs' allegations.  ECF No. 111-2 at 52.  Applications and appeals that seek multiple benefits at the same time were excluded because the "[V3 data] alone cannot be used to discern which benefit type or types a Neutral Physician was evaluating" for such applications.[28]  ECF No. 111-2 at 50-51, 59.  Dr. Lasater analyzed a valid data set consisting of

---

[28] The remaining excluded claims—those for benefit reclassification, benefit continuation, or for

the overwhelming majority of claims and appeals, and Plaintiffs' criticisms are not grounds for

exclusion.  *See, e.g.*, *Burns v. Anderson*, 123 F. App'x 543, 549 (4th Cir. 2004) (claims that

expert "failed to review certain documents which would purportedly influence" his opinion went

to "the proper weight to afford [the expert's] testimony, not its admissibility"); *Synergetics, Inc.

v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007) ("so long as the methods employed are scientifically

valid, ... mere disagreement with the assumptions and methodology used does not warrant

exclusion of expert testimony").

In addition, ███████████████████████████████████████

████████████████████.  ECF No. 173 at 25 n.36.  But there is no reason to believe that

Dr. Lasater's results would be any different if the time period were extended.  Notably, Plaintiffs

argued for an April 1, 2018 start date as the relevant time period for discovery regarding claim

determinations.  ECF No. 134-1 at 9.

### C.    Dr. Lasater's Analysis Of Physician Compensation Is Reliable

Finally, Plaintiffs contend that Dr. Lasater's assessment of physician compensation is

unreliable.  Plan physicians can receive four different types of payment: (1) a flat fee for

performing an evaluation, (2) consulting fees, (3) honoraria for attending trainings, and

(4) expense reimbursements.  *See* ECF No. 115-4 ¶¶ 17 n.4, 23; Vincent Tr. 169:8-11.  To

analyze physician compensation, Dr. Lasater focused on evaluation fees, examining the number

of evaluations each physician performed.  As he explains: "[b]ecause Neutrals are paid a flat rate

for examinations (all physicians within the same specialty receive the same fee) … the amount of

---

an earlier effective date—were omitted from Dr. Lasater's analysis because they were materially
different, since at least one Neutral Physician had already found the player disabled and related
disability benefits had already been approved.  ECF No. 111-2 at 50 (explaining that the
excluded claims are "of a different nature").  And those claims make up only about two percent
of the total application and appeal population combined.  *See id.* at 51, 59.

compensation most Neutrals receive is a direct result of how many players they evaluate."  ECF No. 111-2 ¶ 17 n.10.  Dr. Lasater did not include the remaining payment types in his calculations because they are either insignificant or irrelevant.  Honoraria are small, Garagiola Decl., Ex. L, M. Miller Apr. 4, 2025 Dep. Tr. ("Miller Tr.") 80:10-12, ████████████████████████████ ████████████.  *Id.*; *see* ECF No. 115-4 ¶ 17 n.4.  ████████████████████ ████████████████████████████████████████.  *See* Hayter Tr. 70:15-25 ████████████████████████████████████████  Plaintiffs do not dispute that physicians are compensated on a per-evaluation basis.  Instead, they contend that Dr. Lasater's analysis is incomplete for four reasons, none of which indicates that Dr. Lasater's compensation analysis has an unsound basis.

*First*, ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████.  ECF No. 173 at 27.  But Dr. Lasater's method of measuring compensation based on encounters is not only reliable, it is actually *more* reliable than using the payment amounts listed in the Form 5500s.  Payment amounts listed in the Form 5500s include expense reimbursements (like x-ray fees), which are not a form of compensation, and Dr. Lasater could not have removed expense reimbursements from the amount listed in the form because Form 5500s do not itemize the payment amounts.  *See* Hayter Tr. 70:15-25; Lasater Reb. Decl.¶¶ 112-14.  Relying on Form 5500s would thus inaccurately inflate physician compensation by including reimbursements.

