# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

## BALTIMORE DIVISION

| | |
|---|---|
| JASON ALFORD, DANIEL LOPER, WILLIS McGAHEE, MICHAEL McKENZIE, JAMIZE OLAWALE, ALEX PARSONS, ERIC SMITH, CHARLES SIMS, JOEY THOMAS, and LANCE ZENO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> vs. <br><br> THE NFL PLAYER DISABILITY & SURVIVOR BENEFIT PLAN; *et al.*, <br><br> Defendants. | **Case No. 1:23-cv-00358-JRR** |

# PLAINTIFFS' MEMORANDUM OF LAW
# IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE
# THE OPINIONS OF DR. ANTHONY HAYTER

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 2

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT .................................................................................................................. 8

   I.   Dr. Hayter's Consideration of Exhibits A and B Is Reliable ................................. 8

   II.   Dr. Hayter's Analyses of Exhibits A and B Are Reliable ...................................11

   III.   Dr. Hayter's Criticisms of Dr. Lasater's Analysis Are Proper Rebuttal Testimony ...... 18

     A.   Rebuttal Experts Are Expected to Critique Opposing Methodologies ........................ 18

     B.   Dr. Hayter Identified Specific, Verifiable Flaws in the V3 data ................................... 19

   IV.   Dr. Hayter's Appropriate Observations on the Amended Complaint Are Limited ....... 22

   V.   Dr. Hayter Fully Disclosed All Facts and Data Relied Upon ........................................... 23

CONCLUSION ............................................................................................................... 25

## **TABLE OF AUTHORITIES**

**Cases**                                                                                               **Page(s)**

*Adams v. Ameritech Servs., Inc.*,
   231 F.3d 414 (7th Cir. 2000) ................................................................................. 16

*Bandy v. Amica Life Ins. Co.*,
   2010 WL 2292589 (D. Md. June 4, 2010) ............................................................ 8

*Bresler v. Wilmington Tr. Co.*,
   855 F.3d 178 (4th Cir. 2017) ................................................................................. 14

*Brightview Grp., LP v. Teeters*,
   2021 WL 2627960 (D. Md. Feb. 8, 2021) ......................................................... 6, 19

*Cap. Funding Grp., Inc. v. Zuccari*,
   2021 WL 1339387 (D. Md. Apr. 9, 2021) ............................................................ 8

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ........................................................................................ 5, 7, 8

*Davita Healthcare Partners, Inc. v. United States*,
   128 Fed. Cl. 584 (2016) ....................................................................................... 24

*DL v. Dist. of Columbia*,
   730 F. Supp. 2d 78 (D.D.C. 2010) ................................................................. 17, 18

*Freeman v. Progressive Direct Ins. Co.*,
   733 F. Supp. 3d 463 (D.S.C. 2024) ...................................................................... 16

*G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*,
   2025 WL 1068581 (D. Md. Apr. 9, 2025) ......................................................... 8, 19

*Glass v. Anne Arundel Cnty.*,
   38 F. Supp. 3d 705 (D. Md. 2014) ....................................................................... 21

*In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   892 F.3d 624 (4th Cir. 2018) ................................................................................. 7

*In re Under Armour Sec. Litig.*,
   730 F. Supp. 3d 172 (D. Md. 2024) ...................................................................... 14

*Jordan v. Town of Fairmount Heights*,
   No. 2024 WL 732011 (D. Md. Feb. 21, 2024) ..................................................... 25

*Krakauer v. Dish Network, L.L.C.*,
  2015 WL 5227693 (M.D.N.C. Sept. 8, 2015) ...................................................... 9, 10

*Maryland Shall Issue, Inc. v. Hogan*,
  2021 WL 3172273 (D. Md. July 27, 2021) .............................................................. 15

*McReynolds v. Sodexho Marriott Servs., Inc.*,
  349 F. Supp. 2d 30 (D.D.C. 2004) .......................................................... 10, 15, 16

*Molly C. v. Oxford Health Ins., Inc.*,
  2024 WL 4850813 (S.D.N.Y. Nov. 21, 2024) .......................................................... 9

*NuVasive, Inc. v. Kormanis*,
  2019 WL 9633645 (M.D.N.C. Mar. 18 2019) ........................................................ 10

*Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs.*,
  858 F. Supp. 2d 505 (D. Md. 2012) ........................................................................ 9

*Robinson v. Nationstar Mortg. LLC*,
  2019 WL 4261696 (D. Md. Sept. 9, 2019) ............................................................. 17

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
  318 F.3d 592 (4th Cir. 2003) ................................................................................ 23

*Students for Fair Admissions v. U.S. Naval Acad.*,
  2024 WL 4135782 (D. Md. Sept. 10, 2024) ............................................................ 8

*Sullivan v. Glock, Inc.*,
  175 F.R.D. 497 (D. Md. 1997) .............................................................................. 25

*Tyree v. Bos. Sci. Corp.*,
  54 F. Supp. 3d 501 (S.D.W. Va. 2014) ................................................................. 10

*United States v. Wood*,
  741 F.3d 417 (4th Cir. 2013) .................................................................................. 8

*Ward v. Dixie Nat'l Life Ins. Co.*,
  595 F.3d 164 (4th Cir. 2010) .................................................................................. 9

*Wilkins v. Montgomery*,
  751 F.3d 214 (4th Cir. 2014) ................................................................................ 23

**<u>Rules</u>**

Fed. R. Civ. P. 26.................................................................................................... 24

Fed. R. Civ. P. 37(c) ........................................................................................ 5, 23, 25

Fed. R. Evid 702 ................................................................................................ passim

Fed. R. Evid 703 ...................................................................................................... 9

## INTRODUCTION

Defendants' motion to exclude the testimony of Dr. Anthony Hayter, an experienced statistician with a mathematics degree from Cambridge, a Ph.D. in Statistics from Cornell, and over three decades of experience teaching and publishing in applied statistics, finds no support in the Federal Rules of Evidence or *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993). Having produced a dataset that masks physician-specific behavior, fought all of Plaintiffs' efforts to obtain discovery of a wider set of individual physician recommendations, and relied on an expert who made no attempt to detect the Plan's biased assignment of physicians unfavorable to plan participants, Defendants now seek to exclude the expert who exposed those failings.

