# Exhibit B

# FILED UNDER SEAL

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF MARYLAND
 3                    BALTIMORE DIVISION
 4    _____
 5    JASON ALFORD, et al.,
 6         Plaintiffs,
 7
      -vs-                              Case No.
 8                                      1:23-cv-00358-JRR
 9    THE NFL PLAYER DISABILITY &
10    SURVIVOR BENEFIT PLAN, et al.,
11         Defendants.

      _____
12
13
14
15        REMOTE VIDEO-RECORDED DEPOSITION OF
16               DR. ANTHONY HAYTER
17             11:05 a.m. to 2:16 p.m.
18                August 25, 2025
19
20
21
22
23
24    Job No. 7554391
25         REPORTED BY:  Rhonda D. Tuck, RPR, CRR
```

Page 2

1           Video-Recorded Deposition of DR. ANTHONY

2       HAYTER, taken and transcribed on behalf of the

3       Defendants, by and before Rhonda D. Tuck, RPR, CRR,

4       Notary Public in and for the Commonwealth of

5       Virginia at large, commencing at 11:05 a.m.,

6       August 25, 2025, via remote videoconference.

7

8       APPEARANCES OF COUNSEL:

9

10           ATHLAW LLP

11           8383 Wilshire Blvd, Suite 800

12           Beverly Hills, California 90211

13           (213) 205-2061

14           samkatz@athlawllp.com

15           julia@athlawllp.com

16      BY:  SAMUEL KATZ, ESQUIRE

17           JULIA DAMRON, ESQUIRE

18           Counsel for the Plaintiffs

19

20

21

22

23

24

25

Page 3

```
 1      APPEARANCES OF COUNSEL CONTINUED:
 2
 3          SEEGER WEISS LLP
 4          55 Challenger Road
 5          Ridgefield Park, New Jersey 07660
 6          (973) 639-9100
 7          cseeley@seegerweiss.com
 8          hfidler@seegerweiss.com
 9      BY: CALEB SEELEY, ESQUIRE
10          HILLARY FIDLER, ESQUIRE
11          Counsel for the Plaintiffs
12
13          O'MELVENY & MYERS LLP
14          610 Newport Center Drive, 17th Floor
15          Newport Beach, California 92660
16          (949) 823-6900
17          emckeen@omm.com
18          mgaragiola@omm.com
19          hstodder@omm.com
20      BY: ELIZABETH L. MCKEEN, ESQUIRE
21          MEREDITH GARAGIOLA, ESQUIRE
22          HANA STODDER, ESQUIRE
23          Attorneys for the Defendants
24
25      ALSO PRESENT:
        Curtis Roginski - Videographer
```

Page 4

1                        I N D E X
2        WITNESS:  DR. ANTHONY HAYTER
3            Examination by Attorney McKeen...................6
4            Examination by Attorney Seeley.................115
5
6
7                      E X H I B I T S
8        Exhibit 8.......................................14
            Expert Rebuttal Report of Dr. Anthony Hayter
9            August 15, 2025
10       Exhibit 9.......................................81
            Expert Report of Dr. Anthony Hayter
11           April 11, 2025
12
13
14
15       REPORTER'S NOTE:  All quotations from exhibits are
         reflected in the manner in which they were read into
16       the record and do not necessarily indicate an exact
         quote from the document.
17
18                        *  *  *  *  *
19
20
21
22
23
24
25

Page 5

1      (11:05 a.m., August 25, 2025)

2

3              THE VIDEOGRAPHER:  Good morning.  We are

4           going on the record at 11:05 a.m., on

5           August 25th, 2025.  This is Media Unit 1 of

6           the video-recorded deposition of Dr. Anthony

7           Hayter, taken in the matter of Jason Alford,

8           et al. v. The NFL Player Disability &

9           Survivor Benefit Plan, et al., filed in the

10          United States District Court for the District

11          of Maryland, Baltimore Division.  Case Number

12          1:23-cv-00358-JRR.

13              My name is Curtis Roginski, representing

14          Veritext, and I am the videographer.  The

15          court reporter is Rhonda Tuck, also of

16          Veritext.

17              Will counsel please identify yourselves

18          and state whom you represent.

19              ATTORNEY MCKEEN:  Elizabeth McKeen, of

20          O'Melveney & Myers, on behalf of defendants,

21          and I am joined here in the room today by my

22          colleague, Hana Stodder, and Meredith

23          Garagiola, who is with me by Zoom.

24              ATTORNEY SEELEY:  For the plaintiffs,

25          Caleb Seeley from Seeger Weiss, Hillary

Page 6

```
 1              Fidler also from Seeger Weiss by Zoom.  And
 2              Sam Katz and Julia Damron, of Aflaw, are also
 3              by Zoom for the plaintiffs.
 4                   THE VIDEOGRAPHER:  Would the court
 5              reporter please swear in the witness.
 6                   (Witness sworn.)
 7
 8                   DR. ANTHONY HAYTER,
 9         having been duly sworn, testified as follows:
10                   E X A M I N A T I O N
11     BY ATTORNEY MCKEEN:
12         Q.   Good morning, Dr. Hayter.  I previously
13     took your deposition in this same lawsuit a couple
14     months ago.  Do you remember that?
15         A.   Yes, ma'am.
16         Q.   At the beginning of that deposition, we
17     went over some ground rules.  Those are generally
18     still true today.  Do you understand?
19                   ATTORNEY SEELEY:  Objection to form.
20                   THE WITNESS:  Yes, I understand, ma'am.
21     BY ATTORNEY MCKEEN:
22         Q.   Do you understand that you're under oath
23     today the same way as you would be if you testified
24     in a court of law?
25         A.   Yes, I do understand that.
```

Page 7

```
 1              Q.    Are you on any medication today that
 2       might hinder your ability to testify truthfully?
 3              A.    Not that I am aware of.
 4              Q.    Is there any reason we can't proceed
 5       with your deposition at this time?
 6              A.    Not that I am aware of.
 7              Q.    Dr. Hayter, where are you testifying
 8       from today?
 9              A.    I am in England.
10              Q.    Where in England?
11              A.    I am in the county of Devon.
12              Q.    What time is it there?
13              A.    It is 8 minutes past 4:00 in the
14       afternoon.
15              Q.    Is there anyone else in the room with
16       you, sir?
17              A.    No, ma'am.
18              Q.    Do you have any materials in the room
19       with you?
20              A.    Well, I have my computer, and I have
21       access to my file on my computer, which would be,
22       for example, my reports and Dr. Lasater's
23       declarations, and I have my phone next to me, which
24       is on silent mode.  So I have no hard materials,
25       hard copy materials with me.
```

Page 8

```
1              Q.    So if I understand your testimony
2      correctly, your only form of communication while
3      we're on the record today is this videoconference
4      link.  Is that true?
5              A.    That's how I'm communicating with you,
6      yes.
7              Q.    But you don't have your email open, do
8      you?
9              A.    Not on my computer.  I suppose
10     technically it's on my phone, but my phone is, like,
11     as I said, silent and sort of closed.
12             Q.    And you're not using your phone to
13     communicate with anybody else right now, are you?
14             A.    I am not using my phone.  No, ma'am.
15             Q.    Thank you.  Dr. Hayter, how did you
16     prepare for your deposition today?
17             A.    So I reviewed what I consider to be the
18     relevant materials in this case, and I had one
19     meeting with the attorneys who I am working with.
20     One meeting specifically with regards to this
21     deposition.
22             Q.    When you say you reviewed the relevant
23     materials, which materials were those?
24             A.    I may not be able to recall all of them,
25     but they would have been my two reports.  So
```

Page 9

```
 1     obviously I had an initial report, I think was in
 2     April, and then my rebuttal report in August, and I
 3     would have looked at, maybe referred back to at
 4     least one of Dr. Lasater's declarations from last
 5     year, 2024.  And then to various degrees, I would
 6     have looked at all of the materials which I had
 7     received I think subsequent to the last time you
 8     took my deposition, which they should be all listed
 9     in my second report under "Additional Materials
10     Reviewed," that section.
11              Q.   Dr. Hayter, is it your testimony that
12     you reviewed all of those materials in preparation
13     for this deposition here today?
14                   ATTORNEY SEELEY:  Objection to form.
15                   THE WITNESS:  I wouldn't say necessarily
16              I reviewed all of them.  I certainly I think
17              looked through all of them, but I may be --
18              that may not be correct.
19     BY ATTORNEY MCKEEN:
20              Q.   Did you review any documents other than
21     the ███████████████████████████████████ to
22     your August 15th rebuttal report?
23                   ATTORNEY SEELEY:  Objection to form.
24                   THE WITNESS:  So I'd like to open up my
25              rebuttal report and look at ███████████  Is
```

1          that okay?

2     BY ATTORNEY MCKEEN:

3          Q.   Let's not do that now.  If you don't

4     remember or you don't know, that's okay, and we can

5     get into your report in a few minutes.  Is the

6     answer that you don't remember without looking at

7     your report?

8               ATTORNEY SEELEY:  Objection to form.  He

9               already identified other documents that he

10              looked at.

11              THE WITNESS:  If you're asking me about

12              ████████   in my rebuttal report, which as I

13         recall ██████████████████████████████

14     ████████████████████████████████████████████

15     ████████████████████████████████   as I recall.

16         If you're asking me about ████████, I'd like

17              to open it up and look at it.

18     BY ATTORNEY MCKEEN:

19          Q.   Asking you about ████████   What I'm

20     asking you about is what you reviewed in preparation

21     for your deposition today, and I'm trying to get

22     your best recollection of that.

23          A.   I'm sorry.  So you're asking me what I

24     reviewed in preparation for today's deposition,

25     right?  So my recollection is I would have reviewed

Page 11

1    my initial report, which I think was from April, and

2    then my rebuttal report from August.  I would

3    have -- I think I reviewed at least one of

4    Dr. Lasater's two declarations from 2024, and then

5    my recollection is I would have looked through in

6    various degrees of intensity ███████████████████

7    ██████████████████████████████ of my rebuttal report,

8    ████████████████████████████████████████████████████

9    ███████████████████████████████

10              Q.   Is there anything else that you looked

11   at, in terms of documents, to prepare for this

12   deposition?

13              A.   It's possible, but I don't recall

14   anything.

15              Q.   Okay.  Thank you, sir.  You mentioned

16   one meeting with attorneys to prepare for this

17   deposition.  Do I have that right?

18              A.   It was basically in reference to today's

19   deposition.  Yes, ma'am.

20              Q.   How long was that meeting?

21              A.   My recollection is it was an hour and 15

22   minutes, around about that.

23              Q.   When was that meeting, Dr. Hayter?

24              A.   So let's see.  Today is Monday.  So that

25   would have been before the weekend.  So if I'm

Page 12

1    remembering correctly, that was Friday, the last
2    Friday, which was -- that would have been Friday,
3    the 22nd, I believe.
4         Q.   Who attended that meeting besides
5    yourself?
6         A.   So it was a Zoom meeting, and there was
7    myself and there was Caleb Seeley and his colleague,
8    Hillary Fidler, as I recall.
9         Q.   Anyone else?
10        A.   Not that I was aware of.
11        Q.   Did you discuss your deposition with
12   anyone other than counsel?
13        A.   When you say "counsel," you're referring
14   to the people in that Zoom meeting, right?
15        Q.   That's correct.
16        A.   I do not believe I have discussed it
17   with anyone else.  Not as I recall.
18        Q.   In connection with preparing your
19   rebuttal report in this case, did you have any
20   communications with anyone other than plaintiffs'
21   counsel to prepare your report?
22        A.   I don't believe so.  I don't recall
23   anyone else.
24        Q.   You, for example, didn't communicate
25   with any former NFL players?

Page 13

1           A.    Not with regards to this case.   That is
2      correct.
3           Q.    Well, did you communicate with any
4      former NFL players about anything at all?
5           A.    Are you asking in my entire life,
6      whether I have had communications with former NFL
7      players?
8           Q.    I'm asking about the preparation of your
9      rebuttal report, Dr. Hayter, and whether during the
10     time that you were working on preparing that
11     rebuttal report, you've spoken to any former NFL
12     players?
13          A.    I believe as I indicated, with respect
14     to this case, I have not communicated with any
15     former NFL players that I'm aware of.   Perhaps some
16     of the lawyers I've been working with are and I'm
17     not aware of that.
18          Q.    In connection with your work on this
19     case, have you communicated with any physicians that
20     were compensated by the plan that you're aware of?
21          A.    I do not believe so.   As you asked in
22     had my first deposition, I think my answer was
23     assuming that the lawyers I'm working with are not
24     physicians compensated by the plan, because the only
25     people that I have communicated with would be the

Page 14

1    attorneys that I've been working with.

2          Q.    And the answers -- the testimony that

3    you gave about that in your previous deposition

4    remains true today, with respect to who you've

5    spoken to about this case?

6          A.    Yes.  I think you're asking me now, and

7    I think we had similar discussions at the beginning

8    of my previous deposition, and I think now and in my

9    previous deposition, it's the same answer in that

10   the only people that I have spoken with about this

11   case are the attorneys that I have been working

12   with.

13                ATTORNEY MCKEEN:  Okay, Dr. Hayter.  I'd

14          like to go ahead and mark as Exhibit 8 to

15          your testimony the rebuttal report that you

16          submitted in this case on August 15th.

17                (Exhibit 8 marked for identification.)

18   BY ATTORNEY MCKEEN:

19          Q.    So Dr. Hayter, I'm going to have that

20   put in Exhibit Share and mark it as an exhibit to

21   your deposition.  But if it is easier for you to use

22   the copy that you said you have locally available to

23   yourself, whatever is easiest for you.

24                I'll just ask you, does the copy that

25   you have accessible have any markings or notes on

Page 15

1      it, or is it a clean copy?

2            A.    Okay.  So I'm on the Exhibit Share, and

3      I think it's loading a document.  Right.  So I'm on

4      the Exhibit Share and I see Exhibit 8, which looks

5      very much like the first page of my report of

6      August 15th, but as you indicated, I am also opening

7      up a copy on my computer.

8            So I have a PDF file open on my

9      computer, which is ███████ of my rebuttal report

10     of August 15th, and it does not have any annotations

11     or markings on it beyond what I submitted to Caleb

12     Seeley.

13           Q.    Thank you, Dr. Hayter.  You can refer to

14     whichever version is easiest for you, but before we

15     go forward, I'd just like to ask you to confirm that

16     what we've marked as Exhibit 8 to your deposition is

17     a copy of your August 15th rebuttal report.

18           A.    Well, the first page appears to be

19     identical to the first page of the PDF file that I

20     have open.

21           Q.    Do you need to look at the rest of the

22     report to confirm that this is --

23           A.    Oh, I'm sorry.

24           Q.    It's okay.  That's what it is, I'll

25     represent it to you.  I'd just like your testimony

Page 16

 1    that yes, this is your report.

 2              ATTORNEY SEELEY:  Objection to form.  Do

 3         you want him to go page by page?

 4              ATTORNEY MCKEEN:  I sure hope he doesn't

 5         feel like he has to.  This shouldn't be that

 6         hard.

 7              ATTORNEY SEELEY:  Well, if you're asking

 8         him to confirm it, I think he would need to.

 9         But if you just want to represent it, I think

10         we'll accept your representation.

11    BY ATTORNEY MCKEEN:

12         Q.   Dr. Hayter, I noticed that you deleted

13    the website HayterStatistics.com from your CV

14    between your last report and this one.  Why did you

15    do that?

16         A.   So just to clarify the previously, I

17    didn't actually realize I could scroll through it.

18    I thought you were just showing me the first page.

19    But now I realize I actually have control of it on

20    Exhibit Share and I see it as a 167-page document,

21    or at least that's what it says.

22              So that website, I have, I've

23    essentially stop paying for, and it has been taken

24    down.

25         Q.   What was that website?

Page 17

```
1              A.    The name of it was HayterStatistics.com.
2              Q.    But what was it?  What was included on
3        the website?
4              A.    It was essentially marketing myself as
5        an expert witness in statistics and mathematics, so
6        it had my resume.  It had references from attorneys
7        that I've worked with.  It had some details of the
8        kind of cases I've worked on.  It had my contact
9        information and things like that.
10             Q.    Was there a reason you decided to
11       discontinue paying for the website?
12             A.    Yes, ma'am.
13             Q.    What was that reason?
14             A.    It's because I don't wish to solicit new
15       cases to work on beyond the cases I'm working on and
16       the cases I get from the attorneys I already have
17       relationships with.
18             Q.    Is that the primary source of your new
19       work as an expert witness, the relationships you
20       already have with attorneys?
21                   ATTORNEY SEELEY:  Objection to form.
22                   THE WITNESS:  I'm sorry, just to
23             clarify.  When you said "is that the," you're
24             not --"that" is not the website; it's
25             something else, right?
```

Page 18

1      BY ATTORNEY MCKEEN:

2           Q.   I'm asking you if your relationships

3      that you mentioned with attorneys that you already

4      work with, if that's your main source of new work as

5      an expert?

6                ATTORNEY SEELEY:  Objection to form,

7           scope.

8                THE WITNESS:  I think the answer to that

9           depends upon what time period I look at.

10     BY ATTORNEY MCKEEN:

11          Q.   I'm asking about today, sir.

12          A.   Well --

13               ATTORNEY SEELEY:  Objection to form.

14               THE WITNESS:  -- today, let's say this

15          year, 2025.  I think -- as I recall, I think

16          all of the new cases that I have accepted

17          this year, 2025, I'm thinking that they are

18          all from attorneys that I have previous

19          relationships with or similar matters, maybe

20          colleagues of those attorneys.  I might be

21          wrong, but that's the recollection I have.

22     BY ATTORNEY MCKEEN:

23          Q.   Did you prepare your rebuttal report by

24     yourself, or did you have help?

25          A.   I prepared it entirely by myself.

1    Although, I did receive information from the

2    attorneys that I'm working with.

3         Q.   And is that information all listed in

4    ███████████████████ of your August 15th report?

5         A.   Is this a moment where I can look at

6    █████████

7         Q.   Why don't you have a look at ██████████

8    I'm sorry, ████████ and confirm ██████████████████

9    ███████████████████████████████████

10   ████████████████████████████████████████████████

11        A.   So I'm looking at ████████████

12        Q.   I'm sorry, it should be ██████████████

13   ████████

14        A.   You are absolutely correct.  Thank you.

15        I'm looking at █████████████████████████

16   ██████████████████████████

17          ██████████████████████████████

18   ████████████████████████████████████

19   ██████████████████████████████

20        Q.   ████████████████████████

21   ██████████████████████████████████████████████████

22   ██████████████

23        A.   ██████████████████

24        Q.   And you -- I think you specifically said

25   that you received information from counsel.  Just so

1    we're on the same page, ███████████████

2    ████████████████████████████████████ '

3    ████████████████████████████████████████

4    ████████████████

5                ATTORNEY SEELEY:  So at this point,

6          Doctor, I'll just -- it's more of a caution

7          than an instruction, but obviously to the

8          extent you received or discussed your

9          compensation with counsel or to the extent

10         you received facts or assumptions that were

11         part of your analysis, you are free to

12         discuss them, but any other communications

13         with counsel are protected work product and

14         not subject to discovery pursuant to the

15         rules of evidence, so I just caution you to

16         if you can answer the question given that

17         guidance.

18                THE WITNESS:  Thank you.

19         ██████████████████████████████

20         ███████████████████████████████

21         █████████████████████████████████████

22         █████████████████████████████████████

23         ███████████████████████████████████

24         ██████████████████████████████████████

25         ████████████████████████████████████

Page 21



1

2

3

4

5

6

7 So that was what I was

8 thinking of when I indicated that I have

9 received information from the attorneys that

10 I'm working with.

11 BY ATTORNEY MCKEEN:

12 Q. Okay.

13

14

15

16

17 ATTORNEY SEELEY: Objection to form.

18 THE WITNESS: Right.

19

20

21

22

23

24

25 So those

Page 22

```
 1            are my understandings from the communications
 2            I had from the attorneys that I'm working
 3            with.
 4    BY ATTORNEY MCKEEN:
 5            Q.    The understandings that you describe ███
 6    ███████████████████████████████ those
 7    understandings come from your conversations with
 8    counsel; is that correct?
 9            A.    Yes, if counsel means the attorneys that
10    I'm working with.
11            Q.    Okay.  So with respect to your testimony
12    on ████████████████████████████████████
13    ███████████████████████████████████
14    ██████████████████████████████████████
15    ████████████████████████████████████████
16    ████████████████████████████████████████
17    ████████████  how did you come to have that
18    understanding?
19                  ATTORNEY SEELEY:  Objection to form.
20                  THE WITNESS:  Because it was
21            communicated to me by the attorneys that I'm
22            working with.
23    BY ATTORNEY MCKEEN:
24            Q.    Which attorneys communicated that to
25    you?
```

Page 23

1          A.    It was on Zoom meetings with Caleb

2     Seeley and Hillary Fidler.

3          Q.    Was anyone else present during those

4     Zoom meetings?

5          A.    I'm thinking -- I think -- so there was

6     more than one meeting, and I am now recalling I

7     think on one of the meetings -- it might have been

8     an initial meeting there was another attorney, as

9     well, who I believe was a colleague of Mr. Seeley,

10    Caleb Seeley and Hillary Fidler.

11         Q.    Did Sam Katz participate in any of these

12    meetings?

13              ATTORNEY SEELEY:  Objection to form.

14              THE WITNESS:  Not that I was aware of.

15    BY ATTORNEY MCKEEN:

16         Q.    What about anyone else from his law

17    firm?  Do you know one way or the other?

18         A.    Not that I was aware of.

19         Q.    What was communicated to you in these

20    meetings?

21              ATTORNEY SEELEY:  Objection to form.

22              Asked and answered.

23              THE WITNESS:  Well, we had conversations

24              about a lot of things in these meetings.

25              ATTORNEY SEELEY:  I'm just saying again,

Page 24

1           Doctor, the same caution as before.  To the
2           extent there's facts or assumptions that were
3           provided to you for your opinions, you can
4           answer.  But any other discussions with
5           counsel I will instruct you not to answer.
6    BY ATTORNEY MCKEEN:
7           Q.   Dr. Hayter, you say in your report █████
8    ████████████████████████████████████████████████
9    █████████████, and I want to know what counsel
10   told you to cause you to come to that conclusion
11   that you've expressed here in your report?
12              ATTORNEY SEELEY:  Objection to form.  It
13           states that language in the report.
14              THE WITNESS:  So I'm looking at ██████████
15           of my rebuttal report, and I'll talk about
16           that paragraph, the paragraph on ██████████,
17           because the paragraph on Page -- I've
18           forgotten, was it █████  It's essentially the
19           same except it says ██████████████████████
20           █████████████
21              So looking at this paragraph on
22           Page █████, it says -- this is what I wrote,
23   ██████████████████████████████████████████████
24   ████████████████████████████████████████████████
25           ████████████████████████

Page 25

1          So the communication I had from the

2     attorneys that ███████████████████████████

3     █████████████████████████████████████

4     ███████████████████████████

5          And then following on, I mean, the

6     second part of that sentence that I wrote, I

7     said, ██████████████████████████████████████

8     ████████████████████████████████

9     ███████████████████████████████████████

10         So the communication that I had from the

11    attorneys that ███████████████████████████████

12    ██████████████████████████████████████████████

13    ███████████████████████████████████████

14    ████████████████████████

15  BY ATTORNEY MCKEEN:

16         Q.   I see your words, Dr. Hayter.  What I'm

17  asking you is what they said to you to cause you to

18  write those words.

19            ATTORNEY SEELEY:  Objection to form.

20       Asked and answered.

21            THE WITNESS:  They said to me exactly

22       what I wrote there.

23  BY ATTORNEY MCKEEN:

24         Q.   They said exactly ███████████████████████

25    ██████████  or did they give you any more information

Page 26

1    other than what is on this page?

2         A.   They communicated the meanings to me

3    that I've written there.  I mean, if you're asking

4    me what were the exact words they said, they may

5    very well have been these exact words that I wrote

6    down.

7              So when I said it is my understanding

8    that ████████████████████████████████

9    ██████████████████████, maybe Caleb Seeley

10   on the Zoom call said exactly those words, ████

11   ████████████████████████████████████████████

12   ████████████████

13             When I wrote here ██████████████████

14   ████████████████████████████████████████████

15   ██████████████████████, maybe Caleb Seeley said

16   those exact words, ████████████████████████

17   ██████████████████████████████████████████████

18   ████████████████████

19             But I don't recall the specific words

20   that were used in those meetings, although I'm quite

21   certain that that was the meaning and the

22   understanding that I took.

23        Q.   So you say maybe he said this but that

24   you don't specifically remember the words that were

25   used in that conversation; is that right?

Page 27

```
 1              ATTORNEY SEELEY:  Objection to form.  Do
 2         you want his answer read back to him?
 3              ATTORNEY MCKEEN:  No, I don't.
 4              THE WITNESS:  So let me look at it
 5         again.  I wrote --
 6    BY ATTORNEY MCKEEN:
 7         Q.   Dr. Hayter, I'm not asking you what you
 8    wrote.  I'm asking you to tell me everything you
 9    remember from this conversation?
10              ATTORNEY SEELEY:  Counsel, do not
11         interrupt the witness.  You asked him to
12         repeat back his answer, and he was
13         reconfirming for you his answer.  He's
14         allowed to finish his answer, and then you
15         can continue.  If you want to ask the same
16         question, you're going to get the same
17         answer.
18              ATTORNEY MCKEEN:  I didn't ask him to
19         repeat back his answer, Caleb, and I'll thank
20         you to discontinue the extensive and
21         unnecessary speaking objections, or we're
22         going it take longer today.  I'd really like
23         to not have to do that.
24    BY ATTORNEY MCKEEN:
25         Q.   Dr. Hayter, I'm asking you to tell me
```

Page 28

1   everything you remember that was communicated to you
2   in this conversation with plaintiffs' counsel?
3                   ATTORNEY SEELEY:  Objection to form.
4           That's not a question, and the previous
5           question was not that.
6                   ATTORNEY MCKEEN:  It is a question, and
7           it's the question I'm asking, Caleb.  You can
8           like it or not, but that's my question.
9   BY ATTORNEY MCKEEN:
10          Q.   Dr. Hayter, tell me everything you can
11  remember that was communicated to you about this in
12  your conversation with plaintiffs' counsel?
13                  ATTORNEY SEELEY:  Objection to form.
14          Same objections.
15                  THE WITNESS:  So when you said "this
16          conversation," what exactly are you referring
17          to?  Because as I've said, I've had various
18          meetings with the attorneys that I've been
19          working with since I received Dr. Lasater's
20          rebuttal report.
21  BY ATTORNEY MCKEEN:
22          Q.   Any conversations that inform the
23  testimony that we've specifically been talking about
24  on ██████████
25                  ATTORNEY SEELEY:  Objection to form.

Page 29

```
 1              What's the question?
 2                   THE WITNESS:  Could you please repeat
 3              the question?
 4    BY ATTORNEY MCKEEN:
 5              Q.   What do you remember about these
 6    conversations that inform your testimony on
 7    ██████████ Dr. Hayter?
 8                   ATTORNEY SEELEY:  Objection.
 9    BY ATTORNEY MCKEEN:
10              Q.   What else do you remember about these
11    conversations that you have not already told me?
12                   ATTORNEY SEELEY:  The same objections.
13                   THE WITNESS:  I'm quite certain that all
14              the communications that I had on this topic
15              gave me the understanding that ████
16    ████████████████████████████████████████████████████
17    ██████████████████████████████████████████, and
18              I'm quite certain that these communications
19              gave me the information that -- or the
20              understanding that ██████████████████████
21    ████████████████████████████████████████████████████
22    ████████████████████████████████████████████████
23    ███████████████████████████
24              I cannot repeat to you the dialogue of
25              the conversations that I had on this topic in
```

Page 30

