IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION

JASON ALFORD *et al.*,

        Plaintiffs,

    v.

THE NFL PLAYER DISABILITY &
SURVIVOR BENEFIT PLAN *et al.*,

        Defendants.

Case No. 1:23-cv-00358-JRR

~~FILED UNDER SEAL~~

REPLY IN SUPPORT OF DEFENDANTS'
MOTION TO EXCLUDE THE TESTIMONY
OF ANTHONY HAYTER

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

    I.    DR. HAYTER'S AFFIRMATIVE ANALYSES BASED ON EXHIBITS
         A AND B ARE UNRELIABLE ....................................................................... 2

        A.    Exhibits A and B—and any analyses based on them—are
             incomplete and unreliable. .......................................................... 2

        B.    Dr. Hayter's analyses of Exhibits A and B are not statistically
             valid.............................................................................................. 8

    II.    DR. HAYTER'S OPINIONS ABOUT DR. LASATER'S ANALYSIS
          ARE NOT PROPER REBUTTAL TESTIMONY ............................................. 11

    III.    DR. HAYTER'S OPINIONS ABOUT THE VALIDITY OF THE
          INFORMATION IN PLAINTIFFS' AMENDED COMPLAINT
          SHOULD BE EXCLUDED .............................................................................. 12

    IV.    DR. HAYTER HAS FAILED TO DISCLOSE ALL FACTS AND DATA
          RELIED UPON IN HIS OPINIONS ................................................................ 14

CONCLUSION ................................................................................................................ 15

## TABLE OF AUTHORITIES

**Page(s)**

### <u>CASES</u>

*Bishop v. Triumph Motorcycles (Am.) Ltd.*,
  2021 WL 4316810 (N.D. W. Va. Sept. 22, 2021) ................................................................. 14

*DL v. Dist. of Columbia*,
  730 F. Supp. 2d 78 (D.D.C. 2010) ........................................................................................ 9

*Fernaays v. Isle of Wight Cnty.*,
  2022 WL 866416 (E.D. Va. Mar. 23, 2022) ......................................................................... 14

*Haller v. AstraZeneca Pharms. LP*,
  598 F. Supp. 2d 1271 (M.D. Fla. 2009) ............................................................................... 10

*In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*,
  948 F. Supp. 2d 589 (S.D.W. Va. 2013) .............................................................................. 11

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*,
  145 F. Supp. 3d 573 (D.S.C. 2015) ...................................................................................... 10

*Klaczak v. Consol. Med. Transp.*,
  458 F. Supp. 2d 622 (N.D. Ill. 2006) ................................................................................... 14

*Krakauer v. Dish Network, LLC*,
  2015 WL 5227693 (M.D.N.C. Sept. 8, 2015) ........................................................................ 4

*Lightfoot v. Ga.-Pac. Wood Prods. LLC*,
  2018 WL 4517616 (E.D.N.C. Sept. 20, 2018) ....................................................................... 9

*Molly C. v. Oxford Health Ins., Inc.*,
  2024 WL 4850813 (S.D.N.Y. Nov. 21, 2024) ........................................................................ 4

*Nat'l Fair Housing Alliance v. Deutsche Bank Nat'l Tr.*,
  2025 WL 975967 (N.D. Ill. Mar. 31, 2025) ........................................................................... 9

*NuVasive, Inc. v. Kormanis*,
  2019 WL 9633645 (M.D.N.C. Mar. 18, 2019) ....................................................................... 4

*Oglesby v. Gen. Motors Corp.*,
  190 F.3d 244 (4th Cir. 1999) ..................................................................................... 2, 8, 11

*Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs.*,
  858 F. Supp. 2d 505 (D. Md. 2012) ....................................................................................... 4

*Robinson v. Nationstar Morg. LLC*,
  2019 WL 4261696 (D. Md. Sept. 9, 2019) ......................................................................... 6, 9

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) ................................................................................................ 10

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Taylor-Fifield v. Flint Grp. Packaging Inks N. Am. Corp.*,
    2022 WL 20222820 (N.D. Ga. Mar. 30, 2022).................................................................. 10

*Tyree v. Bos. Sci. Corp.*,
    54 F. Supp. 3d 501 (S.D.W. Va. 2014) .................................................................... 4

*Ward v. Dixie Nat'l Life Ins. Co.*,
    595 F.3d 164 (4th Cir. 2010) .................................................................... 4

