# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

JASON ALFORD, *et al.*,                         *

      Plaintiffs,                              *

v.                                              *          **Civil Action No. JRR-23-358**

THE NFL PLAYER DISABILITY &                     *
SURVIVOR BENEFIT PLAN, *et al.*,
                                    *

      Defendants.                              *

                                           *

## MEMORANDUM OPINION

Plaintiffs filed this putative class action against Defendants on February 9, 2023, alleging violations of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* ECF No. 1. On December 30, 2024, the Honorable Julie R. Rubin referred this case to the undersigned for discovery and all related scheduling pursuant to 28 U.S.C. § 636. ECF No. 139. Thereafter, Judge Rubin referred to the undersigned the motions filed at ECF Nos. 175, 220, and 222, which seek to exclude expert testimony and reports. ECF No. 226. Each of the three motions is fully briefed.[1] No hearing is necessary. Local Rule 105.6 (D. Md. 2025); *see also Adell Plastics, Inc.* v. *Mount Hawley Ins. Co.*, Civil Action No. JKB-17-00252, 2019 WL

---

[1] The memoranda of law filed in connection with the three pending motions are:

(1) ECF No. 175 (David B. Lasater, Ph.D.): ECF Nos. 172 (public) and 173 (sealed) (memorandum in support); 219 (sealed) and 278 (public) (memorandum in opposition); 240 (sealed) and 308 (public) (reply memorandum);

(2) ECF No. 220 (Anthony Hayter, Ph.D.): ECF Nos. 221 (sealed) and 279 (public) (memorandum in support); 244 (sealed) and 309 (public) (memorandum in opposition); 270 (sealed) and 313 (public) (reply memorandum); and

(3) ECF No. 222 (Joseph A. Garofolo, Esq.): ECF Nos. 223 (sealed) and 280 (public) (memorandum in support); 242 (sealed) and 309-1 (public) (memorandum in opposition); 257 (sealed) and 312 (public) (reply memorandum).

2524916, at *1 n.1 (D. Md. June 19, 2019) (noting that a hearing is not required on a motion to exclude expert testimony).  For the reasons set forth below, Plaintiffs' motion to exclude David B. Lasater, Ph.D. (ECF No. 175) is denied; Defendants' motion to exclude Anthony Hayter, Ph.D. (ECF No. 220) is granted in part and denied in part; and Defendants' motion to exclude Joseph A. Garofolo, Esq. (ECF No. 222) is granted.

## I.    BACKGROUND

The allegations that form the basis of the Amended Complaint (ECF No. 56) are more fully set forth in Judge Rubin's memorandum opinion denying Defendants' motion to dismiss. ECF No. 78.[2]  Included here are only those allegations necessary to contextualize the Court's decision on the pending motions to exclude expert reports and testimony.

Plaintiffs Jason Alford, Daniel Loper, Willis McGahee, Michael McKenzie, Jamize Olawale, Alex Parsons, Eric Smith, Charles Sims, Joey Thomas, and Lance Zeno initiated this ERISA action on behalf of themselves and others who are similarly situated against the NFL Player Disability & Survivor Benefit Plan and the NFL Player Disability & Neurocognitive Benefit Plan (formerly, the Bert Bell/Pete Rozelle NFL Player Retirement Plan) (the Plan); the Disability Board of the Plan (the Board); Jacob Frank, Belinda Lerner, Sam McCullum, Robert Smith, Hoby Brenner, and Larry Ferazani (collectively, the Trustees); and the National Football League Commissioner Roger Goodell (the Commissioner).  ECF No. 78 at 1–2.[3]  The Plan provides, among other things, that the (1) "Board will maintain a network of Neutral Physicians

---

[2] *Alford* v. *NFL Player Disability & Survivor Benefit Plan*, Civil Action No. JRR-23-358, 2024 WL 1214000, at *1 (D. Md. Mar. 20, 2024), *amended on reconsideration in part*, 2024 WL 4892573 (D. Md. Apr. 23, 2024).  For ease of reference, further citation to this memorandum opinion will refer to the ECF number only.

[3] Page numbers refer to the pagination of the Court's Case Management/Electronic Case Files system (CM/ECF) printed at the top of the cited document, except that page numbers of exhibits that are deposition transcripts refer to the page and line number of the deposition transcript.

to examine Players who apply for benefits under this Plan"; and that (2) a Neutral Physician must (a) "certify that any opinions . . . will be provided without bias for or against any Player," and (b) "provide services pursuant to a 'flat-fee' agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits." *Id.* at 3.

Plaintiffs are retired National Football League players (Players) who applied for disability benefits under the Plan. ECF No. *Id.* at 2, 4. The Plan offers total and permanent, line of duty, and neurocognitive disability benefits to Players. *Id.* at 2. To qualify for benefits under the Plan, a neutral physician (Neutral Physician) must find that the Player meets the Plan's standards and must provide a complete report on the Player's disability. *Id.* at 3. The Plan's Disability Initial Claims Committee (the Committee) makes the initial decision on a Player's disability benefit claim. *Id.* Players may appeal the Committee's decision to the Board, which must review all facts and circumstances in the administrative record and render a decision without according any deference to the Committee's determination. *Id.* at 4. The Committee and the Board denied Plaintiffs' applications for disability benefits. *Id.*

Plaintiffs allege that process for reviewing disability benefit applications is flawed because the Neutral Physicians are biased and labor under significant financial conflicts of interest. *Id.* Plaintiffs contend that "Defendants have 'a systematic pattern that the more the Defendants compensate their hired physicians, the higher the likelihood that those physicians will render flawed, inadequate, result-oriented opinions adverse to benefits applicants.'" *Id.* (quoting ECF No. 56 ¶ 107). Plaintiffs further allege that Defendants breached their fiduciary duties by providing inaccurate and misleading information about the Plan. *Id.* at 4–5. Based on these and other allegations, Plaintiffs assert multiple violations of ERISA. *Id.* at 5 (identifying the five ERISA violations pleaded in the Amended Complaint); *see also* ECF No. 56. Plaintiffs

seek monetary compensation, injunctive and other relief, a declaratory judgment, attorney's fees and costs, and pre- and post-judgment interest on behalf of themselves and members of the putative class (as to all counts except the alleged breach of fiduciary duty pleaded in Count Five). ECF Nos. 56; 78 at 5.

## II.    DISCUSSION

There are multiple motions pending before the Court. ECF No. 293 (identifying the filings related to eight pending substantive motions). As relevant here, Plaintiffs have moved for class certification (ECF No. 102), which Defendants oppose (ECF No. 111). In their reply memorandum, Plaintiffs challenged Defendants' expert, Dr. Lasater, and relied on reports of two additional experts, Dr. Hayter and Mr. Garofolo. ECF No. 172. Plaintiffs subsequently moved to exclude Dr. Lasater, and Defendants moved to exclude Dr. Hayter and Mr. Garofolo. ECF Nos. 175, 220, 222.

### A.    Admissibility of Expert Evidence

Under the Federal Rules of Evidence, a witness may be qualified as an expert based on "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Such an expert may testify "in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.* The United States Court of Appeals for the Fourth Circuit has instructed that a trial court "should be conscious of two guiding, and sometimes competing, principles." *Westberry* v. *Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). On the one hand, "Rule 702 was intended to liberalize the introduction of relevant expert evidence," but on the other hand,

"expert witnesses have the potential to 'be both powerful and quite misleading.'" *Id.* (quoting *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993)).

As a precursor to admissibility, the trial judge must ensure that expert testimony or evidence is "not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The Court's gatekeeping function "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.'" *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 141 (1999). "In performing this gatekeeping role, a district court 'is not intended to serve as a replacement for the adversary system, and consequently, the rejection of expert testimony is the exception rather than the rule.'" *United States* v. *Smith*, 919 F.3d 825, 835 (4th Cir. 2019) (quoting *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prod. Liab. Litig. (No II)*, 892 F.3d 624, 631 (4th Cir. 2018)); *see also Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). When siting as the factfinder, "the Court has increased discretion in how to perform its gatekeeping role." *Acosta* v. *Vinoskey*, 310 F. Supp. 3d 662, 667 (W.D. Va. 2018).

"[A]n expert's testimony is relevant if it has 'a valid . . . connection to the pertinent inquiry.'" *Belville* v. *Ford Motor Co.*, 919 F.3d 224, 232 (4th Cir. 2019) (quoting *Daubert*, 509 U.S. at 592. In other words, the expert testimony or evidence must "'help' the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702 advisory committee's note to 2023 amendment; *see also Maryland Shall Issue, Inc.* v. *Hogan*, Civil Action No. ELH-16-3311, 2021 WL 3172273, at *3 (D. Md. July 27, 2021) ("Helpfulness to the trier of fact is 'the "touchstone"' under Rule 702.") (quoting *Kopf* v. *Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993)). The expert does not need to "appreciably help," which is "a higher standard than helpfulness" that "is unnecessarily strict." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

Any "[d]oubt regarding whether an expert's testimony will be useful should generally be resolved in favor of admissibility." *Mack* v. *AmerisourceBergen Drug Corp.*, 671 F. Supp. 2d 706, 709 (D. Md. 2009) (internal quotation marks and citation omitted).

