## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**JASON ALFORD**, *et al.*,

     *Plaintiffs*,

   v.

**THE NFL PLAYER DISABILITY,
& SURVIVOR BENEFIT PLAN**, *et al.*,

     *Defendants*.

Case No. 1:23-cv-00358-JRR

### MEMORANDUM OPINION[1]

Pending before the court are Defendants' Joint Motion for Summary Judgment of Plaintiff Daniel Loper's Claims (ECF No. 115), Joint Motion for Summary Judgment of Plaintiff Jamize Olawale's Claims (ECF No. 124), and Joint Motion for Summary Judgment of Plaintiff Charles Sims's Claims (ECF No. 125) (collectively, the "Summary Judgment Motions"). The court has reviewed all papers; no hearing is necessary.[2] Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, the Summary Judgment Motions are denied.

---

[1] Because the court's opinion contains information subject to sealing under Local Rule 105.11, the court files this Memorandum Opinion under seal and will order the parties, within 21 days, to submit a proposed public version of the Memorandum Opinion with redactions of information the court previously found warrants shielding from the public docket pursuant to the Local Rules.

[2] The papers filed in connection with the instant Summary Judgment Motions are as follows:

> Defendants' Loper Motion and Memorandum of Law (public: ECF Nos. 115, 333; sealed: 115-2); Plaintiffs' Corrected Consolidated Memorandum of Law in Opposition (public: ECF No. 196; sealed: ECF No. 197); Defendants' Consolidated Reply (public: ECF No. 281; sealed: ECF No. 235)

> Defendants' Olawale Motion and Memorandum of Law (public: ECF No. 124, 326; sealed: ECF No. 124-1); Plaintiffs' Corrected Consolidated Memorandum of Law in Opposition (public: ECF No. 196; sealed: ECF No. 197); Defendants' Consolidated Reply (public: ECF No. 281; sealed: ECF No. 235)

> Defendants' Sims Motion and Memorandum of Law (public: ECF No. 125, 327; sealed: ECF No. 125-1); Plaintiffs' Corrected Consolidated Memorandum of Law in Opposition (public: ECF No. 196; sealed: ECF No. 197); Defendants' Consolidated Reply (public: ECF No. 281; sealed: ECF No. 235).

## I.    BACKGROUND

As the court set forth in its memorandum opinion at ECF No. 78, Plaintiffs Jason Alford, Willis McGahee, Daniel Loper, Michael McKenzie, Jamize Olawale, Alex Parsons,[3] Eric Smith, Charles Sims, Joey Thomas, and Lance Zeno bring a class action pursuant to the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). They bring this case against Defendants The NFL Player Disability & Survivor Benefit Plan and NFL Player Disability & Neurocognitive Benefit Plan (formerly, the Bert Bell/Pete Rozelle NFL Player Retirement Plan) (the "Plan") and the Disability Board of the Plan (the "Board"). The Plan is an employee welfare benefit plan, as defined by Section 3(1) of ERISA, codified at 29 U.S.C. § 1002(1). (ECF No. 56 ¶ 16.) The Board is the administrator and fiduciary of the Plan, within the meaning of Section 3(16) of ERISA, codified at 29 U.S.C. § 1002(16). *Id.* ¶ 19. Plaintiffs are retired National Football League ("NFL") players who applied for one or more of the disability benefits available under the Plan. (ECF No. 56 ¶¶ 1, 147–266.) They are Plan "participants" as defined by Section 3(7) of ERISA, codified at 29 U.S.C. § 1002(7).

Plaintiffs initiated this action on February 9, 2023. (ECF No. 1.) Following motions practice and pleading amendment, the following claims remain:

> **Count I**: Wrongful Denial of Benefits pursuant to Section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B);
>
> **Count II**: Failure to Provide Adequate Notice in Writing of Specific Reasons for Denial in violation of Section 503(1) of ERISA, 29 U.S.C. § 1133(1);
>
> **Count III**: Denial of Right to Full and Fair Review in violation of Section 503(2) of ERISA, 29 U.S.C. § 1133(2);
>
> **Count V**: Breaches of Fiduciary Duties in violation of Sections

---

[3] Pursuant to the court's memorandum opinion and order at ECF Nos. 78 and 79 (as amended by ECF No. 85), Plaintiff Alex Parsons' claim for wrongful denial of benefits is barred by the statute of limitations where the Board's final appeal letter was issued prior to August 9, 2019.

404(a)(1), 404(a)(1)(B), and 405(a) of ERISA, 29 U.S.C. § 1104(a),
(a)(1)(B) and 1105(a), on behalf of the Plan Only.

(ECF No. 56 ¶¶ 281–349; ECF Nos. 78, 79.)[4]

On November 19, 2024, with leave of court, Defendants filed their three Summary Judgment Motions. (ECF Nos. 115, 124, 125.) Following completion of the parties' briefing, Magistrate Judge Aslan issued her memorandum opinion and order, which this court later affirmed over Plaintiffs' objections, in which the court, relevant here, excluded in part the report of Plaintiffs' expert, Anthony Hayter. (ECF Nos. 318, 319, 331.) The excluded portions of the Hayter report are included in nearly every citation to same Plaintiffs make in support of their opposition papers.

## II.    UNDISPUTED FACTS[5]

### A.  The Plan, the Board, and the Benefits

The Plan is a Taft-Hartley benefit plan that provides for disability benefits to eligible Players and the beneficiaries. (ECF Nos. 115-6, 124-5, 125-5, 2021 Disability Plan Document ("DPD") at p. 1.)[6] It was established and negotiated pursuant to a collective bargaining agreement between the NFL Players Association ("NFLPA") and the NFL Management Council ("Management Council"). *Id.* Under the Plan, "Player" refers to "any person who is or was employed under a contract by an Employer [a member club of the NFL] to play football in the

---

[4] The court's order at ECF Nos. 78 and 79 dismissed all claims against the Trustees (then-Defendants Larry Ferazani, Belinda Lerner, Jacob Frank, Sam McCullum, Robert Smith, and Hoby Brenner) and the Commissioner (then-Defendant Roger Goodell).

[5] Plaintiffs did not respond to Defendants' statements of undisputed facts, opting instead to reassert (by incorporation) the factual background set forth in their opposition to Defendants' motion to dismiss (ECF No. 70). "A party asserting that a fact . . . is genuinely disputed must support the assertion by," in part, citing to particular record evidence. FED. R. CIV. P. 56(c)(1)(A). "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." FED. R. CIV. P. 56(e)(2). Except where Plaintiffs have asserted specific challenges in accordance with Rule 56(c), the court considers Defendants' asserted facts, where supported by record evidence, undisputed.

[6] The Disability Plan Document in effect when Plaintiffs Loper, Olawale, and Sims's claims were decided was amended and restated as of April 1, 2021, and executed on August 17, 2021.

[NFL]." *Id.* §§ 1.15, 1.31.

The Plan's terms designate the Board as the administrator and fiduciary of the Plan, within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16). (DPD §§ 1.2, 9.2.) The Board consists of seven members: "[t]hree voting members appointed by the NFLPA," "[t]hree voting members appointed by the Management Council," and the Commissioner of the NFL as a non-voting member. *Id.* § 9.1. The Board is "responsible for implementing and administering the Plan," subject to its terms. *Id.* § 9.2. It has "full and absolute discretion, authority, and power to interpret, control, implement, and manage the Plan" and authority to "[d]ecide claims for benefits," except where initial claims are decided by the Disability Initial Claims Committee. *Id.* § 9.2(c). It is also within the Board's authority to "[d]elegate its power and duties to other persons and appoint and assign authority to other persons . . . as it deems necessary or desirable in connection with the administration of the Plan," and "rely conclusively upon" the advice or opinion of same. *Id.* § 9.2(f). Both the NFLPA and Management Counsel employ separate party advisors ("Party Advisors") to assist in their review. (ECF Nos. 115-20, 124-17, 125-17, Declaration of Patrick Reynolds ("Reynolds Decl.") ¶ 3; ECF Nos. 115-21, 124-18, 125-18, Declaration of Adora Williams ("Williams Decl.") ¶ 3.)

The Plan establishes a Disability Initial Claims Committee (the "Committee") with three members—one appointed by NFLPA, one appointed by the Management Counsel, and the Plan's Medical Director or another medical professional jointly designated by the NFLPA and Management Council. (DPD § 9.4(a).) With a limited exception not applicable here, the Committee is "responsible for the initial determination of any and all disability benefits under this Plan." *Id.* § 9.5. "If a claim for disability benefits is wholly or partially denied, the Disability Initial Claims Committee will give the claimant notice of its adverse determination within a

reasonable time, but not later than 45 days after receipt of the claim." *Id.* § 13.14(a). The claimant then has "180 days from the receipt of an adverse determination to file a written request for review of the initial decision to the [] Board." *Id.*

The Plan provides three general categories of disability benefits to eligible Players: (1) Total and Permanent ("T&P") benefits; (2) Line of Duty ("LOD") benefits; and Neurocognitive ("NC") benefits. (DPD arts. 3, 5, 6.)

Eligibility for T&P benefits during the relevant timeframe requires the following criteria (among others not relevant here) be met (DPD § 3.1): 1) the Player must submit medical records with his initial application or appeal, *id.* § 3.1(c); 2) at least one Plan Neutral Physician must find the Player is totally disabled, meaning that "he is substantially unable to engage in any occupation or employment for renumeration or profit," and that such condition is permanent, *id.* § 3.1(d); and 3) the Board must, upon review of the report(s) of any Neutral Physician(s), conclude the same. *Id.* § 3.1(e). A disability is "permanent" "if it has persisted or is expected to persist for at least twelve months from the date of its occurrence, excluding any reasonably possible recovery period." *Id.* 3.1(e)(3).