In addition, Dr. Lasater would not always have been able to associate the payments reported in the Form 5500s with the particular physicians who performed the services.  The physician information in the V3 data Dr. Lasater received is anonymized, but Form 5500s report

compensation by individual vendor name. *See Lasater Tr.* 147:18-148:9. Moreover, even if the V3 data were deanonymized, the vendor listed in the Form 5500 is not always an individual physician—many are medical practices that may be associated with multiple Neutral Physicians, with no itemization of how much of the total payment made was attributable to each. *See* Lasater Reb. Decl. ¶¶ 119-20. Dr. Lasater thus reasonably concluded that using the Form 5500s might introduce errors, whereas the number of medical examinations conducted by each Neutral Physician, and the flat amount of compensation associated with each, was reliably known.[29]

    *Second*, ██████████████████████████████████████████████

██████████████████████████████████████. ECF No. 173 at 27.[30]

It is true that some physicians perform evaluations for different benefit types—for instance, an orthopedist might perform both LOD and T&P evaluations. But because evaluations for each benefit type involve different criteria, a reliable analysis should consider them separately. T&P benefits, for example, require a finding that the player is "totally disabled," *see* ECF No. 115-6 § 3.1(d), whereas LOD benefits only require a finding of "substantial disablement," *see id.* § 5.1(c). Two orthopedists who perform 10 evaluations might have very different denial rates if one evaluates nine T&P applicants and one LOD applicant (where the higher T&P standard applies in all but one evaluation) and the other evaluates one T&P applicant and nine LOD applicants (where the lower LOD standard applies in all but one evaluation). In any event, even if Dr. Lasater had aggregated all of each physicians' encounters across all benefit types, he

---

[29] By contrast, Exhibit B to Dr. Hayter's report reveals a compensation analysis based on Form 5500s that is imprecise, riddled with errors, and unreliable. *See* Mem. in Supp. Defs.' Mot. Exclude Test. Dr. Anthony Hayter at 11-15.

[30] ██████████████████████████████████████████████████████████████
████████, ECF No. 172 at 25, 27, but the justification for Dr. Lasater's limited exclusions has already been explained in Section III.B. *See* ECF No. 111-2 at 49-74.

would have reached the same result: no relationship between the number of physician encounters and associated physician denial rates.  Lasater Reb. Decl. ¶¶ 70-72.

> ***Third***, █████████████████████████████████████████████
> ████████████████████████████████████████████████████████
> ████████████████████████████████████████████████████████

ECF No. 173 at 27.  But the existence of these variations does not render Dr. Lasater's compensation analysis based on encounters unreliable.  The higher fees paid to neuropsychologists are irrelevant:  All neuropsychologists are paid the same flat amount, ███████████████████████████████████████████████████████ ███████████████████████████, Garofolo Part I Tr. 161:7-14, and Plaintiffs make no showing that the fee is anything other than reasonable compensation for the services rendered. ████ ████████████████████████████████████████████████████████ ███████████████████████████████. Lasater Reb. Decl. ¶¶ 15, 27 & Table 3.  Considering consulting fees similarly would not change Dr. Lasater's analysis, as only a very small handful of physicians (seven out of 173) served in consulting roles.  ECF No. 115-4 ¶ 17 n.4; Vincent Decl. ¶¶ 1-2; Lasater Reb. Decl. ¶ 12.  Moreover, those fees covered robust additional services such as drafting Neutral Physician manuals and conducting annual audits of Neutral Physician reports—tasks that require considerable time.  Garofolo Part I Tr. 162:12-20. ████████████ ████████████████████████████████████████████████████████ is unclear as to its meaning, and in no way undermines the reliability of his analysis.

> ***Lastly***, ████████████████████████████████████████████
> ████████████████████████████████████████████████████████

No. 173 at 27-28.  But Plaintiffs have brought a class action lawsuit alleging a "plan-wide

scheme." *Supra* Section I.A.  Analyzing this systemic charge requires an examination of all plan physicians' findings, not just the findings of the particular physicians who happened to examine the named Plaintiffs.  For all of these reasons, Dr. Lasater's analysis is reliable and should not be excluded under Rule 702.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for class certification and their Motion to exclude Dr. Lasater's testimony in their entirety.

Date: July 10, 2025

Respectfully submitted,

*/s/ Gregory F. Jacob*
Gregory F. Jacob (D. Md. Bar No. 06769)
Meredith N. Garagiola (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W., 10th Floor
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: gjacob@omm.com
Email: mgaragiola@omm.com

Elizabeth L. McKeen (*pro hac vice*)
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994
Email: emckeen@omm.com

*Attorneys for Defendants The NFL Player
Disability & Survivor Benefit Plan, The NFL
Player Disability & Neurocognitive Benefit Plan,
The Bert Bell/Pete Rozelle NFL Player Retirement
Plan, and The Disability Board of the NFL Player
Disability & Neurocognitive Benefit Plan*

**<u>CERTIFICATE OF SERVICE</u>**

I, Gregory F. Jacob, hereby certify that on July 10, 2025, I caused a copy of the

foregoing document to be served upon all counsel of record via the CM/ECF system for the

United States District Court for the District of Maryland.


*/s/ Gregory F. Jacob*
Gregory F. Jacob