Defendants make four arguments: (1) Dr. Hayter's affirmative analyses should be excluded under Rule 702 because they are entirely unreliable; (2) the Court should preclude Dr. Hayter from offering opinions about Dr. Lasater's analysis; (3) Dr. Hayter's opinions about the validity of the information in Plaintiffs' Amended Complaint are unreliable; and (4) Dr. Hayter's opinions should independently be excluded under Rule 37(c) because he did not disclose the facts or data he considered in preparing his report. None raise any legitimate criticism of Dr. Hayter's methodology, which is reliable and helpful to the Court in understanding Defendants' database for applications and appeals ("V3 datasets") and what those datasets reveal about the Plan's penchant for assigning physicians in such a manner that no physician with a high rate of recommending a player's application or appeal is approved is assigned a high number of applications or appeals to consider. At every turn, Defendants misstate Dr. Hayter's methods, analysis, and conclusions.

First, with respect to Exhibits A and B, these Exhibits provide supplemental data derived from the V3 datasets, which Dr. Hayter properly analyzed. His analysis demonstrates that these Exhibits are consistent with the underlying data and support Plaintiffs' claims of bias. Ignored by

Defendants, Dr. Hayter's analysis begins with the V3 datasets produced by Defendants and relied upon by both parties' experts. His opinions are grounded in a detailed examination of the dataset's contents, structure, and limitations, including the omission of individual physician recommendations and compensation data. Dr. Hayter's analyses of Exhibits A and B properly consider the limitations of the datasets, do not improperly extrapolate, but instead draw conclusions tied to the available data. Defendants' disagreements with his analyses go to the weight of Dr. Hayter's testimony, not its admissibility. Minor flaws in supplemental materials do not undermine the core of Dr. Hayter's analysis, which rests on Defendants' own V3 dataset and applies standard, transparent statistical methods. Nor do Exhibits A or B affect the structural deficiencies Dr. Hayter identified in Dr. Lasater's methodology, or alter the outcome of Dr. Hayter's conclusions.

Second, Defendants argue that Dr. Hayter should not be permitted to criticize Dr. Lasater's opinions. However, such rebuttal testimony is well-accepted as admissible expert testimony. *See Brightview Grp., LP v. Teeters,* 2021 WL 2627960, at *8 (D. Md. Feb. 8, 2021) ("[R]ebuttal expert witnesses may criticize other experts' theories and calculations without offering alternatives")

Third, Defendants claim Dr. Hayter unreliably referred to data in the Amended Complaint as "substantial," asserting that this reflects nothing more than subjective judgment. But Dr. Hayter's identification of patterns and relationships between variables is rooted in well-accepted statistical methods. His conclusion, that the data should have alerted Defendants to the potential for bias in their physician assignment system, flows directly from the application of reliable methodology and professional judgment to interpret data—particularly where complex patterns emerge across multiple dimensions.

Finally, Defendants argue that Dr. Hayter failed to disclose the facts and data he considered in forming his opinions. This is flatly untrue. Dr. Hayter's report and corresponding expert disclosure fully disclosed all the data he analyzed.

At bottom, Dr. Hayter's statistical expertise will assist the Court in evaluating the V3 database, the statistical evidence of bias in physician assignments, and in assessing the reliability of Defendants' statistical argument. His methods are transparent and reliable, his limitations acknowledged, and his conclusions carefully qualified. Defendants may disagree with Dr. Hayter's opinions, but their arguments provide no basis for exclusion. Accordingly, Defendants' motion should be denied.

## <u>LEGAL STANDARD</u>

Pursuant to Federal Rule of Evidence 702, expert testimony is admissible so long as it is both relevant and reliable. *Daubert*, 509 U.S. at 588 (1993). In assessing reliability, courts may consider whether: (1) the theory or technique "can be (and has been) tested;" (2) it "has been subject to peer review or publication;" (3) it has a "known potential rate of error;" and (4) it is "generally accepted" within the relevant scientific community. *Id*. at 593-94.

The district court's role under Federal Rule of Evidence 702 is to act as a gatekeeper, ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Id*. at 597. That gatekeeping function, however, is not a substitute for the adversarial process, and "the rejection of expert testimony is the exception rather than the rule." *In re Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig*., 892 F.3d 624, 631 (4th Cir. 2018).

Rule 702's requirements apply to "principles and methodology, not on the conclusions that they generate*." Id.* (quoting *Daubert*, 509 U.S. at 595). Thus, "[w]hile the Court's gatekeeping role is essential, it is also limited. In evaluating a *Daubert* motion, the court does not decide the

ultimate believability or correctness of an expert's opinion." *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 2025 WL 1068581, at *4 (D. Md. Apr. 9, 2025). Importantly, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

*Daubert*'s "safeguards are relaxed" in non-jury cases. *United States v. Wood*, 741 F.3d 417, 425 (4th Cir. 2013).[1] In the context of a bench trial, "the trial court's gatekeeping function is much less critical . . . because there [is] 'little danger' of prejudicing the judge, who can, after hearing the expert's testimony or opinion, determine what, if any, weight it deserves. *Students for Fair Admissions v. U.S. Naval Acad.*, 2024 WL 4135782, at *4 (D. Md. Sept. 10, 2024) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