```
 1          those Zoom meetings, but I can tell you quite
 2          clearly that those are the understandings I
 3          received.
 4   BY ATTORNEY MCKEEN:
 5          Q.   Did counsel communicate to you any facts
 6   surrounding the circumstances associated with ███
 7   ████████████
 8               ATTORNEY SEELEY:  Objection to form.
 9               THE WITNESS:  You'll have to give me
10          that again, please, but I don't think so.  I
11          think the answer is no, but please ask me
12          that again.
13   BY ATTORNEY MCKEEN:
14          Q.   I'm asking, did they describe the
15   situation to you that ████████████████████████?
16               ATTORNEY SEELEY:  Objection to form.
17               THE WITNESS:  I'm not sure what that
18          means.
19   BY ATTORNEY MCKEEN:
20          Q.   Dr. Hayter, you've said here that it's
21   your understanding that ████████████████████████
22   ████████████, and I'm trying to find out what
23   plaintiffs' counsel told you to lead you to that
24   conclusion.  Did they give you any facts that caused
25   you to conclude that ████████████████████  or
```

1     did they simply say to you ████████████████

2     ███████████████████████████?

3                 ATTORNEY SEELEY:  Apologies for speaking

4           over you.  Objection to form.

5                 THE WITNESS:  I think I understand what

6           you're saying.  So I think you laid out two

7           things there, and I believe it's the second

8           of the two.

9                 So I think the first thing you said

10          there was that I was given some information

11          from which I concluded that, I concluded that

12          ██████████████████████████████

13          ██████████████████████████████

14                I don't think that's what happened.

15          What happened was I was sort of specifically

16          told that, which is how I got the

17          understanding.

18    BY ATTORNEY MCKEEN:

19          Q.   Thank you, Dr. Hayter.  And is that true

20    for both the ████████ paragraph we've been

21    discussing as well as the paragraph that's on

22    ████████?  Is that true for both?

23                ATTORNEY SEELEY:  Objection to form.

24                THE WITNESS:  It is true for both

25          ███████████████████████, and I believe you

Page 32

```
 1              did get the page numbers correct.
 2      BY ATTORNEY MCKEEN:
 3              Q.   Is there any other information given to
 4      you by plaintiffs' counsel that forms the basis of
 5      any of the opinions contained in your report other
 6      than what we've already discussed?
 7                   ATTORNEY SEELEY:  Objection to form.
 8              The same instructions as before.
 9                   THE WITNESS:  So what we just discussed,
10              again those are my understandings.  I don't
11              think I would consider those to be opinions,
12              but thinking -- I can't think of any other
13              information I received from the attorneys
14              that I needed for my rebuttal report.  There
15              may be things, but I can't recall anything
16              else.
17      BY ATTORNEY MCKEEN:
18              Q.   Dr. Hayter, does your rebuttal report
19      along with your initial report, do those two
20      documents contain a complete statement of all the
21      opinions that you do intend to offer in this case?
22              A.   Well, all I can tell you is the opinions
23      I have at the moment, and I would say they do
24      contain -- as far as I'm aware, they do contain all
25      of the opinions I currently hold which I think are
```

Page 33

1  relevant to the task I've been given.  Although, I

2  may have more details on those opinions which would

3  allow me to explain them more fully, I suppose,

4  perhaps.

5          Q.    Could I find information about those

6  more details that you would intend to share about

7  your opinions?

8                  ATTORNEY SEELEY:  Objection to form.

9                  THE WITNESS:  I think if you asked me

10          about them, I would be glad to provide you

11          any additional information which may be

12          helpful that I have, but there may not be any

13          additional information.

14  BY ATTORNEY MCKEEN:

15          Q.    Dr. Hayter, did you conduct any

16  statistical analysis that you did not include in

17  your reports as part of your work on this case?

18          A.    And you're asking me about both reports,

19  right?

20          Q.    Yes, sir.

21          A.    I think you asked me that in my first

22  deposition, didn't you, and I indicated that there

23  were other analyses that I had performed, just

24  getting to know the datasets.

25          Q.    What about in connection with your

Page 34

1    rebuttal report?

2           A.    So to clarify, your question is about

3    any analysis I might have done for my rebuttal

4    report which are not explained or discussed in my

5    rebuttal report; is that correct?

6           Q.    In connection with preparing your

7    rebuttal report and doing work on this case that

8    you've done since your initial report, did you

9    perform any statistical analyses that are not

10   described in your rebuttal report?

11                ATTORNEY SEELEY:  Objection to form.

12                THE WITNESS:  I cannot recall anything

13         along those lines.

14   BY ATTORNEY MCKEEN:

15          Q.    Nothing you did to test or explore the

16   data that then you decided to exclude or not to

17   include in your rebuttal report?

18                ATTORNEY SEELEY:  Objection to form.

19                THE WITNESS:  I do not recall any

20         analyses that I have done since our last

21         deposition that is not described or referred

22         to in my rebuttal report, as I recall.

23   BY ATTORNEY MCKEEN:

24          Q.    Have any of your opinions changed since

25   you signed your rebuttal report on August 15th?

Page 35

1          A.    And you cut out.  I didn't get -- we had

2     the same problem in the first deposition I think.  I

3     can't hear the first words of your question.

4          Q.    Have any of your opinions changed since

5     you signed your rebuttal report on August 15th?

6          A.    I can't think of any opinions that have

7     changed.  Although, I may be able to explain my

8     opinions in more detail.

9          Q.    Have you identified any errors in your

10    rebuttal report since you've submitted it?

11         A.    Not as I recall.

12         Q.    Anything about the rebuttal report that

13    you think needs to be changed or amended in any way?

14         A.    Not beyond as I indicated some of my

15    opinions I could explain in more detail or more

16    fully.

17         Q.    Dr. Hayter, with respect to ▮▮▮▮▮▮ of

18    your report that we were talking about earlier, ▮▮▮

19    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20    ▮▮▮▮▮

21         ATTORNEY SEELEY:  Objection to form.

22         THE WITNESS:  Okay.  So I'm looking at

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thank you for

24    correcting me last time.  It is ▮▮▮▮▮▮

25    ▮▮▮▮▮▮ and it starts on ▮▮▮▮▮▮▮





Page 38

1    BY ATTORNEY MCKEEN:

2         Q.    Any materials that you requested from

3    counsel that they did not send you?

4         A.    I'm pretty sure I didn't hear the

5    beginning of that question.

6         Q.    Were there any materials you requested

7    from counsel that they did not send you, Dr. Hayter?

8         A.    Not as I recall.

9         Q.    Dr. Hayter, on ███████ of your rebuttal

10   report, you talk about ████████████████, correct?

11        A.    So I'm going to ████████ which is the

12   ████████████████████████ Actually -- so if you

13   go to ████████, which is ████████████████

14   ████████████ of my rebuttal report, you'll see I've

15   laid out ████████████████████████████████████

16   ████████████

17        Q.    So explain to me your understanding of

18   ████████████████████ in this case.

19        A.    Well, I thought you were going to say

20   explain████████████████, which I routinely do in

21   front of classes of undergraduates and graduate

22   students.  But you said in this case, so ████████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████████o

25   ████████████████████████

Page 39



1  ████████████████████████████████████

2  ████████████████    █████████████████████

3  ██████████████████████████████████████████

4  █████████████████████████████████████

5  ████████████████████████████████

6  ████████████████████

7  █████████████████████████████████████

8  ██████████████████████████████████████████

9  ████████████████████████████████████

10 █████████████████████████████████████████.

11        Q.   I'm not sure that answers my question,

12  but I'll move on.  Dr. Hayter, is ████████████████

13  ██████████████████████████████████████████

14  ██████████████████████████████████████████

15  ██████████████████████████████████████████

16  █████████████████████████████████████

17  ████████████████████████████████████

18  ██████████████████████████?

19        ATTORNEY SEELEY:  Objection to form.

20        THE WITNESS:  ████████████████████████

21     ████████████████████████████████████████

22     ██████████████████████████████████████

23     █████████████████████████████████████t

24     ████████████████████████████████████

25     ████████████████    ████████████████████

Page 40

1　

2

3

4

5

6

7

8

9　BY ATTORNEY MCKEEN:

10　　　　Q.　That wasn't really my question,

11　Dr. Hayter.

12　　　　　　My question is whether you believe that

13　plaintiffs in this case believe that there is a

14　relationship between the outcomes of players'

15　applications or appeals on the one hand and the

16　number of evaluations performed by neutral

17　physicians on the other hand?

18　　　　　　ATTORNEY SEELEY:　Objection to form.

19　　　　　　THE WITNESS:　Are you still talking

20　about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21　▮▮▮▮▮▮▮▮▮▮▮▮▮▮　Because it seemed to

22　me that what you just said then was different

23　▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24　▮▮▮▮▮▮▮▮▮▮▮▮　of my rebuttal

25　report, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Page 41

1 ████████████████████████████████████████████

2 ████████████████████████████████████████████

3 ███████████████████████████████████████

BY ATTORNEY MCKEEN:

        Q.   Dr. Hayter, what do you understand the
plaintiffs' claims to be in this case?

                ATTORNEY SEELEY:  Objection to form.
        Scope.

                THE WITNESS:  My understanding of
        plaintiffs' claims in the sort of general and
        simple sense is that there's a relationship
        between the individual physician
        recommendations, the recommendations that
        physicians make from their player
        evaluations, there's a relationship between
        the recommendations that the physicians make
        from their player evaluations and their
        overall total compensation.

                That's my understanding from a sort of
        statistical basis, although it may be that
        the plaintiffs are actually claiming some
        reasoning for why that relationship exists.

BY ATTORNEY MCKEEN:

        Q.   Do you understand plaintiffs' claims to
be about wrongful benefit determinations?

Page 42

```
 1              ATTORNEY SEELEY:  Objection to form.
 2         Scope.
 3              THE WITNESS:  So I think you switched
 4         there from individual physician
 5         recommendations to I think you said benefit
 6         determinations which would sort of be the
 7         outcomes of the applications and appeals.
 8              So I don't really want to speak for the
 9         plaintiffs in terms of trying to put into
10         words exactly what their claims are, but I
11         can tell you from my role as a statistician,
12         it's to do with that association between the
13         individual physician recommendations and the
14         total compensations of the physicians.
15    BY ATTORNEY MCKEEN:
16         Q.   Do you have any understanding of how
17    individual physician recommendations affect the
18    benefit outcome that a particular player receives?
19    Those things are related, aren't they?
20              ATTORNEY SEELEY:  Objection to form.
21              THE WITNESS:  I believe that's discussed
22         in great detail in my first report, and that
23         has to do with issues like I think what I
24         call Mr. Hessam, Sam Vincent's general rule
25         and the use of MAPs and things like that.
```

Page 43

1    BY ATTORNEY MCKEEN:
2         Q.   Do you think particular players have an
3    injury or a harm that's associated with a particular
4    physician's recommendation, or is their harm or
5    their injury that they're claiming in this lawsuit
6    associated with the actual outcome of their
7    application for benefits?
8              ATTORNEY SEELEY:  Objection to form.
9         Scope.
10             THE WITNESS:  I think you really lost me
11        there.  And when you say "harm," at first I
12        thought you were talking like a physical
13        injury, like I broke my arm or I have
14        headaches and severe concussion or something
15        like that.
16             Or did you mean sort of like a legal
17        definition of they've been harmed legally by
18        how the plan is being implemented?
19   BY ATTORNEY MCKEEN:
20        Q.   That's a fair question, Dr. Hayter.
21             Do you have an understanding of how
22   plaintiffs claim that they have been legally harmed
23   in this case?
24             ATTORNEY SEELEY:  Objection to form.
25        Scope.

Page 44

1                THE WITNESS:  Okay.  So now -- so now
2           you're asking me about legal harm.  So again,
3           as a statistician, I have an understanding of
4           how I understand the plaintiffs' claims,
5           which I've explained to you, which is that
6           relationship between individual physician
7           recommendations and physician total
8           compensation.
9                So I'm not expressing any legal opinion,
10          but it would then seem obvious to me that the
11          plaintiffs are then claiming -- or the
12          plaintiffs would say that if that claim is
13          correct, then that produces a sort of harm to
14          the players in some way, which I think is
15          what you're referring to as the legal harm.
16     BY ATTORNEY MCKEEN:
17          Q.   Dr. Hayter, for an individual
18     physician's recommendation to affect a player at all
19     one way or another, that recommendation has to have
20     some bearing on the ultimate outcome of that
21     player's request for benefits, right?
22                ATTORNEY SEELEY:  Objection to form.
23     BY ATTORNEY MCKEEN:
24          Q.   That's what matters to the player,
25     right, Dr. Hayter, how their claim for benefits is

Page 45

1    decided one way or the other, right?

2                    ATTORNEY SEELEY:  Objection to form.

3                    THE WITNESS:  I don't think I can agree,

4            in general, completely to what you've just

5            said.

6    BY ATTORNEY MCKEEN:

7            Q.    Why not?

8            A.    It seems to me that what you were saying

9    is that if a physician -- I'm sorry, if a player

10   makes an application or an appeal and they are asked

11   to go to see a physician and be evaluated by the

12   physician and that physician will then make a

13   recommendation based upon the evaluation of the

14   player.

15                    It seemed to me that you were suggesting

16   that the physician's evaluation of the player based

17   upon his or her sort of physical evaluation of a

18   player, you seem to be suggesting that was

19   irrelevant to the player.

20           Q.    That wasn't actually my question,

21   Dr. Hayter.  My question is isn't what matters the

22   outcome of the application for benefits?

23                    ATTORNEY SEELEY:  Objection to form.

24                    THE WITNESS:  I think obviously that the

25           player is affected by the outcome, but I

Page 46

```
 1            think the player is also affected by the
 2            manner in which that outcome was arrived at.
 3      BY ATTORNEY MCKEEN:
 4            Q.    How so?
 5            A.    Because everything that goes into the
 6      decision of the outcome is sort of affecting the
 7      decision of the outcome.
 8            Q.    How so, Dr. Hayter?
 9            ATTORNEY SEELEY:  Objection to form.
10            THE WITNESS:  It's because if the final
11            outcome is based upon a lot of inputs, then
12            all of those inputs are in some sense
13            relevant to the final outcome of the
14            application or appeal.
15      BY ATTORNEY MCKEEN:
16            Q.    How are the inputs relevant to the
17      outcome if they don't affect it?
18            ATTORNEY SEELEY:  Objection to form.
19            Asked and answered, multiple times.
20            THE WITNESS:  I'm not sure how you
21            would -- or why one would say that an input
22            to the outcome does not affect the outcome.
23      BY ATTORNEY MCKEEN:
24            Q.    Okay.  I'll give you a hypothetical
25      example.  Let's say that Physician A is biased
```

Page 47

1       against finding that a player meets the plan's

2       requirements for a disability.

3                   Are you with me so far?  Let's say

4       there's this physician who is biased in the way that

5       is hypothesized by plaintiffs' complaint.  If that

6       physician approves or finds that a particular player

7       does qualify for benefits, do you believe that

8       player has been impacted by that physician's bias?

9                   ATTORNEY SEELEY:  Objection to the

10                  hypothetical.

11                  THE WITNESS:  You say this physician is

12                  biased.  I think you might need to explain

13                  exactly what you mean by all the implications

14                  of the bias.

15                      If a player goes to a physician and that

16                  physician's recommendation is an approval for

17                  the application or the appeal, I think that's

18                  the best the player could hope for.

19      BY ATTORNEY MCKEEN:

20          Q.   And has that player -- again, given this

21      hypothetical, would that player have suffered any

22      harm, in your opinion?

23                  ATTORNEY SEELEY:  Objection to form.

24                  THE WITNESS:  As far as I can tell from

25                  your question here, if on that one individual

Page 48

1          evaluation, if there's an evaluation where a
2          physician recommends approval, I do not
3          see -- possibly there may be, but I don't see
4          how that would harm the player.  I think that
5          would be the best the player could hope for.
6     BY ATTORNEY MCKEEN:
7          Q.   Dr. Hayter, in your report, you talk
8     about ███████████████████████████████████████
9     ████████████████████.  Do I have that right?
10         A.   █████████████████   ████████████████
11         Q.   Okay.  ███████████████████████████████
12    ███████████████████████████████████████████
13              ATTORNEY SEELEY:  Objection to form.
14    BY ATTORNEY MCKEEN:
15         Q.   Can you give me an example or ████████
16    ██████████████████████████████?
17              ATTORNEY SEELEY:  The same objection.
18              THE WITNESS:  ███████████████████████
19         ████████████████████████████████████████
20         ████████████████████████████████████████
21         ██████████████████████████████████████████
22         ███████  ████████████████████████████████
23         █████████████████████████████████████
24         ████████████████████████████████████████
25         ██████████████████████████████████████

Page 49



17    BY ATTORNEY MCKEEN:

18            Q.   Power is something that you can

19    calculate as a numerical value, is it not?

20                    ATTORNEY SEELEY:  Objection to form.

21                    THE WITNESS:  Yes, there are situations

22            for hypotheses tests where one can calculate.

23            It's actually called the power function.  So

24            one can specify values for specific instances

25            of the alternative hypothesis and numerically

Page 50

1           calculate a power value which would then give

2           you a power function.  Although, that's

3           totally irrelevant in this case because it's

4           the format of the chi-square tests which make

5           them have low power.  It's not like you

6           didn't have enough information and that's why

7           it's low power because often power is related

8           to a sample size.

9                So the larger the sample size, the

10          higher the power.  That's not the point here.

11          The point here is that these chi-square tests

12          are just looking in the wrong place for

13          evidence of the plaintiffs' claims.

14   BY ATTORNEY MCKEEN:

15          Q.   Well, looking in the wrong place isn't

16   saying anything about the statistical power of the

17   tests.  Those are two different things, aren't they?

18   You've just described to me the fact that you can

19   calculate a power function.  That's something

20   different from what you call looking in the wrong

21   place.

22                Those are two different critiques,

23   right?  Those are two different things, aren't they?

24                ATTORNEY SEELEY:  Objection to form.

25                THE WITNESS:  No.  In this case, they're

1             exactly the same thing.  The whole point

2             about the low power is that it's because of

3             the preprocessing of the data and looking in

4             the wrong place.

5    BY ATTORNEY MCKEEN:

6             Q.   You haven't calculated a power function

7    for any of Dr. Lasater's chi-square statistics, have

8    you?

9             A.   There's no reason to calculate a power

10   function, ████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████ which I explain in my rebuttal report and

14   the fact that -- as you will see, I gave some

15   examples in my rebuttal report that ████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████

19   ████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████████.  So that's

23   why they're looking in the wrong way for evidence of

24   the plaintiffs' claims, and that's why they're

25   uninformative and meaningless, and there's no reason

Page 52

1     to calculate a power function to understand that.
2     BY ATTORNEY MCKEEN:
3           Q.    Dr. Lasater (sic), I'm going to move to
4     strike your entire answer as nonresponsive to my
5     question.  It was a yes-or-no question about whether
6     you've performed that calculation.  I gather your
7     answer is no?
8                 ATTORNEY SEELEY:  Objection to the
9           motion to strike --
10                ATTORNEY MCKEEN:  I'm not asking for a
11          lengthy speech about why not.
12    BY ATTORNEY MCKEEN:
13          Q.    I'm just asking, have you performed that
14    calculation?  Yes or no.
15                ATTORNEY SEELEY:  Objection to the form.
16          Asked and answered.
17                THE WITNESS:  Did anyone point out that
18          I'm not Dr. Lasater?
19    BY ATTORNEY MCKEEN:
20          Q.    I'm sorry, Dr. Hayter.  Yes, or no?
21                ATTORNEY SEELEY:  Objection to form.
22                THE WITNESS:  There's absolutely no
23          reason to calculate a power function for
24          Dr. Lasater's chi-square tests because of all
25          the reasons I just gave you, because it's so

Page 53

```
 1            obvious that they're uninformative and
 2            meaningless, and I have not done that because
 3            there's absolutely no reason to do that.
 4     BY ATTORNEY MCKEEN:
 5            Q.   In calculating the power function of a
 6     particular chi-square statistic, what would you
 7     consider to be a high-power value?
 8                 ATTORNEY SEELEY:  Objection to form.
 9                 THE WITNESS:  It all depends upon the
10            particular scenario of interest.
11     BY ATTORNEY MCKEEN:
12            Q.   Would you agree that a 99 percent power
13     statistic is not low?
14                 ATTORNEY SEELEY:  Objection to form.
15                 THE WITNESS:  The powers of probability
16            which has to be between zero and one.  So if
17            one calculated a power value of 99 percent,
18            0.99, that would be very close to the upper
19            limit.
20     BY ATTORNEY MCKEEN:
21            Q.   So not low?
22            A.   Well, it all depends on the context, but
23     generally if you're between zero and one, 0.99 is
24     very high.
25            Q.   Thank you, Dr. Hayter.
```

Page 54

```
 1            A.   But if you're talking about the power of
 2       a chi-square test, I mean, that in itself is not the
 3       point.  It's what that power --
 4                 ATTORNEY MCKEEN:  There's no question
 5            pending, sir.
 6                 Can we take a break, please, and go off
 7            the record?
 8                 ATTORNEY SEELEY:  Sure, we can go off
 9            the record.
10                 THE VIDEOGRAPHER:  This marks the end of
11            Media Unit Number 1.  Going off record.  The
12            time is 12:14 p.m.
13                 (Break in proceedings.)
14                 THE VIDEOGRAPHER:  This marks the
15            beginning of Media Unit Number 2.  Going back
16            on record.  The time is 12:22 p.m.
17       BY ATTORNEY MCKEEN:
18            Q.   Dr. Hayter, do you understand that
19       you're still under oath today?
20            A.   Yes, I do.  Thank you.
21            Q.   We've just taken a brief break.  Did you
22       discuss your testimony with anyone during that
23       break?
24            A.   No, I did not.
25            Q.   On ████████ of your rebuttal report, ███
```

Page 55

1    ███████████████████████████████████████████████

2    ███████████████████████████████████████

3    ██████████████████████████████████████████

4    ████████████████████

5          Did I read that correctly?

6    A.    I'm not sure.

7          ATTORNEY SEELEY:  Did you say ███, Liz?

8          ATTORNEY MCKEEN:  Yes.

9          ATTORNEY SEELEY:  I'm not sure I -- I

10   see it.

11         ATTORNEY MCKEEN:  It's at ████████████

12   ████████████.

13         ATTORNEY SEELEY:  Thank you.

14   BY ATTORNEY MCKEEN:

15   Q.    Are you with me, Dr. Hayter?

16   A.    I am looking at ███████    Thank you.

17   Q.    Do you see where you refer to, ████████

18   ███████████████████████████████████████████████

19   ██████████████████████

20   A.    Yes.  Thank you.  In the first full

21   paragraph on ████████.

22   Q.    Is it your understanding that

23   plaintiffs' claims in this lawsuit are only focused

24   on those few physicians who individually received

25   the highest total compensations?

Page 56

1            ATTORNEY SEELEY:  Objection to form.

2            THE WITNESS:  I think so.  Although, I

3     mean, I don't want to speak for the

4     plaintiffs, but my understanding is that the

5     plaintiffs' claims are relating to the

6     physicians who had the highest total

7     compensations and their individual

8     recommendations.

9            The point of this paragraph is that

10    ████████████████████████████████████████,

11    ███████████████████████████████████████████

12    ████████████████████████████████████████

13    ████████████████████████████████████████

14    ███████████████████████████████████████████

15    ████████████████████████████████████████

16    ██████████████████████████████████.

17        █████████████████████████████████████

18    ██████████████████████████████████

19    ████████████████████████████████████████

20    ███████████████████████████████████

21    ██████████████ ██████████████████████████

22    ███████████████████████████

23        ███████████████████████████████████████

24    ████████████████████████████████

25    ████████████████████████████████

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ██████████████

4    BY ATTORNEY MCKEEN:

5         Q.   Dr. Hayter, is it your understanding

6    that plaintiffs' lawsuit is about those six

7    physicians, or is it about a larger group of highly

8    compensated physicians?

9              ATTORNEY SEELEY:  Objection to form,

10             scope.

11             THE WITNESS:  The way I understand this

12             case is that if full information about the

13             entire V3 dataset were available, which it's

14             not, you know, if complete information were

15             available on all the physicians' individual

16             evaluations and all the physicians'

17             compensations, then the plaintiffs would be

18             able to examine that and specifically

19             identify the most highly compensated

20             physicians which they feel are then the basis

21             for their legal claim, but I think it's

22             impossible to actually know the number

23             without a complete analysis of all the

24             information in the V3 datasets which I

25             understand is not available.

Page 58

BY ATTORNEY MCKEEN:

1

2          Q.   Dr. Hayter, do you have an

3   understanding, as the expert in this case, about

4   what subset of physicians would constitute what you

5   refer to as the few physicians who received the

6   highest total compensation?  Is that the top six?

7   Is that the top 10 percent of physicians by

8   compensation?

9               I'm just trying to figure out which

10  population you're referring to when you talk about

11  the few physicians that form the basis for the

12  plaintiffs' claims.

13               ATTORNEY SEELEY:  Objection to form.

14          Asked and answered.

15               THE WITNESS:  So what I am referring to

16          when I said "few physicians" is essentially

17          the physicians that would substantiate the

18          plaintiffs' claims.

19               Now, in order --

20  BY ATTORNEY MCKEEN:

21          Q.   How would you do that?

22               ATTORNEY SEELEY:  Can you let him

23          finish, please?

24  BY ATTORNEY MCKEEN:

25          Q.   You've said that you think we're short

Page 59

1    on time, so I'm really trying to cut down on the

2    speeches that aren't in any way responsive to my

3    questions?

4            ATTORNEY SEELEY:  We can just agree to

5        disagree, but if you can let him answer I

6        think it will move things along.

7    BY ATTORNEY MCKEEN:

8        Q.   I'm just looking for the number,

9    Dr. Hayter.  Is it the top 6?  Is it the top

10   5 percent?

11           ATTORNEY SEELEY:  Objection to form.

12           THE WITNESS:  So when I said ███████

13   █████████████████████████████████████████████

14   █████████████████████████████████████████████

15   ████████████████████████████████████████████

16   ██████████████████████

17           Now, as I explained, in order to

18       actually identify those precisely, one would

19       need all of the information in the V3

20       datasets, which I do not have.

21           So I have not been able to analyze the

22       entire V3 datasets with full information on

23       physician's compensations and physicians'

24       individual recommendations.

25           So without that knowledge, it's

Page 60

1           impossible to precisely specify what that

2           number of physicians would be and who they

3           would be --

4    BY ATTORNEY MCKEEN:

5           Q.   And you've said that --

6           A.   -- in my opinion.

7           Q.   -- that's because you're looking for

8    physicians that would substantiate plaintiffs'

9    claims?  Do I have that right?

10               ATTORNEY SEELEY:  Objection to form.

11           Misstates the testimony.

12   BY ATTORNEY MCKEEN:

13          Q.   What did you mean by that, when you said

14   it would be what substantiates plaintiffs' claims?

15               ATTORNEY SEELEY:  Objection to form.

16               THE WITNESS:  So the plaintiffs' claim

17           as I understand it and as you've asked me

18           before, is that there is an association

19           between the individual physician

20           recommendations and their total compensation.

21               So as a statistician, I would say, okay,

22           let's look at the data.  Now, my

23           understanding is the data is not available.

24           So if the data were available, which would be

25           complete records on all the physicians and

Page 61

1          their compensations and their individual

2          physician recommendations, I would then look

3          at that complete information and I would

4          learn what it told me.

5               And that's what a statistician does with

6          data.  A statistician learns from the data.

7          So I would look at that data and see what it

8          told me and informed me about the physicians

9          with the highest compensations.

10              Now, I can't tell you what that analysis

11         would show because all of that data is not

12         available.  So I can't give you names or

13         numbers of physicians at the moment.

14  BY ATTORNEY MCKEEN:

15         Q.   Would you look at the data associated

16  with all of the physicians in the scenario you're

17  describing?

18         A.   If one wanted to assess the plaintiffs'

19  claims, yes, I think one should have information on

20  all of the physician individual evaluation

21  recommendations and their compensations.

22         Q.   So you wouldn't just look at the data

23  associated with the most highly compensated

24  physicians.  You would look at the data associated

25  with the entire group of physicians, correct?

Page 62