**<u>RULES</u>**

Fed. R. Evid. 703 .................................................................................................... 3

## INTRODUCTION

Statistician Dr. Anthony Hayter has prepared two reports on behalf of Plaintiffs featuring a purported "methodology" that in fact amounts to nothing more than creating scatterplots and shading graphs. In preparing these pictures, he used arbitrary cutoffs and benchmarks that he admits he intentionally varied from graph-to-graph, for the specific purpose of maximizing the appearance that they support Plaintiffs' baseless theory of statistical bias. He offers these analyses based on a slapdash dataset prepared by Plaintiffs' counsel despite not knowing what Plaintiffs' counsel did to prepare it. He has admitted that the only methodology he used is his own say-so. He has vouched for the statistical claims in Plaintiffs' Amended Complaint despite having no involvement in their preparation and admitting that they do not comport with basic statistical principles. And he has offered critiques of Defendants' statistical expert Dr. David Lasater's analyses based primarily on his verbal description of them, without applying any statistical methodology. But Dr. Hayter's bald assertions that the red-shaded areas in his graphs are "important" and that Dr. Lasater's chi-squared analyses are "uninformative and meaningless" amount to no more than an exercise in selecting adjectives, not performing the kind of reliable, methodologically sound analyses that will assist the trier of fact in this or any case.

In opposing Defendants' *Daubert* motion, Plaintiffs make several points to rehabilitate Dr. Hayter's opinions. They argue that Dr. Hayter was not required to personally assemble every data set he analyzed. This is true, but the Federal Rules of Evidence require that an expert offer opinions that are supported by scientific or other valid methods, not unsupported speculation. The Rules do not afford room for an expert who relies on counsel-created data that he does not know even basic information about, including why specific information was included or excluded, and who testified that his methodology was to ███████████████████████

1

███████████████████████████████████ ECF No. 219-12,

May 13, 2025 Depo. of A. Hayter Tr. ("Depo. I Tr.") at 241:19-23; *see Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). Dr. Hayter's opinions are grounded in speculation and non-statistical analysis, as evident in his extensive use of scatterplots and counting exercises, neither of which involve any form of statistical analysis.

Plaintiffs also argue that Dr. Hayter's critiques of Dr. Lasater's opinions are appropriate rebuttal testimony, but his critiques consist of nothing more than Dr. Hayter's wholly subjective and non-scientific observations regarding Dr. Lasater's approach. This form of choice-critiquing, without any attempt to replicate or engage mathematically with Dr. Lasater's analysis, is not acceptable under *Daubert*. Finally, Plaintiffs argue that holding Dr. Hayter to the disclosure requirements of the Federal Rules of Civil Procedure would "elevate form over substance" because Defendants should be able to somehow divine the materials upon which Dr. Hayter relied, though he could not identify them himself. But Dr. Hayter's failure to provide an accurate accounting of the materials he considered in reaching his opinions or other critical information about Exhibits A and B independently disqualifies his opinions.

## ARGUMENT

## I.    DR. HAYTER'S AFFIRMATIVE ANALYSES BASED ON EXHIBITS A AND B ARE UNRELIABLE

### A.    Exhibits A and B—and any analyses based on them—are incomplete and unreliable.

Defendants' motion explained all of the ways Exhibits A and B are inherently unreliable. ECF No. 220-1, Memo. in Supp. of Defs.' Mot. to Exclude the Testimony of A. Hayter ("Mot.") at 5-15. Dr. Hayter has barely a surface-level understanding about how Plaintiffs' counsel assembled the datasets, and upon a closer examination, both exhibits have fundamental flaws. Exhibit A is both incomplete and biased, containing just 7.2% of the applications and 13.6% of

the appeals from the relevant time period, all hand-selected by Plaintiffs' counsel. *Id.* at 7-11.

Dr. Hayter conducted no analysis to determine whether this cherry-picked dataset was

representative or accurate. Exhibit B is likewise unreliable, purporting to assign compensation

amounts to physicians in a way that is not replicable or accurate, based on a methodology that is

not known to Dr. Hayter himself. Mot. at 11-15. When Dr. Lasater attempted to replicate

Exhibit B's compensation calculations, he found obvious inconsistencies, like failing to assign

any compensation to physicians in years where that physician performed evaluations. *Id.* at 14.

None of the arguments that Plaintiffs raise in their opposition sufficiently acknowledge

the seriousness of these deficiencies. Plaintiffs mischaracterize Defendants' critique of Dr.