"A reliable expert opinion must be based on scientific, technical, or other specialized *knowledge* and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby* v. *General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (emphasis in original); *see also Daubert*, 509 U.S. at 590 (observing that "the word 'knowledge' connotes more than subjective belief or unsupported speculation"). "To determine whether an opinion of an expert witness satisfies *Daubert* scrutiny, courts may not evaluate the expert witness' conclusion itself, but only the opinion's underlying methodology." *Bresler* v. *Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017). The United States Supreme Court has identified several factors that bear on the question of reliability. "Those factors include: (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community." *Cooper* v. *Smith & Nephew, Inc.,* 259 F.3d 194, 199 (4th Cir. 2001) (citing *Daubert*, 509 U.S. at 592-594). These factors are "neither definitive, nor exhaustive." *Id.* (citing *Kumho Tire Co.*, 526 U.S. at 150).

At a minimum, there must be a connection between the data, methodology, and conclusion. As the Supreme Court has cautioned, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."[4] *General Elec. Co.* v. *Joiner*, 522 U.S. 136, 146

---

[4] The Latin phrase "*ipse dixit*" means "[s]omething asserted but not proved." IPSE DIXIT, Black's Law Dictionary (12th ed. 2024).

(1997).  Nevertheless, "questions regarding the factual underpinnings of the [expert witness']

opinion affect the weight and credibility of the witness' assessment, not its admissibility."

*Bresler*, 855 F.3d at 195 (alteration in original) (internal quotation marks and citation omitted).

The Fourth Circuit recently held that a trial court committed reversible error when it "waded into

credibility determinations" that were "framed as a 'reliability' question."  *Sommerville* v. *Union*

*Carbide Corp.*, 149 F.4th 408, 426 (4th Cir. 2025).  In so holding, the Court "underscore[d] that

a district court may not exclude expert testimony based on (1) its *mere disagreement* with an

expert's choice of data or (2) its *own* assessment of the correctness of an expert's opinions."  *Id.*

at 427 n.7 (emphasis in original) (citing *Bresler*, 855 F.3d at 195).

Finally, the proponent of the expert must establish admissibility by preponderant

evidence.  *Cooper*, 259 F.3d at 199.  Proponents do not, however "have to demonstrate . . . by a

preponderance of the evidence that the assessments of their experts are correct, they only have to

demonstrate . . . that their opinions are reliable."  Fed. R. Evid. 702, advisory committee's note

to 2000 amendment (internal quotation marks and citation omitted).  "The evidentiary

requirement of reliability is lower than the merits standard of correctness."  *Id.*; *see also Reed* v.

*MedStar Health, Inc.*, Civil Action No. JKB-20-1984, 2023 WL 5154507, at *10 (D. Md. Aug.

10, 2023) (same).

**B.    David B. Lasater, Ph.D.**

Dr. Lasater is a "Senior Managing Director at FTI, a publicly[]held, global consulting

firm," who has provided "statistical and econometrics consulting to clients since 1979."  ECF

No. 111-2 ¶ 1; *see also id.* at 28.  He is a licensed certified public accountant who holds a

master's degree in professional accounting and a doctorate in accounting research

methodologies, capital markets, and quantitative methods.  *Id.* at ¶ 2.

Defendants engaged Dr. Lasater to assess "whether application and appeal outcome data support the overarching theory in the Amended Complaint" and to "evaluate the purported 'statistical' allegations made by Plaintiffs." *Id.* at ¶¶ 5–6. To this end, Dr. Lasater analyzed data from the V3 (the Plan's system of record for disability applications and appeals) that reflected Plan disability benefit applications from January 1, 2018, through July 31, 2024. *Id.* at ¶ 11. For each of the three categories of disability benefits, Dr. Lasater divided the list of Neutral Physicians into two groups: one with the greater number of clinical encounters with applicants and one with the lesser number. *Id.* at ¶ 21. Dr. Lasater then "test[ed], using chi-squared methodology, the Plaintiffs' assertion that that the Neutral Physicians with the greater number of application encounters would be associated with a greater rate of denials" and vice-versa.[5] *Id.* at ¶ 22; *see also id.* at 64–68. Dr. Lasater performed this same chi-squared analysis after dividing the Neutral Physicians and their clinical encounters into four groups or quartiles. *Id.* at ¶ 29; *see also id.* at 69–74. Based on his review of data and documents provided by defense counsel and the Amended Complaint, as well as his training, knowledge, and experience, Dr. Lasater concluded "that the data do not support Plaintiffs' allegation that there is any particular positive relationship between the frequency with which Neutral Physicians are assigned to evaluate applications and the rate at which those applications are denied."[6] *Id.* at ¶¶ 3, 7; *see also id.* at ¶ 10.

---

[5] According to Dr. Lasater, "[w]hen the data of research consists of frequencies in discrete categories, the $X^2$ [chi-squared] test may be used to determine the significance of differences between two independent groups." ECF No. 111-2 ¶ 22 n.15 (second alteration in original) (quoting Sidney Siegel, NONPARAMETRIC STATISTICS FOR THE BEHAVIORAL SCIENCES 104 (1956)).

[6] Dr. Lasater further opined "that the broader statistical assertions that Plaintiffs draw from the limited data sets that they identify in the Amended Complaint are not statistically valid and do not substantiate Plaintiffs' claims regarding the Neutral Physicians." ECF No. 111-2 ¶ 9; *see also id.* at ¶ 10. Plaintiffs do not appear to challenge this opinion in their motion to exclude. *See generally* ECF Nos. 172, 175.

Plaintiffs do not challenge Dr. Lasater's qualifications or the relevance of his opinion. ECF No. 172 at 33–37.  Instead, Plaintiffs question the reliability of Dr. Lasater's opinion regarding the relationship between the financial compensation of the Neutral Physicians and their medical conclusions.  *Id.* at 33.  Plaintiffs posit that a "central allegation in this case is that Defendants have financially incentivized physicians whom they represent as 'absolutely neutral' to render opinions adverse to applicants, negatively influencing the integrity of the claims and appeals process." *Id.*  According to Plaintiffs, Dr. Lasater's opinion is unreliable because "he considered neither the actual compensation of any Plan physician nor the actual individual medical conclusion rendered." *Id.* at 33–34.  During his deposition, Dr. Lasater acknowledged that in forming his opinions he did not consider individual physician reports; medical records; or any Form 5500s, which report service provider payments and expense reimbursements.  ECF Nos. 307-1 at 25:3–7, 26:7–14; *see also* ECF No. 316 ¶ 10.

Plaintiffs also rely on their expert, Dr. Hayter, to challenge several aspects of Dr. Lasater's analysis.  Dr. Hayter contends that the V3 is an inadequate data source because it does not directly contain information about the conclusions of the evaluating physicians, has inadequate data relating to applications and appeals involving multiple benefit requests, does not provide complete information about physicians' total compensation, contains errors, and provides data for an inadequate timeframe.  ECF No. 307 at 23–25, 33, 141.  Dr. Hayter posits that Dr. Lasater's chi-squared analysis is faulty because it omits physician decisions of "unable to determine," incorrectly assigns individual physician recommendations, excludes information about multiple disability benefit requests, and does not distinguish among physician specialties. *Id.* at 52, 54–90, 96, 98, 106, 113–116.  Dr. Hayter also asserts that Dr. Lasater failed to consider individual physician's denial rates and compensation, as well as different award levels.  *Id.* at 91, 147–149.  Finally, Dr. Hayter contests both Dr. Lasater's mixing of Neutral Physicians with

Medical Advisory Physicians because their decisions are "inherently different," as well as Dr. Lasater's failure to exclude certain line of duty disability applications, which Dr. Hayter described as "inherently different" from standard evaluations. *Id.* at 127, 143.

These arguments are an insufficient basis upon which to exclude Dr. Lasater as an expert. Plaintiffs' assertions as to why Dr. Lasater's analysis is faulty point to alleged gaps in the data he analyzed and various aspects of his analysis. None of these contentions, in isolation or in the aggregate, undermine the reliability of Dr. Lasater's opinions. As set forth in his declaration, Dr. Lasater analyzed Plan data regarding applications for disability benefits using established statistical methods of analysis. ECF No. 111-2 ¶¶ 11–13, 21–22, 29, 43, 49. His analyses are supported by appendices that set forth the documents and data he considered, as well as tables that outline his statistical analyses. *Id.* at 33–48 (Appendix 2 – Documents Considered), 49–63 (Appendix 3 – Data Development), 64–68 (Appendix 4 – Supporting Tables for Chi-squared Calculations, Median-split), 69–74 (Appendix 5 – Supporting Tables for Chi-squared Calculations, Quartile-split). Plaintiffs' challenges to the inputs and extent of Dr. Lasater's analyses bear on the weight of his opinion, not its admissibility. *Bresler*, 855 F.3d at 195 (holding that "questions regarding the factual underpinnings of the [expert witness'] opinion affect the weight and credibility of the witness' assessment, not its admissibility") (alteration in original) (internal quotation marks and citation omitted); *Burns* v. *Anderson*, 123 Fed. Appx. 543, 549 (4th Cir. 2004) (holding that arguments that an expert "failed to review certain documents" and drew upon "unreliable data" bore on "the proper weight to afford [the expert's] testimony, not its admissibility"); *Lewis* v. *Circle K Stores, Inc.*, No. 4:23-CV-01720-JD, 2025 WL 2200794, at *8 (D.S.C. Aug. 1, 2025) (finding that arguments that an expert "ignored certain facts" went to the weight and credibility of the expert's opinion and not its admissibility).