Each Player determined to be eligible for T&P benefits is awarded such benefits in one of four categories:

> (a) <u>Active Football</u>. Subject to the special rules of Section 3.5, a Player will qualify for Plan T &P benefits in this category if (i) his disability(ies) arises out of League football activities while he is an Active Player, and causes him to be totally and permanently disabled, and (ii) his application that results in an award of Plan T &P benefits is received by the Plan within 18 months after he ceases to be an Active Player.

> (b) <u>Active Nonfootball</u>. Subject to the special rules of Section 3.5, a Player will qualify for Plan T &P benefits in this category if (i) his disability(ies) does not arise out of League football activities but does arise while he is an Active Player, and causes him to be totally

and permanently disabled, and (ii) his application that results in an
award of Plan T&P benefits is received by the Plan within 18 months
after he ceases to be an Active Player.

(c) <u>Inactive A</u>. Subject to the special rules of Section 3.5, a Player
will qualify for Plan T&P benefits in this category if (i) the Player
does not qualify for benefits in categories (a) or (b) above, and (ii)
his application that results in an award of Plan T&P benefits is
received by the Plan within fifteen (15) years after the end of his last
Credited Season. This category does not require that the disability
arise out of League football activities.

(d) <u>Inactive B</u>. A Player who is determined to be eligible for Plan T
&P benefits in accordance with Section 3.1 or 3.2 but who does not
qualify for such benefits in categories (a), (b), or (c) above will be
awarded Plan T&P benefits in this category. This category does not
require that the disability arise out of League football activities.

(DPD § 3.4.)

The Special Rules under Section 3.5 provide that T&P benefits for a
psychological/psychiatric disorder may only be awarded at the "Active Football" level "if the
requirements for [T&P] disability are otherwise met and the psychological/psychiatric disorder":

(1) is caused by or relates to a head injury (or injuries) sustained by
a Player arising out of League football activities (e.g., repetitive
concussions);
(2) is caused by or relates to the use of a substance prescribed by a
licensed physician for an injury (or injuries) or illness sustained by
a Player arising out of League football activities; or
(3) is caused by an injury (or injuries) or illness that qualified the
Player for Plan T&P benefits under Section 3.4(a).

*Id.* § 3.5.

Eligibility for LOD benefits during the relevant time frame requires the following criteria
(among others not at issue) be met (DPD § 5.1): 1) the Player must submit medical records with
his initial application or appeal, *id.* § 5.1(b); 2) at least one Plan Neutral Physician must find the
Player incurred a "substantial disablement . . . arising out of League football activities"; *id.* § 5.1(c)
(citation modified); and 3) the Board must, upon review of the report(s) of the Neutral Physician(s),

conclude the same.  *Id.* § 5.1(d).  A "substantial disablement" refers to a "permanent" disability

"other than a neurocognitive, brain-related neurological (excluding nerve damage), or psychiatric

impairment that":

> (1) Results in a 50% or greater loss of speech or sight; or
> (2) Results in a 55% or greater loss of hearing; or
> (3) Is the primary or contributory cause of the surgical removal or major functional impairment of a vital bodily organ or part of the central nervous system; or
> (4) For orthopedic impairments,
>
>> (A) With respect to applications received before April 1, 2020, is rated at least 10 points, using the Point System set forth in Appendix A, Version 2 to this Plan. Surgeries, injuries, treatments, and medical procedures that occur after a Player's application deadline in Section 5.4(a) will not receive points and will be disregarded by the Committee and Board.
>> (B) With respect to applications received on and after April 1, 2020, is rated at least 9 points, using the Point System set forth in Appendix A, Version 2 to this Plan. Surgeries, injuries, treatments, and medical procedures that occur after a Player's application deadline in Section 5.4(a) will not receive points and will be disregarded by the Committee and Board.

*Id.* § 5.5(a), (b).  "Arising out of League football activities" refers to "a disablement arising out of

any League pre-season, regular-season, or post-season game, or any combination thereof, or out

of League football activity supervised by an Employer, including all required or directed

activities."  *Id.* § 5.5(c).

Eligibility for NC benefits during the relevant time frame requires the following criteria

(among others not at issue) be met (DPD § 6.1): 1) "[a]t least one Plan Neutral Physician must find

that the Player has a mild or moderate neurocognitive impairment," *id.* § 6.1(e); 2) the Board, upon

review of the report(s) of the Neutral Physician(s), concludes the same, *id.* § 6.1(f); and 3) "[f]or

applications received on and after October 1, 2020, the Player must submit Medical Records with

his initial application or appeal." *Id.* § 6.1(m).

A Player is deemed to have a "mild impairment" if "he has a mild objective impairment in one or more domains of neurocognitive functioning which reflect acquired brain dysfunction, but not severe enough to interfere with his ability to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit." *Id.* § 6.2(a). A Player is deemed to have a "moderate impairment" if "he has a mild-moderate objective impairment in two or more domains of neurocognitive functioning which reflect acquired brain dysfunction and which may require use of compensatory strategies and/or accommodations in order to independently perform complex activities of daily living or to engage in any occupation for remuneration or profit." *Id.* § 6.2(b).

### B.  Neutral Physicians and Medical Advisory Physicians

The requirement that at least one Plan Neutral Physician ("NP") find that the Player meets the applicable standard is referred as the "Neutral Rule." (DPD §§ 3.1(d) 5.1(c) 6.1(e).) The Neutral Rule has been in effect since 2017. (ECF Nos. 115-3, 124-3, 125-3, Declaration of Hessam Vincent ("Vincent Decl.") ¶ 14; ECF Nos. 115-7, 124-6, 125-6, 2017 DPD.) An NP is a "health care professional[] designated under Section 12.3" of the Plan. (DPD § 1.25.) Section 12.3 provides in part:

> (a) Selection and Termination. The Disability Board will maintain a network of Neutral Physicians to examine Players who apply for benefits under this Plan. The Neutral Physician network may include physicians, institutions, or other health care professionals. The NFLPA and Management Council will jointly designate such Neutral Physicians. A Neutral Physician must (1) certify that any opinions offered as a Neutral Physician will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits. . . .

> (b) Duties. The Neutral Physicians will examine each Player referred by the Plan and will provide such report or reports on the Player's condition as necessary for the Disability Board or Disability Initial Claims Committee to make an adequate determination as to that Player's physical or mental condition. The Neutral Physician will complete such form or forms as may be provided by the Disability Board for this purpose.

*Id.* § 12.3(a), (b).  Under the DPD, upon receipt of an application for benefits, the NFL Player Benefits Office ("NFLPBO") is to contact at least one NP to evaluate the Player.  (DPD §§ 3.3(a), 5.4(b), 6.2(d); Vincent Decl. ¶ 18.)  If the Player appeals an adverse finding, the NFLPBO is to assign at least one new NP to evaluate the Player and permit the Player to submit additional information.  (DPD § 13.14(a).)

Relatedly, the Medical Advisory Physician ("MAP") Rule permits that, where three or more voting Board members "conclude that a medical issue exists as to whether a Player qualifies for a benefit under [the] Plan," the Board may submit the medical issue to a MAP "for a final and binding determination regarding such medical issues."  (DPD § 9.3(a).)  A MAP is a "health care professional[] designated under Section 12.2."  *Id.* § 1.22.  Section 12.2 provides in part:

> (a) Selection and Termination. The NFLPA and Management Council will jointly designate one or more health care professionals as a Medical Advisory Physician (MAP). A MAP must (1) certify that any opinions offered as a MAP will be provided without bias for or against any Player, and (2) accept and provide services pursuant to a "flat-fee" agreement, such that the amount of compensation provided by the Plan will not depend on whether his or her opinions tend to support or refute any given Player's application for benefits. . . .

> (b) Duties. A MAP has authority to decide only those medical issues submitted by the Disability Board under Section 9.3(a). In making a determination, a MAP will review all material submitted to the Plan and may arrange for any additional consultation, referral, or other specialized medical services as the MAP deems necessary. In addition, a MAP may require an applicant to submit to such physical or other examinations as the MAP deems reasonable and necessary

> in making a determination. A MAP will submit a written
> determination to the Disability Board on a form provided by the
> Disability Board.

*Id.* § 12.2.

Plaintiffs take issue with a number of things pertaining to Plan physicians,[7] including what they assert are objectionable comments by Plan physicians regarding medical conditions, *see* ECF No. 184-3 at NFLPLTFS-0000024; ECF No. 184-5 at NFL_ALFORD_0004454; ECF No. 56 ¶ 152; ECF No. 196 at p. 9 n.14, 13; retaining a Plan physician for consultation who has demonstrated defense-oriented views, *see* ECF No. 184-8 at NFLPLTFS-0000167; retaining a Plan physician who has previously worked with the NFL purportedly contrary to policy, *see* ECF No. 184-15 at NFLPLTFS-0000071; ECF No. 184-16 at NFLPLTFS-0000073; and retaining Plan physicians who advertise their affiliation with the NFL contrary to policy, *see* ECF No. 184-18.[8]

### C. Plaintiffs Loper, Olawale, and Sims

#### 1. *Plaintiff Daniel Loper*

Mr. Loper applied for LOD benefits on March 3, 2020. (ECF No. 115-9, Administrative Record for Daniel Loper ("AR-DL") at 221.) The NP assigned to evaluate Mr. Loper at the Committee-level was Dr. David Apple, an orthopedist. (AR-DL at 428–34.) Ultimately, Dr. Apple awarded Mr. Loper a total of only three (3) points, thus failing to meet the threshold requirement of 10 points to show that an orthopedic impairment constitutes a substantial disablement arising out of League football activities. (DPD § 5.5(a)(4)(A).) The Committee subsequently denied Mr. Loper's claim because the Neutral Rule was not satisfied (*e.g.*, the NP

---

[7] Most of Plaintiffs' assertions about Plan physicians do not apply to the specific NPs and MAPs that evaluated Plaintiffs Loper, Olawale, and Sims. For example, while Plaintiffs generally allege bias by NPs, they identify no evidence to support a claim that the MAP who evaluated Mr. Sims has a relevant bias.