## **ARGUMENT**

### I.    **Dr. Hayter's Consideration of Exhibits A and B Is Reliable**

Defendants argue that Dr. Hayter's analyses of two datasets, Exhibits A and B, are unreliable because Dr. Hayter ███████████████████████████████████████. DM5.[2] Not so. This argument rests not only on a misrepresentation of Dr. Hayter's opinions and analysis, but on a fundamental misconception of both the Federal Rules of Evidence ("FRE") and the role of

---

[1] *Accord Cap. Funding Grp., Inc. v. Zuccari,* 2021 WL 1339387, at *5 (D. Md. Apr. 9, 2021) ("[A]s this Court has previously noted, the gate keeping function of Rule 702 of the Federal Rules of Evidence carries less significance in a bench trial.") (citing *Bandy v. Amica Life Ins. Co.*, 2010 WL 2292589, at *3 (D. Md. June 4, 2010)).

[2] "DM" refers to pages of the Memorandum in Support of Defendants' Motion to Exclude the Testimony of Dr. Anthony Hayter (unredacted memorandum currently sealed at ECF No. 221).

statistical experts in litigation. "Courts in this circuit and across the country have consistently held that an expert may rely on the work of others when preparing an expert report, particularly when it is the sort of work that is reasonably relied upon by experts in the relevant area of expertise." *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs.*, 858 F. Supp. 2d 505, 512 (D. Md. 2012). Accordingly, Defendants' attempt to impose an impossible standard that they conspicuously fail to apply to their own expert should be rejected.

Fundamentally, the Federal Rules of Evidence impose no requirement that an expert must personally assemble every dataset analyzed. Rule 702 demands only that expert testimony: (a) help the trier of fact understand the evidence; (b) be based on sufficient facts or data; (c) be the product of reliable principles and methods; and (d) reliably apply those principles and methods to the facts of the case. Fed. R. Evid. 702. Rule 703 expressly provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been *made aware of* or personally observed." Fed. R. Evid. 703 (emphasis added).

Nothing in the FRE requires data compilation by the testifying expert, and courts applying FRE 702 and 703 routinely hold that experts may rely on datasets compiled by others. For example, in *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164 (4th Cir. 2010), the Fourth Circuit explained that plaintiffs' expert was entitled to rely upon the "facts and data" contained in six spreadsheets, five of which were "prepared by defendants themselves" and one of which was "prepared by plaintiffs' counsel, who used [discovery material] provided by defendants to generate the data." *Id.* at 182; *accord Molly C. v. Oxford Health Ins., Inc.,* 2024 WL 4850813, at *7 (S.D.N.Y. Nov. 21, 2024) ("[T]estifying experts need not conduct original research; they may rely on facts or data gathered by others.") (citing FRE 703); *Krakauer v. Dish Network, L.L.C.*, 2015 WL 5227693, at *9 (M.D.N.C. Sept. 8, 2015) ("[A]n expert may rely on data that she did not personally collect");

*Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 552 (S.D.W. Va. 2014) ("[N]umerous courts have held that reliance on scientific test results prepared by others may constitute the type of evidence that is reasonably relied upon by experts.") (citation and internal quotation marks omitted).[3]

That the FRE permit analysis of data collected by others reflects the practical necessity that, in litigation, datasets may be assembled from institutional records, internal systems, or other discovery materials. These datasets often come from parties' own sources, and they are typically formatted or organized by attorneys, consultants, or litigation support teams. *See McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 30, 38 (D.D.C. 2004) (expert's failure to independently verify data "raises no barrier to the admissibility of his analyses."). Moreover, while an expert may be an eminently qualified statistician, like Dr. Hayter, *see* Decl. of Meredith Garagiola in Supp. of Defs.' Combined Surreply in Opp. to Pls.' Mot. for Class Certification and Opp. to Pls.' Mot. to Exclude the Testimony of Dr. David Lasater ("Garagiola Decl."), Ex. B (sealed at ECF No. 219) (Hayter Tr. 294:25-297:8), collecting data may entail or require different qualifications or skills entirely. Expecting the expert to reconstruct large-scale data personally would not only be redundant but would also often be unworkable. *See Krakauer*, 2015 WL 5227693, at *9 ("It would make no practical sense to require [expert] to independently verify every [data point] is accurate and perform the same data collection [third-party] has already performed . . . this would defeat the purpose of relying on third parties for data."). Consequently, Defendants' complaints fall flat.

---

[3] Defendants' reliance on *NuVasive, Inc. v. Kormanis*, 2019 WL 9633645 (M.D.N.C. Mar. 18 2019) (DM7, 11), is misplaced. There, a data set lacked any indicia that it was actually the sales data it purported to be. *See id.* at *2. In contrast, Dr. Hayter examined a data set that contained extensive, Bates-numbered citations to the source documents and that were readily identifiable and verifiable as reflecting individual physician disability recommendations and annual compensation.