```
 1              ATTORNEY SEELEY:  Objection to form.
 2              THE WITNESS:  I agree with you, because
 3         you need some context for the physicians with
 4         the highest compensations.
 5  BY ATTORNEY MCKEEN:
 6         Q.   You said earlier that it was your
 7  understanding that plaintiffs' claims were based on
 8  the conduct of the most highly compensated
 9  physicians.  Do I have that right?
10              ATTORNEY SEELEY:  Objection to form.
11              THE WITNESS:  Well, I think you're
12         confusing things in the way that Dr. Lasater
13         did in his rebuttal report.  I mean,
14         obviously one wants to look at the physicians
15         with the highest compensations, and I gave
16         some examples of that in my first report.
17              So there are tables, I think it's
18         Section 4 of my first report where just to
19         illustrate, I took the six highest
20         compensated orthopedists and neurologists and
21         neuropsychologists and psychiatrists.
22              Dr. Lasater says, well, you can't just
23         look at the top six.  You have to look at all
24         of them, like -- he used the word control.
25         But obviously one would do that, and there's
```

Page 63

```
 1            plenty of context for doing that.
 2                 So when I say that you need to look at
 3            the physicians with the highest
 4            compensations, you shouldn't interpret that
 5            as saying you only look at the physicians
 6            with the highest compensations, because
 7            obviously you need to look at all the
 8            physicians to kind of put that in context.
 9     BY ATTORNEY MCKEEN:
10         Q.    Why is that context important?
11         A.    Because essentially to establish the
12     relationship, it's like a comparison of the denial
13     rates of the physicians with the highest
14     compensations as compared with the other physicians.
15         Q.    Have you performed that analysis in
16     either of your reports?
17         A.    I haven't performed it for the entire V3
18     dataset because that information is not available,
19     and that's the information that's needed to properly
20     assess the plaintiffs' claims.
21         Q.    Dr. Hayter, we've been talking about the
22     physicians that have the highest total compensation
23     as being the sort of core plaintiffs' claims.  What
24     about players who were never evaluated by those most
25     highly compensated physicians?  Have they been
```

Page 64

1    harmed in any way, if they were never evaluated by

2    the most highly compensated physicians?

3                    ATTORNEY SEELEY:  Objection to form,

4              scope.

5                    THE WITNESS:  I just want to clarify

6              again.  When you said the physicians with the

7              highest compensations, when I say that,

8              there's sort of an implication that yes, you

9              look at the physicians with the highest

10             compensations, but that's in a comparison to

11             all the other physicians.

12                    So Dr. Lasater was making a point where

13             I only looked at the top six, and he said,

14             well there has to be a context, and obviously

15             there has to be a context.  I'm aware of

16             that.

17                    So when I say the physicians with the

18             highest compensations, yes, you look at those

19             individually, but it's obviously within the

20             context of all the other physicians, and your

21             question -- could you just give me the

22             question again, please, the rest of the

23             question again?

24   BY ATTORNEY MCKEEN:

25        Q.    Yes.  So far I don't think you've gotten

Page 65

```
 1     there.  Can the reporter just read my comment back?
 2                    ATTORNEY SEELEY:  I object to the
 3            prefatory comment.
 4                    (The court reporter read the record.)
 5                    ATTORNEY SEELEY:  The same objection.
 6                    THE WITNESS:  I think it's impossible
 7            for me to say whether a particular player has
 8            been harmed or not.
 9     BY ATTORNEY MCKEEN:
10            Q.    What would you need to know to figure
11     out whether a particular player had been harmed or
12     not?
13                    ATTORNEY SEELEY:  Objection to form,
14            scope.
15                    THE WITNESS:  Well, first I'd like to
16            investigate the plaintiffs' claims properly
17            by having the complete information on the V3
18            datasets available.
19     BY ATTORNEY MCKEEN:
20            Q.    What information --
21            A.    To get the related compensations of the
22     physicians.
23            Q.    What else would you need to know,
24     Dr. Hayter?
25            A.    I'm sorry.  What are you asking me?
```

Page 66

1          Q.   I'm asking you what else you would need
2     to know to determine whether a particular player had
3     been injured in a given circumstance.
4               ATTORNEY SEELEY:  Objection to form and
5               scope.
6               THE WITNESS:  As I said, I would start
7               off by doing a proper and complete analysis
8               of the V3 datasets and physician
9               compensations, if all of that information was
10              made available, and then I would go from
11              there.
12    BY ATTORNEY MCKEEN:
13         Q.   How would you go from there?  What else
14    would you look at?
15         A.   I don't know until I've had the
16    opportunity to do that analysis.
17         Q.   And that's not an analysis you've
18    undertaken to do, for the reasons you've just
19    described?
20              ATTORNEY SEELEY:  Objection to form.
21              THE WITNESS:  It's not possible for me
22              to do an analysis of all the full information
23              of the V3 datasets and compensations, because
24              that data is not available to me.
25

Page 67

1      BY ATTORNEY MCKEEN:
2           Q.   To determine whether a particular player
3      suffered any sort of harm as the result of a
4      particular physician's conduct, would you also need
5      to know what the outcome of their particular
6      application or appeal should have been if the
7      physician had acted properly?
8                ATTORNEY SEELEY:  Objection to form,
9           scope.
10               THE WITNESS:  Okay.  So you did start
11          that off I believe with physician -- harm to
12          a player, so do you want to clarify what kind
13          of harm we're talking about?
14     BY ATTORNEY MCKEEN:
15          Q.   I'm talking about the injury that's been
16     theorized by plaintiffs in their lawsuit,
17     Dr. Hayter.
18          A.   So you're asking me about, like, the
19     legal harm --
20          Q.   Yes.
21          A.   -- not like a physical medical harm.
22          Q.   Yes.
23          A.   Could you please ask me --
24               ATTORNEY SEELEY:  Objection to form.
25               THE WITNESS:  Sorry, counsel.

Page 68

1      BY ATTORNEY MCKEEN:

2              Q.    Dr. Hayter, to figure out whether a

3      particular player was harmed by the conduct that

4      plaintiffs are attacking in this lawsuit, would you

5      also need to know what the outcome of their

6      application or appeal should have been --

7                  ATTORNEY SEELEY:  Objection.

8      BY ATTORNEY MCKEEN:

9              Q.    -- if the particular neutral physician

10     at issue had acted properly?

11                 ATTORNEY SEELEY:  Objection to form and

12             scope.

13                 THE WITNESS:  I'm not comfortable

14             expressing opinions on whether individual

15             players have been harmed or not from a legal

16             perspective, and I think the most helpful

17             thing I can say with respect to your

18             questions is that I think any question about

19             legal harm, you can only really understand

20             and answer that properly if you have the full

21             data necessary to investigate the plaintiffs'

22             claims, which I've explained.

23                 So from my position as a statistician,

24             you need all of that data so that you can

25             properly investigate the plaintiffs' claims,

Page 69

```
 1            and then I think all of these issues you're

 2            asking about with respect to player harm

 3            would sort of follow on from that.

 4     BY ATTORNEY MCKEEN:

 5            Q.   What information is it that you think is

 6     missing from the V3 dataset that you were provided

 7     to enable that kind of analysis?

 8                 ATTORNEY SEELEY:  Objection to form.

 9                 THE WITNESS:  So the V3 datasets which I

10            think -- it's my understanding they've been

11            provided by the defendants, so one thing is

12            the time period.  I mean, obvious -- I think

13            there's essentially a starting period of

14            June -- sorry, January 2018, I think.  So

15            statisticians always say more data the

16            better, so that's what I'll say.  If data

17            were available before 2018, that would be

18            preferable.

19                 But even within that time period, at a

20            minimum, if I were to ask to analyze that

21            with respect to the plaintiffs' claims, at a

22            minimum I would want to know all of the

23            individual physician recommendations and with

24            respect to what claim, what benefit type they

25            were evaluating.
```

Page 70

```
 1              And I think it would also be useful to
 2          have information from the defendants on the
 3          exact compensations provided to the
 4          physicians.
 5  BY ATTORNEY MCKEEN:
 6          Q.   Anything else?
 7          A.   As I said, I believe that's a minimum.
 8  There may be more things, but that's what occurs to
 9  me, certainly as a starting point right now.
10          Q.   Anything else you can think of right
11  now?
12              ATTORNEY SEELEY:  Objection to form.
13              THE WITNESS:  There may be other obvious
14          things that are not occurring to me, but that
15          seems to me the important things at this
16          point in time.
17  BY ATTORNEY MCKEEN:
18          Q.   It can't be that obvious if they're not
19  occurring to you, right?
20              ATTORNEY SEELEY:  Objection to form.
21              THE WITNESS:  As I said, those two
22          things seem to me to be the obvious things,
23          the individual recommendations of the
24          physicians and their total compensations, but
25          there may be other equally obvious things
```

Page 71

```
 1              that are not occurring to me.
 2                   Also, once you start analyzing, you
 3              might find things that suggest to you, oh, we
 4              need that as well to have a complete
 5              understanding, and that may not be obvious
 6              until one has, you know, at least received
 7              the information I just mentioned and started
 8              analyzing it.
 9    BY ATTORNEY MCKEEN:
10              Q.   On ████████ of your report, you say,
11    ████████████████████████████████████████████████████
12    ████████████████████████████████████████████████
13    ████████████████████████████████████████████
14    ████████████████████████████████████████████████████
15    ██████████████████████████████
16                   Do you see that?
17              A.   I do see that, on ████████ which is
18    within this ██████████ with regards to ████████████
19    ████████████████████████████████████████
20              Q.   Dr. Hayter, is it your opinion that to
21    prepare an accurate analysis of the plaintiffs'
22    claims, you'd have to look at each of the individual
23    recommendations of all the evaluating physicians?
24                   ATTORNEY SEELEY:  Objection to form.
25                   THE WITNESS:  Potentially, yes.
```

Page 72

1    BY ATTORNEY MCKEEN:

2            Q.    I'm sorry, I think counsel cut off your

3    answer.  Did you say yes?

4            A.    I said potentially, yes.

5            Q.    Why potentially?

6            A.    It seems to me that the plaintiffs'

7    claims are with regards to all of the physicians and

8    necessarily all of their individual recommendations.

9    So just starting from there, it seems that yes, one

10   would need all of the individual recommendations of

11   all of the physicians.

12               Now, as I said to you, once you start an

13   analysis, you might learn new things, so you might

14   realize some of that information is redundant, but I

15   think potentially, yes, all of it.

16           Q.    Would you have to look at the individual

17   physician's reports on each player, in your opinion?

18               ATTORNEY SEELEY:  Objection to form.

19               THE WITNESS:  I think you would need to

20           accurately know the physician's individual

21           recommendations, and however one was able to

22           do that I think is what one would need to do.

23   BY ATTORNEY MCKEEN:

24           Q.    Would you need to know whether that

25   individual physician's recommendation was correct or

Page 73

1      incorrect medically?

2                      ATTORNEY SEELEY:  Objection to form.

3                      THE WITNESS:  That's sort of outside of

4              my expertise, whether it's correct or

5              incorrect medically.  I mean, I think that is

6              obviously important information, but with

7              respect to assessing the relationship between

8              physicians' individual evaluations and their

9              compensations, that in the sort of medical

10             background or relationship with the

11             individual physician's recommendation is not

12             needed to specifically investigate that

13             association, although I'm not claiming that

14             is not important information.

15     BY ATTORNEY MCKEEN:

16             Q.   Dr. Hayter, please turn to ███████ of

17     your report for me.  There is a sentence towards the

18     bottom of the page that says, ██████████████████████

19     ████████████████████████████████████████

20     ████████████████████████████████████████████

21     ████████████████████████████████████████

22     ████████████████████████████████████████████

23     ██████████████████████████████

24                      Do you see that?

25             A.   I do see it on ████████  Thank you.

Page 74

1          Q.   Did you perform any analysis to check

2     for such a relationship even though it might not be

3     a linear relationship?  Is that an analysis you

4     performed?

5                    ATTORNEY SEELEY:  Objection to form.

6                    THE WITNESS:  So this is where

7               Dr. Lasater has switched from his chi-square

8               test to what we call a simple linear

9               regression analysis.  It's in response to a

10              point I made, which is explained on the

11              previous page, 81.  And the point I made,

12              Dr. Lasater hasn't responded to, he's

13              proposed -- he's proposed a different

14              analysis, which to me is not very important,

15              and I have not investigated it.

16                   Although, what I would say is whenever

17              you do a simple linear regression or

18              reporting it, the first thing you do is make

19              a picture, a visual representation of it, to

20              show everyone because a simple linear

21              regression analysis is putting a straight

22              line through a set of data points.

23                   And as I -- you wouldn't believe the

24              number of times I've explained that to

25              students:  Take a look at the data before you

Page 75

1          fit a line through it, to make sure it makes

2          sense to fit a line through it.

3               So I'm very suspicious of any simple

4          linear regression analysis that does not have

5          a visual representation to go along with it,

6          but I have not -- I have not spent any time

7          replicating that analysis.

8    BY ATTORNEY MCKEEN:

9          Q.   Just to be clear, my question was

10   whether you have investigated whether or not there

11   is such a relationship between these two variables,

12   even though it may not be linear.

13               It sounds like the answer is no, that's

14   not something you specifically investigated; is that

15   right?

16               ATTORNEY SEELEY:  Objection to form.

17               THE WITNESS:  That's what I said.  The

18          first thing one needs to do here is look at a

19          picture, look at a visual representation to

20          see the data points through which the line

21          has been fitted, to see whether that makes

22          any sense whatsoever.

23               And as I said, I've not spent time

24          trying to replicate Dr. Lasater's analysis

25          here or see if it makes sense, although as I

Page 76

```
 1            said I'm very suspicious of anything which is
 2            a linear regression analysis which doesn't
 3            have accompanying pictures to actually show
 4            what's going on.
 5     BY ATTORNEY MCKEEN:
 6            Q.   This section -- on this page of your
 7     report, ███████████████████████████████████████
 8     ████████████████████, and I understand your
 9     critiques, ████████████████████████████████████
10     ███████████████████████████████████?
11            A.   And again, you're still referring to
12     ████████  of my rebuttal report, right?
13            Q.   That's correct, sir.  Thank you.
14            A.   So I think the context is in ██████████,
15     because what I explained to the judge is that ████████
16     █████████████████████████████████████████████████
17     ████████████████████████, so this is what is in my
18     initial report and explained on ██████████ of my
19     rebuttal report, █████████████████████████████████
20     █████████████████████████████████████████████████
21     ████████████████████████████████.
22                 I thought that was important information
23     to provide the judge.  Dr. Lasater has not responded
24     to that.  He's proposed a different analysis, which
25     he says is a more appropriate analysis, but in no
```

Page 77

```
 1    way does it affect the analysis that I showed.
 2              And then as I said, it's not something
 3    I've spent time on because it's not important to me.
 4    Although it violates what I consider elementary
 5    aspects of a simple linear regression analysis,
 6    which is if you're making a claim that it's
 7    meaningful to do a simple linear regression
 8    analysis, then you're making a claim that it makes
 9    sense to fit a straight line through the data.
10              And I also have questions about the
11    data, because it's the data of evaluations that
12    Dr. Lasater is not included all evaluations and
13    we'll probably have a chance to talk about that.
14              My analysis, which was on the previous
15    page, ██ , ████████████████████████████████████
16    ████████████████████████████████████████████████
17    ████████████████    He's analyzing decision outcomes and
18    not physician evaluations, but as I say, I'm
19    suspicious of anything here which doesn't have a
20    simple, clear visual interpretation to go along with
21    it.
22         Q.   Dr. Hayter, that wasn't my question.  Do
23    you understand that you're here to answer my
24    questions today?
25              ATTORNEY SEELEY:  Objection to form.
```

Page 78

1      BY ATTORNEY MCKEEN:

2          Q.    Yes or no?

3          A.    I do understand that, ma'am, and I'm

4      doing my very best to answer your questions as

5      completely and accurately as possible.

6          Q.    Okay.  So my question was whether you

7      found any error in Dr. Lasater's mathematical

8      calculations.  Yes or no?

9              ATTORNEY SEELEY:  Objection to form.

10             THE WITNESS:  As I have explained, the

11             error I see here is not including any visual

12             interpretation of what's going on.  There are

13             errors in my opinion in the actual variables

14             that have been analyzed by Dr. Lasater here.

15             Although, as I have explained, I have

16             not done any of my own analysis here to

17             replicate Dr. Lasater's analysis.

18     BY ATTORNEY MCKEEN:

19         Q.    Dr. Hayter, to be clear, if I ask you a

20     question about something, it's not an invitation for

21     you to answer a different question or to tell me

22     what you think is interesting.  I am here to get

23     answers to my questions today while you're under

24     oath and your counsel has represented to me that I

25     only have a limited amount of time in which to do

Page 79

1      that.

2                    So I would just ask that you listen to

3      my question and answer that question instead of

4      giving me a speech about a topic that you find

5      interesting that doesn't answer my question.

6                    Can you do that for me, please?

7                    ATTORNEY SEELEY:  Let me object to the

8             instruction.  It's entirely improper.  You're

9             badgering the witness.  He's answering your

10            questions.  He's allowed to explain his

11            answers.  The parties have agreed to a three

12            and a half hour time limit on your

13            questioning today which will govern this

14            deposition.

15                    ATTORNEY MCKEEN:  Are you finished,

16            Caleb?

17                    ATTORNEY SEELEY:  I am finished.

18            There's no pending question.  So there's

19            nothing Dr. Hayter needs to answer.  But if

20            you want to ask him a question and proceed

21            with the deposition, go ahead.

22                    ATTORNEY MCKEEN:  Let's take a break and

23            go off the record.

24                    ATTORNEY SEELEY:  Okay.  We can go off

25            the record.

Page 80

```
 1              THE VIDEOGRAPHER:  This marks the end of
 2         Media Unit Number 2.  Going off record.  The
 3         time is 12:56 p.m.
 4              (Break in proceedings.)
 5    BY ATTORNEY MCKEEN:
 6         Q.   Dr. Hayter, we've just taken a brief
 7    break.  Do you understand that you're still under
 8    oath, sir?
 9         A.   Yes, I do.  Thank you.
10         Q.   Did you discuss your testimony with
11    anybody while we were on the break?
12         A.   No, I did not.
13         Q.   On ███████████████ of your report, you
14    say, ███████████████████████████████████
15    ████████████████████████████████████████████████
16    ████████████████████████████████████████████████
17    ██████████████████████████████████████████
18    ███████████████████████████████████████████████
19    ██████████████████
20              Did I read that correctly?
21         A.   I'm not sure.
22         Q.   Take as much time as you need to get to
23    that page of the report.
24         A.   I am looking at the bottom of ██████████
25    and the top of ██████████
```

Page 81

```
 1              Q.    Okay.  So do you see the portion I just
 2       read into the record?
 3              A.    I believe you were reading the sentence
 4       that began at the bottom of ███████ and ended at the
 5       top of ██████.
 6              Q.    That is correct.  So you say that
 7       ████████████████████████████████████████████████████
 8       ██████████████████.
 9                        ████████████████████████████████
10       █████████████████████████████
11              ATTORNEY SEELEY:  Objection to form.
12              THE WITNESS:  So this is in reference to
13       Figures 2.1 to 2.8 of my first report.  I
14       would like to open up my first report and
15       look at those figures.  Is that all right?
16              ATTORNEY MCKEEN:  If that's helpful to
17       you, that's just fine.  Let's pull up what
18       was previously marked as Exhibit 3 to your
19       deposition.
20              If it's possible to screen share that
21       here in the depo, if our tech could make that
22       happen, that would be really helpful.  I want
23       to make sure we're looking at the same thing.
24              (Exhibit 9 marked for identification.)
25
```

Page 82

1    BY ATTORNEY MCKEEN

2           Q.    In the meantime, Dr. Hayter, is there --

3    do you have your report in front of you on your

4    computer, your original report?

5           A.    I do have my original report open.

6           Q.    Is there a particular page number you

7    want to direct us to?

8           A.    You could go to Page 151.

9           Q.    Is this the page that you're directing

10   us to, Dr. Hayter?

11          A.    Yes.    Thank you, ma'am.

12          Q.    Okay.

13          A.    So again, this is Dr. Lasater's reduced

14   dataset.    This is T&P applications for neurologists,

15   but there's seven additional figures on the next

16   pages that go together with this.

17                So as I explained, what was important to

18   me was the relationship shown with the blue dots

19   which I illustrated with that shaded red area which

20   is empty which says, "no physicians here," because

21   that's consistent with and supportive of the

22   plaintiffs' claims.    I also thought it would be

23   helpful to the judge to provide some summary

24   statistic numbers, which is the 40 percent which you

25   are referring to.

Page 83

1            So as you can see, at the bottom of
2    Page 151, I explained that the nine neurologists
3    whose individual recorded denial rates were
4    40 percent or less had an average of five
5    evaluations each, and the 19 neurologists whose
6    individual recorded denial rates were greater than
7    40 percent had an average of 15.4 evaluations each,
8    and it seems to me that's important information
9    because it's one way of understanding the
10    relationship between the recorded denial rates and
11    the number of evaluations.
12            Now, I know you're asking me about the
13    40 percent, and you asked me in my first deposition,
14    and I explained, well, I just looked at the data and
15    that seemed to be a good number to make my point,
16    and there's nothing wrong with that.  That's what
17    statisticians do, they learn from the data, they
18    extract information from the data, but I could have
19    used 20 percent, 10 percent, 35 percent, 55 percent,
20    probably 60 percent, and it would have made the same
21    point.
22            If you look at the last four graphs
23    here, I use 50 percent, but I could have used other
24    numbers as well.
25            If you go too high, so if you went to

Page 84

1      like .8 percent, it might flip around.  This is the

2      graph where Dr. Lasater put like the blue area at

3      the top.  So if you went too high, this may flip

4      around, but the point is for numbers 10, 20, 30, 40,

5      50 percent, you're going it essentially see that

6      same result that I've summarized there.

7              Q.    What do you mean when you say flip

8      around?

9              A.    Well, for example, like there's one

10     point at the top there which is number of

11     evaluations is very small, I suppose, maybe one or

12     two, and the recorded denial rates are 100 percent.

13     There's at least two physicians there because you

14     can see there's sort of physician ID numbers

15     overwritten.  So those two or three physicians had a

16     very small number of evaluations but actually had

17     the highest recorded denial rates of 100 percent.

18             Q.    And that's inconsistent with plaintiffs'

19     theory of the case, isn't it?

20                  ATTORNEY SEELEY:  Objection to form.

21                  THE WITNESS:  Not really, because you

22            need to look at the entirety of the data, and

23            what the entirety of the data here is that --

24            important thing is that red shaded area,

25            which is consistent throughout all eight of

Page 85

```
 1          these graphs and 16 of the graphs which are
 2          probably going to come to -- with respect to
 3          Exhibits A and B.
 4              So there were 24 graphs in total that I
 5          showed in my first report which consistently
 6          have this empty area which I've shaded red.
 7   BY ATTORNEY MCKEEN:
 8          Q.  Just to be clear, Dr. Hayter, when you
 9   testified to me just a moment ago about not wanting
10   something to flip around, what you meant was you
11   wouldn't want to be making the opposite point of
12   what you're trying to make here, right?  That's what
13   you meant by flip around, isn't it?
14              ATTORNEY SEELEY:  Objection to form.
15          Misstates the testimony.
16              THE WITNESS:  Well, it is not a valid
17          point, because what's important here is the
18          large red shaded area.
19   BY ATTORNEY MCKEEN:
20          Q.  Other than your visual assessment, what
21   accepted statistical principle would provide you
22   with guidance on which percentage to choose here?
23   Did you use anything other than your visual
24   assessment?
25              ATTORNEY SEELEY:  Objection to form.
```

Page 86

```
 1              THE WITNESS:  As I've said, I chose
 2         these numbers because I thought they would
 3         provide useful summary statistics for the
 4         judge, but there were other numbers I could
 5         have used which would have made the same
 6         point.
 7   BY ATTORNEY MCKEEN:
 8         Q.   And you wanted to make sure you were
 9   making the same point and not the flipped around
10   point where you are emphasizing that there are in
11   fact physicians with very few evaluations and very
12   high denial rates, right?  You didn't want to
13   emphasize those, did you?
14              ATTORNEY SEELEY:  Objection to form.
15         Misstates the testimony.
16              THE WITNESS:  I wanted to summarize the
17         points that I learned from these graphs with
18         the consistent empty, rich, large, red shaded
19         areas.
20   BY ATTORNEY MCKEEN:
21         Q.   And you wanted to make sure those points
22   were consistent with plaintiffs' theory of the case,
23   didn't you?
24              ATTORNEY SEELEY:  Objection to form.
25              THE WITNESS:  It was plaintiffs'
```

Page 87

```
 1              theory -- well, you said theory of the case.
 2              I'll say plaintiffs' claims, which is what I
 3              have said, it was plaintiffs' claims which
 4              enabled me to realize that it was the empty
 5              red shaded areas that were important.
 6     BY ATTORNEY MCKEEN:
 7         Q.   Would a different statistician looking
 8     at the same graph select a different cutoff point
 9     for their analysis?
10              ATTORNEY SEELEY:  Objection to form.
11              THE WITNESS:  When you say cutoff point,
12              you're referring to the 40 percent in the
13              first four graphs and 50 percent in the
14              second set of four graphs, correct?
15     BY ATTORNEY MCKEEN:
16         Q.   Yes, sir.
17         A.   I could have selected different numbers,
18     as I said.
19         Q.   And in fact, you did, because sometimes
20     you used 40 and sometimes you used 50, right?
21              ATTORNEY SEELEY:  Objection to form.
22              THE WITNESS:  That's correct.  I used 40
23              for the first four graphs, which are
24              applications, and 50 for the second four
25              graphs of appeals.  And that makes sense
```

Page 88