Hayter's use of Exhibits A and B as based on Dr. Hayter having failed to "personally assemble

or collect" the data in the exhibits. ECF No. 244, Plfs.' Mem. in Opp. to Defs.' Mot. to Exclude

the Testimony of A. Hayter ("Opp.") at 8, 10. Defendants do not dispute that an expert can rely

on datasets that they did not prepare themselves. *See* Fed. R. Evid. 703. The problem is that Dr.

Hayter has no idea what methodology Plaintiffs' counsel used to assemble the datasets and, as a

result, made assumptions about them that are demonstrably false. *See* Mot. at 5-7. Plaintiffs'

opposition does not even attempt to address that Dr. Hayter claims that Exhibit A contains "***all*** of

the information …. that is currently available to Plaintiffs," ECF No. 172-5 at 27 (emphasis

added), but Dr. Lasater identified a number of decision letters, PRFs, and joint report forms that

Plaintiffs had access to but did not include in Exhibit A, *see* Mot. at 9-10. Nor do they address

the fact that Dr. Hayter testified that Plaintiffs' counsel assigned compensation in Exhibit B █

██████████████████████████ ECF No. 219-12 at 203:19-204:3, but Dr. Lasater found

instances where compensation was allocated to the same physicians differently from year to year,

Mot at 14. Even though Dr. Hayter need not personally prepare a dataset, he "must have some

basis for believing the data on which [he] relies is what it purports to be." *NuVasive, Inc. v. Kormanis*, 2019 WL 9633645, at *2 (M.D.N.C. Mar. 18, 2019).

The cases Plaintiffs cite are not to the contrary.  For example, *Ward v. Dixie National Life Ins. Co.*, 595 F.3d 164 (4th Cir. 2010) considered whether an expert's reliance on the work of another was hearsay—not whether it was excludable under Rule 702.  *Id.* at 182.  And *Pulse Medical Instruments, Inc. v. Drug Impairment Detection Servs.*, 858 F. Supp. 2d 505 (D. Md. 2012) involved an expert who relied on another person to help prepare sections of his report, "talked about" the other person's analysis, and "went through each one of th[e] items" the other person prepared, *id.* at 512—something Dr. Hayter did not undertake to do here.  *See* Mot. at 5-6. Plaintiffs' remaining cases involved experts who relied on datasets that bore strong indicia of reliability[1]—indicia missing from Exhibits A and B, which were assembled not by a team working at Dr. Hayter's direction, but by Plaintiffs' counsel, and include only 7.2% of the applications and 13.6% of the appeals  that Defendants produced in the V3 data set.  Not one of Plaintiffs' cases involved an expert who had no involvement in the preparation of the data underlying the report or any understanding of how that data was prepared at all.  *See id.* at 5-7.

In contrast, Dr. Lasater's opinions are based on data directly exported from V3, the Plan's system of record for applications and appeals.  *See* ECF No. 111-2 ¶¶ 7, 11, 35.  The data Dr. Lasater relied on was pulled directly from the source database maintained in the ordinary

---

[1] *Molly C. v. Oxford Health Ins., Inc.*, 2024 WL 4850813, at *7 (S.D.N.Y. Nov. 21, 2024) (expert relied on data that was "very robust and statistically solid" and data that was part of "prior academic research" (quotations omitted)); *Krakauer v. Dish Network, LLC*, 2015 WL 5227693, at *9 (M.D.N.C. Sept. 8, 2015) (expert relied on datasets from vendor that provided "maximum accuracy and reliability" and "it [was] common practice in her industry to rely on such data vendors" (quotations omitted)); *Tyree v. Bos. Sci. Corp.*, 54 F. Supp. 3d 501, 552 (S.D.W. Va. 2014) (expert's "reliance on the analysis of others, when considered alongside his own peer-reviewed research" was sufficient).