Here, Judge Rubin will evaluate Dr. Lasater's declarations and testimony and accord his opinions whatever weight she deems appropriate. *Brady* v. *Walmart Inc.*, Civil Action No. AAQ-21-1412, 2025 WL 1569966, at *6 n.6 (D. Md. June 3, 2025) ("Once testimony is admitted, the question of how much weight should be afforded to it remains."). It is not the role of the undersigned to engage in credibility assessments when evaluating the admissibility of expert evidence. *Sommerville*, 149 F.4th at 423-427. Plaintiffs' challenges to the adequacy of Dr. Lasater's analysis may be advanced via traditional advocacy tools, such as competing expert testimony, argument, and cross-examination. *Michael's Fabrics, LLC* v. *Donegal Mut. Ins. Co.*, Civil Action No. JRR-24-1585, 2025 WL 2624280, at *4 (D. Md. Sept. 11, 2025) (concluding that defendant's challenges to plaintiff's expert were "more properly addressed by" the traditional means challenging expert testimony, including "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof") (internal citations and quotations omitted); *Mincey* v. *Southeast Farm Equip., Co.*, No. 4:23-CV-01050-JD, 2025 WL 2450913, at *10 (D.S.C. Aug. 26, 2025) (holding that objections to the expert testimony were properly "addressed through cross-examination and rebuttal expert testimony"); *Viano* v. *THD At-Home Servs., Inc.*, No. 1:19-CV-1272, 2021 WL 10050807, at *2 (E.D. Va. Dec. 27, 2021) ("To the extent that plaintiffs challenge the accuracy of the facts [the expert] reviewed, that challenge is properly raised on cross examination.").

In sum, Defendants have established the admissibility of Dr. Lasater's opinion by preponderant evidence. Plaintiffs' motion to exclude will therefore be denied.

### C.    Anthony Hayter, Ph.D.

Dr. Hayter is a professor in the Department of Business Information and Analytics at the University of Denver. ECF No. 307 at 12. He holds a master's degree in mathematics and a doctorate in statistics and is the author of a textbook on probability and statistics. *Id.* at 12–13.

In his work as a statistician, Dr. Hayter has "routinely analyzed datasets in a variety of fields, such as medical, engineering, traffic safety, and product reliability, for example, that have been of a similar size and complexity as the V3 datasets." *Id.* at 13. In his initial report, Dr. Hayter offers both rebuttal opinions concerning Dr. Lasater's analyses and opinions, as well as affirmative opinions based on his analysis of Plaintiffs' dataset. ECF No. 307. Defendants do not challenge Dr. Hayter's qualifications but seek to exclude his rebuttal and affirmative opinions as unreliable. ECF No. 220 at 1. Defendants further contend that Dr. Hayter failed to disclose the facts or data he relied upon in forming his opinions, contrary to Federal Rule of Civil Procedure 26(a)(2)(B)(ii), thus warranting exclusion under Rule 37(c). *Id.*

      1.    <u>Section 1</u>

Section A of Dr. Hayter's report outlines his statement of opinions. In Section 1 of this portion of the report, Dr. Hayter assesses Dr. Lasater's chi-squared analyses. Although the title to this subsection is conclusory and unhelpful, in the body of the subsection Dr. Hayter outlines a series of challenges to Dr. Lasater's data inputs and analyses, which the undersigned summarized previously, *see* II.B., *supra.*[7] Defendants argue that the rebuttal opinions outlined in Section 1 are unreliable because Dr. Hayter did not attempt to recreate Dr. Lasater's analysis.[8] ECF No. 279 at 25. That is not entirely accurate. Dr. Hayter testified at his deposition that he "reconstructed [Dr. Lasater's] datasets," which allowed him to "underst[an]d what [Dr. Lasater had] done with those datasets." ECF No. 314 at 229:23–24, 230:4-5. Dr. Hayter also "r[a]n one

---

[7] Section 1 is entitled "Dr. Laster's chi-square analyses are uninformative and meaningless." ECF No. 307 at 19 (bold removed).

[8] Defendants also contend that Dr. Hayter's assessment of the utility of Dr. Lasater's analysis constitutes an impermissible personal opinion. ECF No. 279 at 25. The undersigned concurs that Dr. Hayter's conclusory descriptions of Dr. Lasater's chi-squared analyses are unhelpful. The substance of his rebuttal opinion, however, more meaningfully engages with Dr. Lasater's opinions and identifies various critiques that are both helpful and reliable.

chi-square [him]self" and calculated "the same sort of technical numbers in the output of the chi-square test" that Dr. Lasater had conducted.[9]  *Id.* at 230:8, 15–16.  Moreover, this objection misapprehends the role of a rebuttal expert, which, "by nature, criticizes the methodology and/or opinions of another."  *G. W. Aru, LLC* v. *W. R. Grace & Co.-Conn.*, Civil Action No. JKB-22-2636, 2025 WL 1068581, at *9 (D. Md. Apr. 9, 2025) (quoting *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020)).  As courts in this Circuit have recognized, a "rebuttal expert witness may criticize other experts' theories and calculations without offering alternatives."  *Funderburk* v. *South Carolina Elec. & Gas Co.*, 395 F. Supp. 3d 695, 717 (D.S.C. 2019) (internal quotation marks and citation omitted); *accord G. W. Aru, LLC*, 2025 WL 1068581, at *9; *Brightview Grp., LP* v. *Teeters*, Civil Action No. SAG-19-2774, 2021 WL 2627960, at *8 (D. Md. Feb. 8, 2021).

There is nothing inherently unreliable in the critiques of Dr. Lasater's analyses set out in Section 1 of Dr. Hayter's report.  Among other qualifications, Dr. Hayter holds advanced degrees in data analysis fields of study, teaches information and analytics, and has experience analyzing complex data sets.  Similar to a rebuttal expert challenged in *G. W. Aru, LLC*, Dr. Hayter's discussion of his rebuttal opinions "is lucid, plausible, and informed by his extensive experience in applying statistical [and analytical] methods."  2025 WL 1068581, at *9.  It is an appropriate form of rebuttal expert evidence for Dr. Hayter to "use[] his underlying statistical knowledge and experience to attempt to poke holes in [Dr. Lasater's] analysis by focusing on (what he maintains) are flawed assumptions . . . or discordant data."  *Id.*  Defendants' arguments regarding the probative value or correctness of Dr. Hayter's rebuttal opinions, which they may advance through traditional advocacy techniques, bear on weight, not admissibility.  Plaintiffs need

---

[9]  Dr. Hayter acknowledged, however, that he did not attempt to replicate Dr. Lasater's analysis in Section 2 because he did not find it useful.  ECF No. 314 at 237:25–238:8.

demonstrate only that it is more likely than not that Dr. Hayter's rebuttal opinions are reliable, not that they are indeed accurate. Fed. R. Evid. 702, advisory committee's note to 2000 amendment ("The evidentiary requirement of reliability is lower than the merits standard of correctness."). Ultimately, Judge Rubin will determine the weight, if any, to which Dr. Hayter's Section 1 rebuttal opinions are entitled. Defendants' motion to exclude will be denied as to Section 1 of Dr. Hayter's report.[10]

> 2.    Section 2

In Section 2, Dr. Hayter opines that the datasets Dr. Lasater constructed for total and permanent disability benefits are "consistent with and supportive of the Plaintiffs' claims." ECF No. 307 at 150. Dr. Hayter relies on a series of figures to support this opinion. To create these figures, Dr. Hayter used Dr. Lasater's reduced datasets of total and permanent disability applications and appeals to plot the recorded denial rate and number of evaluations for each category of physician (neurologists, neuropsychologists, orthopedists, and psychiatrists) and then shaded a portion of the figure red. *Id.* at 150, 152–159; *see also* ECF No. 314 at 238:9–239:8 (Dr. Hayter's deposition testimony describing the Section 2 figures). Dr. Hayter testified at his deposition that, he "made the blue points first, and then based on the blue points, [he] decided where [he] wanted to put the red shading." ECF No. 314 at 239:17–19. Dr. Hayter asserts that the "important point about each of the eight graphs shown in Figures 2.1-8 is that there are no

---

[10] In Sections 3 and 5 of his report, Dr. Hayter outlines rebuttal opinions of a similar character to those asserted in Section 1. In Section 3, Dr. Hayter addresses the overall rates of approval and denial for disability applications and appeals. ECF No. 307 at 162–163. Specifically, Dr. Hayter identifies what he believes to be data input limitations in Tables 3 and 4 of Dr. Lasater's declaration and other perceived shortcomings. ECF No. 111-2. In Section 5, Dr. Hayter advances similar perceived shortcomings with respect to Dr. Lasater's analyses of the reduced dataset of single benefit total and permanent disability applications. ECF No. 307 at 191–195. Defendants do not raise any particularized argument challenging Dr. Hayter's observations and opinions in Sections 3 and 5 of his report. ECF Nos. 279 at 7, 24–29; 313 at 15–16. To the extent Defendants' motion to exclude encompasses Sections 3 and 5, it is denied for the reasons stated previously with respect to Section 1.

physicians in the lower right areas that are shaded red." ECF No. 307 at 151. According to Dr. Hayter, the lack of physicians in the areas he shaded red implies "there is a relationship between physicians' recorded denial rates and their workloads as measured by the number of evaluations, which results in there being no physicians having a low denial rate and a high workload." *Id.*

For illustration, a sample of the Section 2 figures (the four figures that address total and permanent (T&P) disability applications) are replicated below.