[8] The court is unable to locate some of the sources Plaintiffs cite; of course, Plaintiffs may not rely on their pleading allegations or mere argument to support an asserted fact. *See* FED. R. CIV. P. 56(c). In any event, because the court finds these assertions immaterial, it considers them as undisputed for purposes of its disposition of the Summary Judgment Motions.

did not find a substantial disablement that was rated at least 10 points).  (AR-DL at 435–36.)

Mr. Loper subsequently appealed to the Board, supplementing the record with additional medical records.  (AR-DL at 445.)  The NP assigned to evaluate Mr. Loper on appeal was Dr. Marcus Cook, an orthopedist.  (AR-DL at 584–94.)  Dr. Cook awarded Mr. Loper a total of only nine (9) points, again failing to meet the 10-point threshold.  (DPD § 5.5(a)(4)(A).)  The Board subsequently denied Mr. Loper's appeal because the Neutral Rule was not satisfied.  (AR-DL at 620–22.)  Both NPs who evaluated Mr. Loper were assigned by the NFLPBO and paid a flat fee. (Vincent Decl. ¶¶ 21–22.)

Mr. Loper brings this action related to the denial of his claim for LOD benefits.  (ECF No. 56 ¶¶ 202–214.)  Plaintiffs challenge the reports by Drs. Apple and Cook, and the Committee and Board's resulting denials, on the basis that the NPs and Board failed to consider or address, or improperly disregarded, relevant medical evidence identified in the record—specifically, that related to Mr. Loper's ██████████████ resulting from his time while he was an active Player.  Defendants, of course, dispute this.

### 2. *Plaintiff Jamize Olawale*

Mr. Olawale applied for T&P, LOD, and NC benefits on March 29, 2021.  (ECF No. 124-13, Administrative Record for Jamize Olawale ("AR-JO") at 554.)  The NPs assigned to evaluate Mr. Olawale at the Committee-level were Dr. Matthew Norman, a psychiatrist; Dr. Paul Saenz, an orthopedist; Dr. Eric Brahin, a neurologist; and Dr. Justin O'Rourke, a neuropsychologist.  (AR-JO at 927–31.)  Ultimately, no NP found Mr. Olawale met the relevant standard for any disability benefit.  (AR-JO at 927–29.)  The Committee subsequently denied Mr. Olawale's claims because the Neutral Rule was not satisfied (*e.g.*, no NP found he met the applicable standard).  *Id.*

Mr. Olawale subsequently appealed to the Board.  AR-JO at 946.  The NPs assigned to

evaluate Mr. Olawale on appeal were Dr. Hussein Elkousy, an orthopedist; Dr. ███████████; Dr. ████████████████; and Dr. ████████████████████. (AR-JO at 978–1037, 1048–53.)  None in the second group of NPs found Mr. Olawale met the relevant disability standard (AR-JO at 1048–53), and the Board denied Mr. Olawale's appeal because the Neutral Rule was not satisfied.  (AR-JO at 1048–53.)  Each NP assigned to evaluate Mr. Olawale was assigned by the NFLPBO and paid a flat fee.  (Vincent Decl. ¶¶ 19–22.)

Mr. Olawale brings this action related to the denial of this claims for T&P, LOD, and NC benefits.  (ECF No. 56 ¶¶ 194–201.)  Plaintiffs challenge the NP reports, and the Committee and Board's resulting denials, on grounds that the NPs and Board failed to consider or address, or improperly disregarded, relevant medical evidence—specifically, that related to Mr. Olawale's ███████████████, a screening test for depression and reports of ██████████, and his scores on the Montreal Cognitive Assessment tool ("MoCA"); improperly considered education and ethnicity (via demographically adjusted ████████); and did not address the asserted cumulative effect of Mr. Olawale's conditions as set forth in his benefits application.  Except for their consideration of Mr. Olawale's education, Defendants dispute Plaintiffs' contentions.

### 3. *Plaintiff Charles Sims*

Mr. Sims applied for T&P benefits on May 5, 2020.  (ECF No. 125-12, Administrative Record for Charles Sims ("AR-CS") at 458.)  The NPs assigned to evaluate Mr. Sims at the Committee-Level were Dr. █████████████████; Dr. ████████████████; Dr. █████████████████████; and Dr. ████████████████. (AR-CS at 699.)  Of these NPs, Dr. ███████ found Mr. Sims's ████████ impairments met the standard for T&P benefits.  (AR-CS at 650–69, 699–70.)  Based on Dr. ██████s report, the Committee determined that Mr. Sims qualified for T&P benefits, but Committee members disagreed as to the level of

benefits to be awarded, with one member voting for Active Football benefits and another voting for Inactive A benefits. (AR-CS at 699–70.) Because the Committee found, at a minimum, Mr. Sims was entitled to Inactive A T&P benefits, the Committee awarded Mr. Sims only Inactive A T&P benefits. (AR-CS at 700.)

Mr. Sims appealed the Committee's benefits award level to the Board. (AR-CS at 728.) The Board referred Mr. Sims to a MAP for a final and binding determination on whether his ███████ impairments arose while he was an active player, thus qualifying for Active T&P benefits. (AR-CS at 744.) His records were then reviewed by MAP Dr. ███████. (AR-CS at 750–56.) Dr. ████ opined that "it [did] not appear from his records that Mr. Sims[] had significant ██████ impairments or any ██████ cause for disability that arose while an Active Player." (AR-CS at 756.) The Board thus denied Mr. Sims's appeal because the MAP Rule was not satisfied. (AR-CS at 760–61.) The MAP assigned to evaluate Mr. Sims was assigned by the NFLPBO and paid a flat fee. (Vincent Decl. ¶¶ 23–24.)

Mr. Sims brings this action related to the Board's refusal to award him T&P benefits at the Active Football level based on the MAP review. (ECF No. 56 ¶¶ 190–93.) Plaintiffs challenge the NP and MAP reports, and the Committee and Board's resulting denials, because the NPs, MAP, and Board failed to consider or address, or improperly disregarded, relevant medical evidence— specifically, injury to Mr. Sims's ██████, his ██████ his scores ██████, and his diagnoses for ██████ while an active NFL player; improperly considered education and ethnicity (demographic adjustments); and did not address qualification for benefits under Section 3.5. Except for consideration of Mr. Sims's education, Defendants dispute these allegations.

### III.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9] *Anderson*, 477 U.S. at 248.

When considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a factfinder for resolution at trial.  *Id.* at 249.   Trial courts in the Fourth Circuit have an "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).  A party "need[s] to present more than their own unsupported speculation and conclusory allegations to survive." *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023).  Further, "[u]nder this standard, 'the mere existence of a scintilla of evidence' in favor of the non-movant's position is insufficient to withstand the summary judgment motion." *Wai Man Tom v. Hospitality Ventures, LLC,* 980 F.2d 1027, 1037 (4th Cir. 2020) (quoting *Anderson*, 477 U.S. at 252).

---

[9] In reply, Defendants argue that Plaintiffs' opposition "ignores established summary judgment principles" by raising factual allegations for the first time in opposition papers, and that the court therefore may not consider them.  (ECF No. 281 at pp. 2–4.)  The court is not persuaded.  Federal Rule of Civil Procedure 8(a)(2) requires Plaintiffs to set forth a "short and plain statement of the claim"; it does not require Plaintiffs to set forth every factual allegation (or every piece of evidence) upon which they rely to state (or later prove) their claims.  Further, this is not a circumstance where Plaintiffs purport to assert new claims or new legal theories for their claims in opposition to summary judgment. *See, e.g.*, *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (noting that a party "cannot pursue claims that she failed to plead and only raised for the first time in response to a motion for summary judgment").

In undertaking this inquiry, the court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Libertarian Party of Va.*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). The court "must not weigh evidence or make credibility determinations." *Foster v. Univ. of Md.-Eastern Shore*, 787 F.3d 243, 248 (4th Cir. 2015) (citing *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007)); *see also Jacobs v. N.C. Adin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015) (explaining that the trial court may not make credibility determinations at the summary judgment stage). Indeed, it is the function of the factfinder to resolve factual disputes, including issues of witness credibility. *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014).

Relevant here, the Fourth Circuit has not "endorsed . . . an ERISA-specific quasi-summary-judgment procedure." *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 959 (4th Cir. 2022). In the context of ERISA denial-of-benefits claims (here, Plaintiffs' Count I), the Fourth Circuit has recognized:

> The difficulty with employing summary judgment in the ERISA denial-of-benefits context arises where the parties disagree as to key facts. Although in such cases the court will decide the ultimate legal question of whether the individual meets the relevant plan definition of disability, *see Orndorf*, 404 F.3d at 518, it may first need to resolve competing factual contentions within the administrative record about the cause, severity, or legitimacy of an individual's impairment. But the court's role at the summary judgment stage is not to resolve disputed questions of fact. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

*Id.* at 906. Accordingly, where a court "is faced with directly at-odds contentions regarding" such matters, and "where such findings implicate material issues, summary judgment simply is not appropriate." *Id.*

## IV.    ANALYSIS

Defendants seek summary judgment on all of Plaintiffs Loper, Olawale, and Sims's claims.