Furthermore, Defendants' argument would mandate the exclusion of the opinions of their own purported statistical expert, Dr. Lasater. The V3 dataset serves as the primary dataset analyzed by both Dr. Hayter and Dr. Lasater.   The V3 data was provided to Dr. Lasater by Defendants, *see*, *e.g.*, Reply Decl. of Benjamin R. Barnett (ECF No. 172-1) ("Barnett Reply Decl."), Ex. J (ECF No. 172-7) (sealed at ECF No. 173) (Lasater Tr. 187:9-11), without any indication for how the data is collected, maintained, or verified. *Id.* (Lasater Tr. 44:2-46:11). As Dr. Lasater testified, he has no knowledge as to who selected the fields provided to him from the V3 data, and who, if anyone, ensures the accuracy of the V3 data. *Id.* Dr. Lasater also testified that the V3 dataset that he was provided is a limited, counsel-selected subset of information from the V3 database. *Id.* (Lasater Tr. 38:10-39:4, 192:7-193:15).   Furthermore, Dr. Lasater identified that the V3 dataset provided to him contained errors.  *Id.* (Lasater Tr. 45:2-7); *see* Declaration of David B. Lasater in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF 111-2) ("Lasater Report") at 54. Nevertheless, Dr. Lasater conceded that he took no steps to verify that the data was accurate and instead "worked on a representation by counsel . . . that the data in V3 was accurate." *See* Barnett Reply. Decl., Ex. J. (Lasater Tr. 44:19-46:11) (Q. Other than the representation of counsel, is there any basis provided to you for how you could verify the manner in which the data was collected? A. Even if I could, it was outside the scope of what was asked of me.").

## II.    Dr. Hayter's Analyses of Exhibits A and B Are Reliable

Defendants assert that Dr. Hayter's analyses of Exhibits A and B are unreliable because (1) the underlying data is "unrepresentative, incomplete, irrelevant, and/or inaccurate," DM12, and (2) Defendants disagree with Dr. Hayter's methodology for assessing the data. DM15. These arguments both fail. Defendants misrepresent and mischaracterize Dr. Hayter's methods, analyses, and conclusions, which all reflect generally accepted methods of statistical analysis.

As a threshold matter, Defendants' focus on Exhibits A and B misrepresents Dr. Hayter's analysis. As set forth at length in his Report, Dr. Hayter's opinions—including his critique of Dr. Lasater's flawed chi-square methodology, his analysis of individual physician workload variations, and his identification of a relationship between physician compensation and physician recommendations—begin *with Defendants' own V3 dataset*.[4] Dr. Hayter begins by carefully parsing the variables contained in Defendants' V3 dataset, setting forth how the various fields relate (or fail to relate) to a potential relationship between physician compensation and physician recommendations regarding an award of disability benefits. *Id.* (Hayter Report at 18). He assesses that the V3 datasets exclude information relating to physicians' individual recommendations and fail to include complete information regarding physician compensation. *Id.* (Hayter Report at 22-25). Dr. Hayter explains the importance of performing separate analyses for the different physician types in the dataset. *Id.* (Hayter Report at 105). He then identifies the variation in workload across the various physicians in the V3 dataset. *Id.* (Hayter Report at 130-38). Then, he analyzes the same datasets analyzed by Defendants' putative expert but, instead, considers each physician's individual recorded denial rate and workload separately rather than in aggregate, and also considers the four main types of physicians separately. *Id.* (Hayter Report at 149). Next, Dr. Hayter graphs the data with workload, as measured by evaluations, on one axis, and the physicians' recorded denial rates on the other. *Id.* (Hayter Report at 150). These figures show a consistent, repeated distribution that implies "there is a relationship between the physicians' recorded denial

---

[4] As Dr. Hayter explains, he has "routinely analyzed datasets in a variety of fields, such as medical, engineering, traffic safety, and product reliability, for example, that have been of a similar size and complexity as the V3 datasets that have been produced in this case, and he "applied [his] knowledge and experience with such datasets to [his] analyses of the V3 datasets that have been produced in this case, and to [his] assessments of Dr. Lasater's analyses of the V3 datasets." Barnett Reply Decl., Ex. H (ECF No. 172-5, sealed at ECF No. 173) ("Hayter Report") at 12-13.

rates and their workloads as measured by the number of evaluations, which results in there being no physicians having a low denial rate and a high workload." *Id.* (Hayter Report at 150). The data also revealed that "physicians with higher denial rates for applications tended to receive higher workloads for appeals." *Id.* (Hayter Report at 159-60).

Only after this analysis of the V3 dataset (and its limitations) does Dr. Hayter consider Exhibits A and B. As Dr. Hayter describes, these exhibits were prepared by counsel based on the V3 datasets and information produced in discovery, and contain information not provided in Defendants' V3 datasets, (Hayter Report at 26), and as he readily admits they provide some supplementary information to the V3 datasets but are limited to a subset of the applications and appeals included the V3 datasets. *Id.* (Hayter Report at 27-31). Subject to these limitations, Dr. Hayter analyzes the relationship between the physicians' compensation and their individual denial rates and concludes that, as with the V3 data, "within the Plaintiffs' dataset there is a relationship between the physicians' denial rates and their compensations, which results in there being no physicians having a low denial rate and a high compensation, as represented by the empty shaded red areas," and that "[t]hese analyses of the Plaintiffs' dataset are consistent with and supportive of the Plaintiffs' claims." *Id.* (Hayter Report at 181).[5] In other words, "if the Plaintiffs' claims are correct, then the Plaintiffs' dataset of physician recommendations and compensations is the kind of data that would be expected." *Id.* (Hayter Report at 175). As Dr. Hayter explained, █████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[5] Defendants' hypocrisy in making these criticisms is again on display because their own expert excluded large swaths of data from the V3 database—all applications and appeals that involved multiple benefit types—without making any effort to determine whether that impacted the representativeness of the subset of remaining data.

███████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████." *see* Garagiola

Decl., Ex. B (sealed at ECF No. 219) (Hayter Tr. 294:25-297:8). These analyses and opinions are

reliable.