```
 1              because for appeals, the denial rates of all
 2              of the physicians tend to be higher, so the
 3              blue dots sort of move up in appeals as
 4              compared with applications.
 5    BY ATTORNEY MCKEEN:
 6         Q.   The dots themselves already show you
 7    where the dots are, right?  Why do you need to shade
 8    any area to show where the dots aren't?  Don't the
 9    dots themselves kind of already do that work for
10    you?
11              ATTORNEY SEELEY:  Objection to form.
12              THE WITNESS:  But it's my job to help
13              the judge understand what's important about
14              the placement of these blue dots, so I
15              thought it would be helpful to clarify what
16              is important about the placement of the blue
17              dots by shading the large empty areas red.
18    BY ATTORNEY MCKEEN:
19         Q.   Take this exhibit down.
20              Dr. Hayter, can you turn with me to
21    ███████ of your August 15th, rebuttal report?
22         A.   I am on ████████
23         Q.   On this page, ████████████████
24    ████████████████████████████████ is that
25    correct?
```

1          A.    So this is ███████, which is the ███████

2      page of ████████ and the heading is ████

3    ████████████████████████████████████

4    ██████████████████████████████████████

5    ████████████████████████████

6    ████████████████████████████████████████

7    ████████████████████████████████████

8          Q.    Neuropsychologists have higher

9      examination fees, don't they?

10          A.    That is correct.  As far as I

11      understand, it is $5,000 for neuropsychologists,

12      compared with -- I'm just reading from Dr. Lasater's

13      report on Page 109.  He says it's $3,000 for the

14      other physicians.

15          Q.    Dr. Hayter, do you have an opinion about

16      whether neuropsychologists receiving a higher

17      examination fee makes them more or less likely to be

18      biased?

19          A.    I have never expressed an opinion on

20      that.  Although, as you'll see from my rebuttal

21      report, Dr. Lasater seems to have invented a

22      hypothesis which he attributed to me, though I never

23      expressed anything like that.

24          Q.    So that is not an opinion that you

25      intend to express in this case?

Page 90

```
 1              A.   Not at the moment, based on the
 2      information I have available to me at the moment.
 3              Q.   Why do you think Dr. Lasater should have
 4      conducted a separate analysis for
 5      neuropsychologists, if the difference in fee isn't
 6      any sort of indicator of bias?
 7                   ATTORNEY SEELEY:  Objection to form.
 8                   THE WITNESS:  Well, your question there
 9                 was sort of twofold.  It says why do I think
10                 physician types need to be evaluated
11                 separately.  And I explained that in detail
12                 in my initial report, why it's important to
13                 analyze the different physician types
14                 separately.  So that's in my initial report.
15                   But then you said why is it important to
16                 analyze physician types separately
17                 because --are you trying to relate this to
18                 the difference in the fees?
19      BY ATTORNEY MCKEEN:
20              Q.   I'm trying to ask if you think that
21      that's an important part of why physician types
22      ought to be analyzed separately?
23                   ATTORNEY SEELEY:  Objection to form.
24                   THE WITNESS:  Do you mind if I refer to
25                 my initial report?
```

Page 91

1      BY ATTORNEY MCKEEN:

2           Q.   Do you need to do that to answer my

3      question?

4           A.   Yes.

5           Q.   Then by all means.

6           A.   So somewhere in my initial report -- you

7      might be able to find it quicker than me -- I have a

8      section -- maybe Caleb knows what it is.

9           Q.   We're not going to let Caleb testify

10     today, but --

11          A.   I found it.  It's Section 1.5.  It's on

12     Page 105, and this is my initial report.

13          Q.   Okay.

14          A.   So I'm looking at Page 105, and this is

15     where I explain why it's important to analyze the

16     different physician types separately.

17               In the middle of Page 105, I say this is

18     because with respect to neurologists, say, it is

19     claimed by the plaintiffs that the evaluations that

20     require a neurologist have been assigned

21     disproportionately to specific neurologists rather

22     than to other neurologists.  A proper and insightful

23     way to investigate this claim is to perform an

24     analysis of neurologists separately from the other

25     physician types.  And to me, that's sort of clear

Page 92

1    and obvious.  And then I make the same point with
2    respect to neuropsychologists and orthopedists and
3    psychiatrists.
4              To answer your question, that's got
5    nothing to do directly with the different
6    compensations paid to neuropsychologists as compared
7    with the other physician types.  The problem is I
8    was responding to Dr. Lasater's analysis, and in
9    Dr. Lasater's analyses in 2024, last year, none of
10   his analysis looked at physician types separately,
11   and so I'm explaining here that, well, you do need
12   to look at physician types separately.
13             And the point I'm making is that if you
14   don't look at physician types separately, then the
15   issue of the different compensations, it's
16   mathematically a problem because ranking of
17   evaluations does not mathematically correspond to
18   ranking of compensations from evaluations.
19             But if you analyze the physician type
20   separately, which obviously makes sense, then the
21   issue of the different compensation amounts doesn't
22   matter anymore.
23        Q.   Dr. Hayter, let's look at ██████ of
24   your rebuttal report.  You say██████████████
25   ████████████████████████████████████

Page 93

████████████████████████████████████

████████    ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

6          Is it your opinion that Form 5500s are a

7    better source for measuring physician compensation

8    than encounter data?

9          A.   Well, when you say encounter data, you

10   have to be careful what you mean by that because

11   Dr. Lasater obviously, as you know, used encounter

12   data, and he says that's a proxy for a physician's

13   compensation.  But that only makes sense if you were

14   to use all of the encounters of a physician.

15          So let's suppose Caleb is a physician.

16   He gets income from all of his player evaluations,

17   which is all of his encounters, and then he could

18   get additional compensation from like attending

19   workshops or as a consultant or from expenses.

20          But if you're going to use encounters,

21   you would need to use the sum of all those

22   encounters.  One of the problems with Dr. Lasater's

23   analyses from 2024, last year, is that he never used

24   all encounters.  He kind of sliced and diced, so he

25   would just have, say, encounters for a physician

Page 94

1    doing application LODs for medical.

2                    So he never actually looked at a

3    physician's total encounters.  In one of his

4    analysis in his rebuttal report, he did look at

5    total encounters, but for all the other analysis in

6    his rebuttal report, he didn't look at total

7    encounters either.

8                    So your question about encounters versus

9    the Form 5500s, I mean, for a start you have to say

10   if you're going to use encounters, you should have

11   all encounters, which is not what Dr. Lasater did.

12                   But it's also my opinion that there is

13   additional information in the Form 5500s,

14   particularly the six or seven consultants, because

15   the consultancy fees are quite high, and if you only

16   look at encounters, you may not be able to identify

17   the physicians with the highest compensations

18   without taking into account those consulting fees.

19                   So if you are only using encounters, I

20   think you need to add in the consulting fees as

21   well.  And then I do think expenses can also be a

22   valid form of compensation.

23            Q.   Dr. Hayter, you testified about this at

24   length in your last deposition, about the fact that

25   expenses aren't the same as other forms of

Page 95

1      compensation.  Do you remember that?

2                     ATTORNEY SEELEY:  Objection.

3                     THE WITNESS:  I do remember, but the

4           references to my testimony has been taken out

5           of context in Dr. Lasater's rebuttal report,

6           and it does not reflect my true opinions.

7      BY ATTORNEY MCKEEN:

8           Q.   How so?

9           A.   Well, in my last deposition, you were

10     asking me about my expenses, and I was providing you

11     testimony about my expenses.  So whenever I submit

12     expenses, it's generally for travel, which luckily

13     we don't have to do so much of now that we can all

14     get on Zoom.

15                    But before COVID, I'd have to fly

16     somewhere for a deposition and stay in a hotel, so

17     I'd have to pay money out of my own pocket for my

18     airfare, for my hotel fair and everything.  So I

19     would be sort of negative.  I'm out of pocket for

20     the money I spent.  And then I would select all of

21     my receipts and hopefully they'd get paid and that

22     would bring me back to like zero.

23                    So for me, coming back to zero for the

24     money I've already paid out is very different to

25     like income coming in for my time.  But I don't

1    think that's necessarily the case with expenses for

2    physicians, and I know that people -- I've seen that

3    everyone seems to give the example of x-rays, but my

4    experience with x-rays is like when I go to a

5    dentist to have my teeth cleaned, I expect to pay to

6    have my teeth cleaned and then somebody walks in and

7    says, oh, you're due for your x-rays, and they take

8    you off to another room and they take all the x-rays

9    and then they add $200 or something to the bill, but

10    it didn't cost the dentist $200 to take my x-rays.

11    It only cost them the electricity and the time they

12    spent evaluating them.  So I consider that a sort of

13    income to the dentist.

14              So if physicians are doing the same

15    thing, it is income to their practice, which they

16    may say needs to go towards paying for the x-ray

17    machine and everything, but it is still sort of

18    compensation as a benefit to that physician.

19          Q.   Dr. Hayter, have you done any actual

20    analysis in this case of how physicians handle the

21    sort of expenses that they are compensated for by

22    the plan?

23              ATTORNEY SEELEY:  Objection to form.

24              THE WITNESS:  What I know is just my

25         general understanding that it has been

Page 97

```
1          explained that the Form 5500s can include
2          expenses, and as an example of expenses, I've
3          seen x-rays given.
4   BY ATTORNEY MCKEEN:
5          Q.   But you don't actually know, do you,
6   whether physicians do have to go out of pocket for
7   x-rays or whether or not they use third-party
8   providers for such things.  You haven't undertaken
9   an actual analysis of any of that in this case, have
10  you?
11         A.   I have not, because as far as I
12  understand, that information is not available.
13         Q.   Okay.  But so you haven't looked at that
14  issue at all in this case, have you?
15              ATTORNEY SEELEY:  Objection to form.
16              THE WITNESS:  Well, I have, in the sense
17         that it's my understanding that the
18         Form 5500s include expenses, and because of
19         the example I've given, I can understand how
20         expenses might be considered as part of
21         compensation.  But beyond that, I haven't
22         looked at any expenses in detail because I
23         don't believe that information is available.
24  BY ATTORNEY MCKEEN:
25         Q.   So you don't know for any given
```

Page 98

```
 1      physician or other medical entity for which expenses
 2      they may have actually gone out of pocket versus
 3      not.  You don't know that one way or the other, do
 4      you?
 5                  ATTORNEY SEELEY:  Objection to form.
 6                  THE WITNESS:  I don't know specific
 7            details, because as I said, I understand that
 8            information is not available.
 9      BY ATTORNEY MCKEEN:
10            Q.   And so there could be some expenses for
11      which physicians came out of pocket, and there could
12      be others that are more like the dentist example
13      that you gave, right?
14                  ATTORNEY SEELEY:  Objection to form.
15      BY ATTORNEY MCKEEN:
16            Q.   There could be different kinds, couldn't
17      there?
18                  ATTORNEY SEELEY:  The same objection.
19                  THE WITNESS:  As I said, I don't know
20            the details.
21      BY ATTORNEY MCKEEN:
22            Q.   You mentioned the consulting fees, and I
23      think you mentioned that those get paid to about six
24      or seven physicians only; is that correct?
25                  ATTORNEY SEELEY:  Objection to form.
```

Page 99

1            THE WITNESS:  That is my understanding.
2       Yes, ma'am.
3    BY ATTORNEY MCKEEN:
4       Q.   What's your understanding of how those
5    fees factor into plaintiffs' case?
6            ATTORNEY SEELEY:  Objection to form.
7            THE WITNESS:  My understanding is that
8       that is compensation to those physicians, and
9       the plaintiffs' claims relate to the
10       compensations of physicians.
11    BY ATTORNEY MCKEEN:
12       Q.   Do you understand one way or the other
13    whether it's plaintiffs' claim that those consulting
14    fees cause any of those six or seven physicians to
15    be biased?
16            ATTORNEY SEELEY:  Objection to form.
17       Scope.
18            THE WITNESS:  Again, I think we've been
19       here before.  I think you used the word
20       "cause" there, and I don't want to speak for
21       the plaintiffs with regards to what their
22       claims of causality are.
23            I would simply say as a statistician, I
24       am interested in data wise the association or
25       possible association between a physician's

Page 100

```
 1          evaluations, individual evaluations and their
 2          total compensation.  So as a statistician, I
 3          can recognize that since the consulting fees
 4          are part of a physician's total compensation,
 5          it's important to take those into account.
 6    BY ATTORNEY MCKEEN:
 7          Q.   You understand plaintiffs' case to
 8    include any allegations that relate to the
 9    compensation that physicians receive for, I think
10    you mentioned, workshops.  Is that also encompassed
11    by plaintiffs' claims?
12          A.   I think --
13               ATTORNEY SEELEY:  Objection.
14               THE WITNESS:  -- workshops -- sorry,
15          Caleb.
16               ATTORNEY SEELEY:  No, that's my fault.
17          I'm just going to put an objection to form
18          and scope.
19               You can answer.
20               THE WITNESS:  I did use the word
21          "workshops," and I think they're also
22          referred to as honoraria.  So they contribute
23          to the physician's total compensation, and
24          obviously, as we said, the plaintiffs' claims
25          relate to the physician's total compensation.
```

Page 101

1           So in a sense, the honoraria do sort of
2           contribute to total compensation which is
3           part of the plaintiffs' claims, but the
4           plaintiffs' claims, you know, relate to
5           identifying the physicians with the highest
6           total compensations, and I don't know for
7           sure, but it may be the case that in terms of
8           identifying the plaintiffs with the highest
9           total compensations, it doesn't actually make
10          any difference whether you take into account
11          these, I'll just call them workshop fees,
12          because my understanding is that everybody
13          gets it maybe once every two years.
14                  So if everybody is getting it, it just
15          sort of moves all the physicians'
16          compensations up, but it wouldn't affect the
17          determination of a physician's total -- it
18          wouldn't affect the determination of the
19          physicians who have the highest total
20          compensations, but there's nothing wrong with
21          including those workshop fees in the
22          physician's total compensations.  It just
23          might not make a difference in identifying
24          the physicians with the highest total
25          compensations.

1      BY ATTORNEY MCKEEN:

2           Q.   Dr. Hayter, let's look at ████████ of

3      your report.

4           A.   And we're on my rebuttal report, right?

5           Q.   Yes.  Thank you, sir.

6           A.   I am on ██████.

7           Q.   At the bottom of the page, you say,

8      ████████████████████████████████████████

9      ████████████████████████████

10     ████████████████████████████████████████

11     ████████████████████████████

12           What's your basis for that opinion?

13           ATTORNEY SEELEY:  Objection to form.

14           THE WITNESS:  It's basic elementary

15         statistical principles.

16    BY ATTORNEY MCKEEN:

17           Q.   And what are those statistical

18     principles?

19           A.   The principles are that there's nothing

20    improper about the two time periods here.

21           Q.   What if you compared the same 2009 to

22    2024 period for physician compensation with the

23    individual physician recommendations that were only

24    associated with a single day of physician

25    recommendations?  Would that be improper?

```
                                              Page 103
 1              ATTORNEY SEELEY:  Objection to form.
 2              THE WITNESS:  So let's see if I've got
 3         that.  You're suggesting that the analysis of
 4         an individual physician's recommendations
 5         should be based upon picking what shall we
 6         say, May the 31st, 2019, and only looking at
 7         the evaluations that occurred on May the
 8         31st, 2019?  Is that your question?
 9    BY ATTORNEY MCKEEN:
10         Q.   Yeah.  Would that be proper?
11              ATTORNEY SEELEY:  Objection.
12         Hypothetical.
13              THE WITNESS:  My opinion is that looking
14         at only the individual physician
15         recommendations that occurred on May the
16         31st, 2019 would not be informative with
17         respect to analyzing the plaintiffs' claims.
18    BY ATTORNEY MCKEEN:
19         Q.   Why not?
20         A.   Because it's because the plaintiffs'
21    claims don't relate to -- specifically to the
22    physician evaluations that occurred on May the 31st,
23    2019.  They refer to, in general, all of the
24    individual recommendations of the physicians.
25         Q.   For the time period 2018 to 2024?
```

Page 104

 1              ATTORNEY SEELEY:  Objection to form.
 2              THE WITNESS:  Are you asking me whether
 3         the plaintiffs' claims specifically refer
 4         only to the individual physician
 5         recommendations in the time period 2018 to
 6         2024?
 7    BY ATTORNEY MCKEEN:
 8         Q.   Let me ask you a different question,
 9    Dr. Hayter.  I'm asking you ████████████████████
10    ████████████████████████████████████████████
11    █████████████████.
12                █████████████████████████████████,
13    ████████████████████████████████████████████████
14    ██████████████████████████████████
15    ████████████████████████████████████████
16    ████████████████████████████████ So let
17    me ask it differently.
18              From a statistical point of view, would
19    it be proper to compare physician compensation from
20    2009 to 2024 to the physician recommendations that
21    only occurred during a single week in 2023?  Would
22    that be proper from a statistical perspective?
23              ATTORNEY SEELEY:  Objection to form.
24              THE WITNESS:  Well, it sounds like we've
25         moved from a day to a week.  I mean, I think

Page 105

```
1          the best way to answer your question is to
2          answer -- to properly investigate the
3          plaintiffs' claims, one needs as much data as
4          is available.  So it has been decided that
5          the V3 datasets have been produced for the
6          time period 2018 to 2024.
7               So consequently, necessarily to do the
8          best analysis of the plaintiffs' claim based
9          upon the data available, I would use that
10         entire time period 2018 to 2024.  So I don't
11         understand any rationale for looking at only
12         a week's data or a day's data, because the
13         more data you have, the more insightful
14         analysis you can do.
15    BY ATTORNEY MCKEEN:
16         Q.   What about the time period?  Why not
17    limit the time period to correspond to the time
18    period for the individual physician recommendations?
19    In other words, why not look at 2018 to 2024
20    compensation, because it corresponds to the time
21    period for the recommendations?  Why go back further
22    in time?
23              ATTORNEY SEELEY:  Objection to form.
24              THE WITNESS:  If you look at the middle
25         of page -- the next page, which is ████████,
```

Page 106

1          I answer your question.

2    ████████████████████████████████████

3    ████████████████████  ██████████████

4    ████████████████████████████████████

5    ██████████████

6    ████████████████████████████████

7    ██████████████████████████████████████

8    ██████████████████████████████████████

9    ████████████████████████████████████

10   ██████████████████████████████████

11   ███████████████

12   BY ATTORNEY MCKEEN:

13          Q.   What if you had physician compensation

14   data going all the way back to 1970?  Do you think

15   that would be appropriate to compare to individual

16   physician recommendations for the years 2018 to

17   2024?

18          A.   I think one would have to consider what

19   physicians were involved.  I think one would only do

20   it for the physicians -- one would only obviously --

21   one only wants information for the physicians that

22   conducted evaluations in 2018 to 2024, because

23   that's the physicians you have the individual

24   recommendations for.  Well, actually you don't

25   because the V3 dataset doesn't have that

Page 107

1    information, but that's the only sort of partial

2    information we have on the physician -- well,

3    actually it's not even partial information.

4            That's the time period of the V3 dataset

5    which has some physicians in it.  So obviously you

6    wouldn't want to go back and get compensation for

7    other physicians.

8            In theory one could, although I think

9    it's important to understand that even if you're

10   looking at, say, the time period 2009 to 2024, or I

11   think you said 1970 to 2024, it's important to

12   understand that the different physicians that are

13   included in the V3 dataset, they're not necessarily

14   getting compensations over all of those years.

15           So if you look at exhibit -- it is now

16   Exhibit B to my first report, there are a lot of

17   empty cells where like a physician did not get

18   compensation in a particular year.

19           So it is important also I think to look

20   at sort of like average annual compensation as

21   compared with total compensation.  But in general,

22   the more information you have available to you on a

23   physician's compensation, the better.

24       Q.   So in the hypothetical I gave going all

25   the way back to 1970 in your opinion would be

Page 108

1    statistically appropriate?

2         A.   I said the more information you have

3    generally the better, but obviously you need to

4    think how to analyze that in terms of total

5    compensation and average annual compensation.

6         Q.   Have you undertaken to analyze average

7    annual compensation, as you just mentioned?

8         A.   So I am going to refer you to my first

9    report here, and I think I can find the part pretty

10   quickly.  So I'm looking at my first report.  For

11   example, on Page 182 of my first report, I have a

12   table which has annual average compensation, and --

13   actually, I think I've got eight pages here, eight

14   pages that start on Page 182 which have annual

15   average compensation, although I have also looked at

16   total compensation as well.

17        Q.   Dr. Hayter, let me ask a better

18   question.

19             Have you analyzed annual average

20   compensation for all of the physicians for whom you

21   have available data?

22             ATTORNEY SEELEY:  Objection to form.

23             THE WITNESS:  So I'm looking at Page 182

24        of my first report.  So this is neurologists,

25        and yes, I believe that's all the

Page 109