course of the Plan's operations, not compiled using an unexplained methodology developed by counsel that Dr. Lasater could not describe. To the contrary, Dr. Lasater explained the datasets he relied upon in exacting detail, including detailed appendices in his original report explaining precisely any data that he excluded from the dataset that he ultimately relied upon, as well as a separate document that identified all of the data fields that were produced. *See* ECF No. 111-2 at 49-63. Compare this transparent explanation to Dr. Hayter's reports, which contain zero explanation as to how Exhibits A and B were prepared, *see generally* ECF No. 172-5; Decl. of M. Garagiola in Supp. of Defs.' Reply in Supp. of Defs' Mot. to Exclude the Testimony of A. Hayter ("Garagiola Decl."), Ex. A, Expert Reb. Rpt. of A. Hayter ("Hayter Reb. Rpt."). Dr. Hayter did not simply neglect to include this foundational information in his report; he did not ever bother to find out, as he showed at his deposition when he could not even explain the process himself. Mot. at 5-6. It is therefore nonsensical to argue, as Plaintiffs do, Opp. at 5-6, 11, that Dr. Hayter's reliance on the cherry-picked subset of information contained in Exhibits A and B is the same as Dr. Lasater's reliance on the V3 data. They could not be more different.[2]

Plaintiffs appear to acknowledge that the Exhibits are riddled with errors, instead arguing that these issues should simply go to weight not admissibility. Opp. at 14-16. While Dr. Hayter has since testified that he has been informed by Plaintiffs' counsel that such errors ███████ ████████ Hayter Reb. Rpt. 103, 119; *see also* Garagiola Decl., Ex. B, Aug. 25, 2025 Depo. of

---

[2] Plaintiffs assert that "Dr. Lasater also testified that the V3 dataset that he was provided is a limited, counsel-selected subset of information from the V3 database." Opp. at 11 (quoting ECF No. 172-7 at 38:10-39:4, 192:7-193:15). But this "subset" contained the data fields necessary to analyze a complete set of applications, appeals, and encounters available in the Plan's system of record, all of which were plainly identified to Plaintiffs and to Dr. Hayter via Dr. Lasater's declarations. *See* ECF No. 111-2 ¶¶ 11-14; ECF No. 134-7 ¶ 6 & n.2. And none of the tables or exhibits in any of Dr. Lasater's declarations were created by counsel. Unlike Dr. Hayter, Dr. Lasater relied on data fields that were more than sufficient to perform his analysis.

A. Hayter Tr. ("Depo. II Tr.") at 22:11-22, he also testified to having no information about why such errors occurred beyond that bare representation.[3] Plaintiffs' black-box approach to the data that underlies their entire case may give Dr. Hayter comfort, but it should not comfort the Court that his analysis based on this error-laden compilation can be relied upon.

Plaintiffs' remaining arguments about the problems with each Exhibit are no more availing. As to Exhibit A, Plaintiffs claim that the errors within it "have no bearing on Dr. Hayter's analysis" because they do not "depend[] on physician encounters and physicians' individual recommendations of approve or deny." Opp. at 15. But that is not true—Defendants identified instances where Plaintiffs' counsel linked underlying documents (i.e., the documents that Plaintiffs claim indicate whether a physician recommends "approve or deny") to the wrong application or appeal. Mot. at 10-11. Plaintiffs also blame Defendants for the incompleteness of Exhibit A because Defendants did not produce PRFs and decision letters for non-Named Plaintiffs, citing *Robinson v. Nationstar Morg. LLC*, 2019 WL 4261696 (D. Md. Sept. 9, 2019). Opp. at 17-18. In *Robinson*, a mortgage loan servicer sought to exclude plaintiffs' expert analysis regarding absent class members' loan history as incomplete, after the servicer had refused to provide certain key data fields in discovery. 2019 WL 4261696, at *1-4. In rejecting the request to exclude the expert's testimony, the court held that because the expert's "broad methodology [was] sound, the lack of consideration of unproduced data cannot provide a basis to

---

[3] "Q: Dr. Hayter, you've said here that it's your understanding that ████████ ████████, and I'm trying to find out what Plaintiffs' counsel told you to lead you to that conclusion. Did they give you any facts that caused you to conclude ████████████, or did they simply say to you ████████████████████ ██? A: I think I understand what you're saying. So I think it's the second of the two. . . . What happened was I was sort of specifically told that, which is how I got the understanding." Depo. II Tr. at 30:20-31:17.

strike the expert witness's testimony." *Id.* at *14. By contrast, here, Dr. Hayter's methodology is not remotely sound, and he has chosen to eschew using the data from the V3 database that is more than sufficient to assess Plaintiffs' claims, as evidenced by Dr. Lasater's report. ECF No. 111-2 at ¶¶ 11-54. To be clear: Defendants do not fault Dr. Hayter for not having access to certain unnecessary and irrelevant information that Plaintiffs unsuccessfully moved to compel many months ago; rather, the point is that he ignored large swaths of what he was provided and misinterpreted the rest.