Figure 1:
"Figure 2.1: Dr. Lasater's reduced dataset of
T&P applications for neurologists"
(ECF No. 307 at 152)



Figure 2:
"Figure 2.2: Dr. Lasater's reduced dataset of
T&P applications for neuro-psychologists"
(ECF No. 307 at 153)



Figure 3:
"Figure 2.3: Dr. Lasater's reduced dataset of
T&P applications for orthopedists"
(ECF No. 307 at 154)



Figure 4:
"Figure 2.4: Dr. Lasater's reduced dataset of
T&P applications for psychiatrists"
(ECF No. 307 at 155)

15

Defendants argue that the Section 2 figures are unreliable because Dr. Hayter's "methodology consists of no more than coloring in areas of a graph he thinks are supportive of Plaintiffs' claims, after he has already prepared a scatterplot." ECF No. 313 at 13. Defendants further assert that these figures represent a "results-first approach" that will "mislead the trier of fact by providing a visual representation that suggests a statistical relationship that does not exist." *Id.* at 14. At bottom, Defendants contend that Dr. Hayter's rebuttal opinion "has no basis in statistics and is not the proper subject of expert testimony." ECF No. 279 at 7. With respect to Dr. Hayter's Section 2 rebuttal opinion, the undersigned concurs.

Dr. Hayter's deposition testimony reveals that the opinion outlined in Section 2 of his report is unreliable and thus unhelpful to the factfinder. During his deposition, Dr. Hayter acknowledged that he constructed the Section 2 figures to illustrate a particular point. ECF No. 310 at 82:17–22 ("[W]hat was important to me was the relationship shown with the blue dots which I illustrated with that shaded red area which is empty which says, 'no physicians here,' because that's consistent with and supportive of the plaintiffs' claims."); *see also id.* at 87:3-5 ("[I]t was plaintiffs' claims which enabled me to realize that it was the empty red shaded areas that were important."). Dr. Hayter was asked what statistical methodology he had applied to reach his conclusion that there is a relationship between physicians' recorded denial rates and their workloads. ECF No. 314 at 239:23–25, 240:9–10. Dr. Hayter responded:

> My statistical process was I did my statistical analysis of Dr. Lasater's dataset which gave me the blue points, and then I used my expertise as a statistician to say, hey, look, there's a big empty area in the bottom right, why don't I shade that red so that everyone can clearly see my point.

*Id.* at 240:16–22. This explanation illuminates why Dr. Hayter shaded certain areas of the figures red. It does not, however, reveal the methodology undergirding his analysis. Dr. Hayter's "expertise as a statistician" is not a methodology. *Reed* v. *MedStar Health, Inc.*, Civil

Action No. JKB-20-1984, 2023 WL 5154507, at \*12 (D. Md. Aug. 10, 2023). "Methodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion." *Id.* (quotation marks and citation omitted). As Figures 1 through 4 demonstrate, the red areas are not uniform across the figures and there appears to be no methodological or systematic approach to the application of the red shading other than Dr. Hayter's desire to illustrate a preconceived point.

Dr. Hayter's results-driven approach is further reflected in his decision-making on how to divide the four types of physicians. Dr. Hayter's report reflects that to construct the Section 2 application figures, he divided the physician type into one group "whose individual recorded denial rates were 40% or less" and a second group "whose individual recorded denial rates were greater than 40%." ECF No. 307 at 152–155. When asked at his deposition why he had selected a 40 percent threshold, Dr. Hayter testified, "I just looked at the data and decided what would be a good cutoff point to make the point that I wanted to make." ECF No. 314 at 241:21–23. In contrast, for the Section 2 appeals figures (ECF No. 307 at 156–159), Dr. Hayter used a different threshold. Dr. Hayter explained, "For appeals, I looked at it and said the best way to make my point would be to use a cutoff of 50 percent, which is why I used 40 percent for applications and 50 percent for appeals." ECF No. 314 at 241:25–242:4. Dr. Hayter acknowledged that he selected the threshold percentage based on how supportive it was of his opinion. *Id.* at 242:5–9 (Q. So you picked the cutoff based on which cutoff you thought would better support the point you were trying to make, right? . . . [A.] That is correct."). Dr. Hayter explained that "the point I'm making here is that the physicians with the larger recorded denial rates had more evaluations." *Id.* at 243:8–10. Dr. Hayter further acknowledged that if he had selected a different cutoff percentage, the results would have been different. ECF No. 310 at 83:25–84:17.

This type of outcome-oriented expert opinion is inconsistent with the purposes of expert evidence. As a sister court in this Circuit has explained:

> [T]he pertinent rules of evidence, the underlying philosophy behind allowing experts to testify, as well as the interests of justice, mandate that a testifying expert give [their] own opinion, arrived at by a reliable mode of analysis and that the opinion is not driven by a desire to reach a particular outcome, but by the principled application of 'reliable principles and methods' to 'sufficient facts or data.'

*Trigon Ins. Co.* v. *United States*, 204 F.R.D. 277, 290 (E.D. Va. 2001) (quoting Fed. R. Evid. 702). "Result-driven analysis . . . undermines principles of the scientific method and is a quintessential example of applying methodologies (valid or otherwise) in an unreliable fashion." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig. (No II) MDL 2502*, 892 F.3d at 634; *In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18-MD-2836, 2022 WL 3344191, at *17 (E.D. Va. Aug. 3, 2022) ("A methodology is unreliable when it 'seem[s] artificially induced to produce a desired result.'") (alteration in original) (quoting *Belville*, 919 F.3d at 234). The Fourth Circuit has explained that "just as omitting data might distort the result by overlooking unfavorable data, cherry-picking data produces a misleadingly favorable result by looking only to 'good' outcomes." *Equal Emp't Opportunity Commn'n* v. *Freeman*, 778 F.3d 463, 470 (4th Cir. 2015) (Agee, J., concurring).

Here, Dr. Hayter candidly acknowledges that his analysis was driven by his desire to illustrate a particular point and that he did so because it was supportive of Plaintiffs' claims. His testimony is quite similar to that of another expert whose testimony was excluded due to his results-driven analysis. *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 145 F. Supp. 3d 573, 586 (D.S.C. 2015), *order amended on reconsideration sub nom.*, No. MDL No. 2:14-MN-02502-RMG, 2016 WL 827067 (D.S.C. Feb. 29, 2016) ("When asked why he did not include this analysis in his report, he responded, 'I didn't believe the data . . .

supported that being the basis of the kinds of opinions I wanted to put in my summary, and so I did not include it.'").  As the court in *Trigon* explained, "it is specifically not an expert's position to advocate for a party, lest the witness ceases to be an expert whose testimony is valuable because he or she is not an advocate and becomes, instead, just another legal practitioner for the client." 204 F.R.D. at 290.  Results-driven opinions such as those Dr. Hayter offers in Section 2 are therefore properly excluded.  *Pierce* v. *North Carolina State Bd. of Elections*, No. 4:23-CV-193-D, 2025 WL 2841008, at \*29 (E.D.N.C. Sept. 30, 2025).

In addition to laboring under this deficiency, it is evident that Dr. Hayter's Section 2 opinion is not supported by an accepted and reliable methodology.[11]  When questioned about his methodology, Dr. Hayter offered only his unsupported say-so.  ECF No. 314 at 225:2–3 ("I'm using my expertise to say, hey, look at those empty red areas.  That's important.").  An expert's *ipse dixit* such as this—a  bald assertion that something is important simply because the expert believes it is—"is the hallmark of an unreliable opinion."  *Sardis* v. *Overhead Door Corp.*, 10 F.4th 268, 296 (4th Cir. 2021); *see also* II.D., *infra*.  The Fourth Circuit has cautioned that "[t]here must be some objective basis to satisfy the district court that the conclusion reached was the product of reliable principles and methods."  *Sardis*, 10 F.4th at 292.  An expert opinion is reliable when it rests "not on belief or speculation," but rather "scientific, technical, or other specialized *knowledge*."  *Oglesby*, 190 F.3d at 250 (emphasis in original).  Dr. Hayter has not identified how he drew upon and applied his experience or any such knowledge.  Nor has he otherwise explained how his methodology is testable, reviewable, generally accepted in the

---

[11]  In his rebuttal declaration, Dr. Lasater challenges the reliability of Dr. Hayter's Section 2 opinion and calls into question Dr. Hayter's methodology and application of generally accepted statistical practices.  ECF No. 316 ¶¶ 137–146.  To avoid engaging in a credibility assessment of competing experts, which is inappropriate at this stage, *Sommerville* v. *Union Carbide Corp.*, 149 F.4th 408, 426 (4th Cir. 2025), the undersigned elected not to address Dr. Lasater's rebuttal opinions when deciding the admissibility of Dr. Hayter's Section 2 opinion.

relevant professional community, or demonstrably reliable under any other factor outlined in controlling case law. *Sardis*, 10 F.4th at 295 (finding it was an abuse of discretion to admit expert testimony that had "[n]one of the *Daubert* hallmarks of reliability—testing, peer review, literature, rate of error, or general acceptance").