Plaintiffs expectedly argue there are material facts in genuine dispute on all of these Plaintiffs'

counts. The court agrees with Plaintiffs. Summary judgment is not warranted on any claim

asserted by Plaintiffs Loper, Olawale, and Sims due to the many genuine disputes of material fact

that pepper the record. In view of the voluminous and complex factual record before the court,

the court's analysis below demonstrates several examples of disputed material facts relevant to

each of Plaintiffs' claims, which act as a bar to summary judgment in favor of Defendants.

### A. Foundational Legal Principles

"ERISA is a comprehensive statute designed to promote the interests of employees and

their beneficiaries in employee benefit plans." *Peters v. Aetna Inc.*, 2 F.4th 199, 215 (4th Cir.

2021) (quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 137 (1990)). It "regulates

employee benefit plans 'by establishing standards of conduct, responsibility, and obligation for

fiduciaries of [those] plans, and by providing for appropriate remedies, sanctions, and ready access

to the [f]ederal courts.'" *Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 852 (4th Cir. 2023)

(quoting 29 U.S.C. § 1001(b)). Underlying ERISA are two competing goals: "'offer[ing]

employees enhanced protection for their benefits' without 'creat[ing] a system that is so complex

that administrative costs, or litigation expenses, unduly discourage employers from offering

welfare benefit plans in the first place.'" *Id.* (alterations in original) (quoting *Varity Corp. v. Howe*,

516 U.S. 489, 497 (1996)). "In service of those aims, ERISA creates a wide range of public and

private enforcement mechanisms." *Id.*

Relevant here, Plaintiffs bring their claims pursuant to Section 502 of ERISA, codified at

29 U.S.C. § 1132. Section 502 provides:

> **(a) Persons empowered to bring a civil action**
> A civil action may be brought—
> (1) by a participant or beneficiary—

> (A) for the relief provided for in subsection (c) of this section, or
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;
>
> .                    .                    .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

29 U.S.C. § 1132(a)(1), (3).

### B.  Count I: Wrongful Denial of Benefits

Pursuant to Section 502(a)(1)(B), a participant in an ERISA plan may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights for future benefits under the terms of a plan."  29 U.S.C. § 1132 (a)(1)(B).  "The scope of the district court's review of a challenge to an administrator's coverage determination under § 1132(a)(1)(B) turns on whether the plan at issue vests the plan administrator with discretionary authority."  *Geiger v. Zurich Am. Ins. Co.*, 72 F.4th 32, 37 (4th Cir. 2023) (quoting *Helton v. AT & T Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)).

"In reviewing the denial of benefits under an ERISA plan, a district court first must consider *de novo* whether the relevant plan documents confer discretionary authority on the plan administrator to make a benefits-eligibility determination."  *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011).  "When a plan by its terms confers discretion on the plan's administrator to interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation."  *Id.* (quoting *Colucci v. Agfa Corp. Severance Pay Plan,* 431 F.3d 170, 176 (4th Cir. 2005)).  "Where, as is the case here, the

'ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries, a reviewing court evaluates the plan administrator's decision for abuse of discretion."[10] *Geiger*, 72 F.4th at 37 (quoting *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010)).

The court therefore "will not disturb a plan administrator's decision if the decision is reasonable, even if [the court] would have come to a contrary conclusion independently." *Id.* (quoting *Williams*, 609 F.3d at 630). "To be held reasonable, the administrator's decision must result from a 'deliberate, principled reasoning process' and be supported by substantial evidence." *Smith v. Cox Enters., Inc. Welfare Benefits Plan*, 127 F.4th 541, 545 (4th Cir. 2025) (quoting *Williams*, 609 F.3d at 630). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Geiger*, 72 F.4th at 37–38 (quoting *DuPerry*, 632 F.3d at 869). It "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Wonsang v. Reliance Standard Ins. Co.*, 729 F. Supp. 3d 563, 573 (E.D. Va. 2024), *aff'd sub nom.*, No. 24-1419, 2025 WL 1672860 (4th Cir. June 13, 2025) (citation omitted); *see Vetter v. Am. Airlines, Inc. Pilot Long-Term Disability Plan*, 299 F. Supp. 3d 714, 721–22 (D. Md. 2018), *on reconsideration in part,* No. PWG-16-2833, 2019 WL 398679

---

[10] Although it is not exactly clear to the court, Plaintiffs appear to dispute application of the abuse of discretion standard despite acknowledging its application in opposition to Defendants' motion to dismiss. (ECF No. 196 at pp. 23 n.41, 32–33; ECF No. 70 at pp. 20–21.) There is no dispute that the Plan vests the Board with discretionary authority to make eligibility determinations. (DPD § 9.2.) *See Hayes v. Prudential Ins. Co. of Am.*, 60 F.4th 848, 851 (4th Cir. 2023). Plaintiffs fail to offer any cogent argument why the court should ignore binding Fourth Circuit precedent on the standard of review applicable here. The court further notes strong support, both in and outside of the Fourt Circuit, for application of the abuse of discretion standard to claims for wrongful denial of benefits by the Board under the Plan. *See e.g.*, *Smith v. NFL Player Disability & Neurocognitive Benefit Plan*, No. 1-22-CV-00928-RP, 2024 WL 722594, at *5 (W.D. Tex. Jan. 9, 2024), *report and recommendation adopted,* No. 1:22-CV-928-RP, 2024 WL 1123588 (W.D. Tex. Mar. 13, 2024); *Cloud v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 3:20-CV-1277-S, 2022 WL 2237451, at *28 (N.D. Tex. June 21, 2022); *Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*, No. 4:19-CV-2306, 2020 WL 5628020, at *1 (S.D. Tex. Aug. 17, 2020), *aff'd sub nom.*, 856 F. App'x 497 (5th Cir. 2021); *Mickell v. Bell / Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 594 (11th Cir. 2020); *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147, at *3 (N.D. Cal. Mar. 12, 2018); *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 714 (D. Md. 2012). The abuse of discretion standard applies here.

(D. Md. Jan. 31, 2019) (same).

"In determining the reasonableness of the administrator's discretionary decision, [the court] consider[s] a non-exhaustive list of factors set out in *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335 (4th Cir. 2000)." *Geiger v. Zurich Am. Ins. Co.*, 72 F.4th 32, 37 (4th Cir. 2023). Those factors include:

> (1) the language of the plan;
> (2) the purposes and goals of the plan;
> (3) the adequacy of the materials considered to make the decision and the degree to which they support it;
> (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was reasoned and principled;
> (6) whether the decision was consistent with the procedural and substantive requirements of ERISA;
> (7) any external standard relevant to the exercise of discretion; and
> (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000). "The *Booth* factors incorporate many principles from trust law and, in so doing, reflect a desire to ensure that plan sponsors cannot, through artful plan drafting, 'impinge on the proper role of courts in enforcing contracts and establishing principles of judicial review.'" *Helton v. AT & T Inc.*, 709 F.3d 343, 354 (4th Cir. 2013) (quoting *Booth*, 201 F.3d at 343).

Before turning to its consideration of the *Booth* factors, the court finds it prudent to refer again to its task on summary judgment in the context of a wrongful denial of benefit claim under ERISA. The Fourth Circuit's discussion in *Tekmen v. Reliance Standard Life Insurance Company* bears repeating:

> The difficulty with employing summary judgment in the ERISA denial-of-benefits context arises where the parties disagree as to key facts. Although in such cases the court will decide the ultimate legal question of whether the individual meets the relevant plan definition of disability, *see Orndorf*, 404 F.3d at 518, it may first need to

resolve competing factual contentions within the administrative record about the cause, severity, or legitimacy of an individual's impairment. But the court's role at the summary judgment stage is not to resolve disputed questions of fact. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

The present case is illustrative. Here, Dr. Parker, who examined Tekmen many times over the years following her accident, stated that, although Tekmen may not present as the "classic postconcussion patient," he would nevertheless "vouch for the fact that her disability is severe and she is significantly impaired to the point where gainful work related activities are essentially impossible." J.A. 2198. Dr. Cintron, a neurologist who treated Tekmen continually starting in 2014, described her as "incapacitated" and "debilitated" by her symptoms, supporting his "clinical opinion that she is not able to maintain a job in the foreseeable future." J.A. 1731. On the other hand, the independent examiners who evaluated Tekmen's claims in connection with her application for long-term disability benefits uniformly stated that Tekmen was not impaired to an extent that would preclude her full-time employment.

Rather than addressing the apparent tension between the summary judgment standard and the need to resolve competing factual contentions in cases involving ERISA benefits denials, some courts have concluded that "[w]here review is properly confined to the administrative record before the ERISA plan administrator, . . . there are no disputed issues of fact for the court to resolve." *Orndorf*, 404 F.3d at 518. . . .

We disagree that there can never be disputed issues of fact where review is based on the administrative record. Where, as here, the district court is faced with directly at-odds contentions regarding whether the individual's claimed impairment is genuine, we see no alternative to the district court making findings of fact. And where such findings implicate material issues, summary judgment simply is not appropriate. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Jacobs*, 780 F.3d at 568–69.