Defendants' contention that Exhibits A and B are unrepresentative, biased, and contain

errors is disconnected from Dr. Hayter's methods and conclusions. The data is sufficiently reliable

for the purpose for which it is used in Dr. Hayter's analysis, and Defendants' criticisms and

disagreements with Dr. Hayter's analysis go to weight, not admissibility.[6]  As to the allegedly

unrepresentative or biased nature of Exhibits A and B, Dr. Hayter properly acknowledges the

limitations of the Exhibits, expressly stating that it "only provides supplemental information on

individual physician recommendations for 453 applications and 235 appeals." (Hayter Report at

27-28). Dr. Hayter even states that information "not provided in Exhibit A is necessary for a proper

investigation of the Plaintiffs' claims." *Id.* (Hayter Report at 28).[7] As Dr. Hayter explained in his

deposition, ███████████████████████████████████████████████████████████████

█████████████████████████████████████. (Hayter Tr. 149:14-152:4). Here, Dr. Hayter

---

[6] *See Bresler v. Wilmington Tr. Co*., 855 F.3d 178, 195 (4th Cir. 2017) ("Questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility."); *id*. ("[C]hallenges to the accuracy of [an expert's] calculations affect the weight and credibility of [the expert's] assessment, not its admissibility.") (internal citation omitted); *In re Under Armour Sec. Litig*., 730 F. Supp. 3d 172, 177 (D. Md. 2024) (rejecting defendants' argument that expert "offered his own interpretation of selective facts" because it went to weight, not reliability).

[7] Defendants' disingenuous assertions that Exhibits A and B reflect cherry-picking are not only unsupported but ignore that (1) Plaintiffs requested in discovery (and unsuccessfully moved to compel) a fuller set of physician report forms and decision letters so as to obtain more complete information regarding individual physician recommendations; and (2) such information is available to Defendants, and that they continued to refuse to produce it.

does not claim that ███████████████████████████████████████████

██████ . *Id*. (Hayter Tr. 181:24-183:13). Therefore, the Court should reject Defendants' critique

that Dr. Hayter failed to ensure the representativeness of the data. Defendants' attacks do not target

Dr. Hayter's methodology—which is sound—but, rather, merely reflects their disagreement with

his interpretations of the data available to him. These disputes are textbook examples of arguments

going to weight and are properly reserved for cross-examination. They are not grounds for

exclusion. *See Maryland Shall Issue, Inc. v. Hogan*, 2021 WL 3172273, at *9 (D. Md. July 27,

2021) (explaining that objections that "the data on which [the expert] relies" in his Supplemental

Declaration is "flawed" and the product of "cherry picking" and "data dredging"… "pertain to the

weight of the witness's conclusions, not admissibility.").

Second, as to purported errors in Exhibits A and B, *see* DM15, "beyond enumerating

alleged errors, [Defendants] fail[] to explain how these errors had any substantial bearing on the

reliability of [Dr. Hayter's] report[]." *McReynolds*, 349 F. Supp. 2d at 39-40 (denying motion to

exclude where "the purported flaws in [the expert's] analyses do not, in their totality, cast doubt

on the correctness of his methodologies or materially affect the results of his analyses."),

Defendants identify a handful of isolated typographical and transposition errors in the datasets

themselves, not in Dr. Hayter's analysis—all of which were identifiable because the exhibits used

by Dr. Hayter contained extensive documentation regarding the sources for the underlying data.

Many of the fields identified, such as Person ID, have no bearing on Dr. Hayter's analysis, which

depends on physician encounters and physicians' individual recommendations of approve or deny.

These criticisms go only to the weight of his opinions.

With respect to Exhibit B, Defendants' failure to distinguish arguments that go only to

weight and not admissibility is laid bare. Defendants criticize Dr. Hayter's decision to include

money that they characterize as "expense reimbursements" as part of physicians' compensation. DM11-13. This highly technical disagreement, however, does not point to any methodological flaw. Rather, it is a difference in understanding and interpreting facts that "is not properly the subject of a *Daubert* motion." *McReynolds*, 349 F. Supp. 2d at 39.[8]

Moreover, Defendants' argument misses the point entirely. Dr. Hayter is not offering legal conclusions about what constitutes "compensation" under ERISA or any other legal standard. He is simply analyzing financial relationships between the Plan and physicians to identify potential correlations with recommendation patterns. Whether certain payments are technically classified as "reimbursement" or "compensation" is irrelevant to the statistical question of whether financial relationships correlate with physician denials. Dr. Hayter appropriately analyzed all financial flows from the Plan to physicians, as any complete statistical analysis of potential bias would require. Even if some categorization choices in Exhibit B were imperfect—which Plaintiffs do not concede—such imperfections would affect the weight of the analysis, not its admissibility.

Finally, Defendants' complaints concerning Dr. Hayter's analyses of Exhibits A and B are meritless. Defendants first assert that Dr. Hayter's analysis begins by simply listing "███████ ███████████████████████████████████████████████████████████ ████████████████████████." DM15. Although Dr. Hayter's report does include tables listing certain physicians as described, that is neither the start nor the end of his methodology and analysis. *See generally* Hayter Report *passim*; Hayter Tr. 298:13-299:17 (Dr. Hayter testifying that

---

[8] *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000) ("The disputes that the parties have highlighted between Wertheimer and McCabe (and among the other experts on both sides) went to the weight of the evidence each was presenting, not to its admissibility."); *Freeman v. Progressive Direct Ins. Co.*, 733 F. Supp. 3d 463, 481 (D.S.C. 2024) (denying motion to exclude statistical experts because "[t]he parties dispute whether the Sold Data includes outside costs and fees, but such arguments are best reserved for trial and do not relate to whether Martin's opinions are reliable under *Daubert*.").

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████.") Even if "counting" were an accurate description of

Hayter's analysis, courts have held that it is helpful and reliable expert testimony for a statistical

expert to "count" data in a large database. In fact, "the field of statistics includes this 'counting'

activity. A statistician's purpose is to 'count' by sorting through raw data and putting it in a more

digestible format." *DL v. Dist. of Columbia*, 730 F. Supp. 2d 78, 83 (D.D.C. 2010).