```
 1            neurologists for which I had information
 2            provided in Exhibit B of my first report.
 3                  And if you look at the subsequent
 4            tables, it will have the other physician
 5            types as well.
 6      BY ATTORNEY MCKEEN:
 7            Q.   How did your calculation of average
 8      annual compensation take into account what you just
 9      told me about the fact that for certain time
10      periods, physicians may not have performed any
11      evaluations?
12            A.   I'm looking in my first report where I
13      explained to you how I calculated the annual
14      average -- so if you look at Page 180 -- so this is
15      my first report, and if you look at the bottom
16      paragraph on Page 180, I explain that the
17      physicians' total compensations are the sums of all
18      the compensations for the physicians that are
19      provided in Exhibit B for all years, while the
20      physician's annual average compensations are the
21      average compensations provided in Exhibit B for
22      years in which a physician receives some
23      compensation.
24            Q.   I was just briefly disconnected from the
25      Zoom.  I don't know if that happened to others or
```

Page 110

1    not?

2                ATTORNEY SEELEY:  No, it didn't.  He can

3          repeat that, the answer.

4                ATTORNEY MCKEEN:  If Dr. Hayter was

5          testifying and I wasn't around, I want to

6          know what the answer was.

7                Can the court reporter read Dr. Hayter's

8          testimony, please.

9                (The court reporter read the record.)

10   BY ATTORNEY MCKEEN:

11        Q.   Just so I understand your testimony,

12   Dr. Hayter.  If a physician performed a single

13   evaluation in a particular year, that's good enough

14   for that to factor into how you calculate their

15   average annual compensation the way you've performed

16   your analysis; is that correct?

17               ATTORNEY SEELEY:  Objection to form.

18               THE WITNESS:  I'm not sure exactly what

19          you mean there.  You said if a physician

20          performs only one evaluation in a year.

21               So, I mean, I think the first question

22          would be whether that income would be

23          recorded in Exhibit B, because as you know,

24          the information in Exhibit B is obtained from

25          the Form 5500s, and I think there was like --

Page 111

1          is it $5,000 trigger that if it's less than a

2          certain amount, the form doesn't exist.

3              I think to answer your question, is any

4          evaluation, whether it was just a single one

5          or not, as long as it's represented in a

6          Form 5500, so then it will be some income in

7          that year, then the income in that year will

8          obviously be a component of my total

9          compensation that I used in those figures we

10         were looking at, and if there is some

11         compensation in that year as recorded in

12         Exhibit B, it will contribute to a

13         calculation of the physicians' average annual

14         income as shown in those tables and figures

15         in my first report.

16    BY ATTORNEY MCKEEN:

17         Q.   I'll ask you another hypothetical,

18    Dr. Hayter, just to make sure I understand your

19    testimony on this point.

20              So if a physician received $100,000 of

21    compensation from the plan in 2019 and then $1,000

22    of compensation from the plan on January 1st of

23    2020, under your analysis, you would say that that

24    physician's average annual compensation was $50,500,

25    because that's the $100,000 plus $1,000, divided by

Page 112

1      two, over those two years in which there was
2      compensation; do I have that correct?
3                    ATTORNEY SEELEY:  Just for the sake of
4              clarity, are you just doing math, or are we
5              trying to get specific about plan, financial
6              years?
7                    ATTORNEY MCKEEN:  I'm just doing math,
8              Caleb.  I'm not trying to be --
9                    ATTORNEY SEELEY:  Fair enough.
10                   ATTORNEY MCKEEN:  -- controversial.  I
11             think one of my colleagues, Caleb, would say
12             I'm not even doing math.  I'm just doing
13             arithmetic.
14                   THE WITNESS:  So to answer your
15             question, I think you probably meant this,
16             but you didn't say it, but I think your
17             implication is that this physician only
18             received any compensation in these two years
19             so that they didn't receive any compensation
20             at all and then suddenly one year they
21             received $100,000, and then January 1st they
22             received $1,000, I think you said, and then
23             they never received any other compensation,
24             right?
25

Page 113

1    BY ATTORNEY MCKEEN:

2          Q.    That's my hypothetical, Dr. Hayter.

3    You've got it exactly right.

4          A.    Right.  So in terms of the calculations

5    that I used in my initial report in those tables and

6    figures that we were looking at, I would have

7    calculated total compensation as the sum of those

8    two amounts, which is the $101,000, if I remember

9    your numbers, and I would have calculated average

10   annual income as half of that amount.

11         Q.    And so if we can modify the hypothetical

12   a little bit, if instead of what I described, the

13   same physician instead of receiving that $1,000 on

14   January 1st, 2020 received that $1,000 on

15   December 31st 2019, so that the entire $101,000 was

16   received in 2019, then the way your calculations

17   were performed would mean that his average annual

18   compensation was calculated as $101,000 because

19   that's what he had in 2019 and he didn't have any in

20   2020.

21               Do I have that correct?

22         A.    I think you're right, because now if I

23   understand you correctly, you're saying that this

24   physician had no income at all and then suddenly in

25   one year they got $101,000, and then after that

Page 114

1    year, they never had any other income again.

2              The way I calculated total compensation,

3    that would be $101,000, and average annual

4    compensation would be the same, $101,000.  And

5    that's why I provided analyses both of total

6    compensation and average annual income which show

7    consistent and robust results regardless of whether

8    it's total compensation or average annual

9    compensation.

10             ATTORNEY MCKEEN:  Let's go off the

11        record, please.

12             ATTORNEY SEELEY:  Okay.

13             THE VIDEOGRAPHER:  You just said off the

14        record?

15             ATTORNEY MCKEEN:  Yes, please.

16             THE VIDEOGRAPHER:  This marks the end of

17        Media Unit Number 3.  Going off record.  The

18        time is 1:56 p.m.

19             (Break in proceedings.)

20             THE VIDEOGRAPHER:  This marks the

21        beginning of Media Unit Number 4, going back

22        on record, the time is 2:03 p.m.

23             ATTORNEY MCKEEN:  Dr. Hayter, I don't

24        have any further questions for you.  Thank

25        you very much for your time today, and I'll

Page 115

1             pass the witness.

2                   ATTORNEY SEELEY:  Thanks.  We can stay

3             on the record.  I should only have a small

4             number of questions for you, Doctor, and then

5             hopefully we can get you out of here.

6

7                   E X A M I N A T I O N

8       BY ATTORNEY SEELEY:

9             Q.   I wanted to begin, do you recall earlier

10      in this deposition Ms. McKeen asked you a question

11      about the power function and whether you had

12      described the chi-square analyses done by

13      Dr. Lasater as having low power.

14                  Do you recall that series of questions?

15            A.   Yes, sir.

16            Q.   Can you explain what you mean by "low

17      power"?

18            A.   It's essentially whether the statistical

19      analysis has any chance of rejecting the null

20      hypothesis.  Because as I said, the null hypothesis

21      is a default null hypothesis which gets the benefit

22      of the doubt.

23                  So if you look at data which is

24      uninformative, you can't learn anything from it, so

25      you'll necessarily have to accept the null

Page 116

1     hypothesis which is the default hypothesis.  But as
2     I keep explaining to my students, that doesn't mean
3     you've proved the null hypothesis.  So the power is
4     important because it relates to whether you actually
5     have any chance of being able to reject the null
6     hypothesis.
7              Q.   And is a power function the only way to
8     assess whether a statistical analysis has low power
9     or high power?
10             A.   Not necessarily, because it's also
11    related to like the preprocessing of the data, which
12    I explain in my report related to whether the way
13    you're approaching the problem has any chance of
14    telling you anything informative.
15             Q.   Do you recall being asked various
16    questions throughout the deposition about what the
17    nature of plaintiffs' claims were and whether
18    certain individuals have or have not suffered
19    legally cognizable harms?
20             A.   I do remember that, yes, sir.
21             Q.   Are you now or have you ever been a
22    legal expert?
23             A.   Not beyond providing statistical
24    expertise to legal issues.
25             Q.   And do you offer any opinions about what

Page 117

1    does or does not constitute a legally cognizable

2    harm under the ERISA statute and regulatory scheme?

3         A.    I'm quite certain I don't have the

4    expertise to opine on that beyond opining on

5    statistical matters and data which may be relevant

6    to such an assessment.

7         Q.    Do you still have -- I believe towards

8    the end of the deposition we were talking about --

9    or you were talking about with counsel ████████ of

10   your rebuttal report which has been marked as

11   Exhibit 8.  Do you still have that in front of you?

12        A.    Yes, sir.  I have ████████ of my

13   rebuttal report.

14        Q.    And particularly counsel was referencing

15   ███████████████████████████████████████████████████

16   ███████████████████████████████████████████████████

17   █████████████████████████████████████████████████

18   ████████████████████████████████████████████

19   ██████████████████████████

20        Do you recall that?

21        A.    I do.  Yes, sir.

22        Q.    If you had additional information about

23   individual physician recommendations, would that be

24   relevant to your analysis, from a broader time

25   period beyond 2018 to 2024?

Page 118

1           A.   Yes, absolutely.  Assuming it was

2     relevant information, because what I'm searching for

3     is information on individual physician

4     recommendations, and the more of that you can have,

5     the better.  So if you had any information on

6     physician recommendations, whether it was in this

7     same period, 2018 to 2024, or prior to that or even

8     after that, all of that additional information on

9     additional physician recommendations would be

10    useful.

11           Q.   Is it relevant in your view that some

12    physicians have total compensation that they

13    received prior to the period for which the V3 data

14    has been provided?

15           A.   I think in assessing the plaintiffs'

16    claims, it's important to consider the total

17    compensation received by physicians over as large a

18    time period as one has that data.

19                So if you're specifically asking whether

20    physician compensation data prior to 2018 is

21    relevant to the plaintiffs' claims, then I would say

22    yes, obviously physician compensation data prior to

23    2018 is relative to the plaintiffs' claims, because

24    as I explained, I think I read out the paragraph on

25    the next page, ████, where in the middle of that page

Page 119

1    I say, ███████████████████████████████

2    ████████████████████████████

3    ███████████████████████████████

4    ███████████████████████████████

5    ███████████████████████████████

6         Q.    If you could turn in Exhibit 8 to

7    ████████ and let me know when you have it.

8         A.    So Exhibit 8 would be my rebuttal

9    report, right?

10        Q.    That's right.

11        A.    I'm on ██████████

12        Q.    Yes, and do you recall some questions

13   from counsel about the paragraph in the middle of

14   the page where you discussed ██████████████████

15   ███████████████████████████████

16   ██████████████████████████████

17   ███████████████████████████████

18   █████████████████████.

19         Do you recall questions on that

20   paragraph?

21        A.    I do recall that, yes, sir.

22        Q.    And just to be clear, ██████████████

23   ███████████████████████████████

24   ███████████████████████████

25   ███████████████████████████████

Page 120



1 ████████████████████████████████

2 ██████████████████████████████

3 █████████████████████████████████████

4 ████████████████████████████████

5 ███████████

6          Q.   Now, there were also some questions at

7 the beginning of your deposition about Exhibits A

8 and B, and my question to you is did you review

9 Dr. Lasater's report where he purported to identify

10 some potential errors in Exhibits A and B to your

11 initial report?

12          ATTORNEY MCKEEN:  I want to object to

13          the scope of this question.  I didn't ask the

14          witness any questions about Exhibits A or B.

15          I asked him about ████████ to his report.

16          So I think this exceeds the scope of my

17          examination of the witness and is improper.

18          ATTORNEY SEELEY:  Okay.  We disagree.

19          ATTORNEY MCKEEN:  Caleb, what questions

20          did I ask him about Exhibits A or B?  That

21          just didn't happen.

22          ATTORNEY SEELEY:  First of all, I'm not

23          asking him about Exhibits A and B.  You asked

24          him numerous questions about certain

25          paragraphs in his report where he made

Page 122

1          statements about ███████████████████

2          ███████████████████ It went for about a half

3          hour, and this will be far shorter.  If you

4          want to preserve your objection, it is so

5          noted.

6     BY ATTORNEY SEELEY:

7          Q.   All right.  Dr. Hayter, I'm going to --

8     I don't even remember my previous question.  I'm

9     going to withdraw it and do my best to ask you

10    something identical, but it may differ slightly in

11    wording.

12              Did you review Dr. Lasater's rebuttal

13    declaration in preparing your rebuttal report?

14         A.   Yes, I did.

15         Q.   Did you review the portions of his

16    report where he identified what he said were errors

17    in Exhibits A and B to your initial report?

18         A.   Yes.  I reviewed the entirety of

19    Dr. Lasater's rebuttal report.

20         Q.   Did any of the errors that he identified

21    change any of the opinions that you offered in your

22    initial report in any way?

23         A.   No, they did not.

24              ATTORNEY SEELEY:  I have no further

25         questions.  I pass the witness back to

Page 123

1        Ms. McKeen if she has anything further.

2              ATTORNEY MCKEEN:  I don't have anything

3        further for you, Dr. Hayter.  Thank you for

4        your time.

5              ATTORNEY SEELEY:  Thanks, everyone.

6              ATTORNEY MCKEEN:  Thanks, everybody.

7              THE VIDEOGRAPHER:  I'll take us off the

8        record.  This concludes today's deposition of

9        Dr. Anthony Hayter.  This is Media Unit 4 of

10       4, going off record, the time is 2:16 p.m.

11             THE COURT REPORTER:  Just tell me what

12       day you need the transcript, and also does

13       anyone need a rough draft today?

14             ATTORNEY MCKEEN:  No.  If we could have

15       it by Wednesday, would that be possible?

16             THE COURT REPORTER:  Sure.  I can do

17       that.

18             (Deposition adjourned at 2:16 p.m.)

19                    *  *  *  *  *

20

21

22

23

24

25

Page 124

1                    DEPOSITION ERRATA SHEET

2       Job No.

        Case Caption:  Jason Alford, et al. v. The NFL

3       Player Disability & Survivor Benefit Plan, et al.

        Deposition Date:  August 25, 2025

4

5              DECLARATION UNDER PENALTY OF PERJURY

6              I declare under penalty of perjury that I

7       have read the entire transcript of my Deposition

8       taken in the captioned matter or the same has been

9       read to me, and the same is true and accurate, save

10      and except for changes and/or corrections, if any,

11      as indicated by me on the DEPOSITION ERRATA SHEET,

12      hereof, with the understanding that I offer these

13      changes as if still under oath.

14      Signed on the __ day of _____, 20__.

15

16

17

18              _____

19                       DR. ANTHONY HAYTER

20

21

22

23

24

25

Page 125

1                    DEPOSITION ERRATA SHEET

2        Page No.____ Line No.____ Change to:_____

3        _____

4        Reason for change: _____

5        Page No.____ Line No.____ Change to:_____

6        _____

7        Reason for change: _____

8        Page No.____ Line No.____ Change to:_____

9        _____

10       Reason for change: _____

11       Page No.____ Line No.____ Change to:_____

12       _____

13       Reason for change: _____

14       Page No.____ Line No.____ Change to:_____

15       _____

16       Reason for change: _____

17       Page No.____ Line No.____ Change to:_____

18       _____

19       Reason for change: _____

20       Page No.____ Line No.____ Change to:_____

21       _____

22       Reason for change: _____

23

24       SIGNATURE:_____DATE:_____

25                      DR. ANTHONY HAYTER

Page 126

1                    DEPOSITION ERRATA SHEET

2       Page No._____ Line No._____ Change to:_____

3       _____

4       Reason for change: _____

5       Page No._____ Line No._____ Change to:_____

6       _____

7       Reason for change: _____

8       Page No._____ Line No._____ Change to:_____

9       _____

10      Reason for change: _____

11      Page No._____ Line No._____ Change to:_____

12      _____

13      Reason for change: _____

14      Page No._____ Line No._____ Change to:_____

15      _____

16      Reason for change: _____

17      Page No._____ Line No._____ Change to:_____

18      _____

19      Reason for change: _____

20      Page No._____ Line No._____ Change to:_____

21      _____

22      Reason for change: _____

23

24      SIGNATURE:_____DATE:_____

25                     DR. ANTHONY HAYTER

Page 127

1          COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2          I, Rhonda D. Tuck, RPR, CRR, Notary Public in

3     and for the Commonwealth of Virginia at Large, and

4     whose commission expires on May 31, 2028, do certify

5     that the aforementioned appeared before me, via

6     remote videoconferencing, was sworn by me, and was

7     thereupon examined by counsel; and that the

8     foregoing is a true, correct, and full transcript of

9     the testimony adduced.

10         I further certify that I am neither related to

11    nor associated with any counsel or party to this

12    proceeding, nor otherwise interested in the event

13    thereof.

14         Given under my hand and notarial seal in

15    Fluvanna County, Virginia, this 27th day of August,

16    2025.

17

18

19

20

21              Rhonda D. Tuck, RPR, CRR

22         Notary Public Registration No. 224847

23           Commonwealth of Virginia at Large

24

25    Job No. 7554391

Page 128

1    Caleb Seeley, Esq.

2    cseeley@seegerweiss.com

3                        August 27, 2025

4    RE: Alford, Jason, et al. v. The NFL Player Disability &
         Survivor Benefit Plan, Et Al.

5         8/25/2025, Dr. Anthony Hayter (#7554391)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com.

16    Return completed errata within 30 days from

17   receipt of testimony.

18     If the witness fails to do so within the time

19   allotted, the transcript may be used as if signed.

20

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

**[& - 2:16]** Page 1

**&**

**&** 1:9 3:13 5:8
5:20 124:3
128:4

**0**

**0.99** 53:18,23
**00358** 1:8 5:12
**07660** 3:5

**1**

**1** 5:5 54:11
**1,000** 111:21,25
112:22 113:13
113:14
**1.1** 38:14
**1.1.** 38:12
**1.5.** 91:11
**10** 58:7 83:19
84:4
**100** 84:12,17
**100,000** 111:20
111:25 112:21
**101,000** 113:8
113:15,18,25
114:3,4
**103** 20:19,23
21:15,19 22:6
22:12 24:14,16
24:22 28:24
29:7 31:20
**105** 91:12,14,17
**109** 89:13

**11** 4:11 37:1
**110** 88:21,22
89:1