The same is true with Exhibit B. Plaintiffs argue that Defendants' critiques of Exhibit B come down to a "highly technical disagreement" about the meaning of compensation. Opp. at 15-16. But Plaintiffs' dismissiveness cannot be squared with their theory in this case—that neutral physicians' compensation incentivizes them to opine that player applications and appeals should be denied. A reliable measurement of compensation is thus crucial to assessing Plaintiffs' claims. Dr. Lasater reliably measured compensation by encounter, ECF No. 111-2 at ¶¶ 16-20, which Dr. Hayter just as easily could have done because he was given the very same V3 data that Dr. Lasater relied upon, ECF No. 172-5 at 195-96. Instead, Dr. Hayter relied on the counsel-selected data in Exhibit B and purported to measure "total compensation." ECF No. 172-5 at 30. But Exhibit B included payments that were not, in fact, compensation, and it contained no explanation for how compensation was attributed to each given physician. Mot. 11. The obfuscation of the methodology used for Exhibit B is more than a "disagreement[]" with Dr. Hayter's choices that would go to weight instead of admissibility. Opp. 14 & n.6, 16 & n.8. Without a clear explanation of how the data was assembled, there is simply no way to conclude that the compensation figures in Exhibit B are a reliable basis for the conclusions Dr. Hayter draws or, under Plaintiffs' conception, even how much weight the Court should afford them.

Mot. at 11-15.  *See Oglesby*, 190 F.3d at 250.

**B.      Dr. Hayter's analyses of Exhibits A and B are not statistically valid.**

The fundamental flaws in Exhibits A and B render any analyses based on them unreliable.  Plaintiffs try to minimize the fact that Exhibits A and B are unrepresentative, biased, and contain errors by claiming that they are "disconnected from Dr. Hayter's methods and conclusions," and that the data he used is "sufficiently reliable for the purpose for which it is used."  Opp. at 14-15.  While Plaintiffs appear to concede that Dr. Hayter has not, in fact, analyzed a representative sample of data ("Dr. Hayter properly acknowledges the limitations of the Exhibits"), *id.* at 14, Section 4.2 of Dr. Hayter's report purports to show "a relationship between the physicians' denial rates and their compensations" (the fundamental claim in Plaintiffs' case) based on Exhibits A and B.  ECF No. 172-5 at 171-89.  Dr. Hayter expressly states in his initial report that he could not conduct his analysis without Exhibits A and B because they "provide some information that is ***critical*** for a proper assessment of the Plaintiffs' claims."  ECF No. 172-5 at 26 (emphasis added).  It cannot be that Exhibits A and B are both "disconnected" and "critical" to Dr. Hayter's analysis at the same time.

Even if Dr. Hayter's statistical analyses based on Exhibits A and B were not dependent on an unrepresentative and inaccurate dataset (and they are), the Court should still exclude those analyses because they constitute no more than the non-scientific analyses of counting exercises and visual representations and are not based on any valid statistical methodology.  *See* Mot. at 15-19.  Plaintiffs say that Dr. Hayter's first affirmative analysis, which placed the ███████████ ████████████████████████████████████████████████████, is a "helpful and reliable … "'counting' activity."  Opp. at 16-17.  But adding up the individual physician findings and compensation from the limited subset of data in Exhibits A and B is not helpful to the trier of fact.  *See Lightfoot v. Ga.-Pac. Wood Prods. LLC*, 2018 WL 4517616, at *16 (E.D.N.C. Sept. 20,

2018) ("[W]here a person with no special skill or experience can draw the same conclusion as the proffered expert after only brief exposure to the relevant evidence, the expert's opinion must be excluded as unhelpful."). "[D]escriptive statistics," like counting, "do not have any inferential value by [themselves]": they "cannot be used to draw conclusions about a broader population" and "cannot explain why [any] disparities exist." *Nat'l Fair Housing Alliance v. Deutsche Bank Nat'l Tr.*, 2025 WL 975967, at \*33 (N.D. Ill. Mar. 31, 2025). ███████████

████████████████████████████████████████████████████████

████████████████████████    *See* ECF No. 219-2 ¶ 154.  That absence distinguishes Dr. Hayter's opinions from the case Plaintiffs cite, where the expert only "[s]ort[ed] through raw data and put[] it in a more digestible format."  Opp. at 17 (quoting *DL v. Dist. of Columbia*, 730 F. Supp. 2d 78, 83 (D.D.C. 2010)); *see also Robinson*, 2019 WL 4261696, at \*4 (addressing *Daubert* challenge for "failure to use particular data fields," not for relying on a counting exercise).  The point is not that counting can never be a helpful exercise; it is that the conclusions that Dr. Hayter draws from his counting are not.