Ultimately, Dr. Hayter's Section 2 opinion is supported only by his *ipse dixit* opinion about the importance of an analysis, which—as he acknowledged—he configured to achieve a desired result. "Rule 702(d) requires that 'the expert's opinion reflect[ ] a reliable application of the principles and methods to the facts of the case.'" *Trauernicht* v. *Genworth Fin., Inc.*, No. 3:22-CV-532, 2024 WL 3996019, at *8 (E.D. Va. Aug. 29, 2024) (quoting Fed. R. Civ. P. 702(d)). The undersigned cannot conclude that Dr. Hayter has done so here with regard to his Section 2 opinion. The Court's gatekeeping function is more relaxed when the Court sits as factfinder. *United States* v. *Wood*, 741 F.3d 417, 425 (4th Cir. 2013) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for [it]self.") (quoting *United States* v. *Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005)). "Nonetheless, even in a bench trial case, it is necessary that expert testimony meet the fundamental admissibility requirements of Rule 702 and the decisions in *Daubert* and *Kumho*." *Trauernicht*, 2024 WL 3996019, at *3. Section 2 of Dr. Hayter's report does not meet these requirements and is therefore inadmissible.

3.    Section 4

In Section 4, Dr. Hayter offers opinions regarding (1) the statistical arguments included in Plaintiff's Amended Complaint and (2) Plaintiffs' supplementary information regarding physician recommendations in Exhibit A and physician compensation in Exhibit B. ECF No. 307 at 164–190. Each of these subsections and Defendants' corresponding arguments in favor of exclusion are addressed in turn below.

a.    *Amended Complaint*

Dr. Hayter first opines that "there is nothing improper from a statistical perspective" with respect to the statistical allegations contained in Plaintiffs' Amended Complaint. *Id.* at 165. Dr. Hayter notes that the dataset used was "substantial," both in terms of the time period and the number of applications and appeals, physicians, players, and player evaluations. *Id.* Dr. Hayter asserts that Plaintiffs' statistical process is "consistent with standard statistical practice" and "common in many types of data collection." *Id.* at 166. To rebut Dr. Lasater's critique that the Amended Complaint provides inadequate information to evaluate the statistical allegations contained therein, including data sources and methods of data collection and processing, Dr. Hayter asserts that Plaintiffs applied "straightforward statistical analyses of the data that was available." *Id.* at 167. Dr. Hayter further disputes Dr. Lasater's opinions regarding Plaintiffs' data sample and use of scatterplots. *Id.* at 168–169.

Defendants advance several arguments in favor of exclusion, which essentially boil down to a critique that Dr. Hayter lacks familiarity with the data that forms the basis of the statistical allegations in the Amended Complaint and that his assessment is not founded on an accepted methodology. ECF No. 279 at 29–30. Defendants have made a compelling case that Dr. Hayter lacks familiarity with the data in the Amended Complaint. At his deposition, Dr. Hayter testified that he did not prepare the statistical sample described in paragraph 116 of the Amended Complaint (ECF No. 314 at 101:20–21, 24), did not review the sample (*id.* at 110:8–10, 111:7–10), did not know anything the accuracy of the data associated with the sample (*id.* at 114:8–20), did not conduct any analysis to determine whether the sample was representative of the broader population (*id.* at 114:21–24, 115:1–3), and did not know if anyone else conducted any analysis of the sample (*id.* at 116:3–7). While this testimony establishes limitations on Dr. Hayter's knowledge of the statistical sample, it does not present a barrier to the admissibility of his

opinions.  Defendants' argument regarding Dr. Hayter's familiarity with the Amended

Complaint's statistical allegations bear only on the weight of his opinion.  "One knowledgeable

about a particular subject need not be precisely informed about all details of the issues raised in

order to offer an opinion." *Thomas J. Kline, Inc.* v. *Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir.

1989).  Instead, "questions relating to the bases and sources of an expert's opinion affect the

weight to be assigned [to] that opinion rather than its admissibility." *Bresler* v. *Wilmington Tr.*

*Co.*, Civil Action Nos. PJM 09-2957, PJM 12-3295, 2015 WL 1396265, at *3 (D. Md. Mar. 24,

2015) (alteration in original); *see also Jordan* v. *Town of Fairmount Heights*, Civil Action No.

AAQ-22-2680, 2024 WL 732011, at *5 (D. Md. Feb. 21, 2024) (observing that while the

expert's "opinions would certainly hold more weight had they considered these materials, the

Court is not convinced that [the expert's] testimony should be struck for this reason").

     When asked at his deposition about the basis for his characterization of the dataset as

"substantial," Dr. Hayter testified that it was "an English language word based upon my

statistical expertise and experience looking at datasets and the number of entries in a dataset."

ECF No. 314 at 147:10–13; *see also id.* at 147:17–19 ("It's just a feeling I had about these

numbers based upon all of the datasets I've looked at throughout my career.").  Defendants also

make much of Dr. Hayter's use of the word "feeling," but regardless of any imprecision in his

word-choice as to the source of his opinion it is evident that Dr. Hayter's description of the

dataset as "substantial" was based on his experience working with various data.  Defendants'

contention that Dr. Hayter's characterization of the dataset is subjective is "fertile ground for

cross-examination, not exclusion." *Lins* v. *United States*, Civil Action No. ELH-17-2163, 2024

WL 1604494, at *28 (D. Md. Apr. 12, 2024).  Defendants may challenge Dr. Hayter's opinions

regarding the veracity of the Amended Complaint's statistical allegations through traditional

advocacy tools and Judge Rubin will assign those opinions whatever weight, if any, she deems appropriate.

b.    *Exhibit A and Exhibit B*

In the second portion of Section 4, Dr. Hayter offers opinions based on his analysis of Plaintiffs' datasets of physician recommendations (Exhibit A) and compensation (Exhibit B). ECF No. 307 at 172–190.  Dr. Hayter compared the data in Exhibits A and B and created a series of tables (or charts) and graphs (or scatterplots).  For each physician type, he selected the six physicians with the highest total compensation listed in Exhibit B and outlined in tables counts of their individual recommendations based on the information in Exhibit A.  *Id*. at 174–175. After comparing these tables to others in his report, Dr. Hayter then drew a series of conclusions regarding the correlation between physician total compensation, workload, and denial rates.  *Id.* at 175–176.  Dr. Hayter created another series of tables in which he outlined individual physician denial rates and compensation based on the data in Exhibits A and B.  *Id.* at 181.  Dr. Hayter also created graphs to show the relationship physician compensation and individual denial rates.  *Id.* at 182.  Similar to the figures in Section 2 of his report, Dr. Hayter shaded the lower right areas of these figures red.  *Id.*  Dr. Hayter opined that the results of his analysis of Exhibits A and B were "consistent with and supportive of Plaintiffs' claims."  *Id*. at 176, 182.  He further asserted that, "[i]n other words, if the Plaintiffs' claims are correct, then this is the kind of data that would be expected."  *Id.* at 176.

Defendants argue that Dr. Hayter's opinions are unreliable for multiple reasons.  They contend that Exhibits A and B themselves are incomplete and unreliable (ECF No. 313 at 6–7, 11), that Dr. Hayter did not ascertain how Exhibits A and B were compiled or verify that they were accurate or a representative sample (*id.* 7–9), and that Dr. Hayter's analyses of Exhibits A and B are results-driven and not statistically valid (*id.* at 12–14).  Because Defendants' first two

23

arguments dovetail, they are addressed together.  First, however, it is necessary to understand what Exhibits A and B purport to be.

In his report, Dr. Hayter describes Exhibit A as "a spreadsheet that is an amalgamation of the V3 datasets of applications and appeals" that "has been supplemented with all of the information regarding individual physician recommendations . . . available to Plaintiffs from individual physician reports or decision letters, within the time period of the V3 data."  ECF No. 307 at 28.  Dr. Hayter acknowledged that "Exhibit A only provides supplementary information on individual physician evaluations for 453 [or] 7.2% of the applications in the V3 datasets, and 235 [or] 13.6% of the appeals in the V3 datasets."[12]  *Id.* at 29; *see also* ECF No. 314 at 220:17–22.  Dr. Hayter could not provide any significant additional details regarding Exhibit A during his deposition.  He testified that he did not know how the Exhibit A was prepared, other than the fact that it was prepared "primarily, if not completely," by the law firm Athlaw (ECF No. 314 at 172:20–22) (one of the firms representing Plaintiffs in this case) and was provided to him by Plaintiffs' counsel (*id*. at 170:21–22).  Dr. Hayter describes Exhibit B in his report as "a spreadsheet that contains information . . . available to the Plaintiffs regarding the individual physician compensation from all sources" from April 1, 2009, to March 31, 2024.[13]  ECF No. 307 at 31.  Dr. Hayter testified that he did not prepare Exhibit B, which was provided to him Plaintiffs' counsel.  ECF No. 314 at 190:11–14, 191:10–12.  Dr. Hayter's "general

---

[12]  In his rebuttal declaration, Dr. Lasater characterized the 453 applications and 235 appeals in Exhibit A as "a non-random collection of records assembled and curated by Plaintiffs' counsel from which no reliable statistical conclusions can be extrapolated to the wider population of former players' applications and appeals."  ECF No. 316 ¶ 87.

[13]  Dr. Lasater attested in his rebuttal declaration that "[p]ayment amounts in Exhibit B are derived from the publicly available IRS forms, Form 5500s.  The payment amounts reported in Form 5500s include all direct and indirect compensation to a service provide $5,000 or more in aggregate.  This includes payment[ ] types that are not compensation for Player evaluations."  ECF No. 316 ¶ 112.

understanding" is that the compensation data in Exhibit B was drawn from Forms 5500. *Id.* at 195:19–196:1. Exhibit B contains nine more years of data than Exhibit A. *Id*. at 192:16–25.

The undersigned is left without a clear picture of what Exhibit A and B contain (or do not contain) because of the dearth of information regarding how these datasets were compiled. Dr. Hayter compellingly testified that he has essentially no knowledge as to how the Exhibit A was constructed.