55 F.4th 951, 960 (4th Cir. 2022).

Defendants offer comprehensive arguments to support that the Board's denials of Plaintiffs Loper, Olowale, and Sims's claims were reasonable and supported by substantial evidence, focusing on their individual applications, the NP reports, the medical evidence provided, and the

Board's ultimate review and decision. Against the backdrop of purportedly neutral policies that were followed with regard to Plaintiffs' claims, Defendants urge, according to operation of the Neutral Rule (as to Messers. Loper and Olawale) and the MAP Rule (as to Mr. Sims), the Board was required to deny their claims for benefits because no NP found Messers. Loper and Olawale met the necessary standard, and the MAP's decision to as Mr. Sims was final and binding on the Board.

In opposition, Plaintiffs advance a series of challenges, identifying what they contend are deficiencies in the NPs' and MAP's reports and the Committee's and Board's subsequent consideration of the claims. By way of example, the court considers four general challenges raised by Plaintiffs in their opposition—(1) the Committee and Board, and the NPs and MAP upon whose reports they relied, failed to consider or address, and/or downplayed or disregarded, evidence (including objective testing results) supportive of their claims and/or contradictory to the NPs' and MAP's assessments; (2) contrary to the Plan's terms, the NPs' reports, upon which the Committee and Board relied, reported on Messers. Olawale and Sims' educational levels and demographic adjustments for ethnicity in determining whether they qualified for T&P benefits; (3) the Board's denials of Messers. Olawale and Sims' Plan claims were otherwise contrary to Plan terms because they failed to consider Special Rule 3.5 (as to Mr. Sims) and failed to evaluate the "cumulative effect" of their impairments; and (4) the foregoing disputes (among others) support Plaintiffs' assertion that the Board's decisions were impacted or motivated by bad faith and conflicts of interest.[11]

---

[11] The court addresses Plaintiffs' assertion of a fraudulent scheme with respect to "compensation, rewards, maintenance, monitoring, retention, and training of Plan physicians with histories of inadequate work performance and significant biases against recognizing NFL play-related impairments" as to their claim of breach of fiduciary duty. (ECF No. 196 at p. 4.)

### 1. Consideration of Medical Evidence

As an initial matter, the parties' disputes regarding "the cause, severity, or legitimacy of [Plaintiffs'] impairment[s]" are not well-suited for resolution on summary judgment. *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 960 (4th Cir. 2022). The following three examples illustrate this tension.

First, with regard to Mr. Loper, Plaintiffs contend that, despite NFL team treating physicians' records documenting left wrist injury and pain while he was an active Player—an injury he asserts is connected to his ▮▮▮▮▮▮▮▮▮▮—the NPs who evaluated him, and the Committee and Board's subsequent decision letters, failed to address this. (ECF No. 196 at pp. 41–42; AR-DL at 291, 316, 350–51.) Defendants argue these records were not material to the Board's decision because the NFL treating records do not contradict the NPs' conclusions (which the Committee and Board subsequently relied upon), as they pertain to different conditions. (ECF No. 281 at p. 7–8.) While the court appreciates that may very well be true, the court is required to draw all reasonable inferences in the non-movant's favor. Further, to reach the conclusion Defendants urge would require the court to weigh the evidence and engage in factfinding. That, of course, is impermissible on a Rule 56 motion.

Similarly, with regard to Mr. Olawale, Plaintiffs note that, in evaluating Mr. Olawale, Dr. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ as recently as within the last week (at the time of the report). (ECF No. 196 at p. 44; AR-JO 862, 871.) Plaintiffs further urge that the failure to record a positive screening materially impacted whether Mr. Olawale met the necessary diagnostic criteria. (ECF No. 196 at p. 44 n.44.) In response, Defendants argue that Dr. ▮▮▮▮▮▮ assessment reasonably considered

Mr. Olawale's report as to the frequency of ████████████ (ECF No. 281 at pp. 21–22.) Here,

again, Defendants' arguments are well-taken, but disposition of the Summary Judgment Motion

in Defendants' favor requires resolution of this dispute, which is to say factfinding and weighing

the evidence regarding the reported condition and how it was evaluated.

Finally, with regard to Mr. Sims, Plaintiffs point to records of his treating physician, Dr.

████████████████████████████████████████ while Mr. Sims was an

active Player.  (ECF No. 196 at p. 24; AR-CS at 755–56; ECF No. 235-11, ████████ Report.)

In addressing these records, Dr. ████ ultimately concluded they were not persuasive on the issue

before her, and found that "it [did] not appear from his records that Mr. Sims' had significant

████████████████████████████ for disability that arose while an Active Player."

(AR-CS at 755–56.)  The Board's subsequent denial of Mr. Sims's appeal did not address the facial

conflict between the records of his treating physician and Dr.████ finding.  (AR-CS at 760–

61.)  Again, where the question of the severity and cause of Mr. Sims's condition is at issue in

considering the reasonableness of the Board's decision, including whether the Board even

considered such evidence, summary judgment is not appropriate.

These disputes bear directly on the reasonableness of the Board's decision and the court's

consideration of the *Booth* factors.  While "[i]t is true that, when there are conflicting medical

opinions, the Plan has the discretion to deny benefits based on one set of opinions, despite the other

opinions to the contrary," *see Vetter v. Am. Airlines, Inc. Pilot Long-Term Disability Plan*, 299 F.

Supp. 3d 714, 726 (D. Md. 2018), *on reconsideration in part,* No. PWG-16-2833, 2019 WL

398679 (D. Md. Jan. 31, 2019), it nonetheless "abuses its discretion when it fails to address

conflicting evidence." *Helton v. AT&T Inc.*, 709 F.3d 343, 359 (4th Cir. 2013).

Further, while the court appreciates that Defendants are bound by the Neutral and MAP

Rules, Defendants do not persuade the court that their reliance on the Rules is reasonable (for purposes of Rule 56 motion resolution) where, as here, record evidence exists in support of Plaintiffs' allegations and arguments that the NPs and MAP improperly disregarded or discounted material evidence that the Board then failed to address, which (if believed or weighted in favor of Plaintiffs) may demonstrate a lack of "a deliberate, principled reasoning process."[12] *Smith v. Cox Enters., Inc. Welfare Benefits Plan*, 127 F.4th 541, 547 (4th Cir. 2025). As Plaintiffs contend, the Board may not abandon its discretion by "mere default to a Plan-selected physician," especially in the face of purportedly insufficient evaluations and evaluations contrary to Plan terms. *Dimry v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. 16-CV-01413-JD, 2018 WL 1258147, at *4 (N.D. Cal. Mar. 12, 2018). Due to the prevalence of genuine disputes of material fact, summary judgment is not appropriate.

### 2. *Demographic Adjustments and Consideration of Education*

Plaintiffs also present evidence that, as to Plaintiffs Olawale and Sims, the Committee and Board, by reliance on NP and MAP evaluations, improperly considered education in T&P benefits determinations and made demographic adjustments for ethnicity (*re* Drs. ███████). Here, again, genuine disputes of material fact bar summary judgment.

As to education, the Plan expressly provides: "The educational level and prior training of a Player will not be considered in determining whether such Player is 'unable to engage in any

---

[12] Defendants urge that *Smith* is not applicable here for two main reasons. First, Defendants contend that the evidence at issue is not contradictory to the NPs' findings and/or the Committee and Board's decisions. As the court has already explained, there are material facts in genuine dispute on this point. Second, Defendants correctly note that *Smith* concerned the failure to address a decision that contradicted a Social Security disability determination. (ECF No. 281 at p. 11 n.12.) Although *Smith* raises a different factual circumstance, it is still persuasive here. The Fourth Circuit's analysis turned on the failure to address the Social Security disability determination where the ERISA regulations promulgated for its administration required same. *See* 29 C.F.R. § 2560.503-1(j)(6)(i)(C). While it is true this provision is not at issue here, the regulations relevant here similarly provide that an adverse benefit determination related to disability benefits must include "an explanation of the basis for disagreeing with or not following . . . [t]he views presented by the claimant to the plan of health care professionals treating the claimant . . . ." 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i). Accordingly, where a material dispute remains as to conflicting medical evidence, the Fourth Circuit's analysis and reasoning is on point.

occupation or employment for remuneration or profit.'" (DPD § 3.1(e)(1).) Whether a Player is "substantially unable to engage in any occupation or employment for renumeration or profit" is one of the two findings an NP must make to conclude a Player is totally disabled. *Id.* § 3.1(d). Defendants suggest that consideration of education is standard in neuropsychological practice and, with respect to T&P benefits, the Plan solely operates to bar consideration of education with regard to whether a Player is employable. (ECF No. 219-23, Directive at NFL_ALFORD-0068321; ECF No. 281 at p. 26 n.33.) The court is not persuaded that Defendants' proposed reading resolves the issue. The Plan bars consideration of education in determining whether a Player is "unable to engage in any occupation or employment for remuneration or profit"—this is the exact requirement that an NP must find in determining whether a Player meets the standard. Thus, the impact of this factor on Plaintiffs Olawale and Sims's claims presents a material dispute of fact, as does whether the NPs' practice, and the Committee and Board's reliance on same, comported with the express terms of the Plan.

Further, with regard to demographic norming, a plain and material fact dispute exists as to whether such improper factors were considered: some NP reports say scores were demographically adjusted; and Defendants offer record evidence challenging that.[13] That Defendants' evidence may be more voluminous or persuasive to a trier of fact does not render this issue appropriate for summary judgment.

### 3. *Actions Contrary to Plan Terms*

Plaintiffs similarly urge there are material facts in genuine dispute as to whether the Board failed to abide other Plan terms when responding to Plaintiffs Olawale and Sims's applications.