In *Robinson v. Nationstar Mortg. LLC*, 2019 WL 4261696 (D. Md. Sept. 9, 2019), the court

confronted similar circumstances. There, "because of the manner in which class discovery was

conducted, [Plaintiff's expert] did not have access to all of [Defendant's] data fields for the

representative sample[.]" *Id.* at *4. Instead, due to defendant's failure to produce underlying

documents, plaintiffs' expert "analyzed certain data fields that were returned by the scripts written

by a different expert. *Id.* Defendant challenged the expert's reliance on this limited data, but the

court found that such criticisms "ring hollow" because the limitations were "necessitated by [the

defendant's] unwillingness or inability to produce the relevant data." *Id.* at *14. Significantly, the

court emphasized that the defense mounted "no persuasive attack on [the expert's] principles and

methodology . . . which largely consisted of counting" and concluded that "where the broad

methodology is sound, the lack of consideration of unproduced data cannot provide a basis to strike

the expert witness's testimony." *Id.*

The court's reasoning in *Robinson* should control here. Dr. Hayter analyzed the V3 dataset

that Defendants themselves produced, supplemented by Exhibit A, a dataset compiled from

individual physician recommendation forms ("PRFs") and decision letters that Defendants

possessed but successfully refused to produce. Having successfully denied Plaintiffs access to the

complete underlying data, Defendants cannot now weaponize their own discovery strategy and tactics as grounds for exclusion of Plaintiffs' expert.

Second, as to his analyses that reveal a consistent pattern that there are no highly compensated physicians who have high approval rates, Dr. Hayter's methods are reliable. Defendants disagree with Dr. Hayter's conclusions, but that is not grounds for exclusion. As described above, Dr. Hayter's analysis is not limited to the four tables referenced in Defendants' motion but, rather, begins with the V3 data, and through his nearly 200-page report, "present[s] statistical conclusions that are not evident on the face of the data." *DL v. Dist. of Columbia,* 730 F. Supp. 2d at 83. Such testimony is helpful in providing an understanding of the data and database at issue.

At bottom, the animating principle of FRE 702 is that expert opinions must be reliably connected to work performed—here, statistical analysis. Dr. Hayter's opinions more than satisfy this requirement. Dr. Hayter is a distinguished statistician with an M.A. in mathematics from Cambridge University and a Ph.D. in Statistics from Cornell University. (Hayter Report at 243). He has taught statistics for over 35 years and authored a widely adopted textbook, *Probability and Statistics for Engineers and Scientists*. His role in this litigation was to perform statistical analysis of the V3 dataset, evaluate Dr. Lasater's statistical conclusions, and analyze patterns in a subset of V3 data supplemented with individual physician recommendations. He has capably discharged that role.

## III. Dr. Hayter's Criticisms of Dr. Lasater's Analysis Are Proper Rebuttal Testimony

### A. Rebuttal Experts Are Expected to Critique Opposing Methodologies

Defendants further contend that Dr. Hayter should be precluded from critiquing Dr. Lasater's analysis. DM19. That argument misunderstands the nature of rebuttal testimony. Federal

courts consistently recognize that rebuttal experts may properly criticize an opposing expert's methodology without offering their own competing analysis. As this District has previously explained, "[a] rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *G. W. Aru, LLC*, 2025 WL 1068581, at *9.

Importantly, Dr. Hayter was retained to assess the statistical validity of Dr. Lasater's conclusions. *See* Hayter Report at 11 ("I have been asked to respond to the declarations of Dr. Lasater of November 18th, 2024, and December 10th, 2024, together with other productions from the Defendants."). In fulfilling that role, Dr. Hayter explained that Dr. Lasater's chi-square analyses fail because the V3 dataset lacks the granularity needed to detect the kind of bias alleged. That critique is itself a valid and admissible form of expert testimony. *See Brightview Grp., LP.,* 2021 WL 2627960, at *8 (rebuttal expert witnesses "may criticize other experts' theories and calculations without offering alternatives) (citation and internal quotation marks omitted).

### B. Dr. Hayter Identified Specific, Verifiable Flaws in the V3 data

Defendants attempt to brush aside Dr. Hayter's critique of the V3 datasets and Dr. Lasater's opinions as "nothing more than Dr. Hayter's personal opinion." DM20. That characterization is incorrect. Step by step, Dr. Hayter walks through concrete flaws in the V3 dataset and discusses how and why these issues go to the merits of Dr. Lasater's conclusions. Defendants take the remarkable position that Dr. Hayter's critique should be excluded because he supposedly "did not attempt to analyze the same data set that Dr. Lasater used for his analysis." DM19 . That, however, is simply untrue. Dr. Hayter did analyze V3—the exact same dataset—and identified structural issues that make certain statistical conclusions, and identified structural flaws within it that render

certain statistical inferences uninformative. That does not undermine his credibility. It represents his critique.

In addition, Defendants maintain that the failure of the V3 dataset to include individual physician recommendations, and Dr. Lasater's decision to attribute findings of "approve" or "deny" based on the ultimate benefit outcome are "purely legal arguments." DM22. Not so. The data captured in the V3 datasets and what Dr. Lasater analyzed bear directly on both the methods and conclusions that can be drawn from the V3 dataset. Far from making unsupported legal arguments, Dr. Hayter carefully walks through multiple examples where he demonstrates that Dr. Lasater's analysis of single benefit applications relies on incorrect assignments of individual recommendations, *i.e.*, Dr. Lasater evaluated a physician as having recommended "approve," but documents produced in discovery confirm the physician actually recommended "deny." Hayter Report at 75-89. It is undisputed that the V3 dataset lacks individual physician recommendations and that Dr. Lasater's analysis involved an attribution process based on the outcome of the application or appeal.[9] Although Defendants may *disagree* with Dr. Hayter's criticisms, this disagreement is one rooted in the data and the proper method of analysis, which was not a legal argument.