**115** 4:4 92:23
**117** 102:2,6
117:9,12
**118** 105:25
106:5 118:25
**119** 21:20,20
22:6 24:18
31:22
**11:05** 1:17 2:5
5:1,4
**12** 37:3
**121** 19:13,16
35:25
**122** 19:16
**12:14** 54:12
**12:22** 54:16
**12:56** 80:3
**13** 37:5,14
**14** 4:8 37:9,14
**15** 4:9 11:21
37:11,14
**15.4** 83:7
**151** 82:8 83:2
**15th** 9:22 14:16
15:6,10,17
19:4 34:25
35:5 88:21
**16** 9:21 37:16
85:1
**167** 15:9 16:20

**17** 38:13 39:13
40:1,20,24
49:6
**17th** 3:14
**18** 38:9,11
**180** 109:14,16
**182** 108:11,14
108:23
**19** 83:5
**1970** 106:14
107:11,25
**1:23** 1:8 5:12
**1:56** 114:18
**1st** 111:22
112:21 113:14

**2**

**2** 54:15 80:2
**2.1** 80:17 81:13
**2.8** 81:13
**20** 83:19 84:4
124:14
**200** 96:9,10
**2009** 102:9,21
104:14,20
107:10 117:17
**2018** 69:14,17
102:10 103:25
104:5,15 105:6
105:10,19
106:16,22
117:18,25
118:7,20,23

**2019** 103:6,8,16
103:23 111:21
113:15,16,19
**2020** 111:23
113:14,20
**2023** 104:21
**2024** 9:5 11:4
92:9 93:23
102:9,10,22
103:25 104:6
104:14,15,20
105:6,10,19
106:17,22
107:10,11
117:17,18,25
118:7
**2025** 1:18 2:6
4:9,11 5:1,5
18:15,17 124:3
127:16 128:3
**2028** 127:4
**205-2061** 2:13
**213** 2:13
**224847** 127:22
**22nd** 12:3
**24** 85:4
**25** 1:18 2:6 5:1
124:3
**25th** 5:5
**27** 128:3
**27th** 127:15
**2:03** 114:22
**2:16** 1:17
123:10,18

**[3 - additional]**

| 3 | | | |
|---|---|---|---|

**3**  81:18 114:17
**3,000**  89:13
**3.2**  71:18
**30**  84:4 128:16
**31**  127:4
**31st**  103:6,8,16
  103:22 113:15
**33003**  127:20
**35**  83:19

| 4 | | | |
|---|---|---|---|

**4**  62:18 114:21
  123:9,10
**4,889**  56:16
  57:2
**40**  80:16 81:8
  82:24 83:4,7
  83:13 84:4
  87:12,20,22
**47**  54:25 55:7
  55:16,21
**4:00**  7:13

| 5 | | | |
|---|---|---|---|

**5**  59:10
**5,000**  89:11
  111:1
**50**  80:16 81:8
  83:23 84:5
  87:13,20,24
**50,500**  111:24
**55**  3:4 83:19

**5500**  111:6
**5500s**  93:1,6
  94:9,13 97:1
  97:18 110:25

| 6 | | | |
|---|---|---|---|

**6**  4:3 59:9
**60**  83:20
**610**  3:14
**62**  71:10,17
**639-9100**  3:6

| 7 | | | |
|---|---|---|---|

**7554391**  1:24
  127:25 128:5
**79**  80:13,24
  81:4

| 8 | | | |
|---|---|---|---|

**8**  4:8 7:13
  14:14,17 15:4
  15:16 21:5
  80:17 84:1
  117:11 119:6,8
**8.1**  89:2
**8/25/2025**
  128:5
**80**  80:13,25
  81:5
**800**  2:11
**81**  4:10 74:11
  76:14,18 77:15
  120:8
**82**  73:16,25
  76:12 119:7,11

**823-6900**  3:16
**8383**  2:11

| 9 | | | |
|---|---|---|---|

**9**  4:10 81:24
**90211**  2:12
**92660**  3:15
**949**  3:16
**973**  3:6
**99**  53:12,17

| a | | | |
|---|---|---|---|

**a.m.**  1:17 2:5
  5:1,4
**ability**  7:2
**able**  8:24 35:7
  57:18 59:21
  72:21 91:7
  94:16 116:5
**above**  128:6
**absolutely**
  19:14 39:20
  52:22 53:3
  118:1
**accept**  16:10
  49:8 115:25
**accepted**  18:16
  85:21
**accepts**  49:3
**access**  7:21
**accessible**
  14:25
**accompanying**
  76:3

**account**  94:18
  100:5 101:10
  109:8
**accuracy**  128:9
**accurate**  71:12
  71:21 124:9
**accurately**
  71:14 72:20
  78:5
**acknowledg...**
  128:12
**acted**  67:7
  68:10
**actual**  43:6
  78:13 96:19
  97:9
**actually**  16:17
  16:19 38:12
  41:21 45:20
  49:23 57:22
  59:18 76:3
  84:16 94:2
  97:5 98:2
  101:9 106:24
  107:3 108:13
  116:4
**add**  94:20 96:9
**additional**  9:9
  10:13 11:8
  33:11,13 35:19
  82:15 93:18
  94:13 117:22
  118:8,9

**[address - applicable]**

| | | | |
|---|---|---|---|
| **address** 71:14 | **alternative** | 117:24 120:14 | 110:3,6 111:3 |
| **adduced** 127:9 | 38:15 39:12 | 120:16 121:3 | 112:14 |
| **adjourned** | 40:7,20,23,25 | **analyze** 59:21 | **answered** |
| 123:18 | 49:25 | 69:20 90:13,16 | 23:22 25:20 |
| **affect** 42:17 | **amended** 35:13 | 91:15 92:19 | 46:19 52:16 |
| 44:18 46:17,22 | **american** 37:11 | 108:4,6 120:3 | 58:14 |
| 77:1 101:16,18 | **amount** 78:25 | **analyzed** 78:14 | **answering** 79:9 |
| **affected** 45:25 | 111:2 113:10 | 90:22 108:19 | **answers** 14:2 |
| 46:1 | **amounts** 92:21 | **analyzing** 71:2 | 39:11 78:23 |
| **affecting** 46:6 | 113:8 | 71:8 77:17 | 79:11 |
| **aflaw** 6:2 | **analyses** 33:23 | 103:17 | **anthony** 1:16 |
| **aforemention...** | 34:9,20 39:5 | **annotations** | 2:1 4:2,8,10 |
| 127:5 | 39:10,22 48:8 | 15:10 | 5:6 6:8 123:9 |
| **afternoon** 7:14 | 92:9 93:23 | **annual** 107:20 | 124:19 125:25 |
| **ago** 6:14 85:9 | 102:8 104:13 | 108:5,7,12,14 | 126:25 128:5 |
| **agree** 45:3 | 114:5 115:12 | 108:19 109:8 | **anybody** 8:13 |
| 53:12 59:4 | 117:16 | 109:13,20 | 80:11 |
| 62:2 | **analysis** 20:11 | 110:15 111:13 | **anymore** 92:22 |
| **agreed** 79:11 | 33:16 34:3 | 111:24 113:10 | **anyway** 37:25 |
| **ahead** 14:14 | 57:23 61:10 | 113:17 114:3,6 | 121:1 |
| 79:21 | 63:15 66:7,16 | 114:8 | **apologies** 31:3 |
| **airfare** 95:18 | 66:17,22 69:7 | **answer** 10:6 | **appeal** 45:10 |
| **al** 1:5,10 5:8,9 | 71:13,21 72:13 | 13:22 14:9 | 46:14 47:17 |
| 124:2,3 128:4 | 74:1,3,9,14,21 | 18:8 20:16 | 67:6 68:6 |
| 128:4 | 75:4,7,24 76:2 | 24:4,5 27:2,12 | **appeals** 39:15 |
| **alford** 1:5 5:7 | 76:7,24,25 | 27:13,14,17,19 | 40:15 42:7 |
| 124:2 128:4 | 77:1,5,8,14 | 30:11 39:7 | 76:17,21 87:25 |
| **allegations** | 78:16,17 87:9 | 52:4,7 59:5 | 88:1,3 120:11 |
| 100:8 | 90:4 91:24 | 68:20 72:3 | **appearances** |
| **allotted** 128:19 | 92:8,10 94:4,5 | 75:13 77:23 | 2:8 3:1 |
| **allow** 33:3 | 96:20 97:9 | 78:4,21 79:3,5 | **appeared** 127:5 |
| **allowed** 27:14 | 103:3 105:8,14 | 79:19 91:2 | **appears** 15:18 |
| 79:10 | 110:16 111:23 | 92:4 100:19 | **applicable** |
| | 115:19 116:8 | 105:1,2 106:1 | 128:8 |

application
  43:7 45:10,22
  46:14 47:17
  67:6 68:6
  73:21 94:1
  119:17,24
applications
  39:15 40:15
  42:7 76:17,20
  77:15,17 82:14
  87:24 88:4
  120:10
approaching
  116:13
appropriate
  76:25 106:15
  108:1
approval  47:16
  48:2
approves  47:6
april  4:11 9:2
  11:1
area  82:19 84:2
  84:24 85:6,18
  88:8
areas  80:19
  86:19 87:5
  88:17
argument
  120:6,9,12
arithmetic
  112:13
arm  43:13

arrived  46:2
article  37:5,12
asked  13:21
  23:22 25:20
  27:11 33:9,21
  45:10 46:19
  52:16 58:14
  60:17 83:13
  115:10 116:15
  121:15,23
asking  10:11,16
  10:19,20,23
  13:5,8 14:6
  16:7 18:2,11
  25:17 26:3
  27:7,8,25 28:7
  30:14 33:18
  44:2 52:10,13
  65:25 66:1
  67:18 69:2
  83:12 95:10
  104:2,9 118:19
  121:23
aspects  77:5
assess  61:18
  63:20 116:8
assessing  73:7
  118:15
assessment
  85:20,24 117:6
assigned  91:20
associated  30:6
  43:3,6 61:15
  61:23,24

102:24 127:11
association
  37:11 42:12
  60:18 73:13
  99:24,25
assuming  13:23
  118:1
assumptions
  20:10 24:2
athlaw  2:10
athlawllp.com
  2:14,15
attached
  128:11
attacking  68:4
attended  12:4
attending
  93:18
attorney  4:3,4
  5:19,24 6:11
  6:19,21 9:14
  9:19,23 10:2,8
  10:18 14:13,18
  16:2,4,7,11
  17:21 18:1,6
  18:10,13,22
  20:5 21:11,17
  22:4,19,23
  23:8,13,15,21
  23:25 24:6,12
  25:15,19,23
  27:1,3,6,10,18
  27:24 28:3,6,9
  28:13,21,25

29:4,8,9,12
30:4,8,13,16,19
31:3,18,23
32:2,7,17 33:8
33:14 34:11,14
34:18,23 35:21
38:1 39:19
40:9,18 41:4,7
41:23 42:1,15
42:20 43:1,8
43:19,24 44:16
44:22,23 45:2
45:6,23 46:3,9
46:15,18,23
47:9,19,23
48:6,13,14,17
49:17,20 50:14
50:24 51:5
52:2,8,10,12,15
52:19,21 53:4
53:8,11,14,20
54:4,8,17 55:7
55:8,9,11,13,14
56:1 57:4,9
58:1,13,20,22
58:24 59:4,7
59:11 60:4,10
60:12,15 61:14
62:1,5,10 63:9
64:3,24 65:2,5
65:9,13,19
66:4,12,20
67:1,8,14,24
68:1,7,8,11

69:4,8 70:5,12
70:17,20 71:9
71:24 72:1,18
72:23 73:2,15
74:5 75:8,16
76:5 77:25
78:1,9,18 79:7
79:15,17,22,24
80:5 81:11,16
82:1 84:20
85:7,14,19,25
86:7,14,20,24
87:6,10,15,21
88:5,11,18
90:7,19,23
91:1 95:2,7
96:23 97:4,15
97:24 98:5,9
98:14,15,18,21
98:25 99:3,6
99:11,16 100:6
100:13,16
102:1,13,16
103:1,9,11,18
104:1,7,23
105:15,23
106:12 108:22
109:6 110:2,4
110:10,17
111:16 112:3,7
112:9,10 113:1
114:10,12,15
114:23 115:2,8
121:12,18,19

121:22 122:6
122:24 123:2,5
123:6,14
128:13
**attorneys** 3:23
8:19 11:16
14:1,11 17:6
17:16,20 18:3
18:18,20 19:2
19:18,21 20:21
21:9,13 22:2,9
22:21,24 25:2
25:11 28:18
32:13 36:3,6,9
36:11,14,16,18
36:20 37:21
**attributed**
89:22
**august** 1:18 2:6
4:9 5:1,5 9:2
9:22 11:2
14:16 15:6,10
15:17 19:4
34:25 35:5
88:21 124:3
127:15 128:3
**available** 14:22
57:13,15,25
60:23,24 61:12
63:18 65:18
66:10,24 69:17
90:2 97:12,23
98:8 105:4,9
107:22 108:21

128:6
**average** 83:4,7
107:20 108:5,6
108:12,15,19
109:7,14,20,21
110:15 111:13
111:24 113:9
113:17 114:3,6
114:8
**aware** 7:3,6
12:10 13:15,17
13:20 23:14,18
32:24 64:15

**b**

**b** 4:7 9:21,25
10:12 11:7
19:4,6,8,11,12
19:15,22 20:4
21:7,23 24:19
24:24 29:17,22
31:13,25 35:17
35:23,24 76:16
85:3 107:16
109:2,19,21
110:23,24
111:12 121:8
121:10,14,15
121:20,23
122:2,17
**back** 9:3 27:2
27:12,19 54:15
65:1 95:22,23
105:21 106:14

107:6,25
114:21 122:25
**background**
73:10
**badgering** 79:9
**baltimore** 1:3
5:11
**based** 45:13,16
46:11 51:12
62:7 90:1
103:5 105:8
**basic** 49:15
102:14
**basically** 11:18
**basis** 21:14
32:4 41:20
57:20 58:11
102:12
**beach** 3:15
**bearing** 44:20
**began** 81:4
**beginning** 6:16
14:7 38:5
54:15 104:10
114:21 121:7
**behalf** 2:2 5:20
**behavior** 37:7
**believe** 12:3,16
12:22 13:13,21
19:23 23:9
31:7,25 39:17
40:12,13 42:21
47:7 67:11
70:7 74:23

81:3 97:23 108:25 117:7

**benefit** 1:10 5:9 41:25 42:5,18 49:1 69:24 96:18 115:21 120:23 124:3 128:4

**benefits** 43:7 44:21,25 45:22 47:7

**best** 10:22 47:18 48:5 78:4 105:1,8 122:9

**better** 69:16 93:7 107:23 108:3,17 118:5

**beverly** 2:12

**beyond** 15:11 17:15 35:14 77:16 97:21 116:23 117:4 117:25

**bias** 21:4 22:16 25:9,13 26:15 26:17 29:22 47:8,14 90:6

**biased** 46:25 47:4,12 89:18 99:15

**bill** 96:9

**bit** 88:23 113:12

**blue** 82:18 84:2 88:3,14,16

**blvd** 2:11

**bottom** 73:18 80:24 81:4 83:1 102:7 109:15

**break** 54:6,13 54:21,23 79:22 80:4,7,11 114:19

**brief** 54:21 80:6

**briefly** 109:24

**bring** 95:22

**broader** 117:24

**broke** 43:13

**buried** 57:2

**c**

**calculate** 49:19 49:22 50:1,19 51:9 52:1,23 110:14

**calculated** 51:6 53:17 109:13 113:7,9,18 114:2

**calculating** 53:5

**calculation** 52:6,14 109:7 111:13

**calculations** 76:10 78:8 113:4,16

**caleb** 3:9 5:25 12:7 15:11 23:1,10 26:9 26:15 27:19 28:7 79:16 91:8,9 93:15 100:15 112:8 112:11 121:19 128:1

**california** 2:12 3:15

**call** 26:10 42:24 50:20 74:8 101:11

**called** 37:1 49:23

**caption** 124:2

**captioned** 124:8

**careful** 93:10

**case** 1:7 5:11 8:18 12:19 13:1,14,19 14:5,11,16 32:21 33:17 34:7 38:18,22 38:23 39:8,18 40:13 41:6 43:23 48:18 50:3,25 57:12 58:3 84:19

86:22 87:1 89:25 96:1,20 97:9,14 99:5 100:7 101:7 106:6 119:1 124:2

**cases** 17:8,15 17:15,16 18:16

**causality** 99:22

**cause** 24:10 25:17 99:14,20

**caused** 30:24

**caution** 20:6,15 24:1

**cells** 107:17

**center** 3:14

**certain** 24:8 26:21 29:13,18 48:8 109:9 111:2 116:18 117:3 121:24

**certainly** 9:16 70:9

**certify** 127:4,10

**challenger** 3:4

**chance** 77:13 115:19 116:5 116:13

**change** 122:21 125:2,4,5,7,8 125:10,11,13 125:14,16,17 125:19,20,22 126:2,4,5,7,8

**[change - compensation]**                                            Page 7

126:10,11,13
126:14,16,17
126:19,20,22
**changed** 34:24
35:4,7,13
**changes** 124:10
124:13 128:10
**check** 74:1
**chi** 38:25 39:9
40:3,4 48:8,20
48:22 49:16
50:4,11 51:7
51:11,19 52:24
53:6 54:2 74:7
115:12
**choose** 85:22
**chose** 86:1
121:3
**circumstance**
66:3
**circumstances**
30:6
**claim** 43:22
44:12,25 57:21
60:16 69:24
77:6,8 91:23
99:13 105:8
**claimed** 91:19
**claiming** 41:21
43:5 44:11
73:13
**claims** 39:25
40:5 41:3,6,10
41:24 42:10

44:4 48:24
50:13 51:24
55:23 56:5
57:1 58:12,18
59:16 60:9,14
61:19 62:7
63:20,23 65:16
68:22,25 69:21
71:11,13,22
72:7 82:22
87:2,3 99:9,22
100:11,24
101:3,4 103:17
103:21 104:3
105:3 106:7
116:17 118:16
118:21,23
119:2
**clarify** 16:16
17:23 34:2
64:5 67:12
88:15
**clarity** 112:4
**classes** 38:21
**clean** 15:1
**cleaned** 96:5,6
**clear** 75:9
77:20 78:19
85:8 91:25
119:22 120:3,4
120:15 121:3
**clearly** 30:2
92:25

**close** 53:18
**closed** 8:11
**cognizable**
116:19 117:1
**colleague** 5:22
12:7 23:9
**colleagues**
18:20 112:11
**come** 22:7,17
24:10 85:2
**comfortable**
68:13
**coming** 95:23
95:25
**commencing**
2:5
**comment** 21:6
65:1,3
**commission**
127:4
**commonwealth**
2:4 127:1,3,23
**communicate**
8:13 12:24
13:3 30:5
**communicated**
13:14,19,25
22:21,24 23:19
26:2 28:1,11
**communicating**
8:5
**communication**
8:2 25:1,10

**communicati...**
12:20 13:6
20:12 22:1
29:14,18
**compare**
104:19 106:15
**compared**
63:14 88:4
89:12 92:6
102:21 107:21
**comparison**
63:12 64:10
**compensated**
13:20,24 56:22
57:8,19 61:23
62:8,20 63:25
64:2 96:21
**compensation**
20:9 41:18
44:8 58:6,8
60:20 63:22
92:21 93:7,13
93:18 94:22
95:1 96:18
97:21 99:8
100:2,4,9,23,25
101:2 102:22
104:15,19
105:20 106:13
107:6,18,20,21
107:23 108:5,5
108:7,12,15,16
108:20 109:8
109:23 110:15

**[compensation - correct]**                                    Page 8

111:9,11,21,22
111:24 112:2
112:18,19,23
113:7,18 114:2
114:4,6,8,9
117:17 118:12
118:17,20,22
**compensations**
42:14 51:21
55:4,19,25
56:7,14,19
57:17 59:23
61:1,9,21 62:4
62:15 63:4,6
63:14 64:7,10
64:18 65:21
66:9,23 70:3
70:24 73:9
92:6,15,18
93:3 94:17
99:10 101:6,9
101:16,20,22
101:25 102:10
106:9 107:14
109:17,18,20
109:21 119:4
**complaint** 47:5
**complete** 32:20
57:14,23 60:25
61:3 65:17
66:7 71:4
**completed**
128:16

**completely**
45:4 78:5
**component**
111:8
**computer** 7:20
7:21 8:9 15:7,9
82:4
**concern** 71:11
**concise** 36:24
**conclude** 30:25
**concluded**
31:11,11
**concludes**
123:8
**conclusion**
24:10 30:24
**concussion**
43:14
**conduct** 33:15
62:8 67:4 68:3
**conducted** 90:4
106:22
**confirm** 15:15
15:22 16:8
19:8 80:18
**confusing**
62:12
**connection**
12:18 13:18
19:10 33:25
34:6
**consequently**
105:7

**consider** 8:17
32:11 53:7
77:4 96:12
106:18 118:16
**considered**
39:6 41:1 93:5
97:20
**consistent**
39:17 82:21
84:25 86:18,22
114:7
**consistently**
85:5
**constitute** 58:4
117:1
**constitutes**
48:12
**consultancy**
94:15
**consultant**
93:19
**consultants**
94:14
**consulting**
94:18,20 98:22
99:13 100:3
**contact** 17:8
**contain** 32:20
32:24,24
**contained** 32:5
93:3
**context** 53:22
62:3 63:1,8,10
64:14,15,20

76:14 95:5
**continue** 27:15
**continued** 3:1
**contribute**
100:22 101:2
111:12
**control** 16:19
62:24
**controversial**
112:10
**conversation**
26:25 27:9
28:2,12,16
**conversations**
22:7 23:23
28:22 29:6,11
29:25
**copies** 128:14
**copy** 7:25
14:22,24 15:1
15:7,17
**core** 63:23
**correct** 9:18
12:15 13:2
19:14 22:8
32:1 34:5
38:10 44:13
61:25 72:25
73:4 76:13
81:6 87:14,22
88:25 89:10
98:24 110:16
112:2 113:21
127:8

**correcting** 35:24

**corrections** 124:10

**correctly** 8:2 12:1 55:5 80:20 113:23

**correspond** 92:17 105:17

**corresponds** 105:20

**cost** 96:10,11

**counsel** 2:8,18 3:1,11 5:17 12:12,13,21 19:25 20:3,9 20:13 22:8,9 24:5,9 27:10 28:2,12 30:5 30:23 32:4 38:3,7 67:25 72:2 78:24 117:9,14 119:13 127:7 127:11 128:14

**county** 7:11 127:15

**couple** 6:13

**court** 1:1 5:10 5:15 6:4,24 65:4 110:7,9 123:11,16

**covid** 95:15

**critiques** 50:22 76:9

**crr** 1:25 2:3 127:2,21

**cs** 128:15

**cseeley** 3:7 128:2

**currently** 32:25

**curtis** 3:25 5:13

**cut** 35:1 59:1 72:2

**cutoff** 48:16 87:8,11

**cutoffs** 80:15 81:7

**cv** 1:8 5:12 16:13

**d**

**d** 1:25 2:3 4:1 127:2,21

**damron** 2:17 6:2

**data** 34:16 37:16 48:21 49:11 51:3,13 60:22,23,24 61:6,6,7,11,15 61:22,24 66:24 68:21,24 69:15 69:16 74:22,25 75:20 77:9,11 77:11 83:14,17 83:18 84:22,23

93:8,9,12 99:24 105:3,9 105:12,12,13 106:3,14 108:21 115:23 116:11 117:5 118:13,18,20 118:22

**dataset** 21:4 22:16 25:9,14 26:15,18 29:23 57:13 63:18 69:6 82:14 106:25 107:4 107:13

**datasets** 33:24 57:24 59:20,22 65:18 66:8,23 69:9 76:16 105:5 120:10 120:13

**date** 124:3 125:24 126:24

**day** 102:24 104:25 123:12 124:14 127:15

**day's** 105:12

**days** 128:16

**december** 113:15

**decided** 17:10 34:16 40:2 45:1 105:4 120:3

**decision** 46:6,7 77:17

**declaration** 36:4 120:23 122:13 124:5

**declarations** 7:23 9:4 11:4

**declare** 124:6

**default** 115:21 116:1

**defendants** 1:11 2:3 3:23 5:20 69:11 70:2

**definition** 43:17

**degrees** 9:5 11:6

**deleted** 16:12

**demonstrated** 80:18

**denial** 63:12 73:21 76:19 83:3,6,10 84:12,17 86:12 88:1 119:17,24

**dentist** 96:5,10 96:13 98:12

**depends** 18:9 53:9,22

**depo** 81:21

**deponent** 128:13

**deposing**
128:13
**deposition** 1:15
2:1 5:6 6:13,16
7:5 8:16,21 9:8
9:13 10:21,24
11:12,17,19
12:11 13:22
14:3,8,9,21
15:16 33:22
34:21 35:2
36:12,20 51:16
79:14,21 81:19
83:13 94:24
95:9,16 115:10
116:16 117:8
121:7 123:8,18
124:1,3,7,11
125:1 126:1
**describe** 22:5
30:14
**described**
34:10,21 50:18
66:19 113:12
115:12
**describing**
39:25 61:17
76:7
**design** 49:2,7
**detail** 35:8,15
42:22 90:11
97:22
**details** 17:7
33:2,6 98:7,20

**determination**
101:17,18
**determinations**
41:25 42:6
**determine** 66:2
67:2 71:19
**devon** 7:11
**dialogue** 29:24
**diced** 93:24
**differ** 122:10
**difference** 89:3
90:5,18 101:10
101:23
**different** 40:22
50:17,20,22,23
74:13 76:24
78:21 81:9
87:7,8,17 89:6
90:13 91:16
92:5,15,21
95:24 98:16
104:8 107:12
120:14
**differently**
104:17
**direct** 82:7
**directing** 82:9
**directly** 92:5
**disability** 1:9
5:8 47:2 124:3
128:4
**disagree** 59:5
121:18

**disconnected**
109:24
**discontinue**
17:11 27:20
**discovery**
20:14
**discuss** 12:11
20:12 54:22
80:10
**discussed** 12:16
20:8 32:6,9
34:4 42:21
119:14
**discussing**
31:21
**discussions**
14:7 24:4
**disproportion...**
91:21
**district** 1:1,2
5:10,10
**divided** 111:25
**division** 1:3
5:11
**doctor** 20:6
24:1 115:4
**document** 4:16
15:3 16:20
20:3 36:7,15
36:17
**documents**
9:20,21 10:9
11:11 19:17,20
32:20

**doing** 34:7 49:9
63:1 66:7 78:4
94:1 96:14
112:4,7,12,12
120:15
**dots** 82:18 88:3
88:6,7,8,9,14
88:17
**doubt** 49:2
115:22
**dr** 1:16 2:1 4:2
4:8,10 5:6 6:8
6:12 7:7,22
8:15 9:4,11
11:4,23 13:9
14:13,19 15:13
16:12 24:7
25:16 27:7,25
28:10,19 29:7
30:20 31:19
32:18 33:15
35:17 36:5,19
37:6,8,15 38:7
38:9,24 39:9
39:12,22 40:2
40:11 41:1,5
43:20 44:17,25
45:21 46:8
48:7,8 51:7,16
51:19 52:3,18
52:20,24 53:25
54:18 55:15
56:10,13 57:5
58:2 59:9

**e**

62:12,22 63:21
64:12 65:24
67:17 68:2
71:20 73:16
74:7,12 75:24
76:8,16,23
77:12,16,22
78:7,14,17,19
79:19 80:6
82:2,10,13
84:2 85:8
88:20 89:12,15
89:21 90:3
92:8,9,23 93:5
93:11,22 94:11
94:23 95:5
96:19 102:2
104:9 108:17
110:4,7,12
111:18 113:2
114:23 115:13
119:18 120:1,2
120:10,13,14
121:2,9 122:7
122:12,19
123:3,9 124:19
125:25 126:25
128:5
**draft** 123:13
**drive** 3:14
**due** 96:7
**duly** 6:9

**e** 4:1,7 6:10
26:9 115:7
**earlier** 35:18
62:6 115:9
**easier** 14:21
**easiest** 14:23
15:14
**easy** 49:2,7
**eight** 36:19
84:25 108:13
108:13
**either** 63:16
94:7
**electricity**
96:11
**elementary**
49:15 51:10
77:4 102:14
**elizabeth** 3:20
5:19
**email** 8:7
**emckeen** 3:17
**emphasize**
86:13
**emphasizing**
86:10
**empty** 80:19
82:20 85:6
86:18 87:4
88:17 107:17
**enable** 69:7

**enabled** 87:4
**encompassed**
100:10
**encounter** 93:8
93:9,11
**encounters**
51:18,22 56:12
73:20 93:14,17
93:20,22,24,25
94:3,5,7,8,10
94:11,16,19
119:16,23
120:20,20,22
120:24 121:1,1
**encyclopedia**
36:24 37:13
**ended** 81:4
**england** 7:9,10
**entire** 13:5 52:4
57:13 59:22
61:25 63:17
105:10 113:15
124:7
**entirely** 18:25
79:8
**entirety** 84:22
84:23 122:18
**entity** 98:1
**equally** 70:25
**erisa** 117:2
**errata** 124:1,11
125:1 126:1
128:11,13,16

**error** 78:7,11
**errors** 35:9
78:13 121:10
122:16,20
**esq** 128:1
**esquire** 2:16,17
3:9,10,20,21,22
**essentially**
16:23 17:4
21:22 24:18
37:14 58:16
63:11 69:13
84:5 115:18
**establish** 63:11
**et** 1:5,10 5:8,9
124:2,3 128:4
128:4
**ethical** 37:9,16
**evaluated**
45:11 63:24
64:1 90:10
**evaluating**
69:25 71:15,23
96:12
**evaluation**
45:13,16,17
48:1,1 61:20
71:19 110:13
110:20 111:4
**evaluations**
39:16 40:16
41:15,17 56:16
57:3,16 73:8
77:11,12,18

83:5,7,11
84:11,16 86:11
89:7 91:19
92:17,18 93:4
93:16 100:1,1
103:7,22
106:11,22
109:11 119:5
**event** 127:12
**everybody**
101:12,14
123:6
**evidence** 20:15
37:4 48:23
50:13 51:23
**exact** 4:16 26:4
26:5,16 70:3
106:10 119:5
**exactly** 25:21
25:24 26:10
28:16 42:10
47:13 51:1
110:18 113:3
120:4,5 121:3
121:4
**examination**
4:3,4 88:24
89:9,17 121:17
**examine** 57:18
**examined**
127:7
**examining**
56:25

**example** 7:22
12:24 46:25
48:15 84:9
96:3 97:2,19
98:12 108:11
**examples** 51:15
62:16
**exceeds** 121:16
**except** 21:22
24:19 124:10
**exclude** 34:16
**exhibit** 4:8,10
14:14,17,20,20
15:2,4,4,16
16:20 19:4,6,7
19:11 21:1,3,7
21:23,23 22:14
22:16 24:19,20
24:24 25:4,8
25:13 26:9,11
26:14,17 29:16
29:17,21,22
35:23,23 81:18
81:24 88:19
107:15,16
109:2,19,21
110:23,24
111:12 117:11
119:6,8
**exhibits** 4:15
31:13,25,25
85:3 121:7,10
121:14,20,23
122:2,17

**exist** 111:2
**exists** 41:22
**expect** 96:5
**expenses** 93:19
94:21,25 95:10
95:11,12 96:1
96:21 97:2,2
97:18,20,22
98:1,10
**experience** 96:4
**expert** 4:8,10
17:5,19 18:5
58:3 116:22
**expertise** 73:4
116:24 117:4
**expires** 127:4
**explain** 33:3
35:7,15 38:17
38:20 47:12
48:21 51:13
79:10 91:15
106:3 109:16
115:16 116:12
**explained** 34:4
44:5 48:25
49:12 59:17
68:22 74:10,24
76:15,18 78:10
78:15 82:17
83:2,14 90:11
97:1 109:13
118:24 120:6
120:14

**explaining**
39:21 40:4
92:11 116:2
**explains** 120:19
**explore** 34:15
**express** 21:14
89:25 92:25
**expressed**
24:11 89:19,23
**expressing** 44:9
68:14
**extensive** 27:20
**extent** 20:8,9
24:2
**extract** 83:18

**f**

**face** 31:2
**fact** 50:18
51:14 73:18