In support of Dr. Hayter's other analysis, which primarily consists of scatterplots with red-shaded areas and corresponding summary statistics, Plaintiffs provide lengthy quotes of the conclusions Dr. Hayter draws in his report to assert that the scatterplots he prepared "are reliable."  Opp. 13-14.  But the Court will search in vain for the reason they believe this to be true, and Dr. Hayter's own testimony demonstrates an utter lack of the kind of replicability and soundness required to pass muster under *Daubert*.  *See* Mot. at 18-19.  His methodology consists of no more than coloring in areas of a graph he thinks are supportive of Plaintiffs' claims, after he has already prepared a scatterplot.  *Id.*; Depo. II Tr. 82:9:-25 ("[W]hat was important to me was the relationship shown with the blue dots which I illustrated with that red shaded area which

is empty which says, 'no physicians here,' because that's consistent with and supportive of the plaintiffs' claims."), 86:25-87:5 ("[I]t was plaintiffs' claims which enabled me to realize that it was the empty shaded areas that were important.").

There is nothing scientifically valuable about this results-first approach, and worse, it will mislead the trier of fact by providing a visual representation that suggests a statistical relationship that does not exist. *See id.*; ECF No. 219-2 ¶¶ 141-43; *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 145 F. Supp. 3d 573, 587 (D.S.C. 2015) (excluding expert's "results driven" opinion where, "rather than conducting statistical analyses of the data and then drawing a conclusion from these various analyses, [he] formed an opinion first"). And when asked to explain his methodology for the cutoff points that corresponded with these scatterplots, Dr. Hayter testified that he "just looked at the data that seemed to be a good number to make [his] point," Depo. II Tr. 83:12-21. Incredibly, he conceded that he "could have used other numbers" except that "[i]f you go too high" with other numbers, the results would "flip around," meaning they would no longer support Plaintiffs' theory. *Id.* at 83:12-84:6. While Plaintiffs' soft-spot for unscientific scatterplots has been evident since they filed their complaint, these are just the kind of junk science masquerading as statistical analysis that courts exclude because of the potential to mislead. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 275 (4th Cir. 2021) (explaining that a court's role is to "exclud[e] expertise that is *fausse* and science that is junky"); *Taylor-Fifield v. Flint Grp. Packaging Inks N. Am. Corp.*, 2022 WL 20222820, at *2 (N.D. Ga. Mar. 30, 2022) ("The primary purpose of the reliability inquiry is to 'exclude "junk science"—or junk economics or junk statistics—from consideration."); *see also Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1296 (M.D. Fla. 2009) (excluding expert's testimony where his graph was "visually misleading").

## II.    DR. HAYTER'S OPINIONS ABOUT DR. LASATER'S ANALYSIS ARE NOT PROPER REBUTTAL TESTIMONY

Dr. Hayter's remaining opinions focus on criticizing Dr. Lasater's November and December expert declarations without applying any actual statistical analysis, instead parroting arguments Plaintiffs made themselves in prior filings.  *See* Mot. at 19-23.  While it is certainly true that experts can offer rebuttal testimony "without offering their own competing analysis," Opp. at 18-19, such opinions "must be based on scientific, technical or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby.*, 190 F.3d at 250.  Dr. Hayter's repetitive, blanket assertion that Dr. Lasater's analyses are "uninformative and meaningless"[4] is not based on any specialized knowledge or valid scientific method.  Mot. at 20-21.  Indeed, Dr. Hayter went as far as to testify that ██████████████████████████████████████████ Depo. I Tr. at 231:4-9. While supported, scientifically valid criticisms can form the proper basis for rebuttal testimony, unsupported opinions are not.  *See* Mot. at 21-24; *In re C.R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 948 F. Supp. 2d 589, 644-45 (S.D.W. Va. 2013).