> [Q.] How was Exhibit A prepared? . . .
> [A.] I don't really know who prepared it. It was provided to me by the attorney's I'm working with, based on my request.
>
> * * *
>
> [Q.] Dr. Hayter, do you know how the information in Exhibit A was collected?
> A. . . . I think the supplementary information in Exhibit A . . . was available to the plaintiffs from the various documents they had available to them.
> Q. Do you know where they collected it from?
> A. . . . I think it's just the documents they plaintiffs had from doing their work regarding this case. That's all I know.

ECF No. 314 at 170:17–21, 172:4–17. When questioned repeatedly about how Exhibit A was assembled, Dr. Hayter testified only to generalities, ultimately stating that Exhibit A is "all the information available to the plaintiffs relative to the V3 datasets and on the missing individual physician evaluations." *Id.* at 171:23–25. This paltry description sheds no light on what Exhibit A contains or how its contents were selected.

What is clear is that Exhibit A contains only 7.2 percent of the disability applications and only 13.6 percent of the disability appeals in the V3 datasets. Dr. Hayter testified that it was "impossible" for him to know whether or not the applications and appeals in Exhibit A were representative of the larger group of applications and appeals in the V3 dataset. *Id.* at 181:24–182:21. The size of the sample and inability to determine if it is representative counsel in favor of exclusion. *Tyree* v. *Boston Sci. Corp.*, 54 F. Supp. 3d 501, 535 (S.D.W. Va. 2014), *as*

*amended* (Oct. 29, 2014) (noting that "the fact that [the experts'] sample was not very large or randomly selected affects the reliability of their testing"); *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2:12-CV-4301, 2014 WL 186872, at *8 (S.D.W. Va. Jan. 15, 2014) (excluding expert evidence as unreliable due to the lack of about sample selection and any efforts to control for error or bias).

With respect to Exhibit B, Dr. Hayter testified only about a "general understanding" that the dataset was constructed from information contained in the Forms 5500. When pressed for additional details, Dr. Hayter provided none.

> Q. . . . [I]s there any source for compensation data in your Exhibit B other than these Form 5500s that you've described? . . .
> [A.] It's my understanding the entirety is Form 5500s, but I may be incorrect.
> Q. How would I find out one way or the other? What would I need to do?
> A. I think you'd have to ask the person who put together Exhibit B.
> Q. And who is that?
> ATTORNEY [ ]: I'm going to give you the same instruction I gave before, Doctor.
> THE WITNESS: Is that an instruction not to answer?
> ATTORNEY [ ]: Yes.
> THE WITNESS: Then I will not answer.

*Id.* at 198:5-24. This testimony highlights an inherent tension in Plaintiffs' approach to Exhibits A and B. They want to shield details about how these datasets were created, thus inhibiting Defendants' ability to challenge their accuracy and reliability, while simultaneously leveraging them to establish Defendants' liability. This raises both fairness and reliability concerns.

Ordinarily, questions about the factual underpinnings of an expert's opinion affect the weight and credibility, not admissibility. *Bresler*, 855 F.3d at 195. Here, in contrast, Defendants and the Court—and perhaps even Dr. Hayter—are left to wonder precisely what those factual underpinning are. *NuVasive, Inc.* v. *Kormanis*, No. 18CV282, 2019 WL 9633645, at *2 (M.D.N.C. Mar. 18, 2019) ("The Court, the jury, and Mr. Kormanis should not have to guess that

the information provided by counsel was not a summary, was appropriately queried and selected, and otherwise is from data NuVasive uses in the ordinary course of its business.").  When faced with a similar predicament, another court in this Circuit explained: "The court does not mean to suggest that plaintiff's counsel necessarily gave the expert inaccurate numbers.  But[ ] the court does not know.  Plaintiff's counsel is not a witness.  Defense counsel cannot examine him.  One is left to speculate about the data underlying the expert's conclusions."  *Martin* v. *Bimbo Foods Bakeries Distrib., Inc.*, No. 5:14-CV-17-BR, 2016 WL 4621075, at *2 (E.D.N.C. Sept. 6, 2016).  The same holds true here.

The lack of information about the factual underpinnings of Exhibits A and B also impedes replicability.  "The Fourth Circuit, along with many other circuits, has acknowledged that replicability is a strong indicator of reliability and that the inability to replicate an expert's methods may indicate that the expert's methods are not reliable."  *In re Blackbaud, Inc., Customer Data Breach Litig.*, No. 3:20-MN-02972-JFA, 2024 WL 2155221, at *12 (D.S.C. May 14, 2024).  In *In re Blackbaud, Inc., Customer Data Breach Litig.*, the court excluded expert evidence because, among other things, the plaintiff's expert "failed to provide clear instructions to allow the Defendant's expert . . . to recreate [a database plaintiffs' expert had constructed] for testing purposes."  *Id*.  That is precisely what occurred here.  Dr. Lasater attested in his rebuttal declaration that "[g]iven the absence of citations for payment amounts and the lack of clarity of how doctor-to-entity associations were determined, it was difficult, if not impossible, to replicate and verify the accuracy of the information in Exhibit B."[14]  ECF No. 316 § 132.  The inability to replicate or verify the accuracy of the datasets that underlie Dr. Hayter's analyses and opinions cuts against admissibility.

---

[14]  Dr. Lasater raises other challenges the reliability of Dr. Hayter's analysis of Exhibits A and B and resulting opinions, which the undersigned elects not to address for the reasons stated previously.  *See*, footnote 11, *supra*; *Sommerville*, 149 F.4th at 426.

The uncertainty as to the reliability of Exhibits A and B is further heightened by Dr. Hayter's failure to conduct any due diligence to ensure the accuracy of these datasets. Dr. Hayter did not himself check that the information in Exhibit A was accurate. ECF No. 314 at 257:16–18. Dr. Hayter testified that he understood that Exhibit A was "checked very carefully," but did not know by whom or what was done to check its accuracy. *Id.* at 173:19–25. Dr. Hayter likewise did not check to see if Exhibit B was compiled properly (*id.* 195:16–18) and did not know if it was compiled accurately (*id.* at 203:24–204:1). The only information Dr. Hayter could provide concerning accuracy suggests that the data are not, in fact, reliable. For example, Dr. Hayter testified that the 7.2 percent of disability applications represents 453 of the 6,315 disability applications in the V3 dataset, but "it's not clear whether in any of those 453 the information is complete." *Id.* at 180:16–22. Dr. Hayter's failure to vet the accuracy of Exhibits A and B is difficult to comprehend in light of this testimony. Moreover, it is troubling that Dr. Hayter did not engage in any evaluation of the accuracy and objectivity of the data given that Exhibit A was prepared by Plaintiffs' counsel. As another court in this Circuit has observed, "There are no assurances that [the expert]—or plaintiffs' counsel—did not opportunistically choose samples while ignoring others that might have weakened or disproved his theories." *In re Ethicon, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, 2014 WL 186872, at *8.

Dr. Hayter's lack of diligence tracks that of the expert in *NuVasive, Inc.*, 2019 WL 9633645, at *2, who analyzed sales data that had been provided by counsel. The court took issue with the fact that the expert did "not know who created the spreadsheet," "did not talk to anyone at NuVasive about the query used to obtain the data," did "not know the 'author' of the spreadsheet," "made no effort to independently verify that the information was from NuVasive or to identify who at NuVasive produced it," and did "not know where it came from outside of counsel's representation that it came from NuVasive." *Id.* at *1. The court explained that

28

"[w]hile an expert need not act as a 'private investigator' to track down the accuracy of each piece of data on which [the expert] relies, an expert must have some basis for believing the data . . . is what it purports to be." *Id.* at *2. The court therefore found that on the existing record, the reliability of the expert's opinion had not been established. *Id.* Similarly, in *Martin*, 2016 WL 4621075, at *2, the court excluded expert evidence as unreliable because the expert did not independently verify the data provided by counsel. *Martin* is arguably more analogous to this case because there "plaintiff's counsel did not merely pass along the settlement statements from defendant to [the expert]. Rather, plaintiff's counsel apparently extrapolated data from the statements and *then* gave the figures he deemed appropriate to [the expert]. *Id.* (emphasis in original). The fact that counsel had extrapolated and selected the data the expert analyzed necessitated independent verification because the expert could not testify to the accuracy of the data that formed the basis for the expert's analysis. *Id.*

As in those two cases, here, Dr. Hayter undertook no effort to independently verify the data in Exhibits A and B or otherwise determine that the datasets were what they purported to be. As case law makes clear, there was an even greater need to do so here because the datasets were constructed by Plaintiffs' counsel. Plaintiffs' argument that an expert is not required to personally assemble data or other source materials that form the basis of their analysis is beside the point. ECF No. 309 at 10 (citing *Pulse Med. Instruments, Inc.* v. *Drug Impairment Detection Servs., LLC*, 858 F. Supp. 2d 505, 511-512 (D. Md. 2012)). The issue is not that Dr. Hayter obtained Exhibits A and B from Plaintiffs' counsel. But rather, the issue is that there is insufficient information available about those datasets to ensure their reliability. Dr. Hayter does not know how they were created or what they contain (other than a top-line subject such as "compensation data") and he undertook no effort to verify their accuracy or objectivity. There is insufficient information available to allow for replication by an opposing expert, to account for

any error or bias, or to meaningful challenge via the traditional advocacy tools typically used to test the factual bases for expert evidence. Dr. Hayter's analysis of and opinions regarding Exhibits A and B are therefore excluded as unreliable. For the sake of completeness, the undersigned further notes that the graphs (or scatterplots) contained in Section 4.2 of Dr. Hayter's report suffer from the same deficiencies outlined previously with respect to Section 2, *see* II.C.2.[15]