---

[13] In considering this matter, the court focuses on these allegations as to Mr. Olawale, not Mr. Sims. As discussed above, Mr. Sims's appeal concerned the level of T&P benefits awarded. Plaintiffs offer no evidence that demographic norming from Mr. Sims's evaluation at the Committee-level affected the Board's determination to deny him Active Football T&P benefits.

First, material facts are in dispute as to whether the Board acted reasonably in failing to address the asserted cumulative effect of Mr. Olawale's conditions identified in his application—contrary to Section 3.3.[14]  Mr. Olawale's application (and then appeal) plainly set forth same.  The Board concluded that his assertion "concerning the cumulative effect of your impairments cannot override the express requirements" of the Neutral Rule; the Board further stated that it considered all of his "impairments described by the Plan Neutral Physicians and review[ed] the medical records [he] submitted."  (AR-JO at 1049.)

The Eleventh Circuit's discussion in *Mickell v. Bell / Pete Rozelle NFL Players Retirement Plan*, as identified by Plaintiffs, is instructive:

> Mr. Mickell's final argument is that the Board unreasonably assessed his conditions when it "fail[ed] to consider the cumulative effect of his physical, cognitive, and psychological symptoms on his functionality." The Plan's response to this argument is to say that the District Court was right to find the Plan Neutral Physicians properly limited their conclusions to areas within their expertise, and this supported the reliability of their reports. We agree with Mr. Mickell that the Board abused its discretion by failing to consider the combined effects of all of his impairments.

> We note that the Plan Documents do not place any burden of proof on Mr. Mickell to prove [h]is disability. Rather, the onus is on the Committee or the Board to "find[ ] . . . that he has become totally disabled." The Committee or the Board must decide if a player meets the definition of Disability by requiring the player "to submit to an examination" "[w]henever it reviews a player's application. Mr. Mickell was thus not responsible for telling the Committee or the Board how its Plan Neutral Physicians should evaluate him or how they should analyze his claim. *Cf. Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 673 (11th Cir. 2014) (explaining that, because the plan put the burden of proof on the plaintiff, "neither ERISA nor the Policy required [the plan administrator] to ferret out evidence").

> The Board cannot prevail based on its claim that the Plan Neutral Physicians properly limited their conclusions to areas within their

---

[14] The court again considers this claim as to Mr. Olawale and not Mr. Sims.  Plaintiffs present no evidence that the Board's consideration of Mr. Sims's T&P award level failed to include, or should have included, the cumulative effect of his conditions.

expertise. The Board could have easily required Mr. Mickell to "submit to an examination" by a vocational expert, who could have provided an opinion about whether Mickell's specific impairments—when considered together—prevented his gainful employment. *See, e.g., Bowen v. Yuckert*, 482 U.S. 137, 164, 107 S. Ct. 2287, 2303, 96 L.Ed.2d 119 (1987) (Blackmun, J., dissenting) (discussing vocational evaluations of Social Security claimants and explaining that a disabled person's employability is about more than the effects of individual impairments). The Plan argues that neither the Plan Documents nor any court requires a claimant to undergo a functional capacity evaluation. Perhaps this is true in a vacuum. However, when it denied Mr. Mickell's claim, the Board and the District Court relied on Dr. Faber's opinion that, despite Mickell's depression and anxiety, his psychological difficulties do not "'rise to a level that precludes some kind of employment' such as 'assisting in sports programs for youths.'" Dr. Faber performed no tests to determine whether Mr. Mickell had the physical ability to work in a position like that. However, Mr. Mickell's treating physician, Dr. Lichtblau, did. Dr. Lichtblau opined that because Mr. Mickell "does not have the functional capacity to work 4 hours per day on an uninterrupted basis at this time," he "will be unable to maintain gainful employment." The Board credited Dr. Faber's opinion, but in light of its failure to even consider it alongside Dr. Lichtblau's opinion, as discussed above, the Board abused its discretion.

*Mickell v. Bell / Pete Rozelle NFL Players Ret. Plan*, 832 F. App'x 586, 594 (11th Cir. 2020)

The court finds *Mickell* persuasive and Defendants' efforts to distinguish it from this case unpersuasive. To be sure, unlike Mr. Mickell, Mr. Olawale has not (at least not clearly) submitted a record from his treating provider that specifically opined on his functional capacity to maintain gainful employment. But the court does not read *Mickell* so narrowly. Drawing all reasonable inferences in Mr. Olawale's favor, Defendants have not shown that their failure to consider the cumulative impact of his conditions, as he asserted in his application, is reasonable as a matter of law against the backdrop of favorable medical records reporting on, albeit disjointedly, the various impacts of his conditions. Whether the Board's treatment of the records of the cumulative impact

of Mr. Olawale's conditions bears on the reasonableness of the Board's decision, and if so, how, will not be resolved on a motion for summary judgment.

As to the Board's failure to address Special Rule 3.5(b) raised as part of Mr. Sims's appeal, however, the court is not persuaded that a material fact dispute exists. To be sure, Mr. Sims discussed Section 3.5 in his appeal, arguing that he qualified for Active Football T&P benefits and that he satisfied the exception under Section 3.5(b)(2). But his appeal did not assert, as Plaintiffs seem to here, that Section 3.5(b)(2) offers an independent basis for awarding such benefits. Mr. Sims's appeal argument as to Section 3.5(b)(2) was based on the finding that his physical impairments arose while he was an Active Player. (AR-CS at 737.) In that respect, the MAP determination was dispositive of the issue.

Plaintiffs argue here (and notably, did not do so in Mr. Sims's appeal to the Board) that the language in Section 3.5 "plainly modified" Section 3.4, because it includes the language of "[s]ubject to the special rules of Section 3.5." (ECF No. 196 at p. 35.) The court agrees that such language modifies the Plan term; however, the court is not persuaded that the Plan permits Section 3.5 as an alternative path to Active Football T&P benefits, as opposed to imposing additional requirements as to same. The court repeats both in full here:

> **3.4 Classification**. Each Player who is determined to be eligible for Plan T&P benefits in accordance with Section 3.1 or 3.2 will be awarded benefits in one of the four categories below.
>
> (a) <u>Active Football</u>. Subject to the special rules of Section 3.5, a Player will qualify for Plan T &P benefits in this category if (i) his disability(ies) arises out of League football activities while he is an Active Player, and causes him to be totally and permanently disabled, and (ii) his application that results in an award of Plan T&P benefits is received by the Plan within 18 months after he ceases to be an Active Player.
>
> *          *          *

28

**3.5 Special Rules**. . . .

> (b) <u>Psychological/Psychiatric Disorders</u>. A payment for total and permanent disability as a result of a psychological/psychiatric disorder may only be made, and will only be awarded, for benefits under the provisions of Section 3.4(b), Section 3.4(c), or Section 3.4(d), except that a total and permanent disability as a result of a psychological/psychiatric disorder may be awarded under the provisions of Section 3.4(a) if the requirements for a total and permanent disability are otherwise met and the psychological/psychiatric disorder either (1) is caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions); (2) is caused by or relates to the use of a substance prescribed by a licensed physician for an injury (or injuries) or illness sustained by a Player arising out of League football activities; or (3) is caused by an injury (or injuries) or illness that qualified the Player for Plan T&P benefits under Section 3.4(a).

(DPD §§ 3.4(a), 3.5(b).) Upon a plain reading of these terms, the court simply does not agree with Plaintiffs' interpretation that Special Rule 3.5(b) presents an alternative path to Active Football T&P benefits wherein a Player need not show that his condition arose "while he was an Active Player" to qualify for such benefits.[15] And, in any event, Mr. Sims did not raise this in his appeal. His appeal presents a view, consistent with the court's present analysis, that Special Rule 3.5(b) "preclude[s] an award of Active Football benefits ███████████████████████ *unless*" one of the three exceptions is met; Mr. Sims argued that an exception was met. (AR-CS at 734–37) (emphasis in original). Accordingly, the MAP's determination was dispositive of the issue

---

[15] The court acknowledges Plaintiffs' reliance on the analysis of the *Cloud v. Bert Bell/Pete Rozelle NFL Player Retirement Plan* court on a related issue under Sections 5.4 and 5.5 of the Plan. *See* 2022 WL 2237451 (N.D. Tex. June 21, 2022), *rev'd* 95 F.4th 964 (2024). Indeed, in *Cloud*, the court found that "Section 5.4(b) unambiguously create[d] an 'except[ion]' permitting an award of Section 5.3(a) benefits for certain 'psychological/psychiatric disorders.'" *Id.* The *Cloud* court's analysis turned on same where a psychological/psychiatric disorder was "caused by or relates to a head injury (or injuries) sustained by a Player arising out of League football activities (e.g., repetitive concussions)." *Id.* at *37 (citing the administrative record). The court's analysis does not appear to bear on the requirement under Active Football T&P benefits that a Player's disabilit(ies) "arise[] out of League football activities while he [was] an Active Player." (DPD § 3.4(a).) In any event, the court is not persuaded that *Cloud* changes the outcome here based on its analysis above and, importantly, the fact that Mr. Sims did not raise this issue in his appeal.

asserted on appeal.  The court is not persuaded that generates a material fact in dispute as to the reasonableness of the Board's decision.

### 4.  Evidence of Defendants' Bad Faith Motives

Finally, Plaintiffs contend that the aforementioned disputes regarding consideration of evidence and purported violations of Plan terms also generate a triable issue as to Defendants' motives affecting the Board's consideration of their claims, *i.e.*, whether bad faith motivated Board appeals decisions on their claims.  To be sure, if, as Plaintiffs argue, Defendants ignored material evidence regarding their conditions, improperly considered demographic adjustments, and failed to follow Plan terms in deciding claims, such improper conduct would favor Plaintiffs' assertion that Defendants denied benefits in bad faith.