Similarly, Dr. Hayter's other criticisms are undisputed, verifiable issues with the V3 datasets and Dr. Lasater's methods of analysis. For example, the V3 dataset does not provide

---

[9] The V3 datasets produced by Defendants report only the final benefit determination on an application or appeal basis. As Dr. Lasater admits in his rebuttal declaration, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Recognizing that limitation—and understanding what it means for the reliability of the analysis—is exactly what competent statistical work requires. Dr. Hayter's expertise allowed him to identify that the V3 dataset simply cannot support the kinds of conclusions that Defendants try to draw from it.

sufficient information to analyze multi-benefit applications: when a player applies for multiple benefits and receives mixed results, the V3 dataset provides no way to determine which physician made which recommendation. Lasater Report ¶ 19. And Dr. Lasater confirmed at his July 31, 2025 deposition that ███████████████████████████████████████.[10] Dr. Lasater's exclusion of all multi-benefit applications—a substantial portion of the data—introduces selection bias into the sample he analyzes that is entirely unaddressed. Dr. Hayter's identification of structural flaws in the V3 dataset represents exactly the type of specialized knowledge that assists the Court. A lay person could not identify that the V3 dataset's failure to capture individual physician recommendations creates an attribution problem that undermines statistical inferences. Nor could a lay person recognize how the wholesale exclusion of multi-benefit applications introduces selection bias that affects the reliability of Dr. Lasater's conclusions. These insights require statistical expertise to both identify and explain their significance.

Defendants' own arguments prove why this testimony is necessary. Defendants argue that Dr. Hayter's testimony should be excluded because "███████████████████████████ ████████████" but instead criticized it. DM20-21. But this argument has no basis in FRE 702. The rules do not provide that there is only a single acceptable method for analysis. *Glass v. Anne Arundel Cnty.,* 38 F. Supp. 3d 705, 716 (D. Md. 2014), *aff'd*, 716 F. App'x 179 (4th Cir. 2018) ("objections to [the expert's] conclusions from calculations  and to [the expert's] failure to take other data into account— went to weight of report, not its admissibility, and could be challenged on cross-examination"). Dr. Hayter considered the ████████████████

---

[10] Decl. of Benjamin R. Barnett, dated Aug. 8, 2025, Ex. A (Lasater July 31, 2025 Dep. Tr. at 75:8-16) ██████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ )

███████████████████████████████████████████. Hayter

Tr. at 228:5-229:15. Dr. Hayter acknowledged that ███████████████████

██████████████. Hayter Tr. at 227:22-228:5. Running the test on median split

groupings of physicians based on application type, however, is more likely to confuse rather than

provide useful information for several reasons including, (1) Dr. Lasater's attribution of outcomes

is contrary to the individual physician recommendations, (2) Dr. Lasater excluded approximately

20% of all encounters without justification, (3) Dr. Lasater's ranking of encounters failed to

address physician's by specialty or count all encounters, and (4) the chi-square test tests only the

groups of physicians in the aggregate. Hayter Report at 90-119

Defendants argue that Dr. Hayter offers no "scientific analysis or expertise regarding why

such criticisms should be accepted." DM23. But the criticisms themselves are part of the scientific

analysis and statistical methodology. Understanding a large, complex dataset and what conclusions

can be drawn from what statistical method is squarely within the ambit of a statistician. Parsing

the data and the purported analysis of Dr. Lasater to identify that his analysis failed to properly

reflect individual physician recommendations and total encounters, excluded relevant data without

explanation, and aggregated observations to obscure important variations between the datapoints,

are not "baseless" criticisms (DM24), but rather a reliable method for explaining why Dr. Lasater's

analysis fails to disprove the existence of bias in physician assignments. Such criticisms fall well

within the realm of acceptable rebuttal testimony and are precisely the type of analysis that assists

the trier of fact in evaluating the reliability of statistical evidence.

## IV.     Dr. Hayter's Appropriate Observations on the Amended Complaint Are Limited

Next, Defendants contend that Dr. Hayter's limited comments regarding statistics in the

Amended Complaint are unreliable. DM24. That argument, too, is based on an inaccurate and

distorted reflection of Dr. Hayter's actual opinions. Dr. Hayter does *not* opine that the Amended Complaint cites statistics that are based on a representative sample. Rather, he observes that the patterns in the Amended Complaint data are "substantial" and "notable"—observations well within his expertise. Hayter Report at 164.

Moreover, Dr. Hayter specifically notes that Dr. Lasater's criticisms of the Amended Complaint fail to address key aspects: they cover different time periods, different physicians, and different specific examples than those in the Amended Complaint. *Id.* at 164-69. These observations about the scope and relevance of Dr. Lasater's critique are appropriate expert testimony about statistical analysis, not improper legal argument.

## V. Dr. Hayter Fully Disclosed All Facts and Data Relied Upon

Equally unavailing is Defendants' Rule 37(c) argument (DM26-28). To establish a violation of Rule 37(c) warranting exclusion, the moving party must show both a failure to disclose and resulting prejudice. *See Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014) (listing five-factor test for determining whether failure was "substantially justified or harmless*"*); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co*., 318 F.3d 592, 596 (4th Cir. 2003) ("[T]he basic purpose of Rule 37(c)(1) [is] preventing surprise and prejudice to the opposing party."). Defendants have shown neither.