86:11 87:19
94:24 109:9
**factor** 48:12
99:5 110:14
**facts** 20:10
24:2 30:5,24
**fails** 128:18
**fair** 43:20
95:18 112:9
**far** 32:24 47:3
47:24 64:25
89:10 97:11
122:3

| | | | |
|---|---|---|---|
| **fault** 100:16 | **firm** 23:17 | **follows** 6:9 | 75:16 77:25 |
| **fee** 88:24 89:17 | **first** 10:15 11:9 | **footnote** 120:17 | 78:9 81:11 |
| 90:5 | 13:22 15:5,18 | 120:19 | 84:20 85:14,25 |
| **feel** 16:5 57:20 | 15:19 16:18 | **foregoing** | 86:14,24 87:10 |
| **fees** 73:21 89:3 | 20:23 21:18 | 127:8 | 87:21 88:11 |
| 89:6,9 90:18 | 31:9 33:21 | **forgotten** 24:18 | 90:7,23 93:1,6 |
| 94:15,18,20 | 35:2,3 36:1,13 | **form** 6:19 8:2 | 94:9,13,22 |
| 98:22 99:5,14 | 38:13 42:22 | 9:14,23 10:8 | 96:23 97:1,15 |
| 100:3 101:11 | 43:11 55:12,20 | 16:2 17:21 | 97:18 98:5,14 |
| 101:21 | 56:20 62:16,18 | 18:6,13 20:3 | 98:25 99:6,16 |
| **fidler** 3:10 6:1 | 65:15 74:18 | 21:17 22:19 | 100:17 102:13 |
| 12:8 23:2,10 | 75:18 81:13,14 | 23:13,21 24:12 | 103:1 104:1,23 |
| 51:16 | 83:13 85:5 | 25:19 27:1 | 105:23 108:22 |
| **fifth** 36:12 | 87:13,23 89:5 | 28:3,13,25 | 110:17,25 |
| **figure** 58:9 | 107:16 108:8 | 30:8,16 31:4 | 111:2,6 |
| 65:10 68:2 | 108:10,11,24 | 31:23 32:7 | **format** 49:16 |
| **figures** 80:17 | 109:2,12,15 | 33:8 34:11,18 | 50:4 |
| 81:13,15 82:15 | 110:21 111:15 | 35:21 39:19 | **formed** 21:13 |
| 111:9,14 113:6 | 120:22 121:22 | 40:18 41:7 | **former** 12:25 |
| **file** 7:21 15:8 | **fit** 75:1,2 77:9 | 42:1,20 43:8 | 13:4,6,11,15 |
| 15:19 | **fitted** 75:21 | 43:24 44:22 | **forms** 32:4 |
| **filed** 5:9 | **five** 83:4 | 45:2,23 46:9 | 94:25 |
| **final** 46:10,13 | **flat** 89:3 | 46:18 47:23 | **forward** 15:15 |
| **financial** 112:5 | **flip** 84:1,3,7 | 48:13 49:20 | **found** 19:19 |
| **find** 30:22 33:5 | 85:10,13 | 50:24 52:15,21 | 78:7 91:11 |
| 71:3 79:4 91:7 | **flipped** 86:9 | 53:8,14 56:1 | **four** 83:22 |
| 108:9 | **floor** 3:14 | 57:9 58:11,13 | 87:13,14,23,24 |
| **finding** 47:1 | **fluvanna** | 59:11 60:10,15 | **fourth** 36:10 |
| **finds** 47:6 | 127:15 | 62:1,10 64:3 | **free** 20:11 |
| **fine** 81:17 | **fly** 95:15 | 65:13 66:4,20 | **friday** 12:1,2,2 |
| **finish** 27:14 | **focused** 55:23 | 67:8,24 68:11 | **front** 38:21 |
| 58:23 | **follow** 69:3 | 69:8 70:12,20 | 82:3 117:11 |
| **finished** 79:15 | **following** 25:5 | 71:24 72:18 | **full** 20:23 21:19 |
| 79:17 | | 73:2 74:5 | 55:20 57:12 |

**[full - hayter]**                                                    Page 14

59:22 66:22
68:20 127:8
**fully**  33:3 35:16
**function**  49:23
  50:2,19 51:6
  51:10 52:1,23
  53:5 115:11
  116:7
**further**  105:21
  114:24 122:24
  123:1,3 127:10

**g**

**garagiola**  3:21
  5:23
**gather**  52:6
**general**  41:10
  42:24 45:4
  96:25 103:23
  106:2 107:21
**generally**  6:17
  53:23 95:12
  108:3
**getting**  33:24
  101:14 107:14
**give**  25:25 30:9
  30:24 46:24
  48:15 50:1
  61:12 64:21
  96:3
**given**  20:16
  31:10 32:3
  33:1 47:20
  66:3 97:3,19

97:25 127:14
**giving**  79:4
**glad**  33:10
**go**  14:14 15:15
  16:3 38:13
  45:11 54:6,8
  66:10,13 75:5
  77:20 79:21,23
  79:24 82:8,16
  83:25 96:4,16
  97:6 105:21
  107:6 114:10
**goes**  19:16 37:9
  40:7 46:5
  47:15
**going**  5:4 14:19
  27:16,22 37:24
  38:11,19 52:3
  54:11,15 76:4
  78:12 80:2
  84:5 85:2 91:9
  93:20 94:10
  100:17 106:14
  107:24 108:8
  114:17,21
  122:7,9 123:10
**good**  5:3 6:12
  83:15 110:13
**gotten**  64:25
**govern**  79:13
**graduate**  38:21
**graph**  84:2
  87:8

**graphs**  83:22
  85:1,1,4 86:17
  87:13,14,23,25
**great**  42:22
**greater**  83:6
**ground**  6:17
**group**  56:12,16
  57:7 61:25
**groups**  39:14
  39:15 49:12
  51:18 56:11
**guidance**  20:17
  85:22
**guide**  37:16
**guidelines**
  37:10

**h**

**h**  4:7
**half**  79:12
  113:10 122:2
**hana**  3:22 5:22
**hand**  40:15,17
  127:14
**handle**  96:20
**happen**  81:22
  121:21
**happened**
  31:14,15
  109:25
**happy**  36:21
**hard**  7:24,25
  16:6

**harm**  43:3,4,11
  44:2,13,15
  47:22 48:4
  67:3,11,13,19
  67:21 68:19
  69:2 117:2
**harmed**  43:17
  43:22 64:1
  65:8,11 68:3
  68:15
**harms**  116:19
**hayter**  1:16 2:2
  4:2,8,10 5:7
  6:8,12 7:7 8:15
  9:11 11:23
  13:9 14:13,19
  15:13 16:12
  24:7 25:16
  27:7,25 28:10
  29:7 30:20
  31:19 32:18
  33:15 35:17
  38:7,9 39:12
  40:11 41:5
  43:20 44:17,25
  45:21 46:8
  48:7 52:20
  53:25 54:18
  55:15 57:5
  58:2 59:9
  63:21 65:24
  67:17 68:2
  71:20 73:16
  77:22 78:19

**[hayter - improper]** Page 15

79:19 80:6
82:2,10 85:8
88:20 89:15
92:23 94:23
96:19 102:2
104:9 108:17
110:4,12
111:18 113:2
114:23 122:7
123:3,9 124:19
125:25 126:25
128:5
**hayter's** 110:7
**hayterstatisti...**
16:13
**hayterstatisti...**
17:1
**headaches**
43:14
**heading** 89:2
**hear** 35:3 38:4
**help** 18:24
88:12
**helpful** 33:12
68:16 81:16,22
82:23 88:15
**hereof** 124:12
**hessam** 42:24
**hfidler** 3:8
**hidden** 51:21
57:2
**high** 48:16 53:7
53:24 83:25
84:3 86:12

94:15 116:9
**higher** 50:10
56:12 76:19,20
88:2 89:8,16
**highest** 51:20
55:3,18,25
56:6,18 58:6
61:9 62:4,15
62:19 63:3,6
63:13,22 64:7
64:9,18 84:17
94:17 101:5,8
101:19,24
**highly** 56:22
57:7,19 61:23
62:8 63:25
64:2
**hillary** 3:10
5:25 12:8 23:2
23:10 51:16
**hills** 2:12
**hinder** 7:2
**hold** 32:25
**honoraria**
100:22 101:1
**hope** 16:4
47:18 48:5
**hopefully** 95:21
115:5
**hotel** 95:16,18
**hour** 11:21
79:12 122:3
**hstodder** 3:19

**human** 37:7
**hypotheses**
39:6 40:1
49:22
**hypothesis**
38:10,15,16,18
38:20,22 39:2
39:8,13,17
40:7,20,23,25
49:1,3,4,7,8,25
89:22 115:20
115:20,21
116:1,1,3,6
**hypothesized**
47:5
**hypothetical**
46:24 47:10,21
103:12 107:24
111:17 113:2
113:11

---

**i**

---

**identical** 15:19
122:10
**identification**
14:17 81:24
**identified** 10:9
35:9 119:25
120:1 122:16
122:20
**identify** 5:17
57:19 59:18
94:16 121:9

**identifying**
101:5,8,23
**illustrate** 62:19
80:18
**illustrated**
82:19
**impacted** 47:8
**implemented**
43:18
**implication**
64:8 112:17
**implications**
47:13
**important**
39:24 63:10
70:15 73:6,14
74:14 76:22
77:3 82:17
83:8 84:24
85:17 87:5
88:13,16 90:12
90:15,21 91:15
100:5 107:9,11
107:19 116:4
118:16
**impossible**
57:22 60:1
65:6
**improper** 79:8
80:15 81:7,10
102:8,20,25
104:13 117:16
121:17

**inaccuracies**
20:25 21:2
22:13,15 24:8
24:24 25:3,7
25:12 26:8,11
26:13,16 29:16
29:21 30:7,15
30:21 31:12
**include** 33:16
34:17 97:1,18
100:8
**included** 17:2
77:12 107:13
**including** 78:11
101:21
**income** 93:16
95:25 96:13,15
110:22 111:6,7
111:14 113:10
113:24 114:1,6
**inconsistent**
84:18
**incorrect** 73:1
73:5
**incorrectly**
76:10
**indicate** 4:16
**indicated** 13:13
15:6 20:20
21:8,16 33:22
35:14 56:15
124:11
**indicator** 90:6

**individual**
41:12 42:4,13
42:17 44:6,17
47:25 56:7
57:15 59:24
60:19 61:1,20
68:14 69:23
70:23 71:11,14
71:22 72:8,10
72:16,20,25
73:8,11 83:3,6
100:1 102:11
102:23 103:4
103:14,24
104:4,16
105:18 106:8
106:15,23
117:18,23
118:3 119:3
**individually**
55:3,18,24
56:18 64:19
**individuals**
116:18
**inform** 28:22
29:6
**information**
17:9 19:1,3,9
19:25 20:2,21
21:9,12 25:25
29:19 31:10
32:3,13 33:5
33:11,13 39:24
50:6 57:12,14

57:24 59:19,22
61:3,19 63:18
63:19 65:17,20
66:9,22 69:5
70:2 71:7
72:14 73:6,14
76:22 83:8,18
90:2 93:3
94:13 97:12,23
98:8 106:21
107:1,2,3,22
108:2 109:1
110:24 117:22
118:2,3,5,8
**informative**
103:16 116:14
**informed** 61:8
**initial** 9:1 11:1
23:8 32:19
34:8 76:18
90:12,14,25
91:6,12 113:5
120:7 121:11
122:17,22
**injured** 66:3
**injury** 43:3,5
43:13 67:15
**input** 46:21
**inputs** 46:11,12
46:16
**insightful**
91:22 105:13
**instances** 49:24

**instruct** 24:5
**instruction**
20:7 79:8
**instructions**
32:8
**intend** 32:21
33:6 89:25
**intended** 21:3
22:16 25:9,13
26:14,17 29:22
**intensity** 11:6
**intentional**
21:1 22:14
24:9,25 25:4
26:9,12 29:17
30:22,25 31:1
31:13
**interest** 51:20
53:10 56:25
**interested**
99:24 127:12
**interesting**
78:22 79:5
**interpret** 63:4
**interpretation**
77:20 78:12
**interrupt** 27:11
**invented** 89:21
**investigate**
65:16 68:21,25
73:12 91:23
105:2
**investigated**
74:15 75:10,14

**investigating**
119:14
**invitation**
78:20
**involved**
106:19
**irrelevant**
45:19 50:3
**issue** 68:10
92:15,21 97:14
**issues** 42:23
69:1 116:24
**item** 36:1

**j**

**january** 69:14
111:22 112:21
113:14
**jason** 1:5 5:7
124:2 128:4
**jersey** 3:5
**job** 1:24 88:12
124:2 127:25
**joined** 5:21
**journal** 37:6
**jrr** 1:8 5:12
**judge** 76:15,23
82:23 86:4
88:13
**julia** 2:15,17
6:2
**june** 69:14

**k**

**katz** 2:16 6:2
23:11
**keep** 39:21 40:4
116:2
**kind** 17:8 63:8
67:12 69:7
88:9 93:24
**kinds** 98:16
**know** 10:4
21:24 23:17
24:9 33:24
57:14,22 65:10
65:23 66:2,15
67:5 68:5
69:22 71:6
72:20,24 83:12
93:11 96:2,24
97:5,25 98:3,6
98:19 101:4,6
109:25 110:6
110:23 119:7
**knowledge**
59:25
**knows** 91:8

**l**

**l** 3:20
**laid** 31:6 38:15
**language** 24:13
**large** 2:5 85:18
86:18 88:17
118:17 127:1,3
127:23

**larger** 50:9
57:7
**lasater** 36:5
37:6,8,15
38:24 40:2
41:1 52:3,18
56:10,13 62:12
62:22 64:12
74:7,12 76:8
76:23 77:12,16
78:14 84:2
89:21 90:3
93:5,11 94:11
115:13 120:1,2
120:14 121:2
**lasater's** 7:22
9:4 11:4 28:19
36:19 39:9,22
48:8 51:7,16
51:19 52:24
75:24 76:16
78:7,17 82:13
89:12 92:8,9
93:22 95:5
119:18 120:10
120:13 121:9
122:12,19
**law** 6:24 23:16
**lawsuit** 6:13
43:5 55:23
57:6 67:16
68:4
**lawyers** 13:16
13:23 37:2

**lead** 30:23
**learn** 61:4
72:13 83:17
115:24
**learned** 86:17
**learning** 57:1
**learns** 61:6
**led** 30:15
**legal** 36:1,7,10
36:15,17 37:23
43:16 44:2,9
44:15 57:21
67:19 68:15,19
116:22,24
128:23
**legally** 43:17
43:22 116:19
117:1
**length** 94:24
**lengthy** 52:11
**life** 13:5
**likely** 89:17
**limit** 53:19
79:12 105:17
**limited** 78:25
**line** 74:22 75:1
75:2,20 77:9
125:2,5,8,11,14
125:17,20
126:2,5,8,11,14
126:17,20
**linear** 39:4,10
73:22 74:3,8
74:17,20 75:4

75:12 76:2
77:5,7 119:15
**lines** 34:13
**link** 8:4
**list** 10:14,16,19
11:9 39:13
**listed** 9:8 11:7
19:3,21
**listen** 79:2
**little** 88:23
113:12
**liz** 55:7
**llp** 2:10 3:3,13
**loading** 15:3
**locally** 14:22
**lods** 94:1
**long** 11:20
111:5
**longer** 27:22
**look** 9:25 10:17
15:21 18:9
19:5,7 27:4
49:14 60:22
61:2,7,15,22,24
62:14,23,23
63:2,5,7 64:9
64:18 66:14
71:22 72:16
74:25 75:18,19
76:16 81:15
83:22 84:22
92:12,14,23
94:4,6,16
102:2 105:19

105:24 107:15
107:19 109:3
109:14,15
115:23
**looked** 9:3,6,17
10:10 11:5,10
59:13 64:13
83:14 92:10
94:2 97:13,22
108:15
**looking** 10:6
19:11,15 20:19
24:14,21 35:22
48:23 49:5
50:12,15,20
51:3,23 55:16
59:8 60:7
80:24 81:23
87:7 91:14
103:6,13
105:11 107:10
108:10,23
109:12 111:10
113:6
**looks** 15:4
77:16
**lost** 43:10
**lot** 23:24 46:11
107:16
**low** 48:9,12,16
50:5,7 51:2
53:13,21
115:13,16
116:8

**lower** 117:15
**luckily** 95:12

**m**

**m** 6:10 115:7
**ma'am** 6:15,20
7:17 8:14
11:19 17:12
78:3 82:11
99:2
**machine** 96:17
**made** 66:10
74:10,11 83:20
86:5 89:5
117:15 120:7
121:25
**main** 18:4
**make** 41:14,16
45:12 48:16
50:4 55:1
74:18 75:1
81:21,23 83:15
85:12 86:8,21
92:1 101:9,23
111:18 120:24
**makes** 45:10
75:1,21,25
77:8 87:25
89:17 92:20
93:13
**making** 64:12
77:6,8 85:11
86:9 92:13
120:12

**manner** 4:15
46:2 48:19
**manual** 37:3
**maps** 42:25
**mark** 14:14,20
**marked** 14:17
15:16 81:18,24
117:10
**marketing** 17:4
**markings** 14:25
15:11
**marks** 54:10,14
80:1 114:16,20
119:24,25
**maryland** 1:2
5:11
**materials** 7:18
7:24,25 8:18
8:23,23 9:6,9
9:12 10:13,15
11:6,8 35:19
37:20,23 38:2
38:6
**math** 112:4,7
112:12
**mathematical**
76:10 78:7
**mathematically**
92:16,17
**mathematics**
17:5
**matter** 5:7
56:19 92:22
124:8

**matters** 18:19
44:24 45:21
117:5
**mckeen** 3:20
4:3 5:19,19
6:11,21 9:19
10:2,18 14:13
14:18 16:4,11
18:1,10,22
21:11 22:4,23
23:15 24:6
25:15,23 27:3
27:6,18,24
28:6,9,21 29:4
29:9 30:4,13
30:19 31:18
32:2,17 33:14
34:14,23 38:1
40:9 41:4,23
42:15 43:1,19
44:16,23 45:6
46:3,15,23
47:19 48:6,14
49:17 50:14
51:5 52:2,10
52:12,19 53:4
53:11,20 54:4
54:17 55:8,11
55:14 57:4
58:1,20,24
59:7 60:4,12
61:14 62:5
63:9 64:24
65:9,19 66:12

67:1,14 68:1,8
69:4 70:5,17
71:9 72:1,23
73:15 75:8
76:5 78:1,18
79:15,22 80:5
81:16 82:1
85:7,19 86:7
86:20 87:6,15
88:5,18 90:19
91:1 95:7 97:4
97:24 98:9,15
98:21 99:3,11
100:6 102:1,16
103:9,18 104:7
105:15 106:12
109:6 110:4,10
111:16 112:7
112:10 113:1
114:10,15,23
115:10 121:12
121:19 123:1,2
123:6,14
**mean** 25:5 26:3
43:16 47:13
54:2 56:3,19
60:13 62:13
69:12 73:5
84:7 93:10
94:9 104:25
110:19,21
113:17 115:16
116:2

**meaning** 26:21
**meaningful**
77:7
**meaningless**
39:23 40:6
41:2 49:10
51:25 53:2
**meanings** 26:2
**means** 22:9
30:18 39:1
91:5
**meant** 85:10,13
112:15
**measure** 49:13
**measurements**
37:13
**measuring** 93:7
**media** 5:5
54:11,15 80:2
114:17,21
123:9
**medical** 67:21
73:9 94:1 98:1
**medically** 73:1
73:5
**medication** 7:1
**meeting** 8:19
8:20 11:16,20
11:23 12:4,6
12:14 23:6,8
**meetings** 23:1,4
23:7,12,20,24
26:20 28:18
30:1

**meets** 47:1
**memorandum**
36:2
**mentioned**
11:15 18:3
71:7 98:22,23
100:10 108:7
**meredith** 3:21
5:22
**mgaragiola**
3:18
**midatlantic**
128:15
**middle** 91:17
105:24 106:4
118:25 119:13
**mind** 90:24
**minimum**
69:20,22 70:7
**minutes** 7:13
10:5 11:22
**missing** 69:6
**misstates** 60:11
85:15 86:15
**mode** 7:24
**modify** 113:11
**moment** 19:5
32:23 61:13
85:9 90:1,2
**monday** 11:24
**money** 95:17
95:20,24
**months** 6:14

**morning** 5:3
6:12
**motion** 52:9
**move** 39:12
52:3 59:6 88:3
**moved** 77:16
104:25
**moves** 101:15
**multiple** 46:19
**myers** 3:13
5:20

**n**

**n** 4:1 6:10,10
115:7,7
**name** 5:13 17:1
**names** 61:12
**nature** 37:7
116:17
**necessarily**
4:16 9:15 72:8
96:1 105:7
107:13 115:25
116:10
**necessary**
68:21
**need** 15:21 16:8
36:22 47:12
59:19 62:3
63:2,7 65:10
65:23 66:1
67:4 68:5,24
71:4 72:10,19
72:22,24 80:22

84:22 88:7
90:10 91:2
92:11 93:21
94:20 108:3
123:12,13
**needed** 32:14
63:19 73:12
**needs** 35:13
49:14 71:13
75:18 79:19
96:16 105:3
**negative** 95:19
**neither** 127:10
**neurologist**
91:20
**neurologists**
62:20 82:14
83:2,5 91:18
91:21,22,24
108:24 109:1
**neuropsychol...**
88:24
**neuropsychol...**
62:21 89:4,6,8
89:11,16 90:5
92:2,6
**neutral** 40:16
68:9 76:21
**never** 63:24
64:1 89:19,22
93:23 94:2
112:23 114:1
**new** 3:5 17:14
17:18 18:4,16

72:13
**newport** 3:14
3:15
**nfl** 1:9 5:8
12:25 13:4,6
13:11,15 124:2
128:4
**nine** 36:21 83:2
**nonprobability**
37:12
**nonresponsive**
52:4
**notarial** 127:14
**notary** 2:4
127:2,22
**note** 4:15
128:10
**noted** 122:5
**notes** 14:25
**noticed** 16:12
**null** 38:10,15
38:18,20 49:1
49:3,4,8
115:19,20,21
115:25 116:3,5
**number** 5:11
39:16 40:16
54:11,15 57:22
59:8 60:2
73:20 74:24
80:2 82:6
83:11,15 84:10
84:16 114:17
114:21 115:4

119:16,23
120:19
**numbers** 32:1
61:13 82:24
83:24 84:4,14
86:2,4 87:17
113:9
**numerical**
48:12 49:13,19
**numerically**
49:25
**numerous**
121:24

**o**

**o** 6:10 115:7
**o'melveney**
5:20
**o'melveny** 3:13
**oath** 6:22 54:19
78:24 80:8
124:13
**object** 65:2
79:7 121:12
**objection** 6:19
9:14,23 10:8
16:2 17:21
18:6,13 21:17
22:19 23:13,21
24:12 25:19
27:1 28:3,13
28:25 29:8
30:8,16 31:4
31:23 32:7

**[objection - page]**                                                        Page 21

| | | | |
|---|---|---|---|
| 33:8 34:11,18 | **objections** | 22:11 35:22 | **opportunity** |
| 35:21 39:19 | 27:21 28:14 | 44:1 46:24 | 66:16 |
| 40:18 41:7 | 29:12 | 48:11 60:21 | **opposite** 85:11 |
| 42:1,20 43:8 | **obtained** | 67:10 78:6 | **order** 58:19 |
| 43:24 44:22 | 110:24 | 79:24 81:1 | 59:17 |
| 45:2,23 46:9 | **obvious** 44:10 | 82:12 91:13 | **original** 82:4,5 |
| 46:18 47:9,23 | 48:19 49:15 | 97:13 114:12 | **orthopedists** |
| 48:13,17 49:20 | 51:10 53:1 | 121:18 | 62:20 92:2 |
| 50:24 52:8,15 | 69:12 70:13,18 | **omm.com** 3:17 | **ought** 90:22 |
| 52:21 53:8,14 | 70:22,25 71:5 | 3:18,19 | **outcome** 42:18 |
| 56:1 57:9 | 92:1 | **once** 71:2 72:12 | 43:6 44:20 |
| 58:13 59:11 | **obviously** 9:1 | 101:13 | 45:22,25 46:2 |
| 60:10,15 62:1 | 20:7 37:22 | **open** 8:7 9:24 | 46:6,7,11,13,17 |
| 62:10 64:3 | 45:24 62:14,25 | 10:17 15:8,20 | 46:22,22 67:5 |
| 65:5,13 66:4 | 63:7 64:14,19 | 81:14 82:5 | 68:5 |
| 66:20 67:8,24 | 73:6 92:20 | **opening** 15:6 | **outcomes** 39:15 |
| 68:7,11 69:8 | 93:11 100:24 | **opine** 117:4 | 40:14 42:7 |
| 70:12,20 71:24 | 106:20 107:5 | **opining** 117:4 | 77:17 |
| 72:18 73:2 | 108:3 111:8 | **opinion** 21:14 | **outlined** 120:7 |
| 74:5 75:16 | 118:22 | 40:8 44:9 | **outside** 73:3 |
| 77:25 78:9 | **occurred** 103:7 | 47:22 48:11 | **overall** 41:18 |
| 81:11 84:20 | 103:15,22 | 60:6 71:20 | **overwritten** |
| 85:14,25 86:14 | 104:21 | 72:17 78:13 | 84:15 |
| 86:24 87:10,21 | **occurring** | 89:15,19,24 | **own** 36:22 |
| 88:11 90:7,23 | 70:14,19 71:1 | 93:1,6 94:12 | 78:16 95:17 |
| 95:2 96:23 | **occurs** 70:8 | 102:12 103:13 | |
| 97:15 98:5,14 | **offer** 32:21 | 107:25 | **p** |
| 98:18,25 99:6 | 116:25 124:12 | **opinions** 21:25 | **p** 39:1,5 |
| 99:16 100:13 | **offered** 122:21 | 24:3 32:5,11 | **p.m.** 1:17 54:12 |
| 100:17 102:13 | **oh** 15:23 71:3 | 32:21,22,25 | 54:16 80:3 |
| 103:1,11 104:1 | 96:7 | 33:2,7 34:24 | 114:18,22 |
| 104:23 105:23 | **okay** 10:1,4 | 35:4,6,8,15 | 123:10,18 |
| 108:22 110:17 | 11:15 14:13 | 68:14 95:6 | **page** 15:5,18,19 |
| 122:4 | 15:2,24 21:12 | 116:25 122:21 | 16:3,3,18,20 |

| | | | |
|---|---|---|---|
| 19:13,16 20:1 | 126:17,20 | **particularly** | 51:12 52:6,13 |
| 20:19,23 21:15 | **pages** 15:9 | 94:14 117:14 | 63:15,17 74:4 |
| 21:19,20 22:6 | 80:13 82:16 | **parties** 79:11 | 76:8,9 109:10 |
| 22:12 24:14,16 | 108:13,14 | **party** 97:7 | 110:12,15 |
| 24:17,22 26:1 | **paid** 89:3 92:6 | 127:11 | 113:17 |
| 28:24 29:7 | 95:21,24 98:23 | **pass** 115:1 | **performs** |
| 31:20,22 32:1 | **paragraph** | 122:25 | 110:20 |
| 35:25 38:9,11 | 20:23 21:19,20 | **past** 7:13 | **period** 18:9 |
| 38:12,13,13 | 21:21 24:16,16 | **pay** 95:17 96:5 | 69:12,13,19 |
| 39:13 40:1,20 | 24:17,21 31:20 | **paying** 16:23 | 102:9,10,22 |
| 40:24 49:6 | 31:21 55:21 | 17:11 96:16 | 103:25 104:5 |
| 54:25 55:1,16 | 56:9 104:11 | **pdf** 15:8,19 | 104:14,15 |
| 55:21 71:10,17 | 109:16 117:15 | **penalty** 124:5,6 | 105:6,10,16,17 |
| 73:16,18,25 | 118:24 119:13 | **pending** 54:5 | 105:18,21 |
| 74:11 76:6,12 | 119:20 | 79:18 | 106:10 107:4 |
| 76:14,18 77:15 | **paragraphs** | **people** 12:14 | 107:10 117:17 |
| 80:23,24,25 | 21:25 121:25 | 13:25 14:10 | 117:18,25 |
| 81:4,5 82:6,8,9 | **park** 3:5 | 96:2 | 118:7,13,18 |
| 83:2 88:21,22 | **part** 20:11 25:6 | **percent** 53:12 | 119:5 |
| 88:23 89:1,2 | 33:17 90:21 | 53:17 58:7 | **periods** 102:20 |
| 89:13 91:12,14 | 97:20 100:4 | 59:10 80:16,16 | 109:10 |
| 91:17 92:23,25 | 101:3 106:7 | 81:8 82:24 | **perjury** 124:5,6 |
| 102:2,6,7 | 108:9 119:2 | 83:4,7,13,19,19 | **perspective** |
| 105:25,25,25 | **partial** 107:1,3 | 83:19,19,20,23 | 68:16 104:22 |
| 106:5 108:11 | **participate** | 84:1,5,12,17 | **phase** 119:17 |
| 108:14,23 | 23:11 | 87:12,13 | 119:24 |
| 109:14,16 | **particular** | **percentage** | **phone** 7:23 |
| 117:9,12 | 42:18 43:2,3 | 85:22 | 8:10,10,12,14 |
| 118:25,25 | 47:6 53:6,10 | **percentages** | **physical** 43:12 |
| 119:7,11,14 | 65:7,11 66:2 | 81:10 | 45:17 67:21 |
| 120:8,8 125:2 | 67:2,4,5 68:3,9 | **perform** 34:9 | **physician** |
| 125:5,8,11,14 | 76:7 82:6 | 74:1 91:23 | 41:12 42:4,13 |
| 125:17,20 | 107:18 110:13 | **performed** | 42:17 44:6,7 |
| 126:2,5,8,11,14 | | 33:23 40:16 | 45:9,11,12,12 |

46:25 47:4,6
47:11,15 48:2
60:19 61:2,20
66:8 67:7,11
68:9 69:23
71:18 76:21
77:18 84:14
90:10,13,16,21
91:16,25 92:7
92:10,12,14,19
93:3,7,14,15,25
96:18 98:1
102:9,11,22,23
102:24 103:14
103:22 104:4
104:14,16,19
104:20 105:18
106:8,9,13,16
107:2,17 109:4
109:22 110:12
110:19 111:20
112:17 113:13
113:24 117:19
117:23 118:3,6
118:9,20,22
119:3,4
**physician's**
43:4 44:18
45:16 47:8,16
59:23 67:4
72:17,20,25
73:11 93:12
94:3 99:25
100:4,23,25

101:17,22
103:4 107:23
109:20 111:24
119:16
**physicians**
13:19,24 39:16
40:17 41:14,16
42:14 51:19,20
55:2,18,24
56:6,10,17,24
57:7,8,15,16,20
58:4,5,7,11,16
58:17 59:13,15
59:23 60:2,8
60:25 61:8,13
61:16,24,25
62:3,9,14 63:3
63:5,8,13,14,22
63:25 64:2,6,9
64:11,17,20
65:22 70:4,24
71:12,15,23
72:7,11 73:8
73:19 76:19
82:20 84:13,15
86:11 88:2
89:7,14 94:17
96:2,14,20
97:6 98:11,24
99:8,10,14
100:9 101:5,15
101:19,24
103:24 106:19
106:20,21,23

107:5,7,12
108:20 109:10
109:17,18
111:13 118:12
118:17
**picking**   103:5
**picture**   74:19
75:19
**pictures**   76:3
**place**   48:24
50:12,15,21
51:4
**placement**
88:14,16
**plaintiffs**   1:6
2:18 3:11 5:24
6:3 12:20 20:2
28:2,12 30:23
32:4 39:18,25
40:5,13 41:3,6
41:10,21,24
42:9 43:22
44:4,11,12
47:5 48:24
50:13 51:24
55:23 56:4,5
57:1,6,17
58:12,18 59:16
60:8,14,16
61:18 62:7
63:20,23 65:16
67:16 68:4,21
68:25 69:21
71:11,13,21

72:6 82:22
84:18 86:22,25
87:2,3 91:19
99:5,9,13,21
100:7,11,24
101:3,4,8
103:17,20
104:3 105:3,8
106:7 116:17
118:15,21,23
119:2
**plan**   1:10 5:9
13:20,24 43:18
96:22 111:21
111:22 112:5
124:3 128:4
**plan's**   47:1
**player**   1:9 5:8
41:14,17 42:18
44:18,24 45:9
45:14,16,18,19
45:25 46:1
47:1,6,8,15,18
47:20,21 48:4
48:5 65:7,11
66:2 67:2,12
68:3 69:2
72:17 89:6
93:4,16 106:11
119:5 124:3
128:4
**player's**   44:21
**players**   12:25
13:4,7,12,15

40:14 43:2
44:14 63:24
68:15
**please** 5:17 6:5
29:2 30:10,11
54:6 58:23
64:22 67:23
73:16 79:6
110:8 114:11
114:15
**plenty** 63:1
**plus** 111:25
**pocket** 95:17
95:19 97:6
98:2,11
**point** 20:5
50:10,11 51:1
52:17 54:3
56:9,17 64:12
70:9,16 74:10
74:11 80:14
83:15,21 84:4
84:10 85:11,17
86:6,9,10 87:8
87:11 92:1,13