Plaintiffs point to (i) Dr. Hayter's analysis of the V3 dataset and (ii) his criticisms of Dr. Lasater's interpretations of that dataset as an indication that Dr. Hayter relied on more than his personal opinion for his rebuttal testimony.  Opp. at 19-22.  But Dr. Hayter's analysis of the V3 data was limited and is not based on a methodology that satisfies *Daubert*.  Dr. Hayter's analysis of the V3 dataset in Section 2 of his report is entirely unreliable because it applies the exact same flawed methodology that he uses to analyze Exhibits A and B—namely, to plot the data and then color in the areas of the graph wherever Dr. Hayter sees fit.  *See supra* at 9-10; Mot. at 19, 21.

---

[4] Dr. Hayter repeats this exact phrase nine times in his first rebuttal report and 27 times in his second rebuttal report.

And as with his analysis of Exhibits A and B, when asked why he chose certain cutoffs for his analysis of V3, Dr. Hayter stated: ███████████████████████████████████ ████████████████████████████████ Depo. I Tr. 241:21-23; *see also id.* at 242:5-9.[5]  These subjective and unscientific methods are precisely the kind of analyses *Daubert* was designed to exclude.

Dr. Hayter fails to support his criticisms of Dr. Lasater's interpretations of the V3 data with any authority or explanation of scientific method that they violate.  *See* Mot. at 22-24.   For example, Plaintiffs highlight Dr. Hayter's criticism that "the V3 dataset provides no way to determine which physician made which recommendation," Opp. at 20-21, but that is incorrect in the vast majority of the applications and appeals at issue here. ██████████████████



. ECF No. 219-2 ¶¶ 25, 29.   Dr. Hayter's unscientific and unfounded criticisms of Dr. Lasater should be excluded as outside the province of an expert.  *See Bard*, 948 F. Supp. 2d at 644-45 ("Simply pointing out inconsistencies does not require any scientific, technical, or other specialized knowledge.") (quotations omitted); *see also* Mot. at 22-24.

## III.    DR. HAYTER'S OPINIONS ABOUT THE VALIDITY OF THE INFORMATION IN PLAINTIFFS' AMENDED COMPLAINT SHOULD BE EXCLUDED

Plaintiffs claim that Dr. Hayter's "limited comments" about the statistics Plaintiffs rely

---

[5] Plaintiffs say that, contrary to Defendants' assertion, Dr. Hayter "attempt[ed] to analyze the same data set that Dr. Lasater used for his analysis."  Opp. at 19 (quoting Mot. at 19).  That is incorrect.  Dr. Hayter's analysis of the V3 dataset involved only T&P applications and appeals, ECF No. 172-5 at 149-60, whereas Dr. Lasater's analysis involved applications and appeals from all benefit types, Declaration of Dr. David Lasater at Table 1; Appendix 3.  And while Dr. Hayter started with the same dataset for T&P applications and appeals Dr. Lasater used, he further narrowed Dr. Lasater's dataset by excluding MAP physicians.  ECF No. 172-5 at 150.

on in their Amended Complaint are appropriate expert testimony, Opp. at 22-23. But what Dr.

Hayter actually testified about this topic is that ████████████████████████ ████████

████████████████ on the page, Depo. Tr. I at 138:11-21, and the ████████████████

████████████ *id.* at 147:2-19.  Plaintiffs do not attempt to respond to most of Defendants'

arguments here, instead wrongly claiming only that ██████████████████████

████████████████████████████████████████████████

████████████████████ *Id.*  But Dr. Hayter's "observations" regarding the Amended

Complaint are pure speculation that are in no way grounded in the expertise plaintiffs claim he

has or in any actual analysis whatsoever.  They are thus not reliable or appropriate expert

testimony.

Plaintiffs concede that "Dr. Hayter does *not* opine that the Amended Complaint cites

statistics are based on a representative sample."  *Id.* at 23.   This only begs the question of what

probative value these supposed "statistics" could possibly have if they are non-representative and

based on a counsel-constructed sample, given the Plan-wide scheme that Plaintiffs allege has

occurred in this case.  Neither Plaintiffs nor Dr. Hayter have a reasonable answer to that

question, saying only that the statistics in this convenience sample are somehow "substantial and

notable" on the basis of Dr. Hayter's unsupported and entirely subjective say-so.  Opp. at 22-23.