### D.    Joseph A. Garofolo, Esq.

Mr. Garofolo is an attorney with experience in employee benefits, ERISA, and health, welfare, and retirement plans. ECF No. 307-2 at 2–3. As part of his law practice, Mr. Garofolo has advised clients "regarding fiduciary compliance, service provider arrangements, and various other issues relating to the design, management, and administration of employee benefit plans." *Id.* at 2. Mr. Garofolo is currently a partner with Garofolo & Ramsdale, LLP. *Id.* at 3. His "law practice focuses on transactional and litigation matters relating to employee benefit plans governed by ERISA." *Id.* In addition to practicing law, from 2003 to 2010 Mr. Garofolo "served as a principal with ERISA Consulting Group, a company that provided independent fiduciary, expert witness, and consulting services." *Id.* at 2. Mr. Garofolo is currently a principal of ERISA Expert Services, LLC, an entity he founded to "provide expert witness and

---

[15] It is unnecessary to address Defendants' argument that Dr. Hayter failed to disclose the facts or data he relied upon in forming his opinions, contrary to Federal Rule of Civil Procedure 26(a)(2)(B)(ii), thus warranting exclusion under to Rule 37(c). ECF No. 220 at 1. Defendants' disclosure argument is more pertinent to Dr. Hayter's affirmative opinions, the majority of which are excluded as unreliable. Indeed, the disclosure argument overlaps substantially with Defendants' arguments concerning reliability. *E.g.*, ECF No. 279 at 32 ("Dr. Hayter's decision to withhold key information about the facts or data in his report renders his opinions unreliable—and therefore excludable—under Rule 702."). For the reasons set forth previously, Dr. Hayter's affirmative opinions in Section 2 and 4.2 of his report will be excluded. His rebuttal opinions in Sections 1, 3, and 5 and affirmative opinion in Section 4.1 are admissible. The facts and information upon which Dr. Hayter relied in formulating those opinions are readily apparent and any failure to timely disclose is harmless.

independent fiduciary services relating to employee benefit plans." *Id.* at 3.  Mr. Garofolo has

served as an independent fiduciary for multiemployer health and welfare plans.  *Id.*

In connection with his engagement in this case, Mr. Garofolo prepared a report, the

substantive portion of which addresses four topics.  First, in Section III.A. of his report, Mr.

Garofolo provides an overview of the Plan based on his review and summary of Plan

Documents.  *Id.* at 4–10; ECF No. 314-1 at 190:9–19.  Second, in Section III.B., he describes the

Plan's claims practices based on his review of Plan documents, deposition testimony, Dr.

Hayter's report, and other materials.  ECF No. 307-2 at 10–16.  Third, in Section V.A., Mr.

Garofolo summarizes his understanding of legal obligations under ERISA, including fiduciary

duties, participant disclosures, and claims procedure, citing the governing statute, implementing

regulations, and other guidance.  *Id.* at 16–20; ECF No. 314-1 at 191:20–192:2.  Finally, in

Sections V.B and V.C., Mr. Garofolo offers opinions regarding the Plan's use of Neutral

Physicians and other practices that outline what he would have done if he had been a Plan

fiduciary.  ECF No. 307-2 at 20–23.  Defendants seek to exclude Mr. Garofolo's opinions on

both relevance and reliability grounds.  ECF No. 280 at 7.

As set forth previously, *see* II.A., *supra*, expert evidence is relevant if it is helpful to the

factfinder.  A summary of an expert's interpretation of the law, like that set forth in Section V.A.

of Mr. Garofolo's report, is not helpful to the Court and therefore not relevant.  The Fourth

Circuit has made it clear that "opinion testimony that states a legal standard or draws a legal

conclusion by applying law to the facts is generally inadmissible."  *United States* v. *McIver*, 470

F.3d 550, 562 (4th Cir. 2006); *see also Sun Yung Lee* v. *Clarendon*, 453 Fed. Appx. 270, 278

(4th Cir. 2011) (affirming exclusion of an expert report because "pure questions of law . . . are

inappropriate subjects for expert testimony"); *Adalman* v. *Baker, Watts & Co.*, 807 F.2d 359, 366

(4th Cir. 1986), *abrogated on other grounds by Pinter* v. *Dahl*, 486 U.S. 622 (observing that "it

is the responsibility—and the duty—of the court to state . . . the meaning and applicability of the appropriate law"). Accordingly, both Judge Rubin and the undersigned have excluded expert evidence in the form of proffered legal interpretation because "an opinion on the law . . . goes beyond the proper boundaries or province of an expert witness." *United States* v. *Tendler*, Civil Action No. JRR-24-422, 2025 WL 918132, at *8 (D. Md. Mar. 26, 2025); *see also United States* v. *Neuberger*, Civil Action No. EA-22-2977, 2024 WL 3964886, at *10 (D. Md. Aug. 27, 2024) (same). It is improper for Mr. Garofolo to opine on legal principles related to the issues and claims presented in this case.

Mr. Garofolo's overview of the Plan in Section III.A. of his report is similarly unhelpful. This section of his report offers nothing more than a summary of Plan documents, something that the factfinder can independently glean from the relevant materials. "Rule 702 does not grant an expert an unlimited license to testify in a manner that simply summarizes otherwise admissible evidence without some connection to the expert's proffered expertise." *SAS Inst., Inc*. v. *World Programming Ltd.*, 125 F. Supp. 3d 579, 587 (E.D.N.C. 2015), *aff'd*, 874 F.3d 370 (4th Cir. 2017); *see also City of Huntington* v. *AmerisourceBergen Drug Corp*., No. CV 3:17-01362, 2021 WL 1320716, at *2 (S.D.W. Va. Apr. 8, 2021) ("Expert testimony which merely regurgitates factual information that is better presented directly to the [factfinder] rather than through the testimony of an expert witness is properly excluded.") (internal quotation marks and citation omitted). While there is authority to support the use of an expert to educate a jury on complex or technical evidence based on the expert's field of expertise, *see*, *e.g.*, *SAS Inst., Inc*., 125 F. Supp. 3d at 587-588, this case will be tried without a jury and none of the parties has identified anything particularly complex or technical about the Plan that would call for the use of Mr. Garofolo's expertise in that manner here. Sections III.A. and V.A. of Mr. Garofolo's report will therefore be excluded. *Synopsys, Inc.* v. *Risk Based Sec., Inc.*, No. 3:21CV252, 2022 WL

3005990, at *5 (E.D. Va. July 28, 2022), *aff'd sub nom.*, 70 F.4th 759 (4th Cir. 2023) (excluding expert opinions that stated "legal conclusions" and contained "factual narrative" because "[s]uch material does not aid the Court as the fact-finder in this case").

Defendants further argue that Mr. Garofolo's opinions set forth in Section V.B. and V.C. of his report should be excluded as irrelevant because they "usurp the role of the Court" by "applying case law and statutes to the facts of [the] case." ECF No. 280 at 9. As noted, in these sections of his report, Mr. Garofolo tenders opinion as to what he would have done if he had been a Plan fiduciary. For example, Mr. Garofolo asserts that he "would have taken action to ensure that the Neutral Physicians contemplated by Article 12.3 of the Plan Document were unbiased." ECF No. 307-2 at 20. Mr. Garofolo then sets forth certain additional actions he would or would not have taken to prevent bias if he had been a Plan fiduciary. *Id.* at 20–22. Rather than substituting his judgment for that of the Court as Defendants contend, Mr. Garofolo primarily substitutes his judgment for that of Plan fiduciaries. The majority of Section V.B. does not entail the interpretation and application of legal authorities.[16]

Defendants' argument regarding usurpation of the role of the Court is, however, applicable to Section III.B. of Mr. Garofolo's report in which he summarizes decisions of other federal courts (ECF No. 307-2 at 10–11, 13–15) and then applies the opinions to the alleged facts of this case (*e.g.*, *id.* at 14 ("The evidence that I have reviewed indicates that the Disability Board engages in the same or similar practices of the Retirement Board that Judge Scholer so heavily

---

[16]   In some instances, Mr. Garofolo relies on legal authorities as support his opinion in Section V.B. *E.g.*, ECF No. 307-2 at 21 (noting that the conclusion that Mr. Garofolo "would not have" made was because of, among other things, "numerous federal court decisions involving the Retirement Plan and the Plan over the years"); *id.* (asserting that "to ensure that the Plan operates in a manner that is consistent with its terms and ERISA, I would implement the following"); *id.* at 22 ("I would have reached this conclusion based on the Claim Regulation requirement stated in 29 C.F.R. § 2560.503-1(h)(2)(iv)"). As discussed previously, this type of analysis is an inappropriate expert opinion and is therefore inadmissible.

criticized.").  As set forth previously, this type of opinion falls outside the scope of permissible expert evidence.  *McIver*, 470 F.3d at 562; *Adalman*, 807 F.2d at 366.  Because Mr. Garofolo's application of legal authorities to factual allegations permeates Section III.B., that section of his report is inadmissible as irrelevant.