The court, however, is not similarly satisfied that Plaintiffs have produced evidence of a financial conflict of interest, as they contend.  In *Metropolitan Life Insurance Co. v. Glenn*, the Supreme Court held that where "the entity that administers the plan, . . . both determines whether an employee is eligible for benefits and pays benefits out of its own pocket," the "dual role creates a conflict of interest" that the reviewing court should consider in evaluating "whether the plan administrator has abused its discretion in denying benefits."  554 U.S. 105, 108 (2008).  "The conflict of interest *Glenn* envisioned was one in which the plan administrator had a direct financial stake in eligibility determinations, where 'every dollar provided in benefits is a dollar spent by . . . the employer; and every dollar saved . . . is a dollar in [the employer's] pocket.'" *Parsons v. Power Mountain Coal Co.*, 604 F.3d 177, 184 (4th Cir. 2010) (quoting *Glenn*, 554 U.S. at 112).

This court has addressed such circumstances post-*Glenn*:

> Circuits who have considered the issue after *Glenn* are divided as to whether a conflict should be found where, as here, the entity acting as the administrator of the plan is made up equally of representatives of the employees, who receive benefits from the plan, and the

employer, who funds the plan. The Ninth and Sixth Circuits determined that such a structure did not present a conflict. *See Anderson v. Suburban Teamsters of N. Ill. Pension Fund Bd. of Trs.,* 588 F.3d 641, 648 (9th Cir.2009); *Klein v. Cent. States, Se. & Sw. Areas Health & Welfare Plan,* 346 Fed.Appx. 1, 5 (6th Cir.2009) (unpublished). The Second Circuit, in contrast, concluded that this structure did pose a conflict, and the presence of employee representatives should be considered in determining the "'*significance* or *severity*'"—not the existence—of the conflict. *Durakovic v. Bldg. Serv. 32 BJ Pension Fund,* 609 F.3d 133, 138–39 (2d Cir.2010) (emphasis in original).

In this District, two post-*Glenn* courts have held that the Board is not conflicted by virtue of its composition. *See, e.g., Stewart v. Bert Bell/Pete Rozelle NFL Retirement Plan,* 1:09–cv–02612–WDQ (D.Md. Jan. 13, 2011); *Sagapolutele v. Bert Bell/Pete Rozelle NFL Player Ret. Plan,* No. 1:08–cv–01870–WMN (D.Md. Oct. 22, 2008).

I find the reasoning of these cases to be persuasive, and I too hold that the Board does not suffer from a conflict of interest. *Cf. Sagapolutele,* No. 1:08–cv–01870–WMN, slip op. at 5–6 (stating that any alleged conflict of three Board members could not be imported to the entire Board because a majority vote was required for benefit determinations).

*Boyd v. Bell*, 796 F. Supp. 2d 682, 690–91 (D. Md. 2011) (footnote omitted); *see Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 717 (D. Md. 2012) (discussing *Boyd* and noting, "I agree entirely with Judge Motz and the other judges in this district who have reached similar conclusions, and hold that the Plan does not operate under a structural conflict of interest and, in the alternative, that the effect of any such conflict would be strongly outweighed by other structural protections of the Plan"). *See also Youboty v. NFL Player Disability & Neurocognitive Benefit Plan*, No. 4:19-CV-2306, 2020 WL 5628020, at *6 (S.D. Tex. Aug. 17, 2020), *aff'd sub nom.*, 856 F. App'x 497 (5th Cir. 2021) (holding the Board "had no conflict of interest"); *Johnson v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 468 F.3d 1082, 1086 (8th Cir. 2006) (same).

This court similarly finds *Boyd* (and *Giles*) persuasive. As other judges of this court have noted, the composition of the Board does not present a structural conflict of interest here and Plan structural protections guard against any potentially conflicted member. Defendants point to the balanced composition of the Board, that the Plan is funded by a revenue-sharing agreement between the NFL (including the Management Council) and the NFLPA, and that no leftover funds go to the Board, Management Council, or NFLPA. (DPD § 9.1; ECF Nos. 115-19, 124-16, 125-16, Declaration of Robert Smith ("Smith Decl.") ¶ 3.)

Further, with regard to Plaintiffs' argument that a fulsome conflict-of-interest analysis includes Plan-retained physicians, the court is not persuaded that evaluation of Plan-retained physicians' interests bears on the ultimate question whether the Plan administrator or other Plan fiduciary has breached a duty owed to Plaintiffs. Even assuming without deciding that conflicts of interest of Plan-retained physicians is properly included among the *Booth* factors,[16] Plaintiffs' argument is based entirely on assertions that some Plan-retained physicians were previously employed by the NFL. None of the identified NPs had any involvement in Plaintiffs' claims here, and the vast majority of Plaintiffs' proffered evidence as to Plan physician conflicts has been excluded from consideration per Magistrate Judge Aslan's memorandum opinion and order at ECF Nos. 318, 319 (and this court's order affirming Judge Aslan's rulings at ECF No. 331). Absent

---

[16] Although issued prior to the Supreme Court's decision in *Metropolitan Life Insurance Co. v. Glenn*, in discussing the conflict of interest *Booth* factor, the Fourth Circuit explained that "it is the *administrator's* conflict of interest that is relevant to the conflict-of-interest review conducted by the district court—not the plainly evident 'conflict of interest' of the administrator's *paid* employees and consultants." *Abromitis v. Cont'l Cas. Co./CNA Ins. Companies*, 114 F. App'x 57, 61 (4th Cir. 2004) (emphasis in original). *See Bruce v. Hartford*, 21 F. Supp. 3d 590, 598 (E.D. Va. 2014) (recognizing that, post-*Glenn*, "[t]he court's statement in *Abromitis* that the relevant conflict of interest is that of the plan administrator remains the controlling law on the merits inquiry into an administrator's abuse of discretion"). *See also Zahariev v. Hartford Life & Accident Ins. Co.*, No. 9:20-CV-1072-RMG-MHC, 2020 WL 12783951, at *5 (D.S.C. Aug. 11, 2020) (noting that "it is [the claims administrator's] 'conflict of interest that is relevant to the conflict-of-interest review conducted by the district court—not the plainly evident conflict of interest of [its] paid consultants'"); *Anderson v. Reliance Standard Life Ins. Co.*, No. CIV. WDQ-11-1188, 2013 WL 1190782, at *7 (D. Md. Mar. 21, 2013) (noting that it was "[the fiduciary's] conflict of interest that is one of the factors in the abuse of discretion analysis, not the doctors'").

other relevant, supporting evidence, Plaintiffs fail to present more than a mere scintilla of evidence that the Board labored under a financial conflict of interest. Again, to be clear, the court does find the question of bad faith remains subject to disputes of material fact.

### 5. *Disputed Facts Bearing on the Booth Factors*

The disputed facts discussed above bear on the court's consideration of each *Booth* factor. For instance, as to the first *Booth* factor, this court has previously recognized that "to ignore the plain language of the plan 'constitutes an abuse of discretion.'" *Giles v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, 925 F. Supp. 2d 700, 716 (D. Md. 2012) (quoting *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 639 (4th Cir. 2007)). Plaintiffs' assertions rooted in Plan terms, such as the Neutral and MAP Rules, the NPs' duties, consideration of records, acting in accordance with Plan terms, and consideration of education and demographic adjustments, all bear on the Plan's plain language and meaning, as well as, of course, "whether the fiduciary's interpretation was consistent with other provisions in the [P]lan," and the purposes and goals of the Plan. *Booth v. Wal-Mart Stores, Inc. Associates Health and Welfare Plan*, 201 F.3d 335, 342 (4th Cir. 2000). Where a "primary purpose of the Plan is to provide disability benefits to qualifying NFL players and their beneficiaries," evidence challenging the reasonableness of decisions is probative. *Stewart v. Bert Bell/Pete Rozelle NFL Player Ret. Plan*, No. CIV. WDQ-09-2612, 2012 WL 2374661, at *10 (D. Md. June 19, 2012).

Disputes regarding potentially conflicting records and disregarded evidence, alone, are probative of many of the remaining factors. As Plaintiffs urge, such disputes inform "whether the decisionmaking process was reasoned and principled" because a complete record, meaning one that "rest[s] on good evidence and sound reasoning" and "result[s] from a fair and searching process," is "necessary to make a reasoned decision." *Harrison v. Wells Fargo Bank, N.A.*, 773

F.3d 15, 21 (4th Cir. 2014) (quoting *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322–23 (4th Cir. 2008)).   The Board may not "shut [its] eyes to the most evident and accessible sources of information that might support a successful claim." *Id.*   This is similarly relevant to the court's analysis of "the adequacy of the materials [the Board] considered to make the decision and the degree to which they support it." *Booth*, 201 F.3d at 342.

With regard to the fifth and sixth *Booth* factors, the Fourth Circuit recently reiterated that "failure to address conflicting evidence . . . denie[s the claimant] his statutory right to 'a full and fair review'" and thus does not reflect "a deliberate, principled reasoning process." *Smith v. Cox Enters., Inc. Welfare Benefits Plan*, 127 F.4th 541, 547 (4th Cir. 2025) (quoting 29 U.S.C. § 1133(2) (describing "procedural and substantive requirements of ERISA" as entitling participant to "a full and fair review").

For all the reasons set forth above, the court will deny the Summary Judgment Motion as to Count I.