First, there is no failure to disclose. Dr. Hayter's report identifies the materials that he considered in Section B of his report, which includes: the complete V3 dataset (applications and appeals); Exhibit A (individual physician recommendations); Exhibit B (physician compensation data); specific documents with Bates-stamp citations. The report contains extensive footnotes with citations, allowing Defendants to trace every sentence to a reviewed document. For example, when discussing specific physician patterns, Dr. Hayter provides exact row numbers in the Excel

spreadsheets and Bates numbers for source documents. Because, there is no mystery about what data Dr. Hayter analyzed or how he analyzed it, Defendants cannot show any prejudice.

Defendants' complaint that Dr. Hayter's report included a ███████████ rather than ████████████████ (DM26) elevates form over substance. The governing standard under Rule 26(a)(2)(B)(ii) is whether the expert disclosed the facts and data considered in forming their opinions—not whether their cover sheet used magic words. Here, Defendants received all of Dr. Hayter's underlying data, and they had ample notice of the basis for his opinions, there can be no prejudice.[11]

Moreover, Defendants argument that Dr. Hayter failed to disclose the method by which Exhibits A and B were assembled is equally unavailing. Rule 26 requires disclosure only of the facts and data considered by the expert. Fed. R. Civ. P. 26. Also, as courts have recognized, "Defendants ha[ve] obtained a full factual predicate for this expert's opinions" when the expert has disclosed the data he considered. *Davita Healthcare Partners, Inc. v. United States*, 128 Fed. Cl. 584, 591 (2016). As discussed in Section I and II, Exhibits A and B were provided to Dr. Hayter by counsel as supplements to the V3 data produced by Defendants. Defendants extensively inquired about both exhibits at Dr. Hayter's deposition, and, beyond what he testified and what is plainly disclosed in his expert report, the method of examining the documents produced in discovery to discern the individual physician recommendation for the applications and appeals in the V3 datasets is neither a fact nor data considered by Dr. Hayter. Dr. Hayter repeatedly explained ████████████████████████████████████████. *See, e.g.*, Hayter Tr. 170:15-23, 171:12-17.

---

[11] Dr. Lasater submitted a "materials considered" list that included documents he never reviewed or relied upon, and that he admitted were provided to him only days before his declaration. *See* Lasater Tr. 22:4–23:5.

Even if there were some technical deficiency (which there is not), Defendants cannot show prejudice, the touchstone of the Rule 37(c) inquiry. *See Jordan v. Town of Fairmount Heights*, No. 2024 WL 732011, at *7 (D. Md. Feb. 21, 2024) ("[T]he exclusions of expert testimony on the basis of inadequate 26(a)(2) disclosures,...has traditionally been considered a severe sanction, appropriate only for willful and substantial abuse of the discovery process.") (quoting *Sullivan v. Glock, Inc*., 175 F.R.D. 497, 504 (D. Md. 1997)) Here, Defendants have had every opportunity to explore opportunity to explore Dr. Hayter's opinions: they received his comprehensive 243-page report with detailed citations, have clear identification of all data analyzed, whether from Defendants' own V3 system, Exhibits A and B, or documents produced in discovery; and deposed Dr. Hayter for seven hours.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion.

Dated:  August 8, 2025

Respectfully submitted,

**SEEGER WEISS LLP**

By:  *s/ Benjamin R. Barnett*
Benjamin R. Barnett
**SEEGER WEISS LLP**
325 Chestnut St, Ste 917
Philadelphia, PA 19106
Telephone: (215) 553-7980
bbarnett@seegerweiss.com

***Counsel for Plaintiffs and for the
Proposed Class and Subclasses***

Christopher A. Seeger *(admitted pro hac vice)*
Diogenes P. Kekatos *(admitted pro hac vice)*
Caleb A. Seeley *(admitted pro hac vice)*
Hillary R. Fidler *(admitted pro hac vice)*

25

**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ 07660
Telephone: (973) 639-9100
cseeger@seegerweiss.com
dkekatos@seegereiss.com
cseeley@seegerweiss.com
hfidler@seegerweiss.com

Samuel L. Katz *(admitted pro hac vice)*
Julia M. Damron *(admitted pro hac vice)*
Noah T. Reid *(admitted pro hac vice)*
Yasha Torabi *(admitted pro hac vice)*
**ATHLAW LLP**
8383 Wilshire Blvd., Suite 800
\Beverly Hills, CA 90211
Telephone: (818) 454-3652
samkatz@athlawllp.com
julia@athlawllp.com
noahreid@athlawllp.com
yasha@athlawllp.com

Bryan F. Aylstock *(admitted pro hac vice)*
Justin G. Witkin *(admitted pro hac vice)*
Douglass A. Kreis *(admitted pro hac vice)*
Bobby J. Bradford (*admitted pro hac vice*)
**AYLSTOCK, WITKIN, KREIS, & OVERHOLTZ, PLLC**
17 E. Main Street, Suite 200
Pensacola, FL 32502
Telephone: (850) 202-1010
BAylstock@awkolaw.com
JWitkin@awkolaw.com
DKreis@awkolaw.com
BBradford@awkolaw.com

***Counsel for Plaintiffs and for the***
***Proposed Class and Subclasses***

Jason S. Rathod
Nicholas A. Migliaccio
**MIGLIACCIO & RATHOD LLP**
412 H Street, N.E.
Washington, DC 20002
Telephone: (202) 470-3520
jrathod@classlawdc.com
nmigliaccio@classlawdc.com

***Counsel for Plaintiffs and Liaison Counsel
for the Proposed Class and Subclasses***

Robert K. Scott *(admitted pro hac vice)*
Gerry H. Goldsholle *(admitted pro hac vice)*
**ADVOCATE LAW GROUP P.C.**
2330 Marinship Way, Suite 260
Sausalito, CA 94965
Telephone: (949) 753-4950
bob@advocatelawgroup.com
gerry@advocatelawgroup.com

***Additional Counsel for Plaintiffs***