104:9,12,18
106:2 111:19
**pointed** 93:2
**points** 74:22
75:20 86:17,21
89:4
**population**
58:10

**portion** 81:1
**portions** 22:6
122:15
**position** 68:23
**possible** 11:13
66:21 78:5
81:20 99:25
106:3 123:15
**possibly** 48:3
49:11
**potential**
121:10
**potentially**
71:25 72:4,5
72:15
**power** 48:9,12
49:14,18,23
50:1,2,5,7,7,10
50:16,19 51:2
51:6,9 52:1,23
53:5,7,12,17
54:1,3 115:11
115:13,17
116:3,7,8,9
**powers** 53:15
**practice** 37:10
96:15
**precisely** 59:18
60:1
**prefatory** 65:3
**preferable**
69:18
**preparation**
9:12 10:20,24

13:8 20:25
21:3 22:14,15
24:24 25:3,8
25:12 26:8,11
26:14,17 29:16
29:21 31:12
**prepare** 8:16
11:11,16 12:21
18:23 71:21
**prepared** 18:25
**preparing**
12:18 13:10
19:10 34:6
122:13
**preprocessing**
48:21 49:11
51:3,12 116:11
**present** 3:25
23:3
**presented**
80:17
**preserve** 122:4
**pretty** 38:4
108:9
**previous** 14:3,8
14:9 18:18
28:4 74:11
77:14 120:8
122:8
**previously** 6:12
16:16 81:18
**primary** 17:18
**principle** 85:21

**principles**
102:15,18,19
**prior** 118:7,13
118:20,22
**probability**
53:15
**probably** 77:13
83:20 85:2
112:15
**problem** 35:2
92:7,16 116:13
**problems** 56:14
93:22
**proceed** 7:4
79:20
**proceeding**
127:12
**proceedings**
54:13 80:4
114:19
**produced**
105:5
**produces** 44:13
**product** 20:13
**proper** 66:7
91:22 103:10
104:19,22
**properly** 63:19
65:16 67:7
68:10,20,25
105:2
**proposed** 74:13
74:13 76:24

**protected**
20:13
**proved** 116:3
**provide** 33:10
39:24 76:23
82:23 85:21
86:3
**provided** 24:3
69:6,11 70:3
109:2,19,21
114:5 118:14
**providers** 97:8
**providing**
95:10 116:23
**proxy** 56:13
93:12
**psychiatrists**
62:21 92:3
**public** 2:4
127:2,22
**pull** 81:17
120:18
**purported**
121:9
**pursuant** 20:14
**put** 14:20 42:9
63:8 84:2
100:17
**putting** 74:21

**q**

**qualify** 47:7
**question** 20:16
27:16 28:4,5,6

28:7,8 29:1,3
34:2 35:3 38:5
39:7,11 40:10
40:12 43:20
45:20,21 47:25
52:5,5 54:4
64:21,22,23
68:18 75:9
77:22 78:6,20
78:21 79:3,3,5
79:18,20 90:8
91:3 92:4 94:8
103:8 104:8
105:1 106:1
108:18 110:21
111:3 112:15
115:10 121:8
121:13 122:8
**questioning**
79:13
**questions** 59:3
68:18 77:10,24
78:4,23 79:10
114:24 115:4
115:14 116:16
119:12,19
121:6,14,19,24
122:25
**quicker** 91:7
**quickly** 108:10
**quite** 26:20
29:13,18 30:1
94:15 117:3

**quotation**
119:23,25
**quotations** 4:15
**quote** 4:16
73:19,20,20,21
73:22,23
**quoting** 55:2
119:17

**r**

**ranking** 92:16
92:18
**rate** 73:21
119:17
**rates** 63:13
76:19 83:3,6
83:10 84:12,17
86:12 88:1
119:24
**rather** 21:23
24:19 91:21
93:2
**rationale**
105:11 121:4
**ray** 96:16
**rays** 96:3,4,7,8
96:10 97:3,7
**read** 4:15 27:2
55:5 65:1,4
80:20 81:2
110:7,9 118:24
124:7,9 128:9
**reading** 81:3
89:12 106:4

**realize** 16:17
16:19 72:14
87:4
**really** 27:22
40:10 42:8
43:10 59:1
68:19 81:22
84:21
**reason** 7:4
17:10,13 51:9
51:25 52:23
53:3 125:4,7
125:10,13,16
125:19,22
126:4,7,10,13
126:16,19,22
128:11
**reasoning**
41:22
**reasons** 52:25
66:18
**rebuttal** 4:8 9:2
9:22,25 10:12
11:2,7 12:19
13:9,11 14:15
15:9,17 18:23
20:20 21:5
24:15 28:20
32:14,18 34:1
34:3,5,7,10,17
34:22,25 35:5
35:10,12 38:9
38:14 39:3
40:21,24 48:25

51:13,15 54:25
59:14 62:13
76:12,19 88:21
89:20 92:24
94:4,6 95:5
102:4 117:10
117:13 119:8
120:4 122:12
122:13,19
**recall**  8:24
10:13,15 11:13
12:8,17,22
18:15 26:19
32:15 34:12,19
34:22 35:11
38:8 39:2
115:9,14
116:15 117:20
119:12,19,21
**recalling**  23:6
**receipt**  128:17
**receipts**  95:21
**receive**  19:1
76:20 100:9
112:19
**received**  9:7
19:18,21,25
20:2,8,10,21
21:9,12 28:19
30:3 32:13
35:20 37:21
55:3,18,24
56:18 58:5
71:6 111:20

112:18,21,22
112:23 113:14
113:16 118:13
118:17
**receives**  42:18
109:22
**receiving**  19:10
89:16 113:13
**recognize**
100:3
**recollection**
10:22,25 11:5
11:21 18:21
**recommendat...**
43:4 44:18,19
45:13 47:16
72:25 73:11
**recommendat...**
41:13,13,16
42:5,13,17
44:7 56:8
59:24 60:20
61:2,21 69:23
70:23 71:12,14
71:23 72:8,10
72:21 102:11
102:23,25
103:4,15,24
104:5,16,20
105:18,21
106:8,16,24
117:19,23
118:4,6,9
119:3

**recommends**
48:2
**reconfirming**
27:13
**record**  4:16 5:4
8:3 54:7,9,11
54:16 65:4
79:23,25 80:2
81:2 110:9
114:11,14,17
114:22 115:3
123:8,10
**recorded**  1:15
2:1 5:6 83:3,6
83:10 84:12,17
110:23 111:11
**records**  60:25
**red**  80:19 82:19
84:24 85:6,18
86:18 87:5
88:17
**reduced**  76:16
82:13 120:10
120:13
**redundant**
72:14
**refer**  15:13
21:24 55:17
58:5 90:24
103:23 104:3
108:8
**reference**  11:18
37:3 55:1
81:12 120:6

**referenced**  19:9
37:6 128:6
**references**  17:6
95:4
**referencing**
89:4 117:14
**referred**  9:3
34:21 100:22
**referring**  12:13
28:16 44:15
58:10,15 59:14
76:11 82:25
87:12
**reflect**  95:6
**reflected**  4:15
**regardless**
114:7
**regards**  8:20
13:1 37:20
71:18 72:7
99:21
**registration**
127:22
**regression**  39:4
39:10 74:9,17
74:21 75:4
76:2 77:5,7
**regulatory**
117:2
**reject**  116:5
**rejecting**
115:19
**relate**  90:17
99:9 100:8,25

101:4 103:21
**related** 42:19
  50:7 65:21
  106:9 116:11
  116:12 119:4
  120:9 127:10
**relates** 116:4
**relating** 56:5
**relationship**
  39:14 40:14
  41:11,15,22
  44:6 49:5
  63:12 73:7,10
  73:19,22 74:2
  74:3 75:11
  82:18 83:10
  119:15
**relationships**
  17:17,19 18:2
  18:19
**relative** 118:23
**relevant** 8:18
  8:22 33:1
  46:13,16 117:5
  117:24 118:2
  118:11,21
**remains** 14:4
**remember** 6:14
  10:4,6 26:24
  27:9 28:1,11
  29:5,10 56:20
  95:1,3 113:8
  116:20 122:8

**remembering**
  12:1
**remote** 1:15 2:6
  127:6
**repeat** 27:12,19
  29:2,24 110:3
**replicate** 75:24
  78:17
**replicating**
  75:7
**report** 4:8,10
  9:1,2,9,22,25
  10:5,7,12,15
  11:1,2,7,9
  12:19,21 13:9
  13:11 14:15
  15:5,9,17,22
  16:1,14 18:23
  19:4,10 20:20
  21:6 24:7,11
  24:13,15 28:20
  32:5,14,18,19
  34:1,4,5,7,8,10
  34:17,22,25
  35:5,10,12,18
  38:10,14 39:3
  40:21,25 42:22
  48:7,22 49:1
  51:13,15 54:25
  56:15,20 59:14
  62:13,16,18
  71:10 73:17
  76:7,12,18,19
  80:13,23 81:13

81:14 82:3,4,5
  85:5 88:21
  89:5,13,21
  90:12,14,25
  91:6,12 92:24
  94:4,6 95:5
  102:3,4 107:16
  108:9,10,11,24
  109:2,12,15
  111:15 113:5
  116:12 117:10
  117:13 119:9
  119:18 120:4,7
  121:9,11,15,25
  122:13,16,17
  122:19,22
**reported** 1:25
**reporter** 5:15
  6:5 65:1,4
  110:7,9 123:11
  123:16
**reporter's** 4:15
**reporting**
  74:18
**reports** 7:22
  8:25 33:17,18
  63:16 72:17
**represent** 5:18
  15:25 16:9
**representation**
  16:10 31:2
  74:19 75:5,19
**represented**
  78:24 111:5

**representing**
  5:13
**request** 44:21
**requested**
  37:23 38:2,6
**require** 91:20
**requirements**
  47:2
**respect** 13:13
  14:4 21:6
  22:11 35:17
  38:24 40:5
  41:3 56:25
  68:17 69:2,21
  69:24 73:7
  77:15 85:2
  91:18 92:2
  103:17
**responded**
  74:12 76:23
**responding**
  92:8
**response** 74:9
**responsive** 59:2
**rest** 15:21
  64:22
**result** 67:3 84:6
**results** 114:7
**resume** 17:6
**return** 128:13
  128:16
**review** 9:20
  121:8 122:12
  122:15 128:7

**reviewed** 8:17
 8:22 9:10,12
 9:16 10:13,20
 10:24,25 11:3
 122:18
**rhonda** 1:25
 2:3 5:15 127:2
 127:21
**rich** 86:18
**ridgefield** 3:5
**right** 8:13
 10:25 11:17
 12:14 15:3
 17:25 21:16,18
 26:25 33:19
 39:10 44:21,25
 45:1 48:9
 50:23 60:9
 62:9 70:9,10
 70:19 75:15
 76:12 81:15
 85:12 86:12
 87:20 88:7
 98:13 102:4
 112:24 113:3,4
 113:22 119:9
 119:10 122:7
**road** 3:4
**robust** 114:7
**roginski** 3:25
 5:13
**role** 42:11
**room** 5:21 7:15
 7:18 96:8

**rough** 123:13
**routinely** 38:20
**royal** 37:17
**rpr** 1:25 2:3
 127:2,21
**rule** 42:24
**rules** 6:17
 20:15

**s**

**s** 4:7
**sake** 112:3
**sam** 6:2 23:11
 42:24
**samkatz** 2:14
**sample** 50:8,9
**sampling** 37:12
**samuel** 2:16
**save** 124:9
**saying** 23:25
 31:6 41:2 45:8
 50:16 63:5
 113:23
**says** 16:21
 21:22 24:19,22
 49:4 62:22
 73:18 76:25
 82:20 89:13
 90:9 93:12
 96:7
**scenario** 53:10
 61:16
**scheme** 117:2

**science** 37:17
**scientific** 37:3
**scope** 18:7 41:8
 42:2 43:9,25
 57:10 64:4
 65:14 66:5
 67:9 68:12
 99:17 100:18
 121:13,16
**screen** 81:20
**scroll** 16:17
**seal** 127:14
**searching**
 118:2
**second** 9:9 25:6
 31:7 36:4,20
 38:12 87:14,24
 89:1
**section** 9:10,21
 9:25 10:12
 11:7 19:4,8,12
 19:15,22 20:4
 21:5 35:17,24
 38:12,14 62:18
 71:18 76:6
 89:2 91:8,11
 121:15
**see** 11:24 15:4
 16:20 25:16
 38:14 39:1
 45:11 48:3,3
 51:14 55:10,17
 61:7 71:16,17
 73:24,25 75:20

 75:21,25 78:11
 81:1 83:1 84:5
 84:14 89:20
 103:2
**seeger** 3:3 5:25
 6:1
**seegerweiss.c...**
 3:7,8 128:2
**seeley** 3:9 4:4
 5:24,25 6:19
 9:14,23 10:8
 12:7 15:12
 16:2,7 17:21
 18:6,13 20:5
 21:17 22:19
 23:2,9,10,13,21
 23:25 24:12
 25:19 26:9,15
 27:1,10 28:3
 28:13,25 29:8
 29:12 30:8,16
 31:3,23 32:7
 33:8 34:11,18
 35:21 39:19
 40:18 41:7
 42:1,20 43:8
 43:24 44:22
 45:2,23 46:9
 46:18 47:9,23
 48:13,17 49:20
 50:24 52:8,15
 52:21 53:8,14
 54:8 55:7,9,13
 56:1 57:9

**[seeley - small]**

58:13,22 59:4
59:11 60:10,15
62:1,10 64:3
65:2,5,13 66:4
66:20 67:8,24
68:7,11 69:8
70:12,20 71:24
72:18 73:2
74:5 75:16
77:25 78:9
79:7,17,24
81:11 84:20
85:14,25 86:14
86:24 87:10,21
88:11 90:7,23
95:2 96:23
97:15 98:5,14
98:18,25 99:6
99:16 100:13
100:16 102:13
103:1,11 104:1
104:23 105:23
108:22 110:2
110:17 112:3,9
114:12 115:2,8
121:18,22
122:6,24 123:5
128:1
**seem** 44:10
45:18 70:22
**seemed** 40:21
45:15 83:15
**seems** 45:8
70:15 72:6,9

83:8 89:21
96:3
**seen** 96:2 97:3
**select** 87:8
95:20
**selected** 35:19
36:25 37:2,4,8
37:14,18,20
87:17
**send** 37:24 38:3
38:7
**sense** 37:7
41:11 46:12
75:2,22,25
77:9 87:25
92:20 93:13
97:16 101:1
120:24
**sent** 37:22
128:14
**sentence** 25:6
55:12 59:13
73:17 81:3
**sentences** 25:24
**separate** 90:4
**separately**
90:11,14,16,22
91:16,24 92:10
92:12,14,20
**series** 115:14
**set** 74:22 87:14
**seven** 36:17
82:15 94:14
98:24 99:14

**several** 48:10
**severe** 43:14
**shade** 88:7
**shaded** 80:19
82:19 84:24
85:6,18 86:18
87:5
**shading** 88:17
**share** 14:20
15:2,4 16:20
33:6 81:20
120:18
**sheet** 124:1,11
125:1 126:1
128:11
**short** 58:25
**shorter** 122:3
**show** 61:11
74:20 76:3
88:6,8 114:6
**showed** 77:1
85:5
**showing** 16:18
**shown** 82:18
111:14
**sic** 52:3
**sign** 128:12
**signature**
125:24 126:24
127:20
**signed** 34:25
35:5 124:14
128:19

**silent** 7:24 8:11
**similar** 14:7
18:19 21:6
**simple** 39:4,10
41:11 74:8,17
74:20 75:3
77:5,7,20
**simply** 31:1
48:22 80:17
93:2 99:23
**single** 102:24
104:21 110:12
111:4 120:23
**sir** 7:16 11:15
18:11 33:20
54:5 76:13
80:8 87:16
102:5 115:15
116:20 117:12
117:21 119:21
**situation** 30:15
**situations**
49:21
**six** 56:21,22,23
56:24 57:6
58:6 62:19,23
64:13 94:14
98:23 99:14
**sixth** 36:15
**size** 50:8,9
**sliced** 93:24
**slightly** 122:10
**small** 84:11,16
115:3

social 37:13
society 37:17
solicit 17:14
solutions
　128:23
somebody 96:6
sorry 10:23
　15:23 17:22
　19:8,12 45:9
　52:20 65:25
　67:25 69:14
　72:2 100:14
sort 8:11 31:15
　41:10,19 42:6
　43:16 44:13
　45:17 46:6
　63:23 64:8
　67:3 69:3 73:3
　73:9 84:14
　88:3 90:6,9
　91:25 95:19
　96:12,17,21
　101:1,15 107:1
　107:20
sounds 75:13
　104:24
source 17:18
　18:4 93:2,7
sources 93:4
speak 42:8 56:3
　99:20
speaking 27:21
　31:3

specific 26:19
　49:24 91:21
　98:6 112:5
specifically
　8:20 19:24
　21:2 22:15
　25:7 26:24
　28:23 29:20
　31:15 38:24
　57:18 73:12
　75:14 103:21
　104:3 118:19
specified 9:21
specify 49:24
　60:1
speech 52:11
　79:4
speeches 59:2
spent 75:6,23
　77:3 95:20
　96:12
split 56:11
spoken 13:11
　14:5,10
square 38:25
　39:9 40:3,4
　48:8,20,22
　49:16 50:4,11
　51:7,11 52:24
　53:6 54:2 74:7
　115:12
squared 51:19
start 66:6
　67:10 71:2

　72:12 94:9
　108:14
started 71:7
starting 21:15
　21:21 69:13
　70:9 72:9
starts 19:15
　35:25
state 5:18
　39:14
statement
　32:20 117:15
statements
　71:19 122:1
states 1:1 5:10
　24:13
statistic 53:6
　53:13 82:24
statistical
　33:16 34:9
　37:10,11,17
　41:20 50:16
　80:14 85:21
　102:15,17
　104:9,12,18,22
　115:18 116:8
　116:23 117:5
statistically
　108:1
statistician
　42:11 44:3
　60:21 61:5,6
　68:23 87:7
　99:23 100:2

statisticians
　69:15 83:17
statistics 17:5
　36:25 37:1
　51:7 80:16
　86:3
statute 117:2
stay 95:16
　115:2
stodder 3:22
　5:22
stop 16:23
straight 74:21
　77:9
straightforward
　51:11
strike 52:4,9
students 38:22
　74:25 116:2
subject 20:14
submit 95:11
submitted
　14:16 15:11
　35:10
subsequent 9:7
　10:14 11:8
　109:3
subset 58:4
substantiate
　58:17 59:15
　60:8
substantiates
　60:14

**suddenly** 112:20 113:24

**suffered** 47:21 67:3 116:18

**suggest** 71:3

**suggesting** 45:15,18 103:3

**suite** 2:11

**sum** 93:21 113:7

**summarize** 86:16

**summarized** 84:6

**summary** 80:16 82:23 86:3

**sums** 109:17

**superior** 93:1

**supplied** 36:2,5 36:8,10,12,13 36:15,17,20

**supportive** 82:21

**suppose** 8:9 33:3 84:11 93:15

**sure** 16:4 30:17 38:4 39:11 46:20 54:8 55:6,9 75:1 80:21 81:23 86:8,21 101:7 110:18 111:18 123:16

**surrounding** 30:6

**survivor** 1:10 5:9 124:3 128:4

**suspicious** 75:3 76:1 77:19

**swear** 6:5

**switch** 39:4

**switched** 42:3 74:7 120:16

**sworn** 6:6,9 127:6

**t**

**t** 4:7 6:10 76:16 115:7

**t&p** 77:15,16 82:14 120:10 120:12,13,16

**table** 108:12

**tables** 56:21 62:17 109:4 111:14 113:5

**take** 20:3 27:22 54:6 74:25 79:22 80:22 88:19 96:7,8 96:10 100:5 101:10 109:8 123:7

**taken** 2:2 5:7 16:23 51:15,16 54:21 56:10

80:6 95:4 124:8

**talk** 24:15 38:10 48:7 58:10 77:13 88:23

**talking** 28:23 35:18 40:19 43:12 54:1 63:21 67:13,15 117:8,9

**task** 33:1

**tech** 81:21

**technically** 8:10

**teeth** 96:5,6

**tell** 27:8,25 28:10 30:1 32:22 42:11 47:24 61:10 78:21 123:11

**telling** 116:14

**ten** 36:24

**tend** 88:2

**tended** 76:20

**terms** 11:11 42:9 101:7 108:4 113:4 119:17

**test** 34:15 39:2 40:3,4 49:3,8 54:2 74:8

**tested** 40:3

**testified** 6:9,23 85:9 94:23

**testify** 7:2 91:9

**testifying** 7:7 110:5

**testimony** 8:1 9:11 14:2,15 15:25 22:11 28:23 29:6 54:22 60:11 80:10 85:15 86:15 95:4,11 110:8,11 111:19 127:9 128:9,17

**testing** 38:23

**tests** 38:25 39:6 39:8,9 48:20 48:23 49:16,22 50:4,11,17 51:11 52:24

**textbook** 36:22 37:1

**thank** 8:15 11:15 15:13 19:14 20:18 27:19 31:19 35:23 53:25 54:20 55:13,16 55:20 73:25 76:13 80:9 82:11 102:5 114:24 123:3

| | | | |
|---|---|---|---|
| **thanks** 115:2 | 47:12,17 48:4 | **thousands** | 77:24 78:23 |
| 123:5,6 | 56:2 57:21 | 51:17,17,22,22 | 79:13 91:10 |
| **theorized** 67:16 | 58:25 59:6 | **three** 79:11 | 114:25 123:13 |
| **theory** 39:18 | 61:19 62:11,17 | 84:15 | **today's** 10:24 |
| 84:19 86:22 | 64:25 65:6 | **time** 7:5,12 9:7 | 11:18 123:8 |
| 87:1,1 107:8 | 68:16,18 69:1 | 13:10 18:9 | **together** 82:16 |
| **thereof** 127:13 | 69:5,10,12,14 | 35:24 54:12,16 | **told** 24:10 |
| **thing** 31:9 51:1 | 70:1,10 72:2 | 59:1 69:12,19 | 29:11 30:23 |
| 68:17 69:11 | 72:15,19,22 | 70:16 75:6,23 | 31:16 61:4,8 |
| 74:18 75:18 | 73:5 76:9,14 | 77:3 78:25 | 109:9 |
| 81:23 84:24 | 78:22 90:3,9 | 79:12 80:3,22 | **took** 6:13 9:8 |
| 96:15 | 90:20 94:20,21 | 95:25 96:11 | 26:22 31:2 |
| **things** 17:9 | 96:1 98:23 | 102:9,10,20 | 56:20 62:19 |
| 23:24 31:7 | 99:18,19 100:9 | 103:25 104:5 | **top** 55:1 56:21 |
| 32:15 42:19,25 | 100:12,21 | 104:14,15 | 56:21 58:6,7 |
| 50:17,23 59:6 | 104:25 106:14 | 105:6,10,16,17 | 59:9,9 62:23 |
| 62:12 70:8,14 | 106:18,19 | 105:17,20,22 | 64:13 80:25 |
| 70:15,22,22,25 | 107:8,11,19 | 106:10 107:4 | 81:5 84:3,10 |
| 71:3 72:13 | 108:4,9,13 | 107:10 109:9 | 92:24 120:8 |
| 97:8 | 110:21,25 | 114:18,22,25 | **topic** 29:14,25 |
| **think** 9:1,7,16 | 111:3 112:11 | 117:17,18,24 | 39:3,3 79:4 |
| 11:1,3 13:22 | 112:15,16,22 | 118:18 119:5 | **total** 41:18 |
| 14:6,7,8 15:3 | 113:22 118:15 | 123:4,10 | 42:14 44:7 |
| 16:8,9 18:8,15 | 118:24 120:21 | 128:18 | 51:21 55:3,19 |
| 18:15 19:24 | 120:25 121:16 | **timeframe** | 55:25 56:6,18 |
| 21:5 23:5,7 | **thinking** 18:17 | 128:8 | 58:6 60:20 |
| 30:10,11 31:5 | 20:22 21:8 | **times** 46:19 | 63:22 70:24 |
| 31:6,9,14 | 23:5 32:12 | 74:24 | 73:20 85:4 |
| 32:11,12,25 | **third** 21:20 | **today** 5:21 6:18 | 94:3,5,6 100:2 |
| 33:9,21 35:2,6 | 36:7 97:7 | 6:23 7:1,8 8:3 | 100:4,23,25 |
| 35:13 37:9,19 | **thought** 16:18 | 8:16 9:13 | 101:2,6,9,17,19 |
| 39:7 42:3,5,23 | 38:19 43:12 | 10:21 11:24 | 101:22,24 |
| 43:2,10 44:14 | 76:22 82:22 | 14:4 18:11,14 | 107:21 108:4 |
| 45:3,24 46:1 | 86:2 88:15 | 27:22 54:19 | 108:16 109:17 |

111:8 113:7
114:2,5,8
118:12,16
119:16,23
120:19
**totally**  49:9
50:3
**towards**  73:17
96:16 117:7
**transcribed**  2:2
**transcript**
36:13,19
123:12 124:7
127:8 128:6,19
**travel**  95:12
**trigger**  111:1
**true**  6:18 8:4
14:4 31:19,22
31:24 95:6
124:9 127:8
**truthfully**  7:2
**trying**  10:21
30:22 42:9
58:9 59:1
75:24 85:12
90:17,20 112:5
112:8
**tuck**  1:25 2:3
5:15 127:2,21
**turn**  73:16
88:20 119:6
**two**  8:25 11:4
21:25 25:24
31:6,8 32:19

50:17,22,23
56:11 70:21
73:23 75:11
84:12,13,15
101:13 102:20
112:1,1,18
113:8 119:22
**twofold**  90:9
**type**  69:24
92:19
**types**  89:7
90:10,13,16,21
91:16,25 92:7
92:10,12,14
109:5

---

**u**

**ultimate**  44:20
**unable**  71:19
**under**  6:22 9:9
54:19 78:23
80:7 111:23
117:2 124:5,6
124:13 127:14
**undergraduates**
38:21
**understand**
6:18,20,22,25
8:1 31:5 41:5
41:24 44:4
52:1 54:18
57:11,25 60:17
68:19 76:8
77:23 78:3

80:7 88:13
89:11 97:12,19
98:7 99:12
100:7 105:11
107:9,12
110:11 111:18
113:23
**understanding**
20:24 22:13,18
24:8,23 26:7
26:22 29:15,20
30:21 31:17
38:17 41:9,19
42:16 43:21
44:3 55:22
56:4 57:5 58:3
60:23 62:7
69:10 71:5
83:9 96:25
97:17 99:1,4,7
101:12 106:6
119:1 122:1
124:12
**understandings**
22:1,5,7 30:2
32:10
**undertaken**
66:18 97:8
108:6
**uninformative**
39:23 40:6
41:2 49:10
51:25 53:1
115:24

**unit**  5:5 54:11
54:15 80:2
114:17,21
123:9
**united**  1:1 5:10
**unnecessary**
27:21
**upper**  53:18
**use**  14:21 37:19
40:2 42:25
81:10 83:23
85:23 93:14,20
93:21 94:10
97:7 100:20
102:8 104:13
105:9 106:2
120:25
**used**  26:20,25
37:8,15 38:23
62:24 83:19,23
86:5 87:20,20
87:22 93:11,23
99:19 111:9
113:5 128:19
**useful**  70:1
86:3 118:10
**using**  8:12,14
56:13 80:15
81:7 94:19
117:16

---

**v**

**v**  5:8 124:2
128:4

**v3**  57:13,24
  59:19,22 63:17
  65:17 66:8,23
  69:6,9 105:5
  106:25 107:4
  107:13 118:13
**valid**  85:16
  94:22
**value**  31:2 39:1
  49:19 50:1
  53:7,17
**values**  39:5
  49:24
**variables**  73:23
  75:11 78:13
  119:23,25
  120:1,2 121:2
**various**  9:5
  11:6 28:17
  116:15
**verify**  128:9
**veritext**  5:14,16
  128:14,23
**veritext.com.**
  128:15
**version**  15:14
**versus**  48:16
  94:8 98:2
**video**  1:15 2:1
  5:6
**videoconfere...**
  2:6 8:3
**videoconfere...**
  127:6

**videographer**
  3:25 5:3,14 6:4
  54:10,14 80:1
  114:13,16,20
  123:7
**view**  80:14
  104:10,12,18
  118:11
**vincent's**  42:24
**violates**  77:4
**virginia**  2:5
  127:1,3,15,23
**visual**  74:19
  75:5,19 77:20
  78:11 85:20,23
**vs**  1:7

**w**

**walks**  96:6
**want**  16:3,9
  24:9 27:2,15
  42:8 56:3 64:5
  67:12 69:22
  79:20 81:22
  82:7 85:11
  86:12 99:20
  106:2 107:6
  110:5 120:18
  120:25 121:12
  122:4
**wanted**  61:18
  86:8,16,21
  115:9

**wanting**  85:9
**wants**  62:14
  106:21
**way**  6:23 21:4
  22:17 23:17
  25:9,14 26:15
  26:18 29:23
  35:13 44:14,19
  45:1 47:4
  51:11,23 57:11
  59:2 62:12
  64:1 77:1 83:9
  91:23 98:3
  99:12 105:1
  106:14 107:25
  110:15 113:16
  114:2 116:7,12
  122:22
**we've**  15:16
  28:23 31:20
  32:6 54:21
  63:21 80:6
  99:18 104:24
**website**  16:13
  16:22,25 17:3
  17:11,24
**wednesday**
  123:15
**week**  104:21,25
**week's**  105:12
**weekend**  11:25
**weiss**  3:3 5:25
  6:1

**went**  6:17
  83:25 84:3
  122:2
**whatsoever**
  75:22
**whichever**
  15:14
**wilshire**  2:11
**wise**  99:24
**wish**  17:14
**wit**  127:1
**withdraw**
  122:9
**witness**  4:2 6:5
  6:6,20 9:15,24
  10:11 17:5,19
  17:22 18:8,14
  20:18 21:18
  22:20 23:14,23
  24:14 25:21
  27:4,11 28:15
  29:2,13 30:9
  30:17 31:5,24
  32:9 33:9
  34:12,19 35:22
  39:20 40:19
  41:9 42:3,21
  43:10 44:1
  45:3,24 46:10
  46:20 47:11,24
  48:18 49:21
  50:25 52:17,22
  53:9,15 56:2
  57:11 58:15

**[witness - zoom]**                                                      Page 35

| | | |
|---|---|---|
| 59:12 60:16 | **work** 13:18 | **x** |
| 62:2,11 64:5 | 17:15,19 18:4 | **x** 4:1,7 6:10 |
| 65:6,15 66:6 | 18:4 20:13 | 96:3,4,7,8,10 |
| 66:21 67:10,25 | 33:17 34:7 | 96:16 97:3,7 |
| 68:13 69:9 | 88:9 | 115:7 |
| 70:13,21 71:25 | **worked** 17:7,8 | **y** |
| 72:19 73:3 | **working** 8:19 | **yeah** 103:10 |
| 74:6 75:17 | 13:10,16,23 | **year** 9:5 18:15 |
| 78:10 79:9 | 14:1,11 17:15 | 18:17 92:9 |
| 81:12 84:21 | 19:2,19 20:22 | 93:23 107:18 |
| 85:16 86:1,16 | 21:10,13 22:2 | 110:13,20 |
| 86:25 87:11,22 | 22:10,22 25:2 | 111:7,7,11 |
| 88:12 90:8,24 | 25:11 28:19 | 112:20 113:25 |
| 95:3 96:24 | 36:3 37:22 | 114:1 |
| 97:16 98:6,19 | **workloads** | **years** 101:13 |
| 99:1,7,18 | 76:20 | 106:16 107:14 |
| 100:14,20 | **workshop** | 109:19,22 |
| 102:14 103:2 | 101:11,21 | 112:1,6,18 |
| 103:13 104:2 | **workshops** | **z** |
| 104:24 105:24 | 93:19 100:10 | **zero** 53:16,23 |
| 108:23 110:18 | 100:14,21 | 95:22,23 |
| 112:14 115:1 | **write** 25:18 | **zoom** 5:23 6:1 |
| 121:14,17 | **written** 26:3 | 6:3 12:6,14 |
| 122:25 128:8 | 40:24 | 23:1,4 26:10 |
| 128:10,12,18 | **wrong** 18:21 | 30:1 95:14 |
| **word** 21:15 | 48:24 50:12,15 | 109:25 |
| 37:19 62:24 | 50:20 51:4,23 | |
| 99:19 100:20 | 83:16 101:20 | |
| **wording** | 120:21 | |
| 122:11 | **wrongful** 41:25 | |
| **words** 25:16,18 | **wrote** 24:22 | |
| 26:4,5,10,16,19 | 25:6,22 26:5 | |
| 26:24 35:3 | 26:13 27:5,8 | |
| 42:10 105:19 | | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.