Dr. Hayter admits that he has precious little information about these statistics—he had no

involvement in their preparation, he did not review the evaluations underlying that sample, and

he does not know whether the sample is at all accurate.  Mot. at 24.  He also did not do anything

to even try to assess the accuracy of his (wrong) assumption that those statistics were compiled

using the documents available to Plaintiffs at the time.  Instead he testified that his opinions

about the data ██████████████████████████████ Depo I Tr. 147:2-19, which courts

have expressly held is not a reliable basis for expert opinions under *Daubert. See Bishop v. Triumph Motorcycles (Am.) Ltd*., 2021 WL 4316810, at *8 (N.D. W. Va. Sept. 22, 2021); *Klaczak v. Consol. Med. Transp.*, 458 F. Supp. 2d 622, 667 (N.D. Ill. 2006).

## IV.  DR. HAYTER HAS FAILED TO DISCLOSE ALL FACTS AND DATA RELIED UPON IN HIS OPINIONS

Finally, Plaintiffs argue that Dr. Hayter properly disclosed all of the materials he considered in reaching his opinions, despite ███████████████████. Depo. I Tr. at 93:6-12 ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ They claim that Defendants' argument that Dr. Hayter must comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2)(B)(ii) "elevates form over substance," and that because Dr. Hayter's report contained numerous footnotes, it is clear what materials he relied on in forming his opinions. Opp. at 23-24. Dr. Hayter testified that he did not prepare his materials considered list, did not review many of the materials that are on that list, did review other materials that were left off the list, and that nobody, including he himself, could actually discern the complete set of facts and data that he relied on in preparing his report. Mot. at 26. If not even Dr. Hayter himself knows what materials he relied on, Defendants and the Court are deprived of a complete understanding the facts or data that underlie Dr. Hayter's opinions, which makes them excludable under Rule 702. *See, e.g., Fernaays v. Isle of Wight Cnty*., 2022 WL 866416, at *5 (E.D. Va. Mar. 23, 2022).

Plaintiffs argue that their refusal to provide information about how Exhibits A and B were prepared or what they told Dr. Hayter about these exhibits is somehow justified because "Rule 26 requires disclosure only of the facts and data considered by the expert." Opp. at 24.

But Plaintiffs' argument misses the point—Dr. Hayter was unable to provide critical information about the facts and data in both of these Exhibits, including where precisely they came from, the mathematical formulae that were used to create the compensation allocations in Exhibit B, and other basic facts about the data. This failure plainly violates Rule 26(a)(2)(B)(ii), which applies "even when" the facts or data relied on by the expert are "provided by counsel." *Elm Grove Coal Co. v. Director, O.W.C.P.*, 480 F.3d 278, 300 (4th Cir. 2007).

Plaintiffs have no response to this case law and instead argue that Defendants were not prejudiced by Dr. Hayter's omissions because they had opportunities to question him about his opinions. Opp. at 25. Defendants did question him repeatedly about these documents, but the combination of Dr. Hayter's inability and Plaintiffs' counsel's unwillingness to provide the answers have caused Defendants exactly the type of unfair prejudice that Rule 37(c) is intended to prevent. The Court should therefore exclude Dr. Hayter's testimony for the additional reason that he cannot adequately identify the underlying facts and data upon which it is based.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' Motion to Exclude the Testimony of Dr. Hayter.

Date: September 4, 2025

Respectfully submitted,

*/s/ Gregory F. Jacob*
Gregory F. Jacob (D. Md. Bar No. 06769)
Meredith N. Garagiola (*pro hac vice*)
O'MELVENY & MYERS LLP
1625 Eye Street, N.W., 10th Floor
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414
Email: gjacob@omm.com
Email: mgaragiola@omm.com

Elizabeth L. McKeen (*pro hac vice*)
O'MELVENY & MYERS LLP
610 Newport Center Drive, 17th Floor
Newport Beach, CA 92660
Telephone: (949) 823-6900
Facsimile: (949) 823-6994
Email: emckeen@omm.com

*Attorneys for Defendants The NFL Player Disability & Survivor Benefit Plan, The NFL Player Disability & Neurocognitive Benefit Plan, The Bert Bell/Pete Rozelle NFL Player Retirement Plan, and The Disability Board of the NFL Player Disability & Neurocognitive Benefit Plan*

16

**<u>CERTIFICATE OF SERVICE</u>**

I, Gregory F. Jacob, hereby certify that on September 4, 2025, I caused a copy of the

foregoing document to be served upon all counsel of record via the CM/ECF system for the

United States District Court for the District of Maryland.


*/s/ Gregory F. Jacob*     
Gregory F. Jacob