Defendants also assert that Mr. Garofolo's opinions are inadmissible *ipse dixit* because he does not offer any reasoning or explanation as to why his judgment regarding the appropriate exercise of fiduciary duties, standing alone, should be credited.  ECF No. 280 at 16 (noting that Mr. Garofolo does not refer to "industry standards, common practices, accepted guidelines, articles, treatises, professional understandings, or anything of the sort").  Mr. Garofolo confirmed during his deposition that his opinions are based on what he "would do as a fiduciary acting in accordance with the fiduciary standard of care."  ECF No. 314-2 at 275:2–4.  "Rule 702 expressly contemplates that an expert may be qualified on the basis of experience."  *United States* v. *Wilson*, 484 F.3d 267, 274 (4th Cir. 2007) (quotation marks omitted) (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment).  But if "the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *accord United States* v. *Bynum*, 604 F.3d 161, 167 (4th Cir. 2010); *Wilson*, 484 F.3d at 274.  Mr. Garofolo does not provide any such explanation in his report.  He baldly asserts what he "would have" done without tying his opinions to his experience as an ERISA attorney, consultant, or fiduciary.[17]  Indeed, the only support for Mr. Garofolo's opinions about what he

---

[17] *E.g.*, ECF No. 307-2 at 20 ("I would have viewed"), 21 ("I would take taken the following actions"), 22 ("I would have concluded"), 22 ("I would have adopted"), 23 (I also would have taken action").  These are but a small sampling of Mr. Garofolo's assertions of what he personally would or would not have done as a Plan fiduciary.

personally would or would not have done as a Plan fiduciary is his interpretation of legal authorities, *see* footnote 16, *supra*, which is improper expert evidence.

Case law makes clear that "it still is a requirement that the expert opinion evidence be connected to existing data by something more than the 'it is so because I say it is so' of the expert." *Holesapple* v. *Barrett*, 5 Fed. Appx. 177, 180 (4th Cir. 2001). In *Holesapple*, the Fourth Circuit characterized the excluded expert affidavit, which "reflect[ed] [the expert's] opinions, without relying on any of the standard indicia associated with this particular accident," as "an almost perfect example of an *ipse dixit* opinion." *Id.* at 179-180. Similarly, Mr. Garofolo's report is devoid of any reference to his experience, standards, practices, or any other source of information to substantiate his opinions regarding the role and responsibilities of a fiduciary. Mr. Garofolo's report simply does not contain the connective tissue of explanation and analysis to bridge the gap between his experience and his opinions proffered in this case.[18]

Mr. Garofolo's deposition testimony further reveals the unreliability of his opinions. As Defendants note, Mr. Garofolo "could not identify even a single disability plan that has ever implemented any of the measures that he opines should have been implemented by this Plan." ECF No. 280 at 5 (emphasis removed). For example, Mr. Garofolo opined that if he were a Plan fiduciary, he would have, among other things, "commissioned a statistical sampling of denial rates of Neutral Physicians." ECF No. 307-2 at 21. But when asked about this at his deposition, Mr. Garofolo testified that he has not seen a disability plan that utilizes statistical sampling. ECF No. 314-2 at 398:16–20 ("Q. What disability plan would you point to that does engage in such

---

[18] It is particularly difficult to find Mr. Garofolo's bald opinions reliable in light of his experience with disability plans. Mr. Garofolo testified at his deposition that while he advises fiduciaries, he has never advised fiduciaries of a disability plan. ECF No. 314-1 at 25:14–18; 166:4–7. Mr. Garofolo served as a fiduciary to his law firm's disability plan (*id.* at 27:7–13), but this plan had two or three employees, none of whom filed any claims (*id.* at 28:14–22). Thus, Mr. Garofolo has not had occasion to participate in the adjudication of a disability claim under that plan. *Id.* at 29:11–15; 166:8–10.

statistical sampling? . . . [A.]  I haven't seen one.").  Moreover, Mr. Garofolo was unaware of

any ERISA plan service providers that offer statistical sampling for ERISA plan examining

physicians.  *Id.* at 403:12–25.  The topic of statistical sampling is only one example of the lack of

support for Mr. Garofolo's opinions about the Plan.[19]

       The Fourth Circuit has ruled that it is error to admit such unsupported expert testimony.

In *Sardis*, the trial judge observed that the expert had not "given [] an example of this happening

in the real world other than [the expert's] thought that this is something that they ought to have

done . . . .  Maybe I'm just missing something."  10 F.4th at 296 (4th Cir. 2021).  The Court of

Appeals concluded that the "the district court, in fact, was not missing anything" because the

expert had "simply offered only his *ipse dixit* in support of his opinions."  *Id.*  The Court came to

this conclusion because, among other things, the expert did not "offer any facts, test data, or

peer-reviewed literature for reaching his conclusion."  *Id.* at 295-296.

       Consistent with this guiding precedent, courts in this circuit have held that similarly

unsupported expert opinions are inadmissible.  For example, in *Nelson* v. *Experian Information*

*Solutions, Inc.*, the court excluded expert "opinions regarding the reasonableness of Defendant's

procedures to ensure maximum accuracy in credit reports" as *ipse dixit* because the expert did

"not articulate concrete factual materials or sources on which he base[d] his conclusion[s]" that it

was "not reasonable for Defendant to rely on data furnishers" and that Defendant's maintenance

procedures was "faulty."  No. CV 2:23-1634-RMG, 2024 WL 3219180, at *2 (D.S.C. June 27,

2024).  Similar to the deficiencies with Dr. Garofolo's report, the expert in *Nelson* did not

---

[19]  *See also* ECF No. 314-1 at 142:14–20 ("Q.  . . . What disability plan would you point
me to that has the kind of database or repository for its independent medical examiners or
physicians that are reviewing claims? . . .  A.  . . . I wouldn't point you to any plan."); *id.* at
167:8–17 ("Q.  Your opinion states again and again what you would have done if you were
fiduciary for this plan; correct?  A.  Correct.  Q.  But you can't identify any other fiduciary that's
ever done what you're saying should be done? . . . [A.]  Right, because . . . I haven't seen a plan
that's structured like this.").

"explain how his professional background, experience, or training allow him to arrive at either of the above conclusions." *Id.*  In *Nelson*, the court also rejected the expert's opinion that Defendant's dispute resolution system was "biased" and "cost driven" because it was supported only by the expert's "personal experience" without elaboration of the "factual materials" on which the expert based his conclusion. *Id.* at *3.  Similarly, in *Hines* v. *Wyeth*, the Court concluded that due to the lack of an explanatory foundation or supporting analysis, the proffered expert testimony was nothing more than "personal belief or opinion."  No. CIV.A. 2:04-0690, 2011 WL 2680842, at *5 (S.D.W. Va. July 8, 2011), *order clarified on reconsideration*, No. CIV.A. 2:04-0690, 2011 WL 2730908 (S.D.W. Va. July 13, 2011) (noting that the expert went "to great lengths to criticize defendants' conduct . . . , concluding on numerous occasions that defendants failed to act as reasonable pharmaceutical manufacturers," but "nowhere in her expert report does she explain the basis for these conclusions").

As this Court has held previously, "[t]he absence of a discernable, reliable, independent basis supporting [the] opinion renders . . . expert opinion evidence excludable."  *Montgomery* v. *CSX Transportation, Inc.*, 230 F. Supp. 3d 447, 454 (D. Md. 2017); *see also In re Blackjewel L.L.C.*, 643 B.R. 128, 140 (Bankr. S.D.W. Va. 2022) ("Without a method for reaching these conclusions, Defendant is left with pure conjecture and belief, which is insufficient to support the opinion even if such opinion is purportedly based on years of experience and expertise.").  As these cases make clear, "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."  *McCoy* v. *Biomet Orthopedics, LLC*, Civil Action No. ELH-12-1436, 2021 WL 252556, at *20 (D. Md. Jan. 25, 2021) (quotation marks and citation omitted).

The combined lack of explanation, analysis, or examples renders Mr. Garofolo's opinions in Sections V.B. and V.C. inadmissible.  In so concluding, the undersigned has not engaged in an impermissible credibility assessment, which the Fourth Circuit has found to be error.  In

*Sommerville*, "the district court found [the expert's] testimony was unreliable" because of the expert's "choice of source and meteorological data." 149 F.4th at 423. Upon review, the Fourth Circuit concluded that the expert had "presented detailed reasons for his challenged assumptions," and that the lower court had erroneously "ignored or discounted [Plaintiff's expert's] proffered explanations in favor of those that the Plant Owners' expert." *Id.* In contrast, here, the undersigned has not found one expert to be more credible than another. Instead, Mr. Garofolo's opinions in Section V.B and V.C. are inadmissible because he does not explain *why* his experience is a sufficient basis for his proffered opinions or *how* his experience is reliably applied and leads to his conclusions in contravention of Rule 702 and interpretive case law. This failure bears directly on admissibility, not the weight of the proffered evidence. *In re Blackjewel L.L.C.*, 643 B.R. at 140 ("The failure to connect [an expert's] opinions to any methodology is not something that can be rehabilitated by cross examination at trial.").

## III.     CONCLUSION

For the foregoing reasons, Plaintiffs' motion to exclude David B. Lasater, Ph.D. (ECF No. 175) is denied; Defendants' motion to exclude Anthony Hayter, Ph.D. (ECF No. 220) is granted in part and denied in part; and Defendants' motion to exclude Joseph A. Garofolo, Esq. (ECF No. 222) is granted. A separate Order follows.

Date: November 24, 2025                                     _____/s/_____
                                                           Erin Aslan
                                                           United States Magistrate Judge