### C.  Counts II and III: Failure to Provide Adequate Notice, and Denial of Full and Fair Review

"ERISA imposes on trustees a number of procedural requirements relevant to the denial of claims." *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 21 (4th Cir. 2014).  Such "[p]rocedural guidelines are at the foundation of ERISA." *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008).  At issue here, Section 503(1) requires that every plan "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133(1).  Specifically, a plan administrator (here, the Board) must provide a claimant with notification of an adverse benefit determination, including, relevant here, the "specific reason or reasons for the adverse determination."   29 C.F.R. §

2560.503-1(g)(1)(i). "In the case of an adverse benefit determination with respect to disability benefits," the notification must also include a "discussion of the decision, including an explanation of the basis for disagreeing with or not following [] [t]he views presented by the claimant to the plan of health care professionals treating the claimant," and "the specific internal rules, guidelines, protocols, standards or other similar criteria of the plan relied upon in making the adverse determination." 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i), (C). As the Fourth Circuit has summarized:

> ERISA regulations elaborate what a denial notice must contain:
> (1) The specific reason or reasons for the denial;
> (2) Specific reference to pertinent plan provisions on which the denial is based;
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

*Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 234 (4th Cir. 1997) (quoting 29 C.F.R. § 2560.503–1(f)).

For its part, Section 503(2) provides that every plan shall "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133(2). "A 'full and fair review' includes the opportunity for the claimant to appeal the adverse benefits determination and to submit written comments or records." *Gagliano*, 547 F.3d at 235. The regulations further provide as follows:

> [T]he claims procedures of a plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless the claims procedures—

> (iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(iv); *see Gagliano*, 547 F.3d at 235 (discussing same).

Procedural defects do not "invalidate a plan administrator's decision if there is 'substantial compliance' with the regulation." *Brogan v. Holland*, 105 F.3d 158, 165 (4th Cir. 1997); *Ellis*, 126 F.3d at 234–35 (same). Substantial compliance occurs where the administrator provides the claimant with "a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." *Brogan*, 105 F.3d at 165; *see Switzer v. Benefits Admin. Comm.*, No. CIV.A. MJG-13-1613, 2014 WL 4052855, at *11 (D. Md. Aug. 13, 2014) (same). This does not require the administrator set forth "the reasoning behind the reasons" for its denial. *Blanch v. Chubb & Sons, Inc.*, 124 F. Supp. 3d 622, 639 (D. Md. 2015); *see Gallo v. Amoco Corp.*, 102 F.3d 918, 922–23 (7th Cir. 1996) (cited positively by the Fourth Circuit in *Stephenson v. Holland*, 8 F. App'x 159, 160 (4th Cir. 2001) (recognizing same).

The material facts in dispute that bar summary judgment as to Plaintiffs' wrongful denial of benefits claims similarly pertain to their claims relating to adequate notice and full and fair review. Plaintiffs highlight failures of the Board to address contradictory evidence in favor of their respective claims. At a minimum, such disputes plainly bear on whether Defendants violated § 503(1) for failure to explain the basis for disagreeing with the opinions of Plaintiffs' treating physicians.[17] *See* 29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i). The same is so for Plaintiffs' claims

---

[17] Defendants' correctly note that Plaintiffs must ultimately show a causal connection between any such procedural defects and denials of their claims. *See Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 297 (4th Cir. 2006); *see Carl A. B. v. Blue Cross Blue Shield of N. Carolina*, No. 1:22CV84, 2024 WL 3860072, at *7 (M.D.N.C. Aug. 19,

under § 503(2).  Certainly, "[t]he failure to address conflicting evidence . . . denie[s] [a plaintiff]

his statutory right to 'a full and fair review.'"  *Smith*, 127 F.4th at 547 (quoting 29 U.S.C. §

1133(2)).  Further, evidence supporting a finding of bad faith and evidence of Board consideration

of factors contrary to Plan terms plainly bear on the fairness of the process.

### D. Count V: Breaches of Fiduciary Duties

"ERISA requires fiduciaries to abide by the general duties of loyalty and care that are

firmly rooted in the common law of trusts."  *Peters v. Aetna Inc.*, 2 F.4th 199, 228 (4th Cir. 2021).

Section 1104(a) provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and—
>
> **(A)** for the exclusive purpose of:
>> **(i)** providing benefits to participants and their
>> beneficiaries; and
>> **(ii)** defraying reasonable expenses of administering the
>> plan;
>
> **(B)** with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct of
> an enterprise of a like character and with like aims;
>
> **(C)** by diversifying the investments of the plan so as to minimize the
> risk of large losses, unless under the circumstances it is clearly
> prudent not to do so; and
>
> **(D)** in accordance with the documents and instruments governing
> the plan insofar as such documents and instruments are consistent
> with the provisions of this subchapter and subchapter III.

29 U.S.C. § 1104(a).

Accordingly:

> ERISA imposes three broad duties on ERISA fiduciaries: (1) the
> duty of loyalty, which requires that "all decisions regarding an
> ERISA plan . . . be made with an eye single to the interests of the

---

2024) (discussing same).

participants and beneficiaries"; (2) the "prudent person fiduciary obligation," which requires a plan fiduciary to act "with the care, skill, prudence, and diligence of a prudent person acting under similar circumstances"; and (3) the exclusive benefit rule, which requires a fiduciary to "act for the exclusive purpose of prov[id]ing benefits to plan participants." *James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 448–49 (6th Cir. 2002).

*Peters*, 2 F.4th at 228. Further, a fiduciary may not "deal with the assets of the plan in his own interest or for his own account," or make "'material misrepresentations and incomplete, inconsistent or contradictory disclosures' to the plan beneficiaries." *Id.* (first quoting 29 U.S.C. § 1106(b)(1); then quoting *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 380 (4th Cir. 2001)).

Defendants seek summary judgment on Count V on the basis that "[t]he substantive allegations in Count V are derivative of Counts I, II, and III, and entry of judgment for Defendants on those counts is dispositive of Count V as well." (ECF No. 333 at p. 28; ECF No. 326 at p. 30; ECF No. 327 at p. 28.) Plaintiffs of course reject this. Where the court finds disputes of fact bar summary judgment as to Counts I, II, and III, summary judgment is not warranted as to Count V.[18] The disputed material facts discussed above leave open the question whether Defendants' actions taken in administering the Plan breached their fiduciary duties of loyalty and care owed to Plaintiffs Loper, Olawale, and Sims.

Importantly, however, the court notes that Plaintiffs fail to generate evidence in support of a triable issue that Defendants engaged in a "fraudulent scheme" "reflected in the fiduciaries' actions regarding compensation, rewards, maintenance, monitoring, retention, and training of Plan physicians with histories of inadequate work performance and significant biases against

---

[18] Defendants appear to contend further that Plaintiffs' contentions in support of Count V do not support the extraordinary remedy of removal. Because the court declines to enter summary judgment as to Count V, it declines to reach the question whether removal is a proper form of relief should Plaintiffs prevail. (ECF No. 333 at p. 28.)

recognizing NFL play-related impairments."[19]  (ECF No. 196 at pp. 3–4.)  Plaintiffs' proffered evidence in support of same is rooted predominantly in the now-partially excluded expert report of Dr. Anthony Hayter (ECF No. 172-5).  In the absence of the relevant excluded portions of his opinion, Plaintiffs' assertion of such a fraudulent scheme regarding Plan physicians lacks essential evidentiary foundation.  Indeed, the only other evidence upon which Plaintiffs rely in support of their broad theory is reproduced statements by Plan physicians that Plaintiffs seemingly deem objectionable; that at least one Plan physician previously worked for the NFL (despite a policy that Plan physicians not have previous employment with an NFL team);[20] that a number of Plan physicians have advertised their affiliation with the NFL, contrary to policy; and that Defendants employ and consult with a Plan physician (Dr. Stephen Macciocchi) who has spoken on defending injury claims with comments that are (arguably) offensive on their face.[21]  Such evidence, even if it demonstrates distasteful conduct or sporadic policy violations, does not amount to more than a scintilla of evidence of the broad fraud scheme Plaintiffs contend exists in support of their claims; the court doubts it even does that.[22]  Plaintiffs fail to generate a genuine dispute of material fact by relying on speculation and the building of inferences.  On the undisputed facts before the court, no reasonable factfinder could conclude that Defendants engaged in a fraudulent scheme in their employment of the Plan physicians, and that such a supposed scheme played the necessary causal role required for Plaintiffs to prevail.

Nonetheless, for the reasons set forth above, Defendants' Summary Judgment Motions will

---

[19] In reaching this conclusion, the court considers Plaintiffs' properly supported assertions.  *See* FED. R. CIV. P. 56(c)(1).

[20] *See e.g.*, ECF No. 184-14 at NFL_ALFORD-0012415.

[21] While the court appreciates that Defendants' promotion and retention of Dr. Macciocchi raises questions given his plainly defense-oriented approach, that is simply not sufficient evidence to support the claim Plaintiffs seek—that Defendants employ (or employed) a fraudulent scheme with respect to their Plan physicians as a whole.  Of note, Dr. Macciocchi has little (if any) connection to Plaintiffs Loper, Olawale, and Sims's claims.

[22] This is especially so in view of Plaintiffs' failure to provide evidence to challenge the accuracy of many of the Plan physician comments about which they complain.

be denied as to Count V.

**V.    CONCLUSION**

For the reasons set forth herein, by separate order, the Summary Judgment Motions will be denied in their entirety.

/s/
_____
Julie R. Rubin
January 28, 2026                United States District Judge